—2:19-cr-00295-GMN-NJK—

1            UNITED STATES DISTRICT COURT

2                DISTRICT OF NEVADA

3

4  UNITED STATES OF AMERICA,        )
                                    )  Case No. 2:19-cr-00295-GMN-NJK
5            Plaintiff,             )
                                    )  Las Vegas, Nevada
6       vs.                         )  Wednesday, September 28, 2022
                                    )  9:10 a.m.
7  MARIO CASTRO, SALVADOR           )
   CASTRO, MIGUEL CASTRO, and       )  JURY TRIAL, DAY 3
8  JOSE LUIS MENDEZ,                )  A.M. SESSION
                                    )
9            Defendants.            )  *C E R T I F I E D   C O P Y*
   _____

10

11

12            REPORTER'S TRANSCRIPT OF PROCEEDINGS

13         THE HONORABLE GLORIA M. NAVARRO
14           UNITED STATES DISTRICT JUDGE

15

16

17
   APPEARANCES:        See Pages 2 and 3
18

19

20

21

22  COURT REPORTER:     Patricia L. Ganci, RMR, CRR
                        United States District Court
23                      333 Las Vegas Boulevard South, Room 1334
                        Las Vegas, Nevada  89101
24
   Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

```
                        —2:19-cr-00295-GMN-NJK—
```

1   APPEARANCES:

2   For the Government:

3           **TIMOTHY T. FINLEY, ESQ.**
            **DANIEL E. ZYTNICK, ESQ.**
4           U.S. DEPARTMENT OF JUSTICE
            950 Pennsylvania Avenue, N.W.
5           Washington, D.C.  20530
            (202) 307-0050
6
            **TONY LOPEZ, AUSA**
7           **MINA CHANG, AUSA**
            UNITED STATES ATTORNEY'S OFFICE
8           501 Las Vegas Boulevard South, Suite 1100
            Las Vegas, Nevada  89101
9           (702) 388-6336

10  For Defendant Mario Castro:

11          **JOSHUA L. TOMSHECK, ESQ.**
            HOFLAND & TOMSHECK
12          228 South 4th Street
            Las Vegas, Nevada 89101
13          (702) 895-6760

14          **RICHARD E. TANASI, ESQ.**
            TANASI LAW OFFICES
15          8716 Spanish Ridge, Suite 105
            Las Vegas, Nevada 89148
16          (702) 906-2411

17  For Defendant Salvador Castro:

18          **DONALD J. GREEN, ESQ.**
            LAW OFFICES OF DONALD J. GREEN
19          4760 South Pecos Road, Suite 103
            Las Vegas, Nevada 89121
20          (702) 388-2047

21  ////

22

23

24

25

2:19-cr-00295-GMN-NJK

1  For Defendant Miguel Castro:

2         **LUCAS GAFFNEY, ESQ.**
          GAFFNEY LAW
3         9900 Covington Cross Drive, Suite 290
          Las Vegas, Nevada 89144
4         (702) 742-2055

5         **THOMAS A. ERICSSON, ESQ.**
          THOMAS A. ERICSSON, CHTD.
6         9900 Covington Cross Drive, Suite 290
          Las Vegas, Nevada 89144
7         (702) 878-2889

8  For Defendant Jose Luis Mendez:

9         **CHRISTOPHER MISHLER, ESQ.**
          BROWN MISHLER, PLLC
10        911 N. Buffalo Drive, Suite 202
          Las Vegas, Nevada 89128
11        (702) 816-2200

12        **WILLIAM H. BROWN, ESQ.**
          BROWN MISHLER, PLLC
13        911 N. Buffalo Drive, Suite 202
          Las Vegas, Nevada 89128
14        (702) 816-2200

15

16

17

18

19

20

21

22

23

24

25

2:19-cr-00295-GMN-NJK

1                    INDEX OF EXAMINATIONS

2  CONTINUED TESTIMONY OF JAMES EARL HOKE
      Direct Examination by Mr. Zytnick..................19
3     Cross-Examination by Mr. Tomsheck.................33
      Cross-Examination by Mr. Mishler..................47
4     Cross-Examination by Mr. Green....................60
      Redirect Examination by Mr. Zytnick...............66
5     Recross-Examination by Mr. Mishler...............67

6  TESTIMONY OF TROY SABBY
      Direct Examination by Mr. Zytnick.................87
7     Cross-Examination by Mr. Tomsheck................102

8

                     GOVERNMENT'S EXHIBIT INDEX
9  Exhibit No.                                    Admitted
   78 through 82                                      21
10 214 and 215                                        26
   84 through 88                                      91
11 90 through 93, 96, and 97                          94

12

13

14

15

16

17

18

19

20

21

22

23

24

25

—2:19-cr-00295-GMN-NJK—

1      LAS VEGAS, NEVADA; WEDNESDAY, SEPTEMBER 28, 2022; 9:10 A.M.

2                              --oOo--

3                    P R O C E E D I N G S

4         (Whereupon interpreters are duly sworn.)

5         THE COURT:  Good morning.  Thank you.  You may be

6    seated.  Looks like we're missing a few people.

7         MR. BROWN:  I'll go get them, Your Honor.

8         (Court conferring with court reporter.)

9         THE COURT:  We don't have Mr. Bouchie.  Is that okay?

10        MR. ZYTNICK:  Yes, Your Honor.  He's just handling some

11   witness issues right now.  He's here.

12        THE COURT:  Okay.  So we're back on the record outside

13   the presence of the jury.  I did receive a motion in limine that

14   was filed by the Government?  Does the Defense wish to file a

15   written response or did you want to argue it, orally, today or

16   at lunchtime or tomorrow?

17        I guess how soon do we need to rule on this,

18   Mr. Finley?

19        MR. FINLEY:  Your Honor, we're planning to call Patti

20   Kern today.  That motion is relevant to her testimony.  We

21   could -- you know, I could try to narrow what I'm talking about

22   so that it's only about her testimony.  That might make -- that

23   might take up a little bit less time, but I think it would be a

24   good idea to talk about this before she takes the stand or just

25   as soon as possible.

─────2:19-cr-00295-GMN-NJK─────

1          THE COURT:  All right.  What's the Defense position?

2          MR. TANASI:  Your Honor, I think we can probably

3    address it now.

4          THE COURT:  Okay.

5          MR. TANASI:  So we would object to the Government's use

6    of this information.  They did provide it, I did confirm that,

7    in August, August 29th.  So it was a month before trial.  But as

8    we've kind of painstakingly laid out in the past, our issues

9    with, sort of, being ready even with the universe of information

10   that we had prior was at issue.  And we did it for an

11   continuance.  And so I would still incorporate all of those

12   arguments here and now.

13          And I would say that simply giving us information a

14   month before trial on top of information that we were still

15   trying to digest, is where the prejudice lies and what puts us

16   behind, I think, the eight ball.

17          Getting to sort of the substance of it, yes, they did

18   disclose the particular names, Wager -- Wagner in particular.

19   So we did have that information.  However, I couldn't -- I can't

20   stand before Your Honor and say we're ready to deal with

21   defending, now, another trial within the trial.

22          And so if we're forced to do so, we will do it.  What I

23   would also point out, though, is on the merits, this is

24   information that dates back from 2005-2006, so I think it's too

25   remote to even meet the threshold for a 404(b) analysis.  I

1  think it's solely for criminal disposition.

2          The Government has indicated that we opened the door by

3  arguing that our clients were unknowing printers.  I don't know

4  how that is any news.  I don't know how that's any different,

5  not something that the Government couldn't have anticipated a

6  long time ago.  So I don't think we put them in any new position

7  based on what we've done so far.

8          So, again, just from a sheer prejudice standpoint, Your

9  Honor, it's defending a new mini trial in addition to the trial

10 that we've all been working very diligently to try to defend in

11 the first place.  The Government's changing the landscape here a

12 week into trial by adding new individuals and -- and new

13 arguments through this 404(b) notice.

14         THE COURT:  Thank you.

15         Anyone else want to add something?  Mr. Gaffney?

16         MR. GAFFNEY:  Your Honor, I would join in all of

17 Mr. Tanasi's comments and simply add that he's correct.  We had

18 a limited amount of time to prepare for this trial.  This was an

19 issue that the Government -- they sent over their notice, but it

20 was an issue that I really didn't have time to look into.  So

21 I'm at a disadvantage when it comes to addressing the issues in

22 the 404(b) notice.

23         And then, in addition, I would just add that the

24 initial 404(b) notice that the Government filed had to do with

25 Glen Burk, and one of the reasons they wanted to present

————2:19-cr-00295-GMN-NJK————

1  information related to Glen Burk was also to undermine any

2  potential defense that the defendants didn't have the intent to

3  commit mail fraud or conspiracy to commit mail fraud.  So they

4  already have the Glen Burk information coming in to undermine

5  the same intent, which is the argument I think that they're

6  making in relation to the three witnesses here.

7        And so by piling on more information, I would say,

8  Judge, at some point this has to become more substantially

9  prejudicial than probative.  They're essentially bringing in

10 another -- I believe these are individuals who had a criminal

11 case in which our clients were, in some way, connected.  Like I

12 said, I'm not sure exactly what the connection is.  The 404(b)

13 notice just says defendants.  It doesn't specify which

14 individual defendants they're talking about.

15       And so, I would just submit it to the Court on that,

16 plus with Mr. Tanasi's comments.  Thank you.

17       MR. TANASI:  Your Honor, if I may, just before the

18 Government goes, add one additional argument.  I think it's also

19 important to note that Mario Castro hasn't presented an opening

20 statement yet.  And so to impugn some kind of penalty on our

21 client for an argument that a door was somehow opened that we

22 haven't even had the chance to open at this point, I think,

23 would be improper and prejudicial as well.

24       MR. GAFFNEY:  And Lucas Gaffney for Miguel Castro.

25       Also, that would also pertain to Miguel Castro.  We

—2:19-cr-00295-GMN-NJK—

1  reserved our opening statement, as well.

2       THE COURT:  All right.  So there's -- there's multiple

3  notices that were sent, and I think the one letter said -- was

4  it August and then the other one is March of this year?

5       MR. FINLEY:  The notice that we gave that pertains to

6  what we want to introduce is four weeks ago, Your Honor.  And it

7  was a 404(b) about specifically warning them, if you open the

8  door, we're coming in.  We told them that four weeks ago, and

9  they opened the door yesterday.

10      They did not respond to our number one argument, and I

11 don't think they have an answer to it, which is -- and

12 Mr. Tanasi definitely opened this door -- if you have a white

13 collar case, Your Honor, and the defendant -- 90-plus percent of

14 their business is legitimate, that's a tough row to hoe.  And

15 that's what they suggested.  All of this business is legitimate.

16 They're just a printer.

17      We would like to show -- and by the way, a juror was

18 interested in this.  A juror submitted a question about how many

19 of the notices that you seized -- what percentage was related to

20 prize notices.  So one juror is interested in Mr. Tanasi's

21 argument and, uhm, Mr. Gaffney's argument about that.

22      And we aim to answer that question.  What we would show

23 is that during the conspiracy period a substantial majority, I'm

24 thinking maybe like 70, 80 percent, of their revenue came from

25 prize notices.  So we would answer the jury's question.  We want

1    to address the factual issue that the defendants raised

2    yesterday.

3            No answer to that.  That's not what really --

4            THE COURT:  I think it was Mr. Brown who said, in his

5    opening, that this was like a Kinko's.  That this was ...

6            MR. FINLEY:  Okay.  But I -- I -- I think that there

7    was a suggestion in the questioning that Mr. Tanasi did that,

8    you know, they had all sorts of different kinds of clients.

9    They printed banners.  They did, you know, other types of

10   printing other than prize notices.  He can correct me if I'm

11   wrong, but I think there were questions like that.

12           MR. TANASI:  Your Honor, I questioned one victim

13   yesterday.  And I didn't ask any questions along those lines.

14           THE COURT:  Yeah, I don't remember that.

15           MR. FINLEY:  Okay.  Then maybe I remembered it wrong,

16   but somebody definitely questioned that.

17           And then, you know, Patti Kern is today.  That's a

18   really narrower set of information.  What we want to talk about

19   there, Your Honor, is that Patti Kern has a long history with

20   these types of mailings, as do the defendants.  They actually

21   met each other because they were fellow travelers in this world.

22   And it goes back a long way, but I'm only going to ask a few

23   background questions about it.  It's part of her Giglio anyway.

24           And Your Honor had pointed out earlier that you can't

25   present information as this kind of disjointed set of facts

—2:19-cr-00295-GMN-NJK—

1  without any kind of narrative context.  And I think the jury is

2  going to need to understand what everybody's background is, how

3  they met each other.  It has to do with how the conspiracy

4  started.

5        And so that's what we would raise with Patti Kern,

6  about her history with the Kazdays.  They both had that in

7  common with each other.

8        THE COURT:  So what is --

9        MR. FINLEY:  And that's been disclosed.

10       THE COURT:  All right.  So what is the history?

11       MR. FINLEY:  She began in the prize notice business in

12  the '90s.  They began in the prize notice business at least as

13  early as 2005 or '6.  They both had business dealings with one

14  of the large --

15       THE COURT:  She and who?

16       MR. FINLEY:  Patti Kern, Miguel Castro, Mario Castro.

17       THE COURT:  Okay.

18       MR. FINLEY:  They both had dealings.  And then the

19  other defendants worked in the letter shop, I think, beginning

20  in the late aughts, at least as early as that.  And so, you

21  know, they had business dealings with one of the largest prize

22  notice mailers at that time, and that's how they knew each

23  other.

24       And the name Kazday appears all over the place in our

25  discovery.

1          THE COURT:  When you said they had business dealings,
2   what does that mean?
3          MR. FINLEY:  She did some work with that company.  They
4   were -- she -- I don't remember the exact nature of the work,
5   but she definitely provided services to them.  She worked for
6   them.  Then she started her own businesses.  In fact, the
7   Kazday -- one of the Kasday's signed the cease and desist order
8   that she also signed in 2009.  And we have heard, from multiple
9   witnesses, including Patti Kern, that they did printing and
10  mailing for him.  And by "they," I mean all four of the
11  defendants.
12         THE COURT:  So, she did printing for all four of the
13  defendants?
14         MR. FINLEY:  No.
15         THE COURT:  No.
16         MR. FINLEY:  No.  All four of the defendants did
17  printing for the Kasday's, printing and mailing.
18         THE COURT:  All right.  And so is she going to be your
19  next witness after Mr. Hoke?
20         MR. FINLEY:  We have one more, but he might be quite
21  quick.
22         THE COURT:  All right.  So I'll give you a ruling at
23  lunch.
24         MR. FINLEY:  Thank you, Your Honor.
25         MR. TANASI:  Your Honor, if I may just add one more

1  rebuttal argument.

2          So my recollection of Mr. Finley's position yesterday

3  with respect to the civil injunction is that that particular

4  forfeiture matter, right, brought an end to Patti Kern's

5  involvement in the conspiracy, right.  And so what the

6  Government's trying to do with the 404(b) notice is they're

7  trying to extend this conspiracy all the way back to 2000.  And

8  then they're trying to say we'll put an end on when it ends that

9  fits their argument that sort of protects Patti.

10          So what I would submit that --

11          THE COURT:  Well, you're not saying it's inextricably

12  intertwined.  You're not saying it's part of this conspiracy.

13  This is other prior acts.

14          MR. FINLEY:  That's right.

15          THE COURT:  Okay.  They're not trying to extend the

16  conspiracy.  It's a separate act.

17          MR. TANASI:  I would just point out, though, Your

18  Honor, as you consider this, and I understand that you will make

19  a ruling at lunchtime, if Your Honor is inclined to allow this

20  evidence in, we would still vehemently object to it.  However, I

21  then believe that it makes the civil case much for relevant now

22  and allows us to get into the cross-examination of anything

23  related to the civil case.

24          THE COURT:  That's potentially true.

25          MR. TANASI:  Thank you, Your Honor.

14

1        MR. GREEN:  May we be heard, Your Honor, as well?

2        THE COURT:  Yes, Mr. Green.

3        MR. GREEN:  Thank you.

4        Mr. Brown, did you want to go first?

5        MR. BROWN:  I can go after Mr. Green.

6        THE COURT:  Okay.

7        MR. GREEN:  Your Honor, Donald Green on behalf of

8 Salvador Castro.

9        Your Honor, I have my phone on from notes from this

10 morning, about 1 o'clock.  As to the Government's 404(b), we're

11 responding as follows:  As to Specification Number 1 concerning

12 the travel, I thought the Court had already ruled on that.  So I

13 want to bring it up again.  Second are the cash disbursements

14 which I think the Court has already ruled on or I think -- was

15 that the one which was withdrawn?

