───── 2:19-cr-00295-GMN-NJK ─────

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,        )
                                     )  Case No. 2:19-cr-00295-GMN-NJK
5              Plaintiff,            )
                                     )  Las Vegas, Nevada
6          vs.                       )  March 23, 2023
                                     )  12:51 p.m. to 4:05 p.m.
7   MARIO CASTRO, SALVADOR           )  Courtroom 7D
    CASTRO, MIGUEL CASTRO, and       )
8   JOSE LUIS MENDEZ,                )  JURY TRIAL, DAY 4, PM SESSION
                                     )
9              Defendants.           )  **C E R T I F I E D   C O P Y**
                                     )
10  _____ )

11

12

13

14       REPORTER'S TRANSCRIPT OF JURY TRIAL, DAY 4, PM SESSION
              BEFORE THE HONORABLE GLORIA M. NAVARRO,
15                 UNITED STATES DISTRICT JUDGE

16

17

18   APPEARANCES:        See next page

19

20

21

22   COURT REPORTER:     Samantha N. McNett, RPR, CRR, CCR, CSR
                         United States District Court
23                       333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada  89101
24                       Samantha_McNett@nvd.uscourts.gov

25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.

```
                    ── 2:19-cr-00295-GMN-NJK ──
```

1                              __APPEARANCES__

2    For the Government:

3         **TIMOTHY T. FINLEY  ESQ.**
          **DANIEL E. ZYTNICK, ESQ.**
4         U.S. DEPARTMENT OF JUSTICE
          950 Pennsylvania Avenue, N.W.
5         Washington, D.C. 20530
          202-307-0050
6
          -AND-
7
          **MINA CHANG, ESQ.**
8         UNITED STATES ATTORNEY'S OFFICE
          501 Las Vegas Boulevard South, Suite 1100
9         Las Vegas, Nevada 89101
          702-388-6336
10

11
     For Defendant Mario Castro:
12
          **JOSHUA L. TOMSHECK, ESQ.**
13        HOFLAND & TOMSHECK
          228 South Fourth Street, First Floor
14        Las Vegas, Nevada 89101
          702-895-6760
15
          -AND-
16
          **RICHARD E. TANASI, ESQ.**
17        TANASI LAW OFFICES
          8716 Spanish Ridge Avenue, Suite 105
18        Las Vegas, Nevada 89148
          702-906-2411
19

