———— 2:19-cr-00295-GMN-NJK ————

1        UNITED STATES DISTRICT COURT

2           DISTRICT OF NEVADA

3

4    UNITED STATES OF AMERICA,         )
                                        )   Case No. 2:19-cr-00295-GMN-NJK
5              Plaintiff,               )
                                        )   Las Vegas, Nevada
6         vs.                           )   March 27, 2023
                                        )   9:17 a.m. to 12:06 p.m.
7    MARIO CASTRO, SALVADOR             )   Courtroom 7D
     CASTRO, MIGUEL CASTRO, and         )
8    JOSE LUIS MENDEZ,                  )   JURY TRIAL, DAY 5, AM SESSION
                                        )
9              Defendants.              )   **C E R T I F I E D   C O P Y**
                                        )
10   _____)

11

12

13

14        REPORTER'S TRANSCRIPT OF JURY TRIAL, DAY 5, AM SESSION
            BEFORE THE HONORABLE GLORIA M. NAVARRO,
                 UNITED STATES DISTRICT JUDGE

15

16

17

18    APPEARANCES:      See next page

19

20

21

22    COURT REPORTER:    Samantha N. McNett, RPR, CRR, CCR, CSR
                         United States District Court
23                       333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada  89101
24                       Samantha_McNett@nvd.uscourts.gov

25    Proceedings reported by machine shorthand, transcript produced
      by computer-aided transcription.

1                          **APPEARANCES**

2    For the Government:

3         **TIMOTHY T. FINLEY  ESQ.**
          **DANIEL E. ZYTNICK, ESQ.**
4         U.S. DEPARTMENT OF JUSTICE
          950 Pennsylvania Avenue, N.W.
5         Washington, D.C. 20530
          202-307-0050
6
          -AND-
7
          **MINA CHANG, ESQ.**
8         UNITED STATES ATTORNEY'S OFFICE
          501 Las Vegas Boulevard South, Suite 1100
9         Las Vegas, Nevada 89101
          702-388-6336
10

11
     For Defendant Mario Castro:
12
          **JOSHUA L. TOMSHECK, ESQ.**
13        HOFLAND & TOMSHECK
          228 South Fourth Street, First Floor
14        Las Vegas, Nevada 89101
          702-895-6760
15
          -AND-
16
          **RICHARD E. TANASI, ESQ.**
17        TANASI LAW OFFICES
          8716 Spanish Ridge Avenue, Suite 105
18        Las Vegas, Nevada 89148
          702-906-2411
19

20
     For Defendant Salvador Castro:
21
          **DONALD GREEN, ESQ.**
22        LAW OFFICES OF DONALD J. GREEN
          4760 South Pecos Road, Suite 103
23        Las Vegas, Nevada 89121
          702-388-2047
24
     ///
25
     ///

2:19-cr-00295-GMN-NJK

1                    **APPEARANCES CONTINUED**

2

For Defendant Miguel Castro:

3

        **LUCAS J. GAFFNEY, ESQ.**
4       GAFFNEY LAW
        9900 Covington Cross Drive, Suite 290
5       Las Vegas, Nevada 89144
        702-742-2055
6

        -AND-
7

        **THOMAS A. ERICSSON, ESQ.**
8       THOMAS A. ERICSSON, CHTD.
        9900 Covington Cross Drive, Suite 290
9       Las Vegas, Nevada 89144
        702-878-2889
10

11

For Defendant Jose Luis Mendez:

12

        **WILLIAM H. BROWN, ESQ.**
13      **CHRISTOPHER MISHLER, ESQ.**
        BROWN MISHLER, PLLC
14      911 North Buffalo Drive, Suite 202
        Las Vegas, Nevada 89128
15

16                              *  *  *

17

18

19

20

21

22

23

24

25

1                    __INDEX OF EXAMINATIONS__

2   **TESTIMONY OF PATTI KERN**

      Direct Examination by Mr. Finley.....................9
3      Direct Examination Con't by Mr. Finley.............78

4   **TESTIMONY OF LESLIE PASCARELLA**
      Direct Examination by Mr. Zytnick...................61
5      Cross-Examination by Mr. Tanasi.....................70
      Redirect Examination by Mr. Zytnick.................73
6      Recross-Examination by Mr. Tanasi...................74
      Further Redirect Examination by Mr. Zytnick.........77

7                          *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─────2:19-cr-00295-GMN-NJK─────

1                    **INDEX OF EXHIBITS**

2    GOVERNMENT EXHIBITS

3    EXHIBIT NO.:                OFFERED    ADMITTED    WITHDRAWN

4    106B.............................86        87          --
     106C.............................86        87          --
5    106D.............................86        87          --
     107A.............................93        93          --
6    150..............................33        34          --
     151A.............................49        50          --
7    170..............................12        13          --
     175..............................21        21          --
8    282A.............................83        84          --
     282B.............................83        84          --

9

10

11   DEFENDANT EXHIBITS

12   EXHIBIT NO.:                OFFERED    ADMITTED    WITHDRAWN

     (No exhibits offered or admitted.)
13
                              *   *   *
14

15

16

17

18

19

20

21

22

23

24

25

2:19-cr-00295-GMN-NJK

1          LAS VEGAS, NEVADA; MONDAY, MARCH 27, 2023; 9:17 A.M.

2                              --oOo--

3                    P R O C E E D I N G S

4          THE COURT:  Good morning.  We're going to have you

5    announce your presence on the record when the jury comes in.

6    Sorry for the delay.  We had one late juror, but everybody is

7    here now.

8          As far as exhibit lists, so we're getting deep into

9    the exhibit lists territory.  Make sure that you have updated

10   exhibit lists for Nick.  Make sure that all your exhibits have

11   been marked with the little court stickers and are numbered

12   correctly and organized.  We don't want to make a mistake and

13   give the jury an exhibit that wasn't admitted, so it's really

14   important that you keep updating your exhibit lists and give

15   them to Nick.

16         And, you know, the preferred way is just if you're

17   adding exhibits, add it to the list that you already have or

18   work with Nick to find out what's easiest for him because

19   there's a lot of you.  It isn't just two parties so -- and we

20   have a lot of exhibits.  So please work with him on the breaks

21   with that.

22         All right.  So let's go ahead and bring in the jury.

23         MR. FINLEY:  Your Honor?

24         THE COURT:  Yes?

25         MR. FINLEY:  Quick housekeeping matter.

—— 2:19-cr-00295-GMN-NJK ——

1              We have an out-of-town victim named Leslie Pascarella

2    that we'd like to call out of order after the first break.  She

3    flew in all the way from Chattanooga, traveled about nine hours

4    yesterday and needs to get back tomorrow.  She's elderly.  The

5    defendants have no objection.  We think the testimony will be

6    quick.

7              THE COURT:  Okay.  So you said after the break?

8              MR. FINLEY:  Yeah, after the first break of this

9    morning --

10             THE COURT:  Okay.

11             MR. FINLEY:  -- perhaps at around 10:45 or so.

12             THE COURT:  Okay.  And there's no objection to that?

13             MR. TANASI:  No objection.

14             MR. TOMSHECK:  No, your Honor.

15             THE COURT:  Okay.  We'll do that.  Thank you.

16             MR. GREEN:  No objection, your Honor.

17             (Whereupon, the jury enters at 9:21 a.m.)

18             THE COURT:  All right.  Good morning, everyone.

19   Everyone may be seated.

20             We're joined by the jury.  We have the witness,

21   Ms. Patti Kern, on the stand.

22             I do remind you, Ms. Kern, you are still under oath.

23             And let's have the attorneys go ahead and make their

24   presence on the record.

25             MR. FINLEY:  Thank you, your Honor.  Tim Finley,

────────────────── 2:19-cr-00295-GMN-NJK ──────────────────

 1   United States Department Consumer Protection Branch for the

 2   United States.

 3           With me is Daniel Zytnick, same office; Mina Chang,

 4   Assistant United States Attorney; Barry Bouchie, retired postal

 5   inspector; Tyaka Mallory running the screens today.  She's

 6   taking over from Erica Rush who was crushing it on that job

 7   yesterday.

 8           MR. TANASI:  Thank you, your Honor.

 9           Good morning, ladies and gentlemen.  Rich Tanasi and

10   Josh Tomsheck, Mario Castro.  Also with us helping us with the

11   IT and presentation is Brian Glenn.

12           Thank you.

13           MR. GAFFNEY:  Good morning, your Honor.

14           Ladies and gentlemen, Lucas Gaffney and Tom Ericsson

15   representing Miguel Castro.

16           Thank you.

17           MR. BROWN:  Good morning, your Honor.  Will Brown and

18   Chris Mishler for Mr. Jose Luis Mendez.  Also present is Lisa

19   Smith and Rich Beasley.

20           Thank you.

21           MR. GREEN:  Good morning, ladies and gentlemen.

22   Donald Green on behalf of Salvador Castro and today, finally,

23   Investigator Sharlene [phonetic] Gonzalez will be with us

24   probably today and tomorrow.

25           Thank you.

2:19-cr-00295-GMN-NJK

1          THE COURT:  Okay.  Thank you.

2          All right.  So let's go ahead and continue with direct

3  examination by the Government.  The witness is Patti Kern.

4                     DIRECT EXAMINATION

5  BY FINLEY:

6  Q.  Good morning, Ms. Kern.

7  A.  Good morning.

8  Q.  We were talking about National Price service which was the

9  first mailing company that you opened with the Castro

10  defendants' brother, Epi Castro.

11          Do you remember that testimony?

12  A.  Yes.

13  Q.  And when did that company get started?

14  A.  It was about 2010, early 2011.

15  Q.  Okay.

16          MR. FINLEY:  Let's put Government Exhibit 280, which

17  is already admitted, onto the screen, please.

18  BY MR. FINLEY:

19  Q.  It's just going take a few seconds to warm up, Ms. Kern.

20          Now, you have it in front of you?

21  A.  Is that what this --

22  Q.  It should be on your screen there.

23  A.  Oh.  All right.

24  Q.  Do you see Government's 280 on your screen?

25  A.  Yes.

1    Q.  Okay.  And if you look right about at the middle, about one
2    row down, National Price Service --
3          MR. FINLEY:  If we could blow that up, please, the row
4    for National Price Service about halfway down.
5          Thank you.
6    BY MR. FINLEY:
7    Q.  Now, Government Exhibit 280 is based on state corporation
8    records and bank records.
9          According to Government Exhibit 280, when did National
10   Price Service get opened?
11   A.  2010.
12   Q.  Is that, more or less, consistent with your memory?
13   A.  Yes.
14   Q.  So 2010 was the beginning of the conspiracy period that you
15   were charged with; is that right?
16   A.  Yes.
17   Q.  Okay.  Let's talk about the defendant Mario Castro.
18          MR. FINLEY:  Can we put his picture on the screen, the
19   same one that was shown before, your Honor?
20   BY MR. FINLEY:
21   Q.  Are you looking at a picture of defendant Mario Castro?
22   A.  Yes.
23   Q.  After you became partners with Epi Castro, did you later
24   become partners with his brother, Mario Castro?
25   A.  Yes.

1  *Q.*  When did you first become partners with Mario Castro on a

2  mailing company?

3  *A.*  I believe it was around 2012.  I'm not positive on the

4  date.

5  *Q.*  Would it help -- do you have e-mails from the time?

6  *A.*  I --

7  *Q.*  Did you have e-mails at the time --

8  *A.*  Yes.

9  *Q.*  -- when you were doing this business?

10  *A.*  Probably, yes.

11  *Q.*  Would it be helpful to look at an e-mail from the time

12  period to refresh your memory?

13  *A.*  Yes.

14        MR. FINLEY:  So Government Exhibit 170 is not

15  admitted, so let's just put it on the screen for the witness

16  only.

17  BY MR. FINLEY:

18  *Q.*  Please take a look at Government Exhibit 170.

19        Do you recognize that document?

20  *A.*  Yes.

21  *Q.*  Is that an e-mail between you and somebody named Sean

22  O'Connor dated February 7, 2012?

23  *A.*  Yes.

24        MR. FINLEY:  Your Honor, I move to admit Government

25  Exhibit 170.

─ 2:19-cr-00295-GMN-NJK ─

```
 1              (Government Exhibit 170 offered.)

 2              THE COURT:  Any objection to 170?

 3              MR. BROWN:  No objection from Mr. Mendez, your Honor.

 4   Thank you.

 5              MR. TANASI:  Briefly foundational, the e-mail doesn't

 6   (unintelligible).

 7              (Court reporter interruption.)

 8              MR. TANASI:  The e-mail, foundationally -- it doesn't

 9   appear to be between Mario Castro and Ms. Kern, so therefore,

10   it lacks foundation.

11              MR. FINLEY:  Your Honor, I don't believe I said that.

12              MR. GREEN:  We're objecting unless (unintelligible).

13              (Court reporter interruption.)

14              MR. GREEN:  Attorney Don Green.  Objection.  Unless

15   there's more foundation to Proposed Exhibit 170.

16              THE COURT:  So what is the objection?  I'm not seeing

17   what the -- this is -- it represents that it's written by her.

18              MR. TANASI:  So your Honor --

19              MR. GREEN:  The questions were pending, your Honor --

20   Don Green on behalf of Salvador Castro.

21              The question pending right before that whether it was

22   Mario Castro.  I don't see his name on this proposed exhibit.

23              Thank you.

24              THE COURT:  All right.  And Mr. Tanasi?

25              MR. TANASI:  So your Honor, I would join with
```

—————— 2:19-cr-00295-GMN-NJK ——————

1   Mr. Green and I would also add it's hearsay.

2           THE COURT:  Is this an 801(d)(2)(E)?

3           MR. FINLEY:  Your Honor, it's -- I'm blanking on that

4   rule, but maybe I could --

5           THE COURT:  In furtherance of?

6           MR. FINLEY:  Pardon?  Yes.

7           THE COURT:  In furtherance of?

8           MR. FINLEY:  Absolutely.

9           THE COURT:  All right.  So I'll go ahead and admit it

10  for that purpose.  Exhibit 170 is admitted.

11          (Government Exhibit 170 admitted.)

12  BY MR. FINLEY:

13  Q.  All right.  Let's start at the top.

14          There's an e-mail address, PK1726@AOL.com.  Who does

15  that e-mail address belong to?

16  A.  That e-mail address belongs to me.

17  Q.  Did you send this e-mail?

18  A.  Yes, I did.

19  Q.  And, again, it was February 7, 2012, and it's addressed to

20  Sean O'Connor at nationalprintmail.com.

21          Do you see that?

22  A.  Yes.

23  Q.  Who is he?

24  A.  He is, basically, the -- the go-between who would process

25  the mailings but the -- again, the account rep, per se.

1   Q.  Okay.  Who did he work for?

2   A.  Mario.

3   Q.  And when you say "Mario," do you mean Mario Castro?

4   A.  Yes.

5   Q.  And the e-mail address has the name "National Print Mail"

6   in it?

7   A.  Yes.

8   Q.  Are you familiar with that business?

9   A.  Yes.

10  Q.  Who operated that business?

11  A.  Mario Castro.

12  Q.  Did anyone else run that business with him?

13  A.  I'm not positive.

14  Q.  That's fine.

15         At the bottom, there's an e-mail -- so

16  chronologically, it starts at the bottom.  There's an e-mail

17  from Sean O'Connor to you.

