```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                        FOR THE DISTRICT OF NEVADA

 3   UNITED STATES OF AMERICA,     )
                                   ) Case No. 2:19-cr-00295-GMN-NJK
 4               Plaintiff,        )
                                   ) Las Vegas, Nevada
 5   vs.                           ) March 28, 2023
                                   ) 8:52 a.m. - 11:30 a.m.
 6   MARIO CASTRO, SALVADOR        ) Courtroom 7D
     CASTRO, MIGUEL CASTRO, and    ) JURY TRIAL, DAY 6,
 7   JOSE LUIS MENDEZ,             ) AM SESSION
                                   )
 8               Defendants.       )
     _____    ) CERTIFIED COPY
 9

10                  REPORTER'S TRANSCRIPT OF JURY TRIAL,
                             DAY 6, AM SESSION
11                BEFORE THE HONORABLE GLORIA M. NAVARRO
                    UNITED STATES DISTRICT COURT JUDGE
12

13   APPEARANCES:

14   For the Government:   TIMOTHY T. FINLEY, ESQ.
                           DANIEL E. ZYTNICK, ESQ.
15                         U.S. Department of Justice
                           950 Pennsylvania Avenue, N.W.
16                         Washington, D.C. 20530
                           (202) 307-0050
17

18

19   (Appearances continued on pages 2 and 3.)

20

21   Court Reporter:     Amber M. McClane, RPR, CRR, CCR #914
                         United States District Court
22                       333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada 89101
23                       (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25
```

```
1    APPEARANCES CONTINUED:

2    For the Government (Cont.):

3        MINA CHANG, AUSA
         UNITED STATES ATTORNEY'S OFFICE
4        501 Las Vegas Boulevard South, Suite 1100
         Las Vegas, Nevada 89101
5        (702) 388-6336

6

7    For Defendant Mario Castro:

8        JOSHUA L. TOMSHECK, ESQ.
         HOFLAND & TOMSHECK
9        228 South Fourth Street, First Floor
         Las Vegas, Nevada 89101
10       (702) 895-6760

11   -AND-

12       RICHARD E. TANASI, ESQ.
         TANASI LAW OFFICES
13       8716 Spanish Ridge Avenue, Suite 105
         Las Vegas, Nevada 89148
14       (702) 906-2411

15

16   For Defendant Salvador Castro:

17       DONALD J. GREEN, ESQ.
         LAW OFFICES OF DONALD J. GREEN
18       4760 South Pecos Road, Suite 103
         Las Vegas, Nevada 89121
19       (702) 388-2047

20

21   / / / / /

22   / / / / /

23   / / / / /

24

25
```

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

```
 1   APPEARANCES CONTINUED:

 2   For Defendant Miguel Castro:

 3        LUCAS J. GAFFNEY, ESQ.
          GAFFNEY LAW
 4        9900 Covington Cross Drive, Suite 290
          Las Vegas, Nevada 89144
 5        (702) 742-2055

 6   -AND-

 7        THOMAS A. ERICSSON, ESQ.
          THOMAS A. ERICSSON, CHTD.
 8        9900 Covington Cross Drive, Suite 290
          Las Vegas, Nevada 89144
 9        (702) 878-2889

10   For Defendant Jose Luis Mendez:

11        WILLIAM H. BROWN, ESQ.
          CHRISTOPHER MISHLER, ESQ.
12        BROWN MISHLER, PLLC
          911 North Buffalo Drive, Suite 202
13        Las Vegas, Nevada 89128
          (702) 816-2200

14

15                          * * * * *

16                        I N D E X

17   Government's Witnesses:                    Page

18   PATTI KERN

19        Continued Direct Examination by Mr. Finley      7

20   JOE MISKOVICH

21        Direct Examination by Ms. Chang            62

22        Cross-Examination by Mr. Green             69

23        Questions by the Jury                      75

24        Redirect Examination by Ms. Chang          77

25
```

*2:19-cr-00295-GMN-NJK - March 28, 2023*

1                          * * * * *

2

3                         *E X H I B I T S*

4    EXHIBIT NO.:          OFFERED          RECEIVED

5    Gov't 161, 163, 173,

6    179, 185, 188, 193,

7    195 - 196, 200, 204      6                6

8    Gov't 191               11               12

9    Gov't 197               28               29

10

11                          * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2:19-cr-00295-GMN-NJK - March 28, 2023

```
 1          LAS VEGAS, NEVADA; TUESDAY, MARCH 28, 2023; 8:52 A.M.

 2                              --o0o--

 3                  P R O C E E D I N G S

 4      (Outside the presence of the jury.)

 5          COURTROOM ADMINISTRATOR:  Do you solemnly swear that

 6      you will well and truly interpret from the Spanish language

 7      into the English language and vice versa according to the best

 8      of your knowledge and ability, so help you God?

 9          THE INTERPRETER:  I do.

10          COURTROOM ADMINISTRATOR:  Would you please state your

11      name for the record.

12          THE INTERPRETER:  Carola Anderson.

13      (Pause, 8:53 a.m., until 9:12 a.m.)

14          THE COURT:  Thank you.  You may be seated.

15          Sorry.  Now I'm on.  Thank you.  You may be seated.

16          Okay.  All right.  We have all our jurors here now.

17      So are we ready to begin or anything we need to address or can

18      we just call them in?

19          MR. FINLEY:  Your Honor, we reached a stipulation

20      with the defense this morning to admit a bunch of exhibits,

21      e-mails from Patti Kern, and I can read them.  I had the list.

22      I'm just going to get them back from Nick.

23          THE COURT:  All right.

24          COURTROOM ADMINISTRATOR:  I'm writing them down real

25      quick.
```

1          **MR. FINLEY:**  Thank you, sir.

2          Government Exhibit 161, 163, 173, 179, 185, 188, 193,

3     195, 196, 200, and 204.

4      *(Government Exhibit Nos. 161, 163, 173, 179, 185, 188,*

5        *193, 195, 196, 200, and 204, offered.)*

6          **MR. FINLEY:**  And I'm informed that nobody has an

7     objection to those coming into evidence.

8          **THE COURT:**  Is that right from the defense, everybody

9     is in agreement that these are preadmitted now?

10          **MR. TANASI:**  That's correct, Your Honor.

11          **MR. BROWN:**  Yes, Your Honor.

12          **MR. GREEN:**  Yes, Your Honor.

13          **MR. GAFFNEY:**  Yes, Your Honor.

14          **THE COURT:**  All right.  Thank you.

15      *(Government Exhibit Nos. 161, 163, 173, 179, 185, 188,*

16        *193, 195, 196, 200, and 204, received.)*

17          **THE COURT:**  Let's go ahead and call in the jury then.

18          **COURTROOM ADMINISTRATOR:**  All rise.

19      *(Jury in at 9:15 a.m.)*

20          **THE COURT:**  All right.  Everyone may be seated.

21     We're on the record.  The jury has all returned from the

22     overnight break, and we have the witness, Patti Kern, on the

23     witness stand.  So the Government may now continue its direct

24     examination.

25          **MR. FINLEY:**  Thank you, Your Honor.

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1          **CONT. DIRECT EXAMINATION**

2    **BY MR. FINLEY:**

3    Q.    Good morning, Ms. Kern.

4    **A.**    Morning.

5    Q.    When we broke for the day, we were talking about what

6    happens inside that warehouse on 6925 Pearl Street, and we

7    were looking at Government Exhibit 93 at page 11.  That's

8    already in evidence.

9          **MR. FINLEY:**  If we could put that on the screen,

10   please.

11   **BY MR. FINLEY:**

12   Q.    Okay.  Page 11 is on the -- on the left.  That's page 11,

13   and that's the one that isn't finished yet; is that right?

14   **A.**    Yes.

15   Q.    Is that what you referred earlier to as a shell or a

16   form?

17   **A.**    Yes.

18   Q.    And who took care of printing -- preprinting that shell

19   or form that we see on the left?

20   **A.**    Epi Castro.

21   Q.    And Epi Castro would print that over at New Generation

22   Graphics?

23   **A.**    Correct.

24   Q.    And then where would it go next after that?

25   **A.**    He would deliver it to the laser house where the

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

 1    letter --

 2    Q.    Okay.

 3    **A.**    -- shop was also.

 4    Q.    All right.  And for the later years of the conspiracy,

 5    that was at Pearl Street?

 6    **A.**    Yes.

 7    Q.    If we look over on the right, what is that?

 8    **A.**    That is the form once the personalization or, otherwise,

 9    the laser fill is put in it.

10    Q.    So who finishes that?

11    **A.**    The letter -- the laser house, which is Mario Castro's --

12    Q.    And the -- on the left, that's how they would arrive at

13    that warehouse?

14    **A.**    Correct.

15    Q.    And then, on the right, that's how they would leave the

16    warehouse except they'd be folded up into envelopes and sealed

17    and marked for the mail and put on a truck; is that right?

18    **A.**    Yes.

19    Q.    And from there it would go into the mail stream?

20    **A.**    Yes.

21    Q.    And in order to take that one on the right from a piece

22    of paper to a finished mailing that has the folded piece of

23    paper, the return envelope, the other pages, and the claim

24    form, were machines necessary for that?

25    **A.**    Yes --

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    Q.    And have --

2    **A.**    -- they were.

3    Q.    -- you seen machines that can do that inside that

4    warehouse?

5    **A.**    Yes, sir.

6    Q.    Have you seen machines actually being used for that

7    purpose inside that warehouse?

8    **A.**    Yes, sir.

9    Q.    About how much time per week did you spend in the

10   warehouse?

11   **A.**    Maybe half hour, 45 minutes, depending on if I had to

12   talk about a job or something.

13   Q.    We were talking about Government Exhibit 253, and I just

14   wanted to ask --

15          **THE COURT:**  Before you move on, let me just make --

16   clarify for the record here because I --

17          **MR. FINLEY:**  Yes.

18          **THE COURT:**  -- don't think it's clear.

19          So both of these exhibits are Government Exhibit 93,

20   but they're two different pages.  So on the left is page 11.

21   On the right is page 4.

22          Okay.  That's all.  Thanks.

23          **MR. FINLEY:**  Thank you for that.

24   **BY MR. FINLEY:**

25   Q.   So we were talking about Government Exhibit 253.  We

1    don't need to look at that again.  I just wanted to ask you

2    one question about that.

3            Do you remember when you went through there and

4    removed checks that were not -- that you thought were not

5    profit checks?

6    **A.**    Yes.

7    Q.    Did you remove some checks that were written to yourself

8    that had blank gray lines, even dollar amount, like $500 or

9    so, did you remove some of those checks?

10   **A.**    I didn't remove it.  I crossed things out --

11           *(Simultaneous crosstalk.)*

12   Q.    Right --

13   **A.**    -- yeah --

14   Q.    -- crossed them out --

15           *(Reporter instruction.)*

16   **BY MR. FINLEY:**

17   Q.    That was my fault.  Go ahead.

18   **A.**    I didn't remove any.  I would cross them all out if they

19   didn't pertain to a profit.

20   Q.    What kind of checks would those be generally?

21   **A.**    Payback for shipping of the mail back to, like, Andrea

22   Burrow from the -- for FedEx charges.

23   Q.    You mentioned -- yesterday morning you mentioned that --

24   actually, it was -- it may have been Thursday afternoon or

25   yesterday morning.  You mentioned that you were worried about

1   going to prison because of what you were doing?

2   **A.**   Yes, sir.

3   Q.   Now, you said that in court.  Did you ever tell anybody

4   that at the time?

5   **A.**   Yes, I did.

6           **MR. FINLEY:**  Can we go to Government Exhibit 191,

7   which has already been admitted?

8           **COURTROOM ADMINISTRATOR:**  I don't have it as

9   admitted.

10           **MR. FINLEY:**  Oh.  My mistake.  I meant to admit that.

11   **BY MR. FINLEY:**

12   Q.   So is that an e-mail from you to somebody named

13   appeldar@yahoo.com?

14   **A.**   Yes, sir.

