*2:19-cr-00295-GMN-NJK - March 29, 2023*

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEVADA

 3   UNITED STATES OF AMERICA,    )
                                  ) Case No. 2:19-cr-00295-GMN-NJK
 4              Plaintiff,        )
                                  ) Las Vegas, Nevada
 5   vs.                          ) March 29, 2023
                                  ) 9:08 a.m. - 12:00 p.m.
 6   MARIO CASTRO, SALVADOR       ) Courtroom 7D
     CASTRO, MIGUEL CASTRO, and   ) JURY TRIAL, DAY 7,
 7   JOSE LUIS MENDEZ,            ) AM SESSION
                                  )
 8              Defendants.       )
     _____) C E R T I F I E D   C O P Y

 9

10             REPORTER'S TRANSCRIPT OF JURY TRIAL,
                      DAY 7, AM SESSION
11           BEFORE THE HONORABLE GLORIA M. NAVARRO
               UNITED STATES DISTRICT COURT JUDGE
12

13   APPEARANCES:

14   For the Government:    TIMOTHY T. FINLEY, ESQ.
                            DANIEL E. ZYTNICK, ESQ.
15                          U.S. Department of Justice
                            950 Pennsylvania Avenue, N.W.
16                          Washington, D.C. 20530
                            (202) 307-0050
17

18

19   (Appearances continued on pages 2 and 3.)

20

21   Court Reporter:       Amber M. McClane, RPR, CRR, CCR #914
                            United States District Court
22                          333 Las Vegas Boulevard South, Room 1334
                            Las Vegas, Nevada 89101
23                          (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25
```

2:19-cr-00295-GMN-NJK - March 29, 2023

```
 1    APPEARANCES CONTINUED:

 2    For the Government (Cont.):

 3         MINA CHANG, AUSA
           UNITED STATES ATTORNEY'S OFFICE
 4         501 Las Vegas Boulevard South, Suite 1100
           Las Vegas, Nevada 89101
 5         (702) 388-6336

 6

 7    For Defendant Mario Castro:

 8         JOSHUA L. TOMSHECK, ESQ.
           HOFLAND & TOMSHECK
 9         228 South Fourth Street, First Floor
           Las Vegas, Nevada 89101
10         (702) 895-6760

11    -AND-

12         RICHARD E. TANASI, ESQ.
           TANASI LAW OFFICES
13         8716 Spanish Ridge Avenue, Suite 105
           Las Vegas, Nevada 89148
14         (702) 906-2411

15

16    For Defendant Salvador Castro:

17         DONALD J. GREEN, ESQ.
           LAW OFFICES OF DONALD J. GREEN
18         4760 South Pecos Road, Suite 103
           Las Vegas, Nevada 89121
19         (702) 388-2047

20

21    / / / / /

22    / / / / /

23    / / / / /

24

25
```

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

```
 1    APPEARANCES CONTINUED:

 2    For Defendant Miguel Castro:

 3         LUCAS J. GAFFNEY, ESQ.
           GAFFNEY LAW
 4         9900 Covington Cross Drive, Suite 290
           Las Vegas, Nevada 89144
 5         (702) 742-2055

 6    -AND-

 7         THOMAS A. ERICSSON, ESQ.
           THOMAS A. ERICSSON, CHTD.
 8         9900 Covington Cross Drive, Suite 290
           Las Vegas, Nevada 89144
 9         (702) 878-2889

10    For Defendant Jose Luis Mendez:

11         WILLIAM H. BROWN, ESQ.
           CHRISTOPHER MISHLER, ESQ.
12         BROWN MISHLER, PLLC
           911 North Buffalo Drive, Suite 202
13         Las Vegas, Nevada 89128
           (702) 816-2200

14

15                        * * * * *

16                     I N D E X

17    Government's Witness:                        Page

18    PATTI KERN

19         Continued Cross-Examination by Mr. Tomsheck    8

20         Cross-Examination by Mr. Gaffney              31

21         Cross-Examination by Mr. Mishler             79

22         Cross-Examination by Mr. Green               93

23

24                        * * * * *

25
```

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

1          *I N D E X   C O N T I N U E D*

2                *E X H I B I T S*

3     EXHIBIT NO.:          OFFERED          RECEIVED

4     Defense 9042              7                8

5

6                          *  *  *  *  *

7

8

9

10    / / / / /

11    / / / / /

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          LAS VEGAS, NEVADA; WEDNESDAY, MARCH 29, 2023; 9:08 A.M.

 2                              --o0o--

 3                    P R O C E E D I N G S

 4          *(Outside the presence of the jury.)*

 5          **THE COURT:**  All right.  Thank you.  We have a jury

 6   note.  So I made copies for everybody, Nick, if you want to

 7   hand these -- I just -- one for the Government and one for

 8   each defendant.  They can make more copies if they want.

 9          I'll read it into the record so you-all can think

10   about it.  It's not for a particular witness.  It's just one

11   of those questions that I tell the jury, if you have a

12   question, don't look it up, don't research it; just write it

13   down, and we'll try to work it in so everybody has a chance to

14   respond to it.

15          So I think this is jury note -- the next number in

16   line would be 49, and it starts at the top.  It says:  Note to

17   Judge Navarro, and then lower in the body it says for

18   Government.  When Government seizes money and assets, what

19   happens to it?  So that's Number 1.  And then Question

20   Number 2 is:  Do you try to return it to victims?

21          So just think about that.  We don't need to talk

22   about it right now obviously because we don't have a witness

23   on the stand that we're going to ask about that, but you can

24   think about that, that juror has that question.

25          Mr. Mishler, you wanted to see me at sidebar.  Can we

1    bring one of the government attorneys over so it's not ex

2    parte?  Anyone else who wants to join us is fine, too.  I

3    think there's something...

4        (Sidebar held off the record.)

5        THE COURT:  All right.  We're back on the record.  I

6    think we've got that all straightened out, and we can bring in

7    our jury.  We have Ms. Kern ready.

8        MR. GREEN:  Your Honor?  We -- we have one matter

9    outside the presence, Your Honor.

10        THE COURT:  Oh, okay.

11        MR. GREEN:  Very brief.

12        THE COURT:  Yes.

13        MR. GREEN:  Donald Green on behalf of Salvador

14    Castro.  Please stand up.

15        Your Honor, we have previously asked for -- marked

16    for identification Castro Exhibits 7000 and 7004, both marked

17    for identification and shown to witnesses.  We are withdrawing

18    those exhibits, Your Honor.  We have filed a revised notice of

19    a single exhibit which we will use with the consent of the

20    defendant.

21        THE COURT:  And what is the number for the new

22    exhibit then?

23        MR. GREEN:  7027 already admitted into evidence.

24        THE COURT:  All right.  So 7027 is a compilation of

25    the prior 7000 and 7004.  So we only need one of the two, and

2:19-cr-00295-GMN-NJK - March 29, 2023

```
1    we're going to use 7007 [sic], and then --

2            MR. GREEN:  That is correct.

3            THE COURT:  -- the other two are withdrawn.

4            Any objection to that from the Government?

5            MR. ZYTNICK:  Is -- I thought 7027, isn't that the

6    photo of Ms. Kern?

7            MR. GREEN:  Yes.

8            MR. ZYTNICK:  Okay.  I just want to make sure.

9            MR. GREEN:  It's already admitted.  But, yes, Your

10   Honor.

11           MR. ZYTNICK:  Okay.  Then I don't think we have any

12   objection.

13           THE COURT:  Okay.  So 7007 and 7004 are withdrawn --

14           MR. GREEN:  That is correct, Your Honor.

15           THE COURT:  Okay.  Thank you.

16           MR. GREEN:  Thank you, ma'am.

17           MR. MISHLER:  And on that note, while we have it,

18   Nick wanted me to make sure that I moved to preadmit Defense

19   Exhibit 9042 --

20           THE COURT:  Okay.

21           MR. MISHLER:  -- which I believe the Government has

22   stipulated to.

23       (Defense Exhibit No. 9042, offered.)

