—2:19-cr-00295-GMN-NJK—

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,        )
                                     )  Case No. 2:19-cr-00295-GMN-NJK
5               Plaintiff,           )
                                     )  Las Vegas, Nevada
6        vs.                         )  Wednesday, March 30, 2023
                                     )  9:14 a.m.
7   MARIO CASTRO, SALVADOR           )
    CASTRO, MIGUEL CASTRO, and       )  JURY TRIAL, DAY 8
8   JOSE LUIS MENDEZ,                )  A.M. SESSION
                                     )
9               Defendants.          )  *C E R T I F I E D   C O P Y*
    _____

10

11

12                   REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                   THE HONORABLE GLORIA M. NAVARRO

14                   UNITED STATES DISTRICT JUDGE

15

16

17  APPEARANCES:        See Pages 2 and 3

18

19

20

21

22  COURT REPORTER:     Patricia L. Ganci, RMR, CRR
                        United States District Court
23                      333 Las Vegas Boulevard South, Room 1334
                        Las Vegas, Nevada  89101
24

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.

```
                        ——2:19-cr-00295-GMN-NJK——
```

 1   APPEARANCES:

 2   For the Government:

 3         **MINA CHANG, AUSA**
           UNITED STATES ATTORNEY'S OFFICE
 4         501 Las Vegas Boulevard South, Suite 1100
           Las Vegas, Nevada  89101
 5         (702) 388-6336

 6         **TIMOTHY T. FINLEY, ESQ.**
           **DANIEL E. ZYTNICK, ESQ.**
 7         U.S. DEPARTMENT OF JUSTICE
           950 Pennsylvania Avenue, N.W.
 8         Washington, D.C.  20530
           (202) 307-0050

 9
     For Defendant Mario Castro:
10
           **JOSHUA L. TOMSHECK, ESQ.**
11         HOFLAND & TOMSHECK
           228 South 4th Street
12         Las Vegas, Nevada 89101
           (702) 895-6760
13
           **RICHARD E. TANASI, ESQ.**
14         TANASI LAW OFFICES
           8716 Spanish Ridge, Suite 105
15         Las Vegas, Nevada 89148
           (702) 906-2411
16
     For Defendant Salvador Castro:
17
           **DONALD J. GREEN, ESQ.**
18         LAW OFFICES OF DONALD J. GREEN
           4760 South Pecos Road, Suite 103
19         Las Vegas, Nevada 89121
           (702) 388-2047
20
     ////
21

