1                  UNITED STATES DISTRICT COURT

2                     DISTRICT OF NEVADA

3   UNITED STATES OF AMERICA,        )  Case No. 2:19-cr-00295-GMN-NJK
                                     )
4               Plaintiff,           )  Las Vegas, Nevada
                                     )  Monday, April 3, 2023
5        v.                          )  9:12 a.m. - 12:05 p.m.
                                     )  Courtroom 7D
6   MARIO CASTRO, SALVADOR CASTRO,   )
    MIGUEL CASTRO, and JOSE LUIS     )  FURTHER JURY TRIAL
7   MENDEZ,                          )  DAY 9, A.M. SESSION
                                     )
8               Defendants.          )  *C E R T I F I E D   C O P Y*
    _____ )

9

10

11              REPORTER'S TRANSCRIPT OF PROCEEDINGS

12                THE HONORABLE GLORIA M. NAVARRO
                   UNITED STATES DISTRICT JUDGE

13

14
    APPEARANCES:  (See next page.)

15

16  REPORTED BY:  PAIGE M. CHRISTIAN, RPR, CRR, CCR #955
                  United States District Court
17                333 South Las Vegas Boulevard
                  Las Vegas, Nevada  89101

18

19

20

21

22

23

24  Proceedings reported by machine shorthand.
    Transcript produced by computer-aided transcription.

25

1    **APPEARANCES:**

2

3    For the Government:

4            **TIMOTHY T. FINLEY, ESQ.**
             *U.S. DEPARTMENT OF JUSTICE*
5            950 Pennsylvania Avenue, N.W.
             Washington, D.C.  20530
6            (202) 307-0050
             E-mail: timothy.t.finley@usdoj.gov
7
        *--AND--*
8
             **DANIEL E. ZYTNICK, ESQ.**
9            *U.S. DEPARTMENT OF JUSTICE*
             950 Pennsylvania Avenue, N.W.
10           Washington, D.C.  20530
             (202) 307-0050
11           E-mail: daniel.e.zytnick@usdoj.gov

12       *--AND--*

13           **MINA CHANG, AUSA**
             *UNITED STATES ATTORNEY'S OFFICE*
14           501 Las Vegas Boulevard South
             Suite 1100
15           Las Vegas, Nevada 89101
             (702) 388-6336
16           E-mail: mina.chang@usdoj.gov

17

18   For Defendant Mario Castro:

19           **JOSHUA L. TOMSHECK, ESQ.**
             *HOFLAND & TOMSHECK*
20           228 South 4th Street
             Las Vegas, Nevada  89101
21           (702) 895-6760
             E-mail: josht@hoflandlaw.com

22       *--AND--*

23   ///

24   ///

25

1    **APPEARANCES CONTINUED:**

2

     For Defendant Mario Castro:
3

            **RICHARD E. TANASI, ESQ.**
4           *TANASI LAW OFFICES*
            8716 Spanish Ridge
5           Suite 105
            Las Vegas, Nevada  89148
6           (702) 906-2411
            E-mail: rtanasi@tanasilaw.com
7

8    For Defendant Salvador Castro:

9           **DONALD J. GREEN, ESQ.**
            *LAW OFFICES OF DONALD J. GREEN*
10          4760 South Pecos Road
            Suite 103
11          Las Vegas, Nevada 89121
            (702) 388-2047
12          E-mail: crimelv7777@aol.com

13
     For Defendant Miguel Castro:
14
            **LUCAS GAFFNEY, ESQ.**
15          *GAFFNEY LAW*
            9900 Covington Cross Drive
16          Suite 290
            Las Vegas, Nevada  89144
17          (702) 742-2055
            E-mail: lucas@gaffneylawlv.com
18
       *--AND--*
19
            **THOMAS A. ERICSSON, ESQ.**
20          *THOMAS A. ERICSSON, CHTD.*
            9900 Covington Cross Drive
21          Suite 290
            Las Vegas, Nevada  89144
22          (702) 878-2889
            E-mail: tom@oronozlawyers.com
23
     *///*
24
     *///*
25

1    **APPEARANCES CONTINUED:**

2

   For Defendant Jose Luis Mendez:

3

              **CHRISTOPHER MISHLER, ESQ.**
4             *BROWN MISHLER, PLLC*
              911 N. Buffalo Drive
5             Suite 202
              Las Vegas, Nevada  89128
6             (702) 816-2200
              E-mail: cmishler@brownmishler.com

7      *--AND--*

8
              **WILLIAM H. BROWN, ESQ.**
9             *BROWN MISHLER, PLLC*
              911 N. Buffalo Drive
10            Suite 202
              Las Vegas, Nevada  89128
11            (702) 816-2200
              E-mail: wbrown@brownmishler.com

12                              *  *  *  *  *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      I N D E X

2

3   GOVERNMENT'S WITNESSES:                                    PAGE

4   **TRAVIS SMOOT**

5          Continued redirect examination by Mr. Finley........ 8

6   **MARK HALLISEY**

7          Direct examination by Mr. Zytnick.................. 22

8          Cross-examination by Mr. Tomsheck.................. 33

9          Cross-examination by Mr. Green..................... 47

10  **VICKI MORGAN**

11         Direct examination by Mr. Zytnick.................. 55

12         Cross-examination by Mr. Tomsheck................. 78

13         Cross-examination by Mr. Gaffney.................. 95

14         Cross-examination by Mr. Green.................... 98

15  **SEAN O'CONNOR**

16         Direct examination by Mr. Finley.................. 119

17

18

19                   **E X H I B I T S**

20

21  GOVERNMENT'S EXHIBITS:            MARKED            RECEIVED

22         Exhibit No. 283.................................. 27

23

24

25         LAS VEGAS, NEVADA; MONDAY, APRIL 3, 2023; 9:12 A.M.

1                        --o0o--

2                 P R O C E E D I N G S

3          *(Whereupon, the following proceedings were had outside the*

09:12:05   4     *presence of the jury:)*

09:12:05   5          **COURTROOM ADMINISTRATOR:**  All rise.

09:12:15   6          **THE COURT:**  Good morning.  Thank you.  You may be

09:12:20   7   seated.

09:12:26   8          All right.  So we finally have our last juror in.

09:12:29   9   The musician is always a little bit late, but he's arrived.  So

09:12:34  10   he's here now.

09:12:35  11          Is it all right if we start and bring the jury in?

09:12:39  12   Is there any issues we need to address, or could it wait until

09:12:42  13   the next break?

09:12:45  14          **MR. FINLEY:**  Nothing from the government, Your Honor.

09:12:46  15          **THE COURT:**  All right.  Anything from the defense

09:12:49  16   that can't wait?

09:12:50  17          **MR. BROWN:**  No.

09:12:51  18          **THE COURT:**  All right.  Then let's go ahead and bring

09:12:54  19   in the jury, please.

09:14:05  20          **COURTROOM ADMINISTRATOR:**  All rise.

09:13:36  21     *(Whereupon, the jury enters the courtroom at 9:14 a.m.)*

09:14:04  22     *(Whereupon, the following proceedings were had in the*

09:14:35  23     *presence of the jury:)*

09:14:35  24          **THE COURT:**  All right.  Everyone may be seated.  Good

09:14:39  25   morning and welcome back from the weekend.  Before we get the

09:14:42  1  witness, let's go ahead and have the government and the defense

09:14:45  2  each make their appearance on the record.

09:14:47  3           **MR. FINLEY:**  Good morning, Your Honor.  Thank you.

09:14:49  4           Good morning, everybody.  I'm Tim Finley, United

09:14:55  5  States Department of Justice, Consumer Protection Branch.

09:14:58  6           This (indicating) is Dan Zytnick from the same

09:15:01  7  office.

09:15:01  8           This (indicating) is Mina Chang, Assistant United

09:15:04  9  States Attorney.

09:15:05  10          This is Barry Bouchie, retired postal inspector.

09:15:12  11          And last but not least, Erica Rush (phonetic) running

09:15:12  12  the slideshow.

09:15:13  13          **THE COURT:**  Thank you.

09:15:15  14          **MR. TANASI:**  Rich Tanasi and Josh Tomsheck for Mario

09:15:19  15  Castro.  Also with us at counsel table is Brian Glynn helping us

09:15:24  16  with the IT.  Thank you.

09:15:26  17          **MR. GAFFNEY:**  Good morning, Your Honor.

09:15:27  18          **THE COURT:**  Good morning.

09:15:28  19          **MR. GAFFNEY:**  Lucas Gaffney and Thomas Ericsson on

09:15:31  20  behalf of Miguel Castro.

09:15:34  21          **MR. BROWN:**  Hi.  Good morning, Your Honor.  Good

09:15:36  22  morning, everyone.  Will Brown and Chris Mishler for Jose Luis

09:15:38  23  Mendez.  Also with us is Rich Beasley and Lisa Smith.

09:15:44  24          **MR. GREEN:**  Good morning, Your Honor.  Good morning,

09:15:47  25  government counsel, and ladies and gentlemen of the jury.  Don

09:15:47  1  Green on behalf of Mr. Salvador Castro.  And with me today is my

09:15:51  2  assistant, Heather Tan-Sahl.

09:15:52  3          The investigator may be in later, Charlene Gonzales

09:15:57  4  (phonetic), and I think we introduced her previously.

09:15:59  5          **THE COURT:**  Yes.  Thank you.

09:16:00  6          Good morning, everyone.  All right.  Now we're going

09:16:02  7  to continue with direct examination of our witness, Agent Travis

09:16:05  8  Smoot, by Mr. Finley on behalf of the government.

09:16:08  9          Go ahead.

09:16:09  10                  **CONTINUED REDIRECT EXAMINATION**

09:16:09  11  **BY MR. FINLEY:**

09:16:12  12  Q.    Good morning, Inspector Smoot.

09:16:14  13  A.    Good morning.

09:16:14  14  Q.    I hope you had a nice weekend.

09:16:16  15  A.    Yes.  Thank you.

09:16:17  16  Q.    As I recall, we were on redirect.  I think I just had one

09:16:22  17  question for you.

09:16:22  18          Remember how you were asked about -- I think one of

09:16:26  19  the defense counsel -- about a conversation where Mario Castro

09:16:30  20  was telling you how he taught his son how to do things the legal

09:16:35  21  way?  Do you remember that?

09:16:37  22  A.    I do.

09:16:38  23  Q.    And then I asked you a question about fulfillment.

09:16:42  24          In the context of that conversation that he was

09:16:44  25  having with you about how he was teaching his son how to do this

09:16:47  1    the legal way, did he bring up something called fulfillment?

09:16:51  2    A.    Yes.   During the interview, he talked about solicitations

09:16:58  3    and fulfillment and how that as -- as Junior was getting involved

09:17:05  4    in these types of businesses, that he would -- you know, that he

09:17:08  5    would give him instructions based on his -- his background in the

09:17:11  6    mailing industry in those -- in that particular regard.

09:17:16  7              And -- and that's when he said that when he did have

09:17:19  8    those conversations, that -- to just always stay on the legal

09:17:23  9    side of things is how I recall it.

09:17:25 10    Q.    Did you understand what the word "fulfillment" meant when

09:17:29 11    he brought that up?

09:17:30 12    A.    I don't think we delved a lot into that in that

09:17:34 13    conversation, but fulfillment is fulfilling orders on behalf of

09:17:39 14    customers where the solicitations would go out and that they

09:17:43 15    would be fulfilled through these -- that particular solicitation,

09:17:48 16    whatever that solicitation was -- was talking about.

09:17:54 17              MR. FINLEY:  Thank you, sir.   I have no further

09:17:55 18    questions.

09:17:56 19              THE COURT:  Any recross, Mr. Tanasi?

09:17:59 20              MR. TANASI:  Not at that time, Your Honor.

09:18:00 21              THE COURT:  Mr. Ericsson, any recross?

09:18:04 22              MR. ERICSSON:  No, Your Honor.

09:18:05 23              THE COURT:  Mr. Brown?

09:18:07 24              MR. BROWN:  No.  Thank you, Judge.

09:18:08 25              THE COURT:  Mr. Green?

09:18:10  1          MR. GREEN:  No questions, Your Honor.  Thank you,
09:18:12  2   ma'am.
09:18:12  3          THE COURT:  All right.  So at this time, if any
09:18:15  4   members of the jury have a question for the witness, Mr. Smoot,
09:18:17  5   please go ahead and write it down on the form provided.  Take
09:18:20  6   your time.  Write neatly.  If you have more than one question,
09:18:23  7   you can number them or skip a line.  And when you're all done,
09:18:26  8   just go ahead and fold the piece of paper in half and pass it in
09:18:31  9   the direction of Nick so we can pick them up.  Remember, we don't
09:18:35  10  need your name or juror number or initials.  We just want the
09:18:38  11  anonymous questions.
09:19:54  12          (Pause.)
09:20:28  13          COURTROOM ADMINISTRATOR:  Judge, we have five notes,
09:20:32  14  and we're going to start at No. 82.
09:20:34  15          THE COURT:  Thank you.  Counsel, please join me at
09:20:39  16  sidebar.
09:21:18  17          (Whereupon, the following proceedings were had at sidebar:)
09:21:18  18          THE COURT:  All right.  This is Judge.  We have Jury
09:21:22  19  Note No. 82 with -- looks like one or two questions.  We'll see.
09:21:24  20          Says, "Did you find any stacks of cash in envelopes
09:21:28  21  with defendant's name on it?"
09:21:32  22          Any objection?
09:21:34  23          MR. GREEN:  Was that sacks?
09:21:35  24          THE COURT:  This is Mr. Green.
09:21:37  25          No.  It says, "Did you find any stacks...?"

09:21:39   1              MR. GREEN:  Stacks.

09:21:40   2              THE COURT:  S-T-A-C-K-S.

09:21:40   3              MR. GREEN:  Okay, okay.

09:21:45   4              THE COURT:  Any objection?

09:21:46   5              MR. FINLEY:  No objection.

09:21:47   6              THE COURT:  That was Mr. Finley.

09:21:48   7              Mr. Tanasi, any objection?

09:21:48   8              MR. TANASI:  No objection.

09:21:50   9              THE COURT:  Anyone else, any objection?

09:21:54   10             MR. GAFFNEY:  No.

09:21:54   11             THE COURT:  Okay.  Mr. Gaffney says, "No."

09:21:58   12             And it says, "Or prize award notification letters?"

09:22:02   13             Okay.  The second question is, "Or prize award

09:22:04   14   notification letters?"

09:22:05   15             Any objection from the government?

09:22:09   16             MR. FINLEY:  This is Tim Finley again.  No.

09:22:17   17             MR. TANASI:  Mario Castro.  No objection.

09:22:21   18             MR. GREEN:  No objection, Your Honor.

09:22:22   19             THE COURT:  All right.

09:22:23   20             Juror Note No. 83 asks one question:  "What was taken

09:22:27   21   from Mario's house after the search?"

09:22:30   22             Any objection from the government, Mr. Finley?

09:22:32   23             MR. FINLEY:  No, Your Honor.

09:22:33   24             THE COURT:  Mr. Tanasi?

09:22:34   25             MR. TANASI:  No objection.

| | | |
|---|---|---|
| 09:22:35 | 1 | **THE COURT:**  Mr. Ericsson. |
| 09:22:39 | 2 | **MR. ERICSSON:**  No. |
| 09:22:40 | 3 | **THE COURT:**  Mr. Green? |
| 09:22:41 | 4 | **MR. GREEN:**  No objection. |
| 09:22:42 | 5 | **THE COURT:**  Mr. Brown -- or -- |
| 09:22:45 | 6 | **MR. BROWN:**  Wil Brown.  No objection. |
| 09:22:48 | 7 | **THE COURT:**  Juror Note No. 84 has two questions.  The |
| 09:22:51 | 8 | first one is, "Who was the site supervisor at Mr. and Mrs. Mario |
| 09:22:58 | 9 | Castro's home when it was searched?" |
| 09:23:00 | 10 | Any objection from the government, Mr. Finley? |
| 09:23:02 | 11 | **MR. FINLEY:**  No, Your Honor. |
| 09:23:02 | 12 | **THE COURT:**  Mr. Tanasi? |
| 09:23:03 | 13 | **MR. TANASI:**  No, Your Honor. |
| 09:23:04 | 14 | **THE COURT:**  Mr. Gaffney? |
| 09:23:06 | 15 | **MR. GAFFNEY:**  No, Your Honor. |
| 09:23:06 | 16 | **MR. BROWN:**  Wil Brown.  No, Your Honor. |
| 09:23:09 | 17 | **THE COURT:**  Mr. Green? |
| 09:23:11 | 18 | **MR. GREEN:**  No, ma'am. |
| 09:23:12 | 19 | **THE COURT:**  "In a briefing conducted before |
| 09:23:13 | 20 | conducting the search of Mr. and Mrs. Castro's home, were you and |
| 09:23:16 | 21 | your fellow agents specifically instructed to not record |
| 09:23:19 | 22 | interviews?" |
| 09:23:20 | 23 | Any objection from the government, Mr. Finley? |
| 09:23:22 | 24 | **MR. FINLEY:**  No. |
| 09:23:22 | 25 | **THE COURT:**  Mr. Tanasi? |

09:23:24  1            **MR. TANASI:**  No objection.

09:23:24  2            **THE COURT:**  Mr. Brown?

09:23:25  3            **MR. BROWN:**  No objection.

09:23:26  4            **THE COURT:**  Mr. Gaffney?

09:23:29  5            **MR. GAFFNEY:**  No, Your Honor.

09:23:30  6            **THE COURT:**  Mr. Green?

09:23:31  7            **MR. GREEN:**  No, ma'am.

09:23:32  8            **THE COURT:**  Juror Note 85 asks four questions.  The

09:23:34  9  first one is, "Did you recover any bank information relating to

09:23:38  10  the fraudulent prize companies during the search?"

09:23:41  11            Any objection from the government, Mr. Finley?

09:23:43  12            **MR. FINLEY:**  No, Your Honor.

09:23:43  13            **THE COURT:**  Mr. Tanasi?

09:23:44  14            **MR. TANASI:**  No, Your Honor.

09:23:45  15            **THE COURT:**  Mr. Brown?

09:23:46  16            **MR. BROWN:**  No, Your Honor.

09:23:47  17            **THE COURT:**  Mr. Gaffney?

09:23:48  18            **MR. GAFFNEY:**  No, Your Honor.

09:23:49  19            **THE COURT:**  Mr. Green?

09:23:50  20            **MR. GREEN:**  No, Your Honor.  No objection.

09:23:52  21            **THE COURT:**  Question No. 2 from Juror Note 85 asks,

09:23:55  22  "Did you recover large amounts of cash during the search?"

09:23:58  23            Any objection from the government, Mr. Finley?

09:24:00  24            **MR. FINLEY:**  No, Your Honor.

09:24:00  25            **THE COURT:**  Mr. Tanasi?

09:24:02  1          **MR. TANASI:**  No, Your Honor.

09:24:02  2          **THE COURT:**  Mr. Williams -- Brown.  Sorry.  Brown.

09:24:11  3     Mr. Brown?

09:24:11  4          **MR. BROWN:**  No, Your Honor.

09:24:13  5          **THE COURT:**  Mr. Gaffney?

09:24:14  6          **MR. GAFFNEY:**  No, Your Honor.

09:24:15  7          **MR. GREEN:**  Don Green.  No objection, Your Honor.

09:24:18  8          **THE COURT:**  Juror Note No. 3.  "Did you recover any

09:24:21  9     proofs, shells, or completed prize promotion information during

09:24:24 10     the search?"

09:24:25 11          Any objection from the government, Mr. Finley?

09:24:27 12          **MR. FINLEY:**  No, Your Honor.

09:24:27 13          **THE COURT:**  Mr. Tanasi?

09:24:28 14          **MR. TANASI:**  No, Your Honor.

09:24:29 15          **THE COURT:**  Mr. Brown?

09:24:30 16          **MR. BROWN:**  No, Your Honor.

09:24:30 17          **THE COURT:**  Mr. Gaffney?

09:24:31 18          **MR. GAFFNEY:**  No, Your Honor.

09:24:32 19          **THE COURT:**  Mr. Green?

09:24:34 20          **MR. GREEN:**  No.  No, ma'am.

09:24:35 21          **THE COURT:**  Question No. 4, "Do you believe

09:24:39 22     fulfillment in the described conversation makes it legal?"

09:24:46 23          Any objection from the government, Mr. Finley?

09:24:48 24          **MR. FINLEY:**  No, Your Honor.

09:24:48 25          **THE COURT:**  Mr. Tanasi?

09:24:50    1                  **MR. TANASI:**  No, Your Honor.

09:24:50    2                  **THE COURT:**  Mr. Brown?

09:24:53    3                  **MR. BROWN:**  No, Your Honor.

09:24:54    4                  **THE COURT:**  Mr. Gaffney?

09:24:55    5                  **MR. GAFFNEY:**  No, Your Honor.

09:24:55    6                  **THE COURT:**  Mr. Green?

09:24:57    7                  **MR. GREEN:**  No, no objection, Your Honor.

09:25:04    8                  **THE COURT:**  Juror Note 86 asks one question:  "When

09:25:07    9    they were searching Mario's home, was anything found?"

09:25:11   10                  Any objection from the government, Mr. Finley?

09:25:13   11                  **MR. FINLEY:**  No, Your Honor.

09:25:13   12                  **THE COURT:**  Mr. Tanasi?

09:25:15   13                  **MR. TANASI:**  No, Your Honor.

09:25:15   14                  **THE COURT:**  Mr. Brown?

09:25:16   15                  **MR. BROWN:**  No, Your Honor.

09:25:17   16                  **THE COURT:**  Mr. Gaffney?

09:25:18   17                  **MR. GAFFNEY:**  No, Your Honor.

09:25:19   18                  **THE COURT:**  Any objection, Mr. Green?

09:25:21   19                  **MR. GREEN:**  No objection, Your Honor.

09:25:22   20                  **THE COURT:**  Thank you, Counsel.

09:25:24   21          *(End of sidebar discussion.)*

09:25:30   22                  **THE COURT:**  All right.  Mr. Smoot, Agent Smoot, I

09:25:43   23    have jury questions here.  They're anonymous.  So I'm going to

09:25:46   24    read them into the record, but when you respond, please turn and

09:25:49   25    face the jury because these are really jury questions, not mine.

09:25:53  1          So Jury Note No. 82 asks two questions.  The first
09:25:57  2  part is, Did you find any stacks of cash in envelopes with
09:26:00  3  defendant's name on it?
09:26:02  4          THE WITNESS:  No.  I was not part of the search team.
09:26:08  5  I did not find any -- any cash or stacks of cash with the
09:26:12  6  defendant's name on it.
09:26:13  7          THE COURT:  Did you find any prize award notification
09:26:15  8  letters?
09:26:17  9          THE WITNESS:  No, I did not.  Again, I was not part
09:26:19 10  of the search team.
09:26:20 11          THE COURT:  Juror Note No. 83 asks one question:
09:26:24 12  What was taken from Mario's house after the search?
09:26:27 13          THE WITNESS:  Again, since I was not assigned to the
09:26:31 14  search and the evidence collection, I was not part of that
09:26:35 15  process.  So I -- I do not have that information.
09:26:38 16          THE COURT:  Juror Note No. 84 asks two questions.
09:26:44 17  The first one is, Who was the site supervisor at Mr. and
09:26:46 18  Mrs. Mario Castro's home when it was searched?
09:26:49 19          THE WITNESS:  To the best of my recollection, the
09:26:51 20  site leader -- so the case agents were over the entire case.  The
09:26:55 21  site leader was Inspector Hallisey, Mark Hallisey, who was a
09:27:00 22  postal inspector.
09:27:01 23          THE COURT:  And Question No. 2 in Juror Note 84 asks,
09:27:05 24  In a briefing conducted before conducting the search of Mr. and
09:27:09 25  Mrs. Castro's home, were you and your fellow agents specifically

09:27:12  1  instructed to not record interviews?

09:27:15  2       THE WITNESS:  I don't know if it was specifically at

09:27:18  3  the briefing, but prior to us conducting the search and the

09:27:23  4  interviews, yes, that was part of it.  We were asked not

09:27:27  5  to -- not to record and to take thorough notes.

09:27:30  6       THE COURT:  Okay.  Juror Note 85 asks four questions.

09:27:35  7  The first one is, Did you recover any bank information relating

09:27:39  8  to the fraud prize companies during the search?

09:27:41  9       THE WITNESS:  During the interview, we asked specific

09:27:46  10  questions about specific bank accounts, but it wasn't -- it

09:27:51  11  wasn't something that -- can you reread that, Judge?

09:27:55  12       THE COURT:  Yes.  Did you recover any bank

09:27:58  13  information relating to the fraudulent prize companies during the

09:28:01  14  search?

