─────── 2:19-cr-00295-GMN-NJK ───────

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4    UNITED STATES OF AMERICA,        )
                                      )  Case No. 2:19-cr-00295-GMN-NJK
5               Plaintiff,            )
                                      )  Las Vegas, Nevada
6          vs.                        )  April 3, 2023
                                      )  1:05 p.m. to 4:04 p.m.
7    MARIO CASTRO, SALVADOR           )  Courtroom 7D
     CASTRO, MIGUEL CASTRO, and       )
8    JOSE LUIS MENDEZ,                 )  JURY TRIAL, DAY 9, PM SESSION
                                      )
9               Defendants.           )  **C E R T I F I E D   C O P Y**
                                      )
10   _____)

11

12

13

14          REPORTER'S TRANSCRIPT OF JURY TRIAL, DAY 9, PM SESSION
              BEFORE THE HONORABLE GLORIA M. NAVARRO,
15                  UNITED STATES DISTRICT JUDGE

16

17

18    APPEARANCES:        See next page

19

20

21

22    COURT REPORTER:     Samantha N. McNett, RPR, CRR, CCR, CSR
                          United States District Court
23                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada  89101
24                        Samantha_McNett@nvd.uscourts.gov

25    Proceedings reported by machine shorthand, transcript produced
      by computer-aided transcription.

───── 2:19-cr-00295-GMN-NJK ─────

1                        **APPEARANCES**

2    For the Government:

3         **TIMOTHY T. FINLEY  ESQ.**
          **DANIEL E. ZYTNICK, ESQ.**
4         U.S. DEPARTMENT OF JUSTICE
          950 Pennsylvania Avenue, N.W.
5         Washington, D.C. 20530
          202-307-0050
6
          -AND-
7
          **MINA CHANG, ESQ.**
8         UNITED STATES ATTORNEY'S OFFICE
          501 Las Vegas Boulevard South, Suite 1100
9         Las Vegas, Nevada 89101
          702-388-6336
10

11
     For Defendant Mario Castro:
12
          **JOSHUA L. TOMSHECK, ESQ.**
13        HOFLAND & TOMSHECK
          228 South Fourth Street, First Floor
14        Las Vegas, Nevada 89101
          702-895-6760
15
          -AND-
16
          **RICHARD E. TANASI, ESQ.**
17        TANASI LAW OFFICES
          8716 Spanish Ridge Avenue, Suite 105
18        Las Vegas, Nevada 89148
          702-906-2411
19

20
     For Defendant Salvador Castro:
21
          **DONALD GREEN, ESQ.**
22        LAW OFFICES OF DONALD J. GREEN
          4760 South Pecos Road, Suite 103
23        Las Vegas, Nevada 89121
          702-388-2047
24
     ///
25
     ///

— 2:19-cr-00295-GMN-NJK —

1                        **APPEARANCES CONTINUED**

2

For Defendant Miguel Castro:

3

         **LUCAS J. GAFFNEY, ESQ.**
4        GAFFNEY LAW
         9900 Covington Cross Drive, Suite 290
5        Las Vegas, Nevada 89144
         702-742-2055
6
         -AND-
7
         **THOMAS A. ERICSSON, ESQ.**
8        THOMAS A. ERICSSON, CHTD.
         9900 Covington Cross Drive, Suite 290
9        Las Vegas, Nevada 89144
         702-878-2889
10

11

For Defendant Jose Luis Mendez:
12
         **WILLIAM H. BROWN, ESQ.**
13       **CHRISTOPHER MISHLER, ESQ.**
         BROWN MISHLER, PLLC
14       911 North Buffalo Drive, Suite 202
         Las Vegas, Nevada 89128
15

16                              * * *

17

18

19

20

21

22

23

24

25

1

## INDEX OF EXAMINATIONS

2  **TESTIMONY OF SEAN O'CONNOR**

  Direct Examination by Mr. Finley...................139

3

* * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─────2:19-cr-00295-GMN-NJK─────

1                          **INDEX OF EXHIBITS**

2        GOVERNMENT EXHIBITS

3        EXHIBIT NO.:                OFFERED     ADMITTED    WITHDRAWN

4        154...............................137          137          --
         155...............................137          137          --
5        156...............................137          137          --
         157B..............................137          137          --
6        160A..............................137          138          --
         160B..............................137          137          --
7        160C..............................137          137          --
         160D..............................137          137          --
8        171...............................137          137          --
         172...............................137          137          --
9        185...............................137          137          --
         190...............................137          137          --
10       255...............................137          137          --
         257...............................137          137          --

11

12

13       DEFENDANT EXHIBITS

14       EXHIBIT NO.:                OFFERED     ADMITTED    WITHDRAWN

15       (No exhibits offered or admitted.)

16                                   *  *  *

17

18

19

20

21

22

23

24

25

```
 1          LAS VEGAS, NEVADA; MONDAY, APRIL 3, 2023; 1:05 P.M.

 2                           --oOo--

 3                   P R O C E E D I N G S

 4          THE COURT:  We're back on the record outside the

 5   presence of the jury.

 6          Mr. Finley, did you have a stipulation you wanted to

 7   put on the record about the exhibits?

 8          MR. FINLEY:  Yes, your Honor.

 9          We would like to move some exhibits in related to Sean

10   O'Connor, and we have a stipulation with the defendants that

11   they can all be admitted.

12          They are Government Exhibit 154, 155, 156, 157B, 160A,

13   160B, 160C, 160D, 171, 172, 185, 190, 255, and 257.

14          (Government Exhibits 154, 155, 156, 157B, 160A, 160B,

15   160C, 160D, 171, 172, 185, 190, 255, and 257 offered.)

16          THE COURT:  All right.  Any objection?

17          MR. TANASI:  No objection, your Honor.

18          MR. GAFFNEY:  No objection, your Honor.

19          MR. BROWN:  No objection, your Honor.

20          MR. GREEN:  No objection, your Honor.

21          THE COURT:  I've got 154, 155, 156, 157B, 160B, 160C,

22   160D, 171, 172, 185, 190, 255 and 257.  Those are admitted.

23          (Government Exhibits 154, 155, 156, 157B, 160B, 160C,

24   160D, 171, 172, 185, 190, 255, and 257 admitted.)

25          THE COURT:  All right.  Anything else?
```

1          MR. FINLEY:  That's correct, your Honor.

2          We also have a demonstrative of a map that we just

3   kind of put together on the fly.  It's a map of the warehouse

4   and where it was located.  My understanding is defendants don't

5   have an objection to that one either.

6          THE COURT:  All right.  Any objection from the

7   defense?  Everybody got a chance to see it?

8          MR. GREEN:  What was the number again, counsel,

9   please?

10          MR. FINLEY:  I actually didn't give the number.  I

11   have it.

12          THE COURT:  Okay.  It -- it's 425.

13          MR. ZYTNICK:  429.

14          MR. FINLEY:  429.  Can't read Mr. Zytnick's

15   handwriting.

16          Okay.  And we're not crystal clear on whether you read

17   out 160A, your Honor.

18          THE COURT:  I did not.

19          MR. FINLEY:  Okay.  That's part of the stipulation,

20   too.

21          THE COURT:  All right.  So objection to 160A?

22          MR. TANASI:  No objection, your Honor.

23          MR. GAFFNEY:  No objection, your Honor.

24          THE COURT:  Thank you.

25          (Government Exhibit 160A admitted.)

1          THE COURT:  So -- and then 429 is the map, Mr. Green.

2          Any objection to the map being used?  Is this just for

3    demonstrative or is it for admission?

4          MR. FINLEY:  Yeah, it's just an ID exhibit.  That's

5    all for the 400 series.  It's just for demonstrative purposes.

6          THE COURT:  Okay.  Thank you.

7          MR. GREEN:  There's no objection as far as we're

8    concerned, your Honor.  Thank you.

9          THE COURT:  Thank you.

10          MR. GREEN:  429, that is.

11          THE COURT:  All right.  So we can bring in the jury.

12    And let's bring in Mr. O'Connor.

13          Is it O'Connor with an R at the end?  Or L at the end?

14          THE WITNESS:  R.

15          THE COURT:  R?  Okay.  Thank you.

16          (Whereupon, the jury enters at 1:10 p.m.)

17          THE COURT:  All right.  Everyone may be seated.

18          Welcome back from lunch.  We're going continue now

19    with direct examination of Mr. O'Connor by the Government.

20          Mr. Finley, whenever you're ready, sir.

21                    DIRECT EXAMINATION

22    BY MR. FINLEY:

23    Q.  I had just started asking you about Glen Burke.

24          Who's Glen Burke?

25    A.  He was a client that we had for many years.

1    Q.   Okay.  When you say "he was a client that we had," let me

2    ask you this:  Who produced Glen Burke's mailings for him?

3    A.   Me and the defendants.

4    Q.   Okay.  All four of the defendants were involved in some way

5    in producing those mailings for Glen Burke?

6    A.   That's correct.

7    Q.   And we'll talk more about him later, but a couple quick

8    questions about him.

9         Did something happen to him in 2013?

10   A.   He was shut down.

11   Q.   Okay.  Were you working at the Castro family letter shop

12   when that happened?

13   A.   That's correct.

14   Q.   Now, this scheme that you came here to testify about ended

15   in 2018, didn't it?

16   A.   That's correct.

17   Q.   So that's one shut down in 2018.

18        Now, back in 2013 when Glen Burke was shut down, was

19   the Castro family letter shop in the same place on Pearl Street

20   as it was in 2018?

21   A.   No.

22   Q.   Okay.  I'm going to ask you more about that later.  We're

23   got a map for you to look at.

24        One more question about Glen Burke.  Did he get

25   charged with a crime?

1  *A.*  I believe so.

2  *Q.*  Were you involved in this criminal investigation of Glen

3  Burke as a witness?

4  *A.*  Yes.

5  *Q.*  I'll ask you more about that later.

6        We were talking -- before we got off on Glen Burke, we

7  were talking about how you met the defendants.  I want to ask

8  you now about Patti Kern.

9        Do you know a person named Patti Kern?

10 *A.*  Yes.

11 *Q.*  How did you meet her?

12 *A.*  She was a client of Raphael Rodriguez when I met her.

13 *Q.*  Now, that was -- you haven't mentioned that name before.

14       Was he the guy who owned the print shop -- or the

15 letter shop where you were working right before the -- Miguel

16 and Mario Castro, those two defendants, purchased that letter

17 shop?

18 *A.*  That's correct.

19 *Q.*  That's when you first met Patti Kern?

20 *A.*  Yes.  Sometime before then.

21 *Q.*  Back in the mid-2000s sometime?

22 *A.*  Yes.

23 *Q.*  Did you work with her in 2009?

24 *A.*  Yes.

25 *Q.*  Back in 2009 when you were working with her, what kind of

1  work did you do with her?

2  **A.**  The same as we did up until 2018, the same kind of work.

3  *Q.*  And you testified before, in 2009, you were working for

4  Miguel and Mario Castro?

5  **A.**  That's correct.

6  *Q.*  At their letter shop?

7  **A.**  That's correct.

8  *Q.*  And did you and the four defendants produce mailings for

9  Patti Kern in 2009?

10  **A.**  Yes.

11  *Q.*  What was your role?  Did have you a role?

12  **A.**  I had several.  I was data processing, accounts receivable.

13  I did the setups for the laser and kept track of the jobs

14  logistically.

15  *Q.*  And while you were performing those roles, who did you

16  report to?

17  **A.**  Always Mario or Miguel Castro.

18  *Q.*  You were their employee?

19  **A.**  That's correct.

20  *Q.*  Did you mention -- I don't -- I can't remember.

21      Did you say anything about account manager?

22  **A.**  Well, I did the QuickBooks account receivables, like the

23  billing for the clients.

24  *Q.*  What about account manager in terms of interacting with the

25  client?

1    *A.*  That, also.

2    *Q.*  Managing the relationship?

3    *A.*  That's correct.

4    *Q.*  So you did that, too?

5    *A.*  Yes.

6    *Q.*  Looks like you had a lot of roles?

7    *A.*  Yes.

8    *Q.*  So earlier, you testified about a scheme that got started

9    in 2010 and ended in 2018.  That's what you were charged with,

10   right?

11   *A.*  That's correct.

12   *Q.*  Okay.  Now, back to 2009, one year before that, did have

13   you a conversation with Patti Kern in 2009 about her business?

14   *A.*  Yes.  Several.

15   *Q.*  Okay.  And what did she tell you was going on with her

16   business in 2009?

17   *A.*  She was -- had to sign a cease and desist and she didn't

18   know what else to do and she was going to figure out a way to

19   continue mailing.

20   *Q.*  There's been plenty of testimony about cease and desist.

21   That's an order from the United States Postal Inspection

22   Service to stop sending fraudulent mail.

23          Is that your understanding?

24   *A.*  That is my understanding.

25   *Q.*  Did she get shut down by that order in 2009?

1   *A.*   Yes.

2   *Q.*   So when Patti Kern got shut down in 2009, you testified

3   that you and the four defendants were producing notices for her

4   at the time, right?

5   *A.*   That's correct.

6   *Q.*   Okay.  So let me ask you this.  Were the notices that the

7   Government was saying to Patti Kern were fraudulent, were those

8   notices produced by you and the four defendants?

9   *A.*   Yes.

10  *Q.*   So you did that with her?

11  *A.*   That's correct.

12  *Q.*   Up to that point in 2009, was this something you had ever

13  seen or heard about before, the Postal Service shutting down a

14  prize notice mailer and telling them to stop sending fraudulent

15  mail?

16  *A.*   Yes.

17  *Q.*   What was the nature of the fraudulent mail that you were

18  sending for -- producing and sending for Patti Kern in 2009?

19  Was it similar to the mailings that are the subject of this

20  case?

21  *A.*   Yes.

22  *Q.*   You mentioned before the trick was you got people to think

23  they won money?

24  *A.*   That's correct.

25  *Q.*   Same deal both times, 2009 and now?

1    *A.* Yes.

2    *Q.* Okay.  How much mail were and you the four defendants

3    producing and sending for Patti Kern in 2009 when she got shut

4    down?

5    *A.* I can't remember exact numbers, but I'd say well over

6    250,000 pieces a month.

7    *Q.* And you say "250,000 pieces a month."  I just want to make

8    sure we're clear about what "pieces" are.

9           What are -- when you say "pieces," what are you

10   referring to?

11   *A.* The actual individual letter I would count as a piece.

12   *Q.* Now, when you have a client at the letter shop and they get

13   shut down and they were doing approximately 250,000 mail pieces

14   a month with you, was that something that you had the

15   responsibility to tell your bosses about based on your role as

16   the account manager?

17   *A.* Of course.

18   *Q.* Why would you have to tell your bosses about that?

19   *A.* Logistically, we would have to get rid of all the stock and

20   envelopes so they wouldn't get used again.

21          Financially, we'd have to stop any checks that were

22   being sent for postage if we could get them stopped before they

23   got cashed, or printing that was already started and,

24   obviously, losing a client with a quarter million pieces would

25   hurt the business, our business financially.

1    *Q.*   Financial hit for the business?

2    **A.**   That's correct.

3    *Q.*   You mentioned some concepts there that I want to make sure

4    the jury understands.

5              When one of these cease and desist comes down and your

6    client gets shut down, you mentioned that you have to stop

7    jobs.  Can you explain what is the physical act of stopping a

8    job?

9    **A.**   We have to --

10             MR. GREEN:  Your Honor, we're going to have to object

11   here as to a timeframe and foundation because he's asking him

12   about certain aspects of this case.  The indictment here

13   charges conduct on or after March of 2010.  Now we're a year

14   later -- a year earlier.  So we need either foundation or

15   object to the testimony here as not being relevant for this

16   indictment.

17             MR. FINLEY:  Your Honor, I believe you've ruled on all

18   this previously.

19             THE COURT:  Yeah, there's a prior ruling that we'll

20   allow the testimony to continue, but if you want to maybe just

21   clarify when you are discussing stop jobs, what timing, what

22   area are you referring to.

23             MR. FINLEY:  All right.

24   BY MR. FINLEY:

25   *Q.*   So we're in 2009.  You learn about Patti Kern's cease and

1    desist.

2           Around this time period, did you have a procedure that

3    you had to go through when you learned about something like

4    this, a cease and desist?

5    *A.*   Yes.  Usually, we were notified by the client they received

6    a cease and desist and we would have to trash all the stock

7    that was already pre-printed, forms, envelopes, clawback any

8    checks we could to make sure our invoices got paid and postage

9    was not released.

10   *Q.*   Okay.  Good.  So now we got the time period straight.

11          The question we were on was:  What does it mean to

12   stop a job?  What do you physically do?

13   *A.*   We -- we physically throw away the stock and stop the

14   process of all the jobs.

15   *Q.*   Turn off the machines?

16   *A.*   Turn off the machines for that job.

17   *Q.*   Why would you need to do that, turn off the machines

18   mid-job?  Why would you need to do that?

19   *A.*   Because we're not going to get paid probably for the --

20   the -- finishing the job.

21   *Q.*   So if I understand you, this is about minimizing losses?

22   *A.*   That's correct.

23   *Q.*   Minimizing financial losses?

