———— 2:19-cr-00295-GMN-NJK ————

1                      UNITED STATES DISTRICT COURT

2                          DISTRICT OF NEVADA

3

4    UNITED STATES OF AMERICA,        )
                                      )  Case No. 2:19-cr-00295-GMN-NJK
5                 Plaintiff,          )
                                      )  Las Vegas, Nevada
6         vs.                         )  April 4, 2023
                                      )  1:07 p.m. to 4:31 p.m.
7    MARIO CASTRO, SALVADOR           )  Courtroom 7D
     CASTRO, MIGUEL CASTRO, and       )
8    JOSE LUIS MENDEZ,                 )  JURY TRIAL, DAY 10, PM SESSION
                                      )
9                 Defendants.         )  **C E R T I F I E D   C O P Y**
                                      )
10   _____ )

11

12

13

14          REPORTER'S TRANSCRIPT OF JURY TRIAL, DAY 10, PM SESSION
                 BEFORE THE HONORABLE GLORIA M. NAVARRO,
15                   UNITED STATES DISTRICT JUDGE

16

17

18      APPEARANCES:        See next page

19

20

21

22   COURT REPORTER:    Samantha N. McNett, RPR, CRR, CCR, CSR
                        United States District Court
23                      333 Las Vegas Boulevard South, Room 1334
                        Las Vegas, Nevada  89101
24                      Samantha_McNett@nvd.uscourts.gov

25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.

—— 2:19-cr-00295-GMN-NJK ——

1                          **APPEARANCES**

2    For the Government:

3         **TIMOTHY T. FINLEY  ESQ.**
          **DANIEL E. ZYTNICK, ESQ.**
4         U.S. DEPARTMENT OF JUSTICE
          950 Pennsylvania Avenue, N.W.
5         Washington, D.C. 20530
          202-307-0050
6
          -AND-
7
          **MINA CHANG, ESQ.**
8         UNITED STATES ATTORNEY'S OFFICE
          501 Las Vegas Boulevard South, Suite 1100
9         Las Vegas, Nevada 89101
          702-388-6336
10

11
     For Defendant Mario Castro:
12
          **JOSHUA L. TOMSHECK, ESQ.**
13        HOFLAND & TOMSHECK
          228 South Fourth Street, First Floor
14        Las Vegas, Nevada 89101
          702-895-6760
15
          -AND-
16
          **RICHARD E. TANASI, ESQ.**
17        TANASI LAW OFFICES
          8716 Spanish Ridge Avenue, Suite 105
18        Las Vegas, Nevada 89148
          702-906-2411
19

20
     For Defendant Salvador Castro:
21
          **DONALD GREEN, ESQ.**
22        LAW OFFICES OF DONALD J. GREEN
          4760 South Pecos Road, Suite 103
23        Las Vegas, Nevada 89121
          702-388-2047
24
     ///
25
     ///

2:19-cr-00295-GMN-NJK

1                    **APPEARANCES CONTINUED**

2

For Defendant Miguel Castro:

3
        **LUCAS J. GAFFNEY, ESQ.**
4       GAFFNEY LAW
        9900 Covington Cross Drive, Suite 290
5       Las Vegas, Nevada 89144
        702-742-2055
6
        -AND-
7
        **THOMAS A. ERICSSON, ESQ.**
8       THOMAS A. ERICSSON, CHTD.
        9900 Covington Cross Drive, Suite 290
9       Las Vegas, Nevada 89144
        702-878-2889
10

11

For Defendant Jose Luis Mendez:

12
        **WILLIAM H. BROWN, ESQ.**
13      **CHRISTOPHER MISHLER, ESQ.**
        BROWN MISHLER, PLLC
14      911 North Buffalo Drive, Suite 202
        Las Vegas, Nevada 89128
15

16                              *  *  *

17

18

19

20

21

22

23

24

25

2:19-cr-00295-GMN-NJK

1

## INDEX OF EXAMINATIONS

2    **TESTIMONY OF SEAN O'CONNOR**

Cross-Examination by Mr. Green.....................141
3    Cross-Examination by Mr. Tomsheck..................147

4                                    * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

—2:19-cr-00295-GMN-NJK—

1                       **INDEX OF EXHIBITS**

2    GOVERNMENT EXHIBITS

3    EXHIBIT NO.:                  OFFERED   ADMITTED   WITHDRAWN

4    (No exhibits offered or admitted.)

5

6    DEFENDANT EXHIBITS

7    EXHIBIT NO.:                  OFFERED   ADMITTED   WITHDRAWN

8    (No exhibits offered or admitted.)

9                       * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          LAS VEGAS, NEVADA; TUESDAY, APRIL 4, 2023; 1:07 P.M.

2                          --oOo--

3                    P R O C E E D I N G S

4          THE COURT:  Do we have Mr. O'Connor back?

5          MR. FINLEY:  Yes, your Honor.

6          THE COURT:  All right.  We'll have you take your seat.

7          All right.  Nick, you want to go grab the jury,

8   please?

9          (Whereupon, the jury enters at 1:09 p.m.)

10          THE COURT:  All right.  Everyone may be seated.

11          Welcome back from the lunch break.  We have the jury

12   here and Mr. O'Connor, the witness, is on the witness stand.

13          And I think it was -- was it Mr. Green who was

14   cross-examining?

15          MR. GREEN:  Yes.  May I continue, your Honor?

16          THE COURT:  Yes, you may.

17          MR. GREEN:  Thank you.

18                     CROSS-EXAMINATION

19   BY MR. GREEN:

20   Q.  Good afternoon again, Mr. O'Connor.

21   A.  Good afternoon.

22   Q.  So I'd like to continue with a few more questions

23   concerning the July 31, 2019 interview which you had with the

24   Government attorney from the Department of Justice Consumer

25   Protection Branch, Mr. Finley, and the United States postal

1    inspector by the name of Barry Bouchie.

2          Do you remember that line of questioning so far?

3    **A.**  Yes.

4    *Q.*  Okay.  Thank you.

5          In connection with -- with this, I'm going to ask you

6    a couple of questions, if I may.

7          Did you tell the Government attorney and Mr. Bouchie

8    that Salvador Castro was usually at the business whenever the

9    other Castro brothers went to breakfast?

10   **A.**  I'm sorry.  I missed the middle part there.

11   *Q.*  Did you tell the Government attorney and the postal

12   inspector that on occasions when Salvador Castro was there,

13   that he was there when the others went to breakfast?

14   **A.**  Sometimes, yes.

15   *Q.*  Okay.  Thank you.

16         And that -- did you tell the Government attorney and

17   the postal inspector that, on occasions, you saw Salvador drive

18   a forklift?

19   **A.**  That's correct.

20   *Q.*  Okay.  Thank you.

21         And that from what you learned, you told the -- and

22   being at this business for whatever period of time, you told

23   the Government attorney and the postal inspector that Salvador

24   attempted to manage some of the restaurant businesses of the

25   other Castro brothers?

—2:19-cr-00295-GMN-NJK—

1  **A.**  I don't recall that statement exactly, but they did have a

2  restaurant.

3  *Q.*  All right.  And did you tell the Government attorney and

4  the postal inspector that Salvador Castro had a vegetable

5  processing business?

6  **A.**  As I recall, yes.

7  *Q.*  Okay.  And did you tell the Government attorney and the

8  postal inspector that you were never around when Kern dropped

9  off white envelopes for the Castro group?

10  **A.**  That's correct.  She usually came early in the morning

11  before I got there.

12  *Q.*  And did you tell these gentlemen again that Golden Products

13  Service and Price Awards, that you didn't know anything about

14  it?

15  **A.**  I did not recall the name Price Awards.

16  *Q.*  Okay.

17  **A.**  Golden Products, I do not --

18  *Q.*  As to the entity Imperial Award Services, did you tell the

19  Government attorney and the postal inspector that you thought

20  that was the company -- that is, Imperial Award Services -- was

21  a company attributed to Epi Castro?

22  **A.**  As I understood it, yes.

23  *Q.*  Okay.  And then you also told them on July 31, 2019 that

24  you did not know if Salvador had any companies in his own name?

25  **A.**  That's correct.

─── 2:19-cr-00295-GMN-NJK ───

1   *Q.*  And at an earlier time, were you interviewed in October of

2   2018 again by United States Department of Justice Consumer

3   Affairs Branch attorney Tim Finley and then-United States

4   postal inspector Barry Bouchie?  Did you have an interview with

5   them on October 4th of 2018?

6   *A.*  More than likely, yes.

7   *Q.*  So over the course of time, you had a number of interviews

8   with one or more Government attorneys and/or postal inspectors;

9   would that be safe to say?

10  *A.*  It was always more than one, yes.

11  *Q.*  Yes, sir.

12        And as to the interview on October 4th of 2018, did

13  you tell the Government attorney and the postal inspector that

14  Salvador Castro had a recycling business?

15  *A.*  I don't recall saying he had a recycling business.

16  *Q.*  If I showed you a document, would it refresh your

17  recollection?

18  *A.*  Yes.

19        MR. GREEN:  If I may?

20        Your Honor, with the Court's permission, may I

21  approach the witness to show him a document only for purposes

22  of refreshing recollection?

23        THE COURT:  Yes, you may.

24        MR. GREEN:  Thank you.

25  ///

—2:19-cr-00295-GMN-NJK—

1   BY MR. GREEN:

2   *Q.*   Mr. O'Connor, I'm just showing you -- I'm just going to ask

3   you to take a look at it, if you may, and just let me know if

4   something refreshes your recollection without answering

5   anything, just if your recollection is refreshed.

6   *A.*   Yes.

7   *Q.*   Okay.  Is your --

8           (Court reporter interruption.)

9   *Q.*   Mr. O'Connor, is your recollection refreshed as to whether

10  or not you had told the Government attorney and the postal

11  inspector that Salvador Castro had a recycling business?

12  *A.*   I -- I would say that's not what I meant.  I would say that

13  I meant he would take stuff to recycling, not that he actually

14  had a business in recycling.

15  *Q.*   Fair enough.  Thank you so much.

16          Now, you had mentioned that you were an accounts

17  manager?

18  *A.*   That's correct.

19  *Q.*   Define "accounts manager," please.

20  *A.*   I was the face of the company to the clients, and I would

21  handle invoices and talking to them about drop dates and

22  postage.

23  *Q.*   Sorry.  Say that again, please.

24  *A.*   I would talk to them about drop dates, postage, day-to-day

25  logistics of getting the mail out.

1  *Q.*  You say "day-to-day."  Is this, like, writing checks or is

2  it, like, getting in money or checking ledgers, things like

3  that?

4  *A.*  I wouldn't actually -- the only thing I would actually do

5  for the mailing company at that point was write the invoices

6  and talk to the clients, e-mail the client.

7  *Q.*  When you got an invoice, would the invoice be paid?

8  *A.*  Of course.

9  *Q.*  And who would authorize the payment for the invoice?

10  *A.*  The client.

11  *Q.*  Okay.  And who was the client?

12  *A.*  We had several clients.

13  *Q.*  Define who they were.

14  *A.*  Some of them were Patti Kern, Dan Wagner, Glen Burke.

15  There was other small ones.  I don't remember.  Those are the

16  majority.

17  *Q.*  As to Ms. Kern in particular, would Ms. Kern give you

18  instructions on what invoices would be paid, etc.?

19  *A.*  She would pay the invoices, if that's what you mean, that I

20  sent.

21  *Q.*  Okay.  Did you sign any checks in the connection with this

22  case?

23  *A.*  From On the Side, I paid some of Dan Wagner's invoices.

24  *Q.*  All right.  Now -- thank you.

25        On The Side, was this a corporation or an LLC?

1     **A.**   LLC.

2     *Q.*   Where was it -- where was it formed as an LLC?

3     **A.**   Here in Las Vegas.

4     *Q.*   And in connection with this LLC formation, were you an

5     officer or a manager of this LLC?

6     **A.**   That's correct.

7     *Q.*   As to the purpose stated for this LLC, do you remember what

8     you -- what you put into the papers to the State of Nevada or

9     the county?

10    **A.**   I do not.

11    *Q.*   So did you put in fraudulent mailing activity?

12    **A.**   No.

13    *Q.*   Or did you put in just general business or something like

14    that?

15    **A.**   As I understand it, corporations, LLCs in Las Vegas usually

16    put general, but there's a wide range of stuff an LLC can do.

17    *Q.*   Okay.  Did you open up a bank account for On The Side?

18    **A.**   Yes.

19    *Q.*   Where was the bank account?

20    **A.**   Here in Las Vegas.

21    *Q.*   Without disclosing the bank account number, was it a

22    checking account?

23    **A.**   Yes.

24    *Q.*   Was it a business checking account?

25    **A.**   Yes.

1    Q.  At some point during the time in which -- is it still open?

2    Is the bank account for On The Side still open?

3    **A.**  No.

4    Q.  During the time in which the bank account -- in which the

5    On The Side bank account was opened, did you write checks or

6    deposit money in connection with this fraudulent activity?

7    **A.**  I wrote checks to pay bills and postage and I received

8    money from the fraudulent clients.

9    Q.  When you say you received money from fraudulent clients,

10   was that money deposited into Bank of America?

11   **A.**  Yes.

12   Q.  And I take it that you didn't tell the teller at Bank of

13   America, oh, I'm depositing fraudulent activity proceeds?

14   **A.**  They usually came as wires.

15   Q.  Okay.  Oh.  How much were the wires?

16   **A.**  For the -- the time I worked with Dan Wagner, it was quite

17   a lot of money.

18   Q.  Okay.  Are we talking more than $5,000?

19   **A.**  Yes.

20   Q.  More than $10,000?

21   **A.**  Not usually, no.

22   Q.  Okay.  Let's -- let's go to your minor role.

23         So are you telling the jury that you received wires to

24   the bank account, Bank of America for On The Side?

25   **A.**  Yes.

— 2:19-cr-00295-GMN-NJK —

1  Q.  And these were wires for Mr. Wagner?

2  A.  Yes.

3  Q.  Who is the one who was in Costa Rica?

4  A.  Mr. Wagner.

5  Q.  Okay.  Yeah.  It's been so many names thrown around.

6      Okay.  Who was in Canada?

7  A.  A company called PacNet.

8  Q.  Can you spell that for the record, please?  If you

9  remember.

10  A.  I believe it was P-A-C-N-E-T.

11  Q.  So the money would get wired or -- are these the checks

12  that would come in from -- from the -- these -- from the little

13  old ladies and the retires and the veterans that were sending

14  money to these organizations?

15  A.  Yes.  They were all the respondents.

16  Q.  And were these checks then all sent to Canada?

17  A.  Yes.

18  Q.  And I take it that the arrangement with this -- what was

19  it?  Packman?  What was it?

20  A.  PacNet.

21  Q.  PacNet.

22      Was the arrangement with PacNet such that -- let's say

23  it's a thousand dollars in checks -- now PacNet, I take it, had

24  some kind of a processing fee?

25  A.  I'm not privied to that information.

1  Q.  Okay.  How -- let's say it's a thousand dollars, for

2  example.  Do you know how much money would have been wired or

3  sent from PacNet?

4  A.  Again, I have no information on that.

5  Q.  Would the wires go to Costa Rica?

6  A.  I have no idea what Dan Wagner --

7  Q.  Would some wires -- would some wires --

8        THE COURT:  Just a minute.  Let the witness finish the

9  answer before you ask another question.

10        THE WITNESS:  It was Dan Wagner's PacNet account, not

11  mine.

12  BY MR. GREEN:

13  Q.  Would some wires go to On The Side?

14  A.  That is correct.

15  Q.  When you -- did you receive an e-mail or some kind of a

16  text notification that a wire transfer had gone into the

17  account for On The Side?

18  A.  Yes.  That's the way I had it set up on the banking system.

19  Q.  Okay.  Was it an e-mail or a -- did you check it

20  frequently?

21  A.  I believe it was e-mail.  I'm not positive.

22  Q.  Who was the signatory to the bank account On The Side?

23  A.  Me.

24  Q.  Okay.  Was it you alone?

25  A.  Yes.

1   *Q.*  Over the course of time, let's say from 2013 -- or excuse

2   me -- 2010 until 2018, do you have any idea of how much money

3   was deposited into the account of On The Side?

4   **A.**  From PacNet?

5   *Q.*  Yes.

6   **A.**  I'm not sure on that figure.  I would say a million.

7   *Q.*  Okay.  When you got this money, what, if anything, did you

8   do?

9   **A.**  I distributed the funds for postage, payment, processing,

10  purchase orders, you know, payments to Epi or Edgar Del Rio,

11  payments and postage to the Castros, the defendants for the

12  mailing of these promotions.

13  *Q.*  Isn't it true that you never made a single payment to

14  Salvador Castro?

15  **A.**  That's correct.

16  *Q.*  Ricardo Gonzalez --

17          MR. GREEN:  Government's Exhibit 171, please.

18  BY MR. GREEN:

19  *Q.*  All right.  Before you is Government's Exhibit 171.

20          Today, you were asked, and yesterday you were asked,

21  about this e-mail which was sent to you; is that correct?

22  **A.**  That's correct.

23  *Q.*  And it says that "Sean" -- and after the word "Sean" at the

24  top of the page --

25          MR. GREEN:  If we could highlight that, please, just

─── 2:19-cr-00295-GMN-NJK ───

1  the top quarter of the e-mail.

2  BY MR. GREEN:

3  Q.  Do you see where it says Sean@nationalprintmail?

4  A.  Yes.

5  Q.  Was National Print Mail a website, nationalprintmail.com,

6  or was it merely an e-mail address?

7  A.  That was the e-mail address we had at the time.

8  Q.  So -- okay.  So it wasn't a -- like a business.com?  It was

9  just an e-mail address?

10  A.  Yes, that's correct.

11  Q.  But you used your name, correct?

12  A.  Right.

13  Q.  And your minor role in this event -- I mean, in this case,

14  you used that as -- as your real name?  Sean?  That was you?

15  A.  Yes, that's my e-mail address.

16  Q.  Now, this e-mail mentions -- this e-mail mentions, you

17  know, the CFO and Edgar and Paco.

18        Who was Paco?

19  A.  Paco was the pre-press person at work.

20  Q.  I'm sorry?

21  A.  Paco was a pre-press person that worked for Epifanio

22  Castro.

23  Q.  Now, where it says the subject, "New company" -- excuse

24  me -- "New company.  New promo."

25        Do you see that?

1    *A.*   Yes.

2    *Q.*   Now, over the course of time, you would actually have been

3    involved in the -- in the nomenclature of certain companies,

4    correct?  Developing the names of certain companies?

5    *A.*   Yes.

6    *Q.*   Okay.  So that's one of your other roles, correct?

7    *A.*   Yes.

8    *Q.*   In addition to your role as an account manager?

9          So you had something to do with the -- the -- the

10   setting up of certain businesses in connection with these

11   promotions, correct?

12   *A.*   For AAS, yes.

13   *Q.*   And these were the promotions which were going to utilize

14   these names to be placed on some type of documents to be mailed

15   all over the United States in the hopes that somebody would

16   send a check or cash, correct?

17   *A.*   That's correct.

18   *Q.*   Okay.  Now, you had mentioned about Ricardo Gonzalez

19   that -- do you know who -- do you know what he did for a

20   living?

21   *A.*   He was a CPA.

22   *Q.*   All right.  And as a CPA, did he also act as, like, a

23   resident agent for one or more of these companies, if you know?

24   *A.*   As I understand it, yes, more than one.

25   *Q.*   And did Mr. Gonzalez get paid a fee for his being a

1    resident agent?

2    **A.**   I paid him a fee, but it was to do my taxes.  I don't know

3    if resident agent was included in that fee.

4    *Q.*   Okay.  So you don't know if he received regular payments

5    of, like, 400, 500, 750, things like that?

6    **A.**   He did from me for doing my accounting.

7    *Q.*   Okay.  And what were those payments which he received from

8    you?

9    **A.**   They were payments for doing my accounting.

10   *Q.*   Were they monthly payments?

11   **A.**   Quarterly.

12   *Q.*   And -- quarterly.

13          Do you remember how much you paid Mr. Gonzalez?

14   **A.**   If I recall right, it was $600.

15   *Q.*   So were these payments, were they made with some frequency?

16   **A.**   Every quarter.

17   *Q.*   Okay.  And the -- the reason why -- you're a working man,

18   correct?

19   **A.**   Yes.

20   *Q.*   And you were working, I guess, because of these jobs that

21   you had was -- was it, like, living paycheck to paycheck?

22   **A.**   At some points, yes.

23   *Q.*   So it was important for you to have your business -- your

24   business straightened out as far as taxes are concerned with

25   Mr. Gonzalez, correct?

1    *A.*   That's correct.

2    *Q.*   Did you meet with Mr. Gonzalez quarterly or did you see him

3    other times?

4    *A.*   I met him at his office quarterly to talk about my taxes or

5    my quarterly entries to the Government.

6          And I did see him at the letter shop --

7    *Q.*   Yes.

8    *A.*   -- also.

9    *Q.*   Yes.

10         MR. GREEN:  I'm going through my notes, your Honor, to

11   make sure we haven't covered from the others.  I don't want to

12   go -- overlap.

13         May we have Government's Exhibit 214-89?  214,

14   page 89.

15   BY MR. GREEN:

16   *Q.*   Okay.  On this document, do you see where it says --

17         MR. GREEN:  If we could highlight the top half there.

18   BY MR. GREEN:

19   *Q.*   Do you see where it says Ricardo Gonzalez?

20   *A.*   Yes.

21   *Q.*   Now, yesterday, you were shown this -- this form.

22         Do you remember that?

23   *A.*   Yes.

24         MR. GREEN:  Can we scroll to the bottom of the page,

25   please?  Right there would be fine.  Right there.

—— 2:19-cr-00295-GMN-NJK ——

1   BY MR. GREEN:

2   Q.  Who does it say is the president of this -- of this entity

3   in Government's Exhibit 214?

4   A.  Miguel Castro.

5   Q.  And who does it say is the secretary?

6   A.  Miguel Castro.

7   Q.  And who does it say is the treasurer?

8   A.  Miguel Castro.

9   Q.  And who does it say is the director?

10  A.  Miguel Castro.

11  Q.  And down at the bottom where there's a signature with the

12  "X," do you see a name?

13  A.  Yes.

14  Q.  What is that name?

15  A.  Ricardo Gonzalez.

16  Q.  And over on the right where it says Title, what's that

17  name?

18  A.  President.

19          MR. GREEN:  Can we have Government's Exhibit 214,

20  page 91?

21  BY MR. GREEN:

22  Q.  Do you see where it says Marketing Image Direct up at the

23  top left?

24  A.  Yes.

25          MR. GREEN:  Can we scroll down in this document,

1    please?

2    BY MR. GREEN:

3    Q.  It says --

4           MR. GREEN:  Go up a little bit, please.  Go up.  Okay.

5    Keep going.  This is Government's Exhibit -- okay -- 214.

6    Okay.

7    BY MR. GREEN:

8    Q.  Do you see where it says Miguel Castro?  What does it show

9    as the title on the right?

10   A.  President.

11   Q.  And Miguel Castro on another -- is there another -- is

12   there another job?

