—2:19-cr-00295-GMN-NJK—

1                    UNITED STATES DISTRICT COURT

2                       DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,        )
                                     )   Case No. 2:19-cr-00295-GMN-NJK
5                Plaintiff,          )
                                     )   Las Vegas, Nevada
6        vs.                         )   Wednesday, April 5, 2023
                                     )   9:02 a.m.
7   MARIO CASTRO, SALVADOR           )
    CASTRO, MIGUEL CASTRO, and       )   JURY TRIAL, DAY 11
8   JOSE LUIS MENDEZ,                )   A.M. SESSION
                                     )
9                Defendants.         )   *C E R T I F I E D   C O P Y*

10  _____

11

12                   REPORTER'S TRANSCRIPT OF PROCEEDINGS

13                  THE HONORABLE GLORIA M. NAVARRO

14                   UNITED STATES DISTRICT JUDGE

15

16

17  APPEARANCES:        See Pages 2 and 3

18

19

20

21

22  COURT REPORTER:     Patricia L. Ganci, RMR, CRR
                        United States District Court
23                      333 Las Vegas Boulevard South, Room 1334
                        Las Vegas, Nevada  89101
24
    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

—2:19-cr-00295-GMN-NJK—

1  APPEARANCES:

2  For the Government:

3        **MINA CHANG, AUSA**
          UNITED STATES ATTORNEY'S OFFICE
4        501 Las Vegas Boulevard South, Suite 1100
          Las Vegas, Nevada  89101
5        (702) 388-6336

6        **TIMOTHY T. FINLEY, ESQ.**
          **DANIEL E. ZYTNICK, ESQ.**
7        U.S. DEPARTMENT OF JUSTICE
          950 Pennsylvania Avenue, N.W.
8        Washington, D.C.  20530
          (202) 307-0050

9
   For Defendant Mario Castro:
10
         **JOSHUA L. TOMSHECK, ESQ.**
11       HOFLAND & TOMSHECK
          228 South 4th Street
12       Las Vegas, Nevada 89101
          (702) 895-6760
13
         **RICHARD E. TANASI, ESQ.**
14       TANASI LAW OFFICES
          8716 Spanish Ridge, Suite 105
15       Las Vegas, Nevada 89148
          (702) 906-2411
16
   For Defendant Salvador Castro:
17
         **DONALD J. GREEN, ESQ.**
18       LAW OFFICES OF DONALD J. GREEN
          4760 South Pecos Road, Suite 103
19       Las Vegas, Nevada 89121
          (702) 388-2047
20
   ////
21

22

23

24

25

———2:19-cr-00295-GMN-NJK———

1  For Defendant Miguel Castro:

2        **LUCAS GAFFNEY, ESQ.**
         GAFFNEY LAW
3        9900 Covington Cross Drive, Suite 290
         Las Vegas, Nevada 89144
4        (702) 742-2055

5        **THOMAS A. ERICSSON, ESQ.**
         THOMAS A. ERICSSON, CHTD.
6        9900 Covington Cross Drive, Suite 290
         Las Vegas, Nevada 89144
7        (702) 878-2889

8  For Defendant Jose Luis Mendez:

9        **CHRISTOPHER MISHLER, ESQ.**
         **WILLIAM H. BROWN, ESQ.**
10       BROWN MISHLER, PLLC
         911 N. Buffalo Drive, Suite 202
11       Las Vegas, Nevada 89128
         (702) 816-2200
12

13

14

15

16

17

18

19

20

21

22

23

24

25

2:19-cr-00295-GMN-NJK

1                          INDEX OF EXAMINATIONS

2   CONTINUED TESTIMONY OF SEAN O'CONNOR
        Jury Questions....................................12
3       Redirect Examination by Mr. Finley................41
        Recross-Examination by Mr. Brown..................43
4       Recross-Examination by Mr. Gaffney................45
        Recross-Examination by Mr. Green..................48
5       Recross-Examination by Mr. Tomsheck...............55

6   TESTIMONY OF KEVIN TOWERS
        Direct Examination by Ms. Zytnick.................74

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       LAS VEGAS, NEVADA; WEDNESDAY, APRIL 5, 2023; 9:02 A.M.

2                              --oOo--

3                      P R O C E E D I N G S

4       COURTROOM ADMINISTRATOR:  All rise.

5       THE COURT:  Thank you.  You may be seated.

6       Good morning.  We're still missing Juror Number 9, but

7   since we were going to ask a couple of questions of the witness

8   outside the presence of the jury anyway, I figured we could go

9   ahead and get started.  And then when my law clerk comes in with

10  the thumbs-up, that means we have Juror Number 9 has finally

11  arrived, and then we'll know that they're all here.

12          (Witness takes the stand.)

13      THE COURT:  Just go ahead and have a seat, Mr. Connor

14  [sic].  I do remind you, you are still under oath.  So go ahead

15  and have a seat.

16          And just for the record, does the Government agree that

17  everybody is present so that we don't have to waste time on

18  putting the presence on the record, everybody's here?

19      MR. FINLEY:  Yes, Your Honor.

20      THE COURT:  And, Mr. Tanasi, you agree that all of the

21  Defense counsel are here?

22      MR. TANASI:  Yes, Your Honor.

23      THE COURT:  Okay.  So, Mr. Connor, we have a couple of

24  questions here that the jury asked.  I don't know what your

25  answer's going to be, and depending on your answer, then I have

—2:19-cr-00295-GMN-NJK—

 1  to make a legal ruling.

 2          THE WITNESS:  Okay.

 3          THE COURT:  So we're going to ask you these questions

 4  outside the presence of the jury, and we may or may not ask you

 5  again, you know, when the jury is here.

 6          So the first question is from Jury Note 106:  When you

 7  were paid by Digital Express or any other letter shop owned by

 8  Mario Castro, at the end of a calendar year did you receive a

 9  W-2 or did you receive a Form 1099 reflecting the money that you

10  earned?

11          THE WITNESS:  Once I opened On The Side and I put the

12  payroll -- my checks from Mario Castro, I put them into -- On

13  The Side.  And then I wrote myself a payroll check out of there

14  with taxes taken out, so like an invoice, subcontractor, I guess

15  you would call it.  Before then, I would have regular checks

16  with taxes taken out -- taken out.  Sorry.

17          Uhm.  Before that time frame of On The Side and when

18  Glenn Burke got shut down and all of that.

19          THE COURT:  Okay.  So did you ever -- were you ever

20  issued a W-2 or a Form 1099 from Digital Express?

21          THE WITNESS:  From Digital Express, I don't believe so,

22  no.

23          THE COURT:  Okay.  And then the other jury question we

24  want to ask you outside the presence of the jury is from Jury

25  Note Number 107:  In 2009, when Patti Kern got shut down, were

—2:19-cr-00295-GMN-NJK—

1  the defendants receiving profit checks and cash from that

2  operation?

3          THE WITNESS:  No.  That was strictly Patti's business

4  with whoever else she had business with.  I don't know.

5          THE COURT:  Okay.

6          So does the Government have any objection to the two

7  questions that I asked?

8          MR. FINLEY:  No, Your Honor.

9          THE COURT:  Okay.  And does the Defense have any

10 objection to the two questions that I asked?  Mr. Tanasi?

11         MR. TANASI:  No, Your Honor.

12         THE COURT:  Mr. Gaffney?

13         MR. GAFFNEY:  Your Honor, I think Juror Question 106

14 still poses a problem.  If he's saying that he never got a 1099

15 from Digital Express, I think the inference is that our client,

16 Miguel Castro, is doing the accounting for Digital Express at

17 that time.  And that rolls right into the issue for which

18 there's a motion pending before the Court.

19         THE COURT:  All right.  And, Mr. Brown or Mr. Mishler,

20 do you have any objection?

21         MR. BROWN:  No, no objection, Your Honor.  Thank you.

22         THE COURT:  And, Mr. Green, any objection?

23         MR. GREEN:  No objection, ma'am.

24         THE COURT:  So what's the Government's response to

25 Mr. Gaffney's objection?

```
                    ─────2:19-cr-00295-GMN-NJK─────
```

1          MR. FINLEY:  I think the likelihood of the jury

2    inferring that there's some kind of accounting fraud just from

3    that answer is pretty slim.  So I don't -- I don't object to the

4    juror question.  But whatever Your Honor decides about it, it

5    will be just fine with us.

6          MR. GAFFNEY:  And, Judge, it's not necessarily just the

7    accounting issue, but we're also potentially talking about tax

8    evasion as well.

9          THE WITNESS:  Could I say something else, Your Honor?

10         THE COURT:  All right.  Now, we've got --

11         THE WITNESS:  Okay.

12         THE COURT:  I'm -- so I'm mindful of the concern that

13   Mr. Gaffney presents about Miguel Castro's accounting.

14         The problem I foresee is that the -- I guess we'll

15   respond to this after the Government's response is filed.  We

16   can address it a little bit more.

17         (Pause.)

18         MR. ZYTNICK:  And, Judge, just to let you know, right

19   before you took the bench I did file that brief.

20         THE COURT:  Okay.  I haven't read it yet.  I'm sorry.

21         MR. ZYTNICK:  It was, I mean, seconds before we took

22   the bench.  So if you wanted us to do -- present oral argument

23   or something like that, we could do that, but it's your

24   discretion.

25         THE COURT:  All right.  Let's go ahead and look at

─────2:19-cr-00295-GMN-NJK─────

1  that.

2          (Pause.)

3          THE COURT:  All right.  Well, it sounds as if the

4  Government agrees with my original hunch, that this is

5  inextricably intertwined.  I think there is a difference between

6  information about Digital Express accounting versus information

7  about the Henderson Foods' accounting.  So I'm looking only at

8  this question.  Actually, let me clarify.

9          Mr. Connor, you never worked for the Henderson Foods

10  Company, did you?

11          THE WITNESS:  Never.

12          THE COURT:  Okay.  So this question -- Jury Question

13  Number 109 is relating only to Digital Express and the

14  legitimacy of the business operation is central.  It's the focus

15  of this case is whether or not there was a fraud, whether there

16  was knowledge of a fraud, or whether it was a legitimate

17  business.  And that's been the theory, you know, from the start.

18          So I think that it is relevant and inextricably

19  intertwined, and I will ask the question on Jury Note 106.

20  Later we can talk a little bit more about the Henderson Foods.

21  Well, I guess the Government would say it is moot because it

22  agrees with the relief requested, that it is not going to be

23  mentioning it or bringing it up anymore, asking any other

24  questions about the accounting relating to Henderson Foods.

25          So I guess the -- now what is the motion number here?

—2:19-cr-00295-GMN-NJK—

1          MR. ZYTNICK:  689.

2          THE COURT:  689.  So the motion in limine, 689, is

3   denied.

4          MR. ERICSSON:  Your Honor, may we be heard on this

5   motion?

6          THE COURT:  Well, if you want to make another record.

7   You've already submitted a -- you know, we made the oral motion

8   and then we talked about it again once we had the transcript.

9   Then you did a written motion.  So we've talked about it enough

10  for now.  If you want to add something else to it during the

11  break, we can do that, but we've got all of the jurors here --

12  right, John?

13         THE LAW CLERK:  Yes.

14         THE COURT:  Okay.  So let's go ahead and bring the jury

15  in so that we can finish up with Mr. O'Connor.

16         (Whereupon jury enters the courtroom at 9:12 a.m.)

17         THE COURT:  All right.  Everyone may be seated.

18  Welcome back.  We've got the jury here as well as Mr. O'Connor

19  on the stand.  And I do remind you, sir, that you are still

20  under oath.

21         Let's have the Government, please, place their presence

22  on the record for the jury, and then we'll have the Defense as

23  well.

24         MR. FINLEY:  Thank you, Your Honor.  Good morning.

25         THE COURT:  Good morning.

—2:19-cr-00295-GMN-NJK—

1           MR. FINLEY:  Tim Finley, Dan Zytnick, Mina Chang, Barry

2  Bouchie, Erica Rush for the United States.

3           THE COURT:  Good morning.

4           MR. TANASI:  Thank you, Your Honor.  Good morning,

5  ladies and gentlemen.  Rich Tanasi and Josh Tomsheck for Mario

6  Castro.  Also with us is Bryan Glynn.  Thank you.

7           THE COURT:  Thank you.

8           MR. GAFFNEY:  Good morning, Your Honor.

9           THE COURT:  Good morning.

10           MR. GAFFNEY:  Good morning, ladies and gentlemen.

11           Lucas Gaffney and Thomas Ericsson on behalf of Miguel

12  Castro.  Thank you.

13           MR. BROWN:  Good morning, Your Honor.

14           Good morning, everyone.  Will Brown and Chris Mishler

15  for Jose Luis Mendez.  Also with us, Rich Beasley and Lisa

16  Smith.

17           MR. GREEN:  Good morning, Your Honor.

18           Good morning, ladies and gentlemen of the jury.  Don

19  Green again on behalf of Mr. Salvador Castro, and with me today

20  is Investigator Charlene Gonzalez.

21           THE COURT:  Thank you.  Good morning.

22           MR. GREEN:  Good morning, Your Honor.

23           THE COURT:  All right.  So you'll recall that last

24  night we received some jury notes -- not last night -- yesterday

25  afternoon.  We received some jury notes here.  I have had a

 1  chance to go over them with the attorneys.

 2        And so now I'm going to ask these questions,

 3  Mr. O'Connor, to you on the record because they are anonymous

 4  questions.  But when you respond, you should turn and face the

 5  jury and respond to them because these are really jury

 6  questions, not mine.

 7                          JURY QUESTIONS

 8        THE COURT:  So Jury Note Number 93 asks two questions.

 9  The first one is:  Did your buddy from high school ever open any

10  business related to mail fraud?

11        THE WITNESS:  Uhm.  Mike Ladomerszky, I don't believe

12  he ever opened one.  I never worked for -- didn't work for one

13  of his companies, if he did.  So my understanding is, no, he did

14  not.

15        THE COURT:  And Question Number 2 is:  Did your buddy

16  from high school ever open bank accounts related to fraud

17  companies that you or your clients were involved in?

18        THE WITNESS:  To my knowledge, also, he did not.  He

19  was always the artist.  And he did this -- on these e-mails you

20  see presently were for when he also worked for I believe the

21  Excalibur as a pit boss.  So he never was part of that side of

22  the business.

23        THE COURT:  All right.  Jury Note Number 94 asks four

24  questions.  The first one is:  What is the defendants' role and

25  yourself?  So I think it's asking the difference between your

—2:19-cr-00295-GMN-NJK—

1    role and the role of the defendants.  And if you could be

2    specific one by one instead of lumping them altogether.

3             THE WITNESS:  Uhm.  My role at the company was to, uhm,

4    as discussed in my -- before, I did the data work.  I did the

5    setups.  And I was face-to-face with the clients.  Uhm.

6             As far as I understood it, Mario was manager, you know,

7    uhm, some face-to-face with the clients, uhm, also trying to get

8    other businesses going while running the mailing company.  Uhm.

9             Miguel Castro, as I understood it, personnel,

10   management, management of the business, accounting, uhm, paying

11   the bills, basically.

12            Uhm.  Jose Luis Mendez was the machine operator of the

13   OCE, uh, I would say 90 percent of the time, when it ran.  Uhm.

14   Also working on the burster and the inserters for the day-to-day

15   mailings.  Uhm.  One of his other duties was to gather paper and

16   envelopes from the warehouse, pull it in so we could do it

17   and -- you know, where the inserters were.  Uhm.

18            Salvador Castro, as I said previously, I didn't see him

19   very often.  He -- he would help pull the stock, I remember, you

20   know, a few times, uhm, help trash the stock or recycle the

21   stock.  And sometimes he would tinker with the letter shop

22   machines also, inserters and whatnot.  Uhm.

23            That's how I remember it.

24            THE COURT:  Okay.  Question Number 2 asks:  You said

25   that 98 percent is fraud income from victims.  So is only 2

 1  percent from legal job work?

 2       THE WITNESS:  That was my estimate.  Uhm.  I didn't see

 3  Mario -- I didn't see many jobs that I saw that were, uhm, not

 4  one of these sweepstakes prize notice mailers through the years.

 5  Uhm.  At points we had a wide-format press printer.  You know, I

 6  told with you the car wraps and, et cetera, uhm, banners, uhm.

 7       And then at one other point we had -- Mario had

 8  purchased a small printing press to try to do some other work,

 9  you know, uhm -- I'm trying to think of what it -- I can't

10  remember what it was called.  There was a few letters.  But

11  there was a -- like, a booklet, you know, a handout for

12  something.  I can't remember what it was.

13       So in my recollection, 90 to 98 percent of the business

14  was fraudulent mail.

15       THE COURT:  Question Number 3 asks:  Why is there so

16  many post office mailboxes across the country?

17       THE WITNESS:  I think we talked about it a little bit

18  in my initial testimony on Monday.  Uhm, the mail, in the very

19  way back beginning, used to come into one location.  And if

20  somebody from the Postal Service came into that box, that's

21  where their lead would start.  They would find the return mail

22  and they would know there's something at this address, and they

23  would go to that address and seize all of that mail.

24       Uhm.  And, of course, it had checks and money in it.

25  So as my understanding through the years was you spread that

—2:19-cr-00295-GMN-NJK—

 1   around.  Like the company would spread work around across

 2   different countries, we'd spread it around the United States.

 3   And if they got that box, they wouldn't seize all of the mail.

 4   That's one reason.

 5        Uhm.  Another reason is, uhm, these little post office

 6   boxes are run by normal people that would get, you know, the

 7   little boxes you see.  You see them at the UPS store or whatnot

 8   where you go in and send a FedEx.  They have little boxes there.

 9   And they are little boxes.

10        When they get a tray of mail, which is approximately

11   500 pieces, they kind of freak out about it, like, "What is all

12   of this mail for?"  You know, because they're used to getting

13   fix or six letters for an individual post office box.  So you

14   didn't want trays and trays of returned mail going to one box.

