2:19-cr-00295-GMN-NJK - April 5, 2023

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF NEVADA

 3   UNITED STATES OF AMERICA,    )
                                  ) Case No. 2:19-cr-00295-GMN-NJK
 4              Plaintiff,        )
                                  ) Las Vegas, Nevada
 5   vs.                          ) April 5, 2023
                                  ) 1:07 p.m. - 4:05 p.m.
 6   MARIO CASTRO, SALVADOR       ) Courtroom 7D
     CASTRO, MIGUEL CASTRO, and   ) JURY TRIAL, DAY 11,
 7   JOSE LUIS MENDEZ,            ) PM SESSION
                                  )
 8              Defendants.       )
     _____) CERTIFIED COPY
 9

10              REPORTER'S TRANSCRIPT OF JURY TRIAL,
                      DAY 11, PM SESSION
11            BEFORE THE HONORABLE GLORIA M. NAVARRO
                UNITED STATES DISTRICT COURT JUDGE
12

13   APPEARANCES:

14   For the Government:  TIMOTHY T. FINLEY, ESQ.
                          DANIEL E. ZYTNICK, ESQ.
15                        U.S. Department of Justice
                          950 Pennsylvania Avenue, N.W.
16                        Washington, D.C. 20530
                          (202) 307-0050
17

18

19   (Appearances continued on pages 2 and 3.)

20

21   Court Reporter:     Amber M. McClane, RPR, CRR, CCR #914
                          United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada 89101
23                        (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25
```

2:19-cr-00295-GMN-NJK - April 5, 2023

```
 1    APPEARANCES CONTINUED:

 2    For the Government (Cont.):

 3        MINA CHANG, AUSA
           UNITED STATES ATTORNEY'S OFFICE
 4         501 Las Vegas Boulevard South, Suite 1100
           Las Vegas, Nevada 89101
 5         (702) 388-6336

 6

 7    For Defendant Mario Castro:

 8        JOSHUA L. TOMSHECK, ESQ.
           HOFLAND & TOMSHECK
 9         228 South Fourth Street, First Floor
           Las Vegas, Nevada 89101
10         (702) 895-6760

11    -AND-

12        RICHARD E. TANASI, ESQ.
           TANASI LAW OFFICES
13         8716 Spanish Ridge Avenue, Suite 105
           Las Vegas, Nevada 89148
14         (702) 906-2411

15

16    For Defendant Salvador Castro:

17        DONALD J. GREEN, ESQ.
           LAW OFFICES OF DONALD J. GREEN
18         4760 South Pecos Road, Suite 103
           Las Vegas, Nevada 89121
19         (702) 388-2047

20

21    / / / / /

22    / / / / /

23    / / / / /

24

25
```

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

2:19-cr-00295-GMN-NJK - April 5, 2023

```
1    APPEARANCES CONTINUED:

2    For Defendant Miguel Castro:

3         LUCAS J. GAFFNEY, ESQ.
          GAFFNEY LAW
4         9900 Covington Cross Drive, Suite 290
          Las Vegas, Nevada 89144
5         (702) 742-2055

6    -AND-

7         THOMAS A. ERICSSON, ESQ.
          THOMAS A. ERICSSON, CHTD.
8         9900 Covington Cross Drive, Suite 290
          Las Vegas, Nevada 89144
9         (702) 878-2889

10   For Defendant Jose Luis Mendez:

11        WILLIAM H. BROWN, ESQ.
          CHRISTOPHER MISHLER, ESQ.
12        BROWN MISHLER, PLLC
          911 North Buffalo Drive, Suite 202
13        Las Vegas, Nevada 89128
          (702) 816-2200

14

15                           * * * * *

16                         I N D E X

17   Government's Witness:                        Page

18   KEVIN TOWERS

19        Continued Direct Examination by Mr. Zytnick    xxx

20        Cross-Examination by Mr. Tanasi               xxx

21        Cross-Examination by Mr. Mishler              xxx

22        Cross-Examination by Mr. Gaffney             xxx

23

24                           * * * * *

25
```

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

```
 1        LAS VEGAS, NEVADA; WEDNESDAY, APRIL 5, 2023; 1:07 P.M.

 2                            --o0o--

 3                   P R O C E E D I N G S

 4        (Outside the presence of the jury.)

 5            THE COURT:  And it looks like we've got the witness,

 6    Mr. Tower [sic], back from lunch.

 7            Did y'all have a chance to talk about the juror who

 8    wants to go somewhere Thursday and Friday next week?

 9            MR. FINLEY:  Yes, Your Honor.  I'm fine with whatever

10    you'd like to do about it.  Just offer this as a suggestion.

11    You know, maybe -- maybe we wait just a little bit longer and

12    make the call --

13            THE COURT:  Okay.

14            MR. FINLEY:  -- then?  I know she would like to know

15    now, of course, for the certainty and everything.  And so, if

16    Your Honor would like to just let her know now, that would be

17    fine.  Whatever you want to do is fine.  I thought it might be

18    prudent to wait a little bit and then make the cut when we

19    have a better sense of, you know, the odds of it hurting us

20    somehow would, you know, hopefully go down as we get closer to

21    them going to deliberate is kind of what I'm trying to say.

22    I'm sure it's not coming out as articulately as I want, but

23    that's -- that's what I would suggest.

