1

1     UNITED STATES DISTRICT COURT

2     DISTRICT OF NEVADA

3

4  UNITED STATES OF AMERICA,        )
                                    )  Case No. 2:19-cr-00295-GMN-NJK
5          Plaintiff,               )
                                    )  Las Vegas, Nevada
6       vs.                         )  APRIL 4, 2023
                                    )  9:10 A.M.
7  MARIO CASTRO, et al.,            )  Courtroom 7D
                                    )
8          Defendants.              )  JURY TRIAL - A.M. SESSION
                                    )
9                                   )
                                    )  **C E R T I F I E D   C O P Y**
10 _____ )

11

12
                    REPORTER'S TRANSCRIPT OF PROCEEDINGS
13
            BEFORE THE HONORABLE GLORIA M. NAVARRO
14                 UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20  COURT REPORTER:     Judy K. Moore, CRR, RMR
                        United States District Court
21                      333 Las Vegas Boulevard South
                        Las Vegas, Nevada  89101
22                      Judy_Moore@nvd.uscourts.gov

23

24  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.
25

**2**

1                                    <u>APPEARANCES</u>

2  FOR THE GOVERNMENT:
       MR. TIMOTHY T. FINLEY, ESQ.
3      MR. DANIEL E. ZYTNICK, ESQ.
       U.S. Department of Justice
4      P.O. Box 386
       Washington, D.C. 20044
5
       MS. MINA CHANG
6      Assistant United States Attorney
       501 Las Vegas Boulevard South, Suite 1100
7      Las Vegas, Nevada 89101

8  FOR DEFENDANT MARIO CASTRO:
       MR. JOSHUA TOMSHECK, ESQ.
9      Attorney at Law
       228 South 4th Street
10     Las Vegas, Nevada 89101

11     MR. RICHARD E. TANASI, ESQ.
       Tanasi Law Offices
12     8716 Spanish Ridge, Suite 105
       Las Vegas, Nevada 89148
13
   FOR DEFENDANT SALVADOR CASTRO:
14     MR. DONALD J. GREEN, ESQ.
       Law Offices of Donald J. Green
15     4760 South Pecos Road, Suite 103
       Las Vegas, Nevada 89121
16
   FOR DEFENDANT MIGUEL CASTRO:
17     MR. LUCAS GAFFNEY, ESQ.
       Gaffney Law
18     9900 Covington Cross Drive, Suite 290
       Las Vegas, Nevada 89144
19
       MR. THOMAS A. ERICSSON, ESQ.
20     Thomas A. Ericsson, Chartered
       9900 Covington Cross Drive, Suite 290
21     Las Vegas, Nevada 89144

22 FOR DEFENDANT JOSE LUIS MENDEZ:
       MR. CHRISTOPHER MISHLER, ESQ.
23     MR. WILLIAM H. BROWN, ESQ.
       Brown Mishler, P.L.L.C.
24     911 North Buffalo Drive, Suite 202
       Las Vegas, Nevada 89128
25

UNITED STATES DISTRICT COURT
Judy K. Moore, RMR, CRR

1                              I N D E X

2    GOVERNMENT WITNESSES:
       SEAN O'CONNOR
3        Continued Direct Examination by Mr. Finley, Page 5
         Cross-Examination by Mr. Brown, Page 30
4        Cross-Examination by Mr. Gaffney, Page 60
         Cross-Examination by Mr. Green, Page 95
5

6    EXHIBITS                        OFFERED      RECEIVED

7    Exhibit 101-A (Stipulated)        105          105

8    Exhibit 102-G (Stipulated)        105          105

9    Exhibit 137 (Stipulated)          105          105

10   Exhibit 261 (Stipulated)          105          105

11   Exhibits 263-266 (Stipulated)     105          105

12   Exhibit 281 (Stipulated)          105          105

13   Exhibit 285 (Stipulated)          105          105

14   Exhibit 5046 (Stipulated)         106          106

15   Exhibit 428 (Demonstrative)       107          107

16

17

18

19

20

21

22

23

24

25

**4**

1          LAS VEGAS, NEVADA; APRIL 4, 2023; 9:10 A.M.

2                          --oOo--

3                    P R O C E E D I N G S

4          (Jury in at 9:10 a.m.)

5          THE COURT:  All right.  Everyone may be seated.

6          Welcome back, ladies and gentlemen of the jury.  We

7    have the witness Mr. O'Connor back on the stand.  We'll have

8    the parties please make their appearance on the record.

9          MR. FINLEY:  Thank you, Your Honor.  Good morning.

10          Good morning, everyone.  I'm Tim Finley.  This is

11    Dan Zytnick.  This is Mina Chang.  That's Barry Bouchie.  And

12    that is Erica Rush.  Thank you.

13          THE COURT:  Good morning.

14          MR. TANASI:  Thank you.  Good morning, Your Honor.

15    Rich Tanasi and Josh Tomsheck appearing for Mario Castro.  Also

16    with us here at counsel table is Brian.

17          MR. GAFFNEY:  Good morning, Your Honor.

18          Good morning, ladies and gentlemen.  Lucas Gaffney

19    and Thomas Ericsson on behalf of Miguel Castro.  Thank you.

20          THE COURT:  Good morning.

21          MR. BROWN:  Good morning, Your Honor.  Will Brown

22    and Christopher Mishler for Jose Luis Mendez.  Also with us are

23    Rich Beasley and Lisa Smith.

24          MR. GREEN:  Good morning, Your Honor.

25          Good morning, ladies and gentlemen of the jury.

**5**

1  Again, Don Green on behalf of Mr. Salvador Castro, who's here

2  with me.  And my assistant Heather Tan-Sahl.

3          THE COURT:  Good morning.

4          All right.  We were going to continue with direct

5  examination of Mr. O'Connor.  Sir, I do remind you that you are

6  still under oath.

7          THE WITNESS:  Yes.

8          THE COURT:  Go ahead, Mr. Finley, whenever you're

9  ready.

10          MR. FINLEY:  Thank you.

11          Ms. Rush, if we could please start loading

12  Government's Exhibits 154, 155, 156, and I think those three

13  for now.

14          Those are already admitted, Judge.

15          THE COURT:  All right.

16          MR. FINLEY:  There it is.

17                  CONTINUED DIRECT EXAMINATION

18  BY MR. FINLEY:

19  Q.    So we were talking about the day that Glen Burke got shut

20  down, and I think we were still talking about that morning, but

21  I did want to show you a few of these exhibits real quick.

22          Government's Exhibit 154 is an email that is from

23  you --

24          MR. FINLEY:  If we could just blow up the top,

25  please.  Perfect.  Thank you.

**6**

1  BY MR. FINLEY:

2  Q.    So that is from you.  It's March 17, 2011.  You are

3  writing to Glen Burke, Miguel Castro, and Mario Castro.  Is

4  that who you're writing to?

5  A.    That is correct.

6  Q.    You're attaching an XL sheet.  And then there's an email

7  below that with the subject line "Total," and you're also

8  e-mailing the same three people.  Do you see that?

9  A.    Yes.

10  Q.    Okay.

11       MR. FINLEY:  And if we could just blow up the bottom

12  of that page.

13  BY MR. FINLEY:

14  Q.    You're talking about postage invoices and you're talking

15  about a number of different three-letter designations.  Do you

16  see that?

17  A.    Yes.

18  Q.    Okay.  Are you talking about the prize notice mailings

19  that you all were putting out for Glen Burke in this email?

20  A.    Yes, for four of his companies.

21       MR. FINLEY:  Let's take a look at 155, please.

22  BY MR. FINLEY:

23  Q.    That's another email.  This time you are writing to Glen

24  Burke on March 17th with a cc to who?

25  A.    Miguel Castro.

```
 1  Q.    And is that Miguel Castro the defendant in this case?
 2  A.    Yes.
 3  Q.    And, again, you are talking about postage accounts?
 4  A.    That's correct.
 5  Q.    All right.
 6            MR. FINLEY:  Let's look at 156.
 7  BY MR. FINLEY:
 8  Q.    Again this is an email from you.  You're writing to Glen
 9  Burke and Mario Castro.  Do you see that?
10  A.    Yes.
11  Q.    And this is now we're on May 19, 2011?
12  A.    Yes.
13  Q.    And beneath that, you're writing to someone named Robin
14  Wilhite about jobs.  Do you see that?
15  A.    That's correct.
16  Q.    Is this another email where you are discussing the work
17  of getting these prize notices out?
18  A.    Yes.
19  Q.    And are the emails that we looked at consistent with your
20  testimony that you and the four defendants were producing prize
21  notices for Glen Burke at around this time?
22  A.    That's correct.
23            MR. FINLEY:  If we could look at 157-B, please.  And
24  if we could just blow up the top half.
25  BY MR. FINLEY:
```

1  Q.    There's a name at the top called Rushmore Financial
2  Group.  Do you see that?
3  A.    Yes.
4  Q.    What's that?
5  A.    That's the name of one of the d/b/a's for Glen's
6  companies.
7  Q.    And there's a big, bold-faced capital letter line at the
8  top, starts with "Pay the sum," then it says, "$532,500."  Do
9  you see that?
10 A.    Yes.
11 Q.    And then there's also what looks like -- appears to be a
12 stamp on there that says, "Registered winner"?
13 A.    Yes.
14 Q.    What kind of a document is this?
15 A.    This is a prize notice.  We call it in the business a
16 guaranteed winner prize notice.
17 Q.    Who produced this prize notice?
18 A.    Myself and the defendants.
19 Q.    And who did you do this for?
20 A.    Glen Burke.
21 Q.    Okay.  Let's go back to, when we broke last Thursday --
22 or no, last night -- I can't even remember what day it is
23 anymore.
24        When we broke last night, we were talking about you
25 being at Glen Burke's office, seeing that evidence was being

1 seized by Federal agents.  You came back to the letter shop,

2 and then we were just getting into a conversation that you had

3 with Jose Luis Mendez.

4 A.    Yes.

5 Q.    Do you remember that?

6 A.    Yes.

7 Q.    And I think you said, "I was having this conversation

8 because it concerned me personally we were going to lose a lot

9 of business.  This is our paychecks that I was talking about."

10 Do you remember that?

11 A.    Yes.

12 Q.    I know it was a long time ago, I'm sure you don't

13 remember the exact words, but did you get a sense of the

14 response, the reaction, by Mr. Mendez to what you were telling

15 him?

16 A.    Got a head down like, yeah, this is -- this is a big

17 problem.  You know?

18 Q.    Did you go to lunch that day?

19 A.    Yes.

20 Q.    Did anything happen at lunch, while you were out to

21 lunch?

22 A.    I received a call from Mario to come back to the office

23 because postal inspectors were there and they wanted to talk to

24 me.

25 Q.    When you say "Mario," are you referring to Mario Castro,

1  the defendant in this case?

2  A.    Yes.

3  Q.    Did you finish your lunch?

4  A.    No.

5  Q.    So you went -- had you started eating it?

6  A.    No.  I had ordered it, but I didn't start eating it.

7  Q.    So this was important enough for you to have to not get

8  to have your lunch and come back to the office?

9  A.    Yes.

10  Q.    Who called you?

11  A.    I'm not sure if it was Mario directly.  It might have

12  been Luis Aguilar's phone, but Mario spoke to me.

13  Q.    So you're not sure, but it may have been a call that you

14  received from Luis Aguilar's phone, but it was Mario's voice on

15  that phone?

16  A.    Yes.  That's what I recall.

17  Q.    And, again, I think you may have said this before, is

18  Luis Aguilar the stepson of the defendant Miguel Castro?

19  A.    Yes.

20  Q.    Did you go back to the office?

21  A.    Yes.

22  Q.    Did you speak to the postal inspectors?

23  A.    Yes.

24  Q.    Were there postal inspectors and other people from the

25  Government there at the office when you got back?

1  A.    Yes.  There was one postal inspector I remember.  There

2  might have been another one there.  And some officers.

3  Q.    Okay.  Do you remember if the postal inspector that you

4  spoke to was a man or a woman?

5  A.    It was a woman.

6  Q.    And I -- we've been talking about you having this

7  conversation back at the office.  Are we talking about the

8  office that was inside the letter shop that was at Harrison and

9  Patrick Lane?

10  A.    Yes, that's correct.

11  Q.    Do you remember what the gist of the conversation was

12  that you had with the postal inspectors?

13  A.    Basically, from what the female postal inspector said was

14  that they were there to look into Glen's dealings with us and

15  trying to figure out what our part was with Glen's dealings and

16  if he owned the company, because we were giving him kickbacks.

17  Q.    Okay.  Now, the -- when this was happening, were Glen

18  Burke's fraudulent prize notice mailings sitting around the

19  warehouse?

20  A.    Yes.

21  Q.    And do you recall whether the Federal agents saw that?

22  A.    I was off to lunch.  I would assume they walked through

23  the whole building and saw that.

24  Q.    When you're speaking to this postal inspector, who else

25  was there with -- well, she's there, you're there.  Is anybody

 1  else there while you're talking to her?

 2  A.    I was kind of sitting forward.  Like, she was sitting on

 3  or behind Miguel's desk.  It was Miguel's office.  And I

 4  believe Miguel and Mario were behind me when she was talking to

 5  me directly.

 6  Q.    Did you get the sense that -- well, let me ask you this:

 7  What were your feelings as you're sitting there and they're

 8  talking about -- they're asking about your dealings with Glen

 9  Burke and you know that the prize notices are sitting there in

10  the warehouse?  What is going through your mind when you're

11  having this conversation?

12  A.    That we're going to get in trouble or we're going to lose

13  a lot of work.

14  Q.    Did you get the overall sense from this conversation that

15  you had with the postal inspector and from all the people from

16  the Government being there that the Government thought that

17  these prize notices were fraudulent?

18  A.    Overall, yes.

19  Q.    Did you realize that what was going on was more serious

20  than a cease and desist?

21  A.    Yes.

22  Q.    And what made you think it was more serious than a cease

23  and desist?

24  A.    From what I understand, a cease and desist is usually

25  served by a postal inspector, but there was officers there with

1  guns seizing paperwork in Glen's office, so it felt more

2  serious for sure.

3  Q.    Did Glen Burke getting shut down in January of 2013 have

4  an effect on the letter shop's business?

5  A.    Most definitely.

6  Q.    What was the effect?

7  A.    The loss of work, but more importantly was the -- they

8  locked up all the letter shop checking accounts.

9  Q.    Now, you say "they locked up all the letter shop checking

10  accounts."  Who is "they"?

11  A.    The Government.

12  Q.    So the letter shop's bank accounts got frozen?

13  A.    Correct.

14  Q.    How much business did you all lose as a result of Glen

15  Burke's shutdown?

16  A.    At that time, all of it because there was no way for us

17  to do business without checking accounts.

18  Q.    I see.  Did the checking accounts get unfrozen?

19  A.    I'm not sure on that part, if they eventually got

20  unfrozen.  Eventually we did start working again.