16        So -- and then as to the -- as to the fraud and

17 specifications going back several years ago, I invite the Court

18 back to March of 2002 -- 2022 and February of 2022, in which the

19 Government was alleging, in their 404(b), that they were going

20 to go back some -- back some 12 years to the State of Florida.

21 And I've been asking and asked then and in my responses to

22 various motions and my motions, which have been denied, and the

23 Government's motions, which have been granted as to 404(b), that

24 there's been a lack of specificity as to Salvador Castro,

25 especially if you're going to bring up the 2010 materials from

—2:19-cr-00295-GMN-NJK—

1  Florida.

2          If this is coming up, then it substantially prejudices

3  the defense of Salvador Castro to the extent that, you know,

4  when it comes up, I may have to ask for an emergency severance

5  because it is so prejudicial.  It just -- you cannot unring this

6  bell.

7          The second point is echoing -- echoing what Mr. Tanasi

8  is saying, is that in the Government's opening statement, Your

9  Honor, the -- they mention about Patti Kern having problems in

10 the past.  Well, if the Government opened this door, Your Honor,

11 by their -- their opening statement.  And that's what they're

12 saying about us, our opening statements opened the door.  Well,

13 they're talking about Patti Kern so we can talk about everything

14 that happened to Patti Kern except what happened on February

15 18th, 2018.

16         So does that mean that we can't impeach her on -- on

17 what happened in that case?  Does it mean that we cannot

18 impeach -- we cannot bring up stuff to show this?

19         And, that said, the Government brought up the

20 suggesting possibly the cease and desist, but I'm not sure about

21 the exact words.  Second as to the witness, Ms. Sorrentino, and

22 Government's Exhibit Number 25.  In that exhibit, Your Honor,

23 there are -- there are the check stubs, and on the check stubs

24 it's riddled with payments to Golden Products.  Golden Products

25 was one of the entities in this case.  It was the -- it was a

1 named defendant in the civil case.  It has been owned by

2 Salvador Castro.  That's never been denied.

3            Today, and let me check the date, February 28, 2022,

4 [sic] at 6:54 a.m., we received an e-mail from the Government on

5 a new memo to file.  And the memo to file refers to payments to

6 New Generation Graphics owned by Epi Castro.  Now -- and then

7 Digital Express.  Now, Epifanio Castro's company, New Generation

8 Graphics, was in the civil suit as a defendant.  So now are we

9 now -- we're now bootstrapped to we can ask a question, but we

10 can't explain it.

11           And the Government is correct.  The jury has been very

12 attentive, and they're asking specific questions.  So now we're

13 trying to tailor our defense, and I told the Government I will

14 avoid, to the extent possible, anything which violates the

15 Court's orders on what we can or cannot talk about.  Yet, at

16 6:54 a.m. this morning, on a memo to file involving Patti Kern

17 we receive it.  And it mentions New Generation Graphics and

18 payments to Digital Express which was specifically searched,

19 according to the testimony of the officer yesterday.

20           So for those grounds, the Government has opened the

21 door.  We renew -- as a supplement to the arguments of 404(b),

22 we renew, in a counter motion, to request that we be permitted

23 to expand and explore on -- even in a limited basis, the issues

24 which came up during the civil injunction case.

25           Thank you, Your Honor.

1         THE COURT:  Thank you.  Mr. Brown?

2         MR. BROWN:  Your Honor, I'm going to speak on a

3  separate issue.  I'm admittedly still unclear what the acts in

4  question are here.  I mean, what I -- what I want to avoid is a

5  witness testifying, "Oh, yeah, the defendants also printed fake

6  prize notices for Dan Wagner, Tony Kazday, and Crystal Ewing,"

7  and just leave it at that.  I mean, that is a bell that can't be

8  unrung.  And if that's the kind of evidence that's offered, then

9  I -- I think we have to delve into all of the notifications that

10 were sent by every one of these individuals, whether they were

11 false, and whether and to what extent each defendant was

12 involved in printing them.

13        I think it's going to be a confusing mini trial within

14 a trial, litigating these prior acts.

15        THE COURT:  All right.  Thank you, Mr. Brown.

16        Let's go ahead and bring in the jury.

17        MR. ZYTNICK:  Your Honor, should we have the witness

18 come in now?

19        THE COURT:  Oh, yes.  Let's go ahead and have Mr. Hoke

20 come in and take a seat.

21        That's fine.  You can go get the jury.  It takes a long

22 time for the jury to line up.

23        (Whereupon jury enters the courtroom at 9:30 a.m.)

24        THE COURT:  All right.  Everyone may be seated.  We're

25 joined by the jury.  We have our witness, Mr. Hoke, back up on

 1   the stand.  I'll ask the attorneys to please place their

 2   appearance on the record.

 3           MR. ZYTNICK:  For the Government, Daniel Zytnick from

 4   the Department of Justice Consumer Protection Branch.  Along

 5   with ...

 6           MR. FINLEY:  Good morning, Your Honor.

 7           THE COURT:  Good morning.

 8           MR. FINLEY:  Good morning, everybody.  Tim Finley, same

 9   place, on behalf of the United States.  Thank you.

10           MS. CHANG:  Good morning.  And good morning, Your

11   Honor.  Mina Chang for the U.S. Attorney's Office.

12           MR. TOMSHECK:  Good morning.  Josh Tomsheck and Richard

13   Tanasi on behalf of Mario Castro.

14           MR. TANASI:  Good morning.  Good morning, Your Honor.

15           THE COURT:  Good morning.

16           MR. GAFFNEY:  Good morning, Your Honor.  Lucas Gaffney

17   and Thomas Ericsson on behalf of Miguel Castro who's present.

18           MR. BROWN:  Good morning, Your Honor.  William Brown

19   and Chris Mishler for Mr. Mendez who's present.  Also Lisa

20   Smith, paralegal; Brian Glenn, IT; and our investigator, Richard

21   Beasley.

22           THE COURT:  Good morning.

23           MR. MISHLER:  Good morning, Your Honor.

24           MR. GREEN:  Good morning, Your Honor.  Donald Green on

25   behalf of the accused, Salvador Castro.  He is present, Your

─────2:19-cr-00295-GMN-NJK─────

1  Honor.  With me, this morning, is my trustworthy legal

2  assistant, Marguerite Montaino.  We may be joined later by our

3  investigator, Ms. Putnam, who was in court yesterday morning

4  briefly.

5          THE COURT:  All right.  Thank you.

6          All right.  So yesterday we began hearing testimony

7  from Government's witness, James Earl Hoke.  And so we're going

8  to continue with direct examination by the Government.

9          MR. ZYTNICK:  Thank you, Your Honor.

10          CONTINUED DIRECT EXAMINATION OF JAMES EARL HOKE

11  BY MR. ZYTNICK:

12  *Q.*  Retired Inspector Hoke, can you remind the jurors whose

13  house were you at for a search warrant in February 2018?

14  *A.*  Yes, sir.  I was at the home of Mr. Mendez, Jose Luis

15  Mendez.

16  *Q.*  In addition to the cash that we talked about yesterday, did

17  inspectors find various documents at that house?

18  *A.*  I'm sorry, any what?

19  *Q.*  I'm sorry.  In addition to the cash found at the house, did

20  postal inspectors find various documentary --

21  *A.*  Oh, documents.  Yes, sir.  I'm sorry.  Yes, sir.

22  *Q.*  Can you tell the jury, briefly, what's the process when

23  inspectors find documentary evidence during a search warrant?

24  *A.*  Okay.  Pretty much the same procedures.  Once the

25  documentary items are list -- excuse me -- are found, the

─────2:19-cr-00295-GMN-NJK─────

 1  individual that is taking the photographs will be contacted.

 2  The individual comes to take the photographs of the items in

 3  place as to where they were located.  Subsequently, at some

 4  point in time, those items are given evidentiary numbers that

 5  are specific to those item or items that were found.

 6  *Q.*  Is that the process that was followed at Mr. Mendez's house?

 7  *A.*  Yes, sir.

 8  *Q.*  Was the inventory created or when was the inventory created?

 9  *A.*  The inventory began pretty much at the location and then

10  eventually once it was input into a computer.

11  *Q.*  Have you -- have you reviewed that inventory to prepare for

12  your testimony today?

13  *A.*  Yes, sir, I did.

14          MR. ZYTNICK:  Can we please show the witness Exhibits

15  78 through 82.

16  BY MR. ZYTNICK:

17  *Q.*  Mr. Mendez -- I'm sorry.  Inspector Hoke, were you able to

18  see those or do we need to flip through them again?

19  *A.*  Oh, yes, I can see them.

20  *Q.*  Okay.  Were those documents that were found at Mr. Mendez's

21  house?

22  *A.*  Yes, sir, they were.

23          MR. ZYTNICK:  Your Honor, we'd move to admit 78 through

24  82.

25          THE COURT:  Now, are these exhibits that have been

—2:19-cr-00295-GMN-NJK—

1  previously stipulated to?

2        MR. ZYTNICK:  No, Your Honor.

3        THE COURT:  No.  Okay.

4        So any objection to Exhibits 78 through 82?

5        MR. TOMSHECK:  No, Your Honor.

6        THE COURT:  Mr. Tomsheck says no.

7        MR. GAFFNEY:  No, Your Honor.

8        THE COURT:  No from Mr. Gaffney.

9        MR. MISHLER:  No, Your Honor.

10       THE COURT:  No, Mr. Mishler.

11       MR. GREEN:  No objection, Your Honor, on behalf of

12  Salvador Castro.

13       THE COURT:  Thank you --

14       MR. GREEN:  Thank you.

15       THE COURT:  -- Mr. Green.

16       Exhibit 78 through 82 is admitted and may be published

17  to the jury.

18       MR. ZYTNICK:  Thank you, Your Honor.

19       (Government's Exhibits 78 through 82 are admitted.)

20       MR. ZYTNICK:  Let's actually start with Exhibit 80, and

21  if we can zoom in on the top portion there.

22  BY MR. ZYTNICK:

23  *Q.*  Can you tell us what this -- what this appears to be?

24  *A.*  Yes, sir.  This appears to be a letter from Bank of America

25  that is addressed to Advanced Allocation Systems, Incorporated,

22

—2:19-cr-00295-GMN-NJK—

1    dba, doing business as, Distribution Reporting Services,

2    addressed to the search location where we were, 2255 Marlboro

3    Drive, Henderson, Nevada.

4    Q.   Thank you.

5         MR. ZYTNICK:   Can we go to Page 2, please.   And if we

6    can zoom in on the top half of that page.

7    BY MR. ZYTNICK:

8    Q.   I'd ask, Mr. Hoke, can you tell us, generally, what is the

9    message from Bank of America that is being sent here?

10   A.   Okay.   Basically Bank of America is letting the business

11   know -- businesses know that their business account, obviously

12   with the last four digits, will be ending and is going to be

13   restricted from use.   And, furthermore, Bank of America is

14   letting them know that that particular bank account is going to

15   be permanently closed in 30 days from the date of notice.

16   Q.   And do you know if -- when someone applies for a bank

17   account, do you know if they're able to request that account

18   documents be done in Spanish?   You may or may not know that.

19   A.   I do not know that, sir.

20   Q.   Okay.   Let's -- but this document is in English.   Is that

21   fair to say?

22   A.   Yes, sir.   It is in English.   Yes, sir.

23   Q.   Okay.   Let's -- we're going to come back to the exhibits

24   that we just admitted in just a moment, but I want to briefly

25   look at Exhibit 214 just for the witness.   Well, actually it's

 1  Exhibits 214 and 215.  If the witness could briefly look at

 2  those.

 3        MR. ZYTNICK:  And, Your Honor, there's a stipulation on

 4  authenticity for these, but I'll just do a couple of brief

 5  questions.

 6        THE COURT:  Okay.

 7  BY MR. ZYTNICK:

 8  *Q.* Mr. Hoke, for Exhibit 214, are those records from the Nevada

 9  Office of the Secretary of State?

10  *A.* Yes, sir, they are.

11  *Q.* And for Exhibit 215, are those records from the Clark County

12  Office of the Clerk?

13  *A.* Yes, sir, they are.

14  *Q.* And have you reviewed some of those records?

15  *A.* (Pause.)  No, sir.

16  *Q.* Do you recall when we -- I think it was on Zoom maybe last

17  week, we looked at -- do you recall looking at possibly some of

18  those records on Zoom -- or do you recall looking at this

19  exhibit last week?

20  *A.* I recall looking at this exhibit, yes, sir.

21  *Q.* Okay.  Do you recall looking at Exhibit 214 also?

22  *A.* Yes, sir, I do.

23  *Q.* Do you recall whether there were indications on those words

24  and symbols that indicated those were certified records?

25  *A.* Yes, sir, they were certified.  Yes, sir.

————2:19-cr-00295-GMN-NJK————

1              MR. ZYTNICK:  I'd move to admit 214 and 215, Your

2    Honor.

3              THE COURT:  And you said they're previously stipulated

4    as to authenticity?

5              MR. ZYTNICK:  Yes.

6              THE COURT:  Are there any other objections,

7    Mr. Tomsheck?

8              MR. TOMSHECK:  Not by Mario Castro, no.

9              MR. MISHLER:  Your Honor, I'm just not sure he's laid a

10   foundation for his knowledge.  He said he wasn't familiar with

11   them.  Authenticity's already stipulated.  That's what he just

12   got out.

13             MR. ZYTNICK:  Right.  So it's authentic.  They're

14   certified records, I believe, was the testimony, and it's, you

15   know, evident from the documents, themselves.  So I think that's

16   self-authenticating.

17             THE COURT:  All right.  So you don't have any other

18   objection?  Authenticity has been established and --

19             MR. MISHLER:  Yes, Your Honor, authenticity has.

20             THE COURT:  Okay.

21             MR. MISHLER:  I just don't think this witness has a

22   foundation for testifying about this document.

23             THE COURT:  Okay.  So your objection is as to his

24   ability to testify, but not as to the admissibility of the

25   document?

1           MR. MISHLER:  Yes, Your Honor.  And I don't know if

2      Mr. Zytnick can ask further questions to establish foundation.

3      I just didn't hear it yet.

4           MR. GREEN:  No objection as far as Salvador Castro is

5      concerned.  But we will join in the comments made by counsel for

6      Miguel Mendez, Your Honor.  I mean for Mr. Mendez.

7           THE COURT:  All right.  And so these are documents that

8      were found during the search warrant or not?

9           MR. ZYTNICK:  No, Your Honor.  These are just --

10          THE COURT:  These are bank record documents.

11          MR. ZYTNICK.  These are certified records from the

12     Nevada Secretary of State and the Clark County Office of the

13     Clerk.  And so, you know, I think they -- the authenticity has,

14     obviously, been established both by stipulation and by --

15          THE COURT:  What's the relevance of these documents to

16     this case?

17          MR. ZYTNICK:  That they're documents for various

18     corporations in this case.  And I was planning to ask Inspector

19     Hoke about a couple of those records and, you know, foundation

20     is just -- he's able to read them, essentially.

21          THE COURT:  What are the corporations?  I don't see

22     them on there.

23          MR. ZYTNICK:  It's not on the first page, but on

24     Page -- excuse me.  On Page 8.  The corporation is Advanced

25     Allocation Systems which is the same entity we just saw on

—————2:19-cr-00295-GMN-NJK—————

1  Exhibit 80.  And then on Page 20, Digital Express, which is the

2  same entity we talked about yesterday.  And then on Exhibit 215,

3  Page 3 and 4, it's, again, Advanced Allocation Systems.

4        THE COURT:  All right.  That's sufficient relevancy.

5  So Exhibit 214 and 215 are admitted.

6        MR. ZYTNICK:  Thank you, Your Honor.

7        (Government's Exhibits 214 and 215 are admitted.)

8  BY MR. ZYTNICK:

9  *Q.*  So on Page 8 of Exhibit 214, what company name do you see at

10  the top there, Inspector Hoke?

11  *A.*  Business name indicated is the Advanced Allocation Systems,

12  Incorporated.

13  *Q.*  Can you tell the jury who is listed as the president of

14  Advanced Allocation Systems?

15  *A.*  The president is listed as Jose Luis Mendez.

16  *Q.*  And is -- who is listed as the secretary, the treasurer, and

17  the director of that company?

18  *A.*  Jose Luis Mendez appears to be all of the titled officers

19  listed on that document.

20        MR. ZYTNICK:  Can we go to Page 20, please, of the same

21  document.

22  BY MR. ZYTNICK:

23  *Q.*  What company is listed at the top of this document?

24  *A.*  This is a Digital Express, Incorporated.