20
     For Defendant Salvador Castro:
21
          **DONALD GREEN, ESQ.**
22        LAW OFFICES OF DONALD J. GREEN
          4760 South Pecos Road, Suite 103
23        Las Vegas, Nevada 89121
          702-388-2047
24
     ///
25
     ///
```

2:19-cr-00295-GMN-NJK

1                    **APPEARANCES CONTINUED**

2

For Defendant Miguel Castro:

3
        **LUCAS J. GAFFNEY, ESQ.**
4       GAFFNEY LAW
        9900 Covington Cross Drive, Suite 290
5       Las Vegas, Nevada 89144
        702-742-2055
6
        -AND-
7
        **THOMAS A. ERICSSON, ESQ.**
8       THOMAS A. ERICSSON, CHTD.
        9900 Covington Cross Drive, Suite 290
9       Las Vegas, Nevada 89144
        702-878-2889
10

11

For Defendant Jose Luis Mendez:

12
        **WILLIAM H. BROWN, ESQ.**
13      **CHRISTOPHER MISHLER, ESQ.**
        BROWN MISHLER, PLLC
14      911 North Buffalo Drive, Suite 202
        Las Vegas, Nevada 89128
15

16                              *  *  *

17

18

19

20

21

22

23

24

25

— 2:19-cr-00295-GMN-NJK —

1  <u>**INDEX OF EXAMINATIONS**</u>

2  **TESTIMONY OF TROY SABBY**

Cross-Examination by Mr. Ericsson...................13
3  Cross-Examination by Mr. Green......................27
Redirect Examination by Mr. Zytnick.................51
4  Recross-Examination by Mr. Tomsheck................61
Recross-Examination by Mr. Mishler..................63
5  Further Redirect Examination by Mr. Zytnick........84
Further Recross-Examination by Mr. Mishler.........85
6  Further Recross-Examination by Mr. Tomsheck........95
Further Recross-Examination by Mr. Green...........106

7  **TESTIMONY OF PATTI KERN**

8  Direct Examination by Mr. Finley...................109

9                          * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **INDEX OF EXHIBITS**

2    GOVERNMENT EXHIBITS

3    EXHIBIT NO.:                OFFERED    ADMITTED    WITHDRAWN

4    (No exhibits offered or admitted.)

5
     DEFENDANT EXHIBITS
6
     EXHIBIT NO.:                OFFERED    ADMITTED    WITHDRAWN
7
     9040............................12          12          --
8    9041............................12          12          --

9
                           *  *  *
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2:19-cr-00295-GMN-NJK

1      LAS VEGAS, NEVADA; THURSDAY, MARCH 23, 2023; 12:51 P.M.

2                              --oOo--

3                   P R O C E E D I N G S

4           THE COURT:  So we wanted to talk about something

5    that's coming up next or soon?

6           MR. FINLEY:  Thank you.  It's -- it's just an issue

7    that I would like to get out ahead of because if we don't bring

8    it up in advance, it has the potential to derail the trial and

9    cause a delay of a day or two.

10          So there's, obviously, a lot of questions about

11   handcuffs.  We've been thinking about who the defense might

12   call to put in that evidence that would support all of the

13   suggestions and representations that have been made about

14   handcuffs.  And as far as we can tell -- and the defendants

15   didn't tell me I'm wrong about this -- the only person on the

16   witness list who could testify about this is Maria P. Castro,

17   Mr. Mendez's wife.  Of course, Mr. Mendez could testify about

18   it, as well.  So those are the two possibilities.

19          What I'm raising is the fact that Maria P. Castro

20   needs counsel if she's going to testify.  And I think the

21   defendants -- I'm not positive, but they seem to agree with me

22   on that, or at least agree that that's a fair point.

23          I don't know -- maybe it's obvious enough that I don't

24   have to explain why, but I -- maybe briefly just to put it on

25   the record.  She was getting a lot of these profit payment

—— 2:19-cr-00295-GMN-NJK ——

1    checks that were intended for Jose Mendez.  The profit payment

2    checks would come into Digital Express for a time and Digital

3    Express would turn around and cut a check to Maria P. Castro

4    for -- intended for Jose Mendez.  And so she was in -- she's,

5    you know, literally profiting from the scheme.

6              And of course, just so your Honor is aware, this

7    conduct is outside the statute of limitations.  So I don't want

8    to overstate anything.

9              However, she's going to be asked a lot of questions

10   about her day-to-day relationship with her husband.  She has to

11   know that she's going to have to waive her spousal privilege so

12   we can ask about that.  The privilege can't be used as a sword

13   and a shield.

14             And she also needs to know about the risks she would

15   face because, in the Government's view, she faces a HOBest

16   (CHECK) choice of either lying or incriminating her husband.

17             So that's somebody that somebody needs counsel for in

18   my opinion.  And in my opinion, I'm ethically obligated to

19   raise that.

20             Thank you, your Honor.

21             So if that -- I would just ask that counsel be

22   appointed right now so that we don't have a delay later on

23   while we wait for all that to play out.

24             Thank you.

25             THE COURT:  Thank you.

1          All right.  Well, we -- we have a different office now

2     that appoints counsel for individuals who cannot afford an

3     attorney.  I don't know whether she can afford one.  I'm

4     assuming that she cannot because her husband has CJA counsel

5     appointed.

6          But if -- so if that does come up, if the defense does

7     believe that it would be helpful even for her to decide whether

8     or not she wants to testify, whether you all think that that

9     would be appropriate, we can contact Kim Driggers at the CJA

10    defense office, the budgeting office -- I've forgot what they

11    call it now, but we can give her a call so that she can start

12    looking for someone who doesn't have a conflict with this case.

13    I don't know how difficult that would be.

14         I know that Judge Mahan had part of the -- the bigger

15    part of this case.  So I don't know who the attorneys were on

16    those other, you know, cases that are related somehow to this.

17    I don't know how -- how many -- how difficult it would be to

18    find someone spur of the moment.  So please don't wait until

19    the day of.  I realize the defense case is still down the road.

20         But if you do want to even just have a -- someone

21    appointed for a consultation with her, that's fine, too.

22         I'm willing to sign anything I have to.  My

23    understanding is I don't have to sign anything anymore, but

24    sometimes it helps her to know that I'm on board so that it

25    gets done quicker and maybe leapfrogs over some other work that

1    she's doing.  I'm happy to do that as well if you want me to

2    e-mail her to let her know that I agreed that this is

3    important.  So just consider that.

4              MR. BROWN:  Yeah, can I just respond to what the

5    Government said?

6              THE COURT:  Yeah.

7              MR. BROWN:  Number one, we don't have to call a

8    witness to offer testimony about being handcuffed.  We had a

9    good faith basis to ask all of those questions.  We don't have

10   to call a witness to follow up with those questions.

11             Number two, Patti Kern can explain the checks that the

12   Government's referenced.

13             And number three, we don't have to get into the

14   day-to-day lives and the -- the inner workings of their

15   marriage.  We could call Ms. Castro, if we choose to, for a

16   very specific, very limited purpose.  For example, we could

17   say, "How long were you handcuffed at this search?"  And of

18   course, we would want the Court's blessing with this, but any

19   questions outside of that specific area, "How long were you

20   handcuffed," would be outside the scope.

21             So -- and additionally, statute of limitations has

22   run.

23             THE COURT:  So they would be outside the scope of

24   cross-examination, but then they could call her in rebuttal and

25   then ask her different questions.

—— 2:19-cr-00295-GMN-NJK ——

1          So I think it's still kind of -- I think that's the
2    point that it --
3          MR. FINLEY:  I agree with all that, your, Honor.
4          But I'd also mention that in cross-examination, of
5    course, we get to examine about credibility and bias.  So how
6    could I not be permitted to ask questions about --
7          THE COURT:  The relationship.
8          MR. FINLEY:  -- the relationship and not wanting to
9    see her husband go to prison and all of the other things that
10   would relate to her credibility and bias.  I think we get broad
11   leeway on that so we wouldn't be -- you know, they don't get to
12   put in what they want and we're just handcuffed and we can't
13   even ask legitimate questions about bias and credibility.
14   That's not the case.
15         MR. BROWN:  Yeah, I --
16         THE COURT:  Did you mean the pun or it was --
17         MR. FINLEY:  Tell me what it was.  I didn't even
18   realize, so obviously didn't mean it.
19         THE COURT:  You said you were handcuffed, that they
20   can't handcuff you.
21         MR. FINLEY:  Yes.  Obviously, no pun intended.  My
22   goodness.
23         MR. BROWN:  I'll --
24         THE COURT:  Oh.  I'm not going to make any decisions
25   now about evidence and the breadth of what questions can or

1  cannot be asked and so forth if we don't even know if she's

2  going to be testifying.  So I'm not going to even bother to

3  waste the jury time about that now.

4          First, you all need to decide whether or not you want

5  her or anybody else that you decide that you want to call that

6  we haven't even thought of yet that might be incriminating

7  themselves regardless whether there's statute of limitations

8  applies or not.

9          If you do want to have counsel appointed for her, my

10 understanding is that you just go straight to the -- the

11 resource counsel office and -- and have that done.  But if you

12 do need me to issue an e-mail to her to say, yes, we're in

13 trial, yes, it's fluid, yes, if the defense wants counsel

14 appointed to someone, please do that --

15         MR. BROWN:  I would --

16         THE COURT:  -- sooner than letter.

17         MR. BROWN:  I would probably loop in your chambers

18 through Nick on an e-mail if I were to do that just to expedite

19 it.

20         THE COURT:  I didn't -- I missed this.

21         MR. BROWN:  I said if we were to do that, I would

22 probably loop your chambers in through an e-mail through Nick

23 to the CJA counsel just to expedite that process.

24         THE COURT:  Yeah, use the GMN Chambers e-mail or

25 Nick's e-mail is the e-mail.

1          MR. BROWN:  Perfect.  Thank you.

2          THE COURT:  Yeah.

3          MR. FINLEY:  Thank you, Judge.

4          THE COURT:  Sure.  All right.  So can we call the jury

5   in now?

6          MR. MISHLER:  Your Honor, one quick matter.

7          THE COURT:  Yes.

8          MR. MISHLER:  I believe the Government has had a

9   chance to see two additional exhibits that Mr. Mendez would

10  like to pre-admit, 9040 and 9041.

11          And my understanding is they've seen them and have no

12  objection to those?

13          So we'd ask that they be pre-admitted.

14          (Defense Exhibits 9040 and 9041 offered.)

15          MR. ZYTNICK:  That's correct, your Honor.

16          THE COURT:  Okay.  Thank you.

17          MR. MISHLER:  Thank you, your Honor.

18          (Defense Exhibits 9040 and 9041 admitted.)

19          THE COURT:  All right.  Let's go ahead and bring in

20  the jury.

21          (Whereupon, the jury enters at 1:03 p.m.)

22          THE COURT:  All right.  Everyone may be seated.

23  Welcome back from lunch.

24          We have the jury here, counsel's all here, and we have

25  the witness, Mr. Troy Sabby, is also here.  So now we're going

1    to continue with cross-examination.

2            Mr. Ericsson?

3            MR. ERICSSON:  Thank you, your Honor.

4                        CROSS-EXAMINATION

5    BY MR. ERICSSON:

6    Q.  Good afternoon, sir.

7    A.  Good afternoon.

8    Q.  I'm going to start by asking for an exhibit to be brought

9    up.  It should be, I think, Government's Exhibit 85.

10            Is that showing on your monitor there?

11   A.  Yes.

12   Q.  So earlier you were asked by the prosecution about these

13   envelopes, correct?

14   A.  Correct.

15   Q.  And you recognize those as envelopes that were found and

16   seized at the location you served that search warrant on?

17   A.  That's correct.

18            MR. ERICSSON:  Can we go to 86, please?

19   BY MR. ERICSSON:

20   Q.  And is 86 the opened envelopes that were shown in 85?

21   A.  Yes.

22   Q.  Okay.  Did you count the amount of money in each of those

23   envelopes?

24   A.  I know we counted it.  I don't know how it's listed on the

25   inventory, but we counted it.

1   Q.  So -- and that's what my question focuses on because there

2   were -- in the inventory of cash, there were lots of

3   designations of amounts of cash, correct?

4   A.  There are; you're correct.

5   Q.  Do you know, as you testify here today, whether or not you

6   specifically delineated the amount of cash in each of these

7   envelopes?

8   A.  You know, I don't recall.  I don't -- if I saw the

9   inventory, maybe I could show.  If -- I don't know if it's

10  listed in the inventory like that.

11  Q.  Okay.  And that's fair.

12          Let me bring that up.  It won't be shown up here but

13  something that we can show to you.

14  A.  Okay.

15  Q.  And when that comes up --

16  A.  Yes.

17  Q.  -- if you can, yeah, let us know when you're ready to go to

18  the next page.

19  A.  Will do.

20  Q.  It's a multiple page document.

21  A.  Okay.

22          Next page.

23          Next page.

24          Next page.

25          Next page.

—— 2:19-cr-00295-GMN-NJK ——

1          Next page.

2          Next page.

3          Yeah, I don't recall.

4    Q.  Okay.  And is it accurate to say in reviewing that list of

5    items that were seized, that does not indicate any breakdown

6    of --

7    A.  Yeah.

8    Q.  -- amount of money in envelopes, correct?

9    A.  That's correct.

10          MR. ERICSSON:  If we can go to Exhibit 9040, please.

11          And your Honor, this exhibit has been stipulated and,

12    I believe, admitted.

13          THE COURT:  Yes, 9040 and 9041 were both pre-admitted.

14    BY MR. ERICSSON:

15    Q.  So I'm just going to take you through these photos fairly

16    quickly.

17          Is this the outside front entrance to the house that

18    you served the search warrant on that day?

19    A.  Yes, I believe that is.

20    Q.  So that -- to your knowledge, that's the Kern residence?

21          (Court reporter interruption.)

22    A.  Correct.

23          MR. ERICSSON:  We can go to the next page, please.

24    BY MR. ERICSSON:

25    Q.  And I'm just going to have you go through -- see if you --

—2:19-cr-00295-GMN-NJK—

1   do you recognize this as one of the photographs that was taken

2   of items that were found at that location?

3   **A.**  That's correct.

4   Q.  And does that show a -- some type of box containing a large

5   amount of cash?

6   **A.**  Correct.

7           MR. ERICSSON:  Next page, please.

8   BY MR. ERICSSON:

9   Q.  Are you able to tell, is this -- was this taken inside a

10  larger vault, this photograph?

11  **A.**  If I recall, I think that was in a closet.

12  Q.  Okay.  And in the picture that we see there, there looks

13  like some type of cloth bag, correct?

14  **A.**  Correct.

15  Q.  And did you find -- is that cash that you found inside of

16  that bag?

17  **A.**  Yes.

18          MR. ERICSSON:  Next photograph, please.

19  BY MR. ERICSSON:

20  Q.  And what is depicted in this photograph?

21  **A.**  That's a bunch of mail right there in the bins.

22  Q.  And -- and do you also see a number of stamps there on the

23  left-hand side of that photograph?

24  **A.**  I do.

25  Q.  Do you know -- did you seize those stamps?

—— 2:19-cr-00295-GMN-NJK ——

1  *A.*  I'd have to look again on the inventory.  Sorry.  I don't

2  know.

3  *Q.*  Okay.

4  *A.*  I don't recall.

5          THE COURT:  By "stamps," you mean ink stamps, not mail

6  stamps?

7          MR. ERICSSON:  Yes.  Thank you, your Honor.

8  BY MR. ERICSSON:

9  *Q.*  For clarification, those look like some type of preprinted

10  ink stamp that you press down and they leave some type of --

11  *A.*  Ink stamps, yes.

12  *Q.*  Okay.

13          MR. ERICSSON:  Next photograph, please.

14  BY MR. ERICSSON:

15  *Q.*  What do you identify in this photograph?

16  *A.*  That was more cash that we found in bags.

17  *Q.*  And is it --

18  *A.*  It was in the office.

19  *Q.*  Okay.  And is it accurate to say that the cash that you

20  found at some point you ran through the cash counting machine,

21  correct?

22  *A.*  That's correct, yes.

23  *Q.*  So what's identified in this photograph here, you would

24  have counted that, correct?

25  *A.*  Correct.

2:19-cr-00295-GMN-NJK

1            MR. ERICSSON:  Next photograph, please.

2    BY MR. ERICSSON:

3    Q.   Do you recognize this photograph?

4    A.   I do.  That was the safe.

5    Q.   And is it --

6    A.   It was in the office, also.

7    Q.   Also in the office.

8            And is -- that's a large -- large amounts of cash

9    inside that --

10   A.   Correct.

11           MR. ERICSSON:  Next photograph, please.

12   BY MR. ERICSSON:

13   Q.   So the -- is this -- it looks like a similar type of bin,

14   but is this a -- from two or three photographs ago, is this a

15   different bin that has cash in it?

16   A.   That's correct, yes.

17   Q.   Okay.  And that --

18   A.   It does -- it does kind of look like the one from up, but

19   it's different.

20   Q.   So this is a different one?  Okay.

21           And again, this was found in the office?

22   A.   Yes.  Correct.

23           MR. ERICSSON:  Next photograph, please.

24   BY MR. ERICSSON:

25   Q.   What is shown here?

1  **A.**  Credit cards that were found in the office and money that

2  was found in the office.

3  Q.  Were you the one who laid these out for this photograph?

4  **A.**  Is there any way we can make that bigger?

5  Q.  Yes.

6  **A.**  I'm trying to recall.  I'm not sure -- it was a while ago.

7  But I'm not sure if that maybe was -- maybe on her person.

8  Q.  So --

9  **A.**  I can't say if that's, like, maybe her credit cards or --

10  Q.  Agent, would it help you to refresh your memory if we go

11  back to the inventory and have you look and see if you can

12  identify where these were taken from?

13  **A.**  Her name are on these credit cards.  I believe this is what

14  was on her person.

15  Q.  Okay.  So is your memory refreshed to the point where

16  you're -- you're clear that that's where this came from?

17  **A.**  I should probably look at the inventory again.

18  Q.  Okay.  Yeah.  Because I -- I want to be fair with you.  So

19  we'll --

20  **A.**  It's hard to read.

21  Q.  We'll pause this and we'll go back to the inventory just

22  for you to be...

23        Is that in front of you now?

24  **A.**  It is, yep.

25        Next page.

1          Okay.  That's it.  I'm sorry.  Can you go back to

2    the -- the previous one?  There.  Wait.  There.  That one.  I

3    believe that's the description up top.

4    Q.  Okay.  So -- so --

5    A.  Cards (unintelligible).

6          (Court reporter interruption.)

7    A.  I don't know what exhibit that is, but --

8    Q.  So Agent, let me explain something to you real quick if you

9    can look at me.

10   A.  Yeah.

11   Q.  So this document has not yet been introduced --

12   A.  Okay.

13   Q.  -- so the -- the jury's not looking at the document.

14   A.  Okay.

15   Q.  In looking at that, does that refresh your memory as to

16   where the items that were laid out with all the credit cards

17   were taken from?

18   A.  Yes, sir.

19   Q.  Okay.

20   A.  It's -- it was in the floor safe in the office.

21   Q.  It was in the safe?

22   A.  Yep.

23   Q.  The floor safe of the office?  Okay.  Thank you very much.

24          (Counsel conferring.)

25          MR. ERICSSON:  Your Honor, it's my understanding that

1    actually the document he's been looking at has been stipulated

2    by the parties, so we would ask that it be now shown to the --

3    to the jury so that they can see what he's looking at.

4              MR. ZYTNICK:  That's correct, your Honor.

5              THE COURT:  Is it identified by number?  Does it have

6    an identification tag on it yet?

7              MR. ZYTNICK:  It is.  It's Exhibit 241.

8              THE COURT:  241.

9              MR. ERICSSON:  241.

10             THE COURT:  All right.  Exhibit 241 is admitted and

11   may be published to the jury.

12   BY MR. ERICSSON:

13   Q.  So Agent, is this the page of that document that shows

14   where those items were inventoried?

15   **A.**  Yes.

16   Q.  And which part -- we'll highlight it.  Where?

17   **A.**  The top part -- one there.

18   Q.  Okay.  So --

19   **A.**  That --

20   Q.  -- that top entry there identifies --

21   **A.**  Correct.