18         Do you see that?

19  A.  Yes.

20  Q.  This is dated February 7th.  He writes, "I just went and

21  checked the balance on the GAM account."

22         Do you see that?

23  A.  Yes.

24  Q.  And then you write back on the e-mail above it.

25         Do you see that?

─────── 2:19-cr-00295-GMN-NJK ───────

1    *A.*  Yes.

2    *Q.*  Second sentence, "Mario stopped me yesterday and told me to

3    take $1,500 because they each had already done that and he

4    wanted everyone to be even."

5         Do you see that?

6    *A.*  Yes.

7    *Q.*  Now, who is Mario Castro?

8         I mean -- who -- sorry.  Who is Mario in this

9    sentence?  Are you referring to Mario Castro?

10   *A.*  One of the other parties involved in the mailing of this

11   particular company.

12   *Q.*  Okay.  Let me ask that you again.  I think I bungled that

13   question.

14        You are referring to Mario stopping you and telling

15   you to take $1,500, right?

16   *A.*  Yes.

17             MR. GREEN:  Objection.  It's leading, your Honor.

18             MR. FINLEY:  It's on the document, Judge.

19             MR. GREEN:  Then the document speaks for itself.

20   Objection.

21             THE COURT:  He's laying foundation for the question.

22   It's overruled.

23   BY MR. FINLEY:

24   *Q.*  So who are you referring to?  Mario --

25   *A.*  Mario Castro stopped me.

1   *Q.*  -- the defendant?

2   **A.**  Yes.

3   *Q.*  All right.  And there was a reference to a GAM account?

4   **A.**  Yes.

5   *Q.*  Do you know what GAM is?

6   **A.**  I don't remember what the initials stand for, but that was

7   a mailing company that mailed for a very short time in the

8   beginning.

9   *Q.*  And was that a mailing company that you and Mario Castro

10  used?

11  **A.**  Yes.

12  *Q.*  And did you use the GAM mailing company to send fraudulent

13  prize notices to people?

14  **A.**  Yes.

15  *Q.*  And those fraudulent prize notices would have had the

16  letters "GAM" on those particular notices?

17  **A.**  Yes.

18  *Q.*  So back to the sentence where Mario stops you and tells you

19  to take $1,500 out, were you discussing how to split up money

20  in this particular e-mail?

21  **A.**  Yes.

22  *Q.*  And what kind of money was that that you were splitting up?

23  **A.**  That would have been profit.

24  *Q.*  Okay.  And where did the profit money that you all were

25  splitting up in this e-mail come from?  What was the source of

1    the money?

2    *A.*   The respondents to the prize notices.

3    *Q.*   And was all the money that you were splitting up, was the

4    source fraud victims?

5    *A.*   Yes.

6    *Q.*   Now, who is authorizing you to take money out of the GAM

7    account in this e-mail?

8    *A.*   Mario Castro.

9    *Q.*   Is that how things usually worked?  He has to authorize you

10   to take money out of the GAM account?

11   *A.*   Yes.  Whoever's over the -- whoever has the company

12   authorizes the payment.

13   *Q.*   Who's controlling the money in this e-mail?

14   *A.*   Mario Castro.

15   *Q.*   Now, we were asking when this company got started.

16          In this e-mail, is the company GAM already making

17   money?

18   *A.*   Yes.

19   *Q.*   Now, does it take some time when you set up a mailing

20   company for the money to start coming in?

21   *A.*   Yes.

22   *Q.*   Approximately how long would that take?

23   *A.*   It -- I'd say at least -- at least a month, maybe more.

24   *Q.*   So what does this e-mail tell you about when GAM got

25   started given that you're already making money at this point?

―― 2:19-cr-00295-GMN-NJK ――

1  **A.**  Either the end of 2011 or the very beginning of 2012.  It
2  could have been January 2012.
3  Q.  So based on Government Exhibit 170, when did you and Mario
4  Castro become partners in GAM, the mailing company?
5  **A.**  It would be early 2012 or late 2011.
6  Q.  I think you mentioned GAM earlier just a few moments ago.
7  You mentioned that the GAM mailing company was not around for
8  very long?
9  **A.**  No.
10  Q.  What happened to GAM?
11  **A.**  I believe it received a cease and desist, but I cannot
12  remember.
13  Q.  Okay.
14         MR. FINLEY:  Government Exhibit 128 has not been
15  admitted in evidence, but can we show Government Exhibit --
16  your Honor.
17         THE COURT:  To the witness?
18         MR. FINLEY:  Actually, I was wrong about that.  It
19  actually is admitted.
20         THE COURT:  Exhibit 128, Nick?  Let's double-check
21  that.
22         THE COURTROOM ADMINISTRATOR:  Yes, your Honor.
23         THE COURT:  Yes.  Exhibit 128 may be published to the
24  jury.
25         MR. FINLEY:  Thank you.

1    BY MR. FINLEY:

2    *Q.* Do you see Exhibit 128 in front of you, Ms. Kern?

3    *A.* Yes.

4    *Q.* Is that a cease and desist order that was served on GAM

5    or -- that -- where GAM is in the caption?

6    *A.* Yes.

7         MR. FINLEY: Could you go to page 12, please?

8    BY MR. FINLEY:

9    *Q.* According to page 12 of the cease and desist order, who is

10   the signer?

11        The name is rather hard to pronounce. I won't ask to

12   you to do it. I can't pronounce it either.

13   *A.* I can't --

14   *Q.* But the first name is Sixto?

15   *A.* Yeah. Sixto Teucro -- I -- I --

16   *Q.* Okay. Just -- that's fine.

17   *A.* Okay.

18   *Q.* I think we know what you're talking about.

19        MR. FINLEY: If we could blow that line up, please.

20   BY MR. FINLEY:

21   *Q.* Do you know him?

22   *A.* I do not.

23   *Q.* Did you recruit him to be the owner on paper of this

24   company, GAM?

25   *A.* No, sir.

—— 2:19-cr-00295-GMN-NJK ——

1  *Q.*  Have you ever met him before?

2  ***A.***  No, sir.

3  *Q.*  Did this Sixto person have any real control over GAM?

4  ***A.***  Not to my knowledge.

5      MR. GREEN:  Objection.  She says she doesn't know the

6  man and doesn't know the company, your Honor.

7      THE COURT:  Not knowing the person and knowing whether

8  or not he has control are two different things.  So I'll allow

9  it for that.

10  BY MR. FINLEY:

11  *Q.*  He's not the one telling you that it was okay for you to

12  take money out, right?

13  ***A.***  No.

14  *Q.*  Now, let's -- so I want to make a note of that date.

15      MR. FINLEY:  If we can blow up the date, please.

16  BY MR. FINLEY:

17  *Q.*  April 26, 2012?

18  ***A.***  Correct.

19  *Q.*  Okay.  Let me show you an e-mail from a few days later.

20      MR. FINLEY:  This is Government Exhibit 175.  It is

21  not admitted.

22  BY MR. FINLEY:

23  *Q.*  Do you see Government Exhibit 175 in front of you?

24  ***A.***  Yes.

25  *Q.*  Is that an e-mail from you -- I'm looking at the top -- to

1    Sean@nationalprintmail.com?

2    *A.*  Yes.

3    *Q.*  Is it dated May 1, 2012?

4    *A.*  Yes.

5          MR. FINLEY:  Your Honor, I move to admit Government

6    Exhibit 175.

7          (Government Exhibit 175 offered.)

8          THE COURT:  It says page 1 of 2.  Can we look at

9    page 2?

10          MR. FINLEY:  Certainly, your Honor.

11    BY MR. FINLEY:

12    *Q.*  Do you have page 2 in front of you?

13          (Court reporter interruption.)

14    *A.*  There's only two things on two.

15    *Q.*  Okay.

16          THE COURT:  Any objection to Exhibit 175?

17          MR. TOMSHECK:  Not on behalf of Mario.

18          MR. GAFFNEY:  No, your Honor.

19          MR. BROWN:  No, your Honor.

20          MR. GREEN:  No objection, your Honor.

21          THE COURT:  Exhibit 175 is admitted.  May be published

22    to the jury.

23          (Government Exhibit 175 admitted.)

24          MR. FINLEY:  Okay.  Let's go to the top third of that

25    and blow that up if we can.

—— 2:19-cr-00295-GMN-NJK ——

1  BY MR. FINLEY:

2  Q.  So, again, this is PK1726.  That's you?

3  A.  Yes.

4  Q.  And then, again, we're at -- you're communicating with

5  Sean@nationalprintmail.com?

6  A.  Yes.

7  Q.  And you mentioned he was an account executive or account

8  manager.

9       What was your understanding?

10  A.  Yes, more or less.  I usually ran everything through him.

11  I just dealt with him directly.

12  Q.  Who did he report to?

13  A.  Mario Castro.

14  Q.  Let's look at the first line nearly at the end continuing

15  to the second line.

16       You say to Mr. O'Connor, "Yes.  Trash all PMS, GAM,

17  and ERN," right?

18  A.  Yes.

19  Q.  Now, the letters "GAM," those are the same letters of the

20  mailing company we've been talking about, right?

21  A.  Yes.

22  Q.  And we looked at a cease and desist order that was dated

23  April 26, 2012?

24  A.  Yes.

25  Q.  What's the date on this e-mail?

1   *A.*   May 1, 2012.

2   *Q.*   Are you instructing Sean O'Connor to trash something

3   related to GAM?

4   *A.*   Yes.   The blank stock.

5   *Q.*   Can you tell jury what it means in your industry when you

6   tell somebody at the letter shop to trash something?

7   *A.*   Throw it out.   That way, it's not reused by mistake.   These

8   were promotions that were not to mail anymore.   So the blank

9   stock couldn't be re-lasered with somebody else's information

10  on it so you got rid of it, trashed it, threw it out.

11  *Q.*   And I think you mentioned stock.   What is stock?   Is

12  that -- what is that?

13  *A.*   When I'm talking about the -- the -- the forms that have

14  came in with the pre-printed stuff on it, like the signatures,

15  the stuff that is the same on every piece, that's what I refer

16  to as the stock.   That stock goes into the letter shop.   They

17  personalize it.

18         So when you got the stock, the stock has all the

19  graphics on it.   It will have the part number on it that is

20  referenced when they pull the stuff to run the job.   So that's

21  what I've referred to as -- you know, that's, to me, the stock,

22  the blank stock.

23  *Q.*   Thank you.

24         So if we look at the e-mail below that -- which is

25  from Sean O'Connor to you, that's dated April 30th, so that's

1  four days after that cease and desist.  Sean O'Connor's asking

2  you if he should really trash all this stock.

3           Do you see that?

4  **A.**  Yes.

5  Q.  Okay.  And his -- and he asks about the outers and the

6  inners.

7           Do you see that?  That's about in the middle of the

8  e-mail?

9  **A.**  Yes.

10 Q.  And what are outers and inners?

11 **A.**  The outers are the outside envelopes that carry the -- that

12 are the main mailing for the package, the outside envelope.

13 Like when you mail a bill, you put your, you know, bill in that

14 outer envelope and it mails.

15          The inner is the envelope that's on the inside like

16 you would mail your bill back.  They give you an envelope to

17 mail it back in.  That's what that is.

18 Q.  Why are you instructing him to trash the stock and the

19 outers and the inners -- let me back up a second.

20          Just so we can use terms that everybody already knows,

21 "stock," "outers," "inners," that's just paper and envelopes --

22 **A.**  Correct.

23 Q.  -- that are already ready to go?  They're printed up?

24 **A.**  Yes.

25 Q.  Okay.  So why are you telling Sean O'Connor to trash all

—— 2:19-cr-00295-GMN-NJK ——

1  this paper and envelopes --

2  A.  It's --

3  Q.  -- four days after a cease and desist comes in?

4  A.  It's useless.  And that way, it won't get mixed up somehow

5  with some other mailings.

6  Q.  Now is a -- is getting a cease and desist and having one of

7  these mailing companies shut down, is that a significant

8  development or an insignificant development in the business

9  that you were running?

10  A.  It's significant.

11  Q.  Now, you said this to Sean O'Connor in this e-mail?

12  A.  Yes.

13  Q.  And he also heard about it from somebody named Epi, if we

14  look at the -- near the bottom of that e-mail.

15          MR. FINLEY:  We'll have to zoom back out for the

16  screen.

17  BY MR. FINLEY:

18  Q.  Do you see the line that says, "Epi told the warehouse guy

19  to trash all this, amazing"?

20  A.  Yes.

21  Q.  Do you see that?

22          Who is "Epi" in that sentence?

23  A.  Epi Castro.

24  Q.  And is he, again, the defendants' -- the Castro defendants'

25  brother and the uncle --

—— 2:19-cr-00295-GMN-NJK ——

1          MR. GREEN:  Objection.  Unless there's foundation,

2    your Honor.  The Government is testifying.

3          THE COURT:  Sustained.

4    BY MR. FINLEY:

5    Q.   What's the relationship between Epi Castro and these four

6    defendants?

7    A.   Epi is Mario Castro, Miguel Castro, and Salvador Castro's

8    brother.  And I'm not sure his relationship to Jose Mendez.

9    Q.   So Sean O'Connor, account manager, at National Print Mail

10   is hearing about the need to trash the GAM envelopes and paper

11   from Epi Castro and you, according to this e-mail?

12   A.   Yes.

13   Q.   Why is -- why are you telling him about this?  Why are you

14   telling him to do this?

15   A.   To -- to get it trashed, and also, it makes room on the

16   floor of the warehouse to get unused stock out of there.

17   Q.   Is this something that you did some of the time in response

18   to a cease and desist or is this standard procedure in response

19   to a cease and desist?

20   A.   It's standard procedure.

21   Q.   And Sean O'Connor's the account manager at National Print

22   and Mail reporting to Mario Castro, according to your

23   testimony?

24   A.   Yes.

25   Q.   When you told Sean O'Connor this, did you expect him to

1  tell his boss?

2  **A.**  Probably.

3  Q.  Well, let me ask you this.  You're partners with him on

4  this mailing company, GAM?

5  **A.**  Yes.

6  Q.  Would you --

7  **A.**  It would make sense.

8  Q.  -- want Mario Castro to know about this?

9  **A.**  Yes.

10  Q.  You wouldn't hide it from him?

11  **A.**  Oh, no.

12  Q.  He'd find out when the money stopped coming in, wouldn't

13  he?

14  **A.**  Yes.

15  Q.  Okay.  Thank you.

16        So the C&D against GAM, was that an order from the

17  United States Postal Inspection Service instructing that

18  company to stop sending fraudulent mail?

19  **A.**  Yes, sir.

20  Q.  Did you and your partner, Mario Castro, stop sending

21  fraudulent mail or did you continue to send fraudulent mail

22  after this?

23  **A.**  Continued.

24  Q.  Did you and Mario Castro partner on other mailing companies

25  after GAM got shut down in 2012?

—— 2:19-cr-00295-GMN-NJK ——

1    *A.*  Yes.

2    *Q.*  Did you do that right up until the day that federal agents

3    executed search warrants at your house?

4    *A.*  Yes.

5          MR. FINLEY:  Let's go to Government's Exhibit 88,

6    which is already in evidence.