15   Q.   And is it dated May 15th, 2014?

16   **A.**   Yes.

17           **MR. FINLEY:**  Your Honor, I move to admit Government

18   Exhibit 191.

19       *(Government Exhibit No. 191, offered.)*

20           **THE COURT:**  Any objection to Exhibit 191?

21           **MR. TANASI:**  No.

22           **MR. GAFFNEY:**  No, Your Honor.

23           **MR. BROWN:**  No, Your Honor.

24           **MR. GREEN:**  No objection, ma'am.

25           **THE COURT:**  All right.  Exhibit 191 is admitted and

1    may be published to the jury.

2        *(Government Exhibit No. 191, received.)*

3    **BY MR. FINLEY:**

4    Q.   Okay.  So that's the e-mail.  We went over the top.  If

5    we could blow up that section at the very top with the "to"

6    and the "from."

7            So you're writing to somebody named

8    appeldar@yahoo.com.  Do you know who that is?

9    **A.**   She used to be my next-door neighbor.

10   Q.   And let's go to the first e-mail in time which is on the

11   second page.  So Darla writes "Hi, Patti" at the top.  Do you

12   see that?

13   **A.**   Yes, sir.

14   Q.   I'd like to direct your attention to the beginning of the

15   second paragraph.  If we could just blow up the sentence, "I

16   have been struggling to find a job for two years now."

17           Do you see that?

18   **A.**   Yes, sir.

19   Q.   Okay.  And then if we go to I think what's the third

20   paragraph -- it's a little hard to tell -- but it starts, "I

21   have been thinking a lot."

22           Do you see that --

23   **A.**   Yes.

24   Q.   -- that line?

25           "I've been thinking a lot about how I can achieve

 1   this goal.  I was wondering if you would teach me the mail

 2   business."

 3            Do you see that?

 4   **A.**   Yes.

 5   Q.   Okay.  And then you respond to that e-mail, don't you?

 6   **A.**   Yes.

 7   Q.   And is that on the first page?

 8   **A.**   Yes.

 9   Q.   Okay.  Let's go to the first page again and blow up the

10   bottom half.

11            Okay.  Darla.  About the direct mail business,

12   unfortunately it sucks.  People -- postal people have pretty

13   much shut down everyone -- shut everyone down that were

14   dealing in sweepstakes and reports like I was.

15            Did you write that sentence back to her?

16   **A.**   Yes, sir.

17   Q.   Is what you wrote true at the time?

18   **A.**   Yes, sir.

19   Q.   And you said I had to -- I think you meant to say

20   "sign" -- I had to sign a cease-and-desist order along with

21   some pretty large fines.

22            Had that happened?

23   **A.**   Yes, sir.

24   Q.   And then a couple lines down, I even tried it after that

25   putting everything in Michael's name, and he was shut down in

1    six months.

2         Do you see that?

3    **A.**    Yes, sir.

4    Q.    And did that actually happen?

5    **A.**    Yes, it did.

6    Q.    And a few lines down from that there's a sentence that

7    starts "To this day."

8         Can you find that sentence?

9    **A.**    Yes.

10   Q.    Could you read that sentence, please?

11   **A.**    To this day, I cannot have my name on anything or even

12   remotely close to a sweeps or sweeps report promotional

13   company.  Don't want to go to jail.

14   Q.    Okay.  And you say you don't want to go to jail?

15   **A.**    Yes.

16   Q.    And was that how you actually felt at the time?

17   **A.**    Yes, sir.

18   Q.    Could you read the next sentence, please?

19   **A.**    Right now I have a couple of Mexicans who have a printing

20   and letter shop of their own with their mailings for casinos,

21   et cetera.  And they know that I do not exist if anybody asks

22   what I'm doing there, even if it doesn't have to do with

23   sweeps.

24   Q.    Okay.  Let's take that sentence and talk about a couple

25   of things in there.

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1        You mention that you were helping out with mailings

2   for casinos?  Is that true?  Were you doing that?

3   **A.**   No.

4   Q.   What were you really helping out with?

5   **A.**   Sweeps.

6   Q.   Why did you lie about that to Darla?

7   **A.**   Again, I wasn't supposed to be connected to that anymore.

8   Q.   And then I want to ask you about the phrase "they know I

9   do not exist."

10        What was that about?

11  **A.**   When this all started, that was part -- kind of -- that

12  was part of basically a verbal agreement that I didn't -- I --

13  I was not involved.

14  Q.   That was your deal?

15  **A.**   Yes.

16  Q.   Your friend, Darla, was she involved in this scheme in

17  any way?

18  **A.**   No, sir.

19  Q.   And you didn't want her to get involved in this type of

20  stuff?

21  **A.**   No, sir.

22  Q.   So you told your friend who wasn't involved in this that

23  you didn't want to go to jail.  Did you tell anybody else that

24  you didn't want to go to jail?

25  **A.**   Any -- the gentlemen that I was dealing with.

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    Q.    Can you think of any reason why you wouldn't remind them

2    of that?

3    **A.**    No.

4    Q.    It was important to you to have your name out of things?

5    **A.**    Yes, sir.

6    Q.    Which of your -- which of the four defendants did you

7    speak with directly about that issue?

8    **A.**    It was Mario Castro directly.  I don't remember if I

9    spoke to the other ones directly, but it was well known.

10   Because any time I would see someone I didn't know at the

11   letter shop, I would remind whoever was around, remember, you

12   know, I'm not that -- I don't exist.  Don't be saying my name.

13   Q.    Now, you testified earlier you got a cease-and-desist

14   order from the Postal Service in 2009 telling you to stop

15   sending fraudulent mail --

16   **A.**    Yes.

17   Q.    -- do you remember that?

18         And you testified that there was a company called

19   G.A.M. that you and Mario Castro were partners on that got a

20   cease and desist as well.  Do you remember that?

21   **A.**    Yes, sir.

22   Q.    Now, were those two mailing companies the only mailing

23   companies during the course of the scheme that got

24   cease-and-desist orders?

25   **A.**    No.

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1            **MR. FINLEY:**  Could we have a look at Government

2    Exhibit 120?  It's already admitted.

3    **BY MR. FINLEY:**

4    Q.   Now, this is a chart of cease-and-desist orders that was

5    prepared from Postal Service records.

6            Take a look at the company name column.  Do you

7    recognize any of the names of those companies?

8    **A.**   Yes.

9    Q.   Okay.  Let's -- which ones do you recognize?

10   **A.**   You want me -- like, you want the top one included also?

11   Q.   We already talked about that one --

12   **A.**   Yeah.

13   Q.   -- so we can skip over that.  Let's start with the second

14   line.

15   **A.**   I don't recognize the ones in the second line.

16   Q.   Do you know who Richard Knowles is?

17   **A.**   No, I don't.

18   Q.   So if you ever worked on any mailers for any of these

19   companies, it would have been for a short time?

20   **A.**   Yes.

21   Q.   Look at the line next to Exhibit 123.  Do you recognize

22   that company?

23   **A.**   No.  I -- I might have maybe scheduled some jobs for it,

24   but it's not sticking out.  I mean, I don't really recognize

25   it either.

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    Q.   Do you know who Adrian Flores is?

2    **A.**   I know who he was.

3    Q.   Who was he?

4    **A.**   He was a gentleman that was at the letter shop a lot with

5    Mario.

6    Q.   Did he work there?

7    **A.**   I don't know what he did.

8    Q.   You just saw him there with Mario?

9    **A.**   Yes, sir.

10   Q.   Now, with respect to these two company -- these two lines

11   that we talked about next to Exhibit Number 122 and 123 on the

12   column on the left, is it possible that you may have helped

13   out with those companies a little bit but you don't remember

14   because it wasn't very much work?

15   **A.**   Possibly, yes.

16   Q.   Okay.  Next to Exhibit 124, there's a line for NSD

17   Products, Inc.?

18   **A.**   Yes.

19   Q.   Do you recognize that one?

20   **A.**   I do.

21   Q.   And what is it?

22   **A.**   That -- NSD Products was a company that -- actually, it

23   was Epi Castro's company.  And I -- I scheduled the jobs for

24   that.  It was -- it was a -- a prize notice company also.

25   Q.   Who's Edgar Del Rio?

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1   **A.**   He is another gentleman that had companies, but he

2   originally worked for Epi Castro.

3   Q.   So as of the time that this was Epi's company back in

4   2011 when it was signed, was Edgar Del Rio an employee of Epi

5   Castro?

6   **A.**   Yes.

7   Q.   And did he work at New Generation Graphics?

8   **A.**   Yes.

9   Q.   And then I think you were saying -- I just want to make

10   this clear -- later on, he left and you and him became

11   partners on similar mailings independent of the Castro family

12   printshop?

13   **A.**   Yes, sir.

14   Q.   He had his own little printers, and he was doing

15   something very similar with you as well?

16   **A.**   Yes, sir.

17   Q.   And that was later on?

18   **A.**   Yes, sir.

19   Q.   Okay.  What about Promotional Marketing Solutions?

20   **A.**   That is the one that my husband started and that got shut

21   down quite quickly.

22   Q.   That was the one you were talking about in that e-mail we

23   just look at?

24   **A.**   Yes, sir.

25   Q.   And then we -- we had already talked about the company

1    G.A.M. earlier.

2    **A.**    Yes.

3    Q.    And you said you didn't know who this Sixto person was.

4    **A.**    No, sir.

5    Q.    What about M.K.I. Services?  Do you recognize that

6    company?

7    **A.**    Yes.

8    Q.    And what company -- what kind of company was it?

9    **A.**    That was also a -- a fraudulent prize notice company.

10    That company was Epi -- or was Epi Castro's and Edgar --

11    that -- Omar Del Rio is Edgar Del Rio's brother.

12    Q.    How do you know that?

13    **A.**    Because Edgar told me.

14    Q.    And then last we have Platinum Award Service [sic].  Do

15    you recognize that company?

16    **A.**    I do.

17    Q.    And what kind of a company was that?

18    **A.**    That was a fraudulent prize notification company.

19    Q.    Do you know who Ubaldo Casillas Torres is?

20    **A.**    No, sir.

21    Q.    Now, let's go back to NSD Products for a second, and I

22    want to ask you to look closely at the date.  That's June 6th,

23    2011.  Do you see that?

24    **A.**    Yes, sir.

25    Q.    And the company is NSD Products?

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1  **A.**   Yes.

2         **MR. FINLEY:**  Now let's go to Government Exhibit 161,

3  which has been previously admitted.  Can we blow up the top?

4  **BY MR. FINLEY:**

5  Q.   What's the date on that?

6  **A.**   June 1st, 2011.

7  Q.   Same day that the cease and desist was signed?

8  **A.**   Yes.

9  Q.   And that's from you to an e-mail address called

10 nds52@cox.net.  Do you see that?

11 **A.**   Yes.

12 Q.   Who has that e-mail address?

13 **A.**   That was Neptune Data Services.  That is the company

14 that, when Andrea would key in the numbers on the piece

15 from -- from who replied to it, the data we were talking

16 about, that was the data house.  That was the person that --

17 that did all the processing of the names and then would supply

18 the data that was then used for personalization.  So it was

19 like a -- a data house.

20 Q.   And that's the place that kept track of all the victim

21 names and information?

22 **A.**   Correct.

23 Q.   So what's the subject?

24 **A.**   The subject is -- well, that NSD got a C&D.

25 Q.   And what do you say in the first sentence?

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    **A.**    I said:  No worries.  Already setting up elsewhere.

2    Q.    What did you mean by that?

3    **A.**    That they'd already set it up in somebody else's -- were

4    in the process of setting up everything else -- everything up

5    into someone else's name.

6    Q.    Okay.  So it's not no worries, we're going to stop doing

7    this stuff; it's no worries, we're going to keep on rolling?

8    **A.**    Correct.

9    Q.    Okay.

10        **MR. FINLEY:**  So Government Exhibit 163 is already

11    admitted.  Can we please have that on the screen?  Can we blow

12    up the top?  Thank you.