24           THE COURT:  Okay.  Any objection to 9042?

25           MR. ZYTNICK:  No, Your Honor.
```

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

 1          **THE COURT:**  All right.  So 9042 is admitted.

 2          **MR. MISHLER:**  Thank you, Your Honor.

 3       *(Defense Exhibit No. 9042, received.)*

 4          **COURTROOM ADMINISTRATOR:**  We're all good with the

 5    exhibits now.

 6          **THE COURT:**  Yes.

 7       *(Jury in at 9:16 a.m.)*

 8          **THE COURT:**  All right.  Everyone may be seated.  We

 9    have the jurors all here, and we have the witness, Ms. Kern,

10    back on the witness stand.

11          I remind you, ma'am, you still are under oath.  And

12    we have cross-examination that started yesterday on behalf of

13    Defendant Mario Castro by Mr. Tomsheck.  So you may continue,

14    sir.

15          **MR. TOMSHECK:**  Thank you, Your Honor.

16                      **CROSS-EXAMINATION**

17    BY MR. TOMSHECK:

18    Q.   Welcome back, Patti.  I had just a few questions left

19    yesterday.  So I'm just going to wrap up today, and then some

20    other folks are gonna get a chance to ask you some questions.

21    Okay?

22    A.   Yes, sir.

23    Q.   All right.  When we left off yesterday -- it was a long

24    day, but I think we were talking about some e-mails that the

25    Government had asked you about on direct examination.  Do you

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    remember that?

2    **A.**   Yes.

3    Q.   Okay.

4          **MR. TOMSHECK:**   If you could, please, Brian, pull up

5    Government's Exhibit 161.

6    **BY MR. TOMSHECK:**

7    Q.   I'm going to talk to you about this particular exhibit,

8    but first I want to ask you:  In your preparation for your

9    testimony and your multiple conversations with the Government

10   and with the postal inspectors, did you ever have the

11   opportunity to review the search warrant that Inspector

12   Bouchie drafted?

13   **A.**   Yes.

14   Q.   There's been testimony in this trial that that -- that

15   search warrant was in excess of 90 pages.  It was a lengthy

16   document; right?

17   **A.**   Yes.

18   Q.   Okay.  So you're aware that in the eyes of the Government

19   in their investigation into, as you've put it, a conspiracy,

20   this was referred to as the Kern syndicate?

21   **A.**   No, I'm -- I was not aware of that.

22   Q.   Okay.  You told me just a minute ago that you saw the

23   search warrant?

24   **A.**   Yes.

25   Q.   Okay.  Did you see the affidavit about the search

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1   warrant?

2   **A.**   Probably, yes.

3   Q.   Okay.  Are you guessing, or do you just not know?

4   **A.**   It's been a long time as far as remembering what the

5   actual wording of it all said.

6   Q.   Okay.

7   **A.**   It was a lot of documents.

8   Q.   Okay.  Are you telling the jury that you don't know that

9   this case was referred to as the Kern syndicate?

10  **A.**   Correct, I did not know that.

11  Q.   Okay.  If there was other testimony about that, you

12  wouldn't dispute it, would you?

13  **A.**   No.

14  Q.   Okay.  And just to be clear, in the Kern syndicate you

15  would be the Kern; right?

16  **A.**   But there wasn't a Kern syndicate.

17  Q.   Okay.  It's your testimony it wasn't your syndicate?

18  **A.**   No, sir.

19  Q.   Okay.  You agree with me in your investigation -- or, I'm

20  sorry, in the investigation related to these events, the only

21  Kern, other than your husband when you put him name on stuff,

22  is you; right?

23  **A.**   Yes.

24  Q.   Okay.  I want to talk to you about Exhibit 161.  It's a

25  very brief e-mail.  It's from pk1726.  You told us yesterday

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Page 10*

1  that's you; right?

2  **A.**   Yes, sir.

3  Q.   And it's to nds52@cox.net.  Who's that?

4  **A.**   That is Steve Fennell who does all the data entry and

5  processing.

6  Q.   Okay.  And you said in that e-mail:  No worries, already

7  setting up elsewhere, I need to find out who belongs to a

8  particular ID number, they are a plant; right?

9  **A.**   Yes.

10  Q.   Okay.  In that e-mail you're sending direction to someone

11  who inputs data; right?

12  **A.**   Yes.

13  Q.   Okay.  And you're doing it because NSD got a C&D.  That's

14  the subject line; right?

15  **A.**   Yes.

16  Q.   NSD is one of the companies that you're responsible for?

17  **A.**   Yes.

18  Q.   Okay.  And they got a cease and desist; right?

19  **A.**   Yes.

20  Q.   And so you're telling the data person, hey, no worries,

21  I'm already pivoting and going somewhere else; right?

22  **A.**   Yes.

23  Q.   Okay.  You agree that you're informing someone that

24  you're taking action; right?

25  **A.**   Yes.

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1   Q.   You agree that that e-mail doesn't say anything along the

2   lines of, hey, my partners have advised me they're going

3   elsewhere; right?

4   **A.**   Correct.

5   Q.   And you're giving him direction related to a particular

6   person; right?

7   **A.**   Yes.

8   Q.   Okay.  If you could go to Government's Exhibit 173,

9   please.  Do you see that?

10  **A.**   Yes.

11  Q.   Okay.  That's a series of e-mails over the course of a

12  few days, a couple days, April 25th and April 26th of 2012.

13  Those purport to be e-mails from you to someone by the name of

14  Sean O'Connor; right?

15  **A.**   Correct.

16  Q.   And you know Sean O'Connor; right?

17  **A.**   Yes.

18  Q.   Worked with him a lot over the years; correct?

19  **A.**   Yes.

20  Q.   Okay.  In this e-mail you are discussing with Sean

21  O'Connor and you say, quote:  Damn.  None are the same.

22          Did I read that right at the top there on the first

23  one?  Can you read that?

24  **A.**   Yes.

25  Q.   Okay.  What does that mean?

1   **A.**    It means that none of the -- it means, like, that person

2   wasn't the same as somebody that was a plant or that they

3   didn't match.  Like, they were different names so it wasn't a

4   single person.

5   Q.    Okay.  What were you trying to investigate in these

6   e-mails?

7   **A.**    If there was, again, someone that was, like, set up to

8   get junk mail or sweepstakes and such and report it to the

9   postal authority.

10  Q.    Okay.  So to be clear, you're sending out what you know

11  to be fraud to rip off elderly and vulnerable people; right?

12  **A.**    Correct.

13  Q.    Okay.  You get in trouble for it in the form of the

14  Government says, hey, you got to stop this, I'm going to send

15  you a cease and desist; right?

16  **A.**    Yes.

17  Q.    And as a result, you're combing through these lists

18  trying to identify who the person is that's causing you

19  problems; right?

20  **A.**    Yes, sir.

21  Q.    Because you want to pivot and continue your fraud in

22  another manner; correct?

23  **A.**    Yes.

24  Q.    And in order to do that, you communicate with Sean

25  O'Connor; right?

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    **A.**   Yes.

2    Q.   You have those communications?

3    **A.**   I also communicated with any other person that was

4    involved in that company.

5    Q.   Okay.  You'd agree with me on this particular e-mail it's

6    between you and Sean O'Connor; right?

7    **A.**   Yes.

8    Q.   You'd agree with me that there's nobody else on those

9    e-mails?

10   **A.**   No.

11   Q.   Okay.  You'd agree with me that you've reviewed a lot of

12   e-mails in preparation for your testimony; right?

13   **A.**   Yes.

14   Q.   And the Government asked you about a whole bunch; right?

15   **A.**   Yes.

16   Q.   Now, surely, if you were given direction from Mario

17   Castro and he's doing investigation, you would have seen those

18   e-mails; right?

19   **A.**   That was part of my job.  I handled this end of it.

20   Q.   Okay.  You'd agree with me there aren't any e-mails from

21   Mario to you telling you what to do, to snoop through things,

22   find a plant, change directions, things like that; right?

23   **A.**   No, not that I know of.

24   Q.   Yeah.  Because he didn't do that; right?

25   **A.**   I would have talked to him in person.

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1   Q.   Okay.  You'd agree with me there aren't any e-mails from

2   Mario to you telling you what to do; right?

3   **A.**   Correct.

4   Q.   Okay.  You'd agree with me there's a whole lot of e-mails

5   from you to a whole lot of people telling them what to do;

6   right?

7   **A.**   Yes.

8   Q.   Okay.

9        **MR. TOMSHECK:**  Can you bring up Government's 185,

10  please?

11  **BY MR. TOMSHECK:**

12  Q.   This purports to be an e-mail from that same pk1726@aol

13  address to that same Sean O'Connor e-mail address; right?

14  **A.**   Yes.

15  Q.   And it's a couple of e-mails over the course of a couple

16  days; right?

17  **A.**   Yes.

18  Q.   I'm sorry.  Actually, one day on this one.

19        You're directing Sean to trash SLV; right?

20  **A.**   Yes.

21  Q.   Okay.  You're directing him to talk to Edgar; right?

22  **A.**   Yes.

23  Q.   And you know who Edgar is; correct?

24  **A.**   Yes.

25  Q.   Okay.  You're giving Sean directions to give directions

 1    to someone else; correct?

 2    **A.**    Not directions.  I'm telling him to ask Edgar where to go

 3    to -- where to go from there.

 4    Q.    Okay.  You'd agree with me you're telling him to trash

 5    SLV; right?

 6    **A.**    Yes.

 7    Q.    You're using the acronyms for several different companies

 8    that you're in control of; right?

 9    **A.**    Yes.

10    Q.    And you're telling him to talk to someone else; right?

11    **A.**    Yes.

12    Q.    Okay.  You'd agree with me that communication isn't Mario

13    Castro telling you, Sean, or Edgar what to do; right?

14    **A.**    Correct.

15    Q.    It's you telling them what to do; correct?

16    **A.**    Correct.

17    Q.    Now, I want to talk to you about

18    Government's Exhibit 193.

19          The Government asked you questions about this e-mail

20    yesterday.  Do you remember that?

21    **A.**    Yes, sir.

22    Q.    Okay.  They talked to you about the fact that on

23    October 11th of 2006 Andrea Burrow -- you know who she is;

24    right?

25    **A.**    Yes, sir.

1    Q.   And just so we're crystal clear, she was your employee;

2    right?

3    **A.**   She worked for all of the companies.

4    Q.   Okay.  I'm going to ask you:  Was she your employee?

5    **A.**   I did not pay her paycheck.  She was not my employee.  I

6    gave her directions, yes.  I'd give her mail, yes.  She was

7    not my employee.  I did not do -- 1099 for her or anything

8    else.  She was not my employee.

9    Q.   Okay.  You agree with me that Patti Kern and Kern and

10   Associates didn't list her as an employee; right?

11   **A.**   Correct.

12   Q.   You'd agree with me that you made the decisions about

13   what she would do for which companies; right?

14   **A.**   Yes.

15   Q.   You'd agree with me that you discussed with her her

16   employment; right?

17   **A.**   Correct.

18   Q.   And you'd agree with me that you and her reached an

19   agreement about how much she would be paid for the work she

20   was doing for you; right?

21   **A.**   That was also agreed with the owners of the companies.

22   Q.   Okay.  If she wasn't your employee, can you think of a

23   reason why she would say she was?

24   **A.**   She would use me as a reference if she needed to use

25   somebody as, quote, an employee.  She was a private contractor

1    basically.

2    Q.    And is it your testimony you never told anyone on behalf

3    of the Government that she was your employee?

4    **A.**    No.

5    Q.    Okay.  I want to talk to you specifically about this

6    e-mail then.  In 2016 she sends you an e-mail that says,

7    Justice Department and law enforcement partners announce.  Do

8    you see that?

9    **A.**    Yes.

10    Q.    And you know -- you told us yesterday that this is a

11    crackdown on the type of mail fraud that you've perpetrated

12    for decades; right?

13    **A.**    Yes.

14    Q.    Okay.  And you told us yesterday that when you saw this

15    you said, ope, that's the end, got to shut down now; right?

16    **A.**    Yes.

17    Q.    Okay.  You'd agree with me that after 2016 you didn't

18    shut down; right?

19    **A.**    No.

20    Q.    You pivoted again; correct?

21    **A.**    Yes.

22    Q.    You made some different decisions, and you kept the fraud

23    business going; right?

24    **A.**    Yes.

25    Q.    Okay.  This e-mail is from Andrea Burrow to who?

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    **A.**    To me.

2    Q.    To you and who else?

3    **A.**    No one else.

4    Q.    Just you; right?

5    **A.**    Correct.

6    Q.    Now, surely, if you're in a partnership with all of these

7    individuals and you're all acting equally, you forwarded this

8    to them; right?

9    **A.**    Yes.

10   Q.    Okay.  Where's that e-mail?

11   **A.**    I did not forward it to them.  I spoke to them about it.

12   Q.    Okay.  It's your testimony that you spoke to them about

13   it; right?

14   **A.**    Yes.

15   Q.    You'd agree with me that there's documentation that

16   Andrea Burrow sent it to you; right?

17   **A.**    Yes.

18   Q.    You'd agree with me she sent it to just you?  You told us

19   that a moment ago; right?

20   **A.**    Yes.

21   Q.    She didn't send it to Mario Castro; right?

22   **A.**    No.

23   Q.    Or any of the other defendants in this case; right?

24   **A.**    No.

25   Q.    She sent it to just you?

1    **A.**    Yes.

2    **Q.**    And you agree with me there's no e-mail forwarding that

3    article to anyone else?

4    **A.**    No.

5    **Q.**    Okay.  Do you remember at the beginning of your

6    cross-examination yesterday I asked you a question about

7    whether or not you would tell the truth?

8    **A.**    Yes.

9    **Q.**    Okay.  And, in fact, you agreed with me that, if you lied

10   about anything, the jury shouldn't believe you; right?

11   **A.**    Yes.

12   **Q.**    Okay.  Is it your testimony that from when you first --

13   when you first came into contact with Inspector Bouchie on

14   February 21st of 2018 until now you haven't lied?

15   **A.**    Not that I can remember, no.

16   **Q.**    Okay.

17   **A.**    Not intentionally.

18   **Q.**    It's your testimony that you have been completely

19   truthful from the first time those agents knocked on your door

20   and executed that search warrant?

21   **A.**    Yes.

22   **Q.**    Okay.  You would agree with me that you testified

23   yesterday that the CMRA boxes were opened by other

24   individuals; right?

25   **A.**    Repeat that question.  The what?

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    Q.    The CMRA mailboxes.

2    **A.**    CMRA?  What -- you said CMRA?

3    Q.    The mailboxes with the driver's license and the file

4    folders in your office.

5    **A.**    Yes.

6    Q.    It's your testimony that they did that on their own?

7    **A.**    Yes.

8    Q.    That you did not direct them to do that?

9    **A.**    No, I did not.

10   Q.    That that was their decision to do that?

11   **A.**    Yes.

12   Q.    Okay.  Did you tell the Government on February 21st of

13   2018 that you told other individuals to open those boxes?

14   **A.**    No.

15   Q.    Okay.  You would agree with me that those two things are

16   inconsistent?  You told them or you didn't tell them, it's one

17   or the other; right?

18   **A.**    Yes.

19   Q.    Okay.  You talked about bank accounts yesterday; right?

20   Do you remember that?

21         You indicated that they --

22      *(Reporter clarification.)*

23         **THE WITNESS:**  Yes.

24   **BY MR. TOMSHECK:**

25   Q.    You indicated that your, as you put it, partners opened

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    the bank accounts on their own; correct?

2    **A.**    Correct.

3    Q.    Not at your direction; right?

4    **A.**    No.

5    Q.    Okay.  Did you tell law enforcement on February 21st of

6    2018 that other people opened the accounts because you didn't

7    want to be involved and have the spotlight on you?

8    **A.**    I said other people opened the bank accounts.

9    Q.    Did you tell them that other people -- "them" being law

10   enforcement, Inspector Bouchie and the people that were with

11   him, that other people opened the accounts because you didn't

12   want to be involved or have the spotlight on you?

13   **A.**    Say the question again.

14   Q.    Did you tell Inspector Bouchie and the other inspectors

15   with him on February 21st of 2018 that other people opened the

16   account because you didn't want to be involved or have the

17   spotlight on you, yes or no?

18   **A.**    I don't remember exactly what I said to him.  I know that

19   in the piece of paper that I wrote I had mentioned that other

20   people opened bank accounts.

21   Q.    Okay.  Did you tell them that other people opened bank

22   accounts because you didn't want the spotlight on you?

23   **A.**    Other people opened the bank accounts.  I didn't want the

24   spotlight on me, no.

25   Q.    My question is whether or not you told them that.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    **A.**    Possibly.

2    Q.    Okay.  You told us yesterday that you weren't in charge

3    of all the bank accounts, you just managed them periodically;

4    right?

5    **A.**    Yes.

6    Q.    Okay.  Did you tell postal inspectors on February 21st of

7    2018 that you were in charge of all the accounts because the

8    other people didn't want to do it, they were bad at it, you

9    knew what needed to be ordered, and when?  Did you tell them

10   that?

11   **A.**    Yes.

12   Q.    You were in charge of all the accounts; right?

13   **A.**    Managing them, yes.

14   Q.    Okay.  Did you tell them you were in charge of them?

15   **A.**    I don't remember the exact words.

16   Q.    Okay.  You'd agree with me when you told us yesterday

17   that you weren't in charge, if you had told law enforcement

18   previously that you were in charge, those are two different

19   things; right?

20   **A.**    I managed them.  If that is considered being in charge

21   of, then I guess I was in charge of them.

22   Q.    Okay.

23   **A.**    I managed the bank accounts.  I wrote the checks for

24   bills, and I didn't do their taxes.  I gave them their

25   deposit -- or I gave them their check registers, and on some

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

 1    of the bank accounts they took care ordering their own checks,

 2    supplying me the checks.  I didn't order the checks; they did.

 3    Q.    Okay.

 4    **A.**    Well, I managed them.

 5    Q.    My question was simple.  You told law enforcement you

 6    were in charge of them; right?

 7    **A.**    Correct.

 8    Q.    You told us yesterday you weren't in charge of them;

 9    right?

10    **A.**    I don't remember.

11    Q.    Okay.  You'd agree with me those two things are

12    different; right?

13    **A.**    In charge of or managing or --

14    Q.    In charge of and not in charge of, different; right?

15    **A.**    Yes.

16    Q.    Okay.  You talked yesterday about the fraud and the fact

17    that you sent out fulfillment at the end of the fraud saying

18    it was like sweepstakes reports; right?

19    **A.**    Yes.

20    Q.    Okay.  Did you ever give anybody the prizes they were

21    promised?

22    **A.**    No.

23    Q.    Is it your testimony as you sit here today that you've

24    never paid a prize that someone was promised in one of those

25    mailings?

1    **A.**    Correct.

2    Q.    Okay.  Did you tell law enforcement on February 21st of

3    2018 that you had?

4    **A.**    No.

5    Q.    It's your testimony that you did not tell law enforcement

6    that you had previously paid prizes pursuant to the fraudulent

7    mailings?

8    **A.**    Not that I can remember.  I can't remember the exact

9    words I said to them that long ago.

10    Q.    Okay.  You'd agree with me that, if it's the truth, it's

11    easier to keep straight; right?

12    **A.**    No.

13    Q.    Is it --

14    **A.**    Repeat your question, please.

15    Q.    Yeah.  It's real easy to keep the truth straight; right?

16    **A.**    If you don't remember, you don't remember true or not

17    true.

18    Q.    Okay.

19    **A.**    I don't remember.

20    Q.    Yeah.  I think the common experience of everyone in the

21    jury will probably clear that up, but you'd agree there's only

22    one truth; right?

23    **A.**    Yes.

24    Q.    Okay.  And if you haven't changed your story, you don't

25    have to remember which one you told when; right?

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    **A.**    Yes.

2    Q.    Okay.  Did you tell law enforcement on February 21st of

3    2018 that you had an escrow account set aside that you were

4    going to pay out at the end of the year?  Did you tell them

5    that?

6    **A.**    No.

7    Q.    Okay.  It's your testimony that you did not tell

8    Inspector Bouchie that you had an account that you kept money

9    in that you hadn't paid out yet because the year hadn't ended?

10   **A.**    No.

11   Q.    Okay.  You'd agree with me that -- well, I'll withdraw

12   that question.  That will come up later.

13          Did you tell Inspector Bouchie in February of 2018

14   that, if people wrote to you complaining about the fact they

15   hadn't got their prizes, that you would refund the money they

16   had given you?

17   **A.**    Yes.

18   Q.    Okay.  That wasn't true, was it?

19   **A.**    It was true.

20   Q.    Okay.  You actually received a lot of correspondence from

21   folks over the years complaining; right?

22   **A.**    Yes.

23   Q.    And, in fact, there was a number of those notes from

24   folks seized pursuant to this investigation.  You know that;

25   right?

1    **A.**    Yes.

2    Q.    You'd get letters like I'm 87 years old, can you please

3    send this money quick; right?

4    **A.**    Yes.

5    Q.    You'd get letters like, hey, if you're going to send the

6    courier with my million bucks, don't do it on this day because

7    I have a doctor's appointment that day; right?

8    **A.**    Correct.

9    Q.    Okay.  Is it your testimony that you refunded money to

10    those folks by writing them a check?

11    **A.**    When someone requested they wanted their money refunded,

12    their money was refunded.

13    Q.    Okay.  So, surely, there's some checks for that; right?

14    **A.**    Yes.  They would have been written out of the main

15    accounts.

16    Q.    Okay.  It's your testimony you wrote those checks?

17    **A.**    Yes.  Or gave them cash.

18    Q.    Okay.  Do you remember yesterday when we were talking

19    about that handwritten note that you wrote?

20    **A.**    Yes.

21    Q.    Okay.  You held it up in that photo that we've seen

22    several times now?

23    **A.**    Yes.

24    Q.    Okay.

25             **MR. TOMSHECK:**  Can you bring up on the screen

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    Government -- or, I'm sorry, Defense 9032, please?

2    **BY MR. TOMSHECK:**

3    Q.    Do you see that on the overhead?

4    **A.**    Yes.

5    Q.    Okay.  You had an opportunity to review that in

6    preparation of your testimony today; right?

7    **A.**    Yes.

8    Q.    And you discussed that with the Government over the

9    course of the multiple meetings you've had with them in