22

23

24

25

              PATRICIA L. GANCI, RMR, CRR   (702) 385-0670
```

—2:19-cr-00295-GMN-NJK—

1  For Defendant Miguel Castro:

2      **LUCAS GAFFNEY, ESQ.**
       GAFFNEY LAW
3      9900 Covington Cross Drive, Suite 290
       Las Vegas, Nevada 89144
4      (702) 742-2055

5      **THOMAS A. ERICSSON, ESQ.**
       THOMAS A. ERICSSON, CHTD.
6      9900 Covington Cross Drive, Suite 290
       Las Vegas, Nevada 89144
7      (702) 878-2889

8  For Defendant Jose Luis Mendez:

9      **CHRISTOPHER MISHLER, ESQ.**
       **WILLIAM H. BROWN, ESQ.**
10     BROWN MISHLER, PLLC
       911 N. Buffalo Drive, Suite 202
11     Las Vegas, Nevada 89128
       (702) 816-2200
12

13

14

15

16

17

18

19

20

21

22

23

24

25

—————2:19-cr-00295-GMN-NJK—————

1                  INDEX OF EXAMINATIONS

2   CONTINUED TESTIMONY OF PATTI KERN
       Jury Questions.......................................7
3      Recross-Examination by Mr. Tomsheck................27
       Recross-Examination by Mr. Gaffney.................36
4      Recross-Examination by Mr. Brown...................38
       Recross-Examination by Mr. Green...................39
5      Further Redirect Examination by Mr. Finley.........46

6   TESTIMONY OF MILTON LEE ETTER
       Direct Examination by Ms. Chang....................50
7      Cross-Examination by Mr. Tomsheck..................57
       Cross-Examination by Mr. Green.....................60
8      Recross-Examination by Mr. Tomsheck................65

9   TESTIMONY OF JUAN VILLASENOR
       Direct Examination by Mr. Finley...................68
10     Cross-Examination by Mr. Tanasi...................107

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

—2:19-cr-00295-GMN-NJK—

1          LAS VEGAS, NEVADA; WEDNESDAY, MARCH 30, 2023; 9:14 A.M.

2                               --oOo--

3                    P R O C E E D I N G S

4          THE COURT:  Thank you.  You may be seated.  Looks like

5     we're going to have one juror who's always just a little bit

6     late, but ...

7          But he's here now.

8          (Witness returns to the stand.)

9          THE COURT:  All right.  So I'm going to welcome the

10    jury back in, and then I'll have you stand and make your

11    appearances and say your clients' names again so that we can

12    familiarize the jury with everyone before the weekend break.

13         COURTROOM ADMINISTRATOR:  They're already lined up so

14    they're going to come right in.

15         All rise.

16         (Whereupon jury enters the courtroom at 9:15 a.m.)

17         THE COURT:  All right.  Everyone may be seated.  Good

18    morning and welcome back to the jury.

19         We've got the witness back on the stand, but before we

20    continue with the jury questions, I'd like to have all of the

21    attorneys and parties make their appearance on the record.

22         So go ahead from the Government.

23         MR. FINLEY:  Good morning, Your Honor.  Thank you.

24         Good morning, everybody.

25         Tim Finley, United States Department of Justice,

—2:19-cr-00295-GMN-NJK—

1   Consumer Protection Branch.

2        Dan Zytnick, same office; Mina Chang, Assistant United

3   States Attorney; Barry Bouchie, retired postal inspector; and

4   Erica Rush running the slideshow.

5        Thank you.

6        THE COURT:  Thank you.

7        MR. TANASI:  Thank you, Your Honor.

8        Good morning, ladies and gentlemen.

9        Rich Tanasi and Josh Tomsheck for Mario Castro.  Also

10  with us is Bryan Glynn who's helping us with exhibits.

11       Thank you.

12       MR. GAFFNEY:  Good morning, Your Honor, ladies and

13  gentlemen.

14       Lucas Gaffney for Miguel Castro.  Thomas Ericsson is

15  not present, but he will be joining us shortly.

16       Thank you.

17       THE COURT:  Thank you.

18       MR. BROWN:  Good morning, Your Honor.

19       Good morning, everyone.

20       Will Brown and Chris Mishler for Jose Luis Mendez.

21  Lisa Smith is here and Mr. Rich Beasley will be joining us

22  around 10, 10:15, something like that.

23       MR. GREEN:  Good morning, Your Honor.

24       Good morning, ladies and gentlemen of the jury.

25       Don Green on behalf of Salvador Castro.  And with me

1  again today is legal assistant, Heather Tan-Sahl and

2  Investigator Sharlene Gonzalez.  Thank you.

3          THE COURT:  Thank you.

4          All right.  So we're going to continue now.  We've got

5  Ms. Kern on the stand, the witness.  And remember, please, you

6  are still under oath.

7                        JURY QUESTIONS

8          THE COURT:  The next jury question is in Jury Note

9  Number 56.  It has five questions.

10          The first one is:  Epi was your partner to start the

11  fraud business?

12          Is that correct?

13          THE WITNESS:  Yes.

14          THE COURT:  And Question Number 2 is:  Were you working

15  for the Castro family or did they work for you?

16          THE WITNESS:  They had done work for my company in the

17  past and other companies that I did work for in the past.

18          THE COURT:  And Number 3:  Prior to February 18th,

19  2018, the day of the search warrants, when was the last time you

20  had met up with the Castro brothers?

21          THE WITNESS:  It would have been that week before.

22          THE COURT:  Okay.  And the next, Question Number 4

23  asks:  Do you believe that the Castro brothers knew what they

24  were doing was illegal?

25          So I'm just going to interrupt here and sort of

—2:19-cr-00295-GMN-NJK—

1    rephrase that a little bit because they're not all brothers.

2            THE WITNESS:  Right.

3            THE COURT:  Okay.  So I just want to make sure in case

4    the jury is confused about that.

5            So the defendants here today, do you believe that they

6    knew what they were doing was illegal?

7            THE WITNESS:  Yes, I do.

8            THE COURT:  And Number 5:  Would you speak in English

9    without a problem to all of the Castro brothers?

10           Again, I'm changing that to the defendants.

11           Would you speak in English without a problem to all of

12   the defendants?

13           THE WITNESS:  Yes.

14           THE COURT:  All right.  Jury Note Number 57 asks five

15   questions.

16           The first one is:  When you said you were helping out

17   Mexicans, who were you referring to?

18           THE WITNESS:  I were -- I was referring to the -- the

19   Castro brothers.  And Jose Luis Mendez.

20           THE COURT:  Number 2:  Was it your idea to target the

21   elderly with your mailing lists?

22           THE WITNESS:  What -- what I did was -- unfortunately,

23   the people that were on the lists that we rented that the --

24   that -- this work to mostly were elderly and vulnerable people.

25   This is who -- what -- what got rented.

—2:19-cr-00295-GMN-NJK—

1          THE COURT:  Number 3:  Was any of your family members
2    targeted in this scam?
3          THE WITNESS:  No, we didn't mail to Michigan.
4          THE COURT:  Number 4:  You testified if someone
5    complained, you would send them their money back.  How many
6    times have you done that?
7          THE WITNESS:  Over the years, probably couple thousand.
8    But that's over years.
9          THE COURT:  And Number 5:  Did Mr. Miskovich get his
10   money back?
11         THE WITNESS:  I don't remember.
12         THE COURT:  Jury Note Number 58 asks five questions.
13         The first one is:  Whose signature was on Global Data
14   Funding checks?  Does not look like Patti.
15         THE WITNESS:  Okay.  Global Funding checks, if I didn't
16   have a signature stamp, I would sign the -- the signer's name,
17   the bank -- who was on the bank account, their name.  And I
18   believe on that one I -- I couldn't pronounce the name.  It
19   was -- I -- I don't know the exact name right off the top of my
20   head.
21         THE COURT:  But it was -- but -- so you signed someone
22   else's name?
23         THE WITNESS:  Right, yes.
24         THE COURT:  Okay.  Second question is:  Where were all
25   the notices originally mailed?

—————2:19-cr-00295-GMN-NJK—————

1           THE WITNESS:  All over the United States.

2           THE COURT:  And Number 3:  Looks like you forged checks

3  as well?  Question mark.

4           THE WITNESS:  I was given permission to just sign their

5  name to the checks so that I didn't have to run over there and

6  have them pre-sign a bunch of checks.  If -- most of them gave

7  me signature stamps, but there were a couple that did not.

8           THE COURT:  Question Number 4 asks:  What good is a C

9  and D -- so I believe they're referring to the cease and desist.

10          So what good is a C and D if you don't do it?

11          So I'm guessing it means if you don't cease and desist,

12  what good is the cease and desist notice?

13          THE WITNESS:  It is meant to be good -- I don't know

14  how to answer that, truthfully.

15          I -- I can't say that it's not good or that it doesn't

16  do any good.  Uhm.  It was just getting -- it was just feeling

17  more like it was just kind of a slap on the hand instead of

18  being -- you know, it could have been a little bit more

19  threatening, I guess.

20          THE COURT:  Okay.  And then the last question is:  What

21  accounts were checks deposited?  Why were the checkbook balances

22  so low and where has all of the money gone?

23          So I'll break it down.

24          What accounts were checks deposited?

25          THE WITNESS:  The multiple companies' bank accounts.

—2:19-cr-00295-GMN-NJK—

1          THE COURT:  And why were the checkbook balances so low?

2          THE WITNESS:  There was never a whole lot left in

3    there, uh, just because of expenses and then taking out the --

4    the amounts of the disbursements.  Plus, with the way it was

5    going, if -- if you had to shut down the bank account because

6    the company was shut down or received a C and D, then you would

7    basically just not want a whole lot of money in the accounts.

8    You'd just be pulling it out anyway.

9          THE COURT:  And then, where has all that money gone?

10          THE WITNESS:  It would have gone towards the expense --

11          (Court reporter clarification.)

12          THE WITNESS:  It would go to the expenses to mail the

13    promotions along with the disbursement checks.

14          THE COURT:  When you say "disbursement checks," what

15    are you referring to?

16          THE WITNESS:  Profit checks.

17          THE COURT:  Okay.  Jury Note Number 59 asks two

18    questions.

19          First:  Did your husband ever try to stop you from the

20    fraud business?

21          THE WITNESS:  No.

22          THE COURT:  Okay.  And then the second was:  If yes,

23    why didn't you listen and get a regular job?  Why put yourself

24    at risk again in getting caught?  But the question was -- the

25    answer was no, so we'll skip that.

—2:19-cr-00295-GMN-NJK—

1           Jury Note Number 60 asks five questions.  The first one

2  is:  Who started two whole operations -- no, I'm sorry.

3           Who started this whole operation?

4           THE WITNESS:  In the beginning, it was just one

5  company, and that was between Epi Castro and myself.  And then

6  it branched on.

7           THE COURT:  Number 2:  Why did you do this?  What did

8  you want to do with the money?

9           THE WITNESS:  When I first moved here, I had started

10  working for direct mailers.  That's -- that was the business --

11  because I was a print buyer before.  I worked in purchasing and

12  I bought, like, the shells that we -- you saw.  That was what my

13  job was.  And that's what I started out doing here with junk

14  mailers, Sweepstakes mailers, psychic mailers.

15           And towards about 2000, year 2000, the man that I was

16  working for then basically offered me money to put a business in

17  my name.  And it went on from there.  So then when they got

18  completely out of it, I started a couple more business of my

19  own.  The money was good.  I knew how -- how to -- to order the

20  lists and so on and the printing.

21           And I should have stopped at the first cease and

22  desist, but at that time we had a lot of debt, uhm, and I,

23  again, tried things I knew how to do.  Uh.  I had no experience

24  in the casino industry or anything as far as working as a

25  waitress or anything like that, but that's not an excuse.  Uhm.

—2:19-cr-00295-GMN-NJK—

1    It was basically for the money.

2             THE COURT:  Question Number 3 asks:  Who is Andrea to

3    you besides a business partner?

4             THE WITNESS:  Nothing.

5             THE COURT:  Okay.  And then Question Number 4 asked:

6    How did you meet the defendants and Epi Castro?

7             But the attorneys and I have decided that's not

8    relevant, so you don't need to answer that question.

9             The next one is:  What is or was Kern and Associates?

10   Was it ever a legitimate business before you started this

11   conspiracy?

12            THE WITNESS:  What Kern and Associates was, in 1999 I

13   had spoke about those gentlemen going on and -- and not doing

14   that -- their companies anymore, but the ones that stayed in

15   business -- Kern and Associates what is -- well, was a

16   legitimate business, filed taxes, everything, because I did

17   scheduling for other mailers that -- it wasn't mine.  Well, it

18   wasn't any of the defendants.  They were outside -- other

19   mailers.

20            So basically it was a scheduling and purchasing

21   business because I would also buy their printing and schedule

22   their jobs.

23            THE COURT:  Whose printing and jobs did you schedule?

24            THE WITNESS:  It was other mailers with other

25   type sweepstakes stuff.

—2:19-cr-00295-GMN-NJK—

1          THE COURT:  So the question:  Was it a legitimate

2   business before you started this conspiracy?

3          So were those other mailers legitimate or just

4   different kinds of fraud?

5          THE WITNESS:  They would have been different kinds of

6   fraud, but -- but Kern and Associates, I guess you could -- I

7   don't know if could you call it legitimate then or not.  But it

8   was -- it -- it was a legitimate business in the sense that it

9   had a business license.  It paid the licensing fees.  Uhm.  It

10  paid taxes, you know, filed taxes every year and so on.  I guess

11  that's -- when I say it was legitimate in that sense.

12         THE COURT:  And then the last question of Jury Note

13  Number 60 asks:  If you would not have gotten caught in this

14  when you did, when would you have stopped, if ever?

15         THE WITNESS:  The business was getting slow, the names

16  were getting less and less to rent.  It probably would have

17  ended maybe a couple years after that, say -- you know, for

18  sure, probably 2020.  Postage's gone up.  So your profit margin

19  was getting lower and lower so it wasn't -- it wasn't as

20  profitable as it used to be.

21         THE COURT:  Jury Note Number 61 asks three questions.

22  The first one is:  Does the witness state that all of the

23  currency in her home on the day of the law enforcement seizure

24  was indeed hers and not any portion of it belonged to any of her

25  business partners?

1          THE WITNESS:  Correct.  The only -- the only money

2     that -- they had all been distributed constantly.  So that money

3     in the safe was mine.  The money that was in those envelopes and

4     stuff was theirs to be given that -- that following week.

5          THE COURT:  And Number 2:  Can the witness estimate how

6     much currency, if any, was wrongfully taken by Andrea Burrow?

7          THE WITNESS:  I cannot.  I don't know.  I wasn't really

8     sure that she was stealing.  I didn't know for sure.

9          THE COURT:  Okay.  The witness stated that she

10    eyeballed cash.  Explain to us how long it would have taken to

11    count the money accurately with a currency counting machine.

12         THE WITNESS:  Just a little bit longer with -- with a

13    machine, but sometimes it would jam.  So sometimes if there

14    wasn't a lot, it would just go like this, and if you press on

15    it, it was even.  It might be off a couple of bills most of the

16    time.

17         THE COURT:  Okay.  Jury Note Number 62 asks three

18    questions.  The first one is:  In an e-mail to your friend who

19    was seeking work, you mentioned that you were working with some

20    Mexicans.  Is that right?

21         THE WITNESS:  Yes.  Yes.

22         THE COURT:  Number 2 -- excuse me -- did you -- did

23    your reference to those persons by their nationalities or

24    geographical heritage mean to communicate or imply to your

25    friend that those persons were of a social or economic status

1    that was somehow demeaning or beneath your friend or you?

2         THE WITNESS:  No way.  I -- I'm not prejudiced

3    whatsoever.  It's just -- typing an e-mail, that was just the

4    quickest thing to say instead of, you know, Hispanic men or

5    whatever.  It just came across that way.  I'm not prejudiced.

6         THE COURT:  And then the last question asks you about

7    the citizenship of the defendants, which, again, the parties and

8    I have all agreed is not relevant.  It's not an element of the

9    offense so I'm not going to ask you that question.

10         Jury Note Number 63 asks one question:  The witness

11    testified that she was good at maintaining paper trails and

12    analyzing records of profit distributions.  Please explain how

13    the handling of currency by eyeballing it is consistent or

14    congruent with maintaining orderly records and paper trails and

15    determining profit distributions.

16         THE WITNESS:  I'd have to say that looking at it that

17    way, it wasn't, the way I did it.  But it was quick and most

18    time it was pretty close.  Because I'd do it and then I'd count

19    both, and it would ended up maybe being, like, $20 off.  So it

20    was pretty close.  I mean, if it was a lot, I would run it

21    through the counter and stuff like that.  But I -- I failed at

22    that end as far as keeping good numbers.

23         THE COURT:  All right.  Jury Note Number 64 asks four

24    questions.  The first one is:  The witness testified that

25    profits were split between herself and Epi Castro.  Is that

—————2:19-cr-00295-GMN-NJK—————

1  correct?

2          THE WITNESS:  On Epi's companies, yes.

3          THE COURT:  Number 2:  Did the witness split any losses

4  with Epi or any of the defendants?

5          THE WITNESS:  Okay.  As far as their -- their -- there

6  were no losses.  As the companies would start up, nothing would

7  be taken out of them until bills were paid, like, say your first

8  job, there may be some money pulled from one company to help

9  another company, say, pay its first postage, because you had to

10  pay postage, you know, when the mail went out.  But as far as

11  losses went, there wasn't any that got, like, shut down and --

12  and there was a negative in the account, if that makes any

13  sense.

14          THE COURT:  So it sounds like you're saying you didn't

15  take a certain amount of profit every month regardless, instead

16  you took out the cost of doing business first and --

17          THE WITNESS:  Yes, yes --

18          THE COURT:  -- then split the profit?

19          THE WITNESS:  -- the profit checks were always written

20  after the fact, after all of the bills that they submitted were

21  paid, postage for the jobs, say, for at least the next week or

22  two were paid, that kind of thing.

23          THE COURT:  All right.  Question Number 3:  Did the

24  witness split any investments in printing equipment, forklifts,

25  warehouse fixtures, or anything else associated with the Digital

 1   Express business location?

 2            THE WITNESS:  No.

 3            THE COURT:  And Number 4:  Did the witness mean that

 4   the database was solely hers as her e-mail to a business

 5   associate stated or was database really owned by partners in the

 6   printing business?

 7            THE WITNESS:  The original database that I possessed

 8   when I went to talk to Epi the first time about, you know, I had

 9   the database that was the names, at that time, that beginning,

10   those names were mine.  They were from previous mailings and so

11   on.  But then as -- as the other -- as the businesses progressed

12   and other businesses came in, those names kept feeding that

13   database and, like, it would -- it would revolve.  So as it went

14   along, it ended up belonging to everybody because those

15   businesses contributed to that database with their mailings.

16            THE COURT:  All right.  And so you say it belongs to

17   everybody, but I'm going to need you to be a little more

18   specific.  So who --

19            THE WITNESS:  It belonged --

20            THE COURT:  -- are the people that it belongs to?

21            THE WITNESS:  It belonged to all of the businesses

22   affiliated with the mailings.

23            (Pause.)

24            THE COURT:  All right.  Jury Note Number 65 asks four

25   different questions that the attorneys and I have agreed is not

─────2:19-cr-00295-GMN-NJK─────