09:28:02  15       THE WITNESS:  The only information I received was

09:28:04  16  from the interview asking specific questions about specific bank

09:28:07  17  account numbers.  It was -- I was not, again, part of that search

09:28:11  18  to recover any documentation related to businesses.

09:28:16  19       THE COURT:  Jury Question No. 2 asks, Did you recover

09:28:22  20  large amounts of cash during the search?

09:28:24  21       THE WITNESS:  I think that was already explained, but

09:28:26  22  no, I did not.

09:28:27  23       THE COURT:  Number 3, Did you recover any proofs,

09:28:31  24  shells, or completed prize promotion information during the

09:28:35  25  search?

09:28:37  1            THE WITNESS:  Again, I was not part of that search,
09:28:40  2    so no, I did not.
09:28:41  3            THE COURT:  Number 4, Do you believe fulfilment in
09:28:45  4    the described conversation makes it legal?
09:28:48  5            THE WITNESS:  I -- I don't -- I don't know how to
09:28:54  6    answer -- just the way that that question's written.
09:28:58  7            Fulfillment is -- is a process to fulfill orders or
09:29:02  8    to -- to comply or complete with what was asked or what was
09:29:05  9    solicited.  So I -- I don't know how to answer this particular
09:29:09 10    one because that's -- it's not a question of legal or illegal
09:29:14 11    from how I can interpret that question.
09:29:16 12            THE COURT:  And then the last jury note is No. 86.
09:29:20 13    Asks one question:  When they were searching Mario's home, was
09:29:25 14    anything found?
09:29:26 15            THE WITNESS:  Again, I -- that's not a question for
09:29:30 16    me.  It will be for another agent who was a part of the evidence
09:29:34 17    collection.
09:29:34 18            THE COURT:  All right.  Any follow-up, Mr. Finley?
09:29:37 19            MR. FINLEY:  No, Your Honor.
09:29:38 20            THE COURT:  Any follow-up, Mr. Tanasi?
09:29:41 21            MR. TANASI:  No, Your Honor.  Thank you.
09:29:42 22            THE COURT:  Mr. Gaffney?
09:29:44 23            MR. GAFFNEY:  No, Your Honor.
09:29:45 24            THE COURT:  Mr. Brown?
09:29:46 25            MR. BROWN:  No, Your Honor.

09:29:47  1            **THE COURT:**  And Mr. Green?

09:29:49  2            **MR. GREEN:**  No further questions.  Thank you, Your

09:29:51  3  Honor.

09:29:51  4            **THE COURT:**  All right.  Thank you very much, Special

09:29:53  5  Agent Smoot.  You're all done, so you are excused from your

09:29:56  6  testimony today.  Please be careful on the way out with the

09:29:59  7  steps.

09:30:01  8            **MR. TANASI:**  Your Honor, Court's just brief

09:30:03  9  indulgence.

09:30:03 10       *(Counsel conferring.)*

09:30:03 11            **MR. TANASI:**  Can we have a sidebar for a second

09:30:05 12  before we excuse Agent Smoot?

09:30:08 13            **THE COURT:**  Yes.

09:30:09 14            Have a seat, sir.  Thank you.

09:30:13 15       *(Wheregoupon, the following proceedings were had at sidebar:)*

09:30:36 16            **THE COURT:**  So this mic does work, but she said you

09:30:41 17  have to get really close to it.

09:30:48 18            All right.  We're at sidebar.  You need to get close

09:30:52 19  to the microphone.

09:30:59 20            **MR. TANASI:**  This might be a waste of time, and I

09:30:59 21  apologize --

09:30:59 22       *(Whereupon, the reporter interrupts to preserve the*

09:30:59 23       *record.)*

09:31:00 24            **MR. TANASI:**  This is Rich Tanasi for Mario Castro.

09:31:02 25  My recollection -- and it could have been very off, but I wanted

09:31:05   1   to just call it before we released Agent Smoot.

09:31:09   2              Was there any leftover questions still from the jury?

09:31:15   3         **THE COURT:**  Do you think I missed one?

09:31:17   4         **MR. TANASI:**  Not from...

09:31:17   5      *(Counsel conferring.)*

09:31:31   6         **MR. TANASI:**  Your Honor, I think we can maybe

09:31:33   7   streamline this.  This is my mistake.  I brought us back here

09:31:37   8   for -- for no reason.  I was just conferring with co-counsel, and

09:31:41   9   I'm just going to withdraw the sidebar.  I think we covered --

09:31:44  10         **THE COURT:**  You sure?  You can look through them and

09:31:46  11   see if I forgot to read one.

09:31:48  12         **MR. TANASI:**  All right.

09:31:52  13         **MR. TOMSHECK:**  I think he thought there were some

09:31:52  14   submitted last week --

09:31:52  15      *(Whereupon, the reporter interrupts to preserve the*

09:31:52  16      *record.)*

09:31:55  17         **MR. TOMSHECK:**  This is Josh Tomsheck.

09:31:55  18         **MR. TANASI:**  So, Your Honor, I apologize.

09:31:57  19   I -- again, this is Rich Tanasi for Mario Castro.  I was

09:32:00  20   mistaken, and I'm withdrawing the sidebar.  There's no additional

09:32:04  21   issue.  We can release Agent Smoot.

09:32:06  22         **THE COURT:**  Okay.

09:32:07  23         **MR. TANASI:**  Okay?

09:32:08  24         **THE COURT:**  All right.

09:32:09  25         **MR. TANASI:**  Thank you.

09:32:10  1          *(End of sidebar discussion.)*

09:32:12  2              **THE COURT:**  All right.  We're back on record.  Thank

09:32:17  3  you.

09:32:17  4              All right.  Special Agent Smoot, you are all done.

09:32:20  5  You are excused.  Please be careful on the way down with the

09:32:23  6  steps, sir.  Thank you for coming.

09:32:27  7          *(Whereupon, the witness leaves the witness stand.)*

09:32:25  8              **THE COURT:**  And the government may call its next

09:32:26  9  witness.

09:32:29  10             **MR. ZYTNICK:**  Thank you, Your Honor.  The government

09:32:31  11  calls Mark Hallisey.

09:32:47  12         *(Whereupon, the witness takes the witness stand.)*

09:32:59  13             **THE COURT:**  Good morning, Mr. Hallisey.  You're going

09:33:03  14  to be seated up here on my left.  Please be careful with the

09:33:08  15  steps on the way up.

09:33:11  16             **COURTROOM ADMINISTRATOR:**  Raise your right hand.

09:33:11  17             You solemnly swear the testimony you're about to give

09:33:11  18  in the cause now pending before this court will be the truth, the

09:33:11  19  whole truth, and nothing but the truth, so help you God?

09:33:18  20             **THE WITNESS:**  I do.

09:33:19  21             **COURTROOM ADMINISTRATOR:**  Thank you.  Please take a

09:33:21  22  seat.

09:33:22  23             And for the record, please state and spell your name.

09:33:25  24             **THE WITNESS:**  Mark Hallisey, spelled M-A-R-K, last

09:33:29  25  name, H-A-L-L-I-S -E-Y.

| | | |
|---|---|---|
| 09:33:31 | 1 | **COURTROOM ADMINISTRATOR:** Thank you. |
| 09:33:31 | 2 | **MARK HALLISEY,** |
| 09:33:31 | 3 | called as a witness, after having been first duly sworn to tell |
| 09:33:31 | 4 | the truth, the whole truth, and nothing but the truth, was |
| 09:33:33 | 5 | examined and testified as follows: |
| 09:33:33 | 6 | **DIRECT EXAMINATION** |
| 09:33:33 | 7 | **BY MR. ZYTNICK:** |
| 09:33:36 | 8 | Q.    Good morning. |
| 09:33:36 | 9 | A.    Good morning. |
| 09:33:37 | 10 | Q.    Can you please tell the jury where you work. |
| 09:33:38 | 11 | A.    I work for the Inspection Service in San Diego, California. |
| 09:33:41 | 12 | Q.    What is your current assignment? |
| 09:33:43 | 13 | A.    My current assignment? |
| 09:33:44 | 14 | Q.    Yes. |
| 09:33:45 | 15 | A.    I am the team leader or supervisor of our mail fraud |
| 09:33:48 | 16 | investigations team. |
| 09:33:49 | 17 | Q.    As a postal inspector, are you a federal law enforcement |
| 09:33:52 | 18 | agent? |
| 09:33:53 | 19 | A.    Yes, I am. |
| 09:33:54 | 20 | Q.    Were you involved in a search warrant on February 21st, |
| 09:33:57 | 21 | 2018, in Las Vegas? |
| 09:33:58 | 22 | A.    Yes, I was. |
| 09:33:59 | 23 | Q.    Was that warrant for 4665 Garita Street? |
| 09:34:04 | 24 | A.    Yes. |
| 09:34:04 | 25 | Q.    Whose house was that? |

09:34:08  1    A.      Mario Castro and his wife, I believe.

09:34:10  2    Q.      Was the defendant, Mario Castro, at the house that day?

09:34:13  3    A.      Yes, he was.

09:34:13  4    Q.      Was Mario Castro's son at the house that day?

09:34:16  5    A.      No, he was not.

09:34:17  6    Q.      What was your role in executing the warrant?

09:34:21  7    A.      I was assigned as the site leader to coordinate assignments

09:34:25  8    for the execution of the search warrant and the search of the

09:34:30  9    home.

09:34:30  10   Q.      In addition to the home, did you also -- did inspectors

09:34:34  11   also look for things in a vehicle in the driveway?

09:34:36  12   A.      Yes.  The search warrant did authorize vehicles that were

09:34:40  13   on the premises to be searched.

09:34:42  14   Q.      All right.  And did an inspector take some photos of items

09:34:46  15   that were in the house and in the car?

09:34:47  16   A.      Yes, they did.

09:34:48  17          MR. ZYTNICK:  All right.  Can we please pull up

09:34:50  18   Exhibit 65, which has been preadmitted.

09:35:05  19   **BY MR. ZYTNICK:**

09:35:06  20   Q.      Do you see that in front of you?

09:35:09  21   A.      No, not yet.

09:35:10  22   Q.      Not yet.  Okay.

09:35:26  23          **COURTROOM ADMINISTRATOR:**  Slow this morning.

09:35:27  24          **MR. ZYTNICK:**  That's okay.  Is it on the other

09:35:32  25   screens?

09:35:33  1          **COURTROOM ADMINISTRATOR:**  No.

09:35:35  2          **MR. ZYTNICK:**  Okay.

09:35:36  3          **COURTROOM ADMINISTRATOR:**  I don't even see it.

09:35:37  4          **MR. ZYTNICK:**  Okay.

09:35:37  5          **THE COURT:**  I saw the projector light.  It was blue,

09:35:40  6  but then it wasn't.  Now it's just dark.

09:35:51  7          Want to turn it off and turn it back on?

09:35:53  8          I had to do that to my computer this morning.  It

09:35:56  9  was -- I had to restart it.

09:36:16 10          *(Pause.)*

09:36:36 11          **THE WITNESS:**  I see it now.

09:36:38 12  **BY MR. ZYTNICK:**

09:36:38 13  Q.    Okay.  Was this one of the items recovered from that

09:36:42 14  address on Garita Street?

09:36:43 15  A.    Yes, it is.

09:36:44 16  Q.    And what does this appear to be?

09:36:46 17  A.    This is a copy of a check from a James H. Peters, Jr., paid

09:36:51 18  to the order of Assets Unlimited in the amount of $25, and it is

09:36:57 19  dated January 20th, 2018.

09:36:59 20  Q.    Okay.  And in the bottom right corner of the check, if we

09:37:03 21  can zoom in on that a little bit, does there appear to be a claim

09:37:13 22  number?

09:37:14 23  A.    There is, yes.

09:37:15 24  Q.    Sorry.  A little higher on the zoom.

09:37:18 25          So there's a claim number, and then underneath that,

| | | |
|---|---|---|
| 09:37:21 | 1 | is there also a dollar amount written there? |
| 09:37:23 | 2 | A.    Yes, there is. |
| 09:37:23 | 3 | Q.    That's 1,444,000? |
| 09:37:28 | 4 | A.    That's what it says. |
| 09:37:29 | 5 | **MR. ZYTNICK:**  All right.  Can we please pull up |
| 09:37:31 | 6 | Exhibits 66 and 67, side by side.  These are also preadmitted. |
| 09:37:49 | 7 | **BY MR. ZYTNICK:** |
| 09:37:50 | 8 | Q.    Were these also documents found at Mr. Castro's residence? |
| 09:37:55 | 9 | A.    Yes, they were. |
| 09:37:57 | 10 | **MR. ZYTNICK:**  If we can zoom in on the one on the |
| 09:37:59 | 11 | left, on the top left of that piece of paper. |
| 09:38:05 | 12 | **BY MR. ZYTNICK:** |
| 09:38:09 | 13 | Q.    This appears to be a letter from Clark County, Nevada, |
| 09:38:14 | 14 | regarding a business letter. |
| 09:38:15 | 15 | Who is this letter addressed to? |
| 09:38:17 | 16 | A.    It's addressed to PI Printing Corporation at 4665 Garita |
| 09:38:23 | 17 | Street in Las Vegas, Nevada. |
| 09:38:24 | 18 | Q.    And that was the search warrant location? |
| 09:38:26 | 19 | A.    Yes, it was. |
| 09:38:27 | 20 | **MR. ZYTNICK:**  All right.  And if we can go to |
| 09:38:29 | 21 | Exhibit 67 on the right side and zoom in on the top portion of |
| 09:38:35 | 22 | that piece of paper. |
| 09:38:41 | 23 | **BY MR. ZYTNICK:** |
| 09:38:41 | 24 | Q.    Is this a letter from Bank of America to the same entity |
| 09:38:46 | 25 | and the same address? |

09:38:47  1    A.    Yes, it is.

09:38:47  2    Q.    Below that in this image, in this photo, if we can zoom in

09:38:53  3    on the bottom half of this photo, is that another check to Assets

09:38:56  4    Unlimited?

09:38:58  5    A.    Yes, it is.

09:38:58  6    Q.    All right.  So we're going to come back to the search

09:39:01  7    warrant stuff in a minute, but I want to talk to you about a few

09:39:04  8    things that are not directly related to the search warrant at

09:39:07  9    Mario Castro's house but that you may have knowledge about from

09:39:11 10    your experience as a postal inspector.

09:39:13 11         So, first, are you familiar with some companies named

09:39:14 12    UPS and FedEx?

09:39:15 13    A.    Yes, I am.

09:39:16 14    Q.    Are these private companies?

09:39:18 15    A.    They are.

09:39:19 16    Q.    If someone wants to ship something from a commercial mail

09:39:22 17    receiving agency, like a UPS store or Mail Boxes Etc, can they

09:39:28 18    ship that from UPS or FedEx?

09:39:32 19    A.    Generally, yes.

09:39:32 20    Q.    Do UPS and FedEx ship things across state lines?

09:39:34 21    A.    Yes, they do.

09:39:34 22    Q.    In mail fraud lingo, are UPS and FedEx private commercial

09:39:40 23    interstate carriers?

09:39:42 24    A.    Yes, they are.

09:39:43 25    Q.    Are shipments by UPS and FedEx covered by the mail fraud

09:39:48  1  statute?

09:39:48  2  A.    Yes, they are, indeed.

09:39:51  3  Q.    Let me ask you about a different issue.

09:39:54  4        Does the Postal Inspection Service have access to

09:39:55  5  driver's license information?

09:39:57  6  A.    We do.

09:39:57  7        MR. ZYTNICK:  Can we show the witness only

09:40:02  8  Exhibit 284?

09:40:08  9  BY MR. ZYTNICK:

09:40:10  10  Q.    Do you see that in front of you?

09:40:11  11  A.    I do.

09:40:12  12  Q.    Is Exhibit 284 driver's license information for an

09:40:16  13  individual named Miguel Manuel Castro?

09:40:19  14  A.    Yes, it is.

09:40:22  15        MR. ZYTNICK:  Your Honor, move to admit 284.

09:40:24  16        THE COURT:  Any objection to 284?

09:40:29  17        MR. TANASI:  No, Your Honor.

09:40:31  18        MR. BROWN:  No, Your Honor.

09:40:32  19        MR. ERICSSON:  No objection, Your Honor.

09:40:33  20        THE COURT:  284 is admitted and may be published to

09:40:39  21  the jury.

09:40:40  22        (Government's Exhibit No. 283 was received into evidence.)

09:40:40  23        MR. ZYTNICK:  Thank you.  And we'll come back to that

09:40:42  24  with a different witness, so we can clear that for right now.

09:40:42  25  ///

09:40:42   1   **BY MR. ZYTNICK:**

09:40:44   2   Q.    All right.  So I want to move on to one more brief issue

09:40:47   3   before getting back to the search warrant at Mario Castro's

09:40:51   4   house.  There was recently a note from a juror with some

09:40:53   5   questions about forfeiture and victim compensation, so I'm hoping

09:40:58   6   we can answer that juror's questions.

09:41:00   7            In a criminal mail fraud case, is forfeiture when the

09:41:03   8   government takes money or property that are the proceeds of mail

09:41:06   9   fraud?

09:41:07  10   A.    Yes.

09:41:07  11   Q.    Is one of the goals to compensate victims?

09:41:10  12   A.    Yes, it is.

09:41:11  13   Q.    Are you familiar with something called the Transnational

09:41:14  14   Elder Fraud Strike Force?

09:41:16  15   A.    Yes.  That's a group of postal inspectors from our

09:41:20  16   Washington, D.C. office that work jointly with the Department of

09:41:24  17   Justice to combat elder fraud.

09:41:27  18   Q.    And have postal inspectors on the Elder Fraud Strike Force

09:41:31  19   investigated many cases involving fraudulent prize notices and

09:41:36  20   other fraudulent mailings?

09:41:38  21   A.    Yes, they have.

09:41:39  22   Q.    As a result of the efforts of the Elder Fraud Strike Force,

09:41:40  23   is there a victim compensation fund for victims of certain mass

09:41:45  24   mail-in fraud schemes?

09:41:47  25   A.    Yes, there are.

09:41:48  1   Q.    How many -- how much money was that victim compensation

09:41:51  2   fund?

09:41:51  3   A.    In one particular fund that I am aware of, there was

09:41:57  4   $161 million.

09:41:58  5   Q.    And has that victim compensation fund already sent over

09:42:00  6   $50 million back to victims of mass mailing fraud?

09:42:03  7   A.    That's my understanding.

09:42:04  8   Q.    Was this case, the one that we're here for on trial, was

09:42:07  9   this investigated by postal investigators on what is now known as

09:42:13  10  the Transnational Elder Fraud Strike Force?

09:42:13  11  A.    Yes, it was.

09:42:13  12  Q.    Do you know anyone on that Elder Fraud Strike Force?

09:42:16  13  A.    I do.

09:42:17  14  Q.    Who do you know on that strike force?

09:42:20  15  A.    Ernest Williams is a postal inspector assigned, Clayton

09:42:24  16  Gerber is the supervisor, and retired postal inspector Barry

09:42:30  17  Bouchie is hired back as a contractor, assigned as an analyst to

09:42:33  18  that strike force.

09:42:35  19  Q.    Is one of the inspectors who currently works for you, was

09:42:37  20  that person also recently detailed to the strike force?

09:42:41  21  A.    Yes.

09:42:41  22  Q.    On Thursday, one of the defense attorneys asked a witness,

09:42:45  23  Milton Etter, if the federal government has given back any of the

09:42:50  24  money that his mother-in-law paid in response to prize

09:42:53  25  notifications, and his answer was no.

| | | |
|---|---|---|
| 09:42:55 | 1 | My question for you is, does money that's seized |
| 09:42:58 | 2 | during a criminal case often get returned to victims? |
| 09:43:01 | 3 | A.    It often does after the case is adjudicated. |
| 09:43:03 | 4 | Q.    Okay.  When you say after it's adjudicated -- so at what |
| 09:43:07 | 5 | point in the proceedings or what point during the process often |
| 09:43:11 | 6 | get returned back to victims? |
| 09:43:11 | 7 | A.    Generally, after sentencing. |
| 09:43:12 | 8 | Q.    So I think that would be at the end of the case? |
| 09:43:13 | 9 | A.    At the end of the case. |
| 09:43:14 | 10 | Q.    All right.  Thank you.  I hope that helps answer the |
| 09:43:16 | 11 | questions from the juror. |
| 09:43:17 | 12 | Let's go back to talking about the -- the search |
| 09:43:22 | 13 | warrant at Mario Castro's house. |
| 09:43:24 | 14 | Was there an evidence inventory prepared for that |
| 09:43:28 | 15 | search location? |
| 09:43:29 | 16 | A.    Yes, there was. |
| 09:43:30 | 17 | Q.    And have you reviewed that evidence inventory to help you |
| 09:43:33 | 18 | prepare for your testimony today? |
| 09:43:35 | 19 | A.    Yes, I have. |
| 09:43:36 | 20 | **MR. ZYTNICK:**  Can we put up Exhibit 68, which is |
| 09:43:39 | 21 | preadmitted. |
| 09:43:48 | 22 | **BY MR. ZYTNICK:** |
| 09:43:49 | 23 | Q.    Is this a document found during the search warrant? |
| 09:43:51 | 24 | A.    Yes.  It is one of the documents. |
| 09:43:53 | 25 | Q.    And what type of document is this? |

09:43:55  1   A.    It's a letter from Bank of America to PI Printing

09:43:59  2   Corporation, doing business as Assets Unlimited, at 4665 Garita

09:44:07  3   Street in Las Vegas, Nevada.  And it's in reference to

09:44:12  4   non-sufficient funds.

09:44:13  5               MR. ZYTNICK:  So if we can zoom in on the -- on the

09:44:16  6   address or the to area in the top left.

09:44:16  7   BY MR. ZYTNICK:

09:44:22  8   Q.    So earlier, we were looking at some photos of some

09:44:23  9   documents that referenced PI or PI Printing Corp.

09:44:29  10              Does this letter show that Assets Unlimited is a DBA

09:44:33  11  of PI Printing Corp?

09:44:35  12  A.    Yes, it does.

09:44:36  13              MR. ZYTNICK:  Can we go to page 4 of the same

09:44:39  14  exhibit.  And if we can, again, zoom in on the top left.

09:44:48  15  BY MR. ZYTNICK:

09:44:49  16  Q.    Here we see a similar document, but this time there's a

09:44:51  17  different DBA for PI Printing Corp.

09:44:56  18              Can you tell us what that DBA is this time?

09:44:59  19  A.    The DBA is listed as Money Securities.

09:45:03  20  Q.    Okay.

09:45:03  21              MR. ZYTNICK:  Can we go to Exhibit 69.

09:45:07  22  BY MR. ZYTNICK:

09:45:09  23  Q.    What are we looking at in Exhibit 69?

09:45:12  24  A.    We're looking at a photograph of three Bank of America bank

09:45:17  25  cards, as well as a Bank of America customer receipt.

09:45:21  1    Q.    Okay.  Can you tell us the names of the entities listed on

09:45:27  2    the debit cards?

09:45:29  3    A.    Yeah.  The top left card is Digital Express Incorporated

09:45:33  4    and the name Mario Castro, top right is PI Printing Corporation

09:45:40  5    and the name Mario Castro, and the bottom right card is Money

09:45:44  6    Securities and the name Mario Castro.

09:45:48  7    Q.    And this is something that -- or these debit cards were

09:45:51  8    things that were in Mr. Castro's house?

09:45:53  9    A.    These are items that were in his wallet, and we took a

09:45:57  10   photograph of them.

09:45:59  11        **MR. ZYTNICK:**  Can we go to Exhibit 70, also

09:46:02  12   preadmitted, if we can zoom in on the top.

09:46:08  13   **BY MR. ZYTNICK:**

09:46:08  14   Q.    Is this a business card that was -- or were both of these

09:46:11  15   business cards that were in Mr. Castro's house?

09:46:13  16   A.    Yes.  Those are business cards that were found on the

09:46:16  17   kitchen counter.

09:46:17  18   Q.    The top card, what's the company name on that business

09:46:21  19   card?

09:46:21  20   A.    Digital Express.

09:46:23  21   Q.    Who's listed there as the CEO?

09:46:26  22   A.    Mario Castro.

09:46:27  23   Q.    About how many residential or business search warrants do

09:46:32  24   you do in a typical year?

09:46:34  25   A.    In my current assignment, somewhere between six and eight.

09:46:39  1  Q.    Is that typical, or does it vary by inspector?

09:46:43  2  A.    So it varies by assignment.  In the mail fraud assignment,

09:46:47  3  cases seem -- they go a little longer, so a little less search

09:46:51  4  warrants.  In my prior assignment, I worked narcotics, and so it

09:46:56  5  was much more common to serve search warrants.

09:47:00  6  Q.    Did you conduct any other search warrants related to this

09:47:03  7  investigation?

09:47:04  8  A.    No, I did not.

09:47:05  9         THE COURT:  (Sneezing.)  Excuse me.