24   *A.*   Yes.

25   *Q.*   You mentioned that you want to try to clawback checks, and

1    I also think you mentioned postage.

2              Can you tell the jury what that means?

3    **A.**  For all these jobs, one of the major costs is postage to

4    the U.S. Postal Service which is usually more than we get paid

5    for doing the job.  And if you can stop that check, you can get

6    that postage money back and refund to the client or use it for

7    invoices outstanding.

8    *Q.*  And is this also about minimizing financial losses?

9    **A.**  Yes.

10   *Q.*  Then you mentioned trashing stock.  I think you said stock.

11             What is "stock"?

12   **A.**  Stock is the pre-printed forms and envelopes, outers,

13   inners, sometimes something called a buck slip which is just

14   the little one piece of mail insert.

15   *Q.*  So if you're talking about somebody with a volume like

16   Patti Kern had back in 2009, how much paper are we talking

17   about throwing away?

18   **A.**  Back then, it could be a few pallets of four by four

19   pallets stacked six feet high of paper or envelopes of both

20   outers and inners for one job.

21   *Q.*  So you'd lose money when you threw that paper away?

22   **A.**  It would be recycled, yes, but we'd lose money.  Someone

23   would -- they're already paid for, so some money would be lost

24   automatically.

25   *Q.*  So why would you throw away paper if it -- you're going

1    lose money by doing that?  Why did you have to throw away that

2    paper?

3    *A.*  The paper was pre-printed with the company name, addresses,

4    return addresses on the envelopes, and where the money -- where

5    the -- the return envelopes would be delivered, that address

6    would be pre-printed, too, and that would also have to be not

7    used again.

8    *Q.*  Now, based on your experience as an account manager in

9    2009, how significant for the business -- how would you

10   describe the significance of Patti Kern getting shut down in

11   2009 for the business?  Was it significant?  Insignificant?

12   Somewhere in between?

13   *A.*  At that time, Patti was probably 30 -- 30 percent of our

14   business at that time.  So it's very significant.

15   *Q.*  Is there any way that your bosses would not have known

16   about this?

17   *A.*  No.

18   *Q.*  Mario, Miguel Castro were actually your bosses when this

19   happened in 2009?

20   *A.*  That's correct.

21   *Q.*  Now, you mentioned this procedure that you'd have to go

22   through involving stopping the presses, throwing away paper,

23   trying to see if you could get those postage checks back.

24           Who actually did all that work?  Did you do all of it

25   yourself?

1  *A.*  No.  We had other employees and the defendants and myself.

2  Usually, Miguel Castro would take care of the financial end,

3  the checks, and the cancellations of checks or whatever we

4  could do.

5        Then, like, Jose Luis Mendez or -- or Salvador Castro

6  or another brother not present, Salud Castro, would throw the

7  stock away.  And that was pretty much it.

8        And of course, Jose Mendez would stop any job that we

9  were currently running, return the stock to be trashed.

10 *Q.*  So I think you had mentioned three of the defendants had a

11 role in stopping the presses, throwing away stock.  You've

12 mentioned -- and trying to claw the money back.  That was

13 Miguel Castro, Salvador Castro, Jose Luis Mendez.

14       Did Mario have any involvement -- Mario Castro, the

15 defendant, have any involvement in this procedure that you had

16 to go through when somebody got shut down?

17 *A.*  Not physically.  I mean, he would be notified by me.  If he

18 had conversations with the clients, I'm not sure, without me.

19 *Q.*  Could you throw away a large amount of paper without the

20 knowledge and approval of your boss, Mario Castro?

21 *A.*  No.

22 *Q.*  So back to this conversation you're having with Patti Kern

23 about what's going on with her business.  You remember you

24 testified about that?

25 *A.*  Yes.

─────────── 2:19-cr-00295-GMN-NJK ───────────

1  Q.  What did she tell you what was going on?

2  A.  She got a cease and desist and that she, basically, told me

3  this is all she knew how to do anymore and she had to keep

4  going somehow.

5  Q.  So she wanted to keep going on in spite of being ordered to

6  stop?

7  A.  Correct.

8  Q.  Did you have any suggestion for her about how she might be

9  able to do that?

10  A.  There's -- you can always find people to represent a

11  company and she had the money to -- to support it.

12      So I suggested -- she was thinking about using her

13  husband and other people, and I suggested at the time that

14  maybe she should use some of the Castros because they're

15  financially -- would gain from being partner with Patti.

16  Q.  You mentioned you can always find somebody to represent a

17  company.

18      What did you mean by that?

19  A.  You need somebody to -- I don't know if the term is straw

20  owner, but figurehead of the -- of a company, open the checking

21  accounts, open the business license, open the corporation, you

22  know, somebody to sign the paperwork, and it couldn't be Patti,

23  obviously, anymore.

24  Q.  She couldn't have her name on anything anymore, right?

25  A.  That's correct.

—— 2:19-cr-00295-GMN-NJK ——

1    Q.  And you came up with the solution of maybe she should talk

2    to the Castros?

3    A.  That's correct.

4    Q.  Do you know which Castro she talked to first?

5    A.  From my understanding, she talked to Epi Castro first,

6    Epifaniel [sic] Castro.

7    Q.  Now, Epifanio, or Epi, Castro has been mentioned a few

8    times.  Who's he?

9    A.  He's one of the brothers of the Castros.

10   Q.  So he -- he was the brother of the three Castro defendants

11   in this courtroom?

12   A.  That's correct.

13   Q.  And were you there at that meeting she had with Epi Castro?

14   A.  No, I was not.

15   Q.  Do you know what happened after she had the meeting?

16   A.  At some point, she notified me that she was going to start

17   doing a company with Epi and we'll see work soon.

18   Q.  And did she know Epi Castro before you suggested that she

19   might have a conversation with him to solve her problem about

20   not being able to put name -- her name on things?

21   A.  Yes, Epi's company.  I can't remember what the name was at

22   the time.  He did all the printing of the forms and the

23   envelopes, pre-printing for us.

24   Q.  Was he the one who was doing the pre-printing in 2009 when

25   she was shut down?

 1  *A.*  Yes.

 2  *Q.*  And then after that pre-printing was done, your testimony

 3  is that you and the four defendants would finish those mailings

 4  by laser printing them, putting the personal information,

 5  stuffing them into envelopes, and putting it in the mail?

 6  *A.*  That's correct.  That was the flow.

 7  *Q.*  Did Epi Castro and Patti Kern start doing business?

 8  *A.*  As I understand it, yes.  Or yes, they were.

 9  *Q.*  Did that start happening in 2010?

10  *A.*  Yes.

11  *Q.*  At some point, did Mario Castro become Patti Kern's

12  partner, as well?

13  *A.*  Yes.

14  *Q.*  Just so we're clear, there's always two things going on:

15  There's producing and sending the notices and then there's

16  being partners on some of these individual mailing companies.

17       You understand that those are two different things?

18  *A.*  Yes.

19  *Q.*  So Mario Castro, at the time he became partners with Patti

20  Kern, was he already producing and sending these notices that

21  she and Epi Castro were sending out?

22  *A.*  That's correct.

23  *Q.*  So he got -- Mario Castro was already involved in -- in the

24  scheme that started in 2010 before he even became a partner; is

25  that right?

—— 2:19-cr-00295-GMN-NJK ——

1    *A.*  That's correct.

2            MR. FINLEY:  Can we have Government Exhibit 170 on the

3    screen, please?  It's already admitted, Judge.

4    BY MR. FINLEY:

5    *Q.*  Do you see it in front of you, sir?

6    *A.*  Yes.

7    *Q.*  Okay.  Is Government's Exhibit 170 a February 7, 2012

8    e-mail?

9    *A.*  That's correct.

10   *Q.*  And is it -- at the top, is it between Patti Kern and you?

11   *A.*  Yes.

12           MR. FINLEY:  If we could blow up the top of the

13   e-mail, please.

14   BY MR. FINLEY:

15   *Q.*  Now, Patti Kern writes to you, second sentence, "Mario

16   stopped me yesterday and told me to take $1,500 because they

17   each had already done that and he wanted everyone to be even."

18           Do you see that?

19   *A.*  Yes.

20   *Q.*  Now, according to this e-mail, who is authorizing Patti

21   Kern to take money?

22   *A.*  Mario Castro.

23   *Q.*  And is this e-mail, does it concern something called GAM?

24   *A.*  That's correct.

25   *Q.*  And you -- you're probably looking at the first line of

1  your e-mail to her, right?

2  **A.**  Yes.

3  *Q.*  Okay.  And you talk about checking the balance on the GAM

4  account?

5  **A.**  Yes.  They had, like, a postage account.

6  *Q.*  Was GAM a mailing company?

7  **A.**  Yes.

8  *Q.*  Are Patti Kern and Mario Castro partners on this mailing

9  company together at this time?

10 **A.**  That's how I understand it, yes.

11 *Q.*  Now, is that how you understand it from reading the e-mail

12 or is that how you understand it from your memory or is it

13 both?

14 **A.**  Both.

15 *Q.*  Now, let's look at -- so this is February 7, 2012, this

16 e-mail.

17        MR. FINLEY:  Let's look at Government Exhibit 120,

18 which has been previously been admitted.

19 BY MR. FINLEY:

20 *Q.*  Do you see a line on that chart for GAM?

21 **A.**  Yes, line 128.

22 *Q.*  And according to Government Exhibit 170, which is a chart

23 of information about cease and desist orders, on what day was

24 the cease and desist for GAM signed?

25 **A.**  It says here April 26, 2012.

1  Q.  That is only a couple months after the e-mail we were

2  looking at from February 2012?

3  **A.**  That's correct.

4  Q.  Now, is the cease and desist information that we're looking

5  at and the e-mail, is that consistent with your memory this

6  company got shut down pretty quick?

7  **A.**  Yes.

8  Q.  Looks like the person who signed it has a first name of

9  Sixto, S-I-X-T-O.

10         Do you know that person?

11  **A.**  Yes.  I knew him as another name, though, T.  Just T.

12  Q.  He had a nickname?

13  **A.**  Correct.

14  Q.  T?

15  **A.**  Yeah, I didn't know his name completely like that.

16  Q.  What did you -- what else did you call him besides T?

17  **A.**  Sixto.  That's it.

18  Q.  Okay.  Did you ever call him Teucro?

19  **A.**  Teucro, yes.  That's true.

20  Q.  Is that -- could that be what the T stands for?

21  **A.**  Yes.

22  Q.  How did you know Sixto?

23  **A.**  I think he was trying to do some work for us at one point

24  when we were bigger.  And then he was kind of in and out doing

25  other stuff.  I -- that's how I met him was at the company,

—————— 2:19-cr-00295-GMN-NJK ——————

1   though.

2   Q.   So you met him at the letter shop?

3   **A.**   Yes.  I didn't know him beforehand.

4   Q.   Did he know any of the four defendants?

5   **A.**   He was at the letter shop, so I would assume so, yes.

6   Q.   He wasn't there to see you?

7   **A.**   No.

8   Q.   He was at -- he was just a guy who happened to be there

9   when you're working at the letter shop?

10  **A.**   That's correct.

11  Q.   And you don't know anymore than that?

12  **A.**   Not that I can remember.

13          MR. FINLEY:  Let's look at Government Exhibit 175.

14  It's already been admitted.

15  BY MR. FINLEY:

16  Q.   That is an e-mail from three or four days after that cease

17  and desist for GAM.  That is an e-mail from Patti Kern to you.

18          And at the top, it's dated May 1, 2012?

19  **A.**   Yes.

20  Q.   And then beneath that, there's actually an e-mail from

21  April 30, 2012, about four days after Sixto signed the cease

22  and desist?

23  **A.**   Yes.

24  Q.   It looks like in the middle of the e-mail you're asking

25  Patti Kern if you should trash the GAM stock.

1          Do you see that?  About in the middle?

2   **A.**  Yes.

3   *Q.*  Okay.  And in the e-mail that she replies with at the top,

4   does she confirm that that stock needs to be destroyed?

5   **A.**  That's correct.

6   *Q.*  Is that consistent with your testimony earlier about this

7   was one of the things you would have to do upon receiving a

8   cease and desist to minimize losses?

9   **A.**  Yes.

10  *Q.*  Is this something that you could have done without the

11  knowledge and approval of Mario Castro?

12  **A.**  No.

13  *Q.*  Was he your boss at this time in 2012 when this happened?

14  **A.**  Yes.

15  *Q.*  Let me ask you about the defendant Jose Luis Mendez.

16          During this time period around 2012 or so, did Jose

17  Luis Mendez talk to you about becoming partners with Patti Kern

18  on a mailing company?

19  **A.**  Yes.

20  *Q.*  What did you -- what did you talk about?

21  **A.**  He approached me and asked if he thought it was a good idea

22  to open a mailing company with Patti.

23  *Q.*  And what did you tell the defendant Jose Luis Mendez?

24  **A.**  I said, you know, it's -- it's -- it's a chance, but if you

25  need more money, then that's the only way to do it.  You

1  know --

2  Q.  Let me stop you for a second there.  I just want to clarify

3  part of your answer there.

4         You said something like, "It's a chance," or "There's

5  a chance."

6         Are you referring to a chance to make money or there's

7  a chance of getting caught?

8  A.  Both.

9  Q.  Okay.  You were -- you talked about both things with him?

10  A.  Yes.

11  Q.  What did you say to him about making money?

12  A.  I said you will make good money for a while, but there's no

13  determination of how long that will be.  Will it be a month?

14  Will it be years?  You just don't know.

15  Q.  Why did you tell him you just don't know how long it's

16  going to last?

17  A.  Through my many years of doing this, some last a few months

18  and some last -- some companies last a few years.

19  Q.  Now, you mentioned there's a chance of making money and

20  there's a chance in terms of a risk, right?

21  A.  Yes.

22  Q.  What were you talking about -- or what did you talk about

23  with Jose Luis Mendez about the risk involved with opening one

24  of these mailing companies?

25  A.  The risk was eventually you would probably have to sign a

———— 2:19-cr-00295-GMN-NJK ————

1    cease and desist and stop mailing.

2    Q.   You mentioned a cease and desist.

3    A.   That's correct.

4    Q.   You've warned him that he might have to sign one of those

5    and stop?

6    A.   Yes.

7    Q.   Was that based on your experience?

8    A.   Yes.

9    Q.   You'd seen that happen?

10   A.   That's correct.

11   Q.   Did you warn him you're going to go to prison if you get

12   caught?

13   A.   No.

14   Q.   And why didn't -- why didn't you say you're going to go to

15   prison if you get caught?

16   A.   In my experience, a cease and desist was you signed the

17   letter and you stopped doing it.  That was all that was going

18   to happen.

19   Q.   And so when you -- when you did not warn him about going to

20   prison, was that based on your personal experience up to that

21   date?

22   A.   Yes.

23   Q.   And, again, we're talking 2012 when you're talking to

24   Mr. Mendez?

25   A.   Yes.

1    Q.   What language did you speak in?

2    A.   English.

3    Q.   Do you speak Spanish?

4    A.   Very little.

5    Q.   And I take it you and Mr. Mendez were in the letter shop

6    many times?

7    A.   Every day when I was there.

8    Q.   Did you talk?

9    A.   Of course.

10   Q.   What did you talk about?

11   A.   The schedule, what jobs needed paper, what jobs needed to

12   pull paper for, then day-to-day life stuff, soccer, everything.

13   Clients.

14   Q.   And as a person, how talkative is the defendant Jose Luis

15   Mendez?

16   A.   Moderate as myself.

17   Q.   He's a moderate talker?

18   A.   Yeah.  We were there to get a job done.

19   Q.   He was not the quietest guy there and he wasn't the most

20   talkative guy there?

21   A.   That's correct.  That's the way I remember it.

22   Q.   Did Mr. Mendez sometimes have trouble understanding you?

23   A.   Yes.

24   Q.   And what would you do when that happened?

25   A.   I would usually rephrase the question and, you know, change

1    the wording, make it more understandable.

2    Q.  Were there ever times where you just couldn't get around

3    the language barrier?

4    A.  Yes.

5    Q.  Tell the jury about that.

6    A.  Sometimes I would -- I would find Luis Aguilar or Mario or

7    Miguel and say, "This is what I'm trying to say and I can't get

8    it across right."

9    Q.  So sometimes you wouldn't be able to get past the language

10   barrier with the defendant Jose Luis Mendez at which point you

11   would ask Mario Castro or somebody named Luis Aguilar to help?

12   A.  Yes.  Or Miguel Castro.

13   Q.  Or Miguel Castro.

14           Who's Luis Aguilar, by the way?

15   A.  Luis Aguilar is Miguel's stepson.

16   Q.  Okay.  So did Jose Luis Mendez end up becoming partners

17   with Patti Kern after your conversation?

18   A.  Yes.

19   Q.  And did that happen in approximately January 2012?

20   A.  That sounds about right.

21   Q.  And in addition to Patti Kern -- well, let me ask you this.

22           You remember what the company was called that they

23   started?

24   A.  I believe it was AAS.

25   Q.  AAS.

—— 2:19-cr-00295-GMN-NJK ——

1   *A.*   Advanced Allocation Systems, I think.