13   A.  Secretary.

14   Q.  And is there one -- is there yet another title?

15   A.  The next one down is treasurer.

16   Q.  And is there yet another title that says director?  That's

17   Miguel Castro?

18   A.  That's correct.

19           MR. GREEN:  Can we scroll down, please?

20   BY MR. GREEN:

21   Q.  Okay.  Now, do you see where it says Miguel Castro where

22   there's the "X"?

23   A.  Yes.

24   Q.  And then over on the line is president?

25   A.  Yes.

─ 2:19-cr-00295-GMN-NJK ─

1          MR. GREEN:  Go up all the way on that document,

2     please.  All the way up on 214.

3     BY MR. GREEN:

4     Q.   Right there, it says Marketing Image Direct, Inc.

5          Do you see that?

6     A.   Yes.

7     Q.   Okay.

8          MR. GREEN:  Now, can we go to 214-89?

9          Now, if we can zoom in -- in the top half of that?

10    BY MR. GREEN:

11    Q.   Do you see a name that says Marketing Image Direct?

12    A.   Yes.

13    Q.   And then the last one we saw was Miguel is the president?

14         MR. GREEN:  Can we go down, please?  Go down, please.

15    BY MR. GREEN:

16    Q.   And on this one, does it show Ricardo Gonzalez on the

17    president?

18    A.   Yes.

19    Q.   Okay.  And to the best of your knowledge, do these appear

20    to be some forms which should be submitted to, like, an

21    official government entity --

22    A.   Yes.

23    Q.   -- such as the State of Nevada Secretary of State?

24    A.   Yes.

25    Q.   Thank you.

1           You had mentioned the other day that you had got the

2    name Chango.  For the record, C-H-A-N-G-O.

3           It's a nickname given to you, correct?

4    **A.**   That's correct.

5    *Q.*   And did you know it as -- in Spanish as being monkey?

6    **A.**   I found out later.

7    *Q.*   Okay.  About how much later did you find out?

8    **A.**   I don't recall.

9    *Q.*   Were you offended by the name?

10   **A.**   Not at all.

11   *Q.*   Did it become a nickname for you?

12   **A.**   Yes.

13           MR. GREEN:  Exhibit 255, please.  Thank you.

14           If we could go to the top and highlight that.

15   BY MR. GREEN:

16   *Q.*   This is an e-mail that has been admitted into evidence.

17           And do you see that it's from someone by the name

18   of -- looks like -- what?  What's that name?

19   **A.**   Tod Hoover.

20   *Q.*   And who was Mr. Hoover?

21   **A.**   He's also an artist.

22   *Q.*   An artist?

23   **A.**   Artist.

24   *Q.*   What type of artist?

25   **A.**   He works with Adobe and print shop jobs to create art,

1  forms, letters, envelopes.

2  Q.  Okay.  And when you say that, is this, like -- so if I had

3  a blank piece of paper to put on one of the machines at the

4  Castros' printing business, would it be sometimes that maybe

5  something would be done by Tod Hoover or others to make the

6  artwork to make it look very official?

7  A.  Yes.

8  Q.  Okay.  And to whom is this -- to whom is this e-mail

9  addressed?

10  A.  Chango Consulting.

11  Q.  And is there an e-mail address?

12  A.  ChangoConsulting@Gmail.com.

13  Q.  So not only did you have this as a nickname, you also

14  established an account with Gmail using Chango, the word, and

15  Consulting, for an e-mail address, correct?

16  A.  That's correct.

17  Q.  Part of your minor role in this.  Thank you.

18      You had mentioned that, you know, these guys that come

19  over to get their paychecks, correct?  Excuse me.

20      They come to get envelopes, maybe on Fridays?

21  A.  That's correct.

22  Q.  Okay.

23      MR. GREEN:  Government's Exhibit 160-C, please.

24  BY MR. GREEN:

25  Q.  Down at the bottom, right there, where it looks like it's

1  from Chango, is that a text message?

2  **A.**  Yes, it is.

3  *Q.*  So you were using Chango Consulting in an e-mail?

4  **A.**  Yes.

5  *Q.*  Nickname in the -- in the office Chango?

6  **A.**  Yes.

7  *Q.*  And also using Chango in your text messaging, correct?

8  **A.**  That's incorrect, actually.

9  *Q.*  What was it then?

10  **A.**  That's what Mario has in his phone as referring to me.

11  *Q.*  Okay.  Thank you.

12       But there's something in there about "couldn't find my

13  check."

14       See that?

15  **A.**  Yes.

16  *Q.*  Is that you?

17  **A.**  Yeah, that's my check.  I'm looking for my paycheck.

18  *Q.*  Okay.  And the date on that, sir, is what?

19  **A.**  12-6-2017.

20  *Q.*  I'll represent to you that December 6th of 2017 was a

21  Wednesday.

22       So when were you paid?

23  **A.**  It varied from week to week.

24  *Q.*  Okay.  So was there anything -- so would it be unusual for

25  individuals to get envelopes or checks throughout the week in

—— 2:19-cr-00295-GMN-NJK ——

1   this Patti Kern syndicate?  Would it be unusual?

2   *A.*  This check I'm referring to is my paycheck.  I might not

3   have been in the office --

4   *Q.*  Okay.

5   *A.*  -- at that time.

6          As I testified before, 2014 to 2018, I was coming at

7   night or late at -- or early in the mornings before I went to

8   my job.  So this is referring to a paycheck.

9   *Q.*  Precisely.

10          You wanted your paycheck, didn't you?

11  *A.*  Yes, I did.

12  *Q.*  When was the paydays?  Do you remember?

13  *A.*  For me, not being there, it was when I showed up and

14  received my check.

15  *Q.*  Okay.

16          MR. GREEN:  Now, may we go to Government's

17  Exhibit 160D, page 6?

18  BY MR. GREEN:

19  *Q.*  Do you remember this series of text messages here --

20  *A.*  Vaguely.

21  *Q.*  -- that's in Government's Exhibit 160?

22  *A.*  Vaguely, yes.

23  *Q.*  Vaguely.

24          And you're -- and there's, like, something in here

25  about -- about some envelopes and a mistake on GR.

1          What's GR?

2    **A.**  Gold Rush.

3    Q.  Okay.

4          MR. GREEN:  And can we go to -- is that 6?  Is that

5    page 6 of 6?  Can we go to page 5, please?

6    BY MR. GREEN:

7    Q.  And on this one, we're taking about pay.  Is the question,

8    postage?  Do you see that in the middle?

9    **A.**  Yes.

10   Q.  And at the top, it's from Mario Castro to you, Sean

11   O'Connor?

12   **A.**  That's correct.

13   Q.  Not monkey.

14          And read the text of what that says starting with the

15   words "good morning."

16   **A.**  "Good morning.  Man, you really getting rich with all the

17   overtime.  GR60334 and 60323.  Can you check if those got pay?

18   Thanks."

19   Q.  Now, I take it that you -- you -- you really wanted to make

20   as much money for your family; isn't that true?

21   **A.**  Of course.

22   Q.  Like everybody?

23   **A.**  Yes.

24   Q.  You're working -- you're doing stuff for the stage hands?

25   **A.**  That's correct.

1  Q.  You remember that union?  Do you remember the stage hand's

2  union?

3  A.  I was not part of the stage hand union.  I was working at

4  Mandalay Bay.

5  Q.  But you're working setting up concerts and things like

6  that?

7  A.  That's correct.

8  Q.  And then going in early in the morning and late at night

9  working at this facility, correct?

10  A.  That's correct.

11  Q.  And eventually, from at least Advanced Allocation Systems,

12  getting $67,695, correct?

13  A.  That's correct.

14  Q.  Okay.  Were most of your paychecks, like, round numbers?

15  A.  From the Castros?

16  Q.  From these entities.

17       Most of them, were they mostly round numbers?

18  A.  At this time, yes.

19  Q.  Okay.  So did you ever receive a check which, like, had,

20  like, your withholding, your -- your tax withholding, social

21  security, Medicare, all that?

22  A.  Not once I opened On The Side.

23  Q.  Okay.  And On The Side, did you -- you put this money in

24  the bank there or cashed checks there?

25  A.  Yes.

─── 2:19-cr-00295-GMN-NJK ───

1    Q.  Okay.

2          MR. GREEN:  May we have Government's Exhibit 9040,

3    page 6?

4    BY MR. GREEN:

5    Q.  Mr. O'Connor, did you ever go to the home of Patti and

6    Michael Kern?

7    A.  Yes.

8    Q.  In the time that you went over there, did you go into her

9    home office?

10   A.  Never.

11   Q.  So the document -- excuse me.

12          The photograph in front of you, Government's

13   Exhibit 9 -- excuse me -- Exhibit -- I stand corrected --

14   Exhibit 9040, had you ever seen this picture before?

15   A.  No, sir.

16   Q.  I'll represent to you that it is in evidence and this was a

17   photograph of a safe of some type taken in the home office of

18   Patricia Kern.

19          Do you see what appears to be something inside that

20   safe?

21   A.  Yes.

22   Q.  What is it?

23   A.  Looks like a lot of money.

24   Q.  I take it you didn't have something like that at your

25   house, did you?

— 2:19-cr-00295-GMN-NJK —

1   **A.**  No, sir.

2   *Q.*  Did you know that some -- some -- some $170,000 was taken

3   from the home of Patricia Kern on the morning or afternoon of

4   February 21, 2018?

5           MR. FINLEY:  Objection, your Honor.  No foundation.

6   Counsel's just testifying.

7           THE COURT:  Sustained.

8           MR. GREEN:  I'll withdraw the question.  Thank you.

9   Well-taken objection.

10  BY MR. GREEN:

11  *Q.*  Was your house searched on February 21, 2018?

12  **A.**  No, sir.

13  *Q.*  Were you detained on that day?

14  **A.**  No, sir.

15  *Q.*  At some time, were you detained by the postal inspectors?

16  **A.**  Detained in the sense of when I did my plea agreement, they

17  took me down and fingerprinted me that amount of time.

18  *Q.*  Did you ever -- did you ever remember writing out a

19  statement?

20  **A.**  Yes, sir.

21  *Q.*  And you -- you -- you actually were photographed with your

22  hands, like, on that statement?

23  **A.**  Yes, sir.

24  *Q.*  Do you remember when that statement -- when that photograph

25  was taken?

2:19-cr-00295-GMN-NJK

1    *A.*  No, I do not.

2    *Q.*  Okay.

3    *A.*  Early --

4    *Q.*  Okay.  Go ahead.

5    *A.*  Sorry.  Early on in the investigation.

6    *Q.*  Okay.  Would it have been after February of 2018?

7    *A.*  No, sir.

8    *Q.*  Would it have been before?

9    *A.*  That's correct.

10   *Q.*  Okay.  Was it in connection with Mr. Burke or Mr. Wagner,

11   if you know?

12   *A.*  It was -- it was an interview process for all of it, for

13   everything I've done.

14   *Q.*  Okay.  So in this case, from any of these businesses, did

15   you receive frequent checks?

16   *A.*  I received checks directly from AAS, wires from Dan

17   Wagner's companies, and then checks from the Castro family

18   business, the letter shop for pay.  That's all I recall right

19   now.

20   *Q.*  Isn't it true that you never received a single check to you

21   from Golden Products?

22   *A.*  Not directly, no.

23   *Q.*  Okay.  Well, define "not directly," sir.

24   *A.*  Not a dispersement or a profit but through invoicing Golden

25   Products to the Castro family business and the Castro family

1    business writing me a paycheck.

2    Q.  When you say "invoices," were these invoices, like, from

3    vendors, like, printing, postage?

4    A.  Right.  Invoices from -- I believe it was Marketing Image

5    Direct at that time.

6    Q.  How about Federal Express, things like that?  Did you ever

7    spend any money on Federal Express or U.S. Postal Service?

8    A.  Me directly?

9    Q.  Yes.

10   A.  Not that I can recall.

11   Q.  So would it be safe to say that you personally did not form

12   any of these companies which are the subject of this -- of this

13   case?

14   A.  Well, I formed On The Side, but the other ones --

15   Q.  I'm talking about -- we'll get to that in a minute.

16          You formed On The Side, correct?

17   A.  Correct.

18   Q.  But was On The Side involved in preparing mailers?

19   A.  No.

20   Q.  Okay.  And as far as we know, the only two people in this

21   case who used nicknames or had nicknames or alternative names

22   was you and Ms. Kern, correct?

23   A.  As I know it, we all had nicknames because there was more

24   than one Jose, there was more than one Luis, there was more

25   than one Miguel, and myself.

—2:19-cr-00295-GMN-NJK—

1    *Q.*  But there was only one Salvador?

2    **A.**  That I recall, yes.

3            MR. GREEN:  Government's Exhibit 9041, please.

4    BY MR. GREEN:

5    *Q.*  Okay.  Before you, sir, is a photograph.  It is in

6    evidence.

7            Have you seen this photograph before?

8    **A.**  I have not.

9    *Q.*  So you were not advised of this in connection with your

10   preparation for your examination here at trial; is that

11   correct?

12   **A.**  That's correct.

13   *Q.*  Down at the bottom -- and I know you haven't seen this

14   before -- do you recognize any name down at the very bottom of

15   that photograph?

16   **A.**  It's looks like Golden.

17   *Q.*  Okay.  Do you know where this photograph was taken?

18   **A.**  If I was to take a guess, I would say Ricardo's office.

19   *Q.*  I'm not asking you to guess.  I'm asking if you know where

20   it was taken?

21   **A.**  No, I do not.

22   *Q.*  In connection with your role as accounts manager, part of

23   your minor role, did you have any of the bank statements for

24   Golden Products?

25   **A.**  No.

─ 2:19-cr-00295-GMN-NJK ─

1   Q.  In connection with your minor role as accounting manager,

2   did you have any of the books for Golden Products dba Imperial

3   Awards Services?

4   A.  No.

5   Q.  Earlier today, you were asked a series of questions about

6   these names for these -- for these promotions, you know,

7   Advanced Allocation Systems, you know.

8           They're very fancy names, agreed?

9   A.  I guess.

10  Q.  Okay.  Isn't it true that -- that Salvador Castro, as far

11  as you know, did not develop any of these names used in any of

12  the promotions?

13  A.  I'm not sure where Golden Products came from, no.

14  Q.  Okay.

15          MR. GREEN:  Indulgence another moment, your Honor.

16          Exhibit 253, please, page 1.

17  BY MR. GREEN:

18  Q.  Before you, Mr. O'Connor, is Government's Exhibit page 253,

19  and right down where they have asked you today about a couple

20  of payments to On The Side.

21          Do you remember that questioning, sir?

22  A.  Yes, I do.

23  Q.  And they had asked you about a payment.  I believe it's

24  on -- for $750 on December 14th.

25          Is that on there?

2:19-cr-00295-GMN-NJK

1    **A.**   That sounds correct.

2    *Q.*   Okay.  That sounds correct?

3    **A.**   Yes.

4    *Q.*   Okay.  Do you know what that payment was for?

5    **A.**   It was a profit sharing or disbursement.

6    *Q.*   And $750 in an even -- even numbers?

7    **A.**   Yes.

8    *Q.*   And it's a check, correct?

9    **A.**   That's correct.

10   *Q.*   Did you ask for a check?

11   **A.**   No.

12   *Q.*   But you wanted -- was it your thinking that, you know,

13   "I'm -- I'm working several jobs, I'm stage hand at Mandalay

14   Bay, I'm working at another job, and I've got Mr. Gonzalez

15   doing my taxes," and you wanted to do things right, correct?

16   **A.**   That's correct.

17   *Q.*   So -- and earlier you had mentioned -- remember that date

18   in December where you said, "I want my check," and it was a

19   Wednesday?  Remember that?

20   **A.**   Yes.

21   *Q.*   "I hadn't got my check yet"?

22   **A.**   That's correct.

23   *Q.*   So it was important to you to receive a check, correct?

24   **A.**   A check from the Castros, yes.

25   *Q.*   Okay.  But regardless of who it was from, was it important

—— 2:19-cr-00295-GMN-NJK ——

1  for you to receive a check?

2  **A.**  Of course, for work I'd done for the Castros.

3  **Q.**  For the -- the work you thought you were doing for this --

4  for this company, correct?

5  **A.**  That's correct.

6       MR. GREEN:  May we have page 2 of Government's

7  Exhibit 253?

8       Let's go up to August 8th of 2016.

9  BY MR. GREEN:

10  **Q.**  Do you see that $750 check August 8, 2016?

11  **A.**  Yes.

12  **Q.**  Do you see that?

13  **A.**  Yes.

14  **Q.**  Now, that check was issued -- wait.

15       You testified before the grand jury in July of 2016?

16  **A.**  I'm sorry.  I was -- I didn't hear the question completely.

17  Can you repeat it?

18  **Q.**  Okay.  When did you testify before the federal grand jury?

19  **A.**  July of 2016.

20  **Q.**  When?  If you remember.  Do you remember?

21  **A.**  I said July of 2016.  I don't remember the exact day.

22  **Q.**  Okay.  And -- so later, you had -- you had admitted that

23  the grand jury testimony kind of shook you up, correct?

24  **A.**  That's correct.

25  **Q.**  And you called one or more people after the grand jury

1   proceeding, correct?

2   *A.*   That's correct.

3   *Q.*   And a month later, you -- you're getting money from one or

4   more of these entities, correct?

5   *A.*   Well, at this point, one.

6   *Q.*   And you were getting money up until at least February of

7   2015 -- 2018 on -- on a check that we talked about a few

8   minutes ago?

9   *A.*   The check from the Castros, yes.

10  *Q.*   Okay.  So even though you were maybe shook up with this

11  grand jury testimony or talking to the -- the -- somebody, that

12  didn't stop you, did it?

13  *A.*   From doing the work?

14  *Q.*   It didn't stop you from getting money, did it?

15  *A.*   No.

16  *Q.*   It didn't stop you from being still involved with these

17  promotions, did it?

18  *A.*   No.

19  *Q.*   And you want to make sure that you -- that you -- you're

20  telling the truth, correct?

21  *A.*   That's correct.

22  *Q.*   And so when you left that grand jury proceeding and you

23  were all shook up, did you tell yourself, "I'm going to change

24  for my family"?

25  *A.*   That's what I told myself, yes.

——— 2:19-cr-00295-GMN-NJK ———

1  *Q.*  But you didn't change, did you?

2  **A.**  Not quick enough.

3  *Q.*  And you kept this lie going on for at least another, what,

4  14, 15 months?

5  **A.**  Yes.

6  *Q.*  Because the money was good, wasn't it?

7  **A.**  It's what I needed to pay the bills.

8         MR. GREEN:  Nothing further.  Thank you, your Honor.

9         THE COURT:  Did we hear from everyone?  I'm not sure

10  that we did.

11         Mr. Tomsheck?

12         MR. TOMSHECK:  We did not.  I have a few questions.

13         THE COURT:  Okay.  Thank you.

14                    CROSS-EXAMINATION

15  BY MR. TOMSHECK:

16  *Q.*  You and I don't know each other, do we?

17  **A.**  No.

18  *Q.*  We've never spoken before, right?

19  **A.**  That's correct.

20  *Q.*  Do you know who I am?

21  **A.**  I believe your name is Tom.  That's all I remember.

22  *Q.*  You'd be wrong, but the point I'm making is that you and I

23  have never had any communications with one another whatsoever,

24  right?

25  **A.**  That's correct.

—— 2:19-cr-00295-GMN-NJK ——

1  Q.  Okay.  Contrast that to the communication you've had with

2  the folks seated over at these tables to my right, your left.

3  You know those guys, right?

4  A.  Yes.

5  Q.  Okay.  You'd agree with me that you've talked to the

6  prosecutors, Mr. Zytnick and Mr. Finley, in this case a whole

7  lot of times, right?

8  A.  Over the course of a few years, yes.

9  Q.  Over the course of those few years, you've had more than a

10  few meetings with them, right?

11  A.  That's correct.

12  Q.  You've talked to them in person?

13  A.  Yes.

14  Q.  You've talked to them at different locations?

15  A.  Yes.

16  Q.  You've talked to them on the telephone?

17  A.  By speakerphone, yes.

18  Q.  Speakerphone meaning over the phone, right?

19  A.  More than one was on the speaker.

20  Q.  Okay.  So you've talked to those guys on the phone in

21  answer to my question, right?

22  A.  That's correct.

23  Q.  Okay.  And in fact, you even testified in court proceedings

24  before where Mr. Finley, the guy seated all the way to the --

25  to the side of the table here closest to me, where he asked you

1    questions, right?

2    *A.*  Yes.

3    *Q.*  Okay.  And in preparation for that testimony, you talked to

4    him prior to that, too, right?

5    *A.*  Prior to the testimony today or the grand jury?

6    *Q.*  Prior to both times you testified.

7    *A.*  That's correct.

8    *Q.*  Okay.  In addition to those prosecutors, you've talked to

9    other agents from the Federal Government representing the

10   Postal Inspection Service.

11          You're aware of that, right?

12   *A.*  Yes.

13   *Q.*  You've talked to them a whole lot of times, as well, right?

14   *A.*  Yes.

15   *Q.*  In fact, I think it was Mr. Gaffney that asked the question

16   earlier about Inspector Bouchie.

17          Do you remember that question?

18   *A.*  I don't remember the question, but I remember talking about

19   Mr. Bouchie.

20   *Q.*  Okay.  And when you referred to him, you didn't call him

21   Mr. Bouchie, did you?

22   *A.*  That's correct.

23   *Q.*  You called him Barry, right?

24   *A.*  Yes.

25   *Q.*  You're on a first name basis with him?

2:19-cr-00295-GMN-NJK

1    **A.**   It's easier to remember Barry than Bouchie.

2    *Q.*   Okay.  You'd agree with me Bouchie's kind of a distinctive

3    name, right?

4    **A.**   Yes.

5    *Q.*   Okay.  And in fact, when you were asked the question

6    whether or not you knew Mr. Bouchie, you referred to him, in

7    response to the name Bouchie, with the first name of Barry,

8    right?

9    **A.**   Yes.

10   *Q.*   So in response to my question, you're on a first name basis

11   with him, right?

12   **A.**   Yes.

13   *Q.*   All the questions I asked you about how many times you

14   talked to the prosecution, you've talked to that Inspector

15   Bouchie, or as you call him Barry, at least that many times,

16   right?

17   **A.**   Yes.

18   *Q.*   In person, yes?

19   **A.**   In person or on the phone.

20   *Q.*   In person, you've talked to him, yes?

21   **A.**   Yes.

22   *Q.*   At more than one location, yes?

23   **A.**   Yes.

24   *Q.*   And on the telephone, yes?

25   **A.**   That's correct.

1  Q.  Okay.  Is it safe to say you can't even tell us how many

2  times you've talked to those folks prior to your testimony

3  yesterday and today?

4  A.  Yes.

5  Q.  Okay.  You'd agree with me in response to the Government's

6  questions yesterday and again today that you had some

7  difficulty recalling exact dates?  You'd agree with that,

8  right?

9  A.  Yes.

10  Q.  Because you were giving testimony about a long history of

11  fraud that you knowingly committed, right?

12  A.  Yes.

13  Q.  Over a number of years, correct?

14  A.  That is correct.

15  Q.  And so the Government would ask you questions, "Hey, I'm

16  going direct you to a year, 2016," for instance.