15        Uhm.  And the third reason was -- well, it's kind of

16   the first reason, to -- to keep it moving.  And there's always

17   different partnerships, different companies.  So you didn't want

18   the same company, you know, and all its DBAs going to the same

19   box.

20        And I guess you could say that goes back to, uhm,

21   keeping it -- the mail thin, as we -- as I called it, uhm, and

22   to negate as much damage as possible.  I know it's a terrible

23   way to look at it, but that's the truth.

24        THE COURT:  All right.  And the last question, Jury

25   Note Number 94, asks:  What is a hotline order?

─────2:19-cr-00295-GMN-NJK─────

1        THE WITNESS:  I will say this is -- this is probably

2   one of the -- the questions that gets asked a lot.  Uhm.  It's

3   an industry term from before I started doing this.  It's

4   basically once a month all these companies send their buyers and

5   their frees, because back then there was frees.  There was

6   people that entered without purchase.  And to a broker -- and

7   maybe you've heard this name or not.  One of them was Savoy

8   Lists out of New York.  And they would take all of these names

9   and sell them, and sell them to other mailers.  And they were

10  called a hotline.  You were purchasing a list of names that you

11  thought were buyers of other promotions.

12        So that's where the term "hotline" came from.  And

13  uhm -- well, as I understand it.  It might be back to

14  telemarketing, kind of the same business back in the early '90s.

15  Uhm.

16        So it's purchase lists.  You would mail them.  And it

17  would usually be the bigger jobs.  That's why myself and

18  defendants all knew they were coming.  Once a month we would get

19  a hotline.

20        During this time period, only one of the companies or

21  two of the companies, uhm, one of Patti and her -- and her

22  partner, whoever -- which company that was, and Dan would mail a

23  hotline.  That's where you see the mailings, and they would be,

24  like, 40,000 pieces.

25        I don't know if I'm going too long here, but those jobs

 1  were the most at-risk jobs because you would mail 40,000 pieces

 2  and get a low response, because the people you didn't know were

 3  actual buyers.  You were trusting the broker.  You were trusting

 4  the other people that sold the names to those -- to that

 5  broker -- or the broker represented back to you.

 6         But none of these mailers, clients, I'll call them, is

 7  what I call them, they didn't trust each other.  So they used a

 8  broker.  Like when you buy a house, there's a broker in between

 9  you and the person selling the house.  There's a broker.  So the

10  hotline is a purchase of names to distill it of other lists of

11  people that mailed the same people that you're trying to mail.

12         Does that answer that question, I hope?

13         THE COURT:  All right.  Jury Note Number 95 asks four

14  questions.  The first one is:  When you got rid of stock and all

15  paperwork after a cease and desist order, did you toss it out,

16  shred, burn?

17         THE WITNESS:  Early on, uhm, when recycling was first

18  starting out big, paper was very heavily recycled here in the

19  Valley.  And they would actually pay, uhm, for that paper and

20  for those envelopes, and they would recycle them.  They're --

21  Las Vegas -- they would take it to the recycling facility here

22  in Las Vegas.

23         And sometimes -- I don't know how many people have seen

24  a pallet, but a pallet of mail is a four-by-four pallet, six

25  feet high.  It's full of paper.  It's 2,000 pounds of paper.  So

—2:19-cr-00295-GMN-NJK—

 1  as you -- if you're getting paid a dime a pound, that's, you

 2  know, $200 of recycling paper.  So it was all recycled.

 3         Later on, there's questions of where -- not my -- I'm

 4  just saying in terms of what was happening is the paper was

 5  less.  The amount of stock that was preprinted was brought down,

 6  so it became less and less.  But, yes, we recycled some way, in

 7  some form.  We didn't just burn it or shred it.  It got

 8  recycled.

 9         THE COURT:  All right.  And then the next question is:

10  Was Mario, Miguel, Salvador Castro, and Mr. Mendez already in

11  the printing business prior to?

12         THE WITNESS:  I thought we touched on that.  As I

13  understand it, uhm, Mario, Miguel -- I'm not sure about

14  Salvador -- Jose Luis Mendez had a letter shop in California.  I

15  know there's some terms there:  "mail shop," "letter shop,"

16  "printing shop."  They're all kind of confusing.  Uhm.

17         As far as I understood it, they had a company in

18  California that was just a letter shop, which means they just

19  did the inserting of the forms in California under the name of

20  American Quality Communications, Inc., as far as I understand

21  it.

22         THE COURT:  Okay.  So just to clarify, you believe that

23  Mario and Miguel did, but you don't know if Salvador or

24  Mr. Mendez did?

25         THE WITNESS:  That's correct.

 1          THE COURT:  Third question is:  Did your family know
 2    what you were doing?
 3          THE WITNESS:  Obviously my kids didn't.  My wife knew a
 4    little bit about what was going on.
 5          Uhm.
 6          THE COURT:  The last question is:  Was a search warrant
 7    served at your house?  And if so, what, if anything, was taken?
 8          THE WITNESS:  Uhm, my house was not searched by the
 9    Government.  Uhm.
10          THE COURT:  Okay.  Jury Note Number 96 asks:  Why would
11    Jose Luis Mendez have an outside printing company, such as
12    Western, do his print jobs for AAS when he is part of a printing
13    company already?
14          THE WITNESS:  That touches on a lot of subjects.
15    That's a lot to unpack.  Uhm.  I guess I'll just say that there
16    was a lot of infighting between the family, you know.  And I
17    remember that e-mail and I was like, you know.  It says, "If
18    you, Sean, want to move it to Western, I'll do it right now."
19          But ultimately I would ask Mr. Jose Luis Mendez if he
20    wanted to move it to Western because it's his family.  His wife
21    is related by blood to these -- the Castros.  Uhm.
22          So the reason why was to cut his brothers out of the
23    business.  That's the honest truth.  There was other instances
24    of this that -- that would -- that would -- that come to mind.
25    They're not having to do with these particular brothers.  But

—2:19-cr-00295-GMN-NJK—

1  that's why, to move to Western Mailing.  Uhm.

2        THE COURT:  All right.  Jury Note Number 97 asks:

3  Sean, why did you continue to work at the shop after the

4  difficulties started?

5        THE WITNESS:  The difficulties I guess you're referring

6  to is 2016, when I testified before the grand jury.  Uhm.  The

7  honest truth is we needed the money.  Uhm.  My wife was still

8  not working.  Having a hard time finding a job.  She found --

9  sorry.

10        She found a job one week before Barry and Terry showed

11  up at our door.  She still has that job to this day, which is

12  good.  Uhm.

13        That's the truth.

14        THE COURT:  All right.  Jury Note Number 98 asks two

15  questions.  The first one is:  Do you know if the Castros -- and

16  again, I'll ask you to be specific about each one.  Do you know

17  if the Castros already previously had a print shop or was your

18  business their first print shop?

19        Print shop -- so "your business" referring to the print

20  shop that they bought.

21        THE WITNESS:  Uhm, I think that's answered in the

22  previous question.  As far as I understand, they had a letter

23  shop in California.  As for the print shop, I'm not sure what

24  Epi had before he came to Nevada.  I'm not sure what was going

25  on there.  He seemed to know the business of printing very well,

—2:19-cr-00295-GMN-NJK—

1  and he ran his print shop and had envelope printers and presses

2  for printing the stock.

3         THE COURT:  Okay.  So you mentioned Epi Castro.  Any of

4  the defendants here, did they already previously have a print

5  shop?

6         THE WITNESS:  I'm not sure.  Uhm.  I -- I -- I remember

7  conversations about the ownership of the envelope printers.

8  They're called Jets.  Uhm.  But I'm not sure who owned them

9  before they were brought to Nevada, before they were installed

10 in Epi's shop.

11        THE COURT:  Okay.  The second question is:  How did you

12 become a partner with the defendants?  Was it invest financially

13 or did they take you on to keep you quiet?  So how did you

14 become a partner with the defendants?

15        THE WITNESS:  I guess when they purchased the company

16 from Raphael Rodriguez, I became an employee.  And then that

17 time period when -- when the Castros started to become partners

18 with Patti, Patti Kern, uhm, I was offered, as in my testimony,

19 part of Jose Luis's company.

20        My original idea was that I would sell those promotions

21 to Patti -- a promotion -- a working promotion at this time,

22 Patti would buy from other -- Todd Creates, other people for

23 $3,000.  That was the original thought in my head.  And then

24 when she offered me the money to become profiteer in it, I took

25 it.

─2:19-cr-00295-GMN-NJK─

1          THE COURT:  Jury Note Number 99 says:  Sean, are you

2    certain that Patti was paying you the profits?

3          THE WITNESS:  No.  I didn't see the accounting.  Uhm.

4    I would say she offered me the profits.  I don't know what

5    percentage was mine.  It didn't matter.

6          Again, I was happy to get what I was getting.  And,

7    obviously, over the course of four years it was some $60,000.

8          THE COURT:  So it says:  Since she -- so we assume it's

9    referring to Patti.  Since she had come and gone before you

10   arrived, someone else, like a defendant, may have left the

11   envelope for you?  Yes, question mark.

12         THE WITNESS:  Yes.  Uhm.  Sometimes, like I said, the

13   envelope would be there.  Uhm.  Or I would deliver invoices to

14   her house.  Because it was slow.  We didn't have a lot of work.

15   You know, I knew where she lived, and she'd give me the envelope

16   then.

17         Or even Edgar del Rio, I don't know if you guys

18   remember that name, he would see her more often than I would

19   because I was working full-time.  He was still doing his thing,

20   printing.  Uhm.  He would give it to me because he was close to

21   my office when I was working at Las Vegas Color Graphics.

22         THE COURT:  Okay.  The next question refers to

23   Government's Exhibit 428.  If we could put that up for the

24   witness.

25         Yes, 428.  And the question is:  How is printing

─2:19-cr-00295-GMN-NJK─

1  different from letter shop?  But I'll give you a chance -- wait

2  a moment so you can see what 428 is.

3          THE WITNESS:  Right.  So in this -- this image here,

4  it's different names for the letter shop and then single name

5  for the printing.  The letter shop is -- is where -- let me

6  start with the printing, actually.

7          So the printing is where the envelopes get printed with

8  the addresses that are not variable.  It's always the same

9  address for that job, for that piece.  And the forms are always

10  the same for that job, that piece.  We'll order, at this time,

11  later, you know, 20,000 pieces of this form, this envelope and

12  this envelope.  No variable.  Nothing changes on those.  It's

13  just, you know, written signatures -- or, you know, signatures,

14  graphics to look, you know, nice, exciting, uhm, et cetera.

15          Then you think about -- that was all done there, right,

16  at New Generation Graphics.  Or wherever.  We could get it

17  printed everywhere.  Patti used to get hers printed in Arizona,

18  just for example, at a printing place.

19          Then a letter shop would actually take those preprinted

20  forms with all that graphics and everything.  And usually, in

21  our case, we were just adding the black, the -- the variable

22  data, the person's name.  You know, Sean at this address, "Dear

23  Sean," you know.  Uhm.  "We have exciting news for you, Sean."

24          Anything that would change, we would add.  And the OCEs

25  only printed black.  So you think of when you go back to when we

—2:19-cr-00295-GMN-NJK—

1   had old laser printers, they just printed black.  And then we
2   had color printers now that can print full color.  We had to do
3   it separately.  Once I printed color, printing shop, letter
4   shop, printed black.

5          And then the letter shop would in turn take those, fold
6   them down, stick them in an envelope, and send them to the mail.
7   And the term "letter shop" and "mail shop" are kind of
8   interchangeable, because almost all letter shops became mailing
9   houses also, and the mailing house term just comes from actually
10  putting something into the mail.

11         Sometimes you would -- a letter shop would fold
12  something down and give it to the client for a handout, a folded
13  piece that you would see at 7-Eleven.  And they would open --
14  you know, they would take it and stick it in there.  They
15  wouldn't deliver it to somebody at their house.  That's the main
16  difference that comes to mind.

17         THE COURT:  Okay.  The third question on Jury Note 99
18  asks:  Which defendants ran machines?  And please be specific.

19         THE WITNESS:  Jose Luis Mendez almost exclusively ran
20  the OCE printer, the laser printer, the variable printer.  I've
21  seen him a few times when I was there full-time, uhm, running
22  the bursters and inserters.  Uhm.

23         Miguel Castro, I don't think I've ever seen him run a
24  machine other than a computer to do the accounting day-to-day
25  business.  Uhm.  Miguel Castro -- I'm sorry, I said Miguel

1  Castro.

2        Mario Castro, he was a mechanic, there's no doubt about

3  it.  And he would keep the machines running, help Jose Luis

4  Mendez keep the machines running.  I seen him run a few jobs.  I

5  think he ran the lasers, the OCEs, a few times when Jose Luis

6  Mendez was on vacation or whatever, or myself.  Uhm.

7        And I seen him, you know, run the inserters, make them

8  run, because they were temperamental machines.  They were 30

9  years old.  They were -- it would be great if you guys had an

10  actual tour of a letter shop.  It's -- it's pretty amazing.

11  Uhm.  A legitimate letter shop, of course.

12        Salvador Castro, I seen him, you know, run the

13  letter -- the inserters or bursters also.  Not day-to-day, not

14  every day, you know.  Most of the work was done by Jose Luis

15  Mendez, to be honest with you.

16        Uhm.  And that's -- that's all four defendants.

17        THE COURT:  Okay.  The next question refers to

18  Government's Exhibit 154, 155, and 156.  So if we could put

19  those up for the witness.

20        Okay.  So that's 154.  And then now we're showing you

21  155.

22        (Pause.)

23        THE WITNESS:  Okay.  So --

24        THE COURT:  Hold on.  No, no.  There's no question yet.

25        THE WITNESS:  I'm sorry.

1          THE COURT:  And there's also 156.

2          THE WITNESS:  I'm sorry.

3          THE COURT:  All right.  So the question is:  The

4   postage costs that we saw in Government's Exhibit 154, 155, and

5   156, is that a rough monthly postage cost?

6          THE WITNESS:  Uhm.  Can you go back to 155?

7          That's a good example there of, uhm, the postage costs

8   of a month of Glenn Burke's operation at that time, his four,

9   uhm, DBAs, companies, uhm.  A lot -- a lot of money came through

10  of postage.  And for every -- every piece at this time, uhm,

11  that you mailed first class was about 40 cents each or more.  So

12  if you mailed 10,000 pieces, you know, that's $4,000.

13          Uhm.  And, of course, that number's grown, obviously,

14  as you guys know, to 55 cents.  But that's a month's worth of --

15  worth of postage for Glenn Burke, yes.

16          THE COURT:  Jury Note Number 100 asks three questions.

17  The first one is:  Have you ever witnessed any of the four

18  defendants:  Miguel, Mario, Salvador Castro, and Jose Luis

19  Mendez opening up prize envelopes with cash or checks at Digital

20  Express?

21          THE WITNESS:  No.

22          THE COURT:  Number 2:  Who controlled the bank accounts

23  for Digital Express?  If you know.

24          THE WITNESS:  I'm not sure who actually controlled the

25  bank accounts for Digital Express.

1          THE COURT:  And Number 3:  Did you receive the same

2     amount of money if it was pay or profit?

3          THE WITNESS:  No.  My pay was much less than my profit

4     sharing.

5          THE COURT:  All right.  Jury Note Number 101 asks five

6     questions.  The first one is:  Why would you suggest to Patti

7     she talk to Epi Castro to continue her fraudulent mailings

8     versus telling Epi about Patti's problem?

9          THE WITNESS:  (Pause.)  Well, the conversation I was

10    having was with Patti at the time.  Uhm.  And she knew from her

11    time in the business, in the industry, that she could find other

12    people to represent her.  It was her name that finally was given

13    the cease and desist.  I mean, her previous time is way before

14    my time, uhm, of doing this industry.

15          Uhm.  I cannot recall if I -- if I went to lunch with

16    Patti, you know, I suggested to keep the mail moving, to keep my

17    job in line, you know.  This was a right after the crash.  Lost

18    a lot.  Everybody lost a lot.  Uhm.

19          I'm not sure if I -- I went and told Epi that I

20    suggested that Patti come talk to him after that, after that

21    conversation with Patti.  I talked to Epi quite often also,

22    obviously, talking about jobs, work, printing, what I needed --

23    what I needed to be printed first, what was coming up,

24    quantities on day-to-day basis.  So I'm not sure if I told Patti

25    or not -- I mean, Epi directly after I talked to Patti.

—2:19-cr-00295-GMN-NJK—

1        THE COURT:  All right.  Question Number 2 is:  If Patti

2    was 30 percent of the Castros', Mario's business, where was the

3    other business coming from?

4        THE WITNESS:  Uhm.  At -- before Glenn got shut down, I

5    would say it was Patti, 30 percent; Dan Wagner, 30 percent; and

6    Glenn Burke, the other 40 percent.  He was the biggest client in

7    terms of number -- the volume, the number of pieces.

8        THE COURT:  All right.  Number 3:  If Mario Castro was

9    the boss, how did Patti make the decision to pay you out of

10   profits?

11       THE WITNESS:  (Pause.)  I'll word it this way, and it's

12   the truth, it's word for word.  She said, "I will give you part

13   of my," uhm -- "I will give you part of my profits with my

14   company with Jose after I take my fee," I think she said, I

15   believe she said of $1,000 a month.

16       I don't know why, uhm, Mario was affected by AAS.  That

17   was the question, correct?

18       THE COURT:  Number 4:  If paper for stock and future

19   jobs was needed, who would you notify?

20       THE WITNESS:  (Pause.)  We would keep a pretty close

21   inventory of what we had.  We'd get estimates from the clients

22   of what's coming up.  And in Patti's case, she would say, uhm, I

23   need you to do -- I'm going to send a PO to Epi, purchase order

24   to Epi for 50,000 of this, 50,000 envelopes, 50,000 return

25   envelopes.  It came directly from Patti.