24            THE COURT:  Okay.  How does the defense feel?

25            MR. TOMSHECK:  We don't -- we don't have a position
```

1   either way.

2           **THE COURT:**  Okay.

3           **MR. TOMSHECK:**  That came out just as articulately as

4   I wanted it to.

5           **THE COURT:**  All right.  It's -- well, I don't know

6   how much longer you-all are going to go, and I don't know how

7   much it would affect things to take a Thursday and a Monday

8   off.  So I guess we can wait a little bit more and see.

9           **MR. GREEN:**  Your Honor?

10          **THE COURT:**  Yes?

11          **MR. GREEN:**  Don Green for Salvador Castro.

12          May we state our position?

13          **THE COURT:**  Yes.

14          **MR. GREEN:**  Our position is, is that with the jurors

15  that we have and the alternates is to keep going forward, but

16  I'll leave it to the Court's discretion.  Thank you.

17          **THE COURT:**  Okay.  Thank you.

18          All right.  So let's go ahead and call in the jury.

19      *(Jury in at 1:10 p.m.)*

20          **COURTROOM ADMINISTRATOR:**  All rise.

21          **THE COURT:**  All right.  Everyone may be seated.

22  We're back from the lunch break, and the jury is with us as

23  well as the witness, Mr. Tower.  And we can now continue with

24  direct examination on behalf of the Government.

25          Mr. Zytnick, whenever you're ready.

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    **MR. ZYTNICK:**  Thank you, Judge.

2              **CONTINUED DIRECT EXAMINATION**

3    BY MR. ZYTNICK:

4    Q.    Good afternoon, Inspector Towers.

5    A.    Good afternoon.

6    Q.    Before the break, do you recall that we were looking at

7    some pie charts showing where money from the fraudulent

8    mailing companies was going?

9    A.    I do.

10   Q.    And do you recall that one of the big recipients of

11   those -- of those accounts was Digital Express?

12   A.    That's correct.

13   Q.    Did you also look at bank records for Digital Express?

14   A.    Yes, I did.

15   Q.    Did you focus on two of the Digital Express bank accounts

16   in particular?

17   A.    Yes, I did.

18   Q.    Were those the bank accounts that appeared to be for the

19   printing business?

20   A.    Yes, correct.

21            **MR. ZYTNICK:**  Can we pull up Exhibit 261?

22            **THE COURT:**  Is this preadmitted?

23            **MR. ZYTNICK:**  Yes.  Every exhibit I'll be using with

24   Mr. Towers -- or Inspector Towers is preadmitted or already

25   admitted.

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1          **THE COURT:** Please raise your hand if anybody's

2    monitor is not working because we did have IT come in at

3    lunchtime to check everybody's monitor, and there was a

4    monitor that had become just lightly disconnected enough that

5    it dies. And so I apologize for that. It's our fault, not

6    yours. That's our vulnerability. But sometimes, if it just

7    gets bumped into enough, it disconnects.

8          So it looks like everyone's monitor's working now.

9    Go ahead.

10   **BY MR. ZYTNICK:**

11   Q.   Did you prepare this graphic?

12   **A.**   Yes, I did.

13   Q.   Does this graphic accurately summarize the sources of

14   money coming into these two Digital Express accounts?

15   **A.**   Yes, it does.

16   Q.   How much money total do these two Digital Express

17   accounts receive during the time frames in which you had

18   records?

19   **A.**   $3,443,395.

20   Q.   All right. And what are the time frames covered by this

21   graphic?

22   **A.**   One account is from February 17th, 2015, through

23   December 31st, 2017. And the second account is from

24   February 12th, 2015, through January 31st, 2018.

25   Q.   So slightly different time frame for the two accounts?

1    **A.**    Yes.

2    Q.    But both of them are a little under three years; is that

3    accurate?

4    **A.**    That's correct.

5    Q.    If there was banking activity in the Digital Express

6    accounts before or after the time frames here, would that be

7    included on this graphic?

8    **A.**    No, it would not.

9    Q.    All right.  So there's been testimony about other

10    businesses like -- or other lettershops like National Print

11    and Mail or Marketing Image Direct.  Does this graphic include

12    any information from those bank accounts for National Print

13    and Mail or Marketing Image Direct?

14    **A.**    No.

15    Q.    All right.  So we're just talking about accounts for

16    Digital Express during an under three-year period?

17    **A.**    Yes.

18    Q.    On the right side there's a box, a big box.  Can you tell

19    us what that box is or what's in that box?

20    **A.**    This is a box that itemizes the deposits into the Digital

21    Express accounts from the mailing companies.

22    Q.    So, in other words, what does this box show for -- or

23    what is the significance of, like, the Advanced Allocation

24    Systems line at the very top?

25    **A.**    That a total of $258,646 from Advanced Allocation Systems

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1   was deposited into the -- the accounts.

2   Q.   Okay.  And then was that $258,000 and some change, is

3   that -- looks like maybe 7.51 percent of the total money

4   coming into Digital Express?

5   **A.**   Yes.

6   Q.   And then for the line below that, Imperial Award

7   Services, what is that dollar figure and percentage represent?

8   **A.**   $253,250 and 7.35 percent of the total deposits were

9   deposited into the two accounts from Imperial Award Services.

10  Q.   So below that there are more mailing companies, and then

11  there's a line that says total known credits.  What does that

12  mean?

13  **A.**   That -- that totals the known credits from the mailing

14  companies into the Digital Express accounts.

15  Q.   Is that total -- or how much is that total?

16  **A.**   It's $1,907,095.

17  Q.   So the Digital Express account, if I'm understanding this

18  right, received a little over $1.9 million from -- let me ask

19  you -- strike that and start that again.

20       If I'm understanding this right, the Digital Express

21  accounts received a little over $1.9 million from the mailing

22  companies listed in that box; is that correct?

23  **A.**   That's correct.

24  Q.   Does -- well, let's -- let's look at the pie chart now to

25  the left of that.  Are the funds coming from the mailing

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    companies, are those reflected in the pie chart?

2    **A.**    Yes, they are.

3    Q.    How -- how are they shown in the pie chart?

4    **A.**    They're the colored pie slices.

5    Q.    So, again, for Advanced Allocation Systems, is that that

6    orange slice in the top right?

7    **A.**    Yes, correct.

8    Q.    Looking at the box again, right next to the $1.9 million

9    figure there is a percentage, 55 percentage -- 55 percent.

10    What does that signify?

11    **A.**    That signifies that 55 percent of the deposits into the

12    two accounts during that time period came from the mailing

13    companies.

14    Q.    Does that mean that more than half of the money coming

15    into these two Digital Express accounts came from those

16    mailing companies over there?

17    **A.**    Yes.

18    Q.    And does the pie chart also show that 55 percent of the

19    money going to these Digital Express accounts was from these

20    mailing companies?

21    **A.**    Yes.

22    Q.    The jury has previously heard testimony about On the

23    Side, a company that Sean O'Connor used to relay payments from

24    Dan Wagner regarding a fraudulent prize notice scheme called

25    Gold Rush.  Have you looked at payments to Digital Express

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    from On the Side?

2    **A.**    Yes.

3    Q.    Is that reflected in the pie chart?

4    **A.**    Yes, it is.

5    Q.    Can you tell us where that is in the pie chart?

6    **A.**    The upper left-hand corner, On the Side credits or

7    deposits are --

8    Q.    All right.

9         **MR. ZYTNICK:**    And so if we can maybe highlight that

10   top left area of the pie chart?

11   **BY MR. ZYTNICK:**

12   Q.    So how much money from On the Side was deposited into

13   Digital Express?

14   **A.**    $895,547.

15   Q.    And there's the number 26 percent below that.    Can you

16   explain the significance of that number?

17   **A.**    That's 26 percent of the total credits, so 26 percent of

18   the $3 million total at the top.

19   Q.    Now, is On the Side listed in the box at the right?

20   **A.**    No, it's not.

21   Q.    Okay.    So the box on the right, that's just the mailing

22   companies associated with this case; is that right?

23   **A.**    That's correct.

24   Q.    And On the Side that was associated with -- with Sean

25   O'Connor and Gold Rush, that's -- that's treated separately in

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    your graph?

2    **A.**   I'm not familiar with Gold Rush but, yeah, Sean O'Connor

3    and On the Side, yep.

4    Q.   Okay.  So you said 26 percent from On the Side.  So is

5    that slightly more than a quarter of the money coming into

6    these Digital Express accounts --

7    **A.**   Yes, it is.

8    Q.   -- was coming from On the Side?

9    **A.**   Yes.

10   Q.   So let's do a little math again.  We've got 55 percent

11   coming from the -- from the mailing companies in the box at

12   the right and 26 percent coming from On the Side.  If we add

13   those together, we get 81 percent?

14   **A.**   That's correct.

15   Q.   Does that mean that about 81 percent of the money coming

16   into these accounts was from the fraudulent prize notices --

17   I'm sorry, the mailing companies on the right or from On the

18   Side?

19   **A.**   Yes, that's correct.

20   Q.   All right.  And so how much does that leave -- or what

21   percentage then came from other sources?

22   **A.**   19 percent.

23   Q.   And you haven't broken out those other sources?

24   **A.**   I have not.

25   Q.   But -- but the total that was coming from things that are

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1    not On the Side and not from those mailing companies is

2    19 percent?

3    **A.**    That's correct.

4    Q.    Have you also reviewed checks showing the defendants

5    receiving money from Digital Express?

6    **A.**    Yes, I have.

7    Q.    All right.  So we're going to come back to that.  We're

8    going to go one by one through the defendants.

9              And I first want to ask you, though:  Have you

10    reviewed documentary evidence about each defendant's

11    involvement in this scheme?

12    **A.**    Yes, I have.

13    Q.    So let's start with Salvador Castro.  And we can start

14    with Exhibit 90, page 3, which was found by postal inspectors

15    in Patti Kern's office.

16              Inspector Towers, are you familiar with this type of

17    form?

18    **A.**    Yes, I am.

19    Q.    Can you -- I know that the jury's probably heard this

20    already, but can you remind the jury what this form is?

21    **A.**    It's a PS Form 1583 that -- that people complete when

22    they want to open up a UPS -- mailbox, like at a UPS Store or

23    Mail Boxes Etc.

24    Q.    So if someone wants to rent a mailbox at one of those

25    locations, this form has to be filled out?

1    **A.**   Yes.

2          **MR. ZYTNICK:**  If we can zoom in on the center left a

3    little bit.

4    **BY MR. ZYTNICK:**

5    Q.   Does this form list -- does this form list the applicant

6    as Salvador Castro?

7    **A.**   Yes, it does.

8    Q.   All right.

9          **MR. ZYTNICK:**  And if we can maybe look at the bottom

10   of the form now?

11   **BY MR. ZYTNICK:**

12   Q.   Is -- is this one notarized?

13   **A.**   Yes, it is.

14   Q.   To get a form notarized, does a person have to prove

15   their identity to a notary?

16   **A.**   Yes.

17   Q.   So according to this document, did Salvador Castro appear

18   in front of a notary to sign this mailbox rental form?

19   **A.**   Yes, that's how it appears.

20   Q.   Let's look up at the -- towards the top of the page.

21   Does the form indicate that the mailbox rental is for a

22   company named Imperial Award Services?

23   **A.**   Yes.

24   Q.   Does the form indicate that the mailbox rental is for a

25   place called The Shipping Center in North Little Rock,

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    Arkansas?

2    **A.**    Yes.

3    Q.    All right.

4         **MR. ZYTNICK:**  So let's pull this -- or put this

5    document up side by side with Exhibit 1A.

6    **BY MR. ZYTNICK:**

7    Q.    So Exhibit 1A is a piece of mail for Betty Stirewalt.

8    And if we look at the top left, who is this piece of mail

9    from?

10    **A.**    Imperial Award Services.

11    Q.    Does Imperial Award Services have an address in North

12    Little Rock according to this piece of mail?

13    **A.**    Yes, it does.

14    Q.    And is the address that's listed on this piece of mail,

15    is that for The Shipping Center, the same address we saw on

16    the mailbox rental form in Exhibit 90?

17    **A.**    Yes, it is.

18         **MR. ZYTNICK:**  Let's turn to Exhibit 93, page 5.  And

19    we can clear -- we can do this just -- just that document.

20    **BY MR. ZYTNICK:**

21    Q.    Is this another mailbox rental form?

22    **A.**    Yes, it is.

23    Q.    The applicant is also listed as Salvador Castro?

24    **A.**    Yes.

25    Q.    And at the bottom, this one is also signed and notarized?

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    **A.**    Yes, it is.

2    Q.    According to this document, did Salvador Castro appear --

3    appear in front of a notary for this document to be signed?

4    **A.**    Yes, that's how it appears.

5    Q.    Looking at the top right of the form, can you tell us the

6    city and state that this mailbox rental was located in?

7    **A.**    Congers, New York.

8    Q.    All right.

9          **MR. ZYTNICK:**    Let's put this up side by side with

10    Exhibit 1, page 435.  We can zoom in on that envelope on the

11    right.  Thank you.

12    **BY MR. ZYTNICK:**

13    Q.    So on the right we have a -- a letter to Betty Stirewalt.

14    Do you see that?

15    **A.**    Yes.

16    Q.    Who is this letter from?

17    **A.**    Imperial Award Services.

18    Q.    And do you see that address?

19          **MR. ZYTNICK:**    And maybe if we can -- I don't know if

20    we can see both -- the address on both documents, both the

21    mailbox rental and on the letter.

22    **BY MR. ZYTNICK:**

23    Q.    But are these -- are those the same address?

24    **A.**    Yes, they are.

25    Q.    Are they both in Congers, New York?

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    **A.**    Yes.

2    Q.    Both Box 377 at that Lake Road address?

3    **A.**    Yes.

4    Q.    According to these documents, did Salvador Castro rent

5    the mailbox used by Imperial Award Services on this letter to

6    Betty Stirewalt?

7    **A.**    Yes.

8    Q.    Let's go back to the -- the summary you did of the victim

9    checks.

10           **MR. ZYTNICK:**  If we can pull up Exhibit 281, page 6?

11   **BY MR. ZYTNICK:**

12   Q.    How many checks are there from Ms. Sorrentino's account

13   to Imperial Award Services?

14   **A.**    37 checks.

15   Q.    37.  Okay.  So we're going to look at one of those right

16   now.

17           **MR. ZYTNICK:**  If we can pull up Exhibit 30B, please.

18   **BY MR. ZYTNICK:**

19   Q.    By the way, for this account, do you see who signed -- or

20   this check, do you see who signed the check?

21   **A.**    Cynthia Sorrentino.

22   Q.    Yeah, and it's -- now, the names on the account are Mary

23   Sorrentino and then payable on death, Cynthia Sorrentino.  Do

24   you see that?

25   **A.**    Yes.

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    Q.   So this check is made payable to who?

2    **A.**   IAS.

3    Q.   Could IAS be an abbreviation for Imperial Award Services?

4    **A.**   Yes, it could be.

5         **MR. ZYTNICK:**   Can we go to the next page of Exhibit

6    30B, which is the back of the check?

7    **BY MR. ZYTNICK:**

8    Q.   Does this check on the back have a stamp that says

9    Imperial Award Services?

10   **A.**   Yes, it does.

11   Q.   Does the stamp indicate where the check was deposited?

12   **A.**   Yes, it does.

13   Q.   Is that that sort of account number type, long digital --

14   long stream of numbers to the bottom right of the words

15   Imperial Award Services?

16   **A.**   Yes.

17   Q.   All right.  So that ends in 4866.  Let's come back to

18   that in a moment.

19        **MR. ZYTNICK:**   Why don't we pull up side by -- this

20   side by side with Exhibit 101A, page 11.  Thank you.

21        So on the -- on the left side, if we can zoom in at

22   the top there, the top third of the page.

23   **BY MR. ZYTNICK:**

24   Q.   Before the lunch break -- actually, when we first were

25   starting, we were talking about bank account signature cards.

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1    Do you remember that?

2    **A.**    Yes.

3    Q.    Is this a bank account signature card from Bank of

4    America?

5    **A.**    Yes, it is.

6    Q.    What's the title of this account?

7    **A.**    Golden Products Service, Inc. d/b/a Imperial Award

8    Services.

9    Q.    And d/b/a stands for doing business as?

10   **A.**    Yes, it does.

11   Q.    And Imperial Award Services, that was the company name we

12   were just talking about?

13   **A.**    Yes.

14   Q.    All right.  And do you see that account number there at

15   the top ending in 4866?

16   **A.**    I do.

17   Q.    And is that the same account number as on that check from

18   Ms. Sorrentino to IAS that we were just looking at?

19   **A.**    Yes, it is.

20   Q.    According to these documents, was Ms. Sorrentino's check

21   to IAS deposited into this account at Bank of America?

22   **A.**    Yes, it was.

23   Q.    If we look down at the bottom of that signature card on

24   the -- on the left side, is there a name and signature for

25   Salvador Castro?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    **A.**    Yes.

2    Q.    Does this appear to be dated in July of 2014?

3    **A.**    Yes.

4         **MR. ZYTNICK:**  Can we go to the next page, page 12?

5    And we can -- we can bring that up on the whole screen.  Thank

6    you.  If we can zoom in on the top -- top third of the page.

7    **BY MR. ZYTNICK:**

8    Q.    Do you see a section sort of in the middle, it says

9    review information?

10   **A.**    Yes, I do.

11   Q.    And below that it's Salvador Castro's name and some other

12   information?

13   **A.**    Yes.

14   Q.    Looks like a driver's license -- it mentions a driver's

15   license and a -- a MasterCard?

16   **A.**    Yes.

17   Q.    Does this form indicate that Salvador Castro showed

18   identification to Bank of America to open this account?

19   **A.**    Yes, it does.

20   Q.    According to the signature card, did Salvador Castro go

21   to a Bank of America branch and open an account for Imperial

22   Award Services in July 2014?

23   **A.**    Yes.

24   Q.    And that's the account we were just looking at where that

25   Imperial Award Services check from Betty Stirewalt was

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    deposited -- I'm sorry, from -- from Ms. Sorrentino was

2    deposited?

3    **A.**    Yes.

4          **MR. ZYTNICK:**  Let's go up to page 3 of this exhibit.

5    If we can zoom in on the top?

6    **BY MR. ZYTNICK:**

7    **Q.**    Is this a Bank of America signature card for Golden

8    Products Services, Inc.?

9    **A.**    Yes, it is.

10    **Q.**    On the bottom of this page, if we can zoom in on that,

11    whose name and signature are listed there or shown there?

12    **A.**    Salvador Castro.

13    **Q.**    This -- this signature appears to be dated March 2014?

14    **A.**    Yes.

15          **MR. ZYTNICK:**  Can we go to the next page, please?

16    Let's zoom in on the top third of this page.

17    **BY MR. ZYTNICK:**

18    **Q.**    Does this -- does this form indicate that Salvador Castro

19    showed his ID to Bank of America?

20    **A.**    Yes.

21    **Q.**    According to this signature card, did Salvador Castro go

22    to Bank of America and open an account for Golden Products

23    Services in March of 2014?

24    **A.**    Yes.

25          **MR. ZYTNICK:**  And if we can just go -- actually, look

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1    at the bottom, right there, zoom in on the bottom part.

2    **BY MR. ZYTNICK:**

3    Q.    There's a -- it has the date again, March 2014.  And

4    below that it says banking center name.  Do you see that?

5    **A.**    Yes, I do.

6    Q.    What is listed for the banking center name?

7    **A.**    Airport Center.

8    Q.    Does that appear to be a bank branch?

9    **A.**    Yes, it does.

10            **MR. ZYTNICK:**  Let's go to page 19.  We'll look at one

11    more example of this.  If we can zoom in on the top third?

12    **BY MR. ZYTNICK:**

13    Q.    Can you tell us the account title for this account?

14    **A.**    Golden Products Service, Inc., d/b/a Montgomery Marketing

15    Inn.

16    Q.    Right.  And that's inn, i-n-n, not Inc.; correct?

17    **A.**    Correct.

18    Q.    At the bottom of this page, whose name and signature are

19    shown?

20    **A.**    Salvador Castro.

21    Q.    This time it's dated August of 2015?

22    **A.**    Yes.

23            **MR. ZYTNICK:**  On the next page, can we zoom in on the

24    top third again?

25    **BY MR. ZYTNICK:**

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    Q.   Does this part of the signature card indicate that

2    Salvador Castro showed his identification to Bank of America?

3    **A.**   Yes.

4    Q.   And if we go again to the bottom of this, does the

5    signature card again list Airport Center as the branch?

6    **A.**   Yes, it does.

7    Q.   So looking at this document and the previous signature

8    cards in the same exhibit, did we see three instances where

9    Salvador Castro went to a bank and presented ID and opened

10   bank accounts?

11   **A.**   Yes.

12         **MR. ZYTNICK:**  Can we go to Exhibit 280?  I think the

13   jury's seen this before.

14   **BY MR. ZYTNICK:**

15   Q.   Just looking at the line for Imperial Award Services a

16   little bit up from the middle, does -- does this chart show

17   that bank account records list Salvador Castro as the signer

18   on Imperial Award Services?

19   **A.**   Yes, it does.

20   Q.   And is that consistent with what we just saw, that

21   Salvador Castro opened the bank account for Imperial Award

22   Services?

23   **A.**   Yes.

24   Q.   Do the corporate records show a different name for

25   Imperial Award Services as the president?