21  Q.    Okay.  So let me just ask you this question, then:  Kind

22  of more long-term, okay, look at it about let's say 2013 all

23  the way through to 2014, one-year time period after Glen Burke

24  got shut down.  Can you describe for the jury what the effect

25  on your business was when Glen Burke got shut down?

1  A.    At that time period, Glen was probably 50 percent of our

2  work.  Of course, he was not going to mail anymore.  Once

3  things got straightened out and new businesses were opened, I

4  guess, and checking accounts, we started mailing for Patti and

5  Dan again.

6  Q.    Patti Kern and Dan Wagner?

7  A.    That's correct.

8  Q.    Did it affect your personal financial situation?

9  A.    Of course.  When the initial shutdown happened, Miguel

10 and Mario could only pay me, I think it was $250 cash for a few

11 weeks, like a month.

12 Q.    So you were making $250 cash per week, and that's after

13 the shutdown?

14 A.    That's correct.

15 Q.    Before January 2013, before the shutdown, how much money

16 were you making each week at the letter shop?

17 A.    At that time, I think it was up to $1,100 a week.

18 Q.    So that amounted to how much of a pay cut for you?

19 A.    75 percent.

20 Q.    Did what happened with Glen Burke getting shut down in

21 January 2013, did it cause you any worry?

22 A.    Of course.  I had to find other employment and feed and

23 take care of my family.

24 Q.    At any point in time, did any one of the four defendants

25 try to reassure you about what was going on?

1  A.    I remember a specific conversation with Mario Castro.  At

2  that point, I was taking on a job as a stagehand, and I would

3  come in the office as much as I could because stagehand work is

4  usually at night, for concerts and what-not, and we were

5  talking, and basically it came down to, they're after Glen, not

6  us.  You know?  They're getting Glen on a multitude of things

7  and they're not after us.

8  Q.    Who said, "they're going after Glen, not us" --

9  A.    That was Mario.

10  Q.    -- was it you?

11  A.    No.  That was Mario Castro.

12  Q.    Did you -- we were talking about the day that -- and the

13  one-year aftermath of Glen Burke getting shut down.  Let's jump

14  forward a little bit to 2016.

15  A.    Okay.

16  Q.    So think about 2016.  Did something happen in 2016

17  regarding Glen Burke?

18  A.    Yes.  A postal inspector showed up at my door at my

19  house, Andrea I believe her name was, and she said I was a

20  person of interest because I knew the ins and outs of Glen

21  Burke's business and they wanted to ask me to testify in grand

22  jury.

23  Q.    Did you get a subpoena?

24  A.    Yes.

25  Q.    And did you go ahead and testify in the grand jury?

1  A.    Yes, I did.

2  Q.    So were you aware that testifying in the grand jury means

3  that a grand jury is investigating criminal conduct?

4  A.    Yes.

5  Q.    Was it a Federal grand jury?

6  A.    Yes.

7  Q.    Was it here that you came and did that?

8  A.    Yes.

9  Q.    You testified in front of a bunch of grand jurors?

10  A.    Correct, just like this, without all this.  (Indicating.)

11  Q.    Probably more than are sitting here, right?

12  A.    Yeah.  It -- yes.

13  Q.    And you went into a room, there's no judge there?

14  A.    There was a magistrate?  Is that what it's called?  I'm

15  not sure, or a judge.  It was you --

16  Q.    Are you sure you're not thinking of, like, a grand jury

17  foreperson or something like that?  I can assure you there's no

18  magistrate judge there.  We have the transcript.  There's no

19  magistrate judge in a grand jury.  Are you sure you're not

20  thinking of the grand jury foreperson?

21  A.    That could be.

22  Q.    And you gave sworn testimony?

23  A.    Yes.

24  Q.    And who asked you the questions?

25  A.    You did.

1 Q.    And based on the questions, could you tell that we were

2 asking you, or I was asking you, about your conduct in

3 producing fraudulent mailings for Glen Burke?

4 A.    That's correct.

5 Q.    I asked you all about that?

6 A.    Yes.

7 Q.    What was that like for you?

8 A.    Very stressful.

9 Q.    Now, did the postal inspector, I think you said her name

10 was Andrea, did she explain to you, you're just a witness in

11 this investigation, you're not a target?

12 A.    Yes.

13 Q.    And that's why you went into the grand jury as a witness?

14 A.    That's correct.

15 Q.    Did you still know that you were testifying about some

16 fraud that you had done with Glen Burke?

17 A.    Yes.

18 Q.    And that's what made you concerned?

19 A.    Yes.

20 Q.    Did you feel like you ducked a bullet when you found out

21 you're just a witness?

22 A.    Kind of, yes.

23 Q.    Did you decide to do anything after you walked out of

24 that grand jury?  This was -- was it about July 2016?

25 A.    Yes.

1  Q.    So around July 2016, you walk out of the grand jury.

2  What are your emotions?  What are you feeling?

3  A.    I made some phone calls.  I called my wife and told her I

4  was out.

5  Q.    All right.  Let me stop you there.

6  A.    Okay.

7  Q.    You say you were out.  What do you mean?

8  A.    Out of the actual grand jury.

9  Q.    Oh, you were out of the grand jury.  Okay.

10 A.    Yes.

11 Q.    Go ahead, sir.

12 A.    And then I called Dan Wagner walking to my car and I told

13 him that, "I can't do this anymore.  I need to work my way out

14 of this business."  I was already working full-time for Las

15 Vegas Color at that time, two years in, and...

16 Q.    Dan Wagner was the guy who you were doing fraudulent

17 prize notice business with, and you were using your On The Side

18 bank account to pay Digital Express for printing and mailing

19 those notices, right?

20 A.    That's correct.

21 Q.    You talked about that yesterday?

22 A.    Yes.

23 Q.    Okay.  So you told Dan Wagner you didn't want to do this

24 anymore?

25 A.    Yes.

1   Q.    What did he say?

2   A.    He understood.  I believe he said he was thinking it

3   wasn't worth the risk anymore also.  But I told him I would

4   help him figure something out, you know, if he wanted to

5   continue.

6   Q.    You asked him if he wanted to continue?

7   A.    Right.  If he wanted to continue mailing and doing the

8   business, I would help him figure something out.

9   Q.    What did you mean by that?

10  A.    That someone else could be his account representative

11  here in the States.

12            And I talked to Mario and Miguel about that also,

13  telling them that I wanted to get out.

14  Q.    Okay.  Let's stick to Dan Wagner and just close down that

15  thread, and then we'll go to the next thing.

16  A.    Okay.

17  Q.    So Dan Wagner -- did you really quit right away?

18  A.    No.

19  Q.    Okay.  Did you quit eventually?

20  A.    No.

21  Q.    You didn't eventually quit working with Dan Wagner?

22  You're still working with him today?

23  A.    No.  I did eventually.

24  Q.    All right.  So you eventually quit working with Dan

25  Wagner.  When was that?

1   A.    It was right before we got our subpoenas or letters for

2   this case.

3   Q.    Okay.  Did you get a target letter in this case?

4   A.    Yes.

5   Q.    Is that what you're talking about, right before you got

6   the target letter?

7   A.    The big lawsuit envelope that came to my door.

8   Q.    Okay.

9   A.    It was slightly before that.

10  Q.    That was around February 2018 that you got the big

11  envelope?

12  A.    Yes.

13  Q.    Telling you to stop doing this stuff?

14  A.    That's correct.

15  Q.    It was a Court order, actually?

16  A.    Court order, that sounds accurate.

17  Q.    So just before then, that's when you finally quit working

18  with Dan Wagner?

19  A.    Yes.  He had completely stopped at that point.

20  Q.    So he stopped?  Is that what you said?  Dan Wagner

21  stopped?

22  A.    Yes.

23  Q.    You didn't stop; he stopped, and that ended it?

24  A.    Right.

25  Q.    Okay.  So that's enough about Dan Wagner.

**21**

1      You were mentioning that you had, coming out of this

2  grand jury, you had conversations with other people as well?

3  A.    Yes.

4  Q.    Did you speak to any of your co-conspirators in this

5  scheme?

6  A.    Yes.

7  Q.    Who did you speak with?

8  A.    Mario, Miguel, Jose Luis Mendez, Luis Aguilar, all of

9  them at some point.

10 Q.    Did you also speak with Patti Kern about the issue?

11 A.    And Patti Kern, of course.

12 Q.    And what was the gist of what you were telling people

13 back then, July 2016?

14 A.    During the grand jury, after having a heart attack in

15 2015, was just getting to be too much in this business, that I

16 needed to get out of it and concentrate on my family and myself

17 and my job that I had at Las Vegas Color.

18 Q.    And you said you had a heart attack in 2015?

19 A.    That's correct.

20 Q.    I don't think you had mentioned that before.  So in 2015,

21 you had a heart attack?

22 A.    Yes, November of 2015.

23 Q.    And so you -- we were talking about July 2016.  You're

24 looking back at 2015 and you're thinking, I had a heart attack

25 last year.  Is that what you mean?

1  A.    Yes.

2  Q.    And that's why you brought that up?

3  A.    Yes.

4  Q.    Were you stressed out?

5  A.    Yes.

6  Q.    Let's start with your conversation that you had with

7  Patti Kern.  I take it you told her you wanted to get out?

8  A.    Yes.

9  Q.    Did you have a way of referring to people, you know,

10 describing the risk that you thought you were facing?

11 A.    The risk I thought I was facing?

12 Q.    Let me ask it a different way.

13 A.    Ask it a different way.  I don't --

14 Q.    So you've been testifying you got out of the grand jury,

15 you felt like you were in some hot water.  How did you

16 describe, you know, your personal situation to your

17 co-conspirators?

18 A.    Just that, I was -- I was in hot water, I was, you know,

19 hot in terms of I was definitely a person of interest for the

20 Government, the postal inspectors.  They knew my name.  They

21 knew how to find me.  They knew my house.

22 Q.    You used the word "hot."  You said you were hot?

23 A.    Yeah.

24 Q.    And who did you say that to?

25 A.    I think about everybody.

1    Q.    And did -- when you say "everybody," are you talking

2    about all the co-conspirators that you just named?

3    A.    Yes.

4    Q.    Patti Kern, Mario Castro, Jose Luis Mendez, and Miguel

5    Castro?

6    A.    That's correct.

7    Q.    And when you spoke to those individuals and said to some

8    of them, I'm too hot, did they know what you were talking

9    about?

10   A.    I think so.

11   Q.    You didn't need to -- nobody asked you to explain that?

12   A.    No.  Not that I remember.

13   Q.    What did Patti Kern say to you?

14   A.    She understood that.  She knew my -- you know, more of a

15   personal level, she knew I had a heart attack, she knew what

16   was going on in my life and that she would -- she understands.

17   Q.    Do you remember you had a partnership on one of these

18   mailing companies called Advanced Allocation Systems?  Do you

19   remember testifying about that?

20   A.    Yes.

21   Q.    And do you remember that your partners were Patti Kern

22   and Jose Luis Mendez, according to your testimony from the

23   other day?  Do you remember that?

24   A.    Yes.

25   Q.    Okay.  You also testified that you were getting profit

1  payments that were split up amongst the three of you after all

2  the expenses got paid.  Do you remember that?

3  A.    Yes.

4  Q.    You would get that money by cash and by check?

5  A.    Yes.

6  Q.    Did you continue to receive profit payments from Advanced

7  Allocation Systems after you had that conversation with Patti

8  Kern in 2016?

9  A.    Maybe one or two.  I can't remember exactly when it

10  stopped.  It was close to that time.

11         MR. FINLEY:  Can we show the witness Government's

12  Exhibit 253?  It's already admitted.  This is the profit

13  distribution exhibit with all the checks.  At Page 60, please.

14  Okay.  If we could blow the one up at the top.

15  BY MR. FINLEY:

16  Q.    Now, that is a check to On The Side for $750, round

17  amount --

18  A.    Yes.

19  Q.    -- is that right?

20         And that's written from the Advanced Allocation

21  Systems bank account?

22  A.    That's correct.

23  Q.    Is this a check that Patti Kern gave you?

24  A.    Yes.

25  Q.    And there's nothing in the "Re" line.  Do you see that?

1  A.    Yes.

2  Q.    Is that a profit payment?

3  A.    Yes.

4  Q.    Is the date August 8, 2016?

5  A.    Yes.

6  Q.    Is that a month after you -- approximately a month or

7  maybe a few weeks after you testified in the grand jury?

8  A.    Yes.

9  Q.    And if the bank accounts for Advanced Allocation Systems

10 reflect that that was the last check of this nature that you

11 received, would that be consistent with your memory, that you

12 stopped getting paid as a partner in that company roughly

13 shortly after you got out of the grand jury?

14 A.    That's correct.

15 Q.    And that's because you told Patti Kern you wanted out?

16 A.    To my recollection, yes.

17        MR. FINLEY:  Let's look at Government's Exhibit 198,

18 please.

19 BY MR. FINLEY:

20 Q.    This is a little under a year later.  Patti Kern is

21 writing to you in June of 2017.  Do you see that?

22 A.    Yes.

23 Q.    And it looks like she's responding to a text that you

24 wrote.  It says, "I'm confused by your text."  Do you see that?

25 A.    Yes.

1  Q.    And then she also goes on to say -- this is the last

2  sentence -- "Did not think you wanted to be affiliated with any

3  sweeps type mailing due to what you went through and that was

4  why you quit working with Dan."  Do you see that?

5  A.    Yes.

6  Q.    Is Dan Dan Wagner?

7  A.    Yes.

8  Q.    And when Patti Kern makes a reference to what you went

9  through, what was she referring to?

10  A.    The grand jury and the stress.

11  Q.    And is she responding to a text that you sent her where

12  you complained about something?

13  A.    As I recall, yes.

14  Q.    Okay.  What did you complain to her about in

15  approximately June of 2017?

16  A.    So in helping getting AAS going and eventually getting

17  profit sharing of that, I had found and rewrapped four or five

18  promotions for AAS.  And then in turn, I was out of town and I

19  got an approval for another company, and it looked exactly like

20  the ones I had helped rewrap for AAS, and I was wondering why

21  this company was being started with promotions that I had

22  given -- or had worked on for AAS.

23  Q.    Okay.  So let me make sure I understand this.  You had

24  rewrapped some promotions, so you did some work on AAS, right?

25  A.    Right.

**27**

1  Q.    We saw the email where you were doing the leg work and
2  talking about the rewrap with the graphics guy, right?
3  A.    Yes.
4  Q.    Do you remember seeing that?
5  A.    Uh-huh.
6  Q.    And then you come to find out maybe four or five years
7  later that what you helped create with this guy was getting
8  used for another promotion.  Is that what you're saying?
9  A.    Yes.
10 Q.    Okay.  And why are you complaining about that?  What did
11 you want?
12 A.    I wanted more money.  I was struggling.
13 Q.    So you thought you should be compensated for the past
14 work since they were using it again?
15 A.    Yes.
16 Q.    So you weren't really able to get out of this, were you?
17 A.    No.
18 Q.    Still asking for money that comes from fraud victims?
19 A.    Yes.
20 Q.    So that's the context and that's why she's referring back
21 to, "I thought you wanted out"?
22 A.    That's correct.
23 Q.    Now, you mentioned you get out of the grand jury, you're
24 stressed out.  You talk to Patti Kern, you talk to Dan Wagner.
25 Did you talk to Mario Castro?