25  *Q.*  And who is listed in this document as the president of

─────────2:19-cr-00295-GMN-NJK─────────

1  Digital Express?

2  *A.*  The president is listed as a Mario Castro.

3  *Q.*  Who is listed as the secretary, treasurer, and director of

4  Digital Express?

5  *A.*  Mario Castro appears to be listed as all of the titled

6  officers, as well.

7         MR. ZYTNICK:  Can we go to Exhibit 215, Page 3.

8  BY MR. ZYTNICK:

9  *Q.*  You mentioned earlier when you were talking about that

10  letter, Exhibit 80, you mentioned dba.  Can you tell the jury

11  what dba stands for?

12  *A.*  Doing business as.

13  *Q.*  Is that a similar name or a similar term for, like, a

14  fictitious name?

15  *A.*  Yes, sir, it can be fictitious and just an alias name or

16  just another business name chosen.

17  *Q.*  Can you tell us what the title of this document is at the

18  way top?

19  *A.*  This is a Certificate of a Business Fictitious Firm Name.

20  *Q.*  And if we can zoom on the top third or so.

21         What -- what fictitious name does this document say

22  Advanced Allocation Systems is using?

23  *A.*  Advanced Allocation Systems, Incorporated.

24  *Q.*  I'm sorry.  The question was what name -- what fictitious

25  name is Advanced --

—2:19-cr-00295-GMN-NJK—

1   *A.*  I'm so sorry, sir.  Under the fictitious name of

2   Distribution Reporting Services.

3   *Q.*  Thank you.

4           MR. ZYTNICK:  And if we can go to Page 4 for one last

5   question about this.  If we can zoom in, again, on the top third

6   and same question.

7   BY MR. ZYTNICK:

8   *Q.*  In this certificate, what fictitious name is Advanced

9   Allocation Systems, Inc. using?

10  *A.*  Okay.  The fictitious name on this one is the Pacific

11  Disbursement Reporting.

12  *Q.*  Thank you.  Let's go back to the documents for Mr. Mendez's

13  house.

14          MR. ZYTNICK:  If we can go to Exhibit 81, please.

15          And if we can zoom in on the top third or so.

16  BY MR. ZYTNICK:

17  *Q.*  And, Inspector Hoke, can you tell the jury what this

18  document appears to be?

19  *A.*  This document appears to be, like, a payroll or a salary

20  summation from a business, Digital Express, Incorporated.

21  *Q.*  And who is the employee listed on this document?

22  *A.*  The employee's name is Jose Luis Mendez.

23          MR. ZYTNICK:  Can we go to Exhibit 82?  And, again,

24  zoom in, please, on the top.

25  BY MR. ZYTNICK:

———2:19-cr-00295-GMN-NJK———

1   Q.  Can you tell us what this document appears to be?

2   A.  This document also appears to be some type of salary or

3   employee payment information.

4   Q.  Who is the employee listed on the document?

5   A.  This employee is Jose L. Mendez.

6   Q.  Can you tell sort of in the middle column underneath where

7   it has SSM it says pay period.  Do you see that?

8   A.  Yes, sir, I do.

9   Q.  Can you tell us what the pay period listed there is?

10  A.  Pay period listed is 03/20/2011 through 03/26/2011.

11  Q.  Thank you.

12       MR. ZYTNICK:  Let's go back to Exhibit 78, please.

13  BY MR. ZYTNICK:

14  Q.  Can you tell us what this exhibit is?

15  A.  Yes, sir.  This particular exhibit is a Bank of America

16  debit card, Visa debit card.

17  Q.  And what -- what is the company name listed on the debit

18  card?

19  A.  Pacific Allocation.

20  Q.  Is there another name also listed on the card?

21  A.  The cardholder name is Jose Luis Mendez.

22  Q.  Thank you.

23       While your team was at Mr. Mendez's house, did you also

24  seize an iPhone from that house?

25  A.  Yes, we did.

2:19-cr-00295-GMN-NJK

1          MR. ZYTNICK:  Let's go to Exhibit 79.  And, actually,

2    if we can scroll down to Page 2 of that one.  Can -- if we can

3    zoom in on the top -- on the card at the top there.

4    BY MR. ZYTNICK:

5    Q.  And then, Inspector Hoke, if you could tell us what this

6    item is?

7    A.  Yes.  This item is a Bank of America Visa debit card.

8    Q.  And what company name is listed on this card?

9    A.  The company name is Advanced Allocation Systems.

10   Q.  And what is the individual's name listed on the card?

11   A.  The cardholder's name is Jose L. Mendez.

12          MR. ZYTNICK:  Can we scroll down, please, to Page 3.

13   BY MR. ZYTNICK:

14   Q.  So this is a form of some sort.  Can you -- are you familiar

15   with forms like this?

16   A.  Oh, yes, sir.

17   Q.  How are you familiar with forms like this?

18   A.  This is a -- basically it's a form that a CMRA, or a

19   commercial mail receiving agency, would have a customer fill

20   out.  Typically these forms are filled out by individuals that

21   do not want to receive mail at their home or at a business

22   address.  They utilize this form as a form of receiving mail or

23   other packages at a specific location.

24   Q.  All right.  Inspector Hoke, let me just stop you there just

25   because the question actually -- what the question was is how

—————2:19-cr-00295-GMN-NJK—————

1  are you familiar with this.  Have you seen these types of forms

2  before?

3  *A.*  Oh, yes, sir.  Fortunately and unfortunately 27 years of

4  investigation I've seen fraudulent and criminal activity used

5  with these types of forms.

6  *Q.*  Have you seen these forms during your career as a postal

7  inspector?

8  *A.*  Yes, sir.

9  *Q.*  All right.  And you referred to a CMRA.  Can you explain to

10 the jury maybe like what an example of a CMRA is?

11 *A.*  Okay.  Okay.  Sorry about that.  CMRA is, like I said, a

12 commercial mail receiving agency.  You may see an UPS store,

13 Mail Boxes, Etc. store.  Typically the mailman delivers all of

14 the mail to that location.  Then that location has a business

15 service that they basically distribute the mail to individuals

16 that has solicited their services.  And then they, subsequently,

17 put the mail into the mailbox or P.O. Box that they have given

18 to that particular customer.

19 *Q.*  So if someone wants to rent a mailbox at like an UPS store

20 or a Mail Boxes, Etc., do they have to fill out this form?

21 *A.*  Yes, sir.

22 *Q.*  Who requires that a form be filled out, the store or someone

23 else?

24 *A.*  U.S. Postal Service basically requires that the company

25 receive that information or acquire that information.

2:19-cr-00295-GMN-NJK

1  *Q.*  So -- all right.  On this form can you tell us the name of

2  the place where the mailbox was being rented?

3  *A.*  Yes, sir.  This particular mailbox application was going to

4  be set up at a Beverly Hills mailbox in Beverly Hills,

5  California.

6  *Q.*  What is the name of the company that is on the application?

7  *A.*  The name of the company represented is Advanced Allocation

8  Systems.

9  *Q.*  And do you see the name of the individual who is the

10  applicant on this company?

11  *A.*  Yes, sir, I do.

12  *Q.*  And what is that name?

13  *A.*  Jose Luis Mendez.

14  *Q.*  And do you see a signature at the bottom?

15  *A.*  I do.

16  *Q.*  And what does that signature appear to be?

17  *A.*  Jose Mendez.

18  *Q.*  What does this form say is the type of business that will be

19  receiving mail at this rented mailbox?

20  *A.*  The applicant indicated that it was going to be a health or

21  beauty sales type of business or mailings.

22  *Q.*  Did the application form say anything about prize notices or

23  winning money?

24  *A.*  No, sir.

25          MR. ZYTNICK:  Let's go to Page 6 of this exhibit.

—2:19-cr-00295-GMN-NJK—

1   BY MR. ZYTNICK:

2   *Q.*   What -- what do we see on Page 6?

3   *A.*   Page 6 are basically going to be the forms of identification

4   that are requested to be supplied or presented at the time of

5   the application for the mail service at that particular

6   location.

7   *Q.*   So when someone rents a mailbox at an UPS store or another

8   similar type place to rent a mailbox, are they required to

9   provide identification?

10  *A.*   Yes, sir, they are.

11  *Q.*   And whose identification documents are these?

12  *A.*   The Nevada driver's license has Jose Luis Mendez and an

13  Allstate liability insurance card has the name Jose Mendez.

14          MR. ZYTNICK:  Thank you.  No further questions.

15          THE COURT:  Cross-examination, Mr. Tomsheck?

16          MR. TOMSHECK:  May I proceed, Your Honor?

17          THE COURT:  Yes, you may.

18              CROSS-EXAMINATION OF JAMES EARL HOKE

19  BY MR. TOMSHECK:

20  *Q.*   Good morning, sir.

21  *A.*   Good morning, sir.

22  *Q.*   Welcome back.

23  *A.*   Good to be back.

24  *Q.*   I told you yesterday if I had a voice like yours, I would

25  spend all of my time in a karaoke bar.  I don't, so I'll try to

—2:19-cr-00295-GMN-NJK—

1  keep my comments brief, but I do have some questions for you.

2  Okay?

3  *A.*  Yes, sir.

4  *Q.*  Your involvement in this particular case is limited to the

5  execution of this search warrant at a residence that you defined

6  as Jose Luis Mendez's house, correct?

7  *A.*  That's correct.

8  *Q.*  Okay.  You said a moment ago you mentioned that that was a

9  Nevada driver's license.  You don't live here, right?

10 *A.*  No, sir.

11 *Q.*  Okay.  I'm just going to let you in on a secret.  Those of

12 us that do, it's pronounced Nevada.  Some people that are from

13 here take that real serious.  Okay?

14         Where is home base for you in the time you were working

15 in your 27 years as a Postal Service inspector?

16 *A.*  I've actually worked in two different areas, District of

17 Columbia area and as well as North Carolina.

18 *Q.*  Okay.  So D.C. and North Carolina?

19 *A.*  Yes, sir.

20 *Q.*  Far other side of the country, right?

21 *A.*  East Coast, yes, sir.

22 *Q.*  Okay.  You came over here to assist with a much bigger

23 investigation, right?

24 *A.*  Yes, sir.

25 *Q.*  Certainly, part of your career as a Postal Service inspector

1  has involved search warrants, right?

2  *A.*  Yes, sir.

3  *Q.*  Both the execution of them, like you did in this case, and

4  also in the application for them in front of a judge, right?

5  *A.*  Yes, sir.

6  *Q.*  And so you know that it's really super important and the law

7  requires that the application be thorough, right?

8  *A.*  Yes, sir.

9  *Q.*  And if you were drafting an application for a search

10  warrant, you would want to use as much accurate information as

11  possible, right?

12  *A.*  Yes, sir.

13  *Q.*  Okay.  In this particular case I'm assuming, prior to the

14  execution of this search warrant, that you read the application

15  for the search warrant, right?

16  *A.*  I scanned over it.  Yes, sir.

17  *Q.*  Okay.  I mean, it was 90-some pages, right?

18  *A.*  Correct.

19  *Q.*  Okay.  One thing that you certainly saw when you scanned

20  through that document is all throughout, it in big, bold

21  letters, this investigation was related to the, quote, Kern

22  Syndicate.  Is that true?

23  *A.*  (Pause.)  I don't remember that, to be honest with you.  I

24  just remember scanning the document, and I was given my search

25  location.  But I did not read it.  And I can't sit here and say

—2:19-cr-00295-GMN-NJK—

1    I remember every single detail of what I read.

2    Q.  Did you review it in preparation for your testimony?

3    A.  I did not.

4    Q.  Okay.  Would it surprise you to know that this search

5    warrant was authored into the investigation of an entity

6    referred to by postal and service inspectors as the Kern

7    Syndicate?  Would that surprise you?

8    A.  Uhm.

9            (Pause.)  Uhm, no.

10   Q.  Okay.  And I'm not --

11   A.  I mean, yeah, it wouldn't, no.

12   Q.  I'm not trying to trick you.  I didn't call you as a

13   witness.  They put you up here to talk about particular

14   documents.

15           You'd agree with me a lot of those documents you just

16   testified about, being honest with the jury, you don't have any

17   recollection of what they are or know why they're important to

18   the case, right?

19   A.  (Pause.)  Ask that again.

20   Q.  Yeah.

21           I said I didn't call you as a witness.  I'm not trying

22   to trick you.  You agree that you're here under subpoena or

23   request from the Government to testify as their witness, right?

24   Yes?

25   A.  Yes.

—2:19-cr-00295-GMN-NJK—

1  *Q.*  And you understand that this is a trial where the Government

2  is attempting to convict men of criminal offenses, right?

3  *A.*  Yes.

4  *Q.*  Okay.  In preparation for your testimony, Mr. Zytnick said a

5  moment ago that you sat down with him I think it was on a Zoom

6  call.  Is that true?

7  *A.*  Yes, sir.

8  *Q.*  And he told you, "I'm going to ask you about these

9  particular exhibits," right?

10  *A.*  Yes, sir.

11  *Q.*  Okay.  You'd agree with me that, as you sit here today,

12  being honest with these fine folks that are in our jury, you

13  have no idea the significance or relevance of a particular

14  Nevada Secretary of State registration, right?

15  *A.*  (Pause.)  I would say that I obviously am aware of a state

16  certification document.  How it connects to the overall case, I

17  do not know.

18  *Q.*  Okay.  Precisely my point.

19        When the Government puts up exhibits on this big, high

20  tech screen and they ask you about registrations with the Nevada

21  Secretary of State, you have -- and this isn't an insult, but

22  you have no meaningful testimony to give in this process about

23  why those documents are relevant or important, right?

24  *A.*  Correct.

25  *Q.*  Okay.

2:19-cr-00295-GMN-NJK

1          MR. TOMSHECK:  If we could go to Government's Exhibit

2    214 at Page 20.  Fingers crossed it works today.

3    BY MR. TOMSHECK:

4    Q.  Okay.  Mr. Zytnick -- you know Mr. Zytnick's the name of the

5    prosecutor that asked you questions, right?

6    A.  Yes, sir.

7    Q.  Okay.  You know he asked you questions about this particular

8    exhibit, Government's Exhibit 214 at Page 20 of 224, right?

9    A.  Okay.

10   Q.  You remember that?

11   A.  Yes, sir.

12   Q.  Just 10 minutes ago?

13   A.  Yes, sir.

14   Q.  This particular document purports to be an initial or annual

15   list of officers, directors, and state business license

16   application of a company called Digital Express, right?

17   A.  Correct.

18   Q.  Okay.  And I don't want to belabor the point, but you can't

19   tell us, at all, how Digital Express is relevant to this case,

20   right?

21   A.  No, sir.

22   Q.  Okay.  You can't tell us, at all, who was hiring Digital

23   Express to do their work in 2010 through 2018, right?

24   A.  No.

25   Q.  Okay.  You can look at this document and you can read it,

─────2:19-cr-00295-GMN-NJK─────

1  right?

2  **A.**  Yes, sir.

3  *Q.*  In fact, I think Mr. Zytnick said, a moment ago, that the

4  relevance was that you can read the document that's in front of

5  you.

6          You'd agree with me that one of the requirements to be

7  on a jury is to read and write the English language, did you

8  know that?

9  **A.**  To be on the jury?

10  *Q.*  Yep.

11  **A.**  Uhm.  I -- I, myself, have not served on a jury so I can't

12  really say what the qualifications are.  That would be an

13  assumption, but I just can't say that's --

14  *Q.*  Okay.

15  **A.**  -- you know, what it is in this location.  I don't know.

16  *Q.*  Okay.  If I were to tell you that this judge told all of

17  these jurors, when they came in here in the jury selection

18  process, one of the requirements is to read and write the

19  English language, you wouldn't dispute that, right?

20  **A.**  Oh, no.

21  *Q.*  Okay.  And you would certainly not say that your ability to

22  read the English language is better than any of these folks?

23  **A.**  No.

24  *Q.*  Okay.  You'd agree with me that the names of officers on

25  that document include the name Mario Castro, right?

———2:19-cr-00295-GMN-NJK———

1    *A.*  Yes, sir.

2    *Q.*  Okay.  Who's Mario Castro?

3    *A.*  To my knowledge, he's one of the defendants.  That's all I

4    know.

5    *Q.*  You know that because you saw his name on a piece of paper,

6    right?

7    *A.*  Correct.

8    *Q.*  And if I were to ask you one which of the defendants over

9    here is Mario Castro, probably couldn't tell me, fair?

10   *A.*  Fair.

11   *Q.*  Okay.

12          You'd agree with me that if you were -- well, let me

13   ask you this.  You mentioned a moment ago that you are aware

14   that there are requirements to register business entities with

15   the Government, with the State, for instance, right?