22   Q.  -- the items that were laid out in that photograph that we

23   were looking at?

24   **A.**  Correct.

25   Q.  Okay.  And over on the right-hand side, you've got a

1  column, Recovered Location, correct?

2  A.  Correct.

3  Q.  And you have "Room R" identified.  Is that the office, Room

4  R?

5  A.  Correct.

6  Q.  Okay.

7          MR. ERICSSON:  If we can go back to Exhibit 940 --

8  9040.  Okay.

9          Next photograph, please.

10  BY MR. ERICSSON:

11  Q.  Agent, do you recognize that photograph?

12  A.  I do.

13  Q.  Is that yet another bin that you located in the office that

14  day?

15  A.  That is correct.  It's -- we kept finding them in those

16  different bags like that.

17  Q.  Okay.  And is it accurate to say that there was cash in

18  this bin, as well?

19  A.  Correct.

20          MR. ERICSSON:  Next photograph, please.

21  BY MR. ERICSSON:

22  Q.  And Agent, what -- what are we looking at here?

23  A.  That's the currency counter.

24  Q.  Okay.  So that is the machine that was found at that Kern

25  residence when you arrived there, correct?

1    **A.**  Correct.

2    *Q.*  And that is the machine that you used to count the

3    approximate $170,000 in cash, correct?

4    **A.**  Correct.

5            MR. ERICSSON:  If we can go to 9041.

6    BY MR. ERICSSON:

7    *Q.*  And Agent, before I ask questions about this photograph

8    here, did you ask to use that -- that cash counting machine?

9    **A.**  I don't recall.  She was very cooperative with us.  And

10   I -- I can't say if I did or not.

11   *Q.*  Okay.

12   **A.**  But...

13   *Q.*  All right.  Looking at the picture that's up now, this is

14   Exhibit 9041, do you recognize what's in this photograph?

15   **A.**  Yes.  Binders.

16   *Q.*  And do you know -- do you know what was inside these

17   binders?

18   **A.**  I don't.

19   *Q.*  I -- and I know this investigation was five years ago.

20          Do you know if you seized these binders as part of

21   what you took that day?

22   **A.**  Yes.

23   *Q.*  You did?  Okay.

24   **A.**  Yes.

25   *Q.*  And it looks like on these binders there are labels,

1    correct?

2    **A.**  Correct.

3    Q.  And there are different initials on the outside of these

4    binders, correct?

5    **A.**  Correct.

6         MR. ERICSSON:  Next photograph, please.

7    BY MR. ERICSSON:

8    Q.  What is depicted in this photograph?

9    **A.**  Some more binders that were seized.

10   Q.  Do you know if -- if in at least some of these binders

11   there were business checks?

12   **A.**  I don't.  I -- you know, those would have been reviewed by

13   the agents post the search warrant.

14   Q.  Okay.  If -- let's go back to Exhibit 241, which is the

15   listing of items, the inventory of items that were seized.

16        I would like for you to look through that and see if

17   that refreshes your recollection as to whether or not any

18   business checks were located and seized that day.

19   **A.**  A couple of times, it mentions copies of checks.

20   Q.  Okay.  Let me direct you to page 3 of that and I'll --

21        MR. ERICSSON:  Can you show him page 3 of Exhibit 241,

22   please?

23        THE WITNESS:  Business checkbooks.  There is an entry

24   for business checkbooks.

25   ///

1    BY MR. ERICSSON:

2    Q.   Okay.  So your log shows that business checkbooks were

3    found and seized that day, correct?

4    A.   In the closet, yes, sir.

5    Q.   You say they were in the closet?

6    A.   In Room R.

7    Q.   Okay.  So Room R is the -- the office, correct?

8    A.   Correct.

9    Q.   Okay.

10         MR. ERICSSON:  If we can go back to 9041, please?

11   Let's do to last page.  I'm sorry.

12   BY MR. ERICSSON:

13   Q.   And this is the last of three photographs in Exhibit 9041.

14         Is this just another photograph of additional binders

15   that were found that day?

16   A.   That is correct.

17   Q.   Okay.

18         MR. ERICSSON:  If we can go to Government's

19   Exhibit 120, please.

20   BY MR. ERICSSON:

21   Q.   You've been asked a number of questions about this and I

22   just want to highlight a couple of things.

23         So on this summary document of some cease and desist

24   orders -- you've had a chance to review this, correct?

25   A.   Correct.

1  *Q.*  And one of the individuals identified as a signer is

2  Michael Keith Kern, correct?

3  *A.*  That is correct, Exhibit Number 125.

4  *Q.*  And is it your understanding that Michael Kern is the

5  husband of Patti Kern, correct?

6  *A.*  Correct.

7  *Q.*  And he was there at some point during your search of that

8  residence, correct?

9  *A.*  That is correct.  He -- he -- he showed up later in the

10 day.

11        MR. ERICSSON:  Thank you.  I have no further questions

12 at this time, your Honor.

13        THE COURT:  Thank you.

14        Mr. Green?

15        MR. GREEN:  Thank you.

16        Your Honor, may I approach your courtroom

17 administrator to staple a couple pieces of paper?

18        THE COURT:  Yes, you may.

19        MR. GREEN:  Thank you so much.

20        May I proceed, your Honor?

21        THE COURT:  Yes, you may.

22        MR. GREEN:  With the Court's permission, may

23 Government's Exhibit 120 be placed on the screen?

24 ///

25 ///

2:19-cr-00295-GMN-NJK

CROSS-EXAMINATION

1    BY MR. GREEN:

2    *Q.*  Would you be offended if I said Investigator Sabby?

3    *A.*  Not at all.

4    *Q.*  Excuse me.  Inspector Sabby.  Excuse me.  I'm sorry.

5    *A.*  You got my last --

6    *Q.*  Otherwise we got, you know, so much words, but Inspector

7    Sabby.  Good afternoon, sir.

8    *A.*  Good afternoon.  You know, you got my last name right.

9    Thank you.

10   *Q.*  We've had testimony by yourself about Government's

11   Exhibit 120.  And it talks about a cease and desist order.

12            And Item Number 1 over on the far right for a sign,

13   what name is there, sir?

14   *A.*  The top -- are you talking about the top one?

15   *Q.*  Yes, sir.

16   *A.*  Patti Kern.  Patti A. Kern.

17   *Q.*  What is a cease and desist order?

18   *A.*  It's an administrative action to shut down a P.O. box -- or

19   not a P.O. box, a mailbox, and tell the company to cease doing

20   business.

21   *Q.*  Okay.  So if someone is doing business in violation of a

22   cease and desist order, I take it there are some remedies in

23   which the U.S. Postal Inspection Service or the Government

24   could take, correct?

1    A.   Yes.

2    Q.   We won't get into those, but, basically, if someone is

3    operating a business in violation of this order, that's

4    something which your organization could investigate, correct?

5    A.   That is correct.

6    Q.   And cease and desist order means stop doing business?

7    A.   It does.

8    Q.   Okay.  And when you went to the Kern residence -- and that

9    is the address -- and what was the address again?

10   A.   16 --

11              (Indiscernible simultaneous crosstalk.)

12              (Court reporter interruption.)

13              THE COURT:  Mr. Green, please let the witness finish

14   answering the question.

15              THE WITNESS:  1681 Bogey Way.

16   BY MR. GREEN:

17   Q.   And when you went -- is that a single family residence?

18   A.   It is.

19   Q.   Is it in Henderson, Clark County, Nevada?

20   A.   Yes.

21   Q.   When you approached this residence, did you notice if there

22   were any security cameras in the front?

23   A.   I'm trying to recall if -- my recollection is no.

24   Q.   How was entry made into the Bogey residence?

25   A.   Through the front door.

— 2:19-cr-00295-GMN-NJK —

1    Q.   By what means?

2    A.   We call it a ram.  Busts the door in so you can get in.

3    Q.   So the door was smashed in, correct?

4    A.   Correct.

5    Q.   And was -- was anything yelled as entry was made?

6    A.   Yes.

7    Q.   What was yelled?

8    A.   "Police.  Police."

9    Q.   In what tone?

10   A.   Loud.

11   Q.   Can you demonstrate for the jury?

12   A.   Yes.

13          MR. ZYTNICK:  Objection, your Honor.  I'm not sure

14   what the relevance is.  I think it's also outside the scope.

15          MR. GREEN:  I'll withdraw it, your Honor.

16          THE COURT:  Thank you.

17   BY MR. GREEN:

18   Q.   But an announcement was made as to police or law

19   enforcement, correct?

20   A.   That's correct.  That's the standard procedure.

21   Q.   And then once, I guess, that the residence was secured by

22   all the people, whoever was in there, the search commenced,

23   correct?

24   A.   That's correct, yes.

25   Q.   Okay.  And we know at least that there was -- that

—2:19-cr-00295-GMN-NJK—

1   Ms. Kern's daughter was there, correct?

2   A.  Correct.

3   Q.  We know that, perhaps, there were at least four, what

4   appeared to be, Hispanic women were there?

5   A.  That's correct.

6   Q.  Perhaps domestic workers?

7   A.  They were -- it was a cleaning company.

8   Q.  Cleaning company.  Okay.  Thank you.

9           MR. GREEN:  May we have Exhibit 90 put on the screen,

10  please?

11  BY MR. GREEN:

12  Q.  Now on the screen is Exhibit 90.

13          Kind of -- do you see that that is the -- a copy of

14  the driver's license of Salvador Castro?

15  A.  Yes.

16  Q.  And it was -- this document was found in -- somewhere in

17  the Kern residence on Bogey Way in Henderson, Clark County,

18  Nevada?

19  A.  Correct.

20  Q.  And it was found on -- in the residence on February 18th of

21  2021?

22  A.  Correct.

23          MR. GREEN:  May we have Exhibit 92, please?

24  BY MR. GREEN:

25  Q.  You were asked a few minutes ago, sir, about what appeared

1    to be some kind of an e-mail or some kind of a correspondence.

2         Do you remember that?

3    **A.**  I do.

4    *Q.*  And in front of you is what's been admitted as Government's

5    Exhibit 92.

6         Now, does this appear to be some kind of a copy or an

7    e-mail of something?

8    **A.**  Yes.

9    *Q.*  Okay.  Now, is there anything in this document,

10   Government's Exhibit 92, which shows that Salvador Castro

11   produced the document?

12   **A.**  No.

13   *Q.*  Is it a reference to Salvador Castro at an address?

14   **A.**  Yes.

15   *Q.*  What is that address?

16   **A.**  5685 Sentry Palm Court, Las Vegas, Nevada 89122.

17   *Q.*  For the record, sir, can you spell the word "Sentry"?

18   **A.**  I can.  S-E-N-T-R-Y.

19   *Q.*  Okay.

20        MR. GREEN:  In the e-mail line where it says "To," can

21   that be highlighted, please?

22   BY MR. GREEN:

23   *Q.*  Okay.  And it appears to be some kind of a transmission

24   from or -- it looks like the words "Betsy Spider."

25        Do you see that?

1  *A.*  I do.

2  *Q.*  Any idea who that might be?

3  *A.*  No idea.

4  *Q.*  And it's got a "To" and it looks like Mr. Tom Weedman,

5  W-E-E-D-M-A-N?

6  *A.*  Correct.

7  *Q.*  At a Gmail address.

8       Can you read that Gmail address out for the record?

9  *A.*  Yes.  Tsc1325@Gmail.com.

10  *Q.*  Thank you.

11       MR. GREEN:  May this exhibit still be enlarged but

12  scroll down?

13  BY MR. GREEN:

14  *Q.*  And now we see a more clear -- it says here's the new ship

15  address.

16       We see a more clear reference to Salvador Castro,

17  correct?

18  *A.*  Correct.

19  *Q.*  And a phone number?

20  *A.*  Yes.

21  *Q.*  Can you read that phone number into the record?

22  *A.*  I can.  702-517-0688.

23  *Q.*  Okay.  Thank you.

24       And in this document --

25       MR. GREEN:  If we could scroll down, please --

1   BY MR. GREEN:

2   Q.   -- Government's Exhibit's 92, does there appear to be any

3   kind of an e-mail from Mr. Castro to anybody?

4   A.   No.

5   Q.   But is an e-mail which -- or some kind of a letter or some

6   kind of a document which does -- which does reference

7   Mr. Castro's name, correct?

8   A.   Correct.

9   Q.   Thank you.

10          Earlier you had mentioned that -- let me ask you.

11          Had you seen Patricia Kern, or a woman by a name of

12  Patricia Kern, had you ever seen a picture of her prior to the

13  search?

14  A.   At the briefing, I believe.

15  Q.   Yes, sir.

16  A.   Briefing the day before.

17  Q.   Do you know what type of photograph that was?

18  A.   I don't recall.

19  Q.   Was it a line-up type photograph?

20  A.   I -- I don't recall.

21  Q.   But you did physically see Ms. Patti -- Ms. Patricia Kern

22  at the residence, correct?

23  A.   Yes.

24  Q.   Were you inside or outside at -- let me ask you.

25          Did there come a time -- well, let me -- when you made

1  entry, was Patricia Kern at the Bogey Way residence?

2  *A.*  She was not.

3  *Q.*  Did there come a time later when Ms. Kern arrived at the

4  residence?

5  *A.*  Yes.

6  *Q.*  You mentioned that she arrived in a truck?

7  *A.*  Yes.

8  *Q.*  What type of truck was that?

9  *A.*  I actually remember that.  That was -- it was a red

10  pick-up, and I believe, on the side, it had something like a

11  horse farm or it had some name.

12  *Q.*  Was it a Ford?  Chevrolet?  Don't remember?

13  *A.*  I think it was a Chevy, red Chevy pick-up.

14  *Q.*  Was there a horse trailer on it attached to it?

15  *A.*  No.

16  *Q.*  Was there a horse trailer at the residence?

17  *A.*  No.

18  *Q.*  But Ms. Kern -- did you see Ms. Kern drive up in the

19  vehicle?

20  *A.*  Yes.

21  *Q.*  Okay.  And it was driven up to the Bogey Way address?

22  *A.*  Correct.

23  *Q.*  With Patricia Kern as the driver or passenger?

24  *A.*  I believe she was by herself, so she was the driver.

25  *Q.*  At some point, did you or other agents identify yourselves

1    as postal inspectors?

2    *A.*  Yes.

3    *Q.*  Okay.  Was Ms. Kern taken into the residence?

4    *A.*  Yes.

5    *Q.*  Was she taken into the residence by you or other

6    investigators?

7    *A.*  Myself.  Excuse me.  Myself and Inspector Bouchie brought

8    her into the residence.

9    *Q.*  During the -- were you -- were you, like, the site leader

10   for the search?

11   *A.*  I was.

12   *Q.*  So was it your responsibility to advise the other postal

13   inspectors as to particular -- assigned particular rooms, the

14   garage, home office, etc., for the purposes of the search?

15   *A.*  Basically, yes.

16   *Q.*  Okay.  I take it that you took a -- like a crime scene

17   investigator-type person to take photographs, maybe someone

18   associated with the postal inspection service?

19   *A.*  He was actually a -- a postal inspector from -- from

20   Houston.

21   *Q.*  And he took a number of really detailed photos, agreed?

22   *A.*  He did.

23   *Q.*  Okay.  Were those photos taken at your direction or did you

24   allow him to -- him to use his discretion in the photographs

25   which were taken?

—2:19-cr-00295-GMN-NJK—

1    *A.*  His discretion.

2    *Q.*  Okay.

3           MR. GREEN:  May Defense Exhibit 7027 be put on the

4    screen, please?

5           MR. ZYTNICK:  And that's for the witness, I assume?

6           MR. GREEN:  Excuse me?

7           MR. ZYTNICK:  For the witness, right, as opposed to

8    the -- okay.  Just as long as -- I just want to make sure

9    because I wasn't --

10          THE COURT:  Just for the witness, not for the jury.

11          MR. ZYTNICK:  Yeah, okay.

12          THE COURT:  7027.

13          MR. GREEN:  Okay.

14   BY MR. GREEN:

15   *Q.*  On that picture, do you recognize anyone?

16   *A.*  I do.

17   *Q.*  And who is that?

18   *A.*  Patti Kern.

19   *Q.*  Do you know when that photograph was taken?

20   *A.*  Yes.

21   *Q.*  When was that photograph taken?

22   *A.*  The same day of the search.

23   *Q.*  What day was that?

24   *A.*  February 21st of 2018.

25   *Q.*  I take it that the photograph was taken in Henderson, Clark

─── 2:19-cr-00295-GMN-NJK ───

1    County, Nevada?

2    *A.*  Correct.

3    *Q.*  Was it taken during the search?

4    *A.*  Correct.

5    *Q.*  Okay.  And is that a fair and accurate representation of a

6    woman who you've identified as Patricia Kern?

7    *A.*  Yes.

8         MR. GREEN:  Okay.  Move to admit that exhibit, your

9    Honor.

10        THE COURT:  Any objection?

11        MR. ZYTNICK:  No.  It was actually already admitted.

12   I made a mistake, your Honor.  Thank you.

13        THE COURT:  Okay.  Exhibit 7027 can be published to

14   the jury.

15        MR. GREEN:  Thank you.

16        May the screen be enlarged to the upper torso?

17   BY MR. GREEN:

18   *Q.*  Okay.  Do you see the enlargement of the photograph,

19   Exhibit 7027, of Patricia Kern?

20   *A.*  I do.

21   *Q.*  And does it appear that -- does she have anything on her

22   face?

23   *A.*  She has glasses.

24   *Q.*  What was that, sir?

25   *A.*  She has glasses on her face.

1   Q.  Does it appear as if she's holding anything?

2   A.  Yes.

3   Q.  Do you know what -- do you know of your own knowledge what

4   Ms. Kern was holding?

5   A.  I do.

6   Q.  What was it?

7   A.  It was a signed written statement.

8   Q.  Signed written statement of who?

9   A.  Of -- of Patti Kern.  She signed it.

10  Q.  Do you know when that statement was made?

11  A.  Yes.

12  Q.  When was it made?

13  A.  That same day.

14  Q.  Was it made in your presence?

15  A.  No.

16  Q.  Are you aware whether it was made in the presence of any

17  other postal inspectors?

18  A.  Yes.

19  Q.  Was it made in the presence of the case agent in this case?

20  A.  Yes.

21  Q.  Who is the case agent in this case?

22  A.  Barry Bouchie.

23  Q.  Do you know when the statement was written by Ms. Kern?

24  A.  That same day.

25  Q.  Do you know when?  In the morning?  Later?

—— 2:19-cr-00295-GMN-NJK ——

1   *A.*  Oh.  I don't.

2   *Q.*  And this -- did this search take a long time?

3   *A.*  Yes.

4   *Q.*  Okay.  And at what point -- at what point were you alerted

5   to what appeared to be large amounts of United States currency?

6   *A.*  Pretty quickly.

7   *Q.*  Okay.  Man, that was a lot of money, correct?

8   *A.*  It was a lot of money and it was small bills.  So it was a

9   lot.

10  *Q.*  Yeah.  And it wasn't in the same location, was it?

11  *A.*  It was in the office but all over in the office.

12  *Q.*  Okay.  And when you say "the office," prior to the search,

13  did you -- did you have a schematic drawing of the inside of

14  the house?

15  *A.*  I don't believe so.

16  *Q.*  Okay.  But did you know that it was a single family

17  residence?

18  *A.*  Yes.

19  *Q.*  You had the address?

20  *A.*  Yes.

21  *Q.*  Perhaps, it was two stories or one story?

22  *A.*  Yes.

23  *Q.*  You had information as to whether it was in a cul-de-sac or

24  whatever?

25  *A.*  Yes.

1   Q.  And was that information necessary for your -- your entry

2   team to go over to this house?

3   **A.**  Yes.

4   Q.  And would that be in good practice in your experience and

5   in your training of some 27 years with the postal inspection

6   service?

7   **A.**  Yes.

8   Q.  Okay.

9       MR. GREEN:  May we have Mendez Exhibit 904 -- wait.

10  Is it Mendez 9041?

11      MR. BROWN:  Yes.

12      MR. GREEN:  Excuse me.  Just double-check, your Honor.

13  9041, please, put on the screen.

14      Okay.  That's perfect.

15  BY MR. GREEN:

16  Q.  Is that --

17      MR. GREEN:  I just want to make sure we're on the

18  record, page 1 of 3.  Yes.  Thank you.

19  BY MR. GREEN:

20  Q.  Do you see right at the bottom of that -- of the

21  photograph -- I mean, Mendez Exhibit 9041 where it says

22  "Golden"?

23  **A.**  I do.

24  Q.  And did you -- did you or your agents look through these

25  books?

1  **A.**  The agents would have.

2  *Q.*  Yes.

3        And as a site leader, was it -- okay.

4        Without saying what anybody said to you, did you learn

5  whether these books were, like, corporate books?

6  **A.**  I don't recall learning that.

7  *Q.*  Did the books appear to have something to do with some kind

8  of businesses?

9  **A.**  Yes.

10  *Q.*  So from -- from these books just right here, Golden,

11  marked -- as in -- reflected in page -- page 3 on Mendez

12  Exhibit 9041, these were, like -- were these in the home office

13  area?

14  **A.**  They were.

15  *Q.*  Okay.  And it looks like there was a business going on or

16  something, correct?

17  **A.**  Correct.

18  *Q.*  Okay.

19        MR. GREEN:  Now, if we could look at 9040, page 4 of

20  10.  Page 4 of 10, please.

21        Okay.  Could we zoom in, sir, at the -- at the -- at

22  the center where it shows some kind of stamps?

23        Okay.  A little bit -- could we zoom in a little bit

24  more?

25  *///*

—— 2:19-cr-00295-GMN-NJK ——

1    BY MR. GREEN:

2    Q.  In Government's Exhibit 241, there are some references to

3    some -- appear to be some signature stamps and bank stamps.

4            Do you remember that?

5    A.  I do.

6    Q.  Okay.  And looking at now Exhibit 9040, page 4 of 10, does

7    it appear as if there's some kind of bank stamps?

8    A.  It does.

9    Q.  And on the -- and on the -- in the center, it looks like at

10   an angle, maybe there's, like, a signature stamp?

11   A.  It's possible.  It's kind of hard --

12           MR. GREEN:  Can that picture be rotated, sir?

13   BY MR. GREEN:

14   Q.  All right.  It's hard to see what -- now there's an

15   enlargement of page 4 of 10 of Mendez Exhibit 9040.