7    BY MR. FINLEY:

8    *Q.*  What's that?

9    *A.*  That is a distribution envelope.

10   *Q.*  What does it say on it?

11   *A.*  "Mario."

12   *Q.*  Whose handwriting is on the envelope?

13   *A.*  Mine.

14   *Q.*  What's inside?

15   *A.*  Cash from the respondents.

16   *Q.*  And when you use "respondents," are all of those

17   respondents fraud victims or are they responding -- are any of

18   them responding to something legal, legitimate?

19   *A.*  No.

20   *Q.*  So this money, did it come from one particular victim or

21   did it come from fraud victims all over the place?

22   *A.*  Multiple fraud victims.

23   *Q.*  Was it sent in response to prize notices that you and the

24   defendant Mario Castro were sending people?

25   *A.*  Yes.

1  *Q.*  And that Mario -- that -- the "Mario" that you wrote on

2  that envelope, was that intended for Mario Castro, the

3  defendant?

4  *A.*  Yes.

5  *Q.*  What were you planning to do with it?

6  *A.*  Give it to him.

7  *Q.*  As of February 2018 when this envelope was found in your

8  house, were you and Mario Castro still actively sending

9  fraudulent prize notices to people?

10  *A.*  Yes.

11  *Q.*  Let's talk about the defendant Jose Luis Mendez.

12        MR. FINLEY:  And if we could put his picture on the

13  screen, same one that was shown before.

14  BY MR. FINLEY:

15  *Q.*  Is that the defendant Jose Luis Mendez?

16  *A.*  Yes.

17  *Q.*  Do you remember when you first became partners with Jose

18  Luis Mendez on a mailing company?

19  *A.*  2015.  Again, the dates, -- there were too many different

20  companies.

21  *Q.*  What was that?

22  *A.*  2015.

23  *Q.*  2015?

24        MR. FINLEY:  Let's put Government Exhibit 280 on the

25  screen.  And this is the mailing company chart again.  It's

—— 2:19-cr-00295-GMN-NJK ——

1    already been admitted.

2           Let's blow up the first row.

3    BY MR. FINLEY:

4    Q.   According to state corporation records, there's a company

5    called Advanced Allocation Systems opened in 2012.

6           Do you see that?

7    A.   Yes.

8    Q.   Is it Advanced Allocation Systems a mailing company that

9    you helped run?

10   A.   Yes.

11   Q.   When was -- and it was opened in 2012?

12   A.   Correct.

13   Q.   Who was the president according to state records?

14   A.   Jose Luis Mendez.

15   Q.   And who's the bank account signer on the account according

16   to bank records?

17   A.   Jose Luis Mendez.

18   Q.   Does that refresh your memory about when you started up

19   partnering on the a mailing company with the defendant Jose

20   Luis Mendez?

21   A.   Yes, sir.

22   Q.   Did you and the defendant Jose Luis Mendez continue sending

23   fraudulent mail together as partners on mailing companies from

24   2012 to February 2018?

25   A.   Yes.

1          MR. FINLEY:  Let's look at Government Exhibit 86.

2   It's admitted, your Honor.

3          And if we could zoom in on the first one, please.

4   BY MR. FINLEY:

5   Q.  Is that your handwriting on the first envelope, Ms. Kern?

6   A.  Yes.

7   Q.  Is that your handwriting on all the envelopes?

8   A.  Yes, sir.

9   Q.  What name did you write on it?

10  A.  "Jose Luis."

11  Q.  And is that the -- is that Jose Luis Mendez, the defendant?

12  A.  Yes, sir.

13  Q.  Where did the money in that envelope come from originally?

14  A.  From the respondents to the mailings.

15  Q.  Was the money in this envelope sent in response to

16  fraudulent prize notices that you and the defendant Jose Luis

17  Mendez sent to people?

18  A.  Yes, sir.

19  Q.  What did you intend to do with the money when you put it in

20  that envelope?

21  A.  Give it to Jose Luis.

22  Q.  Had you given Jose Luis Mendez envelopes of cash before?

23  A.  Yes, sir.

24  Q.  Were they mostly in white envelopes like the one in

25  Government Exhibit 86?

1    *A.*   Usually.

2    *Q.*   They weren't always?

3    *A.*   Not always.

4    *Q.*   When they weren't in a white envelope, what kind of

5    envelope did they come in?

6    *A.*   I would stick them in, like, a manilla envelope, a large

7    manilla envelope, and just fold it over.

8    *Q.*   Okay.  Why would you use the large manilla envelope, fold

9    it over, rather than a white envelope, like a regular white

10   letter envelope?

11   *A.*   At that time, it would have been because it held the amount

12   of money better.

13   *Q.*   So you'd use the -- can you show the jury how the -- how

14   you'd fold it over and what it --

15           (Indiscernible simultaneous crosstalk.)

16           (Court reporter interruption.)

17   *Q.*   Just let's -- let me finish the question.  I'll try to let

18   you finish the answer, because it's very hard on the court

19   reporter if we both talk at the same time.

20           So could you show the jury, you know, what the package

21   would look like when you fold would it over, about the size,

22   typically.

23   *A.*   This -- you know.

24   *Q.*   Let me show you Government Exhibit 150, which is not

25   admitted.

1          MR. FINLEY:  Your Honor, the authenticity of the

2    document has been stipulated by the defendants.

3    BY MR. FINLEY:

4    Q.  Do you have 150 in front of you?

5    A.  Yes, I do.

6    Q.  Okay.

7          MR. FINLEY:  It's a longer document, but if we could

8    just kind of scroll through the pages for a little while to let

9    the witness get familiar with that.

10    BY MR. FINLEY:

11    Q.  Have you had a chance to look at few of those pages?

12    A.  Yes.

13    Q.  Did you look at this document before coming here today when

14    we met to prepare for your testimony?

15    A.  I did.

16    Q.  Do you recognize it?

17    A.  Yes.

18    Q.  What is it?

19    A.  It's texts back and forth between me and Jose Luis.

20    Q.  Now, this came from Jose Luis Mendez's phone, not your

21    phone, just so you're not confused about that.

22          MR. FINLEY:  Your Honor, I move to admit Government

23    Exhibit 150.

24          (Government Exhibit 150 offered.)

25          THE COURT:  Any objection to Exhibit 150?

1          MR. BROWN:  No objection.

2          MR. TOMSHECK:  No, your Honor.

3          MR. GAFFNEY:  No, your Honor.

4          MR. GREEN:  No objection, ma'am.

5          THE COURT:  All right.  Exhibit 150 is admitted and

6    maybe be published to the jury.

7          (Government Exhibit 150 admitted.)

8    BY MR. FINLEY:

9    Q.  Okay.  So this is page 1.

10          MR. FINLEY:  Just to be clear:  The texts don't look

11   exactly like that.  We've put it into a format that's easier

12   for everybody to read, but the defendants have stipulated that

13   this is -- these are real texts.

14          Let's go to --

15   BY MR. FINLEY:

16   Q.  And these are texts between -- you already said that.  I'll

17   move on.

18          MR. FINLEY:  Let's go to page 26.

19   BY MR. FINLEY:

20   Q.  Do you see the texts there?

21   A.  Yes.

22   Q.  Let's start at the bottom of that page because it's a new

23   text exchange from the one before.

24          MR. FINLEY:  So if we can blow up the bottom -- bottom

25   half, please.  Thank you.

—— 2:19-cr-00295-GMN-NJK ——

1  BY MR. FINLEY:

2  Q.  And in the first text, is that a text from Jose Luis Mendez

3  to you?

4  A.  Yes.

5  Q.  That's your cell phone number?

6  A.  Yes.

7  Q.  And he's asking you if there's an envelope for him or not;

8  is that right?

9  A.  Correct.

10  Q.  Okay.  And this is August 21, 2017 for the record.

11        You -- did you write him back?

12  A.  Yes.

13  Q.  And what did you say?

14  A.  I said, "I gave the envelope to Mario.  It was a big yellow

15  one for you last week.  He put it on top of the cabinet."

16  Q.  Is that the type of manilla envelope that you were just

17  explaining to the jury what that looked like?

18  A.  Yes, sir.

19  Q.  And it was folded over just like you said?

20  A.  Yes, sir.

21        MR. FINLEY:  Can we go to page 34, please?

22  BY MR. FINLEY:

23  Q.  That looks like a text exchange from September (inaudible)?

24        (Court reporter interruption.)

25  Q.  This is a text exchange from September 20, 2017, correct?

1   *A.*   Yes.

2   *Q.*   Mr. Mendez writes at the top, "I have a package that came

3   for you."

4          Do you see that?

5   *A.*   Yes.

6   *Q.*   What do you write back?

7   *A.*   I said, "Okay.  Thanks.  Do you know what it is?"

8   *Q.*   And he wrote back, "It's the envelopes from Miami."

9          And then after that, about a minute later at

10  6:00 p.m., he sends a message and the only thing he says is

11  dollar sign, dollar sign, dollars sign?

12  *A.*   Yes, sir.

13  *Q.*   Am I reading that correctly?

14  *A.*   Yes.

15  *Q.*   Did Jose Luis Mendez have a mailbox in Miami Lakes,

16  Florida?

17  *A.*   Yes.

18  *Q.*   And did that mailbox store send boxes full of victim mail

19  that had arrived at that store?  Did it ship that box to Luis

20  Mendez's house?

21  *A.*   Yes, sir.

22          MR. GREEN:  Your Honor, I'm going to object.

23          Can we have a side bar, your Honor, please?

24          THE COURT:  All right.

25          (At sidebar on record.)

 1          THE COURT:  Mr. Green, what's your objection, sir?

 2          MR. GREEN:  Yes, your Honor.  The objection here is

 3   two-fold.  It's relevance and we're getting into an area on the

 4   404(b).

 5          Please recall last year, your Honor, about this time,

 6   a series of motions were filed back and forth on the 404(b) as

 7   to incidents occurring in 2010 and -- and in Miami, a separate

 8   conspiracy.  Salvador Castro is not named in that.  He was

 9   never a party to that.  He was never brought up in that.  We

10   presented this information last year.

11          And I'm asking that there be a limiting instruction

12   that Salvador Castro was not involved in this 404(b) type

13   evidence.  And we object.

14          Thank you.

15          If not, we move for mistrial.  If there's any further

16   questions...

17          THE COURT:  All right.  What is the relevance and is

18   this admissible only as to certain defendants or all?

19          MR. FINLEY:  Your Honor, I think that Mr. Green may

20   have misheard the testimony that was coming in.  He made

21   reference to a 2010 conspiracy that I don't know what that is.

22          MR. GREEN:  Miami.

23          MR. FINLEY:  All right.  I don't know what that is,

24   but -- okay.  Now I know what it is.

25          MR. GREEN:  Okay.

—— 2:19-cr-00295-GMN-NJK ——

1           MR. FINLEY:  Anyway, with respect to that, this has
2   nothing to do with that.  This is the conspiracy that was
3   charged.  The date on the text is 2017.  Nothing to do with it.
4   We're not going to get into that.
5           MR. ZYTNICK:  If we may add, we have the mailbox
6   application for the Miami Lakes.  Mr. Mendez is related to the
7   scheme.  It's not 404(b).
8           MR. FINLEY:  So this side bar is kind of a waste of
9   time.
10          THE COURT:  All right.
11          MR. GREEN:  I'd rather make my objection like this
12  rather than on the record in front of the jury.
13          THE COURT:  All right.
14          MR. GREEN:  We were not involved in anything in Miami,
15  period.  That's we'd ask the jury be instructed on that.  If
16  not, move for mistrial.
17          Thank you.
18          THE COURT:  Well -- so what the Government explained
19  is this is not from 2010.  This is from 2017.
20          MR. GREEN:  They just mentioned 2010 and my -- Miami's
21  2010.  They're bringing it in.  The jury's going to have to
22  know what happened in Miami.  We're not involved in that.
23          THE COURT:  All right.  Well, I don't see that there's
24  any mention of 2010 and Miami on the texts that are being
25  discussed at this point.  So objection's overruled.

---- 2:19-cr-00295-GMN-NJK ----

1          MR. GREEN:  Thank you, your Honor.

2          (End of discussion at sidebar.)

3          THE COURT:  You can continue, Mr. Finley.

4          MR. FINLEY:  I apologize, your Honor.  I forgot the

5   pending question.

6          Would you mind reading it back?

7          THE COURT REPORTER:  Yes.

8          MR. FINLEY:  Thank you.

9          THE COURT REPORTER:  The last question included an

10  answer.  Do you want the question and answer read back?

11         MR. FINLEY:  And then there was an objection

12  afterwards?  Is that what happened?

13         THE COURT REPORTER:  Yes.

14         MR. FINLEY:  Okay.  Yeah, let's -- if it would be okay

15  with the judge, yes.

16         THE COURT:  Yes.

17         THE COURT REPORTER:  Okay.  The question was:  "And

18  did that mailbox store send boxes full of victim mail that had

19  arrived at that store?  Did it ship that box to Luis Mendez's

20  house?"

21         Answer:  "Yes, sir."

22  BY MR. FINLEY:

23  Q.  Okay.  That was your answer.

24         Next question:  Did Mr. Mendez communicate with you

25  often by text message asking you to come to his house and pick

1    up boxes full of mail?

2    *A.*  Yes, sir.

3    *Q.*  In those boxes -- inside the mail that was inside the boxes

4    was what?

5    *A.*  Checks and cash.

6    *Q.*  And checks and cash came from who?

7    *A.*  The respondents to the mailings.

8    *Q.*  Were any of these respondents responding to legitimate

9    mailings that were honest and truthful?

10   *A.*  No, sir.

11   *Q.*  That legitimate mailings that gave value for money to

12   people?

13   *A.*  No, sir.

14   *Q.*  Did you and the defendant Jose Luis Mendez profit from

15   fraud together from the years 2010 to 2018?

16   *A.*  Yes.

17   *Q.*  Let's talk about the defendant Miguel Castro.

18            MR. FINLEY:  If we could please put his picture on the

19   screen.

20            (Counsel conferring.)

21   BY MR. FINLEY:

22   *Q.*  I've been talking about 2010 to 2018.  That's the

23   conspiracy period, right?

24   *A.*  Yes.

25   *Q.*  And during that entire conspiracy period, did the defendant

1  Jose Luis Mendez help you produce and send fraudulent notices?

2  *A.*  Yes.

3  *Q.*  Now, I also was talking about a separate issue of

4  Mr. Mendez also being your partner on individual mailing

5  companies, correct?

6  *A.*  Yes.

7  *Q.*  I asked you that?

8        So I'm just going to clarify, at Mr. Mishler's

9  request -- he's counsel for Mr. Mendez, but from 2012, to 2018,

10  that was the time that you were partners?

11  *A.*  Yes.

12  *Q.*  Right?

13        So the answer to the question I asked -- let me go

14  back.  Did you and the defendant Jose Luis Mendez profit from

15  fraud together from 2012 to 2018?

16  *A.*  Yes.

17  *Q.*  Right?

18        That's the period when the two of you were partners?

19  *A.*  Yes.

20  *Q.*  And the period when the two of you were working together to

21  produce and send fraudulent prize notices to people, that's a

22  little bit longer period.  That's 2010 to 2018 according to

23  your testimony, right?  Do I have that right?