13    **BY MR. FINLEY:**

14    Q.    And look at the date.  What's the date?

15    **A.**    June 2nd, 2011.

16    Q.    Is that the next day?

17    **A.**    Yes.

18    Q.    This is an e-mail from you to edgar@nggraphics.com.  Is

19    this the Edgar Del Rio that you were talking about earlier?

20    **A.**    Yes, sir.

21    Q.    And this e-mail address that has NG Graphics in it, is it

22    consistent with your testimony that you just gave that Edgar

23    Del Rio worked at NG Graphics for Epi Castro?

24    **A.**    Yes, sir.

25    Q.    What do you put on the subject line?

1  A.    New game plan.

2  Q.    Let's look at the first e-mail, which is in the middle of

3  the page.  You write to somebody -- well, you write to Edgar

4  Del Rio -- we already mention him, but there's a CC.  Do you

5  see that e-mail?  It's castro@qualitygroup2.com.

6         Do you know whose e-mail address that is?

7  A.    I can't remember if it was Epi's or if it was Mario's.

8  Q.    Well, we'll see some e-mails that, you know, might clear

9  that up later.  But your testimony right now is it would be

10  one of the two of those or --

11  A.    Yes --

12  Q.    -- could it be --

13  A.    -- it would be one -- either Epi Castro's or it would be

14  Mario Castro's e-mail address.

15  Q.    And then what do you write in the first line?

16  A.    Okay.  Here's what I have set up so we don't miss a beat.

17  Q.    And then we have kind of a repetitive series of letters.

18  NSD becomes NPS, and it keeps going like that; right?

19  A.    Um-hum.

20  Q.    So let's just explain the first one.  NSD becomes -- NS8

21  -- NSD08 becomes NPS08.  Could you translate that into English

22  for the jury?

23  A.    So those are part numbers.  Those are part numbers for --

24  each of the packages is basically a promo, promotion.  That's

25  how we referred to it.  Those numbers, NSD08, that's the

1    sequence.  So you would have NSD01 is the first package; 2,

2    second package; 3, on down the line.

3            So this particular package now becomes NPS08, which

4    is -- become another company.  And so with that everything

5    across has got to be changed:  Part numbers, graphics,

6    addresses, the whole deal.  That's why I'm referencing it

7    like, what it's got to be changed over to.

8    Q.   What would happen if you didn't change all this over and

9    just kept on doing things this same way right after getting a

10   cease and desist?

11   **A.**   It would have gotten seized probably.  And -- and they

12   couldn't have give another cease and desist, but it would have

13   been shut down, shut down, shut down.

14           **MR. FINLEY:**  Let's take a look at Government

15   Exhibit 173.  It's already admitted.  If we could blow up the

16   top, please.

17   **BY MR. FINLEY:**

18   Q.   That's an e-mail from you to Sean O'Connor, and this

19   one's dated April 26, 2012.  You told the jury who Sean

20   O'Connor is already.  He's the account manager at the Castro

21   family letter shop where the four defendants worked?

22   **A.**   Yes, sir.

23   Q.   Okay.  There's his e-mail address, and -- and you were

24   saying before National Print and Mail, was that the letter

25   shop -- in the early years of the conspiracy, that was the

1    name?

2    **A.**    Yes.

3    Q.    Let's take a look at the e-mail that starts at the

4    bottom.  The e-mail's different, but this is Neptune Data

5    again, isn't it?  From neptunedata@gmail.com?

6    **A.**    Yes.

7    Q.    And that's to you?

8    **A.**    Yes.

9    Q.    And he's actually giving you some names in response to a

10   request you make in the e-mail beneath that.  Do you see that?

11   **A.**    Yes.

12   Q.    On April 25th, 2012, you write:  Okay.  Mike signed the

13   C&D.  Here is the info to find out who gave these promos to

14   the PO inspector.

15           Do you see that?

16   **A.**    Um-hum.

17   Q.    And what is the PO inspector?

18   **A.**    The postal inspector.

19   Q.    And they blacked out the name and address, but here are

20   the stream codes.  Then you write -- pardon my language, but

21   it's important to be exact -- let me know who this asshole is?

22   **A.**    Right.

23   Q.    So -- and then there's some back and forth.  There's some

24   hunting for names.  We don't need to go into all the detail

25   about that.

1  **A.**   Yes, sir.

2  Q.   What's the goal here?  In a nutshell, what are you trying

3  to figure out?

4  **A.**   How it -- what led to getting a C&D and to try to

5  eliminate that out of -- the names out of the database so that

6  the next company that starts mailing won't get shut down again

7  that quickly.

8  Q.   You were thinking there was a problem with one of the

9  names or addresses?

10  **A.**   Yes.

11  Q.   You mentioned somebody named Glen in the -- in the e-mail

12  in the middle.  Do you see that?

13  **A.**   Yes, sir.

14  Q.   Get these out of Glen's.  Who is Glen?

15  **A.**   Glen Burke.

16  Q.   Who is he?  Who was he?

17  **A.**   He was another mailer that was mailing at the time, and

18  we were trading lists.  So if they were still in his list and

19  we traded with him, they'd come back in again.

20  Q.   Okay.  We'll come back to Glen Burke a little bit later.

21       Let's take a look at Government Exhibit 79, please.

22  Oh.  Government Exhibit 179.  That's already admitted.  That's

23  an e-mail dated May 31, 2012, and it's between -- it's from

24  you to edgar@nggraphics.com.  Do you see that?

25  **A.**   Yes.

1    Q.   Let's take a look at the beginning e-mail from Edgar to

2    you.  He says, "Hi, Patti" -- and then I want to skip to the

3    second paragraph.  Also, when you get back, can you write a

4    check to Omar for $700?

5         Is -- is that Omar Del Rio whose name we saw on the

6    cease-and-desist chart?

7    **A.**   Yes, sir.

8    Q.   And then he says:  It might be coming to an end.  The

9    inspector stopped by his apartment again.

10        What is he -- what did you take that to mean?

11   **A.**   That the postal inspector had stopped by his apartment,

12   and there was going to be a cease and desist probably issued

13   to the company.

14   Q.   Do you recall that happening again at any point, postal

15   inspector stopping by the apartment or the home or the office

16   of people who were involved in this?

17   **A.**   Yes, sir.

18   Q.   When else did it happen?

19   **A.**   I don't know dates for sure.  I --

20   Q.   Just tell us the best you can remember.

21   **A.**   It would happen every -- sometimes a -- twice or so in a

22   year.  It might go a year, nothing would happen.  And then a

23   few would happen, and then it would be quiet again.

24   Q.   Let me show you Government Exhibit 197, which is not

25   admitted.  Do you recognize Government Exhibit 197?

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    **THE COURT:**  Just a minute.  We need to wait for Nick

2    to switch over the screen.

3    **MR. FINLEY:**  Okay.

4    **THE COURT:**  Sorry.  I think he's printing out the

5    exhibit list.

6    All right.  Nick, we just need to switch it over to

7    the witness only, please.

8    **COURTROOM ADMINISTRATOR:**  Okay.

9    **MR. FINLEY:**  Yes.  Thank you.

10   **BY MR. FINLEY:**

11   Q.   Do you recognize that e-mail?

12   **A.**   Yes, sir.

13   Q.   Who's it from?

14   **A.**   Myself.

15   Q.   And what's the date?

16   **A.**   November 27th, 2016.

17   Q.   So this is a few years after all these e-mails we've been

18   talking about?

19   **A.**   Yes, sir.

20   Q.   Who's it to?

21   **A.**   That, again, is to Neptune Data, which would have been

22   Steve Fennell.

23   **MR. FINLEY:**  All right.  Move to admit Government

24   Exhibit 197, Your Honor.

25   *(Government Exhibit No. 197, offered.)*

Patti Kern - Cont. Direct
2:19-cr-00295-GMN-NJK - March 28, 2023

1           THE COURT:  Any objection to Exhibit 197?

2           MR. TANASI:  No, Your Honor.

3           MR. GAFFNEY:  No, Your Honor.

4           MR. BROWN:  No, Your Honor.

5           MR. GREEN:  No objection, Your Honor.

6           THE COURT:  All right.  Exhibit 197 is admitted and

7      may be published to the jury.

8           (Government Exhibit No. 197, received.)

9      BY MR. FINLEY:

10     Q.   Please cancel SMMI05 WO#7331, some postal stuff going on.

11          What were you referring to when you said there was

12     some postal stuff going on?

13     A.   There would -- there had been either a phone call or

14     somebody show up at, again, somebody's house.  This one --

15     this promotion would have been Jose Salud's son, I believe.

16     Q.   Okay.  Now, you didn't seem positive about that.  Would

17     it be helpful to look at the state records --

18     A.   Yes, sir.

19     Q.   -- about that?

20     A.   Yes, sir.

21     Q.   Okay.

22          MR. FINLEY:  If we could go to Government

23     Exhibit 280, please.

24     BY MR. FINLEY:

25     Q.   Okay.  The bottom line is Special Money Managers, Inc.

1    That's what we're talking about here with SMMI?

2    **A.**    Yes, sir.

3    Q.    And who's the president of that?

4    **A.**    Jose Silvestre Castro.

5    Q.    Is it -- and does that refresh your memory about whether

6    it was Jose Salud Castro's son?

7    **A.**    Yes, sir.

8    Q.    Was it?

9    **A.**    Yes.

10   Q.    And Jose Salud Castro is not here, but he -- was he part

11   of the scheme?

12   **A.**    Yes, sir.

13   Q.    Was he a partner on mailing companies with you?

14   **A.**    Yes, sir.

15   Q.    Did he receive cash envelopes?

16   **A.**    Yes, sir.

17   Q.    And was he the brother of the three Castro defendants?

18   **A.**    Yes, sir.

19        **MR. FINLEY:**    If we could go to Government Exhibit 120

20   again.

21   **BY MR. FINLEY:**

22   Q.    Ms. Kern, on what day did Omar Del Rio sign the cease and

23   desist for M.K.I. Services?

24   **A.**    I can't -- all the numbers are going through my head.  I

25   can't --

1    Q.   It's on the screen.  It's --

2    **A.**   Oh.  8/1/2012.

3    Q.   Okay.  So we're -- we're saying August 1st, 2012?

4    **A.**   Yes.

5    Q.   Omar Del Rio signed the cease and desist for M.K.I.

6    Services.  Keep that date in your mind, 8/1/2012.

7         **MR. FINLEY:**  And let's go to Government Exhibit 185,

8    please, which is already admitted.  If we could blow up the

9    top, please.

10   **BY MR. FINLEY:**

11   Q.   You send this e-mail on what date?

12   **A.**   August 2nd, 2012.

13   Q.   Is that the next day?

14   **A.**   Yes, sir.

15   Q.   You tell Sean O'Connor:  Trash SLV.  Also they went to

16   Edgar's brothers both MKI/SLV and SPC's work today and served

17   them C&D.  Talk to Edgar.

18         Do you see that?

19   **A.**   Yes.

20   Q.   And I know you're referring to several companies, but are

21   you referring to M.K.I. here?

22   **A.**   Yes, sir.

23   Q.   And that was the company that, as we saw, just got a

24   cease and desist the day before?

25   **A.**   Yes, sir.

1    Q.    And just so we're clear, Edgar is Edgar Del Rio?

2    **A.**    Yes, sir.

3    Q.    And the brothers are Edgar's brothers?

4    **A.**    Correct.

5    Q.    Why did you tell Sean O'Connor to talk to Edgar?

6    **A.**    I didn't know what was going to happen next I -- as far

7    as what we wanted to do.

8    Q.    And we see that word "trash" again.  We saw that on

9    another e-mail yesterday.  Trash is throw away all the paper

10   and envelopes?

11   **A.**    They're worthless.

12   Q.    Was it important to do that quick?  It looks like you're

13   moving pretty quick here again.

14   **A.**    It was mainly so that things didn't get mixed up and sent

15   out by mistake on the wrong form, using the wrong envelope,

16   that a box was shut down and the mail wouldn't be coming back,

17   et cetera.