10   preparation for today's testimony; right?

11   **A.**    It was discussed once.

12   Q.    Okay.  You'd agree with me you wrote that; right?

13   **A.**    Yes, sir.

14          **MR. TOMSHECK:**  If you'd go to page 2, please, Brian.

15   **BY MR. TOMSHECK:**

16   Q.    Down at the bottom, that's your signature; right?

17   **A.**    Yes.

18   Q.    And Barry Bouchie's signature as well; right?

19   **A.**    Yes.

20   Q.    Okay.

21          **MR. TOMSHECK:**  Go back to page 1, please.

22   **BY MR. TOMSHECK:**

23   Q.    You told us yesterday that you knew what you were doing

24   was fraud; right?

25   **A.**    Yes.

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    Q.    From the very first time you did it, you knew it was

2    wrong; correct?

3    **A.**    Yes.

4    Q.    No doubt about it in your mind, no fuzzy areas, you were

5    committing mail fraud when you did this; right?

6    **A.**    Yes.

7    Q.    Okay.  You agree with me that you wrote on there:  I

8    thought naively that riding that gray line and fulfilling made

9    this somehow okay.  Did you write that?

10    **A.**    Yes.

11    Q.    You told law enforcement that you thought you were riding

12    a gray line and that it was okay; right?

13    **A.**    Yes.

14    Q.    That wasn't true, was it?

15    **A.**    No.

16    Q.    That was a lie, wasn't it?

17    **A.**    It was in the back of my mind.  But when it came right

18    down to it, I knew that it shouldn't be done.

19    Q.    Okay.  As you sit here today, you'd agree with me the

20    evidence is overwhelming that you committed bank fraud -- I'm

21    sorry, mail fraud for decades; right?

22    **A.**    Yes.

23    Q.    Okay.  You'd agree with me there's no gray line there;

24    right?

25    **A.**    No.

*Patti Kern - Cont. Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    Q.   You'd agree with me that you wrote that was in your mind;

2    right?

3    **A.**   Yes.

4    Q.   Okay.  You told us multiple times during both direct and

5    cross-examination that your one job was to come in here and

6    tell the truth; right?

7    **A.**   Yes, sir.

8    Q.   Okay.  Let me ask you this question.  If your only job is

9    to tell the truth, have you done that?

10   **A.**   Yes.

11   Q.   If your only job is to tell the truth, then what did you

12   suck at?

13   **A.**   I beg your pardon?

14   Q.   Did you text the post inspector in the middle of your

15   testimony, "I'm sorry I sucked"?

16   **A.**   What I was referring to was --

17   Q.   Yes or no, did you text a post inspector --

18   **A.**   Yes.

19   Q.   -- that you sucked; right?

20   **A.**   Yes.

21   Q.   You'd agree with me, if your only job is to tell the

22   truth and you told the truth, you did your job; right?

23   **A.**   Yes.

24   Q.   You'd agree with me that, if your only job is to tell the

25   truth, that you didn't suck; right?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Page 30*

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    **A.**    Yes.

2    Q.    Okay.  You'd agree with me you chose those words just

3    like you chose the words in Exhibit 9032; right?

4    **A.**    I don't understand the question.

5    Q.    You chose the words in your text message to Inspector

6    Williams, the same as you chose the words you wrote on that

7    paper in Exhibit 9032?

8    **A.**    No.

9    Q.    Who chose them for you?

10    **A.**    I still -- you're confusing me.

11    Q.    When I write a text message, I write the words.  I decide

12    what to write.

13    **A.**    Right.

14    Q.    You do the same thing; right?

15    **A.**    Yes.

16    Q.    And you chose the words "I'm sorry I sucked," right?

17    **A.**    Yes.

18    Q.    Just like you chose the words you put on paper in that

19    statement; right?

20    **A.**    Yes.

21            **MR. TOMSHECK:**  Nothing further.

22            **THE COURT:**  Mr. Gaffney.

23                        **CROSS-EXAMINATION**

24    **BY MR. GAFFNEY:**

25    Q.    Good morning.

 1   **A.**   Good morning.

 2   Q.   I want to take you back to February 21st, 2018.  There's

 3   been a lot of testimony about that day so far; right?  You

 4   probably have a --

 5        *(Reporter instruction.)*

 6             **MR. GAFFNEY:**  Oh.  I'm sorry.

 7   **BY MR. GAFFNEY:**

 8   Q.   You probably have a fairly vivid memory of what occurred

 9   that day; right?

10   **A.**   Well, it was a rough day.  A lot of it's kind of a blur.

11   Q.   Do you remember if that day you were ever put in

12   handcuffs?

13   **A.**   No, I was not.

14        *(Cell phone interruption in proceedings.)*

15   **BY MR. GAFFNEY:**

16   Q.   Do you remember that day if you were ever arrested?

17   **A.**   I was not.

18   Q.   And since February of -- 21st of 2018, you haven't spent

19   a day in jail; right?

20   **A.**   No, sir.

21   Q.   Eventually, after that day, approximately a year later,

22   you ended up pleading guilty to conspiracy to commit mail

23   fraud; right?

24   **A.**   Yes, sir.

25   Q.   And you understand that the penalties for that offense is

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    a maximum of 20 years in jail; correct?

2    **A.**    Yes.

3    Q.    And it's also a fine of about $250,000; right?

4    **A.**    Yes.

5    Q.    Okay.  So when you go in front of the judge for

6    sentencing eventually, those are the potential penalties that

7    you may be facing?

8    **A.**    Yes.

9    Q.    And in your plea agreement, that acts as a recommendation

10   to the sentencing judge.  Would you agree with that?

11   **A.**    Yes.

12   Q.    And that recommendation is proffered by both you and the

13   Government; correct?

14   **A.**    Yes.

15   Q.    And in that plea agreement that recommendation is for

16   approximately -- I think at best would be 78 months.  Does

17   that sound right?

18   **A.**    I believe so.

19   Q.    That's the best you could do based on the plea agreement?

20   **A.**    I believe -- I think so.

21   Q.    And 78 months is about six and a half years?

22   **A.**    Yes.

23   Q.    Okay.  Much less than the 20-year sentence that could be

24   imposed; right?

25   **A.**    Yes.

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1  Q.   And one of the things that goes into that recommendation

2  of 78 months is the loss amounts that is attributable to your

3  fraud; correct?

4  **A.**   Yes.

5  Q.   And you testified yesterday that you understand the

6  more -- the higher the loss amount, the higher the penalties

7  that you're facing; right?

8  **A.**   Yes.

9  Q.   And so in your plea agreement the loss amount has been

10 limited to under $9.5 million; right?

11 **A.**   Yes.

12 Q.   All right.  And you understand that the defendants here

13 are facing potentially -- or at least the alleged loss amount

14 that they're facing is over $10 million; correct?

15 **A.**   I did not know that, no, sir.

16 Q.   All right.  In conjunction with your plea agreement, you

17 also entered into a cooperation agreement; correct?

18 **A.**   Yes, sir.

19 Q.   And the cooperation agreement is between you and the

20 Government?

21 **A.**   Yes, sir.

22 Q.   And that's one of the reasons why you're here testifying

23 today; right?

24 **A.**   Yes, sir.

25 Q.   And your objective in testifying, you already stated, was

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    to hopefully get a year or two knocked off of your sentence;

2    correct?

3    **A.**    Yes, sir.

4    **Q.**    So if that were to happen, rather than the potential 6.5

5    years that you're looking at based on just the plea agreement,

6    perhaps it could get reduced to one -- maybe 4.5 years.  Fair?

7    **A.**    Fair.

8    **Q.**    Okay.  And the cooperation agreement requires you to tell

9    the truth; right?

10   **A.**    Yes, sir.

11   **Q.**    And who decides if you tell the truth?

12   **A.**    The judge.

13   **Q.**    And how would the judge know if you tell the truth?

14   **A.**    I'm not -- I don't -- she --

15   **Q.**    If you were to lie during these proceedings, isn't it

16   fair to say that the Government would file something with the

17   Court indicating that you didn't tell the truth?

18   **A.**    Repeat the question, please.

19   **Q.**    If you were to lie during these proceedings, isn't it

20   true that the Government could go to the judge and say, hey,

21   she lied, she didn't tell the truth, she breached the

22   cooperation agreement?

23   **A.**    Yes.

24   **Q.**    Okay.  So ultimately it's the Government who also decides

25   whether or not you tell the truth; right?

1   **A.**   Yes, both the Government and the judge.

2   **Q.**   Your sentencing judge is not Judge Navarro; right?  It's

3   Judge Boulware?

4   **A.**   I believe -- I thought it was moved to this judge.  I'm

5   not sure who my sentencing judge is going to be.

6   **Q.**   My point is the Government has the complete discretion to

7   decide unilaterally whether or not you've told the truth;

8   right?

9   **A.**   Yes.

10  **Q.**   And one of the ways in which your sentence can be reduced

11  is through something called 5K cooperation; correct?

12  **A.**   I've heard that mentioned, yes.

13  **Q.**   Okay.  You probably talked to your attorney about that;

14  right?

15          And I don't need to know the discussions.  It's a

16  yes-or-no question.

17  **A.**   Yes.

18  **Q.**   And if the Government believes that you provided them

19  substantial assistance, they can use that 5K cooperation to

20  recommend to the judge to impose a lower sentence than what

21  the plea agreement currently is recommending; right?

22  **A.**   Yes.

23  **Q.**   And that's what you're hoping will happen; correct?

24  **A.**   Yes.

25  **Q.**   And whether or not to file that 5K motion is solely

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1    within the discretion of the Government; right?

2    A.    Yes.

3    Q.    They may file it, they may not; right?

4    A.    Yes.

5    Q.    And that -- a lot of that hinges on you providing

6    substantial assistance in this case?

7    A.    Telling the truth in this case.

8    Q.    Okay.  So -- and it hinges on your testimony here; right?

9    A.    Yes, sir.

10   Q.    Okay.  There's a lot riding on this; correct?

11   A.    Yes, sir.

12   Q.    And to be clear, you haven't been sentenced yet; right?

13   A.    No, sir.

14   Q.    And you obviously want the Government to recommend a

15   lower sentence than what you're currently facing; right?

16   A.    Sure, yes.

17   Q.    Okay.  So we've talked about other people who've been

18   involved in this scheme like Andrea Burrow; right?

19   A.    Yes.

20   Q.    And are you aware that Andrea Burrow has also pled guilty

21   to a crime related to this case?

22   A.    Yes.

23   Q.    Okay.  And she's been sentenced.  Are you aware of that?

24   A.    Yes.

25   Q.    All right.  And are you aware that Sean O'Connor has also

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    pled guilty to a crime related to this case?

2    **A.**    No.

3    Q.    Okay.  Are you aware that Edgar Del Rio has pled guilty

4    to a crime related to this case?

5    **A.**    No, sir.

6    Q.    Okay.  So you had indicated that you met with the

7    Government about 12 times since February 21st, 2018.  Do you

8    remember that?

9    **A.**    Yes.

10   Q.    All right.  And when you meet with them, there's always a

11   postal inspector present; is that fair?

12   **A.**    Yes, sir.

13   Q.    And more -- and it's typically Postal Inspector Bouchie;

14   correct?

15   **A.**    At times.

16   Q.    Okay.  And at the beginning of the interviews that you

17   conduct with them, at least in the very beginning, from

18   February 21st moving forward, they tell you, hey, you can't

19   lie to us; right?

20   **A.**    Yes.

21   Q.    And you know that it's a crime to lie to federal

22   officers; right?

23   **A.**    Yes, sir.

24   Q.    And so it's been your testimony that everything you've

25   told them since February 21st, 2018, has been the truth?

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    **A.**    Yes, sir.

2    Q.    And you realize that when you're talking to the

3    Government or to the postal inspectors, there's always

4    somebody there writing down what you say; right?

5            There's somebody there taking notes as you're

6    explaining how the alleged scheme works?

7    **A.**    Oh.  Yes.

8    Q.    Okay.  And fair to say that that is to memorialize what

9    you're telling them, to document what you're telling them?

10   **A.**    Yes.

11   Q.    Okay.  And the purpose of that, fair to say, is probably

12   so they can look for potential inconsistencies in what you

13   tell them; right?

14   **A.**    I -- I suppose.

15   Q.    So when the postal inspectors showed up at your house

16   February 21st, 2018, they already knew quite a bit about what

17   had gone on; correct?

18   **A.**    Yes.

19   Q.    They knew the company names, right, or at least some of

20   them?

21   **A.**    Yes, sir.

22   Q.    They knew the names of other people who were involved --

23   **A.**    Yes, sir.

24   Q.    -- right?

25           They showed you an identification chart, didn't they?

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1   **A.**   Yes, sir.

2   **Q.**   And it had maybe -- if I said that there were about 22

3   people on the identification chart, would you have any reason

4   to doubt that?

5   **A.**   That sounds about right, yes, sir.

6   **Q.**   And you didn't know everybody on that chart, though;

7   right?

8   **A.**   No, sir.

9   **Q.**   Okay.  They knew about the -- some of the bank accounts

10  that have been involved; right?

11  **A.**   Yes, sir.

12  **Q.**   They knew about some of the post office boxes that have

13  been opened for the mailing companies?

14  **A.**   Yes, sir.

15  **Q.**   And they asked you questions about the Castros; fair?

16  **A.**   Yes, sir.

17  **Q.**   All right.  And over time, during your 12 meetings with

18  the Government leading up to this trial, they've asked you a

19  lot of questions about the Castros, haven't they?

20  **A.**   Yes.

21  **Q.**   And so you knew initially right from the jump that the

22  Castros were also targets of this investigation; fair?

23  **A.**   Fair.

24  **Q.**   Okay.  You told the postal inspectors that at the time

25  the search warrant was executed you were involved with sweeps

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    reports; correct?

2    **A.**    Yes.

3    Q.    And those were the solicitations or the promotions that

4    were produced between 2010 and 2018; right?

5    **A.**    Yes.

6    Q.    And that is the timeline of this alleged conspiracy, 2010

7    to 2018; right?

8    **A.**    Yes, sir.

9    Q.    And the sweeps reports promotions are different than

10   other sweepstakes promotions that you've done before in the

11   past; right?

12   **A.**    Yes, sir.

13   Q.    All right.  And they're different in that the 20-dollar

14   fee that the victims are paying are really to purchase a

15   sweeps report as opposed to entering them into the

16   sweepstakes; is that right?

17   **A.**    Yes, sir.

18   Q.    Okay.

19          **MR. GAFFNEY:**  Can we bring up Exhibit 1F, please,

20   Brian?  And can we go to page 3, please, and highlight or zoom

21   in on that top portion?

22   **BY MR. GAFFNEY:**

23   Q.    Can you see that on your screen there?

24   **A.**    Yes, sir.

25   Q.    So in these sweeps reports, basically there is a set of

1    rules on the back; right?

2    **A.**    Yes, sir.

3    Q.    And is that what we're looking at here where it says full

4    compendium information?

5    **A.**    Yes, sir.

6    Q.    So if someone were to read that and kind of parse through

7    the language, supposedly they would understand that what

8    they're actually purchasing is a sweeps report; right?

9    **A.**    Yes, sir.

10    Q.    Okay.  So you started doing these sweeps reports in 2011

11    or 2010?

12    **A.**    Yes, sir.

13    Q.    All right.  And that's the same time that you had

14    approached Epi Castro about going into business together?

15    **A.**    Yes.

16    Q.    And in the written statement that we just saw displayed

17    just a second ago, you said that you naively believed that you

18    were riding the gray line, and that was in relation to these

19    sweeps reports; right?

20    **A.**    Yes, sir.

21    Q.    And -- meaning you didn't think of them as being flat-out

22    fraudulent; is that correct?

23    **A.**    That's what I was kidding myself into, yes, sir.

24    Q.    That -- that was a naivete that you had?

25    **A.**    It was -- didn't want to admit that they were -- they

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    were scamming, they were scamming pieces.

2    Q.    So you were trying to convince yourself that you were

3    operating in this gray area when you were sending out these

4    promotions that were sweeps reports?

5    **A.**    Yes, sir.

6    Q.    All right.  And isn't it true you told Inspector Bouchie

7    at the time that you can't help what people think in relation

8    to the sweeps reports?

9    **A.**    I believe so.

10    Q.    So basically you're saying, hey, it's not necessarily

11    fraud if they don't understand the rules; right?

12    **A.**    Yes.

13    Q.    And so in your mind with the sweeps reports, if you're

14    fulfilling them, then the person is actually getting what they

15    paid for; right?

16    **A.**    Yes.

17    Q.    And I believe you testified that that was the general

18    belief sort of in the direct mail community at the time, that

19    these sweeps reports were somehow okay?

20    **A.**    Yes.

21    Q.    And is that -- and that's also what you were telling Epi

22    Castro; correct?

23    **A.**    No.  I didn't come out and tell him, oh, you know,

24    they're okay.  It was his decision.  I mean, he knew what they

25    were.

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1    Q.   When you formed this partnership with Epi Castro, weren't

2    you looking to try to do promotions that you thought were

3    clean?

4    **A.**   Yes.

5    Q.   And that would be the sweeps reports?

6    **A.**   Yes.

7    Q.   Okay.  So you used your own name on these promotions

8    until approximately 2009; right?

9    **A.**   Yes, sir.

10   Q.   And then you received the cease-and-desist order?

11   **A.**   Yes, sir.

12   Q.   And then at that point you tried to do things that you

13   thought may be more legitimate, like astrology or selling

14   jewelry or maybe other products; right?

15   **A.**   Yes.

16   Q.   So sometime in 2011 you speak to Epi Castro about mailing

17   these promotions; right?

18   **A.**   Yes.

19   Q.   And you approached him because you needed the money?

20   **A.**   Yes.

21   Q.   And at that point you and Epi start looking at these

22   promotions that you think are clean, like these sweeps --

23   these sweeps reports; right?

24   **A.**   Yes.

25   Q.   And you wanted to make sure moving forward that it was

1    only these sweeps reports that were being sent out; right?

2    **A.**    Yes.

3    Q.    And that was a decision that you made?

4    **A.**    We both made.  He had printed them in the past.

5    Q.    I'm sorry?

6    **A.**    He had printed the promotions in the past.

7    Q.    So you told Epi Castro that, in order to move forward

8    with this fraud, there were a couple of things that needed to

9    happen.  You needed to open mailboxes; correct?

10   **A.**    There needed to be -- he knew what needed to be done.

11   There needed to be mailboxes opened.  Basically a company

12   started to do a mailing.

13   Q.    Okay.  So you talked to Epi Castro, and in order to move

14   forward this -- with this, these mailing companies needed to

15   be opened, these businesses needed to be created; correct?

16   **A.**    Yes.

17   Q.    These mailboxes needed to be opened as well; right?

18   **A.**    Yes.

19   Q.    Bank accounts needed to be opened; correct?

20   **A.**    Yes.

21   Q.    And you used Epi to try to find people to get involved in

22   this venture; right?

23   **A.**    It was a partnership between us, and Epi made the

24   decision on if he wanted it in his name or if he wanted to

25   find --

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    Q.    That's not my question.  You discussed with Epi how to

2    put this fraud into place; correct?

3    **A.**    Yes.

4    Q.    And then you used Epi to try to find people to get

5    involved in this; right?

6    **A.**    Yes.

7    Q.    Okay.  Now, you don't know how Epi got other people

8    involved; right?

9    **A.**    Right.

10   Q.    You weren't there for that conversation when he talked to

11   people and then mailboxes got opened, businesses got opened,

12   bank accounts got opened; right?

13   **A.**    Correct.

14   Q.    And as you've mentioned or testified to, you purposefully

15   didn't want any of these businesses put in your name; right?

16   **A.**    Correct.

17   Q.    Didn't want any of the bank accounts put in your name;

18   right?

19   **A.**    Correct.

20   Q.    Didn't want any of the mailboxes put in your name; right?

21   **A.**    Correct.

22   Q.    And that's because you were trying to shield yourself

23   from any liability; fair?

24   **A.**    Fair.

25   Q.    At that point you knew that, if you were to get in

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    trouble again, potentially you could go to jail; right?

2    **A.**    Yes.

3    Q.    That's why you're taking these precautions?

4    **A.**    Yes, because I would have violated the cease and desist.

5    Q.    Okay.  So -- but at that point you're worried about more

6    than just a cease-and-desist order; right?

7    **A.**    Yes.

8    Q.    All right.  Because you had testified previously a

9    cease-and-desist order constitutes a slap on the wrist; right?

10    **A.**    Well, not the second one wouldn't have probably.

11    Q.    But you were beyond that point --

12    **A.**    Yes.

13    Q.    -- in 2011; correct?

14        *(Reporter clarification.)*

15            **THE COURT:**  The question was:  You were beyond the

16    point?

17            What was the answer?

18            **THE WITNESS:**  Yes.

19    **BY MR. GAFFNEY:**

20    Q.    Let's talk a little bit about the printing process.  Fair

21    to say that you oversaw the creation of these promotions?  Is

22    that fair?

23    **A.**    Yes, I proofed them.

24    Q.    Okay.  So the creation of these promotions really begins

25    with you; right?

1    **A.**    On some of them.  On others, Epi already had the artwork.

2    **Q.**    Okay.  Well, you had a database of promotions; right?

3    **A.**    I had the -- the names were in the database.

4    **Q.**    So you picked which template to use?

5    **A.**    Yes.

6    **Q.**    You gave those templates to Epi to print?

7    **A.**    Yes.

8    **Q.**    And he printed the -- essentially the shells of those

9    promotions; right?

10    **A.**    Yes, sir.

11    **Q.**    And those were the promotions that were used between 2010

12    and 2018; right?

13    **A.**    Those, along with some that Epi actually had from other

14    mailings that he had done for other direct mailers.

15    **Q.**    So I believe you testified that you had someone else

16    write the content of the promotions; is that fair?

17    **A.**    Yeah, that's the way it's done.  Yes.

18    **Q.**    Okay.  So you directed somebody else to write the

19    content; right?