1  relevant and takes you too far afield of the focus where we want

2  to kind of keep everyone thinking about what's going -- what the

3  charges are in this case.  So I'm not going to ask that

4  question.

5          Jury Note 66 has six questions.  Again, the first three

6  talk about something completely different that's not charged in

7  this case.  So I'm not even going to mention that.  We're going

8  to start with Question Number 3.  And, again, the parties and I

9  have agreed that we're not going to Questions 1, 2 and then

10 there's like a 2A and a 2B.  So let's start with Number 3.

11         The fake companies owned by the defendants was run and

12 managed by you.  You are responsible for all cash and checks

13 after Andrea opened the mail.  So why are you -- why you and not

14 the named owners doing this?

15         THE WITNESS:  Can you repeat that?

16         THE COURT:  Yes.

17         The fake companies owned by the defendants was run and

18 managed by you.  You are responsible for all cash and checks

19 after Andrea opens the mail.  Why you and not the named owners?

20         THE WITNESS:  That was what they wanted done.

21         THE COURT:  Number 4:  Who ordered and paid for the

22 signature stamps?

23         THE WITNESS:  The person that was on the account or

24 whoever -- I don't know.  I just know they gave them to me.

25         THE COURT:  Number 5:  Can you explain why you get 50

———2:19-cr-00295-GMN-NJK———

1  percent of profits and the other owners have to split their 50

2  percent?

3          THE WITNESS:  They did -- they didn't.  Okay.  When you

4  would see -- okay.  So, what my 50 percent included was the fact

5  that I didn't invoice for any of the work that I did.  Okay.  I

6  took that as just, okay, I get 50 percent.  That covers

7  everything and then I got a little of the profit.  When you

8  would see a partner split off and, say, Epi would get 1,300 and,

9  say, Salvador got 700, that was -- Epi was the main person in

10  that company.  And it was his decision as to what the other

11  person got if he wanted to split it off.

12          In the beginning, Epi got it all.  And if he wanted to

13  give some to whoever the company was in, he would then himself

14  give it to them without a separate check being written for it.

15  Does that make -- I hope that makes sense.

16          THE COURT:  The question was:  Can you explain why you

17  get 50 percent of profits and the other owners split their 50

18  percent?

19          THE WITNESS:  Because they really didn't.  They got 50

20  percent.

21          THE COURT:  Okay.  And Number 6:  Can you explain why

22  these defendants need you as part of their organization?  If

23  they own the equipment, the labor, and materials, they know all

24  of the process, have their names on everything, why do they need

25  you to run things and take 50 percent?

—2:19-cr-00295-GMN-NJK—

1          THE WITNESS:  That was up to them.  They did.

2          THE COURT:  Jury Note Number 67 asks two questions.

3    The first one is:  How can you be certain all the defendants

4    were fully aware that they were involved in a fraud deal?

5          THE WITNESS:  (Pause.)  There was enough, uhm, work

6    done and mailings done over the years that, uhm, would get shut

7    down or that they would see that would get shut down that -- and

8    if you read the promotions, they were misleading.  Now, uh, I

9    can't -- I feel that they knew what they were doing and that

10   they were misleading.  That's -- I can't say how they thought,

11   but generally speaking, you know, it's pretty obvious.

12         THE COURT:  All right.  And then the second question

13   asks about your history of being involved in other businesses

14   and the defendants' awareness of it.  And the parties and I

15   agreed that it -- it's not relevant in this sense that it's

16   going to be more confusing than not.  If we start talking about

17   other things that you've done in the past and who with and other

18   things that are similar enough that I think that the -- the

19   confusion is too likely.  So we're not going to go into that.

20         So it's not -- it's not that it's a bad question,

21   everybody.  It's just that it has the potential to be more

22   confusing than helpful.

23         So Jury Note Number 68 asks seven questions.  The first

24   one is:  How did you get back in contact with Epi after a year

25   of being shut down?

2:19-cr-00295-GMN-NJK

1          And then it says:  Referring to the beginning.

2          THE WITNESS:  Epi was still doing printing, and Mario

3    and the letter shop area was still doing other jobs because I

4    tried the psychic stuff.  Epi was printing that.  I also tried,

5    uhm, selling products, necklaces and so on, to market that.  And

6    he was involved in printing that also.  So I never lost contact

7    with him, per se.

8          THE COURT:  Question Number 2 asks:  What were you

9    looking for Inspector Ernest Williams to respond to your text

10   with?  Were you looking for validation of your testimony?

11         THE WITNESS:  No, it was -- again, I was so shaky and

12   he kept -- he would say before, "Just take a deep breath.

13   Just" -- because I was just shaking getting up here in front of

14   people.  I'm not good in front of people.  I'm really not.  I'm

15   not a good -- as far as being able to express myself.  And I was

16   just completely -- I was just so nervous on the whole situation.

17   It wasn't -- I won't say validation.  It was more like, "Okay,

18   you're going to be -- it will be all right."  You know, you'll

19   get you'll get through this type of thing.

20         THE COURT:  Question Number 3 asks:  How did your

21   husband get involved in the mailing business?  If he was okay

22   with doing fraud with you, why did he stop after the cease and

23   desist?

24         I think it's really two different questions.

25         So, first, let's say:  How did your husband get

—2:19-cr-00295-GMN-NJK—

1  involved in the mailing business?

2      THE WITNESS:  He was in between jobs at that time, and

3  it seemed like something that might work for a little bit until

4  he got back to work again.

5      THE COURT:  And then if he was okay with doing the

6  fraud with you, why did he stop after the cease and desist?

7      THE WITNESS:  Because as far as him getting in trouble

8  and both of us possibly getting in trouble, not a good idea.  I

9  mean, you needed to have a stable income coming in.  We have a

10  daughter.  And he made the decision, too, that, you know --

11  because he was a buyer also.  He was in purchasing.  So he went

12  and got a different job.

13      THE COURT:  Okay.  Question Number 4 asks:  When you

14  approached Epi to start business, did you tell him it was fraud?

15      THE WITNESS:  No, I did not come out and say it's --

16  it's fraud.

17      THE COURT:  Number 5:  Why do you think the Government

18  cut a deal with you?

19      THE WITNESS:  I don't know how to answer that.  Uhm.

20      Probably because I knew a lot of the inner workings of

21  how everything was handled and how the money flowed, uhm, and

22  could explain a lot of what they had taken from my home and what

23  it was, what it pertained to.

24      THE COURT:  Question Number 6:  If you approved the

25  promos before they were sent out, why did you still have it sent

—2:19-cr-00295-GMN-NJK—

1  to your home?

2          THE WITNESS:  It can always get messed up in the

3  process.  Uhm.  It can -- it can get the wrong inner envelope

4  inserted.  And I would proof it, but, again, sometimes what

5  would happen, too, is, uhm, if the sheet got off, because it's

6  -- going through the lasers, they're continuous forms.  So if

7  something happened and names got off, the verbiage could be

8  mixed up as long -- and as well as the job numbers.  I need to

9  make sure that that was correct.

10          THE COURT:  And then Number 7:  Why did you eyeball the

11  money splits instead of using your money counter?

12          THE WITNESS:  It was plain laziness is what it was.

13  That was -- truthfully, it was just, like, being lazy.

14          THE COURT:  Jury Note Number 69 asks four questions.

15  The first one is:  Is there a difference from profit checks and

16  cash envelopes?

17          THE WITNESS:  No.

18          THE COURT:  Number 2:  Are you saying in -- and then it

19  has in quotation marks -- honor among thieves, one profit check

20  may be more than another person's check to made up later?  And

21  then it says:  Regarding the question about shortage of profit

22  checks.

23          THE WITNESS:  I kind of don't understand that.

24          THE COURT:  Are you saying in honor among thieves, one

25  profit check may be more than another person's check to be made

—2:19-cr-00295-GMN-NJK—

1  up later regarding question about shortage of profit checks?

2          Remember you testified earlier --

3          THE WITNESS:  Yes.

4          THE COURT:  -- that sometimes if there wasn't enough in

5  the account you would -- you would --

6          THE WITNESS:  Right myself a little bit later, yes.

7          THE COURT:  -- give yourself a little less, but then

8  give yourself a little more next time?

9          THE WITNESS:  Yes.  So the answer is yes.  So honor

10 among thieves, basically, yes.

11         THE COURT:  All right.

12         Question Number 3 asks:  What was your position and job

13 title?

14         THE WITNESS:  There was no real positions or job titles

15 per se, because it was basically more like private contractors.

16 They -- they knew what they were doing as far as -- their end of

17 getting the jobs out was the printing, the letter shop stuff,

18 the postage, putting the postage on, getting it to the post

19 office.

20         My end of it was the -- the scheduling, the buying of

21 the printing, and -- and making sure the bills got paid.  Just

22 like then Andrea's job was get the mail opened, to get the

23 checks and the cash separated, and to get those checks deposited

24 and endorsed to the bank.

25         THE COURT:  All right.  And then the last question

―――2:19-cr-00295-GMN-NJK―――

1    asks -- I'm not going to have you answer this.  It's about how

2    you became associated with the Castros in the past.  And so,

3    again, because it -- it might confuse the jury if we start

4    talking about your past again, and they're only on trial for

5    the -- the conduct that the Government is alleging here.  So I

6    don't want to confuse the jury.  So we're not going to ask you

7    that question.

8          Jury Note Number 70 asks three questions.  The first

9    one is:  Patti, did you write all or most checks for the

10   expenses of the businesses?

11         THE WITNESS:  I did, yes.

12         THE COURT:  All or most?

13         THE WITNESS:  All.

14         THE COURT:  And then Number 2:  Why bother with bank

15   accounts that can be traceable?  Just keep the cash and trash

16   the checks.  Why not?  No paper trail then, right?

17         So why did you use checks?

18         THE WITNESS:  (Pause.)  You mean to pay -- to pay the

19   bill and do the postage and so on?

20         THE COURT:  I'll read it again.

21         Why bother with bank accounts that can be traceable?

22   Just keep the cash and trash the checks.  Why not?  No paper

23   trail then, right?

24         THE WITNESS:  There was -- there was much more checks

25   coming in for -- the promotions were generating more --

────2:19-cr-00295-GMN-NJK────

1  respondents were sending back more checks than they were cash,

2  way more checks than cash.  So those checks had to be deposited

3  because that was three-quarters of -- of -- of what was coming

4  in was checks.  It wasn't the cash.

5          THE COURT:  Okay.  And then third question:  Do you

6  still receive Social Security money for retirement even though

7  you have defrauded many for so much?

8          THE WITNESS:  Yes, at this time.  But when I'm -- when

9  I go to prison, I will not.  I will not be able to collect it.

10          THE COURT:  All right.  Any follow-up from the

11  Government?

12          MR. FINLEY:  No, Your Honor.  Thank you.

13          THE COURT:  Any -- any follow-up, Mr. Tomsheck?

14          MR. TOMSHECK:  Thank you.

15                  RECROSS-EXAMINATION OF PATTI KERN

16  BY MR. TOMSHECK:

17  Q.  Good morning.

18  A.  Good morning.

19  Q.  I hope this is the last time we have to meet like this.  I'm

20  sure you do, too, right?

21  A.  Yes, sir.

22  Q.  Okay.  Just a few questions.

23          You want this jury to believe that you had a

24  partnership with these four defendants, yes?

25  A.  Yes.

———2:19-cr-00295-GMN-NJK———

 1  *Q.*  Okay.  In order for the jury to believe that, they would

 2  have to believe what you're telling them about the partnership,

 3  right?

 4  *A.*  Yes, sir.

 5  *Q.*  Okay.  You agree with me that you did not have a partnership

 6  agreement.

 7  *A.*  No, sir, on paper.

 8  *Q.*  Right.  If I go into business, for instance, with

 9  Mr. Tanasi, we can execute a partnership agreement that outlines

10  the scope of that partnership, right?

11  *A.*  Yes.

12  *Q.*  And, in fact, that's what partnerships in legitimate

13  businesses do, right?

14  *A.*  Yes.

15  *Q.*  So we're crystal clear, you did not have a partnership with

16  Mario Castro, right?

17  *A.*  No --

18          MR. FINLEY:  Your Honor, clarification as to form.

19          Written or oral agreement?

20          MR. TOMSHECK:  I just asked her the question and she

21  said no.  He can follow up and clarify if he wants.

22          THE COURT:  I agree.

23  BY MR. TOMSHECK:

24  *Q.*  To be crystal clear, you did not have a partnership with

25  Mario Castro.

—2:19-cr-00295-GMN-NJK—

1  *A.*  I had said prior that I had a verbal agreement with Mario.
2  *Q.*  Okay.  I'm going to ask you about that in just a second.
3          In this partnership, it is your testimony -- and when I
4  say the word "partnership" I'm using it from your description.
5  You understand that, right?
6  *A.*  Yes.
7  *Q.*  Okay.  You understand that these defendants are taking the
8  position they did not have a partnership with you?  You
9  understand that, right?
10  *A.*  If you say so.
11  *Q.*  Okay.  If I were to represent that to you, that wouldn't
12  surprise you, right?
13  *A.*  No.  I guess.
14  *Q.*  Okay.
15          In a business arrangement when someone does work, the
16  expectation is they get paid for that work.  You understand
17  that, right?
18  *A.*  Yes.
19  *Q.*  You take your oil -- your car in for an oil change, for
20  instance.  Someone changes the oil in your car.  You pay them
21  for that, right?
22  *A.*  Yes.
23  *Q.*  Okay.  You made crystal clear that there are certain
24  expenses in the mailing business that you have to pay for,
25  right?

---2:19-cr-00295-GMN-NJK---

1   *A.*   Yes.

2   *Q.*   You have to rent the lists, right?

3   *A.*   Yes.

4   *Q.*   You paid for that.

5   *A.*   The companies paid for that, yes.

6   *Q.*   Yeah.  You wrote the checks, right?

7   *A.*   Yes.

8   *Q.*   There's postage.  That's like a real cost you have to pay

9   for, right?

10  *A.*   Yes.

11  *Q.*   That's an expense, right?

12  *A.*   Yes.

13  *Q.*   That's not profit, right?

14  *A.*   Correct.

15  *Q.*   Okay.  When someone does work, for instance, on a printing

16  machine, someone has to run that machine, a person has to do

17  that, right?

18  *A.*   Yes.

19  *Q.*   Presumably, they would be paid for that work, correct?

20  *A.*   Yes.

21  *Q.*   Okay.  You agree with me you didn't have an agreement as to

22  how much you would pay for each individual job that you did,

23  right?

24  *A.*   They were -- yes, each individual job ... producing the

25  mailing packages was billed.  The printing was billed and

1  invoiced and paid for.  And the letter shop and lasering

2  operation, say, for lasering and for getting it in the mail was

3  paid for.

4  *Q.*  Right.  Those expenses were paid for, right?

5  **A.**  Yes.

6  *Q.*  The actual man hours, the work, you weren't paying them for

7  that, according to you, right?

8  **A.**  That was not up to -- to -- I did not, uh, define that.

9  They billed for their companies what they wanted their companies

10  to be paid for for doing those particular jobs.

11  *Q.*  Okay.  And when you set this up way back when with Epi

12  Castro, who's not one of these defendants -- you understand

13  that, right?

14  **A.**  Yes, sir.

15  *Q.*  Okay.  When you set that up with Epi Castro, the deal was

16  he'd do the work up front and you would pay him on the back end

17  when you -- when you had some money in the bank, right?

18  **A.**  Yes, we -- yes.

19  *Q.*  Okay.  And then, eventually, you start working with these

20  guys, right?

21  **A.**  Yes.

22  *Q.*  Okay.  To be clear, one of the jurors asked this question.

23  They had the printing presses, right?

24  **A.**  Yes.

25  *Q.*  They had the folders, right?

─────2:19-cr-00295-GMN-NJK─────

1  **A.**  Letter shop, yes.

2  *Q.*  Yeah.  You didn't have any of that stuff, correct?

3  **A.**  Correct.

4  *Q.*  Okay.  If they had wanted to perpetrate a fraud, they had

5  all of the machinery in place to do that, right?

6  **A.**  They had the machinery to produce them, yes.  They didn't

7  have the database, they didn't have the names, and they did not

8  have the promotions.

9  *Q.*  Okay.  You agree with me that if they wanted to perpetrate a

10  fraud, they had the machinery in place to get some fraud out

11  there to the public, to rip people off, right?

12  **A.**  Yes.

13  *Q.*  Okay.  They could have done that without you if they wanted

14  to commit fraud, right?

15  **A.**  I suppose.

16  *Q.*  Okay.  You'd agree with me that you couldn't perpetrate your

17  multi-decade-long fraud without people to do the actual manual

18  labor for you, right?

19  **A.**  So -- correct.

20  *Q.*  You didn't have a printing press, right?

21  **A.**  No.

22  *Q.*  You didn't have a letter shop, right?

23  **A.**  No.

24  *Q.*  You didn't have one of those giant folding and stuffing

25  machines, correct?

—2:19-cr-00295-GMN-NJK—

1   *A.*   No.

2   *Q.*   You needed someone to do your fraud, right?

3   *A.*   (Pause.)  Yes.

4   *Q.*   And as you just told me, they wouldn't have needed you,

5   right?

6   *A.*   I suppose they could have found somebody else.

7   *Q.*   Okay.  You'd agree that -- you'd agree with me that if they

8   wanted to perpetrate fraud, they would not have needed you,

9   right?

10  *A.*   Right.

11  *Q.*   Okay.

12         You told the jury a moment ago in response to one of

13  their questions that you communicated with all four of these

14  defendants in English only, right?

15  *A.*   Yes.

16  *Q.*   You --

17  *A.*   I don't speak Spanish.

18  *Q.*   You don't speak a lick of Spanish, do you?

19  *A.*   No, sir.

20  *Q.*   You agree with me that one or two of the defendants speak

21  pretty good English, right?

22  *A.*   Yes.

23  *Q.*   And you'd agree with me that one or two of the defendants

24  hardly speak any English at all, right?

25  *A.*   No, I would not agree with that.

PATRICIA L. GANCI, RMR, CRR   (702) 385-0670

1  *Q.*  Okay.  Is it your testimony that you had ongoing lengthy

2  conversations with Mr. Mendez in English?

3  *A.*  Yes.

4  *Q.*  Is it your testimony that you had ongoing lengthy

5  conversations with Salvador in English?

6  *A.*  Salvador not as much, no.

7  *Q.*  Okay.  You agree with me that those two guys don't speak

8  English very well, if at all, right?

9  *A.*  Mr. Mendez speaks English just fine.  Salvador, not as much.

10  His English -- his English is probably more limited than

11  anybody's.

12  *Q.*  Okay.  And as you told us the other day when you were on the

13  stand, you don't even know what Salvador even did in this

14  process, right?

15  *A.*  No.

16  *Q.*  Okay.

17        This is a crucial point, and I'm going to use your

18  words in response to the jury's question.

19        You were asked the question:  "How do they -- did these

20  four defendants know that it was fraud?"

21        And your response was:  "I can't say how they thought."

22        Right?

23  *A.*  Yes, sir.

24  *Q.*  And you can't say how they thought because they didn't tell

25  you they knew it was fraud, right?

1 *A.* No.

2 *Q.* And you didn't tell them, according to your under-oath

3 testimony throughout the entirety of this trial, you didn't tell

4 them it was fraud, correct?

5 *A.* No.

6 *Q.* You told us a moment ago that they would have to know

7 because it was obvious to you that these mailers were fraud,

8 right?

9 *A.* Yes.

10 *Q.* Okay.  And you'd agree with me that not only was it obvious

11 to you, but you knew from the jump that this was all fraud,

12 right?

13 *A.* Yes.

14 *Q.* But you never had a singular conversation with any of these

15 four guys about it being fraud, correct?

16 *A.* Correct.

17 *Q.* You were asked the question:  "Do you know why the

18 Government cut a deal with you?"

19          Do you remember that question?

20 *A.* Yes.

21 *Q.* You would agree with me that you would have to speculate

22 about why they cut a deal with you, right?

23 *A.* Right.

24 *Q.* But you know exactly why you cut a deal with them, don't

25 you?