09:47:06 10  BY MR. ZYTNICK:

09:47:06 11  Q.    Did you conduct any witness interviews related to this

09:47:09 12  investigation?

09:47:09 13  A.    No, I did not.

09:47:10 14         MR. ZYTNICK:  No further questions.

09:47:14 15         THE COURT:  Any cross, Mr. Tomsheck?

09:47:17 16         MR. TOMSHECK:  Court's indulgence.

09:47:20 17         *(Counsel conferring.)*

09:47:35 18                    **CROSS-EXAMINATION**

09:47:35 19  BY MR. TOMSHECK:

09:47:40 20  Q.    Good morning.

09:47:41 21  A.    Good morning.

09:47:42 22  Q.    How are you?

09:47:42 23  A.    Great.

09:47:43 24  Q.    Awesome.  I think I actually rode up the elevator with you

09:47:47 25  today, had no idea who we were.

2:19-cr-00295-GMN-NJK - Monday, April 3, 2023    34

| | | |
|---|---|---|
| 09:47:48 | 1 | A.    Got you. |
| 09:47:49 | 2 | Q.    We didn't talk though, right? |
| 09:47:51 | 3 | A.    We did not. |
| 09:47:52 | 4 | Q.    Okay.  Well, now's our chance. |
| 09:47:54 | 5 | You indicated that you were part of a larger group of |
| 09:47:56 | 6 | postal inspectors that were here in Las Vegas for a series of |
| 09:47:59 | 7 | search warrants that were being executed on the same day, right? |
| 09:48:02 | 8 | A.    That is correct. |
| 09:48:03 | 9 | Q.    I'm assuming that, like the other inspectors that the |
| 09:48:07 | 10 | jury's already heard from, you took part in a briefing before the |
| 09:48:09 | 11 | execution of those warrants? |
| 09:48:11 | 12 | A.    Yes. |
| 09:48:11 | 13 | Q.    And you mentioned the name "Barry Bouchie" on direct |
| 09:48:16 | 14 | examination. |
| 09:48:16 | 15 | You know that guy? |
| 09:48:17 | 16 | A.    I do. |
| 09:48:18 | 17 | Q.    And you see him here in the courtroom? |
| 09:48:20 | 18 | A.    Yes. |
| 09:48:20 | 19 | Q.    Okay.  Do you recall him being at that briefing? |
| 09:48:22 | 20 | A.    Yes. |
| 09:48:23 | 21 | Q.    Okay.  Do you also recall whether or not there were federal |
| 09:48:28 | 22 | prosecutors at that briefing? |
| 09:48:30 | 23 | A.    I don't recall. |
| 09:48:30 | 24 | Q.    Okay.  Do you know Mr. Finley and Mr. Zytnick who just |
| 09:48:35 | 25 | asked you questions? |

09:48:35  1   A.    I do now.

09:48:36  2   Q.    Okay.  Do you know Ms. Chang seated right behind them

09:48:39  3   there?

09:48:39  4   A.    I do not.

09:48:40  5   Q.    Okay.  You indicated that you know them now.

09:48:42  6         In preparation for your testimony, you probably

09:48:44  7   talked to them several times, right?

09:48:46  8   A.    Three times.  Yeah.

09:48:47  9   Q.    Okay.  Just to be clear, you've never talked to me before,

09:48:51  10  never saw me before the elevator this morning, right?

09:48:54  11  A.    I have not.

09:48:54  12  Q.    Okay.  Mr. Zytnick, I'm assuming, talked to you about what

09:49:00  13  he was going to ask you questions about, right?

09:49:02  14  A.    Yes.

09:49:02  15  Q.    Okay.  Safe to assume that when you do a search warrant,

09:49:05  16  you're focused on that task at that point in time, right?

09:49:09  17  A.    Not understanding the question.

09:49:12  18  Q.    Okay.

09:49:12  19  A.    Can you be more specific --

09:49:14  20  Q.    You executed a search warrant?

09:49:15  21  A.    Yes.

09:49:15  22  Q.    Done that lots of times, right?

09:49:17  23  A.    Yes.

09:49:17  24  Q.    You're focused on it when you're doing it, right?

09:49:20  25  A.    Of course.

09:49:21  1   Q.    If you're not the case agent, kind of everything that goes

09:49:23  2   with that search warrant goes into a file somewhere, right?

09:49:26  3   A.    Can you rephrase that?

09:49:27  4   Q.    Sure.  If you are not the case agent --

09:49:30  5   A.    Yes.

09:49:31  6   Q.    -- you're not taking the whole case home with you, right?

09:49:34  7   A.    That's correct.

09:49:35  8   Q.    Okay.  So your part of this investigation is exclusively

09:49:38  9   the execution of the search warrant?

09:49:40  10  A.    That's correct.

09:49:40  11  Q.    And so everything related to your part of the case goes

09:49:43  12  into a file somewhere, right?

09:49:44  13  A.    Yes.

09:49:45  14  Q.    Okay.  And that file presumably stays with the case agent,

09:49:49  15  right?

09:49:49  16  A.    Generally, that's the way it works.

09:49:51  17  Q.    Okay.  I'm assuming that over the course of the last five

09:49:55  18  years or so, you're not sitting around on your couch every day

09:49:58  19  thinking about this case, right?

09:49:59  20  A.    I was not.

09:50:00  21  Q.    Okay.  In fact, you know you've got a subpoena to come

09:50:03  22  testify, right?

09:50:04  23  A.    Correct.

09:50:04  24  Q.    And in preparation for that, you go back and you refresh

09:50:07  25  your memory about what occurred, right?

09:50:10   1   A.      Correct.

09:50:10   2   Q.      And you agree with me you're kind of limited in that

09:50:14   3   refreshing by what actually exists within the file, right?

09:50:16   4   A.      I review the documents that were part of the search warrant

09:50:20   5   I was a part of.  Yeah.

09:50:21   6   Q.      Okay.  In this particular case, the plan for the execution

09:50:24   7   of the search warrant was discussed at the briefing, right?

09:50:31   8   A.      Yes.

09:50:31   9   Q.      Were you part of the briefing where it was discussed

09:50:31  10   whether or not interviews of people should be recorded?

09:50:34  11   A.      I think that for consistency's sake, what they indicated

09:50:37  12   was that they will not be video recorded.

09:50:40  13   Q.      Okay.  So you're aware going into the execution of the

09:50:43  14   search warrant that you're potentially going to come into contact

09:50:46  15   with people that could be important to the case, right?

09:50:49  16   A.      Yes.

09:50:49  17   Q.      In fact, you're going to come into contact with the owner

09:50:52  18   of the residence, right?

09:50:53  19   A.      Generally, yes, unless they're not home.

09:50:57  20   Q.      And that, in fact, happened in this case, correct?

09:50:59  21   A.      It did.

09:50:59  22   Q.      And you had an understanding that when you did that,

09:51:03  23   knowing that you're trying to preserve stuff for the potential

09:51:07  24   testimony at trial all these years later, you were aware that

09:51:09  25   there was a decision made not to record the interviews, right?

09:51:13  1    A.    Correct.

09:51:15  2    Q.    Okay.  You would agree with me that if we had a recorded

09:51:16  3    interview, that would probably be the best and most accurate

09:51:18  4    information about what transpired in that interview, right?

09:51:22  5    A.    It could be.

09:51:23  6    Q.    Okay.  You'd agree with me that notes and recollections

09:51:26  7    five years later are not going to be as accurate as the actual

09:51:30  8    words spoken, agreed?

09:51:31  9    A.    I wasn't involved in the interviews, so, you know, I didn't

09:51:35  10   read through their notes or --

09:51:37  11   Q.    Not my question.

09:51:38  12         You'd agree with me that handwritten notes

09:51:41  13   summarizing a conversation and a person's recollection of that

09:51:43  14   conversation are probably not going to be as accurate as the

09:51:47  15   actual conversation, correct?

09:51:49  16   A.    I wouldn't agree with that.

09:51:52  17   Q.    Okay.  So it's your testimony, just so we're clear to the

09:51:55  18   ladies and gentlemen of the jury, in a case where you conduct an

09:51:57  19   interview, your notes and your recollections five years later are

09:52:01  20   more accurate related to the actual conversation than the

09:52:05  21   conversation itself.

09:52:07  22         Is that your testimony?

09:52:08  23   A.    It's possible.

09:52:09  24   Q.    Okay.  That you have some clairvoyant ability to recall a

09:52:14  25   conversation better than the conversation itself.

09:52:15   1            Is that your testimony?

09:52:16   2   A.    Or just the ability to take really good notes.

09:52:18   3   Q.    Okay.  If you're taking notes summarizing a conversation,

09:52:22   4   you'd agree with me the idea is to summarize what's said in the

09:52:25   5   conversation --

09:52:26   6   A.    That's correct.

09:52:27   7   Q.    -- yes?

09:52:27   8            You'd agree with me that if you have the actual

09:52:30   9   conversation, you don't have to summarize a thing, right?

09:52:32  10   A.    We're -- we're accustomed to taking notes for interviews,

09:52:40  11   so...

09:52:41  12   Q.    Yeah.  The jury's aware that postal inspectors are

09:52:44  13   accustomed to taking notes.  They heard from a bunch of you guys.

09:52:45  14   A.    Yeah.

09:52:45  15   Q.    I'm just trying to get out of you whether or not it's your

09:52:49  16   belief that your notes summarizing a conversation are more

09:52:52  17   accurate than the actual conversation.

09:52:55  18   A.    I wouldn't say that they would be more accurate, but they

09:52:59  19   may be extremely accurate depending on the note taker.

09:53:02  20   Q.    Okay.  All things being equal, if the jury wants the most

09:53:07  21   accurate recitation of what occurred during the search warrant

09:53:10  22   execution and the interviews that took place on that day, the

09:53:15  23   actual recording of those events would be the most accurate,

09:53:18  24   right?

09:53:19  25   A.    That's possible.

09:53:23  1  Q.    Okay.  All right.  You agree with me that when you executed

09:53:27  2  the search warrant, Mario Castro was present, right?

09:53:31  3  A.    Yes, he was.

09:53:32  4  Q.    All right.  And when I say "Mario Castro," do you see him

09:53:35  5  in the courtroom today?

09:53:36  6  A.    I believe I do.

09:53:37  7  Q.    Okay.  Could you tell us where he's at?

09:53:39  8  A.    I think at that front table on the right.

09:53:41  9  Q.    Okay.  You mentioned that he was home, yes?

09:53:43  10  A.    Yes.

09:53:44  11           **THE COURT:**  Just a minute.  The record will reflect

09:53:47  12  that he did identify Mario Castro in the front row.

09:53:51  13  **BY MR. TOMSHECK:**

09:53:52  14  Q.    Mr. Castro was home in his residence, yes?

09:53:53  15  A.    Yes, he was.

09:53:54  16  Q.    And you knocked on the door to execute the search warrant

09:53:55  17  at approximately what time?

09:53:56  18  A.    It was around 8 a.m.

09:53:57  19  Q.    Okay.  So early in the morning, right?

09:53:59  20  A.    8 a.m.

09:54:01  21  Q.    Okay.  His wife was present?

09:54:03  22  A.    Yes, she was.

09:54:04  23  Q.    Okay.  You were asked a question about another individual

09:54:07  24  by the name of Mario Castro, Jr.

09:54:09  25           You remember that question?

09:54:10  1    A.    Yes.

09:54:11  2    Q.    Okay.  He was not present, right?

09:54:13  3    A.    No, he was not.

09:54:14  4    Q.    Was anybody else present in the house?

09:54:15  5    A.    No.  I believe it was just the two of them.

09:54:19  6    Q.    Okay.  Did you have an understanding about who had lived in

09:54:22  7    that house other than Mr. Castro, who you've identified, and his

09:54:25  8    wife prior to the execution of the search warrant?

09:54:28  9    A.    Not that I remember.

09:54:29  10   Q.    Okay.  Do you recall whether or not Mario Castro, Jr., had

09:54:33  11   lived in that house?

09:54:34  12   A.    I don't remember.

09:54:35  13   Q.    Okay.  You were asked some specific questions about some

09:54:39  14   items of evidence that were located during the search.

09:54:43  15          MR. TOMSHECK:  Could you put up Government's Exhibit

09:54:46  16   No. 65, please, Brian.

09:54:49  17   BY MR. TOMSHECK:

09:55:01  18   Q.    Do you see Government's Exhibit No. 65?

09:55:03  19   A.    I do.

09:55:04  20   Q.    Okay.  It appears to be a check copy with the name "James

09:55:09  21   H. Peters, Jr.," to Assets Unlimited.

09:55:13  22          Do you see that?

09:55:13  23   A.    Yes.

09:55:14  24   Q.    Okay.  Do you know who actually ran Assets Unlimited?

09:55:19  25   A.    Only from those previous documents.  I saw the name "Mario

09:55:25  1    Castro."

09:55:25  2    Q.    Okay.  You'd agree with me that those documents don't

09:55:29  3    indicate whether or not it was Mario Castro, Sr., or Mario

09:55:35  4    Castro, Jr.?

09:55:35  5    A.    To my recollection it said Mario Castro.

09:55:38  6    Q.    Okay.  And you'd agree with me that it doesn't delineate

09:55:42  7    between Mario Castro, Sr., and Mario Castro, Jr., correct?

09:55:45  8    A.    No, it did not.

09:55:47  9    Q.    Okay.  This particular document, Government's Exhibit

09:55:49  10   No. 65, can you tell us where it was located?

09:55:54  11   A.    Yes.  This was from a white Nissan Altima which was parked

09:55:58  12   in the driveway.

09:55:58  13   Q.    Okay.  Do you have any independent knowledge about who

09:56:02  14   drove that vehicle?

09:56:03  15   A.    No, I do not.

09:56:04  16   Q.    Do you have any independent knowledge about whether that

09:56:08  17   vehicle was driven by more than one person?

09:56:12  18   A.    No, I do not.

09:56:13  19   Q.    Do you have any independent information about how that item

09:56:17  20   came to be in this vehicle?

09:56:19  21   A.    No, I do not.

09:56:20  22   Q.    Okay.

09:56:23  23         MR. TOMSHECK:  Could you put up on the screen,

09:56:24  24   please, Government's Exhibit No. 69.

09:56:31  25   BY MR. TOMSHECK:

09:56:36   1   Q.    Okay.  Now, you indicated that these three Bank of America

09:56:43   2   cards -- I don't know if they're debit cards or credit cards, and

09:56:48   3   you'd agree you can't tell from that information depicted in

09:56:52   4   Government's Exhibit 69 whether they're debit or credit cards,

09:56:57   5   right?

09:56:57   6   A.    They say business debit card on them.

09:57:00   7   Q.    Okay.  Do you know who those cards belonged to?

09:57:03   8   A.    Do you want me to read them off?

09:57:06   9   Q.    No.  I'm asking you if you know who they belong to.

09:57:08  10   A.    Only based on what I see here.

09:57:10  11   Q.    Okay.

09:57:11  12   A.    Yeah.

09:57:11  13   Q.    You'd agree with me that all of those cards in Government's

09:57:15  14   69 have an account number, yes?

09:57:17  15   A.    Yes.

09:57:17  16   Q.    As with all credit cards or debit cards, they would have a

09:57:21  17   16-digit account number unique to that account, right?

09:57:25  18   A.    Correct.

09:57:26  19   Q.    You'd agree with me all of those account numbers are

09:57:29  20   different, yes?

09:57:30  21   A.    They are.

09:57:30  22   Q.    You'd agree with me they all have the name "Mario Castro,"

09:57:33  23   right?

09:57:34  24   A.    They do.

09:57:34  25   Q.    You'd agree with me that they contain each their individual

09:57:39  1  business name related to that account, yes?

09:57:41  2  A.    Yes, they do.

09:57:42  3  Q.    On the top left there, there's a card that says Digital

09:57:46  4  Express Incorporated, right?

09:57:48  5  A.    Right.

09:57:49  6  Q.    On the top right, there's one that says PI, as you put it,

09:57:53  7  or PI Printing Corp.

09:57:54  8        Did I read that right?

09:57:55  9  A.    Yes.

09:57:56  10  Q.    And there's one that says Money Securities, right?

09:57:59  11  A.    Correct.

09:58:00  12  Q.    Just so the record's clear, those appear to be different

09:58:03  13  business entity names, yes?

09:58:05  14  A.    They do.  The only common scenario is the name "Mario

09:58:10  15  Castro."

09:58:10  16  Q.    Well, there's a common scenario between the name Mario

09:58:15  17  Castro in each of those cards in that it does not delineate

09:58:17  18  whether it is a junior or a senior, correct?

09:58:18  19  A.    No, it does not.

09:58:19  20  Q.    And as you sit here today, you can't tell us whether or not

09:58:22  21  those cards were issued to Mario Castro, Sr., or Mario Castro,

09:58:28  22  Jr., can you?

09:58:28  23  A.    No, I cannot.

09:58:29  24  Q.    You also cannot tell us whether those cards were mailed to

09:58:33  25  someone else.  You don't know that, do you?

09:58:34  1    A.    I don't know that.

09:58:35  2    Q.    You don't know if those cards came to be in the possession

09:58:38  3    of Mr. Castro because someone else provided them to him?

09:58:42  4    A.    I don't know how they got there.

09:58:44  5    Q.    You can't tell the ladies and gentlemen of the jury who

09:58:46  6    made the decisions, wrote the checks, and managed the accounts --

09:58:50  7    the accounts related to these cards, can you?

09:58:53  8    A.    No, I cannot.

09:58:54  9    Q.    Okay.  You'd agree with me there's a card on the top right

09:58:57  10   there that's cut off, right?

09:58:59  11   A.    Yes.

09:58:59  12   Q.    This photograph in Government's Exhibit 69 does not depict

09:59:02  13   the entirety of the cards that were photographed and impounded

09:59:07  14   during the search, right?

09:59:08  15   A.    No, it does not.

09:59:09  16   Q.    You'd agree with me, when Government's Exhibit 69 was

09:59:14  17   displayed for the jury this morning, that was the prosecutor's

09:59:16  18   decision to show you that photograph and ask you questions about

09:59:19  19   it, right?

09:59:20  20   A.    He showed it to me.

09:59:21  21   Q.    Okay.  He made that decision, right?

09:59:23  22   A.    I assume that he did.

09:59:25  23   Q.    Okay.

09:59:26  24          MR. TOMSHECK:  Could you put up Government's Exhibit

09:59:28  25   No. 70, please.

09:59:30  1  **BY MR. TOMSHECK:**

09:59:34  2  Q.    The prosecutor asked you some questions about a business

09:59:37  3  card in this photograph, as well, right?

09:59:39  4  A.    He did.

09:59:40  5  Q.    Okay.  And in fact, he identified the Digital Express

09:59:44  6  business card on the top of Government's Exhibit No. 70.

09:59:47  7            Do you see that?

09:59:48  8  A.    I do.

09:59:48  9  Q.    Okay.  You'd agree with me there's a business card

09:59:51  10  underneath that, as well, correct?

09:59:53  11  A.    Yes.

09:59:53  12  Q.    Okay.  That purports to be a business card for Mario Castro

09:59:58  13  related to Agave Spirits.

10:00:01  14            Are you familiar with what agave is?

10:00:04  15  A.    I think it's tequila, huh?

10:00:07  16  Q.    Okay.  Agave is a plant that's used to make tequila,

10:00:11  17  correct?

10:00:11  18  A.    That sounds right.

10:00:12  19  Q.    Okay.  You'd agree with me that present in Mario Castro's

10:00:15  20  residence were those business cards, as well, right?

10:00:18  21  A.    Yes.

10:00:19  22  Q.    Okay.

10:00:28  23            **MR. TOMSHECK:**  Court's indulgence.

10:00:28  24            *(Counsel conferring.)*

10:00:34  25            **MR. TOMSHECK:**  Pass the witness, Your Honor.

10:00:35  1          THE COURT:  Thank you.

10:00:36  2          Mr. Gaffney or Mr. Ericsson?

10:00:39  3          MR. GAFFNEY:  No questions, Your Honor.

10:00:41  4          THE COURT:  Mr. Brown?

10:00:41  5          MR. BROWN:  No.  Thank you, Judge.

10:00:41  6          THE COURT:  Mr. Green, any cross?

10:00:49  7          MR. GREEN:  Don Green.  May I have your indulgence

10:00:51  8  for one moment?

10:00:52  9          THE COURT:  Yes, you may.

10:01:26 10      *(Counsel conferring.)*

10:01:26 11          MR. GREEN:  Thank you.  A few questions, if I may,

10:01:29 12  Your Honor.

10:01:29 13          THE COURT:  Yes, you may.

10:01:32 14          MR. GREEN:  Thank you.

10:01:34 15                    **CROSS-EXAMINATION**

10:01:36 16  **BY MR. GREEN:**

10:01:37 17  Q.    Good morning, Inspector -- is it Hallisey?

10:01:38 18  A.    Yes.

10:01:39 19  Q.    Good morning, sir.

10:01:39 20          In connection with the search at 4665 Garita Street

10:01:43 21  in Las Vegas, Nevada, on February 21st, 2018, did you find any

10:01:51 22  stacks of money; that is, U.S. currency?

10:01:56 23  A.    No, we did not.

10:01:58 24  Q.    Did you find any stacks of prize notifications, whether

10:02:02 25  completed or blank?

10:02:03  1  A.    I don't recall.  We did find business records.

10:02:06  2  Q.    Okay.  In this case -- so I take it that there weren't

10:02:11  3  any -- you didn't find any proofs or the shells for these prize

10:02:14  4  notifications?

10:02:17  5  A.    I don't have a recollection of that being part of what --

10:02:21  6  Q.    Thank you.

10:02:22  7          MR. GREEN:  May we have Government's Exhibit No. 284

10:02:26  8  placed on the screen, Your Honor?

10:02:33  9  BY MR. GREEN:

10:02:34  10  Q.    Inspector -- oh, sorry.

10:02:36  11          Inspector Hallisey, you were shown what's now

10:02:40  12  admitted as Government's Exhibit 284.

10:02:42  13          Do you remember being shown that earlier today?

10:02:45  14  A.    Yes, I do.

10:02:46  15  Q.    And this appears to be driver's license information?

10:02:48  16  A.    Yes, it is.

10:02:49  17  Q.    In response to the question which you -- which you were

10:02:52  18  asked by the government, you said that it is common or frequent

10:02:55  19  that the U.S. Postal Inspection Service can receive driver's

10:03:00  20  license information from a particular state; is that correct?

10:03:02  21  A.    Yes.

10:03:02  22  Q.    And in this case, you stated that you did, at least, see

10:03:06  23  this at one time; is that correct?

10:03:07  24  A.    Yes, I did.

10:03:08  25  Q.    When was the first time that you saw what appears to be the

10:03:12  1  driver's license information for this Miguel Castro?

10:03:17  2  A.    Yesterday.

10:03:18  3  Q.    It was just yesterday?

10:03:20  4  A.    Yes.

10:03:20  5  Q.    Okay.  So you hadn't seen it on the morning of

10:03:24  6  February 21st, 2018?

10:03:26  7  A.    Not that I recall.

10:03:27  8  Q.    Okay.  Because -- if you look at the -- at the issue date

10:03:31  9  on this, the issue -- it wasn't issued until November of 2018,

10:03:35  10  some -- some seven or eight months after the search, correct?

10:03:38  11  A.    That's what -- that's the image date.  Yes.

10:03:43  12           **MR. GREEN:**  Thank you.  No further questions.

10:03:45  13           Thank you, Your Honor.

10:03:46  14           **THE COURT:**  Any redirect, Mr. Zytnick?

10:03:47  15           **MR. ZYTNICK:**  No, Your Honor.

10:03:48  16           **THE COURT:**  Mr. -- oh, you said no?

10:03:58  17           **MR. ZYTNICK:**  No.

10:03:59  18           **THE COURT:**  All right.  So at this time, if any

10:04:02  19  members of the jury have a question for the witness,

10:04:04  20  Mr. Hallisey, please write it down on the form provided.  Take

10:04:07  21  your time and write neatly.  If you have more than one question,

10:04:10  22  number the questions or skip a line.  And when you're all done,

10:04:15  23  fold the piece of paper in half so Nick can pick them up.

10:04:19  24           Remember, we don't need your name or your signature

10:04:21  25  or your jury number, just the anonymous question.

10:04:28  1           (Pause.)

10:05:52  2                COURTROOM ADMINISTRATOR:  Judge, we have three

10:05:54  3    questions, and we start at No. 87.

10:05:55  4                THE COURT:  Thank you.  Counsel, please join me at

10:05:58  5    sidebar.

10:06:09  6           (Whereupon, the following proceedings were had at sidebar:)

10:06:31  7                THE COURT:  We have three jury notes.  Jury Note 87

10:06:35  8    asks, "Was all properties ceased" -- I think they mean seized --

10:06:40  9    "ceased returned back?"