2   *Q.*   Did Patti Kern and Jose Luis Mendez have any other partners

3   in Advanced Allocation Systems?

4   *A.*   Eventually, I became a partner.

5   *Q.*   Okay.  You became a partner?

6   *A.*   That's correct.

7   *Q.*   And by "partner," I mean somebody that you split the

8   profits with after all the expenses are paid?

9   *A.*   That's correct.

10  *Q.*   Okay.  Is that your rough understanding of what you're

11  saying when you say you became partner?

12  *A.*   Yes.

13  *Q.*   How did the three of you split up the profits?

14  *A.*   I have no idea.  I was -- I was helping Jose Luis Mendez

15  with promotions and finding boxes and getting things worked

16  out, and Patti, in turn, called me and said, "You're doing so

17  much of the work.  Why don't you take" -- or, "I'll give you

18  part of the profits of this company."  And I accepted.

19  *Q.*   Okay.  And, again, we're talking back in 2012?

20  *A.*   Yes.

21        MR. FINLEY:  Let's take a look at Government

22  Exhibit 171, which has been admitted.

23  BY MR. FINLEY:

24  *Q.*   Okay.  That's an e-mail from Patti Kern to you at the top,

25  right?

─── 2:19-cr-00295-GMN-NJK ───

1    **A.**  Yes.

2    *Q.*  Okay.

3            MR. FINLEY:  Can we blow up the top, please?

4    BY MR. FINLEY:

5    *Q.*  And it's dated March 8, 2012?

6    **A.**  That's correct.

7    *Q.*  And there's an e-mail chain beneath that, right?

8    **A.**  Yes.

9    *Q.*  Before we go to that, do you see your e-mail address there?

10   **A.**  Yes.

11   *Q.*  Does your e-mail address have National Print Mail in it?

12   **A.**  Yes.

13   *Q.*  What is "National Print Mail"?

14   **A.**  It was the name of the company at that time, the letter

15   shop.

16   *Q.*  Okay.  And if you go to e-mail all the way at the

17   beginning -- this is on page 3 of Government Exhibit 171 --

18   you're talking to a guy named Michael Ladomerszky.

19           Do you see that?

20   **A.**  Yes.

21   *Q.*  Who is he?

22   **A.**  He was a friend of mine from high school and he was a

23   guy -- an artist.  He was a pre-press guy.

24   *Q.*  Now, this e-mail at the beginning of the chain is January

25   of 2012, and then the one we just looked at at the top of the

—— 2:19-cr-00295-GMN-NJK ——

1    chain was in March.

2          Did it -- did it usually take some time to get these

3    companies set up?

4    *A.*  When you're starting from scratch, yes.

5    *Q.*  And are you talking to Michael Ladomerszky about some

6    artwork and how you want the -- how you want the mailing to

7    look for Advanced Allocation Systems?

8    *A.*  Yes.

9    *Q.*  Is this what you were referring to when you talked about

10   that you were doing the leg work and that's why Patti wanted to

11   give you some of the profit?

12   *A.*  Correct.

13   *Q.*  This is an example of you doing just that?

14   *A.*  Yes.

15          MR. FINLEY:  Let's take a look next at Government

16   Exhibit 190, which has been admitted.

17          Okay.  Let's look at the top, please.

18   BY MR. FINLEY:

19   *Q.*  That's an e-mail from Patti Kern to an e-mail address

20   called ChangoConsulting@Gmail.com.

21          Do you see that?

22   *A.*  Yes.

23   *Q.*  Do you recognize that e-mail address?

24   *A.*  That was mine, also.

25   *Q.*  You also had an e-mail address called Chango Consulting?

1   **A.**   That's correct.

2   *Q.*   On the subject line, it says, "New dba for AAS."

3          Do you see that?

4   **A.**   Yes.

5   *Q.*   Are you talking about a new dba?

6          What is a dba here?

7   **A.**   I believe the words "are doing business as" or a -- another

8   name for the same company.

9   *Q.*   Okay.  And you referenced AAS.  You testified about that.

10  That's Advanced Allocation Systems, the company that you, Patti

11  Kern, and Jose Luis Mendez were partners on; is that right?

12  **A.**   That's correct.

13  *Q.*   What were you using that company to do?

14  **A.**   Mail prize notices.

15  *Q.*   There's an e-mail at the bottom from you to somebody named

16  rrgonzalezass@hotmail.com?

17          Do you see that e-mail?

18  **A.**   Yes.

19  *Q.*   And you refer to this person as Ricardo.

20          Do you see that?

21  **A.**   Yes.

22  *Q.*   Who's Ricardo?

23  **A.**   Ricardo was a CPA resident agent for opening corporations.

24  *Q.*   Did he work directly with you at any point?

25  **A.**   Yes.

1    Q.   How did he work with you?

2    A.   Well, of this e-mail, it was about getting a dba for AAS.

3    Q.   Okay.  In this e-mail, it appears you're relaying a

4    message?

5    A.   Right.

6    Q.   Did you ever pay him to do work for you?  For you.  Not the

7    letter shop.  For you.

8    A.   For me, personally, yes.

9    Q.   Okay.  What did you pay him to do?

10   A.   Do my accounting.

11   Q.   He was an accountant?

12   A.   Yes.

13   Q.   And here, you are telling him that Jose needs a new dba for

14   Advanced Allocation Systems.

15           Do you see that?

16   A.   Yes.

17   Q.   Is that consistent with your memory -- well, let me ask you

18   this.  I'll back up.

19           Who's Jose there?

20   A.   Jose Luis Mendez.

21   Q.   Okay.  Now, is this consistent, does it support your

22   testimony from earlier that he's one of the owners?

23   A.   Yes.

24   Q.   He's the one who needs the new dba, right?

25   A.   Right.

2:19-cr-00295-GMN-NJK

1    Q.  And you're telling Ricardo Gonzalez that?

2    A.  That's correct.

3    Q.  Did Ricardo Gonzalez do work for any of the four

4    defendants?

5    A.  He was the CPA.  I think he helped Miguel with things on

6    accounting or taxes.  He opened a lot of the corporations that

7    I recall.

8    Q.  He opened a lot of the mailing companies that you all were

9    using to send fraudulent mail?

10   A.  I believe so.

11   Q.  You needed a new company -- or a new dba as we see here?

12   He was the go-to guy for the four defendants for that?

13   A.  I believe so.

14   Q.  And we would -- if we looked at the corporate records, we

15   would expect to see his name all over that for all the

16   different mailing companies, right?

17   A.  As the resident agent, right.

18   Q.  And he worked for the defendants?

19   A.  Correct.

20   Q.  The defendants went to him?

21   A.  As far as I understand, yes.

22   Q.  They didn't ask Patti Kern to open these companies for

23   them?  They asked the defendant -- Mr. Gonzalez?

24   A.  I believe so, yes.

25   Q.  Well, if that's what it says on the corporate records,

—— 2:19-cr-00295-GMN-NJK ——

1  would you -- would you --

2  *A.*  Yes.

3  *Q.*  -- have any reason not to believe that?

4  *A.*  No.

5  *Q.*  Did you see him around the place, Ricardo Gonzalez?

6  *A.*  He came by the office now and then.

7  *Q.*  Let me ask you about the defendant Miguel Castro.

8       Actually, let me back up.  There's something I forgot

9  to ask you.

10       Let me quickly show you Government Exhibit 79, which

11  has been admitted in evidence.

12       MR. FINLEY:  And if we could cycle just a few pages to

13  the mailbox application that was found at the defendant Jose

14  Luis Mendez's house.

15       Okay.  There it is.

16  BY MR. FINLEY:

17  *Q.*  Do you have page 3 of Government Exhibit 79 in front of

18  you?

19  *A.*  Yes.

20  *Q.*  Is that a mailbox application for Advanced Allocation

21  Systems, the company we've been talking about?

22  *A.*  Yes.

23  *Q.*  And that's the company that you, Patti Kern, and Jose Luis

24  Mendez are partners on, right?

25  *A.*  Yes.

1    Q.  And you said before you were using that to send prize

2    notices.

3            What does it say on this application about what

4    Advanced Allocation Systems did for its business?  And I'm

5    looking at Box 11, Type of Business.

6    A.  It says health and beauty sales.

7    Q.  Were you and Patti Kern and Jose Luis Mendez using Advanced

8    Allocation Systems to sell health and beauty products to

9    people?

10   A.  No.

11   Q.  Did Advanced Allocations have anything to do with health

12   and beauty?

13   A.  Not that I know of.

14   Q.  How would you characterize the accuracy of that statement

15   about the type of business that Advanced Allocation Systems

16   was?

17   A.  That's inaccurate.

18   Q.  Okay.  The defendant Miguel Castro, did he ever become

19   partners with Patti Kern on a mailing company at any point

20   between 2012 and 2018?

21   A.  I recall him being one later on closer to 2018.

22   Q.  Could you say that again?  Your mic cut out.

23   A.  I recall him being -- becoming a partner with Patti later

24   on in the timeframe, yes.

25   Q.  You said they telling you.  Do you know who told you that?

1    **A.**    No.  I think Jose Luis Mendez, but I -- I can't swear to

2    that.

3    **Q.**    Would it have been somebody that you're working with at the

4    letter shop who'd have a reason to know?

5    **A.**    Yes.  Or Patti would tell me.

6    **Q.**    Did you ever hear about Salvador Castro becoming partners

7    with Patti Kern on a mailing company at any point between 2010

8    and 2018?

9    **A.**    Yes.

10   **Q.**    Do you recall approximately when that happened?

11   **A.**    I don't recall.

12   **Q.**    Do you remember if it was in the first half or the second

13   half of that time period, eight-year time period?

14   **A.**    I would say somewhere in the middle, so 2015, 2014, but I'm

15   not sure.

16   **Q.**    Now, when Miguel Castro, Salvador Castro became partners on

17   certain of the many mailing companies that were used, were they

18   already producing and sending fraudulent prize notices with you

19   and Patti Kern?

20   **A.**    Yes.

21   **Q.**    So they had already been doing that?

22   **A.**    Yes.

23   **Q.**    So you got some partner money from the company AAS, or

24   Advanced Allocation Systems.

25            Did you ever get partner profits for any of the other

2:19-cr-00295-GMN-NJK

1  mailing companies that you all used?

2  *A.*  No.

3  *Q.*  That was the only one?

4  *A.*  That's correct.

5  *Q.*  Now, when you got the profit payments, who gave those to

6  you?

7  *A.*  At that point in time, they're usually waiting for me at

8  the office when I got there.

9  *Q.*  Okay.  All right.  So they're waiting for you.  So somebody

10  didn't hand it to you; is that right?

11  *A.*  That's correct.

12  *Q.*  Do you know who dropped it off at the office for you for

13  you to find when you got there?

14  *A.*  Patti Kern.

15  *Q.*  Okay.  Then you mentioned an envelope.

16          What would be inside the envelope?

17  *A.*  Either cash or a check or both.

18  *Q.*  What color were the envelopes?

19  *A.*  They were white, plain, No. 10 envelopes.

20  *Q.*  Anything written on them?

21  *A.*  Usually my name was written on it.

22  *Q.*  Did you see similar envelopes sitting around with names on

23  them?

24  *A.*  Yes.

25  *Q.*  Okay.  What did they look like when you saw them sitting

1  around?

2  **A.**  They were usually opened in the trash can or on the

3  computer I was working at.  The laser machine had a computer

4  that a lot of people sat at.

5  Q.  Now, did you ever see Patti Kern hand envelopes of cash to

6  any of the four defendants?

7  **A.**  Not that I recall.

8  Q.  Now, how is it that you're getting these envelopes from

9  Patti Kern with profit, checks and cash in it, or, you know,

10  one or the other or both?

11       How are you getting these and you don't see the four

12  defendants getting them?

13  **A.**  Patti would come by way before I would get to work during

14  that time.  Through 2014, she was an early bird.  She'd be

15  there at 7:00 a.m., and I wouldn't come in until 9:00 or 10:00.

16  Q.  Now, you said that the envelope would be waiting for you

17  somewhere.

18       Where -- was it always waiting for you in the same

19  place?

20  **A.**  Yeah.  It was usually -- if I had a desk, it was under my

21  keyboard or it was in a pocket on the wall.  Like, we had these

22  pockets on the walls.

23  Q.  And do you remember what day of the week, if there was a

24  special day of the week, when she came by and dropped off the

25  cash envelopes?

1    **A.**  It was a usually a Friday or a Thursday.  More than likely

2    a Friday.

3    **Q.**  Did you -- so on envelope day, did you ever witness any one

4    of the four defendants coming in on that day but maybe not

5    coming in the rest of the days of the week?

6    **A.**  I would say we'd definitely all be there Friday.  I would

7    be there Monday through Friday.  Jose Luis Mendez would be

8    there Monday through Friday.  Mario was kind of in and out.

9    Miguel was there Monday through Friday.  And Salvador was

10   usually there later in the week, also, so at the end of the

11   week, Friday, Thursday.

12   **Q.**  There was a time period where you were just working part

13   time; is that right?

14   **A.**  That's correct.

15   **Q.**  During what years were you just working part time?

16   **A.**  After the whole thing with Glen Burke, I looked for a

17   full-time job.  I found a couple odd jobs, but then I started

18   in 2014 working full time for Las Vegas Color Graphics.

19   **Q.**  Okay.  So starting in 2014, you got a full-time job at Las

20   Vegas Color Graphics?

21   **A.**  That's correct.

22   **Q.**  What kind of company is that?

23   **A.**  Another letter shop mailing house.

24   **Q.**  Okay.  Did they print fraudulent prize notices over there?

25   **A.**  No.  It was mostly casino work, government work, and, like,

1    other big business work.

2    Q.  And after you got the full-time job at Las Vegas Color

3    Graphics in 2014, did you -- you must have stayed -- based on

4    your earlier testimony, you must have stayed and worked part

5    time at the Castro family letter shop?

6    A.  That's correct.

7    Q.  Now, can you tell the jury what your schedule was like from

8    2014 to 2018 when you're only working part time?  What part or

9    parts of the day are you coming to the Castro family letter

10   shop?

11   A.  Usually I worked at Las Vegas Color Graphics from 11:00 to

12   7:00, sometimes 10:00.  My schedule kind of moved around.

13          Some days I would come in early depending on when I

14   got the names to process and drop them off to the Castros'

15   letter shop before I would go into work at Las Vegas Color

16   Graphics and sometimes I'd come later at night.

17   Q.  Okay.  So let me make sure I understand you.

18          Sometimes, not always, you would stop by the Castro

19   family letter shop before going to work at Las Vegas Color

20   Graphics, your full-time job?

21   A.  That's correct.

22   Q.  Stop by in the morning and then you would leave.

23          Would you work an eight-hour shift at Las Vegas Color

24   Graphics?

25   A.  Every day.

1   Q.  And -- so you were full time, 40 hours a week?

2   A.  That's correct.

3   Q.  And then would you come back at night, too?

4   A.  Yes.

5   Q.  Okay.  You'd come back to the Castro family letter shop

6   after your shift at Las Vegas Color Graphics was over?

7   A.  That's correct.

8   Q.  So there are two different time periods where you might be

9   coming in to the family letter shop, the morning and at night?

10  A.  Right.  Depending on -- basically, depending on the

11  schedule, data work that I needed to do.  Some of it might need

12  to be done that morning and some could wait until that night.

13  Q.  So from 2014 to 2018 -- because I think your schedule is

14  important -- you wouldn't have seen most of what's going on in

15  that letter shop during the day?

16  A.  That's correct.

17  Q.  And you had -- did you have -- did your level of day-to-day

18  face-to-face contact with the four defendants go down after

19  2014?

20  A.  Tremendously.

21  Q.  You still would see them in the morning from time to time?

22  A.  Yes.

23  Q.  Did you ever show up in the morning back then, 2014 to

24  2018, and see any of the four defendants arrive at work in the

25  morning and then immediately leave for breakfast?

2:19-cr-00295-GMN-NJK

1    *A.*   That happened quite often.

2    *Q.*   Okay.  And which of the four defendants did you see come to

3    work and then turn around and go to breakfast?

4    *A.*   I'm not sure what time they arrived, but when I got there

5    at around 9:30, usually, Jose Luis Mendez, Mario, sometimes

6    Salvador, sometimes Miguel, they would go have breakfast, and

7    whoever else was in the shop.

8    *Q.*   Do you recall about how many times a week that was

9    happening?

10   *A.*   I wasn't there every morning so I couldn't -- I'd say, you

11   know, four or five times a month.

12   *Q.*   What was your job at night?  Were you supposed to have

13   something all ready to go for the morning?

14   *A.*   I would usually drop off the data, important data that had

15   to go, you know, soon in the morning.

16          But at night, I would come back and set up the laser

17   machine with a new -- new form, take more time, you know.  When

18   I drop off the data it would be, you know, 30 minutes or so, an

19   hour, but sometimes when I did the setup, sometimes it would

20   take an hour or two.  At night was better.

21   *Q.*   Okay.  And just so we're real clear on what your schedule

22   was during the conspiracy period, from 2010 to 2014, were you

23   part time then?

24   *A.*   Full time.

25   *Q.*   Full time.