17         You recall those questions, right?

18  A.  Yes.

19  Q.  It's safe to say, as you sit here today, it's kind of hard

20  to keep track of all the different buckets of fraud that you've

21  committed during your fraud career, right?

22  A.  It was always the same fraud.

23  Q.  Same type of fraud, right?

24  A.  Yes.

25  Q.  But you committed that fraud with different people, right?

2:19-cr-00295-GMN-NJK

1    **A.**   Different clients throughout the year, yes.

2    *Q.*   Yes.  We're going to talk about some of those in detail in

3    a moment.

4           But you'd agree with me for purposes of what we're

5    talking about right now that you committed fraud over a long

6    period of time?

7    **A.**   That is correct.

8    *Q.*   So when asked to recall a precise date, you could have some

9    difficulty doing that?

10   **A.**   Yes.

11   *Q.*   Okay.  You understand that you are here today to testify on

12   behalf of the Government, right?

13   **A.**   Yes.  That's part of my cooperation agreement.

14   *Q.*   Okay.  We'll talk about the cooperation agreement, as well.

15          But as you sit here today, just being clear about it,

16   you don't want to come in here and testify, right?

17   **A.**   Not really, no.

18   *Q.*   It's not fun, is it?

19   **A.**   No, it's not.

20   *Q.*   Okay.  You were given a subpoena and you were told to come

21   to court on a certain day, right?

22   **A.**   Yes.

23   *Q.*   And prior to that testimony day, you talked with the

24   prosecution and the inspector service, right?

25   **A.**   Yes.

2:19-cr-00295-GMN-NJK

1  Q.  Okay.  When you come here, you mentioned the cooperation

2  agreement that you entered into and that was part of a bigger

3  agreement that you entered into with the Government, right?

4  A.  Yes.

5  Q.  You'd agree that agreement's not with me, right?

6  A.  That's correct.

7  Q.  Okay.  And it's not with Mario Castro, right?

8  A.  That's correct.

9  Q.  It's with the Government of the United States?

10  A.  Yes.

11  Q.  These prosecutors?

12  A.  Yes.

13  Q.  And at some point -- and I'll give you a specific date

14  because I know they're hard for you to recall, but on

15  August 13th of 2019, you entered into a plea in a courtroom in

16  this building, right?

17  A.  That sounds about right, yes.

18  Q.  Okay.  And when you did that, you had a lawyer with you,

19  right?

20  A.  Yes.

21  Q.  Okay.  And you had a lawyer throughout this process,

22  correct?

23  A.  That's correct.

24  Q.  Okay.  And I don't want you to get into the details of what

25  you and your lawyer discussed because that's for you guys to

1  know and none of our business, but you'd agree with me that you

2  had a lawyer throughout that process, right?

3  *A.*  Yes.

4  *Q.*  And the goal was to get yourself a good deal, right?

5  *A.*  Ultimately, yes.

6  *Q.*  Okay.  I mean, if we're being completely honest about it,

7  you don't want to go to prison, right?

8  *A.*  That's correct.

9  *Q.*  That doesn't sound fun either, does it?

10  *A.*  It does not.

11  *Q.*  Okay.  And so going into that process, you had a lawyer

12  helping with you the goal of getting the least exposure to

13  prison time possible?

14  *A.*  To get a reduction in -- in time in prison.  So I guess

15  exposure in the end, yes.

16  *Q.*  Yeah.

17        Because you don't want to go to prison, right?

18  *A.*  That's correct.

19  *Q.*  Okay.  A number of the attorneys asked you questions about

20  this minor role.

21        Are you familiar with that term?

22  *A.*  As explained to me, it one of the deductions I got from the

23  starting number down was a minor role.

24  *Q.*  Okay.  When you talk about a number, you're talking about a

25  sentencing guideline number, right?

1    **A.**   That's correct.

2    *Q.*   And that's one of the things that you and your attorney are

3    concerned about when you enter a plea, right?

4    **A.**   Yes.

5    *Q.*   On your plea agreement, there's actually a numeric

6    calculation of where you would fall based on the plea, right?

7    **A.**   Yes.

8    *Q.*   And the higher the number, the more time you could get,

9    right?

10   **A.**   That's how I understand it.

11   *Q.*   And you also understand, then, there are things that apply

12   to that number to make it go higher or lower, right?

13   **A.**   Yes.

14   *Q.*   For instance, the total loss of a fraud.  If it's higher,

15   your exposure in terms of prison time is higher, right?

16   **A.**   Yes.

17   *Q.*   So there's a benefit to you to get that number lower,

18   right?

19   **A.**   That is correct.

20   *Q.*   And that was something you took into consideration when you

21   struck a deal with these prosecutors, right?

22   **A.**   Yes.

23   *Q.*   Okay.  And the word "minor role," that's actually a -- a

24   term of art that was explained to you by your attorney as you

25   entered into that plea process, right?

1  *A.*  A term of art?

2  *Q.*  Yeah.

3         That's a legal thing that lawyers use in plea

4  agreements, right?

5  *A.*  As I understand it, yes.

6  *Q.*  So you can enter a plea without a minor role.  You know

7  that, right?

8  *A.*  Yes.

9  *Q.*  And then you don't get points taken off, correct?

10  *A.*  Correct.

11  *Q.*  You entered into a plea where you said, "Hey, I'm going to

12  enter a plea as a minor role participant," correct?

13  *A.*  That's what I was advised with my attorney at that time.

14  *Q.*  Yeah.

15         Your attorney did a good job of getting you a good

16  deal, right?

17  *A.*  It seems like it, yes.

18  *Q.*  Okay.  And it also seems like -- that your deal doesn't end

19  on the day you entered that plea back in 2019, right?

20  *A.*  That's correct.

21  *Q.*  You have an ongoing obligation as part of your deal to talk

22  to these guys whenever they ring your phone, right?

23  *A.*  Yes.

24  *Q.*  Whenever they ask you to come in, right?

25  *A.*  Yes.

1  *Q.*  To discuss with them the exhibits that they show you that

2  they're going to use in trial, right?

3  **A.**  Yes.

4  *Q.*  And then, ultimately, you signed an agreement as part of

5  your deal that you're going to come into court and you're going

6  to testify, right?

7  **A.**  Yes.

8  *Q.*  And you know exactly what they're going to ask you about,

9  right?

10  **A.**  Not in the sense of scripted.  Mr. Finley would ask me

11  different questions at different times of him being with me.

12  *Q.*  Yeah.

13        I never use the word "scripted."  That's your word,

14  right?

15  **A.**  Yes.

16  *Q.*  Okay.  Is it your testimony that you're -- the answers that

17  you're giving aren't scripted?

18  **A.**  That's correct.

19  *Q.*  Okay.  It's your testimony that he asked you questions and

20  you're going to answer them, right?

21  **A.**  Yes.

22  *Q.*  And taking you on back to my question then, you know

23  exactly what he's going to ask you about when you come in here

24  to testify, right?

25  **A.**  In generalities, yes, I know where he's -- which questions

1    he's going to ask.

2    Q.  Because of those many, many conversations you've had with

3    him over those several years?

4    A.  Yes.

5    Q.  Okay.  You agree with me, as you give your version of what

6    occurred with the Castro brothers, as you've termed them, your

7    role in that wasn't minor, right?

8    A.  I agree with that statement, yes.

9    Q.  Okay.  So you'd agree with me that you're willing to enter

10   into a negotiation to better your position, yes?

11   A.  My position?  My position as pertaining to what?

12   Q.  As a -- as your position as pertaining to your exposure in

13   terms of sentence.

14   A.  To my plea agreement?

15   Q.  Yes.

16   A.  Can you ask the question again?

17   Q.  You're willing to enter into an agreement that's better for

18   you even though it may not be true, correct?

19   A.  I guess I'm a little confused by the question.  I have an

20   agreement with the Department of Justice.  If the agreement

21   would be better with them, I would take it.

22   Q.  Yeah.

23           That's exactly what you did here, right?

24   A.  Yes.

25   Q.  You entered into an agreement where you got a reduction for

1    a minor role, yes?

2    *A.*    That's correct.

3    *Q.*    And by your own admission here today under oath, you were

4    not a minor participant, correct?

5    *A.*    I feel as though I was integral to some parts of the

6    business, yes.

7    *Q.*    Okay.  But you're willing to take that deal because it's

8    better for you, right?  Common sense.

9    *A.*    The overall effect of that deal is a better deal, yes.

10   *Q.*    And you're willing to come in here and testify and answer

11   these questions because it's better for you, right?

12   *A.*    That's correct.

13   *Q.*    You know at the end of this process, the Government can

14   make a recommendation based on your testimony that goes well

15   below what the recommended guideline range is, right?  You know

16   that?

17   *A.*    Yes.

18   *Q.*    You're familiar with the term of 5K?  One of the other

19   lawyers asked you about that, right?

20   *A.*    Yes.

21   *Q.*    And you know that's where the Government makes a motion to

22   the Court and say, "Hey, I know this is what his guidelines

23   are, but sentence him to way less because he cooperated and

24   helped us"?  That's what you want to do, right?

25   *A.*    That's one of the things I hope to accomplish, yes.

1    Q.   Okay.  If we're being completely honest with the members --

2    the ladies and gentlemen of the jury, if you were given the

3    opportunity to walk out of this, never pay a dime of

4    restitution, and never do a day in jail, you'd take that deal,

5    wouldn't you?

6    A.   Of course.

7    Q.   Even though you know that's not what you deserve, right?

8    A.   Yes.

9    Q.   I appreciate your honesty about that.

10            When you talked to the Government, did you ever hear

11   the term "Kern syndicate"?

12   A.   Kern syndicate?

13   Q.   Yes.

14   A.   Like, Patti Kern syndicate?

15   Q.   I'm just asking you if you ever heard the term "Kern

16   syndicate"?

17   A.   I don't recall.

18   Q.   Okay.  When you responded to my question a moment ago, you

19   used the name "Patti Kern," right?

20   A.   Yes.

21   Q.   Okay.  You told us a moment ago that you had some

22   difficulty remembering exact dates of when things happened in

23   this case, right?

24   A.   Yes.

25   Q.   You'd agree with me that you can't even tell us the exact

1   date when you met any of the Castro brothers, right?

2   A.  Not exactly no.

3   Q.  You can't even tell us the month and year, right?

4   A.  I could tell you the year of some of them but not all of

5   them.

6   Q.  Taking you back to my question.  You can't tell us the

7   month and the year when you met these folks, right?

8   A.  Not off the top of my head, no.

9   Q.  Okay.  In fact, I think you told Mr. Finley on direct

10  examination that you recall meeting either Mario or Miguel

11  Castro time in 2006, right?

12  A.  Yes.

13  Q.  You can't even tell us which one of those folks you met

14  first, right?

15  A.  I don't remember, no.

16  Q.  Okay.  You would agree with me that the Castro brothers are

17  different people, right?

18  A.  The four defendants?

19  Q.  I'm asking you the term "Castro brothers."

20  A.  Yes.

21  Q.  You were asked that term a lot on direct examination from

22  Mr. Finley, right?

23  A.  That's correct.

24  Q.  And you responded to those questions, right?

25  A.  Yes.

1  *Q.*  You'd agree with me you didn't parse out to each of those

2  questions, "Well, this brother did this and this brother did

3  that," right?

4  *A.*  Some of the questions, I believe we did parse out what jobs

5  each Castro brother had.

6  *Q.*  Yeah, I'd agree with you to some of the questions, when

7  directed, you were able to refer to a specific person.

8         You'd agree with that, right?

9  *A.*  Yes.

10  *Q.*  But not to all the questions, right?

11  *A.*  That's correct.

12  *Q.*  And sometimes you were asked questions about the Castro

13  brothers and you just kind of lumped them together.

14         You'd agree with that?

15  *A.*  Yes.

16  *Q.*  Okay.  You'd agree with me they're different people, right?

17  *A.*  Yes.

18  *Q.*  They do different things, right?

19  *A.*  Yes.

20  *Q.*  These four defendants aren't even all brothers, right?

21  *A.*  Yeah, one of them is not a brother.

22  *Q.*  Okay.  And in fact, you know that the three defendants that

23  are brothers have other brothers, right?

24  *A.*  Yes.

25  *Q.*  And you gave us some of their names on direct examination,

1  right?

2  **A.**  Yes.

3  Q.  Okay.  You know they had different interests, these

4  different brothers, right?

5  **A.**  Yes.

6  Q.  They had different families of their own, right?

7  **A.**  Yes.

8  Q.  They did different jobs, correct?

9  **A.**  Yes.

10  Q.  They worked at different places, right?

11  **A.**  Sometimes, yes.

12  Q.  Okay.  You told us you met either Mario or Miguel -- don't

13  know which one first -- sometime in 2006, right?

14  **A.**  Yes.

15  Q.  Okay.  You met Patti Kern at some point, right?

16  **A.**  Yes.

17  Q.  When was that?

18  **A.**  I don't recall exactly.  I was -- it was a while ago.  It

19  was when I worked for Raphael Rodriguez before 2006.

20  Q.  Point of my question being:  You knew Patti Kern before you

21  knew any of these guys, right?

22  **A.**  That's correct.

23  Q.  Before you knew Mario Castro?

24  **A.**  Yes.

25  Q.  Before you knew Miguel Castro?

1    *A.*  Yes.

2    *Q.*  And certainly before the other two defendants who you've

3    lumped with Mario and Miguel who you met at some point later,

4    right?

5    *A.*  That's correct.

6    *Q.*  Okay.  You were asked a bunch of questions on direct

7    examination about a guy by the name of Glen Burke.

8           Do you remember those questions?

9    *A.*  Yes.

10   *Q.*  And you knew who Glen Burke was, right?

11   *A.*  Yes.

12   *Q.*  Okay.  Glen Burke, just so we're clear, is a fraudster,

13   right?

14   *A.*  Yes.

15   *Q.*  Of many different varieties, yes?

16   *A.*  Yes.

17   *Q.*  Certainly, he was involved in mailing of false sweepstakes,

18   correct?

19   *A.*  Yes.

20   *Q.*  And you were involved with him in that process as well,

21   right?

22   *A.*  Yes.

23   *Q.*  But he was involved in a lot of other schemes, right?

24   *A.*  Yes.

25   *Q.*  He utilized those schemes to hurt a lot of different people

1   in a lot of different ways?

2   *A.*   Yes.

3   *Q.*   And he stole a lot of money, right?

4   *A.*   As I understand it, yes.

5   *Q.*   Okay.  You worked with Glen Burke, right?

6   *A.*   Yes.

7   *Q.*   When did you meet Glen Burke?

8   *A.*   Also before 2006.

9   *Q.*   So you'd agree with me, you had a preexisting relationship

10  with Glen Burke prior to the nameless month in the year 2006

11  when you met one of these brothers, right?

12  *A.*   That's correct.

13  *Q.*   Okay.  You knew him longer than any of these four

14  defendants?

15  *A.*   Yes.

16  *Q.*   Just like you knew Patti Kern longer than any of these four

17  defendants?

18  *A.*   Yes.

19  *Q.*   Okay.  You were asked a number of questions about a guy by

20  the name of Dan Wagner?

21          Do you remember those questions?

22  *A.*   Yes.

23  *Q.*   I think you told us Dan Wagner was living in Costa Rica at

24  the time?

25  *A.*   That's correct.

1  *Q.*  Doing mailers, right?

2  **A.**  Yes.

3  *Q.*  With you, right?

4  **A.**  Yes.

5  *Q.*  When did you meet Dan Wagner?

6  **A.**  I don't remember the exact date.  Obviously, he was

7  introduced to the mailing company through Glen Burke, but I

8  don't remember when he became a client.

9  *Q.*  Okay.  I'm going to talk to you about that word "client."

10  That's a word you used several times in your testimony.

11       You'd agree with that?

12  **A.**  Yes.

13  *Q.*  Okay.  Going back to when you started in the mail fraud

14  business, that was a long time ago, right?

15  **A.**  Yes.

16  *Q.*  When did you first participate in mail fraud?

17  **A.**  I want to say '94 or 1995.  Probably '95.

18  *Q.*  Okay.  You would have been early 20's?

19  **A.**  Fresh out of college.

20  *Q.*  Early 20's?

21  **A.**  A year and a half out of college, yes, early 20's.

22  *Q.*  And you went to work for somebody else?

23  **A.**  I'm sorry.  What?

24  *Q.*  You went to work for somebody else, right?

25  **A.**  Yes, I first started in this line of fraudulent mail with a

1    man named Leo Miran [phonetic].

2    Q.   Okay.  Back in the '90s?

3    A.   Back in the middle '90s, yes.

4    Q.   Okay.  More than a decade before you met any of the Castro

5    brothers?

6    A.   Yes.

7    Q.   You were involved with fraud pre-dating the Castro

8    brothers?

9    A.   That's correct.

10   Q.   With all of the people that you just mentioned, right?

11   A.   Yes.

12   Q.   Okay.

13   A.   Yes.

14   Q.   When you started in the mail fraud business, did you know

15   it was fraud?

16   A.   No.

17   Q.   You started working in the mail business, right?

18   A.   Yes.

19   Q.   And eventually, you figured out it was fraud, right?

20   A.   Yes.

21   Q.   And in fact, you had conversations with the folks that you

22   were engaging in fraud with about it being fraudulent, right?

23   A.   Yeah, I don't recall at the very beginning if I had

24   conversations with Leo Miran and them about the fraudulent

25   nature of the mail.

—— 2:19-cr-00295-GMN-NJK ——

1  *Q.*  Okay.  Shortly into your fraud career, you have

2  conversations with the people that you're committing fraud with

3  about it being fraud, right?

4  *A.*  Sometime, yes.

5  *Q.*  Okay.  And eventually, I think you told us you get up to

6  the point where in 2009, there's a cease and desist that

7  involves Patti Kern, right?

8  *A.*  That's correct.

9  *Q.*  Just so we're clear:  In that whole intervening time

10  between the late '90s and 2009 when the cease and desist

11  involving Patti Kern occurs, you are engaging in fraud, right?

12  *A.*  That's correct.

13  *Q.*  Okay.  And you're doing it long before you meet these guys?

14  *A.*  Yes.

15  *Q.*  Okay.  Now, you said some things like -- as I mentioned

16  before, you and I have never spoken, so I wrote things down

17  that your said that were important to me.  I'm going to ask you

18  about some of those things.  Okay?

19  *A.*  Sounds good.

20  *Q.*  And these are things that you said in this courtroom.

21       You chose the words that you said in response to

22  questions, right?

23  *A.*  Yes.

24  *Q.*  Okay.  You were asked about the cease and desist involving

25  Patti Kern in 2009.

1              Do you have a distinct memory of that?

2    **A.**  Fairly distinct.

3    *Q.*  And in your fairly distinct memory, you responded to some

4    questions by Mr. Finley yesterday, right?

5    **A.**  Yes.

6    *Q.*  You said that it was you who made the suggestion to Patti

7    Kern about what she could do in order to continue engaging in

8    fraud, right?

9    **A.**  Right.  Per our conversation, she was looking for ways to

10   keep mailing and I suggested the Castro brothers might want to

11   do it, a partnership with her.

12   *Q.*  Okay.  The word that you used was that you made the

13   suggestion.  You did that, right?

14   **A.**  Yes.

15   *Q.*  That was your idea?

16   **A.**  Yes.

17   *Q.*  You'd agree with me that in your memory of this incident,

18   Mario Castro didn't knock on the door and say, "Hey, I'm here

19   to commit some fraud with you guys," right?

20   **A.**  Yes.

21   *Q.*  That's silly, isn't it?

22   **A.**  Yes, it is.

23   *Q.*  Okay.  Equally silly is when you get a cease and desist to

24   continue in fraud, right?

25   **A.**  Yes.

1  *Q.*  Okay.  You're aware that when a cease and desist is served

2  on someone -- and you're aware of it because you've been in the

3  fraud industry for so long -- that that means the Government's

4  onto you, right?

5  *A.*  That's correct.

6  *Q.*  And if you got a cease and desist, you wouldn't put your

7  name on anything ever again, would you?

8  *A.*  That's correct.

9  *Q.*  Another one of the words that you chose yesterday is that

10  Patti was discussing using her husband and other people.

11        Those were your words, right?

12  *A.*  Yes.

13  *Q.*  Using her husband, correct?

14  *A.*  Using him as a straw owner or a corporate entity, yes.

15  *Q.*  Yep.

16        So I'm going to take you back to my question again.

17  Your words, using her husband and other people, correct?

18  *A.*  That's correct.

19  *Q.*  Because Patti had been served with a cease and desist,

20  right?

21  *A.*  Yes.

22  *Q.*  So she had to use someone else, right?

23  *A.*  Yes.

24  *Q.*  Are you aware that she actually did use her husband for a

25  period of time?

—— 2:19-cr-00295-GMN-NJK ——

1    *A.*  Yes.

2    *Q.*  And are you aware that she got a cease and desist regarding

3    her husband?

4    *A.*  I'm aware that her husband got a cease and desist, yes.

5    *Q.*  Okay.  You're aware that that idea didn't work, right?

6    *A.*  Yes.

7    *Q.*  Okay.  You're aware that she didn't stop, right?

8    *A.*  Yes.

9    *Q.*  And you're having all these conversations with Patti Kern

10   about a cease and desist from the Government because you're in

11   cahoots with her, right?

12   *A.*  I don't know if "cahoots" is the proper term.

13   *Q.*  Why don't you give me your term for what you were in with

14   Patti Kern in 2009?

15   *A.*  In 2009, she was one of our bigger clients for the -- the

16   letter shop and she was a client.

17   *Q.*  Okay.

18   *A.*  I wouldn't say "cahoots" is a good terminology I would use.

19   *Q.*  You're committing fraud for decades at that point, right?

20   *A.*  Yes.

21   *Q.*  So is she, right?

22   *A.*  Yes.

23   *Q.*  She gets shut down, right?

24   *A.*  Yes.

25   *Q.*  You talk to her about how to avoid being shut down, right?

--- 2:19-cr-00295-GMN-NJK ---

1    **A.**  I talked to her about how she could continue to mail if she

2    wants to, yes.

3    Q.  You are helping her to formulate a plan to continue

4    perpetrating fraud?

5    **A.**  Yes.

6    Q.  Knowing that it's fraud?

7    **A.**  Yes.

8    Q.  And you'd agree with me Mario Castro ain't sitting next to

9    you during that conversation, right?

10   **A.**  That's correct.

11   Q.  Okay.  You keep referring to it as the letter shop, and, in

12   fact, you did that a lot during the questions from the

13   Government.

14          Do you remember that?

15   **A.**  Yes.

16   Q.  As if it's one shop.  Is that your testimony?

17   **A.**  Yes.

18   Q.  It's actually multiple different businesses at multiple

19   different locations owned by different people at different

20   times, right?

21   **A.**  Yes.

22   Q.  Okay.  So when you say it's the Castro brothers letter

23   shop, that's your lumping the defendants together, right?

24   **A.**  That's correct.

25   Q.  Okay.  You're aware that when Patti Kern and you have this

1    conversation, she actually goes out, according to her, and

2    elicits someone to help her, right?