—2:19-cr-00295-GMN-NJK—

1          Uhm.  In Glenn's case and Dan's case, it was kind of on

2    me to figure it out.  They would send me a grid, what they

3    called a grid, of everything they were going to try to mail in

4    approximate quantities of what they thought it was going to be.

5          And then I would talk to Epi and we'd get it printed,

6    what they -- what the clients wanted to have on hand, what they

7    thought was going to be coming down the -- down the road.

8          THE COURT:  Okay.  And Question Number 5 is:  Did you

9    do quality control for all the fraudulent mailings along with

10   Patti or was anyone else involved with quality control?

11         THE WITNESS:  There was quality control checks along

12   the way.  Uhm.  As you lasered a job, the printer would stop.

13   The paper would break.  You'd have to make sure you started and

14   stopped it in the same spot, you know, because it would -- it

15   was going by fairly fast, as noted.

16         And you couldn't -- you didn't -- you wanted to make

17   sure you were close to the right record or you would skip a

18   bunch of records, right, and then someone would be mad that the

19   number of pieces was wrong.  Like, you were always trying to get

20   the number.  They give you 4,000 names, you want to make sure

21   you wrote 4,000 names or they're going to blame you for not

22   mailing 4,000 names, the clients will.

23         There was quality control upon inserting.  You would

24   see -- the inserter sometimes would grab -- or not the inserter,

25   but the piece, while they were loading it, they'd load it the

1  wrong way.  And it would come across and it would be the

2  backside of the insert.  And you couldn't see the name and

3  address because it was on the inside.  It wasn't through the

4  window.

5        The biggest time is when there was, uhm, an issue:  No

6  responses.  You saw that e-mail from Dan Wagner.  There was a

7  couple texts between Mario where we would tell the client it was

8  mailed, but they'd get zero responses.  Possible?  Yes.  Likely?

9  No.  And we'd have to figure out, okay, where's the actual

10  check?  Who paid the postage?  When did the postage get paid?

11  Where's the little rubber stamp from the presort house of

12  accepting the mail?  And usually those things wouldn't happen.

13        Or one of the industry standards was to have seeds in

14  there, which is people they know would be put in the lists and

15  that piece of mail would be sent to a friend's house.  And they

16  would ship it to Patti or Glenn or Dan or whoever and say,

17  "Look, this piece is all crooked.  It doesn't look right.  It's

18  lasered wrong.  It's offline."  That was the quality control

19  issue that would come up later after the mail was already sent.

20        THE COURT:  So I'm not sure if you answered the

21  question.  So the question is:  Did you -- so the question is

22  not how or why --

23        THE WITNESS:  Okay.

24        THE COURT:  -- but who.  Did you do quality control for

25  all the fraudulent mailings along with Patti?  Was anyone else

────2:19-cr-00295-GMN-NJK────

1  involved with quality control?

2      THE WITNESS:  Yes.  So, uhm, Jose Luis Mendez would do

3  quality control on the laser.  Uhm.  As I said, he would do his

4  own quality control on the inserting.  If he did it or one of

5  the other Castros, Mario or Salud -- or Salvador would do it,

6  personal quality control.

7      And then Patti would do her own through her seed lists.

8      THE COURT:  All right.  Jury Note Number 102 has three

9  questions, which are really continuation of Jury Note 101.  So

10  they're numbered 6, 7, and 8.

11      Number 6:  During the time of the mailings, was there

12  competition between printing companies to handle these accounts?

13      THE WITNESS:  (Pause.)  I guess I would say the option

14  was always there for the clients.  If they wanted to move, they

15  could.  There was other places they could get it done.  Uhm, but

16  no -- not that I was privy to, any direct competition where

17  Western Mailing was calling Glenn to try to get the work.  Uhm.

18      Glenn did mention to me a few times that a guy name

19  Omar was trying to get the work from -- from the Castros from

20  myself.  But, no, it was more of a word-of-mouth business.

21  Like, we didn't advertise, you know, we could do your OCE

22  printing letter shop here.  It was all clients that knew each

23  other at some way or form.

24      THE COURT:  Okay.  Number 7:  As a worker for Mario

25  Castro, in her role in the mailing scheme, do you know why she

 1  would get a quote from another printer?

 2          So I think it's referring to Patti because it says

 3  "she."

 4          THE WITNESS:  Right.  To keep the prices in line,

 5  right?  To make sure you're not being overcharged, you get a

 6  quote from three or four sources.  That's -- that's the bottom

 7  line on that.

 8          THE COURT:  Okay.  Question Number 8 asks:  Would you

 9  consider Mario Castro and Patti's business together the same as

10  Mario Castro and Epi Castro's business with Dan Wagner or Glenn

11  Burke?  If so, why?  And if not, why are they different?

12          THE WITNESS:  I guess to ...

13          THE COURT:  Do you want me to reread it?

14          THE WITNESS:  Yeah, reread it.

15          THE COURT:  Okay.  Would you consider Mario Castro and

16  Patti's business together the same as Mario Castro and Epi

17  Castro's business with Dan Wagner or Glenn Burke?  And then if

18  so, why?  And then if not, why are they different?

19          THE WITNESS:  Uhm, Mario Castro and Patti Kern's

20  business together was a partnership.  They became the clients

21  for the letter shop, together.  And an owner and letter shop

22  and -- and client, it seems kind of awkward, that's what it was.

23          Uhm.  Mario and Epi printing for Dan Wagner and Glenn,

24  they weren't in partnership with them.  They weren't receiving

25  profit sharing with Dan or Glenn.  They were the clients that

1   took the profit.  We got paid if the job did well or not.

2          THE COURT:  When you say they were the clients, I lost

3   you.  I don't know who's "they."

4          THE WITNESS:  I'm sorry.  The -- Glenn Burke and Dan

5   Wagner were the clients.  We didn't get to control their

6   checking accounts.  We didn't except -- other than what we

7   invoiced for is what we got paid for.  We didn't get profit

8   sharing.

9          THE COURT:  Okay.  Jury Note Number 103 asks four

10  questions.  The first one is:  You stated that you worked with

11  Jose Luis Mendez for many years.  Is that an accurate statement?

12         THE WITNESS:  Yes.  We worked together -- like I said,

13  I can't remember what year he came in or was introduced to me.

14  Uhm.  But it was shortly after Mario and Miguel, uhm, purchased

15  from Raphael the business.  And many years we worked together

16  until I ultimately left to part-time in 2014.  So somewhere

17  around eight years, six years, day to day, Monday through

18  Friday.

19         THE COURT:  Jury Note 103's second question is:  You

20  stated that the mailbox application for Advanced Allocation

21  Systems inaccurately described the business as involving health

22  and beauty sales.  Is that an accurate statement?

23         THE WITNESS:  Yes.  I mean, as far as I understood it.

24  I did not -- I did not see that application, uhm.  And the boxes

25  I helped them open were in 2012, not 2016.

2:19-cr-00295-GMN-NJK

1            THE COURT:  Okay.  The third question is:  Based on the
2      many years' experience you had working with Jose Luis Mendez,
3      would you recognize his handwriting?
4            THE WITNESS:  No.  Didn't see him write much stuff
5      down.
6            THE COURT:  Okay.  Number 4:  Were the words "health
7      and beauty sales" printed by Jose Luis Mendez, were those words
8      seemingly in his handwriting?  Was the signature of his name
9      seemingly in his handwriting?  So it sounds like you don't know.
10           THE WITNESS:  Yeah, I do not know.
11           THE COURT:  All right.  Jury Note Number 104 asks a few
12     questions here.  The first one is:  Did the warehouse known as
13     Digital Express print t-shirts, fliers, casino-related material,
14     and other jobs that were not fraudulent prize pieces?
15           THE WITNESS:  Uhm, I remember a large silk-screen
16     machine in the front room for a while.  I remember the press
17     that Mario and whoever purchased, a little press in the back
18     room.  Uhm.  Again, at that time I wasn't there full-time.
19           That's it.
20           THE COURT:  Okay.  Question Number 2 is:  Did Digital
21     Express print car wraps?
22           THE WITNESS:  As I understood it, yes.  I never saw one
23     get done.  But that's why -- I remember that's why Jose Luis
24     Mendez bought the -- the wide-format printer.  I mean, it was
25     like six feet wide, and it would print out these long sheets of

-----2:19-cr-00295-GMN-NJK-----

1    material that you could stick to a car or make a banner or other

2    things.

3            THE COURT:  Okay.  Jury Note 105 asks four questions.

4    The first was:  In an e-mail dated 2/7/2012 you stated, "I just

5    went and checked the balance on the GAM account.  It is

6    $6,735.58."  So is that an accurate quote?

7            THE WITNESS:  Yes.  I was checking the access -- I had

8    access to the postage account of the company, and that was the

9    holding place for all the money that came in for each client,

10   the postage account was the holding place.

11           THE COURT:  Second question:  Were you an authorized

12   person to view a prepaid postage account?

13           THE WITNESS:  (Pause.)  Uhm, I guess I'm -- I don't

14   know what you guys know and what I -- I could see these -- in

15   the QuickBooks, I could see that there was a postage account and

16   it was -- had money, you know, ins and outs, and it had money --

17   a total at the bottom available.

18           Uhm.  Yes, I was authorized to go into QuickBooks

19   because I was doing invoicing.  Uhm, I don't know if you're

20   talking about a USPS postage account.  No, I was never -- looked

21   at those accounts.  Uhm.  Never given the privilege of seeing

22   those accounts.

23           THE COURT:  Okay.  And was a password or other secured

24   access information needed to view the account?

25           THE WITNESS:  QuickBooks had a password on it.

1          THE COURT:  And if yes, how was your password first

2    established?  Did you set it up personally or was anyone else's

3    authority needed to get started?  If so, who?

4          THE WITNESS:  (Pause.)  There was, uhm, quite a few

5    times that the -- the QuickBooks was re-setup because the

6    computer would break or whatever.  Uhm.

7          I may have set up a couple of it -- a couple of times

8    because I was computer savvy.  There was a few IT kind of people

9    that they had that would help them set things up, too.

10          Uhm, I don't remember exactly who set up the passwords

11    and when.

12          But I did have my own login and my own password.

13          THE COURT:  Okay.  So you created your own password?

14          THE WITNESS:  For the -- for the times when I -- when I

15    did it, yes, I set up my own password.

16          THE COURT:  All right.  Jury Note Number 106 asks:

17    When you were paid by Digital Express or any other letter shop

18    owned by Mario Castro, at the end of a calendar year did you

19    receive a W-2 or did you receive a Form 1099 reflecting the

20    money you earned?

21          THE WITNESS:  Up until the point of when I opened On

22    The Side, uhm, 2013-2014, uhm, I received a W-2 from the

23    Castros.  Uhm.  After that, uhm, I ran -- put the checks into On

24    The Side, and I -- we treated it as a subcontractor kind of

25    thing.  We'd have to get what -- you know, Ricardo Gonzalez to

—2:19-cr-00295-GMN-NJK—

1  go with the exact terminology, but I didn't pay taxes.  They

2  didn't give me money with taxes.  They gave me a check for $300.

3  I put it in my account.  And then every other week I'd write

4  myself a paycheck with taxes taken out.

5          Uhm.  So I gave myself -- I paid my taxes to myself.

6          THE COURT:  All right.  Jury Note Number 107 asks one,

7  two, three -- five questions.  The first one is:  Did you take

8  directions from Patti Kern?

9          THE WITNESS:  Yes.

10          THE COURT:  Number 2:  Why did you ask Patti about

11 trashing papers if Mario was the boss?

12          THE WITNESS:  (Pause.)  Patti was the first line of

13 finding out what to trash, uhm, what -- she would be notified

14 first.  Uhm.  And I would just confirm with her, being the

15 client, to make sure we -- is this right before we throw all of

16 this stuff away?  Because if we just throw it away, it's gone,

17 obviously.

18          And, again, I thought Mario was my boss for the letter

19 shop.  Uhm.  And Patti was the client at that time.

20          THE COURT:  Right.  Question Number 3 is:  In 2009,

21 when Patti Kern got shut down, were the defendants receiving

22 profit checks and cash from that operation?

23          THE WITNESS:  No, they were not.  So it was all Patti

24 and whoever her subsidiaries or partners were at that time.

25          THE COURT:  Number 4:  Why was Patti able to make the

 1  decision to give you profits from AAS?

 2       THE WITNESS:  Uhm.  (Pause.)  That conversation, uhm,

 3  happened once we started getting AAS going for Jose Luis Mendez.

 4  It was, as I understood it, her and Jose Luis Mendez.  And she

 5  called, I believe, or we had lunch.  And she said that since

 6  you're doing so much of the work, she's going to -- she would

 7  give me her portion of the profit after she took her

 8  $1,000-a-month fee for running the company, taking care of all

 9  of the books and all that stuff.  Uhm.  That's how I understood

10  it from Patti.

11       THE COURT:  And Question Number 5 asks:  Why did you

12  take a deal saying you have a minor role knowing you had a major

13  role?

14       THE WITNESS:  Uhm.  (Pause.)

15       I guess I was going to take what they were going to

16  give me, I mean.  I got to look out for myself and my family.

17  Uhm.

18       Was I a major role for running the letter shop and the

19  day-to-day operations?  Of course.  Was I a major role in the

20  multitude of partnerships with Patti?  No.  I was not a major

21  role on that.  Uhm.  Again, I was profit sharing from one

22  company out of, I don't know, eight or 10 companies at that

23  time.

24       THE COURT:  All right.  Jury Note Number 108 asks four

25  questions.  The first one is:  You and the defendants would do

————2:19-cr-00295-GMN-NJK————

1  fraud work for Glenn Burke, and after Glenn got shut down, the

2  defendants opened their companies to start their own fraud

3  business.  Is that correct?

4          THE WITNESS:  That is correct.

5          THE COURT:  Okay.  And then:  Do you know if any of the

6  defendants' wives knew they were doing a fraud business, since

7  according to Mr. Green the wives have no business in knowing

8  what they do?

9          THE WITNESS:  Uhm, I'm not privy to those

10 conversations.  My wife knew somewhat of what I was doing.

11         THE COURT:  And you mentioned Mario told you, "They're

12 after Glenn, not us."  So what did you understand that statement

13 to mean?

14         THE WITNESS:  Uhm.  I understand that statement to mean

15 that the feds are going after Glenn to shut him down, to put

16 him, you know, in jail, but not us.  Even though we were, uhm,

17 facilitating a kickback to Glenn, uhm, we -- uhm, we were just

18 the letter shop at that point.  We weren't the client at that

19 point.  We were just the letter shop doing a service, getting

20 paid for a service.

21         THE COURT:  Okay.  And the last question in Jury Note

22 108 asks:  Was Jose Luis Mendez not mentioned in those e-mails

23 because that wasn't his role in the scam team?

24         THE WITNESS:  Uhm.  To be honest with you, I don't ever

25 recall having an e-mail for Jose Luis Mendez.  Uhm.

—2:19-cr-00295-GMN-NJK—

1          THE COURT:  And Jury Note 109 asks:  When you had to

2     stop a job, would you recycle the victims' names and addresses

3     with a newly created business?

4          THE WITNESS:  (Pause.)  I'm sorry.  Could you read that

5     again?

6          THE COURT:  Yes.  When you had to stop a job, would you

7     recycle the victims' names and addresses with a newly created

8     business?

9          THE WITNESS:  At this point, we recycled the promos,

10    obviously, as we talked about, rewrapped them.  The names was a

11    big bucket of names.  Uhm.  As it got closer to 2018, the bucket

12    got very small.  The jobs were down to, like, you know, five to

13    1,000 pieces a job, you know, 10,000 pieces a week.  Compared to

14    when we were mailing for Glenn and everybody, we were up close

15    to a half million to a million pieces a month.  Uhm.

16          So the names were cancelled, but they were being mailed

17    10 more times, the exact same name, on all the different DBAs of

18    all of the different partnerships, which was ever growing.  And

19    at some point, I remember having a conversation with -- with

20    Patti Kern about how they wanted to add more companies.  And she

21    was like, "No, we can't hit these people 10 times in a week and

22    a half, you know.  It's not -- not good for anybody."

23          THE COURT:  Okay.  I think that was the last question.

24    Yes.  That was the last question.

25          So any follow-up from the Government?

2:19-cr-00295-GMN-NJK

1          MR. FINLEY:  Thank you, Your Honor.

2               REDIRECT EXAMINATION OF SEAN O'CONNOR

3  BY MR. FINLEY:

4  *Q.*  There was a juror question about the minor role that your

5  plea agreement says that you have.  Do you remember that?

6  *A.*  Yes.

7  *Q.*  And you have an understanding of minor role because those

8  are simple words in the English language, right, "minor" and

9  "role"?

10  *A.*  Yes.

11  *Q.*  And that is based on your ordinary sense of the English

12  language --

13  *A.*  Yes.

14  *Q.*  -- when you answered that question?

15  *A.*  That's correct.

16  *Q.*  And your testimony was that you admit that you had more than

17  a minor role in terms of getting these mailings out, and you

18  testified about that?

19  *A.*  Yes.

20  *Q.*  Were you aware, from discussing with your lawyer, that the

21  term "minor role" has a specific legal meaning which is defined

22  in the United States Sentencing Guidelines?

23  *A.*  No.

24  *Q.*  Your lawyer did not explain that to you?

25  *A.*  I don't remember exactly, no.

─2:19-cr-00295-GMN-NJK─

1   Q.   If he did, you don't remember it now --

2   **A.**   Correct.

3   Q.   -- is that right?

4   **A.**   Yes.

5   Q.   Let me see if you remember this.  Did your lawyer ever

6   explain to you that for legal purposes, under the technical

7   definition of a minor role, how much of the victims' money you

8   receive is a relevant question for that?  Did anyone ever

9   explain that to you?

10  **A.**   Maybe my first lawyer.  I switched lawyers midstream.