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**    Yes.

2    Q.    It says the corporate records show that someone named

3    Jesus Garcia is the president of Imperial Award Services?

4    **A.**    Yes.

5    Q.    Not Salvador Castro?

6    **A.**    Correct.

7    Q.    So Salvador Castro's name is on the bank account but not

8    on the corporate records as the president; is that correct?

9    **A.**    -- this chart, yes.

10   Q.    All right.  Earlier we were looking at some documents

11   regarding The Shipping Center in North Little Rock, Arkansas.

12   Do you remember that?

13   **A.**    Yes.

14        **MR. ZYTNICK:**    Can we go to Exhibit 92, page 3?

15   **BY MR. ZYTNICK:**

16   Q.    Is this a letter from The Shipping Center?

17   **A.**    Yes, it is.

18   Q.    And if you see at the top right -- I'm sorry, on the top

19   left, The Shipping Center has that address in North Little

20   Rock, Arkansas; is that correct?

21   **A.**    Yes, correct.

22   Q.    And the letter is from someone named Tom Weedman on

23   behalf of The Shipping Center?

24   **A.**    Yes.

25        **MR. ZYTNICK:**    Let's go up one page to page 2.  If we

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1  can zoom in on the e-mail at the top -- or the top third of

2  the page rather?

3  **BY MR. ZYTNICK:**

4  Q.   So does this appear to be an e-mail to Tom Weedman?

5  **A.**   Yes.

6  Q.   That's the same name we just saw before associated with

7  The Shipping Center; is that right?

8  **A.**   Yes, correct.

9  Q.   Does this e-mail say that shipments should be made to

10  Salvador Castro?

11  **A.**   Yes, it does.

12  Q.   Does the e-mail provide an address and a phone number for

13  those shipments to be made to Salvador Castro?

14  **A.**   Yes, it does.

15  Q.   Based on this e-mail, did the person using the name Betsy

16  Spider direct Tom Weedman of The Shipping Center to send

17  shipments to Salvador Castro?

18  **A.**   Yes.

19       **MR. ZYTNICK:**  Can we please pull up side by side

20  Exhibits 92, page 2, and Exhibit 58?  If we can zoom in on the

21  driver's license?

22  **BY MR. ZYTNICK:**

23  Q.   So the address that was provided on the left side, do you

24  see that address on 5685 Sentry Palm Court?

25  **A.**   Yes, I see it.

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    Q.    Is that the same address as on Salvador Castro's driver's

2    license?

3    **A.**    Yes, it is.

4    Q.    If there was mail being shipped from The Shipping Center

5    pursuant to the e-mail on the left, would that have gone to

6    the address for Salvador Castro?

7    **A.**    Yes.

8            **MR. ZYTNICK:**    Can we keep Exhibit 58 there and put

9    Exhibit 240 on the other side?    And if we can maybe zoom in on

10   the top there?

11   **BY MR. ZYTNICK:**

12   Q.    Again, we were looking at this address on 5685 Sentry

13   Palm Court for Salvador Castro.    Does this person on the left

14   side, Angeles Castro, have the same address?

15   **A.**    Yes.

16   Q.    Both have the same address on Sentry Palm Court?

17   **A.**    Yes.

18   Q.    All right.

19           **MR. ZYTNICK:**    Let's go to Exhibit 84 found by postal

20   inspectors in Patti Kern's office.    If we can zoom in on that

21   pink Post-it note?

22   **BY MR. ZYTNICK:**

23   Q.    Can you read the name at the top of that Post-it note or

24   the center of that Post-it note?

25   **A.**    Angeles Castro.

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    Q.   Is Angeles Castro the same name that we were just looking

2    at the driver's license for?

3    **A.**   Yes.

4    Q.   And same address as Salvador Castro?

5    **A.**   Yes.

6    Q.   And this Post-it note below that, it's a little hard to

7    read, but does that say "make Salvador checks out to"?

8    **A.**   Yes.

9        **MR. ZYTNICK:**  Can we pull up Exhibit 107A?  If we can

10   zoom in on the top?

11   **BY MR. ZYTNICK:**

12   Q.   Is this a check from Global Data Funding payable to

13   Angeles Castro?

14   **A.**   Yes, it is.

15   Q.   Same name as on the Post-it note?

16   **A.**   Yes.

17   Q.   Same address as Salvador Castro?

18   **A.**   Yes.

19   Q.   Have you seen other evidence about Salvador Castro

20   receiving money directly from this scheme?

21   **A.**   Yes, I have.

22       **MR. ZYTNICK:**  Can we take a look at Exhibit 253?

23   This is page 231 of the PDF.  And -- and if --

24       **MR. GREEN:**  What page reference, Counsel, please?

25       **MR. ZYTNICK:**  It's page 231 of the PDF, but if you

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    have the full thing, it's page 822.

2              **MR. GREEN:**  823?

3              **MR. ZYTNICK:**  822 if you have the full document.

4              **MR. GREEN:**  Thank you, Counsel.  Thank you,

5    Your Honor.  It's hard to read.

6              **MR. ZYTNICK:**  Can you zoom in on the top check,

7    please?

8    **BY MR. ZYTNICK:**

9    Q.   So there was testimony from Patti Kern about profit

10   distribution checks with round numbers and nothing in the for

11   line.

12             Is this check to Salvador Castro for $700?

13   **A.**   Yes, it is.

14   Q.   Is that a round number?

15   **A.**   Yes, it is.

16   Q.   Does this check contain nothing in the for line?

17   **A.**   That's correct.

18             **MR. ZYTNICK:**  Can we also show the witness

19   Exhibit 285?  Actually, I'm sorry, can we go back to that

20   previous thing, 253, page 231?  If we can zoom in on the top

21   check again?

22   **BY MR. ZYTNICK:**

23   Q.   On the right side, is that the back of the check?

24   **A.**   Yes, it is.

25   Q.   And does that contain an endorsement?

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    **A.**    Yes.

2    Q.    Whose name is -- is there as having endorsed this check?

3    **A.**    Salvador Castro.

4    Q.    Does that indicate that Salvador Castro received that

5    check?

6    **A.**    Yes.

7    Q.    All right.

8         **MR. ZYTNICK:**  Let's try again with Exhibit 285.  And

9    Court's indulgence.  Excellent work.  Thank you for your help

10   on that.

11   **BY MR. ZYTNICK:**

12   Q.    All right.  Inspector Towers, this is a 62-page exhibit.

13   Is each of these checks from either Golden Product Services or

14   MMI?

15   **A.**    Yes.

16   Q.    Is each of these checks for $400?

17   **A.**    Yes.

18   Q.    There was also testimony from Patti Kern about Salvador

19   Castro receiving $400 checks for his name being on certain

20   companies.  Does this exhibit contain 31 checks for $400

21   payable to Salvador Castro?

22   **A.**    Yes, it does.

23        **MR. ZYTNICK:**  Can we pull up Exhibit 264?

24   **BY MR. ZYTNICK:**

25   Q.    Have you prepared a series of graphics showing money

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1    payments to the defendants?

2    A.    Yes.

3    Q.    And does -- is this the first page of that exhibit?

4    A.    Yes, it is.

5    Q.    And does this page and the other pages in this exhibit

6    accurately summarize those payments?

7    A.    Yes, they do.

8    Q.    All right.  So on the first page it says direct payments

9    to Salvador Castro.  Can you tell us what is on the left side

10   of the page?

11   A.    The left side shows payments that were made out to

12   Salvador Castro from Digital Express -- two different Digital

13   Express accounts, a New Generation Graphics account, and then

14   other accounts.

15   Q.    All right.  And so on the previous exhibit, 285, we were

16   looking at some checks from MMI and from Golden Products

17   Service.  Are those listed in the box at the bottom left?

18   A.    Yes.

19   Q.    So this -- over on the right side, how much money did

20   Salvador Castro receive from the entities listed on the left

21   side?

22   A.    According to the payments, he received $71,000.

23   Q.    And that's just -- this says over.  Is this -- is this

24   intended to be a minimum amount?

25   A.    Yes.  Yes.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    Q.    The actual amount could be higher?

2    **A.**    Yes, correct.

3    Q.    For the Digital Express -- the payments from Digital

4    Express, do those cover the same period of slightly under

5    three years that you were talking about earlier?

6    **A.**    Yes, they do.

7    Q.    There was evidence in this case that New Generation

8    Graphics belonged to Epi Castro and that it did sort of the

9    preprinting.

10          How much money did New Generation Graphics pay to

11   Salvador Castro during the period for which you have bank

12   records?

13   **A.**    Over $20,000.

14   Q.    That $71,000 listed on the right side, does that include

15   any cash that Salvador Castro received?

16   **A.**    It does not.

17   Q.    Does that include any checks that were payable to Angeles

18   Castro?

19   **A.**    No.

20   Q.    So the $71,000, that's just a minimum amount that was --

21   that was paid to Salvador Castro?

22   **A.**    Yes, that's correct.

23   Q.    Thank you.

24          Let's move on to Jose Luis Mendez.  Have you seen

25   documentary evidence about Jose Luis Mendez's involvement in

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1  the scheme?

2  **A.**  Yes, I have.

3      **MR. ZYTNICK:**  Can we go to Exhibit 280 and look at

4  the line for Pacific Disbursement Reporting?

5  **BY MR. ZYTNICK:**

6  **Q.**  Do corporate and bank records as reflected on this chart

7  show that Mr. Mendez is both the president and bank account

8  signer for Pacific Disbursement Reporting?

9  **A.**  Yes.

10      **MR. ZYTNICK:**  Can we pull up side by side Exhibits

11  27A and 28B?

12  **BY MR. ZYTNICK:**

13  **Q.**  Are these both checks to Pacific Disbursement Reporting?

14  **A.**  Yes.

15  **Q.**  Is the one on the left from James Pascarella?

16  **A.**  Yes.

17  **Q.**  The jury heard from his widow, Leslie Pascarella.

18      Is the one on the right from Joseph Miskovich?

19  **A.**  Yes.

20  **Q.**  The jury heard from him directly.

21      So we have two checks to Pacific Disbursement

22  Reporting; is that correct?

23  **A.**  Yes, that's correct.

24  **Q.**  All right.

25      **MR. ZYTNICK:**  Let's go to exhibits -- or, actually,

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    if we can also now pull up side by side Exhibits 29A and 30A.

2    **BY MR. ZYTNICK:**

3    Q.   Are these also checks to Pacific Disbursement Reporting?

4    **A.**   Yes, they are.

5    Q.   And the one on the left appears to be from Lorraine

6    Ramadan; is that correct?

7    **A.**   That's correct.

8    Q.   The jury heard from her son-in-law, Milton Etter.

9         The one on the right is signed by Cynthia Sorrentino;

10   is that correct?

11   **A.**   That's correct.

12   Q.   And the jury heard from her directly.

13        So did we just look at four checks payable to Pacific

14   Disbursement Reporting?

15   **A.**   Yes.

16   Q.   And that's the company that we just saw Mr. Mendez is the

17   president and bank account signer for; is that correct?

18   **A.**   That's correct.

19        **MR. ZYTNICK:**   Can we go to Exhibit 280 again?

20   **BY MR. ZYTNICK:**

21   Q.   And two lines above the line for Pacific Disbursement

22   Reporting is a line for -- or a row for Pacific Allocation

23   Systems.  Do you see that?

24   **A.**   Yes, I do.

25   Q.   Do the corporate records and bank records as reflected on

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1    this chart indicate that Jose Mendez is the president and bank

2    account signer for Pacific Allocation Systems?

3    **A.**   Yes.

4        **MR. ZYTNICK:**  Can we go to Exhibit 1C, please?

5    **BY MR. ZYTNICK:**

6    Q.    This is an envelope addressed to Betty Stirewalt?

7    **A.**   Yes, it is.

8    Q.    Can you tell us the name of the entity that this letter

9    is -- or this envelope is from?

10   **A.**   Pacific Allocation Systems, Inc.

11   Q.    That's the same company name we were just looking at?

12   **A.**   Yes, it is.

13       **MR. ZYTNICK:**  Can we put this exhibit side by side

14   with Exhibit 41?  So Exhibit 41 was found in Digital Express.

15   If we can -- I don't know if we can zoom in on both -- the

16   addresses on both of them or...

17   **BY MR. ZYTNICK:**

18   Q.    Do these both have the same address on Northwest -- looks

19   like Northwest 77th Court, Box 502, in Miami Lakes, Florida?

20   **A.**   Yes, they do.

21   Q.    According to these documents, did Pacific Allocation

22   Systems have a mailbox in Miami Lakes, Florida?

23   **A.**   Yes.

24       **MR. ZYTNICK:**  Let's look now at Exhibit 137.

25   **BY MR. ZYTNICK:**

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    Q.   Is this a mailbox rental form for Advanced Allocation

2    Systems?

3    **A.**   Yes, it is.

4    Q.   Is the applicant on this form Jose Luis Mendez?

5    **A.**   Yes.

6    Q.   At the bottom is there a signature and a notary stamp?

7    **A.**   Yes.

8    Q.   According to this document, did Jose Luis Mendez appear

9    in front of a notary for this document to be signed?

10    **A.**   Yes.

11    Q.   And the top right of this document -- or, actually, top

12    letter or top right, do you see the same address on 77th Court

13    in Miami Lakes, Florida?

14    **A.**   Yes.

15    Q.   It's a different box number for this one than for the

16    Pacific Allocation Systems envelope; is that right?

17    **A.**   That's correct.

18    Q.   But these are both at the same -- otherwise the same

19    address in Miami Lakes, Florida?

20    **A.**   Yes.

21    Q.   By the way, what was written for box 11 for the type of

22    business?  What is listed there on Mr. Mendez's form?

23    **A.**   Marketing advising.

24    Q.   Does marketing advising, does that say anything about

25    prize notices or winning money?

1    **A.**    No.

2    Q.    All right.  So we've now seen the Pacific Allocation

3    Systems envelope with a Miami Lakes address and the Advanced

4    Allocation Systems mailbox rental form for Miami Lakes; is

5    that correct?

6    **A.**    That's correct.

7         **MR. ZYTNICK:**  Can we pull up Exhibit 150, page 34?

8    These are texts that have been previously shown between

9    Mr. Mendez and Patti Kern.

10        So in the -- if we can zoom in a bit on the four

11   texts?

12   **BY MR. ZYTNICK:**

13   Q.    In the first message on this page, did Mr. Mendez tell

14   Ms. Kern "I have a package that came for you"?

15   **A.**    Yes.

16   Q.    What did Ms. Kern respond?

17   **A.**    "Okay.  Thanks.  Do you know what it is?"

18   Q.    Did -- did Mr. Mendez answer, "It's the envelope from

19   Miami"?

20   **A.**    Yes.

21   Q.    Did Mr. Mendez then follow up with three dollar signs?

22   **A.**    Yes.

23   Q.    Did the envelopes and mailbox application that we saw

24   before say Miami Lakes on it -- or on them?

25   **A.**    Yes.

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    Q.   I want to take a look at a couple other texts between

2    Mr. Mendez and Ms. Kern.  It's a 77-page document, so we're

3    not going to go through all of it.  But if we can look up at

4    page 1.

5            The second text there, did Mr. Mendez text Ms. Kern,

6    "I have the box for you"?

7    **A.**   Yes.

8    Q.   And then if we go to page 60 of this, in the bottom half

9    of the page is there a text from Mr. Mendez referencing buying

10   QuickBooks for Miguel?

11   **A.**   Yes.

12   Q.   Did Ms. Kern respond to Mr. Mendez, "Whatever you want me

13   to do"?

14   **A.**   Yes.

15   Q.   And then on the next page, if we can go to that at the

16   top, did Mr. Mendez respond "Okay" and "Thank you"?

17   **A.**   Yes.

18           **MR. ZYTNICK:**  Can we look at the bottom half of that

19   page?  Zoom in on the bottom two texts.

20   **BY MR. ZYTNICK:**

21   Q.   Did Ms. Kern ask Ms. Mendez [sic] in this text -- text

22   exchange, "So who do you want your check made out to?  Price

23   Awards?"

24   **A.**   Yes.

25   Q.   What -- what did Mendez respond?

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**    "Yes, please."

2    Q.    All right.  Let's look at a couple of the documents that

3    were found in Mr. Mendez's house.

4          **MR. ZYTNICK:**  Can we look at Exhibit 78?

5    **BY MR. ZYTNICK:**

6    Q.    Is this a debit card with the name Pacific Allocation and

7    Jose Luis Mendez?

8    **A.**    Yes.

9          **MR. ZYTNICK:**  Can we look at Exhibit 79, page 2?  If

10   we can zoom in on the top?

11   **BY MR. ZYTNICK:**

12   Q.    Is that a debit card with the names Advanced Allocation

13   Systems and Mr. Mendez's name?

14   **A.**    Yes.

15         **MR. ZYTNICK:**  Can we go to Exhibit 79, page 3?

16   **BY MR. ZYTNICK:**

17   Q.    Is this a mailbox rental application with Mr. Mendez's

18   name for the company Advanced Allocation Systems?

19   **A.**    Yes, it is.

20   Q.    And does this mailbox rental application list the type

21   of -- well, what is listed for the type of business for the

22   mailbox rental application?

23   **A.**    Health and beauty sales.

24   Q.    Nothing about prize notices?

25   **A.**    No.

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    **MR. ZYTNICK:**  Can we show the witness Exhibits 81 and

2    82 side by side -- or maybe top to bottom, if we can do that,

3    if we can do it, like, vertically?  I don't know if we can.

4    Oh, that's not going to look any better.  Can -- we can

5    probably do it the original way.  Thanks.

6          All right.  Maybe we can zoom in on the top half of

7    both documents?  I don't know if that's possible.

8    **BY MR. ZYTNICK:**

9    Q.   All right.  Are these paystubs for -- for two companies?

10   **A.**   Yes.

11   Q.   The one on the left appears to be for Digital Express; is

12   that correct?

13   **A.**   That's correct.

14   Q.   And the one on the right is for -- I don't know if you

15   can read it now, but --

16          **MR. ZYTNICK:**  Can we look -- can we zoom in on the

17   top of the document on the right?  For the -- for the one on

18   the right side, 82, up at the top where it National Print and

19   Mail.  Yeah.  All right.

20   **BY MR. ZYTNICK:**

21   Q.   So the one on the left was a paystub for Digital Express.

22   What's this document on the right, Exhibit 82?  What's that a

23   paystub from?

24   **A.**   From National Print and Mail, Inc.

25   Q.   And both of these documents, both of these paystubs, is

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1   the employee Mr. Mendez?

2   **A.**   Yes.

3   Q.   According to these documents, was Mr. Mendez an employee

4   of Digital Express and National Print and Mail -- National

5   Print and Mail at various times?

6   **A.**   Yes.

7          **MR. ZYTNICK:**   Can we go to Exhibit 253, page 110 of

8   the PDF?  And for anyone who has a full paper copy, that would

9   be page 338.

10  **BY MR. ZYTNICK:**

11  Q.   This is, again, about the -- the Patti Kern testimony

12  about those checks with round numbers and nothing in the for

13  line.  Is this check to Jose Luis Mendez for $1,000?

14  **A.**   Yes, it is.

15  Q.   Is that a round number?

16  **A.**   Yes, it is.

17  Q.   Does this check contain nothing in the for line?

18  **A.**   It does not.

19  Q.   Let's look at some more about the money paid to

20  Mr. Mendez.

21          **MR. ZYTNICK:**   Can we go to Exhibit 264, page 2?

22  **BY MR. ZYTNICK:**

23  Q.   During the less than three years covered by the Digital

24  Express accounts, about how much money was paid to Mr. Mendez

25  from those accounts?

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    **A.**   Over $62,000.

2    Q.   That's over $37,000 from one of the accounts and over

3    $25,000 from the other?

4    **A.**   Yes, that's correct.

5    Q.   Did the Distribution Reporting Services account also pay

6    Mr. Mendez money?

7    **A.**   Yes, it did.

8    Q.   How much from that account?

9    **A.**   Over $24,000.

10   Q.   So what's the total paid directly to Mr. Mendez from just

11   these three accounts?

12   **A.**   Over $86,000.

13   Q.   Does Mr. Mendez also have a personal bank account?

14   **A.**   Yes.

15   Q.   Were there cash deposits into -- into that bank account?

16   **A.**   Yes, there were.

17   Q.   And how much cash deposits into that -- that bank

18   account?

19   **A.**   Over $35,000.

20        **MR. ZYTNICK:**   Can we show the witness or show

21   everybody Exhibit 273?  If we can zoom in on the -- the --

22   yeah, that -- the place where it has, you know, the recipient

23   of the letter?  Thank you.

24   **BY MR. ZYTNICK:**

25   Q.   So this is -- this was found by post inspectors at

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    Mr. Mendez's house.  Can you read the name of the person who's

2    the recipient of this letter?

3    **A.**    Maria P. Castro.

4    Q.    Do bank records show checks from Digital Express to Maria

5    Castro?

6    **A.**    Yes.

7         **MR. ZYTNICK:**  Can we go to Exhibit 264, this time

8    page 3?

9    **BY MR. ZYTNICK:**

10   Q.    And now we're looking at information about someone named

11   Maria Castro, same house as Mr. Mendez.

12         During the less than three years covered by the

13   Digital Express accounts, about how much money did those

14   accounts -- those Digital Express accounts pay to Ms. Maria

15   Castro?

16   **A.**    Over $86,000.

17   Q.    And that's over $24,000 from one account?

18   **A.**    Yes.

19   Q.    And over -- over $62,000 from the other account?

20   **A.**    Yes.

21   Q.    Did you also see some checks from Digital Express to

22   Maria Castro that refer to Jose Luis on the for line?

23   **A.**    Yes, I did.

24         **MR. ZYTNICK:**  Can we pull up Exhibit 265?

25   **BY MR. ZYTNICK:**

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1  Q.  Are the checks in this exhibit some of the checks from

2  Digital Express to Maria Castro?

3  **A.**  Yes, they are.

4  Q.  So this is not all the checks from Digital Express to

5  Maria Castro; is that right?

6  **A.**  No, that's correct.

7       **MR. ZYTNICK:**  On page 1, if we can zoom in at the

8  top?

9  **BY MR. ZYTNICK:**

10  Q.  This check is payable to Maria Castro; is that correct?

11  **A.**  That's correct.

12  Q.  What does the for line say?

13  **A.**  Jose Luis.

14  Q.  Can we go -- well, and Jose Luis, that's mister -- that's

15  Defendant Mendez's first name; right?

16  **A.**  Yes.

17  Q.  Or first two names, I guess.

18       **MR. ZYTNICK:**  Can we go to page 2 of this document,

19  please?  Can we zoom in again on the check?

20  **BY MR. ZYTNICK:**

21  Q.  Is this another check payable to Maria Castro from

22  Digital Express?

23  **A.**  Yes, it is.

24  Q.  All right.  And then let's look at what's in the for

25  line.  It starts out with the letters AAS; is that correct?

1    **A.**    That's correct.

2    Q.    And earlier we were talking about Advanced Allocation

3    Systems.  Do you remember -- do you remember that?

4    **A.**    Yes.