1  A.     Yes.

2  Q.     Did you tell him you wanted out?

3  A.     Yes.

4  Q.     What did he say?

5  A.     Basically, he understood and -- it was over the course of

6  a few days, I believe.  And that we would -- he would work on

7  finding somebody else to handle Dan's accounts, basically.

8  Q.     Dan Wagner?

9  A.     Dan Wagner's, yes.  Sorry.

10 Q.     And when you got out of the grand jury in July of 2016,

11 did you talk to Miguel Castro about wanting to get out?

12 A.     Yes.  Him, too.

13 Q.     And what did you say to him?

14 A.     Basically the same thing, that I, you know -- it was too

15 much stress, you know, I was afraid I was going to have another

16 heart attack and that I needed to find a way out.

17 Q.     And what did Miguel Castro say to that?

18 A.     He agreed also.

19 Q.     When you say, "He agreed also," do you mean he agreed

20 that he should get out or he agreed that you should get out, or

21 both?  If you can recall.  What was your takeaway?

22 A.     My takeaway was, from the overall picture of all of us,

23 is we all needed to get out eventually.

24 Q.     That was --

25 A.     You know, Mario, find some better work, better line of

 1 | work.

 2 | Q.    So when you say that he agreed with you and you said that

 3 | he was just kind of agreeing, yeah, we all kind of need to get

 4 | out of here?

 5 | A.    Yes.

 6 | Q.    And did you speak with Jose Luis Mendez after you got out

 7 | of the grand jury in 2016?

 8 | A.    I'm sure I did.  I don't remember.

 9 | Q.    You might have had several conversations over time?

10 | A.    Yes.

11 | Q.    About this issue?

12 | A.    Yes.

13 | Q.    Do you recall the general tenor of those conversations?

14 | A.    He agreed also.  Shortly after, I believe he bought a

15 | wide format printer to try to get some poster banner type work,

16 | car wraps, you know, trying to develop another business while

17 | he could.

18 | Q.    Do you know if anything came of any of that?

19 | A.    I don't know for sure.  I was not there every day.  I did

20 | see him run the printer, the wide format printer, a few times,

21 | but I don't know if anything came up out of it.

22 | Q.    Did any of the four defendants ask you to stay on a

23 | little longer because they needed you and they needed some time

24 | to find somebody else to do your job?

25 | A.    Yes, Mario.  And Miguel also.  There wasn't many people

1  that knew how to set up the OCE's, do the data.  Basically,

2  that's the more technical side of the job.  It's hard to find

3  somebody to do that job.

4         MR. FINLEY:  Brief indulgence, Your Honor?

5  BY MR. FINLEY:

6  Q.    So did you keep on working for the scheme as a

7  non-partner part-time employee of the letter shop right up

8  until 2018 when everything got shut down by this case?

9  A.    Yes.

10  Q.    And was it shortly after that that you ended up pleading

11  guilty to conspiracy to commit mail fraud because of what you

12  did with these four defendants?

13  A.    That's correct.

14         MR. FINLEY:  Thank you.  No further questions.

15         THE COURT:  Cross-examination, Mr. Brown?

16                   CROSS-EXAMINATION

17  BY MR. BROWN:

18  Q.    Mr. O'Connor, my name is Will Brown.  I represent Jose

19  Luis Mendez.

20  A.    Okay.

21  Q.    How are you?

22  A.    Stressed.

23  Q.    Stressed.  Understandable.

24         What would you like me to call you?

25  A.    Sean is fine.

1    Q.    Sean, okay.

2          All right.  Let's start by talking about the fraud

3    that you and Patti Kern committed here.  You would agree with

4    me that the people who knew that this was fraud didn't want

5    their names on the mailing companies?

6    A.    That is correct.

7    Q.    In fact, you told Postal Inspector Bouchie that the Kern

8    syndicate members didn't want their own names on the businesses

9    because the mailings were fraudulent?

10   A.    Yes.

11   Q.    And your name wasn't on any mailing company?

12   A.    That's correct.

13   Q.    Because you knew this was fraud?

14   A.    Yes.

15   Q.    Patti Kern's name wasn't on a mailing company?

16   A.    That's correct.

17   Q.    Because she knew this was fraud?

18   A.    Yes.

19   Q.    Mr. Mendez's name was on mailing companies?

20   A.    Yes.

21   Q.    And the bank accounts?

22   A.    Yes.

23   Q.    And the P.O. Box applications?

24   A.    Yes.

25   Q.    And he even had the mail sent directly to his house?

1 A.    As far as I understood, yes.

2 Q.    Now, you talked -- yesterday you talked about straw

3 owners or figureheads.  Do you remember that?

4 A.    Yes.

5 Q.    And you described that as someone whose name was on the

6 company?

7 A.    Yes.

8 Q.    And the bank accounts?

9 A.    Yes.

10 Q.    And would be used to apply for the P.O. Boxes?

11 A.    Yes.

12 Q.    All right.  Let's talk a little bit about Advanced

13 Allocation Systems.  You said yesterday, I think, that at some

14 point Patti Kern said, "Hey, you're doing so much work for this

15 company, I think you deserve a share of the profits."  Do you

16 recall telling the jury that?

17 A.    Yes.

18 Q.    And one of the things you were helping with, you said you

19 helped find P.O. Boxes?

20 A.    That's correct.

21 Q.    And the Government showed you an email to Ricardo

22 Gonzalez about getting a new d/b/a for this company, right?

23 A.    Yes.

24 Q.    And d/b/a's, that's something you were familiar with,

25 working in this industry?

1  A.    Yes.

2  Q.    And, as a matter of fact, you even helped pick the name

3  Advanced Allocation Systems, right?

4  A.    We spit-balled a bunch of different names for --

5  randomly, yes.

6  Q.    Okay.  Let's see an email.

7         MR. BROWN:  Brian, can you pull up 9018, please.

8  Can you make that a little bigger?

9  BY MR. BROWN:

10  Q.    Can you see that, Sean?

11  A.    Yes.

12  Q.    Okay.  Now, these are emails between you and Patti Kern,

13  right?

14  A.    That's correct.

15  Q.    This is in January of 2012?

16  A.    That's correct.

17  Q.    And the first email comes from you, right?  That's the

18  email at the bottom?

19  A.    Yes.

20  Q.    And what you do is you suggest a whole bunch of company

21  names, right?

22  A.    Yes.

23  Q.    And you say, "I like three or four of them"?

24  A.    Yes.  At the bottom, yes.

25  Q.    So you email this list of names to Patti Kern?

1   A.    Yes.

2   Q.    And then she responds and she tells you the ones that she

3   likes, right?

4   A.    Yes.

5   Q.    And the first one that she likes is Advanced Allocation

6   Systems?

7   A.    Yes.

8   Q.    And as a result of this email between you and Patti,

9   that's the name that ends up being used?

10  A.    That's correct.

11  Q.    All right.  Let's talk about AAS's promotions, the actual

12  notices that went out.  Let's speak broadly in general terms

13  first.  Broadly stated, there were three people involved in the

14  creations of the AAS promotions, yes?

15  A.    I would agree with that.

16  Q.    So it's you?

17  A.    Yes.

18  Q.    Patti Kern?

19  A.    Yes.

20  Q.    And a guy named Mike Ladomerszky?

21  A.    Yes.

22  Q.    I think you went to high school with Mike, you said?

23  A.    Yes.

24  Q.    And he's, like, a graphic designer?

25  A.    Yes.

1  Q.    So, generally speaking, here's how the process works:
2  You provide some general information to Mike, right?
3  A.    Yes.
4  Q.    And the things that you provide might be, like, an old
5  promotion that you want Mike to rewrap?
6  A.    That's correct.
7  Q.    And you might provide, quote, unquote, rules for the new
8  promotion?
9  A.    Yes.
10 Q.    You might provide the start dates and the end dates?
11 A.    Any date for the rules, yes.
12 Q.    You might tell him what size you wanted the promotion to
13 be?
14 A.    Yes.
15 Q.    You would provide the address that the checks were going
16 to be mailed to?
17 A.    I helped facilitate the address.
18 Q.    Yeah.  And sometimes you even provided the actual
19 language that went into the promotion?
20 A.    Some edits may have been added to the promotion, yes.
21 Q.    And so Mike takes all that information that you provide,
22 along with the form you provide, he puts it all together, and
23 he sends it back to you to review?
24 A.    That's correct.
25 Q.    And then one of two things happens.  Either you send it

 1    to Patti Kern for her to review it, or you review it and
 2    approve it for printing?
 3    A.    Yes.
 4    Q.    Then this product goes to Epi to be printed?
 5    A.    To where?
 6    Q.    Epi Castro to be printed?
 7    A.    Yes.
 8    Q.    And then you provide the data for the laser fill that's
 9    going to be added at the letter shop?
10    A.    The list of names?
11    Q.    Right.
12    A.    I did not provide that data.
13    Q.    Okay.  Where does the data come from?
14    A.    Patti Kern.
15    Q.    Okay.  And she gives that to you?
16    A.    She sends it by email for -- yes.
17    Q.    Okay.  And so you load that data onto the laser printer
18    at the letter shop?
19    A.    Yes.
20    Q.    And by the time this whole project gets to Mr. Mendez,
21    his job is basically to push "Print" on the OCE laser printer?
22    A.    That's correct.
23    Q.    And you said basically his job was to run the OCE
24    printer, right?
25    A.    Yes.

1  Q.    And to fix it.  You said it was kind of temperamental?

2  A.    Yes.

3  Q.    But he was good at fixing it?

4  A.    That's correct.

5  Q.    Now, this OCE printer, it's very fast?

6  A.    Yes.

7  Q.    It prints about 466 pages a minute?

8  A.    Basically.  Way less than that, but yes.

9  Q.    Very fast?

10 A.    Very fast, yes.

11 Q.    And what happens is the OCE printer prints these

12 promotions, then it goes to a folder?

13 A.    Yes.

14 Q.    And the folder takes the promo and folds it once or

15 twice?

16 A.    Well, the burster is the step before the folder, but yes,

17 it takes all the pin holds, puts it together, and folds it,

18 correct.

19 Q.    Okay.  So after it goes through this process and it's

20 been folded, what's visible, basically, is the name and

21 address?

22 A.    And whatever might be above the name and address.

23 Q.    Okay.  So let's walk through some specific solicitations

24 from AAS.

25              MR. BROWN:  Brian, can we pull up 9004, please.

**38**

1      These are all admitted, Your Honor.

2   BY MR. BROWN:

3   Q.    All right.  Do you recognize these generally?

4   A.    Yes.

5   Q.    So these were emails between you and Mike Ladomerszky and

6   Patti Kern?

7   A.    Yes.

8   Q.    All right.  Let's start with Page 3.  Do you see that

9   first email from you to Mike Ladomerszky on January 20, 2012?

10  A.    Yes.

11  Q.    All right.  So what's going on in this is you email to

12  Mike Ladomerszky a promo to be remade?

13  A.    Yes.

14  Q.    You say, "I really like the background on this

15  promotion"?

16  A.    Yes.

17  Q.    And you tell him the name is going to be Advanced

18  Allocation Systems?

19  A.    That's correct.

20  Q.    And you tell him that you will find some rules?

21  A.    Yes.

22  Q.    And you tell him what size you want it?  You say, "Keep

23  it 8 and a half by 14"?

24  A.    That's correct.

25  Q.    And you said, "If you need more clear copy, I will get

1  you one"?

2  A.    Yes.

3  Q.    So the copy in this context refers to the language on the

4  promo?

5  A.    It actually refers to the PDF was kind of fuzzy.

6  Q.    Okay.  And you say, if you need something more clear,

7  you're going to get it to him?

8  A.    Correct.

9  Q.    All right.  So let's go to Page 2.  And, again, these go

10 from the bottom to the top chronologically.

11 A.    Yes.

12 Q.    So very bottom, January 23rd, a couple of days later,

13 Mike emails you back, he says, "Hey Sean, Let me know what you

14 think"?

15 A.    Yes.

16 Q.    So he's provided kind of a proof, a working model for you

17 to look at?

18 A.    That's correct.

19 Q.    And then you give him the name and the address to use?

20 A.    The address, yes.

21 Q.    He says he'll add the address to the promo and asks if

22 you want him to put the address on it?

23 A.    Yes.  Sometimes Epi's company would put the address on

24 it.

25 Q.    Okay.  And then you ask him to send the artwork with

1  addresses on it?

2  A.    That's correct.

3  Q.    But he says, "The promo is still missing a signature and

4  rules" and asks if you have them?

5  A.    Yes.

6  Q.    So he's asking you for the rules for this promo?

7  A.    That's correct.

8  Q.    Let's go to Page 1.  All right.  Bottom of Page 1, this

9  is now March.  You say to Mike, "Can you do the sig"?

10  A.    Yes.

11  Q.    So you're asking Mike if he can do the signature?

12  A.    Yes.

13  Q.    And you say, "And use the same rules as PMS.  Just change

14  the name and address"?

15  A.    Yes.

16  Q.    So PMS, that is Promotional Marketing Solutions?

17  A.    I believe so, yes.

18  Q.    And that's the company that was in Patti Kern's husband's

19  name?

20  A.    Yes.

21  Q.    And you were involved in creating the promotions for that

22  company?

23  A.    I don't recall that.

24  Q.    No?

25          MR. BROWN:  Can we pull up Exhibit 9000, please.

**41**

1  Can you blow that up a little.

2  BY MR. BROWN:

3  Q.    So do you recognize these emails?

4  A.    Yes, between me and Patti Kern.

5  Q.    And at the bottom, this is between you and Mike

6  Ladomerszky, September 9, 2011?

7  A.    Yes.

8  Q.    And the subject is "New promotion for PMS"?

9  A.    That's correct.

10  Q.    And that's Promotional Marketing Services -- Solutions?

11  A.    Yes.

12  Q.    That's Patti Kern's husband's company?

13  A.    Yes.

14  Q.    And you say to Mike, "Here is the artwork of an old

15  promotion that the client wants to rewrap"?

16  A.    Yes.

17  Q.    So you are sending to Mike a PMS promotion to be

18  rewrapped?

19  A.    As I recall, under the direction of Patti Kern, yes.

20  Q.    Right, but you were involved in the creation?

21  A.    Right.  She wanted different artists, different looks.

22  Q.    Right.  And you played your role by providing the stock

23  promotion to Mike Ladomerszky to customize it to make it a PMS

24  promo?

25  A.    Right.  That particular rewrap, I think, was given to me

1  by Patti Kern.