16   *A.*  Yes, sir.

17   *Q.*  You would agree with me that if you were engaging in

18   criminal activity, it would be a bad idea to register that

19   criminal activity under your own name, right?

20   *A.*  That would be a bad idea, yes, sir.

21   *Q.*  In your 27 years of experience as a postal inspector, you

22   mentioned on direct examination that you saw a lot of fraud,

23   right?

24   *A.*  Yes, sir.

25   *Q.*  In fact, when the Government put up an exhibit, it was

—2:19-cr-00295-GMN-NJK—

1  identified as a CMRA.

2          MR. TOMSHECK:  Can you put up Exhibit 79, please.

3          MR. BROWN:  Which one, Josh?

4          MR. TOMSHECK:  79.

5          MR. ZYTNICK:  I believe you're looking for Page 3.

6          MR. GLENN:  Yeah, it's page 3.

7          MR. TOMSHECK:  Got to zoom out on that.  Okay.

8  BY MR. TOMSHECK:

9  *Q.*  You've seen those documents before, right?

10 *A.*  Yes, sir.

11 *Q.*  Okay.

12         MR. TOMSHECK:  Can you zoom in to the bottom of the

13 first full paragraph under the date, please, Brian.

14 BY MR. TOMSHECK:

15 *Q.*  Do you see that last line on the first paragraph?  It says:

16 Commercial mail receiving agency CMRA, right?

17 *A.*  I'm sorry.  Which -- where are you?

18 *Q.*  The very bottom of the first paragraph under the date.

19 *A.*  Okay.  I got you.  Yes, sir.

20 *Q.*  And you know what a CMRA is, right?

21 *A.*  Yes, sir.

22 *Q.*  And when the Government prosecutor asked you some questions

23 about Exhibit 79 at Page 3, he said have you seen these before.

24 Do you remember that question?

25 *A.*  Yes, sir.

1  Q.  And you said, unfortunately, in the 27 years as an inspector

2  you've dealt with fraud and you've seen them, right?

3  A.  Yes, sir.

4  Q.  Okay.  You'd agree with me that document is a required

5  document to file when you're going to receive mail through that

6  type of process, correct?

7  A.  Correct.

8  Q.  And the fact that that document exists is not, in and of

9  itself, any indication of fraud, right?

10  A.  Correct.

11  Q.  In fact, all businesses that are registering to receive mail

12  in this fashion have a process they have to go through, correct?

13  A.  Hopefully.

14  Q.  I mean it's required by federal law, correct?

15  A.  You're asking me do all businesses go through the process

16  of --

17  Q.  Are they required to go through this process to receive mail

18  in this fashion?

19  A.  Through a CMRA?

20  Q.  Yes.

21  A.  They are not.

22  Q.  Okay.  So what -- what is the -- what is, then, the

23  requirement of this particular document?  When is it to be

24  utilized?

25  A.  It is to be utilized -- it is presented to the business or

 1  the CMRA:  FedEx, UPS, Mail Boxes, Etc.  It is presented to that

 2  location by the individual that is wanting their mail or

 3  documents to be received at their particular location.

 4  Q.  Okay.  So if I have a business and I want to get mail sent

 5  to a particular location, a UPS store, for example, I would fill

 6  out documentation like this, right?

 7  **A.**  Yes, sir.

 8  Q.  It creates a paper record, correct?

 9  **A.**  Yes, sir.

10  Q.  It documents what I'm attempting to do, right?

11  **A.**  Correct.

12  Q.  If I was engaging in criminal activity, probably isn't smart

13  to use my own name on that, right?

14  **A.**  Correct.

15  Q.  Okay.  What's the name on that?

16  **A.**  Jose Luis Mendez.

17  Q.  Okay.  Who's Jose Luis Mendez?

18  **A.**  Another defendant.

19  Q.  Okay.  Do you know which one he is?

20  **A.**  Yes, sir.

21  Q.  Okay.  Because you went to his house?

22  **A.**  Yes, sir.

23  Q.  Okay.

24        In this particular instance you had no involvement with

25  Mr. Mendez other than the date of the execution of the search

—————2:19-cr-00295-GMN-NJK—————

1    warrant.  You'd agree with that, right?

2    *A.*  Correct.  Yes, sir.

3    *Q.*  Okay.  You don't know what types of businesses -- excuse

4    me -- Mr. Mendez was in, right?

5    *A.*  No, sir.

6    *Q.*  You don't know --

7            MR. TOMSHECK:  Court's indulgence.

8    BY MR. TOMSHECK:

9    *Q.*  You don't have any idea what Jose Luis Mendez was doing

10   prior to the execution of the search warrant or after the

11   execution of the search warrant, agreed?

12   *A.*  Agreed.

13   *Q.*  Okay.  You'd agree with me, other than identifying what this

14   document is, you really don't have any meaningful testimony to

15   give about it, right?

16   *A.*  About that document?

17   *Q.*  Yes.

18   *A.*  No, sir.

19   *Q.*  Okay.

20           Do you know of the documents you've testified about

21   today, the state registrations of corporations, the CMRAs that

22   the Government asked you about, do you know who made the

23   decision to file those documents?

24   *A.*  No, sir.

25   *Q.*  Do you know who may have directed employees of theirs to

─────2:19-cr-00295-GMN-NJK─────

1   file those documents?

2   *A.*  No, sir.

3   *Q.*  You have no meaningful testimony to give about that,

4   whatsoever, right?

5   *A.*  No, sir.

6   *Q.*  Last thing I'm going to ask you about is, the Government

7   asked you about a dba, a doing business as entity.  Do you

8   remember that?

9   *A.*  Yes, sir.

10  *Q.*  You're familiar with that terminology, right?

11  *A.*  Yes, sir.

12  *Q.*  Okay.  And you mentioned that, as your 27 years as a postal

13  inspector, that you had seen fictitious names used for

14  fraudulent activity.

15  *A.*  Yes, sir.

16  *Q.*  Okay.  You'd agree with me there's nothing fraudulent about

17  a dba, right?

18  *A.*  Correct.

19  *Q.*  In fact, most businesses utilize a dba in some form, right?

20  *A.*  I -- I don't know the business practices, just agree with

21  that, but ...

22  *Q.*  Okay.  Have you ever heard of the company called Google?

23  *A.*  Yes, sir.

24  *Q.*  Would it surprise you to know that when that company was

25  form it was originally registered as a company called Back Rub?

1   *A.*  I wouldn't know.

2   *Q.*  Okay.  Would it surprise you to know that Nike is a dba?

3   *A.*  I had not looked into it.

4   *Q.*  Of a company that was originally registered as Blue Ribbon

5   Sports.  Would that surprise you?

6   *A.*  No.

7   *Q.*  Okay.  And, in fact, you can agree with us that the term

8   "fictitious name" just means that that business entity doesn't

9   have to go start a new corporation in order to change the name

10  of their business or the direction of their business, right?

11  *A.*  I would have to respond I don't know the business protocol

12  that would require them to make a change or not.  So I don't

13  know the business practices.

14  *Q.*  Okay.  You don't have any meaningful testimony to give about

15  that either, correct?

16  *A.*  No, sir.

17  *Q.*  Okay.

18         Just to be clear, last thing I'm going to ask you, you

19  would agree with me that the term "fictitious" related to a dba

20  name does not, in any way, imply that it's fraudulent, right?

21  *A.*  (Pause.)  If you are reading a piece of paper, no.  In the

22  course of an investigation, yes.

23  *Q.*  Yes what?

24  *A.*  It would be determined during the course of an investigation

25  if that name was fictitious or not.

 1  *Q.*  Okay.  You'd agree with me when the document that's filed

 2  with whatever state or federal regulatory agency requires a name

 3  to be filed --

 4  *A.*  Right.

 5  *Q.*  -- if it says dba application for a fictitious name, that

 6  doesn't mean they're applying to commit fraud, right?

 7  *A.*  No.

 8  *Q.*  Completely normal business practice that you've seen many

 9  times unrelated to a criminal investigation, true?

10  *A.*  Correct.

11          MR. TOMSHECK:  Pass the witness, Your Honor.

12          THE COURT:  Mr. Mishler?

13          MR. MISHLER:  Thank you, Your Honor.

14              CROSS-EXAMINATION OF EARL JAMES HOKE

15  BY MR. MISHLER:

16  *Q.*  Good morning, Mr. Hoke.

17  *A.*  Good morning, sir.

18  *Q.*  Is it Hoke?  Am I saying that right?

19  *A.*  Hoke.  Yes, sir.

20  *Q.*  Excellent.  Thanks.

21          All right.  So similar to Mr. Tomsheck, I think we had

22  an interaction in the hallway.  Do you remember that?

23  *A.*  I think I might have said hello or laughed about something.

24  *Q.*  Okay.  I -- to be honest, I think I said you have a nice

25  haircut.

2:19-cr-00295-GMN-NJK

1   **A.** True, true.  Thank you.

2   *Q.* I think you pull it off better than me, but anyway ...

3        So you prepared to give your testimony today, correct?

4   **A.** Yes, sir.

5   *Q.* And part of that was you spoke with Mr. Zytnick by Zoom?

6   **A.** Yes, sir.

7   *Q.* How long was that?

8   **A.** Might have been an hour.  Hour or two hours at the most.

9   *Q.* Okay.  And did you review any of the documents or notes or

10  reports related to this search warrant, to prepare for today?

11  **A.** Related to -- related to the search warrant as in the

12  affidavit, no, sir.

13  *Q.* Okay.  Anything else that you reviewed to prepare for today?

14  **A.** Just the documents that were recovered.

15  *Q.* Okay.  Total, how much time do you think you spent

16  preparing?

17  **A.** (Pause.)  Three or four -- three or four hours.

18  *Q.* Okay.

19        So let me talk to you about the search that happened at

20  Mr. Mendez's house.  You were the site supervisor for that,

21  correct?

22  **A.** Correct.

23  *Q.* How many agents were involved at that location?

24  **A.** Honestly, I don't remember the number of agents.

25  *Q.* A ballpark would be fine.

2:19-cr-00295-GMN-NJK

1  *A.*  (Pause.)  Six or seven.  Six or seven.

2  *Q.*  Okay.

3       Now, when did the search warrant and all of your team

4  begin?  Was it at the house?

5  *A.*  (Pause.)  Yeah, I mean, yes -- yeah, we started the search

6  warrant at the house.

7  *Q.*  Okay.  So my understanding is that it actually started when

8  Mr. Mendez left his house with his son?  7:15 a.m.?

9  *A.*  I don't recall the exact time of the execution, but I know

10  the search warrant was executed at his --

11  *Q.*  Okay.  And basically you had one of your guys, one of the

12  agents, follow him to see where he was going?

13  *A.*  I don't recall that, sir.

14  *Q.*  Okay.  My understanding is that he dropped his son off at

15  school.  You don't recall that?

16  *A.*  Okay.  Yeah, I -- if I didn't follow him, sir, I really

17  don't know what he did.

18  *Q.*  Okay.  So after he drops his son off at school, Henderson PD

19  pulls him over at the request of one of your agents.  That's

20  correct?

21  *A.*  (Pause.)  I don't -- I don't recall who requested him to be

22  pulled over, sir.  I mean, we were at the house to do a search

23  warrant.

24  *Q.*  Right.  Okay.  One of your agents showed up when the

25  Henderson officer had him pulled over, though, on the scene of

—2:19-cr-00295-GMN-NJK—

1   the pullover?

2   *A.*   That's -- that's very possible.  Was that agent assigned to

3   the search warrant?  I don't recall that.  I mean, if there were

4   multiple agents in the area, then a random agent could have done

5   that, but just so far as a search warrant purpose at the house,

6   is when we executed the search warrant.

7   *Q.*  And during that traffic stop with Henderson PD and one of

8   your agents, Mr. Mendez was placed in handcuffs, correct?

9   *A.*   I was -- I was not there at the stop, sir.  I really don't

10  know.

11  *Q.*  Okay.

12          After that stop, he was returned to the house as part

13  of the execution of the search warrant?

14  *A.*   Uhm.  Having him -- no, if -- having him return to the house

15  really would not have been a part of the search warrant.  We

16  would have been searching the -- excuse me -- searching the

17  house.

18  *Q.*  Okay.  Do you think he wasn't at the house during the

19  search?

20  *A.*   Well, he was at the house because we ended up taking his

21  wallet off of him.  So, I mean, he was there.

22  *Q.*  Right.

23  *A.*   But his going and comings, I couldn't just really say

24  what -- where he was or where --

25  *Q.*  Okay.  You don't have any reason to dispute that he was

2:19-cr-00295-GMN-NJK

1  taken from the scene of the traffic stop, in handcuffs, back to

2  his house?

3  *A.*  I -- if that occurred, I honestly don't recall that, sir.

4  *Q.*  Okay.  You're aware that when he got to his front door, the

5  agents said that they were going to break the front door down

6  and he gave the code to his front door so that they could get in

7  without breaking it down?

8  *A.*  I am not aware of any -- that type of conversation.

9  *Q.*  Okay.  It might be because one of your agents spoke Spanish

10  and that was the one he was communicating through.

11  *A.*  I -- that's very -- I don't speak Spanish, so I --

12  *Q.*  I don't either.

13  *A.*  Okay.  I couldn't tell you.

14  *Q.*  If it helps, I believe it was Inspector Boden (phonetic).  I

15  don't know if I'm getting that pronunciation right.  But he was

16  one of the agents you had there that day.

17  *A.*  Again, I know an Inspector Bowden (phonetic), but without

18  seeing the rosters, I just can't say if he was the one that had

19  the communication.

20  *Q.*  Sure.

21      And once you got into the house, you were aware that

22  his wife and son were in the house as well, correct?

23  *A.*  Correct.  I remember there were individuals in the house,

24  yes, sir.

25  *Q.*  And they were in their beds asleep?

---2:19-cr-00295-GMN-NJK---

1  *A.*  (Pause.)  I don't recall if they were sleeping or not, sir.

2  *Q.*  Okay.  But once they got out of bed, they both were cuffed,

3  the wife and the son?

4  *A.*  Yes, sir.

5  *Q.*  And they stayed handcuffed for over an hour.

6  *A.*  I can't say they stayed handcuffed for an hour.

7  *Q.*  Did you have a reason to doubt that it was an hour?

8  *A.*  (Pause.)  No reason to doubt it was an hour, but --

9  *Q.*  Okay.

10  *A.*  -- typically, no.

11  *Q.*  Now, Mr. Mendez was pretty cooperative with your agents,

12  correct?

13  *A.*  I don't recall any -- any negative situations.

14  *Q.*  Right.  He wasn't combative, right?

15  *A.*  No.

16  *Q.*  But the search lasted for about four hours, correct?

17  *A.*  It was -- it was pretty much all morning so three -- two,

18  three, four hours.

19  *Q.*  Sure.  And you left Mr. Mendez in handcuffs that entire

20  four-hour period.

21  *A.*  (Pause.)  I don't recall that.  Typically that would not

22  happen, but I certainly don't recall.

23  *Q.*  It does sound a little out of the norm.

24  *A.*  I don't recall him being in handcuffs for any four hours,

25  no, sir.

2:19-cr-00295-GMN-NJK

1    *Q.*   And you were supervising, right?

2    **A.**   Correct.

3    *Q.*   Okay.

4         You're familiar with search warrants.  You've executed

5    search warrants before, correct?

6    **A.**   Yes, sir.

7    *Q.*   On the very first page of the search warrant it gives some

8    instructions to the officers who are going to execute the search

9    warrant, right?

10   **A.**   Yes, sir.

11   *Q.*   One of those is requires you to leave a copy of the search

12   warrant on the scene.

13   **A.**   Yes, sir.

14   *Q.*   And a copy of any inventory of items taken.

15   **A.**   Yes, sir.

16   *Q.*   That wasn't done in this case.

17   **A.**   (Pause.)  I believe that was done, sir.  That is --

18   *Q.*   Okay.

19   **A.**   -- that has always been done.

20   *Q.*   Okay.  Because at the end of the search warrant and the

21   search, Mr. Mendez asked, through Inspector Boden, who speaks

22   Spanish, for a copy of the property receipt.

23   **A.**   Uhm.  I have no reason to not believe Inspector Bowden

24   didn't leave a copy of the search warrant.

25   *Q.*   So it sounds to me like what you're saying is the practice

1  is to always leave a copy.

2  *A.*  Absolutely.

3  *Q.*  But you don't have knowledge whether a copy was left here in

4  this case.

5  *A.*  (Pause.)  I don't recall.

6  *Q.*  Okay.