16           We can't read the signature, but you -- your officers

17   seized that item, correct?

18   A.  That is correct.

19   Q.  And, perhaps, others.

20           And it's difficult but it looks like a stamp or a

21   signature, right?

22   A.  It does.

23   Q.  Something one might use to sign a check?

24   A.  It does.

25   Q.  Or stamp the back of a check for a deposit?

—— 2:19-cr-00295-GMN-NJK ——

1  *A.*  Yes.

2  *Q.*  And what -- and where was it found?

3  *A.*  In the office.

4  *Q.*  In the office where?

5  *A.*  In the closet, I believe.

6  *Q.*  Of whose home?

7  *A.*  Of Patti Kern's.

8  *Q.*  Thank you.

9       MR. GREEN:  May we look at page 8 of Mendez 9040?

10      Indulgence for one moment, your Honor?

11      THE COURT:  Yes.

12 BY MR. GREEN:

13 *Q.*  Inspector Sabby, are you aware if one or two ATM cards in

14 the name of Salvador Castro were found on February 21, 2018 at

15 the Kern residence?

16 *A.*  I don't know that.

17 *Q.*  Would looking at the inventory, Government's Exhibit 241,

18 refresh your recollection?

19 *A.*  It would help, yes.

20      MR. GREEN:  May I approach the witness, your Honor,

21 for purposes of refreshing recollection?

22      THE COURT:  Yes, you may.

23      MR. GREEN:  Thank you.

24 BY MR. GREEN:

25 *Q.*  Do you have before you Government's Exhibit 241?

1   *A.*   Yes.

2   *Q.*   At the very first entry -- let me ask you this.

3            Does this appear to be, like, the search warrant log

4   on an official, like, computer-type form used by the United

5   States Postal Inspection Service?

6   *A.*   Correct, yes.

7   *Q.*   What is the first item listed in that inventory?

8   *A.*   Two debit cards in the name of Salvador Castro and Golden

9   Products Service.

10  *Q.*   Okay.  Thank you.

11           MR. GREEN:  May I go back, your Honor?

12           THE COURT:  Yes, you may.

13           MR. GREEN:  Thank you.

14           May we look at page 5 of Mendez Exhibit 9040?

15           I only have a couple questions about the money, your

16  Honor, so we move this on.

17  BY MR. GREEN:

18  *Q.*   In this exhibit that's in front of you, sir, that's page 5

19  of 10 of Mendez 9040, appears to be U.S. currency, correct?

20  *A.*   Yes.

21  *Q.*   And there appears to be an envelope, correct?

22  *A.*   Correct.

23           MR. GREEN:  And if we can zoom in on that envelope.

24  BY MR. GREEN:

25  *Q.*   Now, you had mentioned a little bit earlier that other

1    envelopes had been found in -- and, perhaps, in another

2    location with the names of certain people on that, correct?

3    *A.*   Correct.

4    *Q.*   And as to this envelope, is there any name on it?

5    *A.*   No.

6    *Q.*   Okay.   Thank you.

7            MR. GREEN:   If we go to page 6 of Mendez 9040.

8    BY MR. GREEN:

9    *Q.*   Can you explain to the jury and for the record what is

10   depicted in -- on page 6 of Mendez 9040?

11   *A.*   Yes.   That -- that was the safe in the office.

12   *Q.*   And what appears to be inside the safe?

13   *A.*   A lot of money and some binders.

14   *Q.*   And the money, does it look like it's, like, loose or has

15   been wrapped with some type -- in some form or fashion?

16   *A.*   It has definitely been wrapped.

17   *Q.*   Okay.   Now, was this safe opened or closed, if you know,

18   when your -- when your officers took entry?

19   *A.*   I don't know.

20   *Q.*   But at some point, the safe was opened or it was open?

21   *A.*   Correct.

22   *Q.*   Okay.

23           MR. GREEN:   Let's look at page 7, please, of Mendez

24   Exhibit 9040.

25   ///

1  BY MR. GREEN:

2  Q.  Okay.  What's depicted on page 7 of Mendez 9040?

3  A.  There's some bank envelopes or, you know, money envelopes

4  with money in it.

5  Q.  And just give us the bottom line figure on the amount of

6  cash which was found at the Kern residence.

7  A.  Roughly?

8  Q.  Excluding the -- excluding the kitchen money --

9  A.  Yeah.

10  Q.  -- and the child's money and the -- the suspected winnings

11  from the --

12  A.  Yes.

13  Q.  -- gambling or --

14  A.  $170,000 roughly.

15  Q.  Okay.  And predominantly in what type of denomination, if

16  you remember?

17  A.  Small.

18  Q.  Okay.  Small meaning 100 or -- well, not -- 50's?  20's?

19  5's?

20  A.  5's, 10's, 1's.

21  Q.  And it took a long time to collect that, right?

22  A.  Yes.

23  Q.  Okay.

24        MR. GREEN:  Let's look at page 8 of 9040.

25  ///

—— 2:19-cr-00295-GMN-NJK ——

1   BY MR. GREEN:

2   Q.  Okay.  And was this the money that's part of it or was this

3   all the money that was loose or you don't -- we don't know yet?

4   A.  We looked at that earlier and it was found in the -- also

5   in the safe.

6   Q.  Okay.  I might not have written it down, but let me

7   double-check.  I'm looking for the money counter.  Let me

8   double-check.

9         There was a cash counter found, correct?

10  A.  Yes.

11  Q.  And the cash counter, where was the cash counter found?

12  A.  It was also in the office.

13  Q.  And this office, did you learn the principal occupant of

14  that office or who was using it?

15  A.  Patti Kern.

16  Q.  And this was in -- in a home -- or excuse me -- yes, it was

17  in a single family residence, the office was being used, and

18  you found instrumentalities of crimes in there?

19  A.  Correct.

20  Q.  And were those instrumentalities of the crimes the cash?

21  A.  Correct.

22  Q.  Bank stuff?

23  A.  Correct.

24  Q.  Stamps?

25  A.  Correct.

1   Q.   Corporate books?

2   A.   Correct.

3   Q.   Envelopes?

4   A.   Correct.

5   Q.   Envelopes with cash?

6   A.   Correct.

7   Q.   Legal papers concerning a cease and desist order?

8   A.   I don't know if those were -- I don't know if those were

9   found in the office -- or --

10  Q.   Okay.

11         MR. GREEN:  May I approach the witness with the -- for

12  purposes of refreshing recollection, Government's Exhibit 241?

13         THE COURT:  Yes, you may.

14         MR. ZYTNICK:  Mr. Green, it's actually admitted so you

15  can just put it on the screen if you want.

16         MR. GREEN:  Okay.  Very good.  Just being careful.

17         May we approach, your Honor?  I mean, may I approach?

18         THE COURT:  Yes, you may.

19         MR. GREEN:  Thank you.

20         Oh, it's on the screen?  Oh, thank you.

21         If we could highlight the -- and that would be page 5

22  of 7, please.

23         Now, can we highlight the very last line on page 5 of

24  7 of Government's Exhibit 241?

25  ///

—— 2:19-cr-00295-GMN-NJK ——

1    BY MR. GREEN:

2    Q.  Can you read that, Inspector Sabby, where it says,

3    "Official complaint"?

4           Do you see that?

5    A.  I do.

6    Q.  What does it say?

7    A.  It said, "Official complaint and order filed by USPS

8    against Patti Kern and related businesses."

9           And was the found on the credenza desk in the office.

10   Q.  Against who?

11   A.  Patti Kern.

12   Q.  And what was Room R?

13   A.  That's the office.

14   Q.  Okay.  And I take it that before this the postal inspectors

15   and yourself had assigned certain rooms letters or

16   designations, correct?

17   A.  That's correct.

18   Q.  And that would be good practice for later evaluation,

19   reports, etc., correct?

20   A.  Correct.

21   Q.  Okay.  And it was found where?

22   A.  On the desk in the office.

23   Q.  Okay.  Best you know, it -- that's attributed to Patti

24   Kern?

25   A.  Correct.

1    Q.  Okay.  Thank you.

2            MR. GREEN:  May we have Exhibit 84 put on the screen,

3    please?  No.  Yes.  84.

4            Now, may we enlarge the center portion of 84?

5    BY MR. GREEN:

6    Q.  It's not clear, but can you read that?

7    A.  I can.

8    Q.  And what does it say?

9    A.  "Angeles Castro, make Salvador's checks out to."

10   Q.  Okay.  Make checks?

11   A.  Checks.  Plural.

12   Q.  And there was a -- there were envelopes to who on the bed

13   or on the couch which were opened up?

14   A.  I don't remember all the names now.

15   Q.  Let me ask another way.

16   A.  Yes.

17   Q.  Was there an envelope with cash found at the Kern residence

18   in the name of Salvador Castro during the search of -- of

19   February 21, 2018; yes or no?

20   A.  Yes.

21   Q.  It was?  Salvador Castro?

22   A.  I would need to see the exhibit again to be honest.

23   Q.  Okay.  Let's look at it again.

24           MR. GREEN:  Let's look at 85.

25           THE WITNESS:  I have names --

1          MR. GREEN:  Yes, sir, I understand.  It's been --

2   okay.  If we can enlarge those.

3          THE WITNESS:  None of those.

4   BY MR. GREEN:

5   Q.  Okay.  Can you see those names?

6   A.  Yep.  None of those are --

7   Q.  Let me ask the question again.

8          At any time during the search of Patricia Kern's

9   residence on February 21, 2018, was there a single envelope

10  with money in it with the name of Salvador Castro?

11  A.  No.

12  Q.  And the reference to Salvador Castro was a check?

13  A.  On that Post-It note?

14  Q.  Yes.

15  A.  Yes.

16          MR. GREEN:  No further questions.  Thank you.

17          THE COURT:  Any redirect?

18          MR. ZYTNICK:  Yes, your Honor.

19          Can we pull up Exhibit 96, please?

20                    REDIRECT EXAMINATION

21  BY MR. ZYTNICK:

22  Q.  Good afternoon.  I think we looked at this exhibit on -- on

23  direct.

24          Do you recall this being a -- some sort of file

25  folder?

1  *A.*  Yes.

2          MR. ZYTNICK:  And if we can go to page 5?

3  BY MR. ZYTNICK:

4  *Q.*  Do you recall before the lunch break Mr. Mishler asked you

5  about this mailbox rental form.

6          Do you recall that?

7  *A.*  I do.

8  *Q.*  And he asked you if there was an address listed for the

9  business -- I'm sorry -- for the mailbox rental on the top

10  right?

11  *A.*  Yes.

12  *Q.*  And is there an address listed there?

13  *A.*  No.

14  *Q.*  And so there was an implication, at least, that, well,

15  maybe this was not actually connected to a rented mailbox?

16  *A.*  Yes.

17  *Q.*  Was that your understanding?

18  *A.*  Yes.

19  *Q.*  Now, did Mr. Mishler show you two pages up, page 3 of that

20  document?

21          Actually, I should quickly go back to page 5 for just

22  a moment.

23          The name of the company here, Assets Unlimited; is

24  that correct?

25  *A.*  Yes.

1    *Q.*  All right.

2           MR. ZYTNICK:  Let's go up to page 3, please.

3    BY MR. ZYTNICK:

4    *Q.*  Do you see the same name "Assets Unlimited" there?

5    **A.**  I do.

6    *Q.*  Do you see an address there?

7    **A.**  I do.

8    *Q.*  Can you read that address to the jury, please?

9    **A.**  75A Lake Road, Unit 4A, #1000, Congers, New York

10   10920-2323.

11          MR. ZYTNICK:  Let's please go to Exhibit 40 which was

12   previously admitted.  There was previous testimony about this

13   found at Digital Express.

14          Can we zoom in on the return address in the top left

15   there.

16   BY MR. ZYTNICK:

17   *Q.*  Can you read the address there listed for Assets Unlimited,

18   please?

19   **A.**  Yes.  75A Lake Road, Unit Number A, #1000, Congers, New

20   York 10920-2323.

21   *Q.*  Is that the same address that was listed on page 3 of that

22   document in the previous documents?

23   **A.**  Yes.

24          MR. ZYTNICK:  Can we zoom out and actually go back

25   briefly to page 96?  I'm sorry.  Exhibit 96.

1  BY MR. ZYTNICK:

2  Q.  Do you see in the bottom right-hand corner there underneath

3  the Government exhibit stamp, underneath the blue letters,

4  there's some numbers in black written right there?

5          Do you recognize those as a Bates number for that

6  document?

7  A.  Yes.

8  Q.  And we can see that the -- before the hyphen, we see that

9  seven digit number ending 3273.

10          Do you see that?

11  A.  Yes.

12          MR. ZYTNICK:  Can we pull up Exhibit 241, page 3?  And

13  if we can zoom in on the fourth one down.

14  BY MR. ZYTNICK:

15  Q.  Do you recognize that number as being on the left side

16  with -- with the letters "IS" in front of it?

17          Do you recognize that same number?

18  A.  I do.

19  Q.  What is the IS number that's listed there?  Or what is the

20  meaning of the IS number?

21  A.  That's -- it's a number that's assigned in our -- our

22  property inventory system and --

23  Q.  So is this a way that you can tell that the document that

24  we were just looking at was one of the documents found at

25  Ms. Kern's house?

1    *A.*  Yes.

2    *Q.*  All right.  So my question actually relates to the cease

3    and desist papers because I was a little confused and maybe

4    other people were confused.

5         There was a question from Mr. Green about that

6    document, that cease and desist document involving Ms. Kern

7    found at her office.

8         Do you remember that?

9    *A.*  Yes.

10   *Q.*  If you know, were the other cease and desist documents that

11   were -- that we were looking at, were those found at Ms. Kern's

12   office or were those postal service documents?

13   *A.*  I believe those were postal service documents.

14        MR. ZYTNICK:  If we can pull up Exhibit 122?

15        And if we could zoom in on the Bates number in bottom

16   right corner right there?

17   BY MR. ZYTNICK:

18   *Q.*  Does looking at that, does that give you any -- well --

19   strike that.

20        Does that Bates number appear to correspond to any of

21   the evidence numbers from the inventory for Ms. Kern's house?

22   *A.*  It does not.

23   *Q.*  Does looking at this help you -- help refresh your

24   recollection as to whether those other postal service -- I'm

25   sorry -- whether those other cease and desist documents were

1  found at Ms. Kern's house or whether they were postal service
2  records?
3  *A.*  Postal service records.
4        MR. ZYTNICK:  We can clear the exhibit, please.
5  BY MR. ZYTNICK:
6  *Q.*  Now, before lunch, Mr. Tomsheck claimed that Ms. Kern was
7  not searched for weapons when she arrived at the house.
8        Do you remember that?
9  *A.*  Yes.
10        MR. TOMSHECK:  I hate to object.  I really do.
11        (Court reporter interruption.)
12        THE COURT:  Yes.
13        MR. TOMSHECK:  I didn't claim anything.  I asked
14  questions to a witness and he answered them.  For him to couch
15  the question in that format is certainly inadmissible and
16  objectionable.
17        THE COURT:  I'm going to overrule the objection.
18        Go ahead.
19  BY MR. ZYTNICK:
20  *Q.*  Do you recall being asked that question?
21  *A.*  Yes.
22  *Q.*  And do you recall that you -- I think you agreed with what
23  he proposed?
24  *A.*  Yes.  I remember --
25  *Q.*  Let me just -- because the question was just whether you

1  agreed or not.

2          But let me ask you now:  Are you sure one way or the

3  other whether she was not searched for weapons?

4  **A.**  No.

5  Q.  Would it refresh your recollection to review that

6  memorandum to file that you reviewed several times --

7  **A.**  Yes.

8  Q.  -- during his cross?

9          MR. ZYTNICK:  If we could show the witness, please,

10  the memorandum to file.  And in particular, I'll direct the

11  witness's attention to the last full paragraph of page 2.

12  BY MR. ZYTNICK:

13  Q.  And then if you could read that and then let me know when

14  you've finished.

15  **A.**  That refreshes my memory.

16  Q.  Having now reviewed that memorandum to file, do you know

17  whether Ms. Kern was, in fact, searched for weapons when she

18  arrived at the house?

19  **A.**  She was.

20  Q.  And I think I said before Mr. Tomsheck asked you that

21  question.  I may have -- or even made the proposal.  I may have

22  been incorrect in which of the defense attorneys.

23          But do you recall that one of the defenses asked you

24  that question?

25  **A.**  Yes.

1    *Q.*  And was the -- the question and your answer incorrect

2    about...

3    *A.*  (No verbal response.)

4            (Court reporter interruption.)

5    *A.*  Yes.

6    *Q.*  But you now agree that she was searched for weapons?

7    *A.*  Yes.

8    *Q.*  I believe you were also asked the question about whether

9    the daughter, Ms. Kern's daughter was at any point handcuffed

10   during the search?

11   *A.*  I don't believe anybody was handcuffed but --

12   *Q.*  Well, let me ask you this.

13           If -- do you have a 100 percent certainty as to that?

14   *A.*  I don't.

15   *Q.*  Would it refresh your memory to look at the same memorandum

16   to file?

17   *A.*  Yes.

18           MR. ZYTNICK:  If we could show the witness the

19   memorandum to file, and I would direct his attention to the

20   bottom of page 1.

21   BY MR. ZYTNICK:

22   *Q.*  I don't need you to read it, because it's in your evidence

23   and it's not your statement.  So I'm just going to ask a

24   question.

25   *A.*  Okay.

2:19-cr-00295-GMN-NJK

1  *Q.*  Having looked at the memorandum to file, has that refreshed

2  your memory as to whether Ms. Kern's daughter --

3  *A.*  (Unintelligible).

4  *Q.*  Please let me finish the question.

5          Whether Ms. Kern's daughter was, at any point,

6  handcuffed?

7  *A.*  Yes.

8  *Q.*  What do you now recall about that?

9  *A.*  She was briefly handcuffed.

10  *Q.*  I believe you testified there were four members of a

11  cleaning crew there?

12  *A.*  Yes.

13  *Q.*  And they were there when the postal inspectors went through

14  the door with that ram?

15  *A.*  Yes.

16  *Q.*  Did they speak English?

17  *A.*  No.

18  *Q.*  Were any of them handcuffed at any point?

19  *A.*  No.

20  *Q.*  Were they kept in in some way or were they released?

21  *A.*  We took their information down and released them.

22  *Q.*  Do you know why they didn't answer the door?

23  *A.*  I don't.

24  *Q.*  Did anybody interview them about that question?

25  *A.*  Interview the four ladies that were there?

1    *Q.*  Yes.

2    **A.**  I don't recall.

3    *Q.*  Have you seen any sort of memorandum of interview or

4    anything like that related to the interview of the cleaning

5    crew?

6    **A.**  (No verbal response.)

7    *Q.*  Do you know whether --

8              (Court reporter interruption.)

9              THE WITNESS:  Can you please repeat your question?  I

10   don't know.  What was the question?

11             THE COURT REPORTER:  Do you want me to read it back?

12             MR. ZYTNICK:  Yes, please.  That would be great.

13             THE COURT REPORTER:  The last question was:  Have you

14   seen any sort of memorandum of interview or anything like that

15   related to the interview of the cleaning crew?

16             THE WITNESS:  No.  No, I have not.

17   BY MR. ZYTNICK:

18   *Q.*  Would a -- would an interpreter have been required to

19   conduct an interview of them?

20   **A.**  Yes.

21   *Q.*  Was there any interpreter present?

22   **A.**  No.

23             MR. ZYTNICK:  Thank you.  No further questions.

24             THE COURT:  Mr. Tomsheck, any recross?

25   ///

1                        RECROSS-EXAMINATION

2    BY MR. TOMSHECK:

3    Q.  Try to get you out of here by dinnertime.

4           Logical that you, in your career, at some point, have

5    made a mistake?

6    A.  Yes.

7    Q.  I know I've made a lot.

8    A.  Yes.

9    Q.  Every human being makes mistakes, right?

10   A.  Yes.

11   Q.  Okay.  And there's a reason in an investigation with

12   something as serious as a case like this that we would want to

13   document and memorializes things, right?

14   A.  Yes.

15   Q.  Because humans are prone to make mistakes?

16   A.  Yes.

17   Q.  Okay.  For instance, you were asked some questions on

18   cross-examination by myself.  You indicated that documents came

19   from a certain area.  You made a mistake about that, right?

20   A.  Yes.

21   Q.  And the Government showed you some Bates stamps, some

22   memorializations about where things came from, right?

23   A.  Correct.

24   Q.  Okay.  And you don't want to give inaccurate information to

25   the jury?

1  *A.*  Correct.

2  *Q.*  Right?

3        Likewise, Mr. Zytnick just asked you a few questions

4  about questions that I asked you that, in fact, I didn't ask

5  you.  Mr. Mishler did.  He's a different guy at the back table

6  back there.  Nothing wrong with the question.  He was just

7  mistaken about who asked it, right?

8  *A.*  Yes.

9  *Q.*  You made a mistake a moment ago when you had testified that

10  no one was handcuffed at the Kern residence on Bogey Way.

11  After reviewing that memorandum, you know that someone was

12  briefly handcuffed, the point that Mr. Mishler was trying to

13  make this morning?

14  *A.*  Yes.

15  *Q.*  Okay.  You would agree with me that the best way to avoid

16  little mistakes like that that can turn into big issues at a

17  trial is to memorialize them the best as possible, right?

18  *A.*  Yes.

19  *Q.*  Okay.

20        MR. TOMSHECK:  That's all I got.

21        THE COURT:  Mr. Ericsson, any cross?  Recross?

22        MR. ERICSSON:  No, your Honor.  Thank you.

23        THE COURT:  Mr. Mishler?

24        MR. MISHLER:  Thank you, your Honor.

25  ///

─── 2:19-cr-00295-GMN-NJK ───

1                              RECROSS-EXAMINATION

2     BY MR. MISHLER:

3     Q.   Hi, Inspector Sabby.  How are you doing?

4     A.   Good.

5     Q.   All right.  Just to clear this up.  So my understanding is

6     originally this morning when I asked you, you said nobody was

7     handcuffed?

8     A.   That was my belief.

9     Q.   And I understand that.

10             And now that you've refreshed, you understand that one

11    person was handcuffed?

12    A.   Yes.

13    Q.   And that was Cody Kern?

14    A.   Yes.

15    Q.   That's Patti Kern's daughter?

16    A.   Yes.

17    Q.   And she was handcuffed briefly?

18    A.   Yes.

19    Q.   Now, I'm going to ask you again:  When Patti Kern arrived,

20    did you handcuff her?

21    A.   No.

22    Q.   You're sure?

23    A.   Yes.

24    Q.   You're not making any mistake?

25    A.   My recollection is no, we did not.

1    Q.  Okay.  And when Michael Kern came to the house, you did not

2    place him in handcuffs?

3    A.  Correct.

4    Q.  You're absolutely sure?  I just want to avoid a repeat.

5    A.  Yeah, that's my recollection.

6    Q.  Okay.

7    A.  There was no handcuffing.

8    Q.  And that's fine.

9         MR. MISHLER:  Now, if we can bring up Exhibit 241.

10   BY MR. MISHLER:

11   Q.  You remember you testified that large amounts of cash were

12   there?

13   A.  Yes.

14   Q.  I think your testimony was you spent most of that day

15   counting cash?

16   A.  I did.

17   Q.  And this memorializes the cash that you recovered?

18   A.  Yes, it does.

19   Q.  And you do this so that everybody knows what was seized?

20   A.  Correct.

21   Q.  There's no mistakes about it, right?

22   A.  Correct.

23   Q.  Okay.  And you make sure this is accurate because you don't

24   want anybody to come back later and say, you know, for example,

25   if we go to page 3 -- sorry -- page 2 -- I apologize -- so you

1  see there on that second line --

2          MR. MISHLER:  If we could blow that up a little bit.

3  BY MR. MISHLER:

4  Q.  See there where it says $14,288 cash?

5  A.  Yes.

6  Q.  I want to make sure that's absolutely accurate, right?

7  A.  Yes.

8  Q.  Because we don't want somebody to come later and say that

9  was really $17,000 in cash?

10  A.  Correct.

11  Q.  That's sort of the point of making sure it's accurate,

12  right?

13  A.  Correct.

14  Q.  Okay.  And underneath that it says, 40,000 -- 40,010 U.S.

15  currency, right?

16  A.  Correct.

17  Q.  And that's cash that you counted?

18  A.  I did.

19  Q.  You used the counting machine, right?

20  A.  I did.

21  Q.  Okay.  Now, if you go down two, can you read us the amount

22  on that next one?

23  A.  The 106,150?

24  Q.  Yes, please.

25  A.  106,150 U.S. currency converted to USPS deposit at MOW Las

1    Vegas P&DC.

2    Q.  And that number's accurate, right?

3    **A.**  Yes.

4    Q.  Because you counted it?

5    **A.**  Yes.

6    Q.  Okay.  Now, if you look at the second one from the bottom,

7    do you see that one?  And this is almost the end of this one --

8              MR. ZYTNICK:  Judge, I'm sorry to interrupt but --

9              THE COURT:  Yes.

10             JUROR:  (Unintelligible).

11             THE COURT:  Looks like the monitor went out.  Thank

12   you for letting me know.

13             Back on?  Thank you.

14   BY MR. MISHLER:

15   Q.  All right.  Second one from the bottom, do you see that

16   one?

17   **A.**  Yes.

18   Q.  How much currency was that?

19   **A.**  $2,838.00.

20   Q.  That's because you counted it, right?

21   **A.**  Yes.

22   Q.  Okay.  Excellent.

23             Now, if you go up to the fourth from the bottom, do

24   you see that one?  Starts with the word "cash"?

25   **A.**  Yes.

———— 2:19-cr-00295-GMN-NJK ————

1   *Q.*  Can you read that one for me?

2   **A.**  Cash in various denominations converted to USPS deposit at

3   MOW Las Vegas P&DC.

4   *Q.*  Okay.  So that's all that's listed there, right?

5   **A.**  Yes.

6   *Q.*  So I noticed something that I feel like should be there so

7   I'm going to ask you:  There's no dollar amount listed there,

8   right?

9   **A.**  Right.

10  *Q.*  Why -- why would that be?

11  **A.**  I don't know.

12  *Q.*  Do you have any idea how much cash that is referring to?

13  **A.**  No.

14  *Q.*  Could be $50?

15  **A.**  (Unintelligible.)

16          (Court reporter interruption.)

17  **A.**  It says, "Closet inside banker's pouches and envelopes."

18          Yeah, I don't know.

19  *Q.*  Okay.

20          MR. MISHLER:  So if you could pull up Exhibit 9040?

21  Go up to 5.

22  BY MR. MISHLER:

23  *Q.*  Look at 5 for me.  Do you think this is what you're

24  referring to from that description?

25  **A.**  Not sure.

1    *Q.*   Okay.  So the description you read was "Closet inside

2    banker's pouchs and envelopes."

3           Is that what that looks like?

4    *A.*   Very possible, yes.

5    *Q.*   Okay.

6    *A.*   I think we've had, like, several that kind of looked like

7    that but --

8    *Q.*   So let me ask you --

9           MR. MISHLER:  Let's go to -- scroll down a little bit

10   on the side for me, Brian.  No, the -- yeah, sorry.  I believe

11   the other one -- right here.

12   BY MR. MISHLER:

13   *Q.*   This is the other one you're referring to, right?

14   *A.*   Correct.

15   *Q.*   So odds are it was one of these two?

16   *A.*   Correct.

17   *Q.*   Okay.  So I'm not going to ask you if you think it was $50

18   because that doesn't seem like even in the realm.

19           Do you have any idea how much money this should have

20   listed next to it?

21   *A.*   Right now, I do not, no.

22   *Q.*   Okay.  You'd agree that's probably really important, right?

23   *A.*   Yeah.  I -- I don't know why that number's not on there.

24   *Q.*   Do you think it's memorialized somewhere else?

25   *A.*   Very possible.

1  *Q.*  But where would that be?

2  **A.**  I -- I only was at the search warrant, so I don't know.  I

3  didn't turn any of the money into the bank or anything.  So I

4  don't know.

5  *Q.*  Okay.

6  **A.**  I would think that's where it would be memorialized.

7  *Q.*  I would expect that, too, maybe on an inventory.

8  **A.**  Yeah.  Yeah.  I -- I don't know.

9          MR. MISHLER:  Okay.  I don't have any other questions.

10  Thank you, sir.

11          THE COURT:  What is that recording?

12          JUROR:  (Unintelligible).

13          THE COURT:  All right.  Mr. Green, were you -- we're

14  close to taking our afternoon bathroom break.  Do you want to

15  do that before or after your cross-examination?

16          MR. GREEN:  I'll make the Court and the jury happy; I

17  have no further questions.

18          THE COURT:  Okay.  Okay.  All right.  Then we'll go

19  ahead and take our afternoon bathroom break and then we'll come

20  back and see if there's any re-redirect.  If not, the jury can

21  take this time to write down some questions if you have any for

22  the witness.

23          So please remember you are not to discuss with anyone

24  nor permit anyone to discuss it with you.  You are required to

25  let the Court know right away if anyone does attempt to speak

1   to you about the case or if you accidentally overhear anything

2   about the case.  Remember, you're not to speak to the attorneys

3   or to the parties about anything.

4           Do not read or listen to or view anything that touches

5   upon this case in any way and do not attempt to perform any

6   research or any investigation about anything that touches upon

7   this case nor form any opinion yet.  We've got more information

8   to provide you.

9           It's 2:13, so be back here at 2:35.

10          (Whereupon, the jury exits at 2:13 p.m.)

11          THE COURT:  And Mr. Sabby, after the jury exits, you

12  can also take your afternoon break.  We just need you back here

13  at 2:35, please.

14          THE WITNESS:  Okay.

15          THE COURT:  Off record.

16          (Recess taken at 2:13 p.m.)

17          THE COURT:  Are we ready to bring in the jury?

18          MR. FINLEY:  Yes, your Honor.

19          THE COURT:  Okay.  Let's go and do that.

20          MR. ZYTNICK:  Just so the Court knows, we're not going

21  to have any redirect.

22          THE COURT:  Redirect?  Okay.  Thank you.

23          (Whereupon, the jury enters at 2:39 p.m.)

24          THE COURT:  All right.  Everyone may be seated.  We're

25  all back from the afternoon restroom break.  We have the jury

1   back with us and we have the witness, Mr. Troy Sabby, is also

2   back on the witness stand.  We just finished we

3   recross-examination.

4           Does the Government have any redirect?

5           MR. ZYTNICK:  No, your Honor.

6           THE COURT:  All right.  So at this time, if any

7   members of the jury have a question for our witness, please go

8   ahead and write it down on the forms provided.  Take your time

9   and write neatly.  If you have more than one question, go ahead

10  and skip a line or number the questions.

11          When you're all done, go ahead and fold the piece of

12  paper in half and pass it in the direction of Nick, our

13  courtroom deputy.  Remember, we don't need your names or your

14  signature on those.  Don't give us your jury number.  We just

15  want anonymous questions.

16          Counsel will please join me at sidebar.

17          (At sidebar on record.)

18          THE COURT:  Quite a few jury notes.  Jury note number

19  33 has two questions.

20          The first one is:  Do you know if the three envelopes

21  seized with the names contained the same amount of cash?

22          Any objection?

23          MR. ZYTNICK:  No objection.

24          MR. MISHLER:  No objection.

25          THE COURT:  Number two:  Is there a protocol or

1  standard operating procedure for conducting search warrants?

2          MR. ZYTNICK:  No objection.

3          MR. TANASI:  No objection.

4          MR. MISHLER:  No objection.

5          THE COURT:  Jury note number 34 has two questions.

6          Number one:  Is it a policy of the USPS when executing

7  a search warrant that all persons in a home, office, or

8  warehouse be placed in handcuffs?

9          MR. ZYTNICK:  No objection.

10          MR. MISHLER:  No objection.

11          MR. TANASI:  No objection.

12          THE COURT:  Why wasn't Patti Kern?

13          Any objection?

14          MR. ZYTNICK:  Can you repeat the question?

15          THE COURT:  It's same question but it also said, "Why

16  wasn't Patti Kern," so it's still part of number one --

17          MR. ZYTNICK:  Okay.  No objection.

18          THE COURT:  -- about the handcuffs.

19          MR. MISHLER:  No objection.

20          MR. GREEN:  No objection.

21          THE COURT:  Number two:  Were your agents wearing

22  vests on the day that they entered Patti Kern's house knowing

23  that there were possible weapons concealed on the site

24  premises?

25          MR. ZYTNICK:  No objection.

————— 2:19-cr-00295-GMN-NJK —————

1           MR. TANASI:  No objection.

2           MR. MISHLER:  No objection.

3           THE COURT:  Jury note 35 has -- question number one:

4    Is it possible to have blank PS-1583 applications notarized?

5           And then it has a question number two, but there's no

6    actual question written on there.

7           Any objection?

8           MR. ZYTNICK:  No objection.

9           MR. MISHLER:  No objection.

10          THE COURT:  Jury note number 36 has three questions.

11          First one:  Is the witness stated policy is don't in

12   response to a question about recording interviews?

13          Okay.  I think they're just trying to verify if that

14   was -- their recollection of the answer is correct.

15          MR. ZYTNICK:  No objection.

16          THE COURT:  Number two:  Does the witness mean that a

17   postal inspector needs specific approval from a superior person

18   in the U.S. Postal Service to record an interview?

19          MR. ZYTNICK:  No objection.

20          MR. MISHLER:  No objection.

21          THE COURT:  In your experience, was it typical for

22   case agents or USPIS superiors to remind inspectors to not

23   record?

24          MR. ZYTNICK:  No objection.

25          MR. MISHLER:  No objection.

―――― 2:19-cr-00295-GMN-NJK ――――

1          THE COURT:  Jury note 37, two questions.

2          First one is:  Why was Patti Kern not arrested?

3          MR. ZYTNICK:  No objection.

4          MR. MISHLER:  No objection.

5          THE COURT:  Number two:  Why is it not SUP to have

6    recorders or multiple ones in case one fails and have extra

7    batteries?

8          MR. MISHLER:  Might be "SOP."

9          MR. TOMSHECK:  Standard operating procedure.

10          THE COURT:  Thank you.

11          Okay.  Why is it not standard operating procedure to

12    have recorders or multiple ones in case one fails and have

13    extra batteries?

14          MR. ZYTNICK:  No objection.

15          MR. MISHLER:  No objection.

16          THE COURT:  Question -- or note number 38, one

17    question -- no, maybe three questions.

18          What were the ink stamps found in the closet?

19          MR. ZYTNICK:  No objection.

20          MR. MISHLER:  No objection.

21          MR. GREEN:  I'm sorry.  What was that again?

22          THE COURT:  What were the ink stamps --

23          MR. GREEN:  Oh, the ink stamps.

24          THE COURT:  -- found in the closet?

25          Okay.  Then they also want to know about the signature

───── 2:19-cr-00295-GMN-NJK ─────

1   stamps and then the notary stamps.

2           MR. MISHLER:  No objection.

3           MR. ZYTNICK:  No objection.

4           THE COURT:  Jury note number 39, two questions.

5           Number one -- it's misspelled -- were the daughter and

6   husband of Patti Kern interviewed, as well?

7           MR. ZYTNICK:  No objection.

8           MR. MISHLER:  No objection.

9           THE COURT:  Number two:  Did you interview the four

10  females from the cleaning company?

11          MR. ZYTNICK:  No objection.

12          MR. MISHLER:  No objection.

13          THE COURT:  Okay.  Jury note number 40 has two

14  questions.

15          Number one:  Which inspectors had the authority to

16  release cash back to persons at the search site?

17          MR. ZYTNICK:  No objection.

18          MR. MISHLER:  No objection.

19          THE COURT:  Do you feel like your team made the right

20  decision in returning funds that day to the Kern family?

21          MR. ZYTNICK:  No objection.

22          MR. MISHLER:  No objection.

23          THE COURT:  Jury note number 41 has two questions.

24          Was the search for the entire house or just the

25  office?

————— 2:19-cr-00295-GMN-NJK —————

1            MR. ZYTNICK:  No objection.

2            MR. MISHLER:  No objection.

3            THE COURT:  And the second question is:  Is it a

4    judgment call on what is taken during the search such as money

5    and electronics?

6            MR. ZYTNICK:  No objection.

7            MR. MISHLER:  No objection.

8            THE COURT:  Jury note number 42, five questions.

9            Number one:  Were firearms seized at the Kern

10   residence?

11           MR. ZYTNICK:  No objection.

12           MR. MISHLER:  No objection.

13           THE COURT:  From within the premises?

14           MR. ZYTNICK:  No objection.

15           MR. MISHLER:  No objection to that.

16           THE COURT:  From within vehicles?

17           MR. ZYTNICK:  No objection.

18           MR. MISHLER:  No objection.

19           THE COURT:  How many firearms in total?

20           MR. ZYTNICK:  No objection.

21           THE COURT:  Were there firearms that were seen by law

22   enforcement agents but those firearms were not seized?

23           MR. ZYTNICK:  No objection.

24           THE COURT:  Jury note number 43 has two questions.

25           The first one is:  Exhibit 96 with Mario Castro, why

1    notarized without a delivery address?

2            MR. ZYTNICK:  No objection.

3            MR. MISHLER:  No objection.

4            THE COURT:  And number two is:  Would you know any

5    reason to notarize an incomplete P.O. box application?

6            MR. ZYTNICK:  No objection.

7            MR. MISHLER:  I have no objection.

8            THE COURT:  Thank you.

9            (End of discussion at sidebar.)

10            THE COURT:  All right.  Mr. Sabby, we do have quite a

11    number of questions for you here.  These are jury questions.

12    I'm going to read them into the record for you, but when you

13    respond, please turn and face the jury because these are really

14    jury questions, not mine.

15            So jury note number 33 has two questions.

16            The first one is:  Do you know if the three envelopes

17    seized with the names contained the same amount of cash?

18            THE WITNESS:  I do not know that.

19            THE COURT:  Okay.  Number two:  Is there a protocol or

20    standard operating procedure for conducting search warrants?

21            THE WITNESS:  Can you repeat that one again?

22            THE COURT:  Yes.  Is there a protocol or standard

23    operating procedure for conducting search warrants?

24            THE WITNESS:  Yes.  There's a lot of different factors

25    in a search warrant, but there are certain protocols you got to

1  do.  Officer safety is our number one factor that we take into

2  play on that.

3           As for actually searching a house, it varies with the

4  circumstances.  Like you probably saw, we -- we -- if it's a

5  bigger house, we put the number or the letters by the rooms so

6  it helps to distinguish where something was found, we take

7  pictures before and after, and where stuff is found.

8           Our evidence system, everything gets brought to an

9  evidence person and they enter it in the system.  That's how we

10  get the inventory and the printout.  You always have to leave

11  the copy of the inventory with the residents to show what you

12  took.  And they get a copy of the search warrant for the house.

13           THE COURT:  All right.  Jury note number 34 has two

14  questions.

15           The first one is:  Is it a policy of the USPIS when

16  executing a search warrant that all persons in a home, office,

17  or warehouse be placed in handcuffs?

18           THE WITNESS:  No.  That's -- that's -- it's on the --

19  our discretion.  Like the one example with cleaning ladies that

20  were in the house.  No, we don't -- but it -- again, it's

21  officer safety thing.  If you're -- you know, you feel

22  threatened or you know that something -- like, if -- if she had

23  been home, you know, and we knew that she -- she carried a

24  weapon, then it would have changed our whole scenario,

25  probably.

1          THE COURT:  All right.  And the follow-up question to

2    question number one is:  Why wasn't Patti Kern handcuffed?

3          THE WITNESS:  She cooperated immediately.  The case

4    agent was able to talk to her, told her what to do, and she,

5    you know, came to the house.  Yeah, she immediately cooperated

6    and, I believe, was pretty quickly interviewed.  Like, right

7    after that.

8          THE COURT:  And question number two:  Were your agents

9    wearing vests on the day that they entered Patti Kern's house

10   knowing that there were possible weapons concealed on the said

11   premises?

12         THE WITNESS:  That's a good question.  Yes, that's

13   another one of the safety protocols, but we always have to wear

14   vests when we go in.

15         THE COURT:  Okay.  Jury note number 35 asks one

16   question.

17         Is it possible to have a blank PS-1583 application

18   notarized?

19         THE WITNESS:  No, it's not.

20         THE COURT:  Okay.  Jury note number 36 asks three

21   questions.

22         The first one is:  The witness stated -- the question

23   is, did they remember correctly.  Did the witness state policy

24   is you don't, in response to a question about recording

25   interviews?

1          THE WITNESS:  I believe the discussion earlier today
2    was we have to record when a person's in custody.  When they're
3    not in custody, we don't have to and we're not supposed to.
4          THE COURT:  All right.  Second question is:  Does the
5    witness mean that a postal inspector needs specific approval
6    from a superior person in the U.S. Postal Service to record an
7    interview?
8          THE WITNESS:  Again, we don't need any permission if
9    we're going to talk to somebody that's in custody.
10          If we're going to do -- I don't know what the word is,
11    but if we're going to be undercover or if we're going to do
12    anything like that, we're going to -- then, yes.
13          THE COURT:  Okay.  Number three:  In your experience,
14    was it typical for case agents or USPIS superiors to remind
15    inspectors to not record?
16          THE WITNESS:  Can you repeat that one again?  That
17    one --
18          THE COURT:  Yes.  Was it -- in your experience, was it
19    typical for case agents or USPIS superiors to remind the
20    inspectors to not record?
21          THE WITNESS:  No.  No.
22          THE COURT:  Okay.  Jury note number 37 asks two
23    questions.
24          The first one is:  Why was Patti Kern not arrested?
25          THE WITNESS:  Why wasn't she arrested?  We weren't