24        2010 to 2018 was the time period where -- I'm not

25  asking about partnership.  I'm talking about just working

1    together to put these out.

2    *A.*  Yes.

3    *Q.*  He's at the letter shop?

4    *A.*  Yes.

5    *Q.*  Okay.  Thank you.

6          Okay.  We're talking about Miguel Castro.  Is that

7    Miguel Castro?

8    *A.*  Yes.

9    *Q.*  Are you familiar with the company called Marketing Image

10   Direct?

11   *A.*  Yes.

12   *Q.*  Do you know what that company did?

13   *A.*  It did do some fraudulent mailings, but it also, at one

14   time, was the name of the letter shop.

15   *Q.*  Okay.  Let me ask you about that.

16          The Castro family letter shop -- and by "Castro family

17   letter shop," I mean, the letter shop that the defendants

18   worked in.  And some of them ran from 2010 to 2018.

19          Do you understand what I'm talking about when I say

20   "Castro family letter shop"?

21   *A.*  Yes.

22   *Q.*  Okay.  That Castro family letter shop from 2010 to 2018 had

23   various names, didn't it?

24   *A.*  Yes.

25   *Q.*  Okay.  Can you tell the jury what some of those names were?

—— 2:19-cr-00295-GMN-NJK ——

1    *A.*  Well, of course, the one was Marketing Image Direct,

2    National Print and Mail.  The last one -- one of the last ones

3    was -- my mind's going blank.

4    *Q.*  Was it Digital Express?

5    *A.*  Yes, Digital Express.

6    *Q.*  Okay.  So regard -- so the names were changing over the

7    years?

8    *A.*  Yes, sir.

9    *Q.*  So you said Marketing Image Direct was one of the -- was

10   the name for the letter shop for a time period?

11   *A.*  Yes.

12   *Q.*  Do you recall when that time period was?

13   *A.*  Not exactly, no, I do not.

14   *Q.*  Okay.  Let me show you the corporate record for Marketing

15   Image Direct.

16           MR. FINLEY:  This is Government's Exhibit 214.  It's

17   already admitted.

18           And I need page 89, please.

19           If we could blow up -- blow up the top third, please.

20           Could we scroll up a little bit?  All the way to the

21   top.  There we go.

22   BY MR. FINLEY:

23   *Q.*  That's a corporate record for Marketing Image Direct, Inc.;

24   is that right?

25   *A.*  Yes.

—— 2:19-cr-00295-GMN-NJK ——

1    *Q.*  Okay.

2          MR. FINLEY:  Now if you zoom out and blow up the

3    bottom -- the bottom half.

4    BY MR. FINLEY:

5    *Q.*  Who is the soul corporate officer of that company?

6    *A.*  Miguel Castro.

7    *Q.*  Did Miguel Castro work at Marketing Image Direct and help

8    you do your letter shop work there?

9    *A.*  Yes.

10          MR. FINLEY:  Let's look at Government Exhibit 92 at

11   page 6.  It's already been admitted.

12   BY MR. FINLEY:

13   *Q.*  Is that a copy of a check that was sitting in a file folder

14   in your office?

15   *A.*  Yes.

16   *Q.*  Is it a check -- now, is the check written to Marketing

17   Image Direct?

18   *A.*  Yes.

19   *Q.*  What -- what is it -- what company is it being written

20   from?

21   *A.*  Montgomery Marketing Inc., LLC.

22   *Q.*  Did you write checks to Miguel Castro's company, Marketing

23   Image Direct, from other mailing companies, as well?

24   *A.*  Yes.

25   *Q.*  Did the mailing company payments that you made to Miguel

1   Castro's company, Marketing Image Direct, add up to more than

2   $700,000?

3   *A.*   I don't -- I don't know for sure.  I don't know.

4   *Q.*   That's fine.

5           Would the bank records be the place for us to look if

6   we wanted to know --

7   *A.*   Yes.

8   *Q.*   -- a precise amount?

9           Thank you.  Just wait for me to finish the question.

10  *A.*   Okay.

11  *Q.*   Take your time.

12  *A.*   Okay.

13  *Q.*   Did all of the money that you wrote in checks to Miguel

14  Castro's company, Marketing Image Direct -- what was the

15  ultimate source of all that money?  Where did it come from?

16  *A.*   This particular check was for letter shop and lasering at

17  that time.

18  *Q.*   I understand that.  So thank you for that answer.  I'll

19  come back to that, but I was asking a little bit of a different

20  question.

21  *A.*   Okay.

22  *Q.*   Where did the money come from originally?  How did that

23  income come into the business?

24  *A.*   Oh, I got you -- okay.  Now I understand.  It came from the

25  fraudulent mailings --

— 2:19-cr-00295-GMN-NJK —

1    *Q.*  All right.

2    **A.**  -- of the different companies.

3    *Q.*  All right.  And then you were saying that this is paying

4    for what exactly?

5    **A.**  That would have been for the personalization of a

6    particular mailing.

7    *Q.*  Okay.  And you said personalization.

8         What about the other things that the letter shop would

9    do such as inserting --

10   **A.**  Correct.  It was all packaged.

11   *Q.*  Just let me finish.

12        Such as inserting and folding and putting it in the

13   mail?

14   **A.**  Yes.

15   *Q.*  All right.  Now, how do you know that?

16   **A.**  Because I -- I wrote the check for the invoice.

17   *Q.*  So are you referring to the "For" line at the bottom left?

18   **A.**  Yes.

19   *Q.*  What does it say?

20   **A.**  "Invoice -- invoice number 6301."

21   *Q.*  Is that how you know that that's what it was paying for?

22   **A.**  Yes.

23   *Q.*  Did there come a time when you and Miguel Castro became

24   partners on a mailing company?

25   **A.**  Yes.

—— 2:19-cr-00295-GMN-NJK ——

1          MR. FINLEY:  Let's look at Government Exhibit 280,

2    please.  I'm looking at Price Awards which is maybe the fourth

3    row from the bottom.

4    BY MR. FINLEY:

5    Q.   Do you see that row?

6    A.   Yes.

7    Q.   And is the company, Price Awards, which was a dba of

8    Marketing Image Direct?

9    A.   Yes.

10   Q.   And was that a mailing company?

11   A.   Yes.

12   Q.   When was it opened?

13   A.   2016.

14   Q.   Who opened the bank account?

15   A.   Miguel Castro.

16   Q.   Was this about the time that you and Miguel Castro became

17   partners on a mailing company?

18   A.   Yes.

19   Q.   Was the name "Price Awards" a name that was printed on your

20   mailings?

21   A.   Yes.

22   Q.   Now, did the money that victims sent in response to those

23   Price Awards mailings get deposited into the bank account that

24   Miguel Castro opened?

25   A.   Yes.

―― 2:19-cr-00295-GMN-NJK ――

1    Q.  Now, did you use that account sometimes?

2    A.  Yes.

3    Q.  You wrote most of the checks coming out of there, didn't

4    you?

5    A.  Correct.

6    Q.  Did you do that with Miguel Castro's permission or did you

7    just do that secretly?

8    A.  No, that was with his permission.

9    Q.  All right.  Who had the ultimate control over the account?

10   A.  He did.

11   Q.  Did you exchange text messages with Miguel Castro about

12   Price Awards and the Price Awards bank account?

13   A.  Yes.

14   Q.  I'd like to show you Government Exhibit 151A.

15           MR. FINLEY:  It's not admitted.

16   BY MR. FINLEY:

17   Q.  Do you have 151A in front of you?

18   A.  Yes.

19           MR. FINLEY:  Can we scroll through that a little bit,

20   please, just so the witness can see more of it.

21   BY MR. FINLEY:

22   Q.  Do you recognize that?

23   A.  Yes.

24   Q.  What is it?

25   A.  It's texts between me and Miguel Castro.

—— 2:19-cr-00295-GMN-NJK ——

 1  *Q.*  Now, are there some texts in here that you recognize and

 2  other texts that you don't remember?

 3  *A.*  Yeah, there's a couple I don't remember.

 4  *Q.*  And is there anything about the phone number on those texts

 5  that you don't remember?

 6  *A.*  Yeah, it looks like he was sending it to my fax machine.

 7  *Q.*  And do you respond to the texts that he sent to your fax

 8  machine?

 9  *A.*  No.

10  *Q.*  And are those the ones that you don't recognize?

11  *A.*  Yes.

12  *Q.*  Do you think you ever got those?

13  *A.*  No.

14  *Q.*  Now, you do recognize most of the texts?

15  *A.*  Yes.

16  *Q.*  And the ones that you recognize, you recognize that the

17  phone number is correct?

18  *A.*  Yes.

19  *Q.*  And you tended to respond to those?

20  *A.*  Yes.

21       MR. FINLEY:  Your Honor, move to admit Government

22  Exhibit 151A.  The defendants all agreed that these are real

23  texts from Miguel Castro's phone.

24           (Government Exhibit 151A offered.)

25           THE COURT:  Any objection to the admission of

———— 2:19-cr-00295-GMN-NJK ————

1   Exhibit 151A?

2           MR. BROWN:  No objection, your Honor.

3           MR. GAFFNEY:  No, your Honor.

4           MR. TANASI:  No objection, your Honor.

5           MR. GREEN:  No objection, your Honor.  Thank you.

6           THE COURT:  All right.  Exhibit 151A is admitted.

7           (Government Exhibit 151A admitted.)

8           MR. FINLEY:  If we could go to page 6.

9   BY MR. FINLEY:

10  *Q.*  I'm looking at the top.  Is that a text from you to Miguel

11  Castro?

12  *A.*  Yes.

13          MR. FINLEY:  And if we could blow up the top half.

14  BY MR. FINLEY:

15  *Q.*  This is July 12, 2017?

16  *A.*  Correct.

17  *Q.*  What do you write?

18  *A.*  I ask him for the balance in Price Awards account.

19  *Q.*  Does he write back with a number?

20  *A.*  Yes.  6999.

21  *Q.*  Did you understand that -- from that, that the balance was

22  $6,999?

23  *A.*  Yes.

24          MR. FINLEY:  Let's go to page 8.

25          All right.  Let's blow up the top half.

2:19-cr-00295-GMN-NJK

1   BY MR. FINLEY:

2   Q.  Now we're in August 2017.  Are you asking him for balance

3   information again?

4   A.  Yes.

5            MR. FINLEY:  And let's go to page 10.

6            Let's blow up the middle part.  Yeah, those middle two

7   texts, please.

8            There you go.

9   BY MR. FINLEY:

10  Q.  Is that the same thing, asking for balance information?

11  A.  Yes.

12  Q.  Why were you asking for balance information?

13  A.  Because I couldn't access that account online.

14  Q.  Why couldn't you?

15  A.  I didn't have the necessary passwords and such.

16  Q.  Who did?

17  A.  Miguel.

18  Q.  Did you have checks that you could write all those checks

19  with?

20  A.  Yes.

21  Q.  How did you get those?

22  A.  From him.

23  Q.  How did you sign them if you're not the signatory on the

24  account?  How are you able to write all these accounts?

25  A.  He gave me a signature stamp.

2:19-cr-00295-GMN-NJK

1    Q.  Who did you get the signature stamp from?

2    A.  Miguel Castro.

3         MR. FINLEY:  Let's go to Government's Exhibit 151A at

4    11.

5         Let's blow up the bottom two, please.

6    BY MR. FINLEY:

7    Q.  Is that an example of you texting Miguel Castro and asking

8    him for checks?

9    A.  On that one, I'm -- I'm asking for deposit books.

10   Q.  Oh, my mistake.  Deposit books.

11        Who controls this bank account based on the texts that

12   we looked at?

13   A.  Miguel Castro.

14   Q.  And is that consistent with the testimony that you just

15   gave?

16   A.  Yes, sir.

17        MR. FINLEY:  Let's look at pages 13 to 14,

18   Government's Exhibit 151A.

19        Let's blow up that top two-thirds, please.

20   BY MR. FINLEY:

21   Q.  Is this a text exchange from February 14, 2018?

22   A.  Yes.

23   Q.  And are you giving Miguel Castro user ID and password

24   information?

25   A.  Yes.

1   Q.  Can you explain to the jury what kind of password

2   information this was?

3   A.  It was for the bank account for this particular -- for FMI.

4   Q.  Right.

5        FMI is in the middle?

6   A.  Yes.

7   Q.  And then there's also a company called S.M.M.I.?

8   A.  Yes.

9   Q.  What did that stand for?

10  A.  Special Money Marketing.

11  Q.  Could it have been "Special Money Managers, Inc."?

12  A.  Yes.  It's been a while.

13  Q.  And so were both of these mailing companies?  Were both --

14  A.  Oh, yes, they were both mailing companies.

15  Q.  Okay.  Just wait for me to finish the question.

16        Was S.M.M.I. and FMI, were they both mailing

17  companies?

18  A.  Yes.

19        MR. FINLEY:  Let's take a look at page 14.  And I want

20  to blow up the text at the bottom.

21  BY MR. FINLEY:

22  Q.  In this text, are you sending Miguel Castro user ID and

23  password information again?

24  A.  Yes.

25  Q.  And is it for Mario's MS and AU accounts?

2:19-cr-00295-GMN-NJK

1    *A.*  Yes.

2    *Q.*  Who's "Mario" in this text?

3    *A.*  Mario Castro.

4    *Q.*  Did Mario Castro have a son?

5    *A.*  Yes.

6    *Q.*  Did his son have the same name?

7    *A.*  Yes.

8    *Q.*  Are you referring to Mario Castro, Sr., the defendant, or

9    Mario Castro, Jr., the son?

10   *A.*  This would be Mario Castro, the son.  The accounts were in

11   his name.

12   *Q.*  Why did you need to send this user ID and password

13   information to Miguel Castro on four different mailing company

14   bank accounts?

15   *A.*  Miguel would do the accounting for the different mailing

16   companies and he needed the actual physical bank statements.

17   He needed to print them out.  So he needed access to the bank

18   accounts because I wrote checks out of these accounts but I did

19   not get the bank statement.

20   *Q.*  Okay.  I'd ask you to please take a note of the date.

21         What is the date on this text exchange?

22   *A.*  February 14, 2018.

23   *Q.*  Okay.  February 14, 2018.

24         Do you remember when search warrants were executed on

25   your house?

1    *A.*   I believe it was the 18th.

2    *Q.*   So it was approximately February 18th or so?

3    *A.*   I -- yes, sir.

4    *Q.*   Maybe about a week later?

5    *A.*   Yes.

6    *Q.*   Give or take a few days?

7    *A.*   Yes.

8    *Q.*   Okay.  Now, there's been evidence in this case that on the

9    same day that your house was searched, Miguel Castro told

10   federal agents that he had never done any work with you.

11          Based on Government's Exhibit 151A, is that a true

12   statement?

13   *A.*   No.

14   *Q.*   Prior to February -- February 18th or thereabouts, when was

15   the last time that you and Miguel Castro exchanged texts about

16   work according to Government's Exhibit 151A?

17   *A.*   February of 2018.

18   *Q.*   Maybe about a week later -- I mean a week earlier?

19   *A.*   Yes.

20   *Q.*   There was also testimony that Miguel Castro told federal

21   agents on February -- late February, search warrant day, that

22   the last time he saw you was two years before on the street.