18          **MR. FINLEY:**  Can we go to Government Exhibit 120

19   again?

20   **BY MR. FINLEY:**

21   Q.    Take a look at the last line.  That's for Platinum Award

22   Service?

23   **A.**    Yes.

24   Q.    When did that cease and desist get signed?

25   **A.**    January 2nd, 2013.

1    **MR. FINLEY:**  Let's go to Government Exhibit 188,

2    which has already been admitted.

3    **BY MR. FINLEY:**

4    Q.   And this -- on this one, the e-mail is dated January 3rd,

5    2013?

6    **A.**   Yes.

7    Q.   Is that the very next day?

8    **A.**   Yes.

9    Q.   You are writing again to Neptune Data, and you say:  Hi.

10   Well, PAS -- does that stand for Platinum Award Service?

11   **A.**   Sir.

12   Q.   Just got a C&D.  So cancel PAS02 WO#6174 that was to have

13   mailed yesterday.

14         Do you see that?

15   **A.**   Yes, sir.

16   Q.   And why did you want to cancel that mailing before it

17   went out?

18   **A.**   Well, it was canceled on the data end because it wouldn't

19   leave this big hole because there wouldn't be any data coming

20   in and that would be hanging there.  So to cancel it because

21   it was -- it should have mailed but it hadn't mailed yet.  So

22   that was telling him to clear it out of there so that there

23   wouldn't be this gap and we would -- and he'd keep looking for

24   the data when it wasn't ever going to come from that job.

25   Q.   Let me ask you something, Ms. Kern.  What would happen if

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    that mail job went out and a bunch of people wrote checks or

2    sent cash to a mailbox that had been shut down?  Would you

3    lose money?

4    **A.**    Yes, sir.

5    Q.    Okay.  Did that have anything to do with it?

6    **A.**    To Neptune Data per se, no.  But when I sent these --

7    would go out to the letter shop, that would be stopping it.

8    This job was to have mailed yesterday.  It evidently didn't.

9    I just wanted to clear it out of his database.

10   Q.    Okay.  But as far as the letter shop is concerned, would

11   you lose money or --

12   **A.**    Oh yes.

13   Q.    Okay.  And so you'd lose money on the postage that was on

14   those envelopes?

15   **A.**    Yes, sir.

16   Q.    And you'd lose money on the paper that got wasted?

17   **A.**    Yes, sir.

18   Q.    And I know this job was ready to go out, but if you can

19   stop it before it goes out or gets printed, you can save money

20   on paper, too; right?

21   **A.**    Yes, sir.

22   Q.    Okay.  I'd like to show you Government Exhibit 204 which

23   has already been admitted.  So this is a timeline of --

24         **COURTROOM ADMINISTRATOR:**  That's not -- I don't have

25   that as admitted.

1          **MR. FINLEY:**  Okay.

2          **THE COURT:**  204, has that been admitted?

3          **COURTROOM ADMINISTRATOR:**  I don't have that,

4     Your Honor.  I have 240.

5          **MR. ZYTNICK:**  I heard 204 this morning, but we can

6     double-check.

7          **THE COURT:**  So is -- 204, was that preadmitted?

8          **MR. TOMSHECK:**  It was part of the stipulation.

9          **THE COURT:**  All right.  So 204 will be admitted if it

10    hasn't already been.  Thank you.

11    **BY MR. FINLEY:**

12    Q.   So that's a timeline that shows a lot of the content of

13    the e-mail we've been talking about, but this time it has

14    everything in a time order.  Is that what you see there?

15    **A.**   Yes, sir.

16    Q.   And we see that there's law enforcement activity that you

17    and your associates are discussing beginning June 1, 2011, and

18    it continues all the way to November 26, 2016?

19    **A.**   Yes.

20    Q.   And does this accurately summarize some of the

21    communications that were happening?

22    **A.**   Yes, sir.

23    Q.   And all of these I believe we looked at and went over

24    except for one.  There's -- there's one entry down at the

25    bottom right, October 11, 2016.

1          **MR. FINLEY:**  Can we blow that entry up, please?

2     **BY MR. FINLEY:**

3     Q.   Okay.  I want to ask you about that.  Let me show you the

4     actual e-mail that that comes from.

5          Now, this is from 2016, and it's not about a cease

6     and desist, is it?

7     **A.**   No.

8          **MR. FINLEY:**  Let's go to Government Exhibit 193 which

9     has already been admitted.  Let's blow that up.

10    **BY MR. FINLEY:**

11    Q.   This is an e-mail from Andrea Burrow.  You said before

12    that she's the one who would open the mail for you and sort

13    the mail, sort the checks, sort the cash, and enter

14    information about victims into a database?

15    **A.**   Yes.

16    Q.   And she forwards you -- it looks like a website link.  Do

17    you see that?

18    **A.**   Yes.

19    Q.   And this is happening October 11, 2016.  And if we look

20    at the -- approximately the middle of the page on the

21    right-hand side, it says -- there's a link to the Justice

22    Department website, www.justice.gov.  Do you see that?

23    **A.**   Yes.

24    Q.   And then we can't read all the language, but I'll read

25    what we can see on this e-mail.  Justice Department and law

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    enforcement partners announce civil and criminal actions to

2    dismantle global network of mass-mailing fraud schemes

3    targeting elderly and -- and then we can't see anymore; right?

4    **A.**   Yes.

5    Q.   Would we have to click on that to see the rest?

6    **A.**   Yes.

7    Q.   Okay.  It mentions criminal actions.  Do you see that?

8    **A.**   Yes, sir.

9    Q.   And so we're not talking about cease and desists anymore,

10   postal cease and desists; right?

11   **A.**   Yes, sir.

12   Q.   And did you recognize that this was a whole new ball

13   game?

14   **A.**   Yes, sir.

15   Q.   What did you think when you received this?

16   **A.**   That it was -- it was done, the mailings were done; that

17   we needed to start basically keying down.  If there was

18   fulfillment that needed to be done, it should be done.

19   Q.   And Andrea Burrow is sending this to you.  Did you feel

20   that, when she sent this to you, it was pertinent to you?

21   **A.**   Yes, sir.

22   Q.   And is that because, when it talks about a national

23   crackdown on elder fraud, they're talking about what you and

24   the four defendants were doing?

25   **A.**   Basically yes.

1    Q.   Did you decide to take any action in response to finding

2    out about the national crackdown in 2016?

3    **A.**   As far as, like --

4    Q.   Did you do anything to kind of, you know, cover yourself?

5    **A.**   We got some fulfillment out.

6    Q.   Okay.  So let me ask you about that.  You said the word

7    "fulfillment."  So let me back up.  I'll just -- let's break

8    it up into little pieces here because there's some -- you

9    know, there's some stuff that we need people to follow along

10   on.  So we'll break it up into little pieces.

11        Does the word "fulfillment" have a special meaning in

12   the fraudulent mail industry?  Answer that one yes or no, if

13   you can.

14   **A.**   Yes.

15   Q.   Does it refer to any particular activity?  In other

16   words, what does one -- when you're -- when you're in the

17   fraudulent mail industry and you're going to do some

18   fulfillment, we're going to fulfill, what is that person

19   actually gonna do?

20   **A.**   We're going to send them whatever we -- we were really

21   gonna get them instead of what they thought they were gonna

22   get.  They're not gonna get any money, but they're going --

23   Q.   Okay.  Let's not talk about what you're thinking and

24   explain that.  Let's just talk about, in a real simple level,

25   physically what are you doing?  Like, what action are you

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    doing?

2         You are sending something to somebody?  Do you send

3    something to --

4    **A.**    Yes.  We will send them at this -- with what these

5    mailings were, they would get what was referred to as a

6    sweepstakes report.

7    Q.    So fulfillment involves sending victims sweepstakes

8    reports; is that right?

9    **A.**    With these -- with these particular prize notifications,

10   yes.

11   Q.    And you-all would call that fulfillment.  That's a --

12   that's a word that's been around for a long time; right?

13   **A.**    Right.  And it would pertain to -- again, it could have

14   pertained to a piece of jewelry or a coupon booklet, whatever

15   was associated with whatever they -- we were mailing.

16   Q.    And these sweepstakes reports, did they have any value?

17   **A.**    No.

18   Q.    Was it just kind of a worthless little pamphlet?

19   **A.**    Yes.

20   Q.    Did it have information about publicly available

21   sweepstakes on it?

22   **A.**    Yes, sir.

23   Q.    Now, have you ever seen -- in your experience in the

24   fraudulent mail industry, have you ever seen fraudulent prize

25   notice mailers try to pretend that they're a legitimate

1    business that's just sending people information about

2    sweepstakes they can enter?  Have you seen that?

3              Let me ask that again.

4    **A.**    Yeah.

5    **Q.**    Have you ever seen, in your years in the fraudulent mail

6    industry, fraudulent mailers pretend that they're legitimate

7    because they're just sending sweepstakes information to

8    people?

9    **A.**    Yes.

10   **Q.**    They pretty much all did that; right?

11   **A.**    Yes.

12   **Q.**    And you did that as well?

13   **A.**    Correct.

14   **Q.**    Did you and the four defendants sometimes send people

15   these worthless pamphlets with information about sweepstakes

16   that people can enter?

17   **A.**    Yes, sir.

18   **Q.**    And you -- that's what you called fulfillment; right?

19   **A.**    Yes, sir.

20   **Q.**    Is anybody really getting fulfilled when they get those

21   booklets?

22   **A.**    No, sir.

23   **Q.**    Okay.  They're not worth anything, are they?

24   **A.**    No.

25   **Q.**    Was there this belief in your industry that it's somehow

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    better if you send these booklets to people than if you send

2    them nothing?

3    **A.**    Yes.

4    Q.    You -- did you hear loose talk among people over the

5    years, like, this one's a good mailer because we're sending

6    people the booklet, but these guys, they're bad because they

7    never send the booklet?

8    **A.**    Yes.

9    Q.    Have you heard that kind of stuff?

10    **A.**    Yes.

11    Q.    Do you think it makes any difference to the victim

12    whether they get nothing or a booklet that's worth nothing?

13    **A.**    No.

14    Q.    Now, at this point when you're finding out about this

15    national crackdown in 2016, did you become -- I mean, you were

16    aware of this nationwide crackdown.  We were talking about

17    that.

18          At that particular time, were you doing a good job of

19    sending the worthless booklets out?

20    **A.**    No.

21    Q.    And did you -- did you -- did you decide to do anything

22    about that as a result of finding out -- finding out about the

23    crackdown?

24    **A.**    Yes.

25    Q.    What did you decide to do?

1    **A.**    To get some booklets out.

2    **Q.**    Why did you decide -- what did that have to do with the

3    national crackdown?  Why would you want to send people

4    booklets because you're finding out about a national

5    crackdown?

6    **A.**    To make it look less fraudulent.

7    **Q.**    So it was just kind of a -- you're trying to cover

8    yourself?

9    **A.**    Yes, sir.

10   **Q.**    And did you talk to anybody about your plan to start

11   doing a better job of sending these worthless fulfillment

12   booklets?

13   **A.**    Mario Castro.

14   **Q.**    You talked to him about it?

15   **A.**    Yes, sir.

16   **Q.**    Why was it necessary for you to talk to him about it?

17   **A.**    Because he would be the one that would be basically

18   putting them into the mail.

19   **Q.**    And so what did you decide, the two of you?

20   **A.**    To get some -- to get them out.

21   **Q.**    And did you actually do that?

22   **A.**    Yes.

23   **Q.**    Now, let's take a look at Government Exhibit 195.

24          **MR. FINLEY:**  Judge, it's already been admitted.

25          If we could blow up the top half, please.

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    **BY MR. FINLEY:**

2    Q.    This is an e-mail from you to an e-mail address called

3    mcastro1968@me.com.  Do you see that e-mail address?

4    **A.**    Yes.

5    Q.    Who does that e-mail address belong to?

6    **A.**    Mario Castro.