20    **A.**    You would buy the promotion basically.  You would buy the

21    package from a person that that's what they did.  They

22    produced those kind of packages.

23    **Q.**    Okay.

24    **A.**    A writer, a designer.

25    **Q.**    That was part of your job, to secure the content of

1    those -- of those promotions?

2    **A.**    Yes, sir.

3    Q.    Okay.  And you used other people to create the artwork on

4    the promotions --

5    **A.**    Yes, it was a --

6    Q.    -- is that fair?

7    **A.**    -- it was a total package.

8    Q.    Okay.  And you went to Epi's I believe you said on a --

9    fairly frequently to review the promotions; right?

10    **A.**    Or we'd e-mail back and forth or -- most of the time I

11    didn't do an actual press proof.  But he would e-mail me the

12    proofs, and then I'd look them over to make sure everything

13    was correct and then e-mail it back to him.

14    Q.    Okay.  But you reviewed every promotion before it got

15    mailed out; correct?

16    **A.**    Yes.

17    Q.    All right.  And you would be, say, checking it for

18    spelling errors?

19    **A.**    Spelling, yes.

20    Q.    Making sure that the content of the promotion was

21    correct?

22    **A.**    Yes, that it was -- that the shell didn't contain

23    anything that should be lasered instead of printed.

24    Q.    And if there were any changes that needed to be made, you

25    would make those changes?

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1    **A.**    Yes.

2    Q.    All right.  You also took care of ordering the names and

3    addresses that would get inserted into those promotions later;

4    right?

5    **A.**    Yes.

6    Q.    Are those referred to as broker lists?

7    **A.**    Yes.

8    Q.    And so you secured those broker lists?

9    **A.**    Yes.

10   Q.    You scheduled when the solicitations would be printed;

11   right?

12   **A.**    Yes.

13   Q.    Scheduled when the solicitations would be mailed?

14   **A.**    Yes.

15   Q.    All right.  And so the last step in the printing process

16   would be to insert this personalized information on the

17   promotions; right?

18   **A.**    Yes.

19   Q.    Okay.  And that was Sean O'Connor's specialty, wasn't it?

20   **A.**    He was the one that would set up that -- the fill, yes.

21   Q.    All right.

22   **A.**    He put it into the lasers.

23   Q.    So he's setting up that personalized information for

24   laser printing?

25   **A.**    Yes.

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1   Q.   All right.  Nobody else at direct -- excuse me, at

2   Digital Express or Marketing Image Direct was doing that;

3   right?  That was Sean O'Connor's job?

4   **A.**   I believe he was the only one.

5   Q.   Okay.  And he was in charge of managing that data that

6   contained the names and addresses and the personalized

7   information; right?

8   **A.**   Yes.

9   Q.   And so it's the last step in printing out these

10  promotions that's occurring at the Castro's letter shop as you

11  put it?

12  **A.**   Yes.  The -- the lasers were at -- were there also.

13  Q.   Okay.  So nowhere in this process do the defendants have

14  control over the content of the promotion; right?

15  **A.**   No.

16  Q.   There was some -- you had testified that the owners of

17  these mailing companies had control of the bank accounts;

18  right?

19  **A.**   Yes.

20  Q.   All right.  Now, you had checks for all the mailing

21  company bank accounts, didn't you?

22  **A.**   Most of them.  Checkbooks.

23       **MR. GAFFNEY:**  Brian, can we put up Mendez

24  Exhibit 9041, please?

25  **BY MR. GAFFNEY:**

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1   Q.   Can you see that on the screen in front of you?

2   **A.**   Yes.

3   Q.   Do you recognize that?

4   **A.**   Yes.

5   Q.   Are those checkbooks for the various companies that --

6   some of the companies that we've been talking about?

7   **A.**   Yes, sir.

8   Q.   Okay.  And that's a picture that was taken in your home

9   during the search warrant execution February 21st, 2018;

10  right?

11  **A.**   Yes, sir.

12  Q.   Okay.

13         **MR. GAFFNEY:**  Can we go to the next page?

14  **BY MR. GAFFNEY:**

15  Q.   And those are additional checkbooks for the companies

16  we've been talking about; right?

17  **A.**   Yes, sir.

18  Q.   Still in your home; correct?

19  **A.**   Yes.

20  Q.   Okay.

21         **MR. GAFFNEY:**  Can we go to the next page?  Oh.  I

22  think that might be it.  Okay.  Thank you.

23  **BY MR. GAFFNEY:**

24  Q.   So along with these checkbooks, you also had signature

25  stamps; right?

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    **A.**    Yes, sir.

2    Q.    And you had one for Miguel Castro; right?

3    **A.**    Yes.

4    Q.    You had one for Salvador Castro?

5    **A.**    No.

6    Q.    So --

7    **A.**    Salvador's, they just told me to go ahead and just sign

8    the checks.

9    Q.    Okay.  So if you didn't have a signature stamp, you would

10   just forge the signature; right?

11       *(Reporter clarification.)*

12           **THE WITNESS:**  Yes.

13   **BY MR. GAFFNEY:**

14   Q.    Did you have a signature stamp for Jose Mendez?

15   **A.**    Yes.

16   Q.    And for Mario Castro?

17   **A.**    Yes.

18   Q.    You had testified that you wrote most of the checks in

19   regard to Marketing Image Direct; right?

20           Well, let me rephrase.  Excuse me.  Strike that.

21           You wrote most of the checks for all these mailing

22   companies; fair?

23   **A.**    Yes.

24   Q.    All right.  And you would be writing checks for things

25   like postage?

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    **A.**    Yes.

2    Q.    The paper?

3    **A.**    Yes.

4    Q.    Labor for the printing?

5    **A.**    Yes.

6    Q.    Accounting?  Did you write checks to different people for

7    accounting?

8    **A.**    To Miguel Castro.

9    Q.    Shipping; right?

10    **A.**    Yes.

11    Q.    The actual printing of the promotions?

12    **A.**    Yes.

13    Q.    Were you also writing checks to rent out building space?

14    **A.**    No, sir.

15    Q.    You never wrote any checks to either Digital Express or

16    Marketing Image Direct for rent?

17    **A.**    Not that I can remember, sir.

18    Q.    So when you run out of checks you direct the owners, I

19    guess -- your words -- of the mailing companies to order more

20    checks for you; right?

21    **A.**    Yes.  If I did not have -- was able to access the bank

22    account by the computer so that you can go and order your own

23    checks, order the checks for the company, they would have to

24    do it, yes.

25    Q.    Okay.

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1          **MR. GAFFNEY:**  Can we put up Exhibit 151A, page 12,

2      please?  And if you could blow that up, Brian.

3      **BY MR. GAFFNEY:**

4      Q.   So you've already seen a portion of this exhibit before;

5      right?

6      **A.**   Yes, sir.

7      Q.   These are text messages between you and Miguel Castro;

8      right?

9      **A.**   Yes, sir.

10     Q.   And this is an example of you directing Miguel to order

11     more checks for one of these mailing businesses; fair?

12     **A.**   Yes, I was asking him to order more.

13     Q.   Okay.  And it says:  Hi.  Need more checks for Price

14     Awards, and then you give a check number to start at --

15     **A.**   Um-hum.

16     Q.   -- correct?

17     **A.**   Yes.

18     Q.   And then Miguel says:  Okay, I'll do that.

19     **A.**   Yes.

20     Q.   All right.  Along with the checks, fair to say that you

21     also controlled the cash that came into these companies;

22     right?

23     **A.**   Yes, sir.

24     Q.   And what would happen is the victims would send money --

25     or, excuse me, cash or checks to Andrea Burrow; right?

1    **A.**    Yes.

2    **Q.**    Eventually they would make their way to Andrea Burrow --

3    **A.**    Right.

4    **Q.**    -- right?

5    **A.**    Correct.

6    **Q.**    And then Andrea Burrow would sort out the cash and give

7    you, say, a bag of cash; right?

8    **A.**    It would be separated per each company, yes.

9    **Q.**    Okay.  Now, you didn't keep meticulous records of how

10   much cash came in, did you?

11   **A.**    No.

12   **Q.**    All right.  You don't know the total amount of cash that

13   was received between 2010 and 2018; right?

14   **A.**    No, sir.

15   **Q.**    So you weren't there when Andrea Burrow was opening the

16   mail; right?

17   **A.**    Right.

18   **Q.**    So you have to kind of just trust her to be honest with

19   the cash that's coming in and that she's giving you?

20   **A.**    Yes, sir.

21   **Q.**    Honest in that all the cash that comes is in being evenly

22   distributed according to your agreement --

23   **A.**    Yes.

24   **Q.**    -- right?

25          All right.  At some point did you learn that she was

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1   stealing the money as well?

2   **A.**   No, I did not.

3   Q.   No?  Okay.

4        When you determined how to split up the cash amongst

5   yourself and the other people, how did you do that?

6   **A.**   We discussed it, and it was discussed that --

7   Q.   No.  How did you specifically, with a pile of cash,

8   figure out how to divide that amongst the people who needed to

9   receive it?

10  **A.**   I would just, like, split it.

11  Q.   Were you just eyeballing the amounts?

12  **A.**   Sometimes, yes.

13  Q.   Sometimes?

14  **A.**   Yes.

15  Q.   You had a cash counter in your -- in your house; right?

16  **A.**   Yes.  I would use that, too, at times.

17  Q.   But you also would just eyeball the amounts --

18  **A.**   Yes.

19  Q.   -- right?

20       Did your partners know that that's how you were

21  distributing the cash, by eyeballing these piles of cash?

22  **A.**   No.

23  Q.   You claim that the cash that was seized from your

24  residence on February 22nd, 2018, had been accumulated over

25  the years; right?

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    **A.**    Yes.

2    **Q.**    But there's no records of the cash coming in so there's

3    really no way to prove that; correct?

4    **A.**    No.

5    **Q.**    We just have to take your word for it?

6    **A.**    Yes, sir.

7    **Q.**    Okay.  So along with controlling the check, controlling

8    the cash, you also controlled when profit distributions were

9    given?

10   **A.**    Yes.  I would ask -- I would ask the individual before I

11   wrote the check, and I would say how much was there and I

12   was -- I'm going to do this much of a distribution for each of

13   us.  He said okay.

14   **Q.**    Okay.

15          **MR. GAFFNEY:**    Brian, can you go to page 2?

16   **BY MR. GAFFNEY:**

17   **Q.**    And can you see the top portion of that text message?

18   **A.**    Yes.

19   **Q.**    And what it says is:  What is the balance in Marketing

20   Image Direct?  I might be able to give you a distribution.

21   **A.**    Right.

22   **Q.**    Right?

23   **A.**    Yes.

24   **Q.**    So that is you indicating that you may be able to give a

25   distribution depending on how much money's there?

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    **A.**    Right.  If there's enough in the checkbook, yes.

2    Q.    Okay.  So you're in charge of the distributions; fair?

3            And we're talking about the profit distributions;

4    right?

5    **A.**    Yes.

6    Q.    Okay.  So you decide when the profit distribution is

7    given; right?

8    **A.**    What I would do was, if there was a certain amount of

9    money in the account and since I was managing the account, if

10   there was enough in there, then I would give the distribution,

11   yes.

12   Q.    And you would decide when that was; right?

13   **A.**    It would be up to however much cash was in --

14   Q.    Okay.  So you decide when to give the profit

15   distribution, and you decide what amount to give --

16   **A.**    Yes.

17   Q.    -- in the profit distribution?

18   **A.**    Yes.

19   Q.    Okay.  And so, along with the checks, the cash, the

20   profit distributions, you also decide when things like deposit

21   books are needed; right?

22   **A.**    Yes.

23   Q.    Okay.

24        **MR. GAFFNEY:**  Brian, can we go to page 11?  There's

25   an example of that on page 11, if you can scroll down to the

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    bottom.

2    **BY MR. GAFFNEY:**

3    Q.   And this is you indicating more deposit books are needed;

4    right?

5    A.   Yes.

6    Q.   All right.  And you had online access to the bank

7    accounts as well; correct?

8    A.   Yes.

9         **MR. GAFFNEY:**  Can we scroll down to pages 13 and 14,

10   please, Brian?

11   **BY MR. GAFFNEY:**

12   Q.   So in this text exchange -- can you see that on your

13   screen?

14   A.   Yes, sir.

15   Q.   Essentially this is you providing log-in information to

16   Miguel; right?

17   A.   Yes, sir.

18   Q.   Okay.  And this would be for the purpose of accounting;

19   right?

20   A.   Yes.

21   Q.   Okay.

22        **MR. GAFFNEY:**  And can we go to the next page?

23   **BY MR. GAFFNEY:**

24   Q.   And same thing here; right?

25   A.   Yes, sir.

1    Q.   This is log-in information to a bank account you're

2    providing to Miguel to do accounting?

3    **A.**   Yes.

4    Q.   Okay.  You've seen this exchange of text messages before;

5    correct?

6    **A.**   Yes, sir.

7    Q.   You've probably went over them during the -- one of your

8    meetings with the Government; right?

9    **A.**   Yes, sir.

10   Q.   And is it fair to say that most of the communication

11   within the -- this exhibit are communications with Miguel

12   about accounting; right?

13   **A.**   Yes, sir.

14   Q.   Do you need to look at the entire exhibit, or are you

15   comfortable with your answer?

16   **A.**   I'm comfortable with that answer.

17   Q.   Okay.  At one point you were in charge of the accounting

18   for the businesses; right?

19   **A.**   No.

20   Q.   Never?

21   **A.**   No.

22   Q.   Okay.  Miguel would be paid a fee for his accounting

23   services; right?

24   **A.**   Right.

25   Q.   He was getting $250 per business per week.  Does that

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1    sound fair?

2    **A.**    I think it was $200.

3    Q.    Okay.  So some of the checks that you wrote to Miguel

4    would be for accounting?

5    **A.**    Yes.

6    Q.    And do you know whether Miguel was using QuickBooks for

7    his accounting?

8    **A.**    I don't -- I don't really know, sir.

9    Q.    Fair to say that, in order to do the accounting, he has

10   to rely on you to provide him information like check

11   registers; right?

12   **A.**    Right, which I would give him every month.

13   Q.    Okay.  And he has to rely on you to provide access to

14   bank statements; right?

15   **A.**    The bank statements were coming to the individual owners

16   who were on the bank accounts.  The bank statements were being

17   mailed to them, but that is why, like, on this he needed these

18   because I don't know if he wasn't given them or -- to them or

19   not but --

20   Q.    Have you ever accessed a bank account statement online?

21   **A.**    Yes.

22   Q.    Okay.  So you know that by providing log-in

23   information --

24   **A.**    Correct.

25   Q.    -- that information can be found online; right?

1    **A.**    Yes, sir.

2    **Q.**    Okay.  In regard to opening the mailboxes, some of these

3    mailboxes -- a lot of these mailboxes were opened outside of

4    Nevada; right?

5    **A.**    Yes.

6    **Q.**    And at some point the justification for that was that you

7    believed post offices here in Las Vegas were stealing money;

8    is that fair?

9    **A.**    No.  I mean, there were -- there was a time that there

10   was some fraud going on with the -- the boxes here, but --

11   **Q.**    Let me ask you this.  On February 21st, 2018 --

12   **A.**    Yes.

13   **Q.**    -- did you tell Inspector Bouchie that the reason you

14   opened mailboxes out of state was because the Las Vegas branch

15   was known for theft?

16   **A.**    I did not phrase it that way, no.

17   **Q.**    How did you phrase it?

18   **A.**    That there had been theft here.

19   **Q.**    Okay.  So you knew or at least -- that there was some

20   theft in the Las Vegas, I guess, branches; right?

21   **A.**    Yes.

22   **Q.**    And that was one of the reasons you didn't want to put

23   the mailboxes here in Nevada; right?

24   **A.**    No.  The main reason for that was normally you did not

25   open a box --

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    Q.   Well, that's not my question.

2    **A.**   -- where you're -- where you're --

3    Q.   So you're saying that that was not a reason that you

4    opened the mailboxes --

5           **MR. FINLEY:**  Your Honor --

6    **BY MR. GAFFNEY:**

7    Q.   -- out of state?

8           **MR. FINLEY:**  -- I object.  Can the witness be

9    permitted to finish her answer, which was --

10          **THE COURT:**  Yes.

11          **MR. FINLEY:**  -- responsive?  She answered it no, and

12   then she was explaining.  May she be permitted to explain her

13   answer?

14          **THE COURT:**  Yes.  Mr. Gaffney, please let her finish

15   her --

16          **MR. GAFFNEY:**  Okay.

17          **THE COURT:**  -- answer before you provide another

18   question.

19          **THE WITNESS:**  There was stealing going on out of

20   state, too.  You just -- it just happened to -- it could

21   happen all over.  The Arkansas box ended up having a lot of

22   theft at it, too.

23   **BY MR. GAFFNEY:**

24   Q.   Okay.  So just to be clear, you wouldn't have told

25   Inspector Bouchie on February 21st, 2018, one of the reasons

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    you put the mailboxes out of state was because of theft at the

2    Las Vegas branches?

3    **A.**    No.

4    Q.    Okay.  Let's talk about Andrea Burrow a little bit.  You

5    work with her for about ten years, does that sound right, or

6    more?

7    **A.**    Probably more.  She used to be my boss.

8    Q.    Okay.  And so the vast majority of the mail would be

9    routed to her; right?

10   **A.**    Yes.

11   Q.    Okay.  So even if mail was sent to Jose Luis Mendez's

12   house, eventually that would get taken to Andrea Burrow's

13   place; right?

14   **A.**    Yes, sir.

15   Q.    And she's working, what, out of her house?

16   **A.**    Yes, sir.

17   Q.    And she's opening all the mail; right?

18   **A.**    Yes, sir.

19   Q.    So the defendants would have never seen any of the

20   victims' checks; right?

21   **A.**    No.

22   Q.    Burrow was also responsible for tracking responses to

23   these promotions?

24   **A.**    She did the -- she keyed them in, yes.

25   Q.    Okay.  And she would give the names of the people that

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    responded to Stephen Fennell; right?

2    **A.**    Yes, sir.

3    Q.    And Stephen Fennell is the guy who works for Neptune

4    Data; right?

5    **A.**    Yes, sir.

6    Q.    Okay.  So when we say Neptune Data, we're talking about

7    Stephen Fennell; right?

8    **A.**    Yes, sir.

9    Q.    Okay.  And Andrea Burrow would provide him with those

10   names, and Stephen Fennell would put those names on a list so

11   you knew that these are people who you could target

12   repeatedly; correct?

13   **A.**    Yes.

14   Q.    All right.  Andrea Burrow also handled customer service;

15   is that fair?

16   **A.**    She would go -- she would basically go through it, and if

17   there was some main things that needed to be responded to,

18   like the refunds or Attorney General letters and such like

19   that, then she would give those to me.

20   Q.    Okay.  So if she were to receive a complaint, that would

21   be passed along to you; right?

22   **A.**    She should have, yeah.  She should have given them to me.

23   Q.    Okay.  And you would review them?

24   **A.**    Yes.

25   Q.    And you never provided any of those complaints to the

1    defendants; right?

2    **A.**    No, sir.

3    **Q.**    And did you at some point tell Inspector Bouchie that, if

4    a customer responded repeatedly to the sweeps reports, that it

5    was obvious that they didn't know the promotion was for a

6    sweeps report?

7    **A.**    Yes.

8    **Q.**    And that you would remove them from the list?

9    **A.**    Try to, yes.

10    **Q.**    Okay.  So when you testified yesterday that when somebody

11    responds and you would target them upward of 30 times, that's

12    inconsistent with saying, if they were to respond repeatedly,

13    you would remove them because they didn't know it was for a

14    sweeps report; right?

15    **A.**    Repeat that for me, please.

16    **Q.**    So yesterday you testified that -- well, let's just --

17    let me ask it in a more simple way.  If somebody responded to

18    a promotion and sent you money --

19    **A.**    Correct.

20    **Q.**    -- you would target them again; right?

21    **A.**    Correct, yes.

22    **Q.**    And again and again and again; right?

23    **A.**    Correct.

24    **Q.**    Okay.  So when you told Inspector Bouchie that, if

25    somebody responded multiple times to a sweeps report, it was

1    obvious they didn't understand what they were buying was a

2    sweeps report and you would remove them from the list, that

3    wasn't true, was it?

4    **A.**    No.  If somebody responded multiple times -- and you

5    could tell because, if the checks started bouncing -- like,

6    say you had, you know, seven bad checks from some person, that

7    they had responded over and over and over, it was definitely

8    understood that they keep sending it and it keeps bouncing,

9    they don't understand what is going on, and those people would

10   be pulled out of the list.

11   Q.    So you're removing people for bouncing checks; is that

12   what you're saying?

13   **A.**    Correct.

14   Q.    Okay.  So Andrea Burrow, in addition to receiving the

15   checks, the cash, the complaints, is she also receiving

16   cease-and-desist orders?

17   **A.**    No.

18   Q.    Okay.

19         **MR. GAFFNEY:**  Can we put up Exhibit 120, please?

20   **BY MR. GAFFNEY:**

21   Q.    Do you see that on your screen?

22   **A.**    Yeah.  Yes.

23   Q.    Okay.  Looking at Exhibit 120 and the company names of

24   businesses that received a cease-and-desist order there, do

25   you see Marketing Image Direct listed?

1  **A.**   No, sir.

2  Q.   Do you see Digital Express listed?

3  **A.**   No, sir.

4  Q.   Okay.  As far as you know, neither of those companies

5  received cease-and-desist orders; right?

6  **A.**   Correct, sir.

7  Q.   Do you see Price Awards listed?

8  **A.**   No, sir.

9  Q.   I want to go through some of these e-mails that we've

10  already looked at.  Hopefully we can do it fairly quickly.

11       **MR. GAFFNEY:**  Brian, can you put up Exhibit 161?  And

12  if you could blow up the top there.

13  **BY MR. GAFFNEY:**

14  Q.   You recognize this e-mail; right?

15  **A.**   Yes, sir.

16  Q.   We talked about it.

17       And obviously you can see that this is an e-mail

18  between you and -- is it Mr. Fennell?

19  **A.**   Yes, sir.

20  Q.   Okay.  And none of the defendants are copied on this

21  e-mail; right?

22  **A.**   No, sir.

23  Q.   Okay.

24       **MR. GAFFNEY:**  Brian, can we go to 163?  So if we

25  could blow up the bottom portion?

1   **BY MR. GAFFNEY:**