```
                         2:19-cr-00295-GMN-NJK
```

1  **A.**  Yes.

2  *Q.*  And it was to help yourself, wasn't it?

3  **A.**  Yes.

4         MR. TOMSHECK:  Nothing else.

5         THE COURT:  Mr. Gaffney, any follow-up?

6         MR. GAFFNEY:  Yes, Your Honor.

7         THE COURT:  For the record, Mr. Ericsson is back.

8         MR. GAFFNEY:  Thank you.

9              RECROSS-EXAMINATION OF PATTI KERN

10  BY MR. GAFFNEY:

11  *Q.*  Good morning.

12  **A.**  Good morning.

13  *Q.*  Just two questions.

14         One of the jurors asked whether you knew that the

15  people on these broker lists were elderly.  Do you remember that

16  question?

17  **A.**  Yes, sir.

18  *Q.*  And I just want to be clear that you were the one that

19  secured these broker lists, right?

20  **A.**  I did.

21  *Q.*  That wasn't the defendants that did that, correct?

22  **A.**  No, sir.

23  *Q.*  Okay.  You were also asked why bother with bank accounts

24  that were traceable.

25         Do you remember that question?

1    *A.*  Yes, sir.

2    *Q.*  And I think the inference is why do something that is so --

3    why commit a crime that may be so easily detectable by putting

4    your name on a bank account.

5         Would you agree with that, that that would be the

6    inference from that question?

7    *A.*  I got it that why you -- why use -- why deposit checks and

8    use a checking account versus just using cash.

9    *Q.*  Okay.

10   *A.*  I -- and the answer was because there's more checks that

11   come in than the cash, way more checks.  So you had to have a

12   checking account.

13   *Q.*  One of the questions was why bother using bank accounts that

14   are traceable.

15        Do you remember that?

16   *A.*  Yes.

17   *Q.*  You didn't have your name on any of the bank accounts,

18   right?

19   *A.*  No.

20   *Q.*  And that was to shield you from any liability, right?

21   *A.*  Yes.

22   *Q.*  You didn't want to get caught, correct?

23   *A.*  Correct.

24   *Q.*  And that's why you didn't put your name on any bank

25   accounts?

```
                        2:19-cr-00295-GMN-NJK
```

1   *A.*  Correct.

2   *Q.*  Okay.

3           MR. GAFFNEY:  Thank you, Judge.

4           THE COURT:  Mr. Brown?

5                   RECROSS-EXAMINATION OF PATTI KERN

6   BY MR. BROWN:

7   *Q.*  Your testimony under oath is that my client, Jose Luis

8   Mendez, speaks English just fine.  That's what you just told

9   this jury?

10  *A.*  Yes, sir.

11  *Q.*  If Mr. Mendez speaks English just fine, there would never be

12  a need to use someone to translate, right?

13  *A.*  Yes, sir.

14  *Q.*  But you did use someone to translate to speak to Mr. Mendez.

15  *A.*  I did?

16  *Q.*  You did.

17  *A.*  I -- I --

18  *Q.*  You never used someone some to translate to speak to

19  Mr. Mendez?

20  *A.*  No.

21  *Q.*  You never used Luis Aguilar to communicate with Mr. Mendez?

22  *A.*  No.

23  *Q.*  Under oath, you never did that?

24  *A.*  I do not remember even speaking to a Luis Aguilar?

25  *Q.*  Never did that.

---2:19-cr-00295-GMN-NJK---

1  *A.*  I don't recall doing it, no, sir.

2  *Q.*  You just carried on conversations with Mr. Mendez in

3  English.

4  *A.*  Yes, sir.

5  *Q.*  Yeah?

6  *A.*  Yes, sir.

7  *Q.*  Now, I want to ask you about fraud.  You said that this

8  fraud was obviously fraud to you.

9  *A.*  Yes, sir.

10 *Q.*  Not everyone is like you, right?

11 *A.*  Right.

12         THE COURT:  Mr. Green, any follow-up?

13         MR. GREEN:  Yes, please, Your Honor.

14              RECROSS-EXAMINATION OF PATTI KERN

15 BY MR. GREEN:

16 *Q.*  Good morning again, ma'am.

17 *A.*  Good morning.

18         MR. GREEN:  Your Honor, may Government's Exhibit 120 be

19 placed on the screen?

20 BY MR. GREEN:

21 *Q.*  Ma'am, before you, do you see what has been marked and

22 admitted as Government's Exhibit 120?

23 *A.*  Yes, sir.

24 *Q.*  You testified within the past several days that this is a --

25 what appears to be a compilation of cease and desist orders.

2:19-cr-00295-GMN-NJK

1   **A.**  Yes, sir.

2   *Q.*  Several days ago and this morning you mentioned that cease

3   and desist in response to a very -- a very good question from

4   the jury:  What good is a cease and desist if you still

5   continued to do it?

6           Do you remember that question?

7   **A.**  Yes, sir.

8   *Q.*  You said that was a slap on the hand?

9   **A.**  Yes, sir.

10  *Q.*  Cease and desist, what does the word "cease" mean to you?

11  **A.**  To stop.

12  *Q.*  Did you stop?

13  **A.**  No, sir.

14  *Q.*  What does the word "desist" mean to you?

15  **A.**  To -- to stop, to quit.

16  *Q.*  Like, don't do it again?

17  **A.**  Yes.

18  *Q.*  But you continued to do it.

19  **A.**  Yes, sir.

20  *Q.*  So much so that in your home office was found a cease and

21  desist order bearing a date some nine years before the search,

22  correct?

23  **A.**  Yes, sir.

24  *Q.*  Was that cease and desist order like a constant reminder to

25  you to be careful?

1    *A.*  Yes, sir.

2    *Q.*  So it's like a little string on your finger so you don't

3    forget something, correct?

4    *A.*  Yes, sir.

5    *Q.*  You mentioned in response to a question from the jury this

6    morning about some of the accounts may have had low balances,

7    correct?

8    *A.*  Yes, sir.

9    *Q.*  And just so that we're not trying to confuse the record, and

10   these are important numbers, the Bank of America account ending

11   in 1254, do you know -- you testified yesterday that you do not

12   dispute that on February 21st, 2018, that in that account with

13   the four numbers 1254 had a positive balance of $3,101.16?

14   *A.*  Yes, sir.

15   *Q.*  And that was the bank account for Golden Products.

16   *A.*  Okay.

17   *Q.*  And on that day, as to bank account ending in 4886, there

18   was a positive balance of $4,643.94.

19        Do you dispute that?

20   *A.*  No, sir.

21   *Q.*  And that was the bank account of Golden Products dba

22   Imperial Awards.

23        You don't doubt that?

24   *A.*  Correct.

25   *Q.*  And as to the account number ending in 0346 for which we

—2:19-cr-00295-GMN-NJK—

1  showed you a few checks yesterday, it was a positive balance of

2  $6,900 -- 795.15.

3        Do you dispute that?

4  **A.**  No, sir.

5  *Q.*  Do you know that that was also one of the Bank of America

6  accounts for Golden Products?

7  **A.**  Yes, sir.

8  *Q.*  Now, these amounts that were in the bank that we're talking

9  about right now, we do not expect you to remember what I just

10  said about the amounts, but those amounts looked like -- when

11  you got bank statements at the end of the month, most bank

12  statements, in your experience, do they say, like, "Oh, you've

13  got $100 left"?  Or it's like $100.19?

14  **A.**  Most of the time, I suppose it's -- it does have cents

15  involved.

16  *Q.*  Okay.  It's always different numbers, correct?

17  **A.**  Yes, sir.

18  *Q.*  Because you've got bank fees.

19  **A.**  Yes, sir.

20  *Q.*  You've got maybe ATM fees.

21  **A.**  Yes, sir.

22  *Q.*  You've got, like, expenses.

23  **A.**  Yes, sir.

24  *Q.*  Okay.  You've got business expenses.  What you were running

25  was a business, right?

—2:19-cr-00295-GMN-NJK—

1           You had -- you had paper?

2   *A.*  Correct.

3   *Q.*  Blank stock?

4   *A.*  Yes.

5   *Q.*  Regular bills that come up, electrical bill?

6   *A.*  The -- those, I did not write out of the --

7   *Q.*  So was that, like, on the house?

8   *A.*  No, sir.  I wrote checks for what I received invoices for.

9   If I would have received invoices for that --

10  *Q.*  Exactly.

11  *A.*  -- that would have been paid.

12           MR. FINLEY:  Can the witness be permitted to finish her

13  answer?

14           THE COURT:  Yes.

15  BY MR. GREEN:

16  *Q.*  Exactly.  So someone would give you an invoice for, like,

17  Federal Express.

18  *A.*  I'm sorry, I didn't hear.

19  *Q.*  Someone would give you an invoice from, like, Federal

20  Express.

21  *A.*  Yes.

22  *Q.*  And some of those were pretty high, weren't they?

23  *A.*  Yes.

24  *Q.*  And they would give you some for printing costs.

25  *A.*  Printing costs, yes.

—2:19-cr-00295-GMN-NJK—

1   Q.   Some of those were pretty high.

2   A.   Yes.

3   Q.   And some of the other expenses were pretty high.

4   A.   Yes.

5   Q.   And -- and you mentioned the other day in response to

6   Government's Exhibit 253 -- do you remember that 1,902-page

7   document that you were shown in a notebook?

8   A.   Yes, sir.

9   Q.   And you went through all of those checks and remembering all

10  of this stuff several years later.  You remember in there that

11  this was some checks in there that you would -- actually blanked

12  out or struck out with a pen.

13  A.   Yes, sir.

14  Q.   Because they weren't profit checks.

15  A.   Correct.

16  Q.   Those were checks for a business.

17  A.   Yes, sir.

18  Q.   And isn't it true that as to Golden Products for which the

19  checkbook and two ATM cards were found in your house, that you

20  were writing checks on that -- on those accounts and paying

21  whoever had to be paid, correct?

22  A.   Yes, sir.

23  Q.   Just like a regular business.

24  A.   Yes, sir.

25  Q.   And it was run out of your home.

1   *A.*  Yes, sir.

2   *Q.*  And Salvador Castro did not write one single check from any

3   of those accounts.

4   *A.*  No, sir.

5   *Q.*  In response to a juror's question about your use of the word

6   "Mexicans" --

7        MR. GREEN:  May we put Government's Exhibit 191 on the

8   screen.

9        Indulgence, Your Honor.

10       Can we go to Page 2, please.  I can't find it.

11       (Defense counsel conferring.)

12       MR. GREEN:  There it is.

13  BY MR. GREEN:

14  *Q.*  Do you see right there the sentence that's highlighted where

15  it says, "Don't want to go to jail"?

16       MR. GREEN:  Can we highlight that, please.

17  BY MR. GREEN:

18  *Q.*  Do you see the sentence, ma'am, where it says:  "Right now I

19  help out a couple of Mexicans"?

20  *A.*  Yes, sir.

21  *Q.*  You said that word just came out that way, right?

22  *A.*  Yes, sir.

23  *Q.*  You didn't write Hispanics?  Did you write Hispanics?

24  *A.*  I could have.  I -- it just -- I was typing.  I didn't even

25  think about it.  That just popped in.

—2:19-cr-00295-GMN-NJK—

1  *Q.*  I understand.  My question is very simple.  Did you write

2  out Hispanics?

3  *A.*  No, I did not.

4  *Q.*  Did you write out people of color?

5  *A.*  No, sir.

6  *Q.*  Did you write out Latins?

7  *A.*  No, sir.

8  *Q.*  You used what word?

9  *A.*  Mexicans?

10  *Q.*  Thank you.

11          MR. GREEN:  No further questions.

12          THE COURT:  Any follow-up, Mr. Finley?

13          MR. FINLEY:  Your Honor, just a few questions.

14          Can we put Government Exhibit 150 on the screen, which

15  is already in evidence.

16              FURTHER REDIRECT EXAMINATION OF PATTI KERN

17  BY MR. FINLEY:

18  *Q.*  Ms. Kern, you remember you were asked some questions on

19  cross-examination by Mr. Mendez's counsel, Mr. Brown, about

20  whether or not Mr. Mendez could barely speak English.

21          Do you remember that?

22  *A.*  Yes, sir.

23  *Q.*  Okay.

24          Do you have 151 in front of you?

25  *A.*  No, sir.

—————2:19-cr-00295-GMN-NJK—————

1          MR. FINLEY:  I mean 150.  I'm sorry.  150.

2  BY MR. FINLEY:

3  Q.  What's that?

4  A.  Those are text messages from Mr. Mendez to me.

5  Q.  What language are they in?

6  A.  They're in English.

7  Q.  Could you say that again?

8  A.  They're in English.

9          MR. FINLEY:  And if we could blow up the bottom right

10 where it says how many pages.

11 BY MR. FINLEY:

12 Q.  How many pages is Government Exhibit 150, the texts between

13 you and Jose Mendez?

14 A.  77.

15         MR. FINLEY:  Thank you.  No further questions.

16         THE COURT:  Anything else, Mr. Tomsheck?

17         MR. TOMSHECK:  No, Your Honor.  Thank you.

18         THE COURT:  Mr. Gaffney?

19         MR. GAFFNEY:  No, Your Honor.  Thank you.

20         THE COURT:  Mr. Brown?

21         MR. BROWN:  No.  Thank you, Judge.

22         THE COURT:  And Mr. Green?

23         MR. GREEN:  No, Your Honor.  Thank you.

24         THE COURT:  All right.  Thank you, Ms. Kern.  You are

25 all done.  This concludes your testimony.  You are excused and

—2:19-cr-00295-GMN-NJK—

1   just be very careful on the way down with the steps.

2           We still have 20 minutes left if the Government has

3   another witness we can call.

4           MS. CHANG:  Yes, Your Honor.  The Government calls

5   Milton Lee Etter who will be testifying as to Counts Five and

6   Eight.

7           THE COURT:  Thank you.

8           MR. FINLEY:  Your Honor?

9           THE COURT:  Yes.

10          MR. FINLEY:  I'm told Mr. Etter's actually on the fifth

11  floor.  I apologize about that.

12          THE COURT:  That's okay.

13          MR. FINLEY:  Perhaps, we could take our break a little

14  bit early?

15          THE COURT:  We can do that.  So's let's go ahead and

16  take our morning break.  I do remind the jury that you are not

17  to discuss this case with anyone.  You can talk to your fellow

18  jurors about other things, but not about this case.  And

19  remember you are not to speak to the attorneys or the parties or

20  witnesses about anything at all.

21          Do not read or listen to or view anything that touches

22  upon this case in any way.  Please continue to write down your

23  questions.  The attorneys still receive the questions even the

24  ones I don't ask.  It's just that there's -- this could get more

25  confusing instead of helpful.  So there's some questions that

1  you asked already.  We still -- we still accepted them and we

2  still are thinking about ways to help you to answer those

3  questions, but please don't stop asking the questions just

4  because I didn't audibly ask them to the witness.

5          And do not research or make any independent

6  investigation yourself about anything having to do with this

7  case nor form any opinion.

8          So it's 10:12.  Let's go ahead and have a break until

9  10:30-ish, right, 10:30.  All right.  So we'll go ahead and have

10  a break until 10:30.

11          (Whereupon jury leaves the courtroom at 10:12 a.m.)

12          THE COURT:  All right.  We'll be off record.

13          (Recess taken at 10:13 a.m.)

14          (Resumed at 10:34 a.m.)

15          THE COURT:  Do we have the Witness Etter available?

16          MS. CHANG:  Yes, Your Honor.

17          THE COURT:  Great.  Okay.  Let's bring in the jury.

18          COURTROOM ADMINISTRATOR:  All rise.

19          (Whereupon jury enters the courtroom at 10:35 a.m.)

20          THE COURT:  All right.  Thank you.  Everyone may be

21  seated.  We have the jury back from the morning break, and we

22  have Mr. Etter coming forward to the bench here.  There you go.

23          Come on up, all the way.  Watch your step.

24          THE WITNESS:  Thanks.

25          COURTROOM ADMINISTRATOR:  Please stand and raise your