10:06:42  10               Any objection from the government, Mr. Zytnick?

10:06:44  11               MR. ZYTNICK:  No.

10:06:45  12               THE COURT:  Any objection, Mr. Tomsheck?

10:06:47  13               MR. TOMSHECK:  No, Your Honor.

10:06:47  14               THE COURT:  Mr. Brown?

10:06:49  15               MR. BROWN:  No, Your Honor.

10:06:49  16               THE COURT:  Mr. Gaffney?

10:06:50  17               MR. GAFFNEY:  No, Your Honor.

10:06:51  18               THE COURT:  Mr. Green?

10:06:52  19               MR. GREEN:  No objection, ma'am.

10:06:54  20               THE COURT:  Okay.  Jury Note 88 has two questions.

10:06:56  21    The first one is, "Wasn't it U.S. Postal Service's policy for its

10:07:00  22    inspectors that interviews of persons pursuant to searches were

10:07:04  23    not to be recorded?"

10:07:06  24               Any objection from the government, Mr. Zytnick?

10:07:09  25               MR. ZYTNICK:  No, Your Honor.

```
10:07:09   1              THE COURT:  Mr. Tomsheck?

10:07:11   2              MR. TOMSHECK:  No, Your Honor.

10:07:11   3              THE COURT:  Mr. Brown?

10:07:12   4              MR. BROWN:  No, Your Honor.

10:07:13   5              THE COURT:  Mr. Gaffney?

10:07:15   6              MR. GAFFNEY:  No, Your Honor.

10:07:16   7              THE COURT:  Mr. Green?

10:07:17   8              MR. GREEN:  No objection, ma'am.

10:07:18   9              THE COURT:  Second question of Jury Note 20 -- 88

10:07:20  10   asks, Or was the execution of searches guided by the discretion

10:07:22  11   of agents as the -- as to whether they should record or simply

10:07:26  12   take notes of an interview?

10:07:29  13              Any objection from the government, Mr. Zytnick?

10:07:31  14              MR. ZYTNICK:  No, Your Honor.

10:07:31  15              THE COURT:  Mr. Tomsheck?

10:07:33  16              MR. TOMSHECK:  No, Your Honor.

10:07:34  17              THE COURT:  Mr. Brown?

10:07:35  18              MR. BROWN:  No, Your Honor.

10:07:35  19              THE COURT:  Mr. Gaffney?

10:07:37  20              MR. GAFFNEY:  No, Your Honor.

10:07:39  21              THE COURT:  Mr. Green?

10:07:40  22              MR. GREEN:  No objection, ma'am.

10:07:41  23              THE COURT:  Jury Note 89 asks one question:  "At the

10:07:41  24   time of the search, did you discover anything that was related to

10:07:43  25   the mail sweepstakes notifications?"
```

10:07:47  1          Any objection, Mr. Zytnick?

10:07:50  2          **MR. ZYTNICK:**  No, Your Honor.

10:07:50  3          **THE COURT:**  Mr. Tomsheck?

10:07:51  4          **MR. TOMSHECK:**  No.

10:07:51  5          **THE COURT:**  Mr. Brown?

10:07:54  6          **MR. BROWN:**  No.

10:07:54  7          **THE COURT:**  Mr. Green?

10:07:58  8          **MR. GREEN:**  No objection, Your Honor.

10:07:59  9          **THE COURT:**  Thank you, Counsel.

10:08:01 10      *(End of sidebar discussion.)*

10:08:18 11          **THE COURT:**  All right.  Mr. Hallisey, I do have some

10:08:22 12  jury questions here for you.  I'm going to read them into the

10:08:24 13  record because they are anonymous questions, but when you

10:08:28 14  respond, please turn and face the jury because these are the jury

10:08:31 15  questions, not mine.

10:08:32 16          **THE WITNESS:**  Will do.

10:08:34 17          **THE COURT:**  So Jury Note No. 87 asks, "Was all

10:08:36 18  properties seized returned back?"

10:08:39 19          **THE WITNESS:**  Returned back to whom?

10:08:44 20          **THE COURT:**  Returned back to --

10:08:48 21          **THE WITNESS:**  To the party from which it was seized?

10:08:50 22          **THE COURT:**  Yes.

10:08:52 23          **THE WITNESS:**  Not to my knowledge.  I don't know.  I

10:08:54 24  was only responsible for executing the search warrants,

10:08:58 25  supervising the seizing of evidence, and then it was turned over

10:09:01  1  to the case agents.  So what happened with it at that point, I

10:09:04  2  don't have any information on that.

10:09:06  3          THE COURT:  All right.  Juror Note 88 has two

10:09:10  4  questions.  The first one is, Was it the U.S. Postal Service's

10:09:14  5  policy for its inspectors that interviews of people, persons,

10:09:18  6  pursuant to searches were not to be recorded?

10:09:20  7          THE WITNESS:  For the Postal Inspection Service,

10:09:25  8  there is no policy that dictates whether or not we'll videotape

10:09:30  9  an interview at a search warrant site.  No.

10:09:33  10         THE COURT:  And then the second question in Juror

10:09:36  11  Note 88 asks, "Or was the execution of searches guided by the

10:09:39  12  discretion of agents as to whether they should record or simply

10:09:43  13  take notes of an interview?"

10:09:45  14         THE WITNESS:  So generally, the way that it works

10:09:48  15  with a search warrant, it is up to the inspectors that are

10:09:52  16  conducting that search.  In this case, in order to stay

10:09:55  17  consistent, since there were multiple sites, that decision was

10:09:58  18  made ahead of time.  And it's the norm during a search warrant in

10:10:04  19  a residence that you're not going to record that interview.

10:10:08  20         Generally, a recorded interview would be when

10:10:11  21  somebody is under arrest, taken back to a police station or to

10:10:15  22  our offices for an interview is the way that that works.

10:10:19  23         THE COURT:  All right.  And then Juror Note No. 89

10:10:24  24  asks one question:  At the time of the search, did you discover

10:10:27  25  anything that was related to the mail sweepstakes notifications?

```
10:10:33   1              THE WITNESS:  The only thing I could answer on that
10:10:35   2    is that we seized business records that were authorized to be
10:10:38   3    seized during the search warrant.  We didn't conduct a thorough
10:10:42   4    evaluation of those documents to -- as the case agent would once
10:10:47   5    they got them back to their office and they really poured through
10:10:50   6    them.  The only thing I can say is that the items that we seized
10:10:53   7    were authorized to be seized on the search warrant itself.
10:10:57   8              THE COURT:  All right.  Mr. Zytnick, any follow-up?
10:11:00   9              MR. ZYTNICK:  No, Your Honor.
10:11:01  10              THE COURT:  Mr. Tomsheck?
10:11:02  11              MR. TOMSHECK:  No, Your Honor.  Thank you.
10:11:03  12              THE COURT:  Mr. Gaffney?
10:11:06  13              MR. GAFFNEY:  No, Your Honor.
10:11:06  14              THE COURT:  Mr. Brown?
10:11:07  15              MR. BROWN:  No.  Thank you, Judge.
10:11:09  16              THE COURT:  Mr. Green?
10:11:10  17              MR. GREEN:  No follow-up.  Thank you, Your Honor.
10:11:12  18              THE COURT:  All right.
10:11:13  19              Special Agent Hallisey, thank you for coming in.  You
10:11:16  20    are excused.  Please be careful on your way down with the steps.
10:11:21  21              The government may call its next witness, and then
10:11:22  22    we'll take a bathroom break at about 10:30.
10:11:24  23              MR. ZYTNICK:  The government calls Vicki Morgan.
10:12:04  24              THE COURT:  Good morning, Ms. Morgan.  Come on up.
10:12:07  25    You're going to be seated right here to my left, but please be
```

10:12:10  1  careful with the steps up.

10:12:19  2          COURTROOM ADMINISTRATOR:  Do you solemnly swear the

10:12:19  3  testimony you're about to give in the cause now pending before

10:12:22  4  this court will be the truth, the whole truth, and nothing but

10:12:24  5  the truth, so help you God?

10:12:26  6          THE WITNESS:  I do.

10:12:27  7          COURTROOM ADMINISTRATOR:  Thank you.  Please take a

10:12:29  8  seat, and for the record please state and spell your name.

10:12:31  9          THE WITNESS:  Vicki Morgan, M-O-R-G-A-N.

10:12:34 10          COURTROOM ADMINISTRATOR:  Thank you.

10:12:34 11                          VICKI MORGAN,

10:12:34 12  called as a witness, after having been first duly sworn to tell

10:12:34 13  the truth, the whole truth, and nothing but the truth, was

10:12:35 14  examined and testified as follows:

10:12:35 15                      DIRECT EXAMINATION

10:12:36 16  BY MR. ZYTNICK:

10:12:36 17  Q.    Good morning.

10:12:37 18          Can you please tell the jury what kind of work you

10:12:39 19  do.

10:12:39 20  A.    I am a federal agent.  I have been employed as a federal

10:12:43 21  agent -- it will be 21 years on April 6th, this week.  I spent my

10:12:49 22  first 13 years as a postal inspector.  I left the Postal

10:12:55 23  Inspection Service in early 2015, became a special agent with the

10:13:01 24  Food and Drug Administration, worked there for about five years,

10:13:06 25  and then I've been with the Treasury Inspector General for Tax

10:13:13  1    Inspection -- kind of a long title -- or TIGTA for short, since

10:13:17  2    August of 2019.

10:13:18  3    Q.    Are you based here in Las Vegas?

10:13:19  4    A.    I am.

10:13:20  5    Q.    When you were working as a postal inspector, were you based

10:13:24  6    here in Las Vegas?

10:13:25  7    A.    I was.  The first five years of my career, I spent in Los

10:13:30  8    Angeles area.  But I moved back here to Vegas, which I consider

10:13:34  9    home, in 2006.

10:13:37  10   Q.    When you were working as a postal inspector here in Las

10:13:44  11   Vegas, what was your primary area of responsibility?

10:13:45  12   A.    For the majority of the time, I worked what we considered

10:13:48  13   mail fraud, which were bigger, more complex fraud schemes that

10:13:53  14   used the mail at some point in time to further the scheme.

10:13:58  15   Q.    And, so as a postal inspector investigating mail fraud,

10:14:01  16   were you involved in investigations into fraudulent prize

10:14:06  17   notifications?

10:14:07  18   A.    Yes, I was.

10:14:08  19   Q.    Around what period of time, roughly, were you involved in

10:14:09  20   investigations like that?

10:14:10  21   A.    It kind of really ramped up -- I'm not exactly sure because

10:14:15  22   it's been a really long time, but I -- I think probably, like,

10:14:19  23   really started like 2008 or 2009 time period up until the time I

10:14:24  24   left in 2015.

10:14:26  25   Q.    Was there a way that you sometimes resolved fraudulent

10:14:31  1   prize notice investigations without criminal charges?

10:14:34  2   A.    Yes.  We would initiate -- we would find out the

10:14:39  3   information for their commercial mail receiving agency, or CMRA,

10:14:44  4   or P.O. Box --

10:14:45  5   Q.    Let me stop you there.  We'll get to that, but let's go

10:14:45  6   through it a little slower --

10:14:45  7   A.    All right.

10:14:49  8   Q.    -- so we make sure we're covering the right points here.

10:14:52  9   A.    All right.  I would generate a cease and desist order and

10:14:55 10   have that signed.  It was basically like a slap on the wrist kind

10:14:59 11   of warning to whoever was running the box for that note -- prize

10:15:04 12   notification.

10:15:05 13   Q.    All right.  So you mentioned a cease and desist.

10:15:08 14         And what is a cease and desist order, just --

10:15:11 15   A.    It's -- we considered it a civil action versus a criminal

10:15:15 16   action.  So it was a legal document that was filed in a court,

10:15:22 17   but it was basically just explaining to the individual that it

10:15:26 18   was addressed to, what you're doing is illegal.  You could be

10:15:30 19   arrested for it.  We're not going to arrest you now, but if you

10:15:34 20   continue the same type of behavior, you could be arrested in the

10:15:38 21   future.

10:15:38 22   Q.    So why give someone a cease and desist versus, you know, a

10:15:44 23   criminal charge?

10:15:45 24   A.    At this time, I was the only postal inspector working mail

10:15:49 25   fraud.  I was also on the FBI's mortgage fraud task force at this

10:15:54  1  time, and so most of the more complex criminal work I was doing

10:15:58  2  was on mortgage fraud investigations.  But I was only one person,

10:16:02  3  and I didn't have time to start getting grand jury subpoenas

10:16:08  4  and -- and doing all the legwork involved with doing a full-blown

10:16:12  5  criminal investigation on these guys.

10:16:15  6          Plus, there was just so many of them going on at this

10:16:19  7  time in Las Vegas.  It was -- it had been running rampant, out of

10:16:24  8  control, but I felt like at least with doing the cease and desist

10:16:29  9  order, I stopped that particular crime.  And I was actually able

10:16:33  10  to return all the mail to sender.

10:16:35  11          So I really felt like even though in nine times out

10:16:40  12  of ten, the individual that opened up the box would be, like, a

10:16:43  13  runner or something like that, I was able to return all the money

10:16:47  14  to the victims.  So I felt like, you know, whoever the big

10:16:52  15  mastermind was behind all of this, I was at least hitting them

10:16:55  16  where it counted and -- in the financial aspect of it.

10:16:58  17  Q.    So when you were doing the cease and desist, did you

10:17:01  18  sometimes get the impression that the people you were giving the

10:17:05  19  cease and desist to were not -- I think you used the word the

10:17:06  20  "mastermind" or something like that?

10:17:08  21  A.    Yes.  You know, it was kind of general working knowledge.

10:17:11  22  You know, we knew who some of the bigger players were on these

10:17:16  23  schemes.  And I would try to talk to the individuals, you know,

10:17:20  24  when I give the cease and desist order, but in most cases, they

10:17:23  25  were too scared to tell me who had instructed them to open the

10:17:28  1  box.

10:17:28  2  Q.    When you talked to those individuals who you were giving

10:17:31  3  cease and desist to -- well, let me step back.

10:17:34  4              How did you find those individuals?

10:17:36  5  A.    We would get the application, either the P.O. box

10:17:40  6  application or the CMRA application, which is the PS Form 1583 --

10:17:45  7  after 13 years, I can still remember all the numbers of all the

10:17:48  8  forms.

10:17:49  9  Q.    So that's the application someone fills out when they're

10:17:51  10  renting a mailbox at Mail Boxes Etc or, or something like that?

10:17:54  11  A.    Yes.

10:17:55  12  Q.    And what would you do with that -- the information from

10:17:57  13  that application?

10:17:58  14  A.    I would get the name and the identification from that

10:18:01  15  application.  I would just do a quick little brief, you know,

10:18:04  16  criminal history, make sure they're -- you know, don't have an

10:18:08  17  outstanding warrant for their arrest, make sure they're not a

10:18:11  18  violent person.  And then we'd go out, you know, try to find, you

10:18:16  19  know, home address or -- or some kind of address to go and talk

10:18:20  20  to them, and we would go and knock on their door and talk to

10:18:23  21  them.

10:18:23  22  Q.    And what would you say when you talked to these people?

10:18:26  23  A.    I would give the spiel about, you know, what they were

10:18:28  24  doing was illegal and that they need to stop doing it and, you

10:18:32  25  know, and to explain all -- in great detail, everything that was

10:18:37  1  on the cease and desist paperwork that they were signing and make

10:18:42  2  sure that they understood it when they signed it.

10:18:44  3  Q.    So to do one of these cease and desist orders, this whole

10:18:49  4  process, about how long would that take you for just one?

10:18:52  5  A.    It would be a few hours per -- I would have to open up what

10:18:55  6  we considered a case or an investigation for every single one of

10:18:58  7  those.  And I'd probably spend, you know, a few hours max, you

10:19:04  8  know, maybe ten hours total, you know, from start to finish with

10:19:08  9  all of the paperwork involved.

10:19:09  10  Q.    So that's for a cease and desist investigation?

10:19:12  11  A.    Yes.

10:19:12  12  Q.    Now if you're doing a full criminal mail fraud

10:19:16  13  investigation, how long would that take you?

10:19:17  14  A.    Years and many, many hours of many, many months of many,

10:19:20  15  many years.

10:19:21  16  Q.    So in a criminal -- in a mail fraud investigation, a full

10:19:26  17  investigation, would you do things like subpoena bank records?

10:19:29  18  A.    Yes.

10:19:29  19  Q.    What would you -- conduct search warrants?

10:19:32  20  A.    Yes.

10:19:32  21  Q.    Do witness interviews?

10:19:33  22  A.    Yes.  All of those things.

10:19:35  23  Q.    Now, in contrast, for a cease and desist, would you

10:19:38  24  subpoena bank records?

10:19:39  25  A.    Right -- no.  No, I would not subpoena bank records for a

10:19:43   1   cease and desist.

10:19:44   2   Q.    And what about -- would you be conducting search warrants

10:19:47   3   for a cease and desist?

10:19:47   4   A.    No.

10:19:48   5   Q.    Would you interview witnesses for a cease and desist?

10:19:48   6   A.    I would try to interview the individual that I was having

10:19:52   7   sign the cease and desist, but in most cases, they wouldn't talk

10:19:56   8   to me.

10:19:57   9   Q.    And the reason that you were not doing the full mail fraud

10:20:04  10   investigations, was it because these people weren't committing a

10:20:08  11   crime?

10:20:08  12   A.    No.  It definitely was not because they were not committing

10:20:11  13   a crime.  But like I said, I didn't have time to do a full-blown

10:20:15  14   investigation, and at least I felt like I was doing some kind of

10:20:19  15   an impact, you know, to whoever was behind all of this because I

10:20:23  16   was able to return all of the mail -- they had to pay to print up

10:20:28  17   all the prize notifications and pay the post office the postage

10:20:32  18   to mail out all those prize notifications -- and the post office

10:20:36  19   was really, really broke.  I'm sure they still are.

10:20:39  20           So -- but yet, they didn't get to reap the benefits

10:20:44  21   by cashing all the checks that were sent in.

10:20:46  22   Q.    So if -- I think you said you were the only postal

10:20:49  23   investigator investigating mail fraud in the Vegas area?

10:20:52  24   A.    Yes.  It was myself and Bob Hernandez who was a retired

10:20:56  25   inspector, and he was kind of like my partner.  We did almost

10:20:59  1  everything together, but he wasn't considered an agent.  He -- he

10:21:04  2  helped me with a lot of things.

10:21:06  3  Q.    So he was like an analyst.  He wasn't actually a law

10:21:08  4  enforcement officer at that time?

10:21:10  5  A.    Right.

10:21:11  6  Q.    Okay.  You mentioned earlier, I think, at the beginning,

10:21:15  7  you referred to the cease and desist sort of like a slap on the

10:21:18  8  wrist?

10:21:18  9  A.    Yes.

10:21:18  10  Q.    Is that -- are those the words you used?

10:21:20  11  A.    That's an easy way to describe it.  You know, it's stated

10:21:27  12  in the cease and desist paperwork that the individual would not

10:21:29  13  be charged by the Postal Inspection Service.  I had no control

10:21:35  14  over what other law enforcement agencies would do, but -- for

10:21:39  15  that particular crime at that time, but it spelled out in very

10:21:42  16  plain wording.  And like I said, I would explain it, as well.  If

10:21:45  17  they continued to do that particular type of scheme, then they

10:21:50  18  could be prosecuted.  And then I probably would come back and

10:21:55  19  prosecute them at some point.

10:21:57  20  Q.    My question is, why call it a slap on the wrist?  What does

10:22:01  21  that mean to you?

10:22:01  22  A.    They weren't going to prison at that point.  I wasn't going

10:22:05  23  to file criminal charges on them at that point.

10:22:07  24  Q.    If you had evidence that someone had committed mail fraud,

10:22:18  25  were you required to give them a cease and desist before charging

10:22:20  1   them with a crime?

10:22:21  2   A.     No.  The majority of my casework that I did, I did not do

10:22:26  3   cease and desist orders for those types of investigations.

10:22:29  4   Q.     So when you had evidence of a crime, you were allowed to

10:22:32  5   charge that, even if a person hadn't previously gotten a cease

10:22:36  6   and desist --

10:22:36  7          *(Whereupon, the reporter interrupts to preserve the*

10:22:37  8          *record.)*

10:22:37  9   **BY MR. ZYTNICK:**

10:22:37  10  Q.     My question was, if you had evidence of a crime, were you

10:22:41  11  allowed to charge someone with a crime like mail fraud?

10:22:43  12  A.     Yes.

10:22:45  13  Q.     Even if you hadn't previously given them a cease and

10:22:48  14  desist?

10:22:48  15  A.     Yes.  But majority of my cases, I would not do cease and

10:22:51  16  desist on.  The majority of my cases, I would do the work, you

10:22:58  17  know, get all of the subpoenaed bank records, do search warrants,

10:23:00  18  do surveillance, you know, all of the law enforcement

10:23:02  19  investigative techniques in order to identify all of the

10:23:06  20  individuals involved with the scheme and bring them to charges.

10:23:10  21  Q.     All right.

10:23:12  22         **MR. ZYTNICK:**  Let's pull up Exhibit 123, which has

10:23:14  23  been previously admitted.  All right.  If we can go to page 2.

10:23:36  24  **BY MR. ZYTNICK:**

10:23:36  25  Q.     Can you please tell the jury what we're looking at on

10:23:39  1   Exhibit --

10:23:40  2   A.    This would be one of the cease and desist orders.  I'm

10:23:43  3   pretty sure this is one of the ones -- one of the many that I did

10:23:46  4   during this time period.  I went and spoke with Adrian Flores,

10:23:51  5   his particular CMRA box was at 2510 East Sunset Road, Unit 5-176.

10:23:59  6   Usually, the Unit 5 was the suite number for the, you know, UPS

10:24:05  7   store or whatever type of CMRA that was, and then 176 would be

10:24:10  8   the actual mailbox at that location.

10:24:13  9            MR. ZYTNICK:  All right.  If we go -- sorry.  Go to

10:24:15  10  page 6.

10:24:16  11  BY MR. ZYTNICK:

10:24:22  12  Q.    Is -- is this document -- well, did Adrian Flores sign this

10:24:28  13  cease and desist agreement?

10:24:29  14  A.    Yes, he did, in my presence.  Vicki Leonard is my married

10:24:33  15  name.  I've been divorced since 2014.

10:24:35  16  Q.    So did you sign this as a witness to him signing it?

10:24:39  17  A.    Yes, I did.

10:24:40  18  Q.    After a person signs a cease and desist agreement, what

10:24:48  19  happens next to finalize the process?

10:24:51  20  A.    I would have them sign several copies, and I would send

10:24:56  21  those off to the inspector attorney.  In this case, it was

10:25:02  22  Terrence McKeown, and he would file that in court.  And then a

10:25:07  23  stamped copy showing that it had been filed would then be

10:25:09  24  returned to me, and I would include it in the documents for the

10:25:15  25  case that I initiated on this investigation.  And I believe a

| | | |
|---|---|---|
| 10:25:20 | 1 | copy was also mailed to the individual that signed it. |
| 10:25:24 | 2 | Q.    Okay.  And you said "court." |
| 10:25:27 | 3 | Are you referring to, like, a postal service |
| 10:25:30 | 4 | administrative court? |
| 10:25:31 | 5 | A.    I think that's what it was.  My memory on that's a little |
| 10:25:32 | 6 | hazy because it's been quite a while, but I think that's what |
| 10:25:35 | 7 | type of a court it was. |
| 10:25:37 | 8 | MR. ZYTNICK:  All right.  Can we go to Exhibit 124, |
| 10:25:40 | 9 | page 7. |
| 10:25:40 | 10 | **BY MR. ZYTNICK:** |
| 10:25:42 | 11 | Q.    What is the name of the individual who this cease and |
| 10:25:50 | 12 | desist is against? |
| 10:25:51 | 13 | A.    Edgar Del Rio. |
| 10:25:54 | 14 | Q.    Is this the same type of cease and desist agreement that we |
| 10:25:57 | 15 | were looking at with Adrian Flores? |
| 10:25:58 | 16 | A.    Yes.  I believe, for the most part, all the verbiage is the |
| 10:26:02 | 17 | same on all of them. |
| 10:26:04 | 18 | Q.    And going down to page 12 of this document, can you look at |
| 10:26:07 | 19 | that and tell us if you are on this cease and desist? |
| 10:26:12 | 20 | A.    Yes, I was. |
| 10:26:13 | 21 | Q.    And so you would have delivered the message that you talked |
| 10:26:16 | 22 | about? |
| 10:26:16 | 23 | A.    Yes, yes. |
| 10:26:18 | 24 | MR. ZYTNICK:  All right.  Can we go to Exhibit 125. |
| 10:26:18 | 25 | **BY MR. ZYTNICK:** |

10:26:27  1   Q.    Now, this is a -- a complaint part of a cease and desist?