1        And -- so during that first half of the conspiracy,

2   you're there every day during normal business hours working

3   40 hours a week or more?

4   *A.*   Yes.  To about 2013.  And then there was a year in there

5   where I took another job as a stage hand.

6   *Q.*   Okay.  In 2013?

7   *A.*   In 2013.

8   *Q.*   That was -- and did that happen immediately after Glen

9   Burke got shut down?

10  *A.*   Within a few months, yes.

11  *Q.*   And did your -- did your employment changes in that year

12  have to do with the family letter shop losing a lot of

13  business?

14  *A.*   Yes.

15  *Q.*   And did you see Miguel Castro in the letter shop from 2010

16  to 2014 when you're there full time?

17  *A.*   Yes.

18  *Q.*   When you were in the letter shop, 2010 to 2014, were there

19  fully printed prize notices sitting around?

20  *A.*   Of course.  In the laser room, there would be blank forms.

21  Usually Jose Luis Mendez would print them and then stack them,

22  you know, as done pile, and they'd be fully printed, and then

23  they would sit there until it was time to the disperse them,

24  insert them, send them to the post office.

25  *Q.*   I hope this doesn't seem like a strange question, but I

1    feel like I have to ask it.

2         Is it physically possible to produce millions of these

3    fraudulent prize notices in the letter shop without ever

4    looking at them or touching them?

5    **A.**  Not likely, no.  They're all over the place.

6    *Q.*  What are the kinds of things -- and, again, I'm in 2010 to

7    2014.  What are the kinds of things that you saw each of the

8    four defendants doing inside the letter shop during that

9    period?

10        Let's start with Salvador Castro.  What did you see

11   him doing in there?

12   **A.**  Salvador Castro would -- the few times I did see him there,

13   he may have been running the inserters or pulling paper or help

14   throw away stock or driving the forklift to load -- I mean,

15   when you're mailing a cage of mail which is, you know, six-foot

16   cage of mail trays, you load it onto a truck with a forklift.

17   *Q.*  Now, did he work full time, 40 hours a week?

18   **A.**  No.  I don't think he ever there 40 hours a week.

19   *Q.*  Okay.  How often was he there as best you can recall?

20   **A.**  It seemed like two or three times a week I would see him.

21   *Q.*  Okay.  You mentioned him doing some things.  I think you

22   mentioned the forklift?

23   **A.**  Forklift.

24   *Q.*  That's simple enough.

25        And you've testified a couple times he was helping to

—— 2:19-cr-00295-GMN-NJK ——

1   throw away the stock when the cease and desist came down.

2   *A.*   Correct.

3   *Q.*   Is that your testimony?

4   *A.*   Yes.

5   *Q.*   You talked about him helping with the inserter.  Is that a

6   big machine that stuffs a massive amount of letters into

7   envelopes?

8   *A.*   Yes.  It stuffs the envelopes with the -- the forms and the

9   return envelopes and seals it and puts a stamp on it or it

10  meters it.

11          (Court reporter interruption.)

12  *A.*   It stuffs the envelopes and sealed the envelope and it puts

13  a meter strip on it or a stamp on it, all in one pass.

14  *Q.*   What did you see him doing with that machine?

15  *A.*   Running it.

16  *Q.*   What did the defendant Jose Luis Mendez do in the letter

17  shop while you were working there full time, 2010 to 2014?

18  *A.*   Mostly Jose Luis mainly ran the OCE printers, the very

19  large laser printer.  He was good at it.  He knew how the

20  machines worked.  He made them work.  He fixed them quite

21  often.  They were very temperamental.

22  *Q.*   Did you see him doing anything else in there?

23  *A.*   Sometimes he would run the -- the bursters or the

24  inserters, also.

25  *Q.*   Okay.  What's a burster?

———— 2:19-cr-00295-GMN-NJK ————

1    *A.*   The OCE machines --

2            (Court reporter interruption.)

3    *A.*   OCE.  It's German, I think.  I'm not sure.

4    *Q.*   Okay.

5    *A.*   A burster takes -- they're pin fed.  I don't know if you

6    guys remember all the old printers where they had the circles

7    down the side to keep the track, the paper perfect.  And so a

8    burster would take out those pinholes.  Then you could fold it

9    into the envelope, fold it down to size to make it fit in the

10   envelope.

11   *Q.*   You mentioned Miguel Castro handled some financial issues

12   such as clawing postage back?

13   *A.*   Yes.  He did most of the accounting work, the day-to-day

14   accounting work.

15   *Q.*   And you testified that clawing postage back was after cease

16   and desist came back -- came down, you'd try to get some of

17   that postage money back before you lost it?

18   *A.*   Yes.

19   *Q.*   And he did that -- you mentioned he did some accounting.

20            Is he doing some accounting from 2010 to 2014?

21   *A.*   Yes.

22   *Q.*   And during the 2010 to 2014 period, were Mario Castro,

23   Miguel Castro your bosses?

24   *A.*   Always.

25   *Q.*   Now, you're getting paychecks for your work?

-2:19-cr-00295-GMN-NJK-

1  *A.*  Yes.

2  *Q.*  Okay.  And the paychecks that you're receiving from the

3  Castro family letter shop, those are -- where is that money in

4  the paycheck coming from?

5  *A.*  From paying invoices from the clients, which, ultimately,

6  comes from the scheme.

7  *Q.*  Okay.  So you're in there printing these fraudulent prize

8  notices?

9  *A.*  That's correct.

10  *Q.*  And when you're in there printing the fraudulent prize

11  notices, also receiving cash and checks for one of the

12  fraudulent mailing companies, did you have any awareness that

13  the money that was coming back into the business was money that

14  fraud victims had sent in the mail back into the business?

15  *A.*  That's correct.

16  *Q.*  In response to the lies that are on the prize notices?

17  *A.*  Yes.

18  *Q.*  About winning money, "Send us $20"?

19  *A.*  Yes.

20  *Q.*  Were you aware during this period, 2010 to 2014, of any

21  other source of income into the letter shop business besides

22  money from fraud victims?

23  *A.*  I remember a few small jobs here and there but nothing

24  major.  I would say 98 percent of our work was, you know, all

25  the different types of fraud mail that was -- was going through

—2:19-cr-00295-GMN-NJK—

1  the system.

2  Q.  Okay.  So as best you can recall sitting here today, the

3  paychecks you received from 2010 to 2014, they're about

4  98 percent victim money?

5  A.  That's correct.

6  Q.  You mentioned there were some other forms of income that

7  were not significant.

8        What kind of income was that?

9  A.  Usually printing or one-off jobs.  But those things.  We

10  could number stuff, you know, lasering stuff.  I can't remember

11  exact -- something with pills, something with astrology, you

12  know, here and there.  Flyers.  There was a couple times we did

13  some flyers.  Not much.

14  Q.  Okay.  So some mailings about astrology?

15  A.  Yeah.

16  Q.  And were those intended to separate people from their

17  money?

18  A.  Yes.

19  Q.  And what about these pills?  What kind of pills?

20  A.  They were some kind of weight loss pill, I believe.

21  Q.  Like -- okay.  So you're sending out mail asking people to

22  buy diet pills?

23  A.  Yes.

24  Q.  Any other kind of business that was going on besides

25  taking -- stealing money from people with phony notices?  Any

1  other kind of business?

2  *A.*  That's all I can recall.

3  *Q.*  Now, we've been talking about the letter shop and they --

4  and you mentioned earlier when your testimony began, it's had

5  different names over the years?

6  *A.*  Yes.

7        MR. FINLEY:  If we could please show the defendant

8  Government Exhibit 428.  It's a demonstrative exhibit.

9        If we could just show this to the witness for now.

10  BY MR. FINLEY:

11  *Q.*  Do you see that, sir?

12  *A.*  Yes.

13  *Q.*  Do you recognize all the company names on that slide?

14  *A.*  Yes.

15  *Q.*  Okay.

16        MR. FINLEY:  Let's publish Government Exhibit 428 to

17  the jury.

18        I understand there's no obligation to this, your

19  Honor.

20        THE COURT:  That's correct.

21  BY MR. FINLEY:

22  *Q.*  Okay.  A lot of company names flying around in this case,

23  so I thought you should take a look at this slide and break

24  this down for us a little bit.

25        Are all the company names on that slide, are those

1    businesses that were run by members of the Castro family?

2    *A.*   Yes.

3    *Q.*   Okay.  And you worked at the letter shop?

4    *A.*   That's correct.

5    *Q.*   We saw the e-mail that you had that had National Print and

6    Mail in the e-mail address?

7    *A.*   Yes.

8    *Q.*   Was National Print and Mail the name of the Castro family

9    letter shop that you worked at during the early period of the

10   conspiracy?

11   *A.*   Yes.

12   *Q.*   Okay.  Now, in the middle, there's a company called

13   Marketing Image Direct.  What's that?

14   *A.*   That's when, I think, Mario was mainly running the company

15   under his name, Marketing Image Direct, if I remember right.

16   *Q.*   Okay.  You never actually looked at the company records,

17   have you?

18   *A.*   No.

19   *Q.*   Could have been Miguel?

20   *A.*   Could have been Miguel.

21   *Q.*   Now -- but your memory was that Mario was in charge?

22   *A.*   Mario and Miguel, but I don't remember exactly who owned it

23   at that time.

24   *Q.*   Now, was Marketing Image Direct the name that they started

25   using after Glen Burke got shut down?  Kind of the middle

———— 2:19-cr-00295-GMN-NJK ————

1    period of the conspiracy?

2    **A.**   I think so.

3    *Q.*   So I'm talking, like, 2013, 2014, 2015?

4    **A.**   Yes.

5    *Q.*   Okay.  And then Digital Express, what's that?

6    **A.**   Another letter shop name for the same letter shop.

7    *Q.*   Okay.  And was that the letter shop during the latter years

8    of the conspiracy?

9    **A.**   Yes.

10   *Q.*   Now, these print shops, were they always in the same place

11   from 2010 to 2018?

12   **A.**   No.  We moved around.

13   *Q.*   Moved around?

14         So when Glen Burke got shut down, for example, in

15   January of 2013, was the letter shop on 6925 Pearl Street like

16   it was in 2018?

17   **A.**   No.

18   *Q.*   Now, you talked about printing.  That's the first part of

19   the process.

20         And underneath Printing, there's a company called New

21   Generation Graphics.  Do you recognize that name?

22   **A.**   Yes.

23   *Q.*   What's New Generation Graphics?

24   **A.**   That was a printing company that I understood Epifaniel

25   run.  Epi.

1    *Q.*  That was Epi's printing company according to your memory?

2    *A.*  Yes.

3    *Q.*  During what years of the conspiracy was New Generation

4    Graphics in operation?

5    *A.*  I believe it was always called that.

6    *Q.*  So your memory is 2010 to 2018, this company is

7    consistently called New Generation Graphics?

8    *A.*  Yes.

9    *Q.*  Now, back in 2010 to 2014, were you at the Pearl Street

10   warehouse?

11   *A.*  No.

12   *Q.*  Okay.  So it was a different location from the Pearl Street

13   warehouse, which is where the letter shop was in 2018?

14   *A.*  Correct.

15   *Q.*  Okay.  Now, back at this other location when you're working

16   full time in 2010 to 2014, was there produce inside the

17   warehouse?

18   *A.*  When Glen shut down, no.

19          And then we moved across the street, still on Patrick,

20   and there was no produce then either.

21   *Q.*  Okay.

22   *A.*  So, no.  That I can recall.

23   *Q.*  You mentioned Patrick.  Was that where the letter shop was

24   when Glen Burke got shut down?

25   *A.*  Yes.

1    *Q.*  So back during this time period then -- I think you

2    answered the question.  I just want to make sure it's clear --

3    2010 to 2014, is there a produce businesses inside the

4    warehouse?

5    *A.*  No.

6    *Q.*  When did you first notice that all the printing machines

7    and the printing business were inside of a produce warehouse?

8    *A.*  That was when we moved to Pearl Street.

9    *Q.*  So from 2010 to 2014, you mentioned Salvador Castro is

10   there working on a part-time basis occasionally helping out

11   with inserters, driving the forklift, throwing away stock,

12   things like that.

13            Do you remember that?

14   *A.*  Yes.

15   *Q.*  In 2010 to 2014, he was not working at a produce business?

16   *A.*  Not that I know of.

17   *Q.*  He is helping you produce and send fraudulent mail?

18   *A.*  Yes.

19   *Q.*  Now, during the times when you were at the warehouse full

20   time and you saw Salvador Castro, were there times when he just

21   wasn't doing any work?  He was just sitting around?

22   *A.*  Yes.

23   *Q.*  Okay.  How often did you see that?

24   *A.*  Quite often.

25   *Q.*  So we were talking about Marketing Image Direct.  You said

——2:19-cr-00295-GMN-NJK——

1    you thought it was Mario Castro's company, but I asked you if
2    it could have been Miguel's and you said yes, correct?
3    *A.*   Yes.
4    *Q.*   You haven't seen the corporate record; is that correct?
5    *A.*   That's correct.
6    *Q.*   Or at least during this time, right?
7    *A.*   That's correct.
8    *Q.*   You saw it before you came and testified today, right?
9    That's the only time?
10   *A.*   Yes.
11          MR. FINLEY:  Okay.  Let's look at Government
12   Exhibit 214 at page 91.  That is already in evidence.
13          Now, if we go to the top where it says Marketing Image
14   Direct, please.
15   BY MR. FINLEY:
16   *Q.*   Okay.  Is this a state corporate record for Marketing Image
17   Direct, Inc.?
18   *A.*   Yes.
19   *Q.*   Okay.
20          MR. FINLEY:  And can we go to where all the names of
21   the corporate officers are and the signature?
22   BY MR. FINLEY:
23   *Q.*   Okay.  Now, who is the president, secretary, treasurer, and
24   director of Marketing Image Direct?
25   *A.*   Miguel Castro.

—— 2:19-cr-00295-GMN-NJK ——

1    Q.  Now, there's an initial in that name, isn't there?

2    A.  Yes, there is.

3    Q.  What's the middle initial?

4    A.  M.

5    Q.  M.

6            Do you know what the defendant's -- defendant Miguel

7    Castro's middle initial is?

8    A.  No.

9    Q.  Okay.

10           MR. FINLEY:  Let's look at Government Exhibit 59,

11   which is the defendant's driver's license.  Let's see if the

12   defendant's middle initial is M.

13   BY MR. FINLEY:

14   Q.  Do you see the middle initial?

15   A.  It is an A.

16   Q.  Do you recognize the photo?

17   A.  That's Miguel.

18   Q.  Which Miguel?

19   A.  Miguel Castro, the defendant.

20   Q.  Okay.  His middle initial is A, not M, on the driver's

21   license?

22   A.  Yes.

23   Q.  Okay.

24           MR. FINLEY:  Now, let's look at Government

25   Exhibit 284, which is admitted in evidence.

1          If we could blow up the driver license information at

2    the top half of the page.

3    BY MR. FINLEY:

4    Q.   Okay.  So that's driver's license information that has

5    previously been admitted into evidence.

6          Do you recognize the man in that photo?

7    A.   That's Miguel's son.

8    Q.   How are you able to recognize the defendant Miguel Castro's

9    son?

10   A.   I've seen him at the office.

11   Q.   Did he work there?

12   A.   No.

13   Q.   Okay.  So during the time that you were there, you're not

14   aware of him actually working there?

15   A.   That's correct.

16   Q.   But -- so you would see him then doing what?

17   A.   Hanging out.

18   Q.   Okay.  And what is the middle initial of Miguel Castro's

19   son?

20   A.   M, Manuel.

21   Q.   So middle initial M?

22   A.   M.

23   Q.   Is that the same middle initial that we saw on the

24   corporate record for Marketing Image Direct?

25   A.   Yes.

1    Q.   Was Miguel M. Castro, the defendant's son, your boss?

2    A.   Yes.

3    Q.   And Marketing Image Direct was the print shop?

4    A.   Yes.

5    Q.   And that print shop was --

6             (Counsel conferring.)

7    Q.   Okay.  Did you just say "yes"?

8    A.   Yes.  I was wrong.

9    Q.   What?

10   A.   Miguel was -- Miguel A. Castro was my boss, but by this

11   paperwork, Miguel M. Castro was the owner of the company.

12   Q.   Okay.  According to the paper?

13   A.   According to the paper, yes.

14   Q.   According to actual real life, who's your boss?

15   A.   Miguel Castro, with an A.

16   Q.   So the owner on paper, your boss in real life, two

17   different things?

18   A.   That's correct.

19   Q.   Was Marketing Image Direct a company that was used to

20   produce and send fraudulent prize notices?

21   A.   Yes.

22   Q.   And was the fraud that you were doing when -- when the

23   letter shop was called Marketing Image Direct, that was being

24   conducted under the name of Miguel Castro, the defendant's son,

25   Miguel M. Castro?

1   *A.*   I didn't hear the very first part of the question.

2   *Q.*   Was the fraud that you were committing when the letter shop

3   was called Marketing Image Direct, according to the paper --

4   the corporate paperwork, that fraud is being conducted

5   officially in the state records under the name of Miguel

6   Castro's son, Miguel M. Castro?

7   *A.*   Yes, that's correct.