3    *A.*   Yes.

4    *Q.*   And that person's Epi Castro, right?

5    *A.*   That's how I understand it happened, yes.

6    *Q.*   Okay.  And you understand that from Patti Kern?

7    *A.*   Yes.

8    *Q.*   Okay.  You understand that Epi Castro never worked in the

9    letter shop, right?

10   *A.*   Yes, he never worked in the letter shop.

11   *Q.*   Epi Castro had an entirely separate business?

12   *A.*   It was a symbiote business, I guess you could call it.  He

13   supplied the forms -- the printing of the forms and the

14   envelopes to the letter shop.  He was the print shop.  We were

15   the letter shop.

16   *Q.*   You would agree with me that he had a completely separate

17   business, right?

18   *A.*   Separate name, separate address, yes.

19   *Q.*   And he printed stuff, right?

20   *A.*   Yes.

21   *Q.*   And for big periods of time, he didn't even get along with

22   these brothers, right?

23   *A.*   That's how I recall it.

24   *Q.*   That they did not get along, right?

25   *A.*   Yes.

—— 2:19-cr-00295-GMN-NJK ——

1  Q.  Okay.  And Patti goes and talks to Epi, right?

2  A.  Yes.

3  Q.  Epi ain't one of these defendants, right?

4  A.  That's correct.

5  Q.  Okay.  As you understand it, then Epi starts being

6  complicit in fraud, right?

7  A.  That's correct.

8  Q.  You would agree with me at that time Patti Kern never

9  reports to you, "Hey, I went and talked to Mario and Miguel.  I

10  signed them up for fraud," right?

11  A.  That's correct.

12  Q.  Patti Kern testified during this trial.  Were you aware of

13  that?

14  A.  I did not know that for certain.

15  Q.  Okay.  Would it surprise you that she doesn't ever recall

16  having a conversation like that with any of these defendants,

17  "We're going to engage in fraud.  Are you down with that?"

18        MR. FINLEY:  Your Honor, there's no foundation for

19  that.  So, objection.

20        THE COURT:  Sustained.

21  BY MR. TOMSHECK:

22  Q.  Your personal memory of your interactions with Patti Kern

23  in 2009 after her cease and desist doesn't include any memory

24  of her sitting down and talking with, for instance, Mario

25  Castro and saying, "This is a fraudulent activity.  I'd like to

1   bring you on board"?

2           You'd agree with that?

3   **A.**  Yes, I agree with that.

4   *Q.*  Okay.  She reported to you that she had a conversation with

5   Epi, yes?

6   **A.**  Yes.

7   *Q.*  Okay.  When you talk about the Castro brothers letter shop,

8   you're saying Mario Castro's your boss the whole time, right?

9   **A.**  Mario and Miguel were in and out of the office for the

10  whole eight years of the time included and they would both be

11  in and out as my boss.  They were the ones I reported to as my

12  boss.

13  *Q.*  Okay.  You chose the term "eight years."

14  **A.**  Uh-huh.

15  *Q.*  That's a -- a span of time.

16          Starting when and ending when?

17  **A.**  2010 to 2018.

18  *Q.*  2010 to 2018?

19  **A.**  Yes.

20  *Q.*  Okay.  You'd met Mario Castro in 2006, right?

21  **A.**  Yes.

22  *Q.*  You got to know him a little bit over the years, right?

23  **A.**  That's correct.

24  *Q.*  You'd agree with me you never spent a lot of time in the

25  shop with him, right?

1    *A.*  I guess I don't -- are you talking about the time from 2006

2    to 2018?

3    *Q.*  Ever.

4    *A.*  When I was working full time, he would be there quite

5    often.

6    *Q.*  Is it your testimony that you worked a full-time, 40-hour,

7    9:00 to 5:00 job?

8    *A.*  With -- for the letter shop for the Castro brothers, yes.

9    *Q.*  Okay.  I'm going to talk about those individually.

10            The letter shop.

11   *A.*  Yes?

12   *Q.*  In the time you did get to know Mario Castro, you knew he

13   had other businesses, right?

14   *A.*  Yes.

15   *Q.*  You knew that he had a -- let me ask you this.

16            Between 2001 and 2008, you knew he worked in the

17   mailing business working exclusively for casinos, right?

18   *A.*  I don't remember when it started, but I do remember they

19   had a business doing mostly casino work, yes.

20   *Q.*  You keep saying "they."  I'm talking about Mario Castro.

21   *A.*  I'm sorry.  Yes.  Mario Castro.

22   *Q.*  In fact, in your conversations with the Government, you've

23   previously disclosed that you're aware that they had a printing

24   business dealing exclusively with casinos, right?

25   *A.*  Yes.

1    Q.   Not a fraudulent mailing business, right?

2    A.   That's correct.

3    Q.   They ran that business for a long period of time?

4    A.   Yes.

5    Q.   And when I say "they," I'm not talking about all four

6    defendants, am I?

7    A.   That's correct.

8    Q.   Mario had that business, right?

9    A.   As I understand, with maybe other partners.  I'm not sure.

10    Q.   You don't know, do you?

11    A.   No.

12    Q.   But you know that was Mario's business, right?

13    A.   That's correct.

14    Q.   Okay.  You gave us a lot of testimony about this cease and

15    desist time period in 2009.  That's a pretty critical time in

16    this, quote-unquote, conspiracy, right?

17    A.   Yes.

18    Q.   Okay.  You'd agree with me you have no evidence whatsoever,

19    no personal experience, and you haven't even heard that Patti

20    Kern has a conversation with Mario in 2009?

21    A.   That's correct.

22    Q.   You know in 2009 Mario Castro's not even in the United

23    States of America, is he?

24    A.   I'm not sure about that.

25    Q.   Have you ever drank tequila?

1    **A.**    Yes.

2    *Q.*    Do you know what it's made with?

3    **A.**    Agave.

4    *Q.*    Okay.  You know that Mario Castro had a tequila company,

5    right?

6    **A.**    That's correct.

7    *Q.*    And it had "agave" in the name, right?

8    **A.**    It was called Passion.

9    *Q.*    Okay.  That was the name that he gave to that company,

10   right?

11   **A.**    Yes.

12   *Q.*    And that he actually went to Mexico and tried to get that

13   company off the ground, correct?

14   **A.**    Yes.

15   *Q.*    You're aware all of the Castro brothers had different

16   businesses they were involved with, right?

17   **A.**    Yes.

18   *Q.*    So the representation that for all these years you're

19   sitting 9:00 to 5:00 in a letter shop with Miguel and Mario and

20   Salvador and Juan Luis Mendez [sic] isn't accurate, is it?

21   **A.**    As I said before, some -- when I worked there full time,

22   Jose Mendez was there full time.  Mario and Miguel were in and

23   out.  I would see Miguel more than Mario.  And Salvador was in

24   and out.

25   *Q.*    Okay.  You'd agree with me that painting the picture of you

1    working in a letter shop with these four defendants from 2010

2    to 2018 didn't happen, right?

3    **A.**  I did work in a letter shop with them from -- full time

4    from 2010 to 2014.  Were they there full time?  No.

5    Q.  Okay.  You worked in a letter shop with Mario Castro from

6    2010 to 2014 full time.  Is that your testimony?

7    **A.**  I can't attest to that exactly those four years that he was

8    in every day, no.

9    Q.  Let's see if some of these things ring a bell for you.

10           You mentioned you knew he worked in a print shop doing

11   casino print work from 2001 to 2008, right?

12   **A.**  Yes.

13   Q.  The economy in Nevada took kind of a big bump in 2008,

14   right?

15   **A.**  That's correct.

16   Q.  And as a result, he left the casino print business and

17   started this Passion Agave tequila business in Mexico, right?

18   **A.**  Yes.

19   Q.  And that took place in 2009, right?

20   **A.**  It could have, yes.

21   Q.  So you have no idea if Mario Castro and Patti Kern are even

22   in the same country when she's getting served with her cease

23   and desist, right?

24   **A.**  That's correct.

25   Q.  You're aware that Mario's a mechanic by trade, right?

1    *A.*  Yes, I remember that.

2    *Q.*  You know that he's a very mechanically inclined person,

3    right?

4    *A.*  That's correct.

5    *Q.*  You know that he actually worked from 2010 to 2014 as a

6    mechanic, right?

7    *A.*  No, I wasn't aware of that.

8    *Q.*  Did he go to other businesses and perform mechanic duties

9    on their machinery, to your knowledge?  Yes or no.

10   *A.*  To my knowledge, no.

11   *Q.*  Did he work rebuilding Ford Mustang automobiles in 2010 to

12   2014?

13   *A.*  I remember one.

14   *Q.*  Okay.  You'd agree with me that in 2010 to 2014, he doesn't

15   own a print shop, right?  You agree with that?

16   *A.*  That he doesn't own it?  Yes.

17         But, like, you brought up the Mustang.  The Mustang

18   was in the shop.

19   *Q.*  Okay.

20   *A.*  In the letter shop.

21   *Q.*  You would agree with me that Digital Express was a

22   corporate entity with a physical location, right?

23   *A.*  Yes.

24   *Q.*  You would agree with me that you worked in there sometimes,

25   yes?

--- 2:19-cr-00295-GMN-NJK ---

1   **A.**   Yes.

2   *Q.*   You did not work in there 9:00 to 5:00?

3   **A.**   That's correct.

4   *Q.*   You stopped by there periodically, right?

5   **A.**   Yes.

6   *Q.*   Because you were facilitating other people engaging in

7   fraud and you were kind of the person who was responsible for

8   all the data, right?

9   **A.**   Yes.

10  *Q.*   Okay.  You'd agree with me that any representation that

11  you're working full time in Digital Express, like, a 9:00 to

12  5:00 job between 2014 and 2018 just did not happen, right?

13  **A.**   That's correct.

14  *Q.*   Okay.  You're aware that Mario Castro owned Digital

15  Express, right?

16  **A.**   That sounds right.

17  *Q.*   And you're aware that he started that business in January

18  of 2014, right?

19  **A.**   That sounds right, also.

20  *Q.*   Okay.  And you worked in and out of that print shop, right?

21  **A.**   Yes.

22  *Q.*   You'd agree with me that when you talked about what these

23  defendants did in their roles there, you can't tell the ladies

24  and gentlemen of the jury what they did and their 9:00 to 5:00

25  daily responsibilities, right?

1    *A.*   During that time period, that is correct.

2    *Q.*   You might show up and they'd been there for a couple hours

3    and they went to breakfast, right?

4    *A.*   Yes.

5    *Q.*   You would have correspondence via e-mail and on the

6    telephone and through text message to all these different

7    vendors on the outside, right?

8    *A.*   Yes.  Including Mario, Miguel, Jose Luis Mendez.

9    *Q.*   Okay.  You'd agree with me they're not vendors on the

10   outside, right?

11   *A.*   That's correct.

12   *Q.*   Okay.  What did you say your job title was?

13   *A.*   Account manager was one of my titles.

14   *Q.*   Who gave you that title?

15   *A.*   It might have been myself at one point.

16   *Q.*   Yeah.

17          You give yourself the title of account manager, right?

18   *A.*   It's -- I had to put it on some paperwork at some point.

19   *Q.*   Okay.  And you're having correspondence.  We've seen

20   hundreds, if not thousands, of your e-mails with your name all

21   over them.

22          You agree with that, right?

23   *A.*   Yes.

24   *Q.*   You've seen those, too, right?

25   *A.*   Yes.

1  *Q.*  You'd agree with me they dont represent the entirety of the

2  e-mails that you sent, right?

3  **A.**  That's correct.

4  *Q.*  And you'd agree with me that the majority of the

5  correspondence that you're doing related to this fraudulent

6  activity is to other people, right?

7  **A.**  What do you mean by "other people"?

8  *Q.*  I mean when you send e-mails -- it's been pointed out 50

9  times, the jury doesn't need to see them all again -- that you

10  are corresponding with other individuals that aren't any of

11  these four defendants.

12       You agree with that, right?

13  **A.**  Yes, for the stuff that I didn't have to notify Mario or

14  Miguel about, I would correspond directly with the clients.

15  *Q.*  Okay.  There's that word "clients" again.

16       THE COURT:  I'm going to -- let's -- we'll get back to

17  "clients" after the afternoon break.  It's 2:30.  Okay?  I

18  think that might take a while.

19       So let's go ahead and take the afternoon break,

20  stretch, use the bathroom.  Be back here at 2:45.

21       Remember, you are not to discuss this case with anyone

22  nor permit anyone to discuss it with you.  Write down your

23  questions if you have any.

24       Do not read or listen to or view anything that touches

25  upon the case in any way.  Do not perform any investigation or

1    independent research of any kind.  And do not form any opinions

2    yet.

3              Go ahead and stand for the jury as they're the judge

4    of the facts.

5              We welcome you back at 2:45.

6              (Whereupon, the jury exits at 2:30 p.m.)

7              THE COURT:  And Mr. O'Connor, same as before, after

8    the jury is done exiting the courtroom, then you may also step

9    down and stretch.  Just we need you back here by 2:45.

10             All right.  Off record.

11             (Recess taken at 2:31 p.m.)

12             THE COURT:  Do we have Mr. O'Connor back yet?

13             (Whereupon, the jury enters at 2:48 p.m.)

14             THE COURT:  All right.  Everyone may be seated.

15             We're back from the afternoon break in the presence of

16    the jury with Mr. O'Connor back on the stand.  And now we'll

17    continue with cross-examination with Mr. Tomsheck on behalf of

18    Mr. Mario Castro.

19             MR. TOMSHECK:  Thank you, your Honor.

20    BY MR. TOMSHECK:

21    Q.  When we had -- are you with me?

22    A.  Yeah.  I can barely hear you for some reason all of a

23    sudden.  I hear you now.

24    Q.  Okay.  When we had taken a quick break there, I was asking

25    you a question about the word "clients."

—— 2:19-cr-00295-GMN-NJK ——

1          You would agree with me that you chose to use the word

2    "clients" a number of times during your testimony, correct?

3    *A.*   Yes.

4    *Q.*   Okay.  Just so we're clear, when you describe this process

5    that you're involved in where you claim to be a coconspirator

6    with these defendants in the Castro brothers print shop, as you

7    put it, who are your clients?

8    *A.*   Before 2010, Patti Kern, Dan, Glen Burke.

9          Then when Patti started agreements with Epi, Mario,

10   Miguel, Jose Luis, they became the clients, also.

11   *Q.*   Okay.  So this is super confusing to me.  Maybe we can

12   unwrap it a little bit.

13         You candidly admit that prior to 2010 in a time you're

14   not here to testify about because you're testifying about a

15   conspiracy, as you put it, from 2010 to 2018, right?

16   *A.*   That's correct.

17   *Q.*   That your clients were Patti Kern, yes?

18   *A.*   Yes.

19   *Q.*   Dan Wagner, yes?

20   *A.*   Yes.

21   *Q.*   Glen Burke, yes?

22   *A.*   Yes.

23   *Q.*   People you have a pre-existing relationship prior to 2010

24   with knowing full well and discussing amongst yourselves that

25   you're committing fraud, right?

1  *A.*  That's correct.

2  *Q.*  Okay.  Now, subsequent to 2010, you indicated that one of

3  your existing clients, Patti Kern, strikes a deal with Epi

4  Castro.

5        That's what Patti represented to you, right?

6  *A.*  Yes.  As a partnership, yes.

7  *Q.*  You would agree with me that it's never represented to you

8  that Patti Kern says, "Hey, I struck a deal with Mario and

9  Miguel," right?

10 *A.*  Patti never said that exact word to me, no.

11 *Q.*  Okay.  Patti never had the same conversation with you about

12 striking a partnership related to, for instance, Mario, that

13 she did with Epi, right?

14 *A.*  That's correct.

15 *Q.*  Okay.  You told us a moment ago that you have a

16 pre-existing client relationship with Patti, right?

17 *A.*  Yes.

18 *Q.*  She then formulates a partnership with Epi, yes?

19 *A.*  Yes.

20 *Q.*  You're making the assumption that there's a partnership

21 formed with Mario and Miguel and the other defendants, right?

22 *A.*  Not an assumption when it comes to Jose Luis Mendez.  And

23 I -- I'm not sure about Mario Castro.  I never saw paperwork.

24        But, yes, I assume that's what happened.

25 *Q.*  Okay.  You agree that probably not fair to accuse someone

────── 2:19-cr-00295-GMN-NJK ──────

 1  of a crime based on assumption?  You'd agree with that?

 2  A.  I agree with that, yes.

 3  Q.  Probably not fair to convict someone of a crime based on

 4  assumption, right?

 5  A.  That's correct.

 6  Q.  So I want to back up for just a second.

 7          So based on your assumption -- well, just to be clear,

 8  you're here to testify about what you allege to be a conspiracy

 9  with, for instance, Mario Castro, right?

10  A.  That's correct.

11  Q.  Okay.  Based on your assumption, your existing client,

12  Patti Kern, has a partnership deal with your boss, Mario

13  Castro?

14  A.  That's how I understood it, yes.

15  Q.  And Mario Castro is your boss?

16  A.  Yes.

17  Q.  And he then becomes your client?

18  A.  Yes.

19  Q.  So if I'm understanding this correctly, you and your

20  existing client, one-half of the two of you, forms a

21  partnership with your boss who then becomes your client?

22  A.  And boss.  Client and boss.

23  Q.  You realize that the idea that someone being a client of

24  yours and your boss is in the same business is kind of a silly

25  proposition, right?

1  *A.*  To me, he was my boss of the letter shop, and to me, he was

2  also the client of the letter shop.

3  *Q.*  Okay.  And to you, if you're being honest about yourself,

4  you're a fraudster, right?

5  *A.*  Yes.

6  *Q.*  And you're here to make representations in order to better

7  your situation, right?

8  *A.*  That's correct.

9  *Q.*  And it's from that position that you want us to believe

10  that your boss is your client in a partnership with your other

11  client?

12  *A.*  Yes.

13  *Q.*  Okay.  Cool.  Got it.

14       When you would engage in business with, for instance,

15  Dan Wagner -- you testified about him a number of times, right?

16  *A.*  Yes.

17  *Q.*  You indicated that that was part of your boss/client

18  relationship with Mario Castro, right?

19  *A.*  I'm not understanding the question exactly.

20  *Q.*  Yeah.  I'm not understanding the situation exactly, because

21  I'm taking your description of it.  Okay?

22  *A.*  Okay.

23  *Q.*  You would agree with me that you represented to the ladies

24  and gentlemen of the jury that when you did work for your

25  client, Dan Wagner, you utilized the Castros, right?

2:19-cr-00295-GMN-NJK

1   *A.*   That's correct.

2   *Q.*   Okay.  You know you gave that testimony under oath, right?

3   *A.*   Yes.

4   *Q.*   Okay.  And you know there's a court reporter in here typing

5   everything down?

6   *A.*   Yes.

7   *Q.*   Okay.  When the Government was asking you questions about

8   Dan Wagner, you mentioned the company PacNet, right?

9   *A.*   Yes.

10  *Q.*   You're familiar with that company, right?

11  *A.*   Just by name.

12  *Q.*   By name because fraudsters like Dan Wagner and Glen Burke

13  utilize that company, right?

14  *A.*   Yes.

15  *Q.*   In fact, when Glen Burke got taken down, the PacNet

16  interaction with the American economy, you're aware that that

17  was part of an investigation by the Government, right?

18  *A.*   Yes.

19  *Q.*   Okay.  That was common knowledge in the fraud world, right?

20  *A.*   Yes.

21  *Q.*   For which you are a part of, right?

22  *A.*   Yes.

23  *Q.*   Okay.  Dan would use -- Dan Wagner would use PacNet, right?

24  *A.*   Yes.

25  *Q.*   And there would be money that he sent from PacNet, right?

1   *A.*   Yes.

2   *Q.*   Okay.  When you talked about it yesterday, you said money

3   was sent to the printer from PacNet?

4   *A.*   Money was sent to me and then onto the printer, yes.

5   *Q.*   Okay.  Dan Wagner sent money to you?

6   *A.*   That's correct.

7   *Q.*   Your client sent money to you?

8   *A.*   Yes.

9   *Q.*   And then you sent money to the printer?

10  *A.*   Yes.

11  *Q.*   The printer being Epi Castro, right?

12  *A.*   That's correct.

13  *Q.*   Just so we're clear, in this process involving Dan Wagner

14  and PacNet, at this point, when we're sending money to the

15  printer, we're not talking about Mario Castro and Digital

16  Express, right?

17           MR. FINLEY:  Your Honor, that's contrary to the

18  evidence in the record.

19           MR. TOMSHECK:  It's not.  I can read the verbatim

20  question and answer if you'd like.

21           THE COURT:  All right.  Well, you can cover it in

22  cross -- or redirect.

23           THE WITNESS:  That was one aspect, also.

24  BY MR. TOMSHECK:

25  *Q.*   Okay.  And then the other aspect, after you sent money to

1  the printer, you would make a decision about what to happen

2  next, right?

3  **A.**   In terms of what?

4  Q.   Well, in terms of when you testified under oath in this

5  courtroom, you said, "I would assign the jobs to" -- and then

6  you listed three different companies.

7         Do you remember that?

8  **A.**   I don't remember the three companies, but, yes, I would --

9  I would broker the mail out to three different companies.

10  Q.   Okay.  When you chose to give the jury a description of

11  that yesterday under oath, you said, "I would assign the jobs

12  to" -- right?

13  **A.**   On behalf of the client, Dan Wagner, yes.

14  Q.   Okay.  You would assign the jobs to, as you put it, Mario's

15  company, right?

16  **A.**   Correct.

17  Q.   Okay.  Which company was that?

18  **A.**   The letter shop.

19  Q.   No.  Which company?

20  **A.**   Marketing Image Direct.

21  Q.   Okay.  And when was Marketing Image Direct Mario's company?

22  **A.**   As I understood it, always.

23  Q.   Okay.  But I thought you said Mario and Miguel were always

24  in the same letter shop in the same business?

25  **A.**   They were always my bosses at the letter shop.

—2:19-cr-00295-GMN-NJK—

1  Q.  Okay.  I haven't had a boss for a while other than at home,
2  but when I have a relationship with a boss, I don't typically
3  assign them work.
4         You understand that that's not how it normally works,
5  right?
6  A.  Right.  I have more than one bucket, as previously stated,
7  that I worked from.
8  Q.  Okay.  You said, "I would assign the jobs to" -- and you
9  listed three companies.
10         Do you remember what they were?
11  A.  Not offhand -- not exactly, no.
12  Q.  Okay.  If I were to represent to you that the transcript
13  says that you would assign the job to Mario's company, Miguel's
14  company, or Edgar Del Rio's company, would that sound right to
15  you?
16  A.  Yes.
17  Q.  Okay.  You'd agree with me if Mario and Miguel are always
18  working in the same letter shop at the same place at the same
19  time and we're just lumping them together, that wouldn't make a
20  whole heck of a lot of sense, does it?
21  A.  Like I said, I wasn't privied to who was a current owner of
22  a company.  It changed hands several times.
23  Q.  Were you -- were you privied to the words that you chose
24  when you gave your under oath testimony?
25  A.  Yes.