11  Q.   Let me ask you this.  Just based on your sense of what's

12  fair, does it make sense that how much victim money a particular

13  coconspirator receives is relevant to the question of whether

14  they had a minor or major role?  Does that make sense to you?

15  **A.**   Makes sense to me, yes.

16  Q.   As a matter of logic and fairness?

17  **A.**   Correct, yes.

18  Q.   Now, we have agreed that you have a minor role under the

19  law, right?

20  **A.**   That's correct.

21  Q.   And -- but we don't actually -- I don't actually decide and

22  you don't actually decide whether you really had a minor role.

23  That's going to be up to the judge that sentences you.  Has that

24  been explain to you by your lawyer?

25  **A.**   Yes.

1          MR. FINLEY:  Thank you.  No further questions.

2          THE COURT:  Any follow-up, Mr. Tomsheck?

3          MR. TOMSHECK:  You want to go first?

4          THE COURT:  Mr. Brown, you want to follow-up first?

5          MR. BROWN:  Yeah, I started so I'll do this.

6          THE COURT:  Okay.  Go ahead.

7          MR. BROWN:  Thank you.

8               RECROSS-EXAMINATION OF SEAN O'CONNOR

9   BY MR. BROWN:

10  Q.  Hi.  Good morning.

11  A.  Good morning.

12  Q.  There was a question about Mike Ladomerszky?

13  A.  Yes.

14  Q.  And the question was whether he had his name on any mailing

15  companies.  You recall that?

16  A.  Yes.

17  Q.  And I think when I was asking you questions or someone was

18  asking you questions, earlier you said that Mike Ladomerszky had

19  been involved in this fraud business for a long time?

20  A.  That's correct.

21  Q.  That would be a good reason for him to keep his name off of

22  companies.

23  A.  I mean ... he understood the business, yes.

24  Q.  He understood the business enough to know that if you know

25  it's fraud, you don't put your name on the company doing the

1  fraud?

2  *A.*  If you don't want to take that chance, yes.

3       MR. BROWN:  Thank you.

4  BY MR. BROWN:

5  *Q.*  Oh, one more thing.  You talked about things changed for you

6  when Barry showed up.  Do you remember that?

7  *A.*  Yes.

8  *Q.*  And when was that?

9  *A.*  Uhm, it was before I testified -- oh, no.  When Barry showed

10 up, it was shortly after February of 2018, within a couple of

11 months.

12 *Q.*  Okay.  But that wasn't the first interaction you had with

13 the Government?

14 *A.*  No.

15 *Q.*  That was back in 2016?

16 *A.*  Right.

17 *Q.*  And you met with them on July 27th, 2016?

18 *A.*  Yes.

19 *Q.*  And testified before the grand jury July 27th --

20 *A.*  Yes.

21 *Q.*  -- 2016?

22 *A.*  Yes.

23 *Q.*  And you weren't arrested then?

24 *A.*  No.

25 *Q.*  And you went back to committing fraud?

1  *A.*  Yes.

2          MR. BROWN:  Thank you.

3          THE COURT:  Mr. Gaffney?

4              RECROSS-EXAMINATION OF SEAN O'CONNOR

5  BY MR. GAFFNEY:

6  *Q.*  Good morning, Mr. O'Connor.

7  *A.*  Good morning.

8  *Q.*  You had -- there was a jury question asking you to delineate

9  between the defendants' role and your role.  Do you remember

10  that?

11  *A.*  Yes.

12  *Q.*  And in regard to Miguel Castro, your answer was that he was

13  personnel management, managed the business, and did accounting.

14  Does that sound right?

15  *A.*  Yes.

16  *Q.*  And just to be clear, Miguel Castro was never involved in

17  creating the promotional or the prize notifications, right?

18  *A.*  As far as I understand, yes, he was not involve in creating

19  the promotions.

20  *Q.*  Okay.  And he was never involved in printing the physical

21  prize notifications, right?

22  *A.*  That's correct.

23  *Q.*  You had a question about the amount of income from the

24  fraud.  I believe you said it was about 98 percent.

25  *A.*  Yes, that's how I feel, yes.

———2:19-cr-00295-GMN-NJK———

1  Q.  And -- but that figure is based on the jobs that you worked

2  on personally, right?

3  A.  (Pause.)  Yes, my personal face-to-face with the clients and

4  doing the invoicing, yes.

5  Q.  Because you testified that the letter shop was also doing

6  things like banners and car wraps and fliers and things of that

7  nature, right?

8  A.  Yes.

9  Q.  And you didn't see the books for National Print & Mail,

10  Marketing Image Direct, and Digital Express, right?

11  A.  Uhm.  I would open QuickBooks and only do my portion.  Did I

12  look at the final numbers?  No.

13  Q.  You were asked a question about whether you knew if -- I

14  suppose when the Castros took over the company that you were

15  with, if it was their first printing company.  Do you remember

16  that question?

17  A.  Yes.

18  Q.  Is that -- okay.

19          And just to be clear, when they took over, that company

20  had an existing customer base.  Is that fair?

21  A.  That's fair.

22  Q.  Had -- already had employees in place?

23  A.  Yes.

24  Q.  You were asked a question about how did you become partners

25  with the defendants.  Do you remember that question?

1   *A.*  Yes.

2   *Q.*  And I want to make it clear for the jury, you were never

3   partners with Miguel Castro in any of the mailing companies,

4   right?

5   *A.*  That's correct.

6   *Q.*  You were asked a question about profit sharing between Patti

7   Kern, Dan Wagner, and Glenn Burke.  Do you remember that

8   question?

9   *A.*  Yes.

10  *Q.*  And is it your testimony that there was no profit sharing

11  with the defendants in Dan Wagner's business or in Glenn Burke's

12  business?

13  *A.*  That's correct.

14  *Q.*  Okay.  There wasn't a partnership of profit sharing, right?

15  *A.*  As far as I understood, yes.

16  *Q.*  They were merely printing these prize notices.

17  *A.*  Right, they're printing for Glenn Burke and Dan Wagner.

18  *Q.*  You received an -- or you answered a question regarding

19  whether -- when you were paid by the letter shop, you received a

20  1099 or a W-2.  Do you remember that question?

21  *A.*  Yes.

22  *Q.*  And you talked a little bit about the accounting.

23         You had access to the QuickBooks records, right?

24  *A.*  Yes.

25  *Q.*  And I believe you said that you had your own password?

—2:19-cr-00295-GMN-NJK—

1  *A.*  As I said, between -- sometimes I would use Miguel's

2  computer, use Miguel's login, Miguel's password.  And sometimes

3  I had my own password, my own login.  It was continually moving.

4  *Q.*  Okay.  And I believe you had also mentioned Ricardo

5  Gonzalez?

6  *A.*  Yes.

7  *Q.*  Do you know if Ricardo Gonzalez did any accounting for

8  National Print & Mail, Marketing Image Direct, or Digital

9  Express?

10  *A.*  I am not positive on all those aspects.  Uhm.  I just know

11  he was the CPA, and at points he was at the office working with

12  Mario and Miguel.

13          MR. GAFFNEY:  That's it.  Thank you, Judge.

14          THE COURT:  Okay.  Mr. Green, any follow-up questions?

15          MR. GREEN:  Yes, please.  If I may, Your Honor.

16          THE COURT:  Yes, of course.

17               RECROSS-EXAMINATION OF SEAN O'CONNOR

18  BY MR. GREEN:

19  *Q.*  Good morning, Mr. O'Connor.

20  *A.*  Good morning.

21          MR. GREEN:  One moment, Your Honor.

22          May I proceed, Your Honor?

23          THE COURT:  Yes, you may.

24          MR. GREEN:  Thank you.

25  BY MR. GREEN:

1  *Q.*  Mr. O'Connor, in response to a jury's -- juror's question,

2  you were asked what the specific roles of the -- of the people

3  were, that is Mario Castro, Miguel Castro, Jose Luis Mendez, and

4  Salvador Castro.  Do you remember that answer?

5  *A.*  Yes.

6  *Q.*  And do you remember answering that you had seen on occasion

7  possibly Salvador folding some of these material?  Is that

8  correct?

9  *A.*  Yes.

10  *Q.*  The other day you were shown an e-mail.  We won't have to

11  get into it, but it -- the e-mail essentially -- do you remember

12  the e-mail essentially saying, "We're going to need another

13  60,000," or something like that?

14       Do you remember a large number of something in a run

15  for these forms?

16  *A.*  I remember, yes.

17  *Q.*  Okay.  So -- and you saw an occasion that Salvador Castro

18  was folding these.  Is that correct?

19  *A.*  Yes.

20  *Q.*  Now, these items which were put into -- and as a follow-up

21  to the juror's question, these items which are placed into the

22  machines, did they have perforated edges on the sides?

23  *A.*  Yes.

24  *Q.*  Okay.  So when they came out of the machine, was the

25  perforated edge still there, if you remember?

─2:19-cr-00295-GMN-NJK─

1   **A.**   Yes.

2   *Q.*   Okay.  So once it was taken out, was like it -- it was like

3   a machine which cut the form?

4   **A.**   It cut the pinholes and the perforations off.

5   *Q.*   Okay.  So the form that would ultimately come out as a piece

6   of paper, no forms, and cut, correct?

7   **A.**   Correct.

8   *Q.*   Do you have an estimate of how long it would take to fold

9   that form and place it in an envelope?

10  **A.**   Uhm, the -- those two machines would run next to each other.

11  They could run, you know, five to 7,000 per hour.

12  *Q.*   But not hand-folded.  You said you saw things being placed

13  into envelopes by Salvador Castro.

14  **A.**   Yes.  He ran the inserter, which took a folded piece,

15  stuffed it into the envelope.  And then you take that envelope

16  after it's sealed and put it into a tray and ship it to

17  a printing press.

18  *Q.*   Do you know how long that would take to fold several

19  thousand pieces of paper?

20  **A.**   To insert several thousand?

21  *Q.*   Yes.

22  **A.**   Like I said, five -- 5,000 an hour was about --

23  *Q.*   Per person, one person placing -- I'm talking about

24  physically placing --

25  **A.**   Oh.

—2:19-cr-00295-GMN-NJK—

1  Q.  -- as you stated?

2  A.  If he did it by hand?

3  Q.  Yes.

4  A.  It would take days.

5  Q.  But didn't you say that you saw Salvador Castro placing

6  stuff in envelopes?

7  A.  Using the -- using the letter shop inserter.

8  Q.  Okay.  Using the machine, not physically doing it, correct?

9  A.  Correct.

10  Q.  Did it appear to you that Salvador Castro was doing as he

11  was told?

12  A.  Yes.

13  Q.  Okay.  And in connection with this case, as the accounts

14  manager, you were also being done what you were told.  Is that

15  correct?

16  A.  Yes.

17  Q.  Okay.

18        MR. GREEN:  Your Honor, I'm making sure we're not

19  covering stuff which already has been.  We're just

20  double-checking.

21        THE COURT:  Okay.  That's fine.

22        MR. GREEN:  I thank you in response to those questions,

23  sir.

24  BY MR. GREEN:

25  Q.  Oh.  You had mentioned about paychecks and stuff.  Were you

———2:19-cr-00295-GMN-NJK———

1    paid in a paycheck or some kind of pay in an envelope?

2    **A.**  Yes, when ... when I worked there full-time, I was -- when I

3    got the W-2s, I got a regular paycheck, either just the paycheck

4    or a paycheck stuffed in an envelope.

5    *Q.*  Was the -- were the paychecks, to the best of your

6    recollection, were most of those even-numbered dollar amounts?

7    **A.**  Not when we had taxes taken out.

8    *Q.*  Okay.  I'm talking about from Patti Kern's operations.  Did

9    you ever get checks where taxes were taken out?

10   **A.**  From what Patti Kern sent me?

11   *Q.*  Yes.

12   **A.**  No.

13   *Q.*  Were they always, like, almost always even amounts?

14   **A.**  Yes.

15   *Q.*  So, for example, if it was $400, it wouldn't be like

16   $289.14, like if the taxes were taken out or Medicare and all of

17   that, correct?

18   **A.**  Correct.

19   *Q.*  Okay.

20         And in previous employment, prior to your involvement

21   in all of this, had you ever been paid at a job where they gave

22   you an envelope with your check in it?

23   **A.**  Yes.

24   *Q.*  So it wasn't unusual to get a paycheck at Patti Kern's

25   operations in an envelope, correct?

─2:19-cr-00295-GMN-NJK─

1  *A.*  From Patti Kern, that is correct.

2  *Q.*  Okay.  Thank you.

3          MR. GREEN:  May we have Government's Exhibit -- in

4  response to a juror's question about sharing the profit with

5  Patti Kern or her sharing the profit with you, may we have

6  Government's Exhibit -- oh, excuse me -- may we have Defense

7  Exhibit 9040 put on the screen, Page 6, with the Court's

8  permission?

9          THE COURT:  Yes.

10 BY MR. GREEN:

11 *Q.*  Ah.  Do you see that in front of you, sir?

12 *A.*  Yes.

13 *Q.*  Okay.  And you were shown that yesterday.  I will represent

14 to you that there has been evidence and testimony that is a safe

15 found in the house of Patti Kern.

16 *A.*  Yes.

17 *Q.*  Looking at that safe, does there appear to be anything in

18 the safe?

19 *A.*  Yes.

20 *Q.*  What does it appear to be?

21         MR. FINLEY:  Objection, Your Honor.  This is cumulative

22 of material that has already been covered with this witness by

23 Mr. Green.

24         MR. GREEN:  But this is in response to a juror's

25 question, Your Honor.

—2:19-cr-00295-GMN-NJK—

1          THE COURT:  I agree with you.  He's already answered

2   this.  And I understand you're laying a foundation for your next

3   question, but let's hurry up and get to the question.

4          MR. GREEN:  Excuse me, Your Honor.

5          THE COURT:  I understand you're laying a foundation for

6   your question.

7          MR. GREEN:  Yes.

8          THE COURT:  But this is information that Mr. O'Connor

9   has already testified about.  So let's hurry and up and get to

10  your question.

11         MR. GREEN:  Thank you.

12  BY MR. GREEN:

13  *Q.*  Did you get a cut of that money?

14  **A.**  That specific money, no.

15  *Q.*  Okay.  You were asked by a juror about -- about whether you

16  told your family about -- whether you told your family about

17  what you were doing.  Do you remember that -- that question from

18  the juror?

19  **A.**  Yes.

20  *Q.*  Okay.  And you responded that after you had testified before

21  the grand jury, you had called the -- you had called your wife?

22  **A.**  Yes.

23  *Q.*  You called Mr. -- you called Mr. Wagner?

24  **A.**  Yes.

25  *Q.*  Okay.

—2:19-cr-00295-GMN-NJK—

1          Now, after this -- in response to the juror's question,

2     you continued to do these fraudulent activities, correct?

3     *A.*  That's correct.

4     *Q.*  And in response to a juror's question you answered today,

5     emotionally, that it somewhat pained you that your wife had to

6     go to work to supplement the family income.

7     *A.*  No, I wanted her to go to work.

8     *Q.*  You wanted her to go to work?

9     *A.*  So I could leave the fraud business forever.

10    *Q.*  Okay.  Pay the bills legitimately?

11    *A.*  Yes.

12    *Q.*  Deep down inside get a regular job to feed your family?

13    *A.*  That's correct.

14          MR. GREEN:  No further questions.  Thank you, Your

15    Honor.

16          THE COURT:  Mr. Tomsheck?

17              RECROSS-EXAMINATION OF SEAN O'CONNOR

18    BY MR. TOMSHECK:

19    *Q.*  I want to kind of cut to the chase on this whole minor/major

20    role issue.  Okay?

21    *A.*  Okay.

22    *Q.*  The Government got up here, and they asked you some

23    questions in response to a juror's question about why you took a

24    minor role when you know you were a major player.  Do you

25    remember that question from the juror?

—2:19-cr-00295-GMN-NJK—

1    *A.*  Yes.

2    *Q.*  Okay.  And you'd agree with me that in the Patti Kern

3    business, when you're dealing with vendors and dealing with

4    Patti and making decisions about rewraps and mailings and

5    graphics and numbers, you're a major participant in all of that

6    stuff, right?

7    *A.*  A lot of the specific questioning's been about AAS, which,

8    yes, I was a major part of.

9    *Q.*  Okay.  Now, here's the part I want to cut to the chase in.

10   You don't really care at all about the legal definition of what

11   a minor role is, right?

12   *A.*  (Pause.)  I mean, it's -- it's just a number on a sheet that

13   I remember.

14   *Q.*  Right.  It's a number on a sheet where you get less

15   exposure, your guideline range goes down if you're given a minor

16   role, right?

17   *A.*  That's correct, as I understand it.

18   *Q.*  They, the Government, give you the minor role in that plea

19   negotiation, right?

20   *A.*  Yes.

21   *Q.*  And you're not an idiot, right?

22   *A.*  I mean, I don't think so.

23   *Q.*  I mean, you'd be pretty dumb to turn down a deal that's

24   better for you, right?

25   *A.*  Yes.

—2:19-cr-00295-GMN-NJK—

1   Q.  Okay.  You're not concerned with the legality of it, you

2   just want a better outcome for you, right?

3   A.  Me and my family, yes.

4   Q.  Okay.

5        You were asked a question, I think it was by Mr. Brown,

6   about -- in response to a juror question about dates and times,

7   and he talked to you about 2016.  Do you remember that?

8   A.  Yes.

9   Q.  Okay.  Just to be clear, you entered your plea pursuant to

10  the deal that the Government gave you in August of 2019, right?

11  A.  Yes.

12  Q.  And it was this prosecutor right here, Mr. Finley, that was

13  in court when you entered your plea, right?

14  A.  Yes.

15  Q.  It was this prosecutor, Mr. Finley, that was with you in

16  July of 2016 when you were first interviewed, right?

17  A.  Yes.

18  Q.  And it was that same prosecutor who asked you questions at

19  the grand jury that you said was so emotionally traumatizing for

20  you, right?