5    Q.    Are the initials for Advanced Allocation Systems AAS?

6    **A.**    Yes.

7    Q.    Then it has the word -- after AAS it has the word "from"

8    and then a word that could be "party" or maybe "Patti" and

9    then it says "Jose Luis."  Do you see that?

10   **A.**    I do, yes.

11   Q.    It has been suggested during this trial that Jose Luis

12   Mendez has not used anyone else's name related to this scheme.

13   According to this check, did Mr. Mendez use his wife's name to

14   receive money from Digital Express related to AAS?

15   **A.**    Yes.

16          **MR. ZYTNICK:**  Can we go to page 3?

17   **BY MR. ZYTNICK:**

18   Q.    Is this also a check to Maria Castro?

19          Mr. Towers, did you hear the question or?

20   **A.**    I'm sorry.  I didn't hear.

21   Q.    I was asking if this is also a check to Maria Castro?

22   **A.**    It is, yes.

23   Q.    And does the for line of this check say "Jose Luis

24   profit"?

25   **A.**    Yes.

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1    Q.    Are there 12 more checks in Exhibit 265 that the jurors

2    can review at a later time?

3    A.    Yes.

4    Q.    According to these checks, did Digital Express make

5    checks payable to Maria Castro that reference Jose Luis in the

6    for line?

7    A.    Yes.

8    Q.    Have you also reviewed IP address records related to Jose

9    Luis Mendez's house?

10   A.    Yes, I have.

11   Q.    And did you compare those to bank account log-in records

12   from some Bank of America accounts?

13   A.    Yes, I did.

14        MR. ZYTNICK:    Can we pull up Exhibit 266?

15   BY MR. ZYTNICK:

16   Q.    All right.    Is this a summary or is this a graphic that

17   you prepared?

18   A.    Yes, it is.

19   Q.    Does this accurately summarize IP address and bank

20   account log-in information?

21   A.    Yes, it does.

22   Q.    Was the bank account log-in information from Bank of

23   America?

24   A.    Yes.

25   Q.    And was the -- was there other IP address information

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1    records from Cox Communication -- or Cox Communications?

2    A.    Yes.

3    Q.    All right.  Can you tell us what an IP address is?

4    A.    IP stands for Internet protocol address, and each

5    individual that had -- or each -- say, for example, a house

6    that has Internet service during that time, they have an

7    assigned IP address, and it's a unique address throughout the

8    world.  So, for example, in my house if I have -- I have an

9    Internet service, there's an IP address that's assigned to my

10   house by my provider, and it stays with me until the provider

11   changes it.  But there's no one else in the world that has

12   that same IP address at the same time, so...

13   Q.    So if I'm understanding you correctly, during a specific

14   time period an IP address is unique to a specific place?

15   A.    Yes, that's correct.

16   Q.    Can two places -- two separate places have the same IP

17   address at the same time?

18   A.    No.

19   Q.    Did the Cox Communications records allow you to determine

20   the IP addresses in use at Mr. Mendez's house during specified

21   time periods?

22   A.    Yes, they did.

23   Q.    Using those IP address records, were you able to tell if

24   someone at Mr. Mendez's house was logging in to certain Bank

25   of America accounts?

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1   **A.**   Yes, I was.

2   Q.   Can you tell us what's in the box on the left in this

3   graphic?

4   **A.**   The box to the left identifies the Cox Internet

5   subscriber as well as the service address for that Internet

6   account.

7   Q.   And so who is the subscriber on this Cox Internet

8   account?

9   **A.**   Jose Luis Mendez.

10  Q.   And is that the address on Marlboro Road for the service

11  address for the account?

12  **A.**   Yes.

13  Q.   To the right of that there's a yellowish area, an arrow.

14  What's in that arrow?

15  **A.**   Two different IP addresses because they're different time

16  periods that were assigned to the Cox Internet account that's

17  in the name of Jose Luis Mendez.

18  Q.   So during the time periods on the right of the chart, how

19  many times did someone at Jose Luis Mendez's house access the

20  Bank of America accounts for Advanced Allocation Systems?

21  **A.**   177 times.

22  Q.   Were the log-in records the same for all three Advanced

23  Allocation Systems accounts?

24  **A.**   Yes, they were.

25  Q.   During the listed time period, how many times did someone

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    at Jose Luis Mendez's house access the Bank of America account

2    for Pacific Allocation Systems?

3    **A.**    222 times.

4    Q.    So according to the IP address information that you

5    reviewed, did someone at Jose Luis Mendez's house repeatedly

6    access the Bank of America online accounts for Advanced

7    Allocation Systems and Pacific Allocation Systems?

8    **A.**    Yes.

9    Q.    Let's move on to the next defendant.

10            Have you seen documentary evidence about Miguel

11   Castro's involvement in this scheme?

12   **A.**    Yes, I have.

13            **MR. ZYTNICK:**    Can we start with Exhibit 102G?

14   **BY MR. ZYTNICK:**

15   Q.    Is this a bank account signature card?

16   **A.**    Yes, it is.

17   Q.    What is the company name on this account?

18   **A.**    Marketing Image Direct, Inc. d/b/a...

19            **MR. ZYTNICK:**    Can we zoom in on the top?

20            **THE WITNESS:**    ... Price Awards.

21   **BY MR. ZYTNICK:**

22   Q.    Yes.  It appears to be doing business as Price Awards; is

23   that correct?

24   **A.**    Yes, correct.

25   Q.    At the bottom of the page, who's the signer on the

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1   account?

2   **A.**   Miguel A. Castro.

3   Q.   And what titles are listed for Miguel Castro's position?

4   **A.**   Secretary, treasurer, president.

5   Q.   According to this document, did Miguel Castro open a bank

6   account at Bank of America for Price Awards?

7   **A.**   Yes.

8   Q.   All right.   We'll come back to this in a moment, but

9   right now I'd like to go to Exhibit 1E, another letter to

10  Betty Stirewalt.

11          Looking in the top left corner, who is this letter

12  from?

13  **A.**   Price Awards.

14  Q.   The same name we just saw on that bank account signature

15  card?

16  **A.**   Yes.

17          **MR. ZYTNICK:**   Can we pull up Exhibit 27B?

18  **BY MR. ZYTNICK:**

19  Q.   Is this a check from James Pascarella?

20  **A.**   Yes, it is.

21  Q.   Who is this check payable to?

22  **A.**   Price Awards.

23          **MR. ZYTNICK:**   Can we go to page 2 of the check, which

24  is page 2 in the digital form but obviously it's the back of

25  the check in real-life?

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1   **BY MR. ZYTNICK:**

2   Q.    Do you see text showing that this -- this -- this check

3   was deposited into a bank account?

4   **A.**    Yes, I do.

5   Q.    And the last four digits of that bank account, is that

6   that number there, 1646?

7   **A.**    Yes.

8           **MR. ZYTNICK:**    Can we put this page up side by side

9   with Exhibit 102G?  And can we actually go to page 2 of 27B?

10  **BY MR. ZYTNICK:**

11  Q.    Do you see the account number on the back of the check

12  from Mr. Pascarella?

13  **A.**    Yes, I do.

14  Q.    And do you see the account number at the top of the

15  signature card for Price Awards?

16  **A.**    Yes, I do.

17  Q.    Both of those end in 1646?

18  **A.**    Yes, they do.

19  Q.    Are they the same account number?

20  **A.**    Yes, they are.

21  Q.    According to these documents, was Mr. Pascarella's check

22  to Price Awards deposited into this account?

23  **A.**    Yes.

24  Q.    And according to these documents, Miguel Castro opened

25  the account where that check was deposited?

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    **A.**   Yes.

2            **MR. ZYTNICK:**  Let's go to Exhibit 151A.  These are

3    texts the jury has already seen between Patti Kern and Miguel

4    Castro.  We can actually go to page 6.

5    **BY MR. ZYTNICK:**

6    Q.   At the top, is there a text from Patti Kern to Miguel

7    Castro asking what is the balance in the Price Awards account?

8    **A.**   Yes.

9    Q.   Did Miguel Castro write back with an answer?

10   **A.**   Yes, he did.

11   Q.   Two minutes later did Patti Kern write "Does that include

12   the $1,535 that was deposited today?"

13   **A.**   Yes.

14   Q.   And did Miguel Castro also respond to that message?

15   **A.**   Yes.

16           **MR. ZYTNICK:**  Can we go to page 8 at the top?

17   **BY MR. ZYTNICK:**

18   Q.   Is this another message from Patti Kern to Miguel Castro

19   asking about the balance in the Price Awards account?

20   **A.**   Yes, it is.

21           **MR. ZYTNICK:**  Can we go to page 1 of this exhibit?

22   **BY MR. ZYTNICK:**

23   Q.   For that top text did Miguel Castro send a text to Patti

24   Kern about something he referred to as FMI?

25   **A.**   Yes.

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1  Q.   Have you seen references elsewhere to a mailing company

2  named Funding Managers International?

3  **A.**   Yes, I have.

4  Q.   In this text from Miguel Castro to Patti Kern about

5  FMI -- I'm sorry.

6       **MR. ZYTNICK:**  Let's -- can we put up Exhibit 280 just

7  for a moment to make sure that we're...

8  **BY MR. ZYTNICK:**

9  Q.   Is -- I said Funding Managers International, but does

10  Exhibit 280 show that it's actually Funding Managers, Inc.?

11  **A.**   Yes, I see that.

12  Q.   All right.

13       **MR. ZYTNICK:**  Let's go back, please, to Exhibit151A,

14  page 1, that top text right there.

15  **BY MR. ZYTNICK:**

16  Q.   All right.  So Miguel Castro has sent a text to Patti

17  Kern about FMI?

18  **A.**   Yes.

19  Q.   And did Miguel write, "That's the one that Mario told Epi

20  to print"?

21  **A.**   Yes.

22       **MR. ZYTNICK:**  Can we please take a look at

23  Exhibit 253, page 303?  And for anyone who has a full paper

24  printout, that would be on page 1,110.

25  **BY MR. ZYTNICK:**

1   Q.   This is again, of course, about the -- the profit

2   distribution checks that Patti Kern referenced or talked

3   about.  Is this check to Miguel Castro for $1,000?

4   **A.**   Yes, it is.

5   Q.   Is that -- $1,000, is that a round number?

6   **A.**   Yes, it is.

7   Q.   Does this check contain nothing in the for line?

8   **A.**   It -- yeah, there's nothing there.

9   Q.   Let's look at some other evidence about payments.

10          **MR. ZYTNICK:**  Can we go to Exhibit 264, page 4?

11  **BY MR. ZYTNICK:**

12  Q.   So we were talking earlier about those two Digital

13  Express accounts with a time period of just under three years.

14          In that under three-year time frame, how much money

15  did each of those Digital Express accounts pay to Miguel

16  Castro?

17  **A.**   A total of over $100,000.

18  Q.   So over $50,000 from each of those two accounts?

19  **A.**   Yes.

20  Q.   In the bottom left of this graphic, are there other

21  companies that paid money to Miguel Castro?

22  **A.**   Yes, there are.

23  Q.   In total for the companies on this chart during the time

24  period for which you have records, how much money did Digital

25  Express and those other companies pay to Miguel Castro?

1    **A.**   Over $140,000.

2           **MR. ZYTNICK:**  Can we go to the next page, please?

3    **BY MR. ZYTNICK:**

4    Q.   Did you also look at payments to a company named

5    Marketing Image Direct?

6    **A.**   Yes, I did.

7    Q.   And did Digital Express pay money to Marketing Image

8    Direct?

9    **A.**   Yes, it did.

10   Q.   How much money from that Digital Express account listed

11   at the top of your graphic was paid to Marketing Image Direct?

12   **A.**   Over $150,000.

13   Q.   Did a number of other -- of mailing companies, including

14   Pacific Data Awards, Golden Product Services, and Distribution

15   Reporting Services, did they also pay money to Marketing Image

16   Direct?

17   **A.**   Yes, they did.

18   Q.   How much money did those companies on the left side of

19   the page, how much money did they pay to Marketing Image

20   Direct?

21   **A.**   Over $780,000.

22          **MR. ZYTNICK:**  Can we go back to Exhibit 151, the

23   texts between Patti Kern and Miguel Castro?  Maybe that's

24   151A, actually.  I'm sorry.

25          **COURTROOM ADMINISTRATOR:**  That's --

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1          **MR. ZYTNICK:**  On page 2, can we go to that?

2     **BY MR. ZYTNICK:**

3     Q.    Is there a text on this page at the top from Patti Kern

4     to Miguel Castro that references Marketing Image Direct?

5     **A.**    Yes.

6     Q.    And in that text does Ms. Kern first ask Miguel Castro,

7     "What is the balance in Marketing Image Direct?"

8     **A.**    Yes.

9     Q.    In the second sentence does Ms. Kern say to Miguel

10    Castro, "I might be able to give you a distribution"?

11    **A.**    Yes.

12    Q.    Is Marketing Image Direct the name of the company that we

13    were just talking about regarding the $780,000?

14    **A.**    Yes, it is.

15    Q.    All right.  Let's go on to the last defendant.

16          Have you seen documentary evidence about Mario

17    Castro's involvement in the scheme?

18    **A.**    Yes, I have.

19    Q.    We've talked, of course, about Digital Express.

20          **MR. ZYTNICK:**  Can we go over to Exhibit 214, page 20?

21    If we can zoom in at the top?

22    **BY MR. ZYTNICK:**

23    Q.    Is this a corporate filing for Digital Express?

24    **A.**    Yes, it is.

25          **MR. ZYTNICK:**  Can we now zoom in on the bottom half

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1    of the page?

2    **BY MR. ZYTNICK:**

3    Q.    And I'm going to ask you, looking at this -- this

4    document, who is listed as the president, the secretary, the

5    treasurer, and the director of Marketing Image Direct -- I'm

6    sorry, of Digital Express?

7    **A.**    Mario Castro.

8    Q.    And the address listed, is that 4665 Garita Street?

9    **A.**    Yes, it is.

10           **MR. ZYTNICK:**  Can we look at Exhibit 70, please?

11   **BY MR. ZYTNICK:**

12   Q.    So this was a business card -- or business cards found by

13   postal inspectors at that Garita Street address.  For the

14   business card from Digital Express, who is listed as the CEO?

15   **A.**    Mario Castro.

16          **MR. ZYTNICK:**  Can we go now to Exhibit 1D?

17   **BY MR. ZYTNICK:**

18   Q.    Is this -- I think we actually looked at this earlier.

19   It's a letter or an envelope addressed to Betty Stirewalt from

20   Money Securities; is that correct?

21   **A.**    That's correct.

22          **MR. ZYTNICK:**  Can we pull up Exhibits 25A and 25B

23   side by side?

24   **BY MR. ZYTNICK:**

25   Q.    Are these both checks from Betty Stirewalt?

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**    Yes, they are.

2    Q.    Who are both of these checks payable to?

3    **A.**    Money Securities.

4    Q.    That's the same name we just saw on the envelope; right?

5    **A.**    Yes, that's correct.

6    Q.    Okay.

7            **MR. ZYTNICK:**  Can we go to Exhibit 43 now, an

8    envelope found in the Digital Express warehouse?

9    **BY MR. ZYTNICK:**

10   Q.    What's the name of the sender on this envelope?

11   **A.**    The name is Money Securities.

12   Q.    Okay.  So we're looking -- we're talking about Money

13   Securities.  We're going to hold that thought and come back to

14   it in a minute.

15           **MR. ZYTNICK:**  Can we go to Exhibit 29B?

16   **BY MR. ZYTNICK:**

17   Q.    Is this a check from Lorraine Ramadan?

18   **A.**    Yes, it is.

19   Q.    Who is it payable to?

20   **A.**    Assets Unlimited.

21   Q.    Okay.

22           **MR. ZYTNICK:**  Can we look at Exhibit 40, another

23   envelope found in Digital Express?

24   **BY MR. ZYTNICK:**

25   Q.    Who's the sender on this envelope?

1    **A.**    Assets Unlimited.

2    Q.    Okay.  Same name we just saw on the check from Lorraine

3    Ramadan?

4    **A.**    Yes.

5    Q.    On the right side of this envelope, do you see a big

6    dollar amount listed there?

7    **A.**    Yes, I do.

8    Q.    Can you read that dollar amount?

9    **A.**    $1,444,000.

10            **MR. ZYTNICK:**  Can we put Exhibit 40, this exhibit,

11    put it side by side with Exhibit 65 from Mario Castro's

12    address?  And if we can zoom in on that check on the right?

13    **BY MR. ZYTNICK:**

14    Q.    On the right it looks like a person wrote a claim number,

15    and then below that they wrote a dollar amount.  Do you see

16    that?

17    **A.**    Yes, I do.

18    Q.    What's the dollar amount there?

19    **A.**    $1,444,000.

20            **MR. ZYTNICK:**  And if we can maybe move that zoom just

21    down just a little bit so we can see also on -- the check on

22    the left?

23    **BY MR. ZYTNICK:**

24    Q.    Is that the same dollar amount on that check that was

25    found at Mr. Cas -- Mario Castro's house as on that envelope

*Kevin Towers - Cont. Direct*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    at Digital Express?

2    **A.**    Yes, it is.

3    Q.    So we've been talking about Assets Unlimited.  Right

4    before that we were talking about Money Securities.

5            **MR. ZYTNICK:**  Can we go to Exhibit 280, please?

6    **BY MR. ZYTNICK:**

7    Q.    At the top, second row from the top, whose name is on the

8    corporate filings and the bank accounts for Assets Unlimited?

9    **A.**    Mario Castro, Jr.

10   Q.    Okay.  And for Money Securities, midway down, whose name

11   is on the corporate records as the president and the bank

12   account as the signer?

13   **A.**    Mario Castro, Jr.

14   Q.    And to be clear, these corporate records, these bank

15   accounts show Mario Castro, Jr., not the defendant Mario

16   Castro; is that correct?

17   **A.**    That's correct.

18   Q.    Do these corporate records also show that Assets

19   Unlimited and Money Securities are both DBAs of Pi -- or

20   P-i -- Printing?

21   **A.**    Yes.

22   Q.    So, in other words, Pi Printing would be the corporation,

23   and then Assets Unlimited and Money Securities would each be

24   DBAs of that company; is that correct?

25   **A.**    That's correct.

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1          **MR. ZYTNICK:**  Can we go to Exhibit 69, please?

2      **BY MR. ZYTNICK:**

3      Q.   Here are three debit cards.  There was testimony these

4      came from the defendant Mario Castro's wallet.

5               What are the names of the companies on these three

6      debit cards?

7      **A.**   Digital Express, Inc.; Pi Printing Corp.; and Money

8      Securities.

9      Q.   Okay.  So Digital Express, that was the company we talked

10     about just a few minutes ago that the defendant is the

11     president of; is that correct?

12     **A.**   Yes.

13     Q.   And then Money Securities, that's one of the -- the

14     mailing companies where Mario Castro, Jr. is the president?

15     **A.**   That's correct.

16     Q.   And the same thing for Pi Printing, that's the -- the

17     corporate name for Money Securities and Assets Unlimited?

18     **A.**   That's correct.

19     Q.   And the name Mario Castro is on all three debit cards?

20     **A.**   Yes.

21          **MR. ZYTNICK:**  Can we pull up Exhibit 264, page 6?

22     **BY MR. ZYTNICK:**

23     Q.   How much money did Mario Castro, the defendant, receive

24     in direct payments from Digital Express during the less than

25     three years covered by this graphic?

Kevin Towers - Cont. Direct
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**   Over $88,000.

2         **MR. ZYTNICK:**  Can we pull up side by side Exhibits 86

3    and 88?

4    **BY MR. ZYTNICK:**

5    Q.   There's been evidence in this case about cash payments in

6    envelopes.  We've also talked or heard from you about various

7    payments to the defendants from various bank accounts.  Did

8    your analysis include any cash payments to defendants from

9    envelopes like these?

10   **A.**   No.

11   Q.   If defendants received cash, whether in envelopes like

12   this or in any other way, would that be in addition to the

13   payments shown in your summary?

14   **A.**   Yes, it would be in addition.

15         **MR. ZYTNICK:**  No further questions, Your Honor.

16         **THE COURT:**  All right.  Let's go ahead and take our

17   afternoon break.  I remind you all that during this break you

18   are not to discuss this case with anyone nor attempt any --

19   nor allow anyone to speak to you about the case.  Remember you

20   are not to speak to any of the attorneys or the parties,

21   witnesses, or staff members about the case or anything else.

22   And do not read or listen to or view anything that touches

23   upon this case in any way or perform any independent research

24   or investigation.  Write down your questions, and do not form

25   any opinions.

*Kevin Towers - Cross*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1      We'll stand for the jury and welcome them back at
2   2:40.
3      *(Jury out at 2:20 p.m.)*
4          **THE COURT:** And Inspector Tower, you may step down
5   and stretch, take your afternoon break as well after the jury
6   exits.
7          All right.  We'll be off record until 2:40.
8      *(Recess at 2:21 p.m., until 2:43 p.m.)*
9          **THE COURT:** All right.  Looks like we got everybody
10  here.
11         Go ahead and call in the jury.
12     *(Jury in at 2:43 p.m.)*
13         **THE COURT:** All right.  Everyone may take a seat.  We
14  have the jury and the witness, Investigator Tower, on the
15  stand.
16         And now we'll start with cross examination.
17  Mr. Tanasi on behalf of Mario Castro.
18         **MR. TANASI:**  Thank you, Your Honor.
19                    **CROSS-EXAMINATION**
20  **BY MR. TANASI:**
21  Q.   Good afternoon, sir.  How are you?
22  **A.**   Good afternoon.  Well.  Thanks.
23  Q.   Good.
24         So Inspector Towers, you are a U.S. postal
25  inspectors; correct?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    A.    That's correct.

2    Q.    All right.  And you have been since 2005?

3    A.    Yes.

4    Q.    And before that you did civil investigation I think you

5    said for the SEC.  Did I have that right?

6    A.    Federal Trade Commission, FTC.

7    Q.    FTC.  I apologize.

8          Before that, what were you doing?  What was your

9    career?

10   A.    I was an honors paralegal with the Department of Justice

11   in the fraud section.

12   Q.    Okay.

13   A.    And then before that it was graduate school.

14   Q.    All right.  What was graduate school -- what was your

15   degree in graduate school?

16   A.    Political science master's.

17   Q.    Okay.  How about your undergrad.  What did you do there?