2  Q.    And then you provided it to Mike Ladomerszky?

3  A.    Yes.

4        MR. BROWN:  Let's look at 9019, please.  Do you want

5  to make that bigger, please, Brian.

6  BY MR. BROWN:

7  Q.    So at the bottom of the page, this is again from you to

8  Mike Ladomerszky?

9  A.    Yes.

10 Q.    And the subject is "PMS-05 first draft"?

11 A.    Yes.

12 Q.    So that's going to be the fifth promo for PMS, which is

13 Patti Kern's husband's company?

14 A.    That's correct.

15 Q.    And you were telling Mike Ladomerszky to make some

16 changes to this promo?

17 A.    Right.

18 Q.    And you tell him specifically, "The promotion has to say

19 Promotional Marketing Solutions, Inc., not PMS"?

20 A.    Right.

21 Q.    And then you tell Mike, "The banks are getting pretty

22 sticky on this now"?

23 A.    That's correct.

24 Q.    Okay.  Does that refresh your recollection about how you

25 were involved in these PMS solicitations?

1  A.     Yes.

2  Q.     Okay.

3         MR. BROWN:  All right.  Let's go back to 9004, Page

4  1.

5  BY MR. BROWN:

6  Q.     Okay.  So you've just told Mike that we're going to use

7  the same rules as PMS?

8  A.     Yes.

9  Q.     The company we just discussed?

10 A.     Yes.

11 Q.     And then Mike emails you and he says, "The PMS start and

12 end dates seem a little close," and he asks if those are the

13 dates you want to use?

14 A.     Yes.

15 Q.     And then you say, "You are correct, sir.  Let's do

16 December 31, 2013"?

17 A.     That's correct.

18 Q.     So you're the one that's deciding what the dates, the

19 deadline is, I guess, to respond to this promotion?

20 A.     That is -- yes.

21 Q.     Okay.  And then at the top of the page, you email Patti

22 Kern?

23 A.     Yes.

24 Q.     So after you and Mike Ladomerszky have gone through the

25 details and what exactly is going to appear in this promotion,

**44**

1  you email it to Patti Kern for her review and approval?

2  A.    That's correct.

3  Q.    And you tell her, "Sent over the artwork for AAS-01 to

4  Edgar and Paco"?

5  A.    Yes.

6  Q.    And Edgar is who?

7  A.    Edgar is the general manager for Epi's company.

8  Q.    Okay.

9  A.    Paco is the pre-press man for --

10 Q.    Okay.  So you and Mike have created this promo, Patti has

11 blessed it, and now you're telling Patti you've sent it to

12 printing at Epi's place?

13 A.    Right.  I sent the artwork over, final artwork for

14 printing.

15 Q.    Okay.  In all of these emails, no one emails Mr. Mendez?

16 A.    That's correct.

17 Q.    No one even mentions Mr. Mendez?

18 A.    Doesn't look like it, no.

19 Q.    All right.  Let's talk about the second promotion.

20        MR. BROWN:  If we could look at 9005, please.

21 BY MR. BROWN:

22 Q.    All right.  Do you recognize these?

23 A.    Between myself and Patti Kern.

24 Q.    And at the bottom is who?

25 A.    Mike Ladomerszky again.

**45**

1  Q.    Right, Mike Ladomerszky again.  So the subject is AAS-02?

2  A.    That's correct.

3  Q.    That means the second promo for AAS?

4  A.    Yes.

5  Q.    And then there are parens, "PMS-06"?

6  A.    That's correct.

7  Q.    And what that means is you're using Patti Kern's

8  husband's sixth promotion and you're turning it into AAS's

9  second promotion?

10 A.    That's correct.

11 Q.    Okay.  So here's what you write to Mike Ladomerszky:

12 "Here is some more of the edits.  Of course, change to AAS

13 address and name," correct?

14 A.    That's correct.

15 Q.    And you want the word "check"?  You don't like the

16 European spelling there, I guess.  You want it C-H-E-C-K?

17 A.    Yes.

18 Q.    And then you suggest some changes to the language --

19 A.    That's correct.

20 Q.    -- right?

21        What do you tell him you want this to read instead?

22 A.    "Instead of wallet, it's a sponsored awards entitlement,

23 or something like that."

24 Q.    And then you suggest a dollar amount?

25 A.    That's correct.

1  Q.    How much?

2  A.    $2.5 million.

3  Q.    And then you say, "Let me know if you need more copy on

4  the edits, and I will type something up to copy and paste.

5  It's the same old stuff.  Report to people register for

6  millions in sponsored sweepstakes that have to be paid by law,

7  blah, blah, blah"?

8  A.    That's correct.

9  Q.    So when you're talking about copy, what you're talking

10  about is the language that's going to go in this promotion,

11  right?

12  A.    Right, the paragraphs.

13  Q.    The paragraphs.

14        And you say to Mike, "Let me know if you need more

15  of this, and I will type something up"?

16  A.    Right.  Mike was good at the art but not the words.

17  Q.    You're good at the words?

18  A.    I learned the words through my 20 years of experience.

19  Q.    Right.  And in this, you're saying, "I'll type something

20  up"?

21  A.    If necessary, yes.

22  Q.    And then kind of in the middle of the page, Mike emails

23  you back, "Hey Sean, Here are the changes.  Let me know if

24  there are any others," right?

25  A.    That's correct.

1  Q.    Then you email it to Patti.  At the top of the page,
2  "Please check this over carefully," you tell her.  "Let me know
3  what you think"?
4  A.    That's correct.
5  Q.    And she says to you, "This looks good.  Let's try it"?
6  A.    Yes.
7  Q.    Let's talk about the third and fourth promotions.
8          MR. BROWN:  9006, please, Brian.
9  BY MR. BROWN:
10 Q.    Do you recognize these?
11 A.    Looks about the same as the previous; me, Patti and Mike
12 Ladomerszky.
13 Q.    Right.  Only real difference here is this is for AAS-03,
14 right, AAS's third promotion?
15 A.    Yes.
16 Q.    So if we go to Page 4, this is the very first email in
17 this chain.  So this is May 25, 2012, you are e-mailing Michael
18 O'Connor -- I'm sorry -- Mike Ladomerszky, and you say, "Hey
19 bro, The best two promos to redo for AAS are PMS-02 and
20 PMS-04"?
21 A.    That's correct.
22 Q.    Right.  So what you're saying is, I want to take the
23 promotions from Patti Kern's husband, the second and fourth
24 promotions, and I want to redo them and I want to make them
25 into AAS promotions?

1  A.    Yes.

2           MR. BROWN:  All right.  Let's go to Page 3, please.

3  BY MR. BROWN:

4  Q.    So the bottom of Page 3 he says, "Okay, Sean, I'll get

5  started on them ASAP.  Are these redesigns or just graphic

6  lifts/tweaks"?

7  A.    Yes.

8  Q.    And then you say to him, "Change graphics and addresses.

9  Keep layout the same"?

10  A.    That's correct.

11  Q.    And then you tell him, "We just don't know what the PO

12  actually has of PMS"?

13  A.    That's correct.

14  Q.    So what you mean by this is you want to use some

15  promotions from Patti Kern's husband's company?

16  A.    Yes.

17  Q.    But you knew that that company had been caught and that

18  he had to sign a cease and desist order?

19  A.    Yes.

20  Q.    And you knew that that meant that the Post Office had

21  copies of his promotions?

22  A.    As far as I understand it, they could have, yes.

23  Q.    Right.  But you just didn't know exactly what they had?

24  A.    That's correct.

25  Q.    So you had to change them enough so that if the Post

1  Office, postal inspector, saw them, they wouldn't immediately

2  identify them as these promos that had been previously

3  identified as fraudulent?

4  A.     Yes.

5  Q.     You need to tweak them just enough so that they look new?

6  A.     Yes.

7  Q.     But they still perpetuate the fraud?

8  A.     They still perpetuated, I'm sorry, what?

9  Q.     They're still fraudulent?

10 A.     Yes.

11 Q.     But they look just new enough so that they might not get

12 caught?

13 A.     Yes.

14        MR. BROWN:  Okay.  Let's go to Page 2.

15 BY MR. BROWN:

16 Q.     So at the bottom of Page 2 -- Mike, of course, takes your

17 direction, makes the changes you suggest?

18 A.     Yes.

19 Q.     Then he sends something back to you which you forward to

20 Patti, right?

21 A.     That's correct.

22 Q.     And you tell Patti, "Take a look"?

23 A.     Yes.

24 Q.     And she says, "This looks good but needs to say payable

25 to Advanced Allocation Systems, Inc."?

1  A.    Yes, that's correct.

2  Q.    So then you relay that to Mike Ladomerszky?

3  A.    Yes.

4  Q.    And he presumably makes the changes?

5  A.    Yes.

6         MR. BROWN:  Let's look at Page 1 now.

7  BY MR. BROWN:

8  Q.    So in the middle of Page 1, this is from Mike Ladomerszky

9  to you, telling you some details of the promo.  Then at the

10 top, you send it to Patti Kern and you tell her, "Here you go,

11 AAS-03."  And then you ask her, "Going to Western with this

12 one?"

13 A.    That's correct.

14 Q.    That's Western Mailing Services?

15 A.    Yes.

16 Q.    And that's a company here in Las Vegas that did printing

17 and mailing?

18 A.    Yes.

19 Q.    So what you're asking Patti is if she's going to go to

20 someone other than the Castros for this promotion?

21 A.    That is correct.

22 Q.    And then she says to you she's going to get a quote from

23 Western to see the difference?  Last sentence --

24 A.    That's correct.  Yes, I see it now.

25 Q.    All right.

1        MR. BROWN:  Let's look at 9007.

2   BY MR. BROWN:

3   Q.    So at the bottom of the page, the subject is still "PMS

4   to AAS"?

5   A.    Yes, the change is still continuing.

6   Q.    Right, because what you're doing here is you're taking

7   Patti Kern's husband's promos and you're turning them into AAS

8   promos?

9   A.    That's correct.

10  Q.    So you say -- Mike sends you an AAS-04 for your review?

11  A.    Yes.

12  Q.    And then up at the top, you forward this to Patti and you

13  say, "Bad news anyway.  AAS Number 2 is still not printed"?

14  A.    That's correct.

15  Q.    And then she responds, "You give me the word, and AAS

16  will be done elsewhere and we can start making some money"?

17  A.    That's correct.

18  Q.    "Elsewhere" means other than the Castros' place?

19  A.    That's correct.

20  Q.    And "we" is you and Patti?

21  A.    And Jose Luis Mendez.

22  Q.    He's not in any of these emails, is he?

23  A.    But he is making the money.

24  Q.    He's not in any of these emails?

25  A.    He's not in any of the emails.

1  Q.    He's not even mentioned in any of these emails?

2  A.    But it was understood.

3  Q.    He's not even mentioned in any of these emails?

4  A.    He's not mentioned in the emails.

5  Q.    Now, there's lots of emails between you and Patti Kern

6  about these AAS promotions.  You would agree with that?

7  A.    Yes.

8  Q.    In fact, every single AAS promotion that was sent out was

9  a result of emails between you and Mike Ladomerszky and Patti

10 Kern?

11 A.    Yes.

12 Q.    And in all of those emails, not a single one of them is

13 to Mr. Mendez?

14 A.    Yes.

15 Q.    There is not one to Mr. Mendez, correct?

16 A.    There is not one to Mr. Mendez.

17 Q.    And Mr. Mendez is not mentioned at all ever in any of

18 those emails, correct?

19 A.    In those emails, that is correct.

20 Q.    All right.  Let's switch topics and talk about AAS's

21 d/b/a's.  Now, you know that one of AAS's d/b/a's was

22 Distribution Reporting Services?

23 A.    That sounds correct.

24 Q.    And I think the Government showed you an email between

25 you -- or maybe it was me -- Mike Ladomerszky and Patti Kern

**53**

 1  which was going to be sent under the name DRS.  Does that sound
 2  right?

 3  A.    That sounds right.

 4  Q.    And another d/b/a of AAS was Pacific Disbursement
 5  Reporting.  Does that sound right?

 6  A.    I'm sorry.  What was the first word you said?

 7  Q.    Pacific Disbursement Reporting, PDR.

 8  A.    I believe so, yes.  I remember that name.

 9        MR. BROWN:  Let's look at Exhibit 9008, please.

10  BY MR. BROWN:

11  Q.    These are your emails?

12  A.    Yes, between me and Patti Kern.

13  Q.    Well, the first email at the bottom is between you and
14  Ricardo Gonzalez, correct?

15  A.    Ricardo Gonzalez, correct.

16  Q.    So you tell Ricardo, "Jose needs a new d/b/a for Advanced
17  Allocation Systems"?

18  A.    That's correct.

19  Q.    Then you tell Ricardo what the d/b/a is?

20  A.    Yes.

21  Q.    And you say, "He needs this ASAP to keep things moving"?

22  A.    That's correct.

23  Q.    Then you email Patti Kern and you say, "New d/b/a for AAS
24  hopefully"?

25  A.    Yes.

**54**

1  Q.    And she responds to you, "Not going to work"?

2  A.    That's correct.

3  Q.    She explains, "Bank of America will only allow one d/b/a

4  per company, and you already have one, DRS"?

5  A.    That's correct.

6  Q.    Mr. Mendez isn't in on any of these emails, is he?

7  A.    No.

8  Q.    He's not even mentioned in these emails?

9  A.    He is mentioned at the second email.

10  Q.    You're right, he's mentioned.  He's not included?

11  A.    Correct.

12  Q.    Let's talk about the money you made from AAS.  So I think

13  the Government asked you, and you said you had a company called

14  On The Side?

15  A.    That's correct.

16  Q.    On The Side never sent any sweepstake solicitations?

17  A.    That's correct.

18  Q.    But On The Side did receive money from AAS?

19  A.    Yes.

20        MR. BROWN:  Let's look at Exhibit 911, please.

21        MR. GREEN:  9011?

22        MR. BROWN:  Yes, 9011.  Can you just scroll through

23  that?

24  BY MR. BROWN:

25  Q.    Do you recognize these, Sean?

1  A.    Yes.

2  Q.    And what are these?

3  A.    These are disbursement checks from AAS to On The Side.

4          MR. BROWN:  Let's look at 9012.  Can you scroll

5  through that for the witness, please, Brian.

6  BY MR. BROWN:

7  Q.    Do you recognize these?

8  A.    Yes.

9  Q.    What are these?

10 A.    More disbursement collection for On The Side.

11 Q.    From a different bank account, though, right?

12 A.    Well, they all look like AAS, but I didn't see the --

13 Q.    Yeah.  So if you look at the check, the numbers at the

14 bottom of the check --

15          MR. BROWN:  Do you want to blow that up, Brian?

16 BY MR. BROWN:

17 Q.    The last four of this account, 7977, right?

18 A.    Yes.

19 Q.    Then if we look at the prior exhibit, 9011 --

20 A.    Yes.

21 Q.    -- different account number?

22 A.    That's correct.

23 Q.    All told, you got about $67,695 in checks directly from

24 an AAS bank account.  Does that sound right?