7          Now, I believe you testified yesterday, last night

8  before we left, that you found about $70,000 in a safe in the

9  master bedroom.  Do you remember that?

10  *A.*  I believe it was about $70,000 in total from that particular

11  location, be it --

12  *Q.*  Oh, total in the house?

13  *A.*  Right.

14  *Q.*  Okay.

15  *A.*  The wallet, the safe, just ...

16  *Q.*  And you don't have any personal knowledge, you don't know

17  where that money came from?

18  *A.*  No, sir.

19  *Q.*  You don't know how long the money was there in the house?

20  *A.*  No, sir.

21  *Q.*  You know that Mr. Mendez's wife lives there in the house,

22  right?

23  *A.*  I'm sorry?

24  *Q.*  You're aware that his wife lives in the house with him?

25  *A.*  She live -- she lives with him?

--------2:19-cr-00295-GMN-NJK--------

1   Q.  Yes.

2   A.  Then, now, or --

3   Q.  Then, at the time of the search warrant.

4   A.  I believe so, yes, sir.

5   Q.  Okay.  You don't know if that money was Mr. Mendez's,

6   because other people lived in the house?

7   A.  No.

8   Q.  Okay.  You don't know if it was his wife's money?

9   A.  No.

10  Q.  And I believe there was some reference to about $2,000 that

11  you found on Mr. Mendez?

12  A.  In his wallet, yes, sir.

13  Q.  Okay.  And you don't know where he got that money?

14  A.  No, sir.

15  Q.  Okay.  And you don't know how long he had been carrying it

16  around?

17  A.  No, sir.

18  Q.  All right.

19          MR. MISHLER:  If we can pull up 76, Brian.

20  BY MR. MISHLER:

21  Q.  You remember testifying about this letter from Bank of

22  America, correct?

23  A.  Yes, sir.

24  Q.  And the name on this is -- I'll just ask you.  What's the

25  name of the company on this?

—2:19-cr-00295-GMN-NJK—

1  *A.*  Pacific Allocation Systems, Incorporated.

2  *Q.*  Okay.  And what's the address on it?

3  *A.*  2255 Marlboro Drive, Henderson, Nevada.

4  *Q.*  And my understanding is that's Mr. Mendez's home address,

5  right?

6  *A.*  Correct.

7  *Q.*  Okay.  And I think you admitted with Mr. Tomsheck, somebody

8  who's committing a fraud, having mail related to that fraud sent

9  directly to their home address would be pretty foolish?

10 *A.*  Correct.

11          MR. MISHLER:  Court's indulgence, Your Honor.

12          THE COURT:  Yes.

13          (Defense conferring.)

14          MR. MISHLER:  Sorry about that, Your Honor.

15 BY MR. MISHLER:

16 *Q.*  I had one more follow-up question.  The safe, when you got

17 to the master bedroom, it was closed and locked, correct?

18 *A.*  I don't recall.

19 *Q.*  Okay.  Do you recall that Mr. Mendez provided the

20 combination to the safe so that your agents could open it and

21 get in?

22 *A.*  I don't recall that, sir.

23 *Q.*  Okay.  But you don't have any reason to doubt that?

24 *A.*  Don't have any reason to doubt it, but don't recall.

25 *Q.*  I mean, you guys didn't call a locksmith out to open it?

———2:19-cr-00295-GMN-NJK———

1   *A.* No.

2          MR. MISHLER:  All right.  If we could pull up 79,

3   Page 3.

4   BY MR. MISHLER:

5   *Q.* Now, I believe you testified you don't actually have a lot

6   of knowledge about this document, personally, do you?

7   *A.* I do have knowledge about the document, yes.

8   *Q.* Okay.  Well, let me ask you this a better way.

9          You don't know who filled this document out?

10  *A.* The signature -- only based on the signature, the signature

11  of a Jose Mendez.

12  *Q.* Okay.

13  *A.* Yes.

14  *Q.* Let's take a look at that signature.

15         MR. MISHLER:  If you could Zoom in on the signature

16  part.  If you could make that a little bit bigger.

17         So let's take a look at this signature.  And now let's

18  look at the signature on his driver's license on the next page.

19         I think it's a couple of pages down.  Right there.  So

20  zoom in on that signature.

21  BY MR. MISHLER:

22  *Q.* Those look like different signatures to me.  Would you agree

23  that they're different?

24  *A.* Appears to be different, yes, sir.

25  *Q.* Okay.

—2:19-cr-00295-GMN-NJK—

1            So let me ask you a couple of questions about the

2    things that were seized according to the inventory that you

3    provided as part of discovery.  I mean, it's -- unfortunately

4    that's the only inventory we have since one wasn't left that

5    day.

6            There was an Apple iPhone X.  Do you recall that?

7    *A.*  I remember -- I remember there was a phone.

8    *Q.*  Okay.

9    *A.*  I'd have to look at the --

10   *Q.*  I believe there was four thumb drives?

11   *A.*  Again, I would have to refer to the inventory.

12   *Q.*  Okay.  You don't have a reason to think there wasn't four

13   hard drives -- thumb drives.  Okay.  In addition to that first

14   phone, I think there were two additional -- sorry -- three

15   additional iPhones?

16   *A.*  Again, I'd have to look at the list.

17   *Q.*  Okay.  There was an Apple computer?

18   *A.*  I'd have to refer to the list.

19   *Q.*  Okay.  And one of the items that was taken was a hard drive

20   for his kid's Play Station?

21   *A.*  Again, I'd have to refer to the list just to say yes or no

22   as to what was taken.

23   *Q.*  Okay.  None of this stuff has been returned to him, to your

24   knowledge, has it?

25   *A.*  Oh.  I -- I don't have a clue.

1    *Q.*  Okay.

2            And none of these devices had any incriminating

3    information on them, to your knowledge?

4    *A.*  I was not involved with any of the forensic examination, so

5    I don't know what was on them.

6    *Q.*  Right.  But to your knowledge, today, testifying to these

7    jurors, you can't say there's anything incriminating on these

8    devices?

9    *A.*  Not that I'm -- not that I'm aware of.

10   *Q.*  And the Government didn't show you anything from these

11   devices when they talked to you by Zoom, right?

12   *A.*  (Pause.)

13   *Q.*  To prepare you for today's testimony.

14   *A.*  (Pause.)  I believe there was imagery, the back of a credit

15   card, the front of a credit card.  I believe that came from a

16   thumb drive.

17   *Q.*  Really?  Because I thought it was a picture that you guys

18   had taken that day during the search.

19           MR. ZYTNICK:  I object to that.  It's not clear what

20   you're referring to, what exhibit you're referring to.

21           THE WITNESS:  I guess I would have --

22   BY MR. MISHLER:

23   *Q.*  You don't know where -- you think maybe the pictures of the

24   card was on a thumb drive, you said?

25   *A.*  I'm saying that there were images that I reviewed, and I

1  don't recall -- I don't think they were -- I'm sorry.  I don't

2  think there were any thumb drive images that I reviewed.

3  Q.  Okay.

4  A.  I don't -- I don't recall.  I don't think so.

5  Q.  All right.

6       MR. MISHLER:  Thank you very much, sir.  I appreciate

7  your time.

8       THE COURT:  Mr. Gaffney, any cross?

9       MR. GAFFNEY:  Not on behalf of Miguel Castro.  Thank

10 you, Your Honor.

11      THE COURT:  And, Mr. Green, any cross?

12      MR. GREEN:  Yes, Your Honor, please.

13      THE COURT:  Go ahead.

14           CROSS-EXAMINATION OF JAMES EARL HOKE

15 BY MR. GREEN:

16 Q.  Good morning, Inspector Hoke.  How are you, sir?

17 A.  Doing well, sir.  How are you?

18 Q.  In connection with this case in February of 2018, the search

19 of the Marlboro residence, were you aware of searches being

20 conducted by U.S. Postal Service inspectors and other federal

21 agencies in connection with this case?

22 A.  I believe there were other search locations, yes, sir.

23 Q.  And in connection with that, was there like a master

24 briefing of all of the locations which were going to -- which

25 were going to be searched?

2:19-cr-00295-GMN-NJK

1  *A.* Yes, sir.

2  *Q.* And at some point in time I take it that you had been

3  designated as what role in the search?

4  *A.* Like a site leader.

5  *Q.* Site leader. Okay. And as the site leader, what were the

6  responsibilities which you had in February 2018 for the search

7  of the Marlboro residence?

8  *A.* As the site leader I basically would have been responsible

9  for making sure that the search warrant was executed, making

10 sure that personnel were safe, making sure that all of the

11 procedures and protocol of the Inspection Service were followed.

12 *Q.* Would it be safe to say that after the search, you still

13 maintained responsibilities as a site leader?

14      That is, did you meet with your personnel who were

15 involved in the search after the search was completed?

16 *A.* We -- after we concluded the search, we returned back to --

17 to the location. And after the end of that meeting or return

18 location, we -- I left. I left.

19 *Q.* In the 27 years that you've been with the United States

20 Postal Service inspection branch, which is very difficult to get

21 into, I understand, did you make reports in any of these cases

22 which you were involved in investigating?

23 *A.* Did I make reports on cases that I --

24 *Q.* Any case in 27 years?

25 *A.* Yes. Sir.

—2:19-cr-00295-GMN-NJK—

1  Q.  In this case, did you make a report?

2  A.  No, sir.

3  Q.  Thank you.

4       MR. GREEN:  May we have Exhibit 80, Page 2?

5  BY MR. GREEN:

6  Q.  Okay.  Now you testified just a few minutes ago, sir, that

7  somehow or another this document was found at the Marlboro

8  residence, correct?

9  A.  Correct.

10  Q.  Perhaps, inside an envelope, correct?

11  A.  Yes.

12  Q.  What was the date -- this appears to be some kind of bank

13  notification from Bank of America talking about restricting a

14  bank account for how many days?

15  A.  Restricting it for 21 days and subsequently closed 30 days

16  from the date of the notice on the letter.

17  Q.  Yes, sir.  And if we could zoom in at the top right where --

18  where there's a date.  Do you see that date, right?  You see

19  that date under the logo, Bank of America?

20  A.  Yes, sir.

21  Q.  What is that date?

22  A.  June 8, 2017.

23  Q.  And what was the date of the search?

24  A.  February 2018.

25  Q.  So about nine months later there was a search of the -- of

1  the Marlboro residence after the date of that letter, correct?

2  *A.*  (Pause.)  Eight or nine months.

3  *Q.*  Eight or nine months.  I've got to count my fingers, too.

4        MR. GREEN:  If we could have Exhibit 215, Page 4.

5        Okay.  Page 4.

6        Now, right -- right or just above the center if we

7  could have where it says:  By signing below, if we could have

8  that highlighted?  It's right about a quarter of the way down

9  the page, three -- one-third down the page.

10  BY MR. GREEN:

11  *Q.*  Inspector Hoke, do you see the words:  By signing below?

12  *A.*  Oh, yes, sir, I do.

13  *Q.*  Could you read that sentence into the record, please?

14  *A.*  "By signing below, I do solemnly swear (or affirm) under

15  penalty of perjury, that all statements made in this document

16  are true."

17  *Q.*  Okay.  In connection with your review of this case, however

18  many hours you spent, did you review several of these

19  certificate of business and fictitious firm names?

20  *A.*  I did not review several items, sir.  I remember looking at

21  this item, but --

22  *Q.*  All right.

23        MR. GREEN:  Could we go down to the bottom of this

24  page, please.  That would be, for the record, 215-4, I believe.

25  Yes.

───────2:19-cr-00295-GMN-NJK───────

1              Now if we could zoom in at the bottom of that document

2    where it says:  Mail to.  Do you see the bottom of that?  Coming

3    up now.

4    BY MR. GREEN:

5    *Q.*  Do you see that where it says:  Mail to?

6    *A.*  Yes, sir.

7    *Q.*  And what does that say?

8    *A.*  Male --

9    *Q.*  Can you read that into the record?

10   *A.*  Mail to Diana Albe -- Alba, County Clerk, Attention FFN,

11   P.O. Box 551604, Las Vegas, Nevada.

12   *Q.*  A post office box, correct?

13   *A.*  Yes, sir.

14   *Q.*  Okay.  For a state agency, a city -- a county agency, county

15   clerk?

16   *A.*  Yes, sir.

17   *Q.*  Thank you.

18            MR. GREEN:  If we could go to Exhibit 79, Page 3.

19   BY MR. GREEN:

20   *Q.*  Now, in your experience -- and what's this -- what's this

21   form called again?

22   *A.*  It's --

23   *Q.*  CM ...

24   *A.*  The form, itself, is called an application for delivery of

25   mail through an agent.

1   Q.  And what's the CMRA?  Is that the same -- is this the same

2   thing?

3   A.  No.  So the CMR is more or less going to be a physical

4   building or a physical --

5   Q.  Okay.

6   A.  -- location.

7   Q.  Thank you for the clarification.

8          Now, you see where it says, note, in that form?  That

9   might be Government's Exhibit -- just make sure we're on the

10  right one -- 79.  You see where it says "note"?  The applicant

11  must execute, do you see that one word?

12  A.  Oh, yes, sir.  In the top part, yes, sir.

13  Q.  Now, in the middle of that, if we could highlight where the

14  sentence says:  The CMR copy.  Do you see that?

15         MR. GREEN:  If we could highlight that sentence.

16  BY MR. GREEN:

17  Q.  So the CMR copy -- so if I'm a postal inspector and I go to

18  a UPS store and I want to look up the -- I want to look up

19  the -- something, that has to be presented to me when I ask for

20  it if I'm an inspector, correct?

21  A.  Correct.

22  Q.  So I don't even need a search warrant, correct?

23  A.  Correct.

24  Q.  Because isn't that true that UPS and Mail Boxes, Etc. have

25  already got an agreement with the Postal Service that you can

—————2:19-cr-00295-GMN-NJK—————

1  come in and look at it?

2  *A.*  Correct.

3  *Q.*  You don't even need a warrant?

4  *A.*  No, sir.

5          MR. GREEN:  Nothing further.  Thank you.

6          THE COURT:  Thank you, Mr. Green.

7          Any redirect, Mr. Zytnick?

8          MR. ZYTNICK:  Yes, Your Honor.  Just briefly.

9              REDIRECT EXAMINATION OF JAMES EARL HOKE

10 BY MR. ZYTNICK:

11 *Q.*  Retired Inspector Hoke, can you briefly explain why people

12 might be handcuffed during the execution of a search warrant?

13 *A.*  Sure.  Typically people may end up handcuffed in the

14 beginning of search warrants only to ensure the officer safety,

15 to make sure that they don't grab anything or don't harm any of

16 the officers that are there.

17 *Q.*  At some point are those handcuffs removed?

18 *A.*  Yes, sir.

19 *Q.*  Approximately, how long does that typically take?

20 *A.*  Usually will take no longer than -- and it's up to -- it's

21 up to the individuals that are handcuffed, but it usually

22 doesn't take any longer than 15, 30 minutes to -- for everybody

23 to understand why we're there.  We usually tell them why we're

24 there.  Usually we will even tell them that they're not under

25 arrest at the time.  It's just simply done for an officer

—————2:19-cr-00295-GMN-NJK—————

1 safety-type of protocol.

2          MR. ZYTNICK:  Thank you.  No further questions.

3          THE COURT:  Any redirect, Mr. Tomsheck?

4          MR. TOMSHECK:  No, Your Honor.  Thank you.

5          THE COURT:  Mr. Mishler?

6               RECROSS-EXAMINATION OF JAMES EARL HOKE

7 BY MR. MISHLER:

8 *Q.*  So you said 15 minutes is pretty typical.

9 *A.*  15, 30 minutes.  I've -- obviously, over 27 years, I've had

10 it various times.

11 *Q.*  So for the wife and son to have been handcuffed for an hour

12 would be outside the typical?

13 *A.*  Outside of the typical, but at the same time it has -- I

14 have seen it done depending on the disposition or the attitudes

15 or the actions of those individuals that were temporarily

16 handcuffed.

17 *Q.*  Sure.  If they're combative or argumentative.

18 *A.*  Sure.

19 *Q.*  Right.  Which Mr. Mendez and his wife were not.

20 *A.*  I don't -- I don't remember any combative environment at

21 all.

22 *Q.*  Right.  So the fact that Mr. Mendez was handcuffed for four

23 hours is very far outside of standard?