1  prepared at that time to arrest her.

2          THE COURT:  And number two is --

3          THE WITNESS:  And an arrest warrant.  So...

4          THE COURT:  Sorry.  Didn't mean to cut you off there.

5          You said you didn't have an arrest warrant?

6          THE WITNESS:  Did not have an arrest warrant.

7          THE COURT:  Okay.  Then the second question for jury

8  note number 37 is:  Why is it not standard operating procedure

9  to have recorders or multiple ones in case one fails and have

10 extra batteries?

11         THE WITNESS:  I'm sorry.  That one kind of got me,

12 too.

13         THE COURT:  Okay.  So why is it not standard operating

14 procedure to have recorders or multiple ones in case one fails

15 and have extra batteries?

16         THE WITNESS:  I know when I had my recorder, I always

17 had extra batteries, but -- because sometimes it would die in

18 the middle if I was interviewing somebody in jail.  I did not

19 have two recorders, though.

20         THE COURT:  Okay.  And jury note number question

21 number 38 asks:  What were the ink stamps found in the closet?

22 And then for example, they want to know:  What is on the

23 signature stamp?  What is on the notary stamp?  Because we

24 can't see in the photograph what it says.

25         THE WITNESS:  I don't know the answer to that.

1          THE COURT:  All right.  Jury note number 39 has two

2    questions.

3          The first one is:  Were the daughter and husband of

4    Patti Kern interviewed, as well?

5          THE WITNESS:  I don't believe they were.

6          THE COURT:  And number two:  Did you interview the

7    four females from the cleaning company?

8          THE WITNESS:  No, did not.

9          THE COURT:  Jury note number 40 has two questions.

10          The first one is:  Which inspectors had the authority

11    to release cash back to persons at the search site?

12          THE WITNESS:  I did.

13          THE COURT:  And the second question is:  Do you feel

14    like your team made the right decision in returning funds that

15    day to the Kern family?

16          THE WITNESS:  Yes.

17          THE COURT:  Okay.  Jury note number 41 asks two

18    questions.

19          The first one is:  Was the search for the entire house

20    or just for the office?

21          THE WITNESS:  Entire house and garage.

22          THE COURT:  And number two:  Is it a judgment call on

23    what is taken during the search such as money and electronics?

24          THE WITNESS:  There's things -- I guess there is some

25    judgment, but for the most part, we know what we're looking for

1  before we go in and so we take that.  But I guess there is some

2  leeway.

3          THE COURT:  Okay.  Jury note number 42 asks five

4  questions.

5          The first one is:  Were firearms seized at the Kern

6  residence?

7          THE WITNESS:  I -- no, they were not.

8          THE COURT:  And is seized different than secured?

9          THE WITNESS:  Yeah.  They're secured but they were not

10  seized.

11          THE COURT:  Okay.  And the second question is:  How

12  about from within the premises?  Any firearms seized?

13          THE WITNESS:  No.

14          THE COURT:  From within the vehicles, any firearms

15  seized?

16          THE WITNESS:  No.

17          THE COURT:  How many firearms in total?

18          THE WITNESS:  I only know of the one -- personal one

19  that she carries.

20          THE COURT:  And the last question is:  Were there

21  firearms that were seen by law enforcement agents but those

22  firearms were not seized?

23          THE WITNESS:  No.

24          THE COURT:  What about the one in her truck?

25          THE WITNESS:  Other than the one in her truck; that

1  was not seized.

2          THE COURT:  Okay.  But it was secured?

3          THE WITNESS:  Correct.

4          THE COURT:  All right.  So jury note number 43 asks

5  two questions.

6          The first one is:  Exhibit 96, with Mario Castro, why

7  notarized without a delivery address?  Do you know why?

8          THE WITNESS:  On the redress, we kind of went through

9  that.  It was on a different page.  That was the Congers, New

10  York address.

11         THE COURT:  And question number two is:  Would you

12  know any reason why to notarize an incomplete P.O. box

13  application?  Can you think of any reason why?

14         THE WITNESS:  It wasn't incomplete.  It was actually

15  complete, just in a different -- on a different page.

16         THE COURT:  Someone want to throw up Exhibit Number 96

17  so we can -- because the juror seems to think it's incomplete,

18  so I don't want to let it go.  I don't want to let Mr. Sabby

19  leave unless we can clarify that for the jury.

20         MR. MISHLER:  Your Honor, I'm happy to clear that up.

21         THE COURT:  Okay.  You want to do that on follow-up?

22         MR. MISHLER:  Sure.

23         THE COURT:  So Mr. Zytnick, do you have any follow-up

24  questions?

25         MR. ZYTNICK:  Yes.  Just one, your Honor.

———— 2:19-cr-00295-GMN-NJK ————

1    Court's indulgence.

2              FURTHER REDIRECT EXAMINATION

3    BY MR. ZYTNICK:

4    Q.  In response to one of the juror questions, you said you

5    don't believe that Michael Kern was interviewed.

6              If there was other information that he was briefly

7    interviewed, could that be correct?

8    A.  Yes.

9              MR. ZYTNICK:  Nothing further.

10             THE COURT:  All right.  Any follow-up, Mr. Tomsheck?

11             MR. TOMSHECK:  Mishler's first, actually.

12             THE COURT:  All right.  Go ahead, Mr. Mishler.

13              FURTHER RECROSS-EXAMINATION

14   BY MR. MISHLER:

15   Q.  Inspector Sabby, how you doing?

16   A.  It's great.

17   Q.  Been a long, hard day?

18   A.  Yes.

19   Q.  You hanging in there?

20   A.  I am.

21   Q.  All right.  So let's go ahead and pull up Government's

22   Exhibit 96.  And we start on, I think page 5.  I think this is

23   the page that the jury was concerned was not completely filled

24   out.

25             And your testimony is that it is complete, just the

1  address is located somewhere else?

2  **A.**  Right.

3  *Q.*  And if we scroll up two pages, this is what you're

4  referring to?

5  **A.**  Yes.

6  *Q.*  Okay.  So at this point, your testimony is this is the

7  address you believe that mail was going to be sent to --

8  **A.**  Yes.

9  *Q.*  -- after it arrives at a post office box somewhere?

10  **A.**  No.  That -- that is the post office box.

11  *Q.*  That is the post office box?

12  **A.**  Or the Mail Box Etc. box.

13  *Q.*  Okay.

14  **A.**  Yes.

15  *Q.*  So that's where somebody would have to go in person --

16  **A.**  Correct.

17  *Q.*  -- to pick up the mail?

18  **A.**  Correct.

19  *Q.*  But there is no information as far as where that mail would

20  be forwarded to?

21  **A.**  You know what, I don't -- I'm not following.

22  *Q.*  Like, there is no forwarding from that P.O. box or Mail Box

23  Etc.?

24  **A.**  Oh, correct.  A person would have to go into the actual

25  store.

---2:19-cr-00295-GMN-NJK---

1   Q.  Going in in person would be the only way to get it?

2   A.  Correct.

3   Q.  Okay.

4   A.  Yep.

5   Q.  So are you telling us that it's complete in the fact that

6   it doesn't need an address for mail to be forwarded?

7           Sorry.  Let's go back two pages.

8           So in the top right corner where it says, "Mail to be

9   delivered to," that doesn't need to have an address there?

10  A.  Sorry.  Where are you -- where are you?

11  Q.  Sure.

12          If you'll zoom in just the boxes around Unlimited

13  Assets sort of in the middle top right.

14  A.  Right in the middle there?

15  Q.  Yeah.  See the boxes above that?

16  A.  Yeah.

17  Q.  So it doesn't need an address to deliver mail to for this

18  be a complete, full application?

19  A.  That's what that other address is, the two pages down.

20  Q.  Okay.  So I'm a little confused now.  So let me try to

21  clear this up.

22  A.  All right.

23  Q.  See the boxes on the left side where it says, "Name,

24  Address, City"?

25  A.  Yes.

1    Q.  And that's right above the words "Mario Castro"?

2    A.  Yes.

3    Q.  I thought that's where you were saying that address would

4    go?  Because you said that's the address of the Mail Box Etc.?

5    A.  That is true.

6         Okay.  I thought you were talking over here.

7         No.  That is -- that address, the one that you showed

8    in Congers, that is the Mail Box Etc.

9    Q.  So it should go there on the left side?

10   A.  It should, yes.

11   Q.  So on the right is if that Mail Box Etc. was going to

12   forward that mail to someone?

13   A.  Correct.

14   Q.  So is it a complete application without somewhere to

15   forward the mail to?

16   A.  No.  You don't have to always forward it.

17   Q.  Okay.  That's what I'm asking.

18   A.  Oh, okay.

19   Q.  Okay.

20   A.  A lot of times it's -- I mean, the -- it's just going to

21   pick it up from...

22   Q.  So let me ask you --

23   A.  Actually, I don't even know, sir, if they -- I don't know

24   if they would forward it from there because they're -- at that

25   point, they're not -- you know, it's a private -- it's not like

1  a post office or anything.  It's a private or -- and Mail Box

2  Etc. is, like, a private business.  I don't even know if they

3  do forward from -- maybe.  I don't know.

4  Q.  Okay.  Are you familiar with the fact that this form is,

5  basically, designed with a spot that says address to forward

6  mail to?

7  **A.**  Yes.

8  Q.  And that's a post office form, right?

9  **A.**  It is.

10        But when it -- when it says forward mail to -- so,

11 like, the mail would be at the post office, right?

12 Q.  Right?

13 **A.**  And they'll get, you know, a bunch of mail and it's all

14 for, like, a Mail Box Etc. --

15 Q.  Yeah.

16 **A.**  -- store.

17        So I guess that is the forward maybe, but I mean, it's

18 just going to that one address.  If that makes sense.

19        I mean, it's just like going -- your mail going to

20 your house.  It's only going to go to the address that --

21 Q.  So I'm going to be honest with you:  So I'm a little more

22 confused now than when I came up, so I'm going to start at the

23 beginning.

24 **A.**  Okay.  Go ahead.

25 Q.  So --

1  *A.*  I can't answer why the -- I don't know why the address

2  isn't there.  That, I don't know.

3  *Q.*  Right.

4        I -- I'm actually not sure I know what this form is

5  for anymore now, so that's why I got to start over.

6  *A.*  It's to open the P.O. box.

7  *Q.*  Okay.

8  *A.*  Not a P.O. box.  That's a post office box.

9        It's to open the mailbox at Mail Box Etc., and this is

10  the information to apply for that box --

11  *Q.*  Right.

12  *A.*  -- at that store.

13  *Q.*  Okay.  I think I understand that.

14        So I believe you testified they don't have to forward

15  and you're not sure Mail Box Etc. could forward mail because

16  they're a private company?

17  *A.*  Yeah, I don't know.  I think your -- the post office

18  deliveries it to the Mail Box Etc.  I don't know if a person,

19  like, has a box at the Mail Box Etc., if they can tell them,

20  you know, send it somewhere else then.

21        Because most people just go into the store itself and

22  pick up their mail just like a P.O. box, you know.  They have a

23  key and they can go in.  I don't know if they forward or not.

24  *Q.*  Is there something that the UPS [sic], like, has a rule

25  that they can't forward mail from a Mail Box Etc.?

1    *A.*  It's really not mail anymore then.  It's -- because mail is

2    only supposed to be in the mail system.  It's, like, private.

3    *Q.*  Okay.  I think I figured out where the problem is.

4            So, for example, at this Mail Box Etc. --

5    *A.*  Yeah.

6    *Q.*  -- if a company sent all of their mail to a mailbox at Mail

7    Box Etc., and Mail Box Etc. collected all of that mail and put

8    it in a box and then closed up the box, they could then ship

9    that box, but what they couldn't do is independently of the

10   Postal Service write "forward to" and drop it back in the mail?

11   *A.*  Right.

12   *Q.*  Okay.  That's probably the confusion.

13   *A.*  That's correct.

14   *Q.*  Okay.  Thanks for clearing that up.

15   *A.*  How you just said it is correct.

16   *Q.*  It's unexpected.

17           All right.  So I'm going to move on from this.

18           I believe you told, in response to one of the juror

19   questions, that officer safety is number one, right?

20   *A.*  Yeah.

21   *Q.*  That's because -- sorry.  Go ahead.

22   *A.*  I was an officer safety instructor for many years.

23   *Q.*  How many years?

24   *A.*  Ten.

25   *Q.*  With the USPIS?

1    **A.**  Yes.

2    *Q.*  Okay.  What does that entail?

3    **A.**  Teach (unintelligible).

4           (Court reporter interruption.)

5    **A.**  Like, building entry, you know, handcuffing, manual

6    techniques to, like, control a person, sort of things like

7    that.

8    *Q.*  Okay.  So it made me think of a question.

9           One of the reasons that you handcuff people sometimes

10   when you enter during a search warrant execution is for officer

11   safety?

12   **A.**  Correct.

13   *Q.*  So it seems like you have policy discretion, your

14   discretion as the inspector on site on whether to handcuff

15   someone or not?

16   **A.**  There was only one -- I mean, we were not going to handcuff

17   the -- the ladies, the cleaning ladies.

18   *Q.*  Why not?

19   **A.**  No threat.  Assessed it.  There's no threat.

20   *Q.*  Okay.  And I didn't -- I didn't know that the daughter had

21   been temporary handcuffed.  No, that's fine.  I'm not asking

22   about that.

23   **A.**  And with Patti Kern and her husband, they came later and so

24   we kind of just escorted them and, you know, met them outside

25   and escorted them in.

—— 2:19-cr-00295-GMN-NJK ——

1   Q.   Right.

2            So I think my question was:  Your testimony was that

3   you have discretion as an inspector on site whether to handcuff

4   someone or not for officer safety?

5   A.   Yes.

6   Q.   It's not a USPS -- PIS policy?

7   A.   As far as I know, unless it's changed.

8   Q.   Okay.  But you do not have discretion on whether to record

9   someone that you're interviewing that's not in custody?

10  A.   Correct.  Not in custody.  Correct.

11  Q.   Right.

12  A.   Yeah.

13  Q.   So let me explore that a little bit because you're making a

14  real distinction on in custody versus a field interview; is

15  that accurate?

16  A.   Yes.

17  Q.   Okay.  And a field interview is like the one you did in

18  this case?

19  A.   Yes.

20  Q.   Thus, the name "field interview"?

21  A.   Correct.

22  Q.   Right.

23            Now, an in-custody interview, I think you testified,

24  is, like, an interview you would do when somebody had been

25  arrested out of jail?

1    **A.**   Correct.

2    *Q.*   And depending on that jail, they may or may not have video

3    capability?

4    **A.**   Correct.

5    *Q.*   Okay.  And the reason you would record always in an

6    in-custody interview is because you've Mirandized that person?

7    **A.**   Correct.

8    *Q.*   And you would want a memorialization of that Miranda

9    interview that everyone could hear later because that's

10   important?

11   **A.**   Correct.

12   *Q.*   And in the field, you don't give Miranda warnings?

13   **A.**   Correct.

14   *Q.*   And so you don't need to record it because you're not

15   concerned about having to prove to someone later that you gave

16   Miranda warnings?

17   **A.**   That is correct.

18   *Q.*   So in a case like that, just taking notes or just typing up

19   a report later from memory is accurate enough for USPIS

20   purposes?

21   **A.**   Correct.

22   *Q.*   It's not the most accurate way to do it?

23   **A.**   Agreed.

24   *Q.*   But it's the way you do it?

25   **A.**   Correct.

1  *Q.*  Because it's the policy?

2  *A.*  Correct.

3  *Q.*  So you have discretion on whether to handcuff someone?

4  *A.*  Yes.

5  *Q.*  But not on whether to record an interview?

6  *A.*  Do not have the -- do not have it for the field interview.

7  *Q.*  Okay.  I think I'm clear.

8        MR. MISHLER:  Thank you.  I don't have any other

9  questions.

10        THE COURT:  Mr. Tomsheck?

11        MR. TOMSHECK:  Can you pull 96 back up, please?  Go to

12  that first page, please, Brian.

13                FURTHER RECROSS-EXAMINATION

14  BY MR. TOMSHECK:

15  *Q.*  All right.  I'm going to go through this kind of quick.

16  We're not trying to create any new issues.

17        Just so it's clear what we're talking about:  This is

18  an item that was seized in the search warrant, yes?

19  *A.*  Yes.

20  *Q.*  And it came from Patti Kern's office, the room labeled "R"

21  on that inventory, right?

22  *A.*  Correct.

23  *Q.*  Okay.  Looks like to be -- to me, to be a photocopy of a

24  file folder, right?

25  *A.*  I agree.

—— 2:19-cr-00295-GMN-NJK ——

1  Q.  Okay.  So presumably, what you actually found was a file

2  folder, right?

3  A.  Correct.

4  Q.  Okay.

5       MR. TOMSHECK:  Can you zoom in on what's on the file

6  folder tab on the bottom right there, Brian?

7  BY MR. TOMSHECK:

8  Q.  Okay.  Above Government's Exhibit 96 -- turning my head

9  sideways here -- it says, "Mailbox Intro.  Money Securities

10  Assets, Unlimited."

11       Did I read that right?

12       THE COURT:  No, not "Intro."

13       THE WITNESS:  "Into."

14       MR. TOMSHECK:  Okay.

15       THE WITNESS:  "Money Securities Asset Unlimited."

16  BY MR. TOMSHECK:

17  Q.  Could it be "Info"?

18  A.  Oh.  I believe it is "Info."

19  Q.  I don't know.  Your guess is as good as mine.

20  A.  (Unintelligible.)

21       (Court reporter interruption.)

22  A.  It is faded on the top, the "F" part, but I think it's

23  "info."

24  Q.  Okay.  My point being:  You don't really know what anything

25  in there is.  It's just as you find it like we talked about

1  earlier, right?

2  *A.*  Correct.

3  *Q.*  Okay.

4        MR. TOMSHECK:  And go to the next page.

5  BY MR. TOMSHECK:

6  *Q.*  Now the Government asked you some questions about whether

7  or not the application was complete because there was an

8  address written on a piece of paper contained within that

9  exhibit, right?

10  *A.*  Correct.

11  *Q.*  Okay.  You'd agree with me it says "Old GPS Money

12  Securities," and has an address, right?

13  *A.*  Yes.

14  *Q.*  Okay.

15        MR. TOMSHECK:  Go to the next page if you could,

16  please, page 3 of the exhibit.

17  BY MR. TOMSHECK:

18  *Q.*  That says "Old MMI," and has the same address for Unlimited

19  Assets, correct?

20  *A.*  Correct.

21  *Q.*  Okay.

22        MR. TOMSHECK:  Go to the next page, please.

23  BY MR. TOMSHECK:

24  *Q.*  This appears to be a printout of an e-mail.  Would you

25  agree with that?

1    *A.*  It definitely looks like one, yes.

2    *Q.*  Okay.  And it comes from somebody named David Diaz.

3          You have no idea who that is, do you?

4    *A.*  I do not.

5    *Q.*  Okay.  It goes to someone with an address of

6    PK1726@aol.com.

7          Did I read that right?

8    *A.*  You did.

9    *Q.*  Okay.  Do the initials "PK" mean anything to you?

10   *A.*  Could assume it's Patti Kern.

11   *Q.*  Okay.  Easy to assume because in the body of the e-mail, it

12   actually says the name "Patti," right?

13   *A.*  Correct.

14   *Q.*  Okay.  So it appears to be an e-mail to Patti and says,

15   "The two new box numbers are," and then it gives two box

16   numbers, correct?

17   *A.*  It does.

18   *Q.*  Okay.

19          MR. TOMSHECK:  Scroll to the next page for me, please.

20   BY MR. TOMSHECK:

21   *Q.*  On that next page, that's the actual application.  I think

22   you called it a PS-1583; is that correct?

23   *A.*  Correct.

24   *Q.*  Okay.  I have no idea what those numbers mean, but they

25   mean something to you, right?

1  *A.*  Not really.

2  *Q.*  Okay.

3  *A.*  That's just the form number.

4  *Q.*  Appreciate your honesty.

5        When I look at those boxes, there are places within

6  that form to include name, address, identifiers like that.

7        You'd agree with that, right?

8  *A.*  I agree.

9  *Q.*  Okay.  You'd agree with me that on that form, they are

10 blank, yes?

11 *A.*  Yes.

12 *Q.*  Okay.  You'd agree with me the bottom of the form has a

13 notarization?

14 *A.*  It does.

15 *Q.*  Okay.  That's a notary stamp, right?

16 *A.*  Correct.

17 *Q.*  A notary stamp is something you have to apply for, and when

18 you do, you have the ability to notarize something and document

19 it in order to say the person that signed it is actually the

20 person that signed it, right?

21 *A.*  Correct.

22 *Q.*  Okay.  You'd agree with me when a juror asked the question

23 is it possible for a PS-1583 to not be notarized -- I may not

24 have gotten the question correctly verbatim.  The court

25 reporter probably did because we have a real-time reporting of

—— 2:19-cr-00295-GMN-NJK ——

1    it.

2    **A.**  I think the question was a blank with a notary stamp.

3    **Q.**  Okay.  Yes.  You'd agree with me that you can actually put