23          Would that be a true statement?

24   *A.*   No, sir.

25   *Q.*   On the same day that search warrants were executed, was

—— 2:19-cr-00295-GMN-NJK ——

```
 1   there a cash envelope sitting in your house with Miguel's name
 2   on it?
 3   A.  I don't remember.  I would have to see.  I don't remember
 4   exactly.
 5           MR. FINLEY:  Let's put Government Exhibit 86 on the
 6   screen, please.
 7           Can we blow up the middle envelope, please?
 8   BY MR. FINLEY:
 9   Q.  What are we looking at?
10   A.  That is an envelope for Miguel Castro of cash.
11   Q.  So does that refresh your memory?
12   A.  Yes.
13   Q.  Okay.  On the day that search warrants were executed and
14   Miguel Castro gave his interview, was there a cash envelope for
15   him sitting in your house?
16   A.  Yes.
17   Q.  In the two-year period before Miguel Castro's interview,
18   did you deliver any cash envelopes to him?
19   A.  Yes.
20   Q.  Okay.  This one didn't get delivered?
21   A.  No.
22   Q.  But before that, you had been delivering cash envelopes to
23   him --
24   A.  Yes.
25   Q.  -- over that two-year period?
```

--- 2:19-cr-00295-GMN-NJK ---

1    *A.*  Yes.

2    *Q.*  From the time -- approximately from the time that the Price

3    Awards bank account was opened in 2016 up until the day of the

4    search warrants?

5    *A.*  Yes.

6    *Q.*  Let me ask you about the defendant Salvador Castro.

7            MR. FINLEY:  If we could please put his picture up.

8    BY MR. FINLEY:

9    *Q.*  Okay.  There's his driver's license photo.

10           Do you recognize him?

11   *A.*  Yes.

12           THE COURT:  Before we -- I'm sorry, before we switch

13   to a new person, would this be a good time to take our morning

14   break?

15           MR. FINLEY:  Yes, your Honor.

16           THE COURT:  Start with a whole different person for a

17   while, right?  Okay.

18           MR. FINLEY:  Yeah.

19           THE COURT:  So during this bathroom break, I do remind

20   the jury that you are not to discuss this case with anyone nor

21   permit anyone to discuss it with you.  If you inadvertently

22   hear anything about the case, remember that you are required to

23   report it to me immediately.

24           Please do not read, listen to, or view anything that

25   touches upon this case in any way or attempt to perform any

1    research or any investigation.

2          If you have questions, please write them down.  We

3    want to know what they are so we can help you.

4          And do not form any opinion until after you have heard

5    all the testimony, received the evidence.  I will provide you

6    the written jury instructions.  Then you will hear closing

7    arguments.  And after that, you may begin discussing the case

8    with each other and begin your deliberations but not until

9    then.

10         So let's stand for the jury.  We'll welcome them back

11   here at 10:45.

12         (Whereupon, the jury exits at 10:28 a.m.)

13         THE COURT:  Okay.  So we're outside the presence of

14   the jury.

15         So my understanding is Ms. Kern is going to step

16   outside for a while.  We're going have a different witness come

17   in at 10:45.  Is that right?

18         MR. FINLEY:  That's right, your Honor.

19         THE COURT:  Do we expect Ms. Kern back later today or

20   not until tomorrow?

21         MR. FINLEY:  No.  No.  Right after this witness, which

22   we hope will be brief.

23         THE COURT:  Okay.  So what time do I tell her to come

24   back?

25         MR. FINLEY:  Tell her to come back?

1        THE COURT:  1:00?  Or is --

2        MR. FINLEY:  30 minutes.

3        THE COURT:  All right.  So we'll just have you come

4   back like everyone else at 10:45.  I wasn't sure how long the

5   next witness is going to be.

6        MR. FINLEY:  Your Honor, we just don't want to risk

7   wasting the jury's time.  That's all.

8        THE COURT:  Okay.  So we'll just have you come back at

9   10:45.

10        MR. FINLEY:  She doesn't have enough time to go

11   anywhere.

12        THE COURT:  Okay.  Thank you.

13        (Recess taken at 10:29 a.m.)

14        THE COURT:  Let go ahead and bring in the jury.

15        (Whereupon, the jury enters at 10:50 a.m.)

16        THE COURT:  We're back on the record.

17        (Court reporter interruption.)

18        (Off the record discussion.)

19        (Whereupon, the jury exits at 10:52 a.m.)

20        (Whereupon, the jury enters at 10:57 a.m.)

21        THE COURT:  All right.  Everyone may be seated.

22        We're back on the record.  The record is working and

23   we're recording now, the original and a backup.  So we're good.

24   And we've got the jury here.

25        So my understanding is the Government's going to call

1  a witness out of order and there's no objection by the defense.

2  So the Government may call its witness.

3          MR. ZYTNICK:  Thank you, your Honor.  The Government

4  calls Leslie Pascarella testifying about Counts 4 and 11.

5          THE COURT:  Good morning, Ms. Pascarella.  Come on up.

6  You're going to be seated right here to my left.  Please be

7  careful with the steps on the way up.

8          THE COURTROOM ADMINISTRATOR:  Please raise your right

9  hand.

10         You do solemnly swear that the testimony you shall

11 give in the cause now pending before this Court shall be the

12 truth, the whole truth, and nothing but the truth, so help you

13 God?

14         THE WITNESS:  I do.

15         THE COURTROOM ADMINISTRATOR:  Thank you.  Please take

16 a seat.  For the record, please state and spell your name.

17         THE WITNESS:  Leslie Pascarella.  L-E-S-L-I-E.

18 P-A-S-C-A-R-E-L-L-A.

19         THE COURT:  Thank you.

20         All right.  Ms. Pascarella if you could please scooch

21 a little bit forward closer to the microphone as much as you

22 can.

23         And when you speak -- and it's not your fault; it's

24 our electronics.  When you speak, can you try to project your

25 voice to the juror with the striped shirt?  That way, we can

1    all hear you.

2             THE WITNESS:  Okay.

3             THE COURT:  Thank you.

4             You may proceed, Mr. Zytnick.

5                          LESLIE PASCARELLA,

6    called as a witness on behalf of the Government, having been

7    first duly sworn, was examined and testified as follows:

8                          DIRECT EXAMINATION

9    BY MR. ZYTNICK:

10   Q.  Good morning, Ms. Pascarella.

11   A.  Good morning.

12   Q.  Can you tell the jury where you live?

13   A.  Chattanooga, Tennessee.

14   Q.  About how long have you lived there?

15   A.  12 years.

16   Q.  Do you have kids?

17   A.  Three adult sons.

18   Q.  Are you employed right now?

19   A.  No, I'm retired.

20   Q.  What kind of work did you do before retiring?

21   A.  I was a teacher.

22   Q.  Is your husband named James Pascarella?

23   A.  Yes.

24   Q.  Did he pass away?

25   A.  He did.

—— 2:19-cr-00295-GMN-NJK ——

1   Q.  I'm sorry.

2          When was that?

3   **A.**  August 8, 2021.

4   Q.  Did you live with James?

5   **A.**  Yes.

6   Q.  How long were you two married?

7   **A.**  46 years.

8   Q.  Can you tell the jury a little bit about James?

9   **A.**  He was a loving husband, a good father.  He was a hard

10  worker.  He was an accountant for several large corporations,

11  worked his way up to be a controller.  He was also very active

12  in his church -- in our church, and, in fact, he preached at

13  jails, in nursing homes when he had a chance.

14  Q.  Can we actually show a photo of James?

15  **A.**  Certainly.

16  Q.  Is that -- is that your husband?

17  **A.**  That's him.

18  Q.  During the time from around 2014 to 2018, how often did you

19  see James?

20  **A.**  I lived with him.  Constantly.

21  Q.  Okay.

22          MR. ZYTNICK:  We can clear the photo, please.

23  BY MR. ZYTNICK:

24  Q.  At some point, did you realize that James was sending money

25  in the mail?

2:19-cr-00295-GMN-NJK

1   *A.*  Yes, I did.

2   *Q.*  What made you aware of that?

3   *A.*  His multiple orders for new checks which seemed kind of

4   over -- over the top, but -- and then difficulty at times in

5   paying bills.

6   *Q.*  Did you also see him receiving mail?

7   *A.*  Oh, yeah.

8   *Q.*  What kind of mail was James receiving during that period?

9   *A.*  He was receiving a lot of things that were labeled as

10  sweepstakes entries.  He was also receiving donation requests

11  and other things like that.

12  *Q.*  Did you -- when you were talking about James, did you

13  mention that he had served in Vietnam?

14  *A.*  He did.  He was recognized for his service during Vietnam.

15  *Q.*  Did you -- did he serve with distinction?

16  *A.*  He certainly did.

17  *Q.*  Going back to the mail, was some of the mail of a type

18  where it indicated in some way that James was receiving or

19  would receive money?

20  *A.*  Yes.

21  *Q.*  Did that mail require that James send in a sum of money?

22  *A.*  A lot of it did.

23  *Q.*  And do you have -- based on your knowledge, was James

24  sending money in the mail?

25  *A.*  To some of these organizations, yes.

1          MR. ZYTNICK:  Can we show Exhibit 27A, which has been

2     pre-admitted?

3               If we can zoom in on the top half.

4     BY MR. ZYTNICK:

5     Q.  Ms. Pascarella, do you recognize this -- well, do you

6     recognize the name and address on this check?

7     **A.**  Yes.

8     Q.  And it looks like this is a check drawn on an account at

9     Tennessee Valley.

10              Did James have an account at that bank?

11    **A.**  He had an individual account at Tennessee Valley Federal

12    Credit Union, yes.

13    Q.  And on the right side on the bottom, the signature --

14    **A.**  That is -- that is his signature.

15    Q.  Okay.  This is a $20 check payable to Pacific Disbursement

16    Reporting; is that correct?

17    **A.**  It seems to be, yes.

18    Q.  Now, if James wrote out a check like this, to your

19    knowledge, would he have then sent it in the mail?

20    **A.**  He would have sent it in the mail.

21          MR. ZYTNICK:  Let's go to Exhibit 27B, please, also

22    pre-admitted.

23    BY MR. ZYTNICK:

24    Q.  Is this also one of the checks that James appears to have

25    written?

1    *A.*   Yes.

2    *Q.*   And is this a check for $20 to Price Awards?

3    *A.*   Yes.

4    *Q.*   Based on your knowledge of what James was doing, would

5    James have sent this check in the mail?

6    *A.*   It would have been sent in the mail.

7    *Q.*   Now, were these the only two checks that James sent in the

8    mail?

9    *A.*   Oh, no.

10          MR. ZYTNICK:  Can we please take a look at Exhibit 27,

11   which is pre-admitted.

12   BY MR. ZYTNICK:

13   *Q.*   All right.  Now, you can see from the numbers at the

14   bottom, it's a 214-page document.

15          Have you had a chance to look at this previously?

16   *A.*   I have seen the stack and glanced at them.

17   *Q.*   All right.  And are these also checks written by James

18   Pascarella?

19   *A.*   Yes, they are.

20          MR. ZYTNICK:  We can just look at the first one?

21   BY MR. ZYTNICK:

22   *Q.*   That one says it's to Imperial Award Services; is that

23   correct?

24   *A.*   Yes.

25          MR. ZYTNICK:  And if we just scroll down to the next

1    page and then to page 3 -- or we can actually just keep on

2    going just a little bit to give a flavor.

3            I think that's good enough for now.  If the jury

4    wants, they can see the full stack at a later time.

5            Let's take a look at Exhibit 12, also pre-admitted,

6    and we can zoom in on the top.

7    BY MR. ZYTNICK:

8    Q.  All right.  Do you recognize your husband's name and

9    address on the left side of this form?

10   A.  I do.

11   Q.  And on the right side, there's a signature.

12           Do you --

13   A.  That is his signature, yes.

14           (Court reporter interruption.)

15   Q.  You said that his signature?

16   A.  That is his signature, yes.

17   Q.  Okay.  Did you ever see documents mailed that looked like

18   this at your house?

19   A.  Yes.

20   Q.  So on the left side, there's an area that says "Completion

21   Area."

22           Do you see that?

23   A.  Uh-huh.

24   Q.  And the first box, actually, where it says, "Yes, I've

25   enclosed $20 for fees," that's actually not checked; is that

1  correct?

2  **A.**  That's correct.

3  Q.  Now, in the middle, though, where it says, "Indicate method

4  of payment," which box is checked there?

5  **A.**  "Cash" is checked.

6  Q.  Now, did you ever have reason to think that James was

7  sometimes sending cash in response to some of these mailings?

8  **A.**  Yes, I do.

9  Q.  Why is that?

10  **A.**  Because of multiple ATM withdrawals which was out of his

11  normal way of operating.

12  Q.  Did you ever see any signs that you might have associated

13  with mental decline on James's part?

14  **A.**  There were, yes.

15  Q.  Can you briefly describe what you were seeing?

16  **A.**  He was not as quick in thought.  He would get fixated on

17  things.  He spent more time sitting back watching the

18  activities of his 12 grandchildren and -- rather than involving

19  himself in all that.

20  Q.  Now, had you noticed any of that or had you really noticed

21  it while he was still alive?

22  **A.**  Yes, I was trying to ignore it, I think, but it was coming

23  on.

24  Q.  How did these mailings and his responses to them, how did

25  that --

2:19-cr-00295-GMN-NJK

1          (Indiscernible simultaneous crosstalk.)

2          (Court reporter interruption.)

3   Q.  How did these mailings and his responses to them, from your

4   perception, how did those fit into his -- the mental decline?

5   A.  His decline?  He believed what he was reading.  He read

6   what the mailings wanted him to read with highlighted portions

7   and big print, ignoring the smaller print which gave all the

8   ifs and maybes and woulds or coulds or shoulds that made the

9   disclaimer -- you know, made it invalid.

10  Q.  Did you ever hear James talk about winning money or

11  receiving large amounts of money?

12  A.  Oh, yes.  He liked to talk about that.

13  Q.  What would he say?

14  A.  He said, "I'm going to get a million dollars.  We're going

15  to be able to -- to fix up the kitchen or replace the driveway

16  or" -- he was excited about this.

17  Q.  Who did James talk to about his expected winnings?

18  A.  Me, his kids, anybody that would listen.

19  Q.  Did -- well, did you ever see the mail itself that he was

20  responding to?

21  A.  The mail as it came in?  Yes.

22  Q.  What did you think of it?

23  A.  I thought it was all scam.

24  Q.  Did James ever win any money?

25  A.  Maybe a dollar here or there or -- or a bad piece of

1  jewelry or a trinket.

2  Q.  Did that ever stop him from sending in more money?

3  **A.**  No.

4  Q.  Did you or anyone else ever try to convince him not to send

5  more money?

6  **A.**  Yes.

7  Q.  Did that work?

8  **A.**  No.

9  Q.  From what you could tell, why did James keep sending money?

10  **A.**  He was doing what he thought was best to try to come up

11  with extra income for our retirement to make life easier, to

12  make us be able to travel, to enjoy life.

13  Q.  Did the fact that he was sending money, did that end up

14  impacting your family in any ways?

15  **A.**  Oh, yes.  It -- number one, the finances were our major

16  bone of contention.