7    Q.    Does that refresh your memory about what his e-mail

8    address was?

9    **A.**    Yes.

10   Q.    So that other one that we saw --

11   **A.**    That was Epi Castro's e-mail address, yeah.

12   Q.    Okay.  And just to remind the jury, we were looking at an

13   e-mail that had Edgar Del Rio on it, and then there was a CC

14   and you couldn't remember whether that was Epi or Mario Castro

15   on that line.  And I think it said something like

16   castro@qualitygroup on it or something like that.

17          Does this refresh your memory about who that other

18   e-mail belonged to?

19   **A.**    Yes.

20   Q.    Okay.  Who did the other e-mail belong to?

21   **A.**    Epi Castro.

22   Q.    Okay.  Now this mcastro1968, that's Mario Castro just so

23   we're clear?

24   **A.**    Yes, sir.

25   Q.    Okay.  And so it's from you to Mario Castro.  You write:

Patti Kern - Cont. Direct
2:19-cr-00295-GMN-NJK - March 28, 2023

1   Here are the fulfillment newsletters.  Do you see that?

2   A.   Yes.

3   Q.   And it appears that you've attached some of the

4   newsletters that you're talking about there; right?

5   A.   Yes.

6   Q.   And we'll take a look at that in a minute, but just

7   wanted to note that this e-mail here in the middle is from a

8   guy named John Stahl?

9   A.   Yes.

10  Q.   Who's that?

11  A.   He was a young man that would compile these newsletters.

12  Q.   Okay.  And so what's happening in this e-mail is he put

13  these together.  He sent them to you.  You forward it to Mario

14  Castro and you say here's the -- here are the newsletters;

15  right?

16  A.   Correct, yes.

17  Q.   And let's take a look at the next page.

18        So that's the next page.  It looks like there's

19  something called Thrive Market Sweepstakes.  It's got

20  information about eligibility, information about timing, how

21  to enter, has a total -- total ARV -- what's that, do you

22  know?

23  A.   Total -- total approximate retail value.

24  Q.   Of $12,000?

25  A.   Correct.

1    Q.   And then, if we were to continue, there would be more

2    stuff like this about different sweepstakes?

3    **A.**   Yes, sir.

4    Q.   Is all this information publicly available?

5    **A.**   Yes, sir.

6    Q.   And this -- so this particular newsletter goes on for

7    maybe about seven pages or so, but we would just see more of

8    the same if we continued through this?

9    **A.**   Yes, sir.

10   Q.   Okay.  What -- now, why did you send Mario Castro these

11   newsletters?  Did he ask to see them, or did you just take it

12   upon yourself to send it?  You don't usually send him a ton of

13   e-mails about day-to-day business back then, do you?

14   **A.**   No.

15   Q.   Okay.  So why did you send him this?

16   **A.**   Because he was going to take that e-mail and that

17   attachment and then use that attachment to actually print them

18   there at the letter shop and put them in envelopes and get

19   them out.

20   Q.   Okay.

21        **MR. FINLEY:**  Let's look at Government Exhibit 196.

22   It's already in evidence.

23   **BY MR. FINLEY:**

24   Q.   And if we're keeping track of dates, this is about five

25   days after the e-mail where you sent him the actual

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    newsletters; right?

2    **A.**    Yes.

3    Q.    And this e-mail is from you, @aol.com -- that's your

4    e-mail address -- and then you're writing to somebody with the

5    e-mail address changoconsulting@gmail.com.  Do you see that?

6    **A.**    Yes, sir.

7    Q.    And who's that?

8    **A.**    Sean O'Connor.

9    Q.    Okay.  So we saw earlier that he had a

10   nationalprintmail.com e-mail address.  It's now several years

11   later, and the e-mail address has changed?

12   **A.**    Yes.

13   Q.    Okay.  And you write to Sean:  Here's the data for FF1

14   fulfillment.

15           What does FF1 mean?

16   **A.**    Fulfillment 1.

17   Q.    And you say:  This is a preprinted sweeps newsletter that

18   is going into a nonwindow envelope.  Do you see that?

19   **A.**    Um-hum.

20   Q.    And then you write:  Talk to Mario on how they want to do

21   this.  Do you see that?

22           Now, when you say --

23           **THE COURT REPORTER:**  What was the answer?  There was

24   no audible response.

25           **MR. FINLEY:**  Thank you.  There wasn't.  Could you --

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

1    **BY MR. FINLEY:**

2    Q.   Yes or no?

3    **A.**   Yes.

4    Q.   Okay.  And you say talk to Mario on how to do this.

5    Who's Mario?

6    **A.**   Mario Castro.

7    Q.   And then you say "how they want to do this."  Who's they?

8    **A.**   Him and whoever was working with him.

9    Q.   And who are the people who would have been working with

10   him on this?

11   **A.**   It would have been, like, Epi mostly and -- and -- but

12   Epi -- Epi Castro -- pretty much Epi Castro and Mario Castro.

13   It was just kind of like how they want to do this and anybody

14   that would have been involved in the letter shop part of it.

15   Because I didn't know, because of the layout, if it was going

16   to be just printed by Mario or if it was going to be -- go to

17   Epi, then back to Mario, and how they were going to insert it.

18   Because it wasn't a normal envelope, and it had to be

19   addressed on the outside of this envelope.

20   Q.   So in this e-mail, who's the one who's going to be making

21   the decisions about how they're going to do this?  Is it you

22   or Mario Castro?

23   **A.**   Mario Castro.

24   Q.   Is Sean O'Connor making the decisions about how to do

25   this?

1    **A.**    He would be involved because he set up the lasering that

2    had to do with -- when you say "data," the data went to him.

3    He set up the formats.  So he would have had to have been

4    involved as far as being able to either print that data --

5    because it wasn't going in a window envelope.  It was going in

6    a solid envelope.  So that person's name and address would

7    have to be printed actually on that envelope and didn't know

8    if he was going to do it on a label, I'm going to have

9    somebody stick it on the envelope, or the envelope was going

10   to be lasered itself.

11   Q.    But according to this e-mail you say talk to Mario;

12   right?

13   **A.**    Yes.

14   Q.    You don't say, you know, Sean, you decide how you want to

15   do this?

16   **A.**    No.

17   Q.    Okay.  So who's making the decisions on how this is

18   supposed to be done?

19   **A.**    Mario Castro.

20   Q.    At the end of the day -- I understand what you're saying

21   about Sean would take care of a lot of the details, but he

22   would have to check with Mario first?

23   **A.**    Yes.

24   Q.    Okay.  Did -- switch gears for a second.  Did the

25   defendant Jose Luis Mendez put his own name on his mailing

1    companies?

2    **A.**    Yes, sir.

3    Q.    And he had a mailing company called Advanced Allocation

4    Systems, we talked about that?

5    **A.**    Yes.

6    Q.    That had some DBAs under it as well?

7    **A.**    Yes.

8    Q.    Mail went out under both the company name and the DBA

9    name; right?

10    **A.**    Yes.

11    Q.    And from your perspective does it make any difference

12    whether it's a company or a DBA to you when you're sending

13    these mailings out?

14    **A.**    No.

15    Q.    DBA is just another name you can use and you can get it

16    cheaper than you can incorporate a company; is that right?

17    **A.**    Yes.

18    Q.    Okay.  So another company he had was Pacific Allocation

19    Systems.  Do you remember that he opened that company in 2016?

20    **A.**    Yes.

21    Q.    Okay.  Now, it has been suggested in this trial that

22    there's no way someone who knows that he is committing a fraud

23    would put his own name on a mailing company because that would

24    be a very dumb thing to do.

25          Let me ask you this.  Did you ever put your own name

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    on a mailing company?

2    **A.**    Yes.

3    Q.    You did that before 2009; right?

4    **A.**    Yes.

5    Q.    Did you know you were committing fraud back then?

6    **A.**    Yes.

7    Q.    You still did it?

8    **A.**    Yes.

9    Q.    Was it a dumb thing to do in -- in hindsight?

10    **A.**    Oh yeah.

11    Q.    And what happened in 2009 because you did this dumb

12    thing?

13    **A.**    I got a cease and desist.

14    Q.    Now, the cease and desist, that's not the same thing as

15    going to prison; right?

16    **A.**    No.

17    Q.    And you were able to keep going for many years after that

18    by using other people's names?

19    **A.**    Yes, sir.

20    Q.    You even put your husband's name on a mailing company,

21    didn't you?

22    **A.**    Yes.

23    Q.    Did he know this was fraud?

24    **A.**    Yes.

25    Q.    And so was that a dumb thing for him to do?

1    **A.**    Yes.

2    Q.    And it's been suggested that your husband didn't know

3    that he was part of any fraud and that you tricked your

4    husband into putting his name on a company; is that true?

5    **A.**    No.

6    Q.    How long have you been doing this, Ms. Kern?

7    **A.**    I've been involved in the direct mail business since

8    1992.

9    Q.    Did he know what was going on?

10   **A.**    Yes, sir.

11   Q.    Did he see all the mail that came to your house from

12   every single mailing that you and the four defendants put out?

13   **A.**    Yes, sir.

14   Q.    And he did get profit checks, didn't he?

15   **A.**    He did.

16   Q.    That was back in 20 -- 2012?

17   **A.**    Yes.

18   Q.    And that was for a brief period?

19   **A.**    Yes.

20   Q.    We would see those profit checks on that spreadsheet we

21   were going over; right?

22   **A.**    Yes, sir.

23   Q.    And that was right before Promotional Marketing

24   Solutions, which was his company, got shut down?

25   **A.**    Yes.

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    Q.   All right.  Did he -- did he keep going after that?  Did

2    he -- was he -- did he stay involved with this scheme after

3    that?

4    **A.**   No, sir.

5    Q.   Okay.  Did he get a C&D?

6    **A.**   Yes, sir.

7    Q.   Did he go to prison?

8    **A.**   No, sir.

9    Q.   Would you have put his name on a mailing company if you

10   thought he was going to go to prison?

11   **A.**   No, sir.

12   Q.   Did Mario Castro use his son's name to open mailing

13   companies, mailboxes, and bank accounts?

14   **A.**   Yes, sir.

15   Q.   Was that a dumb thing to do?

16   **A.**   Yes, sir.

17   Q.   You mentioned Jose Salud Castro was another one of your

18   partners in this scheme?

19   **A.**   Yes, sir.

20   Q.   And we saw that he put his son's name on a mailing

21   company; right?

22   **A.**   Yes, sir.

23   Q.   Did he also put his daughter-in-law's name on a -- on a

24   mailing company?

25   **A.**   Yes, sir.

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    Q.   That would be a dumb thing to do?

2    **A.**   Yes, sir.

3    Q.   Have you ever watched the news or read the newspaper and

4    seen a story about a criminal who got caught because he did

5    something dumb?

6    **A.**   Yes, sir.

7    Q.   Do people do dumb things sometimes because they're

8    tempted by the lure of easy money?

9    **A.**   Yes, sir.

10   Q.   Is that what you did?

11   **A.**   Yes, sir.

12   Q.   Have you ever heard anyone refer to a C&D order as a slap

13   on the wrist?

14   **A.**   Yes, sir.

15   Q.   Now, from the point of view of trying to avoid legal

16   trouble, putting your husband's name on the mailing company

17   was not smart; right?

18   **A.**   No, it was not.

19   Q.   You were aware of the possibility he could get caught?

20   **A.**   Yes, sir.

21   Q.   In your mind, what was the worst thing that you thought

22   could happen to him if he got caught?

23   **A.**   He would get a cease and desist.

24   Q.   Is that actually what happened?

25   **A.**   Yes, sir.

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    Q.    Was your prediction based on your own experience?

2    **A.**    Yes, sir.

3    Q.    And that prediction ended up being accurate?  He got a

4    cease and desist?

5    **A.**    Yes, sir.

6    Q.    Slap on the wrist?

7    **A.**    Yes, sir.

8    Q.    Did any of the other people that you've been involved

9    with over the years who got C&Ds get criminally charged at the

10    time of the C&D?