2   Q.   And I'll try to be brief.  I know Mr. Tomsheck already

3   covered this.  This is an e-mail between you and Edgar Del

4   Rio; right?

5   A.   Yes, sir.

6   Q.   And this is you telling Edgar that you have essentially

7   transformed the businesses that have received cease-and-desist

8   orders into new businesses; right?

9   A.   Correct.

10  Q.   Okay.  So the top line says:  Okay.  Here is what I have

11  set up so we don't miss a beat.  Right?

12  A.   Yes, sir.

13  Q.   Okay.  So this is you telling Edgar, hey, don't worry,

14  I've already fixed this, here's what we're going to do?

15  A.   Yes, sir.

16  Q.   Okay.

17          **MR. GAFFNEY:**  And can we scroll up, Brian?

18  Actually -- okay.  That's good.

19          Can we go to Exhibit 179, please?

20  **BY MR. GAFFNEY:**

21  Q.   Okay.  So this is an e-mail exchange between you and

22  Edgar Del Rio; right?

23  A.   Yes, sir.

24  Q.   And this is where Edgar is asking you what to do about a

25  box of mail.

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1          **MR. GAFFNEY:**  Brian, can you blow up the top, that

2     top message there?

3     **BY MR. GAFFNEY:**

4     Q.   Do you see that?

5     **A.**   Yes.

6     Q.   Okay.  And he's asking you whether he should call Andrea

7     or whether you want to pick it up; right?

8     **A.**   Yes.

9     Q.   All right.  And you direct him to call Andrea?

10    **A.**   Yes.

11    Q.   Okay.  And as we can see, this is a message between you

12    and Edgar.  None of the defendants are copied on this e-mail;

13    right?

14    **A.**   Yes.

15          **MR. GAFFNEY:**  And can we go to Exhibit 197, please?

16    **BY MR. GAFFNEY:**

17    Q.   This is an e-mail between you and Mr. Fennell?

18    **A.**   Yes, sir.

19    Q.   And you are directing him to cancel a work order;

20    correct?

21    **A.**   Yes, sir.

22    Q.   Okay.  None of the other Castros are copied on this;

23    correct?  None of the defendants, I should say.

24    **A.**   No, sir.

25    Q.   Okay.

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1          **MR. GAFFNEY:**  And can we also go to Exhibit 188?

2    **BY MR. GAFFNEY:**

3    Q.   And so this is an e-mail where you're instructing

4    Mr. Fennell to cancel another promotion; right?

5    **A.**   Yes.

6    Q.   And you're switching the old promotions -- well -- yeah,

7    you're switching the old promotions to a new promotion; is

8    that fair?

9    **A.**   Yes.

10   Q.   And so in this e-mail you say -- the last sentence there

11   is -- well, second to the last sentence is:  Can you send the

12   data to Sean for the AAA01 that is to mail on the night

13   tomorrow?  They want to get it set up.  Right?

14   **A.**   Yes.

15   Q.   All right.  So this is an e-mail where you are sort of

16   directing the flow of data to Mr. Fennell; right?

17   **A.**   Yes.

18   Q.   Okay.  And none of the defendants are copied on this

19   e-mail; correct?

20   **A.**   No.

21          **MR. GAFFNEY:**  Can we go to Exhibit 196, please?

22   **BY MR. GAFFNEY:**

23   Q.   This is an e-mail between you and Sean O'Connor?

24   **A.**   Yes, sir.

25   Q.   All right.  And this is you providing data for one of the

1    fulfillment promotions; right?

2    **A.**    Yes, sir.  Yes.

3    Q.    And this is also you discussing with Sean O'Connor the

4    logistics of how to print the promotion so it will fit within

5    a windowless envelope; is that fair?

6    **A.**    Yes.

7    Q.    Okay.  So this is you directing Sean O'Connor to talk to

8    Mario about the printing logistics of this; right?

9    **A.**    Yes.

10          **MR. GAFFNEY:**  And can we go to Exhibit 198?

11   **BY MR. GAFFNEY:**

12   Q.    This is another e-mail between you and Mr. O'Connor where

13   you're again providing data sheets for upcoming jobs; is that

14   fair?

15   **A.**    Yes.

16   Q.    Okay.  And none of the defendants are copied on this

17   e-mail; right?

18   **A.**    No, sir.

19   Q.    Okay.  In regard to the promotion you did with your

20   husband, how much money did you and your husband make on that

21   promotion?

22   **A.**    Maybe -- maybe a couple thousand dollars.

23   Q.    A couple thousand dollars?

24   **A.**    Yeah.

25   Q.    How much?  Can you ballpark it?

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1   **A.**   Let's see.  It was 15... I'd say roughly around 3,000 or

2   so.

3   Q.   $3,000 total for you and --

4   **A.**   As far as profit, yes.

5   Q.   As far as profit?

6   **A.**   Yes.

7   Q.   How much total -- in total?  How many -- in regard to the

8   victim checks or the victims that responded and sent you

9   money, how much money was sent in?

10  **A.**   I don't remember, sir.

11  Q.   Okay.  If I told you it was in excess of $100,000, would

12  you have a reason to dispute that?

13  **A.**   For Promotional Marketing Solutions?

14  Q.   Yes.

15  **A.**   It... I'm -- I'm -- I don't -- I can't say I can dispute

16  it, no.  I don't -- I don't remember -- honestly don't

17  remember.

18  Q.   Okay.  Well, $100,000 is a lot more than $3,000; right?

19  **A.**   Yes.

20  Q.   Okay.  But you're saying you don't recall the exact

21  amount?

22  **A.**   No, sir.

23  Q.   Were you providing envelopes of cash to your husband in

24  regard to this -- in relation to this promotion?

25  **A.**   No.

1   Q.   You're aware that Miguel Castro had other businesses;

2   right?

3   **A.**   I believe so, yes.

4   Q.   Henderson Produce is one of those businesses; right?

5   **A.**   I don't know the name --

6   Q.   He owned a produce company, is that --

7   **A.**   I -- I knew somebody owned something of a produce

8   company.  I didn't know exactly whose it was, sir.

9   Q.   You're aware that in the letter shop there were more

10  things being printed than just these promotions; right?

11  **A.**   Yes.

12  Q.   Okay.  You're aware that they were printing stuff for

13  casinos; right?

14  **A.**   Yes.

15  Q.   Are you aware that they were also printing things like

16  T-shirts?

17  **A.**   Yes.

18  Q.   Banners?

19  **A.**   Yes.

20  Q.   Car wraps?

21  **A.**   Yes.

22  Q.   Are you aware that Miguel would travel to Mexico because

23  he had a business where he was selling plastic?

24  **A.**   No, sir, I did not know that.

25  Q.   Were you aware that he spent a significant time -- a

1  significant amount of time in Mexico between 2011 and 2018?

2  **A.**   No, sir.

3  Q.   So just to be clear, my client is Miguel Castro, and he

4  never designed any of these promotions; right?

5  **A.**   No, sir.

6  Q.   He never drafted any of the language that were contained

7  in the promotions; right?

8  **A.**   No, sir.

9  Q.   He never gave any input to the content or the artwork;

10  right?

11  **A.**   No, sir.

12  Q.   He didn't have to approve the content before anything was

13  mailed; right?

14  **A.**   No, sir.

15  Q.   He never ordered any broker lists with the names and

16  addresses of the victims; right?

17  **A.**   No, sir.

18  Q.   He didn't draft the disclosure on the back of the sweeps

19  reports where you see the -- the rules; right?

20  **A.**   Right.

21  Q.   He didn't create the fictitious name of the company

22  officials on these promotions?

23  **A.**   No, sir.

24  Q.   He didn't receive any customer complaints; right?

25  **A.**   No, sir.

1   Q.   And he never received any cease-and-desist orders that

2   you're aware of; right?

3   A.   Right.

4   Q.   Okay.

5           MR. GAFFNEY:   I'll pass the witness, Judge.

6           THE COURT:   All right.  We'll go ahead and take our

7   morning break at this time.  I remind the jury that you are

8   not permitted to talk to each other about this case or to

9   anyone else.  You can talk to each other about other things

10  but not about this case.  Remember you are not to discuss

11  anything with the attorneys at all or the parties or the

12  witnesses or people that are involved with the attorneys.

13  Please do not read or listen to or view anything that touches

14  upon this case in any way or attempt to perform any research

15  or any investigation.

16           I did receive a jury note earlier today, and we

17  are -- I did provide that information to the attorneys about a

18  question that somebody had regarding a part of the case.  Not

19  a question for this particular witness but, you know, just a

20  thought that entered into somebody's mind about how does that

21  work.  And so it's important that you go ahead and do that.

22  Let us know so that the attorneys can try to figure out a way

23  to introduce that information to you here in the courtroom so

24  everybody has a chance to -- to ask questions or provide

25  information to you.  Please don't go outside of the courtroom

2:19-cr-00295-GMN-NJK - March 29, 2023

1    for that information.

2            So it is -- well, it was 10:30.  It's now 10:33.

3    Let's go ahead and take our morning break.  We'll plan to be

4    back here by 10:50, if possible.

5            We'll stand for the jury as they are the judge of the

6    facts and welcome them back at 10:50.

7        *(Jury out at 10:33 a.m.)*

8            **THE COURT:**  Ms. Kern, after the jury exits, you may

9    also take your morning break, and we'll ask you to please be

10   back here at 10:50.

11           **MR. FINLEY:**  Your Honor?

12           **THE COURT:**  Yes.

13           **MR. FINLEY:**  I'm sorry.  We just wanted to let you

14   know -- and I'm informed the defense are okay with it -- we

15   would like to call Eileen Beiter, a victim, out of order

16   because she's from out of town and her travel plans.

17           **THE COURT:**  Okay.  Wait.  So, Ms. Kern, come back,

18   please.  I'm sorry.

19           **MR. FINLEY:**  At 1:00.  At 1:00.

20           **THE COURT:**  So, Ms. Kern, we'll have you back at

21   1:00 o'clock.  So I --

22           **MR. FINLEY:**  No, Your Honor.  We will call the --

23   Ms. Beiter at 1:00.

24           **THE COURT:**  Oh.  We're calling someone else at 1:00.

25   Okay.  Never mind.  I was confused.  My mistake.  So we still

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1   need you back at 10:50, but it looks like you're going to have

2   a longer lunch.

3          Will this next witness take up the whole afternoon,

4   or will Ms. Kern need to come back at some point?

5          **MR. FINLEY:**  We expect it to be very short.

6          **THE COURT:**  Okay.  All right.  Thank you for that.

7          **MR. FINLEY:**  Thank you, Your Honor.

8      *(Recess at 10:34 a.m., until 11:00 a.m.)*

9          **COURTROOM ADMINISTRATOR:**  All rise.

10         **THE COURT:**  All right.  Do we have Ms. Kern back, or

11  did I confuse her?  Oh, good.  She's back.

12         **COURTROOM ADMINISTRATOR:**  All rise.

13     *(Jury in at 11:01 a.m.)*

14         **THE COURT:**  All right.  Everyone may be seated.

15  We're back on the record.  The jury has returned from the

16  morning break.  We have the witness back on the stand,

17  Ms. Patti Kern.  Mr. Gaffney, on behalf of Miguel Castro,

18  finished his cross-examination, and has passed the witness.

19  So now we have Mr. Mishler on behalf of Jose Luis Mendez

20  cross-examination.

21         Sir, whenever you're ready.

22         **MR. MISHLER:**  Thank you, Your Honor.

23                          **CROSS-EXAMINATION**

24  BY MR. MISHLER:

25  Q.   Ms. Kern, how are you doing?

1   **A.**   Good.

2   **Q.**   All right.  So they asked a lot of good questions, so I'm

3   going to try to not duplicate it where I can.  Sometimes I

4   might, though, so I apologize.

5          So Mr. Gaffney asked you about Miguel Castro.  So I

6   want to ask you some of the same questions about my client,

7   Jose Luis Mendez.  Okay?

8          Jose Luis Mendez never designed any of the

9   solicitations that his company sent out, did he?

10  **A.**   No.

11  **Q.**   Okay.  He didn't draft the language in those promotions?

12  **A.**   Beg your pardon?

13  **Q.**   He didn't draft the language that was in those

14  promotions?

15  **A.**   No, sir.

16  **Q.**   And he didn't approve the contents of those promotions?

17  **A.**   No, sir.

18  **Q.**   He didn't order any of the lists?

19  **A.**   No, sir.

20  **Q.**   He didn't draft any of the disclaimer language that was

21  in them?

22  **A.**   No, sir.

23  **Q.**   And he didn't create the -- the names that were in these,

24  like the person who signs the promotions; right?

25  **A.**   No, sir.

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1   Q.   And -- all right.  Let's find something new.  Maybe not

2   new.  Let's look at your husband's company, and that was

3   Promotional Marketing Solutions?

4   **A.**   Yes, sir.

5   Q.   Okay.

6        **MR. MISHLER:**  Brian, if you'd put up 9038 for me?

7   **BY MR. MISHLER:**

8   Q.   You can see it on your screen; right?

9   **A.**   Yes, sir.

10  Q.   Okay.

11       **MR. MISHLER:**  Brian, will you go to page 8 for me?

12  **BY MR. MISHLER:**

13  Q.   You recognize this, don't you?

14  **A.**   I'm sorry?

15  Q.   Do you recognize this?

16  **A.**   It's been a lot of years, but I know what it is, yes.

17  Q.   What is it?

18  **A.**   That is the payment promotion.

19  Q.   That was your husband's promotion?

20  **A.**   Correct.

21  Q.   Okay.  So I'm going to just go over a couple of things.

22  Your husband didn't choose the graphics of this promotion;

23  right?

24  **A.**   No, sir.

25  Q.   And your husband didn't choose the fake name that's on

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    this promotion?

2    **A.**    No, sir.

3    Q.    All right.  It may be on the next page.

4        **MR. MISHLER:**  Can we go to the next page, Brian?

5    **BY MR. MISHLER:**

6    Q.    Do you see the name on that?

7    **A.**    Yes.

8    Q.    What is that name?

9    **A.**    The Henry Wanderman, is that what --

10   Q.    I think that's what it says, yeah.

11   **A.**    Yeah.

12   Q.    And your husband didn't choose that name to be put in;

13   right?

14   **A.**    No, sir.

15   Q.    He didn't get the list of names to send the promotions

16   his company mailed out to; right?

17   **A.**    No, sir.

18   Q.    You did all of those things; right?

19   **A.**    Yes, sir.

20   Q.    Okay.  And -- I apologize.  I didn't ask.  The prize

21   amount that's in this notice, your husband didn't choose that

22   prize amount either; right?

23   **A.**    No, sir.

24   Q.    That was you?

25   **A.**    Yes, sir.

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1  Q.   Okay.  Let's talk about Jose Luis Mendez's company.

2  That's AAS; right?

3  **A.**   Yes.

4  Q.   And that's Advanced Allocation Systems?

5  **A.**   Yes.

6  Q.   Okay.  And Jose Luis Mendez had that company in his name?

7  **A.**   Yes, sir.

8  Q.   And he had the bank account for that company in his name?

9  **A.**   Yes, sir.

10  Q.   The mailboxes that were forwarding mail from, like,

11  Florida were in his name?

12  **A.**   Yes, sir.

13  Q.   And he had the mail sent to his house?

14  **A.**   Yes, sir.

15  Q.   Okay.  So you actually picked the name Advanced

16  Allocation Systems, didn't you?

17  **A.**   No, I did not.  I don't -- I don't believe I did.

18  Q.   All right.

19       **MR. MISHLER:**  Brian, would you put up Exhibit 9018?

20  **BY MR. MISHLER:**

21  Q.   Do you recognize this, ma'am?

22  **A.**   Yes.

23  Q.   What is this?

24  **A.**   That is a e-mail from me to Sean at National Print and

25  Mail.

1    Q.   Okay.  So let's look at the bottom part of that e-mail

2    first.  It appears Sean e-mailed you first; right?

3    **A.**   Yes.

4    Q.   And he's saying here's some names that I came up with;

5    right?

6    **A.**   Yes.

7    Q.   And you respond to him?

8    **A.**   Yes.

9    Q.   You picked three of the names that were on his list?

10   **A.**   Yes.  I said the three that I liked.

11   Q.   And then you added a fourth one?

12   **A.**   Yes.

13   Q.   Okay.  So this looks to me like you're picking the name.

14   **A.**   I was just responding to Sean as far as -- because I

15   believe that Sean made the decision on what name to use.

16   Q.   So Jose Luis Mendez didn't pick the name of the company?

17   **A.**   No, sir.

18   Q.   Okay.  And I believe your testimony was that you had the

19   checkbook for all of the Advance Allocation Systems companies?

20   **A.**   Yes.

21   Q.   Okay.  And you also had Mr. Mendez's signature stamp?

22   **A.**   Yes, sir.

23   Q.   You wrote all of the checks from Mr. Mendez's companies?

24   **A.**   Yes, sir.

25   Q.   Okay.  To your knowledge, Mr. Mendez didn't ever write a

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1    single check from those companies?

2    A.    I don't believe so, no.

3    Q.    All right.  And on the promotions for Mr. Mendez's

4    company, you chose the prize amounts for those promotions;

5    right?

6    A.    Yes.

7    Q.    In fact, one of the promotions was originally your

8    husband's promotion; right?

9    A.    I believe so.  I think we may have switched that over to

10   Jose Luis' company.

11   Q.    A change from PMS to AAS?

12   A.    Yes.

13   Q.    Okay.

14   A.    It's possible, yes.

15   Q.    And you would have to make some changes; right?

16   A.    Yes.

17   Q.    What were some of those changes?

18   A.    Oh, we probably changed the graphics.  Possibly the

19   prize -- again, depending -- the -- the money amount and so --

20   to make it look different.  And, of course, the part number

21   and the name of who the person would send the -- the money --

22   check back -- name's in.  So it had to be changed to -- to

23   Advanced Allocation Systems.

24   Q.    And, again, those were all your decisions?

25   A.    Yes.

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1              **MR. MISHLER:**  So if you would pull up

2    Government's Exhibit 173, Brian.

3    **BY MR. MISHLER:**

4    Q.   I believe we've looked at this e-mail a couple of times,

5    so I'll try to limit the questions for you.

6              You remember what this e-mail is; right?

7    **A.**   Yes.

8    Q.   This is basically you trying to figure out who's

9    complaining to law enforcement?

10   **A.**   Correct.

11   Q.   Okay.  And so when victims complained to law enforcement,

12   postal inspectors, what have you, a report would get filed and

13   you'd get a cease and desist?

14   **A.**   Yes.

15   Q.   And as a result, you want to find out who they are to

16   remove those names from the list?

17   **A.**   Yes.

18   Q.   And you maintain the list?

19   **A.**   Yes.

20   Q.   Okay.  And if you can look at the very bottom line for

21   me.  Some of the people who complained were previously

22   victims; right?

23   **A.**   Yes.

24   Q.   Just at some point they figured out of this isn't

25   legitimate?

1    **A.**    Yes.

2    Q.    So they would complain at that point?

3    **A.**    Yes.

4    Q.    And how did you refer to them?

5    **A.**    Oh.  That time I called them a not-so-nice word.

6    Q.    What was that?

7    **A.**    Asshole.

8    Q.    Okay.  So let me ask you about the name on the very top

9    of this.  I think it's the very first.  See that name there?

10    **A.**    The -- the -- in the --

11    Q.    No.  I apologize.  The victim name there.

12    **A.**    Yes.

13    Q.    Whose name is that?

14    **A.**    It's a Linda Etter.

15    Q.    Linda Etter?

16    **A.**    Yes.

17    Q.    Okay.  That's one of the victims of your -- of your

18    fraud; right?

19    **A.**    Yes.

20    Q.    Is there anything she did in particular that made you

21    think she was an asshole?

22    **A.**    We thought that -- that the sample that -- sometimes when

23    you would get a cease and desist, it would have a sample of

24    the promo and then it -- they would black out the person's

25    name.  So it was like -- so this would have been someone that

1    was on the sample from -- from G.A.M. when it got shut down.

2            Did that -- that was -- is that what you wanted?

3    Q.   Let me ask it a different way.

4    **A.**   Okay.

5    Q.   Did you think all of the victims that reported you were

6    assholes or her in particular?

7    **A.**   Oh.  It was just a -- like, when somebody cuts you off in

8    traffic, you know, it was -- it was just a comment.  It wasn't

9    meant like I thought everybody was a asshole.

10   Q.   Okay.  I understand.

11           Have you ever met Linda Etter?

12   **A.**   No, sir.

13   Q.   Okay.  So I think we've -- we've talked at some length

14   about the attorney that you used when you received the cease

15   and desist.  Do you remember that?

16   **A.**   Yes.

17   Q.   The -- the New York attorney; right?

18   **A.**   That was for the -- the civil part of it.

19   Q.   Okay.  So in 2017 you actually talked to Epi Castro and

20   you told Epi talk to Mr. Mendez, tell him it's time to review

21   the promotions.  Do you remember that?

22   **A.**   I remember talking to Mario, and we talked -- I talked to

23   Mr. Mendez.  We needed -- if it was going -- if -- at that

24   time the list -- the place where we rented the lists -- and

25   Mr. Mendez's company at that time was mailing most of what we

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    call the hotline list at that time.  So his company was one

2    that was getting the outside list ordered for.

3           So at that time the list rental company informed us

4    that in order for them to rent names they needed a certificate

5    from a lawyer saying that the piece was clean or not

6    misleading.  That was the discussion.

7    Q.   Now, you told somebody to tell Mr. Mendez that?

8    **A.**   He was involved in it, too.

9    Q.   Right.  But you just said -- I asked if you told Epi.

10   You said, no, I told Mario to tell Mr. Mendez.

11   **A.**   I don't think I was dealing with Epi on that.  It would

12   have been Mario and Mr. Mendez.

13   Q.   Okay.  So, in fact, you actually e-mailed copies of the

14   promotions to an attorney to review; right?

15   **A.**   Yes.

16   Q.   All right.

17         **MR. MISHLER:**  Brian, if you'd pull up Exhibit 9020.

18   **BY MR. MISHLER:**

19   Q.   Do you recognize this e-mail?

20   **A.**   Yes.

21   Q.   Who is this from?

22   **A.**   From me.

23   Q.   And who are you e-mailing to?

24   **A.**   Lustigman firm in New York to review the -- talk to them

25   about reviewing the forms.

1  Q.  Okay.  So your attorney actually reviewed the promotions

2  you were using to mail out?

3  **A.**  Yes.

4  Q.  Okay.  And you paid him to do that; right?

5  **A.**  Yes.

6  Q.  $1,500?

7  **A.**  Yes.

8  Q.  Okay.  So after you had the attorney review these

9  promotions, you told -- and I think it's Mario because you

10  said you weren't working with Epi.  You told Mario to tell

11  Mr. Mendez that the lawyer had approved the promotions?

12  **A.**  No, they never approved the promotions.  I told them that

13  they wouldn't approve them.

14  Q.  Who did you tell that?

15  **A.**  I told Mario and I'm pretty sure I told Mr. Mendez.

16  Because asking at that time, then the list rental place said,

17  okay, don't go with the sweeps report, try puzzles again.

18  Puzzle promotions seem to not be -- being as scrutinized at

19  the time.  So Mr. Mendez was going to get -- then we started

20  working on a brand-new promotion that was a puzzle promotion

21  that his company was going to mail.

22  Q.  And you would have put all of that together?

23  **A.**  Beg your pardon?

24  Q.  You would have put that promotion together?

25  **A.**  Yes.

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