```
                        ─2:19-cr-00295-GMN-NJK─
```

 1  right hand.

 2          MILTON LEE ETTER, having duly been sworn, was examined

 3  and testified as follows:

 4          COURTROOM ADMINISTRATOR:  Thank you.  Please take a

 5  seat.

 6          For the record, please state and spell your name.

 7          THE WITNESS:  My middle -- name is Milton Lee Etter.

 8  My first name is spell M-I-L-T-O-N.  Lee, L-E-E.  Etter,

 9  E-T-T-E-R.

10          COURTROOM ADMINISTRATOR:  Thank you.

11            DIRECTION EXAMINATION OF MILTON LEE ETTER

12  BY MS. CHANG:

13  *Q.*  Good morning, sir.

14  **A.**  Good morning.

15  *Q.*  Can you tell the jury how old are you?

16  **A.**  I'm 79 years old.

17  *Q.*  What is your occupation?

18  **A.**  I'm retired.

19  *Q.*  What did you do before you retired?

20  **A.**  I actually retired from two different jobs.  I was a -- an

21  attorney with the Department of Defense, specifically the

22  Defense Finance and Accounting Service.  I also retired from the

23  Air Force Reserves primarily dealing with finance and

24  accounting.

25  *Q.*  What city and state do you live in?

—2:19-cr-00295-GMN-NJK—

1    *A.*  Say again, please.

2    *Q.*  What city and state do you live in?

3    *A.*  I'm -- Lakewood, Colorado.

4    *Q.*  How long have you lived in Colorado?

5    *A.*  I've been there all my life, except about six years when I

6    was in the Air Force.

7    *Q.*  Are you married, sir?

8    *A.*  Yes, I am.

9          MS. CHANG:  If I could have an image pulled up and

10   published on the screen.

11          THE COURT:  Is this admitted or just for the witness?

12          MS. CHANG:  This is a purely demonstrative image.

13   BY MS. CHANG:

14   *Q.*  Sir, do you recognize the person in this photograph?

15   *A.*  Yes.  That's my mother-in-law, Lorraine Shirley Ramada.

16   *Q.*  What did Ms. Ramada do for a living?

17   *A.*  Say again, please.

18   *Q.*  What did Mrs. Ramada do for a living?

19   *A.*  She was a schoolteacher for 35 years at the elementary

20   school level.

21   *Q.*  Is your mother-in-law still alive?

22   *A.*  She is not.  She passed away February 26th, and her funeral

23   will be this Saturday, April 1st.

24   *Q.*  I'm very sorry to hear that.

25          Can you tell us where she last lived?

—2:19-cr-00295-GMN-NJK—

1  *A.* She last lived in Willowbrook, a memory facility, in

2  Littleton, Colorado.

3  *Q.* Can you explain for the jury what a memory care facility is?

4  *A.* Yes. She suffered from dementia, and that was the cause of

5  her death. And that meant that she -- she basically lost her

6  memory. She was unable to recall many names. Of her three

7  children, she -- when she passed away, she could only remember

8  the name of one child.

9  *Q.* Before she was at the memory care facility, between 2016 to

10  2018 what was your mother-in-law's address?

11  *A.* Her address was 9369 West Baltic Drive, Lakewood, Colorado.

12  *Q.* Who, if anyone, was your mother-in-law's power of attorney?

13  *A.* The power of attorney was my wife, Linda Etter, E-T-T-E-R.

14  *Q.* Did you also help with managing her affairs?

15  *A.* That's correct, she did.

16  *Q.* From 2016 to 2018, did your mother-in-law receive cash prize

17  notices in the mail?

18  *A.* Yes, she did.

19  *Q.* How did you first learn about her cash prize notices?

20  *A.* We found out when she got very giddy and said she was going

21  to take all of us around the world, that she was extremely

22  happy. She was a lady in her 80s and she was dancing around the

23  room.

24  *Q.* Did she ever say that she had won?

25  *A.* She's often said she had won.

—2:19-cr-00295-GMN-NJK—

1    *Q.*  There's a binder in front of you.  If I could have you

2    quickly review behind Tab 11 what's been pre-admitted into

3    evidence as Government Exhibit 11.

4         MS. CHANG:  And if I could have Government Exhibit 11

5    published to the jury as well at this time.

6         THE WITNESS:  What is that you wanted, please?

7    BY MS. CHANG:

8    *Q.*  Could you briefly describe to the jury what we're looking

9    at?

10   **A.**  Yes.  What I'm looking at was a notification of a cash

11   award, a cash prize.  It has my mother-in-law's name, her

12   address.  It's got the amount of money involved.  It indicates

13   that it's -- that she signed this and that she has made

14   payment --

15   *Q.*  Thank you.

16   **A.**  -- on this in order to receive the cash award.

17   *Q.*  Thank you.

18        And you said that she had signed this.  Directing your

19   attention to the bottom of the page by an X, is that her

20   signature?

21   **A.**  On -- on Exhibit 29 is her signature and a check --

22   *Q.*  I apologize.  Just for Exhibit 11, please, sir.

23   **A.**  Oh, I'm sorry.  I'm sorry.

24        That is her signature on 11.

25   *Q.*  Thank you.

1          What, if anything, did your mother-in-law do with these

2    types of prize notices?

3    *A.*  She -- she would show -- showed us the cash awards.  We got

4    to a point, though, when my wife and I would explain to her that

5    she had not won anything.  And as a result, what would happen

6    was she stopped not telling us that.  And we had no indication

7    that she was receiving them.  Once in a while she would leave

8    them out and we would see them.  She also, in order to make

9    payments, we would -- we found out that she would go to the

10   neighbors or to friends to take her to the post office or she

11   would meet the mailman out on the street in order to make the

12   check and send the information in.

13   *Q.*  So you had mentioned earlier that -- you intimated that you

14   didn't believe that she had won anything.  Did you try to stop

15   your mother-in-law from responding to these notices?

16   *A.*  Yes, we did.  And how we would do that was we would try to

17   beat her to the mailbox or we also found out when the neighbors

18   were involved.  We'd asked them not to do that.  So we -- we

19   made an attempt.  It caused problems, conflict, between my

20   mother-in-law and my wife, her daughter, because my

21   mother-in-law totally refused to believe that she had not won a

22   prize, even though we would go over and read the document and

23   point out things that we thought were highly suspicious and that

24   there was no way.

25   *Q.*  You had mentioned something about your mother-in-law's

—2:19-cr-00295-GMN-NJK—

1  money.  Did she ever send money in response to these notices?

2  *A.*  Yes, she did.

3  *Q.*  If I could ask you to look behind Tabs 29, 29A, and 29B, and

4  these have been pre-admitted as Government's Exhibits 29, 29A,

5  and 29B.

6        MS. CHANG:  If I may ask to have 29A and B published to

7  the jury at this time.

8        THE WITNESS:  Okay.  This is a check.  It's -- my

9  mother -- in my mother-in-law's account.  It also indicates that

10  my wife has the power of attorney.  This did not prevent my

11  mother-in-law from cashing checks, paying bills, and so forth,

12  even though my wife had a power of attorney.  It only gave her,

13  my wife, the power to also use that account to pay my

14  mother-in-law's bills.

15  BY MS. CHANG:

16  *Q.*  So you said that these were your mother-in-law's checks.  Do

17  you recognize the handwriting on these checks?

18  *A.*  Yes, I do.

19  *Q.*  Who --

20  *A.*  I recognize the handwriting where -- for the payee, also the

21  amount of money that's written out, and also her signature, I

22  recognize, yes.

23  *Q.*  Thank you.

24        And whose handwriting is it?

25  *A.*  Yes.

—2:19-cr-00295-GMN-NJK—

1    *Q.*  Is it your mother-in-law's handwriting?

2    **A.**  Yes, it is.  It's my mother-in-law's handwriting.

3    *Q.*  On Exhibit 29A, can you tell us who this check is made

4    payable to?

5    **A.**  The ... 29 is the ... looks like Founding Majors --

6    Managers, Inc.

7    *Q.*  Would you mind looking at Exhibit 29A, the first page.  So

8    it should be behind Tab A.

9            THE COURT:  It's also on the screen to your left.  It

10    might be easier to see on your left -- other side.  If you turn

11    your face, the other side.  Turn to the left.  Behind you.

12            THE WITNESS:  Oh, I'm sorry.  Sorry.  Thank you very

13    much.

14            THE COURT:  You're welcome.

15            THE WITNESS:  This is a check made to Pacific

16    Disbursement Reporting.

17    BY MS. CHANG:

18    *Q.*  On Exhibit 29B, who is the check made payable to?

19    **A.**  The check's made to Assets Unlimited.

20    *Q.*  Were these checks deposited?

21    **A.**  Yes, they were.

22    *Q.*  To your knowledge, did your mother-in-law ever receive a

23    large cash prize as a result of these prize notices?

24    **A.**  No, she did not.

25            MS. CHANG:  Thank you.  No further questions.

—2:19-cr-00295-GMN-NJK—

1          THE WITNESS:  I have one more thing I would like to

2   point out.

3   BY MS. CHANG:

4   Q.  Yes, sir.  Does it pertain to the exhibit?

5   A.  It's to the two checks.

6   Q.  Yes, sir.

7   A.  If you notice, the two checks are different numbers.  One of

8   them is a power of attorney, including my wife.  The other is

9   not.  And what we found out was that she had this other account,

10  and she would use that account often to send the prize money for

11  this -- this prize notification.

12          MS. CHANG:  Thank you.  No further questions.

13          THE COURT:  Any follow-up, Mr. Tomsheck?

14              CROSS-EXAMINATION OF MILTON LEE ETTER

15  BY MR. TOMSHECK:

16  Q.  Good morning, sir.

17  A.  Good morning.

18  Q.  Sorry you have to be here for this.  Probably a pretty rough

19  thing to go through with your mother-in-law.

20  A.  Yes, thank you.

21  Q.  You mentioned your wife's name was?

22  A.  Linda.

23  Q.  Okay.

24  A.  Etter.

25  Q.  All right.  Did you and Linda formerly live in Tazewell,

—2:19-cr-00295-GMN-NJK—

1   Virginia?

2   *A.*   Did we -- I have trouble hearing.

3   *Q.*   Sure.  I'll talk louder.  No problem.

4           Did you live in Virginia?

5   *A.*   In Virginia?

6   *Q.*   Uh-huh.

7   *A.*   No, I've never lived in Virginia.

8   *Q.*   Okay.  Did you get any mail in Virginia, do you know?

9   *A.*   Uhm, not that I know of, no.

10  *Q.*   Okay.

11          The checks that your mother-in-law was writing, do you

12  know over what time period that was?

13  *A.*   The time period that it involves here was 2016, 2017 time

14  frame.

15  *Q.*   Okay.  Do you know, did your wife ever report to the Federal

16  authorities anything related to this mail scheme?

17  *A.*   No, she did not.

18  *Q.*   Okay.

19          MR. TOMSHECK:  Can you put up Government's Exhibit 173,

20  please.

21          Can you zoom in on that top box there, please, Bryan?

22  No, further down.  Right there.  Good.

23  BY MR. TOMSHECK:

24  *Q.*   Do you see the name in the bottom left-hand corner there?

25  *A.*   Yes.

─────2:19-cr-00295-GMN-NJK─────

1   Q.  Do you recognize that name?

2   A.  It says -- where it says "Hello, the sample from GAM was

3   Linda Etter."

4   Q.  Uh-huh.

5   A.  Virginia?  She's never lived in Virginia.  I've never lived

6   in Virginia.

7   Q.  Okay.  That's your wife's name, though, right?

8   A.  That's correct.  It's Linda Etter, yes.

9   Q.  Okay.  Those e-mails are between someone named Patti Kern

10  and a guy name Shawn O'Connor.  Do you know those name?

11  A.  I don't recognize those names at all, no.

12  Q.  Okay.  Just have one other question for you.

13          MR. TOMSHECK:  Can you put up what the Government just

14  referred to as 29B, please.

15  BY MR. TOMSHECK:

16  Q.  The Government had asked you a question about the check

17  written to Assets Unlimited.  Do you remember that testimony?

18  A.  Correct.

19  Q.  And that's got the Linda Etter POA?

20  A.  Yeah, that's for power of attorney.

21  Q.  Okay.

22          MR. TOMSHECK:  Can you show me the other check that was

23  referred to by the Government, I think it was 29A.  I'm sorry

24  29 -- yeah, 29A.  That one.

25          THE WITNESS:  Yes.  And there was no power of attorney

1  on that check.

2  BY MR. TOMSHECK:

3  Q.  Okay.  Do you see who that's made out to?

4  A.  It's made out to Pacific Disbursement Reporting.

5  Q.  Okay.  Do you know who picked the name of that company?

6  A.  No.

7  Q.  Okay.

8          MR. TOMSHECK:  No further questions.  Thank you.

9          THE COURT:  Mr. Gaffney or Mr. Ericsson?

10         MR. GAFFNEY:  No questions, Your Honor.  Thank you.

11         THE COURT:  Mr. Brown?

12         MR. BROWN:  Thank you.  No questions, Your Honor.

13         THE COURT:  Mr. Green?

14         MR. GREEN:  Very briefly, Your Honor.

15         THE COURT:  Go ahead.

16         MR. GREEN:  Thank you.

17              CROSS-EXAMINATION OF MILTON LEE ETTER

18 BY MR. GREEN:

19 Q.  Good morning, sir.

20 A.  Good morning.

21         MR. GREEN:  May Government's Exhibit 173 be placed on

22 the screen.  Oh, it still is.  Can we go down to the bottom of

23 this exhibit, please.

24         Highlight that last -- that last line.

25         THE WITNESS:  The one that says here, "Get these out of

———2:19-cr-00295-GMN-NJK———

1  Glenn's.  I will get them to him to send to pas [sic] also."  Is

2  that the one you're referring to?

3  BY MR. GREEN:

4  *Q.*  Yes, sir.

5        Do you see that last line?

6  **A.**  Yes, I see that.

7  *Q.*  Down at the bottom.  There's another one right at the bottom

8  there.  Do you see that last line in this string of e-mails down

9  at the bottom?

10       The very last line -- the very last words --

11  **A.**  Where that says, "Okay.  Mike signed the C and D here with

12  the information to find out who gave these promos to the PO

13  inspector.  They blacked out the name and address, but here are

14  the string codes.  Let me know who this asshole is"?

15  *Q.*  Yes.  Now, that's the same e-mail that mentions that post

16  office box in Virginia.

17  **A.**  Okay.

18  *Q.*  You were in the military?

19  **A.**  I was in the military, but I was never stationed in

20  Virginia.

21  *Q.*  Doesn't matter.

22       You served your country valiantly, correct?

23  **A.**  That's correct.

24  *Q.*  And as a military man, if somebody had an e-mail about your

25  wife or your ex or your mother-in-law that said in the word

—2:19-cr-00295-GMN-NJK—

1  "asshole" in it, I bet you would like to punch them in the nose.
2  **A.**  I ...
3          MR. GREEN:  Thank you.  No further questions.
4          THE COURT:  I'm sorry, Mr. Etter.
5          Any questions from the jury?
6          Go ahead and write them down on the form provided if
7  you have a question for Mr. Etter.
8          Remember to skip a line or number the questions if you
9  have more than one.  And then fold the piece of paper in half
10 and pass in the direction of our courtroom deputy so we can
11 collect them.
12         COURTROOM ADMINISTRATOR:  Judge, we have three notes
13 and we're going to start at Number 71.
14         THE COURT:  Thank you.
15         Counsel, please join me at sidebar.
16         (Whereupon, the following sidebar conference was held.)
17         THE COURT:  All right.  I was letting Mr. Etter know he
18 could sit down.  He stood up when I stood up.  And I didn't need
19 him to stand up, so I wanted to let him know he could sit down.
20 I was waiting for the music to start before I came over here to
21 talk to you all, and the music wasn't starting.  But we got it
22 going so now we're back on track.
23         Jury Note Number 71 says:  Are you aware of how much
24 money your mother-in-law lost to this scam?
25         Any objection from the Government?

─────2:19-cr-00295-GMN-NJK─────

1           MS. CHANG:  No, Your Honor.

2           THE COURT:  From the Defense?

3           MR. GAFFNEY:  No objection.

4           MR. GREEN:  No objection, Your Honor.

5           THE COURT:  Thank you.

6           Jury Note Number 72 asks two questions.  The first one

7    is:  How long has your mother-in-law been doing this?

8           Any objection?

9           MS. CHANG:  No, Your Honor.

10          MR. GAFFNEY:  No objection.

11          THE COURT:  And the second question is:  Why can't no

12   one stop her?

13          Any objection?

14          MS. CHANG:  No objection, Your Honor.

15          MR. GAFFNEY:  No objection.

16          MR. GREEN:  No objection.

17          THE COURT:  And Jury Note Number 73:  Thank you for

18   your service, sir.

19          So no objection?

20          MR. GREEN:  No objection.

21          THE COURT:  Thank you.

22          (Sidebar conference was concluded.)

23          THE COURT:  All right.  Mr. Etter, I have a couple of

24   jury questions here.  They are anonymous so I'm going to read

25   them into the record.  But when you respond, you can turn and

─────2:19-cr-00295-GMN-NJK─────

1  look at the jury because these are really their questions, not
2  mine, and they need to know the answers, not me.
3              THE WITNESS:  I understand.
4              THE COURT:  All right.  So Jury Note Number 71 asks one
5  question.
6              Are you aware of how much money your mother-in-law lost
7  to this scam?
8              THE WITNESS:  We have no idea how much or how many
9  checks that she wrote.
10             THE COURT:  All right.  Jury Note Number 72 asks two
11  questions.
12             The first one is:  How long has your mother-in-law been
13  doing this?
14             THE WITNESS:  We -- all we know is from about 2016
15  through 2018 we saw these types of notices and so forth.
16             THE COURT:  And then the second question on Jury Note
17  72 asks:  Why can't no one stop her?
18             THE WITNESS:  (Pause.)  That's a good question.  My
19  wife is an attorney.  She was one of the lead attorneys for the
20  Internal Revenue Service.  We're dealing with the Department of
21  Defense.  My mother-in-law just was a hard-nosed, full-blooded
22  German lady that grew up on a farm and was very difficult to
23  convince.  She -- her husband had passed away in January of
24  2014, and this became somewhat of an outlet for her, involving
25  -- unfortunately, this wasn't the only situation where we had

1  problems that -- with my mother-in-law and her mother with her

2  money and also having people work on her house and -- and -- and

3  defraud her.

4          THE COURT:  All right.  And then Jury Note Number 73

5  just says, "Thank you for your service, sir."

6          Thank you.

7          THE WITNESS:  Thank you.  I'm particularly proud, for

8  four and a half years I was a navigator on KC-135s.  I flew 134

9  combat missions, Southeast Asia.  Was only after that that I

10  went to law school and became an attorney.

11          THE COURT:  Thank you, sir.

12          Any follow-up questions, Ms. Chang?

13          MS. CHANG:  No, Your Honor.  Thank you.

14          THE COURT:  Mr. Tomsheck, any follow-up?

15          MR. TOMSHECK:  Just real quick.

16          I thank you for your service, too.

17              RECROSS-EXAMINATION OF MILTON LEE ETTER

18  BY MR. TOMSHECK:

19  *Q.*  I have a question for you.

20          Do you know how the Government picked you to come as a

21  witness?

22  *A.*  Do I know what now?

23  *Q.*  How the Government chose you to come as a witness.

24  *A.*  I have no idea except for one thing.  Uhm.  I don't remember

25  the dates, but my wife got a subpoena.  She got a subpoena to

—2:19-cr-00295-GMN-NJK—

1  appear to testify.  She was in -- interviewed by the postal

2  inspectors.  What happened was she was unable to -- she has

3  dementia.  She suffers dementia, and that's why she's not here

4  today testifying rather than me.

5  Q.  Okay.  I'm real grateful you are here.

6        The jury's heard some testimony in the trial -- you

7  wouldn't know this, but has heard some testimony about money

8  that was seized as part of the investigation by postal