10:26:32  2   A.    I'm sorry?

10:26:33  3   Q.    This is the complaint part of a cease and desist; is that

10:26:36  4   correct?

10:26:36  5   A.    Yes.

10:26:36  6   Q.    And what is the name of the individual that this cease and

10:26:40  7   desist is against?

10:26:40  8   A.    Michael Keith Kern.

10:26:42  9   Q.    And if we go down to the very last page of this document --

10:26:46  10  I guess it would be 27 -- did Michael Keith Kern sign this cease

10:26:54  11  and desist agreement?

10:26:55  12  A.    Yes, he did.

10:26:56  13  Q.    And who was the postal inspector who witnessed that?

10:26:59  14  A.    It was me again.

10:27:01  15  Q.    Now, at the time you were doing this cease and desist

10:27:05  16  investigation -- or cease and desist paperwork with Mr. Kern, did

10:27:08  17  you know that his wife, Patti Kern, had signed a cease and desist

10:27:12  18  several years earlier?

10:27:13  19  A.    To the best of my recollection, I was unaware of that at

10:27:16  20  this time.

10:27:17  21  Q.    Had you handled that cease and desist involving Patti Kern

10:27:22  22  several years earlier?

10:27:23  23  A.    I did not, I don't believe.

10:27:24  24  Q.    Let's look at Exhibit 128, page 8.

10:27:33  25        What is the name of the -- well, I'll just say it.

10:27:38  1          This cease and desist appears to be against someone

10:27:40  2   whose first name is Sixto, S-I-X-T-O; is that correct?

10:27:44  3   A.    That's correct.

10:27:45  4   Q.    And on page 12, can you tell us -- once we get to that

10:27:49  5   page, can you tell us which postal inspector witnessed the

10:27:52  6   signing of that cease and desist agreement?

10:27:55  7   A.    That was myself.

10:27:56  8   Q.    So we've seen now four cease and desists that you

10:28:03  9   personally signed.

10:28:04  10         Can we look at a few more?

10:28:06  11  A.    Sure.

10:28:06  12  Q.    Exhibit 122, page 8.

10:28:15  13         So this is a cease and desist involving Richard

10:28:17  14  Knowles; is that correct?

10:28:18  15  A.    Yes, it is.

10:28:18  16  Q.    And can you tell who signed the cease and desist for the

10:28:18  17  Postal Inspection Service?

10:28:24  18  A.    Bob Hernandez.  His first full name is Roberto, but I

10:28:28  19  worked with him for many years.  I recognize his signature.

10:28:30  20  Q.    Okay.  And what about Exhibit 126?  And unfortunately, I

10:28:43  21  don't know the page number on the top where the signature is, but

10:28:47  22  if I represent to you that this one was signed by someone named

10:28:47  23  Robert Bridgeman, do you know who Robert Bridgeman is?

10:28:51  24  A.    Yes.  He was a postal inspector that I worked with.  He

10:28:56  25  works as a special agent for Postal OIG now, but I know about the

10:29:00    1  time of this, August 2012, he was probably a brand new inspector.

10:29:04    2  And when they get out of basic training, new inspectors have to

10:29:09    3  go through post-basic training, and they have a full checklist of

10:29:13    4  all the things that they need to do on the various different

10:29:18    5  aspects of -- of investigations.

10:29:21    6          I was on the mail fraud team, but there's also

10:29:23    7  narcotics team and -- and mail theft teams and things like that.

10:29:28    8  So they had a checklist where they had to work a little bit of

10:29:31    9  assignments from every type of investigation.  So I think, based

10:29:36   10  on the timing of this, he was probably doing his post-basic

10:29:40   11  assignments during this time.

10:29:41   12  Q.    All right.  And if we go to Exhibit 130, then we do see --

10:29:50   13  this is -- back in 126, we're seeing that that is Robert

10:29:53   14  Bridgeman; is that correct?

10:29:54   15  A.    Yes.

10:29:54   16  Q.    Okay.  If we go to Exhibit 130, is this another cease and

10:30:00   17  desist, this one involving someone with the last name Torres?

10:30:04   18  A.    Yes.

10:30:04   19  Q.    All right.  And again, I don't actually have the page

10:30:08   20  number where the signature is, but if I represent to you that the

10:30:12   21  postal inspector who signed this one is named Shari Delaney, do

10:30:16   22  you know who that is?

10:30:17   23  A.    Yes.  So we were actually teammates together during my time

10:30:20   24  when I worked in Los Angeles.  So I do recognize her handwriting,

10:30:24   25  as well.  But she's a postal inspector that was working fraud in

10:30:29  1   the Southern California area.

10:30:30  2   Q.    Okay.  So she was in California, not in Las Vegas?

10:30:33  3   A.    Correct.

10:30:33  4   Q.    And there -- Ms. Rush is very helpful in finding the page

10:30:39  5   numbers even when I don't know them.

10:30:41  6              So there you can see that the signature is Shari

10:30:41  7   Delaney.

10:30:48  8              So when you delivered these -- these -- when you had

10:30:51  9   these cease and desist agreements being signed, I think you saw

10:30:55  10  four that you definitely were on and several others that might

10:30:59  11  have been postal inspectors that you were working with.

10:31:01  12             Did you give those people your standard spiel about,

10:31:03  13  you know, warning them they could be prosecuted?

10:31:05  14  A.    Yes.  Definitely.

10:31:05  15       *(Noise.)*

10:31:12  16             **THE COURT:**  Yeah.  I think we're going to try to

10:31:13  17  close that door.

10:31:20  18  **BY MR. ZYTNICK:**

10:31:20  19  Q.    For the cease and desists that you personally

10:31:24  20  handled -- and this is just a yes or no question.

10:31:25  21             At the time the cease and desists were issued, did

10:31:29  22  you have suspicions that other people were behind the mailing

10:31:32  23  schemes?

10:31:32  24  A.    Yes.

10:31:33  25  Q.    Were you aware that sometimes people involved in mail

10:31:36  1    schemes hide behind straw owners?

10:31:39  2    A.    Yes, I did.

10:31:39  3    Q.    At that time, did you have direct, hard evidence of who was

10:31:42  4    behind the fraudulent mailings?

10:31:43  5    A.    No, I did not.

10:31:45  6    Q.    At that time, did you have enough time or resources to

10:31:49  7    conduct full criminal investigations to find out who was behind

10:31:52  8    those fraudulent mailings?

10:31:53  9    A.    No, I did not.

10:31:54  10   Q.    At the time that you did those cease and desists, did you

10:31:58  11   have any direct, hard evidence that any members of the Castro

10:32:01  12   family were behind those fraudulent mailings?

10:32:04  13   A.    No, I did not.

10:32:05  14   Q.    So let's talk about one more issue.

10:32:17  15         Working as a postal inspector in Las Vegas, did you

10:32:20  16   ever participate in an investigation of someone named Glen Burke?

10:32:24  17   A.    Yes, I did.

10:32:24  18   Q.    Were you familiar with a mailing business that Burke was

10:32:31  19   involved in?

10:32:32  20   A.    Yes.

10:32:32  21   Q.    What kind of business was Burke doing?

10:32:34  22   A.    He was also doing prize notification schemes.

10:32:37  23   Q.    Around January 2013, were you involved in an action by the

10:32:44  24   Federal Trade Commission related to Glen Burke?

10:32:47  25   A.    Yes, I was.

10:32:47  1   Q.    So the Federal Trade Commission, that's an agency that

10:32:50  2   fights fraud?

10:32:51  3   A.    Yes.  They're not law enforcement agents, but they -- they

10:32:55  4   handle things on the civil side.

10:32:58  5   Q.    And the Federal Trade Commission, that's often called the

10:33:02  6   FTC for short?

10:33:02  7   A.    Yes, it is.

10:33:03  8   Q.    What was your involvement in this FTC action regarding Glen

10:33:08  9   Burke?

10:33:08  10  A.    I had assisted them at different parts of their

10:33:12  11  investigation into Glen Burke, but during their actual -- and I

10:33:17  12  would deem it a search warrant on the civil side of things.  I

10:33:21  13  think it was more of a seizure of assets is kind of -- I'm

10:33:26  14  not -- I'm not a lawyer, so -- but I think that's kind of the

10:33:31  15  terminology they used.  But they did need members of law

10:33:34  16  enforcement to be present when they executed their orders, so I

10:33:38  17  was there assisting them in that capacity.

10:33:42  18  Q.    Was the effect of the FTC's action, was that to shut down

10:33:46  19  Glen Burke's operation?

10:33:47  20  A.    Yes, it was.

10:33:48  21  Q.    And you were -- you said you were there.

10:33:50  22        Were you helping out with FTC shutting down Burke's

10:33:55  23  operation?

10:33:55  24  A.    Yes.

10:33:55  25  Q.    After you helped shut down Burke's operation in

10:33:58  1    January 2013, did you then visit another place in Las Vegas?

10:34:02  2    A.    I have a very hazy recollection because it was a good ten

10:34:08  3    years ago, but yes.  I do believe we went to a -- kind of more of

10:34:15  4    a warehouse location that was operated by the Castro brothers.

10:34:18  5    Q.    And why did you go to that warehouse that you believe was

10:34:21  6    operated by the Castro brothers?

10:34:23  7    A.    It was at the request of the FTC.  And I believe they were

10:34:26  8    with me at -- at that time, but they wanted to talk to them.  I

10:34:29  9    don't think they had anything -- they weren't seizing anything of

10:34:34  10   the Castro brothers, but they knew --

10:34:39  11            MR. GAFFNEY:  Your Honor, I'm going to --

10:34:40  12            THE COURT:  Yes.

10:34:41  13            MR. GAFFNEY:  -- I'm going to object.  I think she

10:34:42  14   needs to be specific about which Castro brother she's talking

10:34:44  15   about.

10:34:44  16            THE COURT:  I agree.  There's four different

10:34:46  17   defendants here.

10:34:49  18            MR. ZYTNICK:  Your Honor, can I address that point

10:34:51  19   quickly?

10:34:52  20            THE COURT:  Yeah.  Maybe if you just redirect the

10:34:54  21   question so it's easier for her to --

10:34:56  22            MR. ZYTNICK:  I think the issue is that she doesn't

10:34:58  23   -- I mean, I think her testimony is she doesn't have a specific

10:35:02  24   memory.  There is other evidence --

10:35:02  25            (Whereupon, the reporter interrupts to preserve the

10:35:03  1        record.)

10:35:03  2             MR. ZYTNICK:  I think there's other evidence in the

10:35:05  3    record from which the jury can make a determination as to which

10:35:09  4    individuals, you know, were behind that printing operation.

10:35:14  5    But -- and I think she's just testifying to the best of her

10:35:18  6    recollection about something from a decade ago.

10:35:20  7             THE WITNESS:  I don't remember, specifically.

10:35:21  8             THE COURT:  Right.  If she's going to refer to people

10:35:24  9    specifically, then if she doesn't remember, she can say, I don't

10:35:26 10    remember which one.  But if she does remember which one, then she

10:35:29 11    needs to specify.

10:35:30 12             MR. ZYTNICK:  Okay.

10:35:31 13             THE COURT:  Yeah.

10:35:32 14    BY MR. ZYTNICK:

10:35:33 15    Q.    So, do you have a --

10:35:35 16             MR. GAFFNEY:  Your Honor, I'm going to object.  If

10:35:36 17    she doesn't have direct knowledge of which Castro brother she's

10:35:38 18    talking about, then she can't testify as to what printing or

10:35:43 19    warehouse shop she went to.  We've heard testimony that Epi

10:35:48 20    Castro owned one.  We heard testimony that other Castro brothers

10:35:52 21    owned them, so we need to know specifically about which Castro

10:35:54 22    brother she's talking about.

10:35:54 23             MR. ZYTNICK:  Your Honor, there will be testimony

10:35:57 24    from the next witness, I believe, that will tie this together and

10:35:58 25    help make clear which brothers --

10:36:00  1          THE COURT:  Well, if she can't identify which person,

10:36:02  2    she can identify which location, and then someone else can tie up

10:36:05  3    locations with people or something like that.  But she needs to

10:36:09  4    give some information so that we know what is the relevance of

10:36:13  5    her testimony.

10:36:14  6          MR. ZYTNICK:  I would say it is conditionally

10:36:15  7    relevant based on what we're going to find out from the next

10:36:19  8    witness.

10:36:20  9          THE COURT:  You need to help her to be a little more

10:36:22 10    specific --

10:36:22 11          MR. ZYTNICK:  Okay.

10:36:22 12          THE COURT:  -- and not so general.

10:36:25 13    BY MR. ZYTNICK:

10:36:25 14    Q.    Do you recall visiting a warehouse -- do you have a rough

10:36:30 15    sense of where that warehouse was?

10:36:34 16    A.    I believe it was a warehouse that was on Patrick Lane.  It

10:36:36 17    was definitely very close to the airport.  The main processing

10:36:41 18    plant here in Las Vegas is on Sunset Road.  You know, you can --

10:36:45 19    it's right across the street, right across Sunset from the

10:36:49 20    runways.  So I believe it was the location on Patrick.  It was in

10:36:53 21    close proximity to the main -- we called it the processing and

10:36:57 22    distribution center.

10:36:57 23    Q.    And do you remember specifically who you talked to ten

10:37:02 24    years ago?

10:37:02 25    A.    Unfortunately, I do not remember, specifically.  It's been

10:37:06  1  way too long.  I don't even know if I knew who it was at the

10:37:11  2  time.  I'm sure he introduced himself, but I kind of lumped them

10:37:15  3  together as the Castro brothers as part of my investigation.  I

10:37:19  4  didn't really differentiate.

10:37:21  5  Q.    If a client of a printer was shut down, all else being

10:37:29  6  equal, would that cause the printer to have less business?

10:37:32  7  A.    Yes.  Most definitely.

10:37:33  8  Q.    After Glen Burke got shut down in 2013, did the government

10:37:38  9  take any other action against him in around September of 2016?

10:37:40  10  A.    Yes.  He was indicted criminally.  This was after I left

10:37:45  11  being a postal inspector, but I was still called by the inspector

10:37:50  12  that was handling the investigation.  She told me about it, and

10:37:53  13  then I've since read -- read the entire criminal indictment.

10:37:57  14  Q.    Were those charges related partly to the same conduct that

10:38:00  15  you had investigated, the fraudulent prize notices?

10:38:03  16  A.    Yes.

10:38:06  17  Q.    In pursuing criminal charges, when you're making a decision

10:38:09  18  whether to do a cease and desist versus a full criminal

10:38:14  19  investigation, is one of the things that you considered how much

10:38:17  20  money was taken from victims?

10:38:18  21  A.    Yes.  Most definitely.

10:38:20  22          MR. ZYTNICK:  Nothing further, Your Honor.

10:38:22  23          THE COURT:  All right.  Any cross, Mr. Tomsheck?

10:38:26  24          MR. BROWN:  Break.

10:38:28  25          MR. TOMSHECK:  Want a break?

10:38:31  1          I think some of my colleagues might want a break.

10:38:33  2          **THE COURT:**  Oh, yes.  It's 10:30.  Let's go ahead and

10:38:37  3  take our first break in the morning.

10:38:39  4          So I do remind the jury during this break that you

10:38:41  5  are not to discuss this case with anyone or permit anyone to

10:38:44  6  discuss it with you.  If you do overhear anything touching upon

10:38:46  7  the case, remember that you are required to report that to the

10:38:50  8  Court immediately.

10:38:51  9          Please do not listen to or view anything that touches

10:38:53 10  upon this case in any way or perform any research or independent

10:39:00 11  investigation.  If you do go outside, make sure that you wear

10:39:02 12  your lanyard that identifies yourself as a juror.

10:39:04 13          And please do not form any opinion about this case

10:39:06 14  yet.  You still have more testimony to listen to, more evidence.

10:39:11 15  And I will provide you the written instructions, and after that,

10:39:14 16  you will hear closing arguments, and then I will release you to

10:39:18 17  begin your deliberation process.  At that point, then you can

10:39:21 18  start talking to each other about the case and forming opinions,

10:39:23 19  but not until then.

10:39:24 20          Let's please stand for the jury, as they are the

10:39:27 21  judge of the facts, and we'll welcome you back here at 11 a.m.

10:39:36 22          And to the witness, Ms. Morgan, if you'll wait until

10:39:39 23  the jury exits, then you can take your morning break, as well,

10:39:44 24  stretch, whatnot.  We just need you back here at 11 a.m.

10:39:44 25          And please remember, you are not to discuss this case

| | | |
|---|---|---|
| 10:39:46 | 1 | with anybody or your testimony.  You ask can them where's the |
| 10:39:50 | 2 | bathroom, where can I get something to drink, things like that, |
| 10:39:52 | 3 | logistics, but not about your testimony. |
| 10:39:54 | 4 | THE WITNESS:  Yes, Your Honor. |
| 10:39:32 | 5 | *(Whereupon, the jury leaves the courtroom at 10:39 a.m.)* |
| 10:39:32 | 6 | *(Whereupon, the following proceedings were had outside the* |
| 10:40:01 | 7 | *presence of the jury:)* |
| 10:40:01 | 8 | THE COURT:  All right.  Be off record. |
| 10:40:05 | 9 | *(A recess was taken from 10:40 a.m. to 11:03 a.m.)* |
| 11:03:23 | 10 | COURTROOM ADMINISTRATOR:  All rise. |
| 11:03:30 | 11 | THE COURT:  All right.  We got the jury back. |
| 11:03:34 | 12 | Do we have Ms. Morgan ready? |
| 11:03:54 | 13 | All right.  Come on in, Ms. Morgan, and we're going |
| 11:03:57 | 14 | to bring the jury in now, I think. |
| 11:04:04 | 15 | *(Whereupon, the jury reenters the courtroom at 11:04 a.m.)* |
| 11:04:04 | 16 | *(Whereupon, the following proceedings were had in the* |
| 11:04:36 | 17 | *presence of the jury:)* |
| 11:04:36 | 18 | THE COURT:  All right.  Everyone may be seated. |
| 11:04:39 | 19 | We're back on the record. |
| 11:04:40 | 20 | And for the jurors who were asking, yes, the candy is |
| 11:04:43 | 21 | back.  I apologize for that.  The new law clerk and one of the |
| 11:04:47 | 22 | other law clerks were changing out the decorations from St. |
| 11:04:51 | 23 | Patrick's Day to Easter, and so they were kind of, like, |
| 11:04:55 | 24 | reorganizing and such.  And they took your candy tray and thought |
| 11:04:58 | 25 | it was part of the decoration, which it's not.  So it's back. |

11:05:02  1   The candy is back.

11:05:04  2            All right.  So we're going to start with

11:05:06  3   cross-examination now of the witness, Ms. Vicki Morgan, by Mario

11:05:11  4   Castro's counsel, Mr. Tomsheck.

11:05:12  5            **MR. TOMSHECK:**  Thank you.

11:05:13  6                    **CROSS-EXAMINATION**

11:05:14  7   **BY MR. TOMSHECK:**

11:05:14  8   Q.    Good morning, Ms. Morgan.

11:05:15  9   A.    Good morning.

11:05:16  10  Q.    When you're done testifying, the candy's in that bowl right

11:05:19  11  there (indicating) if you're wondering what we're talking about.

11:05:21  12  You can grab some on your way out.

11:05:23  13            I just want some clarity about the way this process

11:05:26  14  works for you to get in here and testify.  Okay?

11:05:28  15  A.    Okay.

11:05:28  16  Q.    You didn't, like, raise your hand and say, Hey, government,

11:05:33  17  I want to be a witness in this trial against the Castro brothers,

11:05:36  18  right?

11:05:36  19  A.    Definitely, I did not.

11:05:38  20  Q.    All right.  You agree with me that you're not actually part

11:05:42  21  of this investigation as it relates to this case?

11:05:45  22  A.    For the most part not, but I -- I did kind of start on it,

11:05:50  23  you know, 10, 13 years ago.

11:05:54  24  Q.    Okay.  The government makes a decision to bring you in and

11:05:57  25  have you testify, right?

11:05:58   1    A.    Yes.

11:05:59   2    Q.    They issue you a subpoena, say, Show up and talk to us, and

11:06:02   3    then, Hey, we're going to have you testify on Monday morning,

11:06:05   4    right?

11:06:06   5    A.    Something to that effect.  Yes.

11:06:07   6    Q.    Okay.  And that's what happened in this case?

11:06:09   7    A.    Yes.

11:06:09   8    Q.    Okay.  You told us on direct examination that you've worked

11:06:15   9    in the service or the government in a number of different

11:06:18  10    capacities.

11:06:18  11          You've worn different hats during your career, right?

11:06:21  12    A.    Yes.

11:06:21  13    Q.    Okay.  We heard from a bunch of postal inspectors already,

11:06:25  14    but you kind of had that job as a postal inspector -- I think you

11:06:30  15    told us from 2009 to 2000 -- was it '14?

11:06:34  16    A.    I actually started as a postal inspector in April of 2002,

11:06:38  17    and I worked there -- I want to say it was like February or March

11:06:41  18    of 2015.

11:06:43  19    Q.    Okay.  So anything that happens in 2018, you're not a part

11:06:47  20    of as a postal inspector, right?

11:06:51  21    A.    No.

11:06:51  22    Q.    The jury's heard a lot of information about search warrants

11:06:54  23    being executed in February of 2018 in Las Vegas.

11:06:57  24          You're not part of that, right?

11:06:58  25    A.    No.

11:06:58   1   Q.    Jury's heard testimony about decisions to record or not to

11:07:01   2   record interviews of potential witnesses or suspects.

11:07:04   3         You're not part of that, either?

11:07:06   4   A.    No.

11:07:07   5   Q.    Okay.  You're not the case agent related to this case?

11:07:09   6   A.    No.

11:07:09   7   Q.    And you have no task assigned to this particular case.

11:07:13   8         You agree with that, right?

11:07:14   9   A.    Yes.  I mean, I was the original -- the originating case

11:07:19  10   agent on the Glen Burke investigation.

11:07:21  11   Q.    Okay.  And as you told us before, you have an understanding

11:07:26  12   that Glen Burke was someone who participated and was involved in

11:07:31  13   fraudulent sweepstakes mailings at some point in the past in the

11:07:36  14   Las Vegas Valley, right?

11:07:36  15   A.    Prize notifications.

11:07:38  16   Q.    Okay.

11:07:38  17   A.    Yes.

11:07:38  18   Q.    You'd agree with me that you also have knowledge, as you

11:07:41  19   sit here today, that he was eventually indicted, right?

11:07:43  20   A.    Yes.

11:07:44  21   Q.    Okay.  And you understand he's not part of this case.  He's

11:07:46  22   not charged in this indictment?

11:07:49  23   A.    Yes.

11:07:49  24   Q.    And you understand, for instance, Mario Castro wasn't

11:07:51  25   charged in Glen Burke's indictment.

11:07:54  1          You understand that, right?

11:07:54  2  A.    Yes.

11:07:55  3  Q.    Okay.  So you're asked to come in here and give some

11:07:57  4  information about some things that you did related to Glen

11:08:00  5  Burke's investigation and some cease and desist orders that you

11:08:03  6  participated in way back when?

11:08:05  7  A.    Yes.

11:08:05  8  Q.    Okay.  All right.  You would agree with me that when you

11:08:12  9  talked to the government, there's a case agent present, right?

11:08:17 10  A.    Yes.

11:08:18 11  Q.    And there's a prosecutor present, right?

11:08:20 12  A.    If I was there to talk to the prosecutor, yes.

11:08:24 13  Q.    Okay.  In this particular case, in fact, you did talk to

11:08:26 14  the prosecution, right?

11:08:27 15  A.    Yes.

11:08:28 16  Q.    Okay.  Back in January of 2022, you met with inspectors

11:08:33 17  Ernest Williams and Barry Bouchie.

11:08:36 18          You know those guys, right?

11:08:37 19  A.    Yes.

11:08:38 20  Q.    Okay.  You know Mr. Bouchie siting right there, yes?

11:08:41 21  A.    Yes.

11:08:42 22  Q.    And you talked to him back in January of 2022?

11:08:44 23  A.    Yes.

11:08:44 24  Q.    And also present in that interview was a prosecutor by the

11:08:48 25  name of Tim Finley?

11:08:49   1   A.     Yes.

11:08:50   2   Q.     And you know that's the guy sitting right here

11:08:51   3   (indicating), to my right?

11:08:52   4   A.     Yes.

11:08:52   5   Q.     Okay.  You were asked questions in that interview about

11:08:57   6   things related to this case, right?

11:09:00   7   A.     Yes.

11:09:00   8   Q.     Okay.  You were actually asked questions --

11:09:02   9   A.     It's my recollection.

11:09:05  10   Q.     Do you know what an MOI is?

11:09:07  11   A.     Yes, I do.  It's a memorandum of investigation.