8   *Q.*   Okay.  There was some questions throughout the trial about

9   fraud being conducted in other people's names.

10              MR. FINLEY:  Can we look at Government Exhibit 280,

11  please.

12  BY MR. FINLEY:

13  *Q.*   That's a chart of mailing companies based on state records,

14  county records, and bank account records.

15              Do you recognize the mailing companies on that chart?

16  *A.*   Yes.

17  *Q.*   Do you recognize all of them?

18  *A.*   Yes.

19  *Q.*   Did you and your coconspirators during the conspiracy use

20  these mailing company names to put on fraudulent prize notices?

21  *A.*   Yes.

22  *Q.*   And you will see on the right-hand side, or the right half,

23  the presidents and bank account signers are a bunch of

24  different people.

25              Do you see that?

1   **A.**   Yes.

2   *Q.*   Do you -- do you know all those people?

3   **A.**   Most of them, not all.

4   *Q.*   Okay.  So as to the ones you don't know, you were willing

5   to commit fraud under the names of those people; is that right?

6   **A.**   Yes.

7   *Q.*   That's what you did?

8   **A.**   Yes.

9   *Q.*   Did you benefit personally from the fraud that you

10  conducted during the conspiracy under the names of these people

11  that you didn't know?

12  **A.**   Yes.

13  *Q.*   How did you benefit personally from that?

14  **A.**   I received a paycheck.

15  *Q.*   And I think you testified before, that paycheck was 90-plus

16  percent fraud money?

17  **A.**   Yes.

18  *Q.*   It has been suggested that the defendant Jose Luis Mendez

19  did not use any other person's name to commit fraud.

20          Is that true?

21  **A.**   He worked at the company and we had these people as

22  clients.

23  *Q.*   Did he benefit personally, just as you did, from the fraud

24  that all of you conducted under the names of all those people?

25  **A.**   Yes.

———— 2:19-cr-00295-GMN-NJK ————

1    *Q.*  Did the defendant Jose Luis Mendez receive a paycheck that

2    was funded by money from fraud victims?

3    **A.**  Yes.

4         MR. FINLEY:  Could I please have Government

5    Exhibit 1C.  That's already admitted.

6    BY MR. FINLEY:

7    *Q.*  Let me show you one of these price notices, sir.

8         THE COURT:  It looks like we're getting into a

9    different area here, so it might be a good time to take a

10   break.

11        I am going to give the jury, at this point, a limiting

12   instruction just to explain to you that you have received

13   evidence of other acts committed by the defendant according to

14   the testimony provided by Mr. O'Connor.  And this is not

15   usually admissible to prove that the defendants committed the

16   acts with the -- with which they are charged here today.

17   However, sometimes exceptions apply, and so this one is an

18   exception here.

19        So the evidence testimony was provided by Mr. O'Connor

20   about these other acts is admissible to you to consider but

21   only for a limited purpose.  You remember at the beginning of

22   trial, two weeks ago, almost three weeks ago I told you

23   sometimes there's evidence that's admissible only for limited

24   purposes.  This is one of those.

25        So these other acts that was testified to by

1    Mr. O'Connor are admissible and -- for your consideration only

2    as to proving motive, opportunity, intent, preparation, plan,

3    knowledge, identity, absence of mistake, or lack of accident.

4    And you'll have a written instruction for that as well, but I

5    want to tell you now while it's still fresh in your mind

6    because this is such a long trial.

7            So now let's go ahead and take our afternoon break.

8            Remember, you are not to discuss this case with anyone

9    nor permanent anyone to discuss it with you nor to speak to

10   anyone about this case in any way or read or listen to or view

11   anything that touches upon this case in any way or perform any

12   independent research or investigation.

13           And do not yet form an opinion.  We have more

14   testimony and exhibits and jury instructions to provide to you.

15   After closing arguments, that's the last thing that you'll

16   hear, then I'll excuse you to begin your deliberation produce.

17           So let's all stand for the jury so they can take their

18   break.  It's 2:30.  We'll welcome them back at about 2:45.

19           And Mr. O'Connor, after the jury exits, you may also

20   stretch and take your afternoon break.  We just need you back

21   here about 2:45, sir.

22           Remember not to speak to anyone about your testimony.

23           (Whereupon, the jury exits at 2:27 p.m.)

24           THE COURT:  Okay.  So it looks like we actually have

25   until 4:00 today.

────── 2:19-cr-00295-GMN-NJK ──────

1          Anything that we need to discuss before we resume

2    again around 2:45?

3          MR. TANASI:  Not from defense, your Honor.  Thank you.

4          THE COURT:  All right.  Okay.  All right.  We'll see

5    you back here at 2:45.

6          (Recess taken at 2:28 p.m.)

7          (Whereupon, the jury enters at 2:49 p.m.)

8          THE COURT:  All right.  Everyone may be seated.

9          I'm going to go ahead and continue with direct

10   examination of the witness, Mr. Sean O'Connor, for the

11   Government.

12         Mr. Finley, whenever you're ready, sir, you may

13   continue.

14         MR. FINLEY:  Could we get Government Exhibit 1C on the

15   screen, please?  It's already admitted.

16   BY MR. FINLEY:

17   Q.  Do you see that in front of you?

18   A.  Yes.

19         MR. FINLEY:  If we could blow up the envelope.

20   BY MR. FINLEY:

21   Q.  Is this an envelope for one of the prize notices that you

22   and the four defendants were putting out?

23   A.  Yes, for PAS.

24   Q.  And it says -- you say PAS.

25         It says Pacific Allocation Systems in the top left?

1    *A.*  Yes.

2    *Q.*  Is that "PAS" stands for?

3    *A.*  Yes.

4    *Q.*  Do you know who that company belonged to?

5    *A.*  I don't recall.

6          MR. FINLEY:  Let's look at Government Exhibit 280 for

7    a quick second.  That's the mailing company chart.

8    BY MR. FINLEY:

9    *Q.*  Do you see the line for Pacific Allocation Systems?

10   *A.*  Yes.

11   *Q.*  Who's the president and bank account signer for that

12   company?

13   *A.*  Jose Luis Mendez.

14          MR. FINLEY:  Now back to Government Exhibit 1C,

15   please.

16   BY MR. FINLEY:

17   *Q.*  Does -- does this envelope have any of the four defendant's

18   names on it?

19   *A.*  No.

20   *Q.*  Does it have the address of the letter shop on it?

21   *A.*  No.

22   *Q.*  Now, let's take a look at what's inside if we could go to

23   the next page.

24          Okay.  So that's the first page of the notice.

25          Do you see that?

———— 2:19-cr-00295-GMN-NJK ————

1    *A.*  Yes.

2    *Q.*  Now, would a notice like this have a phone number anywhere

3    on it where a person could call and reach you and ask about the

4    money?

5    *A.*  No.

6    *Q.*  Why isn't there any information on this notice that a

7    victim could use to find you all?

8    *A.*  We wouldn't want them to come knocking on the door of the

9    letter shop looking for the money.

10    *Q.*  There's a return envelope.  I think it's on one of the next

11    page -- or pages.

12          Okay.  Never mind.  There is no return envelope.

13          Usually it would come with a return envelope, right,

14    these notices?

15    *A.*  Always.

16    *Q.*  And what would the return address on the envelope be?

17    *A.*  Usually a P.O. box as listed in the front and on the

18    compendium information and throughout the piece.

19    *Q.*  Okay.

20          MR. FINLEY:  Can we look at the envelope again at the

21    top left?  That's page 1 of Government Exhibit 1C.

22    BY MR. FINLEY:

23    *Q.*  There's an address there, right?

24    *A.*  Correct.  Miami Lakes, Florida.

25    *Q.*  Now, would the address on the return envelope be the same

1   as the return address on the original envelope?

2   A.  Usually, yes.

3   Q.  Now, if somebody goes to this address in Miami Lakes,

4   Florida, what would they find there?

5   A.  More than likely a post office mailbox.

6   Q.  Did all of the money that victims sent back in response to

7   these prize notices, did they all go to this one mailbox here?

8   A.  Not usually, no.

9   Q.  Where would the -- where would the rest of it go?

10  A.  There was P.O. boxes, post office mailboxes open across the

11  nation.

12  Q.  Why did you and the four defendants use mailbox locations

13  all over the country?

14  A.  There was a few reasons.  One was to thin the return mail

15  down so it wouldn't raise as many red flags.

16          Another was if a postal inspector would show up,

17  they'd seize all mail at that P.O. box but they wouldn't get

18  all the mail, only that was received at that P.O. box.

19  Q.  Did you exchange text messages with the defendant Jose Luis

20  Mendez during the course of the scheme?

21  A.  Yes.

22          MR. FINLEY:  If we could put Government Exhibit 160A on

23  the screen.  It has already been admitted.

24  BY MR. FINLEY:

25  Q.  What is Government Exhibit 160A?

———— 2:19-cr-00295-GMN-NJK ————

1    *A.*   Text messages from Jose Luis Mendez to me and back and

2    forth.

3    *Q.*   Okay.  And did you exchange text messages with Jose Luis

4    Mendez often?

5    *A.*   Yes, especially from 2-14 on [sic].

6    *Q.*   This exhibit only contains some of these text messages; is

7    that right?

8    *A.*   Yes.

9    *Q.*   You had a lot more of them on your phone?

10   *A.*   That is correct.

11   *Q.*   And these text messages were from Jose Luis's Mendez's

12   phone.

13        Could you take a look and see if you recognize the

14   text messages?

15   *A.*   It looks like we're talking about a job, PA 05.

16   *Q.*   Okay.

17   *A.*   And I couldn't get the machine to work.

18        But I recognize it.

19   *Q.*   You recognize the text messages contained in Government

20   Exhibit 160A as actual texts that you and the defendant Jose

21   Luis Mendez shared?

22   *A.*   Yes.

23   *Q.*   Okay.  And if we look at the first text on page 1, that's a

24   text from Jose Luis Mendez to you, right?

25   *A.*   Yes.

1    *Q.*  He references something called PA 05.

2            What is that?

3    **A.**  It's one of the prize notices.

4    *Q.*  Do you remember what it stands for?

5    **A.**  No, I do not.

6            MR. FINLEY:  Let's take a look real quick at

7    Government Exhibit 280.  That's the list of mailing companies.

8    BY MR. FINLEY:

9    *Q.*  Do you see a mailing company that you all used that matches

10   up to the letters PA?

11   **A.**  I believe it was -- it's a lot of Ps there.  I believe it

12   was Price Awards.

13   *Q.*  Price Awards.  Okay.

14           And was Price Awards a company that you and the four

15   defendants used to send fraudulent mail in 2017, which is the

16   year that this text is written?

17   **A.**  Yes.

18   *Q.*  And if we were to look at the rest of the texts in

19   Government Exhibit 160 A, would we see texts between you and

20   Jose Luis Mendez discussing the logistics and the mechanics of

21   getting these fraudulent prize notices out into the mail?

22   **A.**  Yes.

23   *Q.*  Is that consistent with your memory that you and the

24   defendant Jose Luis Mendez coordinated with one another to get

25   these fraudulent mailings out into the mail?

───── 2:19-cr-00295-GMN-NJK ─────

1   *A.*  Yes.

2         MR. FINLEY:  Let's take a look at Government

3   Exhibit 160B.  This is already admitted, Judge.

4   BY MR. FINLEY:

5   *Q.*  Now, these are some of the texts between you and the

6   defendant Mario Castro.  These are actually from your phone?

7   *A.*  That's correct.

8   *Q.*  Do you recognize these texts?

9   *A.*  Yes.

10  *Q.*  And approximately how many text messages did you exchange

11  from Mario Castro during the life of this scheme?  Again, we're

12  talking 2010 to 2018.  Do you have a rough number?

13  *A.*  I would say thousands.

14  *Q.*  Okay.  And this exhibit right here only contains a small

15  portion of those texts; is that right?

16  *A.*  Yes.

17  *Q.*  Okay.  Let's look at the first one.  That's a text from you

18  to Mario Castro dated June 16, 2015.

19         Do you see that?

20  *A.*  Yes.

21  *Q.*  You write, "Put some jobs there for PK."

22         Who's PK?

23  *A.*  Patti Kern.

24  *Q.*  And then you mention that she -- you billed two jobs for

25  PK.

1              Do you see that?

2    *A.*   Yes.

3    *Q.*   And Mario Castro writes back to you, same day, less than an

4    hour later, "Okay."

5    *A.*   Yes.

6    *Q.*   Is this consistent with your testimony that you reported to

7    Mario Castro while you were engaged in the work of sending

8    these notices out?

9    *A.*   That is correct.

10   *Q.*   Let's take a look at page 4 of Government Exhibit 160B.

11   These are the texts from your phone with Mario Castro.

12              This is -- the text at the top is dated September 8,

13   2015.

14              Do you see that?

15   *A.*   Yes, I do.

16   *Q.*   You say, "I left the work orders for the rest of the week

17   in your desk."

18              I'm sorry.  Let me correct myself.  I misread that.

19              The text at the top is from Mario Castro to you,

20   right?

21   *A.*   That's correct.

22   *Q.*   And this is dated September 8th, and Mario Castro writes,

23   "I left the work orders for the rest of the week in your desk.

24   When are you planning to put the hotline?"

25              Do you see that?

1   *A.*   Yes.

2   *Q.*   What did you take that to mean?

3   *A.*   That is -- usually the hotline was one of the bigger jobs

4   and he's asking when did -- when, logistically, is it going to

5   go out.

6   *Q.*   Did he ask you often about when jobs were going to go out?

7   *A.*   Yes.

8   *Q.*   Do you know why he asked you about that?

9   *A.*   Basically, I was working full time at this point and that's

10  when -- you know, one of the ways we would coordinate.

11  *Q.*   You write back and you mention somebody named Epi.  Who's

12  Epi?

13  *A.*   That would be Epifaniel.

14  *Q.*   Is that -- was he -- is that the last name Castro?

15  *A.*   Castro, yes.

16  *Q.*   And he's the brother of the four defendants who you

17  mentioned before?

18  *A.*   Yes.

19  *Q.*   He had the print shop that did the first part of the

20  printing?

21  *A.*   That's correct.

22  *Q.*   And then you're referring to somebody named Patti.  Who is

23  that?

24  *A.*   That would be Patti Kern.

25  *Q.*   And then apparently Epi told Patti that you've had

1   something for over a week.

2         Do you see that?

3   *A.*   Yes.

4   *Q.*   What are you referring to there?

5   *A.*   Sometimes Patti would talk directly with Epi about the

6   printing of forms.  And this is the -- one of those times where

7   we can't run the stock, the forms, pre-printed forms while they

8   were too wet from the printing, and he's -- Epi's telling Patti

9   that we've had them for over a week.  But we haven't.

10   *Q.*   And so what did Mario Castro say in response to the claim

11   that you had the forms for over a week?

12   *A.*   That that was not true, and he will let Patti know.

13   *Q.*   Okay.  So he -- and when he says at the bottom, "I will let

14   Patti know," is that Patti Kern again?

15   *A.*   Yes.

16   *Q.*   Did Mario Castro and Patti Kern talk to each other, as we

17   see from this text, often?

18   *A.*   At this point, he became more of the face-to-face with her,

19   yes.

20   *Q.*   And you're saying "at this point."  Just to be clear:

21   We're talking about September 8, 2015?

22   *A.*   That's correct.  I was working full time at the other job

23   at this point.

24   *Q.*   So he started taking care of a little bit more of your

25   role, just kind of day-to-day communication with Patti Kern

—— 2:19-cr-00295-GMN-NJK ——

1  about getting these notices out?

2  *A.*  That's correct.

3  *Q.*  On page 5, Government's Exhibit 160B, in November of 2015,

4  you ask why Miguel is still working at my desk, QuickBooks.

5        Do you see that?

6  *A.*  Yes.

7  *Q.*  What's that about?

8  *A.*  That was -- at this point, there was a little desk that sat

9  next to the OCE that was strictly for the OCE's printers to

10  run.  It had special software, special hardware in it.  And for

11  some reason, Miguel was using it to run QuickBooks.  I think

12  his computer was probably having problems at the time.

13  *Q.*  And do you know what QuickBooks is?

14  *A.*  Yes.

15  *Q.*  Tell the jury what QuickBooks is.

16  *A.*  It's accounting software for keeping track of funds, you

17  know.  A lot of people use it.  A lot of companies use

18  QuickBooks.

19  *Q.*  Who was the one who used QuickBooks for accounting at the

20  letter shop at this time?

21        MR. GAFFNEY:  Your Honor, can we have a sidebar,

22  please?

23        THE COURT:  Yes.

24        (At sidebar on record.)

25        THE COURT:  Come on up.

1          MR. GAFFNEY:  I think Mr. Ericsson's going to handle

2    this objection.