1    *Q.*  Okay.  You would agree that when you chose those words, you

2    said that you assigned the work, right?

3    *A.*  Yes.

4    *Q.*  And you said that you assigned it to one of three places,

5    yes?

6    *A.*  Yes.

7    *Q.*  Two of those places being Mario and Miguel, right?

8    *A.*  And Epi.  I should have mentioned Epi in that statement.

9    *Q.*  Okay.  You didn't assign letter shop work to Epi ever did

10   you?

11   *A.*  No.  It was printing.

12   *Q.*  Okay.  You agree that when people in a letter shop do work,

13   it involves lasering addresses that are provided to them onto

14   paper provided to them, right?

15   *A.*  Yes.

16   *Q.*  And that's something that happened at Digital Express in

17   2014 on, right?

18   *A.*  Yes.

19   *Q.*  Nothing illegal about that process, right?

20   *A.*  No.

21   *Q.*  That's what letter shops do, right?

22   *A.*  Yes.

23   *Q.*  You'd agree with me that all the work you participated in

24   was fraudulent, right?

25   *A.*  The clients that I represented and myself, we did

1    fraudulent work, but I had other jobs, too, that was not

2    fraudulent.  So I think that's too general of a statement.

3    Q.  Okay.  What other jobs did you have that weren't

4    fraudulent?

5    A.  I worked for Lyft as a driver.  I worked as a stage hand.

6    I worked for Las Vegas Color Graphics full time.

7    Q.  Yeah.  Maybe my question wasn't clear.

8    A.  Yeah.

9    Q.  All the work that you did in a printing and mailing related

10   business was of a fraudulent variety?

11   A.  More than 95 percent of it, yes.

12   Q.  Okay.  You would agree with me that you weren't privied to

13   the other businesses and activities that Mario Castro was

14   doing, right?

15   A.  Not all of them, no.

16   Q.  Okay.  You have no meaningful testimony to give whatsoever

17   about what percent of his businesses was related to your fraud

18   versus things that weren't your fraud?

19   A.  I guess I would say no, but through the texts and e-mails,

20   you can see that I was reporting to Miguel and Mario Castro.

21   Q.  Okay.  I've looked at hundreds of texts and e-mails.

22        You'd agree with me that the vast majority of the

23   e-mails that have been inquired about related to you are you

24   e-mailing with someone that's not Mario or Miguel, right?

25   A.  Of course.

1    Q.   You e-mailed with a lot of people?

2    A.   Of course.

3    Q.   Making a lot of decisions?

4    A.   Conferring with the clients about those decisions, yes.

5    That's what the e-mails would contain.

6    Q.   Okay.  When you're talking about the clients, you're

7    talking about the people that you're perpetrating fraud with,

8    right?

9    A.   Yes.

10   Q.   And you're talking about vendors that are doing the work

11   related to that fraud, right?

12   A.   That's correct.

13   Q.   Okay.  The Government asked you some questions about -- I'm

14   going to butcher their last name, but Ladomerszky?

15   A.   Ladomerszky, that's correct.

16   Q.   Okay.  Who's that guy?

17   A.   He's a friend of mine from high school.

18   Q.   You and he go way back?

19   A.   Yes.

20   Q.   He's an artist?

21   A.   Yes.

22   Q.   Like a graphic designer type?

23   A.   Graphic designer, yes.

24   Q.   So when you were selecting jobs to get done, you knew that

25   you were putting fraudulent words on paper, right?

1   *A.*   Yes.

2   *Q.*   And you wanted to make that look really cool, right?

3   *A.*   Not say cool but wanted it to work, yes.

4   *Q.*   You wanted to trick people with it, right?

5   *A.*   That's correct.

6   *Q.*   You weren't savvy enough on your own to create the graphics

7   that would trick old people into writing checks for something

8   that didn't exist, right?

9   *A.*   That's correct.

10  *Q.*   So you sought out the help of your high school buddy?

11  *A.*   To do the graphics, yes.

12  *Q.*   Okay.  Did you ever have a discussion with him that it was

13  fraud?

14  *A.*   No.

15  *Q.*   You just sent him, like, "This is what this stuff is.  Put

16  this stuff on it.  Make it look like this.  Here's what I want

17  to accomplish," right?

18  *A.*   Yes.

19  *Q.*   And he did that, right?

20  *A.*   Yes.

21  *Q.*   And you never told him it was fraud, right?

22  *A.*   I never told him directly it was fraud.  He used to work

23  for one of the associated fraud companies directly.

24  *Q.*   Okay.  I'm talking about what you talked to him about.

25  *A.*   That's correct.

—— 2:19-cr-00295-GMN-NJK ——

1    Q.   You never discussed with him it was fraud, right?

2    A.   That's correct.

3    Q.   You'd agree with me you couldn't send out those mailers

4    requesting all that money without those graphics and get --

5    have any expectation they were going to work, right?

6    A.   That's correct.

7    Q.   You needed those cool tricky graphics to convince folks to

8    give up their hard-earned money, right?

9    A.   Yes.

10   Q.   And he helped you with that, right?

11   A.   That's correct.

12   Q.   And those mailers went out to people, right?

13   A.   Yes.

14   Q.   And you got money from it, right?

15   A.   One way or another, yes.

16   Q.   And he got paid for his work, too, didn't he?

17   A.   Yes, he did.

18   Q.   Did he ever get charged with a crime?

19   A.   Not that I know of, no.

20   Q.   You'd agree with me if your high school buddy who you

21   brought into this fraud with you got charged with a crime, you

22   probably would have heard about it?

23   A.   I'm sorry.  Rephrase -- ask the question again.

24   Q.   Yeah.

25             Your high school buddy that you brought into this

1  fraud scheme and you paid for his work, if he had got charged

2  with a crime, you probably would have heard about it, right?

3  **A.**  When you say "brought into this fraud scheme," he was

4  actually in it before me.  He brought me in.

5  Q.  Okay.  I'm talking about when you're sending him letters

6  and paying him money knowing that it's going to be fraud on

7  mailers that you're responsible for.

8        If he got charged with a crime, you'd know about that?

9  Yes or no.

10  **A.**  Yes.

11  Q.  Okay.  All right.  The Government asked you some questions

12  about Exhibit 160D.

13        MR. TOMSHECK:  Brian, if you could bring that up on

14  the screen, please.

15  BY MR. TOMSHECK:

16  Q.  You remember you were asked some questions about

17  Government's Exhibit 160D?

18  **A.**  Yes.

19  Q.  Okay.  In preparation for your testimony, you were shown

20  these particular exhibits, right?

21  **A.**  Yes.

22  Q.  And the Government told you, "I'm going to be asking you

23  questions about these things," right?

24  **A.**  Yes.

25  Q.  You have an understanding that when searches were done in

—— 2:19-cr-00295-GMN-NJK ——

1    this case, electronics were taken, right?

2    A.  That's correct, yes.

3    Q.  Okay.  Was your phone taken pursuant to a search warrant?

4    A.  I surrendered it, yes.

5    Q.  Okay.  You gave it to the Government?

6    A.  That's correct.

7    Q.  Okay.  And you know that they have your electronics?

8    A.  Yes.

9    Q.  So when we see e-mails or text messages, that's presumably

10   from your electronics or someone else's that was taken as part

11   of this investigation?

12   A.  Yes.

13   Q.  Okay.  I want to be clear about Government Exhibit 160D.

14   You didn't put them in that format, correct?

15   A.  That's correct.

16   Q.  Okay.  I'm not in any way disputing, just so it's clear for

17   the jury, that these are actual contents of your text messages,

18   but you would agree with me that's not how it printed out from

19   your phone, right?

20   A.  That's correct.

21   Q.  There's a number of different text messages over a long

22   period of time with different individuals and the Government

23   selected some and put them into these graphics to show them to

24   the jury.

25            You know that, right?

1    *A.*   Yes.

2    *Q.*   Okay.  You'd agree with me if we were to read these text

3    messages in order, it wouldn't be a chronological reporting of

4    all your text messages, right?

5    *A.*   The ones on the screen, no.

6    *Q.*   Okay.  And as it relates to Government's Exhibit 160D, it

7    says at the top, "Sean O'Connor texts Re Gold Rush."

8             Did I read that right?

9    *A.*   Yes.

10   *Q.*   You understand that the Government put that on that graphic

11   to show to the jury, right?

12   *A.*   That's correct, yes.

13   *Q.*   You'd agree with me that these text messages in

14   Government's Exhibit 160D aren't even with the same people,

15   right?

16   *A.*   What do you mean "the same people"?

17            MR. TOMSHECK:  Can you zoom in on that first text,

18   please?

19   BY MR. TOMSHECK:

20   *Q.*   Okay.  Purports to be from a phone number of 702-622-4901

21   with the name Sean O'Connor.

22            Is that you?

23   *A.*   Yes.

24   *Q.*   To Mario Castro at 702-271-0438.

25            Purports to be Mario Castro, right?

1    **A.**  That's correct, yes.

2    *Q.*  Okay.  You'd agree with me all these texts in Exhibit 160D

3    are not between you and Mario Castro?

4    **A.**  In the condensed version here, they're represented as Mario

5    Castro.  In my phone, they are Mario Castro.

6    *Q.*  Yeah, not my question.

7    **A.**  What was your question?

8    *Q.*  You see there on the left-hand side, there's a number of

9    pages in the exhibit that the Government elected to show the

10   jury?

11           Do you see those individual pages numbers 1, 2, 3, 4,

12   5, 6?

13   **A.**  Yes.

14   *Q.*  Okay.  The last page there appears to be page 11.

15   **A.**  Yes.

16   *Q.*  You just told us that page 1 is between you and Mario

17   Castro, right?

18   **A.**  Correct.

19   *Q.*  Not a complete representation of all your communications

20   with Mario, right?

21   **A.**  That's correct.

22   *Q.*  Okay.  Going out on a limb, presumably, if there's a text

23   saying, "Hey, Mario.  We're going to mail out this fraud

24   together," we'd probably see that text in this trial, right?

25   **A.**  Yes.

1  *Q.*  You'd agree with me you never sent a text like that?

2  *A.*  Not to my knowledge, no.

3  *Q.*  Okay.  And the Government asked you questions about this

4  term "Gold Rush" and what that meant, right?

5  *A.*  Yes.

6  *Q.*  And you told us it was what?

7  *A.*  Gold Rush was what we called Dan's overall mailing company.

8  *Q.*  Who's "we"?

9  *A.*  All of us, the Castros, myself including Dan.

10  *Q.*  Okay.

11          MR. TOMSHECK:  Can you go to page 9, please?

12  BY MR. TOMSHECK:

13  *Q.*  At the top on page 9, there appears to be a text from

14  someone named Patti.

15          That's not Mario Castro, right?

16  *A.*  That's correct.

17  *Q.*  To you at that same phone number, right?

18  *A.*  Yes.

19  *Q.*  And she asked you the question, "Hey, what is the name of

20  Dan's HL list he puts up for rent?"

21          Did I read that right?

22  *A.*  Yes.

23  *Q.*  Okay.  Patti Kern is asking you for the name of Dan's --

24  that's Dan Wagner, right?

25  *A.*  Yes.

1    Q.   HL list, right?

2    A.   Yes.

3    Q.   "HL" means?

4    A.   Hotline.

5    Q.   "Hotline" means?

6    A.   Current names for sale in the business.

7    Q.   Yeah.

8         So Dan's in the business of swapping people that might

9    be suckers for a scam, right?

10   A.   That's correct.

11   Q.   And Patti Kern wants those names, right?

12   A.   I think at this point she just wants to make sure she's

13   ordering them or not ordering them.  I'm not sure which it is.

14   Q.   Okay.  Well, if we read on there, she tells us, right?

15   A.   Oh.  Yes, you do.

16   Q.   She says, "Just want to make sure we are renting it,"

17   right?

18   A.   Yes.

19   Q.   Okay.  Patti Kern's asking you for Dan's fraudulent list

20   and wants to make sure she has it, right?

21   A.   Right.  Through a broker, yes.

22   Q.   Right.

23         She's going to you for it?

24   A.   Right.  She doesn't have a phone number for Dan Wagner.

25   Q.   Okay.  You'd agree with me that she probably had a phone

1  the number for Mario Castro?

2  *A.*  I'm sorry.  What?

3  *Q.*  Did she have a phone number for Mario Castro?

4  *A.*  I believe so.

5  *Q.*  Okay.  You'd agree with me she ain't texting him asking him

6  for Dan Wagner's list, right?

7  *A.*  Right.

8  *Q.*  She's texting you?

9  *A.*  Because she knows I work with Dan.

10  *Q.*  Okay.  And in fact, you go out and get that information for

11  her because you know you're going to perpetrate fraud using

12  Dan's list, right?

13  *A.*  Right.  I find out from the next text message.  I say, "I

14  Will have to ask."

15  *Q.*  Uh-huh.

16  *A.*  I contacted Dan and said the name is Gold Rush, I believe,

17  at some point.

18  *Q.*  Yep.

19         MR. TOMSHECK:  Scroll down to the one right below it

20  at the bottom of the page there.

21  BY MR. TOMSHECK:

22  *Q.*  You is say Gold Rush comes to mind, right?

23  *A.*  Right.

24  *Q.*  You'd agree with me that that's indicative of you

25  remembering the name versus saying, "Hey, someone told me it's

—— 2:19-cr-00295-GMN-NJK ——

1   Gold Rush"?

2   **A.**   Right.

3   *Q.*   Okay.  She says, "I'm ordering that one," right?

4   **A.**   Correct.

5   *Q.*   That's you and Patti talking about Gold Rush, right?

6   **A.**   Yes.

7   *Q.*   You and Patti talking about a fraudulent mailing, right?

8   **A.**   Yes.

9   *Q.*   You'd agree with me Mario Castro's not on that text

10  message?

11  **A.**   He is not.

12  *Q.*   There are texts between you and Mario talking about

13  payments, right?

14  **A.**   Yes.

15  *Q.*   He's referring to specific jobs, right?

16  **A.**   Yes.

17  *Q.*   Mario Castro ran a letter shop called Digital Express

18  starting in 2014, right?

19  **A.**   That sounds right.

20  *Q.*   Okay.  In that letter shop, there were jobs that went out,

21  right?

22  **A.**   Yes.

23  *Q.*   They had with them big expenses, right?

24  **A.**   They come with big expenses; is that what you said?

25  *Q.*   Yeah.

1   *A.*   Yes.

2   *Q.*   I mean, someone's got to pay for all that postage, right?

3   *A.*   Postage, printing, and letter shop work.

4   *Q.*   Yeah.

5          And man hours, right?

6   *A.*   And man hours, yes.

7   *Q.*   You'd agree with me that if Mario Castro's going to do a

8   print job where he's going to laser on names, pay for postage,

9   stuff envelopes, and send them out, he should probably get paid

10  for it, right?

11  *A.*   Yes.

12  *Q.*   If you go into a business without an expectation you get

13  paid for doing a job, that's a pretty stupid business idea.

14         You'd agree with that, right?

15  *A.*   Yes.

16  *Q.*   Okay.  And your communications with Mario Castro are about

17  precisely that, getting paid for a job, right?

18  *A.*   Yes.

19  *Q.*   All right.

20         MR. TOMSHECK:  If you could put up Government's

21  Exhibit 255, please.

22  BY MR. TOMSHECK:

23  *Q.*   All right.  The Government asked you some questions about

24  this correspondence back and forth.  It involves somebody --

25  this is nine pages of an exhibit, and they ask you about that

———— 2:19-cr-00295-GMN-NJK ————

1    first page there.  It appears to be from Tod Hoover.

2              MR. TOMSHECK:  Can you blow up that first e-mail,

3    please?

4    BY MR. TOMSHECK:

5    Q.  You didn't select which e-mails the Government asked you

6    about, right?

7    A.  No.

8    Q.  The prosecutors made the decision about what questions to

9    ask you about, yes?

10   A.  Yes.

11   Q.  And which exhibits to show you, correct?

12   A.  Correct.

13   Q.  Okay.  Who's Tod Hoover?

14   A.  Tod is another graphic artist.

15   Q.  Okay.  And what's Tod Hoover doing as it relates to

16   Government's Exhibit 255?

17   A.  He's rewrapping a promotion for Dan Wagner.

18   Q.  What does "rewrapping" mean?

19   A.  That's taking a promotion -- an old promotion, changing the

20   graphics, maybe change some wording, tweak some addresses, and

21   put it back out in the mail.

22   Q.  Changing some things up to an existing fraud to make it a

23   new fraud, right?

24   A.  That's correct.

25   Q.  Okay.  Tod's talking to you in that e-mail, right?

1    **A.**  Yes.

2    *Q.*  Okay.  And the Government asked you a question about that,

3    and the reason I selected this exhibit that the Government

4    showed you is because -- again, I'm using your words.  The

5    Government asked you how you know about this promotion and you

6    said, "Because I set it up," right?

7    **A.**  Yes.

8    *Q.*  You did?

9    **A.**  Yes.

10   *Q.*  Okay.  You'd agree with me when you're making the decision

11   about which promotions to rewrap and how to utilize them to

12   perpetrate fraud, you're making that decision, right?

13   **A.**   In this case, working with the client, Dan, either by phone

14   or not, we discussed rewrapping this promotion, yes.

15   *Q.*  Okay.  Dan, fraudulent mastermind, dealing with you, and

16   you're talking to Tod, right?

17   **A.**  Yes.

18   *Q.*  Okay.  Mario Castro's not on that e-mail, right?

19   **A.**  He's not on that e-mail, no.

20   *Q.*  Mario Castro's not calling the shots about that e-mail,

21   right?

22   **A.**  That's correct.

23   *Q.*  Mario Castro's not making the decision what to rewrap and

24   how to rewrap it, right?

25   **A.**   That's correct.

—— 2:19-cr-00295-GMN-NJK ——

1   *Q.*  You are, right?

2   **A.**  Yes.

3   *Q.*  On behalf of Dan, correct?

4   **A.**  On behalf of Dan, yes.

5   *Q.*  And you're talking to people all by your lonesome, right?

6   **A.**  Yes.

7           MR. TOMSHECK:  Could you put up Government's

8   Exhibit 257, please?

9   BY MR. TOMSHECK:

10  *Q.*  Okay.  The Government asked you some questions about 257.

11  It purports to be an e-mail sent in 2015 from Jerry Stampman to

12  you at that Chango e-mail address we've heard so much about.

13  **A.**  Yes.

14  *Q.*  Who's Jerry Stampman?

15  **A.**  That's Dan Wagner.

16  *Q.*  Okay.  I think you said you don't know why he used that

17  name, right?

18  **A.**  That's correct.

19  *Q.*  Okay.  You'd agree with me Dan was doing a lot of stuff to

20  fly under the radar, right?

21  **A.**  Yes.

22  *Q.*  Wasn't putting his name on stuff?

23  **A.**  That's correct.

24  *Q.*  Wasn't even in the U.S.?

25  **A.**  Yes.

1    *Q.*  Okay.  He's utilizing you to do things so that he can

2    continue to profit from fraud, right?

3    *A.*  Yes.

4    *Q.*  And you got no problem with doing that?

5    *A.*  At the time -- after the shutdown, I started working

6    directly with Dan in terms of being a broker because he had so

7    many problems with the letter shop, yes.

8    *Q.*  When -- when was this shutdown you're referring to?

9    *A.*  When Glen Burke got shut down in 2013.

10   *Q.*  Okay.  When Glen Burke got shut down, you knew there was a

11   problem in the industry that you had made a career of, right?

12   *A.*  Yes.

13   *Q.*  You didn't stop, did you?

14   *A.*  No.

15   *Q.*  Okay.  In fact, you start working with -- more hand-in-hand

16   with Dan, right?

17   *A.*  Yes.

18   *Q.*  Okay.  And you're doing that because you want Dan to be

19   able to continue to perpetrate fraud.  You're going to help

20   him, yes?

21   *A.*  If I can expand on that?

22   *Q.*  It's a yes or no question.

23       Are you trying to help Dan?

24   *A.*  No.  I'm trying to make the point that he was a cut client

25   of the Castro brothers and myself.  There was a problem in

— 2:19-cr-00295-GMN-NJK —

1   2013.  Dan's mail was not going out.  So I, in turn, opened the

2   On The Side to keep Dan's mail going out so we all could

3   continue to do Dan's work.

4   Q.  Okay.  When you're doing Dan's work, it's not a noble

5   thing.  It's not like the Lord's work, is it?

6   **A.**  That's correct.

7   Q.  It's fraud, right?

8   **A.**  Yes.

9   Q.  And you're making arrangements so that it can continue to

10  occur, right?

11  **A.**  That's correct.

12  Q.  So much so that you go open a business, right?

13  **A.**  Yes.

14  Q.  Okay.  And you call it On The Side?

15  **A.**  Yes.

16  Q.  You came up with that name?

17  **A.**  That's correct.

18  Q.  What's it mean?

19  **A.**  It's something I do on the side for my regular job.

20  Q.  Okay.  If your regular job is working for the Castros --

21  that's what you want the jury to believe, right?

22  **A.**  Yes.

23  Q.  Dan's your client, right?

24  **A.**  Dan is a client of myself and the Castros, yes.  I'm the

25  account manager.

——— 2:19-cr-00295-GMN-NJK ———

1   *Q.*  Yep.

2        You know Dan a lot longer than the Castros?

3   **A.**  That's correct.

4   *Q.*  Was your client long before he had any idea who those folks

5   were?

6   **A.**  I can't remember when Dan came in and when the Castros

7   purchased the company, so I'm not sure on that point.

8   *Q.*  Okay.  Well, you told us earlier that it was before.

9   You're not --

10  **A.**  Right.

11  *Q.*  -- circling back on that, are you?

12  **A.**  No.

13  *Q.*  Okay.  You understand I'm -- I haven't talked to you 25

14  times over the years so I'm kind of stuck with what you tell us

15  under oath?

16  **A.**  That's correct, yes.

17  *Q.*  Okay.

18  **A.**  I understand.

19  *Q.*  This communication is between you and Dan, right?

20  **A.**  Yes.

21  *Q.*  Okay.  You would agree with me that you're talking to Dan

22  about jobs that have been sitting at Mario's, right?

23  **A.**  That's correct.

24  *Q.*  Okay.  And you talk about getting Digital Express the

25  money, right?

213

—— 2:19-cr-00295-GMN-NJK ——

1    **A.**   Yes.

2    *Q.*   You're talking to Dan about a job that's been sitting there

3    that hasn't been paid for, right?

4    **A.**   Yes.  It looks like a partial went out and we're waiting

5    for the rest of the postage money to come in to finish the job.

6    *Q.*   Yeah.

7         They're a letter shop that prints addresses and

8    provides postage to send things out in the mail, right?

9    **A.**   Yes.

10   *Q.*   Okay.  But for a letter shop putting stuff in the mail, you

11   would agree with me, like, Patti Kern and Dan Wagner can't do

12   fraud, right?

13   **A.**   Do you mean personally?

14   *Q.*   Yeah.

15   **A.**   I mean, they are fraudulent, but they hire people to do

16   their work for them, yes.

17   *Q.*   They have to use people to perpetrate their fraud, right?

18   **A.**   That's correct.