21  A.  That's correct.

22  Q.  In July of 2016, correct?

23       Do you have any idea how much money Patti Kern and

24  yourself were able to take from people pursuant to this fraud

25  between July of 2016 until you entered your plea in 2019?

—2:19-cr-00295-GMN-NJK—

1  *A.*  No.

2  *Q.*  You agree that whole time you're still doing fraud, right?

3  *A.*  Yes.

4  *Q.*  And so is Patti, right?

5  *A.*  Yes.

6  *Q.*  Saw the dollar bills in the safe.

7       MR. FINLEY:  Objection, Your Honor.  I think you'll

8  agree with me that the conspiracy ended in 2018.  So there was

9  nothing going on between 2018 and Mr. O'Connor's plea.  I'm sure

10 Mr. Tomsheck would be happy to clarify that.

11      MR. TOMSHECK:  I'd be perfectly happy to clarify that.

12 BY MR. TOMSHECK:

13 *Q.*  You agreed you talked to this prosecutor in 2016, July,

14 right?

15 *A.*  Yes.

16 *Q.*  And you still committed fraud up to until the day when

17 federal agents knocked on people's doors on February 21st of

18 2018, right?

19 *A.*  That's correct.

20 *Q.*  Any idea how much money you all stole from people in that

21 time?

22 *A.*  No idea.

23 *Q.*  A lot, right?

24 *A.*  I'm not sure.

25 *Q.*  You were asked the question by a juror about why Patti would

—2:19-cr-00295-GMN-NJK—

1  get a quote for printing for someone that isn't related to the

2  people you're alleging to be her coconspirators, right?

3  **A.**  That's correct.

4  *Q.*  Okay.  You agree Patti did that, right?

5  **A.**  That Patti got a quote from another printer?

6  *Q.*  Right.

7  **A.**  Uhm.  I don't remember if that -- if she told me that other

8  than that e-mail that says, "If you want to move this to

9  Western, we'll do it."

10 *Q.*  Okay.  Well, in fact, you gave the jurors a reason why Patti

11 did that, right?

12 **A.**  Yes.

13 *Q.*  You said it was 'cause she could keep costs down, right?

14 **A.**  Checking costs, yes.

15 *Q.*  Yeah.

16       So she can go out and get a quote related to printing

17 in order to keep costs down, right?

18 **A.**  Yes.

19 *Q.*  That's a normal thing to do in a business, right?

20 **A.**  Yes.

21 *Q.*  Okay.  You're aware that if she went out to someone else for

22 printing or mailing shop quotes, it would have nothing to do

23 with these guys, right?

24 **A.**  Well, if it was partnerships with one of them, I would

25 assume that she would have to talk to them, too.

—2:19-cr-00295-GMN-NJK—

1    Q.  Okay.  You'd agree with me that if she went and got a quote
2    from another letter shop or another printing shop, it doesn't
3    have anything to do with the Castros, right?
4    A.  Right.
5    Q.  Okay.
6          You agree with me that if Patti Kern is going to send
7    out huge pallets of fraudulent mail, she needs someone to print
8    it, right?
9    A.  Yes.
10   Q.  And she needs someone to mail it, right?
11   A.  Yes.
12   Q.  And if she can keep her costs down, she can make more money,
13   right?
14   A.  I'd agree with that -- with you, yes.
15   Q.  Okay.
16          Let me ask you if you were aware of this.  Were you
17   aware, yes or no, that Patti Kern had a deal with Epi Castro
18   where she would go to him and do printing jobs on credit without
19   a front-end payment?  Were you aware of that?
20   A.  No.
21   Q.  Okay.  Were you aware that she would then pay Epi on the
22   back end?  Were you aware of that?
23   A.  Not to my recollection, no.
24   Q.  That's not something Patti Kern discussed with you?
25   A.  Not to my recollection, no.

———2:19-cr-00295-GMN-NJK———

1  *Q.*  You were aware that Mario Castro, within Digital Express,

2  had a number of large printing-related items that had nothing to

3  do with fraudulent mailings, right?

4  *A.*  No, I was not aware.

5  *Q.*  Okay.  You told us a moment ago that there was this six foot

6  wide press, printing press, that was designed to print car

7  wraps, right?

8  *A.*  As I understood, that was Jose Luis Mendez's.

9  *Q.*  Yeah.  It was in Digital Express, right?

10  *A.*  Yes.

11  *Q.*  That's Mario's business, right?

12  *A.*  Yes.

13  *Q.*  Okay.

14      But you saw that, there, right?  You don't dispute that

15  there was large-scale printing equipment that had nothing to do

16  with the fraudulent mailings that you were involved in?

17  *A.*  That's correct.

18  *Q.*  Were you aware that Patti Kern controlled the bank accounts

19  for all these mailings businesses?

20      MR. FINLEY:  Objection, Your Honor.  There's no

21  foundation for that and it mischaracterizes the evidence.

22      MR. TOMSHECK:  Patti Kern testified she managed them.

23  I'm asking him if he's aware of it.

24      MR. FINLEY:  Manage is different from control.  There

25  has been testimony that the ultimate control was with the people

—2:19-cr-00295-GMN-NJK—

 1  who opened the accounts.

 2          THE COURT:  Right.  So I'll allow the question in the

 3  phrasing of to the defendants' knowledge of how he interprets

 4  that phrase, because that phrase, we've heard it used many

 5  different ways in trial.

 6  BY MR. TOMSHECK:

 7  Q.  Were you aware that Patti Kern controlled the bank accounts

 8  for these mailing companies?

 9  A.  As I understood it, yes.

10  Q.  You told us a moment ago that Patti Kern gave you

11  directions, right?

12  A.  Yes.

13  Q.  And you followed them.

14  A.  That's correct.

15  Q.  Patti Kern controlled you, too, right?

16  A.  Uhm, as the client, yes, to handle her jobs.

17          MR. TOMSHECK:  Nothing further.

18          THE COURT:  Any re-redirect follow-up, Mr. Finley?

19          MR. FINLEY:  No, Your Honor, nothing further.

20          THE COURT:  All right.  So, Mr. Connor, [sic] this does

21  conclude your testimony.  You're all done and excused.  Please

22  be careful on the way out with the steps.

23          And we're going to take our after -- or our morning

24  break.  During the break, I do remind the jury that you are

25  still not to discuss this case with each other.  You can discuss

—2:19-cr-00295-GMN-NJK—

1    other things, but not this case.

2            Remember, you are not allowed to speak to the attorneys

3    or the parties or the witnesses or their staff at all about

4    anything.

5            And please do not read or listen to or view anything

6    that touches upon the case in any way or perform any independent

7    research or investigation.  If you do happen to overhear anyone

8    talking about the case, remember you are required to bring it to

9    the Court's attention right away.  And please do not form any

10   opinion about the case until after everything has been provided

11   to you and I tell you that you may now begin your deliberation

12   process.

13           Let's go ahead and stand for the jury as the judge of

14   the facts.  We'll welcome you back around 12:45 -- 10:50, 10:50.

15           (Whereupon jury leaves the courtroom at 10:34 a.m.)

16           THE COURT:  All right.  We're still on the record

17   outside the presence of the jury.  Everyone may have a seat.

18           I did receive a jury note this morning.  So I have

19   numbered it Jury Note Number 110.  And the juror says:  If a

20   family member of an individual testifying knows what's going on

21   about the crime, aren't they just as guilty of the crime?  If

22   yes, are they charged or is it part of the plea deal that they

23   would not be?

24           For example, Patti Kern's husband knew and he got a C

25   and D, and all the jury knows is that Patti was charged and

——2:19-cr-00295-GMN-NJK——

 1   given a plea deal.

 2           So obviously this is not a question that we're going to

 3   ask anyone and not a question that we're necessarily going to

 4   answer, but I wanted to read that to you so that you're aware

 5   that there is a juror that has that concern.  What I could,

 6   if -- if you agree, what I could do is when we come back from

 7   the break say, you know, that there's a couple of different

 8   questions that we've -- that I've received that would -- the

 9   response would produce evidence that is not admissible by law.

10   So that's why I didn't ask all of the questions.

11           However, after trial, after there is a verdict, I do

12   allow the jury to speak to whoever they want to about the case,

13   including me, including the attorneys, and we can answer all of

14   those questions that they have, because they're naturally

15   cure -- you know, the curiosity is there.  It's a natural

16   question.

17           It's not a bad question.  And that way we kind of give

18   them a little bit of hope that they'll find out eventually and

19   not try to figure it out on their own.  I don't know.  So

20   that's -- that's my suggestion to you.  You can think about it

21   during the break and tell me what you think.  And we'll make

22   sure to give you guys copies of all of these questions, too.

23           MR. TOMSHECK:  Thank you.

24           THE COURT:  So we'll see you at 10:50.  Off record.

25           (Recess taken at 10:36 p.m.)

---2:19-cr-00295-GMN-NJK---

 1          (Resumed at 10:54 a.m.)

 2          THE COURT:  All right.  Is everybody back?

 3          All right.  You may be seated.  We're back on the

 4  record outside the presence of the jury.  And, Mr. Ericsson, you

 5  wanted to proffer a record on appeal?

 6          MR. ERICSSON:  Yes, Your Honor, if I may.

 7          THE COURT:  Yes.

 8          MR. ERICSSON:  Your Honor, this goes to our motion to

 9  limit evidence related to Miguel Castro and his accounting as

10  presented to the jury.  And as you're aware, we filed this

11  motion after the Government through -- Mr. Villasenor had

12  introduced this information for the first time.  And for the

13  record, I want to just briefly quote from the -- the information

14  that was given in the sidebar.

15          And because the Government is now in this response that

16  we received at 9:02 this morning taking a different position

17  than it did during the sidebar.  So in the sidebar testimony,

18  Government counsel indicates the following, quote, I think the

19  last time I met him, I do think he mentioned that Miguel was bad

20  at accounting.  He did mention that.  I don't believe I

21  disclosed that information, but it was, like, literally that

22  brief.  I mean, I probably should have.  An oversight.

23          And then -- so they acknowledge they heard this

24  information, did not turn it over to us.  We had specifically

25  requested, as included in our motion back in August 17th of

─────2:19-cr-00295-GMN-NJK─────

1    2022, that any 404(b) information be turned over to us prior to

2    trial.

3         Because what we're dealing with is the rush situation

4    of us having to respond to their response literally in five

5    minutes this -- this morning is when the ruling was made after

6    it came down.  And during the -- on examination that was going

7    on, I looked at the main case that they cite to that has very

8    critical information that the Court needs to know in their

9    argument that this accounting information is intrinsic to their

10   case against Miguel Castro.

11        So -- and I'm sorry.  One other quote from the sidebar.

12   He says, quote, The information I heard was about his

13   competence.  It's not about a bad act.  It was his competence.

14   I've heard nothing about Miguel Castro engaging in fraud.

15        What we received I think Sunday evening was a proposed

16   exhibit from the Government detailing allegations of the books

17   showing inaccurate amounts as to postage.  And the way that they

18   have it down in their summary is, "total excess postage kept by

19   Digital Express for five work orders."

20        And they have a total of $5,083.42 with the allegation

21   of what's in QuickBooks, what was actually the bank records, and

22   with the allegation that there's some type of fraudulent

23   bookkeeping going on and that Digital Express is keeping money

24   that it shouldn't related to postage.

25        That implication as to Miguel Castro is incredibly

─────2:19-cr-00295-GMN-NJK─────

1   damaging and affects his credibility.  In addition to this, the

2   Court made no 403 analysis as to even if you're somehow going to

3   allow them to introduce this, whether or not it is more

4   prejudicial than probative.

5        We now have the testimony from Mr. O'Connor that he had

6   access to the QuickBooks.  He had his own count -- account login

7   information.  Sometimes he would use Miguel's computer and

8   access through Miguel's account information.  And he

9   specifically talked about the different postage accounts and

10  things of that nature.

11       For there to be any suggestion that Miguel Castro

12  somehow was fraudulent -- fraudulently doing these books as to

13  be able to keep more money than they should have I think is

14  completely prejudicial.

15       And that is the reason the rules require the Government

16  to present 404(b) information prior to trial.  So --

17       THE COURT:  How is retaining postage 404(b)?  How is it

18  not part of the -- part and parcel of the crime?

19       MR. ERICSSON:  The -- the allegation, as I see it here,

20  is that it is more evidence that they were, one, doing

21  fraudulent work and that he is being fraudulent in his

22  relationship to accounting with the supposed partners that he

23  had --

24       THE COURT:  As it relates --

25       MR. ERICSSON:  -- that Patti Kern was -- pardon me?

1          THE COURT:  As it relates to the crime that's charged.

2          MR. ERICSSON:  Your Honor, if I may go to the case that

3    they talk about.  Intrinsic to what was alleged.  The case that

4    they cite to is the case of *United States versus Lillard,* which

5    is 354 F.3d 850, 2003 case.  And that is what they cite to for

6    this intrinsic connection to what is charged.

7          In that case, the -- the information that they were

8    trying to get out was that one of the defendants had stolen some

9    of the cocaine that was being charged in the possession of

10   drugs.  That charge itself was actually included in the

11   indictment, and they had had litigation of that issue prior to

12   the case even going to trial.  And, there, the Court ruled what

13   you're trying to keep out was -- was specifically charged in

14   this indictment.

15         Here, the Government first said they're not -- they're

16   just trying to say he's a bad accountant, that it isn't anything

17   404(b), that it's not that he was -- that there was something --

18   and I'm adding words -- nefarious about it.

19         Your Honor, that is not what they're now trying to

20   present.  They're trying to present that there was some type of

21   fraud within the accounting to improperly take money from the

22   supposed partners, Mary -- or Patti Kern in there.

23         So -- and, again, with the 403 analysis, where we now

24   have this witness, Mr. O'Connor, indicating he was in the

25   QuickBooks and doing -- making entries as to things related to

—2:19-cr-00295-GMN-NJK—

 1  him, I think it -- there is no proper basis for the Government

 2  to be able to, through their next witnesses, try to suggest that

 3  Miguel Castro was putting in improper information that was

 4  coming -- somehow giving them a financial advantage in this big

 5  transaction.

 6         That is not what is charged in this case.  And we

 7  certainly have not had the opportunity, hearing about this

 8  mid-trial, that the Government acknowledges probably should have

 9  been turned over to us, to have our own -- we can't retain an

10  expert that quickly to address this.

11         Now, one of the problems is that one of the other

12  defendants, they have an accounting expert that's going to come

13  in.  That's not our client's accounting expert.  The fact that

14  they want to use it, that is one of the challenges of lumping

15  multiple defendants in one case.

16         And if that is a problem, then we would request under

17  Rule 14 a severance as to Mr. Miguel Castro in this trial.  If

18  the Government is going to make these allegations where we now

19  have multiple people having access to these QuickBooks to try to

20  go after another defendant's expert, that should not harm

21  Mr. Miguel Castro in his defense.

22         So I wanted to make that record.  I certainly stand by

23  our request that the Government be limited and not make any

24  suggestions that the accounting done by Miguel Castro was in any

25  way improper or used to gain a financial benefit for Mr. -- for

————2:19-cr-00295-GMN-NJK————

 1   Mr. Castro or these companies.

 2          THE COURT:  All right.  So I've already given my ruling

 3   on the evidence of the accounting done for the companies that

 4   are charged in this case, and I do think that the -- even the

 5   retaining of postage is potentially evidence of knowledge of a

 6   cease and desist or something like that.

 7          I don't know how it's going to be used, but the -- the

 8   accounting of the companies that are being run and that the

 9   defendants work for is certainly intertwined and is -- is the

10   basis for the involvement of these individuals in the crimes

11   that are charged.  So that's still admissible evidence.

12          I'm not sure about your severance issue because I'm not

13   seeing where there's a mutually antagonistic defense that's

14   being proffered by Mario Castro saying this is all Miguel

15   Castro's fault because of his accounting or something?  I don't

16   know.  I'm not sure that I'm following the severance argument.

17          MR. ERICSSON:  Your Honor, if I may briefly address

18   that.

19          It's my understanding in listening to the arguments

20   made by the Government that they believe they should be able to

21   get into these alleged discrepancies to challenge the accounting

22   expert that Mario Castro, I believe, is going to be presenting

23   and the accuracy of her analysis because the numbers are not

24   accurate to it.

25          So they're trying to use information that they are

—2:19-cr-00295-GMN-NJK—

1   suggesting Miguel Castro -- or data that Miguel Castro put into

2   the system to attack the analysis of Mario's expert.  And I

3   guess we could -- you could ask that of the Government, but I

4   think that that's how they're trying to make this relevant as to

5   accounting discrepancies on the postage.

6        THE COURT:  Well, certainly, if one of the defendants

7   puts in issue the accounting and with an expert who's going to

8   testify about the accounting, then the Government has the right

9   to cross-examine that person and present their own expert if

10  there's a discrepancy in the testimony provided by the Defense.

11  So I'm not seeing how this is cause for a severance.

12       MR. ERICSSON:  And, Your Honor, our position is each

13  defendant is entitled to only have proper evidence introduced

14  against him in the trial.  And that that information will be

15  used either directly or indirectly to attack the credibility of

16  our client, and that the Government shouldn't be able to do that

17  because one of the other defendants is trying to introduce an

18  expert.

19       And that's why we believe, if you're making the

20  decision that this -- the Government can use this, that Miguel

21  Castro should be severed from this trial at this point.

22       THE COURT:  All right.  Is the Government prepared to

23  respond to that argument now or do you ...

24       MR. FINLEY:  Your Honor, Mr. Zytnick, who's calling

25  Mr. Towers, informs me that we -- we are not going to elicit

—2:19-cr-00295-GMN-NJK—

1  testimony from Inspector Towers, rather, about any alleged

2  accounting fraud on the part of Miguel Castro.  Is that correct,

3  Mr. Zytnick?

4          MR. ZYTNICK:  That is correct.

5          MR. FINLEY:  So we can just address this later.  And

6  Your Honor has already ruled.  I mean, there's the Henderson

7  Foods issue, but I don't really know that there's much to do

8  about that.  It was really just a -- kind of almost an aside to

9  the testimony of the witness.  He said more than I knew he was

10 going to say.  What he said to me was he's a terrible

11 accountant.  He said it kind of like "terrible," and I remember

12 I kind of laughed -- not out of disrespect to Miguel Castro, but

13 just because I find Mr. Villasenor's candor kind of refreshing.