18   A.    Bachelor's, double major in criminal justice and

19   political science.

20   Q.    Okay.  So fair to say none of your post-high school

21   education had anything to do with accounting or finances or

22   anything along those lines; correct?

23   A.    Correct.

24   Q.    As you sit here today and as you testified to the ladies

25   and gentlemen of the jury, you don't hold yourself out as a

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    CPA, a certified public accountant; right?

2    A.   Correct, don't.

3    Q.   Don't hold yourself out as an accountant of any kind;

4    right?

5    A.   No.

6    Q.   All right.  Again, an inspector who's been doing law

7    enforcement work for the majority of your career; correct?

8    A.   That's correct.

9    Q.   Really, all of your career; fair?

10   A.   Fair.

11   Q.   All right.  In this case, are you familiar with Inspector

12   Bouchie?

13   A.   Yes.

14   Q.   Okay.  Would you agree with me he is the lead inspector

15   in this case?

16   A.   He was.  He's -- he's since retired.

17   Q.   Right.  But at the time you were doing your investigation

18   in this particular case, your lead inspector was Inspector

19   Bouchie; right?

20   A.   I guess I'm -- I -- he was originally the lead inspector

21   until he retired.  I work on a different team than he does,

22   but we help out in different, you know, cases so --

23   Q.   Ultimately fair to say before he retired, though, he was

24   sort of your boss in the investigation?

25   A.   No.  Again, I assisted on the case a little bit during

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    2018 with the search warrants, and up until last year I really

2    wasn't associated with the case.

3    Q.    Okay.  So during your time in the investigation in this

4    case, who was your boss?  Who was your lead inspector?

5    A.    Again, we work -- he was the lead case inspector, but as

6    far as boss, manager, I have a team leader.  So --

7    Q.    So if I think I just heard you right, Inspector Bouchie

8    was your lead case inspector; fair?

9    A.    For this case, yes.

10   Q.    For this case; right?

11   A.    Right.

12   Q.    And this case, let's talk about that.

13         Do you understand this case to be coined the Kern

14   syndicate?  Are you familiar with that term?

15   A.    I'm not.

16   Q.    You're not.  You've never heard the word Kern syndicate?

17   A.    It doesn't ring a bell.

18   Q.    Okay.  How often, if at all, did you meet with Inspector

19   Bouchie?

20   A.    Regarding this case?

21   Q.    Yes.

22   A.    I think, before the search warrants in 2018, we probably

23   briefed before the search warrants.  And then he was present a

24   couple of times during trial prep.  Other than that, it's --

25   Q.    Okay.  Let's talk about trial prep, and let's talk about

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Kevin Towers - Cross*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    some of the exhibits that we went over here today.

2            The exhibits that house things like pie charts, fair

3    to say you created those; right?

4    **A.**   I did, yes.

5    Q.   Okay.  Did you create those at the direction of Inspector

6    Bouchie?

7    **A.**   No.

8    Q.   No?

9            Who did you create those charts for at the direction

10   of?

11   **A.**   Worked with the prosecution team.

12   Q.   Okay.  You said that you reviewed bank accounts in this

13   case; correct?

14   **A.**   Yes.

15   Q.   All right.  And you also reviewed bank statements; right?

16   **A.**   Yes.

17   Q.   Checks?

18   **A.**   Yes.

19   Q.   Okay.  Wire transfers?

20   **A.**   Yes.  That were part of them, yes.

21   Q.   Okay.  Did you also review QuickBooks?

22   **A.**   No.

23   Q.   No QuickBooks review in this case?

24   **A.**   No.

25   Q.   Okay.  Weren't asked to look at them?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**    No.

2    Q.    At any time?

3    **A.**    No.

4    Q.    By any inspector?

5    **A.**    No.

6    Q.    By anybody working on this side of the courtroom

7    (indicating) for the Government, never asked once?

8    **A.**    Never asked, correct.

9    Q.    Okay.  You used the phrase spot-check.  Do you remember

10   that?

11   **A.**    Yep.

12   Q.    Okay.  Explain to me what that means.

13   **A.**    During the court -- for this analysis in particular?

14   Q.    Absolutely.

15   **A.**    Okay.  So, as I mentioned before, when the initial

16   analysis was done using CFIS, the original investigative team

17   had loaded the scanned statements into CFIS, and then CFIS

18   turned those statements into spreadsheets for each account and

19   it creates kind of a raw data spreadsheet, master spreadsheet.

20   And it separates it by debits and credits.

21        And so then, at that point in time, once they got all

22   the subpoena returns, put them in CFIS, that team went through

23   and did the initial data entry on certain things like checks.

24   And for the deposits they looked at those to make sure there

25   were deposits containing victim checks of those deposits.  And

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    that was over the -- as I mentioned, there's hundreds and

2    hundreds of thousands of documents.

3            So when I was asked to testify as a summary witness,

4    the first thing I did was go into these spreadsheets that were

5    created.  I also had the account statements themselves.  I

6    checked the beginning and ending balances on -- for -- the

7    monthly beginning and ending balances for those statements to

8    make sure they matched up with what CFIS had.  And then as far

9    as actual checks and deposits, I did random, you know,

10   spot-checks to make sure that that was, you know, done

11   correctly within the -- the file spreadsheet.  So I didn't

12   look at every single check or every single deposit.

13   Q.   Okay.  And that was sort of the -- the gist and -- and

14   the spirit behind my question to start.

15           Fair to say you haven't looked at every single

16   document in this case; right?

17   **A.**   That's fair.

18   Q.   But you're being asked to testify today, to give a

19   summary of documents that you didn't look at in their

20   entirety; fair?

21   **A.**   There -- it wasn't physically possible to look at every

22   single one.

23   Q.   Okay.  So it's your testimony that it's not physically

24   possible to comb through all of the evidence that you would

25   come into court and testify about?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    A.   Well, again, using the CFIS software that's used as an

2    investigative tool to summarize bank statements.  Once I was

3    comfortable with the fact that the initial analysis and

4    creation of the -- the files or the Excel files for each

5    account, once I was satisfied with that, then I was satisfied

6    with being able to create the summary charts that I did.

7    Q.   Understood.  You were satisfied, I think -- and I don't

8    want to put words in your mouth.  You were satisfied after you

9    did your spot-check; right?

10   A.   Well, after I did the -- so -- well, again, I did the

11   account beginning and ending balance checks on the accounts to

12   make sure the numbers matched up in the spreadsheet from CFIS.

13   And then, as far as the spot-checks, yes, correct.

14   Q.   You didn't spot-check every single check to make sure it

15   matched somewhere?

16   A.   I did not, no.

17   Q.   Okay.

18         MR. TANASI:   If we could please, Brian, look at

19   Government's Exhibit 281?

20   BY MR. TANASI:

21   Q.   Okay.  Sir, do you see that before you?

22   A.   I do.

23   Q.   All right.  So on this particular exhibit there's a total

24   of 131 checks; correct?

25   A.   Yes.

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    Q.   Did you go through and count each and every one of those

2    131 checks and come to that total yourself for $2,820?

3    **A.**   No.

4    Q.   Okay.

5        **MR. TANASI:**  Brian, if we can go to the next page?

6    **BY MR. TANASI:**

7    Q.   We see 129 checks.  Fair to say you didn't go through and

8    actually add up each one of those checks; correct?

9    **A.**   Well, I want to qualify a little bit.  Because -- well,

10   for Gambon I did.  I worked with an analyst at Department of

11   Justice.  For so for Mr. Gambon I went through all the checks,

12   put them into a spreadsheet, did the totals, counted those up.

13       For the other victim checks, again, working with the

14   analyst who put together the summaries, I, again, went through

15   and did a check of his work and then spot-checked like the

16   specific checks.  I saw the checks, but as far as, like, if --

17   looking at any deposits, I didn't look at the back of the

18   check or anything like that.

19   Q.   Okay.  So for Gambon there was another individual

20   involved in totaling these, or these are the ones you went

21   through yourself?

22   **A.**   So the Gambon was the one that I had gone through myself,

23   and then --

24   Q.   Okay.

25       **MR. TANASI:**  So, Brian, if we can go back to the

1    first page?

2    **BY MR. TANASI:**

3    Q.   So for Betty Lou Stirewalt, those you had another

4    individual who was inputting --

5    **A.**   Well, in conjunction with me.  I worked with him --

6    Q.   Right.

7    **A.**   -- on that, and I did -- again, I did the checks through

8    the spreadsheet.

9    Q.   And then did you spot-check his work?

10   **A.**   Yes.

11   Q.   But you didn't check each entry that he put into the

12   accounting?

13   **A.**   I didn't look at each specific check, no.

14   Q.   Okay.  And we don't need to go through all of 281.  Let's

15   just go to page 3.

16         And for James Pascarella, 109 checks; same idea.  You

17   didn't actually go through and look at every check to add it

18   up to then say, okay, the total is $2,356; right?

19   **A.**   So I guess technically I looked at every check, but as

20   far as doing the -- all the data entry, I did not do all the

21   data entry.

22   Q.   Okay.  So you can't be 100 percent sure whether these

23   numbers are 100 percent accurate that you're summarizing;

24   fair?

25   **A.**   I mean, as much time that we put into it and with the

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    spot-checking, pretty close if not.

2    Q.    Pretty close.

3          Fair to say that we don't want to have a conviction

4    on something that's pretty close; right?

5    A.    I understand.

6    Q.    Right.  You'd agree with me on that; right?

7    A.    Yeah, I would agree with you.

8    Q.    We want to be -- we want to be accurate?

9    A.    Right.

10   Q.    100 percent accurate; right?

11   A.    Yeah.  And I think we're --

12   Q.    Right.  Because numbers are numbers; right?  We should --

13   A.    Right.

14   Q.    -- be able to at least rely on accurate, concrete

15   numbers; right?

16   A.    Yes.

17   Q.    And we really can't do that in this case, can we?

18   A.    Again, using the investigative team and CFIS and doing

19   the spot-checks, I'm pretty confident that the numbers were

20   pretty good.

21   Q.    Okay.

22         MR. TANASI:  All right.  Brian, if we could look at

23   Exhibit 260, please?

24   BY MR. TANASI:

25   Q.    All right.  So this particular exhibit is a summary of

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    victim payments; correct?

2    **A.**    Yes.

3    Q.    All right.  So same idea.  The numbers that go into this

4    far right column, can you sit here with 100 percent certainty

5    and tell the ladies and gentlemen of the jury that those

6    numbers are 100 percent accurate?

7    **A.**    Again, I'm pretty confident they're good.  Because with

8    the CFIS software, the process we had in place for the

9    analysis, and, again, we didn't use cents but we rounded to

10    the dollar, and pretty confident they're pretty accurate.

11    Q.    Pretty confident that they're close enough?

12    **A.**    Close -- they're -- they're pretty accurate.

13    Q.    Okay.

14    **A.**    If anything, it was conservative, these numbers.

15    Q.    All right.

16         **MR. TANASI:**  Brian, if we could bring up 263, please?

17    **BY MR. TANASI:**

18    Q.    All right.  Sir, do you see 263 before you?

19    **A.**    Yes, I do.

20    Q.    All right.  And this is your summary of Money Securities;

21    correct?

22    **A.**    Yes.

23    Q.    All right.  And on the left we have the victim payments;

24    correct?

25    **A.**    Correct.

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    Q.   All right.  So those particular payments, those payments

2    you're indicating went in part to the pie chart on the right;

3    correct?

4    A.   Sorry.  Could you say that again?

5    Q.   Those victim payments, you have a dotted line going from

6    left to right?

7    A.   Yes.

8    Q.   So that's you showing the ladies and gentlemen of the

9    jury that that's money flowing from what you quote victim

10   payments into the pie chart as it's divvied up on the right;

11   fair?

12   A.   Yes.  As it's shown in that account, yes.

13   Q.   Okay.  And so do you have any idea what any of those

14   payments were for particularly?

15   A.   You mean the payments to Digital Express and --

16   Q.   Correct.

17   A.   It doesn't matter.  They're -- it's -- it's victim money

18   that's going to whatever, so --

19   Q.   You have no idea the reason for any of that flow of

20   payments from one circle on the left to the circle on the

21   right; right?

22   A.   Again, no.

23   Q.   Okay.  All right.

24        MR. TANASI:  If we can look, Brian, now at 261?

25   BY MR. TANASI:

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    Q.   All right.  Sir, you prepared 261; correct?

2    A.   Correct.

3    Q.   And 261 is a summary that you title Known Credits Into

4    Digital Express Bank of America Accounts; correct?

5    A.   Yes.

6    Q.   And you have two account numbers.  9160; correct?

7    A.   Correct.

8    Q.   And 9296; correct?

9    A.   Correct.

10   Q.   And from a total time period of 2/17/15, so

11   February 17th, 2015; correct?

12   A.   Correct.

13   Q.   To January 31st, 2018; correct?

14   A.   Correct.

15   Q.   All right.  You'd agree with me that's approximately

16   three years; right?

17   A.   Yes.

18   Q.   All right.  The title is Known Credits; correct?

19   A.   Correct.

20   Q.   Who came up with that title?

21   A.   Again, it was in conjunction with working with

22   prosecution team.

23   Q.   So fair to say the Government gave you that title to use?

24   A.   No.  I was -- I was asked to put together these summary

25   charts, and I would come up with titles and, you know, so

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    forth and see if it's okay.  And then whatever made it to the

2    final version.

3    Q.   Right.  So, again, the word "Known Credits," that's what

4    I'm focusing on.  That word, was that your word or was that

5    one of the nice prosecutors here to my right?

6    A.   I don't recall.  It was -- at the end of the day, it was

7    one we agreed on, but I don't recall --

8    Q.   Okay.

9    A.   -- whose specific idea it was.

10   Q.   So it could have been your words, could have been someone

11   else's?

12   A.   I mean, again, it could have been a collaboration to come

13   to that.

14   Q.   But this is your summary; right?

15   A.   Yes.

16   Q.   Okay.  So known credits you'd agree with me is everything

17   that increases a bank balance; right?

18   A.   Yes.

19   Q.   Regardless of source; right?  It's anything that will

20   increase a bank account regardless of where that money came

21   from or what that money is; right?

22   A.   Generally, sure.  Yes.

23   Q.   Right?  If the money came into the account, it increases

24   the known credits; right?

25   A.   Yes.

*Kevin Towers - Cross*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    Q.    All right.  And so things that can increase known credits

2    could be things like owner contributions; correct?

3    **A.**    Yeah.  Yeah.

4    Q.    Okay.  Return checks; right?

5    **A.**    Yes.  On -- on -- before it's accounted for, yes.

6    Q.    Okay.  Let's look at the bottom right corner.  You have

7    an asterisk -- well, actually, I apologize.  Let's go back up

8    to the top just after the Number $3,443,395.  Do you see that?

9    **A.**    Yes.

10   Q.    Okay.  So that asterisk there then shoots down to the

11   bottom, and it says "Includes transfers between Digital

12   Express accounts."  Do you see that?

13   **A.**    Yes.

14   Q.    All right.  Underneath you have two numbers, $47,000 from

15   account ending 9296; correct?

16   **A.**    Yes.

17   Q.    To account ending 9160; correct?

18   **A.**    Yes.

19   Q.    So let's imagine that that's my left pocket; right?  I've

20   got $47,000 in that pocket; right?

21   **A.**    Yes.

22   Q.    Okay.  And then underneath you have $40,000 from 9160 to

23   9296; right?

24   **A.**    Correct.

25   Q.    That's in my right pocket; fair?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    A.    Fair.

2    Q.    Okay.  Let's pretend I'm Digital Express; right?

3          If I transfer money back and forth between pockets,

4    it's still the same number; correct?

5    A.    Yes.

6    Q.    All right.  So did you calculate $87,000 to come up with

7    that $3 million on the top, or did you calculate $40,000 or

8    did you calculate $47,000?

9    A.    The reason for the footnote was to be, you know,

10   conservative and also to show that, once the analysis was

11   done, we had done the analysis on the two accounts and then

12   when I -- or actually, I'm sorry, when the -- the

13   investigative team initially did that and then when I checked

14   it, noticed that -- that, yes, it included different transfers

15   between the two accounts.  So I wanted to point that out with

16   that footnote.

17   Q.    Okay.  Fair to say it's essentially double counting,

18   though; right?

19   A.    Um... it's just, um... I don't know.  I -- there was --

20   I'm trying to think of... I want to -- potential some double

21   counting, but... it's really -- again, it's a negligible

22   amount.  So if you just take it out -- if you even took it out

23   of the $3 million --

24   Q.    Right.  We're close enough again; right?

25   A.    Well, again, it's notated there, so --

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    Q.   Okay.  You're familiar with postage; right?

2    A.   Yes and no.

3    Q.   Postage could be viewed as a pass-through cost.  Are you

4    familiar with that term?

5    A.   I'm not sure.  No, that doesn't --

6    Q.   Postage could come into Digital Express' two bank

7    accounts and increase the number of known credits; correct?

8    A.   What do you mean postage into the account?

9    Q.   Sure.  So postage that is purchased goes out of the

10   account; correct?

11   A.   Yes.

12   Q.   Okay.  But postage that's repaid comes back into the

13   account; correct?

14   A.   Repaid by?

15   Q.   Any source.  If the money comes into the account, you'd

16   agree with me that that's a known credit; right?

17   A.   Yes.

18   Q.   So if money for postage came into the account, then

19   that --

20   A.   You mean from --

21   Q.   -- would be a --

22   A.   -- the post office?

23   Q.   -- known credit; correct?

24   A.   From the -- you mean from the post office?  That

25   doesn't --

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    Q.    Not directly from the post office, no.

2    **A.**    Just an entity or --

3    Q.    An entity paying for postage.

4    **A.**    Well, but in this case these are -- if you're saying that

5    postage is coming into the Digital Express account, the --

6    that postage is from victim funds.

7    Q.    Not disputing that.  What I'm asking you is:  The postage

8    amount, right, associated with any funds, if it's itemized as

9    coming back into the account as repaying postage that was paid

10   for on the front end, that repayment would be viewed as a

11   known credit that would inflate or adjust this number;

12   correct?

13   **A.**    Again, the -- the known payment -- or the known credit,

14   if it was for postage from these charts and the analysis, any

15   of these credits were based on credits from the mailing

16   companies, and we show that the mailing companies were

17   receiving victim funds.

18   Q.    Okay.

19   **A.**    So if that included postage, then that's still victim

20   money that's being used to pay for postage.

21   Q.    Not my question.  Let's go back to -- to the concept of

22   postage and -- and your review in this case.

23          Would you agree or disagree with me that in your

24   review of this case Digital Express paid $3 million --

25   $3,400,481.99?  Would you agree with me that that's how much

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    Digital Express paid for postage?  Do you have any idea?

2    **A.**    If I -- if I ran through the -- the sorting of the -- the

3    filters on the -- the spreadsheets that we have.

4    Q.    Did you do that?

5    **A.**    No.

6    Q.    Okay.  Would you agree or disagree with me that Digital

7    Express was repaid $3,034,112.41 for postage?  Would you agree

8    or disagree with me with that?

9    **A.**    I don't know.

10   Q.    You don't know because you didn't take the time to look;

11   fair?  Didn't look at the QuickBooks in this case; fair?

12   **A.**    I wasn't asked to look at the QuickBooks.

13   Q.    Okay.  Let me ask you this general question.  Are you

14   familiar with the ability of just buying a book of stamps?

15   **A.**    Yes.

16   Q.    All right.  You can buy a book of stamps.  It will cost X

17   amount of dollars and you can have, say, ten stamps on that

18   book; fair?

19   **A.**    Yes.

20   Q.    And then maybe you might just use one or two of those

21   stems -- those stamps; right?

22   **A.**    Okay.

23   Q.    That would leave eight, right, that -- that are unused

24   that you could use on future jobs; fair?

25   **A.**    Okay.

*Kevin Towers - Cross*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    Q.   You could use that for future mailing purposes; right?

2    **A.**   Sure.

3    Q.   Okay.  No disagreement with me there on the concept of a

4    book of stamps; fair?

5    **A.**   Fair.

6    Q.   All right.

7         **MR. TANASI:**  If we can look at Exhibit 261 a little

8    further now?

9    **BY MR. TANASI:**

10   Q.   On the left there are two designations.  On the Side,

11   Inc.  Do you see that?

12   **A.**   Yes.

13   Q.   Okay.  And then also other.  Do you see that?

14   **A.**   Yes.

15   Q.   Now, you're familiar with Sean O'Connor; correct?

16   **A.**   I've just heard the name.

17   Q.   Right.  In the course of your investigation, you've come

18   across the name Sean -- Sean O'Connor; right?