25 A.    That sounds right.  I never added it up.

56

1   Q.    Do you have any reason to think that's wrong, though?

2   A.    No.

3   Q.    Now let's talk about your cooperation with the

4   Government.  We saw those checks, and they were dated as late

5   as 2016?

6   A.    That's correct.

7   Q.    That's when you were getting money directly from AAS?

8   A.    Yes.

9   Q.    What also happened in 2016 is you were interviewed by the

10  Government?

11  A.    Yes.

12  Q.    July 27, 2016?

13  A.    Yes.

14  Q.    You had an interview at the U.S. Attorney's Office here

15  in Las Vegas?

16  A.    Yes.

17  Q.    Mr. Finley was there?

18  A.    Yes.

19  Q.    Mr. Zytnick was there?

20  A.    I'm not sure.  I believe so.

21  Q.    Okay.  And a postal inspector was there?

22  A.    Yes.

23  Q.    And that same day, July 27, 2016, you testified in front

24  of the grand jury?

25  A.    Yes.

1  Q.    And you said you testified about your fraud with Burke?

2  A.    Yes.

3  Q.    You said it was very stressful?

4  A.    Yes.

5  Q.    You said you felt like you dodged a bullet?

6  A.    That's correct.

7  Q.    Now, in your plea agreement and when you were answering

8  questions for the Government, you admitted you continued to

9  commit fraud up through 2018?

10  A.    That's correct.

11  Q.    So that means in 2016 your fraud is in full swing?

12  A.    Yes.

13  Q.    So while you're talking to the Government in 2016, you're

14  also committing fraud?

15  A.    That's correct.

16  Q.    And while you're testifying in front of the grand jury in

17  2016, you're also committing fraud?

18  A.    That's correct.

19  Q.    Now, I think you said you started working nights in 2014

20  at the Castros' place?

21  A.    Yes.

22  Q.    So in 2016, you're only doing nights at the letter shop;

23  is that right?

24  A.    Nights and some mornings, yes.

25  Q.    Nights and some mornings.  So during the day in 2016,

1  you're meeting with the Government and testifying in front of

2  the grand jury, and at night you're committing fraud?

3  A.    That's correct.

4  Q.    And that continued for at least another year, through

5  2017 and up until 2018?

6  A.    That's correct.

7          MR. BROWN:  Thank you.  Pass the witness, Your

8  Honor.

9          THE COURT:  Let's go ahead and take our --

10          MR. GAFFNEY:  Your Honor, can we --

11          THE COURT:  I'm sorry.  Mr. Gaffney, do you mind if

12  we take our morning break first?

13          MR. GAFFNEY:  I was going to suggest that.

14          THE COURT:  Okay.  We're going to go ahead and take

15  our morning break.  During the break, I will remind the jury,

16  you are not to speak to each other about this case.  You can

17  talk to each other about other things but not anything touching

18  upon this case.

19          Also, remember you are not to talk to the attorneys

20  or the parties or the witnesses in this case at all about

21  anything.

22          Please do not listen to or read or review anything

23  that touches upon this case in any way.  Do not attempt to

24  perform any independent research or investigation and please do

25  not form any opinions.

1              It's 10:30, so we'll go ahead and stand for the

2    jury, as they are the judge of the facts, and we'll welcome

3    them back at 10:45.

4              Mr. O'Connor, after the jury exits, you may also

5    stretch, take your morning break.  We need you back here at

6    10:45, sir.

7              (Jury out at 10:29 a.m.)

8              THE COURT:  All right.  So we'll take a break until

9    10:45.  I did briefly review a motion that was filed by Mr.

10   Ericsson, and I think I'm setting the briefing schedule for a

11   response by Monday, but you all know better than I do if it

12   needs to be done sooner or not.  So I'm just kind of letting

13   you know so you can think about that over the break and then

14   tell me afterwards.

15             MR. ERICSSON:  Thank you, Your Honor.

16             THE COURT:  All right.  So we'll see you at 10:45.

17             (Recess from 10:29 a.m. to 10:48 a.m.)

18             THE COURT:  Thank you.  You may be seated.  Can we

19   have Mr. O'Connor back on the stand?  Do we have everybody?

20   Okay.  We're going to bring in the jury.

21             (Jury in at 10:48 a.m.)

22             THE COURT:  All right.  Everyone may be seated.

23   We're joined by the jury.  We have the witness Mr. O'Connor

24   back on the stand, and now we're going to begin

25   cross-examination by Mr. Gaffney on behalf of Mr. Miguel

1    Castro.

2            Go ahead.

3            MR. GAFFNEY:  Thank you, Judge.

4                          CROSS-EXAMINATION

5    BY MR. GAFFNEY:

6    Q.    Good morning, Mr. O'Connor.

7    A.    Good morning.

8    Q.    So if I remember correctly, you received a target letter

9    sometime in 2018?

10   A.    That's correct.

11   Q.    And that was letting you know that you were a target,

12   potentially a target, in this case, right?

13   A.    Yes.

14   Q.    And it also invited you to come in and talk to the

15   Government, correct?

16   A.    That's correct.

17   Q.    And you did that voluntarily, right?

18   A.    Yes.

19   Q.    You were never arrested or placed in handcuffs?

20   A.    That's correct.

21   Q.    They just asked you to come in and talk to -- they asked

22   you to come in and talk to them, and that's what you did?

23   A.    That's correct.

24   Q.    And the first interview you had was in May of 2018.  Does

25   that sound right?  Was it -- did it take place at a Post

1  Office?

2  A.    As I recall, the first interview I had was in front of my

3  house.

4  Q.    Okay.  Eventually did you have an interview in May of

5  2018 that took place at a Post Office?

6  A.    I met with them twice.  It could have been May, yes.

7  Q.    And during that meeting, was Postal Inspector Bouchie

8  present?

9  A.    Barry?  Yes.

10 Q.    And I would assume that he told you, "When you talk to

11 us, you need to tell us the truth," right?

12 A.    That's correct.

13 Q.    And that's probably an admonition that you get every time

14 you talk to the Government, right?

15 A.    Yes.

16 Q.    And so after you meet with postal inspectors in May of

17 2018, eventually you enter into what's called a proffer

18 agreement, right?

19 A.    I'm sorry, what?

20 Q.    A proffer agreement.

21 A.    A plea agreement?

22 Q.    A proffer agreement.

23 A.    Proffer.

24 Q.    Do you recall that?  An agreement where you tell the

25 Government, "I will talk to you and provide information in

 1  furtherance of your investigation"?

 2  A.    Yes.

 3  Q.    Okay.  It's different than a cooperation agreement.  Do

 4  you understand that?

 5  A.    Yes.

 6  Q.    Okay.  And eventually, in August of 2018, you enter into

 7  a plea agreement, right?

 8  A.    That's correct.

 9  Q.    And so that's almost a full year, over a year after all

10  the search warrants in this case are executed, right?

11  A.    Yes.

12  Q.    And pursuant to your plea agreement, you pled guilty to

13  one count of conspiracy to commit mail fraud, right?

14  A.    That's correct.

15  Q.    And you understand the penalties you're facing by

16  pleading to that charge, don't you?

17  A.    Yes.

18  Q.    You understand there's a maximum sentence that you could

19  receive of up to 20 years?

20  A.    That's correct.

21  Q.    And there's also a potential fine that goes along with

22  that, right?

23  A.    That's correct.

24  Q.    And what the plea agreement does is it acts like a

25  recommendation to the sentencing judge, correct?

**63**

1  A.    That's my understanding, yes.

2  Q.    So the sentencing judge doesn't have to follow the

3  recommendation in the plea agreement.  Is that your

4  understanding?

5  A.    Yes.

6  Q.    Okay.  And Judge Navarro is not your sentencing judge.

7  Do you know that?

8  A.    I did not know that.

9  Q.    Okay.  Do you know who your sentencing judge is?

10  A.    I am not sure.

11  Q.    Does Jennifer Dorsey sound familiar?

12  A.    Yes.

13  Q.    So pursuant to the plea agreement that you entered into

14  with the Government, the sentencing guidelines recommended a

15  sentence between 63 and 78 months.  That's the best you could

16  do pursuant to the plea agreement as it stands now.  Is that

17  your understanding?

18  A.    Yes.

19  Q.    And one of the components of that plea agreement is

20  calculating a loss amount for the money that the victims gave

21  pursuant to this fraud, right?

22  A.    That's what it's based on is the number, as I understand

23  it.

24  Q.    And you know that your loss amount is capped at

25  $9.5 million?

1  A.    The paperwork I saw said 8.5, but I -- it could have

2  changed.

3  Q.    Your understanding is the loss amount for you is capped

4  at $8.5 million?

5  A.    That's correct.

6  Q.    All right.  And you understand that you also received a

7  potential sentencing reduction for a minor role?

8  A.    Yes.

9  Q.    Okay.  Meaning that you played a minor role in this

10  alleged conspiracy, right?

11  A.    That's correct.

12  Q.    And that was a sentencing recommendation that both you

13  and the Government agreed upon, correct?

14  A.    Yes, along with my lawyer.

15  Q.    And so if nothing changes with that guideline range,

16  potentially you're looking at a 63-month sentence?

17  A.    As far as I understand it, yes.

18  Q.    And that's because the Government agreed to recommend the

19  low end of that sentencing range, right?

20  A.    That's correct.

21  Q.    Okay.  So potentially a little over five years?

22  A.    As I understand it, yes.

23  Q.    And you're free to ask the Court to impose a lower

24  sentence, right?

25  A.    At my sentencing time, yes.

1  Q.    But, understandably, that might be a tough sell,
2  considering your 20-year history of fraud, right?
3  A.    That's correct.
4  Q.    And that's why getting the Government to recommend a
5  lower sentence would be extremely beneficial to you, wouldn't
6  it?
7  A.    Of course.
8  Q.    On the same day you entered your plea, were you taken
9  into custody?
10 A.    I don't remember exactly the order of things.  When I
11 came here, I did get taken into custody and processed,
12 fingerprinted, photo, but I didn't sit in a jail cell, if
13 that's what you mean.
14 Q.    Right.  And you haven't spent any time in jail other than
15 the booking process?
16 A.    That's correct.
17 Q.    Okay.  And the Government, as far as you know, hasn't
18 sought to detain you pending sentencing, right?
19 A.    That's correct.
20 Q.    So you have a cooperation agreement with the Government,
21 don't you?
22 A.    Yes.
23 Q.    And that requires you to cooperate with the Government in
24 the prosecution of these defendants, correct?
25 A.    That's correct.

1  Q.    And if the Government believes that you have not provided

2  full and truthful cooperation, it can inform the Court that you

3  have breached the plea agreement, right?

4  A.    That's correct.

5  Q.    And whether they decide that you've breached the plea

6  agreement is left up to their sole discretion, right?

7  A.    Yes.  The Government decides if I have breached the

8  agreement.

9  Q.    So if the Government says you breached the plea

10 agreement -- or excuse me -- the cooperation agreement, there's

11 really nothing that you can do to try to push back on that,

12 right?

13 A.    I haven't been advised by a lawyer what I can do at that

14 point, no.

15 Q.    And if the Government decides that you've breached the

16 plea agreement in some way, then the Government no longer has

17 to stand by its sentencing recommendation, which is potentially

18 63 months, right?

19 A.    As far as I understand it, yes.

20 Q.    And if the Government decides you've breached the plea

21 agreement, they can even prosecute you for additional crimes,

22 right?

23 A.    As far as I understand it, yes.

24 Q.    And given your involvement with these fraudulent prize

25 notices for 20-plus years, that could be extremely detrimental

**67**

1  to your potential sentence, correct?

2  A.    That is correct.

3  Q.    You'd be facing a lot more charges than what you

4  currently pled to, right?

5  A.    As I understand it, yes.

6  Q.    The Government could also add sentencing enhancements to

7  the conspiracy to commit mail fraud that you've already pled

8  to?

9  A.    That's correct, yes.

10 Q.    And sentencing enhancements would increase the sentencing

11 range that you're looking at, right?

12 A.    Yes.

13 Q.    So the Government wields a lot of power when it comes to

14 what sentence to recommend to the Court.  Fair?

15 A.    That's fair.

16 Q.    At your sentencing -- or before your sentencing, the

17 Government can inform the Court that you provided substantial

18 assistance in their case.  That's what you're hoping for,

19 right?

20 A.    Yes.

21 Q.    And that would be what's referred to as 5K cooperation?

22 A.    As I understand it, yes.

23 Q.    You're familiar with that term?

24 A.    I've heard it.

25 Q.    And so if the Government files a 5K -- or a motion for 5K

**68**

 1  cooperation, it can recommend a sentence much lower than 63
 2  months, right?
 3  A.    As I understand it, they can recommend, yes.
 4  Q.    And that's solely within their discretion?
 5  A.    The recommendation, yes, but as I understand it, the
 6  judge -- sentencing judge decides about my sentence.
 7  Q.    And you want the Government to recommend a lower
 8  sentence, right?
 9  A.    Of course.
10  Q.    And you haven't been sentenced yet?
11  A.    I have not.
12  Q.    As you sit here today, you don't know what your sentence
13  might be?
14  A.    I do not know, yes.
15  Q.    You've got a lot riding on this, don't you?
16  A.    Yes.
17  Q.    And, understandably, you're scared that you could spend a
18  lot of time in prison?
19  A.    That's my understanding.
20  Q.    So as you sit here and testify today, you kind of have,
21  like, a sword hanging over your head.  Is that fair?
22  A.    That's fair.
23  Q.    So you have a huge incentive to make sure the Government
24  is happy by the time you get to sentencing, correct?
25  A.    Can you repeat the question?

**69**

1  Q.    You have a huge incentive to make sure that the

2  Government is happy with the assistance you provided by the

3  time you get to sentencing?

4  A.    That's correct, and make the recommendation for me.

5  Q.    There's been a lot of testimony about Glen Burke.  I just

6  want to talk about him for a minute.  You had testified that

7  Glen Burke was shut down in 2013, right?

8  A.    Yes.

9  Q.    And when his office was shut down, you just happened to

10 be going there for some purpose; is that correct?

11 A.    That's correct.

12 Q.    And when you saw all these Federal agents at Burke's

13 office, you said to yourself, oh, he's in trouble; is that

14 correct?

15 A.    That's my testimony, yes.

16 Q.    And at the time, you didn't know what Glen Burke was in

17 trouble for; is that right?

18 A.    That's correct.

19 Q.    Because you knew that he was engaged in different kinds

20 of fraud, correct?

21 A.    That's correct, yes.

22 Q.    One of the things that he was engaged in was

23 telemarketing fraud, right?

24 A.    Yes.

25 Q.    Yesterday the Government asked if you knew whether Glen

1  Burke had been charged with a crime, and your answer was, "I

2  believe so."  Do you know what Glen Burke was charged with?

3  A.    I don't remember exactly what he was charged with, no.

4  Q.    If I told you that he was charged with one count of

5  conspiracy to commit wire fraud and mail fraud and 16 counts of

6  wire fraud for a telemarketing scheme, would that surprise you?