24          MR. ZYTNICK:  Objection.  Facts not in evidence, Your

25 Honor.

———2:19-cr-00295-GMN-NJK———

1        THE COURT:  Sustained.  I don't think he said very far,
2  but outside.
3  BY MR. MISHLER:
4  *Q.*  Okay.  How would you characterize somebody being handcuffed
5  for four hours when typically 15 minutes is the norm?
6        MR. ZYTNICK:  Same objection, Your Honor.
7        THE COURT:  He didn't say 15 minutes is the norm.  He
8  said 15 to 30 minutes.
9  BY MR. MISHLER:
10  *Q.*  How would you characterize somebody being handcuffed for
11  four hours compared to what you typically have people handcuffed
12  for?
13  *A.*  If somebody was handcuffed for four hours, it would have
14  been a situation where they were, I'm assuming, going to be
15  combative, cursing, or threatening or disruptive to the protocol
16  or the reason that we were there in the first place.
17  *Q.*  Right.  And your testimony was Mr. Mendez was not combative,
18  correct?
19  *A.*  I don't recall, no, sir.
20        MR. MISHLER:  Thank you.
21        THE COURT:  Any other recross?  Mr. Green?
22        MR. GREEN:  Not from the defense of Salvador Castro.
23  Thank you, Your Honor.
24        THE COURT:  Any further redirect from the Government?
25        MR. ZYTNICK:  No, Your Honor.

—2:19-cr-00295-GMN-NJK—

1          THE COURT:  At this time if any members of the jury
2     have a question for a witness, for Mr. Hoke, please go ahead and
3     write it down on the form provided.  Take your time.  Write
4     neatly so we can read the question.  If you have more than one,
5     you can number the questions or skip a line.  After you're done,
6     just fold the piece of paper in half.  Don't sign your name or
7     your jury number.  We just need your anonymous question.
8          I don't see anybody writing.  I think we have no
9     questions for you, Mr. Hoke.  This concludes your summons
10    service for coming in as a witness.  So thank you very much.
11    Please be careful on the way down.  You are excused.  There's
12    steps right behind you, and then remember there's more steps on
13    the way down.
14          THE WITNESS:  Okay.  Thank you.
15          THE COURT:  We're going to go ahead and take our
16    morning bathroom break now.  It's 10:36, so we should be able to
17    be back by 10:50.  Let's go ahead and stand for the jury.
18    Remember you're not to discuss this case with anyone nor permit
19    anyone to discuss it with you.  Do not speak to the attorneys
20    about anything.  Do not read or listen or review anything that
21    touches upon this case, in any way, and do not research or make
22    any independent investigation and do not form any opinion.
23          (Whereupon jury leaves the courtroom at 10:37 a.m.)
24          THE COURT:  All right.  We're outside the presence of
25    the jury.

1           I can tell you that I think that the 404(b) evidence

2   would tend to prove a material point about whether there was a

3   mistake.  It also is relevant to the intent and knowledge of a

4   defendant.  I don't think it is too remote in time.  And I think

5   that it is similar enough to the offense charged.

6           My issue really is whether or not there's sufficient

7   evidence to support a finding that the defendants have committed

8   this other act.  So I looked through the information that's

9   being provided and maybe there's more because there was some

10  discovery provided, but what's being provided, to me, is just

11  that Ms. Kern would testify that she -- let's see.

12          She learned about the identities -- learned about these

13  particular defendants' printing company business because they

14  were printing for other fraudulent prize notice schemes

15  involving Kazday, the two Kazdays.  How did she -- is it

16  personal knowledge or hearsay?  So I'm confused about that.

17          And then the second part -- so if that's all you have,

18  that doesn't seem to be enough.  On the other hand, the

19  cooperating -- another cooperating -- you say another

20  cooperating witness will testify.  Okay.  Who is that?  Are we

21  talking about Sean Connor [sic], the other?

22          MR. FINLEY:  Yes, Judge.

23          THE COURT:  Okay.  So if he will testify that he met

24  the defendants because they purchased, "they" being the

25  defendants, purchased the letter shop where he, "he" being Shawn

1   Connor, was working in that space, the defendants printed

2   fraudulent prize notices or that Sean Connor was already

3   printing -- so I'm just confused as to what is the evidence?

4   That Sean Connor was printing fraudulent notices and then the

5   defendants bought his -- the shop where he was printing

6   fraudulent notices.  That would be insufficient.  That doesn't

7   show that the defendants were also involved in that, unless you

8   meant the other way.  That Sean was working for the print shop

9   that was printing fraudulent notices, and then the defendants

10  bought it and continued to print the fraudulent notices.  And,

11  again, how does Sean know this?  Is he still working there?

12          So I'm just trying to wrap my head around is this

13  sufficient evidence or not.

14          MR. FINLEY:  I got it, Your Honor.  I think I probably

15  bungled the explanation of that.

16          The -- so I'll answer your second question first.  Sean

17  O'Connor was working at a letter shop that he -- he doesn't know

18  the exact ownership, but he believes that the two people who,

19  then, purchased the letter shop that he was working at kept him

20  on.  And he continued to be their employee from about 2005/2006,

21  all the way until 2018, with the change in status.  And that

22  those two men who he believed to have purchased the business

23  where he was working remained his bosses from that point -- from

24  that point in time until 2018.  And they continued to print

25  fraudulent mail for the Kazdays.

1          Now, as to Patti Kern, she is also a witness who has --
2     who had some sort of business relationship with the Kazdays.
3     I'm a little fuzzy on that, but she did provide services to
4     them.  She also had her own business where she was the customer
5     of the Castros.  They printed the fraudulent mailings that
6     actually resulted in her 2009 cease and desist order.  So she
7     had an ongoing relationship, she had personal knowledge that
8     they were printing for other printers because she's, on an
9     almost daily basis, interacting with these defendants on her own
10    business.  And she's also a service provider to Kazday, so she
11    would know about that.
12          THE COURT:  So how does she know that they are printing
13    for other people?
14          MR. FINLEY:  She would have heard it.
15          THE COURT:  Did they state that to her?
16          MR. FINLEY:  Yes, she would have heard it.  She would
17    have -- yes.
18          THE COURT:  From whom?  Heard it from the defendants or
19    someone else?
20          MR. FINLEY:  Sean O'Connor, the defendants.
21          THE COURT:  Okay.
22          MR. FINLEY:  The Kazdays.
23          THE COURT:  So that's hearsay.  So she's just hearing
24    it from Sean O'Connor.  So she can testify about her personal
25    knowledge and her personal dealings with the defendant, but she

—2:19-cr-00295-GMN-NJK—

1   can't testify about what she heard from Sean O'Connor if it's

2   just hearsay.

3           MR. FINLEY:  Well, they are both conspirators and

4   cooperating witnesses.

5           THE COURT:  I see.  Okay.

6           And ...

7           MR. FINLEY:  I'm sorry.  Are you asking me a question?

8   I just wanted to make sure.

9           THE COURT:  Yeah, I'm thinking about they're

10  coconspirators --

11          MR. FINLEY:  Okay.

12          THE COURT:  -- in this conspiracy, are they

13  coconspirators in the other conspiracy.

14          MR. FINLEY:  Your Honor, we never alleged that this

15  conspiracy began in 2010.  It's -- you know, the allegation in

16  the indictment is at least since 2010.  We knew it started

17  before then.  We just chose to focus on 2010 to 2018 because

18  that seems long enough.

19          MR. BROWN:  Your Honor, the indictment, Page 5,

20  Paragraph 9 reads:  Beginning in or around March 2010 and

21  continuing through or on about February 2018.

22          That's the conspiracy count in the indictment.

23          THE COURT:  So beginning 2010.

24          (Pause.)

25          THE COURT:  So if this comes in, if the evidence of

1  defendants' previously creating fraudulent prize notifications

2  in print for Kevin and Tony Kazday, Crystal Ewing, and Dan

3  Wagner, and I think you only mentioned two different people

4  who -- two of the defendants owned or bought, purchased, the

5  print letter shop where Sean -- I keep wanting to say Sean

6  Connery -- Sean O'Connor worked.  So are those two, Miguel and

7  Mario, are the two owners?

8          MR. FINLEY:  Yes.

9          THE COURT:  The two new owners?  Okay.  What about the

10 other defendants?  How is this ...

11         MR. FINLEY:  They worked at the same print shop

12 beginning in, at least the late aughts, 2007/2009, and I believe

13 Mr. Mendez was the first one that the cooperators met.  And then

14 later it was Defendant Salvador Castro.

15         Your Honor, in addition, I would mention that Sean

16 O'Connor was an employee who was responsible for producing those

17 notices that I'm talking about.  And he was doing that in his

18 capacity as an employee of Defendants Miguel and Mario Castro.

19         THE COURT:  Okay.  Then you say the -- and I'm looking

20 at Page 5, that the Wagner mailings were around February 2015 to

21 December 2017.  What about the other mailings?  For example, the

22 Crystal Ewing mailing.

23         MR. FINLEY:  Your Honor, we --

24         THE COURT:  When is that?

25         MR. FINLEY:  -- we don't intend to raise Crystal Ewing.

1  We're not trying to raise every single piece of 404(b).  We

2  won't raise Crystal Ewing.  We're actually not going to raise

3  Richard Knowles' criminal conviction, even though Your Honor did

4  rule that that was admissible 404(b) evidence.  We're not just

5  -- we're not trying to throw in the kitchen sink here.  This is

6  relevant to their background.

7         This is Giglio for these witnesses, and it's relevant

8  to how the conspiracy started.  I think the testimony will come

9  in kind of disjointed and confusing if you don't explain how

10  these people met and what their joint background is.

11         THE COURT:  All right.  But one of the four things I

12  need to consider for 404(b) is the remoteness.  And it looks

13  like only the Wagner mailings are within the time frame, unless

14  you can tell me that there's other -- that the other mailings

15  are also within the time frame?

16         MR. FINLEY:  I don't know exactly how long the Kazdays

17  continued and when it ended, but I can tell you that as of 2009,

18  they were printing and mailing for the Kazdays because that's

19  when Kevin Kazday signed a cease and desist order, the same one

20  that Patti Kern signed.

21         THE COURT:  Okay.  So that would be only one year prior

22  to the beginning of this conspiracy so that would not be too

23  remote in time.

24         And you're not -- okay.  So as to the Kazday and the

25  Wagner, it's not remote.

1          And then so my question still is as to the sufficiency

2   of the evidence because I'm not sure about this coconspirator

3   statement from a prior conspiracy.  Let me look at that.

4          (Pause.)

5          MR. FINLEY:  Independent of the hearsay issue, Your

6   Honor, I could -- I would proffer that Sean O'Connor saw these

7   mailings with his own eyes and he produced them inside the

8   letter shop where he worked as an employee with these

9   defendants.  So I think it comes in independent of any hearsay

10  issue.

11         THE COURT:  I think that for Sean Connor it might -- it

12  definitely is more evidence for the sufficiency.  The Patti Kern

13  I'm not so sure, yet, how she knew, other than through hearsay,

14  but I know you're telling me they're -- they told each other and

15  they're codefendant -- even though, you know, it would be

16  potentially admissible as coconspirator statements, I'm not --

17  it's still hearsay for purposes of finding sufficiency of the

18  evidence under 404(b), I think.  I don't know.  I'm just -- I'm

19  just not clear because this has kind of sprung up at the last

20  minute so I'll have to do a little bit of research.  But those

21  are my inclinations.  So thank you for that additional

22  information.

23         Mr. Tanasi?

24         MR. FINLEY:  Thank you.

25         MR. TANASI:  Your Honor, briefly, and with respect to

—2:19-cr-00295-GMN-NJK—

 1  Your Honor's inclinations, I would still just point out.  I'm

 2  still not clear on exactly who Wagner would be testifying, which

 3  defendant Wagner would have information against, which defendant

 4  Kazday would have information against, and exactly if it's based

 5  on the words of another person, hearsay or, not or if it's

 6  the --

 7          THE COURT:  All right.  I don't think that Kazday or

 8  Wagner were testifying.  The only two witnesses that you would

 9  be bringing this testimony through would be Kern and Connor or

10  did I misunderstand that?

11          MR. FINLEY:  That's correct, Your Honor.

12          THE COURT:  Because you're not calling these other

13  people.  Okay.

14          MR. TANASI:  My understanding, though, is that they're

15  being called and then they're going to testify about what

16  they've heard or what they learned from Wagner and what they

17  heard, what they learned from Kazday.  And so I'm not clear on

18  what those two individuals have said that directly implicate

19  Mario Castro.

20          THE COURT:  That wasn't my understanding.  Is that what

21  you're saying?  You're not saying that Wagner and Kazday are the

22  ones who told Kern and Connor?  I thought it was Connor worked

23  there and saw it happen and was --

24          MR. FINLEY:  That's right.

25          THE COURT:  -- part of it.

─────────2:19-cr-00295-GMN-NJK─────────

1           MR. FINLEY:  Yes.

2           THE COURT:  And he told Patti Kern about it and that's

3     how Kern knows about it.  So there's nobody else making

4     statements to them or are -- was that also part of it?

5           MR. FINLEY:  Your Honor, if we're talking about Wagner,

6     is that what we're talking about?  Wagner?

7           MR. TANASI:  Wagner and Kazday, I guess.

8           MR. FINLEY:  Yeah.

9           MR. TANASI:  Their knowledge and how it, ultimately,

10    makes its way into an allegation against Mario and Digital

11    Express through either Patti Kern or Sean O'Connor.  I'm still

12    not clear on those connections.

13          THE COURT:  Because Mario and -- I have to look at

14    this.  Mario and Miguel are the ones who purchased the letter

15    shop where Connor was working when they were making the

16    fraudulent notices and they continued to make the fraudulent

17    notices even after the purchase by Mario and Miguel.  And then

18    how it connects?

19          MR. FINLEY:  That's the Kazdays, Your Honor.  If we're

20    talking about Wagner, you know, we're talking about conduct

21    that's happening in the conspiracy period and is relevant to

22    answer that juror's question about the relative percentage of

23    prize notices versus legitimate business.  And we have bank

24    records on that, we have e-mails on that that we've produced, as

25    well as Sean O'Connor's testimony.  So it's not just his word;

1    it's e-mails and bank records.

2            And Patti Kern, we're not asking about Patti Kern, and

3    we can -- I'd be happy to ask around the Kazday issue.  It is

4    part of her background.  So if I can narrowly tailor my requests

5    to get to her relevant background without -- you know,

6    permission to lead a little bit on that.  I can ask around it.

7    And I may revisit it if there's a very clear factual foundation.

8    I think I understand what Your Honor's concerns are about the

9    foundation for that and the level of evidence.

10           If that becomes apparent, I might revisit it, but I can

11   start the testimony by asking around that issue.  If I could

12   just have permission to lead just so that I can draw out her

13   background, without navigating her into this issue of the

14   defendants also being involved with these people.

15           THE COURT:  So I'm looking at Page 5, Lines 10 and 11,

16   and it says that:  When the defendants purchased the letter shop

17   where Connor -- the confidential informant was working they

18   printed the fraudulent prize notices for Kevin Kazday, Tony

19   Kazday, Crystal Ewing, and Dan Wagner.

20           So how are the Wagner and Kazday notices at different

21   times or different company -- I thought that they were all being

22   produced at the same, Digital Express?

23           MR. FINLEY:  There's a lot -- there are a lot of

24   different times periods in there that are overlapping.  We --

25   our intent on Wagner is to focus more on him during the

1   conspiracy period.

2           THE COURT:  But Connor -- Sean Connor was working at

3   the print shop while the defendants owned and worked there.

4           MR. FINLEY:  Yes.

5           THE COURT:  And printing for both Kazday and Wagner.

6           MR. FINLEY:  Yes.  And he said that in MOIs that have

7   been produced two years ago.

8           THE COURT:  Okay.  And so now let's go back so I can

9   better understand the question that Mr. Tanasi had because I --

10  sorry, I had misunderstood the evidence that was being

11  proffered.

12          MR. TANASI:  Understood, Your Honor.  Again, I was

13  trying to hone in and understand whether the premise of the

14  information that Kern and O'Connor is willing to testify about

15  regarding Wagner and Kazday will be solely based on what they

16  say and what they heard.  If it's not based solely on that, then

17  the hearsay exception is -- or the hearsay issue is probably not

18  there.

19          I will say overarching, though, and just this record

20  that we're making right now demonstrates the inherent confusing

21  nature of all of this.  And I think, ultimately, that's the

22  reason why none of this should be admitted into this case.

23          I think that even with the Government's good intention

24  to lead the witness through this portion, if Your Honor were

25  inclined to even allow that, opens the door to an entirely new

1   and different trial and something that is entirely too confusing

2   at this point.  Given all of the dbas, fictitious names,

3   business names, multiple other business names that have already

4   come into this case, now we're adding more individuals, more

5   names, more entities.  It's too confusing and that confusing

6   issue overrides any probative value it has.