4    a notary stamp on anything, right?

5    **A.**  True.

6    **Q.**  You can put it on a blank piece of paper?

7    **A.**  True.

8    **Q.**  You can put a notary stamp on your forehead if you wanted

9    to, right?

10   **A.**  True.

11   **Q.**  Presumably, there's a protocol on how to properly notarize

12   something so that we have assurances related to it, right?

13   **A.**  I agree, yes.

14   **Q.**  Okay.

15            MR. TOMSHECK:  Can you zoom in on the notary stamp for

16   me, please?

17   BY MR. TOMSHECK:

18   **Q.**  There's a Javier Berbey, Notary Public, State of Nevada,

19   County of Clark, with a notary number that expires on January 9

20   of 2020.

21            Do you see that?

22   **A.**  I do.

23   **Q.**  Okay.  Presumably, if you wanted to find out if something

24   was notarized, you could go back to this person, look at their

25   book and see, right?

—— 2:19-cr-00295-GMN-NJK ——

1    *A.*   Agreed.

2    *Q.*   Do you have any idea if that done in this case?

3    *A.*   I don't know.

4    *Q.*   Okay.  Can you go up to the top of the page there where it

5    has the name of the applicant?

6          Do you see the name of the applicant halfway down on

7    the left-hand side, box number 8, I believe?

8    *A.*   Box number 6?  No.  6?  Mario Castro?

9    *Q.*   Yeah.  Do you see that?

10   *A.*   I do.

11   *Q.*   Do you know who Mario Castro is?

12   *A.*   I don't other than he's one of the defendants.

13   *Q.*   Okay.  That's my question.

14         MR. TOMSHECK:  Can you cycle down to where they're --

15   go past that particular page to the next one.

16   BY MR. TOMSHECK:

17   *Q.*   There's some customer information, has the name Mario

18   Castro.

19         Do you see anything after the name "Castro"?

20   *A.*   I do.

21   *Q.*   Okay.

22         MR. TOMSHECK:  Can you scroll down further there on

23   the exhibit, Brian?  You're going to see an identification of

24   someone.

25         Next page.

1          Next page.  Keep going until you see an ID.

2          Next page.  All the way down.  Until you see an ID.

3          All right.  Page 11 of that exhibit.  Can you zoom in

4  on that license?

5  BY MR. TOMSHECK:

6  Q.  Okay.  Do you see the person depicted there as Mario

7  Castro?

8  A.  That's what it says, yes.

9  Q.  Okay.  Do you see a date of birth on that driver's license

10  in the box in the middle on the bottom?  DOB?

11  A.  I do.  February 16, 1990.

12  Q.  Okay.  Just so it's abundantly clear, not trying to confuse

13  you at all, you look over here, the guy in that driver's

14  license isn't seated over here, right?

15  A.  No.

16  Q.  Okay.

17  A.  I would say no.

18  Q.  All right.  And if you look at the defendants the

19  Government's charged in this case, none of them were born in

20  1990, agreed?

21  A.  Agreed.

22  Q.  Okay.  You would agree with me that somebody knows how that

23  application was done, how it was notarized, and the purpose of

24  that whole folder of information, right?

25  A.  I agree.

1  *Q.*  Okay.  You'd agree with me it's not you?

2  *A.*  Right.

3  *Q.*  You'd agree with me that folder was found in Patti Kern's

4  office, right?

5  *A.*  Yes, it was.

6  *Q.*  It contained correspondence that those numbers for those

7  applications were sent via e-mail to Patti Kern, right?

8  *A.*  Correct.

9  *Q.*  Okay.  I want to talk to you next real quickly about you

10  mentioned the standard operating procedure on the execution of

11  search warrants.

12           Remember those questions?

13  *A.*  Yes.

14  *Q.*  And you said the first thing, the most important thing was

15  officer safety, right?

16  *A.*  Correct.

17  *Q.*  Anytime a law enforcement officer is going into a home, a

18  business, a residence to execute a search warrant, the most

19  paramount concern for those officers is officer safety, right?

20  *A.*  Correct.

21  *Q.*  We don't want anyone to get hurt or, God forbid, killed,

22  right?

23  *A.*  Correct.

24  *Q.*  Okay.  And because of that, there are protocols in place,

25  right?

1  **A.**  Correct.

2  *Q.*  And they include both wearing things that identify you as

3  law enforcement officers so there's no confusion, shooting

4  somebody that's not a cop?

5  **A.**  Correct.

6  *Q.*  And do you actually announce yourselves as police officers?

7  **A.**  Yes.

8  *Q.*  And do you put on bulletproof vests in order to protect

9  officers?

10  **A.**  Yes.

11  *Q.*  All good things.  You'd agree with that, right?

12  **A.**  I agree.

13  *Q.*  Because you are trying to protect human life, correct?

14  **A.**  Correct.

15  *Q.*  You would agree with me that in the execution of a search

16  warrant, people are more important than stuff, right?

17  **A.**  I agree.

18  *Q.*  You'd agree with me that the value of human life doesn't

19  just apply to law enforcement officers?  It applies to citizens

20  and, in fact, suspects, right?

21  **A.**  One hundred percent yes.

22  *Q.*  Those people are more important than stuff.  You'd agree

23  with that, right?

24  **A.**  One hundred percent.

25  *Q.*  Last thing I'm going to talk to you about is the decision

—— 2:19-cr-00295-GMN-NJK ——

1    to give back money to the Kern family.

2              You made that decision, right?

3    *A.*  I did.

4    *Q.*  You did that when you reviewed the evidence at the scene,

5    correct?

6    *A.*  Yes.

7    *Q.*  And you talked to some of the people there, right?

8    *A.*  Yes.

9    *Q.*  And you made the decision to return some of the funds?

10   *A.*  Yes.

11   *Q.*  And you did that because you did not know if they were

12   instrumentalities of criminal activity, right?

13   *A.*  Correct.

14   *Q.*  And if you don't know if something is an instrumentality of

15   criminal activity, you're not going to seize it, fair?

16   *A.*  Fair.

17             MR. TOMSHECK:  Nothing further.

18             THE COURT:  Mr. Gaffney?  Or I'm sorry.  Mr. Ericsson,

19   any follow-up?

20             MR. ERICSSON:  No.  Thank you.

21             THE COURT:  Mr. Green, any follow-up?

22             MR. GREEN:  Very briefly.  I have to look at something

23   very quickly.  It will just take a moment.

24             THE COURT:  Go ahead.

25             MR. GREEN:  Indulgence for another moment, your Honor.

1  I may save some time.  I have a couple of questions.

2          THE COURT:  Yes, you may.

3          MR. GREEN:  Thank you.

4                  FURTHER RECROSS-EXAMINATION

5  BY MR. GREEN:

6  Q.  I believe that Government's Exhibit -- I believe that

7  Government's Exhibit 93 --

8          MR. GREEN:  93 is in evidence, your Honor.  May we go

9  to page -- Exhibit 93, page 5?

10 BY MR. GREEN:

11 Q.  Inspector Sabby, before you we have page 5 of 11 of

12 Government's Exhibit 93.

13         MR. GREEN:  If we could zoom in on where it says --

14 right where it says 75A Lake Road in Congers, New York.

15 BY MR. GREEN:

16 Q.  Do you see that?

17 A.  I do.

18         MR. GREEN:  Highlight that in that block.

19 BY MR. GREEN:

20 Q.  Do you see that?

21 A.  Yes.

22 Q.  75A Lake Road.

23         MR. GREEN:  Now, could we go to page 1 of Exhibit 93

24 which I think is the folio, the folder.  There we go.

25         We can go to the right.

—— 2:19-cr-00295-GMN-NJK ——

1           I might have the wrong exhibit, your Honor.

2    BY MR. GREEN:

3    Q.  Do you see that in front of you is Government's Exhibit --

4    can't quite see it.  96.  Page 2.  96.  Page 2.

5           Do you see that in front of you?

6    A.  I do.

7    Q.  Now, I'm not asking you to be a handwriting expert or

8    anything, but do you see where it says "Money Securities" and

9    it says, "75A Lake Mead -- Lake Avenue -- Lake Road, Unit A,

10   Suite 900 or Number 900"?

11   A.  I do.

12   Q.  And it says "Congers, New York"?

13   A.  Yes.

14   Q.  Okay.

15           MR. GREEN:  Can we go back to 93, page --

16           THE COURT:  Five.

17           MR. GREEN:  93, page 5.

18           And go up.

19   BY MR. GREEN:

20   Q.  Do you see where it says "75A Lake Road, Unit A, Number

21   377"?

22   A.  Yes.

23   Q.  Do you see that?

24           So it looks like maybe there was two boxes in that

25   Congers, New York address, correct?

1   **A.**   Correct.

2   *Q.*   Okay.

3         MR. GREEN:  We can go down, scroll down on that page.

4   BY MR. GREEN:

5   *Q.*   Do you see where --

6         MR. GREEN:  Stop right there, sir.

7   BY MR. GREEN:

8   *Q.*   Do you see where it says "5679 Sentry Palm Court, Las

9   Vegas"?

10  **A.**   Yes.

11  *Q.*   Do you know whose address that is?

12  **A.**   We earlier had a Sentry Palm Court address.

13  *Q.*   Yes.  We have evidence that that's the address of Salvador

14  Castro.

15        MR. GREEN:  Okay.  Thank you.  No further questions.

16  Thank you, your Honor.

17        THE COURT:  Any follow-up, follow-up?

18        MR. ZYTNICK:  No, your Honor.

19        THE COURT:  All right.

20        Thank you, Mr. Troy Sabby, for your testimony today.

21  You're all done.  You may be excused.  Please be careful on the

22  way down with the steps.

23        THE WITNESS:  Thank you, your Honor.

24        THE COURT:  And the Government may call its next

25  witness.

—— 2:19-cr-00295-GMN-NJK ——

1           MR. FINLEY:  Your Honor, the Government calls Patti

2    Kern.

3           THE COURT:  Good afternoon, Ms. Kern.  You're going to

4    be seated right here to my left.  Come on up, all the way up

5    here.  Please be careful with the wires and the steps on your

6    way up.  More steps when you turn the corner.  Then please

7    remain standing when you reach the seat.

8           THE COURTROOM ADMINISTRATOR:  Please raise your right

9    hand.

10          You do solemnly swear that the testimony you shall

11    give in the cause now pending before this Court shall be the

12    truth, the whole truth, and nothing but the truth, so help you

13    God?

14          THE WITNESS:  I do.

15          THE COURTROOM ADMINISTRATOR:  Thank you.  Please take

16    a seat.  For the record, please state and spell your name.

17          THE WITNESS:  Patti Ann Kern.  P-A-T-T-I.  A-N-N.

18    K-E-R-N.

19          THE COURTROOM ADMINISTRATOR:  Thank you.

20                         PATTI KERN,

21    called as a witness on behalf of the Government, having been

22    first duly sworn, was examined and testified as follows:

23                    DIRECT EXAMINATION

24    BY MR. FINLEY:

25    Q.  Good afternoon, Ms. Kern.  Are you from the Las Vegas area?

--- 2:19-cr-00295-GMN-NJK ---

1   *A.*   Not originally.

2   *Q.*   Where are you from originally?

3   *A.*   Michigan.

4   *Q.*   And when was it that you moved to Las Vegas?

5   *A.*   1991.

6   *Q.*   Have you lived here since then?

7   *A.*   Yes, sir.

8   *Q.*   You live in Henderson?

9   *A.*   Yes, sir.

10  *Q.*   What do you do for a living currently?

11  *A.*   I muck stalls and feed livestock.

12  *Q.*   Okay.  What kind of livestock?

13  *A.*   Mostly equestrian.

14  *Q.*   And how did you learn to take care of horses and other

15  livestock?

16  *A.*   I was raised on a farm in Michigan.

17  *Q.*   How old are you, Ms. Kern?

18  *A.*   I'm 66 on the downward slide to 67.

19  *Q.*   What's your educational background?

20  *A.*   I have a high school diploma.

21  *Q.*   What made you decide to move to Las Vegas in 1991?

22  *A.*   My husband and I got laid off of our jobs and we had

23  friends that had moved out and said that there was good job

24  market out here.

25  *Q.*   Your husband is Michael Kern?

2:19-cr-00295-GMN-NJK

1    **A.**   Yes, sir.

2    *Q.*   How long have you the two of you been married?

3    **A.**   Almost 33 years.

4    *Q.*   Do you have children?

5    **A.**   One.

6    *Q.*   And what's her name?

7    **A.**   Cody Ann Kern.

8    *Q.*   Do you have any grandchildren?

9    **A.**   One.

10   *Q.*   How old is she?

11   **A.**   Just turned four months.

12   *Q.*   You need a moment?

13   **A.**   I'm good.

14   *Q.*   Well, let's talk about why you're here.

15          Ms. Kern, were you charged with a crime a few years

16   ago?

17   **A.**   Yes, I was.

18   *Q.*   What crime were you charged with?

19   **A.**   Conspiracy to commit mail fraud, which I pled guilty to.

20   *Q.*   And -- so you said you pled guilty from -- did you

21   actually -- are you actually guilty of mail fraud?

22   **A.**   Yes, sir.

23   *Q.*   Did you commit mail fraud from 2010 to 2018?

24   **A.**   Yes, sir.

25   *Q.*   And you said it was a conspiracy?

1    *A.*  Yes.

2    *Q.*  Did you conspire with other people to do this?

3    *A.*  Yes.

4    *Q.*  How did you defraud people?

5    *A.*  Mailing out fraudulent prize notices.

6    *Q.*  And what was fraudulent about the notices?  How did they

7    trick people?

8    *A.*  The way they were designed, it made people think that they

9    had won large sums of money.

10    *Q.*  Did anybody really win any money?

11    *A.*  No, sir.

12    *Q.*  Why did you lie to them and tell them they were going to

13    win large sums of money?

14    *A.*  To get them to send money back.

15    *Q.*  How much?

16    *A.*  It would range from maybe $20 to $25.

17    *Q.*  And just so we're clear:  How much prize money in total did

18    you send back to the people who sent all these fees?

19    *A.*  Zero.

20    *Q.*  Are the people that you conspired with sitting in this

21    courtroom?

22    *A.*  Yes, sir.

23    *Q.*  How many of the four defendants conspired with you to

24    commit mail fraud?

25    *A.*  I can't tell who -- I notice some of them, but the -- when

—2:19-cr-00295-GMN-NJK—

1   you -- point out when you say defendants, where the general

2   area is.  I've never been in a courtroom before.

3   Q.  I see --

4           MR. GREEN:  Judge, she's nonresponsive to the

5   question, your Honor.

6           MR. FINLEY:  She's asking me to clarify.  I'd like to

7   clarify.  She just wants to know where the defendants are

8   sitting the courtroom.

9           THE COURT:  I think that was your question is that

10  there are more than --

11          THE WITNESS:  Just the area, the whole -- so I can

12  see.

13          MR. FINLEY:  I see.

14          THE COURT:  Go ahead and take your time and look

15  around.

16          THE WITNESS:  Okay.  Okay.

17  BY MR. FINLEY:

18  Q.  Do you have a clear view of everyone on this side of the

19  courtroom?

20  A.  Yeah.

21  Q.  Okay.

22  A.  Sort of.

23  Q.  Do you know the defendant Mario Castro?

24  A.  Yes.

25  Q.  Can you identify him, please?

———— 2:19-cr-00295-GMN-NJK ————

1   *A.*  Yes.  He's sitting right there with the gray top on, suit

2   jacket.

3   *Q.*  Suit jacket, no tie?

4   *A.*  Yes.

5   *Q.*  Okay.  Can you identify Miguel Castro?

6   *A.*  I see Jose Luis Mendez.

7   *Q.*  Okay.

8   *A.*  In the far back.

9           THE COURT:  Can you describe Mr. Jose Mendez?

10          THE WITNESS:  He's -- there's a computer screen in

11  front of him, so it's hard to see him.

12          THE COURT:  You can stand up.

13          THE WITNESS:  I think he's just got a shirt on and not

14  a jacket of any kind.

15          Salvador is sitting in the back with a blue shirt on.

16          And -- okay.  There's -- there's Miguel with -- he's

17  got kind of a turquoise blue shirt on with a jacket.

18          THE COURT:  All right.  The record will reflect that

19  she has identified all four defendants.

20  BY MR. FINLEY:

21  *Q.*  Did you conspire with all four defendants to commit mail

22  fraud?

23  *A.*  Yes.

24  *Q.*  And you've agreed to come here and testify today?

25  *A.*  Yes, sir.

---
2:19-cr-00295-GMN-NJK
---

1    *Q.*   What do you hope to accomplish by testifying?

2    *A.*   (Unintelligible.)

3         (Court reporter interruption.)

4    *A.*   Some leniency on my sentencing possibly.

5    *Q.*   And how -- how would it be that you being here today would

6    possibly end up in some leniency on your sentence?

7    *A.*   I could maybe get -- I'm hoping to get maybe a year or two

8    knocked off by telling the truth.

9    *Q.*   Do you have what's called a cooperation agreement with the

10   Department of Justice?

11   *A.*   Yes, sir.

12   *Q.*   What does your require -- what does your cooperation

13   agreement require you to do?

14   *A.*   It requires me to cooperate fully with United States and

15   tell truthfully of anyone that helped and was involved with me

16   in giving these fraudulent pieces out into the mail.

17   *Q.*   And if you tell the truth, what do you hope the Department

18   of Justice will do for you under the agreement?

19   *A.*   Tell the judge I did what I was supposed to do.

20   *Q.*   Which is tell the truth?

21   *A.*   Tell the truth.

22   *Q.*   What happens under the cooperation agreement if you lie?

23   *A.*   I could be charged with multiple crimes including lying and

24   my plea agreement also would be null and void and I'd get a lot

25   of years if they thought I was lying.

—— 2:19-cr-00295-GMN-NJK ——

1    *Q.*  Do you understand that if the judge who sentences you

2    believed that you lied in this court that you could get extra

3    time in prison?

4    *A.*  Yes, sir.

5               MR. GREEN:  Objection, your Honor.  The decision as to

6    truth-telling in this claim is the jury's province at this

7    stage.

8               THE COURT:  I think the question was about the

9    cooperation agreement, so it's overruled.

10              And the witness can answer the question.

11   BY MR. FINLEY:

12   *Q.*  What was your answer, Ms. Kern?

13   *A.*  Repeat the question?

14   *Q.*  Sure.

15              You understand if you lie in this court, the judge who

16   ultimately sentences you may give you extra prison time?

17   *A.*  Yes, sir.

18   *Q.*  Let's talk about your work background before all this

19   began.

20              What was your first job after you moved to Las Vegas

21   in 1991?

22   *A.*  Manpower, running Xerox machines at night.

23   *Q.*  And how long did you do that for?

24   *A.*  Probably just about six months or so.

25   *Q.*  Now, you've been involved in the direct mail business for a

—— 2:19-cr-00295-GMN-NJK ——

1  long time?

2  **A.**  Yes, sir.

3  *Q.*  When did you start doing that?

4  **A.**  My next job after manpower was with a direct mailer here in

5  town.

6  *Q.*  I'm sorry.  Could you say that again, please?

7  **A.**  My next job was with a direct mailer or junk mailer or

8  in-mail sweepstakes here in town.  I was hired in their

9  purchasing department.

10  *Q.*  You were hired in the purchasing department of what you're

11  calling a junk mailer?

12  **A.**  Yes.

13  *Q.*  Did that junk mailer send out fraudulent prize notices?

14  **A.**  Yes, sir.

15  *Q.*  And you -- and how long were you working there before you

16  realized that the prize notices that the junk mailer was

17  sending out were fraudulent?

18  **A.**  That particular point, I wasn't -- I wasn't really involved

19  much.  I was just buying the blank forms.

20       But it wasn't long after that, I got a job at another

21  sweepstakes mailers and that one I was little more -- I saw

22  more of the finished pieces, and that's when I kind of got to

23  know that they weren't really what they were put up -- putting

24  out, what they were advertising was not truthful.

25  *Q.*  Okay.

1        MR. FINLEY:  And your Honor, with this next set of

2   questions, I am going to try to lead a little bit to navigate

3   404(b).

4        THE COURT:  All right.

5   BY MR. FINLEY:

6   Q.  So from the period, let's say, the mid '90 --

7   A.  Uh-huh.

8   Q.  -- until, let's say, 2005 or so, did you work for numerous

9   fraudulent prize notification mailers?

10  A.  Yes, I did.

11       MR. GREEN:  Objection.  It's irrelevant, your Honor.

12       THE COURT:  What is the relevance?

13       MR. FINLEY:  Your Honor, it goes to her background and

14  her knowledge of this industry and how games like this work.

15       THE COURT:  All right.  Objection is overruled.

16       She may answer the question.

17  BY MR. FINLEY:

18  Q.  And that's just a "yes" or "no," please.

19  A.  Yes.

20  Q.  And how many others -- how many, in total, fraudulent

21  mailing operations have you worked for?  Just a number, please.

22  A.  Three.

23  Q.  At some point in time, did you start your own business?

24  A.  Yes, I did.

25  Q.  And when was that?

—— 2:19-cr-00295-GMN-NJK ——

1  **A.**  That was around 2002.

2  *Q.*  What made you --

3  **A.**  I was just --

4  *Q.*  You want to clarify?

5  **A.**  No, that's all right.

6  *Q.*  2002 is roughly, correct?

7  **A.**  Yes.

8  *Q.*  What made you want to start your own mail business?

9  **A.**  I had worked in the -- the prize notification business for

10  quite a while and some of the owners were getting out and I had

11  the opportunity to take over some of the businesses.  So that

12  was a good opportunity for me to go ahead and take those over

13  and maybe start a couple more.

14  *Q.*  And were these -- was your business a fraudulent prize

15  notification business?

16  **A.**  Yes, it was.

17  *Q.*  And after you started your own mailing business, for how

18  many years did you continue to send fraudulent mail to

19  people --