17        And number two, it made life difficult for me as I was

18  trying to run the household and keep household expenses paid,

19  to have to penny-pinch and think about where the increase --

20  where the money was coming from.

21        MR. ZYTNICK:  Thank you.  No further questions.

22        THE COURT:  Any cross-examination?

23        MR. TANASI:  Briefly, your Honor.

24        THE COURT:  Yes.

25  ///

2:19-cr-00295-GMN-NJK

1                    CROSS-EXAMINATION

2  BY MR. TANASI:

3  *Q.*  Ma'am, I'm very sorry for your loss.

4  **A.**  Thank you.

5            MR. TANASI:  No further questions, your Honor.

6            THE COURT:  Mr. Gaffney?

7            MR. GAFFNEY:  No, your Honor.

8            MR. BROWN:  No.  Thank you, Judge.

9            THE COURT:  And Mr. Green?

10           MR. GREEN:  No questions, your Honor.  Thank you.

11           THE COURT:  At this time, if any members of the jury

12  have a question for Ms. Pascarella, please go ahead and write

13  it down on the form provided.  Write neatly, take your time.

14  Skip a line or number the questions if you have more than one.

15  And when you're all done, go ahead and fold the piece of paper

16  in half and pass it to our courtroom deputy.

17           Remember, we don't need your name or your jury number

18  or your initials.  Just anonymous questions.

19           THE COURTROOM ADMINISTRATOR:  Judge, we have three

20  questions.  And we'll start at number 44.

21           THE COURT:  Okay.  Thank you.

22           Counsel, please join me at side bar.

23           (At sidebar on record.)

24           THE COURT:  All right.  We have three jury notes.

25           The first one is jury note number 44, asks:  How much

1  did you lose, estimate?

2          MR. ZYTNICK:  The only caution we raise there is that

3  the amount she lost to this scheme is just a portion of much

4  larger losses.  And so I'd just flag that as a potential issue.

5  Otherwise, we have no objection to the question.

6          THE COURT:  So she might give an estimate of her total

7  loss and not just the loss related to these defendants?

8          MR. ZYTNICK:  Exactly.  Yes.

9          THE COURT:  Okay.  Any objection?

10         MR. TANASI:  No objection your Honor.  I think we can

11 follow up.

12         MR. GREEN:  No.

13         THE COURT:  Okay.  Jury note number 45 has a question

14 and follow-up.

15         The first one is:  Did you take steps, actions to

16 limit your husband's access to funds since he was mentally

17 deteriorating?

18         Any objection?

19         MR. ZYTNICK:  No objection.

20         MR. TANASI:  No objection.

21         THE COURT:  If yes, what actions did you take?

22         MR. ZYTNICK:  No objection.

23         MR. TANASI:  No objection.

24         THE COURT:  All right.  Jury note number 46 has one

25 question.  About how much money in total was sent in with the

—— 2:19-cr-00295-GMN-NJK ——

1    prize notification letters?

2            Any objection?

3            MR. ZYTNICK:  No objection.

4            MR. TANASI:  No objection.

5            THE COURT:  Thank you.

6            (End of discussion at sidebar.)

7            THE COURT:  All right.  We're back on the record.

8            Ms. Pascarella, I do have some jury questions for you.

9    I'm going to read them into the record, but when you respond,

10   please turn around and face the jury because these are really

11   jury questions, not mine.

12           THE WITNESS:  Okay.

13           THE COURT:  Okay.  So the first jury note is number

14   44.  And it asks one question:  How much did you lose,

15   estimate?

16           THE WITNESS:  That's hard to say.  After the fact, I

17   was told that there was somewhere around $6,000 that they knew

18   of.

19           THE COURT:  Jury note number 45 asks two questions.

20           The first one is:  Did you take steps or actions to

21   limit your husband's access to funds since he was mentally

22   deteriorating?

23           THE WITNESS:  No, I did not.  The deterioration was

24   not yet at the point where I felt that I needed to move from

25   being his wife to being his caretaker.  I was trying to let him

—— 2:19-cr-00295-GMN-NJK ——

1  be the husband he was as long as possible and, basically, this

2  was just a -- an individual fixation on trying to earn some

3  money.

4          THE COURT:  All right.  The follow-up was:  If yes,

5  what actions did you take?  But it sounds like you didn't take

6  any actions.

7          So jury note number 46 asks one question.  About how

8  much money total was sent in with the price notification

9  letters?

10         THE WITNESS:  I have absolutely no idea.

11         THE COURT:  All right.  Any follow-up, Mr. Zytnick?

12         MR. ZYTNICK:  Just one, please.  Maybe two or three,

13  but just same topic.

14                    REDIRECT EXAMINATION

15  BY MR. ZYTNICK:

16  Q.  That 6,000 you mentioned, could that involve multiple

17  schemes beyond the scheme that we're here today about?

18  A.  There could have been many more dollars than the scheme

19  we're here for today.

20  Q.  Okay.  And if we -- if the Government were to later present

21  evidence calculating the total number of checks, dollars, sent

22  by your husband, and that was less than $6,000, would you agree

23  that sort of the number that we calculate would be probably a

24  more accurate number?

25  A.  Certainly.

—— 2:19-cr-00295-GMN-NJK ——

1          MR. ZYTNICK:  No further questions.

2          THE COURT:  Any follow-up, Mr. Tanasi?

3          MR. TANASI:  Very briefly, your Honor.

4                    RECROSS-EXAMINATION

5    BY MR. TANASI:

6    Q.  Good morning, ma'am.

7    A.  Good morning.

8    Q.  I'm Rich Tanasi.  I represent Mario Castro.  Couple of

9    quick questions for you.

10          You don't know who I am, right?

11   A.  Correct.

12   Q.  We've never met, fair?

13   A.  Correct.

14   Q.  Same thing for Mr. Mario Castro, no idea who he is, right?

15          MR. ZYTNICK:  Your Honor, I object this as being

16   outside the scope of the jury questions.

17          MR. TANASI:  Your Honor, I would submit that the

18   question related to the number of potential schemes that her

19   husband potentially fell victim to, and I'm just getting to the

20   point to clarify that the individuals in this courtroom aren't

21   necessarily even alleged to be part of any of those schemes.

22          THE COURT:  All right.  You can -- you can inquire as

23   to her understanding.

24          MR. TANASI:  Fair enough.  Thank you, your Honor.

25   ///

--- 2:19-cr-00295-GMN-NJK ---

1    BY MR. TANASI:

2    Q.  Your husband, at one point, did receive, you think, a

3    dollar at some point maybe or a couple dollars here and there?

4    **A.**  Uh-huh.  Yes.

5    Q.  And also received dream-catchers?  Does that sound right?

6    **A.**  Trinkets.

7    Q.  Trinkets.  Right.

8            Those are different than sweepstakes --

9    **A.**  Yes.

10   Q.  -- correct?  Right.

11           Husband, fair to say, in his failing state -- and I'm

12   sorry to hear about that -- was part of several different

13   schemes, fair?

14   **A.**  Probably.

15   Q.  Kind of fell victim to several different, right?

16   **A.**  Probably.

17   Q.  All right.  So that $6,000 that you put out there, do you

18   know what alleged scheme that's attributed to?

19   **A.**  That $6,000 I put out there was from this situation that

20   we're here for today.

21   Q.  And that's based on your accounting of the checks that you

22   looked at earlier?

23   **A.**  That's based on what I have been told, yes.

24   Q.  What you've been told?

25   **A.**  Uh-huh.

1    Q.   Who told you?

2    A.   The postal inspectors.

3    Q.   Okay.  So the postal inspectors have told you how much they

4    believe that your husband lost?

5    A.   Yes.

6    Q.   Because you, fair to say, don't know that for yourself?

7    A.   I do not know that for myself.

8    Q.   All right.  Thank you.

9            MR. TANASI:  Pass the witness.

10           THE COURT:  Mr. Gaffney?

11           MR. TANASI:  One last question.  I apologize.

12           THE COURT:  Okay.

13   BY MR. TANASI:

14   Q.   Do you recall which postal inspector gave you that

15   information?

16   A.   There were several that I talked to.

17   Q.   Okay.  Mr. Bouchie?

18   A.   Yes.

19   Q.   Okay.  Any others?  You said several.  Do you happen to

20   remember their names by any chance?

21   A.   I think he probably is the one who told me.

22   Q.   Okay.  All right.  Thank you, ma'am.

23           THE COURT:  Mr. Gaffney?

24           MR. GAFFNEY:  No questions, your Honor.  Thank you.

25           MR. BROWN:  No, thank you, Judge.

1          THE COURT:  Mr. Green?

2          MR. GREEN:  No questions again.  Thank you.

3          THE COURT:  Any follow-up questions, Mr. Zytnick?

4          MR. ZYTNICK:  Yes.  Just something to make sure the

5     record is clear on this.

6                    FURTHER REDIRECT EXAMINATION

7     BY MR. ZYTNICK:

8     *Q.*  If the -- if the number -- the dollar amount you were told

9     by a postal inspectors was a smaller amount, maybe not $6,000,

10    would that be the actual dollar amount like --

11    *A.*  I saw a stack of photocopies.  I did not add them up.  I

12    did not total to find out what the money amount was.  I was --

13    it was estimated to me at six.

14    *Q.*  Okay.  I guess what I'm trying --

15    *A.*  If it's less, I'm not questioning it.

16    *Q.*  Okay.

17          MR. ZYTNICK:  Court's indulgence for a moment, your

18    Honor.

19          No further questions, your Honor.

20          THE COURT:  All right.  Any other follow-up questions

21    from the defense?  Mr. Tanasi?

22          MR. TANASI:  No, your Honor.  Thank you.

23          THE COURT:  Mr. Gaffney?

24          MR. GAFFNEY:  No, your Honor.

25          THE COURT:  Mr. Brown?

1             MR. BROWN:  No.

2             THE COURT:  Mr. Green?

3             MR. GREEN:  No, your Honor.  Thank you.

4             THE COURT:  Thank you very much, Ms. Pascarella, for

5     your -- the information and testimony you provided today.  This

6     does conclude your service, so thank you very much.  You are

7     excused.

8             THE WITNESS:  Thank you.

9             THE COURT:  Please be careful on the way down with

10    those steps, though.

11            THE WITNESS:  Yes, ma'am.

12            THE COURT:  Thank you.

13            And we do have time to recall Ms. Kern?  Is she

14    available?

15            MR. FINLEY:  I believe so, your Honor.

16            THE COURT:  All right.  Let's have Ms. Kern come back

17    to the witness stand then.

18            Good morning again, Ms. Kern.  Come on up and please

19    be careful with the steps.  And I do remind you:  You are still

20    under oath to tell the truth.

21                   DIRECT EXAMINATION CON'T.

22    BY MR. FINLEY:

23    Q.  We were talking about the defendant Salvador Castro.

24            MR. FINLEY:  If we could please have his picture

25    published again.

1          MR. GREEN:  What exhibit is that, counsel, please?

2          MR. FINLEY:  It's not an exhibit.  It's just a picture

3    that we've published previously without objection from you.

4          MR. GREEN:  Yes, sir.  That's fine.  We'd like some

5    kind of a reference, your Honor.

6          Thank you.

7    BY MR. FINLEY:

8    Q.  Is that Salvador Castro?

9    A.  Yes, it is.

10   Q.  At some point, did you help manage mailing companies that

11   had been opened by Salvador Castro?

12   A.  Yes, sir.

13          MR. FINLEY:  Can we have Government Exhibit 280 on the

14   screen, please?  This is the chart of mailing companies.

15   BY MR. FINLEY:

16   Q.  Do all of these companies on this chart have something in

17   common?

18   A.  Well, they're all the fraudulent mail companies.  They

19   mailed -- they were the fraudulent mailers.  This is a list of

20   those companies.  And they're all -- have some affiliation with

21   the Castros.

22   Q.  How do you know that?

23   A.  By looking at the company names, who the president and who

24   the bank accounts are under.

25   Q.  Right.

—— 2:19-cr-00295-GMN-NJK ——

1          Now, this is a chart that's prepared from records?

2    *A.*  Yes.

3    *Q.*  Do you have an independent memory that all of these mailing

4    companies are affiliated with the Castros?

5    *A.*  Yes.

6    *Q.*  Did you do work on all of these mailing companies?

7    *A.*  Yes.

8    *Q.*  Look at the row that says "Golden Products Service, Inc."

9          Do you see that?

10   *A.*  Yes.

11   *Q.*  Did you -- back when you were working on that company, did

12   you refer to it by anything for short?

13   *A.*  GPS.

14   *Q.*  Who is the president of GPS in 2014?

15   *A.*  It's Salvador Castro.

16   *Q.*  Who opened the bank account?

17   *A.*  Salvador Castro.

18   *Q.*  And is what is written on this chart consistent with your

19   memory?

20   *A.*  Yes.

21   *Q.*  The next row says "Imperial Award Services, a dba of GPS."

22          Did you refer to this by anything for short?

23   *A.*  IAS.

24   *Q.*  Who opened the IAS bank account in 2014?

25   *A.*  Salvador Castro.

—— 2:19-cr-00295-GMN-NJK ——

1  *Q.*  Is that consistent with how you remember it?

2  *A.*  Yes.

3  *Q.*  The next row says "Montgomery Marketing" -- I'm sorry.  It

4  says "MMI," actually, "dba of GPS."

5        Do you see that?

6  *A.*  Yes.

7  *Q.*  Who is the president?

8  *A.*  Salvador Castro.

9  *Q.*  And who opened the bank account?

10  *A.*  Salvador Castro.

11  *Q.*  And then the last entry is "Montgomery Marketing Inn, dba

12  of GPS."

13        President?

14  *A.*  Salvador Castro.

15  *Q.*  And who opened the bank account?

16  *A.*  Salvador Castro.

17        MR. FINLEY:  We can clear this screen.  Thank you.

18  BY MR. FINLEY:

19  *Q.*  Now, when GPS got started in 2013, who was your real

20  partner?

21        And by "real partner," I mean, who did you split the

22  profits with?

23  *A.*  Epi Castro.

24  *Q.*  And we're talking 2013 right now?

25  *A.*  Yes.

1    *Q.*  All right.  Do you know anything -- did you have any

2    conversations about how Salvador Castro's name ended up on this

3    company if Epi Castro was your real partner?

4    *A.*  Epi would have made that decision.  He would have gone to

5    him evidently and put his name on it.  I didn't -- I didn't

6    solicit Salvador to open a bank account or open a company.

7    *Q.*  Did Salvador get anything for -- for putting his name on

8    this company?

9    *A.*  Yes.

10   *Q.*  What did he get?

11   *A.*  Epi would instruct us to file -- Epi would instruct me on

12   the amount to give him in the beginning.

13   *Q.*  And who made the decision in the first place to pay money

14   to Salvador Castro for the use of his name?

15   *A.*  Epi Castro.

16   *Q.*  And what about these other companies that we talked about,

17   IAS and MMI, did you also pay Salvador Castro for the use of

18   his name on those companies?

19   *A.*  He would have gotten paid, yes.

20   *Q.*  Was it your decision to do that?

21   *A.*  No.

22   *Q.*  Whose decision was it?

23   *A.*  Whoever was the main entity behind those companies.