11    **A.**    No.

12    Q.    Did they all get slaps on the wrist?

13    **A.**    Yes, sir.

14    Q.    Let me ask you this.  In your years of sending fraudulent

15    prize notices, have you ever seen anyone get criminally

16    charged just for putting their name on things?  In other

17    words, just for putting their name on the mailbox, just for

18    putting their name on the bank account?  Nothing more than

19    that?

20    **A.**    No.

21    Q.    You've never seen that?

22    **A.**    Hmm-mm.

23            **THE COURT REPORTER:**  Is that a "no"?

24            **THE WITNESS:**  No.

25    **BY MR. FINLEY:**

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1  Q.   Now, previously we were talking about that national law

2  enforcement crackdown.  I want to show you an e-mail.  This is

3  Government Exhibit 200, which is already admitted.  It's an

4  e-mail from you to Mario Castro.

5           **MR. FINLEY:**  Can we blow up the top, please?

6  **BY MR. FINLEY:**

7  Q.   That's the same e-mail address we saw before, Mario

8  Castro's?

9  **A.**   Yes.

10 Q.   And that's from you?

11 **A.**   Yes.

12 Q.   And now we're in July 2017, approximately a year after

13 you found out about the crackdown.  Now -- and you're

14 forwarding him an e-mail that has in the subject line in all

15 caps:  "Urgent:  Saavoy Status Please Read."

16           Can you explain to the jury what Saavoy is?

17 **A.**   Saavoy was a list -- like I talked about, that you could

18 get a list -- rent a list from.  Saavoy was a place that

19 that's what they did.  They managed hundreds of thousands of

20 lists for different things, for different mailings.

21 Q.   You're sending this information to Mario Castro as an

22 FYI, for your information?

23 **A.**   Yes.

24 Q.   That's what it says.

25           And then this e-mail at the -- just underneath that,

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    that's from somebody named Jill Baer Castellano at Saavoy --

2    **A.**    Yes.

3    Q.    -- do you see that?

4           Who is she?

5    **A.**    She is the lady that I dealt with over all the years of

6    doing the mailings as far as renting lists from.

7    Q.    So she rented lists to you and Mario Castro to use?

8    **A.**    Yeah.

9    Q.    It says:  Dear valued Saavoy clients, it is no secret

10   there has been much government scrutiny of your industry of

11   late.

12          Do you understand what she's talking about here?

13   **A.**    Yes.

14   Q.    What is she talking about there?

15   **A.**    She's talking about that -- that same notice that Andrea

16   had sent.  That's what she's talking about.

17   Q.    Nationwide crackdown?

18   **A.**    Yes.

19   Q.    I'm going a couple paragraphs down where it starts,

20   "Accordingly, we have come to the conclusion that effective

21   immediately we will simply no longer be able to process any

22   brokerage or management orders" -- and then she lists the

23   kinds that she can't accept anymore.  It says sweepstakes,

24   sweepstakes reports.  Do you see that?

25   **A.**    Yes.

 1    Q.   What did that mean to you?

 2    **A.**   That mean -- this meant that there would be -- there

 3    would be no more renting of outside lists.

 4    Q.   And, you know, again, it's signed by Jill Baer

 5    Castellano.  Do you -- do you know if any law enforcement

 6    action has been taken against her?  Have you heard anything

 7    about that?

 8    **A.**   I had heard that they were -- had been completely shut

 9    down.

10    Q.   And what did this mean for the fraud scheme that you and

11    the four defendants were operating?

12    **A.**   It was done.  If you couldn't get new names -- which is

13    where we got the new names from, was from renting outside

14    lists -- it was done because there would be no more coming in.

15    You couldn't just keep mailing and mailing and mailing to the

16    names that you had anymore.  It was too much.  It was -- it

17    would be worthless.

18    Q.   Did you and Mario Castro talk about it?

19    **A.**   Yes.

20    Q.   What did you talk about?

21    **A.**   What to -- what -- what to do next.

22    Q.   Did you decide on anything?

23    **A.**   When this -- we had talked about possibly -- and before

24    this came out, we had a puzzle one -- a puzzle promotion in

25    the works to go out and -- but then it wasn't that long and it

1    was completely -- I was -- I was served the -- with -- my

2    house was raided.  So there was still stuff.  Just didn't

3    really know what we're going to do.

4    Q.  Did you talk about whether you should stop?

5    **A.**  Yes.

6    Q.  Did you stop?

7    **A.**  No.  At the time we just kept doing the small mailings to

8    the house names.

9    Q.  And did you and the four defendants just keep on going

10   right up until the raid that you just talked about?

11   **A.**  Yes.

12   Q.  And that was in 2018.  That's maybe about seven months

13   later?

14   **A.**  Yes.

15   Q.  You mentioned somebody named Glen Burke?

16            **THE COURT:**  Mr. Finley, is this a good place to stop

17   for a morning break?

18            **MR. FINLEY:**  It is, Your Honor.

19            **THE COURT:**  Are you going into a new area with a

20   different person?

21            **MR. FINLEY:**  Yes.

22            **THE COURT:**  All right.  Let's go ahead and take our

23   morning break.  I do remind the jury that you are not to

24   discuss this case with anyone nor permit anyone to discuss it

25   with you.  Remember, you are required to report it to the

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    Court if you overhear anything about the case.  Remember you

2    are not to speak to the attorneys or the parties that are

3    witnesses at all about anything.  Please do not read or listen

4    to anything that touches upon this case in any way or perform

5    any research or any independent investigation.  If you have a

6    question, write it down and let us know.  And please do not

7    form any opinion.

8            We'll go ahead and stand for the jury as they are the

9    judge of the facts so they can go ahead and have their break.

10   It's 10:30.  We'll be back at 10:45?  10:50?

11           **MR. FINLEY:**  Yes, Your Honor.  And --

12           **THE COURT:**  Because you have someone --

13           **MR. FINLEY:**  -- we're going to call a witness out of

14   order at that time.

15           **THE COURT:**  Is she or he here?

16           **MR. FINLEY:**  He.  Yes.

17           **THE COURT:**  He.  He.  Okay.  So let's say 10:45, if

18   possible.  We'll begin again with a different witness that

19   we're calling out of order.  And then Ms. Kern again, I think,

20   in the afternoon.  Is that the plan?

21           **MR. FINLEY:**  That's right.

22           **THE COURT:**  Okay.  So we'll have a little -- a little

23   bit of change.  But we'll just expect you back here at 10:45.

24   Go ahead and stretch.

25           Ms. Kern, we'll have you back here at 1:00 p.m.  So

*Patti Kern - Cont. Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    after the jury exits, then you may also step down.

2        *(Jury out at 10:27 a.m.)*

3        **THE COURT:**  Take your lunch break and then come back

4    at 1:00 p.m.

5        Okay.  And we're still on the record outside the

6    presence of the jury.  I just want to clarify that for

7    Mr. Mario Castro, that Mr. Tanasi is going to be here for the

8    next witness, and I understand that this is a witness that

9    Mr. Tanasi is prepared to cross-examine.  And Mr. Tomsheck is

10   going to step out during this witness but will be back when

11   Ms. Kern begins again because this is -- because Ms. Kern is

12   Mr. Tomsheck's witness that he's prepared to cross-examine.

13       So I just want to make sure on the record,

14   Mr. Castro, that you're okay with that arrangement that

15   they've come up with?

16       **MARIO CASTRO:**  Yes.

17       **THE COURT:**  All right.  So you don't mind that

18   Mr. Tomsheck is going to miss the testimony of the next

19   witness?

20       **MARIO CASTRO:**  I don't mind.

21       **THE COURT:**  And I wish I knew the name because I

22   can't make a good record.  But what is the name of the next

23   witness?

24       **MR. FINLEY:**  Joseph Miskovich.

25       **THE COURT:**  Okay.  So Joseph Miskovich is going to be

 1    testifying next, and you're all right with Mr. Tomsheck not

 2    being here?

 3             **MARIO CASTRO:**  Yes, I am.

 4             **THE COURT:**  Okay.  Thank you, sir.

 5             All right.  We'll be back about 10:45 or so.

 6        *(Recess at 10:28 a.m., until 10:54 a.m.)*

 7             **THE COURT:**  Thank you.  You may be seated.

 8             So I understand the next witness is in a wheelchair,

 9    and we did do a dry run to make sure that we can get him to

10    the witness chair.  And so we're all good to go?  I don't want

11    to make him feel uncomfortable in front of the jury if there's

12    any problem getting him up on the witness chair.

13             **MS. CHANG:**  Thank you, Your Honor.  The Government

14    would just make a request that perhaps before the jury is

15    called, if our witness could have a head start in making his

16    way toward the witness stand?  It might take some time for him

17    to actually make it there.  So --

18             **THE COURT:**  Okay.

19             **MS. CHANG:**  -- in the interest of time.

20             **THE COURT:**  All right.  So do you want me -- well,

21    I'll welcome back in the jury because it takes them awhile to

22    get in anyway and then have him come in at the same time?

23             **MS. CHANG:**  Yes, please.  Thank you.

24             **THE COURT:**  All right.  So let's do that.

25             **COURTROOM ADMINISTRATOR:**  All rise.

*Joe Miskovich - Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

 1          *(Jury in at 10:56 a.m.)*

 2              **THE COURT:**  Please watch your step, sir, coming up.

 3     The step's right there.  Come around and you're going to be

 4     seated right here to my left.  More steps.  Go ahead and

 5     remaining for a moment.

 6          *(The witness is sworn.)*

 7              **THE WITNESS:**  Yes.

 8              **THE COURT:**  I'm sorry.  Can we do that again?

 9              **THE WITNESS:**  Yes.

10              **COURTROOM ADMINISTRATOR:**  Okay.  Thank you.

11     Please --

12              **THE COURT:**  Can we have him -- the witness do that

13     again?  And could you raise your right hand, sir, while you --

14     while we administer the oath?  Thank you.

15          *(The witness is sworn.)*

16              **THE WITNESS:**  Yes.

17              **COURTROOM ADMINISTRATOR:**  Thank you.  Please take a

18     seat.

19              And for the record, please state and spell your name.

20              **THE WITNESS:**  Joe, J-o-e; Miskovich,

21     M-i-s-k-o-v-i-c-h.

22              **COURTROOM ADMINISTRATOR:**  Thank you.

23                        **DIRECT EXAMINATION**

24     **BY MS. CHANG:**

25     Q.   Good morning, sir.

*Joe Miskovich - Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    **A.**    Good morning.

2    Q.    How old are you?

3    **A.**    79, 78.

4    Q.    What is your current occupation?

5    **A.**    Retired.

6    Q.    Can you tell the jury what you did for work before you

7    retired?

8    **A.**    Worked for the Federal Government as a hearing assistant.

9    Also, before that, went to social security -- I'm sorry, the

10   Immigration Service, Charlotte, North Carolina.

11   Q.    What --

12   **A.**    Transferred to the social security hearing appeals office

13   in Greensboro, North Carolina.

14   Q.    Thank you.

15         What city and state do you live in?

16   **A.**    Present time, Greensboro, North Carolina.

17   Q.    Between 2015 and 2017, what address did you live at?

18   **A.**    5424 Dobson, D-o-b-s-o-n, Road, Greensboro, North

19   Carolina 27410, dash --

20        *(Reporter clarification.)*

21   **BY MS. CHANG:**

22   Q.    Would you mind restating the ZIP code, please?

23   **A.**    27410.

24   Q.    Thank you.

25         I'd like for us to talk a little bit about cash prize

*Joe Miskovich - Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    notices.  Have you received cash prize notices in the mail

2    before?

3    **A.**    Yes.

4    Q.    From 2015 to 2017, what address were those prize notices

5    sent to?

6    **A.**    5425 Dobson, D-o-b-s-o-n, Road, Greensboro, North

7    Carolina 27410-5 -- [indiscernible] that was added recently.

8    Q.    Sir, there should be two binders in front of you, and if

9    you could please open the smaller binder?  It's labeled trial

10   exhibits on the front.  And if you could look at the documents

11   behind Tabs 8 and 9?  And these have been previously admitted

12   into evidence as Government Exhibits 8 and 9.