```
 1    Q.   All right.

 2              THE COURT:  Just to clarify, did you say puzzle

 3    promotion?

 4              THE WITNESS:  Yes.

 5              THE COURT:  Okay.  Thanks.

 6    BY MR. MISHLER:

 7    Q.   Do you remember going to the letter shop, seeing

 8    Mr. Mendez, picking up one of his promotions, showing it to

 9    him, and giving him a thumbs-up?

10    A.   No, sir.

11              MR. MISHLER:  Can we look at Government's

12    Exhibit 120?

13    BY MR. MISHLER:

14    Q.   We've talked about this quite a bit; right?

15    A.   Yes, sir.

16    Q.   All right.  And the first cease and desist on this list

17    is your company; right?

18    A.   Yes.

19    Q.   And it has your name on it?

20    A.   Yes.

21    Q.   Because you received a cease and desist?

22    A.   Yes, sir.

23    Q.   All right.  In the middle for Promotional Marketing

24    Solutions, that's your husband's company?

25    A.   Yes.
```

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    Q.   And he got a cease and desist?

2    **A.**   Yes, sir.

3    Q.   Okay.  I don't see Mr. Mendez's name.

4    **A.**   No, sir.

5    Q.   He didn't get a cease and desist?

6    **A.**   No, sir.

7    Q.   All right.

8           **MR. MISHLER:**  If you'll pull up Exhibit 204?

9    **BY MR. MISHLER:**

10   Q.   You remember this exhibit; correct?

11   **A.**   Yes, sir.

12   Q.   Okay.  It's a lot of e-mails.  All of them are to you or

13   from you?

14   **A.**   Correct.

15   Q.   All right.  And some of the other people involved are

16   Andrea Burrow?

17   **A.**   Yes.

18   Q.   Sean O'Connor?

19   **A.**   Yes.

20   Q.   Edgar Del Rio?

21   **A.**   Yes.

22   Q.   I don't see any of these e-mails were ever sent to or

23   from Mr. Mendez; is that right?

24   **A.**   No, sir.

25   Q.   Okay.  Do you even know Mr. Mendez's e-mail?

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    **A.**    No, I do not.

2    Q.    You actually never even sent him an e-mail, did you?

3    **A.**    No, sir.

4    Q.    Okay.  Thank you.

5          **THE COURT:**  Mr. Green, do you have any

6    cross-examination questions for Ms. Kern?

7          **MR. GREEN:**  Yes, please, Your Honor.

8          **THE COURT:**  Go ahead, sir.

9          **MR. GREEN:**  Thank you.

10                    **CROSS-EXAMINATION**

11   BY MR. GREEN:

12   Q.    Good morning, Ms. Kern.

13   **A.**    Good morning.

14         **MR. GREEN:**  May we have Exhibit 7027 put on the

15   screen, please?

16   BY MR. GREEN:

17   Q.    Before you, ma'am, is Exhibit 7027.  Do you recognize

18   that person?

19   **A.**    Yes, sir.

20   Q.    Was that photograph taken on the morning of Wednesday,

21   February 21st, 2018?

22   **A.**    Yes, sir.

23   Q.    Do you remember approximately what time that photograph

24   was taken?

25   **A.**    No, sir.

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