9  inspectors.  You told us you don't know exactly how much money

10 your mother-in-law had paid over to this scheme, right?

11 **A.**  I do not know that.

12 Q.  Okay.  Let me ask you this.  Has the Federal Government

13 given you back any of the money that was paid?

14 **A.**  No.

15        MR. TOMSHECK:  Thank you.

16        THE COURT:  Mr. Gaffney?

17        MR. GAFFNEY:  No, Your Honor.  Thank you.

18        THE COURT:  Mr. Brown?

19        MR. BROWN:  No.  Thank you, Judge.

20        THE COURT:  Mr. Green?

21        MR. GREEN:  No questions, Your Honor.  Thank you,

22 ma'am.

23        THE COURT:  All right.  Anything else, Ms. Chang?

24        MS. CHANG:  No, Your Honor.  Thank you.

25        THE COURT:  All right.  Thank you, Mr. Etter.  This

────────2:19-cr-00295-GMN-NJK────────

 1  concludes your testimony for today, so you are excused.  Please

 2  be very careful on the way down with the steps.

 3          THE WITNESS:  Very good.  Thank you.

 4          THE COURT:  Thank you.

 5          THE WITNESS:  I do apologize for my inability to hear

 6  very well.

 7          THE COURT:  No, you did fine.  You did very well.

 8  Thank you.  Be careful.

 9          THE WITNESS:  I'm all right.

10          THE COURT:  I tell everybody to be careful with the

11  steps, and that's why.  Thank you.  And it's usually on the way

12  out because they can't wait to get out of here.  I'm sorry.

13          All right.  So does the Government have another witness

14  that you're ready to call?

15          MR. FINLEY:  Yes, Your Honor.  Juan Villasenor.

16          THE COURT:  Good morning, Mr. Villasenor.  Come on up.

17  You're going to be seated right here to my left.  Please be

18  careful with the steps on the way up.

19          THE WITNESS:  Got it.

20          COURTROOM ADMINISTRATOR:  There's two more steps over

21  here as well.

22          You can put your things down, and I'm going to swear

23  you in.  Please remain standing and raise your right hand.

24          JUAN VILLASENOR, having duly been sworn, was examined

25  and testified as follows:

———2:19-cr-00295-GMN-NJK———

1          COURTROOM ADMINISTRATOR:  Thank you.  Please take a

2    seat.  And for the record, please state and spell your name.

3          THE WITNESS:  My name is Juan Villasenor.  J-U-N --

4    J-U-A-N, and Villasenor is V, as in Victor, I-L-L-A-S-E-N-O-R.

5          COURTROOM ADMINISTRATOR:  Thank you.

6              DIRECT EXAMINATION BY JUAN VILLASENOR

7    BY MR. FINLEY:

8    *Q.*  Good morning, Mr. Villasenor.

9    **A.**  Good morning.

10   *Q.*  Where do you live, sir?

11   **A.**  Here in Vegas.

12   *Q.*  How long have you lived here?

13   **A.**  Ooph.  '96.  About -- since '96, 1996.

14   *Q.*  Where -- where -- where did you come from before you moved

15   to Vegas?

16   **A.**  Los Angeles.

17   *Q.*  Where were you born?

18   **A.**  Mexico.

19   *Q.*  What part of Mexico?

20   **A.**  Jalisco.

21          THE COURT REPORTER:  Can you spell that?

22          THE WITNESS:  Mexico or Jalisco?

23          THE COURT:  Jalisco, J-A-L-I-S-C-O.

24          MR. FINLEY:  The Judge is familiar with it.

25          THE WITNESS:  She's good.

———2:19-cr-00295-GMN-NJK———

1   BY MR. FINLEY:

2   *Q.*  It's a nice place?

3   **A.**  Oh, very nice.

4   *Q.*  Does it share a border with the Pacific Ocean?

5   **A.**  It's close to that.  Close to Puerto Vallarta.  That's where

6   I'm from.

7   *Q.*  And Mexico City's just a little to the east?

8   **A.**  Yeah.

9   *Q.*  Did you go to -- is that where you grew up?

10  **A.**  I -- yeah, I grew up -- I grew up in Mexico.  I came here

11  about -- when I was 15 years old.

12  *Q.*  Did you go to high school?

13          THE COURT:  Can you hear him?  I'm not sure if you --

14  if we can ask you, Mr. Villasenor, if you could lean forward a

15  little bit towards that microphone with the red dot.

16          THE WITNESS:  Oh.

17          THE COURT:  Do you see that?  That's a microphone.  It

18  doesn't look like it, but it is.

19          THE WITNESS:  Okay.

20          THE COURT:  If you could either lean into that and try

21  to project your voice to the juror that is the farthest away on

22  the top.  Yeah, he just raised his hand.  And that will make it

23  easier for everyone to hear you.

24          THE WITNESS:  Okay.

25          THE COURT:  Thank you.

1    BY MR. FINLEY:

2    *Q.*   Did you go to high school in the United States?

3    ***A.***   Yes.

4    *Q.*   Was that in the Southern California area?

5    ***A.***   Yeah.  I went to Alhambra.  San Gabriel High School, that

6    was the name of it, but it was Alhambra City.

7    *Q.*   Where do you work, sir?

8    ***A.***   Oh, my produce company.

9    *Q.*   So you own a produce business?

10   ***A.***   Yeah, I've been in the produce business for about 28 years.

11   *Q.*   Is business good?

12   ***A.***   It is good.

13   *Q.*   Glad to hear it.

14          How long have you had that business?

15   ***A.***   About seven years.

16   *Q.*   How did you get into that kind of work?

17   ***A.***   When I originally came from the -- from Mexico to the --

18   California, my relatives work in the supermarkets, produce

19   department, and they got me a job being there as a part-time.

20   And that's how I started working in the produce business.

21   *Q.*   And did you start your own business right away or did you

22   work in the produce business for a little while first?

23   ***A.***   No, I work in the supermarket.  And then I move over here

24   and I start working in the big companies here, produce companies

25   here, as a puller.  One of the companies was Get Fresh, and then

———2:19-cr-00295-GMN-NJK———

1   Collins which is no longer operated.

2          And then I kind of got my -- my experience in selling

3   produce, doing more -- more Mexican markets and all that stuff.

4   That's how I got into the business because of the Mexican

5   markets.  They were looking for -- at that time there was only,

6   like, one store per chain, and now there's like five or six per

7   chain.  So that's -- they were looking for -- for produce

8   locally.

9   Q.  And you are -- are you married?

10  A.  Yes.

11  Q.  For how many years?

12  A.  Since 1998, '97.

13  Q.  Is your wife here?

14  A.  No, she's not here.

15  Q.  I'm glad she's not.

16  A.  I know.

17  Q.  Do you have any children?

18  A.  Yeah, I got four.  I got two kids and two -- two -- two boys

19  and two girls.

20  Q.  Okay.  Are -- are they grown or little kids?

21  A.  I got two grownups.  One is -- the girl is 24.  The boy is

22  22.  And I got a boy 13 and a little girl of 9.

23  Q.  How old are you, sir?

24  A.  51.

25  Q.  Mr. Villasenor, do you know the defendant, Salvador Castro?

—2:19-cr-00295-GMN-NJK—

1  *A.*  Yes, I do.

2  *Q.*  Is Salvador Castro in the courtroom today?  And you can

3  take -- it will take you a minute to look around.  There's a lot

4  of people here.

5        THE COURT:  You can stand up if you need to.

6        THE WITNESS:  No, I just -- I just saw him.  Yeah, he's

7  here.

8  BY MR. FINLEY:

9  *Q.*  Okay.  Can you identify him by something that he's wearing?

10  *A.*  He's wearing like a brown jacket or sweater.  Well, not

11  brown.  Like ... he's in the back, way in the back, way -- the

12  last guy in the back.

13        THE COURT:  What is he wearing?  I know a lot of the

14  men are wearing --

15        THE WITNESS:  I have to stand up.

16        THE COURT:  Yeah, you can stand up.

17        THE WITNESS:  It's a shirt, maybe button-up shirt.  But

18  he's way in the back.

19        THE COURT:  All right.  So ...

20        THE WITNESS:  I can point at him if you want to.

21        THE COURT:  Yeah.  So no jacket?

22        THE WITNESS:  No jacket.  It seems from here like a

23  jacket, but it's not.  It's a -- it's a shirt.

24        THE COURT:  All right.  So the record will reflect that

25  he has identified Mr. Salvador Castro in the far corner there

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

—2:19-cr-00295-GMN-NJK—

1  behind Mr. Green.

2  BY MR. FINLEY:

3  Q.  How did you meet Salvador Castro?

4  A.  Well, I knew him from soccer, you know.  He -- he likes

5  soccer and then I -- of course, I like soccer, too.  And that's

6  how I kind of knew them, through soccer.

7  Q.  How long did you play soccer?

8  A.  (Pause.)  Like, 25 years.

9  Q.  And what position did you like to play?

10  A.  I was a defender, but when I got older, I was playing

11  goalie.

12  Q.  And was Salvador Castro a soccer player as well?  Is that

13  how you met him?

14  A.  No, he was kind of like coaching at that time.

15  Q.  Okay.

16        And was he coaching your team or a different team?

17  A.  Oh, no, no, no, no, no.  Other team.

18  Q.  Did he do that for a long while?

19  A.  I guess.  He's still -- even last season he was still

20  coaching.

21  Q.  Did you and Salvador Castro do any business together?

22  A.  We did, yeah.

23  Q.  What kind of business?

24  A.  It was produce, too.  Mainly avocados.  They had a guy out

25  of Mexico, a broker that he was bringing avocados to the states.

—2:19-cr-00295-GMN-NJK—

1   And, you know, they were pretty good prices.  So, yeah, that's

2   how I got in business with them, originally.

3   Q.  Approximately, when did this happen?

4   A.  2017, '18.  I mean, it's been a few years back.

5   Q.  Did you agree to get into business with him at first, the --

6   the first time he asked you?

7   A.  No.  He was calling me at least once every other week to

8   convince me to go work with -- with him and his brother.  At

9   first, I didn't -- I didn't want to do that.

10  Q.  Why not?

11  A.  I just didn't trust that much Mr. Castro, Salvador.  I just

12  didn't feel comfortable doing business with him at that time.

13  Q.  Any particular reason?

14  A.  Uh, no.  I just didn't trust him.

15  Q.  So if you didn't trust him and he was calling you every

16  other week to ask you to get into business with him, why did you

17  end up getting into business with him?

18  A.  I got a call from his brother, Miguel Castro.  You know, at

19  the time I -- I knew him, too, and he -- he seems -- he seems

20  pretty -- pretty honest guy at that time.

21  Q.  Is the defendant, Miguel Castro, sitting in the courtroom

22  today?

23  A.  Yes.

24  Q.  Could you identify him, please, sir?

25  A.  Yeah, he's right --

—2:19-cr-00295-GMN-NJK—

1            THE WITNESS:  Is that okay if I point?

2            THE COURT:  Yes, you may.

3            THE WITNESS:  He's right there.

4            THE COURT:  Can you identify an article of clothing

5    that he's wearing?

6            THE WITNESS:  He's wearing like a blue -- and a jacket.

7    I don't know the color of the jacket.  Blue shirt and a jacket.

8            THE COURT:  Yes.  The record will identify -- will

9    reflect that he has identified Mr. Miguel Castro in the royal

10   blue shirt.

11   BY MR. FINLEY:

12   Q.  So you had a conversation with the defendant, Miguel Castro,

13   and after that conversation, what happened?

14   A.  I kind of made my mind because he was more serious about it

15   and it was a good opportunity, to be honest, with the avocados.

16   I mean, it's a huge business -- it's a huge business here in the

17   States.  So I -- I decided to -- you know, to go with them.

18   Q.  Is there anything about your background, your experience,

19   that you brought to the table?

20   A.  Correct.

21   Q.  In other words, what did they want from you?

22   A.  I guess they wanted someone because I knew -- I had the

23   contacts from the stores at that time.  And, of course, I had a

24   lot of experience in produce.  So that was the main thing.  They

25   didn't know anything about produce.  So they wanted -- they

—2:19-cr-00295-GMN-NJK—

1   wanted someone that knew produce, had contacts and everything.

2   Q.  You mentioned contacts in the -- is that contacts in the,

3   you know, avocado buyers in the Las Vegas area type of thing?

4   A.  Correct.  Not just avocados.  Other -- other produce.

5   Q.  Thank you.

6           When you spoke to Salvador Castro and Miguel Castro,

7   I take it most of the time you spoke in Spanish?

8   A.  Correct.

9   Q.  When you got into business with Salvador Castro and Miguel

10  Castro, did you become partners?

11  A.  Yeah.  They told me it was going to be -- the guy from

12  Mexico was going to have 50 percent of the company and we were

13  going to split the 50 percent of the remaining.

14  Q.  And did you have a name for the business?

15  A.  Yeah.  It was called Henderson Foods.

16  Q.  Henderson Foods.

17          Was this still around 2017?

18  A.  Yeah.

19  Q.  Now, did you have your own business at the time?

20  A.  I did have my own business.  I didn't close it down.

21  Because I was -- wanted to see if it was going to work out, but

22  I did have my own business back then.

23  Q.  And so you kept both businesses open?

24  A.  Yeah.

25  Q.  Did you have to work more?

─────2:19-cr-00295-GMN-NJK─────

1   *A.*  Uh, yep.

2   *Q.*  How much were you working back then when you had the two

3   businesses?

4   *A.*  Well, because I moved my business to the warehouses, so I

5   was mainly just going to other warehouses.  We didn't have

6   anything in my old warehouse.  Once in a while, we'll pull one

7   or two pallets, but it was -- most of the stuff, it was in their

8   location in -- Henderson Foods location.

9   *Q.*  So you mentioned the Henderson Foods location.

10          Do you remember where that was?

11  *A.*  Yeah, it was on Pearl Street.

12  *Q.*  Pearl Street?

13  *A.*  Yeah.

14  *Q.*  6925 sound familiar?

15  *A.*  Yeah, that sounds familiar, yeah.

16  *Q.*  That's the warehouse near the airport.

17  *A.*  Correct.

18  *Q.*  Okay.

19          And so you -- you got in business with Henderson Foods.

20  That business was at the warehouse on Pearl Street.

21          Did -- did you actually work at that warehouse for a

22  time?

23  *A.*  Yes.

24  *Q.*  Okay.  Approximately how long did you work at that

25  warehouse?

─2:19-cr-00295-GMN-NJK─

1   *A.*  Uh, couple -- actually, a few months.  Maybe six, seven

2   months.

3   *Q.*  What did the warehouse look like?

4   *A.*  Big.

5          MR. FINLEY:  Can we show Government's Exhibit 36 on the

6   screen, please.  It's already admitted, Judge.

7          THE COURT:  The image will be up on the screen, but it

8   will also be up --

9          THE WITNESS:  Oh, I can see?

10          THE COURT:  It will be on both so you can choose

11   whichever one's easier.

12          THE WITNESS:  Okay.

13   BY MR. FINLEY:

14   *Q.*  Do you see that?

15   *A.*  That's the one.

16   *Q.*  That's where you used to work?

17   *A.*  Yeah.

18   *Q.*  Now, before you started working at the warehouse, was there

19   a time when you visited it so you could see what it looked like

20   before you started the business up?

21   *A.*  Correct.

22   *Q.*  Okay.  Was that -- and was that the first time you had ever

23   seen the warehouse, when you -- when you went that time?

24   *A.*  At that time, yeah.

25   *Q.*  Okay.

─────2:19-cr-00295-GMN-NJK─────

1   *A.*   It was empty.  It had no coolers or nothing.

2   *Q.*   That's some time in 2017 or thereabouts?

3   *A.*   Yeah.

4   *Q.*   And when -- when you walked inside that warehouse, did you

5   see anything that surprised you?

6   *A.*   Yes.

7   *Q.*   What did you see that surprised you?

8   *A.*   I saw some printers that day on some kind of like machines.

9   *Q.*   You weren't expecting to see that?

10  *A.*   No.

11  *Q.*   Let me show you Government Exhibit 32 which is already

12  admitted.

13          MR. FINLEY:  If we could put that on the screen,

14  please.  Thank you.

15  BY MR. FINLEY:

16  *Q.*   Do you see that diagram?

17  *A.*   Yeah, that's the -- the warehouse.

18  *Q.*   And does the diagram show the basic layout of the warehouse

19  while you were working there?

20  *A.*   Yes.  There's a few changes that I saw there that were not

21  there.  But, yeah, everything looks similar.

22  *Q.*   Can you describe for the jury where the printing machines

23  that you saw were.

24  *A.*   I saw them on letter E, and outside letter E there was one

25  machine.  And then there was another on letter D.

1  Q.  Were those -- were those machines actually being used the

2  first time you saw them?

3  A.  When I was there, they were not.  They were not used.

4  Q.  Did you ever find out what they were being used for?

5  A.  After.

6  Q.  When you started working there?

7  A.  Yeah, when I was going pretty much every day.

8  Q.  Can you describe for the jury what you saw when you first

9  found out what the machines were being used for.

10  A.  Uhm.  When I was there, at the time that I saw there was

11  some papers being printed, and also there was some envelopes

12  being put -- they were running a bunch of envelopes, and there

13  were some stamps they were getting together.  They were putting

14  some envelopes in a box.  And they were taking it to -- I guess

15  to the -- to the mail -- mailboxes or something.

16  Q.  And did you learn or did you see whose doing the work?

17  Who's running the machines?  Who's --

18  A.  I saw Jose Luis Mendez.

19  Q.  Okay.  There you go.

20  A.  I saw Mario Castro and Mr. Salud Castro.

21  Q.  Mr. Salud Castro?

22  A.  Yes.

23  Q.  Okay.  You mentioned the defendant, Jose Luis Mendez, and

24  the defendant, Mario Castro?

25  A.  Correct.

 1  *Q.*  Are you able to identify those two defendants in this
 2  courtroom today?
 3  ***A.***  Yes, sir.
 4  *Q.*  Okay.  Let's start with Jose Luis Mendez.
 5        Can you identify Mr. Mendez by an article of clothing
 6  that he is wearing?
 7  ***A.***  He's also wearing, like, a --
 8        THE WITNESS:  I can stand up?
 9        THE COURT:  Yes, you may.
10        THE WITNESS:  He's just wearing, like, a -- like, a
11  jacket, like, a blue or black jacket.  He's the second person
12  from the -- from left to right on the back.
13        THE COURT:  All right.  So the first person is Bryan
14  Glynn, and the person next to him is Jose Luis Mendez.
15        THE WITNESS:  Yes.
16        THE COURT:  And the record --
17        THE WITNESS:  And then Mr. --
18        THE COURT:  -- will reflect that he has identified
19  Mr. Jose Luis Mendez.
20  BY MR. FINLEY:
21  *Q.*  Okay.  Now, what about Mario Castro?  Can you identify him?
22        THE COURT REPORTER:  I'm sorry.
23        THE COURT:  One at a time.
24        THE WITNESS:  Oh, sorry.
25        THE COURT:  Go ahead.

—2:19-cr-00295-GMN-NJK—

1    BY MR. FINLEY:

2    *Q.*  Go ahead, sir.

3    *A.*  He's right there.

4    *Q.*  Okay.  What -- can you identify something he's wearing?

5    *A.*  He is wearing glasses right now and, like, a jacket, too.  I

6    don't know if it's a pink shirt.

7            THE COURT:  All right.  Yes.  So that is Mr. Mario

8    Castro.  The record will reflect that the witness has also

9    identified Mr. Mario Castro.

10           And just to clarify, I believe the third name you said

11   was Salud.  You were not referring to Salvador?

12           THE WITNESS:  No, it's Salud.  I don't know -- I only

13   knew him as Salud.  I don't know what was his name.

14           THE COURT:  No, that's fine.  I just wanted to clarify

15   that.  There's a lot of different names here for the jury to

16   keep track of.

17           So Salud is a different person.  It's not one of the

18   defendants.  I think we all agree on that.

19           THE WITNESS:  No, he's not here.

20           THE COURT:  Okay.

21   BY MR. FINLEY:

22   *Q.*  Salud Castro, was it -- did you come to learn that he was

23   brothers with the three Castro defendants?

24   *A.*  Yes.

25   *Q.*  Did you -- so you mentioned you saw some envelopes, some

PATRICIA L. GANCI, RMR, CRR    (702) 385-0670

—2:19-cr-00295-GMN-NJK—