11:09:10  12   Q.     Okay.  Well, as they've been referred to throughout this

11:09:13  13   trial, and, in fact, in the one related to your case, it's a

11:09:16  14   memorandum of interview.

11:09:17  15   A.     Yes.

11:09:18  16   Q.     That's what you meant?

11:09:19  17   A.     I thought that's what I said.  I don't --

11:09:21  18   Q.     You said "investigation."

11:09:23  19   A.     Oh, I'm sorry.  Yeah.  Interview.  I'm sorry.

11:09:26  20   Q.     That would have been a mistake if you said investigation

11:09:29  21   rather than interview?

11:09:30  22   A.     Yes.

11:09:30  23   Q.     Okay.  You understand that in a courtroom, there's a court

11:09:33  24   reporter that's writing down exactly what we say?

11:09:34  25   A.     Yes.

11:09:35    1    Q.    Okay.  Just like if we're hitting record on a tape player.

11:09:39    2         You understand that?

11:09:40    3    A.    Very similar.  Yes.

11:09:41    4    Q.    Okay.  And you'd agree with me that a real-time recording

11:09:45    5    of actually what's being said is critically important, right?

11:09:48    6    A.    In some instances, yes.

11:09:50    7    Q.    Because it's the most accurate information we can have?

11:09:54    8    A.    It can be.  Unfortunately, as part of my training and

11:09:58    9    experience as a federal agent for 21 years, sometimes recordings

11:10:03   10    fail, so you don't want to rely on that as the sole means of

11:10:06   11    documentation of an interview.

11:10:08   12    Q.    Okay.  If you record an interview, you can take notes,

11:10:13   13    right?

11:10:13   14    A.    Yes.

11:10:14   15    Q.    So you have both, right?

11:10:15   16    A.    Usually.

11:10:15   17    Q.    And sometimes if people misspeak or write down the wrong

11:10:19   18    word or say the wrong word, an actual memorialization of the

11:10:23   19    actual words used is important, right?

11:10:25   20    A.    It can be helpful.

11:10:27   21    Q.    And that's why we have a court reporter in court, right?

11:10:29   22    A.    Yes.

11:10:29   23    Q.    Okay.  All right.  So you were asked some questions in that

11:10:32   24    interview, and they were later reduced to a memorandum of

11:10:37   25    interview, right?

11:10:37  1    A.    Yes.

11:10:38  2    Q.    And in fact, in preparation for your testimony, you

11:10:41  3    reviewed that, right?

11:10:41  4    A.    Yes.

11:10:42  5    Q.    It's a couple pages summarizing your interview with

11:10:45  6    Mr. Bouchie, Mr. Finley, and Mr. Williams, right?

11:10:47  7    A.    Yes.

11:10:48  8    Q.    Okay.  You're aware that when a memorandum of interview is

11:10:54  9    done, there's some things that are put at the heading of that

11:10:58  10   document, right?

11:10:58  11   A.    Yes.

11:10:59  12   Q.    And so you know that they would include the case name, case

11:11:02  13   number, person interviewed, date of interview, place of

11:11:06  14   interview, and who the interview was conducted by?

11:11:09  15   A.    Yes.

11:11:09  16   Q.    Okay.  In this particular case, the case name had to do

11:11:13  17   with the international mass mailings Kern Syndicate, right?

11:11:18  18   A.    I'm not familiar with the MOIs.  I haven't looked at any of

11:11:23  19   them.  I couldn't tell you what they would have put on there.

11:11:26  20   Q.    Okay.  Because when I asked you a minute ago whether or not

11:11:28  21   you reviewed that MOI in preparation for your testimony, you

11:11:32  22   indicated you had.

11:11:33  23              Was that --

11:11:33  24   A.    I -- no.  I was part of the interview.  I did not review

11:11:37  25   the memorandum -- the MOI afterwards.

2:19-cr-00295-GMN-NJK - Monday, April 3, 2023      85

| | | |
|---|---|---|
| 11:11:39 | 1 | Q.    Okay.  You know who Patti Kern is, right? |
| 11:11:42 | 2 | A.    I have a general idea. |
| 11:11:44 | 3 | Q.    You knew who she was way back when you were conducting |
| 11:11:50 | 4 | investigations as a postal inspector between the years 2002 and |
| 11:11:55 | 5 | 2015, right? |
| 11:11:56 | 6 | A.    I don't have a specific recollection of her. |
| 11:12:01 | 7 | Q.    Okay.  So is it your testimony that you're not aware that |
| 11:12:05 | 8 | the memorandum of interview case name is Kern Syndicate? |
| 11:12:09 | 9 | A.    I'm not aware of that, no. |
| 11:12:10 | 10 | Q.    Okay.  Have you ever looked at the memorandum of interview? |
| 11:12:13 | 11 | A.    Looked at which MOI? |
| 11:12:15 | 12 | Q.    The one related to your interview in January of 2022 that |
| 11:12:19 | 13 | we've been talking about for -- |
| 11:12:21 | 14 | A.    No.  I have not seen it.  No. |
| 11:12:22 | 15 | Q.    Okay.  You're aware that in that interview, you were asked |
| 11:12:27 | 16 | about specific people related to this case -- |
| 11:12:29 | 17 | A.    Yes. |
| 11:12:30 | 18 | Q.    -- right? |
| 11:12:30 | 19 | Okay.  You'd agree with me that you were asked about |
| 11:12:33 | 20 | Patti Kern? |
| 11:12:35 | 21 | A.    I believe I was asked.  Yes. |
| 11:12:37 | 22 | Q.    Okay.  And you indicated at the time of your interview to |
| 11:12:41 | 23 | Mr. Finley and Mr. Bouchie and Mr. Williams that you had |
| 11:12:45 | 24 | previously talked to Patti Kern, right? |
| 11:12:49 | 25 | A.    I don't recall that -- saying that. |

11:12:50   1   Q.    Okay.  You'd agree with me that -- well, let me ask you

11:12:54   2   this:  If that was in the memorandum of interview, you wouldn't

11:12:56   3   dispute that, right?

11:12:57   4   A.    I don't recall everything that we discussed a year ago, but

11:13:00   5   I don't remember.  I know the name.  I know of Patti Kern.  I

11:13:06   6   don't know that I've ever spoken to her.

11:13:08   7   Q.    You know of Patti Kern because she's involved in the

11:13:11   8   fraudulent sweepstakes mailings?

11:13:14   9   A.    Yes.

11:13:14  10   Q.    Is it your testimony you are not aware this investigation's

11:13:17  11   referred to as the Kern Syndicate?

11:13:17  12   A.    No.

11:13:18  13   Q.    Okay.  You wouldn't have made that decision about what to

11:13:21  14   call the investigation, right?

11:13:22  15   A.    No.

11:13:22  16   Q.    That would be Inspector Bouchie, the case agent, right?

11:13:25  17   A.    Yes.

11:13:26  18   Q.    Okay.  You were actually shown photographs of people who

11:13:35  19   may or may not be important in this investigation during that

11:13:37  20   interview, right?

11:13:38  21   A.    Yes.

11:13:39  22   Q.    You were shown a photo of the name of Mario Castro, right?

11:13:44  23   A.    Yes.

11:13:44  24   Q.    And you indicated you weren't sure on the photo, right?

11:13:47  25   A.    Correct.

11:13:48   1   Q.    You looked at a photo of Mario Castro, and you just didn't

11:13:51   2   recognize him?

11:13:52   3   A.    I didn't -- did not recall whether I had seen him before or

11:13:55   4   not.

11:13:55   5   Q.    Okay.  If I were to ask you right now to identify Mario

11:13:59   6   Castro, Miguel Castro, Salvador Castro, and Jose Luis Mendez in

11:14:06   7   this courtroom, you wouldn't have any idea who those guys are?

11:14:10   8   A.    No, I would not.

11:14:10   9   Q.    Okay.  And as you sit here today, you have no recollection

11:14:13  10   whatsoever of interviewing those folks?

11:14:15  11   A.    I don't have a specific recollection of who I interviewed.

11:14:17  12   No.

11:14:17  13   Q.    Okay.  And you told the jury on direct examination that you

11:14:20  14   have a hazy recollection of going to a warehouse at some point in

11:14:25  15   time related to the service of a cease and desist pertaining to

11:14:29  16   Glen Burke, right?

11:14:30  17   A.    I don't know that it was a cease and desist, but whatever

11:14:34  18   the FTC's action was, I do have a hazy recollection of visiting a

11:14:40  19   print shop.  Yes.

11:14:42  20   Q.    Okay.  And the government was asking you some questions

11:14:44  21   about that, and you had some recollection that it may or may not

11:14:47  22   have been a Castro, correct?

11:14:48  23   A.    Yes.

11:14:49  24   Q.    You know that's a super common surname, right?

11:14:51  25   A.    I do know that's a super common surname.  But I don't know

11:14:54  1  that it's -- other than the Castro brothers -- it's that common

11:14:57  2  in the prize notification sweepstakes world of Las Vegas.

11:15:00  3  Q.    Okay.  And when you say "Castro brothers," you're kind of

11:15:04  4  lumping them all together, right?

11:15:05  5  A.    I was.  Yes.

11:15:06  6  Q.    Okay.  You're aware that there's Castro brothers that

11:15:09  7  worked in the printing business that aren't part of this

11:15:12  8  indictment, right?

11:15:13  9  A.    Not aware of that, specifically.  No.

11:15:14 10  Q.    You didn't know that fact?

11:15:15 11  A.    No.

11:15:16 12  Q.    Could it have been Epi Castro you talked to?

11:15:19 13  A.    I believe it was Mario or Miguel, but I don't know,

11:15:22 14  specifically.

11:15:23 15  Q.    And you're basing that on a hazy recollection with no

11:15:26 16  notes, no documentation, no date, and not even a location,

11:15:29 17  correct?

11:15:30 18  A.    Correct.

11:15:30 19  Q.    Okay.  You told us on direct examination that you went out

11:15:34 20  to this warehouse, and you said it was over by the airport,

11:15:40 21  right?

11:15:40 22  A.    In that general vicinity.  Yes.

11:15:42 23  Q.    Okay.  Did you volunteer those words, "over by the

11:15:45 24  airport," or did you have a conversation with prosecutors about

11:15:47 25  it?

11:15:47  1   A.    I believe I knew the general location that it was someplace

11:15:53  2   by the airport.  I believe that was a recollection.  I don't

11:15:57  3   think I had that recollection in January of 2022.  I think it was

11:16:00  4   more recently, but...

11:16:02  5   Q.    Okay.  You actually talked to prosecutors again in

11:16:06  6   September of 2022, right?

11:16:08  7   A.    Yes, if you say so.  I don't know the specific dates.

11:16:12  8   Q.    Well --

11:16:12  9   A.    There's been several times over the last few months.

11:16:15  10  Q.    Okay.  And in September of 2022, you don't dispute that on

11:16:20  11  the 16th, you had an interview with those same people, right?

11:16:23  12  A.    I don't know the specific dates, but --

11:16:26  13  Q.    Okay.  And you told them at that time for the first time

11:16:28  14  that you had this hazy recollection of seeing a Latino male,

11:16:33  15  right?

11:16:33  16  A.    Yes.

11:16:33  17  Q.    Okay.  And you don't know who that was?

11:16:35  18  A.    Not specifically, no.

11:16:36  19  Q.    Okay.  And you can't look at any of these guys over here

11:16:39  20  and say, That's the guy I saw?

11:16:41  21  A.    No.  I don't recognize them.

11:16:42  22  Q.    Okay.  But you have a general idea that it was in a

11:16:45  23  warehouse over by the airport?

11:16:47  24  A.    Correct.

11:16:47  25  Q.    Okay.  And you actually gave us a street name on direct

11:16:50    1   examination, right?

11:16:51    2   A.      Yes.

11:16:51    3   Q.      What street was it?

11:16:52    4   A.      On Patrick.

11:16:53    5   Q.      Okay.  Just so we're clear -- and this may not make any

11:16:57    6   sense to you, but it may to the jury -- Patrick is a different

11:17:00    7   street than Pearl, right?

11:17:02    8   A.      Yes.

11:17:03    9   Q.      You were never present for the search of a warehouse at

11:17:09   10   6925 Pearl Street, right?

11:17:10   11   A.      No.

11:17:11   12   Q.      Okay.  And you don't have any independent recollection,

11:17:14   13   knowledge, or any meaningful testimony to offer about Digital

11:17:19   14   Express's warehouse location, correct?

11:17:21   15   A.      No.

11:17:21   16   Q.      You've never been there, right?

11:17:23   17   A.      Not to the best of my recollection.  I don't -- I've never

11:17:27   18   -- I don't think I've ever been to an address on Pearl.

11:17:30   19   Q.      Okay.  This time that you went to this address at this hazy

11:17:33   20   location somewhere near Patrick or on Patrick, what year was it?

11:17:38   21   A.      I believe that would have been in 2013, when the FTC did

11:17:42   22   their action.

11:17:42   23   Q.      Okay.  Are you aware that the Digital Express location at

11:17:49   24   6925 Pearl Street was not occupied by Mario Castro until the end

11:17:55   25   of 2014?

11:17:55  1  A.    I didn't -- was unaware of any of those facts.

11:17:59  2  Q.    Okay.  Just so we're crystal clear, the hazy recollection

11:18:04  3  you have of being in a warehouse is not a warehouse on Pearl

11:18:08  4  Street?

11:18:08  5  A.    I don't believe so.  No.

11:18:10  6  Q.    Okay.  All right.  You gave some testimony about a whole

11:18:14  7  bunch of cease and desists.

11:18:16  8        You remember those?

11:18:20  9  A.    Yes.

11:18:20  10  Q.    I won't have us take a look at them again, but I'm going to

11:18:24  11  run through them real quick.

11:18:26  12        Government's Exhibit 123 was signed by an Adrian

11:18:27  13  Flores?

11:18:27  14  A.    Yes.

11:18:28  15  Q.    Government's Exhibit 124 was signed by Edgar Del Rio?

11:18:31  16  A.    Yes.

11:18:31  17  Q.    And you know the name "Edgar Del Rio"?

11:18:34  18  A.    I don't have a specific recollection of that -- of when I

11:18:38  19  specifically talked with him, but I know the name.

11:18:40  20  Q.    Okay.  You were shown Government's Exhibit 125, a cease and

11:18:47  21  desist signed by Michael Kern?

11:18:48  22  A.    Kern.  Is that what you said?

11:18:49  23  Q.    Yes.

11:18:50  24  A.    Yes.

11:18:50  25  Q.    You have an understanding that he is the husband of Patti

11:18:53    1   Kern, right?

11:18:54    2   A.    I know that now.  I don't know if I knew that then.

11:18:57    3   Q.    Okay.  You were shown Government's Exhibit 128.

11:19:00    4         I think the prosecutor said it was some guy named

11:19:03    5   Sixto, right?

11:19:04    6   A.    Yes.

11:19:04    7   Q.    Okay.  You were shown Government's Exhibit 122 related to

11:19:09    8   Richard Knowles?

11:19:10    9   A.    Yes.

11:19:10   10   Q.    You were shown Government's Exhibit 126 related to Omar Del

11:19:14   11   Rio?

11:19:14   12   A.    Yes.

11:19:15   13   Q.    And you were shown Government's Exhibit 130 that's signed

11:19:18   14   by a guy named Torres?

11:19:19   15   A.    Yes.

11:19:20   16   Q.    Okay.  The government asked you some questions related to

11:19:25   17   straw individuals, people that are -- their names are put on

11:19:31   18   titles to things.

11:19:32   19   A.    Yes.

11:19:33   20   Q.    Okay.  You're familiar with that, right?

11:19:34   21   A.    Yes.  Very familiar.

11:19:35   22   Q.    And in fact, you said that sometimes the mastermind of the

11:19:39   23   operation may do that in order to not expose themselves to either

11:19:46   24   civil or criminal liability?

11:19:49   25   A.    Sometimes.  Yes.

11:19:49  1    Q.    Are you aware that that's what Patti Kern did in this case?

11:19:53  2    A.    I'm not aware.  The cease and desist orders that I did, I'm

11:19:56  3    not aware of who was behind running those specific boxes.

11:20:02  4    Q.    Okay.  I want to ask you this question, and I want to be

11:20:07  5    real concise about it.

11:20:08  6          Mario Castro, you know that name because it came up

11:20:11  7    in preparation for your testimony in this trial, right?

11:20:14  8    A.    I knew it 13 years ago when I began doing these

11:20:18  9    investigations.

11:20:18  10   Q.    You agree with me that Mario Castro, you've referred to as

11:20:24  11   a greater group of the Castro brothers, right?

11:20:26  12   A.    Yes.

11:20:27  13   Q.    You'd agree with me, you've never met with that man, right?

11:20:30  14   A.    I do not know whether it was him or somebody else that I

11:20:34  15   met with.

11:20:34  16   Q.    Okay.  You agree with me that regardless of who that

11:20:37  17   individual you have a hazy recollection of, you didn't give that

11:20:41  18   person a cease and desist?

11:20:42  19   A.    No.

11:20:42  20   Q.    You've never given Mario Castro a cease and desist?

11:20:46  21   A.    No, not as far as I know.  I did probably 50 of them during

11:20:52  22   my time period there.  I do not remember exactly all of the

11:20:55  23   names.

11:20:56  24   Q.    And in those 50 names, you would agree with me that none of

11:21:00  25   them are Mario Castro?

11:21:02   1   A.    I don't -- do not know that for sure.  I don't think so,

11:21:06   2   but I don't know all of the names on all of them.

11:21:08   3   Q.    Okay.

11:21:09   4   A.    I can't remember --

11:21:10   5   Q.    You'd agree with me if there was one that said Mario

11:21:16   6   Castro, they would have shown you that one, right?

11:21:17   7   A.    I'm sorry?

11:21:18   8   Q.    If there was a cease and desist that said Mario Castro, the

11:21:21   9   government would have shown you that one?

11:21:22  10   A.    Probably.  Yes.

11:21:23  11   Q.    And you agree you didn't seen that one?

11:21:26  12   A.    No.

11:21:26  13   Q.    And as you sit here today, you have no recollection of

11:21:29  14   Mario Castro ever getting one?

11:21:30  15   A.    No.

11:21:30  16   Q.    Nor do you have a recollection of Miguel Castro ever

11:21:33  17   getting one?

11:21:33  18   A.    I do not, no.

11:21:34  19   Q.    You don't have a recollection of Salvador Castro ever

11:21:37  20   receiving a cease and desist, right?

11:21:40  21   A.    (Witness nods head up and down.)

11:21:40  22   Q.    And as far as you're aware, Jose Luis Mendez never received

11:21:43  23   a cease and desist, either?

11:21:43  24   A.    As far as I know, no.

11:21:49  25            **MR. TOMSHECK:**  I'm going to pass the witness, Judge.

| | | |
|---|---|---|
| 11:21:51 | 1 | THE COURT:  Thank you. |
| 11:21:52 | 2 | Mr. Gaffney, any cross-examination for Ms. Morgan? |
| 11:22:00 | 3 | MR. GAFFNEY:  Yes, Judge. |
| 11:22:02 | 4 | CROSS-EXAMINATION |
| 11:22:03 | 5 | BY MR. GAFFNEY: |
| 11:22:04 | 6 | Q.    Good morning, Ms. Morgan. |
| 11:22:05 | 7 | A.    Good morning. |
| 11:22:06 | 8 | Q.    So just -- |
| 11:22:07 | 9 | THE COURT:  I'm sorry.  It's Special Agent Morgan, |
| 11:22:10 | 10 | isn't it? |
| 11:22:12 | 11 | THE WITNESS:  Yes, it is. |
| 11:22:13 | 12 | MR. GAFFNEY:  My apologies. |
| 11:22:14 | 13 | BY MR. GAFFNEY: |
| 11:22:15 | 14 | Q.    Just to be clear, you're here testifying about your |
| 11:22:17 | 15 | investigation into Glen Burke; is that fair? |
| 11:22:21 | 16 | A.    Not necessarily.  I mean, every single one of these cease |
| 11:22:25 | 17 | and desist orders had their own case opened up on them.  So, you |
| 11:22:29 | 18 | know, it's kind of umbrella for all prize notification schemes. |
| 11:22:37 | 19 | It falls under a lot of different investigations. |
| 11:22:39 | 20 | Q.    Okay.  So Glen Burke, he wasn't -- his fraudulent |
| 11:22:43 | 21 | activities wasn't just limited to prize notifications, was it? |
| 11:22:47 | 22 | A.    I believe it -- he had two different kinds of prize |
| 11:22:51 | 23 | notifications, but it was prize notifications. |
| 11:22:53 | 24 | Q.    Was he also being investigated for a telemarketing scheme? |
| 11:22:57 | 25 | A.    Yes.  But that was also a prize notification scheme, and |

| | | |
|---|---|---|
| 11:23:00 | 1 | they would just call individuals on the phone. |
| 11:23:03 | 2 | Q.    But it wasn't sending anything through the mail, correct? |
| 11:23:06 | 3 | A.    No.  They would mail the, you know, $2,000 vitamins and |
| 11:23:11 | 4 | their wonderful grand prize that they won, which would be some |
| 11:23:15 | 5 | cheap -- |
| 11:23:16 | 6 | Q.    Okay. |
| 11:23:16 | 7 | A.    -- something. |
| 11:23:17 | 8 | Q.    But you understand that the defendants here today are not |
| 11:23:20 | 9 | on trial for a telemarketing scheme, right? |
| 11:23:23 | 10 | A.    Yes. |
| 11:23:24 | 11 | Q.    But that was something Glen Burke was being investigated |
| 11:23:26 | 12 | for back in 2013? |
| 11:23:27 | 13 | A.    That was one of the two types of prize notification schemes |
| 11:23:33 | 14 | that he was doing. |
| 11:23:33 | 15 | Q.    The cease and desist orders that we looked at today, none |
| 11:23:38 | 16 | of them were for Miguel Castro, right? |
| 11:23:41 | 17 | A.    Not that I recall.  No. |
| 11:23:43 | 18 | Q.    And none of them were -- had the business name attached to |
| 11:23:47 | 19 | it of Marketing Image Direct? |
| 11:23:50 | 20 | A.    No. |
| 11:23:50 | 21 | Q.    Or Price Awards (phonetic), right? |
| 11:23:54 | 22 | A.    No.  I don't think so. |
| 11:24:02 | 23 | **MR. GAFFNEY:**  Could we bring up Exhibit 123, page 2, |
| 11:24:06 | 24 | please. |
| 11:24:09 | 25 | **BY MR. GAFFNEY:** |

11:24:10  1  Q.    When you're serving a cease and desist order -- well, let

11:24:17  2  me back up.

11:24:18  3          How are cease and desist orders normally resolved in

11:24:21  4  your experience?

11:24:22  5  A.    I don't think I understand what you're asking.

11:24:24  6  Q.    Can they be resolved through a -- an agreement containing a

11:24:31  7  consent order to cease and desist?

11:24:33  8  A.    Yes.

11:24:33  9  Q.    And that would be something that's signed by the person

11:24:36 10  receiving the cease and desist order, right?

11:24:38 11  A.    Yes.

11:24:39 12  Q.    And --

11:24:43 13          MR. GAFFNEY:  You have that?

11:24:47 14  **BY MR. GAFFNEY:**

11:24:47 15  Q.    Can you see on your screen, the exhibit?

11:24:51 16  A.    Yes.

11:24:51 17  Q.    123, page 2?

11:24:53 18  A.    Yes.

11:24:53 19  Q.    Okay.

11:24:54 20          MR. GAFFNEY:  Has that been admitted into evidence?

11:24:58 21          I believe it was up on the projector earlier.

11:25:00 22          MR. ZYTNICK:  It is.

11:25:01 23          MR. GAFFNEY:  Okay.  If we can put that up, please.

11:25:09 24          THE COURT:  I don't see the light on, Nick, on the

11:25:13 25  projector.

11:25:13    1            COURTROOM ADMINISTRATOR:  Oh.

11:25:22    2            THE COURT:  Oh, there we go.

11:25:46    3            MR. GAFFNEY:  And, Brian, can you zoom in on that

11:25:49    4    second paragraph there.

11:25:54    5    BY MR. GAFFNEY:

11:25:55    6    Q.    So in resolving a cease and desist order, when the person

11:26:00    7    receives the cease and desist, signs this consent order to cease

11:26:05    8    and desist, one of the things that they're made aware of is

11:26:10    9    Paragraph No. 1; is that fair?

11:26:11   10    A.    Yes.

11:26:12   11    Q.    And what that says is, This agreement is for settlement

11:26:16   12    purposes only.  Does not constitute an admission of the making of

11:26:22   13    any statement or violation of any law or regulation, right?

11:26:23   14    A.    Correct.

11:26:23   15    Q.    So they're able to resolve the cease and desist orders

11:26:26   16    without admitting that they've made any false statements or that

11:26:29   17    they've broken any laws, right?