3          THE COURT:  Mr. Ericsson?

4          MR. ERICSSON:  Your Honor, I'm -- this is an objection

5    following up with our prior objection, the testimony that was

6    brought through Juan Villasenor about the accounting issues

7    that the Government has been eliciting.  We'll be filing a

8    motion either tonight or in the morning more specifically about

9    this, but we have never received any 404(b) notice about this

10   issue of there being accounting discrepancies or issues as to

11   Miguel in this case.

12          I'm looking at the Court's order in this case.  And

13   this is the order --

14          THE COURT:  509.

15          MR. ERICSSON:  Pardon me?

16          THE COURT:  Was it 509?

17          MR. ERICSSON:  Yes.  Document 509, where the

18   Government had, in fact, filed a 40(b) [sic] notice that they

19   were going to be introducing certain evidence.

20          And one of the critical issues that is spelled out

21   here is that in order to be properly admitted under Federal

22   Rule of Evidence 404(b), evidence must satisfy four

23   requirements:

24          1.  It must prove a material element of the offense

25   for which the defendant is now charged;

1              2.  In certain cases where knowledge or intent are at

2    issue, the prior conduct must be similar to the charged

3    conduct;

4              3.  Proof of the prior conduct must be based upon

5    sufficient evidence;

6              4.  The prior conduct must not be too remote in time.

7              And that's citing the Arambula-Ruiz --

8    A-R-A-M-B-U-L-A, hyphen, R-U-I-Z -- case.

9              Here, there are no allegations in the charging

10   document that Miguel's accounting is a material element of the

11   offense for which he is charged.

12             THE COURT:  Is this an other act or is it inextricably

13   intertwined with the crime that's being charged?

14             MR. ERICSSON:  It is another act.  They -- we have

15   received just, I think, last night a proposed exhibit that

16   shows discrepancies in accounting and the allegations that

17   what -- the billing that was being submitted was higher than

18   what the actual postage charges were, which is a clear wrongful

19   act and was not charged in this case.  It was not part of the

20   allegations of fraudulent mailers going out.

21             We have -- again, we have never been noticed of this.

22   We think --

23             THE COURT:  So are you saying the distinction is it's

24   not mere incompetence?  It's more intentional skimming or

25   stealing?

1          MR. ERICSSON:  Yes, your Honor.

2          And even if it is incompetence, it has nothing to do

3    with the allegations in this case.  He's not on trial for being

4    a bad accountant.

5          And -- so we would ask that, at this point, this

6    witness not be allowed to go into anymore of the accounting

7    with Miguel.  We -- we're working on this motion.  We'll be

8    filing it, but it will go to this bigger issue and the evidence

9    or the --

10          THE COURT:  All right.  What's the Government's

11    position?

12          MR. FINLEY:  Okay.  Yes.  Your Honor -- which mic do

13    you want me to use?

14          (Court and court reporter conferring.)

15          MR. FINLEY:  This isn't 404(b) for a bunch of reasons,

16    one of which is that the defendants are offering Miguel

17    Castro's QuickBooks as evidence.  They can't offer that as

18    evidence and then not expect serious issues with the

19    credibility of that evidence to arise.

20          So if you don't want to use that, that would be one

21    thing.

22          Now -- I'm sorry.  I shouldn't have addressed you.

23    Didn't mean anything.  Just so close.

24          But your Honor, if --

25          THE COURT:  Okay.  So when you say they're using it,

1    it's on their evidence list?

2              MR. FINLEY:  Yes.

3              THE COURT:  Exhibit list?

4              MR. FINLEY:  And I think that that's fair.  They have

5    an expert report from an expert they -- the defendants or the

6    lawyers from Mario Castro have told us they intend to use.  And

7    it relies on -- exclusively on this QuickBooks record that has

8    a problem with it.  Or has problems.

9              Now, this is something that we can unpack a little bit

10   later, but also, it's in furtherance of the scheme.  He's doing

11   accounting work to further this scheme.  So -- and if he's

12   doing anything fraudulent with them -- and I'm not saying that

13   yet.  We're trying to figure this out.  We just got this stuff.

14   But if he is, that would be an action in furtherance of the

15   scheme to enrich himself with victim money just like the

16   scheme.  So it's not 404(b) at all.

17             But I think I can short-circuit this.  It is not my

18   intent today with this witness to elicit anything about

19   accounting, it's fraud, accounting inaccuracies, accounting

20   irregularities.  I'm not going there.  I'm just talking about

21   Mr. Miguel's Castro's role in the scheme.

22             THE COURT:  All right.

23             MR. ERICSSON:  Your Honor, my response to that as far

24   as Miguel Castro is we are not introducing accounting evidence.

25   And this may be a basis for a motion to sever because how this

─── 2:19-cr-00295-GMN-NJK ───

1  is being used is coming after Miguel and is -- we are not

2  bringing that evidence forward.

3          And the Government -- they're the ones who provided

4  this information to the other defendants.  If they're using

5  that with their experts, it is not our expert.  It is not

6  evidence that we, on behalf of Miguel, are going to be

7  introducing.

8          THE COURT:  So what is the line of questioning that

9  the Government plans to elicit from this witness in regards to

10 Miguel's accounting?

11         MR. FINLEY:  This is to show that Miguel Castro did

12 the accounting for these mailing company businesses.

13         THE COURT:  Okay.

14         MR. FINLEY:  That's about it.

15         THE COURT:  So you're not asking the jury to draw any

16 conclusions --

17         MR. FINLEY:  About the accuracy or how --

18         THE COURT:  His intentions or the --

19         MR. FINLEY:  No.

20         THE COURT:  Okay.  All right.  So I'll allow the

21 testimony to continue, but I think it's a good idea if you

22 continue to brief your motions so that if -- sounds like maybe

23 later on in the trial, whether with this witness or a different

24 witness, we might start to cross over again into that area.

25         MR. ERICSSON:  Thank you, your Honor.

1              (End of discussion at sidebar.)

2              THE COURT:  All right.  We're back on the record now.

3              You may continue, Mr. Finley.

4    BY MR. FINLEY:

5    Q.  Did Miguel Castro do accounting work for the scheme?

6    A.  Yes.

7    Q.  And does this text message on page 5 of Government

8    Exhibit 160B show some of that work being done?

9    A.  Yes.

10   Q.  Let me ask you about page 6 of Government Exhibit 160B.

11             That starts out with the text message from you to

12   Mario Castro?

13   A.  Yeah.

14   Q.  And now the date is December 14, 2015.

15             Do you see that?

16   A.  Yes.

17   Q.  And you're talking about jobs for Patti and a bunch of

18   invoices; is that right?

19   A.  Yes.

20   Q.  Are you discussing the day-to-day work of committing this

21   fraud with Mario Castro in this text?

22   A.  Yes.

23   Q.  Okay.  And then Mario Castro writes to you a minute later

24   and he says, "Need more jobs.  Need to buy gifts.  Lots of

25   them."

─── 2:19-cr-00295-GMN-NJK ───

1              And then you write back, "Lol."

2              Do you see that?

3    A.   Yes.

4    Q.   What was this about?

5    A.   We needed more work so he could buy more gifts for

6    Christmas for the family.

7    Q.   Christmas is nine days away?

8    A.   Nine days away, yes.

9    Q.   Okay.  And then were the gifts.

10             Based on what your takeaway from this is, were the

11   gifts going to be paid for by the jobs?

12   A.   By the work, yes, by the jobs.

13   Q.   And the jobs involved sending lies to people to steal their

14   money?

15   A.   That's correct.

16   Q.   And your understanding of this communication here is that's

17   how Mario Castro's going to buy his Christmas gifts?

18   A.   Yes.

19   Q.   Okay.  Now, page 7, a couple days later, you are

20   reporting -- or I'm sorry.  Did it again.

21             On page 7, two days later on December 16th, Mario

22   Castro is informing you that Patti is sending all the jobs that

23   she has for the year tonight, right?

24   A.   Yes.

25   Q.   That's going to help the money come in to buy the Christmas

1  gifts, right?

2  *A.* Yes, that's correct.

3  *Q.* And that was Mario Castro who talked to Patti Kern about

4  that, not you?

5  *A.* Yes.

6  *Q.* According to this text that we see right here?

7  *A.* According to the text, yes.

8          MR. FINLEY:  Let's take a look at Government

9  Exhibit 160C.  That's already admitted, your Honor.

10  BY MR. FINLEY:

11  *Q.* Are these texts between Miguel Castro, Mario Castro, and

12  you?

13  *A.* Yes.

14  *Q.* Looks like you are in Miguel Castro's phone as Chango.

15          Do you see that?

16  *A.* That is correct.

17  *Q.* Is that something he used to call you?

18  *A.* Yes, I was known as Chango.  There's no Spanish translation

19  for Sean.

20  *Q.* No Spanish translation for Sean?

21  *A.* Yes.

22  *Q.* Did any of the four defendants inform you what Chango means

23  in Spanish?

24  *A.* Yes.

25  *Q.* What did they tell you?

1    **A.**   Monkey.

2    *Q.*   So Miguel Castro called you monkey.  That is what he called

3    you?

4    **A.**   Basically, yes.

5    *Q.*   And then you're asking him for your check in this text

6    message, aren't you?

7    **A.**   Yes, at the very bottom.

8    *Q.*   So why are you asking for your check?  Why isn't that just

9    given to you on a schedule?

10   **A.**   It was usually left for me and I couldn't find it that

11   morning.  I was there that evening.

12   *Q.*   And there's a reference again to the letters PA.  Is that

13   the same PA that we were talking about before?

14   **A.**   Yes, it's actually the same exact PA 05.

15   *Q.*   Oh, the exact same job we were talking about before?

16   **A.**   Yes.

17   *Q.*   Price Awards?

18   **A.**   That's correct.

19   *Q.*   Another fraudulent mailing company?

20   **A.**   Yes.

21   *Q.*   On page 2, again, at the bottom, there's an e-mail exchange

22   between you, Chango, Miguel Castro, and Mario Castro.

23          Do you see that?

24   **A.**   (Unintelligible).

25          (Court reporter interruption.)

1    *A.*  Yes.

2    *Q.*  And again, this is about accounting, right?

3    *A.*  Yes.

4    *Q.*  Is this -- does this text exchange support your testimony

5    that Miguel Castro did the accounting for the fraud scheme?

6    *A.*  That is correct.

7         MR. FINLEY:  Let's look at page 6.

8    BY MR. FINLEY:

9    *Q.*  Couple of texts at the top.

10        You are writing to Miguel Castro and Mario Castro

11   again?

12   *A.*  That is correct.

13   *Q.*  You're asking for your check again?

14   *A.*  Yes.

15   *Q.*  Are you familiar with the name Dan Wagner [phonetic]?

16   *A.*  Yes.

17   *Q.*  Who is Dan Wagner?

18   *A.*  He was one of the clients we had later on.  I don't

19   remember exactly when he started, sometime before Glen left.

20   *Q.*  Okay.  So you say Glen left?

21   *A.*  Yeah.

22   *Q.*  Are you referring to Glen Burke getting shut down?

23   *A.*  That's correct.

24   *Q.*  And that happened in January 2013?

25   *A.*  Yes.

1    *Q.*  So sometime before January 2013, another client that you

2    had is Dan Wagner.  Is that what you're telling us?

3    **A.**  Yes.  He was a friend of Glen Burke.

4    *Q.*  Okay.  What kind of business did Dan Wagner do with you?

5    **A.**  The same, promote prize notices.

6    *Q.*  Who printed and inserted and folded and put his fraudulent

7    prize notices into the mail to go to people?

8    **A.**  Myself and the four defendants.

9    *Q.*  So Dan Wagner, the fraudulent prize notice mailer, had a

10   name for all the different kind of fraudulent prize notices

11   that he would send out, right?  Kind of like a business name

12   that he used?

13   **A.**  Yes.

14   *Q.*  Do you recall what that was?

15   **A.**  Gold Rush.

16   *Q.*  Okay.  So when you and the four defendants were working on

17   getting his fraudulent mail out, Dan Wagner's, you would refer

18   to that group of mailings, the Dan Wagner mailings, by the name

19   of Gold Rush?

20   **A.**  Gold Rush, or I would say Dan.

21   *Q.*  Dan.

22        And would the defendants know what you were talking

23   about if you sent them a text about Dan or Gold Rush?

24   **A.**  Yes.

25        MR. FINLEY:  Let's look at Government Exhibit 160D.

-------- 2:19-cr-00295-GMN-NJK --------

1   BY MR. FINLEY:

2   Q.  Are those texts from your phone about Gold Rush?

3   A.  Yes.

4   Q.  Okay.  Now, this Gold Rush series of fraudulent mailings

5   that you and the four defendants were putting out for Dan

6   Wagner, was that part of the same scheme that you were involved

7   with with Patti Kern?

8   A.  No, not at all.

9   Q.  Dan Wagner didn't have anything to do with Patti Kern?

10  He's a separate client?

11  A.  That's correct.

12  Q.  He may have known her, but she didn't involve herself in

13  his business.  Is that what you're saying?

14  A.  Yes.

15  Q.  So you said that that business started sometime before

16  2013, this Dan Wagner Gold Rush fraudulent mailing business.

17         And it looks like from the first text, it's still

18  going on as of June of 2015.

19  A.  That's correct.

20  Q.  Is that what the text shows?

21  A.  Yes.

22  Q.  When you say, "Mario.  Mario.  Dan sent me another job.

23  Has zero responses.  And it was never lasered!", what are you

24  talking about?

25  A.  Since I wasn't there full time, the work orders were left

1   for me for billing as marked being done in a stack or a folder

2   on the wall and I would mark it done in the system and bill it.

3          Then a few weeks, close to a month would pass and Dan

4   would come to me and say, "This job got zero responses.  Not

5   one response.  Did it mail?"

6   Q.  And did Mario Castro respond to your text?

7   A.  Yes.

8   Q.  What did he say?

9   A.  He wanted the job number and he'll check it out in the

10  morning.

11         MR. FINLEY:  Let's take a look at page 2.

12  BY MR. FINLEY:

13  Q.  Second text, is that a text from Mario Castro to you?

14  A.  Yes.

15  Q.  And there's a reference to something called GR.

16         Do you see that?

17  A.  Yes.

18  Q.  What is that?  What is GR?

19  A.  Gold Rush, also.

20  Q.  And he writes, "A bank account is low.  Is GR making

21  payment soon?"

22  A.  Yes.

23  Q.  Have you noticed that several of the texts we've looked at

24  so far today are about Mario Castro asking you about when he's

25  going to get his money?

1  **A.**  Yes.

2  *Q.*  Did he send texts to you about that a lot?

3  **A.**  Usually that or problems.

4  *Q.*  Looking at page 3 of Government Exhibit 160D, the text at

5  the top referencing Gold Rush again?

6  **A.**  Yes.

7  *Q.*  And you're communicating with Mario Castro about getting

8  these Gold Rush mailings out?

9  **A.**  Yes.  I'm telling him I'm -- I'm leaving postage for part

10  of it and I'm paying for some envelopes, etc., for Gold Rush

11  and the other affiliates.

12  *Q.*  Okay.  And if we continue looking at this Government

13  Exhibit 160D, we would see more texts between you and Mario

14  Castro about getting those Gold Rush mailings out for Dan

15  Wagner?

16  **A.**  Yes.

17  *Q.*  Let me ask you this.  Did Patti Kern trick the four

18  defendants into doing business with Dan Wagner and sending out

19  fraudulent prize notices with him?

20         MR. GREEN:  Objection.  It's a lack of foundation as

21  to this question, your Honor.  Did he trick?  It's got to be

22  based on personal knowledge, if he knows, not whether he says,

23  oh, they got tricked.

24         Thank you.

25         THE COURT:  All right.  You want to clarify and set

1  another foundation for his knowledge?

2          MR. FINLEY:  Yes.

3  BY MR. FINLEY:

4  *Q.*  So the question is about Patti Kern.

5          While you were there, did you see or hear or come

6  across any evidence that Patti Kern had actually tricked the

7  defendants into doing business with Dan Wagner?

8  *A.*  No.

9          MR. FINLEY:  Let's look at Government Exhibit 255,

10  please.  And that has already been admitted.

11  BY MR. FINLEY:

12  *Q.*  Is that an e-mail?

13  *A.*  Yes.

14          MR. FINLEY:  Can we look at the top of that e-mail,

15  please.

16  BY MR. FINLEY:

17  *Q.*  That's an e-mail from Todd Hoover to Chango Consulting.

18          Do you see that?

19  *A.*  Yes.

20  *Q.*  It's dated June 2014?

21  *A.*  That's correct.

22  *Q.*  Is this an e-mail that's talking about a fraudulent prize

23  notice mailing?

24  *A.*  Yes.

25  *Q.*  Is there an attachment?

1   **A.**   Yes.  Some PDFs.

2   *Q.*   Okay.  And who's Todd Hoover?

3   **A.**   Todd Hoover is another artist, pre-press guy.

4   *Q.*   So he's the guy that would -- that you would send the prize

5   notice to so he could come up with the artwork for it?

6   **A.**   Right.  He would, as the title states, rewrap it from an

7   old promotion to a new, change the names, change the look.

8   *Q.*   Okay.  That's what rewrapping means?

9   **A.**   Yes.

10  *Q.*   Rewrapping, changing the names, changing the look, is that

11  sometimes something you had to do in response to, like, a cease

12  and desist or something like that?

13  **A.**   Yes.

14  *Q.*   There's a attachment.  It is -- starts at page 3.  Could

15  you take a look at that, please?