19   *Q.*   The reason mail fraud is a crime is because you're using

20   the Federal Government to perpetrate that fraud, right?  You

21   know that, right?

22   **A.**   I guess I don't understand what you mean by we're using the

23   Government.

24   *Q.*   Okay.  I'm going to take a step back real quick.

25         Patti Kern comes up with a list and the idea, right?

—— 2:19-cr-00295-GMN-NJK ——

1   *A.*   Yes.

2   *Q.*   And you do what?

3   *A.*   I print it and mail it.

4   *Q.*   Okay.  You don't, right?

5   *A.*   No.

6   *Q.*   You facilitate the brokerage of those things, right?

7   *A.*   I mean, sometimes I actually did do the lasering, but, yes.

8   *Q.*   Okay.  You need a letter shop because you don't -- what's

9   the name of that fancy machine that you know how to use?

10  *A.*   OCE.

11  *Q.*   Yeah.  You don't have one in your living room, right?

12  *A.*   That's correct.

13  *Q.*   So you got to go find a letter shop, right?

14  *A.*   Yes.

15  *Q.*   Okay.  Patti and you can't perpetrate that fraud without

16  using people to do it, right?

17  *A.*   Yes, we need companies to help do that.

18  *Q.*   Okay.  And you need the United States Government in the

19  form of the Postal Service to send the mail, right?

20  *A.*   That's correct.

21  *Q.*   But for the letter carriers going door to door handing out

22  mails, fraud doesn't get perpetrated, right?

23  *A.*   Correct.

24  *Q.*   Okay.  Those clearly stamped envelopes that are clearly

25  fraud to you get delivered in the U.S. mail, right?

2:19-cr-00295-GMN-NJK

1    *A.*  Yes.

2    *Q.*  And the return money comes back in an envelope that you've

3    provided them with instructions, right?

4    *A.*  Yes.

5    *Q.*  Through the U.S. mail, right?

6    *A.*  Yes.

7    *Q.*  You have to utilize the mail carriers to do that, yes?

8    *A.*  That's correct, yes.

9    *Q.*  Okay.  You would agree with me that what we were looking at

10   in Government's Exhibit 257 is you talking to Dan about, "Hey,

11   we need money -- you got to give it to me so that I can get the

12   rest of this job out," right?

13   *A.*  That's correct.

14   *Q.*  Because it's sitting in the letter shop?

15   *A.*  Yes.

16   *Q.*  And it's not going out because you're not paying for it,

17   right?

18   *A.*  The postage money, yes.

19   *Q.*  Okay.  You'd agree with me when you had those types of

20   communications with Dan, Mario wasn't involved?

21   *A.*  I would have to go back through thousands of e-mails to

22   decide that or not.

23   *Q.*  Okay.  In the one e-mail we just talked about, Mario's not

24   involved, right?

25   *A.*  That's correct.

1    Q.  You mention his name, right?

2    **A.**  Yes.

3    Q.  Okay.  And you'd agree with me that if in those thousands

4    of e-mails, there's one where Mario Castro's directing Dan

5    Wagner to do something, might have seen that one, huh?

6    **A.**  I believe there was one that we looked at in exhibits where

7    Mario is asking about Dan's hotline and if he's getting it or

8    not, but I can't remember which exhibit that is.

9    Q.  Okay.  You'd agree with me that if there was an e-mail from

10   Mario Castro in Las Vegas to Dan Wagner in Costa Rica talking

11   about, "Hey, I'm rewrapping these things.  I need these

12   graphics.  I need this money," we probably would have seen

13   something like that, right?

14   **A.**  Yes.

15   Q.  Okay.  The Government asked you about Exhibit 157B.

16         MR. TOMSHECK:  Could we have that on the screen,

17   please?

18         It appears we have a projector issue.

19         THE COURT:  Yeah, it's flickering when he's trying to

20   do something.  Can we disconnect and reconnect?  It might not

21   be -- there you go.  Okay.  Sometimes they just come loose.

22   Sorry.

23         MR. TOMSHECK:  For the record, I fixed that.

24   BY MR. TOMSHECK:

25   Q.  All right.  I was going to ask you about 157B.

1   *A.*   Okay.

2   *Q.*   The Government asked you some questions about 157B.

3          MR. TOMSHECK:  Can you zoom in a little bit at the top

4   of that?

5   BY MR. TOMSHECK:

6   *Q.*   Appears to be one of these fraudulent mailers that you've

7   been testifying about, right?

8   *A.*   Yes.

9   *Q.*   You were asked if you recognized that, right?

10  *A.*   Yes.

11  *Q.*   Okay.  And you said you did and you said you recognized it

12  because yourself and the defendants produced it?

13  *A.*   Yes.

14  *Q.*   Okay.  I'd like you to look at 157B and tell me what you

15  produced on it.

16  *A.*   From top to bottom, the whole form was printed usually by

17  Epi Castro.

18  *Q.*   Just asking about what you did.

19  *A.*   Okay.  I set it up to do the variable text in the middle

20  paragraphs, the name, address, and then if you can scroll down

21  a bit more, there's a bar code and a number and the name again

22  and a deadline to file.  That kind of stuff was all lasered on

23  after -- on the pre-printed form.

24  *Q.*   Okay.  So who comes up with the words on the page?

25  *A.*   Usually the graphic artist or somebody to that effect.

─────── 2:19-cr-00295-GMN-NJK ───────

1    *Q.*  The graphic artist that you're communicating with?

2    *A.*  Yes.

3    *Q.*  On behalf of your client, like Patti Kern or Dan Wagner or

4    Glen Burke?

5    *A.*  Yes.

6    *Q.*  Okay.  It was Mr. Brown who asked you some questions where

7    you said in an e-mail it's kind of the same stuff and you ended

8    the e-mail with blah, blah, blah.

9           Do you remember that?

10   *A.*  Yes.

11   *Q.*  Okay.  You're rewriting something in that e-mail so that it

12   can go out in the mail, right?

13   *A.*  Yes.  That was a rewrap, yes.

14   *Q.*  Okay.  So you're taking an existing fraud and you're, as

15   you put it, rewrap -- that's your terminology, right?

16   *A.*  That's correct.

17   *Q.*  By editing the words, right?

18   *A.*  Words and/or graphics depending.

19   *Q.*  Okay.  Make it new and shinier with a better promise that's

20   not going to come true.  Agreed?

21   *A.*  Agreed.

22   *Q.*  You do that, right?

23   *A.*  I do some of the edit, yes.

24   *Q.*  In conjunction with a graphic artist, right?

25   *A.*  Yes.

1    Q.  Okay.  Mario Castro's not a graphic artist, right?

2    A.  That's correct.

3    Q.  When you said you produce this with the defendants, you can

4    tell me things that you do like making edits, corresponding

5    with a graphic artist.

6          I'd like you to tell me what, for instance, Salvador

7    Castro did for Government's Exhibit 157B.

8    A.  He may have stuffed it using the inserter.  He may not

9    have.

10   Q.  May have?

11   A.  May have, yes.

12   Q.  May not have even been at the shop when this went out?

13   A.  That's correct.

14   Q.  You have no idea, do you?

15   A.  I have no idea to track every single job to individual

16   people.

17   Q.  Okay.  We can track the job that you do because you're

18   writing e-mails and you're corresponding with the actual

19   fraudsters, but you're in agreement with me that you have no

20   idea what any of the defendants did as it relates to 157B,

21   right?

22   A.  I could tell that you more than likely, Jose Luis Mendez

23   lasered it.

24   Q.  Okay.  I thought you told me that you might have lasered

25   it?

---

2:19-cr-00295-GMN-NJK

1    **A.**    That's true.  I did sometimes.  When Jose Luis Mendez

2    wasn't there, I might laser it.

3    Q.    Okay.  You'd agree with me that when you sit up here and

4    testify under oath for the Government in their hope to convict

5    these defendants, you can't tell us with any certainty

6    whatsoever what any of those four defendants did with this

7    exhibit, right?

8    **A.**    With this particular exhibit, no.

9    Q.    You would have to speculate, right?

10    **A.**    It would be a guess.  I didn't always run the laser.

11    Q.    Okay.  You would agree with me that it would be unfair to

12    convict someone based on your guesses, right?  Yes or no.

13    **A.**    Yes.

14    Q.    You were asked some questions about this awful day that you

15    had where you testified in front of the grand jury.

16            Do you remember that?

17    **A.**    Yes.

18    Q.    Okay.  You left the grand jury, right?

19    **A.**    Yes.

20    Q.    You knew you were there under subpoena from the Government,

21    yes?

22    **A.**    Yes.

23    Q.    Mr. Finley asked you questions, right?

24    **A.**    That's correct.

25    Q.    Not a whole lot of fun, right?

—— 2:19-cr-00295-GMN-NJK ——

1    *A.*   Yes.

2    *Q.*   In fact, it scared you so much that you made a decision, as

3    you walked out to your car, you were going to leave the fraud

4    business behind forever?

5    *A.*   Yes.

6    *Q.*   And so you made a phone call?

7    *A.*   Yes.

8    *Q.*   And when you were making the decision about who to call in

9    this life altering conscious stream that was hitting you

10   after that awful experience, whose number did you dial?

11   *A.*   The first number I called was my wife.

12   *Q.*   Okay.  You agree on direct examination you didn't tell us

13   you called your wife, right?

14          MR. FINLEY:  Objection, your Honor.  He did.

15          THE COURT:  It's -- I do remember him saying he called

16   his wife first.

17          MR. TOMSHECK:  Okay.

18          THE WITNESS:  Yes.

19   BY MR. TOMSHECK:

20   *Q.*   Who's the first person you called other than your wife

21   then?

22   *A.*   Dan Wagner.

23   *Q.*   When you're making a decision about your exit from the

24   fraud business, you called Dan Wagner, right?

25   *A.*   Yes.

1    Q.  It's your testimony that you didn't call the person you've

2    identified as your boss, right?

3    **A.**  That's correct.

4    Q.  You called Dan?

5    **A.**  I called Dan first.

6    Q.  The guy that you did fraud with, right?

7    **A.**  That's correct.

8    Q.  Okay.  You told us on direct examination that you told

9    Patti Kern that you wanted out, right?

10   **A.**  Yes.

11   Q.  You made that representation to her, right?

12   **A.**  Yes.

13   Q.  You said, "I'm not going to do this anymore"?

14   **A.**  I said I want to try to get out of it, yes.

15   Q.  Okay.

16          MR. TOMSHECK:  Can you put up Government's

17   Exhibit 198, please.

18   BY MR. TOMSHECK:

19   Q.  See that e-mail?

20   **A.**  Yes.

21   Q.  Okay.  I've read that e-mail a few times.  I wasn't privied

22   to what was going on in your mind back in 2017.  But you

23   apparently sent Patti a text, right?

24   **A.**  Yes.

25   Q.  And as I understand Patti's response, your text must have

—— 2:19-cr-00295-GMN-NJK ——

1  been something along the lines of, "Hey, there's these jobs out

2  here I'm not going paid for," right?

3  **A.**  Basically, yes.

4  Q.  Okay.  You'd agree with me that as I read this e-mail,

5  you're not saying to Patti, "Hey, the Castro brothers are

6  entitled to some money," right?

7  **A.**  Did you say "entitled to some money"?

8  Q.  Right.

9  **A.**  Yes, I'm asking for myself.

10  Q.  You reached out to Patti in 2017 and said, "Hey, these jobs

11  are going out that you owe me money for," right?

12  **A.**  I -- I guess what I'm saying is I didn't understand why

13  something got rewrapped without my knowledge.

14  Q.  So Patti did some work without your knowledge?

15  **A.**  Yes.

16  Q.  Okay.  And that bothered you, right?

17  **A.**  Just wondered what was going on.

18  Q.  You thought you were entitled to that money, right?

19  **A.**  To a point, yes.

20  Q.  Okay.  And you would agree with me that Patti responds to

21  you and said, "Didn't think you wanted to be affiliated with

22  any sweeps type mailing due to what you went through and that

23  was why you quit working with Dan," right?

24  **A.**  Yes.

25  Q.  You'd agree with me she didn't say in that e-mail, as I

—— 2:19-cr-00295-GMN-NJK ——

1  read that text to you, you quit working for the Castros, right?

2  A.  Correct.

3  Q.  She indicated that you had quit working with Dan, right?

4  A.  Yes.

5  Q.  Okay.

6      MR. TOMSHECK:  If you could put up Government's

7  Exhibit 190, please.

8  BY MR. TOMSHECK:

9  Q.  This purports to be an e-mail from Patti Kern to you at

10 your Chango Consulting e-mail address about Patti saying

11 something isn't going to work.

12      "Bank of American [sic] will only allow one dba per

13 company and you already have one DRS.  Also, the dba for SDS is

14 Pacific Data Awards.  Think it's too close."

15      Did I read that right?

16 A.  Yes.

17 Q.  Okay.  Patti's corresponding with you in response to an

18 e-mail that you had sent, correct?

19 A.  Yes.

20 Q.  The e-mail that you had sent had to do with Jose needing a

21 new dba for Advanced Allocation Systems.

22      "The new dba is" -- and then you put -- "Pacific

23 Dispersement Reporting," right?

24 A.  Correct.

25 Q.  Okay.  So you're actually providing a dba for a business

1    that you say Jose needs a new dba for, right?

2    *A.*  Yes.  I'm passing along the information.

3    *Q.*  Okay.  It's your testimony that you're passing information,

4    right?

5    *A.*  Uh-huh.

6    *Q.*  Okay.  You'd agree with me that you're telling Patti what

7    the new dba is, right?

8    *A.*  Yes.

9    *Q.*  And Patti's telling you it won't work, right?

10   *A.*  Yes.  She knew something that I did not know.

11   *Q.*  Because you already have one, correct?

12   *A.*  Yes.  Well, she says you, but for me, that was understood

13   that Jose Luis Mendez and myself already have one.

14   *Q.*  Okay.  So Jose Luis Mendez came up with the name Pacific

15   Disbursement Reporting?

16   *A.*  I don't remember the exact conversation that we might have

17   had external for texts, you know, actual face-to-face

18   conversation, if I picked that name or I showed Jose Luis

19   Mendez a list and he picked the name.  I don't remember.

20   *Q.*  Okay.  Can you reference me to an e-mail between yourself

21   and Jose where he identifies names he likes for dbas?

22   *A.*  No, I cannot.

23   *Q.*  Can you reference me to a text message where you ever have

24   a conversation with him at all about what the name for a

25   business entity should be?

--- 2:19-cr-00295-GMN-NJK ---

1   **A.**  Again, I saw him face to face most of the time.

2            MR. TOMSHECK:  Can you put up Government 9018?  I'm

3   sorry.  Defense Exhibit 9018.

4   BY MR. TOMSHECK:

5   *Q.*  This appears to be you communicating with Patti Kern,

6   right?

7   **A.**  Yes.

8   *Q.*  Okay.  Nobody else on that e-mail, right?

9   **A.**  That's correct.

10  *Q.*  There's a list of names, right?

11  **A.**  Yes.

12  *Q.*  And you say, "I like three or four of them," right?

13  **A.**  Yes.

14  *Q.*  And Patti kind of bounces it back off you and says, how

15  about Advanced Allocations, Central Fund Awards, American Prize

16  Network, and how about Pacific Payment Services, right?

17  **A.**  Yes.

18  *Q.*  You and Patti would talk about what the names for these

19  businesses should be, right?

20  **A.**  In this instance, yes.

21  *Q.*  Okay.  You And Patti would be responsible for what goes on

22  the mailers, right?

23  **A.**  In terms of getting the artwork done and -- and the rewrap

24  or whatever for this client, AAS, yes, I was part of it.

25  *Q.*  Okay.  If we're being honest about it, in a mailing that

1    involves you and Patti as opposed to, like, you and Dan, you
2    and Patti were responsible for everything that goes on the
3    mailing, right?
4    *A.*  More Patti than myself.  Again, this is one company of
5    several.
6    *Q.*  Okay.  In any mailing that you and Patti worked on
7    together, you'd agree with me that you and Patti would be
8    responsible for everything that goes on the mailing, the
9    artwork, the words, the names on the list were a result of you
10   and Patti's combined efforts, right?
11   *A.*  Combined efforts, yes.
12   *Q.*  Okay.
13            MR. TOMSHECK:  Could you put up Government's
14   Exhibit 280, please?
15   BY MR. TOMSHECK:
16   *Q.*  The Government asked you some questions about this exhibit,
17   number 280.
18            Do you remember those questions?
19   *A.*  Yes.
20   *Q.*  Okay.  You recognize those company names, right?
21   *A.*  Yes.  Overall, yes.
22   *Q.*  Most of those companies you recognize because you worked on
23   them, right?
24   *A.*  Yes.
25   *Q.*  And in fact, most of those company names you know because

1  you and Patti came up with the names, right?

2  **A.**  I can go through the list one by one if you would like.

3  *Q.*  You'd agree with me that most of the names on that list are

4  ones that were discussed by you and Patti, right?

5  **A.**  I would not say most, no.

6  *Q.*  Okay.  You'd agree with me that you and Patti had this

7  conversation back in 2009, you told us before, where you

8  suggested to her that she could always come up with other names

9  for the companies, right?

10  **A.**  Are we talking about my conversation of -- with Patti

11  concerning other partners?

12  *Q.*  Yes.

13  **A.**  Yes, we had that conversation.

14  *Q.*  And in fact, you told us on direct examination that you

15  recognize most of the names in Government's Exhibit 280, right?

16  **A.**  I recognize most of the names but I'm not -- did not create

17  all those names.

18  *Q.*  I'm talking about the names of the individuals that the

19  companies were formed under.

20  **A.**  Yes, I recognize most of them.

21  *Q.*  Okay.  You knew a lot of those people, right?

22  **A.**  Correct.

23  *Q.*  And when you discussed with Patti that you could always

24  find other names to put the companies under, you were talking

25  about people, right?

2:19-cr-00295-GMN-NJK

1    **A.**  That I said that?  My testimony today or yesterday?

2    *Q.*  Yes.

3    **A.**  I don't remember that.

4    *Q.*  Okay.  When you had this conversation with Patti and she

5    was saying that she was going to use her husband's name and you

6    suggested to her that you could always find other names to put

7    companies under, that was you talking to her, right?

8    **A.**  Right.  Something she already knew, yes.

9    *Q.*  Okay.  And in fact, she did just that, right?

10   **A.**  That's correct, yes.

11   *Q.*  She continued to operate in business up until the point the

12   Federal Government knocked on her door in 2018, right?

13   **A.**  That's correct.

14   *Q.*  And so did you, didn't you?

15   **A.**  Yes.

16   *Q.*  You continued to perpetrate fraud, yes?

17   **A.**  Yes.

18   *Q.*  And you continued to do it by using people so that your

19   name wouldn't be on a business, right?

20   **A.**  Yes.

21          MR. TOMSHECK:  Pass the witness, your Honor.

22          THE COURT:  I think we've heard from all the defense

23   attorneys now.

24          So redirect?

25          MR. FINLEY:  No redirect, Judge.

1          THE COURT:  All right.  So if any members of the jury

2    have a question for the witness, Mr. O'Connor, please write it

3    down on the form provided if you haven't already.  Take your

4    time and write neatly so I can read them, and skip a line if

5    you have more than one question or number the questions.

6          When you're all done, fold the piece of paper in half

7    and pass it to our courtroom deputy, Nick.  And remember, we

8    don't need to know your name or your initials.  We don't need

9    to know your jury number, just your anonymous question.

10          Counsel, please join me side bar.

11          I'm sorry.  Counsel, you can go ahead and take your

12    seat.  (Unintelligible).

13          (Court reporter interruption.)

14          THE COURT:  All right.  So it's 3:48, so we only have

15    12 minutes left anyway.  Jury questions start at 93 and go all

16    the way to 109, so I think rather than keep everybody here,

17    although I know we'd love to hear the music, I'm going to go

18    ahead and let the jury have an early out.  And when you come

19    back at 9:00 a.m. tomorrow morning, I will have already gone

20    through all the questions with counsel, so then we can start

21    right with Mr. O'Connor and ask him the jury questions.  All

22    right?

23          So during the overnight break, remember that you are

24    still not to discuss the case with anyone.  You can tell your

25    coworkers, your boss, your family, your daycare worker,

1  whatever, to let them know, yes, I'm still in trial, no, I

2  still have to be there tomorrow but don't tell them anything

3  about the trial at all.  Remember, you are not to discuss the

4  case or anything with the attorneys, witnesses, any of the

5  individuals that you see here in court working for the parties.

6          And please do not read or listen to or view anything

7  that touches upon the case in any way or perform any research

8  or any independent investigation.

9          Even though you've already submitted the questions, if

10 you think of something else tonight, please write it down.

11 Don't go online and try to figure it out yourself.  Ask us the

12 questions so we can get you the information and present it to

13 you here in open court, so that everybody has a fair chance to

14 respond to you and ask follow-up questions about it.

15         And do not form any opinions about any of the

16 information in the case yet until after you have heard all the

17 testimony, received all the evidence, I'll give you the written

18 jury instructions, then you'll hear closing arguments.  After

19 that, you can begin the deliberation process.

20         So let's stand for the jury so they can exit for the

21 night.  We'll welcome you back at 9:00 a.m. tomorrow morning.

22         And Mr. O'Connor, likewise, you can exit also after

23 the jury and then just we need you back here at 9:00 a.m.

24 tomorrow morning.

25         (Whereupon, the jury exits at 3:49 p.m.)

─────────── 2:19-cr-00295-GMN-NJK ───────────

1          THE COURT:  All right.  Everyone may be seated.

2          After Mr. O'Connor leaves, then I'll go ahead and

3    start listing the questions.

4          All right.  So jury note number 39 asks two questions.

5          The first one is:  Did your buddy in high school ever

6    open any businesses related to mail fraud?

7          Any objection from the Government?

8          MR. FINLEY:  No objection.

9          MR. TOMSHECK:  No, your Honor.

10         MR. GAFFNEY:  No, your Honor.

11         MR. BROWN:  No, your Honor.

12         THE COURT:  Mr. Green, any objection?

13         MR. GREEN:  I don't see how it's relevant, your Honor.

14         With all due respect, he's not on trial here.  This

15   material has not been brought in here.  For example, his

16   business associations or affiliations just have been a name

17   brought in and maybe he did some of the artwork.

18         THE COURT:  All right.  Well, the witness has

19   testified about his experience and his relationships in the

20   mail fraud business, and there was questioning about his buddy

21   both on direct and on cross.  And I don't see that it would be

22   prejudicial, so I'm going to go ahead and ask the question.

23         The second question for jury note number 93 asks:  Did

24   your buddy from high school ever open bank accounts related to

25   fraud companies that you or your clients were involved in?

—— 2:19-cr-00295-GMN-NJK ——

1            Any objection from the Government?

2            MR. FINLEY:  No, your Honor.

3            THE COURT:  Any objection from defense?

4            MR. TOMSHECK:  No, your Honor.

5            MR. GAFFNEY:  No, your Honor.

6            MR. BROWN:  No, your Honor.

7            MR. GREEN:  No, your Honor, based on your other

8    rulings.  Thank you.

9            THE COURT:  All right.  Jury note number 94 asks four

10   questions.