14 So I just kind of laughed.  And that was it.

15         So -- and I do think that I should have disclosed that,

16 but it would be in the nature of a *Jencks*.  And, you know, under

17 the statute you can provide *Jencks*, you know, right at the time.

18 So I don't think there's any prejudice to that.

19         And, you know, this other issue, Your Honor's already

20 ruled on it.  We can talk about it more later, but we don't need

21 to talk about it now.  We can bring the jury in.

22         THE COURT:  All right.  So let's go ahead and bring the

23 jury in, and we'll table that severance motion for now until

24 it's -- it's a bit premature because I don't know what the

25 expert from the Defense is going to say anyway.

—2:19-cr-00295-GMN-NJK—

1            MR. GREEN:  Your Honor, Don Green, may we be heard for

2   10 seconds?

3            THE COURT:  Yes.

4            MR. GREEN:  To the extent that Mr. -- the motion for

5   Miguel Castro is considered by the Court, we adopt the arguments

6   of cocounsel.  We join in that.  We also join in the request for

7   severance.

8            And in the alternative, we also request a limiting

9   instruction as to the admissibility of this evidence as to a

10  particular defendant, and in particular, Salvador Castro.  Thank

11  you, Your Honor.

12           THE COURT:  What limiting instruction would that be?

13           MR. GREEN:  Well, if they're eliciting information --

14  if they do, if it comes out -- on this accounting discrepancies,

15  we'd like a limiting instruction that Salvador Castro is not

16  involved in the production of any of these documents nor was he

17  involved in any accounting of whatever type.  Thank you.

18           THE COURT:  All right.  Well, that would not be a

19  proper limiting instruction.  A limiting instruction would be

20  that if this is evidence of other acts, that it's not admissible

21  for the purposes of demonstrating tax fraud or money laundering,

22  which I think is a bell you don't want me to ring.  Unless you

23  think it's already been rung and you want me to clarify that.

24           But -- all right.  So as far as the motion to join,

25  that's granted.  The motion for a limiting instruction is

—2:19-cr-00295-GMN-NJK—

1  denied.

2          All right.  So let's go ahead and bring in the jury.

3          COURTROOM ADMINISTRATOR:  All rise.

4          (Whereupon jury enters the courtroom at 11:11 a.m.)

5          THE COURT:  All right.  Everyone may be seated.  We've

6  got the jury back.  We're on the record.  And now the Government

7  may call its next witness.

8          MR. ZYTNICK:  The Government calls Kevin Towers.

9          THE COURT:  I didn't hear the last name.  Kevin?

10         MR. ZYTNICK:  Towers, T-O-W --

11         THE COURT:  Oh, Towers.

12         MR. ZYTNICK:  -- E-R.

13         THE COURT:  Good morning, Mr. Towers.  Come on up.

14  You're going to be seated to my left.  Please be careful with

15  the steps up.

16         KEVIN TOWERS, having duly been sworn, was examined and

17  testified as follows:

18         COURTROOM ADMINISTRATOR:  Please state your name for

19  the record, spell your full name.

20         THE WITNESS:  Kevin Towers, K-E-V-I-N, T-O-W-E-R-S.

21               DIRECT EXAMINATION OF KEVIN TOWERS

22  BY MR. ZYTNICK:

23  Q.  And both of those devices in front of you are actually

24  microphones.  So just please make sure you're speaking into them

25  so that the jurors can hear.

2:19-cr-00295-GMN-NJK

1    *A.*    Okay.

2    *Q.*    So can you please tell the jury what kind of work you do.

3    *A.*    I'm a United States postal inspector.

4    *Q.*    How long have you been a postal inspector?

5    *A.*    Since 2005.

6    *Q.*    Now, the jury has heard I think from a lot of postal

7    inspectors.  They probably know too much about postal

8    inspectors.  But what types of crimes do you investigate as a

9    postal inspector?

10   *A.*    My whole career I've been assigned to the mail fraud

11   assignment.

12   *Q.*    And how -- so that's been since 2005?

13   *A.*    Yes.

14   *Q.*    Before becoming a postal inspector, where did you work?

15   *A.*    I was a civil investigator with the United States Federal

16   Trade Commission.

17   *Q.*    What kind of work did you do at the Federal Trade

18   Commission?

19   *A.*    I investigated consumer fraud.

20   *Q.*    And the Federal Trade Commission, that's sometimes referred

21   to as F -- the FTC?

22   *A.*    Correct.

23   *Q.*    And that's an agency that investigates fraud?

24   *A.*    Yes, it is.

25   *Q.*    All right.  So there's been a number of questions from

————2:19-cr-00295-GMN-NJK————

1  jurors at various points in this trial about how much money

2  certain victims spent or where the money went, things like that.

3  Do you have some information related to those issues?

4  *A.*  Yes, I do.

5  *Q.*  All right.  Have you looked at checks drawn on the accounts

6  of Betty Lou Stirewalt, James Gambon, James Pascarella, Joseph

7  Miskovich, Lorraine Ramadan, and Cynthia Sorrentino?

8  *A.*  Yes, I have.

9  *Q.*  Did you calculate how many checks and how much money those

10 people sent to the mailing companies in this scheme?

11 *A.*  Yes, I did.

12 *Q.*  Did you prepare a chart or series of charts to summarize how

13 much money the six -- those six individuals sent to the mailing

14 companies in this scheme?

15 *A.*  Yes, I did.

16       MR. ZYTNICK:  Can we please show Exhibit 281.  And this

17 exhibit, along with all of the exhibits I think that we're going

18 to be talking about today, have already been admitted.

19 BY MR. ZYTNICK:

20 *Q.*  Is it on the screen in front of you?

21 *A.*  No.

22 *Q.*  Okay.

23       (Pause.)

24       THE COURT:  Nick, the projector light is cutting in and

25 out.

———2:19-cr-00295-GMN-NJK———

1          COURTROOM ADMINISTRATOR:  I know.  I just hit it a

2     couple of times.

3          THE COURT:  Okay.  It was on then off, then on, then

4     off.  Now it's on.

5          (Pause.)

6     BY MR. ZYTNICK:

7     Q.  While we are awaiting for that, why don't I just ask you a

8     few other questions and then we'll -- we'll come right back to

9     this.

10    A.  Okay.

11    Q.  Is one of the things that you also looked at bank signature

12    cards?

13    A.  Yes.

14    Q.  And what type of information can you find out on a bank

15    signature card?

16    A.  Uhm.  Typically it's the person who opens the account, with

17    their name and signature.  Also includes, uhm, identification

18    information that was provided to whoever was helping at the bank

19    to open the account, like driver's license, Social Security

20    card, credit cards, debit cards, so forth.

21    Q.  So you mention, like, there's someone's name on there.  If

22    it's a corporate account, like an account for a company, would

23    there be the name of an individual on the bank signature card?

24    A.  Yes.

25    Q.  And you said that's the person who typically opens the

1  account?

2  *A.*   Yes.

3  *Q.*   Do we sometimes refer to that person as the account signer?

4  *A.*   Yes.

5  *Q.*   They have signature -- signatory authority over that

6  account?

7  *A.*   Yes, correct.

8  *Q.*   Did you look at bank signature cards to determine who the

9  account signers are for various of the mailing companies in this

10 case?

11 *A.*   Yes, I did.

12 *Q.*   And so you've see the names of the people who opened those

13 accounts?

14 *A.*   Yes, I have.

15        THE COURT:  When you say "those accounts," are you

16 referring to bank accounts?

17        MR. ZYTNICK:  Yes, bank accounts.  And we'll talk about

18 specific ones later.

19 BY MR. ZYTNICK:

20 *Q.*   And now that we have the slide up.  So earlier, you know,

21 two and a half minutes ago, we were talking about a chart or

22 series of charts you prepared including for the six specific

23 victims in this case.

24        Is this the first page of that?

25 *A.*   Yes, it is.

1   *Q.*  And does this page and the other pages for the other five

2   victims, does that accurately summarize the checks drawn on

3   those victims' accounts?

4   **A.**  Yes, it does.

5   *Q.*  All right.  So on this first page, can you tell us what we

6   are looking at?

7           MR. GREEN:  Excuse me, Your Honor.  There's two

8   monitors which are not on now.

9           THE COURT:  Okay.

10          MR. GREEN:  Apologize, Your Honor, for the

11  interruption.

12          THE COURT:  No, that's fine.  Looks like there's ...

13          (Pause.)

14          THE COURT:  And we got some over here.  You try

15  unplugging and plugging it because it --

16          MR. MISHLER:  I mean, it's on.  It's just not getting a

17  signal from anything.

18          (Discussion held off the record.)

19          THE COURT:  Is it all three monitors in the row or just

20  one of the monitors?

21          MR. MISHLER:  No, it's all three.

22          THE COURT:  Okay.  Because they work like Christmas

23  lights.  If one goes out, then they ...

24          (Discussion held off the record.)

25          THE COURT:  We use those blue fabric Velcro things over

1    the wires to try to keep them from moving, but sometimes there's

2    so many people walking in and out, it loosens up one of the

3    wires and that's enough.

4          MR. GREEN:  For the record, Your Honor -- Don Green on

5    behalf of Salvador Castro -- we can see this large screen in

6    front of us.

7          THE COURT:  Okay.  Well, we'll call IT and take a look

8    at it over the lunch break.  So long as you can still see the

9    big screen or one of the other monitors from the other

10   defendants.

11   BY MR. ZYTNICK:

12   *Q.*  So does this -- does this first page here show how many

13   checks Betty Lou Stirewalt wrote to the mailing companies in

14   this case?

15   *A.*  Yes, it does.

16   *Q.*  How many was that?

17   *A.*  131 checks.

18   *Q.*  What is the total dollar amount of those checks?

19   *A.*  $2,820.

20   *Q.*  So let's take a look at just a few examples.  On the left

21   side there, we see a box for "Assets Unlimited."  Can you tell

22   us what is indicated in that box?

23   *A.*  This box shows that Ms. Stirewalt wrote 14 checks to Assets

24   Unlimited for a total of $322.

25   *Q.*  Okay.  And underneath the words "Assets Unlimited," in that

—2:19-cr-00295-GMN-NJK—

1    box, there's a name in parentheses, Mario Castro, Jr.

2    **A.**    Yes.

3    *Q.*    Why is that name there?

4    **A.**    That was the name on the signature card for the account.

5    *Q.*    Okay.  So when we were talking about who opened the account,

6    who's listed as the signer on the bank account, that's what

7    you're referring to?

8    **A.**    Yes.

9    *Q.*    And that -- for Assets Unlimited, that's Mario Castro, Jr.?

10   **A.**    Yes.

11   *Q.*    Let's look at one more example on this one.  According to

12   the bank signature card, who opened the Imperial Awards Services

13   account?

14   **A.**    Salvador Castro.

15   *Q.*    How much money did Ms. Stirewalt pay to Imperial Award

16   Services?

17   **A.**    $390.

18   *Q.*    All right.  And so is the same type of information

19   applicable to these other boxes on this page?

20   **A.**    Yes.

21   *Q.*    So we can tell how many checks and the dollar value of those

22   checks?

23   **A.**    Yes.

24   *Q.*    Okay.

25            MR. ZYTNICK:  Let's go to page 2.

1    BY MR. ZYTNICK:

2    *Q.*  Does this show the same type of information for James

3    Gambon?

4    *A.*  Yes, it does.

5    *Q.*  How many checks did Mr. Gambon write?

6    *A.*  129 checks.

7    *Q.*  What was the total dollar amount of those checks?

8    *A.*  $2,723.

9    *Q.*  Let's look at one of the examples, the Price Awards box.

10   How much money did Mr. Gambon pay to Price Awards?

11   *A.*  $165.

12   *Q.*  According to the bank signature card, who opened the Price

13   Awards account?

14   *A.*  Miguel Castro.

15   *Q.*  So Mr. Gambon paid 160 -- or wrote checks worth $165 to an

16   account that was opened by Miguel Castro?

17   *A.*  Yes.  Uhm.  The only hesitation I have is the checks were

18   written to Price Awards.

19   *Q.*  Okay.  So at least from here, you can't tell if they were

20   necessarily all deposited in the Price Awards account?

21   *A.*  Correct.

22   *Q.*  But they were all written -- like, where it says "pay to,"

23   it always said Price Awards?

24   *A.*  Yes.

25           MR. ZYTNICK:  Why don't we go to the third page.

—2:19-cr-00295-GMN-NJK—

1  BY MR. ZYTNICK:

2  *Q.*  How many checks did James Pascarella write?

3  *A.*  109 checks.

4  *Q.*  What is the dollar value of those checks?

5  *A.*  $2,356.

6  *Q.*  And if we look in the bottom middle, we see a box for

7  Pacific Disbursement Reporting.  Do you see that?

8  *A.*  Yes, I do.

9  *Q.*  Can you tell us who opened that Pacific Disbursement

10  Reporting account?

11  *A.*  Jose Luis Mendez.

12  *Q.*  How many checks -- or, actually, let me ask, what is the

13  dollar value of the checks that James Pascarella wrote to

14  Pacific Disbursement Reporting?

15  *A.*  $188.

16  *Q.*  And we're seeing a lot of the same company names on this

17  page as we've seen on the other pages.  Is that correct?

18  *A.*  Yes.

19  *Q.*  Is that something you found that, you know, the company

20  names were appearing over and over?

21  *A.*  Yes.

22        MR. ZYTNICK:  Let's go to Page 5, please.

23  BY MR. ZYTNICK:

24  *Q.*  Can you tell the jury how many checks Lorraine Ramadan

25  wrote?

———2:19-cr-00295-GMN-NJK———

1  *A.*  123 checks.

2  *Q.*  What is the total dollar value of those checks?

3  *A.*  $2,633.

4       MR. ZYTNICK:  Let's go to Page 6, the last page with

5  information about one of the six victims.

6  BY MR. ZYTNICK:

7  *Q.*  How many checks were written on Cynthia Sorrentino's

8  account?

9  *A.*  384 checks.

10 *Q.*  What is the total dollar amount of those 384 checks?

11 *A.*  $8,186.

12 *Q.*  Let me ask you about a few more examples from this page.

13      How many of those Sorrentino checks were written to

14 Pacific Disbursement Reporting?

15 *A.*  53 checks.

16 *Q.*  What is the dollar value of those checks written to Pacific

17 Disbursement Reporting from Ms. Sorrentino?

18 *A.*  $1,091.

19 *Q.*  And who opened the Pacific Disbursement Reporting bank

20 account, according to the signature card?

21 *A.*  Jose Luis Mendez.

22 *Q.*  Did Mr. Mendez also open the accounts for Distribution

23 Reporting Services and Pacific Allocation Systems?

24 *A.*  Yes.

25 *Q.*  Can you tell the jury the dollar value of the checks from

 1  Ms. Sorrentino to Distribution Reporting Services?

 2  *A.*  $260.

 3  *Q.*  What about the dollar value of the checks to Pacific

 4  Allocation Systems?

 5  *A.*  $694.

 6  *Q.*  Of these 384 checks, can you tell us how many were written

 7  to Golden Products Service?

 8  *A.*  55 checks.

 9  *Q.*  What's the dollar value of those 55 checks?

10  *A.*  $1,195.

11  *Q.*  Who opened the Golden Products Services bank account,

12  according to the signature card?

13  *A.*  Salvador Castro.

14  *Q.*  Does your summary also show that Salvador Castro opened the

15  accounts, the bank accounts, for Imperial Award Services and

16  Montgomery Marketing?

17  *A.*  Yes.

18  *Q.*  Can you tell the jury how much those accounts -- well,

19  actually, let me -- let me rephrase it.

20          Can you tell the jury the value of the checks

21  Ms. Sorrentino wrote to those companies?

22  *A.*  Uhm.  $790 to Imperial Award Services, and $326 to

23  Montgomery Marketing, Incorporated.

24  *Q.*  According to the bank signature cards, who opened the

25  accounts for both Assets Unlimited and Money Securities?

1  *A.*  Mario Castro, Jr.

2  *Q.*  Can you tell us the dollar value of the checks that

3  Ms. Sorrentino wrote to Assets Unlimited and Money Securities?

4  *A.*  $405 to Assets Unlimited, and $311 to Money Securities.

5  *Q.*  And I believe we previously talked about Price Awards and

6  how that account was opened by Miguel Castro.  Is that correct?

7  *A.*  That's correct.

8  *Q.*  How much money -- or how many money -- what was the dollar

9  value of the checks that Ms. Sorrentino wrote to Price Awards?

10  *A.*  $205.

11  *Q.*  So we've been talking about these six specific victims, you

12  know, each of them sending hundreds or thousands of dollars in

13  checks.  Is that right?

14  *A.*  That's right.

15  *Q.*  Now, if a victim did not send a check -- or let me ask it

16  this way.

17         If a victim sent cash in addition to checks, if they

18  sent cash, does your exhibit, does your summary --

19         MR. ZYTNICK:  And we can leave the summary up there.

20  BY MR. ZYTNICK:

21  *Q.*  Does that summary include cash the victims sent also?

22  *A.*  It does not include cash.

23  *Q.*  Okay.

24         MR. ZYTNICK:  Why don't we go to Exhibit 12, actually.

25  And if we could zoom in on the top.

 1  BY MR. ZYTNICK:

 2  *Q.*  Inspector Towers, have you reviewed documents showing that

 3  victims sometimes sent cash?

 4  *A.*  Yes, I have.