19   **A.**   Again, I wasn't part of the investigative team.  I really

20   don't know who that is.  I just heard the name.

21   Q.   Do you have any idea whether Mr. O'Connor was doing work

22   for another guy named Wagner?  That name sound familiar at all

23   to you?

24   **A.**   No.

25   Q.   Okay.  Any idea that Mr. O'Connor brought that book of

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    business into Digital Express?  Any -- any recollection?

2    A.   Never heard about that at all.

3    Q.   Okay.  Never something you went over with -- with Case

4    Agent Bouchie?

5    A.   No.

6    Q.   Okay.  So this On the Side is on the top.  Underneath is

7    other.  Do you see that?

8    A.   I do.

9    Q.   Okay.  And then just to the bottom left of it there's a

10   box that says sources.  Do you see that?

11   A.   Yes.

12   Q.   All right.  Those sources are the bank accounts that you

13   reviewed in this case; right?

14   A.   Yes.

15   Q.   And so certainly you're aware that Digital Express also

16   did business as Tierra Produce; right?

17   A.   I don't know what that is.

18   Q.   You don't know what that is?

19   A.   No.

20   Q.   Okay.  Again, didn't look at any of the QuickBooks?

21   A.   I -- no.

22   Q.   No?  Okay.

23   A.   I just looked at the bank accounts and the bank records.

24   Q.   During -- during the course of your investigation, did

25   you come across names like AAA Produce?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

Kevin Towers - Cross
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1     **A.**   No.

2     Q.   Chaparral High School?

3     **A.**   No.

4     Q.   Dreams Boutique?

5     **A.**   No.

6     Q.   Furniture and Design?

7     **A.**   No.

8     Q.   Harbor Green?

9     **A.**   No.

10    Q.   La Bonita?

11    **A.**   No.

12    Q.   Nalco Water?

13    **A.**   No.

14    Q.   Paradise Produce?

15    **A.**   Doesn't sound familiar.

16    Q.   Power Promotion?

17    **A.**   No.

18    Q.   Produce Express?

19    **A.**   No.

20    Q.   RT Customer and Design?

21    **A.**   No.

22    Q.   Did you come across RT Drapery & Furniture, Inc.?

23    **A.**   No.

24    Q.   Did you come across The Grandview at Las Vegas?

25    **A.**   Doesn't sound familiar.

*Kevin Towers - Cross*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1   Q.   Didn't come across any of those names during the course
2   of your investigation?
3   **A.**   No.
4   Q.   But, again --
5   **A.**   Again, they might have -- so when I made the charts using
6   the filters on the spreadsheets, they could have been within
7   the -- the other portion that I didn't select for the charts
8   just because they weren't -- they weren't the mailing
9   companies.
10  Q.   Right.  You weren't asked to look at the potential other
11  business that Digital Express was doing; right?
12  **A.**   These -- these were the mailing companies, so that's what
13  I was asked to look at and --
14  Q.   Right.  You were asked just to look at just one side,
15  just Digital Express' work with the Kern syndicate companies;
16  right?
17  **A.**   I'm not familiar with Kern syndicate, but with the --
18  with these -- with these mailing companies that were
19  associated with the -- the fraudulent mailings, yes.
20  Q.   That's it; right?  Weren't asked to look at the entire
21  picture of Digital Express' operations; right?
22  **A.**   This is what I was asked to look at.
23  Q.   Okay.
24       **MR. TANASI:**  Brian, if we can look at 264?  All
25  right.  Particularly if we can go to page 6.

1    **BY MR. TANASI:**

2    Q.   All right.  Sir, you see that before you?

3    **A.**   I do.

4    Q.   All right.  That is direct payments to Mario Castro from

5    Digital Express; correct?

6    **A.**   Correct.

7    Q.   And there are two boxes.  One says one Digital Express

8    account number, and the other says the other Digital Express

9    account number; correct?

10   **A.**   Correct.

11   Q.   All right.  Now, you indicate that Mario Castro, the

12   total received was over $88,000; right?

13   **A.**   Correct.

14   Q.   All right.  Not an exact number.  You don't have an exact

15   number in -- in this summary; correct?

16   **A.**   Correct.

17   Q.   Because you don't know it; right?

18   **A.**   We have it.  We just -- when I -- when I -- when I put

19   this together and I met with the prosecution team, we

20   decide -- or they asked to put -- just a round number and be

21   conservative with it.

22   Q.   They just --

23   **A.**   So it's --

24   Q.   -- kind of gave you the number --

25   **A.**   No, no, no, no --

1      *(Reporter instruction.)*

2           **MR. TANASI:**  Sorry.

3           **THE WITNESS:**  No.  It was -- this was the base

4      amount, and it was -- you know, it was definitely above the

5      $88,000.  But for simplicity's sake --

6      **BY MR. TANASI:**

7      Q.   Right.  But you don't know what that number is above the

8      $88,000.  You just think it's some number?

9      **A.**   I do know.  It's just -- I mean, it's on -- on my

10     spreadsheet that, again, we're just trying to simplify and --

11     and -- a round number for this chart.

12     Q.   All right.  So this $88,000 that we're going to go with

13     as the number that is your best guess?

14     **A.**   Actually more than that, yeah.

15     Q.   Okay.  But we don't know what that number is.  That's the

16     point.  And I don't know that you can calculate that number.

17     That's the other point.

18          So if you can, tell the ladies and gentlemen of the

19     jury.  If you can't, then we'll move on; fair?

20     **A.**   So the sources which include the checks that were made

21     payable to Mr. Castro, again, they would show that that total

22     amount of the checks written to Mr. Castro is -- it's close

23     but it's just over $88,000.

24     Q.   Okay.  Can -- for my next line of questioning, let's just

25     assume the number $88,000 because that's the number that we

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    have before us and that's the number that the ladies and

2    gentlemen of the jury have before them.  $88,000; fair?

3    A.    Yes, but --

4    Q.    Okay.

5    A.    -- with the sourcing --

6    Q.    And we know that Digital Express was operating for three

7    years; right?

8    A.    Yes.

9    Q.    Okay.  And that's the sum total, the duration of the time

10   that you looked at for bank --

11   A.    The accounts that I have.  I don't know how long it was.

12   I mean, so --

13   Q.    That's what you were asked to look at; correct?

14   A.    Those accounts that I have, that's -- those are the years

15   that I had for Digital Express.

16   Q.    Three years; right?

17   A.    Yeah.

18   Q.    Okay.  So if we divide 88 by 3, what do we get?

19        I don't mean to put you on the spot with the math.

20   I'll represent to you that it's $29,333.33; fair?

21   A.    Fair.

22   Q.    Okay.  So over the duration of the bank accounts that you

23   looked through, the duration of Digital Express' existence,

24   you are representing to the ladies and gentlemen of the jury

25   that Mario Castro was making $29,000-and-change a year;

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1   correct?

2   **A.**   Not correct.  These checks -- these were just checks

3   specifically written to Mr. Castro, and they don't include

4   cash.  So there's potential --

5   Q.   What's the other number then?

6   **A.**   I'm just saying these were checks that are specifically

7   written to him.

8   Q.   Right.

9   **A.**   That's that amount that's right there.

10  Q.   So give me the number over $29,000 a year.  Can you give

11  that to us?

12  **A.**   That are specifically written -- checks written to

13  Mr. Castro from those two accounts?

14  Q.   No.  That -- that you're alleging that Mr. Castro's

15  making.  What is the number?

16  **A.**   No, I'm not alleging.  I'm saying that from these two

17  accounts there were checks written to Mr. Castro during the

18  relevant time period that totaled over $88,000 specifically

19  written to him, and those checks are in the sources.

20  Q.   Right.  Again, the total being $88,000; right?

21  **A.**   Of those checks written to him.

22  Q.   Over the period of three years?

23  **A.**   Yes.

24  Q.   $29,000-and-change a year; correct?

25  **A.**   For those checks.

1    Q.   Okay.  As you sit here today, you don't know and you

2    don't put in your summary the purpose for those checks, the

3    work that went into those checks; right?

4    A.   I'm just looking at the bank records.

5    Q.   Okay.

6         MR. TANASI:  Court's indulgence.

7         Pass the witness, Your Honor.  Thank you.

8         THE COURT:  Mr. Mishler, cross on behalf of Jose Luis

9    Mendez?

10        MR. MISHLER:  Thank you, Your Honor.

11                    CROSS-EXAMINATION

12   BY MR. MISHLER:

13   Q.   How are you doing?

14   A.   Good afternoon.

15   Q.   Are you ready?

16   A.   Yeah.  Just...

17   Q.   Okay.

18   A.   Thank you.

19   Q.   So you keep talking about the source of your summary

20   charts; right?

21   A.   Yes.

22   Q.   And that's a giant spreadsheet is my understanding.

23   A.   The sources were the exhibits that were listed there that

24   were used to create spreadsheets prior to them becoming

25   exhibits.

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    Q.    Okay.  So the sources are, like, checks?

2    **A.**    Yes.

3    Q.    Okay.  So you've reviewed at least some checks, not

4    hundreds of thousands of checks but some checks?

5    **A.**    Correct.

6    Q.    And you've seen some checks in the name of Mr. Jose Luis

7    Mendez?

8    **A.**    Yes.

9    Q.    And you're aware that the backs of a lot of those checks

10   have no endorsement?

11   **A.**    I'm not aware of that.

12   Q.    Are you saying every check you've seen with Jose Luis

13   Mendez's name on it was endorsed?

14   **A.**    I honestly just don't recall.

15   Q.    Okay.  So if I represented to you that a large number of

16   checks had no endorsement on the back, would you have a reason

17   to disagree with me?

18   **A.**    I just don't know if that's true or not.

19   Q.    Okay.  Is there somebody who knows more about the source

20   material than you?

21   **A.**    No.  It's just a matter of me going and looking at the

22   backs of the checks.

23   Q.    Okay.  I understand.

24         So if there was a check that was not endorsed, what

25   does that mean?

1    A.    That it wasn't endorsed.  Sometimes checks get deposited

2    without endorsements, and --

3    Q.    Okay.

4    A.    -- it depends on, you know, what the bank's doing.  And

5    the records we have came from the banks for those accounts.

6    So, yeah, I guess, again, I just don't know about unendorsed

7    backs of checks.

8    Q.    Okay.  So in a case like that you're saying there is a

9    possibility that a cash -- or, sorry, a check that was not

10   endorsed could have been deposited in a bank account?

11   A.    Possibly.

12   Q.    Or it could have been cashed?

13   A.    Maybe.  Again, depending on the -- yeah, if the bank

14   teller decided to do that.  I don't know.

15   Q.    And because it's not endorsed, we don't have a way of

16   knowing?

17   A.    Again, it depends on where the source of the check is

18   from that you're talking about.  So, for example, if the check

19   without the endorsement was from Mr. Mendez's account, then it

20   showed that they deposited the check without the endorsement.

21   It was in his account from the subpoena production.

22   Q.    Okay.  I'm following you.

23         But just looking at the back of the check there's no

24   way to tell whether it was deposited or cashed if there's no

25   endorsement?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**    Correct.  But you corroborate that with bank statements

2    and deposit slips.  And, again, wherever that -- whatever this

3    check is that you're talking about, I'd be -- you know,

4    what -- what's the source of the subpoena production for that?

5    Was it Mr. Mendez's account, or was it -- I don't know.

6    Q.    And you would know what the source was, right, because

7    you used the source to put together these summaries that we've

8    been at?

9    **A.**    Again, I didn't look at every single document, no.

10   Q.    Let me ask you about that.  You had a team of analysts is

11   my understanding; correct?

12   **A.**    Correct.

13   Q.    How many analysts?

14   **A.**    Two analysts.  One analyst and one -- I'm not sure if the

15   other person was an analyst or what their title is, but they

16   helped.  They assisted.

17   Q.    Okay.  So a total of three people were working on the

18   source material?

19   **A.**    Initially, yes.  Before -- before.  Then I started

20   putting together my summary -- or doing my verifications and

21   then putting together summary charts.

22   Q.    So three plus you?

23   **A.**    Yes.  I'm trying to think if there was... I mean, again,

24   maybe -- if someone else helped out the initial, you know, cut

25   of the analysis, I'm not aware of.  But, yeah, four.  Four or

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1   five --

2   Q.   Was it ever more than that?

3   **A.**   I don't think so.  We're -- we're not that -- we don't

4   have a lot of people that are -- you know, that were working

5   on this as far as I know.

6   Q.   Okay.  Did that include people from the DOJ, or was that

7   just postal inspectors?

8   **A.**   The one that I'm -- that I just don't know the title of

9   was with Department of Justice.  And then Inspector Bouchie

10  and then an analyst on the postal inspection service team.

11  Q.   Are you saying Inspector Bouchie helped with the source

12  material?

13  **A.**   He was part of the team that did the -- the analysis.

14  Q.   But he didn't put together the summary exhibits.  You

15  did?

16  **A.**   I did after I did the verification.

17  Q.   Okay.

18       **MR. MISHLER:**   If you can pull up Exhibit 281?  I'm

19  just going to look at one of these.  I think the answer

20  applies to all of these.  So if you want to go through them

21  all, just let me know.

22  **BY MR. MISHLER:**

23  Q.   But just looking at this exhibit, all these companies

24  have the name of the signatory on them, right, for the

25  company?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1   **A.**   Most of them do.

2   Q.   Okay.  Can you point to the one or let me know which one

3   shows Patti Kern's name?

4   **A.**   There isn't.

5   Q.   I'm sorry?

6   **A.**   There isn't one --

7   Q.   Okay.  So her name's not listed on any of these?

8   **A.**   No.

9   Q.   And this would be the company incorporation documents or

10  the bank account?

11  **A.**   These are from the signature cards for -- for those --

12  yes, for those bank accounts.

13  Q.   Okay.  Do you have any reason to think we need to go

14  through all of these to check for Patti Kern's name?

15  **A.**   To see if her name's on there?

16  Q.   Yeah.

17  **A.**   I don't think her name's on there.

18  Q.   Are you comfortable saying her name's not on any of these

19  summaries?

20  **A.**   For this particular exhibit?

21  Q.   Yes.  I'm just trying to save some time.

22          **THE COURT:**  It's a five-page exhibit.

23          **THE WITNESS:**  Yeah, I just -- yeah, I don't --

24          **MR. ZYTNICK:**  I'll stipulate that her name is not on

25  there.

1            **MR. MISHLER:**  All right.  That's my understanding.  I

2    was just trying to save some time.

3            **THE WITNESS:**  I don't think -- I don't think it's on

4    there, but I just don't -- yeah.

5            **THE COURT:**  The Government stipulated it's not on any

6    of --

7            **MR. MISHLER:**  Okay.

8            **THE COURT:**  -- the five pages that comprise

9    Exhibit 281.

10           **MR. MISHLER:**  All right.

11   **BY MR. MISHLER:**

12   Q.   Just one more question on this.  Can you show me where

13   Sean O'Connor's name is listed?

14   **A.**   Again, excuse me, Sean O'Connor's name isn't on this

15   exhibit either.

16   Q.   Okay.  Are you comfortable that his name's not on any of

17   these summary pages?

18   **A.**   For this exhibit, correct.

19   Q.   Okay.  Great.

20           And you're aware -- I think you said you did a search

21   warrant in this case; is that right?

22   **A.**   I was part of one of the search sites, yes.

23   Q.   Which search site?

24   **A.**   It was Mr. Del Rio's.

25   Q.   Mr. Del Rio's.

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1           As part of that you said you went to a briefing;
2    right?
3    A.    Yes.
4    Q.    And as part of that briefing you read through the search
5    warrant application?
6    A.    You read through the affidavit, yes.
7    Q.    Okay.  And you said you never heard the words Kern
8    syndicate; is that your testimony?
9    A.    It doesn't sound familiar.  Maybe it was in the
10   affidavit, if you're asking, but I just --
11   Q.    Okay.
12   A.    This was five years ago was the search.
13   Q.    I understand.
14           So you just don't remember whether it was in the
15   search warrant --
16   A.    I don't recall.
17   Q.    -- because it's -- okay.
18           And since you did all the financial summaries, you're
19   aware that Patti Kern wrote all the checks for all of these
20   companies; right?
21   A.    I've heard the name Patti Kern referred to during my
22   direct talking about the previous testimony, I guess, about
23   round dollar amounts, but...
24   Q.    So you don't know whether she wrote all of the checks
25   from these accounts?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**    I don't know.

2    Q.    Okay.  Now, on direct the Government asked you -- let me

3    see which exhibit it was.  I want to say it's 263B.

4          **MR. MISHLER:**  Can you pull that up for me, Brian?

5    **BY MR. MISHLER:**

6    Q.    Yeah, this exhibit.  You remember looking at this; right?

7    **A.**    Yes.

8    Q.    And the Government asked you, you don't see any large

9    cash prizes being awarded from this account; right?

10   **A.**    Correct.

11   Q.    That's still your testimony; right?

12   **A.**    Large cash prizes that reflected those prize letters, no,

13   I did not.

14   Q.    Not on this account; right?

15   **A.**    For any of the accounts I didn't see large cash prizes

16   reflecting --

17   Q.    Okay.

18   **A.**    -- or reflective from those letters.

19   Q.    If, for example, Patti Kern had prizes in a separate

20   account, that wouldn't show up on any of these accounts;

21   right?

22   **A.**    It would not.

23   Q.    Okay.  Now, I want to get into how you put these charts

24   together.  And I apologize.  I don't know a lot of the

25   technical aspects, so forgive me.

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1          You said CFIS is a program that reads bank

2    statements?

3    A.    Bank statements, correct.

4    Q.    Okay.  And it puts that into a spreadsheet?

5    A.    Correct.

6    Q.    With debits and credits?

7    A.    Correct.

8    Q.    Okay.  And then the OCR is like document scanning for

9    words?

10   A.    And numbers.

11   Q.    Okay.  And what -- what does that do?

12   A.    So CFIS, again, you -- it's got templates for different

13   banks as well as for their bank statements as well as

14   different years.  So, for example, Bank of America

15   statements -- because they change over time; right?  So if you

16   have a -- an account or a set of account statements for Bank

17   of America for a pretty good time period, you pull up that

18   template in CFIS.  You load the -- the PDF of those statements

19   and then it -- again, it scans those statements and then puts

20   them into an Excel file that you can sort and fix with -- you

21   know, when it does point out those, you know, things it has an

22   issue with reading, like a number.  Then you go back and you

23   look at it.

24   Q.    Okay.  And that Excel sheet is the spreadsheet that

25   you're talking about with the source material?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

1    **A.**    It's a spreadsheet of the -- yes, of the bank accounts.

2    Q.    Okay.  And you said you did data entry of checks?

3    **A.**    So there were some -- the -- there were checks that were

4    hand entered because they're handwritten so it's hard to --

5    for the OCR to -- to, you know, read that if it's -- if it's

6    hand -- you know, it's script or whatever.

7            So, right, the investigative team went through and --

8    went through all the checks or a lot of -- or the checks and

9    hand entered them --

10   Q.    So let me ask about that.  Is that the OCR that tries to

11   read the checks in the first place?

12   **A.**    It's a separate part of the program.  So the -- the

13   initial part of the program reads the -- the bank

14   statements --

15   Q.    Okay.

16   **A.**    -- and identifies what -- you know, that there are checks

17   on the statements.  And then you follow that up with the bank

18   production with the checks, and then you go through and

19   itemize those checks and hand enter the ones that -- that you

20   get from the bank.

21   Q.    And my understanding is it's pretty accurate?

22   **A.**    Yeah, that's --

23   Q.    You feel pretty confident that these are accurate; right?

24   **A.**    Again, like, this is a serious matter.  So, yeah,

25   that's -- yep.

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1   Q.   Okay.  And it's important that it's accurate; right?

2   A.   It is.

3   Q.   Why is it important that it's accurate?

4   A.   Because we're in -- dealing with, you know, criminal

5   charges.

6   Q.   Right.  Because we're in trial?

7   A.   Correct.

8   Q.   And these guys are defendants?

9   A.   Yep.

10  Q.   Okay.  So that's why you're trying to be as accurate as

11  possible?

12  A.   Yes.

13  Q.   Okay.  Are you aware of any problems with your

14  spreadsheets that we need to know about?

15  A.   No.

16  Q.   Okay.

17       MR. MISHLER:  So let's pull up 263, page 3.  I'm not

18  sure -- yeah.  No, I think it's the very last page.  I'm

19  sorry, Brian.  This is the one.  And if you can zoom on the

20  top right chart?

21       THE COURT:  So, for the record, this is page 7.

22       MR. MISHLER:  Yes.  Page 7.  Thank you.

23  BY MR. MISHLER:

24  Q.   This is the chart that your team put together for

25  Distribution Reporting Services; correct?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1   **A.**   I put this chart together.

2   Q.   I'm sorry?

3   **A.**   I put this chart together.

4   Q.   Okay.  You put this -- not anybody else on your team.  Is

5   that all of the charts?

6   **A.**   All of the charts that we've gone over today I created.

7   Q.   Okay.  So you're very confident that they're accurate?

8   **A.**   Yeah.

9   Q.   Okay.  So the Government drew attention to this On the