7  A.    Not at all.

8  Q.    And did you know that the telemarketing scheme involved

9  calling victims rather than mailing them prize notifications?

10  A.    As I understand it, yes.

11  Q.    And so the fraud there was deceiving victims into

12  purchasing inexpensive vitamins.  Did you know that?

13  A.    I didn't really understand the telemarketing business,

14  but as I understood it through talking to Glen and other people

15  and worldly knowledge, that's what happens.

16  Q.    And Glen Burke was promising these victims things like --

17  if they were to purchase the vitamins, he was promising things

18  like a new car?

19  A.    I have no idea.

20  Q.    Okay.  But you're aware that the criminal charges that he

21  was facing have nothing to do with prize notifications, aren't

22  you?

23            MR. FINLEY:  Your Honor, I need a sidebar on this.

24            THE COURT:  All right.  Let's go over to sidebar.

25            (The following proceedings were held at the bench,

 1  outside the hearing of the jury.)

 2          THE COURT:  Go ahead, Mr. Finley, you wanted a

 3  sidebar?

 4          MR. FINLEY:  Yes.  The representations that Mr.

 5  Gaffney is making are inaccurate.  There is a count in Mr.

 6  Burke's indictment that includes the prize notice mailings that

 7  he was doing with Sean O'Connor, and it's a criminal contempt

 8  charge, but the conduct is fraudulent mail prize notices.  He

 9  was doing this in violation of the prior Federal order, so

10  that's how we did the count, but the underlying conduct is

11  exactly the conduct that I've been asking Sean O'Connor about

12  with Glen Burke.  So that's not correct.

13          I would like that -- this is something that can be

14  taken judicial notice of.  I'm -- you know, there's been a lot

15  of misrepresentations to the jury, and I'm not saying it's

16  intentional or anything, but I just think that it's causing a

17  lot of confusion.

18          THE COURT:  So is that your understanding, too, Mr.

19  Gaffney, that while the charge for Mr. Burke was not mail

20  fraud, there is a contempt charge that relates to the

21  conspiracy in this case?

22          MR. GAFFNEY:  There is a contempt charge.

23          THE COURT:  Does the contempt charge relate to the

24  conduct in this case?

25          MR. GAFFNEY:  Well --

1          THE COURT:  The businesses with the co-defendants?

2          MR. GAFFNEY:  It relates to Sean O'Connor.  It

3    doesn't relate to the defendants in this case.

4          THE COURT:  Okay.

5          MR. FINLEY:  That's not correct.

6          MR. GAFFNEY:  Well, the jury has heard or has been

7    basically told that Glen Burke was, like, a cautionary tail,

8    that because he was doing prize notification fraud, that the --

9    and Mr. O'Connor testified about it, that the defendants should

10   have known that there was a prize notification -- but that the

11   prize notifications were illegal, but I think the jury needs to

12   know that the main charges that Glen Burke was facing had to do

13   with a telemarketing scheme and not necessarily the prize

14   notifications.

15         THE COURT:  But if you are representing to the jury

16   through this witness that there was no charge for the

17   conduct --

18         MR. FINLEY:  Yes, that was my question.

19         THE COURT:  That was the problem.

20         MR. GAFFNEY:  Well, I was telling the telemarketing

21   scheme.

22         THE COURT:  Because that would be a

23   misrepresentation.

24         MR. GAFFNEY:  The telemarketing scheme had nothing

25   to do with the prize notifications, and that is the vast

1  majority of the charges that he was facing.  If the Court wants

2  to take judicial notice, I'll move away from this line of

3  questioning.

4          THE COURT:  Well, I'll give you a chance to clarify

5  it with the witness if you want to, but otherwise I think I do

6  need to clarify it.  It would probably be easier for you to

7  clarify it so it doesn't sound like I'm correcting you.

8          MR. GAFFNEY:  Well, and he never answered the

9  question, so I can also just withdraw that last question.

10          THE COURT:  Would that be sufficient?

11          MR. FINLEY:  Your Honor, that's not adequate.  I am

12  fine with Mr. Gaffney clarifying if it's a real clarification.

13  There was a clarification earlier in this trial that was not a

14  clarification, but if he's going to do an actual real

15  clarification, that would be absolutely fine with me.

16          But just so everyone is clear on what happened, I

17  put Sean O'Connor in grand jury, I questioned him about the

18  prize notice mailings that he and the defendants were doing

19  with Glen Burke.  I didn't ask him about a telemarketing

20  scheme.  And then the Department of Justice charged Glen Burke

21  for exactly that conduct.  So this is just trying to confuse

22  the jury.  And the last question is inaccurate.  It's a

23  representation in the form of a question, and it's inaccurate.

24          THE COURT:  All right.  So I'll give you a chance to

25  correct it.  Otherwise, I'm going to have to read from the

 1 indictment what it was that was actually charged.

 2          MR. GAFFNEY:  Okay.

 3          THE COURT:  I'm not going to try to paraphrase it,

 4 so I'll have to pull it up and read it and refer to it by case

 5 number and docket number and all that.

 6          MR. GAFFNEY:  Okay.

 7          THE COURT:  So try to fix it yourself.  I think it

 8 will go over better.  Otherwise, I'll have to do it.

 9          MR. GAFFNEY:  Okay.

10          (The following proceedings were held in open court.)

11          THE COURT:  Go ahead, Mr. Gaffney.

12          MR. GAFFNEY:  Thank you.

13 BY MR. GAFFNEY:

14 Q.   Mr. O'Connor, I was asking you about the criminal charges

15 that Glen Burke was facing.  Do you remember that?

16 A.   Yes.

17 Q.   And I had asked you whether you were aware of what

18 criminal charges he was facing, right?

19 A.   Yes.

20 Q.   Were you aware that in addition to the telemarketing

21 scheme, Mr. Burke was also charged with one count of contempt

22 of court?

23 A.   I'm not aware of that.

24 Q.   And are you aware that that contempt of court charge had

25 to do with prize notifications that you had helped him with?

1  A.    I was not aware of that.

2  Q.    So Glen Burke is shut down in 2013, right?

3  A.    Yes.

4  Q.    You don't testify in his prosecution until July of 2016.

5  Is that fair?

6  A.    That's fair.

7  Q.    Okay.  So there's a three-year period between when you

8  know Glen Burke is shut down and then when you go in to

9  testify, right?

10 A.    Yes.

11 Q.    And are you aware that Glen Burke was also released on

12 his own recognizance like you?  Yes or no is fine.

13 A.    No.

14 Q.    Are you aware that Glen Burke eventually entered into a

15 guilty plea in December of 2017?

16 A.    Yes.

17 Q.    And are you aware that he didn't actually go to prison

18 until December of 2018?

19 A.    I didn't know that either.

20 Q.    So Glen Burke is shut down in 2013, right?

21 A.    Yes.

22 Q.    But he doesn't actually go to prison until December of

23 2018, correct?

24 A.    As I understand it now, yes.

25 Q.    Okay.  So he's out of custody that entire time.  Fair?

1    A.    Yes.

2    Q.    The scheme that you described was started by yourself and

3    Patti Kern in 2009, correct?

4    A.    The scheme that I described?

5    Q.    Well, so let me break that down.  2009 Patti Kern gets a

6    cease and desist order, right?

7    A.    Yes.

8    Q.    And at that time, your understanding is that she's

9    desperate, right?

10   A.    Yes.

11   Q.    She's been in the fraud business throughout her adult

12   life, right?

13   A.    Yes.

14   Q.    Doesn't know how to do anything else, as far as you know?

15   A.    As far as I know.

16   Q.    And when she comes to you, you tell her, "Hey, we can use

17   the Castros to send out prize notifications," right?

18   A.    Those are not my exact words.

19   Q.    Okay.  What were your exact words?

20   A.    I said, "If you're looking for partners, maybe try the

21   Castros."

22   Q.    That was your suggestion?

23   A.    Yes.

24   Q.    And the suggestion is to use the Castros, essentially,

25   as, as you described them, figureheads or straw owners?

 1              MR. FINLEY:  Your Honor, mischaracterizes the

 2    witness' prior answer.

 3              THE COURT:  I don't remember what the witness' prior

 4    answer was, so we'll let the jury decide.  What their

 5    recollection is is what counts.

 6    BY MR. GAFFNEY:

 7    Q.    When you talked to Patti Kern, you talked about opening

 8    up mailing companies, right?

 9    A.    When I talked to Patti Kern, we talked about continuing

10    to do the work, yes.

11    Q.    Okay.  And that included opening up mailing companies?

12    A.    Yes.

13    Q.    And opening up bank accounts?

14    A.    That was Patti's end.

15    Q.    Okay, that was Patti's idea.  And opening up mailboxes?

16    A.    Again, I just wanted to have -- to keep my job going.

17    Q.    Okay.  So you had a self interest, right?

18    A.    Yes.  Working for the Castros, I wanted to keep my

19    current job.

20    Q.    And you directed Patti to talk to Epi, right?

21    A.    That's correct.

22    Q.    And Epi owned his own print shop, New Generation

23    Graphics?

24    A.    Yes.

25    Q.    None of the defendants work there, right?  None of these

**78**

1  four defendants worked there at the time?

2  A.    I'm not sure about one of them.

3  Q.    You didn't work there, did you?

4  A.    No.

5  Q.    You weren't present for the conversation Patti Kern had

6  to get Epi on board with this fraud?

7  A.    That's correct.

8  Q.    And after Patti Kern enlists Epi in her fraud, she tells

9  you that she's ready to move forward, right?

10  A.    I don't remember who I heard it from, if it was Patti

11  directly or Epi, or just saw the promotion prize notice for me

12  to set up.

13  Q.    And you're not privy to the conversations that Epi had

14  with anybody about the plan that you and Patti Kern cooked up,

15  right?

16  A.    I'm not privy to her conversations with Epi other than

17  what she told me or Epi told me.  I don't think the term

18  "cooked up" is valid.

19  Q.    Okay.  So in regard to creating these prize notices that

20  we've seen, Patti Kern was basically in charge of that, right?

21  A.    Yes.

22  Q.    So you had testified that in between 2010 and 2018, you

23  always reported to Mario and Miguel.  Do you remember that?

24  A.    Yes.  They were my bosses.

25  Q.    They were your bosses at the letter shop?

1  A.    Correct.

2  Q.    But you don't need their permission to make any changes

3  to these promotions that you were -- you and Patti Kern were

4  creating, right?

5        Let me ask you this:  Mario and Miguel didn't design

6  any of these promotions that we've been talking about, did

7  they?

8  A.    No.

9  Q.    They never drafted any of the language in these prize

10 notifications, right?

11 A.    That's correct.

12 Q.    They never gave any input about the design?

13 A.    They did not.

14 Q.    Or the content?

15 A.    They did not.

16 Q.    Or the artwork?

17 A.    They didn't do that either.

18 Q.    They didn't have to approve the contents of these prize

19 notifications before they were mailed, right?

20 A.    I'm not sure about that.  I wasn't privy to their

21 conversations directly with Patti.

22 Q.    They didn't select the rules that go on the back of the

23 prize notifications, right?

24 A.    I was only privy to AAS on that one.

25 Q.    But the things I just described, those were all things

Case 2:19-cr-00295-GMN-NJK    Document 699    Filed 04/06/23    Page 80 of 108

1  that you had a hand in doing, correct, creating the prize

2  notifications?

3  A.    For AAS, yes, but the other multitude of companies, some

4  I had no part of.

5  Q.    Okay.  You were an account manager?

6  A.    That was my title.

7  Q.    You interacted with the clients?

8  A.    Yes.

9  Q.    You secured Dan Wagner as a client for the letter shop,

10 didn't you?

11 A.    No.

12 Q.    You managed his account?

13 A.    Yes.

14 Q.    You helped create his promotions?

15 A.    No.

16 Q.    Did you send him invoices for the work at the letter

17 shop?

18 A.    Yes.

19 Q.    Did you secure payment for the services rendered by the

20 letter shop?

21 A.    Did I send invoices?  Yes.

22 Q.    And was that money paid into your On The Side bank

23 account?

24 A.    That's correct.

25 Q.    You also managed the Glen Burke account, right?

1  A.    Yes.

2  Q.    You helped him create promotions?

3  A.    No.

4  Q.    Okay.  You sent him invoices for work done at the letter

5  shop?

6  A.    Yes.

7  Q.    And you also secured payments for services rendered,

8  right?

9  A.    I did the invoicing, yes.

10 Q.    Okay.  And was that money also paid into your On The Side

11 bank account?

12 A.    No.

13 Q.    You testified yesterday and today that Patti Kern decided

14 to bring you in as a partner for Advanced Allocation Systems,

15 right?

16 A.    That's correct.

17 Q.    Not Mario Castro, not Miguel Castro?

18 A.    Patti said she would give me her part direct.

19 Q.    So she brought you in, right?

20 A.    Yes.

21 Q.    That was her decision?

22 A.    That was her decision.

23 Q.    And you always discussed the creation and mailing of

24 these promotions with Patti Kern, correct?

25 A.    For AAS, yes.

**82**

 1   Q.    All right.  And she had the final word on what companies

 2   would be created, as far as you know?

 3   A.    Yes.

 4   Q.    She had the final word on what promotions to use?

 5   A.    As I understood it, yes.

 6   Q.    When the promotions would be scheduled to print?

 7   A.    She would give us dates on a fax of when we were supposed

 8   to mail them.  Scheduled to print, I believe she had directed

 9   Epi to do that directly.

10   Q.    Okay.  So not only scheduling them to print, but also

11   scheduling when the promotions would be mailed?

12   A.    Yes.

13         MR. GAFFNEY:  Brian, can we bring up Exhibit 175,

14   please.  And if you could zoom in on the portion that says,

15   "Hey Patti."

16   BY MR. GAFFNEY:

17   Q.    This is an email that the Government showed you

18   yesterday.  Do you remember this one?

19   A.    Yes.

20   Q.    And this is an email about trashing stock, right?

21   A.    That's correct.

22   Q.    Okay.  This is about trashing pre-printed forms?

23   A.    Yes.

24   Q.    And outers and inners, which would be -- is that the

25   envelopes?

1  A.    That's correct.

2  Q.    And you had testified that when you trash stock like

3  this, it results in a significant loss of money, correct?

4  A.    At this point, most of it was pre-paid, so the money was

5  already spent, but the work in -- afterwards, the money the

6  letter shop would have made is now going to be gone.

7  Q.    So some of the revenue is going to be lost?

8  A.    Correct.

9  Q.    And before you trashed these promotions, you're

10 confirming with Patti Kern that that's what needs to be done,

11 right?

12 A.    That is correct, because at the bottom, it says, "Epi

13 told the warehouse guy to trash these forms," and I'm

14 confirming with Patti, and this is correct.