7              THE COURT:  Mr. Green.

8              MR. GREEN:  Yes, Your Honor.

9              I want -- respectfully want to make something

10  absolutely clear.  Sean O'Connor is not now and has never been a

11  conspirator named in this indictment.  Sean O'Connor is Case

12  Number 2-19-cr-00179-JAD filed on August 13th, 2019.  His case

13  is not -- he's not a coconspirator and neither is Ms. Kern, not

14  in this indictment.

15             The -- the initial pages of the indictment, in this

16  case, say that the grand jury charges the following people and

17  others known and unknown.  We've never had a clarification of

18  who those known and unknown, and we've been led to believe that

19  maybe -- okay, maybe it's O'Connor and Kern, but not as -- not

20  as an official designation.

21             So when they're -- and the Government's own words just

22  a few minutes ago is that some of the evidence might come in

23  disjointed.  That's exactly what 404(b) is tempered by Rule 403,

24  to prevent any unnecessary confusion, et cetera, and relevance

25  issues.  So on that ground I'll supplement my argument to the

─────────2:19-cr-00295-GMN-NJK─────────

1   argument of counsel so I don't want have to re -- beat the dead

2   horse on the other arguments.  We'll submit it on that.

3         Thank you, Your Honor.

4         THE COURT:  Thank you, Mr. Green.

5         So there is a difference between a coconspirator and a

6   codefendant.  In a conspiracy it charges usually that the events

7   occurred with others known and unknown, and they're not all

8   named in the same case number; sometimes not even in the same

9   jurisdiction.  And so you don't have to be a codefendant to be a

10  coconspirator, and you certainly don't even have to be indicted

11  to be a coconspirator.

12        But I'll take that -- I'll take notice of that as well.

13  That these other individuals, Burrow, Kern, Connor, I think that

14  those are the only three that we're interested in for right now,

15  right, are not defendants in this particular case number.

16        Does the Government want to add something else about

17  that?  About their -- their standing as coconspirators even if

18  they're not codefendants?

19        MR. FINLEY:  The same MOIs that we turned over more

20  than two years ago lay out that they conspired with these

21  defendants.  They have pled guilty to informations prior to this

22  indictment being filed and those -- there's perfect factual

23  overlap between all those charging documents.

24        I don't have anything else to say about that, unless

25  Your Honor has a question.

—2:19-cr-00295-GMN-NJK—

1          THE COURT:  Okay.  Nope.  So go ahead and use the

2     bathroom as quick as you can.

3          MR. GAFFNEY:  Your Honor.

4          THE COURT:  And then we'll come back and call the next

5     witness.

6          MR. GAFFNEY:  Your Honor?  Your Honor, I had just one

7     brief point I wanted to make if we're still on the record.

8          THE COURT:  Uh-hmm.

9          MR. GAFFNEY:  The Government had told this Court that

10    they want to bring in this testimony because, otherwise, it's

11    going to be confusing to the jury how these parties met and sort

12    of the history.  I just wanted to point out that until today

13    they were not planning to introduce this evidence.  So their

14    404(b) notice indicates that the Government does not plan to

15    introduce this evidence unless the defendants open the door

16    through introduction of contrary evidence.

17         So as of yesterday in preparing, you know, their case

18    for trial, they weren't planning to introduce this to clarify

19    the relationship of the parties.  So we're only hearing, today,

20    that this testimony may come in disjointed and may be confusing

21    for the jury unless they get this information about Tony Kazday

22    and the others.

23         One other point is I wasn't sure on the timeline of

24    the, I guess, the sweepstakes solicitations that Tony Kazday was

25    supposed to be involved in.  It was -- it's my understanding

─────2:19-cr-00295-GMN-NJK─────

1  that Tony Kazday passed away in 2011.  So I don't know -- I'm

2  not exactly clear on the timeline of events and how -- if he's

3  passing away in 2011, that's just one year into the conspiracy.

4  I'm just not clear on, I guess --

5          THE COURT:  And that's one of the two Kazdays.

6          MR. GAFFNEY:  Anthony George Kazday is -- yeah,

7  correct.

8          THE COURT:  The other one is Kevin or something with a

9  K?

10         MR. GAFFNEY:  I believe that's his son.

11         THE COURT:  I write down KK.  I don't even try to

12 remember everybody's name.  I had down TK and KK is how they are

13 in my brain.

14         MR. GAFFNEY:  And that's it, Your Honor.

15         THE COURT:  Okay.  All right.

16         All right.  Go ahead and use the restroom.

17         (Recess taken at 10:58 a.m.)

18         (Resumed at 11:10 a.m.)

19         THE COURT:  Thank you.  You may be seated.  I think

20 we're still waiting for one or two more.

21         MR. TANASI:  Your Honor, if I may go grab my client?

22         THE COURT:  Yes.

23         MR. TANASI:  Thank you.

24         (Pause.)

25         THE COURT:  Okay.  So the motion in limine is Number

1   552.  I'm granting in part, denying in part.  As to the

2   statements of Ms. Kern, I don't find that she can provide a

3   coconspirator statement as sufficiency of the evidence for the

4   Kazday prize mailings.  And for Mr. Connor, while he has --

5   Government has proffered that Mr. Connor has personal knowledge

6   about the Kazday mail prize notifications, that's all we have.

7   And so I think it's insufficient.

8           As to Crystal Ewing, that's been withdrawn.

9           As to Wagner, again, Kern's statements about Wagner

10  appear to be hearsay.  Whether or not they're admissible is a

11  question of admissibility if they are a coconspirator statement.

12  That's not the issue.  The issue is whether there's sufficiency

13  of the evidence.  And I'm not considering a coconspirator

14  hearsay statement to be sufficient evidence.

15          But Connor does have personal knowledge of the Wagner

16  printed fraudulent prize notices.  I think that, alone, may or

17  may not be sufficient, but what helps me, I think, in this case

18  is that there are e-mails and bank records related to the Wagner

19  fraudulent prize notifications.  And they're part -- there's

20  evidence of the Digital Express revenue from that period.  So I

21  think that that's -- there's sufficient evidence for me to find

22  that ...

23          To support a finding that the defendant committed the

24  other acts.  Now that is for the two owners, Mario and Miguel,

25  and the two employees, which is Salvador and Jose Mendez.

1          Now, as far as whether this now means that the evidence

2    about the civil case is admissible depends on what part of the

3    civil case is relevant and probative, and I'm not clear on what

4    part of it is.

5          MR. GREEN:  All of it.

6          THE COURT:  So I'm thinking not all of it.  I heard

7    someone say "all of it."  I don't see how that could possibly be

8    true.  Not all of it.  But in regards to Connor being involved

9    in that civil case, I don't know what -- I understand there was

10   a default, but I don't know what his knowledge was and whether

11   he's making -- I guess I'm not going to feed you information,

12   but -- so that's my question, is what is the probative value of

13   the civil case?  What parts of the civil case do you want to

14   introduce and through which witness?  I'm guessing it's Kern and

15   Connor because that's what I think I recall you mentioning

16   previously.  But so I'll need some more information on that so

17   you can chew on that during lunch.

18         Okay.  So let's go ahead and bring in the jury.

19         (Whereupon jury enters the courtroom at 11:16 a.m.)

20         THE COURT:  Everyone may be seated.  We're joined by

21   the jury.  And the Government may now call its next witness.

22         MR. ZYTNICK:  The Government calls Troy Sabby.

23         THE COURT:  Good morning, sir.  Come on in.  Please be

24   careful.

25         THE WITNESS:  Good morning, Your Honor.

—2:19-cr-00295-GMN-NJK—

1          THE COURT:  Please be careful with the wires.  Good

2    morning.  And you have two steps up and then come around the

3    corner and then two more steps.

4          COURTROOM ADMINISTRATOR:  Please remain standing and

5    raise your right hand.

6          TROY SABBY, having duly been sworn, was examined and

7    testified as follows:

8          COURTROOM ADMINISTRATOR:  Thank you.  Please take a

9    seat.  And then please state and spell your name for the record.

10          THE WITNESS:  My name's Troy, T-R-O-Y, Sabby,

11    S-A-B-B-Y.

12          COURTROOM ADMINISTRATOR:  Thank you.

13                    DIRECT EXAMINATION OF TROY SABBY

14    BY MR. ZYTNICK:

15    *Q.*  Good morning, Mr. Sabby.

16    **A.**  Good morning.

17    *Q.*  Where did you spend most of your career?

18    **A.**  I spent all of my career in Minnesota.

19    *Q.*  And what were you doing during your career?

20    **A.**  Uhm.  I was originally a 13 postal inspector, and I worked

21    mail theft and drugs through the mail.  In my last five years, I

22    was a team leader which is you're in charge of a team.

23    *Q.*  How long did you serve as a postal inspector?

24    **A.**  Almost 27 years.

25    *Q.*  Are you still a postal inspector?

2:19-cr-00295-GMN-NJK

1   A.  No.  I retired March of 2020, right around when the pandemic

2   hit.

3   Q.  Are you doing any work now?

4   A.  Just working on my golf game.  That's not going well.

5   Q.  I want you to think about to February 21st, 2018.  Were you

6   in Las Vegas that day?

7   A.  I was.

8   Q.  Were there a number of postal inspectors in Las Vegas that

9   day?

10  A.  Quite a few, actually, yes.

11  Q.  What was going on that day?

12  A.  There was seven or eight search warrants that were going to

13  be served for a case.

14  Q.  Were you involved in one of those search warrants?

15  A.  I was.

16  Q.  Whose house were you doing a search warrant at?

17  A.  I had Patti Kern's house, which was in Henderson, I believe.

18  Q.  What was your role in connection with that search warrant?

19  A.  I was a site leader there.

20  Q.  At Patti Kern's house, did you and your team find any white

21  envelopes?

22  A.  Yes.

23  Q.  Did those envelopes have anything written on the outside?

24  A.  Yes.

25  Q.  Just, generally, what type of thing was written on the

--------------------------------2:19-cr-00295-GMN-NJK--------------------------------

1   outside?

2   **A.**   Names.

3   Q.   Like people's names or company's names?

4   **A.**   People's names.

5   Q.   When the postal inspectors found those envelopes, were they

6   sealed or unsealed?

7   **A.**   They were sealed.

8   Q.   Did your team open the envelopes?

9   **A.**   Yes.

10   Q.   Can you tell the jury what was in those envelopes?

11   **A.**   Not exactly, other than it was money.  I don't know how

12   much.

13   Q.   All right.  But I'm not asking how much.  But it was, like,

14   what kind of money?  Like, checks?  Cash?

15   **A.**   Cash.

16   Q.   Did -- did someone on your team take photographs at

17   Ms. Kern's house?

18   **A.**   Yes.

19   Q.   Is that a normal process at a search warrant?

20   **A.**   That is.  That's standard process.  We take pictures before

21   we start the search and we take pictures after.  Then we take

22   pictures of the evidence that we find.

23   Q.   Have you reviewed the photos from that day's search warrant?

24   **A.**   Yes.

25           MR. ZYTNICK:  Can we please show the witness Exhibits

───2:19-cr-00295-GMN-NJK───

1  84 to 88.

2  BY MR. ZYTNICK:

3  *Q.*  And, Mr. Sabby, I want you to take a brief look at each one

4  of these.

5        Retired Inspector Sabby, are those from Ms. Kern's

6  house on the day of the search warrant?

7  *A.*  Yes, they are.

8  *Q.*  Do these photos fairly and accurately represent things that

9  were at Ms. Kern's house that day?

10  *A.*  Yes.

11        MR. ZYTNICK:  Move to admit 84 through 88, Your Honor.

12        THE COURT:  Any objection?

13        MR. TOMSHECK:  No objection.

14        MR. ZYTNICK:  I'd like to publish Exhibit 85 --

15        THE COURT:  Just a minute.  Let me hear from all of the

16  defendants.

17        MR. ZYTNICK:  I'm sorry, Your Honor.

18        THE COURT:  Mr. Gaffney, any objection?

19        MR. GAFFNEY:  No, Your Honor.  No objection.

20        MR. BROWN:  Will Brown, no objection from Mr. Mendez.

21        MR. GREEN:  No objection on behalf Mr. Salvador --

22  Salvador Castro.  Thank you.

23        THE COURT:  So Exhibit, is it, 84 and 85?

24        MR. ZYTNICK:  84, 85, 86, and 87 and 88.

25        THE COURT:  84 through 88 are admitted and may be

—2:19-cr-00295-GMN-NJK—

1  published to the jury.

2          (Government's Exhibits 84 through 88 are admitted.)

3          MR. ZYTNICK:  Thank you, Your Honor.

4  BY MR. ZYTNICK:

5  Q.  So we're going to start with Exhibit 85.  Can you tell us

6  what this is a picture of.

7          MR. ZYTNICK:  And, Ms. Mallory, if you can zoom in a

8  little bit.  Thank you.

9          THE WITNESS:  Yes, those are the envelops you spoke of

10  earlier that were found that contained the cash.

11  BY MR. ZYTNICK:

12  Q.  So what are the names on the outside of these envelopes?

13  Can you read those?

14  A.  I can.  Jose Luis, Miguel, Epi.

15  Q.  Okay.  And then let's go to Exhibit 86.  What are we looking

16  at in Exhibit 86?

17  A.  That's after they were tore open.

18  Q.  So that's the cash that was inside?

19  A.  Right.  Yes.

20  Q.  Okay.

21          MR. ZYTNICK:  Let's go to Exhibit 87, please.

22  BY MR. ZYTNICK:

23  Q.  And what is this that we're looking at?

24  A.  That says Mario on it.

25  Q.  And is that another envelope?

—2:19-cr-00295-GMN-NJK—

1   *A.*  One of the envelopes, correct.

2          MR. ZYTNICK:  And can we go to Exhibit 88, please.

3   BY MR. ZYTNICK:

4   *Q.*  What are we looking at in Exhibit 88?

5   *A.*  That's after it was tore open.

6   *Q.*  And what's inside of this torn-open envelope?

7   *A.*  The cash.  The cash.

8   *Q.*  So just to make clear, how many envelopes total?

9   *A.*  I believe there's four.

10  *Q.*  Right.  And the names on them were Mario, Jose Luis --

11  sorry -- Miguel, and Epi.  Is that correct?

12  *A.*  Yeah.  Jose Luis, yeah.

13  *Q.*  And just because there was no envelope that had the name

14  Salvador on it.  Is that correct?

15  *A.*  No.  That is correct.

16          MR. ZYTNICK:  Let's go to Exhibit 84, please.

17  BY MR. ZYTNICK:

18  *Q.*  Can you tell us what we're looking at in this exhibit?

19  *A.*  Two Post-It notes.

20  *Q.*  And if we can zoom in on the one on the left.  Are you able

21  to read what that Post-It note says?

22  *A.*  It says:  "Angeles Castro make Salvador's checks out to."

23  *Q.*  All right.  In addition to taking photographs at Ms. Kern's

24  house, did inspectors also seize documentary evidence?

25  *A.*  Yes.

—2:19-cr-00295-GMN-NJK—

1    *Q.*  Was that evidence logged in some way?

2    **A.**  Yes.  Inspection Service has an evidence program that while

3    you're doing the search you can -- when you find an item you can

4    enter it in that gets into our system.

5    *Q.*  What is the result of entering the evidence items into the

6    system?

7    **A.**  What's the result of it?

8    *Q.*  Yeah.

9    **A.**  At the end of the day we have a list of everything that

10   they're going to seize.

11   *Q.*  Okay.  Have you reviewed -- well, is that list sometimes

12   called an inventory?  Is that list sometimes referred to as an

13   inventory?

14   **A.**  Yes, same.

15   *Q.*  Have you reviewed that inventory to prepare for your

16   testimony today?

17   **A.**  Yes, I looked at it.

18          MR. ZYTNICK:  I'd like the show the witness Exhibits 90

19   through 93, please.

20          And then if we can also show the witness exhibits 96

21   and 97, please.

22   BY MR. ZYTNICK:

23   *Q.*  Retired Inspector Sabby, are these all documents that were

24   found at Ms. Kern's house?

25   **A.**  Yes.

―2:19-cr-00295-GMN-NJK―

1          MR. ZYTNICK:  Your Honor, move to admit 90 through 93

2    and 96 and 97.

3          THE COURT:  Any objection to Exhibit 90 through 93 and

4    96 and 97?

5          MR. TANASI:  No objection from Mario Castro.

6          MR. GAFFNEY:  No objection from Miguel Castro.

7          MR. BROWN:  No objection from Jose Luis Mendez.

8          MR. GREEN:  No objection as far as Salvador Castro is

9    concerned, Your Honor.