20  **A.**  Up through --

21  *Q.*  -- before --

22  **A.**  Go ahead.

23  *Q.*  I'm sorry.

24        For how many years did you continue to send fraudulent

25  prize notices to people?

2:19-cr-00295-GMN-NJK

1    *A.*  Up through into 2009.

2    *Q.*  What happened in 2009?

3    *A.*  I signed a cease and desist.

4    *Q.*  And there's been testimony about this.

5         A cease and desist order is an order from the United

6    States Postal Inspection Service instructing you to stop

7    sending fraudulent mail.  Is that your understanding?

8    *A.*  Yes, sir.

9    *Q.*  How did you find out about this cease and desist?

10   *A.*  Actually, I was called by attorneys in New York.  It was --

11   it was kind of a group.  There was several other large mailers

12   involved and they were being represented by one law firm and

13   that's why I got called.

14   *Q.*  So a lawyer for that group let you know about it?

15   *A.*  Yes.

16   *Q.*  Did you have to sign something?

17   *A.*  Yes.

18   *Q.*  Did the order cause you to lose income?

19   *A.*  Yes, it did.

20   *Q.*  Did you comply with the order to stop sending fraudulent

21   mail?

22   *A.*  No.

23   *Q.*  Did you violate that order?

24   *A.*  Yes, I did.

25   *Q.*  What did you do to violate the order?

—— 2:19-cr-00295-GMN-NJK ——

1   *A.*  I got involved again in the mailing of fraudulent prize

2   notices.

3   *Q.*  And how long after you received the order in 2009 did you

4   get started again?

5   *A.*  It was, like, 2000 -- beginning of 2011, I think.  I

6   believe.

7   *Q.*  Let's talk about how you became partners with the

8   defendants.

9          Before you got shut down in 2009, who was printing and

10  mailing your fraudulent prize notices for you?

11  *A.*  Epi Castro was doing all the printing and Mario Castro's

12  and Miguel, their letters shop and lasering were doing the

13  finishing work.

14  *Q.*  Okay.  Let me break down your answer a little bit.

15         You mentioned somebody named Epi Castro.  Is that --

16  is his full name Epiphanio [phonetic] Castro?

17  *A.*  Yes.

18  *Q.*  And he has the same last name as three of the defendants.

19         Is there any relationship?

20  *A.*  They're brothers.

21  *Q.*  And then you mentioned a Mario Castro.  Is that the

22  defendant Mario Castro?

23  *A.*  Yes.

24  *Q.*  And did you mention Miguel Castro?

25  *A.*  Yes.

1    Q.   Okay.  And is that defendant Miguel Castro?

2    A.   Yes.

3    Q.   And you mentioned Epi Castro did the printing.

4         In a nutshell, what does that consist of?

5    A.   It -- you have -- you take blank paper and you would

6    pre-print on that paper the fancy stuff, the graphics, like

7    anything that wasn't personalized, and he would also print the

8    envelopes, the outside envelope that has the window in it, you

9    put your address and any decoration or wording you want on that

10   envelope along with the return envelope, the address and so on

11   that it comes back to.

12   Q.   Okay.  So after Epi Castro took care of that part of the

13   printing process, what happened next?

14   A.   Then it goes to the letter shop and lasering house which

15   they would then take the data that had all the names and then

16   they would print the personalized stuff on that form and -- and

17   then they would then -- then -- first, it would be put in the

18   outside envelope along with the small envelope and then mailed

19   out.

20   Q.   So let me make sure I understand this.

21        The second part of the process, that was handled at

22   the letter shop, and that's some laser printing to finish the

23   personalized part of the notice?

24   A.   Correct.

25   Q.   And then folding it up, inserting it into envelopes and

1    putting it in the mail?

2    *A.*   Correct.

3    *Q.*   And who handled that part of the process for you?

4    *A.*   Mario.  And I -- Mario, I know, for sure.  I believe, at

5    times, the letter shop might have been owned by Miguel, also.

6    *Q.*   At various times?

7    *A.*   Yes.

8    *Q.*   How big was your mailing operation before it got shut down?

9    What quantity of mail was it putting out?

10          MR. TOMSHECK:  Judge, if we could have some

11   clarification as to "before it got shut down."  Sounds like

12   multiple different times she was shut down.

13   BY MR. FINLEY:

14   *Q.*   In 2009.

15   *A.*   In 2009?

16   *Q.*   Yes.

17   *A.*   It was probably mailing, 250-, 500,000 pieces maybe month.

18   *Q.*   When you got shut down, did you tell any of the defendants

19   about it?

20   *A.*   They all -- yes, they all knew.

21   *Q.*   Who did you tell?

22   *A.*   Epi -- I would have told Epi, Mario for sure.  Sean

23   O'Connor was my main -- he's, like, the account manager for the

24   mailings.

25   *Q.*   Okay.

─── 2:19-cr-00295-GMN-NJK ───

1   *A.*  And I told him.

2   *Q.*  So Sean O'Connor, you called him an account manager.  Where

3   did he work?

4   *A.*  He worked for Mario.  He worked at the letter shop and

5   lasering place.

6   *Q.*  Okay.  And what was your understanding of his relationship

7   with that letter shop?  Was he an owner?  Was he an employee?

8   What was he?

9   *A.*  Employee.

10  *Q.*  And so you told him.

11          Do you remember if you told Salvador Castro?

12  *A.*  I do not remember.

13  *Q.*  Do you remember if you told Jose Luis Mendez?

14  *A.*  I do not remember for sure, no.

15  *Q.*  Were they working there at the time?

16  *A.*  Yes.

17  *Q.*  Would they have had to have known because the amount of

18  mail they were putting out for you at the time --

19          (Indiscernible simultaneous crosstalk.)

20          MR. BROWN:  Calls for speculation as to what they

21  would have to had known.

22          MR. GREEN:  And it is also leading, your Honor.  I

23  think we're out of the leading stage.  Thank you.

24          MR. FINLEY:  I'll rephrase.

25          THE COURT:  Yeah, I was going to say it's not leading,

1    but you can rephrase it to make it less speculative.

2    BY MR. FINLEY:

3    Q.  Given the logistics of putting this mail out, is there any

4    possibility that the defendants could not have known that you

5    were shut down?

6          MR. GREEN:  Objection, your Honor.  Calls for

7    speculation.  We're here to determine facts, not what she

8    thinks in the realm of possibility.

9          MR. BROWN:  Your Honor, if I would also say, there are

10   four different defendants in the case and they are not all the

11   same.  So I would object to the Government continuing to use

12   the term "defendants" and be very specific as to questions he's

13   requesting and as to which defendants those questions apply to.

14         THE COURT:  All right.  Well, my understanding is that

15   this question refers to Salvador and Jose Luis Mendez.  She

16   previously said she doesn't recall telling them specifically.

17         Is that your -- that your -- the purpose of the

18   question, Mr. Finley, is just --

19         MR. FINLEY:  Yes, your Honor.

20         THE COURT:  -- just to those two?

21         All right.  I'll allow it for that purpose.

22         THE WITNESS:  Repeat the exact question now with all

23   this.  What is the exact question, please?

24   BY MR. FINLEY:

25   Q.  Okay.  I'll rephrase.

—2:19-cr-00295-GMN-NJK—

1  *A.*  Okay.

2  *Q.*  Because you were shut down, you stopped sending mail?

3  *A.*  Yes.

4  *Q.*  And at the time you were -- right before you were shut

5  down, Salvador Castro and Jose Luis Mendez were working in the

6  letter shop?

7  *A.*  Yes.

8  *Q.*  And they were working to put out a large quantity of mail

9  for you, as you testified?

10  *A.*  Yes.

11  *Q.*  Okay.  Would it be possible for them not to notice that

12  they weren't doing that anymore after you were shut down?

13  *A.*  No.

14      MR. GREEN:  Objection, your Honor.  It is still what

15  she knows, not what's possible.  So it's irrelevant and it's

16  leading.

17      THE COURT:  Overruled.  She can testify as to whether

18  she knows some reason why they would be aware.

19      THE WITNESS:  It would have took away well over half

20  the business because of all of the mailers that were involved

21  in that particular cease and desist was a large portion of the

22  business.  So if nobody knew at --

23  BY MR. FINLEY:

24  *Q.*  Now, is there a financial reason, monetary reason, why you

25  would let them know that you'd been shut down?

2:19-cr-00295-GMN-NJK

1   *A.*   So that there was no additional printing, additional

2   mailing, there isn't postage put on because I would be liable

3   for the bills.

4   *Q.*   If they continued to print for you and you're shut down and

5   you can't send it out, would you lose money?

6   *A.*   Yes.

7            MR. GREEN:   Objection, your Honor.   It's irrelevant;

8   what would have happened if this would have happened.   We are

9   here to determine facts.   It's irrelevant and leading.

10           MR. TOMSHECK:   Judge, I have an objection as to

11   "they."

12           THE COURT:   Let's do one at a time.

13           So the objection is overruled as to whether there

14   would be a loss of income if the printing company had lost her

15   business.   She can testify as to that.

16           But as far as being more specific or each of the

17   defendants, if you can, try to identify by name instead of

18   saying "they" because it looks like we do have now subsets.

19           MR. FINLEY:   Thank you, your Honor.

20   BY MR. FINLEY:

21   *Q.*   Would you have lost money on paper and printing if you did

22   not tell Mario Castro or Sean O'Connor or somebody at the

23   letter shop to stop?

24   *A.*   Absolutely.

25   *Q.*   After you were ordered to stop sending fraudulent mail in

2:19-cr-00295-GMN-NJK

1   2009, did you try doing something else for a while?

2   A.   Tried psychic mailings, some product, and neither worked.

3   Q.   Were you successful?

4   A.   No.

5   Q.   Did you quit?

6   A.   Yes.

7   Q.   What did you decide to do then?

8   A.   Start back into the fraudulent prize notifications.

9   Q.   And when was this?

10  A.   I believe around 2011, I believe.  I think it was 2011.

11  Maybe 2010.  Late 2010.  Early 2011.

12  Q.   Did you worry about getting caught?

13  A.   Yes.

14  Q.   What did you think might happen if you got caught again?

15  A.   I would go to jail.

16  Q.   Were you afraid of that?

17  A.   Yes, sir.

18  Q.   Did it stop you?

19  A.   No, sir.

20  Q.   When you started sending prize notices again, did you do

21  anything to avoid getting caught?

22  A.   Yes.

23  Q.   What did you do?

24  A.   I informed anyone that I was dealing with that I was a

25  ghost.  I was not to be -- I didn't exist.

—2:19-cr-00295-GMN-NJK—

1   Q.   So going forward, you told the people you were dealing with

2   that you were a ghost?

3   A.   Correct.

4   Q.   Now, prior to 2009 when you got shut down, so before that,

5   did you put your own name on the mailing companies you were

6   using?

7   A.   Yes.

8   Q.   So you listed yourself on the company paperwork and on the

9   mailbox application, all that?

10  A.   Yes, sir.

11  Q.   After 2010, did you put your own name on any of the mailing

12  companies you used to send out fake prize notices?

13  A.   No, sir.  I didn't have a company.

14  Q.   Did you have other people put their names on the mailing

15  companies?

16  A.   I did not directly, no.

17  Q.   Who did that?

18  A.   I started with Epi and Epi and I worked out, and then from

19  there, he kind of took it and he found the people that he

20  wanted to put the names on it and so on.

21  Q.   Okay.  So that -- we're going to get to your conversation

22  with Epi Castro, but let me back up and ask you this.

23       Were you the first person to invent the idea of using

24  someone else's name on the mailing company after you get shut

25  down?

2:19-cr-00295-GMN-NJK

1   *A.*   No, sir.

2   *Q.*   Did you learn how to do this from somewhere?

3   *A.*   Other large, old mailers.

4   *Q.*   How did you go about finding other people to open up the

5   mailing companies for you?

6   *A.*   Are you talking about --

7   *Q.*   The first one was Epi?  Was he the first person that you

8   talked to about this issue?

9   *A.*   Yes.

10  *Q.*   When was this?

11  *A.*   It would -- end of 2010, maybe 2011.

12  *Q.*   And why did you choose him?

13  *A.*   Epi had done the printing before.  He had printed the

14  psyche --

15  *Q.*   Okay.  Let me just stop you there.

16         Without thinking about the past, like, think about the

17  future --

18  *A.*   That --

19  *Q.*   -- when I ask this question.

20  *A.*   Okay.

21  *Q.*   Just the future, from 2010 or so forward.

22  *A.*   Okay.

23  *Q.*   Okay?  What were you hoping that Epi Castro would do for

24  you?

25         MR. GREEN:  Objection, your Honor, as to what she

────── 2:19-cr-00295-GMN-NJK ──────

 1   believes another person who's not here would hope to have done.

 2   She either knows --

 3          THE COURT:  The question was what did she hope he

 4   would do for her?

 5          MR. FINLEY:  Yes, your Honor, that was the question.

 6          THE COURT:  Overruled.  She may answer that question.

 7   BY MR. FINLEY:

 8   Q.  Okay.  Do you need to hear it again?

 9   A.  No.

10   Q.  Okay.

11   A.  I hoped that he would do the printing for me on credit, get

12   it in the mail, and then from there, we would split whatever

13   profits and just get it started that way.

14   Q.  Okay.  Now, what about this idea of using another person's

15   name to open the company?  Did you talk about that with Epi

16   Castro?

17   A.  Yes.

18   Q.  And what was his response?

19          MR. TOMSHECK:  Judge, I'd object as to hearsay.

20          THE COURT:  Sustained.

21   BY MR. FINLEY:

22   Q.  Did you ultimately end up doing business with Epi Castro

23   again?

24   A.  Yes.

25   Q.  Did he print fraudulent prize notices for you?

 1   *A.*  Yes, sir.

 2   *Q.*  And did he do that from 2010 to 2018?

 3   *A.*  Yes.

 4   *Q.*  Did you become partners?

 5   *A.*  Yes.

 6   *Q.*  Did you open up new mailing companies together?

 7   *A.*  Yes.

 8   *Q.*  Are you familiar with a company called National Prize

 9   Service -- National Prize Service, Inc.?

10   *A.*  Yes, sir.

11   *Q.*  Was that one of the first companies that you and Epi Castro

12   used to send prize notice mailings?

13   *A.*  Yes.

14   *Q.*  Let me show you Government's Exhibit 214 at page 116.

15        MR. FINLEY:  And that's in evidence.

16        THE COURT:  Exhibit 214?  What was the page?

17        MR. FINLEY:  214.

18        THE COURT:  214 is the page, not the exhibit?

19        MR. FINLEY:  Page 119 of Government's Exhibit 214.

20        THE COURT:  Got it.  Thank you.

21        MR. FINLEY:  Sorry, your Honor.

22        THE COURT:  And this has been admitted, Nick, so I'm

23   not sure -- I don't see the projector light on.

24        MR. FINLEY:  Your Honor, I'll just move on, cover that

25   later.

 1          THE COURT:  So I don't think we're going to be able to

 2   go on, because it's already 4:00.

 3          MR. FINLEY:  Okay.

 4          THE COURT:  So we're going to go ahead and take our

 5   weekend break.

 6          MR. FINLEY:  Very good.

 7          THE COURT:  All right.  All right.  So at this time, I

 8   do remind the jury you've got -- you're off tomorrow.  You're

 9   off Saturday.  You're off Sunday.  We need you back here 9:00

10   in the morning on Monday.

11          I think at least one of you or more are working this

12   weekend, which is fine, but just remember you are not to

13   discuss this case with anyone.  You can tell your boss, your

14   coworkers, your spouse, your childcare help, yes, we're still

15   in trial, yes, next week I still need to be there, and so

16   forth.  But please don't start talking about the case.

17          It's natural.  They're going to be interested and

18   curious.  What is it like?  They're going to ask you:  What is

19   it about?  What do you think so far?  You know, please do not

20   answer any of those questions, as innocent as it may sound.

21   Once you get started, it's just so hard to stop talking about

22   it.  So don't.  Say, "Judge Navarro told me I cannot speak

23   about the case."  It is a court order.  You could be held in

24   contempt.  So just don't.  Just tell them that, "No, I can't.

25   I was ordered not to talk about the case."

1          And you can tell them -- you can talk to them

2     afterwards.  Once it's all over and you've finished and there's

3     a verdict, you can tell them anything you want to.  You're free

4     to talk about the case after the verdict.  But not before.

5     Because we want you to only concentrate on what happens here in

6     this courtroom.

7          So please remember not to discuss this case with

8     anyone nor permit anyone to discuss it with you.  Remember that

9     you do need to tell the Court right away if you do accidentally

10    overhear anything about the case or if someone intentionally

11    comes to talk to you about the case.

12         Please do not read or listen to or view anything that

13    touches upon the case in any way.

14         You know, if you've got some nagging concern, write it

15    down, fold it, bring it back on Monday so that we can explore

16    and hopefully try to answer the question for you.

17         And please do not research or make any independent

18    investigation yourself concerning anything about this case nor

19    form any opinion until after you have heard all the testimony,

20    received all the evidence, I'll give you the written jury

21    instructions, then we'll listen to closing arguments.  After

22    that, you go back and start talking to each other about the

23    case and form your decisions and your opinions.

24         So thank you very much for your patience this week.

25    We'll excuse you and welcome you back at 9:00 a.m. on Monday

1   morning.

2          Let's all stand for the jury since they are the judge

3   of the facts.  Have a great weekend, everybody.

4          (Whereupon, the jury exits at 4:03 p.m.)

5          THE COURT:  All right.  Ms. Kern, after the jury

6   exits, you are free to do, as well.  We just need you back here

7   at 9:00 a.m. Monday morning.

8          THE WITNESS:  Okay.

9          THE COURT:  And do the parties want any time today --

10  I'm here until 5:00 p.m.  So do you have anything that you want

11  to discuss today or Monday morning between 8:00 and 9:00 a.m.

12  regarding whether it's Ms. Kern or anybody else's evidence,

13  testimony, anything else that you want to make good time?

14  Nothing you can think of right now?  Okay.

15         MR. FINLEY:  Nothing from the Government, your Honor.

16         THE COURT:  Okay.  E-mail Nick and each other, like, a

17  group -- you know, group e-mail to Nick if it turns out, oh,

18  yeah, we do need to discuss this Monday morning and you want to

19  meet at 8:00 a.m., so I can be sure to have a court recorder

20  here because we -- that's not part of the schedule right now.

21  It's just 9:00 to 4:00 is their schedule.  So let me know and

22  I'll have someone here at 8:00 a.m. on Monday, or 8:30,

23  whatever you ask for.  Put it in a group e-mail to Nick.

24         MR. FINLEY:  You'll have someone here.  You're not

25  going to be here?

—— 2:19-cr-00295-GMN-NJK ——

1          THE COURT:  I'll be here.  I mean, a court reporter,

2    because otherwise --

3          MR. FINLEY:  Right.

4          THE COURT:  -- they're scheduled -- I don't have a

5    court reporter.  I have a court recorder.  It's different.  She

6    just makes DVDs.  You all want a daily transcripts.

7          MR. FINLEY:  Yeah.

8          THE COURT:  So I am pulling from all the other judges

9    who do have a real-time reporter and that's why we have the

10   schedule of five different people on a rotational basis coming

11   in for half a day.  But what I didn't think ahead of was that

12   their schedule is 9:00 -- it's actually 9:00 to 12:00, 1:00 to

13   4:00, so when they come in lunchtime, they're coming in on

14   their own lunchtime.

15          So likewise, if we're going to stay after 4:00 or if

16   we're going to be here before 9:00, if you want to be here at

17   8:00, we can make it happen, I just need a little bit of time

18   to organize that and make it happen so we can pull someone in

19   here and make that happen.

20          MR. GAFFNEY:  Your Honor, can we leave everything in

21   the courtroom or do we need to take everything with us?

22          (Court reporter interruption.)

23          THE COURT:  We can go off the record.

24          (The proceedings concluded at 4:05 p.m.)

25                                    * * *

─── 2:19-cr-00295-GMN-NJK ───

--o0o--

COURT REPORTER'S CERTIFICATE


    I, SAMANTHA N. MCNETT, Official Court Reporter, United

States District Court, District of Nevada, Las Vegas, Nevada

certify that the foregoing is a correct transcript from the

record of proceedings in the above-entitled matter.


Date:  March 23, 2023


                              /s/ Samantha N. McNett
                              Samantha McNett, RPR, CRR, CCR