24   *Q.*  Okay.  And I recognize there were a lot of companies.

25   *A.*  Yes.

1  *Q.*  Can you recall, as you sit there, who was the real partner

2  on IAS, for example?

3  **A.**  That would have been Epi.

4  *Q.*  What about MMI?

5  **A.**  MMI wasn't Epi.  MMI was -- I believe it was Mario Castro.

6  *Q.*  I'd like to show you Government Exhibit 282A and Government

7  Exhibit 282B.

8          MR. FINLEY:  Those are not admitted.

9  BY MR. FINLEY:

10  *Q.*  Do you have those exhibits in front of you?

11  **A.**  Yes.

12  *Q.*  Do you recognize those?

13  **A.**  Yes.

14  *Q.*  What are they?

15  **A.**  Those are -- that were checks written to Salvador Castro

16  from Golden Products Services, Inc. in the amount of -- and

17  that was for -- I was instructed to write those by Epi, told me

18  that was what I was to give Salvador.

19  *Q.*  All right.

20          MR. FINLEY:  Your Honor, move to publish Government

21  Exhibits 282A and B.

22          (Government Exhibits 282A and 282B offered.)

23          THE COURT:  Any objection to Exhibit 228A and B?

24          MR. TOMSHECK:  I think the request was to publish.  I

25  don't think they're admitted.

2:19-cr-00295-GMN-NJK

1           MR. FINLEY:  Did I say publish?

2           THE COURT:  Yes.

3           MR. FINLEY:  Admit and then publish.

4           THE COURT:  All right.  So any objection to

5    Exhibit 228A and B to admit?

6           MR. TOMSHECK:  No objection.

7           MR. BROWN:  No objection, your Honor.

8           MR. GAFFNEY:  No, your Honor.

9           MR. GREEN:  Indulgence for one moment, your Honor, if

10   I could speak with counsel.

11          (Counsel conferring.)

12          MR. GREEN:  No objection, your Honor.  Thank you.

13   Thank you, counsel.

14          THE COURT:  Exhibit 282A and B is admitted and may be

15   published to the jury.

16          (Government Exhibits 282A and 282B admitted.)

17   BY MR. FINLEY:

18   Q.  So one is a check, 282A.  That's a check to Golden Products

19   Service, Inc. -- or from Golden Products Service, Inc.?

20   A.  Correct.

21   Q.  And 282B is a check from Golden Products Service, Inc., dba

22   MMI?

23   A.  Oh, I -- yes.

24   Q.  Okay.  So those are checks for two different mailing

25   companies?

1   *A.*   Yes.

2   *Q.*   What's the amount on the check?

3   *A.*   $400.

4   *Q.*   What's the date on the first one?

5   *A.*   July 6, 2015.

6   *Q.*   What's the date on the second one?

7   *A.*   February 6, 2017.

8   *Q.*   And what were these checks for?

9   *A.*   Those were what I was instructed to write to Salvador as

10  payment -- I -- for his name being on the companies, is what I

11  understood it for.

12  *Q.*   That's what we were just talking about?

13  *A.*   Correct.

14  *Q.*   So do these two exhibits support your recollection?

15  *A.*   Yes.

16  *Q.*   Now, would there be a lot of checks that look like these

17  two?

18  *A.*   Yes.

19  *Q.*   And if we looked at the bank records for the companies, you

20  would expect us to find many such checks?

21  *A.*   Yes.

22  *Q.*   Could there have been as many as 30?

23  *A.*   Yes.

24  *Q.*   The bank records could tell us a more precise number?

25  *A.*   Yes, sir.

─────── 2:19-cr-00295-GMN-NJK ───────

1    Q.  At some point, in addition to putting his name on company

2    documents, did Salvador Castro become your partner on mailing

3    companies?

4    **A.**  Yes.  His -- his amount increased.

5    Q.  And, again, when I use the word "partner," I mean the

6    person or persons that you were splitting the profits with?

7    **A.**  Yes.

8    Q.  Did Salvador Castro receive any profit payments from you?

9    **A.**  Yes.

10   Q.  What form did the profit payments take?

11   **A.**  Both check and cash.

12   Q.  Let me show you Government Exhibit 106D, 106C, and 106B.

13          MR. FINLEY:  Those are not admitted.

14   BY MR. FINLEY:

15   Q.  Have you had a chance to look at those three exhibits?

16   **A.**  I have two.

17   Q.  You've seen two?

18   **A.**  I see C and I see B.  There's -- there's D.  Okay.  Yes.

19   Q.  All right.  What are those?

20   **A.**  Those would be considered disbursement checks.

21   Q.  Considered by who?

22   **A.**  Myself and Salvador.

23          MR. FINLEY:  Your Honor, I move to admit 106D, C, and

24   B.

25          (Government Exhibits 106B, 106C, and 106D offered.)

1          THE COURT:  Any objection to Exhibit 106 B, C, and D?

2          MR. TOMSHECK:  No, your Honor.

3          MR. GAFFNEY:  No, your Honor.

4          MR. BROWN:  No, your Honor.

5          MR. GREEN:  No, your Honor.

6          THE COURT:  Okay.  Exhibit 106B, C, and D are admitted

7   and may be published.

8          (Government Exhibits 106B, 106C, and 106D admitted.)

9          MR. FINLEY:  Okay.  Let's start with D, please.  It's

10  all the way on the left at the bottom.

11         Okay.  That's B.  But that's fine.  We can leave that

12  up there.  We'll just start with that.

13  BY MR. FINLEY:

14  Q.  Is that a $700 check to Salvador Castro?

15  A.  Yes.

16  Q.  Whose handwriting is on it?

17  A.  Mine.

18  Q.  What's the company name at the top of the check?

19  A.  Global Data Funding, Inc.

20  Q.  What is that?

21  A.  It's a fraudulent prize notice mailing company.

22  Q.  And what about 106D?  Same thing?

23  A.  Yes, sir.

24  Q.  $700 to Salvador Castro?

25  A.  Yes.

1    Q.  And the name at the top is Global Data Funding?

2    A.  Yes.

3    Q.  Let's look at 106C.  Again, this is a $700 check to

4    Salvador Castro?

5    A.  Yes.

6    Q.  And it's from Global Data Funding?

7    A.  Yes.

8    Q.  Did you write all these checks?

9    A.  Yes.

10   Q.  What was the purpose of the checks?

11   A.  Those were his part of the profit sharing.

12   Q.  The checks are from late 2017.

13            When did he become a partner with you?

14   A.  I'm not sure on the exact as far as a date goes because it

15   started out being -- his name being on it and then it went to

16   him actually getting a bigger percentage.

17   Q.  And at the time that he got the bigger percentage --

18   A.  Yes.

19   Q.  -- was that when he started getting checks like this or --

20   so those were at the same time?

21   A.  Yes.

22   Q.  Did you ever make Salvador Castro's profit check out to

23   another person?

24   A.  Yes.

25   Q.  Who was that person?

─── 2:19-cr-00295-GMN-NJK ───

1   *A.*   I believe it was his daughter.

2   *Q.*   Did someone tell you to do that or was it your decision to

3   do that?

4   *A.*   No.  I was instructed to make it out a certain way.

5   *Q.*   Who instructed you to make Salvador's checks out to his

6   daughter?

7   *A.*   I -- I can't remember.  I really can't.  It -- it would

8   have came from some -- one of the brothers or -- somebody

9   instructed me to do it.

10   *Q.*   Is the number of people who would have been in a position

11   to instruct you to do that limited?

12   *A.*   Yes.

13   *Q.*   Okay.  Who are the people who might have instructed you to

14   do that?

15   *A.*   It might have been --

16          MR. GREEN:  Objection.  Calls for speculation, your

17   Honor.  She either knows or she doesn't.  She can't remember.

18          THE COURT:  Overruled.  She's providing the list of

19   limited individuals who would have the ability to instruct her

20   on that particular request.  So it's overruled.

21   BY MR. FINLEY:

22   *Q.*   You may answer.

23   *A.*   I may answer?  More than likely, it would have been either

24   Epi or Mario.

25   *Q.*   You're not sure which?

1    *A.*  No.

2    *Q.*  Could it have been anyone else?

3    *A.*  No.

4    *Q.*  Was it your understanding that the instruction was

5    something that Salvador wanted or was it something that you

6    were being told in secret to secretly make a check --

7            MR. GREEN:  Objection.  Calls for speculation.  And

8    objection.  Foundation.

9            MR. FINLEY:  If I could just finish my question before

10   the objection.

11           THE COURT:  Yes, finish the question.

12           MR. FINLEY:  Okay.

13   BY MR. FINLEY:

14   *Q.*  Was it your understanding when you received this

15   instruction that it was a secret instruction that Salvador

16   Castro was not supposed to know about?  Or was it your

17   understanding that this was being done with Salvador Castro's

18   consent?

19   *A.*  With his consent.

20   *Q.*  When somebody told you to make checks out to Salvador

21   Castro's daughter, did you write it down somewhere?

22   *A.*  Yes.

23   *Q.*  What did you write it down on?

24   *A.*  I wrote it on a Post-It note and stuck it up so that when I

25   made his check out, I would remember to make it out to that

1    person.

2         MR. FINLEY:  Let's have a look at Government

3    Exhibit 84.  That's already been admitted.

4    BY MR. FINLEY:

5    Q.  Do you see that?

6    A.  Yes.

7    Q.  Is that the Post-It note that you were talking about?

8    A.  Yes.

9    Q.  What does it say?

10   A.  "Angeles Castro."

11   Q.  And then --

12   A.  "Make Salvador's check out to," and that person.

13   Q.  What's it taped to?

14   A.  A desk.

15   Q.  And was this desk -- where was the desk?

16   A.  In my office.

17   Q.  Was that note sitting there on your desk in your office on

18   the day that the search warrants got executed?

19   A.  Yes.

20        MR. FINLEY:  Let's take a look at Government

21   Exhibit 240, which has been admitted in evidence.

22        Could we blow up the top by the photo and the text

23   next to it?

24   BY MR. FINLEY:

25   Q.  Is there an address on this driver's license information?

1    *A.*  Yes.

2    *Q.*  What's the address, just the street number and name,

3    please?

4    *A.*  5685 Sentry Palm Court.

5              MR. FINLEY:  If we could take that down and put up

6    previously admitted Government Exhibit 93 on the screen at

7    page 7.

8              If we could blow up the license, please.

9              Thank you.

10    BY MR. FINLEY:

11    *Q.*  What is Salvador Castro's address according to this

12    driver's license?

13    *A.*  5685 Sentry Palm Court.

14    *Q.*  Do Salvador Castro and Angeles Castro have the same name on

15    their driver's licenses -- or same address, rather?

16    *A.*  Yes, sir.

17    *Q.*  Did you actually follow the instruction to start making

18    Salvador Castro's checks out to Angeles Castro?

19    *A.*  I did.

20              MR. FINLEY:  Let's take a look at Government

21    Exhibit 107A.  It's not admitted.

22    BY MR. FINLEY:

23    *Q.*  Do you have that check in front of you?

24    *A.*  Yes, I do.

25    *Q.*  What is it?

1    **A.**  It is a check made out to Angeles Castro from Global Data

2    Funding for $500.

3          MR. FINLEY:  Move to admit, your Honor.

4          (Government Exhibit 107A offered.)

5          THE COURT:  Any objection to Exhibit 107A?

6          MR. TOMSHECK:  No, your Honor.

7          MR. GAFFNEY:  No, your Honor.

8          MR. BROWN:  No, your Honor.

9          MR. GREEN:  No, your Honor.  No objection.

10         THE COURT:  All right.  Exhibit 107A is admitted and

11    may be published to the jury.

12         (Government Exhibit 107A admitted.)

13         MR. FINLEY:  If we could blow up the check part,

14    please.

15    BY MR. FINLEY:

16    *Q.*  Who wrote the check?

17    **A.**  I did.

18    *Q.*  What's the company name at the top of the check?

19    **A.**  Global Data Funding, Inc.

20    *Q.*  When did you write it?

21    **A.**  January 30, 2018.

22    *Q.*  Who did you make it out to?

23    **A.**  Angeles Castro.

24    *Q.*  Look at the date.  January 30, 2018?

25    **A.**  Yes, sir.

2:19-cr-00295-GMN-NJK

1  *Q.*  Was that about three weeks before federal agents searched

2  your home?

3  **A.**  Yes, it was.

4  *Q.*  Now, there was testimony in this trial that Salvador Castro

5  told federal agents that he didn't know you and that he didn't

6  recognize your photo.

7       As of February 2018, how long had you known Salvador

8  Castro?

9  **A.**  Several years.

10  *Q.*  Have you written checks to him from different mailing

11  companies?

12  **A.**  Yes, sir.

13  *Q.*  What do you think the -- I know it's -- you don't have an

14  exact number, but approximately or roughly, what amount of

15  money did you pay to Salvador Castro out of mailing companies,

16  both in fees for the use of his name and in profit payments?

17  **A.**  I can't give an exact amount.  They all would have been

18  checks and there would have been cash, also.  Again, I would

19  just be guessing.

20  *Q.*  Was the amount more than thousands of dollars?

21  **A.**  It was over a couple thousand dollars especially, yes.

22  *Q.*  Did those checks get deposited or did they get returned

23  back to you?

24  **A.**  No.  They would have been deposited.

25  *Q.*  Did you deliver cash envelopes to Salvador Castro in the

1    six-month period before February 2018?

2    *A.*   Yes.

3    *Q.*   When you handed cash envelopes to him, did he appear to

4    recognize you?

5    *A.*   Yes.

6    *Q.*   Have you had conversations with him?

7    *A.*   Yes.

8    *Q.*   What kinds of things have you talked about?

9    *A.*   Horse racing.

10   *Q.*   Anything else?

11   *A.*   No.  Just pleasantries.  That was it.

12   *Q.*   What kind of pleasantries?

13   *A.*   Just hello, how you doing, type thing.

14   *Q.*   When you spoke with him or you said hello to him, did he

15   sometimes say your name?

16   *A.*   Yes.

17   *Q.*   Like you might say, "Hi, Salvador"?

18          Did you say that?

19   *A.*   Yes.

20   *Q.*   And tell the jury what he would say back at times.

21   *A.*   "Hi, Patti."

22   *Q.*   I'd like to spend a little bit of time talking about how

23   this scheme worked.

24          Let's start with the mailing companies.

25          MR. FINLEY:  Government Exhibit 280.  That's been

1   admitted.

2   BY MR. FINLEY:

3   Q.  You testified earlier that these are mailing companies that

4   you and the four defendants used?

5   A.  Yes, sir.

6   Q.  And did -- what did you use them all for?

7   A.  For mailing out the -- the fraudulent prize notices.

8   Q.  Did you use them for any other kind of business?

9   A.  No.

10  Q.  Do you recognize that -- all of the companies on the chart,

11  all of them?  Take a look.

12  A.  I recognize all of them.

13  Q.  Did you actually use all of these companies to send out

14  mail?

15  A.  The Montgomery Marketing Inn, no.

16  Q.  You're not sure about that one?

17  A.  No.  I'm not sure, no.

18  Q.  So except for that one, did you and the four defendants

19  send out fraudulent mail bearing the names of each one of these

20  mailing companies?