13          **MS. CHANG:**  And if I could have Exhibits 8 and 9

14   published to the jury as well?

15          **THE COURT:**  8 and 9 are admitted and may be published

16   to the jury.

17          I forgot to ask you, Ms. Chang, for this witness,

18   Mr. Joe Miskovich, which counts are they -- is -- will his

19   testimony be related to?

20          **MS. CHANG:**  Yes, Your Honor.  They'll be related to

21   Counts 2 and 3 of the indictment.

22          **THE COURT:**  Thank you very much.

23          All right.  So Exhibits 8 and 9 are admitted and may

24   be published.

25   **BY MS. CHANG:**

*Joe Miskovich - Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    Q.   Sir, who are these notices addressed to?

2    **A.**   Oh.  My name and address.

3    Q.   Based on prize notices like this, did you think you had

4    won anything?

5    **A.**   Oh yes.  It said I had.

6    Q.   What did you think you had won?

7    **A.**   Okay.  On some of them a brand-new car.  You have won a

8    brand-new car -- well, most of the prize things around the

9    country.  I mean, in my opinion somebody wins the prize, so I

10   thought I had won.

11   Q.   In the case of prize notifications, did you think you

12   would win money?

13   **A.**   Yeah, some of them were very large amounts.

14   Q.   After you got these prize notices, did you do anything

15   with them?

16   **A.**   Yes.  I filled out the form and attached $20 checks and

17   sent them back in.

18   Q.   I'd like to direct your attention to the screen in front

19   of you to your left, and I will focus on Exhibit Number 9.

20   **A.**   Yes, I see it.

21   Q.   Excuse me.  To the right.

22   **A.**   Okay.  I see it.

23   Q.   In addition to the printed text, there's handwriting at

24   the top of the page in cursive that appears to say:  Last try.

25   Never got anything back from you.

*Joe Miskovich - Direct*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1  **A.**   Well, yes.

2  **Q.**   Do you recognize that handwriting?

3  **A.**   Yes, I do.  It's mine.

4  **Q.**   At the bottom of the page, there's a signature.  Whose

5  signature is that?

6  **A.**   That's my signature.

7  **Q.**   There's also handwriting in cursive underneath the

8  signature that appears to say, "Cash enclosed."

9           Whose handwriting is that?

10 **A.**   It's mine.

11 **Q.**   You told us earlier that you believed you'd had won

12 something based off of these notices.

13 **A.**   Yes.

14 **Q.**   Why did you think that you had won a prize?

15 **A.**   Why did I -- ma'am, could you repeat that?

16 **Q.**   Yes, sir.

17          Can you explain for us why you thought you had won?

18 **A.**   Well, it plainly said I had.

19 **Q.**   What did you think you had to do in order to claim your

20 prize?

21 **A.**   Submit $20 and the form back to an address of a

22 corporation.

23 **Q.**   You said you had sent in money.  What types of payment

24 did you send in response?

25 **A.**   A check and a few times cash, just a 20-dollar bill, and

1    a form.

2    Q.    Do you remember what percentage of the money you sent in

3    cash versus check?

4    **A.**    Very little cash.  Very little.  Most of them was by

5    check I would say.  We -- all right.  Okay.

6    Q.    I'm now going to ask that you look behind Tabs 28, 28A

7    and B at the back of the binder.  And these documents have

8    been previously admitted into evidence as Government's

9    Exhibits 28, 28A, and 28B.

10            **MS. CHANG:**  If I may have Exhibits 28A and B

11    published to the jury as well?

12            **THE WITNESS:**  I'm sorry, honey.  I didn't understand.

13    **BY MS. CHANG:**

14    Q.    Just let me know when you're finished reviewing the

15    documents behind Tabs 28, 28A, and 28B.

16    **A.**    Yes.

17    Q.    Can you tell the jury what these documents are?

18    **A.**    Well, 28A is a check that I wrote to a corporation called

19    Special Money Managing -- Special Money, Incorporated, $20.

20    Q.    Thank you.

21            And can you tell us who signed these checks?

22    **A.**    I did, my signature.

23    Q.    What were these checks for?

24    **A.**    A prize.

25    Q.    After you wrote out these checks, what did you do with

1    them?

2    **A.**    Put them in the mail to the corporation.

3    Q.    Did you stop responding to prize notices at a certain

4    point?

5    **A.**    Yes.

6    Q.    Why did you stop?

7    **A.**    My family decided that -- they just kept -- my family --

8    by that I mean my wife, my son, to help my family.  Just, you

9    know -- hey, you know, you -- said stop.  Sending off too much

10    money for nothing.

11    Q.    Do you remember how many times you sent in money before

12    you stopped?

13    **A.**    40?  60?  I -- 80?

14    Q.    Thank you.

15            If I could pull up Government Exhibit 8.  At the

16    lower left-hand corner of Exhibit 8 there appears to be some

17    handwriting.  Whose handwriting is that?

18    **A.**    Yes.  That's mine.

19    Q.    As a final question, did you ever win a large cash prize?

20    **A.**    No, unfortunately.

21    Q.    Thank you.

22            **MS. CHANG:**  No further questions.

23    **BY MS. CHANG:**

24    Q.    Sir, did you serve in the military?

25    **A.**    Yes, I did.  Yes.

*Joe Miskovich - Cross*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    Q.   Were you a military veteran?

2    **A.**   Yes, I am.

3    Q.   Thank you.

4         **MS. CHANG:**  No further questions.

5         **THE COURT:**  Any cross, Mr. Tanasi?

6         **MR. TANASI:**  I have no questions, Your Honor.

7         Thank you for your service.

8         **THE COURT:**  Mr. Gaffney?

9         **MR. GAFFNEY:**  No, Your Honor.

10        **THE COURT:**  Mr. Brown?

11        **MR. BROWN:**  Thank you.  No questions, Your Honor.

12        **THE COURT:**  And Mr. Green?

13        **MR. GREEN:**  Yes, Your Honor.  Please.

14        **THE COURT:**  Go ahead, sir.

15        **MR. GREEN:**  Thank you.

16                       **CROSS-EXAMINATION**

17   BY MR. GREEN:

18   Q.   Good morning, Mr. Miskovich.  How are you, sir?

19   **A.**   Fine.

20   Q.   Okay.  Thank you.

21   **A.**   Thank you.  How are you?

22   Q.   Are we ready to go?

23   **A.**   Yes, sir.

24   Q.   Okay.  Thank you.

25        Mr. Miskovich, you were shown a few minutes ago

1    Government's Exhibit 28.

2          **MR. GREEN:**  May we look at Government's Exhibit 28,

3    page 2?  May that be put on the screen, Your Honor?

4          **THE COURT:**  Yes.

5          **MR. GREEN:**  There we go.

6    **BY MR. GREEN:**

7    Q.   Do you -- Mr. Miskovich, do you see what appears to be

8    page 2 of a number of pages, and that looks like the back of a

9    check?

10   **A.**   Shown on the screen here.

11   Q.   Yes, sir.

12   **A.**   Yes, sir.

13   Q.   And if we could look at page -- excuse me,

14   Government's Exhibit 28, page 1.  That's the front of the

15   check.  That's the check that you wrote to Golden Products?

16   **A.**   Yes, sir.

17   Q.   Now, page 2 again, if we could turn to that, 28-2.

18          Does it appear as if the check had been deposited?

19   **A.**   Well, it says Bank of --

20          *(Reporter instruction.)*

21          **THE WITNESS:**  Yes, it does.  It says -- oh.  Here it

22   is.  Bank of -- no.  It's Bank of America.  By Bank of

23   America.

24   **BY MR. GREEN:**

25   Q.   Date it was deposited looks like?

*Joe Miskovich - Cross*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    **A.**    Date?  July 23rd of '15.

2    Q.    Okay.  That would be fine.

3         **MR. GREEN:**  Okay.  May we put on the screen

4    Government's Exhibit 9?  And could we zoom in to the top half

5    right below the handwriting or right where the handwriting is?

6    Could we zoom in there, please?

7    **BY MR. GREEN:**

8    Q.    All right.  Mr. Miskovich, on Government's Exhibit 9, do

9    you see a "Name Number 1"?

10   **A.**    Yes, sir.

11   Q.    Whose name is that, if you recognize it?

12   **A.**    It's me.  Mine.

13   Q.    Say what the name is?  We're making a record here, sir.

14   If you don't mind, please say what the name is.

15   **A.**    Joe Miskovich.

16   Q.    And after that, there's some initials?

17   **A.**    It just says, comma, NC.

18   Q.    Does it look like NC, North Carolina maybe?

19   **A.**    Yes, sir.  I would say so.

20   Q.    And over on the right, is that -- is that your name, Joe

21   Miskovich?

22   **A.**    I don't see that on the right, sir.

23   Q.    Okay.  You see where it says "Name Number 1"?  That's

24   your name, Joe Miskovich?

25   **A.**    Yes.

1   Q.   Okay.  To the right of that, is there a check mark that

2   says confirmed prize?

3   **A.**   Yes, it does.

4   Q.   And read what that says about the confirmed prize.

5   **A.**   Oh.  Confirmed prizes over -- well, maybe it would be

6   $3,341,006 and no cents.

7   Q.   And over on the right, is there a check mark where it

8   says collected and uncollected?

9   **A.**   Yes, sir, I see that.

10  Q.   Which is checked off, collected or uncollected?

11  **A.**   Uncollected.

12  Q.   Thank you.

13        **MR. GREEN:**  May we have Government's Exhibit 93,

14  page 4 put on the screen?  93, page 4.

15        Okay.  Page 4.  Can we zoom in on that area right

16  before the -- right below the handwriting?  Right there.

17  **BY MR. GREEN:**

18  Q.   Now, sir, on that document it looks like something that

19  was like the prize notification that you got,

20  Government's Exhibit 28 -- or, excuse me,

21  Government's Exhibit 9?

22  **A.**   Are you -- are you talking to me?

23  Q.   Yes, sir.  I am.  Does it look very similar?

24  **A.**   Yes, sir.

25  Q.   Do you see where it says "Name Number 1"?

Joe Miskovich - Cross
2:19-cr-00295-GMN-NJK - March 28, 2023

1    **A.**    Yes, sir.

2    Q.    What is that name?

3    **A.**    Okay.  Patti Kern.

4    Q.    Over on the right of that name, does it show a prize

5    amount?

6    **A.**    Yes, sir.

7    Q.    What is that prize amount?

8    **A.**    Confirmed prize is over $3,341,006 and no cents.

9    Q.    Is there a reference to that prize collected or

10   uncollected?

11        **THE COURT:**  I'm just gonna -- I'm sorry.  Let me --

12   is this something that was sent to him or someone else?  What

13   is his basis to testify about this particular --

14        **MR. GREEN:**  It's the identical exhibit just without

15   the markings of Mr. Miskovich.

16        **THE COURT:**  So he didn't receive it?  He's never seen

17   this before today?

18   **BY MR. GREEN:**

19   Q.    You haven't seen this before today, Mr. Miskovich?

20   **A.**    This one here?

21   Q.    Yes.

22   **A.**    As far as -- no, sir.  I don't think.

23   Q.    This is -- this is in evidence.  Is that the same amount,

24   that 3 million-and-change?

25   **A.**    I believe it is.

*Joe Miskovich - Cross*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    Q.    And over on the right, does it say collected or

2    uncollected as to the name Patti Kern?

3    **A.**    Uncollected is checked --

4    Q.    Thank you.

5    **A.**    -- by someone.

6    Q.    Thank you.

7              **MR. GREEN:**  No further questions.

8              **THE COURT:**  Ms. Chang, any redirect?

9              **MS. CHANG:**  No, Your Honor.  Thank you.