```
 1   Q.   On the morning of February 21st, 2018, I take it that at
 2   some time you got up and you went to the horse stables?
 3   A.   Yes, I had to feed.
 4   Q.   How long were you at the horse stables?
 5   A.   I was there until I received a phone call from the
 6   housekeepers.
 7   Q.   And in response to the call from the housekeepers, what,
 8   if anything, did you do?
 9   A.   I asked to speak to my -- my -- finally got to speak to
10   my daughter, and she just told me that -- that there was some
11   police there.
12   Q.   Okay.  I -- now, Ms. Kern, throughout this whole trial or
13   this -- these proceedings the past several days since last
14   Thursday, you were actually trying to hide from the police and
15   hide your identity; correct?
16   A.   Hide my identity, yes.
17   Q.   Yes.  So on the screen, is that Betsy Spear [sic], or is
18   that Patricia Kern?
19   A.   Both.
20   Q.   Thank you.
21        In the times that -- from let's say 2015 to
22   February 21st of 2018, how many times did you color your hair?
23   A.   Oh, it was... quite often.
24   Q.   Okay.  And what -- what colors were they?  I got to ask.
25   A.   Wild.
```

1    Q.    Well, describe wild.

2    **A.**    Geisha looking.  Sometimes it would be blue.  Sometimes

3    it would be three or four colors.

4    Q.    Like a rainbow?

5    **A.**    Yes, sir.

6    Q.    But I take it you always wore glasses?

7    **A.**    No, sir.

8    Q.    Oh, you didn't?

9    **A.**    No.  I -- I only wear them when I need to read.

10    Q.    Okay.  But you're wearing the glasses today?

11    **A.**    Yes, sir.

12    Q.    And you're wearing the glasses in the photograph that's

13    7027; correct?

14    **A.**    Yes, sir.

15    Q.    That is the -- the person in 727 [sic] is Patti Kern and

16    Betsy Spear [sic]?

17    **A.**    Spider.

18    Q.    Okay.  Thank you.

19         **MR. GREEN:**  May we have Government's Exhibit 121 put

20    on the screen, please?

21    **BY MR. GREEN:**

22    Q.    I believe that Exhibit 121, is it -- was that -- was that

23    found in your house?

24    **A.**    Yes, sir.

25    Q.    Okay.  And it was found in your house on February 21st,

1    2018?

2    **A.**    Yes, sir.

3         **MR. GREEN:**  And if we can zoom in on a date.  Is

4    there a date on that top right?

5    **BY MR. GREEN:**

6    Q.    Do you see a date over on the right?  It's, like, written

7    in --

8    **A.**    Yes, sir.

9    Q.    -- in handwriting?

10         What is that date?

11   **A.**    April 21st, 2009.

12   Q.    April 21st, 2009.  So that would be, like, almost nine

13   years -- oh, see, almost nine years, and you had that in your

14   house?

15   **A.**    Yes, sir.

16   Q.    And in your house you had a money counter?

17   **A.**    Yes, sir.

18   Q.    You had books, books like the books of account?  You had

19   checkbooks?

20   **A.**    I had checkbooks, yes.

21   Q.    You had -- you had stamps for signing the -- you know,

22   signature stamps?

23   **A.**    Yes, sir.

24   Q.    I take it that you also had the stamps that you had for

25   the back like for deposits?

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

 1   **A.**   Yes, sir.

 2   Q.   And you had -- you had a computer?

 3   **A.**   Yes, sir.

 4   Q.   Because you said the Government seized your computer.

 5   **A.**   Yes, sir.

 6   Q.   And this was in a home office?

 7   **A.**   Yes, sir.

 8   Q.   And this was at 1861 Bogey Way in Henderson, Clark

 9   County, Nevada?

10   **A.**   Yes, sir.

11   Q.   So in your office -- and so, actually, were you running

12   like a business out of your home office?

13   **A.**   Yes.

14   Q.   And you also had a safe there; correct?

15   **A.**   Yes, sir.

16   Q.   And how fast did you -- when you left the horse stables,

17   how fast did you rush home?

18   **A.**   As fast as I could rush home.  My daughter was there by

19   herself.  Well, not by herself, but...

20   Q.   I take it when you got -- when you got to your house,

21   like, a near state of shock?

22   **A.**   Yes, sir.

23   Q.   Because Patti Kern had been found out?

24   **A.**   Yes, sir.

25   Q.   Okay.  Now, in your house you had some $170,000 in U.S.

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1    currency?

2    **A.**    Yes, sir.

3    Q.    Can you describe the denominations of the bills, if you

4    remember?

5    **A.**    I don't remember, sir.

6    Q.    Okay.  Would it be safe to say that a majority of that

7    money came in from the -- from the victims who sent in cash?

8    **A.**    Yes.  That was savings from ever since I'd been in the

9    direct mail business prior to the cease and desist.  That was

10   a -- many years of savings.

11   Q.    But the cease and desist is dated in April of 2019 [sic].

12   That -- that didn't stop you, did it?

13   **A.**    You mean the one in 2009?

14   Q.    The 2009 cease-and-desist order which was found in your

15   house, that didn't stop you, did it?

16   **A.**    No, sir.

17   Q.    You continued to defraud people?

18   **A.**    Yes, sir.

19   Q.    You continued to defraud people who you work with?

20   **A.**    I never lied or defrauded the people I worked with.

21   Q.    Okay.  You know, did you defraud yourself?

22   **A.**    I guess you could look at it that way.

23   Q.    Okay.

24          **MR. GREEN:**  May we have Government's Exhibit 19 put

25   on the screen, please?  Okay.  Could we go to page 3?

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1    **BY MR. GREEN:**

2    Q.    Just giving you an example here.  Before you is, like,

3    one of these promotions that went out?

4    **A.**    Yes, sir.

5    Q.    Okay.  On the right where it says 678,000-and-change,

6    there's some handwriting.

7              **MR. GREEN:**  Can we zoom in on that, please?

8    **BY MR. GREEN:**

9    Q.    What does it say next to the -- to the dollar amount,

10   ma'am?

11   **A.**    This is verified okay, and then there's some initials.

12   Q.    JW.  Right.  Do you see that letter T and the word

13   "this"?

14   **A.**    Yes, sir.

15   Q.    That's very distinctive, isn't it?

16   **A.**    I don't understand.

17   Q.    It's very -- that letter T, is that your writing?

18   **A.**    No, sir.

19             **MR. GREEN:**  Can we go to Government's -- can we go to

20   Exhibit 9032?  Can we zoom in to the fourth line from the

21   bottom, please, on page 1.  Page 1.  We zoom in on the bottom

22   half of -- right there.  Zoom in.

23   **BY MR. GREEN:**

24   Q.    Do you see on the -- on the Exhibit 9032 where it starts

25   with the word "these," do you see that T?

1    **A.**    Yes.

2    Q.    Is that your writing?

3    **A.**    Yes, sir.

4    Q.    And down below it says the group -- do you see that

5    letter T in capital letters?

6    **A.**    Yes, sir.

7    Q.    Is that your writing?

8    **A.**    Yes, sir.

9        **MR. GREEN:**    Can we go to page 2 of 9032, please?

10    Right in the middle right after the name Andrea Burrow, can

11    that be highlighted, please?    Right in the middle.

12    **BY MR. GREEN:**

13    Q.    Okay.    Do you see where the words Andrea Burrow are?

14    **A.**    Yes, sir.

15    Q.    You see the letter T in the word "the"?

16    **A.**    Yes, sir.

17    Q.    Is that your writing?

18    **A.**    Yes, sir.

19        **MR. GREEN:**    Can we go back to Exhibit 19, please?

20    Can we zoom in on that -- that amount right there where -- the

21    dollar amount.

22    **BY MR. GREEN:**

23    Q.    See that letter T?

24    **A.**    Yes, sir.

25    Q.    You're saying that's not your writing?

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    **A.**    That's not my writing.

2          **MR. GREEN:**  Go to Exhibit 280, please.

3    **BY MR. GREEN:**

4    Q.    These are the mailing company charts.  Agreed?

5    **A.**    Yes, sir.

6    Q.    And on here it does show the name of Salvador Castro?

7    **A.**    Yes, sir.

8    Q.    And Salvador Castro opened up some -- some mailboxes?

9    **A.**    Yes, sir.

10   Q.    And you said the other day that in the applications for

11   the mailboxes you actually filled that information out;

12   correct?

13   **A.**    Yes, sir.

14   Q.    So when -- when these applications were taken to a

15   mailbox place or wherever, the information in the middle where

16   these -- where the mail's to be forwarded and the names of the

17   company, that was written in the -- by Patti Kern or Betsy

18   Spear [sic]; correct?

19   **A.**    Sometimes, yes.

20   Q.    And to the best of your knowledge did, in fact,

21   Mr. Salvador Castro use his own name, his company, and his

22   home address?

23   **A.**    Yes, sir.

24   Q.    And his phone number?

25   **A.**    Yes, sir.

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    Q.   And I got to -- did you tell him to go to a mailbox

2    place?

3    **A.**   No.  The -- those -- paperwork was always usually faxed

4    over.  Nobody went to that --

5    Q.   Okay.

6    **A.**   -- places.

7    Q.   So when you get a -- how would he know to go to a mailbox

8    place if you faxed or e-mailed it over?

9    **A.**   I beg your pardon?  Repeat that, please.

10   Q.   Okay.  How would someone know to go to the mailbox place

11   if he just faxed it over?

12   **A.**   It was faxed over because we didn't use the boxes in

13   Nevada.

14   Q.   Okay.

15   **A.**   That box -- some of the boxes were -- most of them all

16   were out of state.

17   Q.   All right.  Do you know how that completed application

18   got to a mailbox out of state?

19   **A.**   Yes.  I faxed it for him.

20   Q.   So you faxed the completed applications for a mailbox to

21   mailbox places out of the -- out of the state of Nevada?

22   **A.**   Yes, sir.

23   Q.   And who chose those addresses for the mailboxes?

24   **A.**   They would -- Andrea would look for some.  I would look

25   for some.

1  Q.   But Mr. Castro didn't pick out the names; correct?  Or,

2  excuse me, Salvador Castro did not pick out the names?

3  **A.**   No, sir.

4  Q.   That is the names of the mailing -- of the -- of the

5  mailboxes or the locations of the mailboxes --

6  **A.**   Correct.

7  Q.   -- is that correct?  Yes?

8  **A.**   Correct.

9  Q.   Thank you.

10        Now, could we go -- in the inventory -- do you

11  remember seeing Government's Exhibit 241?  This was the

12  inventory of the search at -- at Bogey Way on February 21st,

13  2018?

14  **A.**   I don't remember -- I don't remember seeing it on the

15  screen, no, sir.

16  Q.   Okay?

17        **MR. GREEN:**  Can we put up Government's Exhibit 241,

18  please?  Can we highlight the first item?  A little bit more,

19  right where it says two debit cards.

20        **THE WITNESS:**  Okay.

21  **BY MR. GREEN:**

22  Q.   Now, do you see a reference to two debit cards in the

23  name of Salvador Castro and Golden Products?

24  **A.**   Yes, sir.

25  Q.   Okay.  And those were real debit cards.  They weren't --

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    they weren't Xeroxes; correct?

2    **A.**    No, sir.

3    Q.    And isn't it true that those -- once those -- bank

4    account was opened and the debit cards were delivered to you

5    by some manner or means, those debit cards were never used?

6    **A.**    Correct.

7    Q.    Okay.  And they were always in your house?

8    **A.**    Yeah, never used.

9    Q.    Thank you.

10          **MR. GREEN:**  Can we go to --

11   **BY MR. GREEN:**

12   Q.    Now, on 241, do you see where it says --

13          **MR. GREEN:**  Page 3.  If we could go to page 3 of

14   Exhibit 241, please?

15   **BY MR. GREEN:**

16   Q.    Right in the middle where it says sweepstakes mailing.

17   The sweepstakes mailing proof, what is a proof?

18   **A.**    Sweepstakes mailing proof, it would be like a -- a sample

19   of a package, of a mailing package.

20   Q.    Yes.  And you had mentioned yesterday about blank stock.

21   What is blank stock?

22   **A.**    That is the preprinted shells of the mailing promotions.

23   Q.    I see.

24          And there was a lot of money seized from your house

25   on February 21st of 2018; correct?

1    **A.**    Correct.

2    Q.    Boy, I bet you -- I bet you that was heartbreaking when

3    you saw that go, didn't you -- wasn't it?

4    **A.**    Yes, sir.

5    Q.    Okay.

6         **MR. GREEN:**    Can we have Government's Exhibit 93 put

7    on the -- put on the screen, please?  If we could go to

8    page 4, and if we could be -- top half could be highlighted.

9    **BY MR. GREEN:**

10    Q.    Okay.  If that -- on Exhibit 93, page 4, do you see a

11    name?

12    **A.**    Yes, sir.

13    Q.    Do you recognize that name?

14    **A.**    Yes, sir.

15    Q.    Now, down below it says Name Number 1.  What is that

16    name?

17    **A.**    That is my name.

18    Q.    Okay.  And over on the right it says uncollected;

19    correct?

20    **A.**    Yes.

21    Q.    Why did -- why didn't you collect the $3,341,006?  How

22    come you didn't collect it?

23    **A.**    Okay.  That is variable data.  So --

24    Q.    No, no, no.  How -- my question is very specific.

25    **A.**    Okay.

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1   Q.   Why didn't you collect that $3 million?  Your name's on

2   there.

3   **A.**   I didn't enter any sweepstakes or anything to -- I didn't

4   enter a sweepstakes to collect it.

5   Q.   Ms. Kern.  Ms. Kern, what -- weren't you trying to hide

6   your name and hide your identity from everybody?

7   **A.**   When it came to being on a company, yes.

8   Q.   How'd your name get on this document?

9   **A.**   Because I got a seed from every mailing.  So that's

10  variable data.  So when the address -- when it's -- when the

11  person's name was put in the address area, it would drop down

12  also into Name Number 1.

13  Q.   But, again, why would you -- why would you have this

14  done?  Your name, your home address where somebody could find

15  you, even if it wasn't sent out, why did you do that?

16  **A.**   I got these because I proofed them.  I've lived in the

17  same house for almost 25 years.

18  Q.   So you didn't use a mailbox?

19  **A.**   This was --

20  Q.   It's yes or no.

21  **A.**   No.  I don't --

22  Q.   You didn't use a mailbox in your own name?

23          Did you ever have a mailbox in your own name during

24  the period of this conspiracy?

25  **A.**   No, sir.

1  Q.   Okay.  But everybody else had mailboxes according to what

2  you've been testifying?

3  **A.**   Yes, sir.

4  Q.   Okay.  And do you see the name -- the second name, what's

5  that second name?  What is that --

6  **A.**   Dorothy Skyler.

7  Q.   Okay.  And the third name?

8  **A.**   David Wixom.

9  Q.   Okay.  And the fourth name?

10  **A.**   Walter Bondowski.

11  Q.   Okay.  And as to Names 2, 3, and 4, what does it say

12  about the confirmed prizes and collection?

13  **A.**   That they were collected.

14  Q.   So you wanted someone to believe -- or whoever did this

15  wanted someone to believe or make someone believe that

16  somebody won a lot of money?

17  **A.**   Yes, sir.

18  Q.   But Patti Kern didn't because she didn't collect it?

19  **A.**   This, where my name is on there, would have only come to

20  me.  This -- this particular -- so I got one seed.  There was

21  one printed with my name and address on it from every job that

22  went out.  That came to me at my house so I could check it.

23       As far as my name, that's just how the laser fill was

24  designed.  Whoever's name was in the address, that person's

25  name also was at -- was Number 1.  So it would change -- so,

1  now, say, the next person that was in the data that dropped

2  down to the next form, the person that that was addressed to,

3  their name would be then in Name Number 1.  Because you marked

4  it -- it was marked as uncollected because you wanted that

5  person to then return back the form with the money.

6  Q.   You wanted to defraud that person?

7  **A.**   Yes, sir.

8  Q.   Okay.  Did you -- were you going to send yourself $20, or

9  this was like a proof, a pretend?

10  **A.**   I'm sorry, I still don't --

11  Q.   Was this like the -- like pretend?  Let's just put a name

12  on here, let me check it out?

13  **A.**   It was meant so that I could check to make sure that the

14  laser fill was done correctly and that everything was put

15  where it was supposed to be.

16  Q.   Okay.  But we have the names Skyler, Wixom, and

17  Bondowski, those are on Exhibit -- those are on the exhibit

18  that's before you?

19  **A.**   Yes.

20  Q.   Okay.

21       **MR. GREEN:**  May we go to Government's Exhibit 009?

22  May we -- may we highlight the top half?

23  **BY MR. GREEN:**

24  Q.   Now, we have Mr. Miskovich testifying in this court.

25  Now, do you see an address for Mr. Miskovich?

1    **A.**    Yes.

2    Q.    Okay.  Do you see a Name Number 1 for Mr. Miskovich?

3    **A.**    Yes.

4    Q.    Okay.  And what's -- what's checked over on the right to

5    his name?

6    **A.**    Uncollected.

7    Q.    You wanted him to, say, oh, man, you're not collected,

8    you need to send in money?

9    **A.**    It means that he hadn't -- he could collect it.  He was

10    uncollected -- he uncollected it.  He hadn't got it yet.

11    Q.    Yes.  But the names -- Name Number 2, Skyler, same as the

12    one that was for Patti Kern; right?

13    **A.**    Yes.

14    Q.    Name Number 3 for -- I can't read that.  I can't read

15    that third name.  Excuse me.  I don't have my glasses on.  Oh.

16    Wixom, same name for Patti Kern?

17    **A.**    Yes.

18    Q.    Okay.  And then the last name, Bondowski, the same name

19    that was on the proof for Patti Kern?

20    **A.**    Yes.

21    Q.    Do you know the time difference between these two, when

22    you -- when you approved it and when it was sent out?

23    **A.**    Okay.  So I -- no, sir, I don't.

24    Q.    Okay.  But no matter what, you got money from all these;

25    correct?

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    **A.**    As did the -- as did the defendants.

2    **Q.**    And we've seen pictures of money in a safe and money in,

3    like, pouches.  Did you ever show that money to any of the

4    defendants?

5    **A.**    Those defendants got the same amount of money that I did.

6    **Q.**    You're not answering my question.

7          Did the defendants see the money in your house?

8    **A.**    No.

9    **Q.**    Did any of these people, Mario Castro, Miguel Castro,

10   Salvador Castro, or Jose Luis Mendez, ever go to your house?

11   **A.**    Jose Luis dropped off a box of mail once in awhile.

12   **Q.**    Okay.  Did you invite him in and say, look at my safe,

13   look at all the money we're making?

14   **A.**    He knew all the money we were making because he was

15   getting the same amount.

16   **Q.**    That's not my question.  My question is:  Did you take

17   him into the home office, open the safe, and show him the

18   money?

19   **A.**    No, sir.

20   **Q.**    Was the safe locked or was it opened when you -- when you

21   went home on February 21st, 2018?

22   **A.**    It was locked.  They asked me to open it.

23   **Q.**    Okay.  You opened it?

24   **A.**    Yes.

25   **Q.**    Okay.  Is there postal inspectors?

1    **A.**    Yes.

2    Q.    Did they have black jackets on?

3    **A.**    Yes, sir.

4    Q.    Did they have firearms?

5    **A.**    Yes, sir.

6    Q.    But you weren't handcuffed?

7    **A.**    No, sir.  I was searched outside.

8    Q.    Okay.

9    **A.**    I was frisked outside before coming into the house.

10    Q.    Inside the house you opened up the safe?

11    **A.**    Yes.

12    Q.    Okay.  And you knew at that moment that money was gone?

13    **A.**    Yes, sir.

14         **MR. GREEN:**  May we go to Exhibit 9040, please?

15    **BY MR. GREEN:**

16    Q.    Is that -- the picture, 9040, appear to be the front of

17    some kind of a residence or apartment or something?

18    **A.**    Yes.  That's my home.

19    Q.    Okay.  Like the front of your house?

20    **A.**    Yes, sir.

21    Q.    Okay.

22         **MR. GREEN:**  Can we go to -- I believe it's page -- if

23    we could scroll down?  I believe it's page -- it's where the