```
 1  stamps.
 2          Did you ever get a chance to see --
 3          THE COURT:  Bless you.
 4  BY MR. FINLEY:
 5  Q.  -- what was inside the envelopes, what was being printed to
 6  be put inside?
 7  A.  Not really.  I just saw them printing on the machines.
 8  Q.  You saw them being printed on the machines?
 9  A.  Correct.
10  Q.  And did you look at them?  Did you look at what was being
11  printed?
12  A.  One time I -- I kind of look at it one time.
13  Q.  Okay.
14  A.  And it looked to me like certificates.
15  Q.  Okay.  Certificates?
16  A.  Yeah.
17  Q.  And what kind of certificates?
18  A.  Like a prize certificates.
19  Q.  Prize?
20          Can you describe for the jury what -- what it looked
21  like?
22  A.  They were, like, this big and probably like this -- you
23  know, this wide and this tall.
24  Q.  And what -- did -- did you see anything on there that made
25  you think it's a prize certificate?  What did you see on there
```

 1  that made you think that?

 2  *A.*   I saw them and I asked them what was it.  And that's when

 3  they told me that -- what it was.

 4          MR. TANASI:  Objection, Your Honor, as to "them."

 5          THE COURT:  Do you remember who was it that told you

 6  that?

 7          THE WITNESS:  Mr. Mario -- Mario Castro.

 8          THE COURT:  All right.

 9  BY MR. FINLEY:

10  *Q.*   Okay.  And did you have a reaction to these certificates?

11  *A.*   Yeah, I -- when I was talking to them, I did.

12  *Q.*   Okay.

13  *A.*   I told them that -- excuse my language.  I said, "This is

14  fucking illegal."

15  *Q.*   Okay.

16          And so when you -- excuse my language also, but the

17  exact words are important.

18          When you said to him, "This is fucking illegal" --

19  *A.*   That it looks fucking illegal, yeah.

20  *Q.*   -- what -- what did he say to you?

21  *A.*   I'm going to say it in Spanish first, okay?

22          He said, "No" --

23          COURT REPORTER:  Your Honor, I cannot write Spanish.

24          MR. FINLEY:  Oh.

25          THE WITNESS:  I can say it in English, too.

—2:19-cr-00295-GMN-NJK—

1  BY MR. FINLEY:

2  *Q.*  Please, sir.

3  *A.*  He said, "No, sir.  If it would've been legal, we would have

4  been doing this for this long."

5  *Q.*  Did he ever tell you that the Government have been actually

6  trying to shut him down?

7  *A.*  No.

8  *Q.*  Did he ever tell you that one of his biggest clients, Glenn

9  Burke, was shut down?

10  *A.*  No.

11  *Q.*  Did you believe him?

12  *A.*  Eh.  No.

13  *Q.*  Why not?

14  *A.*  Eh.  I see those -- and I mentioned it, it was the prizes --

15  I used to get it on my house, too.  There's no way I'm going to

16  believe they're going to give you money if I send money out.  I

17  never did that, so that's why I didn't -- I didn't -- I didn't

18  believe it.

19  *Q.*  What did his -- what was his reaction?  What did his face,

20  expression, look like?  Was he calm?

21  *A.*  He was calm.

22  *Q.*  When he said that to you?

23  *A.*  Yeah.

24  *Q.*  Did you speak to anyone else, any other of the four

25  defendants, about those notices that you saw and -- at all?  Did

———2:19-cr-00295-GMN-NJK———

1  you speak about them at all?

2  **A.**  There was one person that we talk about it, and actually

3  this person said that he sold the business to them.

4  *Q.*  Okay.  What about the four defendants that are in this

5  courtroom today, did you talk about that -- you must have talked

6  about the notices at some time with them?

7  **A.**  It was mainly -- the people who was mainly talking was Mario

8  and Jose Luis Mendez.  That was the only two persons because

9  they were the ones running it and Salud.

10  *Q.*  Did you talk to the defendant, Miguel Castro, about, you

11  know, what the notices were about?  How they worked?

12  **A.**  Not that I remember.

13  *Q.*  Do you ever remember talking to the defendants about how

14  much money they made by sending the notices, that kind of thing?

15  **A.**  Yeah, we talk about that, yeah.

16  *Q.*  Okay.  Now -- so which one of the four defendants did you

17  talk about -- about how much money they were making?

18  **A.**  They never tell me the exact amount --

19  *Q.*  I'm sorry.  We've got to be careful with "they."

20  **A.**  Okay.

21  *Q.*  We got to talk about each person, you know, by name.

22  **A.**  Mr. Mario Castro never mentioned the exact amount that he

23  was making, only says they were making good money.  Same -- same

24  with Mr. Jose Luis Mendez.

25          And actually, Mr. Miguel Castro, we talk about how much

—2:19-cr-00295-GMN-NJK—

1   money they were making, too.  They said they were making -- him

2   and Salvador Castro the less money out of the -- out of the

3   money that they were getting.

4   Q.  Okay.  Let me make sure I understand you.  You mentioned

5   Miguel Castro?

6   A.  Mentioned that, yeah.

7   Q.  And make sure I understand you right.  He was -- he told you

8   that he and his brother, Salvador, made less money than the

9   other two?

10  A.  Correct.

11  Q.  Okay.

12        Where did you work -- what area did you work in when

13  you were at the warehouse?

14        MR. FINLEY:  If we could get the diagram back up.

15        (Prosecution conferring.)

16        THE WITNESS:  There was -- letter A, that was an

17  office.  I started -- I don't remember if it was started first

18  there.  But I work in A and G mainly.

19  BY MR. FINLEY:

20  Q.  And when did you arrive at the Pearl Street warehouse on

21  most days?

22  A.  I'm sorry?

23  Q.  Your typical day while you were working there, when did you

24  get to work?

25  A.  3 o'clock, 4 o'clock in the morning.

2:19-cr-00295-GMN-NJK

1  Q.  Did you say 2 o'clock in the morning?

2  A.  Yeah, 3 o'clock, sometimes 2 o'clock.  It varies.  It

3  depends on the deliveries that we were getting.  The truck

4  dropping the stop.  It varies, 2 o'clock, 3 o'clock, 4 o'clock,

5  most of the time.

6  Q.  Why would you need to get there so early?

7  A.  Because I was pulling the orders at that time.

8  Q.  And when you would get there at 2 o'clock in the morning,

9  4 o'clock in the morning, were the -- any of the four defendants

10 there when you got there?

11 A.  No.

12 Q.  What about your produce business partners, Miguel Castro and

13 Salvador Castro?

14 A.  No.

15 Q.  So you were there, but your partners were not there?

16 A.  Yes.

17 Q.  What -- on a typical day, when would you leave?

18 A.  It varies.  It could be 12.  It was 12, 1 o'clock,

19 2 o'clock, after 3 o'clock.

20 Q.  Okay.  So maybe 10 to 13 hours a day?

21 A.  10 hours, yeah.  And sometimes seven days a week.

22 Q.  Seven days a week?

23 A.  Yeah.

24 Q.  And your --

25 A.  Not the 10 hours on Sunday.  It was a few hours on Sunday.

—2:19-cr-00295-GMN-NJK—

1   Q.  And then you had your other business that you had to take

2   care of, too, right?

3   A.  Not really because I was working out of the location now.

4   Q.  Okay.  Did you go back and forth between locations or

5   just --

6   A.  No.

7   Q.  Okay.  You were at Pearl Street warehouse for those hours?

8   A.  Correct.

9   Q.  What time would -- well, let's talk about them individually.

10          What time would Mario Castro arrive in the morning?

11  A.  Late.  9 to 10.

12  Q.  9 or 10 a.m.?

13  A.  Yeah.

14  Q.  And what about the defendant, Jose Luis Mendez?

15  A.  Same thing.  They always come -- most of the time they were

16  coming together.

17  Q.  Okay.  So Defendant Mendez and Defendant Mario Castro

18  arriving at the same time?

19  A.  Correct.

20  Q.  Was that once in a while or regularly?

21  A.  Almost -- it was a regular thing for them.

22  Q.  Did they leave together each day?

23  A.  Sometimes they did.  I didn't get to see when they were

24  leaving together because I leave sometimes before them.

25  Q.  And what about the defendant, Miguel Castro, when would he

—2:19-cr-00295-GMN-NJK—

1    arrive?

2    *A.*    He was late, too.

3    *Q.*    Around what time?

4    *A.*    8 to 9, 8 to 10 sometimes.

5    *Q.*    Okay.

6         And Defendant Salvador Castro, when would he show up?

7    *A.*    Same thing, 7 to 8, 7 to 9.

8    *Q.*    How did the defendant, Mario Castro, spend his time in the

9    warehouse?

10   *A.*    Well, they used to come with Starbucks coffee pretty much

11   every day.  They was just talking the first couple of hours.

12   And then I guess when -- like, leave or something.  They were --

13   they were, I guess, doing the work.  I barely see them working

14   on the printers except for a few -- maybe one hour, two hours

15   working on the job -- on the printers.

16   *Q.*    Okay.  And we were talking about Mario Castro?

17   *A.*    And Jose Luis, both of them.

18   *Q.*    Okay.  The two of them?

19   *A.*    Yeah.

20   *Q.*    You would see -- and then you would see them working on the

21   machines from time to time?

22   *A.*    Yeah, for a while.  Just not for that long because they were

23   printing by themselves.  So it was just when the paper was

24   running out.

25   *Q.*    How about the Defendant, Salvador Castro, what would you see

-2:19-cr-00295-GMN-NJK-

1  him doing in there?

2  *A.*  He was just -- got there.  Then just working on getting the

3  orders to the rest of the orders that were needed to do, the

4  produce orders.

5  *Q.*  Okay.  So he's spending time working on the produce orders?

6  *A.*  Correct.

7  *Q.*  And what else do you see him doing in the warehouse?

8  *A.*  Uh.  That's -- that's about it.  Sometimes they were having

9  barbecue out there and he was cooking.

10  *Q.*  They would have barbecues?

11  *A.*  Yeah.

12  *Q.*  How often would they have barbecues?

13  *A.*  I would say, like, four times, three times out of the week.

14  *Q.*  Okay.

15       How about the defendant, Miguel Castro, how did he

16  spend his time at the warehouse?

17  *A.*  He was mainly in the -- in the office.

18  *Q.*  And can you identify his office in the diagram?

19  *A.*  Yes, it's B.

20  *Q.*  Okay.

21       And then at the bottom of the diagram, that's the front

22  entrance that we saw the picture of, right?

23  *A.*  Correct.

24  *Q.*  And then at the other end at the top, what's that?

25  *A.*  That's the loading docks.

———2:19-cr-00295-GMN-NJK———

1  Q.  Okay.

2       Did you see trucks coming to take away all the notices

3  or certificates that you saw being printed?

4  A.  They were bringing boxes.  They were -- they were going out

5  only envelopes and -- and, like, a mailboxes.

6  Q.  Okay.  And how would those leave the warehouse?

7  A.  Mr. Salud used to take them in his truck.

8  Q.  Okay.

9       Were there times when Mario Castro and Jose Luis Mendez

10 would get to the warehouse in the morning holding Starbucks

11 coffee --

12       MR. TANASI:  Objection, leading.

13       MR. FINLEY:  And then -- he just said that.

14       THE COURT:  Overruled.

15 BY MR. FINLEY:

16 Q.  Holding Starbucks coffee, and then pretty soon after

17 arriving, go out?

18 A.  Yeah, for breakfast.

19 Q.  How often would Jose Luis Mendez and Mario Castro go out for

20 breakfast?

21 A.  A lot.

22 Q.  How many times per week on average?

23 A.  Probably four times per week or five times.

24 Q.  What about the defendant, Miguel Castro, did he sometimes

25 arrive and also go out to breakfast?

—2:19-cr-00295-GMN-NJK—

1   *A.*  It was only one time.  Actually, I was there, too.  But I

2   can't say that it was with them either.  Only one time I went

3   with -- with him that I saw him with them.

4   *Q.*  Okay.  Just make sure I understand you.  It was only one

5   time that you saw Miguel Castro go out to breakfast --

6   *A.*  Yeah.

7   *Q.*  -- with the defendant, Mario Castro, and the defendant, Jose

8   Luis Mendez?

9   *A.*  Yeah.  And actually, Mr. Salvador Castro was there, too.

10  *Q.*  Okay.  And he would sometimes go out to breakfast or not?

11  *A.*  With them, I don't know.  Only that time.

12  *Q.*  Oh, the one time you saw all four of them -- all four of the

13  defendants going out to breakfast together?

14  *A.*  Yeah.

15  *Q.*  And when the defendant -- when -- it was usually Mr. Mario

16  Castro and Mr. Jose Luis Mendez who were going out to breakfast

17  all the time?

18  *A.*  Correct.

19  *Q.*  That's your testimony?

20  *A.*  Yeah.

21  *Q.*  Okay.  Well, when they would go out to breakfast, would you

22  go with them or would you stay at the -- at the --

23  *A.*  I'd stay at the warehouse.

24  *Q.*  Okay.  Stay at the warehouse.

25          Would you keep working?

2:19-cr-00295-GMN-NJK

1   *A.*  Correct.

2   *Q.*  Are you still partners with Salvador Castro and Miguel

3   Castro in the produce business?

4   *A.*  No.

5   *Q.*  Why did you leave?

6   *A.*  Uh.  I just didn't like being working that many hours and --

7   and actually taking -- caring more about the business.  I see

8   that they didn't do that much work that I was doing.  One time I

9   had a discussion with Mr. Salvador Castro, and I told him, "I'm

10  not your employee to be working all these many hours."  So --

11  and then he said, "Well, you can leave."  So that's -- after

12  that, probably a month after that, I decided to leave.

13  *Q.*  Were there any other reasons why you decided to quit the

14  business?

15  *A.*  With them?

16  *Q.*  Yes.

17  *A.*  That was the main reason.  And then I just didn't feel

18  comfortable working with them no more.  You know, they lied to

19  me a lot.

20  *Q.*  Okay.

21        Let's talk about people by name.  Who lied to you a

22  lot?

23  *A.*  Mainly Salvador.

24  *Q.*  Okay.  What did he lie to you about?

25  *A.*  Well, we agree that it was going to be 13 -- well, the 50

—2:19-cr-00295-GMN-NJK—

 1  percent was divided in three parts.  Then later I had to find

 2  out, like, he sold some of the shares to a friend of them.  I

 3  don't know -- I don't remember his name, to be honest.

 4         So at the time I was kind of upset because, you know,

 5  we're partners.  You were supposed to tell us everything.  And

 6  since that day, I starting to kind of feel uncomfortable with

 7  that.  And then I was finding out more things that Mr. Salvador

 8  Castro was doing, and I wasn't comfortable with that.

 9  *Q.*  Now, let me make sure I understand what you just said.  Are

10  you saying that the defendant, Salvador Castro, brought another

11  partner into the business without asking you?

12  **A.**  I didn't know if he was a partner.  I found out after

13  because he told me.  And then he's the one who told me.  I don't

14  remember his name.  It's a friend of them.  You know, he told me

15  that he gave him money so he can be part of the company.

16  *Q.*  Did Miguel Castro do any accounting work for Henderson

17  Foods?

18  **A.**  Yeah, he was in accounting for them.  And not only for them,

19  for Digital Express, I think that's what it was called.

20  *Q.*  And talking about Henderson Foods, did Miguel Castro -- was

21  he accurate about his accounting?

22  **A.**  Uh-hmm.

23         THE COURT:  You need to say yes or no.

24         THE WITNESS:  I'm sorry.  I had water, Your Honor.  My

25  fault.

2:19-cr-00295-GMN-NJK

1          No.

2   BY MR. FINLEY:

3   Q.  No.  What makes you say that?

4   A.  Because I keep asking about reports.  He keeps giving me the

5   same reports that I was asking all the time.  So it didn't

6   change that much.  And I find out more when the guy from Mexico

7   used to come to ask for, of course, money.  And he used to give

8   us this statement that it was not accurate from what I thought

9   it was going -- it was at that time.  Like, for example, he came

10  out with the statement of, like, 400 and something thousand

11  dollars, and to my knowledge, it was less than that.  So that's

12  when I started to feel uncomfortable, too.

13  Q.  Did your business partners at Henderson Foods, Miguel Castro

14  and Salvador Castro, did they make any business decisions that

15  you disagreed with?

16  A.  It was mainly Salvador who was making the decision.  I don't

17  know if Miguel was doing that all the time, too.  But it was

18  mainly Salvador that was making those decisions.

19  Q.  Did he make any decisions you disagreed with?

20  A.  Correct.

21  Q.  Okay.  What kind of decisions was he making?

22  A.  One of them was selling -- selling produce for way less and

23  never asked me how much he was going to sell it.  He just was

24  selling it.

25  Q.  And you said "way less."  What do you mean?

1    **A.**  Well, I'm going to give you an example.  One time we got a

2    load of limes.  Limes, like, right now, they're very expensive.

3    We got a good deal on it.  I got them, and of course he knows

4    how much we're paying because he can check.  And he was selling

5    it, like, 2, $3 over cost when they were like $20 that we could

6    have made per case, and he was making like $3, $2.  So I was

7    wanting to tell him, "Why would you sell them for cheap when

8    they're high right now?"  And, you know, his answer is, "We have

9    to sell, we have to sell."

10    *Q.*  Did you lose money or did you make money from being

11    involved?

12    **A.**  I lost money being involved.

13    *Q.*  With Henderson Foods?

14    **A.**  Correct.

15    *Q.*  Did you quit in around late 2017?

16    **A.**  Around that, yeah.

17    *Q.*  Did you have any conversations with any of the four

18    defendants about whether the mailing business they were doing

19    was a good way to make money?

20    **A.**  Yeah.

21    *Q.*  Okay.  Now, who, by name, did you talk to about that?

22    **A.**  It was mainly Mario Castro and Jose Luis Mendez.

23    *Q.*  Okay.  You talked to both of them about that?

24    **A.**  It was just mainly those two.

25    *Q.*  Okay.  Let's take them one by one.  What did you talk --

1  what did you talk about with Mario Castro about whether this was

2  a good way to make money?  What -- what did you talk about?

3  *A.*  Well, because I saw how -- what -- how many hours they would

4  actually work.  And then I asked them.  I said, "That's got to

5  be money."  And he was mentioning, yeah.  It was never the exact

6  amount that they told me how much actually they were making.

7  *Q.*  And what about the defendant, Jose Luis Mendez, did you talk

8  to him?

9  *A.*  Yeah, it was the same thing, too.

10  *Q.*  And what did he say about whether it's a good way to make

11  money?

12  *A.*  Because what they were doing, it was a good way for them to

13  make money, and it was less work and it was easy.

14  *Q.*  So they said it was less work and it was easy?

15  *A.*  Yeah.

16  *Q.*  Did it look like easy money to you?

17  *A.*  Yeah, it did.

18  *Q.*  Did anybody explain to you how the mailing business they

19  were running worked?

20  *A.*  I'm sorry, what was that?

21  *Q.*  Did anyone explain to you how they made the money?

22       MR. TANASI:  Objection, Your Honor, as to anybody.

23  BY MR. FINLEY:

24  *Q.*  It 's just a yes or no, sir.  And then I'll ask you by name.

25  *A.*  Yes.

—2:19-cr-00295-GMN-NJK—

1  Q.  Okay.  Who told you -- who talked to you about how they made
2  the money?
3  A.  It was Mario Castro.
4  Q.  Okay.  And what did he say about how they made the money?
5  A.  They were selling those certificates.  They were mailing it
6  out, and then people were sending 20, $30 back to them.
7  Q.  And did there ever come a time when you said to Mario
8  Castro, you know, "These are old people who are sending this
9  back to you"?  Did you ever tell him that?
10  A.  Yeah, we had one conversation one time.
11  Q.  And what did he say to you?
12  A.  He said, "We're not putting a gun to his head -- to their
13  heads."
14  Q.  Okay.  Nobody's putting a gun to their heads?
15  A.  Yeah, they're sending the money because they want to send
16  their money.
17  Q.  And did you take him to mean that he's talking about nobody
18  was putting a gun to the heads of the people who are sending the
19  money?
20  A.  Correct.
21  Q.  Okay.  The old people that you mentioned?
22  A.  Correct.
23  Q.  Did any of the defendants talk about maybe you getting
24  involved in the business with them, the mailing business?
25  A.  Actually, I did.

—2:19-cr-00295-GMN-NJK—

1   Q.  Okay.  Oh.  You brought it up?

2   A.  Yeah, I brought it up.  I was -- I was --

3   Q.  Tell us about that, sir.

4   A.  Well, one time I asked them, "Hey, so I want to -- I want to

5   get into the business."  And then he told me that, "Well, you

6   have to come up with money, and you're going to be the -- the

7   last guy to print the, I would say, work orders."  So I said,

8   "Nah, I'm not going to be the last guy."

9           But I was just playing around with them because I knew

10  it was -- it wasn't -- it wasn't good what they were doing.

11  Q.  So you would have never done it, you're just --

12  A.  No, no, I was just playing around.

13  Q.  Making conversation, that's what you're saying?

14  A.  Correct.

15  Q.  Was there a woman who would come by the warehouse and hand

16  out envelopes of cash?

17  A.  Yes.

18  Q.  Did you meet her?

19  A.  Yeah, yeah.  A couple of times.

20  Q.  What was her name?

21  A.  Patti.

22  Q.  Do you know her last name?

23  A.  I think it's Mu.

24  Q.  Pardon?

25  A.  Mu.  Patti Mu, something like that.  I only knew him as a

—2:19-cr-00295-GMN-NJK—

1  Patti.

2  *Q.*  You only knew her as Patti?

3  **A.**  Yeah.

4  *Q.*  Not sure about that last name?

5  **A.**  No.

6  *Q.*  So there were times that you were working there and she

7  stops by?

8  **A.**  Correct.

9  *Q.*  How many times did that happen while you were there?

10  **A.**  A couple of times.  Four, five times, maybe.

11  *Q.*  And did you see her pass out the envelopes?

12  **A.**  Correct.

13        MR. FINLEY:  Can we put up Government Exhibit 85, which

14  is already admitted.

15        Can we blow up the first two envelopes, please, on the

16  left-hand side.

17        THE WITNESS:  I got to have some water because I'm

18  getting -- my throat gets dry.

19        THE COURT:  Yeah, we'll get you another one.

20        THE WITNESS:  He's getting me one.

21        THE COURT:  Oh.  We have one here, Nick.

22        THE WITNESS:  Sorry about that.

23        THE COURT:  No, that's okay.

24  BY MR. FINLEY:

25  *Q.*  Okay.  We're looking at Government Exhibit 85, sir.  Did the

—2:19-cr-00295-GMN-NJK—

1  envelopes that you saw getting passed out, did they look like

2  this?

3  *A.*  Yeah.

4  *Q.*  They had the defendants' names on them?

5  *A.*  I never see the names on it.  I just saw the envelopes when

6  they were opening up and what they would get in it.

7  *Q.*  Oh, they opened it up in front of you?

8  *A.*  Yeah.

9  *Q.*  Okay.

10          Tell us about that.

11  *A.*  Well, Patti --

12  *Q.*  They would open it up?

13  *A.*  Yeah, Patti used to come and give them the envelopes.  And

14  then they would open it up to get the cash out of the envelopes.

15  *Q.*  And they'd do that right in front of you?

16  *A.*  Yeah.  The only two guys that were doing that, it was

17  Miguel -- not Miguel -- Mario Castro and Jose Luis Mendez.

18  *Q.*  Okay.  They were the only two who would open it in front of

19  you?

20  *A.*  The other two guys, they never -- Mr. Salvador Castro and

21  Miguel Castro, they never did open it in front of me.

22  *Q.*  They didn't open their envelope in front of you?

23  *A.*  Not that I recall.

24  *Q.*  Did you see those two, Mr. Miguel Castro and Salvador

25  Castro, receive envelopes?

—2:19-cr-00295-GMN-NJK—

1   *A.*   Yes.

2   *Q.*   They just didn't open them in front of you?

3   *A.*   Correct.

4   *Q.*   Did you see what was inside the envelopes?

5   *A.*   It was cash.

6          MR. FINLEY:  Let's look at Government Exhibit 86.

7   BY MR. FINLEY:

8   *Q.*   Did they look kind of like that when they were opened?

9   *A.*   Yeah.

10  *Q.*   Did you ever get an envelope?

11  *A.*   Oh, no.  I was asking Patti, "Where's my envelope," when she