11:26:32   18    A.    Correct.

11:26:33   19            MR. GAFFNEY:  I'll pass the witness, Judge.

11:26:36   20            THE COURT:  Thank you.

11:26:39   21            Mr. Green?

11:26:42   22            MR. GREEN:  Yes, please.  Thank you, Your Honor.

11:26:45   23                    CROSS-EXAMINATION

11:26:45   24    BY MR. GREEN:

11:26:49   25    Q.    Good morning, Agent Morgan.

| | | |
|---|---|---|
| 11:26:51 | 1 | How are you? |
| 11:26:52 | 2 | A.    Good. |
| 11:26:52 | 3 | How are you? |
| 11:26:53 | 4 | Q.    Just a few minutes ago, on direct examination, in response |
| 11:26:57 | 5 | to the government's question, you mentioned that -- that |
| 11:26:59 | 6 | sometimes these cease and desist orders are -- you kind of, like, |
| 11:27:03 | 7 | track down, like, someone who's got a mailbox that starts the |
| 11:27:07 | 8 | process? |
| 11:27:09 | 9 | A.    Yes. |
| 11:27:09 | 10 | Q.    Okay. |
| 11:27:12 | 11 | MR. GREEN:  May we have Government's Exhibit 123-2, |
| 11:27:16 | 12 | page 2.  If we can go up a little bit, please. |
| 11:27:29 | 13 | BY MR. GREEN: |
| 11:27:31 | 14 | Q.    Agent Morgan, in front of you, this is Government's |
| 11:27:34 | 15 | Exhibit 123. |
| 11:27:35 | 16 | Does this pertain to what appears to be one |
| 11:27:38 | 17 | Mr. Flores? |
| 11:27:38 | 18 | A.    Yes, it does. |
| 11:27:40 | 19 | Q.    And his company looks like Financial Reserve Network? |
| 11:27:44 | 20 | A.    Yes. |
| 11:27:44 | 21 | Q.    And this was a cease and desist order which apparently was |
| 11:27:47 | 22 | served by yourself or someone associated with the United States |
| 11:27:52 | 23 | Postal Investigative Inspection Service, correct? |
| 11:27:55 | 24 | A.    Yes.  I believe I was the one -- |
| 11:27:58 | 25 | Q.    Thank you. |

11:27:58  1    A.    -- that served this one.

11:28:00  2            MR. GREEN:  May we have Government's Exhibit 120 put

11:28:03  3    on the screen.

11:28:10  4    BY MR. GREEN:

11:28:11  5    Q.    Earlier today, ma'am, and just a moment ago, you were asked

11:28:14  6    about Government's Exhibit 123.  I'm showing you what's on the

11:28:18  7    screen as Government's Exhibit 120.  This is a compilation of

11:28:23  8    cease and desist orders.

11:28:24  9            Now, around the middle, do you see the numbers 123?

11:28:30  10   A.    Yes.

11:28:30  11   Q.    And over on the right, just right where there's a date,

11:28:34  12   what's that date, ma'am?

11:28:35  13   A.    November 3rd of 2010.

11:28:38  14   Q.    And is there a name, a company name, under that column?

11:28:42  15   A.    Financial Reserve Network.

11:28:44  16   Q.    Does that -- and over on the right, there's the name of

11:28:47  17   Adrian Flores?

11:28:47  18   A.    Yes.

11:28:48  19   Q.    That's the man that you said that you had served a cease

11:28:50  20   and desist order, Government's Exhibit 123, which was admitted

11:28:54  21   earlier, correct?

11:28:55  22   A.    Yes.

11:28:57  23           MR. GREEN:  May we have Government's Exhibit 124 put

11:29:01  24   on the screen, page 7.

11:29:05  25   BY MR. GREEN:

11:29:08  1   Q.    Okay.  On the screen there, ma'am, does it appear to have

11:29:12  2   a -- does this appear to be some type of cease and desist or

11:29:15  3   related order or agreement pertaining to a person by the name of

11:29:21  4   Edgar Del Rio?

11:29:22  5   A.    Yes, it is.

11:29:23  6          MR. GREEN:  May we have Government's Exhibit 120 put

11:29:25  7   on the screen, please.

11:29:27  8   BY MR. GREEN:

11:29:30  9   Q.    Again, Agent Morgan, we have Government's Exhibit No. 120

11:29:36  10  in front of you.

11:29:37  11         Right in the middle of the page, do you see the

11:29:39  12  numbers 124?

11:29:40  13  A.    Yes.

11:29:40  14  Q.    I'll represent to you, ma'am, that those are referring to

11:29:44  15  exhibit number.

11:29:45  16         Over on the right, is there a date -- to the right of

11:29:49  17  exhibit -- or the number 124?

11:29:51  18  A.    June 1st of 2011.

11:29:53  19  Q.    Is there a name?

11:29:54  20  A.    NSD Products, Incorporated is the company name.

11:29:59  21  Q.    And over on the right, there's Mr. Edgar Del Rio.

11:30:04  22         Is that his name?

11:30:04  23  A.    Yes.

11:30:05  24  Q.    Thank you.

11:30:06  25         MR GREEN:  May we have Government's Exhibit 125,

11:30:08  1   page 26, 125-26.  May we have the previous page, please.  I may

11:30:26  2   have written the number down -- the one right before that.

11:30:30  3   Before, please.  One more.

11:30:34  4            There we go.  Excuse me.  I wrote the number down

11:30:38  5   wrong.

11:30:39  6   **BY MR. GREEN:**

11:30:40  7   Q.    Ma'am, in front of you is Government's Exhibit 125, page 22

11:30:43  8   of 27.

11:30:44  9            Do you see that?

11:30:45 10   A.    Yes.

11:30:45 11   Q.    Do you see up at the top left the name of Michael Kern?

11:30:49 12   A.    Yes.

11:30:50 13            **MR. GREEN:**  May we have Government's Exhibit 120 put

11:30:52 14   on the screen, please.

11:30:55 15   **BY MR. GREEN:**

11:30:58 16   Q.    Right down there, right on the left, you see that number

11:31:01 17   125?

11:31:01 18   A.    Yes.

11:31:02 19   Q.    We just saw that exhibit a moment ago.

11:31:04 20            Is there a date next to that -- that number 125?

11:31:08 21   A.    April 25th of 2012.

11:31:11 22   Q.    And is there a name for some kind of a company to the right

11:31:14 23   of the date?

11:31:15 24   A.    Promotional Marketing Solutions, Incorporated.

11:31:18 25   Q.    And over on the right, is there a name attributed to

11:31:22  1   Government's Exhibit 125 and Promotional Marketing Solutions?

11:31:26  2   A.    Michael Keith Kern.

11:31:27  3   Q.    Kern?

11:31:28  4   A.    Yes.

11:31:28  5   Q.    Okay.  Thank you.

11:31:29  6         MR. GREEN:  May we have Government's Exhibit 128 put

11:31:32  7   on the stage -- the stage -- put on the screen, please.

11:31:38  8   BY MR. GREEN:

11:31:39  9   Q.    Okay.  On Government's 128, do you see over on the left,

11:31:43  10  the name of Sixto Teucro Araux-Vidalez?

11:31:49  11  A.    Yes.

11:31:50  12  Q.    We'll just call him Sixto to be real simple.

11:31:53  13  A.    Yes.

11:31:54  14  Q.    Do you see that name up there?

11:31:54  15  A.    Yes.

11:31:55  16        MR. GREEN:  Government's Exhibit 120 on the screen,

11:31:55  17  please -- oh, excuse me, 128.  120 on the screen, please.  There

11:32:06  18  we go.

11:32:07  19  BY MR. GREEN:

11:32:08  20  Q.    Down on the bottom -- on the left column, do you see the

11:32:12  21  numbers 128?

11:32:12  22  A.    Yes.

11:32:13  23  Q.    Is there a date next to these numbers?

11:32:15  24  A.    April 26th of 2012.

11:32:17  25  Q.    Is there a name, like, on that same line?

11:32:19  1  A.    The company name is G.A.M.

11:32:22  2  Q.    So for the record, G as in golf, A as in apple, M as in

11:32:28  3  Mary?

11:32:28  4  A.    Yes.

11:32:29  5  Q.    Thank you.  And over on the right, does there appear to be

11:32:31  6  a name?

11:32:31  7  A.    Yes.  It's --

11:32:32  8  Q.    To make it real simple, does it look like Sixto?

11:32:35  9  A.    Yes.

11:32:35  10  Q.    Thank you so much.

11:32:36  11        MR. GREEN:  May we have Government's Exhibit 122,

11:32:40  12  page 8 put on the screen.

11:32:42  13  BY MR. GREEN:

11:32:45  14  Q.    You have in front of you, ma'am --

11:32:48  15        MR. GREEN:  If we could put the first page.  Excuse

11:32:50  16  me.  Page 7.  There we go.

11:32:54  17  BY MR. GREEN:

11:32:55  18  Q.    Do you see the name of -- do you see a name at the top

11:32:58  19  left?

11:32:58  20  A.    Yes.

11:32:59  21  Q.    What is that name, ma'am?

11:33:00  22  A.    Richard Knowles, Jr.

11:33:01  23  Q.    And earlier you were shown Government's Exhibit 122,

11:33:04  24  correct?

11:33:04  25  A.    Yes.

11:33:05  1   Q.    Appears to be some kind of a cease and desist, a motion to

11:33:09  2   suspend proceedings?

11:33:10  3   A.    Yes.

11:33:11  4   Q.    And this was, I guess, in connection with your work as an

11:33:14  5   investigator, as an inspector, and as special agent.

11:33:19  6         There were a number of documents associated with

11:33:21  7   cease and desist orders; is that correct?

11:33:22  8   A.    Correct.

11:33:23  9   Q.    Would it be safe to say that this is perhaps one of those

11:33:27  10  particular papers?

11:33:27  11  A.    Yes.

11:33:28  12  Q.    But for the purposes of these proceedings, there is the

11:33:31  13  name of Richard Knowles at the top, correct?

11:33:33  14  A.    Correct.

11:33:34  15        MR. GREEN:  May we have Government's Exhibit 120 put

11:33:37  16  on the stage -- I don't know why I'm saying that -- put on the

11:33:40  17  screen.  122 -- no.  120.

11:33:40  18  BY MR. GREEN:

11:33:45  19  Q.    Okay.  Do you see the number 122?

11:33:46  20  A.    Yes.

11:33:47  21  Q.    Is there a date associated with that exhibit number?

11:33:51  22  A.    November 3rd of 2010.

11:33:53  23  Q.    Okay.  And then there's a series of -- of companies.

11:33:56  24        Can you read those into the record, please.

11:33:59  25  A.    Money Trust Alliance, MTA; Promotional Recovery Awards

11:34:08  1  Network, or PRAN; Advisement Directory -- Directed Services; and

11:34:13  2  Advisory Directed Services.  Twice.  I think that's the same

11:34:17  3  thing twice.

11:34:17  4  Q.    Thank you.

11:34:18  5  A.    ADS.

11:34:20  6  Q.    And in this column of Exhibit 122, over on the right, do

11:34:23  7  you see a name?

11:34:24  8  A.    Richard J. Knowles, Jr.

11:34:28  9  Q.    Thank you very much.

11:34:29  10        MR. GREEN:  May we have put on the screen

11:34:30  11  Government's Exhibit 126.

11:34:30  12  BY MR. GREEN:

11:34:34  13  Q.    And on this, ma'am, do you see what appears to be the --

11:34:37  14  over on the top left of the name of Omar Del Rio?

11:34:41  15  A.    Yes.

11:34:41  16  Q.    And you testified earlier today about perhaps someone -- or

11:34:46  17  perhaps you may have served a cease and desist order or

11:34:50  18  affiliated papers on one person by the name of Omar Del Rio; is

11:34:55  19  that correct?

11:34:55  20  A.    I believe this one was done by Postal Inspector Shari

11:35:00  21  Delaney out in Southern California.

11:35:01  22  Q.    Thank you --

11:35:02  23  A.    I know who she is.

11:35:04  24  Q.    Thank you for the clarification.

11:35:07  25        MR. GREEN:  May we have Government's Exhibit 120 put

11:35:08  1   on the screen.

11:35:10  2   **BY MR. GREEN:**

11:35:10  3   Q.    Okay.  Down at the bottom left, you'll see the numbers 126,

11:35:13  4   referring to Government's Exhibit 126.

11:35:16  5             Do you see that?

11:35:17  6   A.    Yes.

11:35:17  7   Q.    Over on the right -- to the right of that, is there a date?

11:35:20  8   A.    August 1st of 2012.

11:35:21  9   Q.    Does there appear to be some kind of company name to the

11:35:26 10   right of the date in 2012?

11:35:28 11   A.    MKI Services, Incorporated.

11:35:32 12   Q.    And over on the right, is there a name?

11:35:34 13   A.    Omar Del Rio.

11:35:35 14   Q.    Thank you.

11:35:36 15             **MR. GREEN:**  And may we have Government's Exhibit 130

11:35:40 16   put on the screen.

11:35:40 17   **BY MR. GREEN:**

11:35:44 18   Q.    As to this Government's Exhibit 130 at the top left, do you

11:35:48 19   see a name?

11:35:49 20   A.    Yes.

11:35:50 21   Q.    Okay.  Does it appear to be Ubaldo Casillas Torres?

11:35:57 22   A.    Yes.

11:35:57 23   Q.    We'll call it Ubaldo for sake of ease of reference.

11:35:59 24             And on that appears to be, like, some kind of an

11:36:01 25   order?

11:36:01  1   A.    Yes.

11:36:02  2   Q.    Again, perhaps one of the many documents associated with

11:36:06  3   the service of a cease and desist order?

11:36:07  4   A.    Yes.

11:36:08  5   Q.    Thank you so much.

11:36:09  6              MR. GREEN:  May we go back to Government's

11:36:11  7   Exhibit 120.

11:36:11  8   BY MR. GREEN:

11:36:16  9   Q.    On the bottom left, do you see the number 130?

11:36:18 10   A.    Yes.

11:36:19 11   Q.    We just saw that exhibit a moment ago.

11:36:21 12              To the right of that, is there a date?

11:36:24 13   A.    It says January 2nd of 2013.

11:36:27 14   Q.    In the next column to the right, is there a reference to

11:36:31 15   some sort of company name?

11:36:32 16   A.    Yeah.  Platinum Awards Service Incorporated, Platinum

11:36:39 17   Awards Services, a Platinum Awards Service, and Platinum Award

11:36:42 18   Services.

11:36:43 19   Q.    And over on the right, is there the name of Ubaldo?

11:36:46 20   A.    Yes, there is.

11:36:48 21   Q.    Okay.  You would -- you would -- you have heard

11:36:50 22   of -- excuse me.

11:36:51 23              You've been asked a couple of questions about a

11:36:53 24   person by the name of Patti, or Patricia Kern.

11:36:56 25              Do you remember those questions?

11:36:57  1   A.    Yes.

11:36:57  2   Q.    On Government's Exhibit 120 in front of you, ma'am, you had

11:37:02  3   mentioned that you were not involved in the service of any kind

11:37:05  4   of cease and desist order pertaining to Patti Kern, or Patricia

11:37:10  5   Kern?

11:37:10  6   A.    No.

11:37:10  7   Q.    Okay.  Now, again, I have just a few more questions.

11:37:15  8         As to the -- the cease and desist orders, would you

11:37:18  9   say that a cease and desist order served on the person associated

11:37:24  10  with the company or a mailbox, that the cease and desist order is

11:37:27  11  like notice of a problem?

11:37:29  12  A.    It can serve as that.  Yes.

11:37:32  13  Q.    Okay.  What else can a notice -- a cease and desist serve

11:37:36  14  as notice?

11:37:37  15  A.    I'm not quite sure I know what you're asking --

11:37:43  16  Q.    Okay.  Let me ask --

11:37:45  17  A.    We would return all the mail to the victims.

11:37:47  18  Q.    Okay.  So when I get served with a cease and desist, and I

11:37:49  19  have a mailbox at Mail Box Etc, and let's say I had a hundred of

11:37:54  20  these, kind of, like, mailers going out.

11:37:56  21        Would you say that that cease and desist is notice to

11:37:59  22  me that I have to stop?

11:38:00  23  A.    Yes.

11:38:01  24  Q.    Okay.  And in this case, as to Government's Exhibit 120,

11:38:09  25  over on the -- oh, what -- when I sign for that cease and desist,

11:38:14  1  does that mean that, like, I'm signing for myself and my company

11:38:17  2  or both?

11:38:18  3  A.    It would be for the individual.  The company names would

11:38:24  4  change very, very frequently.  Like, every single mailing would

11:38:28  5  have a different company name on it.

11:38:30  6  Q.    Okay.  But when I sign, I'm signing my name only on behalf

11:38:35  7  of my company or both?

11:38:37  8  A.    Yes.

11:38:37  9  Q.    Thank you.  In Government's Exhibit 120, over on the right,

11:38:41  10  where you see "signer," do you see the name of Epi, or Epifano

11:38:47  11  Castro?

11:38:47  12  A.    No.

11:38:48  13  Q.    Do you see the name of Glen Burke?

11:38:50  14  A.    No.

11:38:51  15  Q.    Do you see the name of Andrea Burrow?

11:38:54  16  A.    I'm sorry.  Who?

11:38:55  17  Q.    Andrea Burrow --

11:38:57  18  A.    No.

11:38:57  19  Q.    -- B-U-R-R-O-W?

11:38:58  20  A.    No.

11:38:59  21  Q.    Do you see the name of Mario Castro?

11:39:01  22  A.    No.

11:39:01  23  Q.    Do you see the name of Miguel Castro?

11:39:04  24  A.    No.

11:39:05  25  Q.    Do you see the name of Jose Luis Mendez?

11:39:08  1  A.    No.

11:39:09  2  Q.    Do you see the name of Salvador Castro?

11:39:13  3  A.    No.

11:39:15  4          **MR. GREEN:**  No further questions.  Thank you, ma'am.

11:39:17  5          **THE COURT:**  Mr. Brown, any cross?

11:39:19  6          **MR. BROWN:**  No.  Thank you, Judge.

11:39:20  7          **THE COURT:**  And any redirect, Mr. Zytnick?

11:39:22  8          **MR. ZYTNICK:**  No, Your Honor.

11:39:23  9          **THE COURT:**  Okay.  At this time, if any members of

11:39:25  10  the jury have a question for the witness, Special Agent Morgan,

11:39:29  11  please go ahead and write it down on the form provided.  Take

11:39:33  12  your time.  Write neatly.  Skip a line if you have more than one

11:39:36  13  question, or you can just number the questions.

11:39:38  14          And when you're all done, fold the piece of paper in

11:39:40  15  half and look up so Nick may collect those.  Remember, we don't

11:39:44  16  need your names or initials or jury numbers, just the anonymous

11:39:49  17  questions.

11:41:30  18      *(Pause.)*

11:41:30  19          **COURTROOM ADMINISTRATOR:**  Judge, we have three notes,

11:41:31  20  and we start at No. 90.

11:41:35  21          **THE COURT:**  Thank you.

11:41:36  22          Counsel, please join me at sidebar.

11:42:09  23      *(Whereupon, the following proceedings were had at sidebar:)*

11:42:16  24          **THE COURT:**  So we have Jury Note No. 90.  Asks one

11:42:21  25  question:  "How, in your professional experience, does your

11:42:24  1    testimony relate or pertain to today's defendants?"

11:42:28  2              Any objection from the government, Mr. Zytnick?

11:42:30  3              **MR. ZYTNICK:**  No objection.

11:42:32  4              **THE COURT:**  All right.  Any objection, Mr. Tomsheck?

11:42:34  5              **MR. TOMSHECK:**  No.

11:42:34  6              **THE COURT:**  Mr. Brown?

11:42:36  7              **MR. BROWN:**  No.

11:42:37  8              **THE COURT:**  Mr. Gaffney?

11:42:38  9              **MR. GAFFNEY:**  No objection.

11:42:39  10             **THE COURT:**  And Mr. Green?

11:42:41  11             **MR. GREEN:**  No objection, ma'am.

11:42:42  12             **THE COURT:**  Jury Note No. 91 asks two questions.  The

11:42:46  13    first one is, "As a federal agent, have you ever executed a

11:42:50  14    search warrant for someone or a company that has not complied

11:42:56  15    with a cease and desist?"

11:42:58  16             Any objection from the government, Mr. Zytnick?

11:43:01  17             **MR. ZYTNICK:**  No objection.

11:43:02  18             **THE COURT:**  Mr. Tomsheck?

11:43:04  19             **MR. TOMSHECK:**  No, Your Honor.

11:43:04  20             **THE COURT:**  Mr. Brown?

11:43:05  21             **MR. BROWN:**  No, Your Honor.

11:43:06  22             **THE COURT:**  Mr. Gaffney?

11:43:08  23             **MR. GAFFNEY:**  No, Your Honor.

11:43:13  24             **THE COURT:**  The next question is, "When you have

11:43:15  25    executed a search warrant or been involved in one, would you have

```
11:43:18   1   placed all individuals in handcuffs -- men, women, and children?"
11:43:22   2              Any objection, Mr. Zytnick?
11:43:24   3          MR. ZYTNICK:  No objection, Your Honor.
11:43:26   4          THE COURT:  Mr. Tomsheck?
11:43:27   5          MR. TOMSHECK:  No, Your Honor.
11:43:28   6          THE COURT:  Mr. Brown?
11:43:28   7          MR. BROWN:  No objection.
11:43:30   8          THE COURT:  Mr. Gaffney.
11:43:31   9          MR. GAFFNEY:  No objection.
11:43:32  10          THE COURT:  Mr. Green?
11:43:34  11          MR. GREEN:  No objection.  Thank you.
11:43:35  12          THE COURT:  Jury Note 92 asks three questions.  The
11:43:37  13   first one is, "How many people have disregarded the cease and
11:43:41  14   desist letters, that you know of?"
11:43:43  15              Any objection from the government, Mr. Zytnick?
11:43:45  16          MR. ZYTNICK:  No objection, Your Honor.
11:43:47  17          THE COURT:  Mr. Tomsheck?
11:43:47  18          MR. TOMSHECK:  No objection.
11:43:48  19          THE COURT:  Mr. Brown?
11:43:49  20          MR. BROWN:  No objection.
11:43:50  21          THE COURT:  Mr. Gaffney?
11:43:51  22          MR. GAFFNEY:  No objection.
11:43:52  23          THE COURT:  And Mr. Green?
11:43:53  24          MR. GREEN:  No objection, Your Honor.
11:43:55  25          THE COURT:  Number two, "How much money, estimated,
```

11:43:59  1    has been returned to the victims from prize notification award

11:44:02  2    letters, that you know of?"

11:44:05  3              Any objection from the government, Mr. Zytnick?

11:44:07  4              **MR. ZYTNICK:**  No objection, but I would just note

11:44:08  5    that I think that that question might require --

11:44:13  6              *(Whereupon, the reporter interrupts to preserve the*

11:44:13  7              *record.)*

11:44:13  8              **MR. ZYTNICK:**  No objection.  That question may

11:44:18  9    require some clarification, but I can handle that with the judge

11:44:21  10   and witness.

11:44:22  11             **THE COURT:**  Or follow up.

11:44:23  12             **MR. ZYTNICK:**  Or follow up.  You are right.

11:44:25  13             **THE COURT:**  Mr. Tomsheck, any objection?

11:44:26  14             **MR. TOMSHECK:**  No.

11:44:27  15             **THE COURT:**  Mr. Brown?

11:44:28  16             **MR. BROWN:**  No.

11:44:28  17             **THE COURT:**  Mr. Gaffney?

11:44:29  18             **MR. GAFFNEY:**  No, Your Honor.

11:44:30  19             **THE COURT:**  Mr. Green?

11:44:31  20             **MR. GREEN:**  No objection, ma'am.

11:44:32  21             **THE COURT:**  Last question for Juror Note No. 92 asks,

11:44:36  22   "Did you find any applicant to have any criminal records on the C

11:44:40  23   and D orders?"

11:44:43  24             Not relevant to this case, is it?  Is that referring

11:44:47  25   to other people, not these defendants?

11:44:55  1              Any objection to my not asking that question?

11:45:01  2              MR. TOMSHECK:  No.

11:45:03  3              MR. ZYTNICK:  The government does not object to you

11:45:06  4     not asking the questions.

11:45:07  5              THE COURT:  Sorry about the double negative.  All

11:45:09  6     right.  So that's the last one.  Thank you.

11:45:12  7          (End of sidebar discussion.)

11:45:19  8              THE COURT:  All right.  Special Agent Morgan, I'm

11:45:28  9     going to ask you these jury questions.  Because they're

11:45:32 10     anonymous, I will read them into the record.  But when you

11:45:34 11     respond, please turn and face the jury because these are really

11:45:37 12     the jury's questions, not mine.