16          What's that?

17  **A.**   That was one of the prize notices we sent out.

18  *Q.*   And it says American Fiduciary Disbursements at the top

19  left.

20          Do you see that?

21  **A.**   Yes.

22  *Q.*   And there's a picture of something there.  What is that?

23  **A.**   A statue.

24  *Q.*   What's this document called?

25  **A.**   Client Funds Release Authorization.

1  Q.  Is that what it really is?

2  A.  No.

3  Q.  Is that just a fraudulent prize notice?

4  A.  Yes.

5  Q.  Big -- big amount of money splashed on it?

6  A.  Yes.

7  Q.  And it says, "You have won a guaranteed cash award," near

8  the top in big letters, right?

9  A.  Yes.

10  Q.  Okay.  Do you know who the client was for this fraudulent

11  prize notice?

12  A.  Dan Wagner.

13  Q.  How do you know that?

14  A.  I helped set it up.

15  Q.  And where we see the initials AFD in your texts?

16  A.  Yes.

17  Q.  Standing for American Fiduciary Disbursements?

18  A.  Yes.

19  Q.  And those would be the same texts that were discussing Dan

20  Wagner and Gold Rush?

21  A.  Yes.

22        MR. FINLEY:  If we could look at Government

23  Exhibit 257, please.

24        MR. GREEN:  What was the previous exhibit, Government

25  counsel?

—— 2:19-cr-00295-GMN-NJK ——

1          MR. FINLEY:  It was Government Exhibit 255.

2          MR. GREEN:  Thank you.

3    BY MR. FINLEY:

4    Q.  Do you have it there, sir?

5    A.  Yes, I do.

6          MR. FINLEY:  Could we blow up the top?

7          Thank you.

8    BY MR. FINLEY:

9    Q.  This is an e-mail dated March 24, 2015.  It is from Jerry

10   Stampman with an e-mail address of danwaysouth@Yahoo.com.

11         Who's Jerry Stampman?

12   A.  That's Dan Wagner.

13   Q.  Why is he using the name Jerry Stampman?

14   A.  I have no idea.

15   Q.  And this e-mail is to you at Chango Consulting?

16   A.  That's correct.

17   Q.  And it's signed by Dan?

18   A.  Yes.

19   Q.  Who's Dan?

20   A.  Dan Wagner.

21   Q.  Dan Wagner tells you, "Yes, I think 60K is a safe quantity

22   to have ready."

23         Are you talking about producing and mailing fraudulent

24   prize notices to 60,000 victims on a purchased list?

25   A.  Yes.

—— 2:19-cr-00295-GMN-NJK ——

1   Q.   Also called a hotline?

2   A.   Hotline, yes.

3   Q.   Look at the e-mail below.  That's from you.  You write,

4   "Morning, Dan."

5            Do you see that?

6   A.   Yes.

7   Q.   You mention Mario in this e-mail, somebody named Mario?

8   A.   Yeah, it mentions -- it's stating that Mario since

9   Wednesday.

10  Q.   Who's Mario?

11  A.   Mario Castro.

12  Q.   The defendant?

13  A.   Correct.

14  Q.   Is there a reference to Digital Express?

15  A.   Yes.

16  Q.   What's Digital Express?

17  A.   The company, the letter shop at that time.

18  Q.   Whose letter shop was that?

19  A.   Mario Castro's.

20  Q.   Now, you say something about -- oh, here it is.  In the

21  middle of the e-mail -- I want to draw your attention to the

22  middle of the e-mail, the sentence that says, "which I will get

23  Digital Express the money tonight."

24            Do you see that?

25  A.   Yes.

2:19-cr-00295-GMN-NJK

1  Q.  Okay.  Was it your responsibility to get money from Dan

2  Wagner to Digital Express?

3  **A.**  Yes.  I -- I was Dan's broker.

4  Q.  What do you mean by that, "broker"?

5  **A.**  I was handling Dan's account directly with a separate

6  company at that point.

7  Q.  Okay.  So you were handling Dan's account with a separate

8  company.

9        What was that company called?

10  **A.**  It was called On The Side.

11  Q.  Was it called On The side, Inc.?

12  **A.**  Inc., yes.

13  Q.  And that's your company?

14  **A.**  Yes.

15  Q.  Did you open it?

16  **A.**  Yes.

17  Q.  When did you first open On The Side, Inc.?

18  **A.**  A long time before this when I was working for Raphael.  It

19  was the company we put the laser printer business part under

20  for a few years.

21  Q.  And what have you used the company, On The Side, Inc. for

22  over the years, from the time you formed it way back in the

23  2000s up until this point, 2015?  What did you use that company

24  for?

25  **A.**  For everything.  I used it for my own payroll.  I used it

1   for Lyft at one point.  I used it to --

2   Q.  Let me stop you for a second there.

3        You said Lyft.  Are you talking about L-Y-F-T?

4   **A.**  Yes.

5   Q.  Okay.  What's that?

6   **A.**  That's the service like Uber.

7   Q.  So you -- do I take it you were a Lyft driver?

8   **A.**  For a little bit, yes.

9   Q.  And what did you use On The Side with for your Lyft

10  driving?

11  **A.**  Just to deposit the funds.

12  Q.  So you used On The Side for a bunch of different things

13  over the years?

14  **A.**  Right.  I -- and brokering Dan's work for him.

15  Q.  Now, in this particular case, you're using On The Side as a

16  vehicle to transfer funds from Dan Wagner to Digital Express;

17  is that right?

18  **A.**  That's correct.  That's correct.

19  Q.  Tell us how you did that.  Tell us:  How did that work?

20  **A.**  Dan would wire me the money from different locations,

21  usually a company called PacNet.  And from there, I would send

22  monies to the printers, Epi Castro, or Silver State Printing,

23  and assign the jobs to either Mario or Miguel's company or

24  another company, Edgar Del Rio's company at that point.

25  Q.  Okay.  So there's a lot to unpack there.

1    **A.**   Yes.

2    *Q.*   First of all, what is PacNet?

3    **A.**   PacNet was a check cashing service.  And I believe they

4    were in Canada.

5    *Q.*   Okay.  A check cashing service?

6    **A.**   That's correct.

7    *Q.*   What did they do for Dan Wagner?

8    **A.**   They took his high volume of checks, deposited them into an

9    account, and then send out wires for -- for me, it was for

10   postage and printing.

11   *Q.*   Okay.  So in plain English, they took a bunch of checks,

12   you said a high volume, they took those checks, and they turned

13   that -- those checks into money?

14   **A.**   Correct.

15   *Q.*   Is that right?

16   **A.**   Correct.

17   *Q.*   Where did the checks come from?

18   **A.**   The fraudulent schemes from before that.

19   *Q.*   Okay.  So are we talking about checks that have been sent

20   by who?

21   **A.**   By the people that responded to the fraudulent promotions.

22   *Q.*   Okay.  So Dan Wagner is having wires sent to On The Side

23   from PacNet and other places?

24   **A.**   Correct.

25   *Q.*   The money in those wires, is all that money victim money

─── 2:19-cr-00295-GMN-NJK ───

1  like you mentioned in the case of PacNet?

2  **A.**  Yes.

3  *Q.*  Okay.  So Dan Wagner is having all the money that victims

4  send back in response to his fraudulent prize notices and he's

5  having that money wired to On The Side?

6  **A.**  That's correct.

7  *Q.*  Where does it go?  What's the container?  Is it like a bank

8  account?

9  **A.**  Yes.

10  *Q.*  Okay.  So you opened a bank account in the name of your

11  corporation, On The Side, and that's where the -- that's the

12  container that all the victim money got wired into; is that

13  right?

14  **A.**  That's correct.

15  *Q.*  And then where does Dan Wagner live at this time?

16  **A.**  Costa Rica.

17  *Q.*  Did he need somebody with a bank account in the United

18  States to carry out this fraud?

19  **A.**  I think at that point it was me, but before then, he had

20  other people.

21  *Q.*  Okay.  But the question is:  He's in Costa Rica?

22  **A.**  Yes.

23  *Q.*  Did he need somebody with a bank account in the United

24  States to help him carry this out?

25  **A.**  Yes.

1    *Q.*  And were you that person?

2    **A.**  Yes.

3    *Q.*  Did you have a bank account in the United States under the

4    name of On The Side?

5    **A.**  Yes.

6    *Q.*  Did you use that bank account to send money to Digital

7    Express?

8    **A.**  Yes.

9    *Q.*  And if you sent a large amount of money from Digital

10   Express -- from your On The Side bank account to Digital

11   Express during this time period roughly -- I'm looking at

12   2015 -- if you're sending large amounts of money to Digital

13   Express from that On The Side bank account, is that money that

14   Dan Wagner and you and the four defendants had made by sending

15   fraudulent notices to people?

16   **A.**  Yes.

17   *Q.*  And were you paying invoices to Digital Express for their

18   printing services?

19   **A.**  Yes.

20   *Q.*  And their mailing services?

21   **A.**  Yes.  And postage.

22   *Q.*  Postage.  That's a big cost?

23   **A.**  Big cost is postage, yes.

24   *Q.*  And you wouldn't pay the postage to the post office?  You'd

25   pay it to the Digital Express?

───────── 2:19-cr-00295-GMN-NJK ─────────

 1   *A.*   That's correct.

 2   *Q.*   And then they could take care of paying the post office?

 3   *A.*   Correct.

 4   *Q.*   Is there any other reason that you'd be transferring money

 5   from your On The Side bank account to Digital Express, your

 6   employer?

 7   *A.*   No.

 8   *Q.*   That was the only reason you can remember?

 9   *A.*   Yes.

10   *Q.*   So if we see in the Digital Express bank account large

11   amounts of money going into Digital Express from On The Side,

12   that could only be an influx of victim fraud money?

13   *A.*   Yes.

14   *Q.*   We talked earlier about the steps that you and the four

15   defendants took whenever a cease and desist shut one of your

16   mailing companies down.

17         Do you remember that?

18   *A.*   Yes.

19   *Q.*   And one of the companies that got a cease and desist was

20   GAM, which got shut down shortly after Mario Castro and Patti

21   Kern became partners in that mailing company.

22         Do you remember that?

23   *A.*   Yes.

24   *Q.*   Was that the only time that the postal inspectors tried to

25   stop the scheme that you, Patti Kern, and the four defendants

1  were running?

2  *A.*  No.

3  *Q.*  Did it happen other times, as well?

4  *A.*  Yes.

5  *Q.*  And what -- when it happened, would you generally have to

6  take those steps that you described, the procedure for dealing

7  with the C&D?

8  *A.*  Yes.

9  *Q.*  And just so everybody remembers, that involves stopping the

10 presses, throwing away paper, trying to clawback postage money,

11 switching things up, changing names so you can keep rolling,

12 right?  All those things would need to be done?

13 *A.*  That's correct.

14 *Q.*  And all those things would be done with the knowledge and

15 approval of your bosses, the people you worked for?

16 *A.*  Yes.

17         MR. FINLEY:  Let's look at Government Exhibit 185,

18 please.

19 BY MR. FINLEY:

20 *Q.*  This is an e-mail from August 2, 2012.  And it's from Patti

21 Kern to you.  And the two of you are talking about trashing

22 jobs again, aren't you?

23 *A.*  That's correct.

24 *Q.*  Why do you have to trash jobs this time?

25 *A.*  From this one, it looks like Edgar's brother got served

—— 2:19-cr-00295-GMN-NJK ——

1  with a C&D, a cease and desist.

2  Q.  And who's Edgar?

3  A.  Edgar Del Rio.

4  Q.  You knew him, right?

5  A.  Yes, he worked for -- I first met him, he worked for Epi

6  Castro at National -- or New Graphics.

7  Q.  Was it -- are you thinking of New Generation Graphics?

8  A.  New Generation Graphics, yes.

9  Q.  Was Edgar Del Rio Epi Castro's employee?

10 A.  Yes.

11 Q.  Back at the time you met him?

12 A.  Yes.

13 Q.  And did Edgar Del Rio get a cease and desist?

14 A.  I believe he got one, also.

15 Q.  Did the two of you talk about that?

16 A.  Yes.

17 Q.  And you -- there's a reference to Edgar's brothers?

18 A.  That's correct.

19 Q.  Do you see that?

20       And according to this e-mail, Edgar's brothers both

21 got cease and desist.

22       Do you see that?

23 A.  Yes.

24 Q.  And she tells you to talk to Edgar?

25 A.  Yes.

—— 2:19-cr-00295-GMN-NJK ——

1    *Q.*  Is this an example of the kinds of things that you would

2    need to start doing right away after you find out about a cease

3    and desist?

4    *A.*  That's correct.

5    *Q.*  And this is dated August 2, 2012.

6         MR. FINLEY:  Let's look at Government Exhibit 120.

7    BY MR. FINLEY:

8    *Q.*  What was the date that Omar Del Rio signed a cease and

9    desist?

10   *A.*  August 1, 2012.

11   *Q.*  The day before?

12   *A.*  The day before, yes.

13   *Q.*  Does this support your testimony that you had to act fast

14   after getting a cease and desist?

15   *A.*  That's correct.

16   *Q.*  Let me ask you about some of the company names on this

17   chart at Government Exhibit 120.

18        Let's skip the first one.  That's the 2009 cease and

19   desist that Patti Kern signed.

20        Let's focus on the conspiracy period in this case,

21   20010 to 2018.  Let's look at the row besides Exhibit

22   Number 122.

23        Do you see that?

24   *A.*  Yes.

25   *Q.*  There's a list of company names.  Do you recognize any of

───────────── 2:19-cr-00295-GMN-NJK ─────────────

1    those?

2    **A.**  Yes.  They're all companies we did work for.

3    *Q.*  Okay.  Money Trust Alliance?

4    **A.**  Yes.

5    *Q.*  So when you say you did work for it, does this mean that

6    you would send out fraudulent prize notices that would say

7    things like Money Trust Alliance on them or Promotional

8    Recovery Awards Network, things like that?

9    **A.**  That's correct.

10   *Q.*  That C&D was signed by Richard Knowles, Jr.

11           Do you know that is?

12   **A.**  Yes.

13   *Q.*  Who is he?

14   **A.**  He was -- I don't know if he was a salesman or -- or

15   whatnot for Mario's company, Printing and Mailing Solutions.

16   *Q.*  Okay.  Printing and Mailing Solutions?

17   **A.**  That's correct.

18   *Q.*  Is that -- is that one of the mailing company names from

19   before 2010?

20   **A.**  Yes.

21   *Q.*  Okay.  And that's how you know him?

22   **A.**  Yes.

23   *Q.*  Salesman at Mario Castro's letter shop?

24   **A.**  That's correct.

25   *Q.*  Okay.  And looks like the next one is Financial Reserve

1  Network.  That's the next cease and desist on the list.

2         Do you see that?

3  *A.*  Yes.

4  *Q.*  Are you familiar with a company called Financial Reserve

5  Network?

6  *A.*  Yes.  That was Adrian Flores's short-lived company.

7  *Q.*  Okay.  Adrian Flores's short-lived company?

8  *A.*  Yes.

9  *Q.*  Who -- who put out the fraudulent mailings for Financial

10  Reserve Network?

11  *A.*  Myself and the defendants.

12  *Q.*  All four of them?

13  *A.*  Yes.

14  *Q.*  Who's Adrian Flores?

15  *A.*  He came with Mario Castro.  He was a good friend of Mario's

16  from California.

17  *Q.*  He came from California to?

18  *A.*  Las Vegas.

19  *Q.*  Las Vegas with Mario Castro?

20  *A.*  About the same time, if not shortly after.

21  *Q.*  Do you know how that happened?  Are they family or

22  something?

23  *A.*  I believe they worked together in California.  I'm not sure

24  on that, but I think that's what I remember.

25  *Q.*  Okay.  That's what you've heard?

1   **A.**  Yes.

2   *Q.*  And then did they work together when they got to Las Vegas,

3   as well?

4   **A.**  Adrian worked on the machines and stuff for a little while.

5   *Q.*  Now when you say "machines," what machines are you talking

6   about?  Where?

7   **A.**  Inserters, the lasers, the bursters.

8   *Q.*  Okay.

9   **A.**  He was very mechanically inclined.

10  *Q.*  So he fixed the machines?  He's like a mechanic?

11  **A.**  Right.

12  *Q.*  And the machines, were those the machines that were sitting

13  inside the Castro family letter shop?

14  **A.**  Yes.

15  *Q.*  In Las Vegas?

16  **A.**  That's correct.

17  *Q.*  That's how you know him?

18  **A.**  Right.

19  *Q.*  We talked about Edgar Del Rio.  We know how you know him.

20         Do you know a guy named Sixto?

21  **A.**  Yes.  We talked about him earlier.

22  *Q.*  Okay.  And how do you know him?

23  **A.**  His name was -- we called him T, or Teucro.  He was there

24  at the office.  I can't remember why he was at the office for a

25  little while.

—— 2:19-cr-00295-GMN-NJK ——

1  *Q.*  Do you know Omar Del Rio?

2  *A.*  That's Edgar's brother.  I don't know if I actually ever

3  met him personally.

4  *Q.*  Okay.  You just know who he is from talking to Edgar?