11           The first one is:  What is the defendants' role and

12   yourself?  What is the defendants' role and yourself?

13           Any objection from the Government?

14           MR. FINLEY:  No, your Honor.

15           MR. TOMSHECK:  Can we refer them back to the last two

16   days?

17           I don't have an objection, no, your Honor.

18           MR. BROWN:  No, your Honor.

19           THE COURT:  Mr. Green?

20           MR. GREEN:  No, your Honor.

21           THE COURT:  Okay.  Second question is:  You say

22   98 percent is fraud income from victims.  So is only two

23   percent from legal job work?

24           Any objection from the Government?

25           MR. FINLEY:  No, your Honor.

—— 2:19-cr-00295-GMN-NJK ——

 1          MR. TOMSHECK:  No, your Honor.

 2          THE COURT:  Any objection from the defense?

 3          (Court reporter interruption.)

 4          THE COURT:  Okay.  So I'll start again.

 5          Any objection from the defense?

 6          MR. TOMSHECK:  No.

 7          MR. GAFFNEY:  No, your Honor.

 8          MR. BROWN:  No, your Honor.

 9          MR. GREEN:  No objection, your Honor.

10          THE COURT:  Number three:  Why is there so many post

11  office mailbox across the country?

12          Any objection from the Government?

13          MR. FINLEY:  No.

14          THE COURT:  From the defense?

15          MR. TOMSHECK:  No objection.

16          MR. GAFFNEY:  No, your Honor.

17          MR. BROWN:  No objection.

18          MR. GREEN:  No objection, ma'am.

19          THE COURT:  And the fourth question is:  What is a

20  hotline order?

21          Any objection from the Government?

22          MR. FINLEY:  No, your Honor.

23          THE COURT:  Defense?

24          MR. TOMSHECK:  No.

25          MR. GAFFNEY:  No.

1           MR. BROWN:  No.

2           MR. GREEN:  No objection, your Honor.

3           THE COURT:  Jury note number 95 asks four questions

4    the.

5           First one is:  When you got rid of stock and all

6    paperwork after a C&D, did you toss it out?  Shred?  Burn?

7           Any objection from the Government?

8           MR. FINLEY:  No.

9           THE COURT:  From defense?

10           MR. TOMSHECK:  No objection.

11           MR. GAFFNEY:  No, your Honor.

12           MR. BROWN:  No objection.

13           MR. GREEN:  No objection, ma'am.

14           THE COURT:  Number two.  Was Mario, Miguel, Salvador

15    Castro, and Mr. Mendez already in the printing business?

16           Any objection from the Government?

17           MR. FINLEY:  It's vague as to time, but I don't have

18    an objection.

19           MR. TOMSHECK:  No objection.

20           THE COURT:  From the defense?

21           MR. GAFFNEY:  No, your Honor.

22           MR. BROWN:  No, your Honor.

23           MR. GREEN:  No, your Honor.

24           THE COURT:  And I think that parties can follow up if

25    you need to for the timing element there.

—— 2:19-cr-00295-GMN-NJK ——

1            Number three:  Did your family know what you were
2    doing?
3            Any objection from the Government?
4            MR. FINLEY:  No, Judge.
5            THE COURT:  Defense?
6            MR. TOMSHECK:  No.
7            MR. GAFFNEY:  No.
8            MR. BROWN:  No.
9            MR. GREEN:  No objection, your Honor.
10           THE COURT:  And then the last question on jury note
11   number 95 asks:  Was a search warrant served at your house?  If
12   so, what, if anything, was taken?
13           Any objection from the Government?
14           MR. FINLEY:  No objection.
15           MR. TOMSHECK:  No objection.
16           MR. GAFFNEY:  No, your Honor.
17           MR. BROWN:  No, your Honor.
18           MR. GREEN:  No objection, ma'am.
19           THE COURT:  All right.  Jury note number 96 asks one
20   question.  Why would Jose Luis Mendez have an outside printing
21   company, such as Western, do his print jobs for AAS when he is
22   part of a printing company already?
23           Any objection from the Government?
24           MR. FINLEY:  No objection.
25           THE COURT:  Defense?

—— 2:19-cr-00295-GMN-NJK ——

1                MR. TOMSHECK:  No.

2                MR. GAFFNEY:  No, your Honor.

3                MR. BROWN:  No, your Honor.

4                MR. GREEN:  No objection, ma'am.

5                THE COURT:  All right.  Jury note 97 asks one

6     question.  Sean, why did you continue to work at shop after the

7     difficulties started?

8                Any objection from the Government?

9                MR. FINLEY:  No, your Honor.

10               THE COURT:  Defense?

11               MR. TOMSHECK:  No.

12               MR. GAFFNEY:  No, your Honor.

13               MR. BROWN:  No, your Honor.

14               MR. GREEN:  No objection.

15               THE COURT:  Okay.  Jury note 98 asks one, two -- two

16    questions.  The second question has an A and a B.  And then

17    there's a third question that's all scratched out.

18               So first one is, says:  Do you know if the Castros

19    already previously had a print shop or was your business their

20    first print shop -- print shop they bought?

21               Any objection from the Government?

22               MR. FINLEY:  None, your Honor.

23               THE COURT:  Defense?

24               MR. TOMSHECK:  I have an objection to "the Castros"

25    because there's multiple print shops of different varieties and

—— 2:19-cr-00295-GMN-NJK ——

1   multiple Castros.

2           THE COURT:  All right.  And Mr. Gaffney?

3           MR. GAFFNEY:  Same objection.

4           THE COURT:  Mr. Brown?

5           MR. BROWN:  Join.

6           THE COURT:  And Mr. Green?

7           MR. GREEN:  Join in the objection, your Honor.  Thank

8   you.

9           THE COURT:  All right.  So I'll ask the witness to

10  specify as to the print shops that he's referring to.

11          Question number two has an A and a B.  The first one

12  is:  How did you become a partner with the defendants?

13          A.  Invest financially?

14          B.  Did they take you on to keep you quiet?

15          So any objection from the Government?

16          MR. FINLEY:  No objection.

17          THE COURT:  Any objection from the defense?

18          MR. TANASI:  No objection, your Honor.

19          MR. GAFFNEY:  No, your Honor.

20          MR. BROWN:  No, your Honor.

21          MR. GREEN:  No objection, ma'am.

22          THE COURT:  All right.  Jury note number 99 asks:

23  Sean, are you certain that Patti was paying you the profits?

24          Any objection from the Government?

25          MR. FINLEY:  No, your Honor.

2:19-cr-00295-GMN-NJK

```
1          THE COURT:  Any objection from the defense?

2          MR. TOMSHECK:  No.

3          MR. GAFFNEY:  No, your Honor.

4          MR. BROWN:  No, your Honor.

5          MR. GREEN:  No objection, your Honor.

6          THE COURT:  Second question.  Since she had come and

7  gone before you arrived, someone else like a defendant may have

8  left the envelopes for you, yes?

9          Any objection from the Government?

10         MR. FINLEY:  No.

11         THE COURT:  Defense?

12         MR. TOMSHECK:  No.

13         MR. GAFFNEY:  No, your Honor.

14         MR. BROWN:  No.

15         MR. GREEN:  No objection.

16         THE COURT:  And then this says it's in reference to

17  Government's Exhibit 428.  How is printing different from

18  letter shop?

19         Any objection from the Government?

20         MR. FINLEY:  No, your Honor.

21         THE COURT:  Defense?

22         MR. TOMSHECK:  No.

23         MR. GAFFNEY:  No, your Honor.

24         MR. BROWN:  No, your Honor.

25         THE COURT:  Mr. Green?
```

1           MR. GREEN:  We would ask for clarification because

2    remember, his role was kind of limited as to what he stated as

3    the account manager.  Then setting up some of the stuff.  I

4    didn't hear a lot of about the actual printing although he did

5    see it, but...

6           THE COURT:  All right.  So the question will be

7    limited to his -- his understanding when he uses the words

8    "printing" and "letter shop."

9           Fourth question from jury note 99 is:  Which

10   defendants ran the machines?

11          Any objection from the Government?

12          MR. FINLEY:  No, your Honor.

13          THE COURT:  Defense?

14          MR. TOMSHECK:  No.

15          MR. GAFFNEY:  No, your Honor.

16          MR. BROWN:  No, your Honor.

17          MR. GREEN:  Again, your Honor, the only objection or

18   statement would be that there are multiple print shops with

19   multiple printers.

20          THE COURT:  All right.  And the fifth question in jury

21   note 99 is:  The postage costs we saw in Government's

22   Exhibits 154 through 155 and 156, a rough monthly postage cost?

23          I think they're asking is it a monthly postage cost.

24   Is that roughly what a monthly postage cost is, what we saw in

25   Government's Exhibit 154, 155, and 156?

1           Any objection from the Government?

2           MR. FINLEY:  No, your Honor.

3           THE COURT:  Defense?

4           MR. TOMSHECK:  No, your Honor.

5           MR. GAFFNEY:  No, your Honor.

6           MR. BROWN:  No, your Honor.

7           THE COURT:  Mr. Green, any objection?

8           MR. GREEN:  Your Honor, Don Green on behalf of

9    Salvador Castro.

10           Your Honor, we have an -- we have two accounts for the

11   entity On The Side.  One of them was the general -- I guess the

12   general account and the other was the wire transfer account.

13   There are approximately 15 or 16 checks that were written with

14   postage -- maybe not all that many but several were indicated

15   with postage from -- during the month of September of 2016.

16   They -- they're, like, in the thousands of dollars.

17           So with that question in mind, are we now able to

18   bring in the On The Side Bank of America general account which

19   was receiving money from the On The Side wire transfer account

20   with the reference going to postage?  That's all I'm saying.

21   Jury hasn't seen that yet.  But it opens up that door with that

22   question.  And those are specific to Mr. O'Connor.

23           THE COURT:  Okay.  So explain how does it open up the

24   door to the workings of On The Side if it's asking the postage

25   costs in 154, 155, 156?  Was that roughly a month postage cost?

1          MR. GREEN:  It's generically -- I guess, I -- if we

2     can limit it to the exhibits, the answer is no objection.

3          But if it's, like, overall cost, then I think it opens

4     up for a few more exhibits as to this particular witness.

5          THE COURT:  All right.  What's the Government's

6     position?

7          MR. FINLEY:  I think we're mixing apples and oranges a

8     little bit.

9          The On The Side account was a specific method of

10    paying the Digital Express company for Gold Rush business

11    coming from Dan Wagner.  The exhibits that the juror is asking

12    about has to do with something different entirely.  That's --

13    that's the letter shop business that was being conducted with

14    Glen Burke.  So -- and that wouldn't implicate On The Side at

15    all.  There's a different way that Glen Burke would pay the

16    letter shop.  He would not pay through On The Side.

17         THE COURT:  All right.  I'm going to go ahead and ask

18    that question.

19         MR. GREEN:  May I respond briefly, your Honor?

20         THE COURT:  Yes.

21         MR. GREEN:  And I don't want to belabor the point.

22         There's one check that is check number 1647 to Digital

23    Express issued on September 12, 2016 in the amount of $5,658.70

24    from the account of the On The Side wire account to the On The

25    Side -- to the -- to -- from that account.

1           So all these other checks from On The Side wire

2    account, which do mention postage, go to the On The Side, Inc.

3    regular account.  There's only one check that goes to Digital

4    Express and that's check number 1647 and that was attached to

5    the interview -- excuse me for one moment.  That was attached

6    to the October 4, 2018 memorandum of interview between -- or

7    among Mr. O'Connor, Mr. Finley from the Department of Justice,

8    and Postal Inspector Barry Bouchie.

9           Again, I'm just saying that --

10          THE COURT:  So is that a postage cost?

11          MR. GREEN:  Excuse me?

12          THE COURT:  Is that postage cost?

13          MR. GREEN:  Let me double-check, your Honor, if I may.

14    That's check number 1647.

15          THE COURT:  1647.

16          MR. GREEN:  May I approach?

17          THE COURT:  I'm just --

18          MR. GREEN:  It's for postage.

19          THE COURT:  I don't see what the connection is because

20    you didn't say it was for postage.

21          MR. GREEN:  It's for postage and it's got the

22    indication on the check itself.

23          THE COURT:  And so is that amount different than the

24    monthly amount in check number 154, 155, and 156?

25          MR. GREEN:  May I double-check, please?

—————— 2:19-cr-00295-GMN-NJK ——————

1           THE COURT:  Yes.

2           MR. GREEN:  Let me see the exhibits, please.

3           THE COURT:  Because that's the question the witness

4    [sic] is asking is this roughly a monthly postage cost, and if

5    the answer is yes, and, in fact, there's a different check that

6    shows, no, the numbers are very different, then, yes,

7    obviously, can you cross-examine.

8           MR. GREEN:  Indulgence, your Honor.  One moment.  We

9    have index here.

10          MR. FINLEY:  Your Honor, Mr. Green is still talking

11   about the Gold Rush and the juror's questions are about Glen

12   Burke.  They're two different clients.

13          MR. GREEN:  154, your Honor, is an e-mail.  155 is an

14   e-mail.  156 is an e-mail.  They're asking about the postage

15   cost and the postage costs are in there.  I'm just making a

16   point, your Honor.  We have to make a record.

17          THE COURT:  I don't understand your point.

18          So the postage cost that that's reflected in

19   Government's Exhibit 154, 155, and 156, what is that?

20          MR. GREEN:  I don't have that right in front of me,

21   your Honor, but I know it was a lot.  It was a lot.

22          And this one is -- this one on September 12th of 2016

23   was $1,647.00 written from the On The Side wire account to

24   Digital Express September 12, 2016, and it was signed by Sean

25   O'Connor, and it was deposited into the Digital Express

 1   account.

 2           THE COURT:  So is it --

 3           MR. GREEN:  I understand it's apples and orange.  I'm

 4   just saying we're getting into an area where we've been talking

 5   about a lot of postage and I want to make sure --

 6           THE COURT:  And I'm just trying to understand why you

 7   think that it's opening the door.

 8           So is the amount different?

 9           MR. GREEN:  Postage.  It's part of it.

10           THE COURT:  How different is it?

11           MR. GREEN:  Maybe it's part of the postage.

12           THE COURT:  How different is the amount?

13           MR. GREEN:  The e-mail is quite -- is quite -- a quite

14   a lot of postage.  I saw a reference in there of over

15   10,000-plus.

16           But it doesn't delineate -- the e-mails do not

17   delineate the exact postage -- excuse me -- does not delineate

18   to whom the postage was paid.  It just says postage.

19           THE COURT:  The question is not about who the postage

20   is paid.  The question is whether that's roughly a monthly

21   postage cost, what is reflected in Exhibit 154, 155, and 156.

22           So if you believe the answer should be no but the

23   witness is going to say yes, then you want to redirect with

24   something else to show the monthly cost is --

25           MR. GREEN:  All right.

──────── 2:19-cr-00295-GMN-NJK ────────

1    THE COURT:  -- different.  Then I understand that

2  would be appropriate, yes.

3    MR. GREEN:  Based on that, we'll withdraw the

4  objection.  I just wanted to make a record.  Thank you.

5    THE COURT:  Okay.  Jury note number 100 asks three

6  questions.

7    The first one is:  Have you ever witnessed any of the

8  four defendants, Miguel, Mario, Salvador Castro, and Jose Luis

9  Mendez, opening up prize envelopes with cash or checks at

10  Digital Express?

11    Any objection from the Government?

12    MR. FINLEY:  No, your Honor.

13    THE COURT:  Defense?

14    MR. TOMSHECK:  No.

15    MR. GAFFNEY:  No, your Honor.

16    MR. BROWN:  No, your Honor.

17    MR. GREEN:  No objection, ma'am.

18    THE COURT:  Number two.  Who controlled the bank

19  accounts for Digital Express?

20    Any objection from the Government?

21    MR. FINLEY:  No.

22    THE COURT:  Defense?

23    MR. TOMSHECK:  No objection.

24    MR. GAFFNEY:  No, your Honor.

25    MR. BROWN:  No, your Honor.

───────── 2:19-cr-00295-GMN-NJK ─────────

1          MR. GREEN:  No objection, your Honor.

2          THE COURT:  And number three.  Did you receive the

3    same amount of money if it was pay or profit?

4          Any objection from the Government?

5          MR. FINLEY:  No.

6          THE COURT:  Defense?

7          MR. TOMSHECK:  None.

8          MR. GAFFNEY:  No, your Honor.

9          MR. BROWN:  No objection.

10          MR. GREEN:  No objection, ma'am.

11          THE COURT:  All right.  Jury note number 101 asks five

12    questions.

13          The first one is:  Why would you suggest to Patti she

14    talk to Epi Castro to continue her fraudulent mailings versus

15    telling Epi about Patti's problem?

16          Any objection in the Government?

17          MR. FINLEY:  No.

18          THE COURT:  Any objection from the defense?

19          MR. TOMSHECK:  No, your Honor.

20          MR. GAFFNEY:  No, your Honor.

21          MR. BROWN:  No, your Honor.

22          MR. GREEN:  No objection.

23          THE COURT:  Number two.  If Patti was 30 percent of

24    the Castros, Mario's, business, where was the other business

25    coming from?

—— 2:19-cr-00295-GMN-NJK ——

1           Any objection from the Government?

2           MR. FINLEY:  No objection, your Honor.

3           THE COURT:  Defense?

4           MR. TOMSHECK:  No.

5           MR. GAFFNEY:  No, your Honor.

6           MR. BROWN:  No, your Honor.

7           MR. GREEN:  No objection, ma'am.

8           THE COURT:  Number three.  If Mario Castro was the

9   boss, how did Patti make the decision to pay you out of

10  profits?

11          Any objection from the Government?

12          MR. FINLEY:  No, your Honor.

13          THE COURT:  Defense?

14          MR. TOMSHECK:  No, your Honor.

15          MR. GAFFNEY:  No, your Honor.

16          MR. BROWN:  No, your Honor.

17          MR. GREEN:  No objection.

18          THE COURT:  Number four.  If paper for stock and

19  future jobs was needed, who would you notify?

20          Any objection from the Government?

21          MR. FINLEY:  No.

22          THE COURT:  Defense?

23          MR. TOMSHECK:  None.

24          MR. GAFFNEY:  No, your Honor.

25          MR. BROWN:  No, your Honor.

———— 2:19-cr-00295-GMN-NJK ————

1           MR. GREEN:  No objection, ma'am.

2           THE COURT:  And number five.  Did you do quality

3    control for all the fraudulent mailings along with Patti or was

4    anyone else involved with quality control?

5           Any objection from the Government?

6           MR. FINLEY:  No.

7           THE COURT:  Defense?

8           MR. TOMSHECK:  No objection.

9           MR. GAFFNEY:  No, your Honor.

10          MR. BROWN:  No, your Honor.

11          MR. GREEN:  No objection.

12          THE COURT:  Okay.  Jury note number 102 asks -- oh, it

13   is actually continuation of the one we did because it's

14   numbered.  That's nice.  Okay.  So this is actually six, seven,

15   and eight, but it's on jury note 102.

16          During the time of the mailings, was there competition

17   between printing companies to handle these accounts?

18          Any objection from Government?

19          MR. FINLEY:  No, your Honor.

20          THE COURT:  And defense?

21          MR. TOMSHECK:  No, your Honor.

22          MR. GAFFNEY:  No, your Honor.

23          MR. BROWN:  No, your Honor.

24          MR. GREEN:  No objection.

25          THE COURT:  Number seven.  As a worker for Mario

—— 2:19-cr-00295-GMN-NJK ——

1  Castro in her role in the mailing scheme, do you know why she

2  would get a quote from another printer?

3          MR. FINLEY:  No objection, Judge.

4          THE COURT:  I guess it's referring to Patti Kern.  Is

5  that how you read it?  Let me do it again.

6          As a worker for Mario Castro in her role in the

7  mailing scheme, do you know why she would get a quote from

8  another printer?

9          Any objection from the Government?

10         MR. FINLEY:  I agree, your Honor.  It's got to be her.

11  It couldn't be anyone else.

12         THE COURT:  Objection from the defense?

13         MR. TOMSHECK:  No.

14         MR. GAFFNEY:  No, your Honor.

15         MR. BROWN:  No, your Honor.

16         MR. GREEN:  No objection with the clarification, your

17  Honor.

18         THE COURT:  All right.  And then number eight is:

19  Would you consider Mario Castro and Patti's business together

20  the same as Mario Castro and Epi Castro's business with Dan

21  Wagner or Glen Burke?  If so, why?  And if not, why are they

22  different?

23         Any objection from the Government?

24         MR. FINLEY:  No objection.

25         THE COURT:  From the defense?

1          MR. TOMSHECK:  No, your Honor.

2          MR. GAFFNEY:  No, your Honor.

3          MR. BROWN:  No, your Honor.

4          MR. GREEN:  No objection.

5          THE COURT:  All right.  Jury note 103 asks four

6   questions.

7          The first one is:  You stated that you worked with

8   Jose Luis Mendez for many years.  Is that an accurate

9   statement?

10         Any objection from the Government?

11         MR. FINLEY:  No.

12         THE COURT:  Any objection from the defense?

13         MR. TOMSHECK:  No, your Honor.

14         MR. GAFFNEY:  No, your Honor.

15         MR. BROWN:  No, your Honor.

16         MR. GREEN:  No objection.

17         THE COURT:  Second question.  You stated that the

18  mailbox application for Advanced Allocation Systems

19  inaccurately described the business as involving health and

20  beauty sales.  Is that an accurate statement?

21         Any objection from the Government?

22         MR. FINLEY:  No.

23         THE COURT:  Any objection from the defense?

24         MR. TOMSHECK:  No, your Honor.

25         MR. GAFFNEY:  No, your Honor.

— 2:19-cr-00295-GMN-NJK —

1          MR. BROWN:  No, your Honor.

2          MR. GREEN:  No objection, your Honor.

3          THE COURT:  Number three.  Based on the many years

4    experience you had working with Jose Luis Mendez, would you

5    recognize his handwriting?

6          Any objection from the Government?

7          MR. FINLEY:  No objection.

8          THE COURT:  Any objection from the defense?

9          MR. TOMSHECK:  No.

10         MR. GAFFNEY:  No, your Honor.

11         MR. BROWN:  No, your Honor.

12         MR. GREEN:  No objection.

13         THE COURT:  And number four.  Were the words "health

14   and beauty sales" printed by Jose Luis Mendez or were those

15   words seemingly in his handwriting?  Was the signature of his

16   name seemingly in his handwriting?

17         Any objection from the Government?

18         MR. FINLEY:  No.

19         THE COURT:  Any objection from the defense?

20         MR. TOMSHECK:  No.

21         MR. GAFFNEY:  No, your Honor.

22         MR. BROWN:  No, your Honor.

23         MR. GREEN:  No objection.

24         THE COURT:  Jury note number 104 asks three questions.

25         The first one is:  Did the warehouse known as Digital

─────────────── 2:19-cr-00295-GMN-NJK ───────────────

1    Express print T-shirts, flyers, casino related materials, and

2    other jobs that were not fraudulent prize pieces?