 5  *Q.*  So if we can look here at Exhibit 12, we've got -- you know,

 6  it has James Pascarella's name on the side.  And do you see

 7  where it has a box in the middle, it says, you know -- or it has

 8  boxes, I guess, for cash, check, or money order?

 9  *A.*  Yes, I do.

10  *Q.*  Which box is checked?

11  *A.*  The cash box.

12  *Q.*  Now, if Mr. Pascarella sent cash to Price Awards, because --

13  oh, yeah, it says at the bottom, "Make check or money order

14  payable to Price Awards."  Do you see that?

15  *A.*  I do.

16  *Q.*  So if Mr. Pascarella sent cash to Price Awards, would that

17  be included in the summary that we were just looking at?

18  *A.*  No, it would not.

19  *Q.*  So all of that money that you were saying that

20  Mr. Pascarella sent, that was just checks, that would not

21  include any cash?

22  *A.*  Correct, just checks.

23  *Q.*  Okay.

24          MR. ZYTNICK:  Can we go to Exhibit 8, please, at the

25  bottom.

—2:19-cr-00295-GMN-NJK—

1  BY MR. ZYTNICK:

2  *Q.*  So here we have a prize notice addressed to Joseph

3  Miskovich.  You can kind of see his name, second line from the

4  bottom on this ...

5          And do you see there that a box is checked for cash or

6  check or money order?

7  *A.*  Yes, I do.

8  *Q.*  And which box is checked?

9  *A.*  The cash box.

10 *Q.*  All right.

11          MR. ZYTNICK:  Let's take another look at Exhibit 9 --

12 actually, if we can stay here -- actually, I'm sorry, if we can

13 go back to Exhibit 8 for just one moment.  You can zoom in on

14 the bottom left.

15 BY MR. ZYTNICK:

16 *Q.*  Does that appear to be handwriting that says:  "Okay, here

17 is my cash"?

18 *A.*  Yes, it does.

19 *Q.*  And after that, does it -- it's a little hard to read, but

20 it appears to say:  "Where is your awards?"

21          Is that what you see?

22 *A.*  That's what it appears to say.

23 *Q.*  Okay.

24          MR. ZYTNICK:  Can we go to Exhibit 9, please.  And if

25 we can zoom in on the bottom.

—2:19-cr-00295-GMN-NJK—

1  BY MR. ZYTNICK:

2  *Q.*  So, once again, we're looking at a prize notice sense to

3  Joseph Miskovich and the part he filled out at the bottom.  Do

4  you see where it has a signature that appears to be Joe

5  Miskovich?

6  *A.*  Yes, I do.

7  *Q.*  And underneath that, can you read what that handwritten note

8  appears to say?

9  *A.*  Appears to say:  "Cash enclosed."

10  *Q.*  So earlier, when you said that Joseph Miskovich had sent

11  checks valued at a total of $880, that includes only the checks,

12  not any of these times when he may have sent cash.  Is that

13  correct?

14  *A.*  Correct, just checks.

15  *Q.*  And so these exhibit examples we just looked at, Exhibits 8,

16  9, and 12, are these examples of victims indicating that they

17  had sent cash to the scheme?

18  *A.*  Yes, they are.

19  *Q.*  All right.

20      All right.  So let's move a little more broader than

21  the six individual victims.  Are there bank records showing

22  payments by many other victims?

23  *A.*  Yes, there are.

24  *Q.*  What kind of bank records have you reviewed in this case?

25  *A.*  I've reviewed account signature cards, uhm, account opening

—2:19-cr-00295-GMN-NJK—

1  documents, bank statements, deposit slips, uhm, including the

2  offsets for those deposit slips, checks and whatever else were

3  used to make those deposits, checks written from accounts, wire

4  transfer information.  And, again, bank statements, if I didn't

5  say that.

6  *Q.*  All right.  So it's basically a whole set of information

7  about money coming into accounts, money coming out, where it's

8  going, where it's coming from, things like that?

9  **A.**  Yes, correct.

10  *Q.*  Was this a small or large amount of bank records?

11  **A.**  It was very large, significant.

12  *Q.*  Can you give us, you know, a rough sense?

13  **A.**  Conservatively, hundreds of thousands of pages.

14  *Q.*  Did you personally look at every single page of those

15  hundreds of thousands of pages of bank records?

16  **A.**  I did not.

17  *Q.*  Did you have some sort of help to analyze the bank records?

18  **A.**  Yes, I did.

19  *Q.*  What did -- well, what did you and your team do to analyze

20  the bank records?

21  **A.**  Uhm.  The initial analysis was done by the investigative

22  team, including postal inspectors and personnel at the

23  Department of Justice, where they took the subpoena bank account

24  information and import it into a software program called CFIS.

25          And this CFIS program is -- I guess the best way to

—2:19-cr-00295-GMN-NJK—

1   think about it is you can set it up with templates.  So if --

2   depending on the bank accounts, if you have Bank of America

3   statements that you want to analyze, you select Bank of America

4   template on CFIS, and you import the statements.

5          And then CFIS uses OCR to scan those documents and then

6   convert the data or the information that are on the bank

7   statements into an Excel spreadsheet.

8   Q.  You referenced "OCR."  Is that a way of computers reading

9   text from paper?

10  A.  Yes.  It's kind of like similar to if you're taking --

11  making a deposit on your phone.  You can take a picture of it,

12  and your bank is -- that app is using OCR to recognize that

13  check when it makes that deposit into your bank account.

14  Q.  Now, you mentioned the CFIS.  Is that C-F-I-S?

15  A.  Yes.

16  Q.  Is this top-secret government technology?

17  A.  It's not.  It's a publicly-available piece of software.

18  Q.  How did you ensure that the information you're getting

19  through the software is accurate?

20  A.  As I mentioned initially, the -- the initial round of bank

21  account analysis, so to speak, done by the initial team, CFIS

22  has an ability to check -- has a self-check within the program

23  as it's running through the accounts.  And it looks at dates,

24  and it also looks at beginning and ending balances.

25          So when you have the final output of the product, it

—2:19-cr-00295-GMN-NJK—

1  will identify if there are any issues where maybe it maybe had

2  problems with looking at the -- when it was scanning a number or

3  a date.

4         And then the people that were working on CFIS at the

5  time would see those errors -- or not errors, the problems that

6  were identified, and then go hand-check what those might be

7  within the statement itself, and then make those corrections in

8  the -- the raw data spreadsheet.

9  Q.  So with a bank account you've got money coming in and money

10 going out, right?

11 A.  Yes.

12 Q.  And you've got a beginning balance and an ending balance,

13 right?

14 A.  Yes.

15 Q.  And do -- those numbers are supposed to all match up, right?

16 A.  Correct.

17 Q.  So does the software have a way of -- is that what you're

18 referring -- does the software have a way of making sure that

19 the numbers are matching up?

20 A.  Yes, it's like a self-reconciliation, you know, process that

21 it goes through.

22 Q.  Is there anything else that you and your team did to ensure

23 that the numbers and your analysis are accurate?

24 A.  So after importing the -- the bank statements and

25 identifying any potential problems and then self -- you know,

—2:19-cr-00295-GMN-NJK—

1  correct -- making those corrections, they went through and

2  looked at checks that were written from the accounts and

3  imported that -- those specific items into those checks, if it

4  wasn't captured through the CFIS process.  So, you know, checks

5  written to an individual or an entity, and making sure that that

6  matches up with the amount that CFIS did pull.  Because CFIS

7  identifies if a check is written based on the statements.

8          And then after that, so what I did after the -- the

9  team did the initial analysis, I went through and looked at the

10 accounts and their beginning and ending balances, making sure

11 those matched up on the statements.  And then I did spot-checks

12 on the deposits, wire transfers, checks written to, checks

13 written from.

14 *Q.*  Did you also review some entire sets of checks to ensure

15 that they were accurate?

16 *A.*  Yes, I did.

17 *Q.*  Hundreds of thousands of pages of bank records, do you have

18 the results of the analysis all memorized in your head?

19 *A.*  I do not.

20 *Q.*  Have you -- or is there any way humanly possible you could

21 memorize all of that analysis?

22 *A.*  No.

23 *Q.*  Have you prepared some summary exhibits, though, to help the

24 jury understand certain aspects of the bank records?

25 *A.*  I have, yes.

—2:19-cr-00295-GMN-NJK—

1        MR. ZYTNICK:  All right.  Can we please show

2   Exhibit 260.

3   BY MR. ZYTNICK:

4   *Q.*  And, Inspector Towers, did you analyze payments from victims

5   that were deposited into mailing company bank accounts?

6   *A.*  Yes, I did.

7   *Q.*  What did the victim deposits in this case look like?

8   *A.*  Uhm, they were typically deposits consisting of multiple

9   checks written to 20, $25 amounts.

10  *Q.*  So when you had a group of checks, multiple checks, that

11  were 20 or $25, did you -- did you presumptively treat those as

12  victim checks?

13  *A.*  Yes.

14  *Q.*  If there was some sort of $250 deposit that didn't look like

15  that, would you have treated that as a victim check?

16  *A.*  No.

17  *Q.*  Did you and your team spot-check the deposits to ensure that

18  they were actually victim checks?

19  *A.*  Yes, we did.

20  *Q.*  Did you calculate the total amount of victim payments for

21  each of the mailing company accounts listed on this chart?

22  *A.*  Yes, I did.

23  *Q.*  Does this chart, Exhibit 260, accurately summarize the total

24  amount of victim payments for each of these accounts?

25  *A.*  Yes, it does.

—2:19-cr-00295-GMN-NJK—

1  *Q.* Can you tell us what the column titles on this chart

2  indicate?

3  **A.** I'm sorry. Can you repeat that? I couldn't hear you.

4  *Q.* Can you tell us what the column titles on this chart

5  indicate?

6  **A.** Uhm. On the left side is the number -- just identifying the

7  number of how many accounts that are on the chart. And then

8  going to the right of that is the account information that

9  identifies the mailing -- or the mailer, the -- sorry, I'm

10 having trouble reading it -- as well as the signer on the

11 account.

12         The column to the right of that, the summary period,

13 shows the date -- the date range that was -- that was used. And

14 then the final column shows the total number of -- or total

15 amount of victim payments deposited into that specific account.

16         MR. ZYTNICK: So maybe we can zoom in on the top half.

17 BY MR. ZYTNICK:

18 *Q.* So in that first row there, is this showing how much money

19 -- how much money in victim payments was deposited into the

20 Pacific Data Awards account?

21 **A.** Yes, it does.

22 *Q.* What is that dollar amount?

23 **A.** $898,480.

24 *Q.* Who opened that account, according to the bank signature

25 card?

—2:19-cr-00295-GMN-NJK—

1  *A.*  Claudia E. Castro.

2  *Q.*  And then in the second row, how much money was deposited in

3  victim payments into the Pacific Disbursement Reporting account?

4  *A.*  $609,624.

5  *Q.*  And who opened that account, according to the bank signature

6  card?

7  *A.*  Jose L. Mendez.

8       MR. ZYTNICK:  Let's zoom out for a moment.

9  BY MR. ZYTNICK:

10 *Q.*  And we're going to do a little quick math here.  So for

11 row 2, you just said that account opened by Jose Mendez had over

12 $600,000 in victim payments deposited into it.  Is that correct?

13 *A.*  That's correct.

14 *Q.*  All right.  If we go down to row 9, is that another account

15 opened by Jose Mendez?

16 *A.*  Yes, it is.

17 *Q.*  And that one had 273-some thousand dollars deposited into

18 it, correct?

19 *A.*  Correct.

20 *Q.*  So if we add those together, roughly, we're looking at over

21 870 or $880,000, just those two accounts?

22 *A.*  Yes, correct.

23       MR. ZYTNICK:  Okay.  And then if we go to the account

24 right below that -- or row 10, actually, right there.  Thank you

25 already, Ms. Rush.  You were way ahead of me.

1  BY MR. ZYTNICK:

2  *Q.* So we're at 880,000 or so. We add in -- and then we see

3  this row 10, Mr. Mendez's Distribution Reporting Services

4  account?

5  *A.* Yes.

6  *Q.* And if we add another $264,000 to the 880,000, does that put

7  us over $1.1 million?

8  *A.* Yes, it does.

9  *Q.* So just those three accounts opened by Mr. Mendez, is there

10  over -- or was there over $1.1 million in victim payments?

11  *A.* Yes.

12          MR. ZYTNICK:  Let's do the same thing starting at

13  row 4.

14  BY MR. ZYTNICK:

15  *Q.* We see there an account for Imperial Award Services.  Is

16  that right?

17  *A.* Yes, I see it.

18  *Q.* And I believe you previously testified -- and consistent

19  with this chart -- that the account signer there was Salvador

20  Castro?

21  *A.* Yes.

22  *Q.* How much money in victim payments was deposited into the

23  Imperial Award Services account opened by Salvador Castro?

24  *A.* $521,362.

25  *Q.* Okay.

1          MR. ZYTNICK:  So if we can zoom back out.

2    BY MR. ZYTNICK:

3    Q.  So we got, you know, over 500,000 in that account.  Go down

4    to row 6.  Is that another account opened by Salvador Castro?

5    A.  Yes, it is.

6    Q.  And so there we've got over $457,000 in victim payments?

7    A.  Yes.

8    Q.  So doing the quick math again, and just kind of roughly,

9    we're over $970,000, just from those two accounts.  Is that

10   right?

11   A.  Yes.

12   Q.  All right.  And then we go down to row 13.  Is that another

13   account opened by Salvador Castro?

14   A.  Yes, it is.

15   Q.  And that one had $174,200 in victim payments?

16   A.  Yes.

17   Q.  So if we add the 970,000 to, you know, 170,000, being

18   conservative here, we're talking about a total of over $1.1

19   million into the accounts opened by Salvador Castro.  Is that

20   right?

21   A.  Yes, correct.

22   Q.  Thank you.

23          Let's take a quick look at Page 2.  We're going to get

24   to the bottom-line information in just a moment.  But I want to

25   actually point out row 18.  Is that another account opened by

—2:19-cr-00295-GMN-NJK—

1   Jose L. Mendez, according to the bank signature card?

2   *A.*  Yes, it is.

3   *Q.*  And so that would add, you know, just under another $100,000

4   to the amount of victim payments that went into accounts that

5   were opened by Jose Mendez?

6   *A.*  Yes.

7   *Q.*  Can you tell us for these accounts what was the total amount

8   of victim payments deposited into these mailing company

9   accounts?

10  *A.*  $6,159,238.

11  *Q.*  By the way, are these amounts rounded?

12  *A.*  Yes, they are.

13  *Q.*  All right.  To the nearest dollar?

14  *A.*  Yes.

15  *Q.*  All right.  Did you generally round -- in the various charts

16  you made, did you generally round to the nearest dollar?

17  *A.*  Yes.

18  *Q.*  All right.

19          So we were just talking about the total amount, this --

20  this figure over $6 million.  Earlier, we looked at some

21  exhibits, you may remember, where victims indicated they were

22  sending cash.  If that -- if victims sent cash and it wasn't

23  deposited into these mailing company accounts, would that be

24  included in this -- this number, 6 million here?

25  *A.*  No.

—2:19-cr-00295-GMN-NJK—

1   Q.  So any cash would actually be in addition to the

2   6,159,328 -- or $238 listed here?

3   A.  Yes, correct.

4   Q.  So, in other words, could the actual amount of victim

5   payments be higher than what you have listed here?

6   A.  It could be.

7   Q.  Have you also seen documents showing that there are

8   additional mailing companies that are not even on this chart?

9   A.  Yes, I have.

10          MR. ZYTNICK:  Let's take a brief look at Exhibit 175.

11  I'm sure the jury has seen several times.

12          If we can zoom in at the top on Line 2.

13  BY MR. ZYTNICK:

14  Q.  Do you see at the second line there there's a mention of

15  some things called PMS, GAM, and ERN?

16  A.  Yes.

17  Q.  Did you have any bank records for mailing companies with

18  those names?

19  A.  No, I did not.

20  Q.  Does your chart include any victim payments that were sent

21  as checks to those companies?

22  A.  No.

23          MR. ZYTNICK:  All right.  So let's go back to Exhibit

24  2 -- whatever we were just on -- 260.

25  BY MR. ZYTNICK:

---2:19-cr-00295-GMN-NJK---

1   Q.  So, for instance, this chart does not include any reference

2   to the companies that are PMS, GAM, or ERN.  Is that correct?

3   A.  Correct.

4   Q.  So any money paid to those accounts would be in addition to

5   the $6 million that you listed on Page 2.  Is that correct?

6   A.  That's correct.

7   Q.  All right.  So let's move onto the next steps of following

8   the money.  We've been talking about the money going into these

9   mailing company accounts.  Now I'm going to ask you about where

10  the money went from those mailing company accounts.

11      Did you look at who the money in the mailing company

12  accounts was paid to?

13  A.  Yes, I did.

14      MR. ZYTNICK:  Can we pull up Exhibit 263.

15  BY MR. ZYTNICK:

16  Q.  Is this exhibit and the other pages in this exhibit, is this

17  a chart that you created to summarize where the victim money --

18  or let me rephrase that -- where the money in the accounts was

19  paid to?

20  A.  Yes.

21  Q.  And can you tell us, what's on the left there?  There's a

22  smaller circle on the left.  Can you tell us what's going on

23  with that circle?

24  A.  The left -- left side shows the deposits in this case into

25  Money Securities' account during the time period at the top of

---
———2:19-cr-00295-GMN-NJK———

1    the -- the title bar there.  And --

2    Q.  So that's -- oh, sorry.

3          So that's looking at the money going into the account?

4    A.  Yes.

5    Q.  And based on your calculation, about 99 percent of the money

6    going into that account was victim payments?

7    A.  Yes, correct.

8    Q.  Okay.

9          Now, on the right side, the bigger pie chart, can you

10   tell us what that is?

11   A.  These were the debits from the Money Securities account and

12   what the debits were made payable to, checks and so forth.