10  Side slice of this.  Do you remember that?

11  **A.**   I do.

12  Q.   And they actually made a point to point out in great

13  detail this is the only one of these that has On the Side

14  payments; right?

15  **A.**   Yes.

16  Q.   Do you want to look at them all again to make sure that's

17  right?

18  **A.**   Yeah, it's the only one with the yellow pie.

19  Q.   Do you want to look at them all, or are you confident

20  with that?

21  **A.**   I mean, we can look at them all.  I'm pretty sure that's

22  the one.

23  Q.   Okay.

24        **MR. MISHLER:**  Go ahead and zoom back out, Brian.

25  **BY MR. MISHLER:**

*Kevin Towers - Cross*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1   Q.   That's the only one on this page; right?

2   **A.**   Yes.

3   Q.   All right.

4        **MR. MISHLER:**  Go to the next page up.

5   **BY MR. MISHLER:**

6   Q.   And there's none of the yellow ones here; right?

7   **A.**   Correct.

8   Q.   All right.

9        **MR. MISHLER:**  Go up one more.

10  **BY MR. MISHLER:**

11  Q.   And there's no yellows here for On the Side?

12  **A.**   Correct.

13  Q.   All right.

14       **MR. MISHLER:**  And let's go up.

15  **BY MR. MISHLER:**

16  Q.   No On the Side here; right?

17  **A.**   No.

18  Q.   Okay.  I think this is the last one of them.  Maybe

19  there's two more.  On the Side?

20  **A.**   Not on the chart unless it's in -- yeah.  I don't know.

21  It's not there.

22  Q.   All right.  And the very last one, page 1, no On the Side

23  here; right?

24  **A.**   Correct.

25  Q.   Okay.  And that was important to the Government; right?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    A.    I don't know.

2    Q.    Okay.  I mean, you understood that On the Side was

3    important as part of this case for the summaries, right,

4    because you created a -- a slice on one of them?

5    A.    I don't know what On the Side is, but I was asked to --

6    to -- right, to pull out On the Side for one of the analysis

7    for that chart, yeah.

8    Q.    Okay.  Great.

9          MR. MISHLER:  Let's go back to page 7.

10   BY MR. MISHLER:

11   Q.    And what's the account -- the last four numbers of the

12   account for the one that has On the Side?

13   A.    1339.

14   Q.    1339.  Okay.

15         MR. MISHLER:  So let's look at page -- sorry.  My

16   notes are a little off here.  I think it's the page above

17   this?  Court's indulgence.

18         Yes.  This is the right page.  The top left one, if

19   you could zoom in on that.

20   BY MR. MISHLER:

21   Q.    And that's Distribution Reporting Services; right?

22   A.    Yes.

23   Q.    And that's Advanced Allocation Systems?

24   A.    Yes.

25   Q.    Okay.  And the account number on that is different than

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    the one we just looked at; right?

2    **A.**    Yes.

3    Q.    I believe that you said the other one was 1399 [sic]?

4    **A.**    I believe so.

5    Q.    Okay.  And this one is 7977?

6    **A.**    Yes.

7    Q.    And this has no On the Side slice?

8    **A.**    It does not.

9    Q.    Okay.  Great.

10            **MR. MISHLER:**  Brian, can you pull up Exhibit 9012?

11    Will you blow that check up for me?

12    **BY MR. MISHLER:**

13    Q.    Can you tell me what this is, sir?

14    **A.**    It's a check written to On the Side.

15    Q.    Right.  And can you read the last four numbers of that

16    account at the bottom?

17    **A.**    7977.

18    Q.    Okay.  So 7977 did write checks to On the Side according

19    to this?

20    **A.**    According to that check, yes.

21    Q.    All right.

22            **MR. MISHLER:**  Can we go to the next page, Brian?

23            So -- I'm sorry.  Go to the next one.

24    **BY MR. MISHLER:**

25    Q.    So this is page 3.  And this is another different check

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    to On the Side; right?

2    **A.**    Yes.

3    Q.    Also from account 7977?

4    **A.**    Yes.

5    Q.    All right.  I'm going to go ahead and represent to you

6    that this is a large number of checks.

7         **MR. MISHLER:**  If you'll go to the bottom of this

8    page, Brian?  No, just this page that's up.  Well, that did

9    not work.

10   **BY MR. MISHLER:**

11   Q.    All right.  This is 28 pages which means there's 14

12   checks to On the Side.  I'm going to represent to you that

13   they're all from the account 7977.  If you'd like to look at

14   them individually, we can do that.

15        Do you want to do that?

16   **A.**    I guess you can just flip through it.

17   Q.    Sure.

18        **MR. MISHLER:**  Brian, will you slowly scroll through

19   all the checks?

20        **THE WITNESS:**  Okay.

21   **BY MR. MISHLER:**

22   Q.    So you'd agree with me all of these checks are written to

23   On the Side?

24   **A.**    Yes.

25   Q.    And they're all written from an account ending in 7977?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**    Yes.

2    Q.    All right.

3          **MR. MISHLER:**  Let's go back to 263B, page 6.  Right

4    here.

5    **BY MR. MISHLER:**

6    Q.    This is that account, right, 7977?

7    **A.**    Yes.

8    Q.    And there are no slices here for On the Side?

9    **A.**    Yeah.  It might be in the other.

10   Q.    The other what?

11   **A.**    The other -- where it says other, 27 percent.

12   Q.    I mean, you knew you -- you wanted to pull On the Side

13   out to make a slice for it, right, because you did that on the

14   other page?

15   **A.**    Right.

16   Q.    Do you know how much was written to On the Side from this

17   account?

18   **A.**    Off the top of my head, no.

19   Q.    Would you have a problem with me telling you it's

20   $11,800?

21   **A.**    I just don't know.  Again, if I went back and looked at

22   my work product that --

23   Q.    Right.  And the work product is what you used to create

24   these; right?

25   **A.**    Yes.

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1   Q.   So I have to ask you.  I noticed this discrepancy on my

2   lunch break in between your testimony.  Can you tell me how

3   many other issues like this there are in your sheets?

4   A.   Again, I went over this a lot.  So... even if On the

5   Side -- again, it's not... again, I've gone over these quite a

6   bit and pretty confident that the --

7   Q.   Pretty confident still?

8   A.   Yeah.  I mean, that other amount can still include the On

9   the Side.  I just don't know off the top of my head.

10  Q.   Pretty confident still.  Okay.

11        MR. MISHLER:  Let's go ahead and look at Exhibit 264

12  and specifically page 2.

13  BY MR. MISHLER:

14  Q.   All right.  So I remember that you testified on your

15  direct that -- maybe it was your direct -- these summaries

16  don't account for any cash; right?

17  A.   Yes.

18  Q.   Okay.  So I'm looking at this sheet that's up in front of

19  you.

20  A.   Right.

21  Q.   Does this account for cash?

22  A.   The summaries meaning that the big blue -- the big box

23  doesn't include cash.

24  Q.   Okay.  But, I mean, you noted cash here on this one;

25  right?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**    Yes.

2    Q.    For Jose Luis Mendez?

3    **A.**    Yes.

4    Q.    So when the Government asked you whether any of these

5    accounted for cash and you said no, that wasn't entirely

6    accurate?

7         **MR. ZYTNICK:**    That's not a correct description of my

8    question.  It was a little more nuanced than that.

9         **THE COURT:**    I'm sorry?  I did not hear the objection.

10         **MR. ZYTNICK:**    Sorry, Your Honor.  My question was

11    more nuanced than that.  That is not an accurate description

12    of my question.

13         **THE COURT:**    All right.  Well, the jury's recollection

14    is what they should abide by.

15    **BY MR. MISHLER:**

16    Q.    You'd agree this does have cash on it?

17    **A.**    Again, the question was about the amount received from

18    those -- the payors.

19    Q.    Right.  And the payors were --

20    **A.**    It did not include cash.

21    Q.    Right.  Just seems like you -- you didn't make this

22    clarification that one of them actually does reference cash

23    when you gave your answer before.

24    **A.**    We actually mentioned this one, that this one had cash.

25    And then I -- again, the -- it -- this is to show -- or this

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1   whole exhibit is to show payments made by the payors that were

2   checks.

3   Q.   So you're aware that Mr. Mendez received a regular

4   paycheck for his work that he actually did the labor at the

5   printshop; right?

6   **A.**   I'm trying to remember if he was -- it was the -- the

7   paystubs we went over.

8   Q.   It was, but we can look at them.

9   **A.**   I'm sorry?

10   Q.   We can look at them.

11   **A.**   Yeah.  I was going to say, if that was one of the

12   paystubs...

13          **MR. MISHLER:**  Brian, will you pull up

14   Government's Exhibit 81?

15   **BY MR. MISHLER:**

16   Q.   You remember looking at this; right?

17   **A.**   Yes.

18   Q.   This is Mr. Mendez's paycheck?

19   **A.**   A paystub, yes.

20   Q.   Right.  Paystub.

21          And what's the -- what's the date on this check?

22          **MR. MISHLER:**  Brian, will you blow it up so he can

23   see it a little bit better?

24          **THE WITNESS:**  You mean the pay period?

25   **BY MR. MISHLER:**

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    Q.   Yes.

2    A.   Or the pay -- or the pay date, I guess.  The pay date is

3    July 29th, 2018.  It's the same -- looks like it has the same

4    paystub number --

5    Q.   Right.  And what's the net pay through July for

6    Mr. Mendez?

7    A.   For year-to-date?

8    Q.   Yes.

9    A.   $11,956.90.

10   Q.   All right.

11        MR. MISHLER:  And let's go ahead and go back to 264.

12   BY MR. MISHLER:

13   Q.   These numbers -- you obviously took out what he received

14   as his regular paycheck from Digital Express on this number,

15   didn't you?

16   A.   Again, these -- Digital Express, those two boxes

17   reference the checks that are in the exhibits.

18   Q.   Okay.  So this actually includes his regular paychecks?

19   A.   Again, they were -- they're the checks that are in the

20   exhibits.  I don't know what they were for.

21   Q.   Did you delete any checks from your spreadsheet from

22   Digital Express?

23   A.   I looked -- again, these are the checks that I used for

24   the summary.

25   Q.   Right.  Your source material included all checks from

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    Digital Express to Mr. Mendez; right?

2    **A.**    Again, these -- the -- this chart is using the sources

3    there that are -- that are the checks written to him.

4    Q.    Okay.  You didn't delete any lines and just go, I'm not

5    going to include that in this summary number; right?

6    **A.**    No.

7    Q.    Right.  So this does include checks he would have gotten

8    as a regular paycheck then?

9    **A.**    Again, I'm -- these are the -- that's -- going by the

10   source material, whatever the checks are in the source

11   material are what I included in the summary chart.

12   Q.    All right.  Okay.  I'm not going to do a rudimentary --

13   try to get you divide by three.  I think we can all can sort

14   of ballpark that number.

15          I do want to look at page 3, though.  You remember

16   talking about this one; right?

17   **A.**    Yes.

18   Q.    And did the Government ask you who Maria Castro was?

19   **A.**    I think I was asked that.

20   Q.    Who is that?

21   **A.**    Is that Mr. Mendez's wife?

22   Q.    I'm asking you, sir.  I don't --

23   **A.**    I'm trying to remember.  I think it's -- yes, I think

24   it's Mr. Mendez's wife.

25   Q.    Okay.  So this number you're accounting for is all Maria

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1   Castro, Mr. Mendez's wife?

2   **A.**    These are payments -- these are checks, again, that are

3   written out to Maria Castro.

4   Q.    Okay.  And you're -- to your knowledge you're aware that

5   there's more than one Maria Castro involved somehow with this

6   case?

7   **A.**    I don't know.

8   Q.    Okay.  So I think we've seen a check for Maria P. Castro.

9   I think you looked at the exhibit from the search of

10  Mr. Mendez's house.  Remember you saw the bank statement,

11  Maria P. Castro?

12  **A.**    Yes.

13  Q.    Okay.  That would be his wife; right?

14  **A.**    I don't know.

15  Q.    Okay.  You're aware that there's a Maria E. Castro?  E,

16  as in echo.

17  **A.**    I don't know.

18  Q.    Okay.  Are you aware that that's Mr. Miguel Mendez's --

19  sorry, Mr. Miguel Castro's ex-wife?

20  **A.**    I don't know.

21  Q.    Okay.  Are you also aware that Salvador's wife is named

22  Maria?

23  **A.**    Not aware.

24  Q.    Okay.  Are you aware that the defendant's mother is named

25  Maria?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**    Not aware.

2    Q.    Okay.  I'll tell you what.  It sounds to me like you

3    didn't actually look at the checks to see if you can figure

4    out which Maria was which, did you?

5    **A.**    I was just aware of the name Maria Castro, and so I

6    looked at the checks that were written out to Maria Castro.

7    Q.    Okay.  I'll tell you what.

8         **MR. MISHLER:**  Brian, will you pull up 264F, 3.  I

9    believe that's the source for the summaries.

10        Mr. Zytnick, is that right?

11        **MR. ZYTNICK:**  Let's see.  That is a source for some

12    of the checks to Maria Castro.

13        **MR. MISHLER:**  I would agree with that.

14        Brian, if you'll go to page 78?

15   **BY MR. MISHLER:**

16   Q.    So we're looking at an endorsement on the back of one of

17   these checks written to a Maria Castro.  You'd agree?

18   **A.**    I would agree.

19   Q.    Okay.  And this endorsement looks like it has the letter

20   P as a middle initial; right?

21   **A.**    Yes, appears to be.

22   Q.    All right.  Now I want to -- sort of try to remember what

23   this signature looks like.  Okay?

24        **MR. MISHLER:**  Now, Brian, if you'll go to page 88.

25   **BY MR. MISHLER:**

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    Q.   Do you think that's the same signature?

2    **A.**   What's the front of it?  It's the --

3    Q.   Sure.

4         **MR. MISHLER:**  Go up one page to the front of this

5    check.

6         **THE WITNESS:**  So --

7         **MR. MISHLER:**  Go back to the signature, please.

8    BY MR. MISHLER:

9    Q.   You'd agree with me that's a different signature?

10   **A.**   It is a different signature.

11   Q.   Okay.

12        **MR. MISHLER:**  Now, Brian, will you go to page 28?

13   And now that I've had you go there, will you actually go up

14   one page?

15   BY MR. MISHLER:

16   Q.   This is a check to a Maria Castro; right?

17   **A.**   It is.

18   Q.   All right.

19        **MR. MISHLER:**  Let's go to the next page, Brian.

20   BY MR. MISHLER:

21   Q.   I feel like this is a third signature.

22   **A.**   But that doesn't -- again, I mean, people -- someone else

23   could have signed that as Maria Castro.  I don't know.

24   Q.   Sure?

25   **A.**   I'm looking at the front of the checks --

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    Q.   My question to you is:  That's not the same signature;
2    right?
3    **A.**   It's a different signature, but I don't know who did it.
4    Q.   Okay.  Pretty easy to discover this signature doesn't
5    match -- pretty easy to break them out by signatures that
6    match, right, but you guys didn't do that?
7    **A.**   I was looking for Maria Castro, and that's -- those --
8    that's who the checks were written to.
9    Q.   Right.  So you just group them all together in one
10   exhibit; right?
11   **A.**   Maria Castro, yeah, that's --
12   Q.   Yeah.  All right.  I'm going to look at one last exhibit
13   with you.
14         **MR. MISHLER:**  Brian, will you pull up 266?
15   **BY MR. MISHLER:**
16   Q.   You remember this exhibit; right?
17   **A.**   I do.
18   Q.   You put this exhibit together?
19   **A.**   I did.
20   Q.   Okay.  Great.
21         Again, my understanding of this is that this is a
22   summary based on a spreadsheet.
23   **A.**   Based on subpoena returns from Bank of America and Cox
24   Internet.
25   Q.   And what's shown here is the IP address and which account

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1   it logged into; right?

2   A.   Yes.

3   Q.   Okay.

4   A.   Well, which -- I think it's a profile.  So the Bank of

5   America accounts for those three that are in the gray, the way

6   the production came from Bank of America, it just shows that

7   that -- those IP addresses were accessing the profile that was

8   over all those three accounts, I think.

9   Q.   Okay.  So you see the dates on the gray and the dates on

10  the white section; right?  They overlap, don't they?

11  A.   Yes.

12  Q.   Large portion of it is an overlap; right?

13  A.   Yes.

14  Q.   Okay.  You're aware that when you log in to a bank

15  account, if you have more than one account listed, it will

16  show you both accounts; right?

17  A.   I would -- I guess so -- yes, I would -- yes.

18  Q.   And you're aware that that would basically doubt count

19  every log-in when you did that.  One for the AAS account and

20  one for the PAS account?

21  A.   No.  So for -- so, for example, those three grayed out

22  accounts, when I looked at -- because they provided each

23  account as a tab, and when I looked at those accounts you

24  could see that in total 177 times during that time period

25  accessed that profile that oversaw those three accounts.

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1   Q.   Okay.

2   **A.**   Does that make sense?

3   Q.   Yes.

4        Let me ask you about the spreadsheet that you just

5   talked about.  It shows other things other than dates and IP

6   addresses; right?

7   **A.**   Yes.

8   Q.   It shows you a whole lot of information?

9   **A.**   It shows times, yes, like time of day --

10  Q.   Everything the bank gave you; right?

11  **A.**   Yes.

12  Q.   Including what transaction happened with that log-in;

13  right?

14  **A.**   I don't recall.  So for these what I searched for when I

15  sorted them in the spreadsheet that Bank of America provided,

16  I found the -- kind of the confirmation log-in.  Because each

17  log-in process was maybe a five or six-step process.  So I

18  found the one that was the final part of the process and then

19  sorted them and filtered that one out, and that's how I came

20  to the 177 and then the 222.

21  Q.   And what you ended up with, one of those columns is

22  transaction type; correct?

23  **A.**   I just don't recall.

24  Q.   Okay.  And one of the columns is, like, dollar amount for

25  each transaction?

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**    Oh, I just -- I don't recall.

2    Q.    Don't recall.

3          Were you not interested in that information?

4    **A.**    What I was looking for was the times the accounts were

5    accessed, and --

6    Q.    Okay.

7    **A.**    -- that's what I was sorting and filtering by.

8    Q.    And on that same sheet you had log-in information for

9    Patti Kern as well; right?  You knew her IP address?

10   **A.**    I don't know what that was.

11   Q.    I mean, it was listed; right?  The bank gave you every IP

12   log-in; correct?

13   **A.**    I just don't -- I don't remember again.  Again, I was

14   asked to look for these log-ins, and that's how I sorted and

15   filtered.

16   Q.    Seems like a silly question with what you just answered.

17   Can you tell me how many times Patti Kern logged into these

18   accounts?

19   **A.**    I don't know.

20   Q.    Okay.  Would it surprise you that it's a lot more times

21   than this?

22   **A.**    I don't know.  I -- I really don't.

23   Q.    Okay.  Would it be a surprise to you that every

24   transaction on these accounts came from a Patti Kern's IP

25   address?  And by transactions I mean three things:  A deposit,

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    a withdrawal, or a transfer.

2    **A.**    Again, I was provided the Cox Internet subscriber

3    information for Mr. Mendez.  Those two IP addresses were

4    identified on that production.  Then I went to Bank of America

5    IP production and found those IP addresses, and that's what I

6    looked at to create this chart.

7    Q.    Okay.  Do you have a reason to doubt me when I say every

8    one of these 177 times Mr. Mendez logged into his bank account

9    in his name, AAS, there was no deposit from that IP address?

10   **A.**    Again, I don't -- I haven't seen records that -- that

11   would support that.  If it's in the -- the spreadsheet then --

12   but, again, I was looking for the log-ins to the accounts from

13   the service address with those two IPs.

14   Q.    Is there somebody who would know more about the

15   spreadsheet than you that could have testified about these IP

16   addresses?

17   **A.**    I had -- I'm not sure what you mean.

18   Q.    You don't seem to know anything except what the

19   Government wanted you to look at on this.  I'm just wondering

20   was there somebody who did an actual investigation into these

21   IP addresses more thoroughly than you did?

22   **A.**    Again, I just produced the chart based on the information

23   I was given and asked to put together this based on those IPs

24   associated with Mr. Mendez.

25   Q.    Who gave you the directions to focus only on Mr. Mendez?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**    The prosecution team.

2    Q.    Okay.  Are you aware that none of these -- I'm going to

3    go ahead and add these up.  I think it's 399 total between the

4    two accounts, which your testimony is none of these are

5    duplicates.

6            Any of these 399 that Mr. Mendez logged in with are

7    deposits?

8    **A.**    I don't know what the actual activity was.

9    Q.    Okay.  Do you know if any of these 399 times Mr. Mendez

10   made a withdrawal?

11   **A.**    Again, I don't know what the activity was.

12   Q.    And do you have any information on any of these 399

13   log-ins whether it was to transfer money?

14   **A.**    Again, I don't know what the activity was for the

15   log-ins.

16   Q.    Let me ask you something.  If there was a deposit, a

17   withdrawal, or a transfer under Mr. Mendez's IP, do you think

18   the Government would have asked you that?

19   **A.**    Again, I just put the summary chart based on what I was

20   asked to -- to look at.

21            **MR. MISHLER:**  I don't have any other questions.

22   Thank you.

23            **THE COURT:**  Mr. Gaffney.

24                    **CROSS-EXAMINATION**

25   **BY MR. GAFFNEY:**

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Page 237*

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