15 Q.    So you hear from Epi that they need to -- you need to

16 trash some stock, and your response is to confirm that with

17 Patti Kern, right?

18 A.    Epi actually told the warehouse guy, and then the

19 warehouse guy said to me, "We need to trash all this stuff."

20 And then Patti --

21 Q.    But before it gets trashed, you want to confirm with

22 Patti Kern that that's what actually needs to happen?

23 A.    That's correct.

24 Q.    Okay.  Are Miguel Castro or Mario Castro copied on this

25 email?

1  A.    They are not.

2  Q.    In this email --

3       MR. GAFFNEY:  I think if you scroll to the bottom,

4  Brian.

5  BY MR. GAFFNEY:

6  Q.    -- are you also directing Patti Kern to send a check to

7  Mike for artwork?

8  A.    Yes.

9  Q.    So there is a discussion about sending a check to Mike

10 for artwork, there's a discussion about trashing stock for

11 these various mailing companies, and this is a conversation

12 compartmentalized between you and Patti Kern, right?

13 A.    The email, yes.

14 Q.    Miguel and Mario are not copied on this?

15 A.    They are not, but I would have told them, or the

16 warehouse guy would have told them --

17 Q.    But they're not copied on this email, right?

18 A.    They're not copied on this email.

19 Q.    You're confirming trashing the stock with Patti Kern?

20 A.    That's correct.

21       MR. GAFFNEY:  Can we go to Exhibit 185, please.

22 BY MR. GAFFNEY:

23 Q.    This is another email the Government showed you

24 yesterday.  It's also about trashing stock, right?

25 A.    Yes.

1   Q.    Trashing quite a bit of stuff, right?

2   A.    I don't remember the amount of stock, but it's definitely

3   a few companies.

4   Q.    And this is an email between you and Patti Kern, right?

5   A.    Yes.

6   Q.    Mario and Miguel are not copied on this email, correct?

7   A.    That's correct.

8         MR. GAFFNEY:  Can we go to Exhibit 171.

9   BY MR. GAFFNEY:

10  Q.    Do you remember looking at this email yesterday?

11  A.    Yes.

12  Q.    And this is an email between yourself and the graphic

13  designer where you're discussing the creation of a promotion,

14  right?

15  A.    Rewrapping a promotion, yes.

16  Q.    And, again, no Miguel, no Mario on this email?

17  A.    That's correct.

18  Q.    And you inform Patti Kern when the promotion's complete,

19  correct?

20  A.    Right.  I'm asking her to review it.

21        MR. GAFFNEY:  Could we look at Exhibit 90, please.

22  Excuse me.  190.

23  BY MR. GAFFNEY:

24  Q.    So we saw this email today.  This is an email where

25  you're trying to create a new d/b/a and you're contacting

1  Ricardo Gonzalez to do that, correct?

2  A.    That's correct.

3  Q.    And you let Patti Kern know what you're doing and to get

4  her approval, but she shoots the idea down.  She says, "No, you

5  can't do it this way," right?

6  A.    That's correct.

7  Q.    And the creation of this d/b/a is an email between you

8  and Patti Kern -- well, you, Patti Kern, and Ricardo Gonzalez,

9  right?

10  A.    Yes.  That's what the email chain is.

11  Q.    Okay.  So Miguel Castro, Mario Castro, not copied on this

12  email, right?

13  A.    That's correct.

14  Q.    Yesterday the Government showed you Exhibit 214.

15         MR. GAFFNEY:  If we could bring that up, Brian, and

16  go to Page 91.

17  BY MR. GAFFNEY:

18  Q.    And so this is the initial list of officers, directors,

19  registered agents for Marketing Image Direct, right?

20  A.    Yes.

21  Q.    And if you recall, yesterday the Government was asking

22  you questions about who the corporate officers are on this

23  document, right?

24  A.    Yes.

25  Q.    And it says it's Miguel M. Castro, right?

1    A.    Yes.

2            MR. GAFFNEY:  Now, Brian, can you zoom in on the box

3    in the upper right corner?

4    BY MR. GAFFNEY:

5    Q.    Do you see the "Filed on" date there?

6    A.    Yes.

7    Q.    And that's October 17, 2017?

8    A.    2012.

9    Q.    Excuse me.  2012?

10   A.    Yes.

11           MR. GAFFNEY:  Brian, can you zoom out?  And can you

12   zoom in on the portion that says "For the filing period of"?

13   It's upper left.

14           THE COURT:  I'm sorry.  I'm going to have to

15   interrupt you there.  I need to take a little break, about ten

16   minutes.  We'll go ahead and stand and let the jury go to the

17   jury room.  John, if you can show them to the jury room.

18           (Jury out at 11:26 a.m.)

19           THE COURT:  All right.  We're off record.

20           (Recess from 11:27 a.m. to 11:39 a.m.)

21           (Jury in at 11:40 a.m.)

22           THE COURT:  All right.  Everyone may be seated.

23   We're joined by the jury.  We have the witness Mr. O'Connor

24   back on the stand.  I apologize, everybody, for that

25   interruption.  We just had a little something we had to take

**88**

1  care of very quickly, but we're all ready to proceed now, Mr.

2  Gaffney.

3          MR. GAFFNEY:  Thank you, Your Honor.

4  BY MR. GAFFNEY:

5  Q.    Mr. O'Connor, when we left off, we were talking about

6  Exhibit 214?

7  A.    Yes.

8  Q.    This was an exhibit that was shown to you by the

9  Government yesterday.  You remember that, right?

10  A.    Yes.

11  Q.    And the corporate officers that are listed are all Miguel

12  M. Castro, right?

13  A.    That's correct, yes.

14          MR. GAFFNEY:  And, Brian, if you could zoom in again

15  on that upper right box, please.

16  BY MR. GAFFNEY:

17  Q.    This docket has a filing date of October 17, 2012, right?

18  A.    Yes.

19          MR. GAFFNEY:  And then, Brian, if you can then zoom

20  in on the other side of the page for the filing period.

21  BY MR. GAFFNEY:

22  Q.    So all the way at the top of the page, kind of to the

23  right, you see that there's a filing period there, right?

24  A.    Yes.

25  Q.    And it's October 2012 to October 2013, correct?

**89**

1  A.    Yes.

2  Q.    Okay.

3            MR. GAFFNEY:  Brian, can we now go to Page 89.  And

4  can you scroll down to where the corporate officers are?

5  BY MR. GAFFNEY:

6  Q.    And you see the corporate officers there are listed as

7  Miguel Castro, right?

8  A.    Yes.

9  Q.    Not Miguel M. Castro?

10  A.    That's correct.

11            MR. GAFFNEY:  And, Brian, can you go to the upper

12  right and look at the filing date, please, or zoom in on the

13  filing date.

14  BY MR. GAFFNEY:

15  Q.    And that's November 2012, right?

16  A.    Yes.

17  Q.    Okay.  So it's about a month after the first filing?

18  A.    Yes.

19            MR. GAFFNEY:  And, Brian, can we also look at the

20  filing period over to the right -- or excuse me -- the left.

21  BY MR. GAFFNEY:

22  Q.    And so this is also for the filing period of October 2012

23  to 2013?

24  A.    That is what it says, yes.

25  Q.    So it covers the same filing period as Miguel M. Castro?

90

1   A.     Yes.

2   Q.     But this is for Miguel Castro?

3   A.     Yes.

4   Q.     All right.  So possible that the first one filed in

5   October of 2012 was a mistake?

6   A.     I have no idea.  I didn't file it.

7   Q.     All right.  You had mentioned a person by the name of

8   Luis Aguilar, right?

9   A.     Yes.

10  Q.     And he's somebody that worked at the letter shop?

11  A.     I would use the word loose -- "work" loosely.  He hung

12  about.  He was doing -- he would help sometimes.

13  Q.     Okay.  And you also said that Miguel Castro, Jr., would

14  be at the letter shop as well from time to time?

15  A.     Yes.

16  Q.     Are you aware that Luis Aguilar and Miguel Castro, Jr.,

17  had started a clothing company together?

18  A.     I remember some T-shirts and what-not.

19  Q.     And that was Luis Aguilar's company, right?

20  A.     I knew it was Luis.  I did not know about Miguel, Jr.

21  Q.     Okay.  One of the topics that you discussed yesterday was

22  this national crackdown in 2016.  Do you remember that?

23  A.     Yes.  I believe it was called a sweep.

24  Q.     And one of the things that that prompted was to try to

25  make good on these fulfillments.  Is that fair?

1  A.    That is fair.

2  Q.    And the belief was that sending out the sweeps report was

3  a way to avoid getting in trouble?

4  A.    I would say legally, yes.

5  Q.    Okay.  And Patti Kern, we heard today, used different

6  printers, didn't she?

7  A.    Yes.

8  Q.    She -- well, she used Epi Castro.  He was a printer,

9  right?

10  A.    Correct.

11  Q.    You talked about Western.  That's another printing

12  company that Patti Kern used, right?

13  A.    As far as I know, yes.

14  Q.    The jury has heard the name Edgar Del Rio.  Did he also

15  have his own printing company at one point?

16  A.    Yes.  After he left Epi's, he had his own printing

17  company.

18  Q.    Yesterday you testified, if I got the quote correctly,

19  that you heard whispers of Miguel becoming partners with Patti

20  Kern.

21  A.    That is correct.

22  Q.    You believe you may have heard it from Patti Kern or

23  someone else, but you don't know.  Is that fair?

24  A.    I don't remember who I heard it from exactly.

25  Q.    So the alleged formation of this partnership was not

 1  something that you witnessed firsthand, right?

 2  A.    That's correct.

 3  Q.    You have no personal knowledge of it?

 4  A.    No personal knowledge.

 5  Q.    Do you recall meeting with the Government on July 13th --

 6  excuse me -- July 31st of 2019?  This would have been a few

 7  weeks after you signed your cooperation agreement.

 8  A.    I met with them several times after signing that

 9  cooperation agreement.  That could be one of the dates, yes.

10  Q.    Do you have any reason to dispute that?

11  A.    No.

12  Q.    And at that meeting, if you recall, was there a postal

13  inspector present?

14  A.    Usually Barry -- I can't remember his last name -- was

15  there.

16  Q.    Barry Bouchie?  You're on a first name basis?

17  A.    Well, I just don't remember his last name very well.

18  Q.    And was Mr. Finley there as well?

19  A.    If I'm thinking of the right one, yes.

20  Q.    And during that meeting, did you tell them that you

21  didn't know anything about a company called Price Awards?

22  A.    I don't remember.

23  Q.    You know about it today?

24  A.    Yes.

25  Q.    And is that due to your conversations with the

**93**

1  Government?

2  A.    By them showing me the cease and desist list, it was on

3  there.  To me, it was just PA, but I didn't know the whole

4  name.

5  Q.    You believe you saw a cease and desist for Price Awards?

6  A.    No.  I saw the list of cease and desists from the

7  Government.

8  Q.    Okay.  Did you see a cease and desist order for Price

9  Awards?

10  A.    No.

11  Q.    During that same conversation, do you recall telling

12  Barry and Mr. Finley that you actually worked full-time from

13  2011 to 2013 at the Castros' letter shop?

14  A.    Yes.

15  Q.    And I believe yesterday you testified that you were

16  working full-time from 2010 to 2014.  Do you recall that?

17  A.    I don't recall exactly what I said, but there was a time

18  period after Glen got shut down that I was trying to find other

19  means of financially...

20  Q.    So fair to say you're a little fuzzy on what you were

21  working full-time, when you were working part-time?

22  A.    That's correct, but I was working a job that required me

23  to be there -- as a stagehand, that was kind of random on-call

24  status.

25  Q.    Okay.  Taking you back to the first conversation you had

1  with the Government on May 2nd of 2018, do you remember telling
2  Barry that you worked part-time at the letter shop beginning in
3  2012?

4  A.    No.

5  Q.    You testified that you weren't aware of any printing
6  business other than the prize notifications when you were
7  working at the Castros' letter shop.  Is that fair?

8  A.    For the time period stated, it was most of our work, yes.

9  Q.    And that accounts for the time that you were there,
10 right, that you were present in the shop?

11 A.    That's correct.

12 Q.    So when you're working part-time, you might be coming in
13 for a portion of the morning, you might be coming in for a
14 portion of the evening, right?

15 A.    That's correct.

16 Q.    You don't know what's going on there during the day.
17 Fair?

18 A.    That's fair.  I'm not there.

19        MR. GAFFNEY:  I'll pass the witness, Judge.

20        THE COURT:  Mr. Tanasi, any cross?  Or Mr. Green?

21        MR. TANASI:  Your Honor, Mr. Tomsheck will be
22 handling it for us, but I believe Mr. Green wants --

23        THE COURT:  Do you want to go next, Mr. Green?  Go
24 ahead, sir.

25        MR. GREEN:  Yes, please.  Thank you, ma'am.

| | |
|---|---|
| 1 | CROSS-EXAMINATION |
| 2 | BY MR. GREEN: |
| 3 | Q.    Good morning, Mr. O'Connor.  How are you? |
| 4 | A.    Good morning. |
| 5 | Q.    Who is Betsy Spider? |
| 6 | A.    That would be Patti Kern. |
| 7 | Q.    Thank you. |
| 8 | MR. GREEN:  Government's Exhibit 120, please. |
| 9 | BY MR. GREEN: |
| 10 | Q.    Mr. O'Connor, before you, you have Government's |
| 11 | Exhibit 120.  You were shown this document yesterday.  Do you |
| 12 | remember? |
| 13 | A.    Yes. |
| 14 | Q.    On this document, it is entitled "Cease and Desist |
| 15 | Orders."  Do you see that? |
| 16 | A.    Yes. |
| 17 | Q.    Do you see the time periods?  The first time period is |
| 18 | March 9th of 2009, going to the last item of January 2nd, 2013. |
| 19 | Do you see that? |
| 20 | A.    Yes. |
| 21 | Q.    Over on the right, you see a series of names, correct? |
| 22 | A.    Yes. |
| 23 | Q.    On this list of names that you see, have you ever been |
| 24 | shown any other cease and desist orders compilation in |
| 25 | connection with this case or your testimony? |

1  A.    Any other compilation?

2  Q.    Any other compilation of cease and desist orders in

3  connection with this case.  Have you ever been shown that?

4  A.    I've been shown this.  I don't recall other ones, no.

5  Q.    Okay.  On this document, Government's Exhibit 120, is

6  there any reference to a cease and desist order to any company

7  by the name of Golden Products?

8  A.    No.

9  Q.    Is there any cease and desist order on this document,

10 Government's Exhibit 120, as to a company Golden Products d/b/a

11 Imperial Award Services?

12 A.    No, I do not see that.

13 Q.    Is there any reference on the right to any signature by

14 Glen Burke?

15 A.    No.

16 Q.    Is there any item -- or excuse me -- is there any

17 signature referencing the name Dan or Dan Wagner?

18 A.    No.

19 Q.    Is there any signature for the name of Salvador Castro?

20 A.    No.

21        MR. GREEN:  May we have Government's Exhibit 157-B,

22 please.