10         THE COURT:  All right.  So Exhibit 90 through 93 and 96

11   and 97 are admitted and may be published to the jury.

12         (Government's Exhibit 90 through 93 and 96 and 97 are

13   admitted.)

14         MR. ZYTNICK:  Thank you.  And let's start with Exhibit

15   90, Page 3.

16   BY MR. ZYTNICK:

17   Q.  I'm just going to ask you a handful of questions about some

18   of these documents.  Can you tell us what we're looking at in

19   Exhibit 90, Page 3?

20   A.  Yeah, that's a CMRA application that needs to be filled out

21   when a box is going to be opened at a -- CMRA is like a UPS

22   store, a FedEx store.  It's something other than an actual post

23   office.

24   Q.  Who is the applicant listed -- or let me ask it a different

25   way.  Does this form list an applicant?

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

2:19-cr-00295-GMN-NJK

1   **A.**   Yes.

2   *Q.*   Who is the applicant listed on this form?

3   **A.**   Salvador Castro.

4   *Q.*   Does this form have a signature?

5   **A.**   Yes.

6   *Q.*   Who does that signature appear to be just --

7   **A.**   S. Castro.

8   *Q.*   Okay.  Is there a notarization stamp on this document?

9   **A.**   Yes.

10  *Q.*   In general, can you just explain to the jury what does it

11  mean for something to be notarized?

12  **A.**   What does?

13  *Q.*   What does it mean for something to be notarized?

14  **A.**   Oh.  It makes it -- you have a witness and it makes it a

15  legal document, I guess.

16  *Q.*   Do notaries generally require that someone, you know, prove

17  their identity before they can notarize a document?

18  **A.**   Yeah, they do.

19  *Q.*   What is the name of the company that is going to use the

20  mailbox on this form?

21  **A.**   Imperial Award Services.

22  *Q.*   And does this form show where the location of the mailbox

23  rental company is?

24  **A.**   Yes.

25  *Q.*   Is that mailbox rental company in Nevada?

1  *A.*  No.

2  *Q.*  Where is it?

3  *A.*  North Little Rock, Arkansas.

4         MR. ZYTNICK:  And if we can go up to Page 1 of this

5  document.  And if we could zoom in on that.  I don't know if we

6  can also rotate it 90 degrees clockwise.

7         THE WITNESS:  I can turn my head I guess.

8         MR. ZYTNICK:  Oh, there we go.

9  BY MR. ZYTNICK:

10  *Q.*  Can you tell the jury what this document is?

11  *A.*  Yeah, it's a Nevada driver's license in the name of Castro

12  Salvador.

13         MR. ZYTNICK:  Let's go to Exhibit 92 on Page 2.

14  BY MR. ZYTNICK:

15  *Q.*  So can you tell us who -- well, what type of document does

16  this appear to be?

17  *A.*  This appears just to be an e-mail.

18  *Q.*  Who is the e-mail from and to?

19  *A.*  Betsy Spider and it's to a Tom Weedman.

20  *Q.*  Do you know who either of those people are?

21  *A.*  No.

22  *Q.*  Whose name and address do you see in the e-mail?

23  *A.*  Salvador Castro.  And it's an address in Las Vegas.

24  *Q.*  And then can you please read the sentence above Salvador

25  Castro's name?

1  **A.**  Yes.  "Here is the new ship too [sic] address.  Remember to

2  mark as not needing a signature."

3          MR. ZYTNICK:  Let's go down to Page 13.

4  BY MR. ZYTNICK:

5  *Q.*  Is this another of those mailbox rental forms that we were

6  talking about earlier?

7  **A.**  Right.  Postal Form 1583, yes.

8  *Q.*  What is the name of the place where this mailbox is being

9  rented?

10  **A.**  Secured Data Service, Inc.

11  *Q.*  To clarify, my question was the name of the place, where the

12  mailbox is being rented?

13  **A.**  Oh, where is it?  Sorry.  North Little Rock, Arkansas.

14  *Q.*  And what's the name of the store where that North Little

15  Rock, Arkansas, location is?

16  **A.**  Mail Boxes, Etc.

17  *Q.*  And you mentioned Secure Data Services, Inc.  Is that the

18  name of the applicant or the company applying for this mailbox?

19  **A.**  Yes.

20  *Q.*  Who is the person listed as the applicant on this form?

21  **A.**  Claudia E. Castro.

22  *Q.*  And if we turn to the next page, Page 14, can you tell us

23  what this document or page appears to be?

24  **A.**  This is something that a notary public, you know, gave their

25  approval to and had a witness for.

—2:19-cr-00295-GMN-NJK—

1   Q.  All right.

2          MR. ZYTNICK:  Let's go to Exhibit 93, Page 5.

3   BY MR. ZYTNICK:

4   Q.  Can you tell us what we're looking at here?

5   A.  What was the question on that one?

6   Q.  I'm sorry.  Can you tell us what we're looking at with this

7   page?

8   A.  It's another of the PS Form 1583, application for a CMRA.

9   Q.  Who is the applicant on this form?

10  A.  Salvador Castro.

11  Q.  Is this application signed?

12  A.  Yes.

13  Q.  Is there a notary stamp on this page?

14  A.  Yes.

15  Q.  What's the name of the company that's going to use this

16  mailbox?

17  A.  Imperial Award Services.

18  Q.  And I believe you testified about -- you know, when we were

19  looking at Exhibit 90, that form was for a mailbox rental in

20  North Little Rock, Arkansas.  Do you remember that?

21  A.  Yes.  North Little Rock, yes.

22  Q.  Can you tell the jury where this mailbox rental form is for?

23  Where the location of the mailbox rental place is?

24  A.  Congers, New York.

25          MR. ZYTNICK:  Let's go to Exhibit 91.

2:19-cr-00295-GMN-NJK

1   BY MR. ZYTNICK:

2   Q.   Can you tell from this form if the company named Golden

3   Products Services is using a fictitious name at any point?

4   A.   Fictitious firm name, yes.

5   Q.   What fictitious name does Golden Products Service use,

6   according to this form?

7   A.   Can't read that.  MMI.

8   Q.   And who is listed as the president of the company on this

9   form?

10  A.   Salvador Castro.

11          MR. ZYTNICK:  Let's go to Exhibit 96, please, Page 5.

12  BY MR. ZYTNICK:

13  Q.   All right.  Another form.  Is that right?

14  A.   Correct.  Right.  Another PS Form 1583.

15  Q.   And are you familiar with these forms from your time as a

16  postal inspector?

17  A.   Yes.

18  Q.   What is the name of the company on this form?

19  A.   Assets Unlimited.

20  Q.   What is the name of the applicant renting the mailbox?

21  A.   Mario Castro.

22  Q.   Is this -- is there a signature on this form?

23  A.   There is.

24  Q.   Is there also a notary stamp on this form?

25  A.   Yes.

2:19-cr-00295-GMN-NJK

1  Q.  On the next page, if we can look at the top there, have you

2  seen pages like this before also?

3  A.  Yes.

4  Q.  In what capacity or how have you seen pages like this?

5  A.  When -- when I was working mail theft, a lot of times we'd

6  go -- or, actually, not even mail theft.  It would be drugs

7  through the mail.  We'd want to know who had a box because the

8  box would show up.  And, you know, we wanted to see who had the

9  box, and so we would go to the CMRAs and ask for the application

10  for that box.

11  Q.  And to be clear, there's no allegation of drugs in the mail

12  or mail theft here?

13  A.  No, but that's how I --

14  Q.  Yeah, yeah, yeah.  That was --

15  A.  -- that's the only time I ever was involved with them

16  because, you know, it's a postal form.  It's not a postal

17  inspector form.

18  Q.  Right.  Okay.

19         So, anyway, on the top of this document whose name do

20  we see associated with Assets Unlimited?

21  A.  Mario Castro, Jr.

22  Q.  Okay.  Can we go to Page 8 of this document.

23  A.  The date of it?

24  Q.  No, I'm sorry.  I said Page 8.

25  A.  Ah.  Page 8.

2:19-cr-00295-GMN-NJK

1  Q.  The question on this form is, who or what company is

2  applying for the mailbox on this form?

3  A.  Money Securities.

4  Q.  And who is the name of the person renting the mailbox?

5  A.  Mario Castro.

6  Q.  Is the form signed?

7  A.  Yes.

8  Q.  Is the form -- is there a notary stamp on the form?

9  A.  Yes.

10  Q.  On the next page, once again at the top, whose name do we

11  see above the words "Money Securities"?

12  A.  Mario Castro, Jr.

13  Q.  Let's go to Exhibit 97, Page 12.

14       On this form what is the name of the company that is

15  trying to rent the mailbox?

16  A.  Special Money Managers, Inc.

17  Q.  Can you tell us what the name of the applicant is on this

18  form?

19  A.  Jose Castro.

20  Q.  Is this form signed?

21  A.  Yes.

22  Q.  Is this form notarized?

23  A.  Yes.

24  Q.  Going down to Page 16, can you tell us what we're looking at

25  here?

2:19-cr-00295-GMN-NJK

1          MR. ZYTNICK:  And maybe zoom a little bit, please.

2          THE WITNESS:  I'd a say Nevada driver's license,

3    commercial driver's license, for a Castro Jose Silvestre.

4    BY MR. ZYTNICK:

5    Q.  All of these documents and all of this cash or the envelopes

6    with cash, whose house were these found in?

7    A.  Patti Kern's.

8          MR. ZYTNICK:  No further questions, Your Honor.

9          THE COURT:  Cross-exam, Mr. Tomsheck.

10         MR. TOMSHECK:  Thank you, Your Honor.

11                CROSS-EXAMINATION OF TROY SABBY

12   BY MR. TOMSHECK:

13   Q.  Good morning, sir.

14   A.  Good morning.

15   Q.  Minnesota, huh?

16   A.  Yeah.

17   Q.  Is that where you live now?

18   A.  I do.

19   Q.  Okay.  So you're here just to testify in this case, right?

20   A.  Yes.

21   Q.  You'd agree with me that your involvement in this case is

22   limited to a couple of days in early 2018, correct?

23   A.  Correct.

24   Q.  Specifically, you were the leader of a search warrant

25   execution at a residence identified to you as Patti Kern's home,

—2:19-cr-00295-GMN-NJK—

 1  right?

 2  *A.*  That's correct.

 3  *Q.*  As you sit here today, do you remember the address?

 4  *A.*  I remember Henderson, Nevada, and that's all I remember.

 5  *Q.*  Okay.  Do you remember well enough to talk to us about what

 6  you did in preparation for the execution of that search warrant?

 7  *A.*  I have some general things I can tell you, yes.

 8  *Q.*  Okay.

 9  *A.*  That I remember.

10  *Q.*  Okay.  For instance, let me ask you this.  Are you familiar

11  with the name Patti Kern other than you were at her house?

12  *A.*  No.

13  *Q.*  Are you aware that she was the principal target of that

14  search warrant?

15  *A.*  I might have been back then, but ...

16  *Q.*  Does the name Kern Syndicate mean anything to you?

17          (Court reporter clarification.)

18          MR. TOMSHECK:  He said no.

19  BY MR. TOMSHECK:

20  *Q.*  You'd agree you said no to that question?

21  *A.*  No.  Yes.  No.  Yes, I said no.  I'm sorry.

22          THE COURT:  Why don't you go ask the question again.

23  Go ahead and ask the question again.  Please speak up, sir.  So

24  you can all hear.  In fact, do you see the lady up there sitting

25  in the back with the black sweater and the white dress?

———2:19-cr-00295-GMN-NJK———

1          THE WITNESS:  Yeah.

2          THE COURT:  If you project your voice towards her, then

3  everybody will be able to hear you.

4          THE WITNESS:  Okay.  I can do that, Your Honor.

5          THE COURT:  Thank you very much.

6  BY MR. TOMSHECK:

7  *Q.*  So as you're probably aware, everything I say and everything

8  you say is getting typed down by this nice young lady here.  So

9  we got to speak loud and not talk over each other.  Okay?

10  *A.*  Okay.

11  *Q.*  All right.  So are you familiar with the term Kern

12  Syndicate?

13  *A.*  I am not.

14  *Q.*  Okay.  Would you have reviewed the search warrant

15  application prior to the execution of this search warrant

16  document?

17  *A.*  Yes.

18  *Q.*  Do you know who wrote it?

19  *A.*  I don't.

20  *Q.*  Okay.  Have you ever drafted an application for a search

21  warrant?

22  *A.*  Yes.

23  *Q.*  When you draft an application for a search warrant, there's

24  a target, an individual or a location related to that search

25  warrant, right?

2:19-cr-00295-GMN-NJK

1   *A.*  Correct.

2   *Q.*  And you would identify that person in the search warrant.

3   *A.*  Yes.

4   *Q.*  And in that application you would include the information

5   you have about that person.

6   *A.*  Yes.

7   *Q.*  And you were aware that when you were asked to execute a

8   search warrant back in February of 2018, you were part of a much

9   larger investigation.

10  *A.*  That's correct.

11  *Q.*  Okay.  Your involvement was fairly limited that day, right?

12  *A.*  Yes.

13  *Q.*  Okay.  Were you in charge of the search of the residence in

14  Henderson, Nevada?

15  *A.*  Yes, as a site leader you are in charge.  You have certain

16  roles that you do.

17  *Q.*  Okay.  Do you remember what yours were in this case?

18  *A.*  Yes.  As a site leader, probably the number one thing is you

19  stay in communication with the agents whose case it is, because

20  questions come up or if there's any issues or problems that

21  come, you need to talk to them.  The other main thing is the

22  inventory of the evidence and what's found.

23          THE COURT:  Okay.  I'm going to stop you there

24  Mr. Tomsheck, because I just received notification the jury's

25  food is here and it's hot food.  So I can't delay because we

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

—————2:19-cr-00295-GMN-NJK—————

1  only have two microwaves and it won't work out.

2       So we're going to go ahead and let the jury break for

3  their lunch.  Please remember you are not to discuss this case

4  with anyone nor permit anyone to discuss it with you.  Do not

5  read or listen to or view anything that touches upon the case in

6  any way.  Do not perform any research or independent

7  investigation, and please do not form an opinion.

8       It's 11:40, so we'll plan to be back here by 12:15.

9       Mr. Sabby, after the jury exits, you may also step

10  down, stretch, have some lunch, use the rest room.  We need you

11  back here by 12:15.  Please remember during this break you're

12  not permitted to talk to the attorneys about the case or your

13  testimony.  You can talk to them about where am I supposed to

14  eat and things like that, that's fine, but don't talk to them

15  about this case at all yet.

16       THE WITNESS:  Yes, Your Honor.

17       (Whereupon jury leaves the courtroom at 11:41 a.m.)

18       THE COURT:  All right.  We're still on the record

19  outside the presence of the jury.  I just need to put this on

20  the record for our court reporter.  We did -- I did sign on

21  September 25th of 2022 three stipulations for evidence that has

22  been stipulated to as being authentic, so in Stipulation Number

23  539 on the docket.  And it was in regards to Exhibits 101

24  through 118, that they are true and correct authentic copies.

25       Stipulation Number 538 is for Exhibits 214 and 215 as

—2:19-cr-00295-GMN-NJK—

1  well as 212 and 213 and 218 through 221 as well as 203 and

2  207 -- sorry.  I said those out of order -- as well as Exhibit

3  150 through 152, 154 through 156, 161 through 180, and 181

4  through 203 as well as 207.  I hope I said that right.  And

5  those are true and correct, authentic copies.

6          Now, as to Stipulation Number 537, these exhibits are

7  stipulated to be true and correct, but also admissible:  Exhibit

8  5001 through 5009, 5018 through 5023, and then Exhibit Number

9  5027 and 5030.

10          Okay.  All right.  So be back here at 12:15.

11          MR. TANASI:  Thank you, Your Honor.

12          MR. GAFFNEY:  Thank you, Your Honor.

13          MR. ZYTNICK:  Thank you, Your Honor.

14          THE COURT:  Thank you.

15          (Recess taken at 11:44 a.m.)

16

17

18

19

20

21

22

23

24

25

```
                    ─2:19-cr-00295-GMN-NJK─
 1
 2                          --oOo--
 3               COURT REPORTER'S CERTIFICATE
 4
 5       I, PATRICIA L. GANCI, Official Court Reporter, United
 6  States District Court, District of Nevada, Las Vegas, Nevada,
 7  certify that the foregoing is a correct transcript from the
 8  record of proceedings in the above-entitled matter.
 9
10  Date:  September 28, 2022.
11                              /s/ **Patricia L. Ganci**
12                              Patricia L. Ganci, RMR, CRR
13                              CCR #937
14
15
16
17
18
19
20
21
22
23
24
25
```