21  A.  Yes.

22  Q.  And did victims, except for Montgomery Marketing Inn,

23  except for that one, did victims send back checks written to

24  each of these companies?

25  A.  Yes, sir.

2:19-cr-00295-GMN-NJK

1    Q.   What happened to the checks when they got back to you?

2    A.   They were deposited into each of the company's bank

3    accounts.

4    Q.   And did all of these companies, with the possible exception

5    of Montgomery Marketing Inn, have bank accounts that the checks

6    you're mentioning went into?

7    A.   Yes, sir.

8    Q.   Who actually physically took the checks and deposited them?

9         Was it you?

10   A.   No.  It was Andrea Burrow.

11   Q.   Who's that?

12   A.   She was a gal that worked, basically, for all the

13   companies.  And that's what she did.  She opened the mail.  She

14   made the deposits into the bank.

15        And then she did what was called keying, which on each

16   of the respondents that came back, there's a code, and that

17   code would be typed in and then entered into a database so that

18   you had in there that they paid and how much and so on.

19   Q.   So she did -- she deposited checks, she entered information

20   about each person who responded into a database.

21        Is that -- do I understand that?

22   A.   Correct.

23   Q.   Did she do anything else?

24   A.   She would pick up the mail from me and she would give me

25   back any correspondence and any -- and the cash to be given

1  out.

2  Q.  Now, you mentioned cash just now.  We saw cash envelopes.

3       I take it the victims sometimes sent the cash?

4  A.  Yes, sir.

5  Q.  And how would Andrea Burrow sort the cash?

6  A.  She would bundle it according to the company that it came

7  back under.

8  Q.  And then what did she do with it?

9  A.  Give it to me.

10  Q.  And then what did you do with it?

11  A.  I split it between the owner of the company and myself.

12  Q.  Now, this chart that we're looking at, Government

13  Exhibit 280, does that chart show every single mailing company

14  that you and the four defendants ever used during the 2010 to

15  2018 time period?

16  A.  (Unintelligible).

17       (Court reporter interruption.)

18  Q.  Could you repeat that answer, please?

19  A.  That GAM is not on this list.

20  Q.  Okay.  The GAM mailing company does not appear on

21  Government Exhibit 280?

22  A.  No.  That's the only one.

23  Q.  And I think you were explaining that that company wasn't

24  very -- around for very long?

25  A.  It was only in business for a couple of months.

1   Q.  And we looked at the cease and desist for that company

2   earlier, right?

3   **A.**  Yes.

4   Q.  That was in May 2012?

5   **A.**  Yes.

6   Q.  So there may be some mailing companies from the early days

7   that weren't around very long that are not shown on this chart?

8   **A.**  Maybe one, but, again, that -- that -- these are the main

9   mailing companies.

10  Q.  What about Promotional Marketing Solutions?  Do you

11  recognize that name?

12  **A.**  I do.

13  Q.  Is it on the chart?

14  **A.**  No.

15  Q.  And was that a company that you had your husband put his

16  name on?

17  **A.**  Yes.  He put his name on a company -- opened a company.

18  Q.  What happened to that company?

19  **A.**  It was shut down in a very short period of time.

20  Q.  Okay.  So we're talking about GAM.  Now we have

21  promotional --

22  **A.**  PMS.

23  Q.  -- Marketing Solutions?

24  **A.**  Yes.

25  Q.  Just make sure we don't talk at the same time for the court

─── 2:19-cr-00295-GMN-NJK ───

1    reporter.

2            What did you call Promotional Marketing Solutions for

3    short?

4    **A.**   PMS.

5    Q.   And both GAM and PMS were shut down after a short while,

6    you said?

7    **A.**   Yes.

8    Q.   Okay.  So that's not on here?

9    **A.**   No.

10   Q.   Did it make much money?

11   **A.**   No.

12   Q.   Was it shut down a long time ago?

13   **A.**   Yes.

14   Q.   But the companies that are on here, I think you're trying

15   to say, this is pretty close to all of them?

16   **A.**   Yes, sir.

17   Q.   Based on your memory?

18   **A.**   Yes, sir.

19   Q.   Is there at least one mailing company being opened every

20   year from 2010 to 2017?

21   **A.**   Yes.

22   Q.   Did the Castro family letter shop produce and mail all of

23   the prize notices that went out under the names of these

24   companies?

25   **A.**   Yes, sir.

—— 2:19-cr-00295-GMN-NJK ——

1  Q.  Did the defendant Mario Castro work at the Castro family

2  letter shop for most of the period between 2010 and 2018?

3  **A.**  Yes.

4  Q.  Did the defendant Miguel Castro work at the letter shop for

5  most of that same period?

6  **A.**  Yes.

7  Q.  Same question for defendant Salvador Castro:  Was he

8  working at the letter shop for most of the conspiracy period on

9  a part-time basis?

10  **A.**  Yes.

11  Q.  Did the defendant Jose Luis Mendez work at the letter shop

12  for most of the conspiracy period?

13  **A.**  Yes.

14  Q.  Did all of the money that these companies made come from

15  fraud victims?

16  **A.**  Yes.

17  Q.  Are there names of people that you don't know on Government

18  Exhibit 280?

19  **A.**  Yes.

20  Q.  Which ones?

21  **A.**  Jose Reyes, Maria De Los Angeles Ramirez, Jose Garcia.

22  Q.  Did you mean to say Jesus?

23  **A.**  Jesus.

24  Q.  Okay.  Keep going, please.

25  **A.**  Ubaldo Casillas.

─── 2:19-cr-00295-GMN-NJK ───

1    Q.  Okay.

2    A.  Mark Lee Jordan.  Those are it.

3    Q.  The people that you just mentioned, you don't know them?

4    A.  No.

5    Q.  Have you seen -- have you seen or heard any documents or

6    had any conversations that these people were actually involved

7    in running these mailing companies?

8    A.  Explain that a little bit better -- explain --

9    Q.  Okay.  Let me ask a different question.

10            Did you write profit distribution checks to any of

11   these people?

12   A.  No.

13   Q.  Did any of these people -- I know you don't know them, but

14   did any of them relay instructions to you through the people

15   you were working with?

16   A.  No.

17   Q.  Did any of these people get envelopes full of cash from

18   you?

19   A.  No.

20   Q.  Was it your job to find the people who put their names on

21   these companies?

22   A.  No.

23   Q.  Who had that job?

24   A.  Whoever wanted to open the company.

25   Q.  Let's look at one of these prize notices.

1          MR. FINLEY:  Can we please put Government Exhibit 1F

2    on the screen.  This has already been admitted.

3    BY MR. FINLEY:

4    Q.  What are we looking at on page 1 of Government's

5    Exhibit 1F?

6    **A.**  This is what would be considered the OSE, the outside

7    envelope, for S.M.M.I., one of the mailing companies.

8    Q.  What does it say approximately in the middle above the

9    address part in big bold letters?

10   **A.**  "Legal S.M.M.I. Notification."

11   Q.  Was it really a legal notification?

12   **A.**  No.

13   Q.  Who is it addressed to?

14   **A.**  A Betty Stirewalt.

15   Q.  And where does Betty Stirewalt live according to this

16   envelope, just the city and state, please?

17   **A.**  Kannapolis, North Carolina.

18   Q.  And in the top right, was this envelope actually mailed?

19          Do you need --

20   **A.**  No.  Because you said top right?

21   Q.  Right.  I was just -- I'm taking your attention away from

22   that and then over to the top right.

23          Do you see where it says, "Mailed from ZIP

24   900-something"?

25          Was this envelope mailed?

--- 2:19-cr-00295-GMN-NJK ---

1   **A.**   Yes.

2   *Q.*   There's a stamp on there in blue.  Maybe it's purple.  What

3   does that say?

4   **A.**   It says, "Return within seven days."

5   *Q.*   What did you --

6   **A.**   "Avoid" -- "avoid" -- I think it says (unintelligible).

7           (Court reporter interruption.)

8   **A.**   I think it says, "Return within seven days to avoid

9   delinquency."  I can't make it out.

10  BY MR. FINLEY:

11  *Q.*   Could it be "disqualification"?

12  **A.**   Maybe.  Could be, yes.

13  *Q.*   Maybe it's de-qualification?

14  **A.**   That's what it looks like is "de-qualification."

15  *Q.*   Is that even a word?

16  **A.**   I don't know.  No.

17  *Q.*   What did you want people to think when they got this type

18  of an envelope?

19  **A.**   To think it was important, that they needed to open it and

20  they needed to get it back, get the contents back right away.

21          MR. FINLEY:  Let's look at the second page.

22  BY MR. FINLEY:

23  *Q.*   This is the first full page of what's inside the envelope.

24          What does it say at the top?

25  **A.**   "Final Winner's Contact Attempt Letter."

2:19-cr-00295-GMN-NJK

1   *Q.*  And it says again over in the blue print that's in all caps

2   on the left-hand side in the middle, "Official S.M.M.I. Legal

3   Notification."

4            Is this a real legal notice?

5   **A.**  No.

6   *Q.*  There's some initials.  It appears that this letter was

7   authorized by somebody with the initials J.U.S.

8            Do you see that?

9   **A.**  Yes.

10  *Q.*  Is that true?

11  **A.**  No.

12  *Q.*  Is J.U.S. a real person?

13  **A.**  No.  It's all fictitious.

14  *Q.*  On this page, he calls himself the head disbursement

15  officer for S.M.M.I. Worldwide.

16           Do you see that?

17  **A.**  Yes.

18  *Q.*  And then there's a line in the next paragraph, it's bolded,

19  all caps, underlined.

20           Do you see that?

21  **A.**  Yes.

22  *Q.*  "You are confirmed and verified to receive the $1,200,000

23  winner's prize eligibility package."

24  **A.**  Yes.

25  *Q.*  Is any of that true?

— 2:19-cr-00295-GMN-NJK —

1    *A.*  No.

2    *Q.*  The next line says, "This is a hundred percent certainty."

3         Is that true?

4    *A.*  No.

5    *Q.*  What did you want people to think when they read this?

6    *A.*  That they had won lots of money.

7    *Q.*  Let's go down further a little bit.

8         In bold, there's a sentence that begins, "Have you

9    checked your records?"

10        Do you see that?

11   *A.*  Yes.

12   *Q.*  "Have you checked your records?  Do you recall entering a

13   monies giveaway or competition by mail anytime in the past

14   eight months?  You have been declared a successful entrant for

15   new monies and we have made attempt after attempt to contact

16   you."

17        And then down there at the bottom, it says, "Betty, I

18   can't understand it.  We have sent out three notices."

19        Do you see that?

20   *A.*  Yes.

21   *Q.*  Is any of this true?

22   *A.*  No.

23        MR. FINLEY:  Let's take a look at the next page,

24   please.

25   ///

——2:19-cr-00295-GMN-NJK——

1   BY MR. FINLEY:

2   Q.   Does that say "Full Compendium Information" --

3   A.   Yes.

4   Q.   -- at the time top?

5        How would you describe the language that's being used

6   under the heading?

7   A.   Confusing.

8   Q.   Do you see anywhere where it says you didn't win anything?

9   A.   Not in so many words, no.

10  Q.   Do you see anywhere on here where it says you're not going

11  to receive anything of value for your $25?

12  A.   No.

13       MR. FINELY:  Take a look at page 4, please.

14  BY MR. FINLEY:

15  Q.   On page 4, J.U.S. is described as, this time, a prize

16  awards executive.

17       Do you see that?

18  A.   Yes.

19  Q.   Did S.M.M.I. have any prize awards executives?

20  A.   No.

21  Q.   And if they were paying any salaries to executives, would

22  that have been in the bank accounts?

23  A.   Repeat that again.

24  Q.   You would expect to see payments to executives in the bank

25  accounts that you were operating had there been any executives?

—2:19-cr-00295-GMN-NJK—

1    **A.**   Yes.

2    *Q.*   There's what appears to be a handwritten note.

3          "Please make one more effort to contact this potential

4    winner.  It would be bad publicity for our company to fail to

5    award the prize to the rightful winner."

6          Do you see that?

7    **A.**   Yes.

8    *Q.*   Is that real handwriting?

9    **A.**   No.

10          MR. FINLEY:  Let's look at the next page, please.  And

11   if we could blow up on the top.

12   BY MR. FINLEY:

13   *Q.*   Is that a return envelope?

14   **A.**   Yes, that's a return envelope.

15   *Q.*   Where was that printed and finished?

16   **A.**   That would have been printed by Epi Castro.

17   *Q.*   So he would handle the first part of the printing?

18   **A.**   Yes.

19   *Q.*   And then where did it get finished?

20   **A.**   At the laser and letter shop.

21          MR. FINLEY:  We can clear this screen.

22   BY MR. FINLEY:

23   *Q.*   So you saw that Government Exhibit 1F had the word

24   "notification" on it?

25   **A.**   Yes.

─── 2:19-cr-00295-GMN-NJK ───

1    Q.  Did most of the mailings that the scheme sent out have

2    words like that on that?

3    A.  Yes.

4    Q.  And they might not always say "notification," but there

5    would be words that made it look like some kind of official

6    communication?

7    A.  Yes.

8    Q.  Are most of the mailings that the scheme sent out from some

9    sort of person with some kind of fancy title?

10   A.  Yes.

11   Q.  Are all of the notices that you sent out with the four

12   defendants from a company with a fancy name?

13   A.  Yes.

14   Q.  Did any of these companies have any actual employees?

15   A.  No.

16   Q.  Did any of them have any physical offices?

17   A.  No.

18   Q.  Did all of the notices that you and the four defendants

19   sent out from 2010 to 2018 suggest that the recipient had won

20   or would win a large amount of money?

21   A.  Yes.

22   Q.  Was it ever true?

23   A.  No.

24   Q.  Let me show you Government Exhibit 1, which is a physical

25   exhibit.

———— 2:19-cr-00295-GMN-NJK ————

1          MR. FINLEY:  It's been admitted.

2          THE COURT:  If you're going to start on a different

3   exhibit, can we go ahead and take our lunch break?  It's 12:05.

4          MR. FINLEY:  Of course.  Thank you.

5          THE COURT:  Okay.  So during this lunch break, I do

6   remind the jury that you are still not to discuss this case

7   with anyone, not even your fellow jurors nor should you allow

8   anyone to discuss it with you.

9          If you do have any questions, please right write it

10  down on the forms provided.

11         Do not read or listen to or view anything that touches

12  upon the case in any way or perform any investigation or

13  research.  And do not form any opinions yet.  We've got more

14  information to provide to you.

15         We'll go ahead and stand for the jury and welcome them

16  back at 1:05.

17         (Whereupon, the jury exits at 12:05 p.m.)

18         THE COURT:  And Ms. Kern, after the jury exits, you

19  may also exit and take your lunch break and stretch.  We just

20  need you back here by 1:05.

21         THE WITNESS:  Okay.

22         THE COURT:  Okay.  All right.  See you back here at

23  1:05.

24         (Recess taken at 12:06 p.m.)

25                                * * *

—2:19-cr-00295-GMN-NJK—

--o0o--

COURT REPORTER'S CERTIFICATE

     I, SAMANTHA N. MCNETT, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  March 27, 2023

                              /s/ Samantha N. McNett
                              Samantha McNett, RPR, CRR, CCR