10             **THE COURT:**  All right.  At this time if any members

11   of the jury have a question for our witness, Mr. Miskovich,

12   please go ahead and write it down on the form provided.  Take

13   your time.  Write neatly.  If you have more than one question,

14   skip a line or number the questions.  And when you're all

15   done, fold the piece of paper in half and pass it in the

16   direction of our courtroom deputy, Nick, to collect them.

17   Remember, these are anonymous questions so don't give us your

18   name or initials or jury number.

19             **COURTROOM ADMINISTRATOR:**  Judge, we have two

20   questions, and we start at Number 47.

21             **THE COURT:**  All right.  Counsel, please join me at

22   sidebar.

23       *(At sidebar on the record.)*

24             **THE COURT:**  So we have two jury notes.  The first one

25   is Jury Note Number 47, asks:  How much money did you lose

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Page 74*

*Joe Miskovich - Questions by the Jury*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1   total sending these checks?

2           Any objection?

3           **MS. CHANG:**  No, Your Honor.

4           **MR. TANASI:**  No objection.

5           **MR. BROWN:**  No objection.

6           **THE COURT:**  All right.  Jury Note Number 48 asks one

7   question:  What makes you think this is real?

8           Any objection?

9           **MS. CHANG:**  No, Your Honor.

10          **MR. BROWN:**  No objection.

11          **MR. GAFFNEY:**  No, Your Honor.

12          **THE COURT:**  Thank you.

13      *(End of discussion at sidebar.)*

14                   **QUESTIONS BY THE JURY**

15          **THE COURT:**  All right.  Mr. Miskovich, I have two

16  jury questions for you.  I'm going to read them into the

17  record.  But when you answer, go ahead, sir, turn and face the

18  jury because these are really jury questions, not mine.

19          Jury Note 47 asks one question:  How much money did

20  you lose total sending these checks?

21          **THE WITNESS:**  $1,200, maybe $1,300?  In that area.

22  Not a terrible large...

23          **THE COURT:**  All right.  And then Jury Note

24  Number 48 --

25          **THE WITNESS:**  They didn't ask about cash, so I don't

1    know what --

2            **THE COURT:**  All right.  Well, no, how much money

3    total?  I think that is the question.  How much money total?

4    So that includes cash, checks, money orders, anything like

5    that.

6            **THE WITNESS:**  $1,400, $1,500 maybe at the top.

7            **THE COURT:**  You can go ahead and tell the jury that.

8            **THE WITNESS:**  $1,400, $1,500 at the top, yeah.

9            **THE COURT:**  All right.  And then Jury Note Number 48

10   is in reference to I think it's Exhibits 8 and 9, if we want

11   to put those up there for him.

12           The jury question is:  What makes you think this is

13   real?  And I think the "this" is referring to 8 and 9; is that

14   right?

15           **MS. CHANG:**  I believe so, Your Honor.

16           **THE COURT:**  All right.  So you can go ahead and look

17   on your screen there.

18           **THE WITNESS:**  Could you repeat the question,

19   Your Honor?

20           **THE COURT:**  Yes.  What about those documents that you

21   received made you think that this was real?

22           **THE WITNESS:**  Well, I did write at the bottom, okay,

23   here is my cash, where is my prize?

24           Yes, I thought I had won something.  Is that

25   satisfactory?

*Joe Miskovich - Redirect*
*2:19-cr-00295-GMN-NJK - March 28, 2023*

1    **THE COURT:**  Are there any particular words?  I'm not

2    the jury, so...

3    **THE WITNESS:**  I'm sorry?

4    **THE COURT:**  I think I'll just ask Ms. Chang if you

5    have any follow-up questions for him.

6    **MS. CHANG:**  Yes, Your Honor, briefly.

7    **THE COURT:**  Go ahead.

8    **REDIRECT EXAMINATION**

9    BY MS. CHANG:

10   Q.   Sir, you gave an estimate of about $1,400 and $1,500 in

11   loss.  Do you remember every different organization that you

12   sent money to?

13   A.   Different corporations, names of different corporations,

14   companies, corporations.

15   Q.   Is your estimate of loss based on collectively where you

16   sent out money to?

17   A.   Yes, that's correct.  You all seem to have -- all of them

18   are here apparently.

19   Q.   And one final question.  Based off of these prize

20   notices, was there anything specifically to make you believe

21   that you had won something?

22   A.   Well, it stated I had, so...

23   Q.   If we could zoom up on Exhibit 8 to the right side.

24   There are three small boxes.  And if I may direct your

25   attention to Americans for Award Promotion re and then a

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Page 77*

1    number.  Based off of this, did you believe you had won

2    something?

3    **A.**   Yes.

4    Q.   What did you think you had won?

5    **A.**   The award.

6    Q.   On Exhibit 9, if I could direct your attention to right

7    underneath your handwriting, "Name Number 1, Joe Miskovich,"

8    and to the right a checked box stating "confirmed prizes over"

9    and a number.

10           Based off of this, what did you think you had won?

11   **A.**   The prize amount.

12   Q.   And what is that prize amount?

13   **A.**   $3,341,006 and no cents.

14   Q.   Thank you.

15           **MS. CHANG:**  Nothing further.

16           **THE COURT:**  Any follow up, Mr. Tanasi?

17           **MR. TANASI:**  No, Your Honor.  Thank you.

18           **THE COURT:**  Mr. Brown, any follow up?

19           **MR. BROWN:**  Thank you.  No, Your Honor.

20           **THE COURT:**  Mr. Gaffney?

21           **MR. GAFFNEY:**  No, Your Honor.

22           **THE COURT:**  And Mr. Green, any follow up?

23           **MR. GREEN:**  No follow up.  Thank you, Your Honor.

24           **THE COURT:**  All right.  Thank you, Mr. Miskovich.

25   This completes your testimony today, so you are excused.

2:19-cr-00295-GMN-NJK - March 28, 2023

1    Thank you for coming in.  Please be very careful on the way

2    down with the steps.  And more steps.

3            All right.  So we have Ms. Kern coming back at

4    1:00 o'clock; is that right?

5            **MR. FINLEY:**  Yes, Your Honor.

6            **THE COURT:**  All right.  So let's go ahead and take

7    our lunch now, and then we'll reconvene at 1:00 o'clock.

8            I remind the jury, during this time if you do

9    decide -- because we have a little extra time -- to go for a

10   walk, just please be careful to make sure that you wear your

11   jury lanyard outside as you're walking around so that people

12   can see you and are aware that they're not supposed to talk to

13   you about a case.  Remember, you are not to discuss this case

14   with anyone, not even with your fellow jurors.  And remember

15   you're not allowed to talk to the attorneys, the witnesses,

16   the parties in any way at all about anything.  Do not read or

17   listen to or view anything that touches upon the case in any

18   way or perform any investigation or research about the case.

19   And please do not form any opinion yet.  You will hear more

20   testimony.  You'll receive more evidence.  Then I will give

21   you the written jury instructions.  After that, you will hear

22   closing arguments from all the different attorneys, and then

23   you can start deliberating and talking to each other about the

24   case and forming opinions.

25           So let's go ahead and stand for the jury, and we'll

1    welcome you back at 1:00 p.m.

2         *(Jury out at 11:24 a.m.)*

3         **THE COURT:**  All right.  So we're still on the record

4    outside the presence of the jury.  Since we got a few minutes

5    left, I thought it might be helpful to let you know I did

6    review the operation plans in camera that were provided by the

7    Government.  I do think that they fit squarely into the

8    Rule 16(a)(2) information discovery that is not subject to

9    disclosure.  The information is very much for the purpose of

10   the internal investigation and the execution of the search

11   warrant in a safe way with backup information in case there is

12   unforeseen trouble in the sense of safety.

13        So to give you an example, it has maps, maps of where

14   they're meeting, maps of where the -- where the execution of

15   the search warrant is going to be, what is the nearest

16   hospital with a trauma unit, what is the phone number, what is

17   a map route of how to get there, also for what is the nearest

18   location of a police department.  In some cases it's a

19   Henderson local police department.  Sometimes it's the

20   metropolitan Las Vegas police department.  What are the phone

21   numbers, what is it the route to take.  So these are -- safety

22   information.  There's also information about hand signs to use

23   when audible information cannot be provided to each other

24   about what's going on.  So it's -- it's very much for the

25   safety of the officers to be able to communicate with each

1    other and to promptly resolve things if problems do arise, if

2    there is an injury and so forth.

3         I didn't see anything in there that would be *Brady*

4    information or exculpatory in any way.  So I -- I don't think

5    that it needs to be provided.  There is a list of the

6    individuals who are on each of the teams and what their

7    assignment is.  So who's taking photographs, who's doing

8    interviews, who's on the entry -- like, making entry team, and

9    things like that.  But I don't see that any of that is

10   discoverable.

11        So I'm going to deny the motion to -- to order the

12   Government to provide the operation plans.  I don't see

13   anything in there that doesn't fit neatly into the 16(a)(2)

14   and nothing that has since become discoverable because of

15   something in the case that has made something otherwise not

16   discoverable into discoverable.  I mean, if there actually had

17   been a shooting -- God forbid, but if there had been a

18   shooting and they went to the wrong hospital and then

19   something happened, you know, that was not the hospital you're

20   supposed to go to, things like that.  You know?  And because

21   you went to the wrong hospital, that it took longer and there

22   was some miscommunication -- if it was that kind of a case,

23   then I could see where it might be relevant.  But I didn't see

24   any information in there that was relevant to this case that

25   could be exculpatory information.

1          **MR. ERICSSON:**  Your Honor?

2          **THE COURT:**  Yes.

3          **MR. ERICSSON:**  I would ask, was there any information

4    about directions about the -- the interrogations or the -- the

5    questioning of witnesses?

6          **THE COURT:**  No.

7          **MR. ERICSSON:**  Thank you.

8          **MR. GREEN:**  Your Honor, understanding the Court's

9    ruling, would the Court entertain a motion to have those items

10   as court exhibits under seal for possible appellate and/or

11   post-conviction review?

12          **THE COURT:**  I don't mind putting them under the --

13   oh.  What is it called now, Nick?  SSI?  Is that what it is?

14   We have a sensitive documents location in the -- the court

15   Clerk's Office, and so I could place them in there for in

16   camera review by the appellate court.

17          **MR. GREEN:**  Thank you so much, Your Honor.

18          **THE COURT:**  Okay.

19          **MR. TANASI:**  Your Honor, if I may?

20          **THE COURT:**  Yes.

21          **MR. TANASI:**  There was one other request in that

22   motion, and it might be premature to get to it because it

23   related to a jury instruction and we're not yet settling

24   those.  Would Your Honor just reserve the ruling on that until

25   we get to the jury instruction component --

1          **THE COURT:**  Yes.  Yes.

2          **MR. TANASI:**  Okay.

3          **THE COURT:**  That was asked in Ms. Kern's testimony

4     regarding -- I can't remember now what the exhibit is.  23?

5     One of the exhibit -- 53?

6          **MR. TANASI:**  253.

7          **THE COURT:**  253.  Yes.

8          **MR. TANASI:**  Okay.  Thank you.

9          **THE COURT:**  Okay.  So if there isn't anything -- we

10    do have half an hour.  So if there is something else that you

11    expect is going to come up with either Ms. Kern on direct or

12    cross or any other scheduling issues that you want to discuss,

13    we've got a little bit of time to do that now.  No?  Okay.

14          Everybody's hungry.  Okay.  All right.  Go and enjoy

15    your lunch, and please plan to be back here by 1:00 o'clock.

16        *(Lunch recess at 11:30 a.m.)*

17                         --o0o--

18               COURT REPORTER'S CERTIFICATE

19        I, AMBER M. McCLANE, Official Court Reporter, United
      States District Court, District of Nevada, Las Vegas, Nevada,
20    do hereby certify that pursuant to 28 U.S.C. § 753 the
      foregoing is a true, complete, and correct transcript of the
21    proceedings had in connection with the above-entitled matter.
      DATED:  3/28/2023

22

23        /s/ *Amber M. McClane*
      _____
24         AMBER McCLANE, RPR, CRR, CCR #914

25