24    safe -- the safe is.  There we go.

25    **BY MR. GREEN:**

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    Q.   Now, you see the -- you see the picture -- for the

2    record, that is 9040 -- let me double-check here -- page 5 of

3    10 -- page 6 of 10.

4            Do you see that money nice and stacked up and put in

5    rubber bands or some kind of bands?

6    **A.**   Yes, sir.

7    Q.   Now, was that before -- I take it that was maybe after

8    you had counted the money with a money counter?

9    **A.**   Yes, sir.

10   Q.   So we had a safe in your home office with money?

11   **A.**   Yes, sir.

12   Q.   We had a money counter?

13   **A.**   Yes, sir.

14   Q.   The money counter, was that for, like, ease of counting

15   all the money that was coming in from these people?

16   **A.**   Yes, sir.

17   Q.   Okay.

18   **A.**   Yes, sir.

19   Q.   Were -- were -- did anybody send any checks?

20   **A.**   Yes.

21   Q.   What happened to the checks?

22   **A.**   Those were deposited into the bank.

23   Q.   But no cash?

24   **A.**   No.

25   Q.   Whose -- whose direction was to deposit checks but not

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Page 112*

1    cash?

2    **A.**    It was a joint decision made by the company owners and

3    myself.

4    Q.    Oh.  When was this -- when was this decision made?

5    **A.**    It was made when the companies were opened and once they

6    started making enough money to start being able to take cash.

7    Q.    My question is when.  When were these decisions made?

8    **A.**    In the --

9    Q.    On what dates?

10    **A.**    Whenever a company was opened, sir.

11    Q.    But you don't know the dates?

12    **A.**    It ranged from the years 2010 through 2017.

13    Q.    Okay.

14         **MR. GREEN:**  May we have Government's Exhibit 283 put

15    up on the -- on the screen, please?  Or 253.  Excuse me.

16    **BY MR. GREEN:**

17    Q.    Now, before you is Government's Exhibit 253, a document

18    of some 1,902 pages.  And within the past 10 or 15 days, right

19    after the trial started, you were called in to look at this

20    document; correct?

21    **A.**    Yes, sir.

22    Q.    And had you seen this document before?

23    **A.**    No, sir.

24    Q.    In actuality, did you get to take this document home

25    for -- like, to do some homework?

1    **A.**    Yes, sir.

2    Q.    And tell us what homework that you did.

3    **A.**    I went through and made sure that these -- that the

4    checks were listed, no dupes, and that the checks were

5    actually for disbursement of profit.

6    Q.    And you could remember all those thousands of checks by

7    looking at that listing?

8    **A.**    Yes, sir.

9    Q.    Did you prepare that listing?

10   **A.**    No, sir.

11   Q.    Did you have any backup as to these checks, or you just

12   had the -- you had the reference and then maybe the check in

13   the back of the exhibit?

14   **A.**    There was a reference of the check in the back of the

15   exhibit, yes.

16   Q.    So if -- if somebody got a check for $700, that was

17   automatically a -- a distribution check?

18   **A.**    Yes, sir.

19   Q.    Even dollar amounts were distribution checks?

20   **A.**    I knew that amount to that person and what it was for.

21   Q.    After all these years?

22   **A.**    Yes.

23   Q.    You remembered all those names and those thousands of

24   checks?

25   **A.**    There wasn't a whole lot of names.

1  Q.   Well, but there's thousands of checks.  To whom were they

2  written?

3  **A.**   To the different companies.

4  Q.   Oh.  So the company -- but you remember which companies?

5  **A.**   Yes, the companies that I worked with.

6  Q.   As of February -- as of February 21st, 2018, in your

7  statement you said, This is all I've been doing for 11 years.

8  **A.**   Yes, sir.

9  Q.   And -- but you knew exactly what to do when it came to

10 these checks on a document you had just seen for a few moments

11 before you took it home; correct?

12 **A.**   I -- I don't understand your question --

13 Q.   Well, let me ask it this way.  As to all of these even

14 dollar amounts, those were all distribution checks?

15 **A.**   Yes, sir.

16 Q.   Now, how about the $1,500 that you sent to the lawyer.

17 Was that a distribution check, or was that to look over

18 something?

19 **A.**   That was to look over something.

20 Q.   But it was an even amount.

21 **A.**   Correct.  But it would have been noted in the memo area.

22 Q.   Okay.  All right.  Isn't it true that there's some checks

23 here that have no memos?

24 **A.**   None of these checks have anything in the memo area.

25 Q.   Oh.  Is there -- is there a particular reason why?

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1   **A.**   It -- because it was a disbursement check.  I didn't

2   write that in there.  The only time I wrote something in there

3   was if it was for an invoice or a payment so that I could know

4   that that bill had been paid.

5   Q.   Yes.

6       **MR. GREEN:**  May we look at Government's Exhibit 214,

7   please?  May we go to page 89?

8   **BY MR. GREEN:**

9   Q.   All right.  Before you, ma'am, do you see this is a --

10  this is some kind of a document from the state of Nevada or

11  some kind of application for fictitious name or something;

12  correct?

13  **A.**   Yes, it's a --

14      *(Simultaneous crosstalk.)*

15      **MR. GREEN:**  And if the top part can be highlighted.

16  **BY MR. GREEN:**

17  Q.   Do you see a name, Ricardo Gonzalez?

18  **A.**   Yes, sir.

19  Q.   Who is he?

20  **A.**   He is somebody that the Castros used for --

21  Q.   It's always the Castros.  Of course.

22      **MR. GREEN:**  Can we -- can we -- can we scroll down,

23  please?  And on here -- stop right there.

24  **BY MR. GREEN:**

25  Q.   On here it says Miguel Castro, president?

1   A.   Yes, sir.

2   Q.   The next one, Miguel Castro -- Miguel Castro, secretary?

3   A.   Yes, sir.

4   Q.   And then it says -- does it say Miguel Castro, treasurer?

5   A.   Yes, sir.

6   Q.   And then does it say Miguel Castro, director?

7   A.   Yes, sir.

8   Q.   And if we can scroll down, it says under penalty of

9   perjury -- what does it say for the officer?  What does it

10  say --

11  A.   Ricardo --

12  Q.   -- for the president of that corporation?

13  A.   Ricardo Gonzalez.

14  Q.   And what does it say over on the right for title?

15  A.   President.

16  Q.   Thank you.

17       **MR. GREEN:**  May we look at Government's Exhibit 282A?

18  **BY MR. GREEN:**

19  Q.   Okay.  Here's a check that's in evidence, ma'am,

20  Government's Exhibit 282A, in the amount of $400.  Does that

21  bear a date?

22  A.   7/6/2015.

23       **MR. GREEN:**  Now, Your Honor, there is a stipulation

24  with us, I guess, that this will now be renumbered.  10 --

25  101?

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1           MR. ZYTNICK:  I'm not sure --

2           MR. GREEN:  It's all right.  We'll just stay with

3   this.  Okay.

4   BY MR. GREEN:

5   Q.   On this document, ma'am, it's $400; correct?

6   A.   Yes, sir.

7           MR. GREEN:  Let's -- if we can zoom in on the account

8   number starting with 5010?

9   BY MR. GREEN:

10  Q.   Over on the right where it says 5010, can you read that

11  account number into the record?

12  A.   501013580346.

13  Q.   Did you know that that was the account for -- 0346 was

14  the account for Golden Products?

15  A.   Yes, sir.

16          MR. GREEN:  May we -- may we scroll into the whole

17  check, please?

18  BY MR. GREEN:

19  Q.   And you see where it says Salvador Castro is the payee

20  for $400?

21  A.   Yes, sir.

22  Q.   And the date is July 6th of 2015?

23  A.   Yes, sir.

24  Q.   And there's a signature?

25  A.   Yes, sir.

1    Q.   Okay.  It's $400?

2    **A.**   Yes, sir.

3    Q.   Okay.

4         **MR. GREEN:**  Can we go to 282B, please?  Oh.  Stay on

5    that one.  If we can go back to 282A.  There we go.

6    **BY MR. GREEN:**

7    Q.   Ma'am, where that account number is ending in 304 --

8    0346, Check Number 1 -- 177 for July 6th of 2015 being the

9    account for Golden Products, did you know, ma'am, that on the

10   morning of February 21st, 2018, that in that account there was

11   a positive balance of $3,106.16?

12   **A.**   Not right off the top of my head, no, sir.

13   Q.   Okay.

14        **MR. GREEN:**  Let's go to 282B, please.  Is that 282B?

15   **BY MR. GREEN:**

16   Q.   Okay.  Does this appear to be a check to Salvador Castro?

17   **A.**   Yes.

18   Q.   What is the date, ma'am?

19   **A.**   2/6/2017.

20   Q.   So it's like almost two years after -- two years after

21   that other check for $400; correct?

22   **A.**   Yes, sir.

23        **MR. GREEN:**  Can we zoom in, please, on the account

24   number at the bottom right?

25   **BY MR. GREEN:**

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1    Q.    Can you read that account number into the record?

2    A.    501019281254.

3    Q.    Did you know, ma'am, that that account number ending in

4    1254 was the account for Golden Products?

5    A.    Yes.

6    Q.    Okay.  All right.  Thank you.

7          Now, did you know that that account had a positive

8    balance on February 21st of 2018?

9    A.    I don't -- no.

10   Q.    At any time for any of the bank accounts attributable to

11   Golden Products, whether it was Golden Products d/b/a Imperial

12   Award, isn't it true that there was not a single time when

13   there was a negative balance on those accounts?

14   A.    No, sir.

15   Q.    And you testified the other day on direct examination

16   that you gave envelopes with cash in it; correct?

17   A.    Yes, sir.

18   Q.    And you saw the other day that the name of Salvador

19   Castro was not on one of those envelopes; correct?

20   A.    Not that day, no, sir.

21   Q.    Not that day.

22          But you did make a note -- you did make a note --

23          MR. GREEN:  And if we could have

24   Government's Exhibit 84, please?  Okay.  If we could zoom in

25   to the pink Post-it note?

1    **BY MR. GREEN:**

2    Q.    What is -- what is depicted, please, on Exhibit 84 --

3    yes.  84, what is that?

4    **A.**    That's instructions for me to make Salvador's check out

5    to a person by the name of Angeles Castro.

6    Q.    Do you know when this photograph was taken?

7    **A.**    When they served the search warrant on my house.

8    Q.    Was that February 21st of 2018?

9    **A.**    Yes, sir.

10   Q.    Sometime during the day on that Wednesday?

11   **A.**    Yes, sir.

12          **MR. GREEN:**  Can we have -- look at --

13   **BY MR. GREEN:**

14   Q.    And the date -- the date is February 21st, 2018; correct?

15   **A.**    Yes.

16          **MR. GREEN:**  May we look at Government's Exhibit 107A?

17   Okay.  If we can zoom in on that check?

18   **BY MR. GREEN:**

19   Q.    Now, do you see what's depicted in this Exhibit 107A?

20   **A.**    Yes, sir.

21   Q.    Does it appear to be a check?

22   **A.**    Yes, sir.

23   Q.    And is it a check to whom?

24   **A.**    Angeles Castro.

25   Q.    What is the date of that check?

1    **A.**    January 30th, 2018.

2    Q.    And so that's, like, what, 20 days prior to the Post-it

3    note?

4    **A.**    Yes, sir.

5    Q.    So are you telling this jury that the Post-it note was

6    there all the time and just didn't get taken down?

7    **A.**    That Post-it note was there so that I did that, so that I

8    made that check out to who I was supposed to make it out to.

9    Q.    Okay.  But the -- my question's very simple.  The Post-it

10   note on your desk in your home office --

11   **A.**    Yes, sir.

12   Q.    -- where you had all this money was -- was February 21st,

13   2018, and this check is dated January 30th, 2018, some two and

14   a half weeks before.

15   **A.**    Right.

16   Q.    Are you saying that the Post-it note was for this check

17   or another check?

18   **A.**    It was for this check and then the checks to follow.

19   Q.    Okay.  So maybe I'm not getting something straight.  This

20   check was written three weeks before that Post-it note was

21   discovered in a photograph taken by the United States postal

22   inspection officers; correct?

23   **A.**    Yes, sir.

24   Q.    So you just didn't take the Post-it note down, or was

25   that a constant reminder?

Patti Kern - Cross
2:19-cr-00295-GMN-NJK - March 29, 2023

1    **A.**    It was a constant reminder.

2    Q.    A constant reminder for what?

3    **A.**    To -- to make the checks out to this person.

4    Q.    To make what?

5    **A.**    To make out the profit checks to this person.

6    Q.    Checks?

7    **A.**    Correct.

8    Q.    Oh.  Thank you.

9            **MR. GREEN:**  Your Honor, I have one more brief area.

10   It will have three exhibits.  Court's discretion.  It will

11   take about five minutes.

12           **THE COURT:**  Go ahead.

13           **MR. GREEN:**  Thank you so much, Your Honor.

14           May we have Government's Exhibit 106B put on the

15   screen?  Okay.  If we can enlarge that, please?

16   **BY MR. GREEN:**

17   Q.    Ma'am, do you see this -- this on here?  This is

18   Government's Exhibit 106B.  Do you see this as being a check?

19   **A.**    Yes, sir.

20           **MR. GREEN:**  And can we scroll down to where the

21   account number is?

22   **BY MR. GREEN:**

23   Q.    If you could read that into the record, please.

24   **A.**    501016964736.

25   Q.    Do you know that that was also an account for Golden

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1    Products or one of its affiliates?

2    **A.**   Yes, sir.

3    Q.   Okay.

4           **MR. GREEN:**  If we could go up, please?  If we could

5    enlarge it?

6    **BY MR. GREEN:**

7    Q.   What is the date of this check?

8    **A.**   December 12th, 2017.

9    Q.   And is there an amount?

10   **A.**   $700.

11   Q.   Whose writing is in the pay to the order and the amount

12   of $700?

13   **A.**   Mine.

14   Q.   Whose signature is that?

15   **A.**   That is the person that -- that is over that particular

16   company.  That's -- whose signature is supposed to be on the

17   checks for that company, and I don't remember what the name

18   was, sir.

19   Q.   Who's that at Global Data Funding?

20   **A.**   I know that that was one of Epi's companies, but I cannot

21   remember the name of the person.

22   Q.   But it's not signed by Salvador Castro?

23   **A.**   No.

24   Q.   I mean, you had his signature stamp; correct?

25   **A.**   No.

*Patti Kern - Cross*
*2:19-cr-00295-GMN-NJK - March 29, 2023*

1  Q.  You never had the signature stamp for Salvador Castro?

2  **A.**  No.  He just had me sign it -- sign his name.

3  Q.  Okay.  He told you to sign his name?

4  **A.**  Yes.

5  Q.  You had the -- you had the ATM cards which he never got

6  to use?

7  **A.**  They were given to me just to hold on to.  They'd never

8  been used.

9  Q.  Yeah.

10      **MR. GREEN:**  May we have 106C?

11      And we'll have one after this, Your Honor.

12      106C.  There we go.

13  **BY MR. GREEN:**

14  Q.  Now, does this appear to be another check, 106C, Global

15  Data Funding?  What's the date on that, ma'am?

16  **A.**  12/5/17.

17  Q.  Okay.  And how much is the amount?

18  **A.**  $700.

19  Q.  And then there's -- there was a signature there.  You

20  don't recognize that?

21  **A.**  No.  It's for the Global Data Funding account.

22      **MR. GREEN:**  And if we can have 106D.  And can we have

23  the --

24  **BY MR. GREEN:**

25  Q.  You see that in front of you, ma'am, that's already

1    admitted into evidence, 106D, do you see the date on that?

2    **A.**    Yes.

3    Q.    What's the date?

4    **A.**    November 20th, 2017.

5    Q.    And the writing, Salvador Castro, and the numbers under

6    the letter 700 and the 00 over the 100, whose writing is that?

7    **A.**    Mine, sir.

8    Q.    But it's not your signature?

9    **A.**    No, sir.

10            **MR. GREEN:**    Indulgence, Your Honor.

11            Can we go into another area?

12            **THE COURT:**    Okay.

13            **MR. GREEN:**    It's up to you, Your Honor.

14            **THE COURT:**    No, you're fine.  You're good.

15            **MR. GREEN:**    Okay.

16    **BY MR. GREEN:**

17    Q.    And as to the accounts for Golden Products or Golden

18    Products d/b/a Imperial Services or Golden Products Funding,

19    et cetera, all these names, you were not a signatory to those

20    accounts; correct?

21    **A.**    Correct.

22    Q.    You wanted to keep your name out of everything?

23    **A.**    Yes, sir.

24    Q.    Okay.  But the -- the cease and desist for nine years, it

25    didn't stop you, did it?

1    **A.**   No, sir.

2    Q.   Okay.

3         **MR. GREEN:**   The next area, Your Honor, will be quite

4    lengthy.

5         **THE COURT:**   All right.  So you want to go ahead and

6    take our lunch break?

7         **MR. GREEN:**   Court's discretion.

8         **THE COURT:**   We can go ahead and do that.

9         So the jury is reminded during this lunch break you

10   are not to discuss the case with anyone.  You can discuss

11   other things with each other during lunch but not this case.

12   Remember that you are not permitted to talk to the attorneys

13   at all about anything nor the parties or witnesses or

14   individuals related to the parties.  Remember to wear your --

15   your lanyard with your jury name on there so that everyone can

16   hopefully realize that you're a juror and not speak within

17   your earshot about anything having to do with the case.

18   Please remember you need to report that to me right away if

19   you do accidentally overhear anything about the case or if you

20   hear other people talking about the case.  Please do not read

21   or listen to or view anything that touches upon this case or

22   perform any independent research or investigation.  And please

23   do not form any opinion until after you have heard all the

24   testimony, received the evidence, I will give you the written

25   jury instructions, and then you will hear from counsel.  The

1    attorneys will provide their closing arguments to you.  After

2    all that, then I will allow you to begin your deliberation

3    process and you can talk to each other about your thoughts

4    about the case and start to create conclusions and opinions to

5    reach a verdict.

6              Let's go ahead and stand for the jury.  It's about

7    12:00 o'clock.  So we'll welcome them back at 1:00 p.m.

8        *(Jury out at 11:58 a.m.)*

9         **THE COURT:**  And what time should we have Ms. Kern

10   come back?  Like 1:30?

11        **MR. FINLEY:**  I'd just as soon have her back at 1:00,

12   Judge, just to be safe.

13        **THE COURT:**  All right.  So --

14        **MR. FINLEY:**  This witness might be extremely brief.

15        **THE COURT:**  Okay.  So it sounds like we're going to

16   have a short witness at 1:00 o'clock, so we want you to still

17   be here at 1:00 o'clock ready to go as soon as we're done with

18   that one short witness.  Okay?  Thank you.

19             We're just going to have a short witness, another

20   victim witness, testify very quickly.  Did I confuse the jury?

21        **MR. D'ORAZIO:**  Yeah.

22        **THE COURT:**  Okay.  Sorry.

23             With the witness -- the victim witness that's coming

24   in next, any objections or any exhibit issues we need to

25   discuss?  No?

2:19-cr-00295-GMN-NJK - March 29, 2023

1          Okay.  We'll see you back here at 1:00 o'clock.

2          **MR. GREEN:**  No objections, Your Honor.

3          **THE COURT:**  All right.

4      *(Lunch recess at 12:00 p.m.)*

5                          --o0o--

6              COURT REPORTER'S CERTIFICATE

7

8      I, AMBER M. McCLANE, Official Court Reporter, United

9  States District Court, District of Nevada, Las Vegas, Nevada,

10 do hereby certify that pursuant to 28 U.S.C. § 753 the

11 foregoing is a true, complete, and correct transcript of the

12 proceedings had in connection with the above-entitled matter.

13

14 DATED:  3/29/2023

15

16                  /s/  *Amber M. McClane*

17                  AMBER McCLANE, RPR, CRR, CCR #914

18

19

20

21

22

23

24

25