12  used to come.  And she would just laugh at me.

13  *Q.*   Okay.  So when Patti came -- can you explain this a little

14  bit?  Patti came.  You asked her for an envelope, and she

15  laughed at you?

16  *A.*   Yeah, I asked her, "Where's my envelope?"  And she'd just

17  laugh at me, and she'd say, "Go ask Mario."

18  *Q.*   Talk to Mario?

19  *A.*   Yeah, talk to Mario.

20  *Q.*   Okay.

21         Who got the most money?

22  *A.*   From what they -- Mr. Mario Castro told me, it was him and

23  then it was Jose Luis.  Then it -- Jose Luis Mendez.  Then it

24  was Mr. Salud, and then Miguel Castro and Salvador Castro was

25  the guy getting less money.

1    Q.  So they would talk to you about who's getting the most money

2    and kind of compare with each other?

3    A.  Yeah.

4    Q.  Let me ask you this.  Did the four defendants seem kind of

5    excited right before the money was going to come?

6    A.  Correct.

7    Q.  Were there times when they showed up at the warehouse just

8    to get the money and then left?

9    A.  Yeah.

10    Q.  And who are we talking about?  Who did that?

11    A.  Miguel, Mario -- Mario Castro and Jose Luis Mendez and

12    Mr. Salud.

13    Q.  How did they act when they got the envelopes?

14    A.  Oh, they were happy.

15    Q.  Okay.

16    A.  It was funny because Mario Castro used to brag about the

17    money that he was getting.  He used to get the cash and just

18    throw it on the table.

19    Q.  Okay.

20    A.  And he was saying, "Oh, today I make" -- he didn't mention

21    the exact amount.  He just mentioned how much money he -- he

22    make.  "Oh, I made, like, $6,000 in a few checks.  A couple

23    thousand dollars in checks."

24    Q.  Who was he saying this to?  He's throwing the money on the

25    table so it, like, spreads out a little?  And who's he saying

1  out -- who's he telling how much he made money?  Just everybody

2  or is he saying it to somebody?

3  *A.*  Mainly he was telling it to me, and then everybody was

4  there, so ...

5  *Q.*  Okay.

6        Did any of them get jealous over -- with each other

7  over the money?

8  *A.*  There was one guy that you can see his face impression.  It

9  was Mr. Salvador Castro.

10  *Q.*  Okay.  So you could see Mr. Salvador Castro's expression

11  when everybody's getting the money, and what was his expression

12  when everybody was getting the money?

13  *A.*  Sad.

14  *Q.*  He was sad?

15  *A.*  Yeah.

16  *Q.*  And do you know why?

17  *A.*  He was getting less money.  He was the one actually getting

18  the less money.  That was according to them -- to Mr. Mario

19  Castro and Jose Luis Mendez.

20  *Q.*  Did you ever hear certain -- certain of the defendants --

21  and this is just a yes or no, and then I'll ask more.

22        Did you ever hear certain of the defendants talking

23  about the different print jobs and who -- you know, who had what

24  company, that kind of thing?

25  *A.*  No.

—2:19-cr-00295-GMN-NJK—

1  *Q.* Like, this job is Mario's job, this job is Salud's job, that

2  kind of thing?  Did you hear that?

3  *A.* They did mention it.  It was Jose Luis Mendez saying --

4  mainly Jose Luis Mendez.  The way they do the -- the

5  certificates, it was a work order and it has some numbers.  And

6  it goes -- it was in order.  Whoever had more -- more of the

7  company was getting the first one to print out.

8  *Q.* Was part of the reason you left your feelings about what

9  they were doing with the certificates?

10  *A.* It was part of it.  And then the main part was the produce

11  decisions that Mr. Salvador Castro was making.  You know, he was

12  selling -- selling stuff, you know, less -- for less money than

13  we should be selling.  Plus, I find out after that they sold

14  some loads of avocados to L.A., and I didn't know anything about

15  it.  I knew, but I thought they -- they were telling me that

16  never got paid, and I find out that they were -- that they got

17  paid, some of the avocados.  So there was no trust.

18  *Q.* I see.

19         MR. FINLEY:  If you could give me a moment, Your Honor,

20  just to check with counsel.

21         (Prosecution conferring.)

22         MR. FINLEY:  No further questions, Your Honor.

23         Thank you, sir.

24         THE WITNESS:  You're welcome.

25         THE COURT:  Any cross-examination, Mr. Tanasi?

———2:19-cr-00295-GMN-NJK———

1          MR. TANASI:  Thank you, Your Honor.

2          THE COURT:  On behalf of Mr. Mario Lopez.

3              CROSS-EXAMINATION OF JUAN VILLASENOR

4  BY MR. TANASI:

5  Q.  Good morning, sir.

6  A.  Good morning.

7  Q.  Did you drink any coffee today?

8  A.  Yes, I did.

9  Q.  You did?  Where did you get it?

10 A.  My warehouse.

11 Q.  At your warehouse?

12 A.  Yeah.

13 Q.  Did you have breakfast today?

14 A.  I haven't had breakfast.

15 Q.  Haven't eaten yet.

16 A.  No.

17 Q.  Have you ever had any barbecue or lunch?

18     Have you ever had lunch?

19 A.  Lunch?  Yeah, I did have lunch.

20 Q.  Yeah.  And had you ever had barbecue at lunch?

21 A.  Yeah, barbecue, yep.

22 Q.  Okay.  Now, you say you have coffee at your warehouse.

23     Have you ever gotten coffee outside of there or do you

24 only drink coffee from your warehouse?

25 A.  I used to get from Starbucks once -- once a week, but then I

—2:19-cr-00295-GMN-NJK—

1  have coffee machine at my warehouse.  That's where I get it.

2  Q.  Gotcha.

3        So at one point you were drinking Starbucks, fair?

4  A.  I would say once every two weeks.

5  Q.  Okay.  Drink Coke?

6  A.  Diet Coke.

7  Q.  Diet Coke.

8        Where do you get the Diet Coke?

9  A.  Mainly 7-Eleven.

10 Q.  Okay.  So you testified earlier that I think one of the

11 things that sort of upset you was that Mario Castro drank

12 Starbucks, come in with a coffee.

13 A.  I didn't say --

14      MR. FINLEY:  Your Honor --

15      THE WITNESS:  I didn't say that it upset me.

16 BY MR. TANASI:

17 Q.  No?

18 A.  Nope.

19 Q.  Okay.  So one of the things that maybe you thought he wasn't

20 working as hard as you was because he was drinking coffee.

21 A.  Nope.  Listen, whatever they were doing there, it wasn't my

22 concern.  My concern was the produce business.  I cared about

23 produce business.  That was it.  Whatever they were doing on

24 their own time, it was their own time.

25 Q.  Well, let me ask you this question then.  Why did you feel

—2:19-cr-00295-GMN-NJK—

1  you needed to tell the jury about Mario drinking Starbucks?

2  *A.*  Because they asked me.  I just tell them what it was.

3  *Q.*  Okay.

4  *A.*  It was a question that they asked me.

5  *Q.*  Right.  And so it's not -- it's your testimony then that --

6  let me ask you this way.  Do you feel you worked as hard as --

7  as Mario Castro?

8  *A.*  That I work as hard as Mario Castro?

9  *Q.*  Yeah.

10  *A.*  Did I feel?

11  *Q.*  Yeah.

12  *A.*  Yeah, that's 100 percent.  But that had nothing to do with

13  what he was doing.  That was his own business.  My business was

14  produce.

15  *Q.*  Understood.

16        But, in general, do you consider yourself a person who

17  works harder than Mario Castro?

18  *A.*  Right now -- not maybe right now, but at the time, yeah.

19  *Q.*  So when you were in the avocado business --

20  *A.*  It was produce, but mainly avocados, yeah.

21  *Q.*  Understood.  Understood.

22        But at that point did you feel as though you were

23  working harder than Mario Castro?

24  *A.*  Yeah.

25  *Q.*  Okay.  And did that upset you?

─────2:19-cr-00295-GMN-NJK─────

1  *A.*  Nope.

2  *Q.*  Didn't upset you?

3  *A.*  Nope.

4  *Q.*  Okay.

5       There were times you said that Mario and Miguel would

6  go to breakfast, right?

7  *A.*  Not Mario and Miguel.  Mario and Jose Luis.

8  *Q.*  Okay.  Mario and Jose Luis would go to breakfast, fair?

9  *A.*  Correct.

10  *Q.*  You weren't there, though, right?

11  *A.*  Only one time, that I remember.

12  *Q.*  Right.

13       Did you feel sort of left out?

14  *A.*  Nope.

15  *Q.*  No?  Okay.

16       Prior to today's testimony, you've met with the

17  Government a few times, fair?

18  *A.*  Correct.

19  *Q.*  All right.  Let's go through a few of those.

20       February 21st, 2018, do you remember that?

21  *A.*  It's been a few years back, but not to my recall.  But I did

22  met a couple of times.

23  *Q.*  Okay.  So do you remember being at your produce company?

24  It's AAA Produce, correct?

25  *A.*  Correct.

2:19-cr-00295-GMN-NJK

1  Q.  Okay.  Do you remember being there sometime in February of

2  2018 and meeting with an Inspector Wayne Palomar and an

3  Inspector Brian Hess?

4  A.  The only thing that I remember is when they actually went to

5  my warehouse.

6  Q.  Right.

7  A.  Because they had a -- like, a warrant or something.  That

8  was the only time that I -- that I remember talking to them at

9  that warehouse.  If it would have been another time, I don't

10  recall.

11  Q.  Okay.  So let's talk about that time at the warehouse.

12          And the warehouse was at 311 South Valley View?

13  A.  Correct.

14  Q.  Okay.  That meeting with the inspectors, that was when they

15  were serving a search warrant, correct?

16  A.  Well, one of them, yeah.

17  Q.  Right.  So were there to search your location, to search

18  your produce company, right?

19  A.  Correct.

20  Q.  Okay.  And so were just getting to work that day expecting a

21  regular day and then you were greeted by a bunch of postal

22  inspectors, fair?

23  A.  I wasn't there.  My daughter was there.

24  Q.  Okay.

25  A.  My daughter called me that there was some -- that the police

—2:19-cr-00295-GMN-NJK—

1  was there, and that was it.  So I went back to the -- to the

2  warehouse to see what was going on.

3  Q.  Okay.

4  A.  That was when I find out.

5  Q.  You didn't expect to find postal agents when you got there,

6  though, right?

7  A.  No.

8  Q.  You didn't expect to be served with a search warrant that

9  day, right?

10  A.  Nope.

11  Q.  Okay.

12        When you got there, ultimately you gave a statement to

13  the inspectors, fair?

14  A.  Correct.

15  Q.  Were you handcuffed?

16  A.  No.

17  Q.  Not handcuffed, right?

18  A.  No.

19  Q.  Okay.

20        Now, you were advised that you were not under arrest,

21  right?

22  A.  I'm sorry, what was that?

23  Q.  You were advised that you were not under arrest, correct?

24  A.  Correct.

25  Q.  Okay.  And you were told you were free to leave, right?

-2:19-cr-00295-GMN-NJK-

1   *A.* Correct.

2   *Q.* Okay. With all of those postal inspectors there, did you

3   feel like you were free to leave?

4   *A.* Yeah, because I didn't do anything wrong.

5   *Q.* Understood.

6        Again, though, you weren't handcuffed, right?

7   *A.* No, I was -- I was not handcuffed.

8   *Q.* Okay. Now, do you recall whether or not you were

9   videotaped?

10  *A.* I don't recall that.

11  *Q.* No? Do you recall whether or not you were audiotaped? Did

12  anybody record the conversation?

13  *A.* I don't recall that.

14  *Q.* Okay. So fair to say you felt free to leave, in part,

15  because you weren't handcuffed?

16  *A.* No. I feel free because I didn't do anything wrong.

17  *Q.* All right.

18  *A.* And I was in my warehouse so I couldn't leave.

19  *Q.* Say that again.

20  *A.* And I was in my warehouse so I couldn't leave.

21  *Q.* So you couldn't leave?

22  *A.* I was in my warehouse. I was working.

23  *Q.* But you drove there, though?

24  *A.* Yeah, but I was doing deliveries and then I came back.

25  *Q.* Right. But, again, you weren't handcuffed, right?

1  *A.*  No.

2  *Q.*  So you could freely feel as though you could leave, correct?

3  *A.*  Of course.

4  *Q.*  All right.

5         Now, you gave another statement to Inspector Bouchie

6  and Mr. Finley and Mr. Zytnick on February 11th, 2019.  Do you

7  remember that?

8  *A.*  Uh.  The dates, like I said, I only know that I spoke to

9  them a couple of times.  I can't tell you exact date, to be

10  honest.

11  *Q.*  If I told you it was February 11th, 2019, would you have any

12  reason to disagree with me?

13  *A.*  Like I said, I don't remember.

14  *Q.*  Okay.

15  *A.*  So if it was that day, I agree, if it happened that day.

16  *Q.*  Maybe if we talk about where it was.

17         It was at the U.S. Attorney's office just across the

18  street?

19  *A.*  Correct, I was there.

20  *Q.*  Right.

21  *A.*  Yeah.

22  *Q.*  It was in a conference room, right?

23  *A.*  It was a big conference room, correct.

24  *Q.*  Gave them a statement, right?

25  *A.*  Yep.

—2:19-cr-00295-GMN-NJK—

1  Q.  That wasn't recorded, right?

2  **A.**  Not that I recall.

3  Q.  Okay.  Not audio-recorded, right?

4  **A.**  Not that I recall.

5  Q.  Not video-recorded, correct?

6  **A.**  Not that I recall.

7  Q.  Okay.

8        Do you remember testifying on February 12th, 2019,

9  before the grand jury?

10  **A.**  I did testify in front of the grand jury.  I don't remember

11  what day it was.

12  Q.  Okay.  If I told you it was February 12th, 2019, would you

13  have any reason to disagree with me?

14  **A.**  No.

15  Q.  All right.  So you testified here in this building?

16  **A.**  Actually, yeah.

17  Q.  Okay.

18        And you met with the postal inspectors prior to that

19  testimony on that day, fair?

20  **A.**  I don't recall, but it could have happened.

21  Q.  Right.  Did you meet with Mr. Finley as well prior to that

22  testimony?

23  **A.**  I don't remember.

24  Q.  Okay.  Do you remember being asked questions by Mr. Finley

25  at that grand jury proceeding?

—2:19-cr-00295-GMN-NJK—

1    *A.*  Uh, yes.

2    *Q.*  Okay.  And at that proceeding you swore an oath to tell the

3    truth, right?

4    *A.*  Correct.

5    *Q.*  The whole truth, right?

6    *A.*  Correct.

7    *Q.*  Okay.

8         And there was a court reporter there, right?

9    *A.*  Yes.

10   *Q.*  Just like there's one here today?

11   *A.*  Yes.

12   *Q.*  Okay.  And you told them everything in that grand jury

13   proceeding that you knew about Mario Castro and his printing

14   business, fair?

15   *A.*  That I knew.

16   *Q.*  Yeah.

17   *A.*  That I knew what they were doing, yes.

18   *Q.*  Not that -- wasn't my question.

19        When you testified before the grand jury, did you tell

20   them everything you knew about Mario Castro and about the

21   printing business?

22   *A.*  Correct.

23   *Q.*  All right.

24        You had an opportunity to meet again with Inspector

25   Williams and Inspector Bouchie on January 19th, 2022.  Do you

─2:19-cr-00295-GMN-NJK─

1  remember that?

2  *A.*  I don't remember.  Like I said, I mentioned it to you three

3  times already.  I talked to them a couple of times.  I don't

4  remember the dates.

5  *Q.*  Okay.  Do -- do you remember the location, 2710 Losee Road?

6  *A.*  Yeah, that's my warehouse.

7  *Q.*  That's your warehouse?

8  *A.*  Correct.

9  *Q.*  For which company?

10  *A.*  For AAA Produce.

11  *Q.*  Okay.  So, again, if I tell you that it was January 19th,

12  2022, would you have any reason to disagree with me?

13  *A.*  I will agree with you.

14  *Q.*  All right.

15        That day you were served with a subpoena to testify in

16  trial, correct?

17  *A.*  Correct.

18  *Q.*  And you gave a statement that day to Inspector Bouchie and

19  Inspector Williams, correct?

20  *A.*  I don't remember giving a statement, but ...

21  *Q.*  You talked to them?

22  *A.*  I talked to them, yeah.

23  *Q.*  Okay.  How long?  Do you ...

24  *A.*  It wasn't that long.  20 minutes, 15 minutes at the most.

25  *Q.*  Wasn't audio-recorded, right?

-2:19-cr-00295-GMN-NJK-

1  *A.*  Not that I recall.

2  *Q.*  Wasn't video-recorded, right?

3  *A.*  Not that I recall.

4  *Q.*  Okay.

5        Again, on September 16th, 2022, you met with Inspector

6  Williams, correct?

7  *A.*  Again, if you said that we met, we met.

8  *Q.*  Okay.  It wasn't audio-recorded, right?

9  *A.*  No.

10  *Q.*  Wasn't video-recorded, right?

11  *A.*  Not that I recall.

12  *Q.*  All right.

13        Now, on direct you testified concerning envelopes,

14  correct?

15  *A.*  Correct.

16  *Q.*  All right.  And you testified that Patti Kern would come by

17  with these envelopes, correct?

18  *A.*  That's her last name, Kern?  Okay.  Yeah.

19  *Q.*  Okay.  But I'm giving you the word and the last name Kern.

20  Fair to say you don't know, outside of me telling you, what her

21  last name was, correct?

22  *A.*  I don't remember her name.

23  *Q.*  Okay.

24  *A.*  Just her first name, Patti.

25  *Q.*  Understood.

1          Fair to say you don't know her last name, right?  Would

2   you know her if you saw a picture of her?

3   *A.*  Oh.  Yeah, I would probably recognize her.  It's been a few

4   years.  But, yeah, I'd probably recognize her.

5   *Q.*  Okay.

6          MR. TANASI:  Bryan, if you could bring up Defendant's

7   Proposed Exhibit 8019 for just the witness.

8   BY MR. TANASI:

9   *Q.*  All right, sir.  Do you see that in front of you have?

10  *A.*  Yes.

11  *Q.*  Defendant's Proposed Exhibit 8019.

12         Do you recognize it?

13  *A.*  That looks like her.

14  *Q.*  Okay.  So when you say, "That looks like her," is that the

15  person that you call "Patti" unname last known -- last name

16  unknown?

17  *A.*  Correct.

18  *Q.*  All right.

19         MR. TANASI:  Your Honor, I move to admit Defense

20  Exhibit 8019.

21         MR. FINLEY:  Your Honor, I object to this -- I object

22  to this exhibit.  And I'd like to be heard at sidebar about it.

23         THE COURT:  All right.  Let's go ahead then and take

24  the lunch break so the jury can have their lunch.

25         Remember, during this lunch break, ladies and gentlemen

—2:19-cr-00295-GMN-NJK—

1   of the jury, that you are not to discuss this case with each

2   other or anyone else.  You can talk to each other about other

3   things, but not about this case.  Do not talk to the attorneys,

4   the parties, the witnesses, anyone related to this case.

5          And please do not read or listen to anything touching

6   upon this case or attempt to perform any research or any

7   independent investigation nor form any opinion.

8          We'll go ahead and take our one-hour lunch.  So it's

9   12 o'clock now.  We'll welcome you back at 1 o'clock.

10          Everyone, please stand for the jury as they are the

11  judge of the facts.

12          Enjoy your lunch, everybody.

13          Mr. Villasenor, if you'll please wait after the jury

14  exits, then you can take your lunch break, too.  And we just

15  need you back here in the chair by 1 p.m.

16          THE WITNESS:  That's fine.

17          (Whereupon jury leaves the courtroom at 12:02 p.m.)

18          THE COURT:  And during this break, you are not allowed

19  to talk to anybody about this case or your testimony.  Okay?

20          THE WITNESS:  That's fine.

21          THE COURT:  You can talk to them about where do I go

22  eat, but not about this case.  Okay?

23          THE WITNESS:  No problem.

24          THE COURT:  All right.  You may go ahead and go.

25  Please be careful with the steps.

—2:19-cr-00295-GMN-NJK—

1          THE WITNESS:  Got it.

2          (Whereupon witness leaves the courtroom.)

3          THE COURT:  All right.  So what is the objection to the

4   exhibit?

5          MR. FINLEY:  Your Honor, I think it's just specifically

6   chosen to embarrass Patti Kern.  And it's prejudicial.  I think

7   there are other exhibits that could be used.

8          THE COURT:  She looks like she's in costume and there's

9   two other people.  I don't know who the two other people are.

10  So if we don't need to put them --

11         MR. FINLEY:  I think they are just trying to say she's

12  a goofball or something, and it's just -- it's not necessary.

13         THE COURT:  Can we crop the picture so it shows her

14  face?  Because that's who he's identified.  So we don't see the

15  other two people or the costumes that they're wearing.

16         MR. TANASI:  Your Honor, if I could just be heard on

17  this --

18         THE COURT:  Yes.

19         MR. TANASI:  -- briefly.  So there's been differing

20  testimony as to how Patti Kern looked, the color of her hair,

21  different ways she's been identified by different witnesses

22  throughout the case.  And she's conceded that she's had

23  different hair colors throughout the case as well.

24         And so this particular witness didn't know Patti Kern's

25  last name, and so it lends itself to the argument that she

—2:19-cr-00295-GMN-NJK—

1  doesn't -- he doesn't necessarily even know who she is or she'd

2  be -- or would he be able to identify her in other pictures.

3        And so this is another picture that -- not necessarily

4  a lineup, but it's a picture that demonstrates potentially what

5  Patti Kern looks like and whether or not he can accurately

6  identify who Patti Kern is.  So it's a relevant identification

7  of a witness that's been kind of covert in her identification

8  throughout this case.

9        THE COURT:  Okay.  Well, I don't have any problem with

10 the hair color.  I jut don't know who the two other people are,

11 and I agree that it looks like they're in some kind of a costume

12 or something.  And it -- I don't think that that's necessary to

13 have those other people in there, too.

14       So my ruling is that -- I guess I'm granting in part

15 and denying in part.  The picture -- the photo of Ms. Patti

16 Kern's, you know, face and neck is admissible.  I'll ask you to

17 crop out the two other people and -- you know, like, the chest

18 down of whatever she's wearing.  So, I mean, she's wearing what

19 she's wearing, but I don't think we need to see the whole

20 outfit.  So maybe like -- you know, like a bust, you know, like

21 a chest.  Crop out the people on the sides.

22       And, you know, doesn't matter what's on top I guess,

23 but -- so we don't see the people and we don't see her from the

24 chest down.  That's -- that's the order.

25       MR. TANASI:  I will attempt --

—2:19-cr-00295-GMN-NJK—

1          MR. FINLEY:  Thank you.

2          THE COURT:  Hopefully it won't take too long to do that

3   because it is a digital photo, I think.

4          MR. TANASI:  We should be able to make the edits --

5          THE COURT:  Okay.  Otherwise, if you need to print it

6   and cut it and rescan it, we do have a color printer.  I'm not

7   going to say how great the quality is going to be, but ...

8          Can you get that done over the lunch?

9          MR. TANASI:  Yeah, we should be able to, Your Honor.

10  No problem.

11         THE COURT:  Okay.  Any other issues that you want to

12  discuss while we still have a court recorder about --

13         MR. TANASI:  Nothing from the Defense, Your Honor.

14         THE COURT:  All right.  Anything else?  Nope?

15         Okay.  So we'll see you back here at 1 o'clock.

16  Otherwise, I don't have a court recorder -- reporter coming back

17  before 1 o'clock unless you tell me to.  That's why.

18         So we're good?

19         COURTROOM ADMINISTRATOR:  Not before 1.

20         THE COURT:  So we're good?  All right.

21         MR. TANASI:  Thank you.

22         THE COURT:  All right.

23         MR. FINLEY:  Thank you, Judge.

24         THE COURT:  Be back here at 1 o'clock.

25         (Recess taken at 12:06 p.m.)

1

2                                --oOo--

3                   COURT REPORTER'S CERTIFICATE

4

5        I, PATRICIA L. GANCI, Official Court Reporter, United

6   States District Court, District of Nevada, Las Vegas, Nevada,

7   certify that the foregoing is a correct transcript from the

8   record of proceedings in the above-entitled matter.

9

10  Date:  March 30, 2023.

11                              /s/ **Patricia L. Ganci**

12                              Patricia L. Ganci, RMR, CRR

13                              CCR #937

14

15

16

17

18

19

20

21

22

23

24

25