11:45:39 13              So Jury Note No. 90 asks one question:  "How, in your

11:45:43 14     professional experience, does your testimony relate or pertain to

11:45:46 15     today's defendants?"

11:45:48 16              THE WITNESS:  Based on my expert -- my years of

11:45:55 17     experience, I did a lot of these prize notification cease and

11:46:02 18     desist orders during my tenure when I was working as a postal

11:46:07 19     inspector.  It was a quick and easy way to try to get a box shut

11:46:13 20     down and return some of the money to -- to the victims.

11:46:17 21              I also felt like it kind of penalized the individuals

11:46:22 22     who were ultimately going to get the proceeds from that if I

11:46:27 23     hadn't returned all the money to the victims.  But specifically

11:46:31 24     to this investigation, I was not part of the Postal Inspection

11:46:37 25     Service and not part of this investigation, so I'm not

11:46:41  1  familiar -- other than knowing that the Castro brothers printed

11:46:47  2  up the solicitations and put the postage on them and dropped -- I

11:46:51  3  would assume also, based on mailing processes, dropped -- you

11:46:56  4  know, put them into the mail stream at the -- at the processing

11:47:00  5  facility down on Sunset.  That's the -- basically, the extent of

11:47:05  6  my knowledge.

11:47:06  7          THE COURT:  All right.  Jury Note No. 91 has two

11:47:09  8  questions.  The first one is, "As a federal agent, have you ever

11:47:12  9  executed a search warrant for someone or a company that has not

11:47:17 10  complied with the cease and desist?"

11:47:19 11          THE WITNESS:  I do not believe I have.

11:47:22 12          THE COURT:  And number two, "When you have executed a

11:47:25 13  search warrant or been involved in one, would you place all

11:47:28 14  individuals in handcuffs -- men, women, and children?"

11:47:32 15          THE WITNESS:  Generally, I don't think I've ever put

11:47:35 16  a child in handcuffs.  But generally, all the adult individuals

11:47:39 17  are handcuffed when we first enter the premises until we can

11:47:45 18  determine that they don't have any weapons on them and -- and

11:47:48 19  that there's not any weapons within their immediate vicinity.

11:47:52 20          THE COURT:  All right.  Jury Note No. 92 has several

11:47:56 21  questions.  The first one is, "How many people have disregarded

11:48:00 22  the cease and desist letters, that you know of?"

11:48:04 23          THE WITNESS:  There's been several.  I know -- I have

11:48:10 24  a very specific recollection of an individual by the name of

11:48:14 25  Crystal Ewing.  She actually used to work for Glen Burke, and

11:48:19  1   then she actually had her name on some P.O. boxes that were

11:48:22  2   actually at the post office.  And I served her with a cease and

11:48:27  3   desist order, and she was also charged criminally after I left

11:48:30  4   the Postal Inspection Service.

11:48:33  5           So there's at least that one, in particular, that I

11:48:37  6   can remember right off the top of my head.  But I don't -- I did

11:48:40  7   a lot of these cease and desist orders, so I didn't keep track of

11:48:44  8   everybody.

11:48:45  9           THE COURT:  All right.  And then the next question

11:48:46 10   is, "How much money, estimated, has been returned to the victims

11:48:51 11   from the prize notification award letters, that you know of?"

11:48:55 12           THE WITNESS:  I do not know of.  In some cases,

11:48:59 13   especially when we very first started doing these cease and

11:49:03 14   desist orders and starting to shut them down, you know, most of

11:49:08 15   the payments were around $20, sometimes $25 per envelope.  And

11:49:14 16   there was trays, upon trays, upon trays of mail that we were able

11:49:19 17   to send back to the victims for some of the boxes.

11:49:25 18           Some boxes, there would be maybe one tray of mail,

11:49:28 19   but...

11:49:28 20           THE COURT:  All right.  And then the last question

11:49:31 21   asks you about the criminal records of the people who did sign

11:49:35 22   the C and D orders, but they are not these defendants.  And so

11:49:40 23   I've talked to the attorneys, and I believe it's not relevant to

11:49:44 24   this case, so I'm not going to ask that question.

11:49:47 25           And the parties can follow up if there is a way to

11:49:50  1  restate that question in a way that's relevant, but I'm not going

11:49:53  2  to ask you about the criminal records of the other individuals

11:49:56  3  that are not the defendants in this case and that are part of

11:49:59  4  those other cease and desists.

11:50:01  5          Any follow-up questions from Mr. Zytnick?

11:50:04  6          **MR. ZYTNICK:**  No, Your Honor.

11:50:05  7          **THE COURT:**  Any follow-up, Mr. Tomsheck?

11:50:09  8          **MR. TOMSHECK:**  No, Your Honor.  Thank you.

11:50:10  9          **THE COURT:**  Mr. Gaffney?

11:50:11  10          **MR. GAFFNEY:**  No, Your Honor.

11:50:11  11          **THE COURT:**  Mr. Green -- I'm sorry, Mr. Brown?

11:50:16  12          **MR. BROWN:**  No, Your Honor.  Thank you.

11:50:17  13          **THE COURT:**  And Mr. Green?

11:50:20  14          **MR. GREEN:**  No follow-up.

11:50:22  15          **THE COURT:**  Thank you.

11:50:23  16          Agent Morgan, you are excused.  Please be careful on

11:50:27  17  the way down with the steps.

11:50:27  18      *(Whereupon, the witness leaves the witness stand.)*

11:50:31  19          **THE COURT:**  Should we call the next witness for about

11:50:32  20  ten minutes and then take a lunch break?

11:50:34  21          **MR. FINLEY:**  That would be just fine, Your Honor.

11:50:36  22          **THE COURT:**  All right.  Let's do that.

11:50:38  23          **MR. FINLEY:**  The government calls Sean O'Connor.

11:50:43  24      *(Whereupon, the witness takes the witness stand.)*

11:51:12  25          **THE COURT:**  Good morning, Mr. O'Connor.  You're going

```
11:51:14   1   to be seated up here to my left.  Please be careful with the
11:51:16   2   steps up.
11:51:18   3           COURTROOM ADMINISTRATOR:  Do you solemnly swear the
11:51:24   4   testimony you're about to give in the cause now pending before
11:51:27   5   this court will be the truth, the whole truth, and nothing but
11:51:29   6   the truth, so help you God?
11:51:31   7           THE WITNESS:  I do.
11:51:32   8           COURTROOM ADMINISTRATOR:  Thank you.  Please take a
11:51:34   9   seat.
11:51:34  10           For the record, please state and spell your name.
11:51:36  11           THE WITNESS:  Sean Donovan O'Connor, S-E-A-N, O,
11:51:42  12   apostrophe, C-O-N-N-O-R.
11:51:45  13           COURTROOM ADMINISTRATOR:  Thank you.
11:51:45  14                        SEAN O'CONNOR,
11:51:45  15   called as a witness, after having been first duly sworn to tell
11:51:45  16   the truth, the whole truth, and nothing but the truth, was
11:51:46  17   examined and testified as follows:
11:51:46  18                     DIRECT EXAMINATION
11:51:47  19   BY MR. FINLEY:
11:51:48  20   Q.   Good morning, Mr. O'Connor.
11:51:50  21           THE COURT:  Did the jury hear that?  Could you hear
11:51:52  22   that all the way in the back?
11:51:56  23           JUROR NO. 16:  If we could move the microphone.
11:51:58  24           THE COURT:  Yeah.  Let's move the microphone.
11:51:58  25           We're going to move the microphone closer you.  And
```

11:52:00  1   if you could, also try to project your voice.  I know it's hard

11:52:04  2   because the person who's asking you the questions is going to be

11:52:06  3   standing at the podium, so it's natural that you want to respond

11:52:09  4   to the person who asks you the question, but we need to make sure

11:52:12  5   the jury can hear your answers.  So if you can try to project in

11:52:17  6   that far -- you know, far into that area, that would make it

11:52:19  7   easier.  Thank you.  It's not your fault.  It's our electronics.

11:52:28  8   **BY MR. FINLEY:**

11:52:29  9   Q.    Where do you live, sir?

11:52:30  10  A.    Las Vegas, Nevada.

11:52:31  11  Q.    How long have you lived here?

11:52:32  12  A.    45 years.

11:52:33  13  Q.    Do you remember the year you moved here?

11:52:36  14  A.    I believe it was 1977.

11:52:38  15  Q.    Where were you coming from then?

11:52:41  16  A.    Minneapolis, Minnesota.

11:52:44  17  Q.    How old were you at that time?

11:52:45  18  A.    Eight years old.

11:52:47  19  Q.    Are you married?

11:52:49  20  A.    Yes, sir.

11:52:50  21  Q.    How long have you been married?

11:52:52  22  A.    Coming up on 20 -- it's 26 years.

11:52:56  23  Q.    Do you have any children?

11:52:57  24  A.    Two children.

11:52:59  25  Q.    Boys?  Girls?

| | | |
|---|---|---|
| 11:53:03 | 1 | A.    Both girls. |
| 11:53:04 | 2 | Q.    Did you get charged with a crime a few years ago? |
| 11:53:09 | 3 | A.    Yes. |
| 11:53:10 | 4 | Q.    What crime did you get charged with? |
| 11:53:14 | 5 | A.    Conspiracy to commit mail fraud. |
| 11:53:16 | 6 | Q.    How did you plead? |
| 11:53:18 | 7 | A.    Guilty. |
| 11:53:18 | 8 | Q.    Are you guilty of conspiring with people to commit mail |
| 11:53:23 | 9 | fraud? |
| 11:53:24 | 10 | A.    Yes. |
| 11:53:24 | 11 | Q.    And what made you guilty of that crime? |
| 11:53:27 | 12 | A.    I helped them commit mail fraud, facilitate it. |
| 11:53:33 | 13 | Q.    And exactly what was the fraud?  What was the trick? |
| 11:53:37 | 14 | A.    Basically, people would send in $20 thinking they were |
| 11:53:44 | 15 | going to win a lot of money, and we would send them something |
| 11:53:48 | 16 | back that was not worth $20. |
| 11:53:52 | 17 | Q.    You said you'd send them something back? |
| 11:53:57 | 18 | A.    Sometimes, yes. |
| 11:53:58 | 19 | Q.    What -- sometimes? |
| 11:53:59 | 20 | A.    That's correct. |
| 11:54:00 | 21 | Q.    Okay.  Well, we'll get to that. |
| 11:54:03 | 22 | And was it a newsletter? |
| 11:54:05 | 23 | A.    Yes. |
| 11:54:06 | 24 | Q.    Did that newsletter have any value, whatsoever? |
| 11:54:09 | 25 | A.    No. |

11:54:10  1  Q.    And you said you sent it sometimes, not all the time.

11:54:16  2       Do I understand you?

11:54:17  3  A.    Yes.  That's correct.

11:54:18  4  Q.    And why did you lie to people and make them think they won

11:54:24  5  money?

11:54:24  6  A.    To make money ourselves.

11:54:27  7  Q.    And how much would you ask for with each one of these

11:54:31  8  fraudulent prize notices?

11:54:33  9  A.    Usually, around $20.

11:54:35  10  Q.    So you would lie to people for $20 at a time?

11:54:41  11  A.    That's correct.

11:54:47  12  Q.    Did you and your coconspirators lie to elderly and

11:54:52  13  vulnerable people with these notices?

11:54:54  14  A.    Yes.

11:54:54  15  Q.    Was it a fraud scheme?

11:54:55  16  A.    Yes.

11:54:56  17  Q.    Are any of your co-conspirators in the courtroom today?

11:55:00  18  A.    Yes.

11:55:01  19  Q.    Could you -- how many of the four defendants were

11:55:07  20  co-conspirators with you in this fraud scheme?

11:55:10  21  A.    All four.

11:55:15  22  Q.    Could you identify each of the four defendants, sir, by

11:55:19  23  describing an article of clothing they're wearing?

11:55:22  24  A.    Sure.

11:55:24  25  Q.    If you need to stand up, that would be fine.

11:55:26  1  A.    Okay.  Mario Castro in the blue blazer and the glasses.

11:55:32  2  Miguel Castro, no glasses, a black blazer.  Jose Luis Mendez, a

11:55:38  3  blue jacket, looks like.  And Salvador Castro in the very back

11:55:42  4  with a white shirt, bluish white shirt.

11:55:47  5          **THE COURT:**  All right.  The record will so reflect he

11:55:49  6  has correctly identified all four defendants.

11:55:51  7  **BY MR. FINLEY:**

11:55:52  8  Q.    Do you have a cooperation agreement with the Justice

11:55:56  9  Department?

11:55:56  10  A.    Yes, I do.

11:55:57  11  Q.    What does the cooperation agreement require you to do?

11:55:59  12  A.    Tell the truth.

11:56:01  13  Q.    What do you hope will happen if you tell the truth?

11:56:07  14  A.    Basically, I hope to get a reduction in sentence.

11:56:11  15  Q.    Under the cooperation agreement, what could happen if you

11:56:18  16  lie?

11:56:19  17  A.    The cooperation agreement is broken, and I could

11:56:24  18  potentially be charged with more crimes.

11:56:26  19  Q.    And so, if you lie, your cooperation agreement could be

11:56:33  20  broken.  You could be charged with more crimes.

11:56:36  21          Are you aware of any sentencing enhancements that

11:56:40  22  might happen if the judge who sentences you believed that you

11:56:43  23  lied?

11:56:44  24  A.    Yes.

11:56:45  25  Q.    So what is the bottom line for you of all those things if

2:19-cr-00295-GMN-NJK - Monday, April 3, 2023    124

```
11:56:49   1    you lie?  What are you concerned about if you lie?
11:56:53   2    A.    I will spend 20 years in prison.
11:56:56   3    Q.    Have you been around these fraudulent prize notices for a
11:57:04   4    long time?
11:57:04   5    A.    Yes, sir.
11:57:04   6    Q.    Can you remember the very first time you ever saw one?
11:57:09   7    A.    Yes.
11:57:11   8    Q.    Approximately, when was that?
11:57:13   9    A.    Sometime around 1995, 1996.
11:57:22  10    Q.    When was the first time in your life that you realized that
11:57:30  11    these prize notices were fraudulent?
11:57:32  12    A.    Within a few months.  I was working for a company called
11:57:38  13    Emerald Isle, and I noticed a few of them out.  I was doing data
11:57:47  14    for them.
11:57:48  15    Q.    And so, was that the first time that you realized that
11:57:51  16    these prize notices were fraudulent?
11:57:53  17    A.    Yes.
11:57:53  18    Q.    And if I recall your testimony from a moment ago, that was
11:57:56  19    in the '90s?
11:57:57  20    A.    Yes.
11:57:57  21    Q.    How many prize notice mailers have you worked for over the
11:58:06  22    years?
11:58:07  23          And I'm just asking for a number here, no names.
11:58:10  24    A.    The major companies, probably 10 to 15.
11:58:15  25    Q.    And for how many years have you worked on these types of
```

| | | |
|---|---|---|
| 11:58:22 | 1 | fraudulent prize notices? |
| 11:58:24 | 2 | A.    More than 20 years. |
| 11:58:26 | 3 | Q.    Over that 20-year period, did you gain an understanding of |
| 11:58:32 | 4 | how a scheme like this works? |
| 11:58:34 | 5 | A.    Yes. |
| 11:58:35 | 6 | Q.    Let's talk about how you met the defendants. |
| 11:58:40 | 7 | Do you remember which of the four defendants that you |
| 11:58:43 | 8 | identified you met first? |
| 11:58:45 | 9 | A.    I met Mario Castro first or Miguel Castro.  It was kind of |
| 11:58:54 | 10 | the same time. |
| 11:58:55 | 11 | Q.    Okay.  You're not sure which of the two that you met first, |
| 11:58:58 | 12 | but you met both Mario Castro and Miguel Castro at around the |
| 11:59:02 | 13 | same time? |
| 11:59:02 | 14 | A.    That's correct. |
| 11:59:03 | 15 | Q.    When was that? |
| 11:59:05 | 16 | A.    I believe it was right around 2006. |
| 11:59:11 | 17 | Q.    How did you meet? |
| 11:59:14 | 18 | A.    I was working for a company that they purchased, and they |
| 11:59:21 | 19 | introduced themselves at that point. |
| 11:59:23 | 20 | Q.    Okay.  And what kind of a company was it that you were |
| 11:59:25 | 21 | working at when the defendants Mario Castro and Miguel Castro |
| 11:59:31 | 22 | purchased that company? |
| 11:59:32 | 23 | A.    It was in the business, a letter shop or a mail house. |
| 11:59:36 | 24 | Q.    Okay.  And the jury's heard what a letter shop is. |
| 11:59:39 | 25 | Just briefly, then, is a letter shop a place where |

11:59:45  1  mailings are laser printed, so the printing is finished, and then

11:59:52  2  the mailings are then folded by machines, inserted by machines

11:59:56  3  into envelopes, and then carried off and put into the mail

11:59:59  4  stream?

12:00:00  5  A.    That's correct.

12:00:00  6  Q.    That's where you were working?

12:00:02  7  A.    That is correct.

12:00:03  8  Q.    When did the defendants Mario Castro and Miguel Castro buy

12:00:09  9  that shop that you were working in?

12:00:10  10  A.    2006, to my recollection.

12:00:13  11  Q.    After they bought that letter shop, did you have to find

12:00:21  12  another job?

12:00:21  13  A.    I worked for them for several years.  And then in 2013,

12:00:33  14  2012, I -- I got an additional job.

12:00:36  15  Q.    I see.  So you continued working there, then?

12:00:39  16  A.    Correct.

12:00:40  17  Q.    All right.  And from approximately 2006 or so, have you

12:00:46  18  continued to work with the four defendants in some way, shape, or

12:00:52  19  form up until 2018?

12:00:54  20  A.    That's correct.

12:00:56  21  Q.    So the defendants Mario and Miguel Castro bought the letter

12:01:05  22  shop.

12:01:06  23          You stayed on as an employee?

12:01:07  24  A.    Yes.

12:01:08  25  Q.    Did they know how to run the letter shop, or did you have

12:01:11  1    to teach them how to do that?

12:01:12  2    A.    They knew.

12:01:14  3    Q.    And we were talking about a period that goes from 2006 to

12:01:19  4    2018.

12:01:21  5          Who was your boss or bosses during that period?

12:01:26  6    A.    I always reported to Mario and Miguel Castro.

12:01:29  7    Q.    Were there many name changes over the years for the letter

12:01:33  8    shop?

12:01:34  9    A.    Yes.

12:01:34  10   Q.    But those were always your bosses?

12:01:37  11   A.    That's correct.

12:01:42  12   Q.    When did you meet the defendant Salvador Castro?

12:01:45  13   A.    I don't remember the year, exactly, but it was within a few

12:01:49  14   years of Mario and Miguel purchasing the company.

12:01:55  15   Q.    I know you can't remember the exact year.  That's fine.

12:01:58  16   It's a long time ago.

12:01:59  17         Was it before 2009?

12:02:01  18   A.    Yes.  I would say so.

12:02:04  19   Q.    Okay.  And how did you meet Salvador Castro?

12:02:07  20   A.    Just in the office.  I was working there full-time.  I

12:02:15  21   don't remember if I was introduced by Mario or Miguel

12:02:19  22   or -- saying this is my brother, Salvador.  I -- I don't

12:02:22  23   remember, exactly.

12:02:22  24   Q.    And you said the "office."

12:02:23  25         Is that the office inside the letter shop?

12:02:25  1    A.    That's correct.

12:02:26  2    Q.    Did Salvador Castro start working at the letter shop after

12:02:29        you were introduced to him?

12:02:31  4    A.    Yes.

12:02:31  5    Q.    And has he worked at that letter shop on and off throughout

12:02:37  6    the time period that you mentioned?

12:02:40  7    A.    Yes.

12:02:41  8    Q.    2006 to 2018 -- no.  I'm sorry.

12:02:43  9           At least 2009 through 2018, that's your testimony,

12:02:49  10   right?

12:02:49  11   A.    Yes.

12:02:51  12   Q.    Okay.  When did you meet the defendant Jose Luis Mendez?

12:02:54  13   A.    About the same time as Salvador Castro.

12:02:57  14   Q.    So it was before 2009?

12:02:59  15   A.    Yes.

12:02:59  16   Q.    Have you worked with the defendant Jose Luis Mendez at the

12:03:04  17   letter stop, wherever it might have been located, whatever the

12:03:09  18   year was, from that time until 2018?

12:03:12  19   A.    Yes.

12:03:12  20   Q.    It's had different locations over the years, hasn't it?

12:03:18  21   A.    That's correct.

12:03:18  22   Q.    The jury heard some testimony about a guy named Glen Burke

12:03:22  23   who got shut down?

12:03:24  24   A.    Yes.

12:03:25  25   Q.    Okay.

12:03:26  1          **THE COURT:**  Before we switch over to Glen Burke, can

12:03:28  2   we go ahead and take our lunch break? because it's past noon.  Is

12:03:32  3   that all right?

12:03:33  4          **MR. FINLEY:**  Oh, yes.

12:03:34  5          **THE COURT:**  Okay.  It just sounded like we were going

12:03:36  6   into a larger, different area.

12:03:37  7          So during this lunch break, I do remind the jurors

12:03:39  8   that you are not to discuss this case with anyone or permit

12:03:42  9   anyone to discuss it with you.  Wear your jury badges if you go

12:03:45  10  outside or as you're walking around about in the cafeteria or

12:03:49  11  bathrooms so everybody is aware that you're a juror.

12:03:51  12         If you do accidentally overhear anyone speaking about

12:03:54  13  the case, even fellow jurors, remember, you're required to let me

12:03:57  14  know.

12:03:57  15         And please don't listen to or read anything that

12:03:59  16  touches upon this case in any way or attempt to perform any

12:04:03  17  research or independent investigation about the case.  You will

12:04:06  18  receive more testimony, more evidence, and closing arguments and

12:04:10  19  written jury instructions before you should begin forming

12:04:13  20  opinions about the case.

12:04:14  21         Let's all stand for the jury, as they are the judge

12:04:17  22  of the facts.  And we'll welcome you back at one o'clock.

12:04:25  23         Mr. O'Connor, after the jury exits, you may also take

12:04:28  24  your lunch break.  Just remember that you are not permitted to

12:04:31  25  talk about this case, your testimony to anybody.  You can talk to

12:04:34  1  people about the logistics of where do I go to the bathroom,

12:04:37  2  where can I get something to eat, or where should I walk or not

12:04:41  3  walk, things like that, but don't talk to anybody about your

12:04:44  4  testimony or about this case.  And we'll welcome you back at

12:04:47  5  one o'clock, as well.  All right?

12:04:47  6        *(Whereupon, the jury leaves the courtroom at 12:04 p.m.)*

12:04:47  7        *(Whereupon, the following proceedings were had outside the*

12:04:47  8        *presence of the jury:)*

12:04:50  9            **THE COURT:**  Anything that you want to discuss during

12:04:52  10  the lunch break, let me know because we need to switch

12:04:57  11  jury -- court reporters.

12:04:59  12            So is there anything that you wanted to address now?

12:05:01  13        **MR. FINLEY:**  The only thing the government needs to

12:05:03  14  do is just read a stipulation about some exhibits that are going

12:05:10  15  to come in during Mr. O'Connor's testimony out loud into the

12:05:16  16  record.  There's no objection to those exhibits, and it will just

12:05:19  17  move things along.  So if we could do that five minutes before

12:05:22  18  the jury comes back, that would be great.

12:05:24  19            **THE COURT:**  All right.  We'll plan to do that.

12:05:27  20            Anything else from the defense that you think we

12:05:29  21  should address before we reconvene at one o'clock?

12:05:32  22            **MR. TANASI:**  Not at this time, Your Honor.

12:05:33  23            **THE COURT:**  Okay.  All right.

12:05:34  24            **MR. TANASI:**  Thank you.

12:05:35  25            **THE COURT:**  Have a good lunch.  We'll see you back

12:05:37  1    here at one o'clock.

12:05:38  2                    **MR. TANASI:**  Thank you.

12:05:39  3                    **MR. FINLEY:**  Thank you, Your Honor.

         4                    *(A lunch recess was taken at 12:05 p.m.)*

         5                            --o0o--

         6                   COURT REPORTER'S CERTIFICATE

         7        I, Paige M. Christian, Official Court Reporter, United

         8    States District Court, District of Nevada, Las Vegas, Nevada, do

         9    certify that pursuant to 28 U.S.C. § 753, the foregoing is a

        10    true, complete, and correct transcript of the proceedings had in

        11    connection with the above-entitled matter.

        12

        13    DATED:  April 3, 2023

        14

        15                         /s/ Paige M. Christian_____
                                   Paige M. Christian, RPR, CRR, CCR #955
        16                         Official Court Reporter
                                   United States District Court
        17                         District of Nevada

        18

        19

        20

        21

        22

        23

        24

        25