5  *A.*  Yes.

6  *Q.*  Do you know who Ubaldo Casillas Torres is?

7  *A.*  No idea.

8  *Q.*  Do you recognize the name Platinum Award Services?

9  *A.*  Yes.  That's PAS, is what we called it.

10 *Q.*  Okay.  What is that?

11 *A.*  A fraudulent mail company.

12 *Q.*  Are all of the company names that we see on this chart

13 except the first one mailing company names that you and the

14 four defendants used to put out fraudulent mail?

15 *A.*  Yes.

16 *Q.*  Have you ever heard of the term "fulfillment" as it relates

17 to fraudulent prize notices?

18 *A.*  Yes.

19 *Q.*  And when somebody in the fraudulent prize notice industry

20 engages in the act of fulfillment, what exactly do they do?

21 *A.*  They're usually mailing or returning something to the

22 customer that they paid for.

23 *Q.*  In this case --

24 *A.*  In this case --

25 *Q.*  -- what are they sending?

2:19-cr-00295-GMN-NJK

1   *A.*   They're sending back a -- they're sending a sweepstakes

2   reporter which is, basically, a list of free online sweepstakes

3   you can enter for free, junk.

4   *Q.*   You call it junk.  Does it have any value?

5   *A.*   No.  It's free online if you did the research.

6   *Q.*   Would you pay any money for one of those things?

7   *A.*   No.

8   *Q.*   Now, when you send these prize notices to people, I want to

9   talk about what you wanted.

10         Did you want them to think that they won a lot of

11  money?  Or did you want them to think that they were buying a

12  worthless booklet?  What did you want them to think?

13  *A.*   We wanted them to think they had a -- the chance to get a

14  lot of money or win a lot of money.  Big numbers.  Millions of

15  dollars at this point.

16  *Q.*   Would the business work if you -- if you told people right

17  up front, "We'd like to sell you this book of publicly

18  available sweepstakes information and, you know, we'd like

19  $20"?  Would that be a successful business model?

20  *A.*   I wouldn't think so, no.

21  *Q.*   So you would send these booklets as part of this scheme,

22  right?

23  *A.*   Yes.

24  *Q.*   How often did you actually do that compared to how many of

25  these fraudulent prize notices that you put out?

1   *A.*  My recollection is very rarely as you move through the

2   timeline.  In the beginning, once a month, but at the end, we

3   wouldn't do it at all.

4   *Q.*  So let's say a victim gets a bunch of fraudulent prize

5   notices, sends a bunch of money back, let's say they -- they

6   get these notices and send money back a hundred times, this

7   victim, approximately how many times would they get one of

8   these worthless newsletters for that 100 times that they sent

9   money?

10  *A.*  Maybe once.  Maybe not at all.

11  *Q.*  So it's your testimony that you guys weren't even really

12  fulfilling?

13  *A.*  That's correct.

14  *Q.*  Not that it means anything, but you weren't even doing it,

15  right?

16  *A.*  That's correct.

17          MR. FINLEY:  Let's look at Government Exhibit 196,

18  please.

19  BY MR. FINLEY:

20  *Q.*  Is that an e-mail between Patti Kern and yourself?

21  *A.*  Yes.

22  *Q.*  Are you talking about fulfillment there?

23  *A.*  Yes.

24  *Q.*  Is this in November 2016?

25  *A.*  That's correct.

1   *Q.* And did something happen in 2016, perhaps a month or so

2   before this e-mail, that made you all of a sudden want to start

3   sending these booklets to people?  If you know.

4   *A.* My understanding was that there was a sweep, basically, a

5   national sweep of sweepstakes companies by the Government.

6   *Q.* Okay.  Kind of -- there's been testimony before that there

7   was a national crackdown?

8   *A.* A crackdown.  That's --

9   *Q.* Sweep it is fine.  I just --

10  *A.* Yep.

11  *Q.* Just, is that what you're talking about, a crackdown?

12  *A.* Yes.

13  *Q.* And that made you want to start sending these fulfillments

14  again?

15  *A.* That's correct.

16  *Q.* Who does Patti tell you to talk to about how to do it?

17  *A.* Mario.

18  *Q.* And who is Mario?

19  *A.* Mario Castro.

20  *Q.* Okay.  We were talking about Glen Burke before.  There's

21  been a lot of talk about how he was shut down in January 2013.

22          Do you actually remember how you learned about it?

23  *A.* Yes.

24  *Q.* Okay.  Do you remember the day that Glen Burke got shut

25  down?

1   A.   Not exactly.

2   Q.   Okay.  Do you remember how you started your day?

3   A.   Yes.

4   Q.   How did you start your day?

5   A.   Glen Burke's office was on the way from my house to the

6   letter shop.  I stopped by his office as I usually did once or

7   twice a week and I was returning a -- a scale.

8            And when I approached the door, an officer opened the

9   door.  You couldn't see in the door.  But an officer opened the

10  door and asked me why I was there.

11  Q.   Okay.  So is this about early 2013?

12  A.   Yes.

13  Q.   Why are you going to Glen Burke's office in the morning to

14  drop off a scale?

15  A.   One of Glen's associates was using it to weigh the mail, to

16  check the quantity that we mailed by weight, and I was

17  returning it.  He wasn't going to do that any longer.

18  Q.   So you got to his office.

19           You said there were federal agents there?

20  A.   Yes.

21  Q.   Did you try to go inside?

22  A.   They asked me why I was there.  I told them to drop off

23  this scale.  They took a copy of my ID.  And they eventually

24  let me continue on my way to the letter shop, to work.

25  Q.   Okay.  So a federal agent greets you at the door, he says,

─── 2:19-cr-00295-GMN-NJK ───

1    "What are you doing here?  Who are you?"  Right?

2    A.  That's correct.

3    Q.  You show him who you are.  You tell him you need to drop

4    off the scale.

5            And then they let you go inside?

6    A.  Yes.

7    Q.  What did you see that morning when you went inside Glen

8    Burke's office to drop off the scale?

9    A.  There was -- I didn't see any employees.  It was several

10   federal agents going through, collecting paperwork, boxes.  I

11   couldn't tell if they were taking computers or whatnot

12   throughout the offices.

13   Q.  Did it look to you like they were taking evidence?

14   A.  Yes.

15           MR. GREEN:  Objection, your Honor.  This is beyond the

16   scope of this indictment.  You can ask him, look, is there

17   something going on.  Now we're getting to what evidence is

18   seized.  Objection.  This goes beyond the scope of this

19   indictment.

20           Thank you.

21           MR. FINLEY:  Your Honor, I would ask that there not be

22   improper speaking objections particularly when there's been a

23   ruling on this.

24           THE COURT:  I agree.

25           MR. GREEN:  Your Honor, with all due respect, there's

————— 2:19-cr-00295-GMN-NJK —————

1  been no ruling on the seizure of this material from -- from

2  this particular business operation.

3          THE COURT:  Order 509.

4  BY MR. FINLEY:

5  Q.  So you went inside the office.  You dropped off the scale.

6  You saw federal agents seizing evidence.

7          What did you think?

8  A.  I thought Glen was in trouble for his endeavors in mailing

9  and telemarketing and who knows what else.

10  Q.  Where did you go after that?

11  A.  I went to the letter shop, to the Castros.

12  Q.  Was it called National Print and Mail at the time?

13  A.  I believe so, yes.

14  Q.  Now, there's been some confusion about where this letter

15  shop was on the day that Glen Burke got shut down.  I want to

16  show you a map.

17          MR. FINLEY:  Can we put Government Exhibit 429 on?

18  BY MR. FINLEY:

19  Q.  Wait.  Before we see that, where was the letter shop?

20  A.  At this point, I believe it was on Patrick, but the

21  buildings all kind of face different directions.  It was an

22  office complex.

23  Q.  Right.

24          You said that before, Patrick?

25  A.  Yes, Patrick.

1    *Q.*  And the jury heard about that street today before you came

2    up there.

3              And so let's take a look at the map.

4              Do you see that, sir?

5    **A.**  Yes.

6    *Q.*  Can you describe where on the map the letter shop for

7    National Print and Mail was on that day?

8    **A.**  It's taking a minute to get my bearings here.

9    *Q.*  Well, you said Patrick, didn't you?

10   **A.**  Yeah.  So Patrick --

11             MR. FINLEY:  Can we blow up Patrick, please?

12             THE WITNESS:  Russell.  There's a school.

13   BY MR. FINLEY:

14   *Q.*  Do you see Patrick yet?

15   **A.**  Yeah.  It's Patrick and Harrison Drive.

16   *Q.*  Okay.  Patrick and Harrison?

17   **A.**  Yes.

18   *Q.*  Okay.  Where was the letter shop with -- in relationship to

19   Patrick and Harrison?

20   **A.**  Like, close to the corner.

21   *Q.*  Okay.  And just for the record, I'm using shorthand, East

22   Patrick Lane, Harrison Drive?

23   **A.**  That's correct.

24   *Q.*  It sits approximately at the intersection of those two

25   streets?

───── 2:19-cr-00295-GMN-NJK ─────

1    *A.*   Pretty close.

2    *Q.*   Is that your memory?

3    *A.*   Yes.

4              THE COURT:  So I'll offer this, but I can't guarantee

5    it's going to work:  Supposedly the witness should be able to

6    draw on the screen.  We call it, like, the Madden style of, you

7    know, football writing on it.  You know, it used to work great

8    when we first got it, but I don't know if it still does.  But

9    that's an opportunity that's available.

10             MR. FINLEY:  All right.

11             THE COURT:  Do you want to see if that still works?

12   BY MR. FINLEY:

13   *Q.*   Mr. O'Connor, do you want to draw a circle around where

14   National Print Mail was?

15   *A.*   Oh, yeah.  It's not working very.

16   *Q.*   Okay.  I thought you said it was at Patrick and Harrison?

17   *A.*   Yeah.  It's not letting me do circles or anything.  It's

18   doing lines.

19   *Q.*   Okay.  Screen is not maybe the easiest to use.

20             THE COURT:  I guess not.  Sorry.

21   BY MR. FINLEY:

22   *Q.*   Can you indicate where the letter shop was on the day that

23   Glen Burke got shut down by identifying some words or symbols

24   or anything that's in the same place on this map?

25   *A.*   Yeah.  It's somewhere around these four corners by Glitch

1  Fitness, Vegas Micro, and Sin City Iron.  In that area.

2           MR. FINLEY:  Can we blow it back out?

3  BY MR. FINLEY:

4  Q.  What's that on the left-hand side of the map, big area?

5  Right there.  Maybe the left-third of the map.  What's that?

6  A.  That's the airport.

7  Q.  Okay.  So the Pearl Street warehouse is by the airport,

8  too, right?

9  A.  That's correct.

10  Q.  And then this -- this letter shop on Harrison and Patrick

11  Lane, that's also right by the airport?

12  A.  We're always by -- because the post office is right across

13  the street from the airport at Sunset.

14  Q.  And could the address have been actually not Patrick Lane,

15  but Harrison Drive that -- you know, because of the -- where

16  the -- is -- the official address, like if -- on your e-mails

17  and your documents from National Print and Mail?

18           You remember what the official address was?

19  A.  I can't remember for sure if it was Patrick or Harrison,

20  but I remember both those addresses.

21  Q.  It would have been one of the two?

22  A.  Right.  Because we moved at one point, like, to the next

23  building over.

24  Q.  Now, regardless of what it says as the address, the

25  physical location, is it sitting at the intersection of

—— 2:19-cr-00295-GMN-NJK ——

1  Harrison Drive and Patrick Lane?

2  *A.*  That's correct.

3  *Q.*  Okay.  When you got to the letter shop, did you tell

4  anybody what you saw?

5  *A.*  Yes.  I had an office there.

6  *Q.*  Who did you talk to?

7  *A.*  The first couple people I talked to was Jose Luis Mendez

8  and Luis Aguilar.

9  *Q.*  Okay.  And I think you mentioned before Luis Aguilar is

10  Miguel Castro, the defendant's, stepson?

11  *A.*  That's correct.

12  *Q.*  And then you spoke to Jose Luis Mendez?

13  *A.*  Yes.

14  *Q.*  Can you recall anything about that conversation when you

15  got back on that day in early 2013 from Glen Burke's office?

16  *A.*  Just that I remember telling him that I thought Glen was

17  getting in trouble, that there was, you know, officers there,

18  and we'd probably lose a lot of work.

19  *Q.*  Why did you tell them that?  Did it have any relevance to

20  you?

21  *A.*  To all of us.  It was part of our paychecks.

22  *Q.*  Did you --

23          THE COURT:  Mr. Finley, I'm going to need to stop you

24  there.  It's 4:00.

25          MR. FINLEY:  Oh, okay.

———— 2:19-cr-00295-GMN-NJK ————

1          THE COURT:  So during this overnight break, I remind

2    the jury that you are not to discuss this case with anyone nor

3    permit anyone to discuss it with you.  Remember, you are not to

4    speak to the attorneys or the parties or the witnesses at all

5    about anything, not the weather, not the parking, not the --

6    anything.

7          Do not read or listen to or view anything that touches

8    upon the case in any way or attempt to perform any independent

9    research or investigation.  And do not form any opinion.

10         We welcome you back at 9:00 a.m. tomorrow morning.

11         Let's please stand for the jury.

12         Mr. O'Connor, after the jury exits, you may also take

13   your overnight break.  We need you back here at 9:00 a.m.

14   tomorrow morning.

15         Please remember that you are not to discuss your

16   testimony or anything having to do with this case.  You can ask

17   about logistics, where to go, where to park, things like that

18   but nothing about the facts of this case.

19         (Whereupon, the jury exits at 4:01 p.m.)

20         THE COURT:  All right.  Anything that you want to

21   discuss before 9:00 a.m. tomorrow?  Do you want to discuss it

22   now or tomorrow?

23         MR. GREEN:  One quick matter, your Honor.

24         THE COURT:  Yes.

25         MR. GREEN:  Don Green on behalf of Salvador Castro.

2:19-cr-00295-GMN-NJK

1          THE COURT:  Yes.

2          MR. GREEN:  Your Honor, I meant no disrespect a few

3    minutes ago in making the objection.  We have studied the

4    Court's ruling, document 509, with great care.

5          THE COURT:  Page 6.  There's many lines.

6          MR. GREEN:  Yes, ma'am.

7          And I did not -- I did not see a reference to allowing

8    evidence of the physical search of either Burke or the Wagner

9    places, so that's why I made the objection.

10          So, again, I meant no disrespect, but I did not see

11    those specific items in there to go to, you know, motive,

12    opportunity, absence of mistake, etc.  So that's the nature of

13    my objection.  So, again, no disrespect to the Court.

14          Thank you.

15          THE COURT:  All right.  Well, in the future, let's do

16    these objections at sidebar so that nobody -- obviously, every

17    one of these motions, someone is successful, someone's

18    unsuccessful, and the jury doesn't need to know.  So let's do

19    these objections at sidebar.

20          MR. GREEN:  Thank you, your Honor.

21          THE COURT:  Anything else that you want to use this

22    time for?

23          I don't have anything between 4:00 and 5:00 today, so

24    if you do have something you want me to address or even just to

25    mull over until tomorrow.

———— 2:19-cr-00295-GMN-NJK ————

1           MR. FINLEY:  The Government doesn't have anything,

2     your Honor.

3           THE COURT:  Okay.

4           MR. TANASI:  Your Honor, one quick matter.

5           THE COURT:  Yes.

6           MR. TANASI:  Just with respect to the Government's

7     witnesses in this case, I'm not sure exactly what the

8     Government's plan is moving forward with respect to each

9     witness they plan to call, but regarding Inspector Bouchie, we

10    did have a conversation with the Government this morning and

11    I'm not a hundred percent sure whether or not they're planning

12    to call him at this point.

13          However, they did represent to us that they would make

14    him available since he's been in the courtroom everyday if they

15    intend not to call Inspector Bouchie and not make us have to

16    jump through the hoops of Rule 17 and Toughy.

17          So I just want to put that on record to make sure

18    we're all on the same page.

19          THE COURT:  Is that your understanding as well,

20    Mr. Finley, if the Government decides that it does not want to

21    call Inspector -- retired Inspector Bouchie, that he will still

22    be available if the defense wants to call him in his case?

23          MR. FINLEY:  Yes.

24          THE COURT:  Okay.

25          MR. TANASI:  Thank you, your Honor.

─────2:19-cr-00295-GMN-NJK─────

1          THE COURT:  All right.  You're welcome.  See you back

2     here at 9:00 a.m., or 9:05 when the jury gets here.

3          (The proceedings concluded at 4:04 p.m.)

4                               *  *  *

5

6

7

8                             --o0o--

9               COURT REPORTER'S CERTIFICATE

10

11      I, SAMANTHA N. MCNETT, Official Court Reporter, United

12    States District Court, District of Nevada, Las Vegas, Nevada

13    certify that the foregoing is a correct transcript from the

14    record of proceedings in the above-entitled matter.

15

16    Date:  April 3, 2023

17

18                              /s/ Samantha N. McNett
                                _____
19                              Samantha McNett, RPR, CRR, CCR

20

21

22

23

24

25