3              Any objection from the Government?

4              MR. FINLEY:  No.

5              THE COURT:  Any objection from the defense?

6              MR. TOMSHECK:  None.

7              MR. GAFFNEY:  No, your Honor.

8              MR. BROWN:  No, your Honor.

9              MR. GREEN:  No objection.

10             THE COURT:  Number two.  Did Digital Express print car

11   wraps?

12             Any objection from the Government?

13             MR. FINLEY:  No.

14             THE COURT:  Defense?

15             MR. TOMSHECK:  No.

16             MR. GAFFNEY:  No, your Honor.

17             MR. BROWN:  No, your Honor.

18             MR. GREEN:  No objection.

19             THE COURT:  And number three.  You mentioned kickbacks

20   in your testimony today.  Describe that more specifically.  Who

21   made payments and to whom were the payments made?  What is your

22   definition of a "kickback"?

23             Any objection by the Government?

24             MR. FINLEY:  Yes, your Honor.  That's 404(b).

25             He's talking about something that was going on with

2:19-cr-00295-GMN-NJK

1   the Glen Burke scheme where Glen Burke would have too much

2   money wired from PacNet over to -- I believe it was National

3   Print Mail and then they would cash that money and then they

4   would give -- give some of that money back to Glen Burke.  So

5   they're hiding Glen Burke, essentially, and laundering money

6   for him.

7           So that's -- that's 404(b).  I don't think we need to

8   inject that into this trial, so I would object to that

9   question.

10          THE COURT:  What's the defense position?

11          MR. TANASI:  Judge, I think we would actually join

12  with the Government's concern and argument.

13          THE COURT:  All right.  Mr. Gaffney?

14          MR. GAFFNEY:  We would join, as well.

15          THE COURT:  Mr. Brown?

16          MR. BROWN:  Join, your Honor.

17          THE COURT:  Mr. Green?

18          MR. GREEN:  We join the Government's objection.  Thank

19  you.

20          THE COURT:  All right.  So I won't ask that question.

21          All right.  Jury note number 105 asks four questions.

22          The first one is:  In an e-mail dated 2-7-2012, you

23  stated, "I just went and checked the balance on the GAM

24  account.  It is $6,735.58."  Is this an accurate quote?

25          Any objection from the Government?

───────── 2:19-cr-00295-GMN-NJK ─────────

1              MR. FINLEY:  No, your Honor.

2              THE COURT:  Any objection from the defense?

3              MR. TOMSHECK:  No.

4              MR. GAFFNEY:  No, your Honor.

5              MR. BROWN:  No, your Honor.

6              MR. GREEN:  No, your Honor.

7              THE COURT:  Number two.  Were you an authorized person

8    to view a pre-paid postage account?

9              Any objection from the Government?

10             MR. FINLEY:  No, your Honor.

11             THE COURT:  Defense?

12             MR. TOMSHECK:  No.

13             MR. GAFFNEY:  No.

14             MR. BROWN:  No.

15             MR. GREEN:  No objection, your Honor.

16             THE COURT:  Number three.  Was a password or other

17   secured access information needed to view the account?

18             Any objection from the Government?

19             MR. FINLEY:  No objection.

20             THE COURT:  Defense?

21             MR. TOMSHECK:  No.

22             MR. GAFFNEY:  No.

23             MR. BROWN:  No.

24             MR. GREEN:  No objection, your Honor.

25             THE COURT:  And number four.  If yes, how was your

1  password first established?  Did you set it up personally or

2  was anyone else -- else's authority needed to get started?  If

3  so, who?

4           Any objection?

5           MR. FINLEY:  No objection.

6           THE COURT:  From the defense?

7           MR. TOMSHECK:  No.

8           MR. GAFFNEY:  No, your Honor.

9           MR. BROWN:  No, your Honor.

10          MR. GREEN:  No objection.

11          THE COURT:  Mr. Green, did you --

12          MR. GREEN:  No objection, your Honor.

13          THE COURT:  Sorry.  Didn't hear that one.

14          Jury note number 106 asks one question.  When you were

15  paid by Digital Express or any other letter shop owned by Mario

16  Castro at the end of a calendar year, did you receive a W-2 or

17  did you receive a Form 1099 reflecting the money that you

18  earned?

19          Any objection from the Government?

20          MR. FINLEY:  No, your Honor.

21          THE COURT:  Any objection from the defense?

22          MR. TOMSHECK:  No.

23          MR. GAFFNEY:  No, your Honor.

24          MR. BROWN:  No, your Honor.

25          MR. GREEN:  No objection.

1          THE COURT:  And jury note number 107 asks six
2    questions.
3          The first one is:  Are you aware if any of the
4    defendants were offered a cooperation agreement prior to this
5    trial?
6          I think that's not a question we can ask.  I won't ask
7    that question.  I'm writing my initials on it as a block.
8          Okay.  Second question.  Did you take directions from
9    Patti Kern?
10          Any objection from the Government?
11          MR. FINLEY:  No.
12          THE COURT:  Defense?
13          MR. TOMSHECK:  No.
14          MR. GAFFNEY:  I'm sorry, your Honor.  Could you read
15    that again?
16          THE COURT:  Yes.  Did you take directions from Patti
17    Kern?
18          MR. GAFFNEY:  No objection.
19          MR. BROWN:  No objection.
20          MR. GREEN:  No objection.
21          THE COURT:  All right.  Number three.  Why did you ask
22    Patti about trashing papers if Mario is the boss?
23          Any objection from the Government?
24          MR. FINLEY:  No.
25          THE COURT:  Defense?

1          MR. TOMSHECK:  No.

2          MR. GAFFNEY:  No, your Honor.

3          MR. BROWN:  No, your Honor.

4          MR. GREEN:  No objection.

5          THE COURT:  Okay.  The fourth question.  In 2009 when

6   Patti Kern got shut down, were the defendants receiving profit

7   checks and cash from that operation?

8          Any objection from the Government?

9          MR. FINLEY:  No.

10          THE COURT:  Defense?

11          MR. TOMSHECK:  No.

12          MR. GAFFNEY:  No, your Honor.

13          MR. BROWN:  No, your Honor.

14          MR. GREEN:  I'm sorry, your Honor.  It says in 2009

15   when she received that?

16          THE COURT:  Yes.  In 2009 when Patti Kern got shut

17   down, were the defendants receiving profit checks and cash from

18   that operation?

19          I don't know the answer so that's up to you to tell me

20   if there's an objection.

21          MR. GREEN:  Objection.  Outside the scope of this

22   conspiracy by virtue of the language on the indictment.  It's

23   in March of 2010.  Objection.

24          THE COURT:  What's the Government's position?

25          MR. FINLEY:  Your Honor, evidence of this nature has

1  previously been admitted over Mr. Green's similar objection.

2  And so it's -- you know, it's relevant.  It's been coming in

3  and the issue or one very close to it has already been decided

4  by your Honor.

5            THE COURT:  So is this included in the notice that my

6  order 509 addresses or is this different?

7            MR. FINLEY:  No.  It's -- this is her background, how

8  she met the defendants, the -- it's -- it's explaining how the

9  conspiracy began.  The conspiracy began in 2010.  And she got

10  shut down in 2009.  And then she needed to have a partnership

11  because she needed other people's names.  So that's been the

12  testimony.  It's not --

13            THE COURT:  So should the answer be no, that they were

14  not receiving profit checks and cash in 2009 when Patti Kern

15  got shut down because they didn't start up with her until

16  after?

17            MR. FINLEY:  That's -- that's what the answer is going

18  to be, yes.

19            THE COURT:  All right.  So Mr. Green, do you still

20  have an objection?

21            MR. GREEN:  I would hope that that would be the

22  answer --

23            THE COURT:  Okay.

24            (Court reporter interruption.)

25            MR. GREEN:  I hope that the answer to the question

─ 2:19-cr-00295-GMN-NJK ─

1  would be no, but once he makes his response, you can't

2  disregard the elephant which just walked through the courtroom.

3          THE COURT:  Is there any reason that he would say yes?

4          MR. FINLEY:  You know, I -- I never know what

5  somebody's going to say.

6          THE COURT:  Do you want me to ask the question in the

7  morning before we get the jury?

8          MR. FINLEY:  I have no reason to believe he would say

9  that.  If he was saying that, I think he'd be mistaken.  But...

10          MR. BROWN:  Your Honor, can I just make one point?

11          THE COURT:  Yes.

12          MR. BROWN:  It's seems that through the evolution of

13  this trial, the Government has had a theory that profits from

14  the fraud are not just, for example, checks that were from AAS

15  to my client, Mr. Mendez, but, in effect, that every paycheck

16  that my client received while working at the letter shop was,

17  essentially, profits from the fraud because the flyers were

18  being printed at the letter shop.

19          So I think that confuses the issue.  And if the

20  Government has had discussions with this witness and suggested

21  that that is the case, that every penny that my client received

22  while working at the letter shop is traceable to fraud, then he

23  may well say yeah.

24          THE COURT:  All right.  So when he arrives tomorrow

25  before we call in the jury, I will ask him this one question

—— 2:19-cr-00295-GMN-NJK ——

1   outside the presence of the jury so we know what the answer is

2   and then we can more carefully decide based on his answer

3   whether the question should be asked in front of the jury or

4   not.  So I put a little sticky on it so I'll remember to ask

5   tomorrow morning.

6           MR. TANASI:  Your Honor --

7           MR. GAFFNEY:  Well, perhaps -- your Honor, there was a

8   jury note that you had read just a minute ago that had to do

9   with asking Sean O'Connor when he was paid by Digital Express,

10  did you receive a W-2 or a 1099.

11          THE COURT:  Yes.

12          MR. GAFFNEY:  We may want to ask him that question

13  outside the presence of the jury, as well, because I think that

14  ties into the motion we filed regarding the potential

15  representations of our client, Miguel Castro's accounting

16  methods.  We certainly don't know what he's going to say, and

17  so I think out of an abundance of caution, that may be

18  something that we need to either reserve until -- I mean, I

19  guess we're not going to necessarily call him back, but that

20  question is potentially problematic given the pending motion

21  before the Court.

22          THE COURT:  All right.  All right.  So I do have that

23  here about the W-2 or 1099.  So I'll put a sticky on that one,

24  as well.

25          MR. GAFFNEY:  And there was also a 404(b) issue raised

──── 2:19-cr-00295-GMN-NJK ────

1   by the Government prior to trial that had to do with the

2   defendants getting cash and not paying taxes on that cash.  And

3   so I think that question may also be relevant to that 404(b)

4   issue, as well.

5            THE COURT:  Okay.  We'll ask him the question before

6   the jury arrives, and then depending on his answer, we can

7   address whether there's --

8            MR. GREEN:  Thank you for the suggestion, your Honor.

9            THE COURT:  -- an objection.

10           MR. GAFFNEY:  Thank you, Judge.

11           THE COURT:  All right.  So where did I leave off?

12           All right.  So next question is:  Why was Patti able

13   to make the decision to give you profits from AAS?

14           Objection from the Government?

15           MR. FINLEY:  No, your Honor.

16           THE COURT:  Any objection from the defense?

17           MR. TOMSHECK:  No.

18           THE COURT:  Mr. Gaffney, any objection?

19           MR. GAFFNEY:  No, your Honor.

20           MR. BROWN:  No, your Honor.

21           MR. GREEN:  No objection, your Honor.

22           THE COURT:  All right.  And then the last one is:  Why

23   did you take a deal saying you have a minor role knowing that

24   you have a major role?

25           Any objection from the Government?

─── 2:19-cr-00295-GMN-NJK ───

1              MR. FINLEY:  No objection.

2              THE COURT:  Any objection from the defense?

3              MR. TOMSHECK:  No.

4              MR. GAFFNEY:  No, your Honor.

5              MR. BROWN:  No objection.

6              MR. GREEN:  No objection, your Honor.

7              THE COURT:  All right.  Jury note number 108 asks five

8    questions.

9              The first one is:  You and the defendants would do

10   fraud work for Glen Burke, and after Glen got shut down, the

11   defendants opened their companies to start their own fraud

12   business?

13             Any objection?

14             MR. FINLEY:  No, your Honor.

15             THE COURT:  Any objection from the Government?  I

16   mean, from the defense.

17             MR. TOMSHECK:  No.

18             MR. GAFFNEY:  I'm sorry.  Could you read that one more

19   time?

20             THE COURT:  Yes.

21             You and the defendants would do fraud work for Glen

22   Burke.  After Glen got shut down, the defendants opened their

23   companies to started their own fraud business?

24             So they're trying to clarify in their mind, what did I

25   just hear.

———— 2:19-cr-00295-GMN-NJK ————

1          MR. GAFFNEY:  No objection, your Honor.

2          MR. BROWN:  No objection.

3          MR. GREEN:  No objection, your Honor.

4          THE COURT:  Number two.  Would you agree that the

5    defendants knew what they were doing was illegal since they

6    knew the risks and consequences?

7          Any objection from the Government?

8          MR. FINLEY:  No, your Honor.

9          THE COURT:  Any objection from the defense?

10         MR. TOMSHECK:  Yes, we have an objection to that

11   question.

12         THE COURT:  What is the objection?

13         MR. TOMSHECK:  Speculation.

14         MR. GAFFNEY:  Could you read the question again, your

15   Honor?

16         THE COURT:  Yes.  Would you agree that the defendants

17   knew what they were doing was illegal since they knew the risks

18   and consequences?

19         MR. FINLEY:  If it helps, I wouldn't object to you not

20   asking it.

21         THE COURT:  All right.  Anybody else want me to ask

22   it?

23         MR. GAFFNEY:  No, your Honor.

24         MR. BROWN:  Certainly not.

25         THE COURT:  Mr. Green?

 1           MR. GREEN:  We would request that the Court not ask

 2    that particular question.

 3           THE COURT:  All right.  So I'll write on that

 4    abstained.

 5           All right.  Number three.  Do you know if any of the

 6    defendants' wife knew they were -- what they were -- do you

 7    know if any of the defendant' wives knew they were doing a

 8    fraud business since, according to Mr. Green, the wives have no

 9    business in knowing what they do?

10           Any objection from the Government?

11           MR. FINLEY:  I think, based on the discussion we had

12    about the last question about, you know, testifying about what

13    other people knew, you know, if we're being consistent, we're

14    not going to ask that one either.

15           But I don't know.  We'll see what the --

16           THE COURT:  This one more specifically asks do you

17    know if any of the defendants' wives knew they were doing a

18    fraud business, so it's not asking them to speculate as much,

19    but I don't know.

20           What is the defense position on that.

21           MR. TOMSHECK:  If it helps, I agree with the

22    Government on this one.

23           THE COURT:  All right.  Mr. Gaffney?

24           MR. GAFFNEY:  Your Honor, I don't have an objection,

25    but I actually wanted to raise a concern about the previous

1    question that you were not going to ask.

2              THE COURT:  Uh-huh.

3              MR. GAFFNEY:  It seems to be the Court's practice that

4    you actually read the question into the record in front of the

5    jury and then proffer a reason why it's not being asked of the

6    witness.  That particular question, I think, it maybe best not

7    to ask at all.

8              THE COURT:  Okay.  That's fine.  I won't mention that

9    one.

10             MR. GAFFNEY:  Thank you, Judge.

11             THE COURT:  Is there any objection to the next

12   question about the wives knowing about businesses?

13             MR. GAFFNEY:  No, your Honor.

14             THE COURT:  Mr. Brown?

15             MR. BROWN:  No, your Honor.

16             THE COURT:  Mr. Green?

17             MR. GREEN:  No objection as proposed.

18             THE COURT:  All right.  Number four.  You mentioned

19   Mario told you they're after Glen, not us.  Did Mario think

20   they were coming after him and the scam team?

21             Any objection from the Government?

22             MR. FINLEY:  No, your Honor.

23             THE COURT:  Any objection from the defense?

24             MR. TOMSHECK:  Yes.  Same objection as before.

25   Speculation as to what Mario was thinking.

—— 2:19-cr-00295-GMN-NJK ——

1              MR. FINLEY:  I suppose the form could be changed a

2    little bit to get at the question without the speculation about

3    what someone's thinking.  In other words, what's his

4    impression.

5              THE COURT:  What's the defense position if I change

6    it?

7              MR. BROWN:  How would the changed question read, your

8    Honor?

9              THE COURT:  You mentioned Mario told you they're after

10   Glen, not us.  Do you know what Mario meant by that?

11             Or no?

12             MR. TOMSHECK:  It's the same objection.

13             MR. FINLEY:  What did you understand that to mean?

14             THE COURT:  All right.  Any objection from the defense

15   if I changed it to, what did you understand that to mean?

16             MR. TOMSHECK:  Mr. Tanasi wants you to read the whole

17   question again.

18             THE COURT:  Yes.  You mentioned Mario told you they're

19   after Glen, not us.  What did you understand that to mean?

20             MR. TANASI:  No objection as written, your Honor.

21             THE COURT:  All right.  Mr. Gaffney, any objection?

22             MR. GAFFNEY:  No objection, your Honor.

23             THE COURT:  Mr. Brown?

24             MR. BROWN:  No objection to that question, your Honor.

25             THE COURT:  Mr. Green?

2:19-cr-00295-GMN-NJK

1          MR. GREEN:  No objection, your Honor.

2          THE COURT:  All right.  Then number five.  Was Jose

3  Luis Mendez not mentioned in those e-mails because that wasn't

4  his role in the scam team?

5          Any objection from the Government?

6          MR. FINLEY:  No, your Honor.

7          THE COURT:  Any objection from the defense?

8          MR. TOMSHECK:  No.

9          MR. GAFFNEY:  No, your Honor.

10          MR. BROWN:  No, your Honor.

11          MR. GREEN:  No objection, your Honor.

12          THE COURT:  And then last question 109:  When you had

13  to stop a job, would you recycle the victim's names, addresses,

14  with the newly created business?

15          Any objection from the Government?

16          MR. FINLEY:  No objection.

17          THE COURT:  Any objection from the defense?

18          MR. TOMSHECK:  No.

19          MR. GAFFNEY:  No, your Honor.

20          THE COURT:  Mr. Brown?

21          MR. BROWN:  No, your Honor.

22          THE COURT:  Mr. Green?

23          MR. GREEN:  No objection, your Honor.

24          THE COURT:  All right.  So we're done.  That's all the

25  questions.

─── 2:19-cr-00295-GMN-NJK ───

1          Is there anything else that you want to address before

2     tomorrow morning?

3          MR. FINLEY:  Nothing from the Government, your Honor.

4          THE COURT:  All right.  So after Mr. O'Connor -- do we

5     have another Government witness or do we start with the defense

6     case?  And if we do start with the defense case, does the

7     defendant have a -- a witness besides the expert that won't be

8     here until Thursday?

9          MR. TOMSHECK:  They've got at least one more witness

10    that will take a couple hours, I think, is their estimate.

11         THE COURT:  Is that right?

12         MR. FINLEY:  That is correct.

13         THE COURT:  And then does defense have someone that

14    they can call after the Government's witness?

15         MR. TOMSHECK:  We still have to do openings.

16         THE COURT:  Oh.  Very good.  Okay.  Thank you for

17    reminding me.  All right.  So we'll do that then.

18         MR. BROWN:  Your Honor, we still don't know if the

19    Government is going to call the case agent.  We'd like some

20    clarity on that.

21         THE COURT:  Is there some clarity on whether

22    Mr. Bouchie is going to be called?

23         MR. FINLEY:  We haven't made a call on that yet, your

24    Honor, because, you know, his name gets mentioned a lot on

25    cross, and we don't know what issue we might need to call him

—— 2:19-cr-00295-GMN-NJK ——

1    on.  So we'll make a call about that after tomorrow.

2           MR. BROWN:  Makes preparing for cross-examination very

3    difficult, your Honor.

4           THE COURT:  Well, then we might have to take him out

5    of order for cross and take a break, because we're doing --

6    Thursday is the expert.

7           Is that going to be an all day thing or just a short

8    thing?

9           MR. TANASI:  No.  I think it might be an hour.

10          THE COURT:  Half day?

11          MR. TANASI:  An hour, two hours at the most.  I don't

12   think it will be very long.

13          THE COURT:  Okay.  But you're not calling -- well, I

14   guess you would call Mr. Bouchie tomorrow in the afternoon if

15   you were going to call him.

16          MR. FINLEY:  That's right.

17          MR. TOMSHECK:  Your Honor?

18          THE COURT:  Okay.  So if that happens, that would be

19   direct.  We wouldn't start cross until after the accounting

20   expert on Thursday.  And so if that's the case, then we need to

21   come back on Monday for cross, then we would have time.

22          What I'm saying is we'll cross that bridge when we get

23   to it, but it sounds like we don't know yet whether

24   Mr. Bouchie's going to testify, and based on that, you need to

25   have at least a little bit of prep time.

1          MR. TOMSHECK:  I think there's a very high likelihood

2    he testifies.  It's whether or not they call him.

3          THE COURT:  Okay.  Say that again.  There's a

4    likelihood he testifies regardless whether they call him?

5          MR. TOMSHECK:  Yep.

6          THE COURT:  Okay.

7          MR. TOMSHECK:  I think it's likely that someone calls

8    him.

9          THE COURT:  Right.

10          But I think that Mr. Brown's point was he needed some

11    time to prep if -- for cross if Mr. Bouchie's going to be

12    called, because if not, then he's preparing for other things.

13          Remind me who gave an opening and who didn't.

14          MR. BROWN:  I think we --

15          THE COURT:  Was Mr. Brown the only --

16          MR. BROWN:  I think so.

17          THE COURT:  Okay.  So we have three openings that we

18    still -- potentially.  You don't have to give any opening at

19    all, but if we were -- so there's three left that have not

20    given an opening?

21          Okay.  Well, I don't think we get to Bouchie's cross

22    this week anyway, but I will give you time if we do get

23    there --

24          MR. BROWN:  Thank you.  Yes.

25          THE COURT:  -- and it's a surprise.

1          MR. BROWN:  Perfect.

2          MR. ERICSSON:  Your Honor, Tom Ericsson for Miguel

3    Castro.

4          The issue of the timing of the determination on the

5    motion that we filed this morning, I know the Government

6    counsel had something about when they think they're going to

7    file a response, but I didn't hear.  We figured out when we

8    would be addressing that, but I do think that that could have

9    an impact on witnesses, order, and things of that nature.

10          THE COURT:  All right.  So when we're -- when were you

11    planning to have the response?

12          MR. ZYTNICK:  Tomorrow morning or midday at the

13    latest, your Honor.

14          THE COURT:  Okay.  So tomorrow morning or midday.  If

15    we need to take a longer lunch break, we can.

16          MR. ERICSSON:  Thank you.

17          THE COURT:  See you tomorrow morning at 9:00.

18          Off record.

19          (The proceedings concluded at 4:31 p.m.)

20                                    * * *

21

22

23

24

25

—————— 2:19-cr-00295-GMN-NJK ——————

--o0o--

COURT REPORTER'S CERTIFICATE


    I, SAMANTHA N. MCNETT, Official Court Reporter, United

States District Court, District of Nevada, Las Vegas, Nevada

certify that the foregoing is a correct transcript from the

record of proceedings in the above-entitled matter.


Date:  April 4, 2023


                              /s/ Samantha N. McNett
                              Samantha McNett, RPR, CRR, CCR