13   Q.  All right.  So looking at this pie chart on the right, who

14   received more money from the Money Securities account?  Digital

15   Express or Patti Kern?

16   A.  Digital Express.

17   Q.  There's been evidence in this trial that Digital Express is

18   owned by Mario Castro and that the other three defendants worked

19   there.  What percent of the money from the Money Securities

20   account was pay -- was paid to Digital Express?

21   A.  65 percent.

22   Q.  And that's represented with a blue slice.  Is that correct?

23   A.  That's correct.

24   Q.  What percent of the money from the Money Securities account

25   was paid to Patti Kern?

---

—2:19-cr-00295-GMN-NJK—

1  *A.*   16 percent.

2  *Q.*   And when I say "Patti Kern" -- and when we talk about Patti

3  Kern, are we including her company, Kern and Associates?

4  *A.*   Yes, we are.

5  *Q.*   So any money payable to Patti Kern or Kern and Associates,

6  her company, that's in the -- the yellowish slice of the pie?

7  *A.*   Yes, correct.

8  *Q.*   So -- you know, so the record is clear, which slice of the

9  pie is bigger, the blue slice for Digital Express or the

10  yellowish slice for -- for Patti Kern?

11  *A.*   The blue slice, Digital Express.

12  *Q.*   And that means -- that means that Digital Express got 65

13  percent of the money; whereas, Kern got only 20 -- or sorry --

14  16 percent?

15  *A.*   Correct.

16          MR. ZYTNICK:  Can we show the -- show Exhibit 1D

17  which ...

18          Zoom in at the top.

19          Actually, if we could zoom in -- actually, the entire

20  bit of the top of the envelope is what I should have said.

21  BY MR. ZYTNICK:

22  *Q.*   All right.  So this is a letter to Betty Stirewalt.  Do you

23  see that?

24  *A.*   Yes.

25  *Q.*   And looking up at the return address in the top left, can

—2:19-cr-00295-GMN-NJK—

1  you tell what entity this letter is from?

2  *A.*  Money Securities.

3  *Q.*  And so Money Securities, was that the same entity we were

4  just looking at with that pie chart?

5  *A.*  Yes.

6          MR. ZYTNICK:  Can we go to Page 2 of this exhibit?  And

7  if we zoom in on the top half, little bit further down.  There

8  we go.

9  BY MR. ZYTNICK:

10  *Q.*  So we see a letter addressed to Patti -- I'm sorry --

11  addressed to Betty Stirewalt?

12  *A.*  Yes.

13  *Q.*  So the jury heard about Ms. Stirewalt at the beginning of

14  this case, from her daughter, Angela Measimer, the very first

15  witness in this case.  At the beginning of this letter, in that

16  sort of indented area, do you see the value of the money in

17  prizes that Betty Stirewalt supposedly won?

18  *A.*  Yes, I do.

19  *Q.*  What amount of money is that?

20  *A.*  $2 million.

21  *Q.*  Now, if Ms. Stirewalt had actually won $2 million from Money

22  Securities, do you think we might expect to see that in the

23  Money Securities' bank account?

24  *A.*  Yes.

25  *Q.*  There might be some sort of $2 million payment to Betty

—2:19-cr-00295-GMN-NJK—

1  Stirewalt in the --

2  **A.**  Yes.

3          MR. ZYTNICK:  Let's go back to Exhibit 263.

4  BY MR. ZYTNICK:

5  *Q.*  In the Money Securities' bank account, did you see any

6  indication that Betty Stirewalt had won $2 million -- or let me

7  rephrase that -- any indication that Betty Stirewalt was paid $2

8  million?

9  **A.**  No.

10 *Q.*  In the money Money Securities' bank account, did you see any

11 indication that anyone was paid $2 million?

12 **A.**  No.

13 *Q.*  Is there any indication in the Money Securities' bank

14 account that anyone was paid prize money?

15 **A.**  No.

16          MR. ZYTNICK:  Let's go to Page 2, please.

17 BY MR. ZYTNICK:

18 *Q.*  Which -- which account did you analyze for this summary?

19 **A.**  Assets Unlimited.

20 *Q.*  What percent of the money in the Assets Unlimited account

21 was paid to Digital Express?

22 **A.**  63 percent.

23 *Q.*  What percent was paid to Kern?

24 **A.**  16 percent.

25 *Q.*  So, once again, the blue slice for Digital Express is much

—2:19-cr-00295-GMN-NJK—

1  larger than the yellowish slice for Patti Kern?

2  **A.**  Yes.

3       MR. ZYTNICK:  Can we pull up Exhibit 2A.

4  BY MR. ZYTNICK:

5  *Q.*  Do you see in the top -- or I guess it's the center middle

6  here, the name Assets Unlimited?

7  **A.**  Yes, I do.

8       MR. ZYTNICK:  And below that, if we can zoom in on that

9  sort of top area.

10  BY MR. ZYTNICK:

11  *Q.*  It says:  "Pending moneys slated and earmarked for James

12  Gambon."  Do you see that?

13  **A.**  Yes, I do.

14  *Q.*  So the jury heard about Mr. Gambon from his daughter, Eileen

15  Beiter.

16       MR. ZYTNICK:  Let's go back to Exhibit 263, Page 2.

17  BY MR. ZYTNICK:

18  *Q.*  In the Assets Unlimited bank account, did you see any

19  indication that James Gambon was paid a large amount of money?

20  **A.**  No.

21  *Q.*  In the Assets Unlimited bank account, did you see any

22  indication that anyone was paid a large prize?

23  **A.**  No.

24       MR. ZYTNICK:  Let's go to Page 3, please.

25  BY MR. ZYTNICK:

2:19-cr-00295-GMN-NJK

1    Q.   What account did you analyze for this summary?

2    A.   Golden Products Service.

3    Q.   Looking at the pie chart on the right, can you tell us what

4    percentage of the money from the Golden Products Service account

5    went to Digital Express?

6    A.   45 percent.

7    Q.   Now, there's been testimony about a company called New

8    Generation Graphics owned by Epifanio Castro.  Can you tell the

9    jury what percent of the money from the Golden Products Services

10   account went to New Generation Graphics?

11   A.   18 percent.

12   Q.   There's also been testimony about another letter shop called

13   Marketing Image Direct.  Can you tell the jury what percentage

14   of the money from Golden Products Services was paid to Marketing

15   Image Direct?

16   A.   12 percent.

17   Q.   And can you tell the jury what percent went to Patti Kern?

18   A.   6 percent.

19   Q.   And, again, when we're talking about Patti Kern, for all of

20   these charts or at least these -- on these -- in this exhibit,

21   that includes the company or the person, right?

22   A.   That's correct.

23   Q.   Okay.

24        Was there any indication in the Golden Products

25   Services account that anyone was paid a large cash prize?

---2:19-cr-00295-GMN-NJK---

1   **A.**  No.

2   **Q.**  Did Salvador Castro also receive some of the money from this

3   account?

4   **A.**  Yes.

5   **Q.**  What percent of the money from this account was paid to

6   Salvador Castro?

7   **A.**  2 percent.

8           MR. ZYTNICK:  Let's go to Page 4.

9   BY MR. ZYTNICK:

10  **Q.**  What account did you analyze for this -- for this chart?

11  **A.**  Pacific Disbursement Reporting.

12  **Q.**  Now, this one looks a little different than the other three.

13  Is that right?

14  **A.**  That's correct.

15  **Q.**  So let's -- we'll come back to the blue and orange -- the

16  dark blue and orange slices here.  Let's start with some of the

17  smaller slices.

18          What percentage of the money from the Pacific

19  Disbursement Reporting account went to Digital Express?

20  **A.**  7 percent.

21  **Q.**  Did Kern and her company get a smaller percentage than that?

22  **A.**  Yes.

23  **Q.**  What -- what did they get?

24  **A.**  4 percent.

25  **Q.**  So where did most of the money from this Pacific

—2:19-cr-00295-GMN-NJK—

1  Disbursement Reporting account go?

2  *A.*  To Advanced Allocation Systems DBA, doing business as,

3  Distribution Reporting Services.  And another account, Advanced

4  Allocation Systems, doing business as Distribution Reporting

5  Services.

6  *Q.*  Okay.  So most of the money in the Pacific Disbursement

7  Reporting account went to two different accounts, but both of

8  those accounts were basically the same company name.  Is that

9  right?

10 *A.*  Yes.

11 *Q.*  In both cases the company name was Advanced Allocation

12 Systems doing business as Distribution Reporting Services?

13 *A.*  Yes.

14 *Q.*  And according to the bank account signature card, who opened

15 those two accounts that received all that money?

16 *A.*  Jose Luis Mendez.

17 *Q.*  And then there's some arrows pointing at the top and at the

18 bottom.  Can you tell us what that top arrow indicates?

19 *A.*  It shows that from the amount that initially went to that

20 account for Advanced Allocation Systems, when you follow the

21 money, $213,000 of that went to Digital Express.

22 *Q.*  Okay.  So, in other words, the biggest recipient of funds

23 from the Pacific Disbursement Reporting account is that blue

24 account there, the Distribution Reporting Services account.  Is

25 that correct?

─────2:19-cr-00295-GMN-NJK─────

 1  *A.*  Yes.

 2  *Q.*  And then from that account, if you follow the money, the

 3  biggest recipient of funds was Digital Express?

 4  *A.*  Yes.

 5  *Q.*  And then for the orange slice at the bottom, can you tell us

 6  what the arrow down there indicates?

 7  *A.*  Uhm, from that amount that went into that particular

 8  account, over $164,000 was -- was made payable to or sent to

 9  Marketing Image Direct.

10  *Q.*  All right.  So the orange slice is another account opened by

11  Jose Luis Mendez?

12  *A.*  Yes.

13  *Q.*  And following the money into that account, the biggest

14  recipient of money from that account was to Marketing Image

15  Direct.  Is that what you're saying?

16  *A.*  Yes.

17          MR. ZYTNICK:  Can we go to Page 5.

18  BY MR. ZYTNICK:

19  *Q.*  Now, we didn't make these -- or you didn't make these big

20  charts for all of the -- all 19 accounts, did you?

21  *A.*  No.

22  *Q.*  But did you put together a more -- a more condensed version

23  for 15 additional accounts?

24  *A.*  Yes.

25  *Q.*  And for those 15 additional accounts, were you also looking

—2:19-cr-00295-GMN-NJK—

1  to see where the money went from those mailing company accounts?

2  *A.*  Yes.

3  *Q.*  So, for instance, if we look in the top left there, the MMI

4  account, what entity received 71 percent of the money from that

5  account?

6  *A.*  Digital Express.

7  *Q.*  And Kern or Kern's company got 5 percent?

8  *A.*  Yes.

9        MR. ZYTNICK:  All right.  Let's zoom back out.

10  BY MR. ZYTNICK:

11  *Q.*  I'm not going to go through each of these, but maybe just

12  take a moment to look at each of these and then we'll move onto

13  the next page.

14        MR. ZYTNICK:  Can we go to Page 6 now, please.

15  BY MR. ZYTNICK:

16  *Q.*  This is the same thing, just six more accounts.  Is that

17  right?

18  *A.*  Yes.

19  *Q.*  And in all of these charts that we're looking at, is that

20  light blue, is that -- is that Digital Express?

21  *A.*  Yes, it is.

22  *Q.*  And Kern, I think before it was a little more yellow, but

23  now it looks kind of orange?

24  *A.*  Yes.

25  *Q.*  So on these 15, is Kern always -- or is Kern and her

—2:19-cr-00295-GMN-NJK—

1  company, are they always that orange slice?

2  *A.* Yes.

3         MR. ZYTNICK:  And if we can go to Page 7.

4  BY MR. ZYTNICK:

5  *Q.* Are those the last three accounts?

6  *A.* Yes, they are.

7  *Q.* Let's take a brief look.  There is a bright yellow slice in

8  the Distribution Reporting Services account.  Do you see that?

9  *A.* Yes, I do.

10 *Q.* What -- what was the name of that entity that received 12

11 percent of the money from the Distribution Reporting Services

12 account?

13 *A.* On The Side.

14 *Q.* And there's been testimony that On The Side was Sean

15 O'Connor's company.  Is there -- did any of the other accounts

16 have any payments to or -- to On The Side?

17 *A.* No.

18 *Q.* So On The Side, Sean O'Connor's company, that received money

19 only from the Digital Reporting Services account?

20 *A.* From the Distribution Reporting Services, yes.

21 *Q.* I'm sorry.  Yes, Distribution Reporting Services.  Thank

22 you.

23        MR. ZYTNICK:  If we can zoom back out.  Maybe we can

24 just go back up to the previous page.

25 BY MR. ZYTNICK:

———2:19-cr-00295-GMN-NJK———

1  *Q.*  No pay -- no payments in there to On The Side?

2  **A.**  No.

3        MR. ZYTNICK:  And if we can go to the page before that.

4  BY MR. ZYTNICK:

5  *Q.*  No payments to On The Side?

6  **A.**  No.

7  *Q.*  For all of these pie charts, did the companies associated

8  with Castro family members, such as Digital Express, National

9  Print & Mail, and Marketing Image Direct, did they consistently

10 receive more money than Kern and her company?

11 **A.**  Yes, they did.

12 *Q.*  Is there any indication in any of these accounts that anyone

13 was paid a large cash prize?

14 **A.**  No.

15       MR. ZYTNICK:  Your Honor, I'm about to move onto a new

16 section, but I see it's noon, so ...

17       THE COURT:  I think it's a good time for our lunch

18 break.  During this time, I remind the jury that you are not to

19 discuss this case with anyone or permit anyone to discuss it

20 with you.  You can talk to your fellow jurors about other

21 things.

22       If it is a nice day today -- I haven't checked yet --

23 but please make sure, if you go outside, that you wear your

24 juror badge over your coat or -- don't cover it up so that

25 anybody who's out there, whether it be witnesses or other people

1  related to the Court or to the parties, so they're aware that

2  you're a juror.

3        And please do not read or listen to or view anything

4  that touches upon this case in way or attempt to perform any

5  independent investigation or research.

6        I did not read all of the questions that were provided,

7  and there was an extra question that was provided to me this

8  morning about families of people who are involved.  There's

9  questions about risk and consequences and plea agreements and

10  cooperation agreements and all kinds of other things that

11  legally are not admissible.

12        So I can't ask the question because the answer would

13  provide testimony that is not legally admissible, which means

14  it's not information that the jury can consider in determining

15  whether the Government has met its burden of proof, which is

16  beyond a reasonable doubt, that these individuals committed the

17  crime that they are charged with.

18        However, the good news is that after the case is over,

19  after there's been a verdict, you are relieved from the duty to

20  not talk about the case.  So you are able to talk about the case

21  after there's a verdict.  And I do make the courtroom available

22  in an informal way for you to be able to ask questions of me or

23  the Government or the Defense attorneys.

24        So all of those questions can be posed after the trial

25  so that your curiosity can be satisfied.  But that information

─2:19-cr-00295-GMN-NJK─

1  is not something that you are to consider in reaching a verdict

2  in -- you know, it's not legal for you to consider that

3  information in reaching a verdict.

4          So I hope that helps a little bit.  We will go ahead

5  and stand for the jury because they are the judge of the facts.

6  And we'll welcome them back at 1 o'clock.  Enjoy your lunch.

7          (Whereupon jury leaves the courtroom at 12:02 p.m.)

8          THE COURT:  And Special Inspector Tower [sic], after

9  the jury exits, then you may also step down and take your

10 lunchtime break.  Just remember that you are not permitted to

11 talk to the attorneys about your testimony or anything related

12 to this case.  You can talk to them about logistics, where

13 should I eat, where do I park, those kind of things, but not

14 about the facts of the case.  Okay?

15         THE WITNESS:  Yes, Your Honor.

16         THE COURT:  You're excused -- not excused, but just for

17 the lunchtime.  We'll have you back at 1 o'clock.  Be careful

18 with the steps down.

19         All right.  We are switching out some staff.  So if you

20 do need me to come back on record before 1 o'clock, let me know

21 so that we can see if the afternoon court recorder [sic] can

22 come in a little bit earlier.  Anybody foresee the need for

23 that?

24         Remember, we do have that juror who has a Thursday --

25 Thursday next week?

2:19-cr-00295-GMN-NJK

1          COURTROOM ADMINISTRATOR:  Yes.

2          THE COURT:  -- and Monday, the day after, so two days

3   off that the jury -- the juror is requesting.  So if you haven't

4   already had a chance to talk to each other about that yet,

5   please do that -- do that at some point so you can inform me as

6   to whether you agree that we can take those two days off or --

7   or it looks like that would be too much, which is sort of where

8   I'm leaning is that taking two days off at this point is too

9   much, and that we should just let that juror know.  So that

10  juror can make the decision whether or not to take that trip or

11  not, because the juror might decide, "Well, I don't want to be

12  kicked off.  I want to stay.  I'll just skip the trip.  Or the

13  juror might decide, "No, I really want to take the trip and this

14  trial's boring anyway."

15          So I don't know what the juror's going to think, but we

16  can leave it up to the juror to decide whether to stay or not.

17  So think about that and let me know when you can, because I'm

18  sure the juror would like to know whether they get to stay or

19  not, too.  Okay.

20          All right.  See you at 1 o'clock.

21          MR. TOMSHECK:  Thank you, Your Honor.

22          MR. FINLEY:  Thank you, Your Honor.

23          THE COURT:  Off record.

24          (Recess taken at 12:04 p.m.)

25

─────────2:19-cr-00295-GMN-NJK─────────

1

2                              --oOo--

3                  COURT REPORTER'S CERTIFICATE

4

5        I, PATRICIA L. GANCI, Official Court Reporter, United

6   States District Court, District of Nevada, Las Vegas, Nevada,

7   certify that the foregoing is a correct transcript from the

8   record of proceedings in the above-entitled matter.

9

10  Date:  April 5, 2023.

11                              /s/ **Patricia L. Ganci**

12                              Patricia L. Ganci, RMR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25