```
 1    Q.   Good afternoon, Inspector Towers.

 2    A.   Good afternoon.

 3         MR. GAFFNEY:   Brian, can you put Exhibit 281 up,

 4    please?  Oh.  281.  Yeah.  Thank you.

 5    BY MR. GAFFNEY:

 6    Q.   Inspector, this was a chart that you created; right?

 7    A.   Yes.

 8    Q.   And each one of those green boxes contains the name of a

 9    signer to a bank account; correct?

10    A.   Yes.

11    Q.   And those names came from a business signature card; is

12    that fair?

13    A.   Yes.

14    Q.   Okay.  So you can't tell us -- you can't tell the jury

15    who actually had access to these accounts, though, can you?

16    A.   Other than the signer on the account?

17    Q.   Well, other than the name that you found on the business

18    signature card, can you tell us who else had access to those

19    accounts?

20    A.   No.

21    Q.   You don't know who controlled or managed those bank

22    accounts, do you?

23    A.   Typically the signer is.

24    Q.   Typically the signer?  You know that for sure, or is that

25    just your assumption?
```

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**    Just regular working investigations and...

2    Q.    Okay.

3    **A.**    My own personal bank accounts.

4    Q.    Mr. Mishler just asked you some questions about the IP

5    addresses -- IP addresses for Mr. Jose Luis Mendez.  Do you

6    remember that?

7    **A.**    Yes.

8    Q.    And you indicated that that information came from a

9    subpoena return; right?

10   **A.**    Yes.

11   Q.    Did you actually review the entire subpoena return?

12   **A.**    I looked at the return for the IP addresses associated

13   with the Cox account that Mr. Mendez has.

14   Q.    Okay.  So were you aware that the search warrant and the

15   application connected to that subpoena return contained the

16   names of other individuals as well other than Mr. Jose Luis

17   Mendez?

18   **A.**    Well, I assume it did because I was the -- I just don't

19   recall specifically, but because there were many search sites

20   that -- back in 2018.

21   Q.    Okay.  And you testified that an IP address is unique to

22   a residence; is that fair?

23   **A.**    Or -- or the -- yes, to that account.

24   Q.    Okay.

25   **A.**    Yeah.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Page 239*

1    Q.    And were you asked to look at IP log-in information for

2    Patti Kern?

3    **A.**    No.

4    Q.    Were you asked to look at IP log-in information for Edgar

5    Del Rio?

6    **A.**    No.

7    Q.    Would it surprise you to know that Edgar Del Rio was also

8    accessing bank accounts for Distribution Reporting Center?

9    **A.**    I don't know anything about that.

10   Q.    He was -- did you know he was accessing the bank account

11   for NSD Products Incorporated or Inc.?

12   **A.**    Again, I don't know anything about that.

13   Q.    Did you know that he was accessing looks like North

14   American Disbursement Agency?

15   **A.**    I don't know anything about that.

16   Q.    So you specifically were only asked to look at the IP

17   addresses for Mr. Jose Luis Mendez?

18   **A.**    The IP addresses associated with that Cox production,

19   yes.

20   Q.    So if I were to represent to you that Patti Kern

21   accessed -- one, two, three, four, five, six, seven, eight --

22   nine of the mailing company bank accounts, would you have any

23   reason to dispute that?

24   **A.**    I don't know.  I haven't looked at those records.

25   Q.    Would you have any reason to dispute that she accessed

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    those accounts hundreds of times?

2    **A.**    Again, I don't know if she did that.

3          **MR. GAFFNEY:**  Brian, can you bring up Exhibit 263,

4    please, page 1?

5    **BY MR. GAFFNEY:**

6    Q.    So this was another exhibit that you prepared; right?

7    **A.**    Yes.

8    Q.    And one of the slices on this chart is for Patti Kern;

9    correct?

10   **A.**    Correct.

11   Q.    And it attributes $27,000 to her; right?

12   **A.**    Yes.

13   Q.    But you had testified that one of the things you weren't

14   able to include in that total were cash; is that fair?

15   **A.**    That's fair.

16   Q.    Okay.

17          **MR. GAFFNEY:**  Brian, can you bring up Exhibit 9040?

18   And I believe it's page 2.

19   **BY MR. GAFFNEY:**

20   Q.    Do you know what we're looking at there?

21   **A.**    A fire safe with cash in it.

22   Q.    Do you know whose cash or where that was found?

23   **A.**    I don't.

24   Q.    If I represented to you that that was found in Patti

25   Kern's house, would you have any reason to dispute that?

*Kevin Towers - Cross*
*2:19-cr-00295-GMN-NJK - April 5, 2023*

1    **A.**    Again, I don't know where that's from.

2    Q.    Okay.  Do you know if that cash was included in any of

3    these summaries that you created?

4    **A.**    Again, the summaries were of -- did not include cash.

5    Q.    Okay.

6         **MR. GAFFNEY:**  Brian, can you scroll down to the

7    next -- or, excuse me, page 6, please?

8    **BY MR. GAFFNEY:**

9    Q.    This was additional cash found in Patti Kern's home.  Any

10   idea if that was included in the summaries?

11   **A.**    Again, cash was not included.

12   Q.    Okay.

13        **MR. GAFFNEY:**  Brian, can you bring up Exhibit 263?

14   263, please.

15   **BY MR. GAFFNEY:**

16   Q.    This was a chart you created for Money Securities;

17   correct?

18   **A.**    Yes, correct.

19   Q.    And you see that one of the thinner slices is attributed

20   to Miguel Castro?

21   **A.**    Yes.

22   Q.    And what's the amount there?

23   **A.**    $1,400.

24   Q.    Okay.  Do you know why he was given that money from Money

25   Securities?

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1    **A.**    I do not.

2           **MR. GAFFNEY:**  Brian, can we go to page 2?

3    **BY MR. GAFFNEY:**

4    Q.    Same question here.  There's an allocation of $1,400 to

5    Miguel Castro; right?

6    **A.**    Correct.

7    Q.    And you don't know why he was given that money; right?

8    **A.**    I do not know.

9    Q.    Okay.  Did you know that Miguel Castro was providing

10   accounting services for some of these companies?

11   **A.**    I did not know that.

12   Q.    And the $1,400 for Assets Unlimited, that's the same

13   amount for the Money Securities company that we were just

14   looking at; right?

15   **A.**    Yes.

16   Q.    Okay.  And this covers about a one-year period; fair?

17   **A.**    The payments?

18   Q.    Right.

19   **A.**    Oh.  Yes.  I'm sorry.  Yes.

20   Q.    Okay.  Do you know what Marketing Image Direct is?

21   **A.**    I don't.

22   Q.    Do you know what they do?

23   **A.**    No.

24          **MR. GAFFNEY:**  Brian, can we go to page 3?

25   **BY MR. GAFFNEY:**

Kevin Towers - Cross
2:19-cr-00295-GMN-NJK - April 5, 2023

1   Q.   This is another chart you created; right?

2   **A.**   Yes.

3   Q.   And there is about $58,000 attributed to Marketing Image

4   Direct?

5   **A.**   Yes.

6   Q.   You don't know what that's for?

7   **A.**   I don't, no.

8   Q.   And this is a period covering from March 2014 to

9   December 2017?

10  **A.**   Yes.

11  Q.   Okay.  So approximately three years, nine months; right?

12  **A.**   Yes.

13  Q.   About 45 months.  Would you agree with that?

14  **A.**   Yes.

15  Q.   Okay.  If you were to break that out month by month, just

16  divide it evenly, do you know how much that would be?

17  **A.**   The $58,000?

18  Q.   The -- the total amount given to Marketing Image Direct.

19  **A.**   Right.

20  Q.   Well, I'll save you some time.  I broke it out.  It's

21  about $1,300 per month.  Do you have any reason to dispute

22  that?

23  **A.**   I was going to say a little over $1,200.  But, yeah, 13,

24  if that's --

25  Q.   There you go.  Okay.

1    **MR. GAFFNEY:**  And can we look at page 7, please?

2    **THE COURT:**  All right.  If we're going to move to a

3    different page, then I'm going to go ahead -- I need to cut

4    you off because it's 4:00 o'clock.

5        So we're going to go ahead and let the jury go.

6    Remember, ladies and gentlemen, you still are not to speak to

7    anyone about this case, not even to each other.  Do not read

8    or listen to or view anything that touches upon this case in

9    any way.  Write down your questions.  Don't form any opinions.

10       We'll see you back here at 9:00 a.m. tomorrow

11   morning.  Let's all stand for the jury.

12       *(Jury out at 4:02 p.m.)*

13   **THE COURT:**  And Inspector Tower, you may also exit

14   for the night.  We need you back here at 9:00 a.m.  After the

15   jury is all done, then you can go ahead.  And be careful on

16   your way down with the steps.

17       All right.  We're outside the presence of the jury.

18   So the good news is we do have some people coming in to look

19   at the electronics for the upgrade that hopefully eventually

20   we'll get.  The bad news is that means that you need to clean

21   up the tables because there are people who are going to be in

22   here.  I don't know exactly what they're doing, but -- do you,

23   Nick?

24   **COURTROOM ADMINISTRATOR:**  I don't know.

25   **THE COURT:**  Yeah.  It's not -- it's sort of -- I

1    don't know if it's like an inspection or they're going to give

2    a quote?  I don't -- but they're coming in, and they're going

3    to be checking things out so that we can upgrade the

4    electronics.  So me, too.  I have to clean up.  So we need to

5    clean up tonight, and then we'll be back at 9:00 a.m. tomorrow

6    morning.  We can finish close -- cross-examination, redirect,

7    recross, jury questions, and then if the Government rests,

8    then we'll do the 29(a) motion and then opening statement --

9    no, because we're having the expert out of order.  Is that

10   still the plan?

11        MR. TANASI:  Your Honor, I think we can probably go

12   through that exact chronology and then have her testify

13   tomorrow late morning as opposed to first thing in the

14   morning.

15        THE COURT:  Is that okay?

16        MR. TANASI:  I don't think it's ideal for her, but I

17   think -- I think, given where we're at, I think that will

18   work.

19        THE COURT:  Okay.  Now, obviously, if the plan is to

20   call Bouchie, then we'd have to do everything out of order

21   differently.

22        So has the Government decided yet?

23        MR. FINLEY:  I think it's a very high probability we

24   will not be calling Mr. Bouchie.

25        THE COURT:  Okay.

2:19-cr-00295-GMN-NJK - April 5, 2023

```
 1            MR. FINLEY:  Or Bouchie.

 2            THE COURT:  Okay.  I'm sorry.  Bouchie.

 3            MR. FINLEY:  No, that was me.

 4            THE COURT:  So many ways.  Okay.  Bouchie.  So --

 5   Bouchie.  So we'll finish cross with Tower, redirect, recross,

 6   jury questions, 29(a) motion, and then not do openings but,

 7   rather, call the accountant expert?  Is that your --

 8            MR. TANASI:  Your Honor, I think that's fine.

 9            THE COURT:  I'm asking you.

10            MR. TANASI:  Yeah, that's --

11            THE COURT:  I'm not telling you.  I want to make sure

12   that's clear.  I'm not telling you.  I'm asking you if that's

13   your preference or not.

14            MR. TANASI:  Your Honor -- okay.  I apologize.  We're

15   conferring with counsel.  I think we can call Ms. McHard and

16   then go into openings.

17            THE COURT:  Okay.

18            MR. TANASI:  I think that is probably best for her

19   schedule.

20            THE COURT:  All right.  Any objection to that from

21   the Government?

22            MR. FINLEY:  Yeah, they're going to call her first

23   and then -- and then they do their openings after --

24            THE COURT:  Yes.

25            MR. FINLEY:  -- because of her schedule?
```

2:19-cr-00295-GMN-NJK - April 5, 2023

1          **THE COURT:**  Yes.

2          **MR. FINLEY:**  We don't have an objection to that.  No

3     objection.

4          **THE COURT:**  All right.  Okay.  Then that will be the

5     plan for tomorrow.

6          **MR. TANASI:**  Thank you, Your Honor.

7        *(Proceedings adjourned at 4:05 p.m.)*

8                        --o0o--

9              COURT REPORTER'S CERTIFICATE

10

11      I, AMBER M. McCLANE, Official Court Reporter, United

12    States District Court, District of Nevada, Las Vegas, Nevada,

13    do hereby certify that pursuant to 28 U.S.C. § 753 the

14    foregoing is a true, complete, and correct transcript of the

15    proceedings had in connection with the above-entitled matter.

16

17    DATED:  4/5/2023

18

19                    /s/ *Amber M. McClane*

20                    AMBER McCLANE, RPR, CRR, CCR #914

21

22

23

24

25