23 BY MR. GREEN:

24 Q.    Yesterday you were shown Government's Exhibit 157-B.

25        MR. GREEN:  If we could blow it up to the left

1  quadrant, please.

2  BY MR. GREEN:

3  Q.    You were asked about this document mentioning Rushmore

4  Financial Corporation, or Financial Group.  Do you see that?

5  A.    Yes.

6  Q.    In Government's Exhibit 120 --

7         MR. GREEN:  If we can have that, please.

8  BY MR. GREEN:

9  Q.    -- do you see any reference to Rushmore Financial Group?

10  A.    I do not.

11  Q.    Okay.  Thank you.  A few moments ago you were asked by

12  counsel about an interview on January -- excuse me -- on

13  July 31, 2019.  Do you remember that?

14  A.    Yes.

15  Q.    And at that time, you may have remembered that there may

16  have been a government agent or postal inspector, first name

17  Barry, present there; is that correct?

18  A.    Correct.

19  Q.    And possibly a Department of Justice consumer branch

20  attorney by the name of Tim or Timothy Finley?

21  A.    Yes.

22  Q.    And when you talked to them, were you telling them the

23  truth?

24  A.    Of course.

25  Q.    And I take it that in 2019, it was closer in time to when

1  events occurred, so maybe you had a better recollection in the

2  year 2019, correct?

3  A.    Yes.

4  Q.    And yesterday, one of the first things that you told this

5  jury is that you want to tell the truth, correct?

6  A.    That's correct.

7  Q.    And nothing but the truth, correct?

8  A.    That's correct.

9  Q.    So do you remember on July 31, 2019, telling the

10 Government attorney and the postal inspector that you and

11 Salvador Castro did not talk much, only to say hello once in a

12 while?

13 A.    That's correct.

14 Q.    And did you also tell the Government attorney and the

15 postal inspector that you may have had one or two longer

16 conversations but they were nothing of substance?

17 A.    That's correct, usually, yes.

18 Q.    Did you also tell the Government attorney and the postal

19 inspectors that Salvador Castro was always in and out of

20 Digital Express?

21 A.    Yes.

22 Q.    And that Salvador Castro was usually there on Fridays,

23 which were paydays?

24 A.    That's what I recall, yes.

25 Q.    Did you tell the Government attorney and the postal

1  inspector that Salvador Castro was usually at the business

2  whenever the rest of the Castros were out at breakfast?

3  A.    I'm sorry.  I'm confused by that question.

4  Q.    Let me ask the question again.  Did you tell the

5  Government attorney and the postal inspector that Salvador

6  Castro was usually at the business when the other Castros were

7  at breakfast?

8  A.    I guess what I meant to say was he went to breakfast with

9  them.

10 Q.    Okay, but that's...

11 A.    A big difference.

12 Q.    So are you saying that the postal inspector's

13 recollection in the memorandum of interview is incorrect?

14 A.    It's a --

15       MR. FINLEY:  Your Honor?

16 A.    -- a small inconsistency.

17       MR. FINLEY:  I object and I would like sidebar.

18       THE COURT:  All right, let's go over to sidebar.

19       (The following proceedings were held at the bench,

20 outside the hearing of the jury.)

21       THE COURT:  Go ahead, Mr. Finley, you had an

22 objection?

23       MR. FINLEY:  Yes.  I am informed by Mr. Zytnick,

24 who's looking at the memo that Mr. Green is talking about, that

25 there's nothing in there about breakfast at all.

 1             MR. GREEN:  Page 2, July 31st, bottom right.

 2  July 31, 2019, bottom right, Question Number 2 or 3.  I'll get

 3  it for you, if you'd like.

 4             MR. ZYTNICK:  I can --

 5             MR. GREEN:  I'll get it for you.

 6             MR. FINLEY:  We're looking at it, and it's not

 7  there.

 8             MR. GREEN:  (Producing document.)  Page 2.

 9             MR. ZYTNICK:  I think that must be a different page,

10  different number, maybe.

11             MR. FINLEY:  This is a different memo, I think.

12             MR. GREEN:  Highlighted portion, Page 2.

13             MR. ZYTNICK:  It's clearly in theirs.

14             MR. FINLEY:  Well, it's not on what I'm looking at.

15             MR. ZYTNICK:  They clearly have it at some point,

16  even if the date is different.

17             MR. FINLEY:  All right.  So, yeah, that's ambiguous.

18  I mean, it could be read to mean that he stayed or he went with

19  them.

20             MR. GREEN:  I think it could be cleared up on

21  redirect, but this is what was said.  I'm asking a question.

22             THE COURT:  All right.  But does your memo look

23  different -- does the Government's memo look different than the

24  memo that the defendant has?

25             MR. GREEN:  This is filed in the Court, top right.

1          MR. FINLEY:  Well, this has a different Bates

2    number.

3          THE COURT:  What the defense is showing is from Case

4    Number 19-cr-295, Document 418-1, filed 8/30/22, and it's Page

5    291 and 292 of 330.  May I see the bottom?  And they both say

6    K-13, Exhibit K-14, USAMOI115 and 116.  But yours doesn't look

7    like that?

8          MR. FINLEY:  No.  Our Page 2 has different content.

9          MR. ZYTNICK:  It's got our Bates number on it.

10         So I would say that it's 11:59 now.  Maybe we should

11   figure this out over lunch.

12         THE COURT:  Yeah, I think you need to, because if

13   you've got something different, you need to give it to the

14   defense.

15         While we're back here, Mr. Green, you're wearing

16   jeans again during court.  You wore jeans last week and the

17   week before.  I know it's a lot of trial and not everybody gets

18   their dry cleaning back when it's supposed to be done.

19         MR. GREEN:  I'll change pants, ma'am.

20         THE COURT:  Are you wearing jeans because you think

21   it's acceptable or because you didn't get your dry cleaning

22   back?

23         MR. GREEN:  I've been wearing jeans for years, but

24   I'll change.

25         THE COURT:  Yes.  Jeans are not acceptable for

1    court.

2              MR. GREEN:  I'll change.

3              (The following proceedings were held in open court.)

4              THE COURT:  Okay.  We're back on the record, but

5    we're going to go ahead and take our one-hour lunch break and

6    be back here at 1:00.

7              I do remind the jury that you are not to discuss

8    this case with anyone, not even your fellow jurors, not yet.

9    And you can speak to your fellow jurors about other things but

10   not about this case.  And remember, you are not to speak to the

11   attorneys, the parties, the witnesses, about anything at all.

12             And please do not read or listen to or view anything

13   that touches upon this case in any way or attempt to do your

14   own research or any independent investigation.  If you have any

15   questions about anything at all, please feel free to write them

16   down on the forms provided, whether it's for this witness or

17   just a general question about anything.  And please do not form

18   any opinion until after you have heard all the testimony, seen

19   the evidence.  I will give you the written jury instructions.

20             Last thing we'll do is hear closing arguments from

21   the attorneys, and then I will excuse you to begin the

22   deliberation process where you actually can talk to each other

23   about the case and then share your opinions and views in order

24   to reach a verdict.

25             So we'll go ahead and stand for the jury.  Have a

 1   good lunch, everybody.  See you back here at 1:00 p.m.

 2          (Jury out at 12:02 p.m.)

 3          THE COURT:  Mr. O'Connor, you can also take your

 4   break.  We just need you back here by 1:00.  Please be careful

 5   with the steps down.

 6          MR. ZYTNICK:  Your Honor, I have a couple of brief

 7   things if the Court --

 8          THE COURT:  Yes.  I wanted to read something into

 9   the record, too.  So you can take a seat.

10          All right.  So the witness, Mr. O'Connor, was asked

11   about whether he was aware of the contempt charge that the

12   co-defendant Mr. Glen Burke faced in the other case, and my

13   understanding is that his response was no, he was not aware of

14   it, so I looked it up.  I have it here.  It's Case Number

15   16-cr-262.  Docket 1 is the indictment.  The contempt charge is

16   on Page 9?  Well, no.  Actually, it looks like it's Page 10,

17   because the first one is sealed at first.  But it's Count 24,

18   Paragraphs 23 through 26, and it says, in relevant part, "In

19   addition to his fraudulent telemarketing business, Burke

20   operated another scheme from his offices in Nevada.  Burke

21   caused deceptive mailers to be sent to consumers.  The mailers

22   were designed to fool them into believing they had won

23   thousands or millions of dollars.  The mailers used fictitious

24   names and many looking like they came from law firms or

25   financial institutions.

1    The mailers advised consumers to pay a small fee,

2  usually $20 to $30, in order to claim their winnings.  Once

3  consumers paid, however, Burke either failed to deliver any

4  money or sent consumers a check or money order for less than

5  $2, far less than what the consumer paid as a processing fee to

6  claim the prize.  As a result of this scheme, from at least as

7  early as September 2011 to in and or about January 2013, in the

8  District of Nevada and elsewhere, Burke did knowingly and

9  willfully disobey and resist a lawful order, decree, and

10 command of this Court, namely, Section 2B of the 1998 Court

11 order, by causing mailers that misrepresented and failed to

12 disclose material facts to be sent to consumers, in violation

13 of Title 18 of the United States Code, Section 4013.

14    All right.  So, Mr. Finley, what was it you wanted

15 to place on the record?

16    MR. ZYTNICK:  Thank you, Your Honor.

17    THE COURT:  I'm sorry, Mr. Zytnick.

18    MR. ZYTNICK:  That's okay.  So first off, let me

19 apologize to Mr. Green and the Court.  I was wrong on that one.

20 Mr. Green was correct and he has the MOI.  That was the correct

21 MOI, so apologies for the unnecessary sidebar on that.

22    Second issue was the -- I saw the Court entered a

23 minute order on the deadlines.  I wanted to let you know that

24 we will be submitting our response tomorrow.

25    THE COURT:  Okay.

1          MR. ZYTNICK:  And the reason I -- just to give the

2   Court a heads-up, this is going to be relating to Mario

3   Castro's expert witness who is planning to testify on Thursday.

4   We will likely have rested by then, and so assuming us filing

5   tomorrow probably mid day is enough time for the Court, that

6   would be our intention.

7          THE COURT:  Okay.  Thank you.

8          MR. ZYTNICK:  And then the last thing, we have a

9   handful of stipulated exhibits.  And I can go ahead and read

10   that in if this is a good time.

11          THE COURT:  Yes.  Are you ready, Nick?

12          COURTROOM ADMINISTRATOR:  I am ready.

13          MR. ZYTNICK:  So the exhibits are 101-A, 102-G, 137,

14   260, 261, 263, 264, 265, 266, 281, and 285.

15          MR. GREEN:  I'm sorry.  Last one, Counsel, please?

16          MR. ZYTNICK:  285.

17          MR. GREEN:  Thank you.

18          THE COURT:  Any objection from the defense?

19          MR. TANASI:  No objection, Your Honor.

20          THE COURT:  All right.  So Exhibits 101-A, 102-G,

21   137, 260, 261, 263, 264, 265, 266, 281, and 285 are admitted.

22          MR. GREEN:  For the record, no objection, Your

23   Honor.

24          THE COURT:  All right.  Anything else, Mr. Tanasi,

25   you wanted to raise?

1    MR. TANASI:  Thank you.  With respect to exhibits,

2  if we could also put a stipulation on the record that Mario

3  Castro's Defense Exhibit 5046 is also admitted by way of

4  stipulation.

5    THE COURT:  And that's 5046, 5-0-4-6?

6    MR. TANASI:  Yes, Your Honor.

7    THE COURT:  Any objection from the Government?

8    MR. FINLEY:  No, Your Honor.

9    THE COURT:  All right.  So Exhibit 5046 is admitted.

10    MR. TANASI:  And, Your Honor, if I may as well, with

11  respect to housekeeping and timelines, our expert is slated to

12  testify in this case, and her travel arrangements have her

13  coming in on Wednesday afternoon.  I would ask that wherever it

14  is that we wind up ending tomorrow, we could start with her

15  first thing on Thursday morning if that's the case?

16    THE COURT:  All right.  Any objection to calling her

17  out of order if necessary on Thursday morning?

18    MR. FINLEY:  No objection to that, Your Honor.

19    THE COURT:  All right.  So that will be the plan,

20  Thursday morning we'll call her.

21    I don't have all the details yet, but I'm told that

22  there is a juror who has something and he's going to be out of

23  town Thursday and Monday of next week.  So not this Thursday,

24  not two days from now, but next week Thursday and Monday.  At

25  first I thought it was only Thursday and I thought, well, maybe

**107**

1  we can take a day off.  I don't know if we're running on time

2  or not.  But two days off seems way too much, and we've got all

3  of our alternates still here, so we've got 16 jurors.  I don't

4  know how much more you -- how much further you plan to go, if

5  you think we're going to lose more and we need to take two days

6  off.  It's sort of a -- that's always the guess, right, if we

7  take two days off to save one juror, then does that mean the

8  trial takes longer and we're going to end up losing more jurors

9  because we took longer than if we just dropped the one juror?

10 So I'll give you that to mull over during lunch, and then we

11 can discuss it if we need to.

12         MR. FINLEY:  I forgot to do one thing yesterday,

13 which was there was an Exhibit 428, which was just a simple

14 slide with some company names on it that was used as a

15 demonstrative aid without objection.

16         THE COURT:  Right.

17         MR. FINLEY:  That was 428, and I didn't move it into

18 the record for demonstrative purposes, so I would like to do

19 that now.

20         THE COURT:  All right.  So Exhibit 428 is part of

21 the record for demonstrative purposes, not to be sent to the

22 jury for deliberations.  So not admitted as a trial exhibit for

23 them to review, but it is admitted as part of the record on

24 appeal.

25         MR. FINLEY:  Thank you.

1          THE COURT:  Anything else?

2          MR. TANASI:  Not from the defense, Your Honor.

3          MR. MISHLER:  I apologize, Your Honor.  I was

4  unclear on the juror.  You said Thursday, the 13th?

5          COURTROOM ADMINISTRATOR:  That's correct.

6          THE COURT:  Yes.

7          MR. MISHLER:  Which Monday?  Is it Monday, the 17th?

8          THE COURT:  Yes.  The 13th and 17th.

9          MR. MISHLER:  Okay.  That's what I was wondering.

10          THE COURT:  All right.  See you back here at 1:00.

11          (A.M. proceedings concluded at 12:09 p.m.)

12

13                COURT REPORTER'S CERTIFICATE

14      I, Judy K. Moore, Official Court Reporter, United States

15  District Court, District of Nevada, Las Vegas, Nevada, do

16  certify that pursuant to 28 U.S.C. § 753, the foregoing is a

17  true, complete, and correct transcript of the proceedings had

18  in connection with the above-entitled matter.

19

20  DATED:  April 4, 2023

21

22                    /s/ Judy K. Moore_____
                      Judy K. Moore, CRR, RMR
23                    Official Court Reporter
                      United States District Court
24                    District of Nevada

25

                UNITED STATES DISTRICT COURT
                 Judy K. Moore, RMR, CRR