──────────────2:19-cr-00295-GMN-NJK──────────────

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEVADA

3

4  UNITED STATES OF AMERICA,        )
                                    )  Case No. 2:19-cr-00295-GMN-NJK
5              Plaintiff,           )
                                    )  Las Vegas, Nevada
6        vs.                        )  April 10, 2023
                                    )  1:07 p.m. to 4:11 p.m.
7  MARIO CASTRO, SALVADOR           )  Courtroom 7D
   CASTRO, MIGUEL CASTRO, and       )
8  JOSE LUIS MENDEZ,                )  JURY TRIAL, DAY 13, PM SESSION
                                    )
9              Defendants.          )  **C E R T I F I E D   C O P Y**
                                    )
10 _____ )

11

12

13

14      REPORTER'S TRANSCRIPT OF JURY TRIAL, DAY 13, PM SESSION
            BEFORE THE HONORABLE GLORIA M. NAVARRO,
15                 UNITED STATES DISTRICT JUDGE

16

17

18    APPEARANCES:       See next page

19

20

21

22  COURT REPORTER:     Samantha N. McNett, RPR, CRR, CCR, CSR
                        United States District Court
23                      333 Las Vegas Boulevard South, Room 1334
                        Las Vegas, Nevada  89101
24                      Samantha_McNett@nvd.uscourts.gov

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.

1                              **APPEARANCES**

2    For the Government:

3         **TIMOTHY T. FINLEY  ESQ.**
          **DANIEL E. ZYTNICK, ESQ.**
4         U.S. DEPARTMENT OF JUSTICE
          950 Pennsylvania Avenue, N.W.
5         Washington, D.C. 20530
          202-307-0050
6
          -AND-
7
          **MINA CHANG, ESQ.**
8         UNITED STATES ATTORNEY'S OFFICE
          501 Las Vegas Boulevard South, Suite 1100
9         Las Vegas, Nevada 89101
          702-388-6336
10

11
     For Defendant Mario Castro:
12
          **JOSHUA L. TOMSHECK, ESQ.**
13        HOFLAND & TOMSHECK
          228 South Fourth Street, First Floor
14        Las Vegas, Nevada 89101
          702-895-6760
15
          -AND-
16
          **RICHARD E. TANASI, ESQ.**
17        TANASI LAW OFFICES
          8716 Spanish Ridge Avenue, Suite 105
18        Las Vegas, Nevada 89148
          702-906-2411
19

20
     For Defendant Salvador Castro:
21
          **DONALD GREEN, ESQ.**
22        LAW OFFICES OF DONALD J. GREEN
          4760 South Pecos Road, Suite 103
23        Las Vegas, Nevada 89121
          702-388-2047
24
     ///
25
     ///

─────────── 2:19-cr-00295-GMN-NJK ───────────

1                    **APPEARANCES CONTINUED**

2

For Defendant Miguel Castro:

3

        **LUCAS J. GAFFNEY, ESQ.**
4       GAFFNEY LAW
        9900 Covington Cross Drive, Suite 290
5       Las Vegas, Nevada 89144
        702-742-2055
6
        -AND-
7
        **THOMAS A. ERICSSON, ESQ.**
8       THOMAS A. ERICSSON, CHTD.
        9900 Covington Cross Drive, Suite 290
9       Las Vegas, Nevada 89144
        702-878-2889
10

11

For Defendant Jose Luis Mendez:

12

        **WILLIAM H. BROWN, ESQ.**
13      **CHRISTOPHER MISHLER, ESQ.**
        BROWN MISHLER, PLLC
14      911 North Buffalo Drive, Suite 202
        Las Vegas, Nevada 89128
15

16                              *  *  *

17

18

19

20

21

22

23

24

25

1                    **INDEX OF EXAMINATIONS**

2    **TESTIMONY OF BARRY BOUCHIE**

     Cross-Examination by Mr. Finley....................100
3    Redirect Examination by Mr. Tomsheck..............178

4                         *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

―――― 2:19-cr-00295-GMN-NJK ――――

1                          **INDEX OF EXHIBITS**

2    <u>GOVERNMENT EXHIBITS</u>

3    EXHIBIT NO.:                    OFFERED     ADMITTED     WITHDRAWN

4    132A...........................130           --           --
     134............................130           --           --
5    152............................114          115           --
     158............................106          106           --
6    296............................123          123           --
     297............................126          126           --
7    299............................164          164           --
     300............................145          145           --
8

9

10   <u>DEFENDANT EXHIBITS</u>

11   EXHIBIT NO.:                    OFFERED     ADMITTED     WITHDRAWN

12    (No exhibits offered or admitted.)

13                              * * *

14

15

16

17

18

19

20

21

22

23

24

25

———— 2:19-cr-00295-GMN-NJK ————

1          LAS VEGAS, NEVADA; MONDAY, APRIL 10, 2023; 1:07 P.M.

2                          --oOo--

3                    P R O C E E D I N G S

4          THE COURT:  Is everybody back?  Let's go ahead and --

5    Mr. Bouchie, you can go ahead and step up here.  Yes, grab your

6    water.

7          We can go ahead and bring the jury in.

8          (Whereupon, the jury enters at 1:08 p.m.)

9          THE COURT:  Hi.  Everyone may be seated.

10         Welcome back from lunch.  We have the jury back.  And

11   the witness, Mr. Bouchie, is back on the witness stand.

12         I remind you, sir, you are still under oath.

13         And we will continue now with cross-examination by the

14   Government, Mr. Finley.

15         MR. FINLEY:  Could we have Government Exhibit 264 at

16   page 5 on the screen?

17         It's already been admitted, Judge.

18                    CROSS-EXAMINATION.

19   BY MR. FINLEY:

20   Q.  While we're waiting for that, the -- before the break, you

21   had testified about --

22         (Court reporter interruption.)

23         (Pause in proceedings.)

24   BY MR. FINLEY:

25   Q.  Okay.  So before the break, we were talking about the

—2:19-cr-00295-GMN-NJK—

1    company Marketing Image Direct.

2    *A.*  Yes.

3    *Q.*  We saw a few of the bank accounts that were opened under

4    that name, not all of them.

5              Is that your recollection; there were some that I

6    didn't show?

7    *A.*  Yes.

8    *Q.*  Is that right?

9    *A.*  Yes, sir.

10   *Q.*  Okay.  So there's been testimony in this trial that

11   Marketing Image Direct was the name of the letter shop right

12   after it was called National Print and Mail and before it was

13   called Digital Express.

14             Do you recall that?

15   *A.*  Yes, I do.

16   *Q.*  And we saw checks paying invoices for letter shop work

17   during the trial.

18             Do you remember that?

19   *A.*  Yes.

20   *Q.*  Okay.  Now, this Government Exhibit 264, page 5, that shows

21   the total amount of what was going into Marketing Image Direct

22   bank accounts?

23   *A.*  Total amount of checks.

24   *Q.*  Total amount of what?

25   *A.*  Checks.

—2:19-cr-00295-GMN-NJK—

1    *Q.*  What kind of checks?

2          Well, let me ask it this way.  What is the source --

3    what is the original source of the $780,000 in money there?

4    *A.*  Victim funds.

5          MR. FINLEY:  Now let's go to Government Exhibit 280

6    for a second.

7    BY MR. FINLEY:

8    *Q.*  According to Government Exhibit 280, Miguel Castro, the

9    defendant, did open a bank account.

10          Can you look at Price Awards, the row for Price

11   Awards?

12          MR. FINLEY:  If we could blow that up.

13   BY MR. FINLEY:

14   *Q.*  That's a dba of Marketing Image Direct.

15          Do you see that?

16   *A.*  Yes, I do.

17   *Q.*  And according to this chart, Government Exhibit 280, which

18   is, again, based on state records and bank records, Miguel

19   Castro, the defendant, opened that bank account at Bank of

20   America?

21   *A.*  Yes.

22   *Q.*  And then there's that person Mark Lee Jordan again?

23   *A.*  Yes.

24   *Q.*  That was the person you looked for but couldn't find?

25   *A.*  Yes.  I think he passed away.

—— 2:19-cr-00295-GMN-NJK ——

1  *Q.* And he opened the mailing company on the corporate

2  paperwork that was filed with the secretary -- actually, in

3  this case, because it's a dba, it would have been the Clark

4  County fictitious name department?

5  **A.** Yes.

6  *Q.* And victim money went into that Price Awards account at

7  Bank of America?

8  **A.** I believe that's where it was at.

9  *Q.* And did victim money go there?

10  **A.** Yes.

11  *Q.* Now, you've seen evidence that Miguel Castro, the

12  defendant, did accounting work for the mailing companies that

13  were sending out these fake prize notices.

14        Do you remember that?

15  **A.** Yes, I have.

16  *Q.* And you saw that in the form of testimony from Patti Kern,

17  Sean O'Connor?

18  **A.** Yes.

19  *Q.* And we also saw admitted into evidence texts from Miguel

20  Castro's phone with Patti Kern discussing accounting work that

21  he was doing.

22        Do you recall that?

23  **A.** Yes.

24  *Q.* Now, you heard testimony from Sean O'Connor and Vicki

25  Morgan about Glen Burke being shut down in early 2013.

─── 2:19-cr-00295-GMN-NJK ───

1          Do you remember that?

2    *A.*   Yes.

3    *Q.*   And are you aware of any documentary evidence that backs up

4    Sean O'Connor's testimony that Miguel Castro was aware of the

5    shutdown at the time that it happened?

6    *A.*   I thought he had received something from a -- receivership.

7    *Q.*   Are you -- are you referring to a letter from a Thomas

8    Seaman?

9    *A.*   Yes.

10   *Q.*   Who was the -- okay.

11          And was he the court-appointed receiver in the case

12   that was brought to shut Glen Burke down?

13   *A.*   I believe so, yes.

14   *Q.*   Can you explain to the jury what a court-appointed receiver

15   is?

16   *A.*   He basically comes in and he takes over the company, checks

17   on the books, all that stuff.

18   *Q.*   And when the receiver takes over a company that is being

19   shut down for fraud, can you tell the jury what the overall

20   goal of the receiver -- having the receiver is?

21   *A.*   It's to liquidate or find out what the -- what the business

22   was doing and then eventually to liquidate the funds.  Company.

23   *Q.*   And if there's any funds to be returned to victims, is it

24   the receiver's job to try to seize those funds or get control

25   of those funds?

1   *A.*   Yes, it is.

2   *Q.*   And now, you inherited the Glen Burke case from another

3   agent in approximately 2015; is that correct?

4   *A.*   No.  I worked with -- with one.

5   *Q.*   I'm sorry.  I stand corrected.

6          Did you work with Andrea Avery, United States postal

7   inspector, who was the case agent on that case?

8   *A.*   Yes, I did.

9   *Q.*   You helped her out?

10  *A.*   I helped her out, yes.

11  *Q.*   And we talked about that was your first prize notice case

12  when you joined the strike force, what is now called the strike

13  force?

14  *A.*   Yes, sir.

15  *Q.*   Okay.  Now, in your file that -- you know, the case file,

16  is there a letter from Thomas Seaman addressed to the defendant

17  Miguel Castro and his stepson Luis Aguilar?

18  *A.*   Yeah.  It wasn't in my file, but it was in her file, yes.

19  *Q.*   It was in the case file, not your personal file?

20  *A.*   Case file, yes.

21  *Q.*   Thank you.

22          MR. FINLEY:  Could we show Government Exhibit 158 to

23  the witness?

24  BY MR. FINLEY:

25  *Q.*   Do you see that in front of you, sir?

—— 2:19-cr-00295-GMN-NJK ——

1    **A.**  Yes, I do.

2    *Q.*  Is that the letter we've been talking about?

3    **A.**  It appears to be, yes.

4    *Q.*  And is that a letter from Thomas Seaman to National Print

5    and Mail and the representatives of that company, Miguel

6    Castro, the defendant, and Luis Aguilar?

7    **A.**  Yes, it is.

8    *Q.*  Does that letter concern the Glen Burke shutdown?

9    **A.**  Yes, it does.

10           MR. FINLEY:  Your Honor, I move to admit Government

11   Exhibit 158.

12           (Government Exhibit 158 offered.)

13           THE COURT:  Is that 158 or 258?  158.  Any objection

14   to 158?  Mr. Tanasi?

15           MR. TANASI:  No objection, your Honor.

16           THE COURT:  Mr. Gaffney?

17           MR. GAFFNEY:  No, your Honor.

18           THE COURT:  Mr. Brown?

19           MR. BROWN:  No, your Honor.

20           THE COURT:  And Mr. Green?

21           MR. GREEN:  No objection, ma'am.

22           THE COURT:  Thank you.  Exhibit 158 is admitted and

23   may be published to the jury.

24           (Government Exhibit 158 admitted.)

25           MR. FINLEY:  If we could blow up the top half?

—— 2:19-cr-00295-GMN-NJK ——

1  BY MR. FINLEY:

2  Q.  At the top, there's a reference to Thomas Seaman company.

3        Do you see that?

4  A.  Yes, sir.

5  Q.  And this is dated March 20, 2013.

6        Do you see that?

7  A.  Yes, sir.

8  Q.  Who is it addressed to?

9  A.  Miguel Castro and Luis B. Aguilar.

10 Q.  And let me read to you from the first line of the RE

11 section.

12       Does it say, "Request for funds of all accounts

13 controlled by Glen Burke"?

14 A.  Yes, it does.

15 Q.  Is that what it says?

16       MR. FINLEY:  And if we could blow up the bottom half

17 now.

18 BY MR. FINLEY:

19 Q.  Is this -- looking at the first sentence, is this

20 consistent with your testimony that Thomas Seaman was the

21 court-appointed receiver in charge of recovering funds from

22 Glen Burke's business?

23 A.  Yes, it does.

24 Q.  Does Mr. Seaman, in the first paragraph, refer to an asset

25 freeze?

1    *A.*  Yes, he does.

2    *Q.*  Okay.  And this reference to an asset freeze, is that

3    consistent with Sean O'Connor's testimony that the bank

4    accounts for National Print and Mail were frozen for a time

5    period immediately after Glen Burke was shut down?

6    *A.*  Yes, it does.

7    *Q.*  Now, in the second paragraph, does the court-appointed

8    receiver request the defendant, Miguel Castro, and his stepson,

9    Luis Aguilar, that they return some money to the receivership?

10   *A.*  Yes, it does.

11   *Q.*  Does it make reference to the fact that on January 29,

12   2013, a check was returned due to insufficient funds back to

13   the National Print and Mail account?

14   *A.*  Yes, it does.

15   *Q.*  And that was a check that was deposited into a Merchant

16   Depot account.

17         Do you see that?

18   *A.*  Yes, it was deposited there.

19   *Q.*  And Merchant Depot is referenced in the RE line as one of

20   the companies that was controlled by Glen Burke.

21         Do you see that?  In the RE line?

22   *A.*  I can't, no.

23   *Q.*  Thank you.

24         Do you see that reference?

25   *A.*  Yes, it does.

—— 2:19-cr-00295-GMN-NJK ——

1   *Q.*  And then it says, once that check bounced on January 29th,

2   the following day, that $25,000 amount was withdrawn from a

3   Chase bank account by Luis Aguilar.

4            Do you see that?

5   *A.*  Yes.

6   *Q.*  And he is saying, in the last sentence, that money belongs

7   to me, essentially, isn't he?  These assets are funds of the

8   receivership estate?

9   *A.*  Yes.

10  *Q.*  That's what that means --

11  *A.*  Yes.

12  *Q.*  -- in plain English, correct?

13  *A.*  Correct.

14            MR. FINLEY:  Can we go to the second page, please.

15  BY MR. FINLEY:

16  *Q.*  That first line, he demands the money again, correct?

17  *A.*  Yes, he does.

18  *Q.*  And then on the last paragraph, does Mr. Seaman reference

19  funds being frozen in the National and Mail Account?

20  *A.*  Yes, he does.

21  *Q.*  Consistent or inconsistent with Sean O'Connor's testimony

22  about those bank accounts being frozen?

23  *A.*  Consistent.

24  *Q.*  And he says -- Thomas Seaman says, "As we discussed when we

25  met," in the last paragraph.

─────────── 2:19-cr-00295-GMN-NJK ───────────

1          Do you see that in?

2    *A.*   Let me look here.

3    *Q.*   Beginning of the last paragraph --

4    *A.*   Yes.

5    *Q.*   -- of the letter.

6    *A.*   Oh, yes.

7    *Q.*   Okay.  What does this letter tell you about whether the

8    receiver for the Glen Burke case met with the defendant, Miguel

9    Castro, and his stepson, Luis Aguilar?

10   *A.*   It says in there, "As we discussed when we met."

11   *Q.*   Now, there's a CC and there's a name of Ricardo Gonzalez,

12   registered agent.

13          Do you see that?

14   *A.*   Yes, I do.

15   *Q.*   Based on your review of the corporate records in the case,

16   was Ricardo Gonzalez the registered agent for National Print

17   and Mail?

18   *A.*   Yes.

19   *Q.*   And was he also, based on your review of corporate records,

20   the registered agent and the person who actually incorporated

21   all or almost all of the mailing companies that sent the

22   fraudulent mail to the victims?

23   *A.*   Yes.

24   *Q.*   And it was Mr. O'Connor's testimony that Ricardo Gonzalez

25   worked for the defendants?

──────── 2:19-cr-00295-GMN-NJK ────────

1    **A.**  Yes, he did.

2    *Q.*  Have you seen any evidence in this case, documentary or

3    electronic, that Ricardo Gonzalez even knew Patti Kern?

4    **A.**  I don't think so.  I don't think he did.  He might have

5    known the name, but I don't think he knew her.

6    *Q.*  Now, there was evidence in this case that Miguel Castro was

7    interviewed on the day that the search warrants were executed

8    in February 2018.

9            Do you remember that?

10   **A.**  Yes, he was.

11   *Q.*  And there was evidence in this trial that Miguel Castro

12   said that the last time he saw Patti Kern was two years before

13   that day in February 2018 --

14   **A.**  Yes.

15   *Q.*  -- walking down street.

16           Do you remember that?

17   **A.**  Yeah.  It was something like that, yes.

18   *Q.*  Now, do you remember that Miguel Castro -- that the time

19   that Miguel Castro said that, were there text messages sitting

20   on his phone that would suggest that Mr. Castro -- Mr. Miguel

21   Castro was actually working with the defendants on prize

22   notices a week before his interview?

23   **A.**  That was either a week or two, yes.

24   *Q.*  Now, there's been some question in this case about the

25   ability of certain defendants to speak English.

───── 2:19-cr-00295-GMN-NJK ─────

1          You are familiar with those questions?

2   *A.*   Yes, I am.

3   *Q.*   And three of the defendants are wearing headphones.

4          Do you see that?

5   *A.*   Yes.

6   *Q.*   And the defendant Mario Castro is not?

7   *A.*   Correct.

8   *Q.*   And you are aware that somebody who speaks English as a

9   second language has an absolute right to have these proceedings

10  translated into that person's best language, right?

11  *A.*   Totally.

12  *Q.*   No problem with that?

13  *A.*   No.

14  *Q.*   Okay.

15  *A.*   Not at all.

16  *Q.*   But there have been some questions about the ability of

17  three of the defendants to speak English including Miguel

18  Castro?

19  *A.*   Correct.

20  *Q.*   Did you ever serve a subpoena of -- requiring Miguel Castro

21  to provide documents and give testimony in a grand jury?

22  *A.*   Yes.  I think that was me or someone from the team, yes.

23  *Q.*   And that subpoena, while you were working on the case as

24  one of the case agents, that went out while you were the guy

25  who was, you know, the case agent, right?

—— 2:19-cr-00295-GMN-NJK ——

1    *A.*   One of the co-case agents, yes.

2    *Q.*   Right.  Co-case agent.

3          So you sent that subpoena out shortly after these

4    search warrants were executed at some point in early 2018.

5          Is that what your memory is?

6    *A.*   I think so, yes.

7    *Q.*   Okay.  And did -- in response to that, did Mr. Miguel

8    Castro's lawyer send a flash drive to the Department of Justice

9    with some documents and also with a statement that had been

10   authored by the defendant Miguel Castro?

11   *A.*   Yes.  Yes.

12   *Q.*   Have you read the statement that Miguel Castro sent in

13   response to the subpoena?

14   *A.*   Yes, I have, but it's been -- it's been some time, but yes,

15   I have.

16          MR. FINLEY:  If we could show Government Exhibit 152

17   to the witness.

18   BY MR. FINLEY:

19   *Q.*   Is that the statement that Miguel Castro sent in response

20   to the subpoena?

21   *A.*   It appears to be, yes.

22   *Q.*   It's a one-page letter, right?

23   *A.*   Yes.  It's only one page typed letter.

24   *Q.*   Okay.  And it is from Miguel Castro at the top?

25   *A.*   Yes.

─────── 2:19-cr-00295-GMN-NJK ───────

1   *Q.*  And it's also -- it's not signed, but it says, "Sincerely,

2   Miguel Castro," at the bottom?

3   *A.*  Correct.

4   *Q.*  And there's one page of single-spaced text providing some

5   information about some companies that he was asked to produce

6   documents about.

7        Do you see that?

8   *A.*  Yes, I have.

9   *Q.*  He provides some information about --

10        THE COURT:  Mr. Finley, I don't think this is

11   admitted, is it?

12        MR. FINLEY:  It is not admitted.

13        THE COURT:  Okay.  So are you laying the foundation?

14        MR. FINLEY:  Yeah, but I --

15        THE COURT:  Okay.

16        MR. FINLEY:  I should have moved it by now.

17        THE COURT:  That's what I was thinking.

18        MR. FINLEY:  Thanks for reminding me.

19        Move to admit Government Exhibit 152, your Honor.

20        (Government Exhibit 152 offered.)

21        THE COURT:  Okay.  Any objection, Mr. Tanasi?

22        MR. TANASI:  No objection.

23        THE COURT:  Gaffney?

24        MR. GAFFNEY:  No, your Honor.

25        THE COURT:  Brown?

---
2:19-cr-00295-GMN-NJK
---

1              MR. BROWN:  No, your Honor.

2              THE COURT:  Green?

3              MR. GREEN:  No, your Honor.

4              THE COURT:  Exhibit 152 is admitted and may be

5      published to the jury.

6              (Government Exhibit 152 admitted.)

7      BY MR. FINLEY:

8      Q.  Okay.  So we were reviewing the statement and I was talking

9      about he was providing some information here on the statement

10     about Master Mailers, Quality Printing, Printing and Mailing

11     Solution, Marketing Image Direct, and Henderson Foods.

12             Do you see that?

13     A.  Yes.  All five of them are there.

14     Q.  What language is this written in?

15     A.  It is written in English.

16     Q.  And is this -- according to the English that this is

17     written in, does it appear to you, based on your understanding

18     of the English language, that Miguel Castro would understand a

19     question such as, "When was the last time you saw Ms. Kern?"

20     A.  Yeah.  Based on this, yes, I would think so.

21     Q.  And by the way, in this letter, does he say anything about

22     Patti Kern?

23     A.  I don't think so, no.

24     Q.  Does he say that Marketing Image Direct was opened in 2012

25     when he was trying to open a new business?

1   *A.*   Yes, it does.

2   *Q.*   Does he say that he transferred the company to Mark Jordan

3   who he described as a friend of his?

4   *A.*   Yes, that's what he says.

5   *Q.*   Then doesn't he say that he asked permission to open an

6   account on this company?  Do you see that?

7   *A.*   Yeah.  He asked permission to open an accident on this

8   company to (unintelligible).

9          (Court reporter interruption.)

10  *A.*   Yes.  He says that -- that he asked permission to -- to

11  open an account on this company to get payments coming from

12  printing shirts and cars wrap [sic].

13  *Q.*   Does he say anywhere on here that he opened a bank account,

14  Marketing Image Direct dba Price Awards, that received fraud

15  money from victims?

16  *A.*   No.

17  *Q.*   Does he say anything here about his partnership with Patti

18  Kern?

19  *A.*   No, he does not.

20  *Q.*   Was the subpoena that you sent him intended to call for

21  documents related to the prize notice scheme?

22  *A.*   That's why we would have done it, yes.

23  *Q.*   Did he provide you in this statement any information about

24  the prize notice scheme?

25  *A.*   No.  No.

―― 2:19-cr-00295-GMN-NJK ――

1    *Q.*  And is this statement -- shortly after his interview with

2    postal inspectors in February 2018, is this statement

3    consistent with the testimony in this trial that Miguel Castro

4    tried to distance himself from Patti Kern?

5    *A.*  Yes, he did.

6    *Q.*  Thank you.

7            MR. FINLEY:  We can clear the screen.

8    BY MR. FINLEY:

9    *Q.*  Now, there was an opening statement this morning and a lot

10   of questioning about using other people to commit fraud.

11           Do you recall all the questions that we've had about

12   that?

13   *A.*  Yeah, there's been a lot of those.

14   *Q.*  And you got some questions about that during your

15   testimony, right?

16   *A.*  Correct.

17   *Q.*  So -- and we saw -- we were talking about Miguel Castro,

18   Jr.'s name appearing on some Marketing Image Direct bank

19   accounts.

20           Let's talk about other people whose names have been

21   used to commit fraud.

22           MR. FINLEY:  Let's take a look at Government

23   Exhibit 280, please.

24   BY MR. FINLEY:

25   *Q.*  Let's look at the bottom row, Special Money Managers.

─── 2:19-cr-00295-GMN-NJK ───

1   *A.*   Yes, sir.

2   *Q.*   Who's the president of that company according to state

3   records?

4   *A.*   Jose Silvestre Castro.  I apologize if I don't have that

5   right.

6   *Q.*   Okay.

7          MR. FINLEY:  Now, can we show Government Exhibit 96 at

8   page 11.

9   BY MR. FINLEY:

10  *Q.*   Okay.  That's actually Miguel Castro, right?

11  *A.*   Mario Castro.

12  *Q.*   I'm sorry.  That's -- you're correct.

13         Who is that?

14  *A.*   That's Mario Castro, Jr.

15  *Q.*   Okay.  We'll come back to him.

16         MR. FINLEY:  Let's go to page 9 -- Exhibit 97, page 9.

17  BY MR. FINLEY:

18  *Q.*   I'm sorry for the poor quality of the photocopy, but if you

19  look to the right, there's a face that's a little easier to

20  see.  Who is that?

21  *A.*   Jose Silvestre Castro.

22  *Q.*   Have you met him during your investigation?

23  *A.*   Yes, I've talked to him.

24  *Q.*   Is he the son of Jose Salud Castro who has been described

25  in the trial as one of the partners in the prize notice scheme?

1    *A.*  Yes, he is.

2          MR. FINLEY:  Let's go to Government Exhibit 34 at

3    page 2.

4          If we could blow up the photograph in the bottom

5    right.

6    BY MR. FINLEY:

7    *Q.*  And who is that?

8    *A.*  Claudia Castro.

9    *Q.*  And for the record, this is a photo from the photo array

10   that was shown to Salvador Castro during his interview

11   according to the testimony at this trial?

12   *A.*  Okay.

13   *Q.*  So that's Claudia Castro.

14         Have you met her?

15   *A.*  I don't think I have.

16   *Q.*  You sure about that?

17   *A.*  I'm not positive.  I have talked to a lot of people.

18   *Q.*  Got it.

19         You do know that she testified in the grand jury.

20   Maybe you weren't there that day?

21   *A.*  Oh, she might have been, yeah.

22   *Q.*  Okay.

23   *A.*  I apologize.  We have -- we've talked to a lot of people.

24   *Q.*  Maybe you weren't there.

25         You talked to a lot of people?

2:19-cr-00295-GMN-NJK

1    **A.**  Yeah.

2    *Q.*  So who is Claudia Castro?

3    **A.**  I believe she's the spouse of Jose Mendez.

4    *Q.*  Okay.  Could you mean the spouse of Jose Silvestre Castro?

5    **A.**  Oh, I apologize.  Yes.

6    *Q.*  Okay.

7    **A.**  Now I know who this is.

8    *Q.*  So she'd be the daughter-in-law of Jose Salud Castro who we

9    were just talking about?

10   **A.**  Yes.

11        MR. FINLEY:  Let's take a look at Government

12   Exhibit 280.

13        THE WITNESS:  Now I know her.

14   BY MR. FINLEY:

15   *Q.*  Do you see the name "Claudia Castro" three lines up from

16   the bottom?

17   **A.**  Yes.

18   *Q.*  And she, for a time, was the president of Secure Data

19   Service, one of the fraudulent mailing companies?

20   **A.**  Yes.

21   *Q.*  And she opened a bank account for that company, as well?

22   **A.**  Correct.

23   *Q.*  There's been testimony that the defendant Jose Luis Mendez

24   had checks made out to his wife.

25        Do you remember that?

1    *A.*   Yes.

2    *Q.*   And we have seen checks from Digital Express that say --

3    that are to Maria Castro and say things like, "Profit for

4    Patti," or, "Jose" in the "for" line.

5            You've seen that in this trial?

6    *A.*   Yeah.  There are a few of those checks there, yes.

7    *Q.*   And there was another person who received a profit check by

8    the name of Angeles Castro.

9            Do you remember that?

10   *A.*   Yes, I think I seen one or two of those checks.

11           MR. FINLEY:  Could we look at Government Exhibit 240?

12   BY MR. FINLEY:

13   *Q.*   Now, are you looking at a picture of a young woman who's

14   much younger than the defendant Salvador Castro?

15   *A.*   Yes.

16   *Q.*   And is her name, according to driver's license records that

17   we're looking at, Angeles Castro?

18   *A.*   Correct.

19   *Q.*   Does she have the same address that appears on Salvador

20   Castro's driver's license?

21   *A.*   Yes.

22   *Q.*   Now, there was a suggestion made to the witness, Patti

23   Kern, that, perhaps, she was just repeating what the Government

24   told her to say when she said that Angeles Castro was the

25   defendant Salvador Castro 's daughter.

———— 2:19-cr-00295-GMN-NJK ————

1              Do you remember that?
2    **A.**  Yes.
3    *Q.*  Now, I think it was suggested that Salvador's wife's name
4    was Angeles, right, during that same line of questioning?
5    **A.**  Yeah.  I think that was made, yes.
6    *Q.*  There was a question along the lines of, "Did you know that
7    her -- his wife's name is Angeles?"
8              Do you remember that?
9    **A.**  Yes, I do.
10   *Q.*  Now, Salvador Castro's wife has also been described during
11   this trial by another one of the defense counsel as having the
12   name Maria.
13             Do you remember that?
14   **A.**  Yeah, I think I do.  Yep.
15   *Q.*  Okay.
16             MR. FINLEY:  Can we show Government Exhibit 296 to the
17   witness, which is a driver's license.  It is not in evidence
18   yet.
19   BY MR. FINLEY:
20   *Q.*  Is that a driver's license for someone by the name of Maria
21   D.L.A. Castro?
22   **A.**  Yes, it is.
23   *Q.*  Does this driver's license have an address of 5685 Sentry
24   Palm Court?
25   **A.**  Yes, it does.

———— 2:19-cr-00295-GMN-NJK ————

1    *Q.*  Is that the same address that appears on the driver's

2    license for Angeles Castro that we just looked at?

3    *A.*  I believe it does, yes.

4    *Q.*  Same address on Salvador Castro's driver's license, as

5    well?

6    *A.*  Yes.

7              MR. FINLEY:  Your Honor, move to admit Government

8    Exhibit 296.

9              (Government Exhibit 296 offered.)

10             THE COURT:  Any objection to 296?  Mr. Tomsheck?

11             MR. TOMSHECK:  None whatsoever.

12             THE COURT:  Mr. Gaffney?

13             MR. GAFFNEY:  No, your Honor.

14             THE COURT:  Mr. Brown?

15             MR. BROWN:  No objection, your Honor.

16             THE COURT:  Mr. Green?

17             MR. GREEN:  No objection, your Honor.

18             THE COURT:  Exhibit 296 is admitted and may be

19    published to the jury.

20             (Government Exhibit 296 admitted.)

21    BY MR. FINLEY:

22    *Q.*  Now, on the license in the printed part, it says Maria

23    D.L.A. Castro.

24             Do you see that?

25    *A.*  Yes, I do.

1   Q.  And there's a date of birth here of August 23, 1972.

2          Do you see that?

3   A.  Yes, I do.

4   Q.  That would put her much closer to the defendant Salvador

5   Castro's age, right?  Maybe about six years younger?  Give or

6   take.

7   A.  Yeah, I think so.

8   Q.  Okay.  Now, it's signed Maria, and on the bottom, the

9   signature at the bottom, it says Maria de los Angeles Castro.

10         Do you see that?

11  A.  Yes, it does.

12  Q.  Now, the way that this driver's license is signed, that

13  would explain why she has been described in the trial as having

14  the name Maria and having the name Angeles, right?

15         MR. TOMSHECK:  Judge, I think at this point, we either

16  need to swear Mr. Finley in or maybe direct him to actually ask

17  questions rather than testify and look for agreement.

18         MR. FINLEY:  We're just reading a driver's license,

19  your Honor.

20         THE COURT:  I agree.  You can help the jury read the

21  driver's license.

22         Objection is overruled.

23  BY MR. FINLEY:

24  Q.  And the question was:  Would that explain why Salvador

25  Castro's wife has been described as having the name Maria and

─── 2:19-cr-00295-GMN-NJK ───

1   Angeles?

2   *A.*  Yes.

3   *Q.*  Both?

4   *A.*  Yes.

5   *Q.*  Because she does have both of those names, right?

6   *A.*  Yes, it appears to be.

7   *Q.*  Now, my wife is named Maria.  She's got seven Marias in her

8   family.

9           THE COURT:  Mr. Finley, that's -- that's testimony.

10          MR. FINLEY:  Okay.

11          THE COURT:  Now you're testifying.

12          MR. FINLEY:  All right.  Got it, your Honor.

13  BY MR. FINLEY:

14  *Q.*  Many people named Maria, in your experience, do they use

15  their middle name?

16  *A.*  Yeah, I guess.

17  *Q.*  Okay.  Now, let's see how she signed another document.

18          MR. FINLEY:  Can we show the witness Government

19  Exhibit 297?

20  BY MR. FINLEY:

21  *Q.*  Now, in front of you is a picture that was taken at Digital

22  Express on 6925 Pearl Street on February 21, 2018?

23  *A.*  Okay.

24  *Q.*  Do you agree?

25  *A.*  Yes.

─────── 2:19-cr-00295-GMN-NJK ───────

1   *Q.*  And the picture at the bottom, actually, there's a version

2   of that in evidence, right?

3   ***A.***  I believe so, yes.

4   *Q.*  It's the black BMW?

5   ***A.***  Correct.

6   *Q.*  Okay.  Now, the picture at the top shows the front of a

7   black BMW next to a red car?

8   ***A.***  Yes, sir.

9   *Q.*  And then in the bottom of that picture, there's a little

10  temporary movement permit.

11          Do you see that?

12  ***A.***  Yes.

13  *Q.*  Okay.

14  ***A.***  There is one.

15          MR. FINLEY:  Move to admit Government Exhibit 297.

16          (Government Exhibit 297 offered.)

17          THE COURT:  Any objection to 297?

18          MR. TOMSHECK:  None at all.

19          MR. GAFFNEY:  No, your Honor.

20          MR. BROWN:  No, your Honor.

21          MR. GREEN:  No objection.

22          THE COURT:  Exhibit 297 is admitted and may be

23  published to the jury.

24          (Government Exhibit 297 admitted.)

25  *///*

1    BY MR. FINLEY:

2    Q.  So the picture at the bottom, that's the black BMW that the

3    jury has seen in another picture, right?

4    **A.**  Yes, it is.

5    Q.  Parked in front of the Pearl Street warehouse?

6    **A.**  It appears to be, yes.

7    Q.  And in the picture at the bottom, that car, in the review

8    shot here, is next to a red car, right?

9    **A.**  It is.

10   Q.  And then if you look at the top, that's a front view,

11   right, on the left?

12   **A.**  Front view and it's next to the red car.

13   Q.  Okay.

14   **A.**  Correct.

15   Q.  And there's a little permit down in the corner that's blown

16   up on the right, right?

17   **A.**  Yes, sir.

18          MR. FINLEY:  And if we could blow up the permit,

19   please.

20   BY MR. FINLEY:

21   Q.  What does it say on the owner's signature?

22   **A.**  Looks like Maria de poa Angeles Castro.  I'm sorry if I

23   don't pronounce that right.

24   Q.  Could it -- could it read Maria de los Angeles Castro?

25   **A.**  Yes, of course.

1  Q.  Okay.  Now, did Patti Kern tell you in a prior interview

2  that she believes that Angeles Castro was Salvador Castro's

3  daughter?

4  A.  Yes, she did.

5  Q.  And in that prior interview, at that point in time, had she

6  ever even seen Angeles Castro's driver's license photo?

7  A.  No.

8          MR. TOMSHECK:  Objection.  Speculation.

9          THE COURT:  As far as he knows.

10  BY MR. FINLEY:

11  Q.  As far as you know?

12  A.  As far as I know.

13  Q.  You hadn't shown it to her?

14  A.  I hadn't shown it to her.

15  Q.  And she's testified in this trial she's never actually met

16  her in person, right?

17  A.  I believe that's what she said, yes.

18  Q.  So we're talking about using other names to commit fraud.

19          MR. FINLEY:  Let's go back to Government Exhibit 280.

20          Can we blow up the row for the Company National Price

21  Service, Inc., NPS?

22  BY MR. FINLEY:

23  Q.  That was a company that was opened in 2010.  Patti Kern

24  testified that was one of the first companies that this scheme

25  opened.

—— 2:19-cr-00295-GMN-NJK ——

1          Do you remember that testimony?

2     *A.*   Yeah.

3     *Q.*   Now, somebody named Jose Carrillo is the president of that

4     company in 2010 and also opened a bank account.

5          Do you see that?

6     *A.*   Yes.  The -- the same person did both, yes.

7     *Q.*   Now, do you know who Jose Carrillo is?

8     *A.*   Yes, I do.

9     *Q.*   And do you know who is he from your investigation in this

10    case and your analysis of state driver's license and

11    identification cards?

12    *A.*   Yes.

13    *Q.*   Okay.  Who is Jose Carrillo?

14    *A.*   Jose Castro, I believe, is his name.

15    *Q.*   Okay.  So Jose Salud Castro is Jose Carrillo?

16    *A.*   Yes, it is.

17    *Q.*   Have you seen evidence that Jose Salud Castro maintained an

18    alternative ID card in the name of Jose Carrillo?

19    *A.*   Yes, I have.

20    *Q.*   Have you seen a driver's license that says Jose Salud

21    Castro on it, driver's license information, and have you seen a

22    state ID card that says Jose Carrillo on it?

23    *A.*   Yes, I have.

24    *Q.*   And you've met Jose Salud Castro before as part of your

25    investigation?

———— 2:19-cr-00295-GMN-NJK ————

1    **A.**  I don't know if I actually met him or not.  Possibly.

2    Q.  Did you go to his house to serve a subpoena on his son at

3    some point in time?

4    **A.**  Yes, I did.

5    Q.  And did you go with Ernest Williams?

6    **A.**  I think I did, yes.

7           MR. FINLEY:  I'd like to show the witness Government

8    Exhibit 132A -- it's not admitted -- And Government

9    Exhibit 134, also not admitted.

10          Can we do a side-by-side on those?

11   BY MR. FINLEY:

12   Q.  Okay.  Are you looking at those -- that ID card and that

13   driver's license I mentioned?

14   **A.**  Yes, I am.

15   Q.  Now, do you recognize the man in both photos?

16   **A.**  Yes, I do.

17   Q.  Who is that man?

18   **A.**  Jose Salud Castro.

19          MR. FINLEY:  Your Honor, move to admit Government

20   Exhibit 132A and Government Exhibit 134.

21          (Government Exhibits 132A and 134 offered.)

22          THE COURT:  Any objection to 132A or 134?

23          MR. TOMSHECK:  The objection would be relevance.  I

24   don't know why we're talking about this.

25          THE COURT:  In relation to National Price Service,

—— 2:19-cr-00295-GMN-NJK ——

1    Inc.?

2          MR. FINLEY:  We're talking about how a mailing company

3    was opened here.

4          THE COURT:  Relevant to this -- this mailing company

5    that's named in 280?

6          Any other objection?

7          MR. TOMSHECK:  It's a 2001 identification card.

8          THE COURT:  Oh.  So the date you're saying is not --

9          MR. FINLEY:  Your Honor, can he answer the question?

10         THE COURT:  What was the question?

11         MR. GREEN:  Your Honor, before he answers the

12   question, we have an objection.

13         THE COURT:  All right.  Let's go to sidebar.

14         (At sidebar on record.)

15         THE COURT:  So Mr. Finley, the relevance of this --

16   these two driver's licenses.  One is from 2001 and the other

17   one is from 2002.  I'm sorry.  2022.

18         MR. FINLEY:  Yes.  It was one of the first companies

19   opened by this scheme.  The partnership was between Patti Kern

20   and Epi Castro.  The whole deal was, "I need somebody to put

21   things in other people's names."  That was the defendants' side

22   of this deal.  We're talking about a company formed at the

23   birth of this conspiracy, and that's exactly what's happening,

24   a company is being put under an alternative identity by one of

25   the coconspirators.

1          Now, your Honor made a ruling prior to the last trial

2   regarding relevance of Jose Salud Castro's conviction for using

3   that same fake state ID card to defraud the State of Nevada out

4   of unemployment benefits.  He was double-dipping using those

5   two cards.  Your Honor said that was relevant.

6          Now, knowledge that Jose Salud Castro is not a

7   defendant in this case, but given how this demonstrates the

8   motus operandi of this scheme and it demonstrates the use of

9   another person's name, in this case, a fake name, to perpetrate

10  fraud which has been such a question in this case.  Also

11  rebuts that Patti Kern did it all.

12          THE COURT:  Are you getting into -- so I understand

13  that rebutting the idea that Patti Kern did it all is certainly

14  relevant.

15          Are you going to get into the unemployment benefits

16  scheme --

17          MR. FINLEY:  Yes.

18          THE COURT:  -- or just the --

19          MR. FINLEY:  Yes.

20          THE COURT:  -- the two IDs?  Okay.

21          MR. FINLEY:  Your Honor ruled it was relevant.

22          MR. TOMSHECK:  So as it understand it, it may be

23  relevant when he's sitting at one of the defense tables.  He's

24  not here.

25          But what we have is the representation that's a

--------------------- 2:19-cr-00295-GMN-NJK ---------------------

1  fraudulent ID.  It's got his name on it.  It says Carrillo on

2  the last name and so does the 2022 driver's license.  It's a

3  hyphenated last name.  His full last name is Castro, hyphen,

4  Carrillo.

5       We're talking about an allegation that someone has a

6  fake ID and is collecting unemployment benefits and that

7  they're a fraudster and, as such, it should be imputed on the

8  defendants who are actually here in front of the jury that

9  they're committing fraud.  That is, like, the furthest stretch

10 with two double hops that I can possibly imagine.

11      I know why he's doing it, the same reason he's been

12 testifying for the last hour and then trying to get a witness

13 to agree with him because he wants to dirty up people through

14 other people's actions.  It's not relevant --

15      THE COURT:  So is there an objection to the fact that

16 Jose Carrillo was also using the name -- that Castro was using

17 the name Carrillo?  I don't know which way it goes.

18      MR. TOMSHECK:  They can put in the current driver's

19 license printout, identify who is he.  It's got both name

20 hyphenated names.  Mr. Green may have an objection about that.

21 I have no idea.

22      MR. GREEN:  Yes, we have an objection.

23      MR. TOMSHECK:  But I don't understand what putting in

24 a 20-something-year-old ID card, which isn't a fraudulent

25 name -- it's how the State of Nevada chose to print his name on

─────────────── 2:19-cr-00295-GMN-NJK ───────────────

1    that document.  It happens all the time.

2          MR. FINLEY:  Well, I think the -- if that's the

3    position, the conviction puts --

4          THE COURT:  Right.  Because if there was an agreement

5    that this individual had IDs in two different names but the --

6    both names represent the same person, if there's no objection

7    to that, then it wouldn't open the door to anything else and I

8    would not allow the testimony about the unemployment benefits,

9    but if the defense is going to claim that these are just two

10   different people that look the same or something like that and

11   not the same person, then, certainly, that would make it

12   relevant.

13         But he's actually been convicted of having used both

14   cards to get -- but it is one and the same person using two

15   different cards, but if there's not an objection that the same

16   one person had two different names and used two different names

17   at different times, apparently -- maybe.  But I don't know.

18         MR. TOMSHECK:  They can put in the 2022 driver's

19   license info that has the full name including both of those

20   last names.  I don't care.

21         But asking them about a fake ID --

22         THE COURT:  So tell me the names again.

23         (Indiscernible simultaneous crosstalk.)

24         (Court reporter interruption.)

25         THE COURT:  The two names are Jose Carrillo,

——— 2:19-cr-00295-GMN-NJK ———

1   C-A-R-I-L-O, and the other one is?

2           MR. FINLEY:  Jose Salud Castro.

3           THE COURT:  Jose Salud Castro.

4           MR. TOMSHECK:  Your Honor, hyphen Carrillo.

5           MR. FINLEY:  For your Honor's information, Carrillo is

6   a family name.  I'm not going to assert that this is a fake ID.

7   It's just two IDs with different names.  That's what it is.

8           THE COURT:  Okay.

9           MR. FINLEY:  And this is the act that gave birth to

10  this conspiracy and it's powerful corroboration of what the

11  deal was with Patti Kern.

12          MR. TOMSHECK:  Except it has nothing to do with these

13  defendants.  I mean --

14          THE COURT:  So I guess that's the question.  What is

15  the relevance then --

16          MR. GREEN:  Right.

17          THE COURT:  -- of Patti Kern using Jose Salud Castro

18  Carrillo's name to open up --

19          MR. TOMSHECK:  And --

20          MR. FINLEY:  She didn't use that name.  That wasn't

21  part of the deal.

22          THE COURT:  Oh.

23          MR. FINLEY:  This is -- this also rebuts the idea

24  that she is a liar who tricked everyone.  She didn't have

25  anything to do with this.

—— 2:19-cr-00295-GMN-NJK ——

1          MR. TOMSHECK:  They could have asked her about it
2    and --
3          THE COURT:  But what do these defendants have to do
4    with this?
5          MR. TOMSHECK:  Any relevance that would come from the
6    Government's argument is woefully overrun by the prejudice to
7    our defendants who are in the courtroom.
8          MR. FINLEY:  I'll answer your question, your Honor.
9          The defendants have to do with it because they printed
10   and produced all of that mail and they made money off of that
11   company.
12         THE COURT:  At Price Awards?
13         MR. FINLEY:  Yeah.  No.  National Price Service.
14         THE COURT:  National Price Service.
15         MR. FINLEY:  Victim money went into the defendants'
16   pockets from that company.  It's completely relevant.
17         MR. TOMSHECK:  Based on --
18         MR. FINLEY:  Three different reasons.
19         MR. TOMSHECK:  Based on what?  Where does that --
20   where -- where is the evidence that all four of these
21   defendants profited from that company?
22         THE COURT:  Well, it doesn't have to be all four.  It
23   could be anyone.
24         What was your objection, Mr. Green?
25         MR. GREEN:  Donald Green on behalf of Salvador Castro.

─────────────── 2:19-cr-00295-GMN-NJK ───────────────

1          Our objection is based on Rule 404(b) and 403, but
2    it's more basic.
3          It is my understanding that the law is that you cannot
4    try an incompetent person who has been declared incompetent
5    until he or she regains competency.  Salud Castro has been
6    declared incompetent.  He is not here by order of federal court
7    orders.
8          So my objection is that it would be irrelevant and
9    under 404 -- under 403, the balancing test should show
10   that it's more prejudicial than probative.  He's not here to
11   defend himself.  He's been tried in absentia.  We ask that it
12   be stricken and move to strike all the testimony.  Thank you.
13         THE COURT:  All right.  Well, he's not being tried so
14   this testimony is not admissible against him.  He's not present
15   and his attorney's not present, so it couldn't be used against
16   him.
17         But I want to clarify:  What is the relevance of this
18   person using a 2001 and 2022 ID with two different names?
19         When was the -- the company was in 2014?  2010?  2012?
20         MR. FINLEY:  2010 was National Price Service, 2010,
21   the beginning of the conspiracy period.
22         And I also intend to elicit, your Honor, evidence that
23   that really old state ID card is really old because it was the
24   one that was presented when Jose Salud Castro opened a mailbox
25   in Utah and it was presented to the mailbox store.  That's what

—————— 2:19-cr-00295-GMN-NJK ——————

1  we're looking at here.  And Mr. Bouchie obtained that photocopy

2  of that ID card from the mailbox store owner.  He's going to

3  testify about that.  So that's the relevance of that card.

4        MR. TOMSHECK:  One of the big issues in this trial is

5  the Government's complete lack of identification of which

6  defendant.  We just lump all the Castro brothers together.  In

7  fact, consistently through the questioning of witnesses, the

8  Government would say "the Castro brothers letter shop" as if

9  it's just all one thing.  It's not.

10       They're introducing evidence that is certainly

11 prejudicial to our clients on behalf of someone who's not here

12 as a defendant.  I mean, the -- the idea that it's relevant, I

13 think, is a huge stretch, but, certainly, if there's any

14 relevance to it whatsoever, the probative versus prejudicial

15 analysis --

16       MR. GREEN:  Correct.

17       MR. TOMSHECK:  -- completely tips in our favor.

18       THE COURT:  So I agree that the elicitation of the

19 unemployment benefit conviction --

20       MR. FINLEY:  Understood.

21       THE COURT:  -- is overly prejudicial.

22       MR. FINLEY:  Understood.

23       THE COURT:  I'm just not clear what is prejudicial

24 about him having two different ID cards if it's really his name

25 and it's just printed out in two different ways.

1              MR. FINLEY:  Your Honor may recall the opening

2      statement and the questioning of Mr. Bouchie regarding how

3      Patti Kern controlled all aspects of this and these guys were

4      just printers.  This says no, they're not.

5              THE COURT:  How does it say no, they're not?

6              MR. FINLEY:  She didn't have anything to do with

7      opening the mailbox that this card was used to open.  She

8      didn't have anything to do with the bank account --

9              MR. TOMSHECK:  Well --

10             MR. FINLEY:  -- that this card was used to open.

11             THE COURT:  How does this show that, though?  I guess

12     I'm not clear how it connects to that.

13             MR. FINLEY:  Because Mr. Bouchie is going to testify

14     that he interviewed the owner of a mailbox store in Utah who's

15     provided the application that was filled out by the person who

16     came there to open it.  And it was Jose Salud Castro drove a

17     long way to open that mailbox.  It wasn't Patti Kern.

18             There's been suggestions that Patti Kern controlled

19     all the mailboxes, opened everything, did all the -- all

20     aspects of that, and this directly rebuts the opening that was

21     made today and all the questioning --

22             THE COURT:  So it was provided in person?

23             MR. FINLEY:  Yes.

24             MR. TOMSHECK:  All that's going to be hearsay.

25             THE COURT:  Hearsay.

 1            MR. TOMSHECK:  However, not subject to any exception.

 2            And you'll recall from the opening and the examination

 3    of Mr. Bouchie that the Government just brought up, those were

 4    direct quotes from him in a sworn affidavit.  It wasn't

 5    anything we elicited.  That's what he testified to in the form

 6    of an affidavit.  I just asked him if he still believed it was

 7    the truth based on the evidence.  They don't get to then go

 8    back and introduce evidence from a hearsay conversation,

 9    opening of a mailbox, where.

10            By the way, in the time period he's talking about, one

11    or two of these defendants didn't even live in the United

12    States.

13            THE COURT:  I don't know what that means.

14            MR. FINLEY:  It's not hearsay.  It's a -- I'm not

15    going to get into conversations.  I'm going to talk about

16    physical actions.

17            MR. TOMSHECK:  The documents --

18            MR. FINLEY:  He drives to Utah.  He speaks to someone.

19    Still no words.  This person provides him with --

20            THE COURT:  How do we know he drives to Utah?

21            MR. FINLEY:  He did, yeah.

22            MR. TOMSHECK:  He's saying --

23            THE COURT:  "He," meaning the inspector drove to Utah?

24            MR. FINLEY:  Yeah.

25            THE COURT:  Okay.  And met with someone who gave him

—— 2:19-cr-00295-GMN-NJK ——

1   this paperwork?

2           MR. FINLEY:  Yeah.

3           THE COURT:  But you don't know how that person

4   received the paperwork.  Does it say it on the paperwork?

5           MR. FINLEY:  That, we'd have to get into hearsay.

6           THE COURT:  Was it in person or --

7           MR. TOMSHECK:  The paperwork is hearsay.

8           THE COURT:  That's why I think it would be hearsay.

9   So I'm not -- I think it's --

10          MR. FINLEY:  It's an official Government record.  The

11  mailbox application is an official Government record --

12          THE COURT:  But does the record represent on its face

13  how it was provided?

14          MR. FINLEY:  No.

15          THE COURT:  Because that's the problem is how it was

16  provided, right?  Was it just mailed in or faxed in by Patti or

17  did the -- I think we're just kind of getting far afield here

18  and it's becoming less relevant, which I guess does make it

19  little bit more prejudicial at that point.

20          I'm not going to allow it.  Going to try to refocus.

21  All right.  So the objection is sustained.

22          MR. GREEN:  Thank you.

23          (End of discussion at sidebar.)

24          MR. FINLEY:  Can we have Government's Exhibit 280 on

25  the screen?

—2:19-cr-00295-GMN-NJK—

1        (Court reporter interruption.)

2   BY MR. FINLEY:

3   Q.   Take a look at Government Exhibit 280 at the second row.

4        Do you see a company called Assets Unlimited which is

5   a dba of Pi Printing Corp.?

6   A.   Yes.

7   Q.   And is Mario Castro, Jr. listed as the president and bank

8   account signer?

9   A.   Yes, he is.  He is the president and bank account signer.

10  Q.   And look at the line from -- for Money Securities in the

11  middle.

12  A.   Yes, sir.

13  Q.   That's Mario Castro, Jr. again?

14  A.   Mario Castro, Jr. again as president and bank account

15  signer.

16        MR. FINLEY:  If we could go to Government Exhibit 91

17  at page 11.  Correction.  Government Exhibit 96 at page 11.

18  BY MR. FINLEY:

19  Q.   Is that a copy of a driver's license that was found in a

20  file that was sitting in Patti Kern's house in February 2018?

21  A.   I believe so, yes.

22  Q.   And whose name is on that?

23  A.   It is Mario Castro -- it's Mario Castro, Jr.

24  Q.   And you can tell from looking at the picture?

25  A.   Yes.  Because I talked with him before, too.

1    *Q.*  So Mario Castro, Jr. was a name that was used to commit

2    fraud?

3    *A.*  Yes.

4    *Q.*  Those two companies that we just identified on Government

5    Exhibit 280, those are fraudulent mailing companies that sent

6    prize notices to victims?

7    *A.*  Yes, they were.

8    *Q.*  And money from victims went into those bank accounts that

9    are listed on that chart, Government Exhibit 280?

10   *A.*  Yes.

11   *Q.*  Now, it was suggested in opening statement that this was

12   really just Patti Kern and Mario Castro, Jr. who were doing

13   this.

14           Do you remember that?

15   *A.*  Yes, that's what they said.

16   *Q.*  I think the statement in -- in opening was that the

17   defendant Mario Castro, Jr. connected -- or that the defendant

18   Mario Castro, rather, connected Mario Castro, Jr. and Patti

19   Kern?

20   *A.*  Yes.

21   *Q.*  And this was, like, a separate thing?

22   *A.*  I believe so, yes.

23   *Q.*  Who printed the fraudulent prize notices that were sent out

24   under the name Money Securities and Assets Unlimited?

25   *A.*  Digital Express.

─────── 2:19-cr-00295-GMN-NJK ───────

1    Q.  They printed and they did the letter shop work for those

2    mailings?

3    A.  Yep.  Yes, they did.

4    Q.  As a postal inspector who enforces mail fraud, would you

5    still recommend charges against somebody who printed and mailed

6    fraudulent mailings to victims and received money from those

7    victims in the form of payment on invoices knowing that it's a

8    fraud?  Is that something you'd recommend charges on?

9    A.  Yes, I would.

10   Q.  There's no requirement that you have to be actual literal

11   business partners, right?

12   A.  No.

13   Q.  Just contributing and participating in the fraud by

14   printing and mailing those notices and receiving money, that's

15   something that you'd recommend charges on?

16         MR. TOMSHECK:  Objection, Judge.  That's an inaccurate

17   statement of the law.

18         MR. FINLEY:  I wasn't asking about the law.

19         THE COURT:  Right.  He was asking whether or not he

20   would recommend the charges.

21         The objection is overruled.

22   BY MR. FINLEY:

23   Q.  Now, are you aware of texts that were on Sean O'Connor's

24   phone between Mario Castro and Sean O'Connor?

25   A.  Yes, I am.

───── 2:19-cr-00295-GMN-NJK ─────

1   *Q.* And there was testimony about Gold Rush and Dan Wagner

2   being a fraudulent mailing client of Mario Castro?

3   *A.* Yes, they were.

4   *Q.* And there's been text messages about that from Sean

5   O'Connor's phone in this trial?

6   *A.* I believe so, yes.

7   *Q.* Let me show you Government Exhibit 300.

8        Have you seen Government Exhibit 300 before?

9   *A.* Yes, I have.

10  *Q.* And is that a text message exchange between Sean O'Connor

11  and Mario Castro regarding somebody who is referred to as Jr.

12  starting a new company?

13  *A.* Yes, it does.

14       MR. FINLEY:  Your Honor, I move to admit Government

15  Exhibit 300.

16       (Government Exhibit 300 offered.)

17       THE COURT:  Any objection to 300?

18       MR. TOMSHECK:  None at all.

19       MR. GAFFNEY:  No, your Honor.

20       MR. BROWN:  No, your Honor.

21       MR. GREEN:  No objection, your Honor.

22       THE COURT:  Exhibit 300 is admitted and may be

23  published to the jury.

24       (Government Exhibit 300 admitted.)

25  ///

1    BY MR. FINLEY:

2    Q.   Let's start at the top of page 1.

3         What does Sean O'Connor write to Mario Castro on

4    September 7th of 2016?

5    A.   "Did Junior start on the new company?  What do you need to

6    know from me?"

7    Q.   And does Mario Castro reply?

8    A.   He does.

9    Q.   What does he say?

10   A.   "He is at the -- he is at city hall now.  Dan told me to

11   ask you for money for the new corporation.  I will give the

12   total after he finish everything."

13   Q.   And we saw text messages earlier between Mario Castro and

14   Sean O'Connor referencing somebody that they both knew by the

15   name Dan, right?

16   A.   Dan, yes.

17   Q.   And you heard testimony from Sean O'Connor that that's Dan

18   Wagner who did the Gold Rush fraudulent mailings?

19   A.   Yes, sir.

20   Q.   And in this text here, is Mario Castro telling Sean

21   O'Connor that Dan said that Mario Castro could ask for money so

22   that a new company could be formed by Junior?

23   A.   Yes.

24   Q.   And that's -- he's referencing a conversation with Dan

25   Wagner?

—— 2:19-cr-00295-GMN-NJK ——

1  *A.*  I believe so.

2  *Q.*  Now, if you look at the next text from Sean O'Connor, what

3  does he say?

4  *A.*  He says, "What?  How can I justify the money in my

5  accounting?  That's not going to happen."

6          MR. FINLEY:  Can we look at the next page, please.

7  BY MR. FINLEY:

8  *Q.*  Does Mario Castro write back, "Is up to you and Dan.  I

9  have no said so on this matter."

10          Do you see that?

11  *A.*  Yes.

12  *Q.*  And then Sean O'Connor replies, "I got the money to start

13  my company from my dad."

14          Do you see that?

15  *A.*  Yes.

16  *Q.*  Did Sean O'Connor have a company called On The Side?

17  *A.*  Yes, he did.

18  *Q.*  Take a look at the next text from Sean O'Connor to Mario

19  Castro again.  What is he saying?

20  *A.*  He says, "It was 1,000 bucks and Ricardo did it."

21  *Q.*  And have you heard testimony from Sean O'Connor that there

22  was a man named Ricardo Gonzalez who opened companies for the

23  defendants?

24  *A.*  Yes, he did.

25  *Q.*  What does Mario Castro reply?

——— 2:19-cr-00295-GMN-NJK ———

1  *A.*  He says, "I'm calling Junior to cancel.  Don't worry."

2  *Q.*  So based on these texts, he's calling someone named Junior

3  who was at city hall to cancel?

4  *A.*  Yes, sir.

5       MR. FINLEY:  Next page, please.

6  BY MR. FINLEY:

7  *Q.*  What does Sean O'Connor write in reply?

8  *A.*  "Come on, Mario."

9  *Q.*  And then what -- the last text on September 7, 2016, what

10  does Mario Castro say to Sean O'Connor?

11  *A.*  "Junior don't have any money and I'm just trying to help."

12  *Q.*  Have you seen any evidence in this case or at this trial

13  that Patti Kern was a part of this Dan Wagner, Gold Rush

14  fraudulent mailing business?

15  *A.*  No.

16  *Q.*  Now, ultimately, Patti Kern did end up managing the Assets

17  Unlimited and the Money Securities companies that were opened

18  by Mario Castro, Jr.?

19  *A.*  Yeah.  She wrote the checks, yes.

20       MR. FINLEY:  Can we look at Government Exhibit 69?

21  That's in evidence.

22  BY MR. FINLEY:

23  *Q.*  Are those debit cards that were found in Mario Castro, the

24  defendant's wallet on February 21, 2018?

25  *A.*  Yes.  I believe that's a true...

—— 2:19-cr-00295-GMN-NJK ——

1   *Q.* And what is the name of the two companies on the right on

2   the card?

3   *A.* The name is Pi Printing Corp., Mario Castro with the last

4   four digits of 2565, and Money Securities, Mario Castro with

5   the last four digits of 4131.

6           MR. FINLEY:  We can clear the screen.

7   BY MR. FINLEY:

8   *Q.* So a lot of questions in this case including questions from

9   the jurors about recording of interviews, and you received some

10  questions about that from Mr. Gaffney this morning.

11  *A.* Correct.

12  *Q.* So I want to see if we can clear up any confusion about

13  recording of interviews.  I'd like to take a big picture view

14  of this issue to start.

15          How many different law enforcement agencies are there

16  in the United States?

17          And I'm talking about local cops like Metropolitan

18  Police, county sheriffs, state police, federal law enforcement

19  agencies.  How many different agencies are there?

20  *A.* There's got to be thousands, probably.

21  *Q.* Do they all have the same policies about recording?

22  *A.* No.

23  *Q.* In certain years, have certain municipal police departments

24  started to use body cameras and other methods of recording in

25  recent years?

1    *A.*  Yes.

2    *Q.*  Now, let's talk about February 2018 when these interviews

3    were conducted.

4    *A.*  Okay.

5    *Q.*  The interviews that we're talking about were all conducted

6    in connection with search warrants?

7    *A.*  Yes.

8    *Q.*  Is that accurate?

9    *A.*  Yes, sir.

10   *Q.*  We're talking about Mario Castro -- Mario Castro, Miguel

11   Castro, and Salvador Castro, all of those were in connection

12   with search warrants, weren't they?

13   *A.*  Yes, sir.

14   *Q.*  As of that date in 2018, had you ever been on a search

15   warrant where an interview is conducted inside somebody's

16   residence or business and that was recorded in some way, audio

17   recorded or video recorded during a search warrant?

18   *A.*  I've been doing this for a long time and I don't recall

19   doing that.

20   *Q.*  And have you been on search warrants to assist other

21   federal agencies such as the FBI?

22   *A.*  I have worked cases with them, but I haven't been...

23   *Q.*  Okay.  You've done what's called a noncustodial interview

24   with -- alongside FBI agents and other federal agents?

25   *A.*  Yeah.  FBI, Secret Service.

—— 2:19-cr-00295-GMN-NJK ——

1    *Q.*  And were those noncustodial interviews recorded?

2    **A.**  Not that I can recall, no.

3    *Q.*  In your career, up until 2018, how often did you record a

4    noncustodial interview?

5    **A.**  I -- I don't think I ever recorded one that was

6    noncustodial.

7    *Q.*  And noncustodial is a little bit of a technical term.  What

8    that really means is that person is not restrained and that

9    person is free to go at any time.  That's a noncustodial?

10    **A.**  Yes.

11    *Q.*  And a custodial interview, on the other hand, would that be

12    the kind of interview that might be conducted in a jail or at a

13    police station with a one-way mirror in the room, that kind of

14    interview?

15    **A.**  Yes.  That, and if -- and if you know you are going to

16    arrest the person after you are done talking to them, you would

17    record that, too.

18    *Q.*  Those are the -- those are examples of the type of

19    interview that you consider custodial?

20    **A.**  Yes, sir.

21    *Q.*  Now, you -- have you -- do you have any memory of ever

22    recording a noncustodial interview right up -- your whole

23    career, up until 2018, do you have any memory of doing that

24    ever?

25    **A.**  I just don't -- I don't recall doing that, yes.

1   *Q.* And in terms of what you've seen other federal agencies do

2   in noncustodial interviews, was it common to record those in

3   the years prior to 2018?

4   *A.* No. I've -- I've worked with the Internal Revenue Service

5   and the FBI in my district and I just don't recall us ever

6   recording a noncustodial interview.

7   *Q.* Now, talking about your law enforcement career up until

8   2018, let's talk about custodial. For example, in a jail. How

9   often would you record a custodial interview during all those

10  years up to 2018?

11  *A.* I think that we did that all the time.

12  *Q.* Okay.

13  *A.* All the time.

14  *Q.* So always or almost always you have no memory of not

15  recording a custodial interview?

16  *A.* Yeah. I just -- I don't think -- yes. I think that we

17  recorded those. I know I've been in a lot of jails and a lot

18  of prisons talking to people and those were always recorded.

19  *Q.* Can you give a conservative ballpark of how many interviews

20  you've conducted in your career, both custodial and

21  noncustodial?

22  *A.* I -- I don't know. Maybe 50 custodial, maybe more, and a

23  lot more than that noncustodial.

24  *Q.* All right. Now, Mr. Gaffney asked you about an attorney

25  general policy about recording that was issued in 2014 and that

1    was in effect at the time of the search warrants.

2            Do you remember that?

3    *A.*  Yes.

4    *Q.*  And Mr. Gaffney said that that policy, quote, encouraged

5    recording of noncustodial interviews.

6            Do you remember that?

7    *A.*  Yes.

8    *Q.*  Out of custody?

9    *A.*  Right.

10   *Q.*  Encouraged?

11   *A.*  That was -- that was in our consideration.

12   *Q.*  Right.

13           But in the question that was asked to you, it was

14   encouraged that, policy encouraged, right?

15   *A.*  Yes.

16   *Q.*  Did he show you the policy?

17   *A.*  I don't think he did, no.

18   *Q.*  Let's -- let's show you what it really says.

19           MR. FINLEY:  Government Exhibit 299 for the witness,

20   please.

21   BY MR. FINLEY:

22   *Q.*  At the top, it says, "Attorney General Holder Announces

23   Significant Policy Shift Concerning Electronic Recording of

24   Statements."

25           Do you see that?

———— 2:19-cr-00295-GMN-NJK ————

1   *A.*   Yes, sir.

2   *Q.*   Do you remember when this came out?

3   *A.*   I believe -- yeah, it's Thursday, May 22, 2014.

4   *Q.*   And who appointed general -- Attorney General Holder?

5   *A.*   President Obama.

6   *Q.*   In 2014, this is when this is issued.  This is in effect in

7   2018 when everybody's doing the interviews?

8   *A.*   Yes, it is.

9   *Q.*   Okay.  Now, if you look at the first paragraph --

10          MR. FINLEY:  If we can blow that up.

11  BY MR. FINLEY:

12  *Q.*   The new policy is, "There is a presumption that statements

13  made by individuals in federal custody following arrest but

14  prior to their first appearance in court will be electronically

15  recorded," right?  That's what it says?

16  *A.*   That's what it says, yes.

17  *Q.*   And what was your takeaway from that?

18  *A.*   That when -- that when you have a person in custody, you

19  had better record.

20  *Q.*   Subject to very limited exceptions?

21  *A.*   Very.

22  *Q.*   Now, did that require you to change anything that you had

23  actually been doing up to that point?

24  *A.*   No.

25  *Q.*   And that's because, as you just said, you always recorded

—2:19-cr-00295-GMN-NJK—

1  custodial anyway?

2  A.  Yes, sir.

3  Q.  You're already doing it?

4  A.  Yes.

5  Q.  But even so, this was a big deal, this policy?

6  A.  This?

7  Q.  Yeah.

8  A.  I don't think it was a big deal.  It was a continuation of

9  what we had been doing.

10 Q.  Got it.

11       So let me -- let's go further down this document to --

12 I know it's here.  I'm looking for the word.

13       MR. FINLEY:  Let's go to the next page, please.

14       Okay.  Let's blow up the paragraph about a third of

15 the way down that begins, "That's why."

16 BY MR. FINLEY:

17 Q.  Now, if you look at the last sentence of that paragraph

18 that begins, "That's why," what does it say?

19 A.  "The policy also encourages agents and prosecutors to

20 consider electronic recording in investigative or other

21 circumstances not covered by this presumption."

22 Q.  Now, does it say -- so in other words -- "circumstances not

23 covered."

24       Would the circumstances not covered include

25 noncustodial interviews?

1   **A.**   Yes, it would.

2   *Q.*   So is this sentence giving you some guidance about

3   noncustodial interviews?

4   **A.**   Yeah.

5   *Q.*   What does it say?

6   **A.**   Basically, it encourages you to record, but it doesn't tell

7   you that you have to.

8   *Q.*   It says "encourages agents to consider," right?

9   **A.**   Uh-huh.

10   *Q.*   Is that the same thing as encourages agents to record?

11   **A.**   No.

12   *Q.*   Under the language of this policy, if you consider it, it's

13   up to you?  There's no thumb on this scale one way or the other

14   in this sentence, is there?

15   **A.**   No.  None.

16   *Q.*   And in this case, did you give consideration to whether or

17   not you should record in 2018?

18         Did -- rather, your boss.  Did your boss give

19   consideration to that?

20   **A.**   Bosses did, yes.

21   *Q.*   And under this policy, he was permitted to say that we

22   should not record these interviews?

23   **A.**   Yes.  And that's what he did.

24   *Q.*   And these interviews were being done in conjunction with

25   eight search warrants related to this case, right?

—— 2:19-cr-00295-GMN-NJK ——

1    *A.*   Eight to this case and two other ones.

2    *Q.*   There were two other search warrants being executed by

3    agents at the same briefing in Las Vegas?  Is that what you're

4    referring to?

5    *A.*   Yes, sir.

6    *Q.*   And did those agents executing unrelated search warrants in

7    Las Vegas that day also receive the same instruction?

8    *A.*   They did.

9    *Q.*   And did agents who were executing -- well, let me ask you

10   this.

11           On the day of the searches on February 21, was it part

12   of a larger operation of searches in other places in the

13   country, as well?

14   *A.*   Yes.  There was searches going on in Florida, in Phoenix, I

15   believe, and also in Tucson and maybe some other parts of the

16   country, too.

17   *Q.*   And what was the instruction with respect to those other

18   searches in other places in the country, if you know?

19   *A.*   All I know is that for our group, the ten, my supervisor,

20   Inspector Gerber, while he was talking about the entire -- all

21   the cases and what -- what our team does, he mentioned that

22   there be no recordings because we all want to be -- do it in

23   conformity.

24   *Q.*   Now, there was some question raised in this trial about

25   Salvador Castro's ability to understand questions that may have

—— 2:19-cr-00295-GMN-NJK ——

1   been asked of him during his interview?

2   A.   Yes.

3   Q.   Have you ever spoken to the defendant Salvador Castro?

4   A.   Yes, I have.

5   Q.   When did you do that?

6   A.   It was approximately 2019, I believe.

7   Q.   And was it shortly before this case got indicted?

8   A.   Yeah, I am not sure what the exact date is, but...

9   Q.   Okay.

10  A.   Yes.

11  Q.   So -- but 2019 sometime is your best memory?

12  A.   I think so, yes.

13  Q.   And there's a memo on that anyway that we could get the

14  exact date from?

15  A.   Yes.  Yes, you could.

16  Q.   And if I represented to you that that memo says 2019, that

17  would be consistent with what you just said?

18  A.   Yep.

19  Q.   Now, what did you talk about with the defendant Salvador

20  Castro?

21  A.   Well, what we talked about was that Patti Kern had

22  purchased a $50,000 vegetable cutter/slicer/washer with victim

23  funds and she had wanted to go in partnership, I believe, with

24  the Castros in the vegetable business.

25  Q.   Okay.  I think people might need that to be broken down a

1   little bit.

2   *A.*   Good.

3   *Q.*   So let me just ask you about a couple things that you said

4   there.

5        Your testimony is that you went to speak to Salvador

6   Kern -- I mean --

7   *A.*   Castro.

8   *Q.*   -- Salvador Castro about a vegetable slicer/washer that

9   Patti Kern had bought?

10  *A.*   Yes.

11  *Q.*   Okay.  Where did this conversation happen?

12  *A.*   This happened in the back of the Digital Express building.

13  *Q.*   Okay.

14  *A.*   By the back docks.

15  *Q.*   And what -- and why were you talking to Salvador Castro

16  about this vegetable washer/slicer -- dicer that Patti Kern had

17  bought for -- what did you say it was?

18  *A.*   Vegetable -- approximately $50,000.

19  *Q.*   Okay.  Why were you talking to Salvador Castro about that?

20  *A.*   We were trying to figure out if we could forfeit that.

21  *Q.*   Okay.  In other words, take it and sell it and return the

22  money to victims?

23  *A.*   Return the money to the victims.

24  *Q.*   And this -- and -- but where was -- at the time you had

25  this conversation with Salvador Castro at the Pearl Street

— 2:19-cr-00295-GMN-NJK —

1   warehouse, where -- where was the vegetable slicer/washer

2   thing?

3   **A.**   It was right in the building there.

4          In fact, Mr. Castro was very, very nice.  He took me

5   to it and I took a picture of it.

6   *Q.*   And what else did you talk about regarding the washer --

7   the vegetable washer/slicer machine?

8   **A.**   I believe he told me that he had purchased it or obtained

9   it from his brother, Mario Castro.  I believe that's what it

10  was, yes.

11  *Q.*   Okay.  So just so everyone can follow along, Patti Kern

12  buys a vegetable slicer for some $50,000?

13  **A.**   Approximately.

14  *Q.*   You saw the credit card bill, by the way, that shows that

15  purchase?

16  **A.**   Yeah.  That's been -- it's been a while but, yeah.

17  *Q.*   And that machine is sitting inside the Pearl Street

18  warehouse and you go to talk to Salvador Castro about it

19  because you want him to do what?

20  **A.**   Hopefully eventually that we can pick it up, get it.

21  *Q.*   So you didn't want him to get rid of it and sell it or

22  anything like that?

23  **A.**   No.

24  *Q.*   So -- and then he said, "Well, I went ahead and bought this

25  machine from my brother"?

─ 2:19-cr-00295-GMN-NJK ─

1    *A.*   I believe that's what he told me, yes.

2    *Q.*   "My brother," Mario Castro?

3    *A.*   Mario Castro.

4    *Q.*   And what language was this conversation in?

5    *A.*   It was in English because I do not speak Spanish.

6    *Q.*   And were you able to accomplish your goal of -- with

7    respect to this machine?  Were you able to accomplish what you

8    went there to do?

9    *A.*   Yes.

10   *Q.*   You were able to communicate in English with the defendant,

11   Salvador Castro?

12   *A.*   Yes.

13   *Q.*   Did he, you know, respond to your questions?

14   *A.*   Yeah.  He appeared to, yes.

15   *Q.*   Now, based on the conversations that you had with him --

16   how long was it?

17   *A.*   Oh, it wasn't that long.  Maybe five or ten minutes, max.

18   *Q.*   And are you saying to the jury that he's an expert English

19   language speaker or anything like that?

20   *A.*   No.  No.  No.  No.

21   *Q.*   But how would you characterize his ability to speak English

22   based on that short conversation?

23   *A.*   I mean, I talked to him.  He seemed to understand what --

24   what I was talking about.  And he also took -- took me to the

25   vegetable washer and he allowed me to take a picture of it.

—2:19-cr-00295-GMN-NJK—

1    So...

2    Q.  Salvador Castro -- thank you, sir.

3          So Salvador Castro's been charged in the case with

4    making a false statement about whether he knew Patti Kern and

5    whether he could recognize her photo.

6    A.  Yes.

7    Q.  Okay.  Based on your conversation with Salvador Castro in

8    English, would he have the ability to understand a basic

9    question such as, "Do you know this person?"

10   A.  I would think so, yes.

11   Q.  And based on your conversation with him and your assessment

12   of his English-speaking ability, would he also be able to

13   understand a basic question such as, "Do you recognize this

14   photo?"

15   A.  Yeah, I would think so.

16   Q.  Those two questions, "Do you know this person?  Do you

17   recognize this photo," in your experience, are those -- in your

18   life experience, in your professional experience, are those

19   questions that a four-year-old child just learning to speak

20   English would know how to answer?

21   A.  Probably.

22          THE COURT:  All right.  Let's go ahead and take our

23   afternoon break.  Looks like it's a good time to do that.

24          Remember that during this break, you are not to

25   discuss the case with anyone nor permit anyone to discuss it

1    with you.  If you accidently overhear anything about the case,

2    remember, you are required to let the Court know right away.

3            And please do not perform any investigation or any

4    independent research or read or listen to or view anything that

5    touches upon this case in any way nor form any opinion.

6            We'll go ahead and stand for the jury and welcome them

7    back at 2:50.

8            Mr. Bouchie, after the jury exits, you may also

9    stretch and take your afternoon break.  We just need you back

10   here by 2:50.  Remember not to talk to anybody about your

11   testimony.

12           (Whereupon, the jury exits at 2:34 p.m.)

13           THE COURT:  We'll be off record until 2:50.

14           (Recess taken at 2:34 p.m.)

15           THE COURT:  If everyone's ready, we can invite the

16   jury back in.

17           (Whereupon, the jury enters at 3:01 p.m.)

18           THE COURT:  Everyone may be seated.

19           We're back on the record.  Jury is with us and

20   Mr. Bouchie is back on the witness stand.

21           I'll remind you, sir, you're still under oath.

22           And we can now continue with cross-examination on

23   behalf of the Government by Mr. Finley.

24           MR. FINLEY:  Thank you, your Honor.

25           Could we get Government Exhibit 280 on the screen?

─── 2:19-cr-00295-GMN-NJK ───

1              And while we're doing that, your Honor, I forgot to

2    move into evidence Government Exhibit 299.  That's the

3    recording policy that we went over.

4              (Government Exhibit 299 offered.)

5              THE COURT:  Any objection to 299?

6              MR. TANASI:  No, your Honor.

7              THE COURT:  Mr. Gaffney?

8              MR. GAFFNEY:  No, your Honor.

9              MR. BROWN:  No, your Honor.  Sorry.

10             THE COURT:  299, the DOJ policy.

11             MR. GREEN:  No objection, your Honor.

12             THE COURT:  All right.  Exhibit 299 is admitted and

13   may be published to the jury either now or later, but it will

14   be part of the exhibits.

15             (Government Exhibit 299 admitted.)

16             MR. FINLEY:  Thank you.

17   BY MR. FINLEY:

18   Q.  So Government Exhibit 280, do you see it on your screen?

19   A.  Yes, I do.

20   Q.  Okay.  So we haven't talked very much about the defendant

21   Jose Luis Mendez and I thought we would wrap up with him.

22             Do you see that the defendant Jose Luis Mendez's name

23   appears as the president and bank account signer for Advanced

24   Allocation Systems, Inc.?

25             THE COURT:  Nick, it's not up on the screen.  I don't

———— 2:19-cr-00295-GMN-NJK ————

1    know if the light's not on -- the projector light.

2              Can the jury see it on the screen in front of you?

3    You can?

4              So it's just the projector now.  It will come up

5    eventually.  As long as the jury can see it on their screens,

6    it's fine.  It just goes cold and then it takes forever to warm

7    up.  I'm sorry.  You can -- you can continue.

8              MR. FINLEY:  Thank you, Judge.

9    BY MR. FINLEY:

10   Q.  So the defendant Jose Luis Mendez is also on the company

11   Pacific Allocation Systems, Inc., which was opened in 2016.

12             Do you see that?

13   A.  Yes, I do.

14   Q.  And he's listed as the president and bank account signer,

15   as well, right?

16   A.  Jose Mendez and Jose Luis Mendez, yes.

17   Q.  Okay.  And the defendant Jose Luis Mendez is also listed as

18   president and bank account signer for Distribution Reporting

19   Services which was opened in 2012?  And I'm looking at the

20   third line now.

21   A.  Yes.

22   Q.  Okay.  So we see that his name appears on this and we've

23   also gone over a number of names of members of the Castro

24   family who are on here as presidents or bank account signers.

25             Do you see all those?

---------- 2:19-cr-00295-GMN-NJK ----------

1    *A.*  Yes, I do.

2    *Q.*  So we've got Jose Luis Mendez.  We have Salvador Castro.

3    We have Mario Castro, Jr.  We have Jose Carrillo.  We have

4    Claudia Castro.

5            Am I leaving any other -- oh, Jose Silvestre Castro.

6            Those are all different Castro family members that you

7    have actually met, right?

8    *A.*  Yes.

9    *Q.*  Okay.  So with the possible exception of Claudia Castro --

10   we don't know whether you were there for the grand jury

11   testimony, right?

12   *A.*  I don't know.

13   *Q.*  Okay.

14   *A.*  I have been to a lot of them.

15   *Q.*  Okay.  So, you know, there is a name that we don't see on

16   here.  We don't see the defendant Mario Castro on here.

17           Do you see that?

18   *A.*  Yes, sir.

19   *Q.*  Just Jr.?

20   *A.*  Yes.

21   *Q.*  Now, there's been testimony in this trial that typically

22   when a cease and desist gets served, they find out about it

23   from the mailbox, they go to the person who's listed on the

24   mailbox application, and the cease and desist gets served and

25   no charges get brought.  That's the procedure that has happened

──────── 2:19-cr-00295-GMN-NJK ────────

1   with many, many cease and desists prior to 2013, let's say.

2            Do you recall that testimony?

3   *A.*  Yes.

4   *Q.*  All right.  And there was testimony that it's just a slap

5   on the wrist.

6            Do you remember that?

7   *A.*  That's what they called it.

8   *Q.*  Now, would it be different, in your mind as a postal

9   inspector, if you went to serve a cease and desist on somebody

10  who was on a mailbox and you went to serve it and you went to

11  serve it at a letter shop where millions of these fraudulent

12  notices were being produced under the names of many companies?

13           Would that be a little different?

14  *A.*  That --

15           MR. GREEN:  Objection, your Honor.  Speculation.

16           THE COURT:  Based on his experience.

17           THE WITNESS:  That would be something that I would

18  want to check out more.

19  BY MR. FINLEY:

20  *Q.*  That would be something that you'd want to conduct a --

21  possibly a criminal investigation if you found out that the guy

22  on the mailbox also owns the place that's sending millions of

23  prize notices out to victims?

24  *A.*  Yeah.  Possibly.

25  *Q.*  And Mario Castro, the defendant, owned a letter shop for

———— 2:19-cr-00295-GMN-NJK ————

1  much of the conspiracy period, right?

2  *A.*  Yes, he did.

3  *Q.*  His name does not appear on any mailing company or any

4  mailbox application?

5  *A.*  Correct.

6  *Q.*  Just the name of his son?

7  *A.*  Yes.

8  *Q.*  Okay.  Now, Jose Luis Mendez is listed here.  He -- he's

9  been the subject of some questions about English-speaking

10  ability.

11        Do you remember?

12  *A.*  Yes.

13        MR. FINLEY:  Let's go to Government Exhibit 150, which

14  is in evidence.

15  BY MR. FINLEY:

16  *Q.*  And these are the texts between Jose Luis Mendez and Patti

17  Kern?

18  *A.*  Yes, sir.

19  *Q.*  What language are these in?

20  *A.*  They are in English.

21        MR. FINLEY:  And let's go to page 51 of this 77-page

22  document.

23  BY MR. FINLEY:

24  *Q.*  Okay.  There's a text at the top.

25        Do you see that?

—— 2:19-cr-00295-GMN-NJK ——

1   **A.**  Yes, I do.

2   *Q.*  Is it a text from Jose Luis Mendez to Patti Kern?

3   **A.**  Yes, it is.

4   *Q.*  Could you read the English sentence that Jose Luis Mendez

5   wrote to Patti Kern?

6   **A.**  "Hi, Patti.  Good morning.  I took the box with me because

7   no one will be home at that time.  But you tell me if you want

8   me to take it somewhere."

9   *Q.*  Thank you.

10          MR. FINLEY:  We can clear the screen.

11  BY MR. FINLEY:

12  *Q.*  And did the defendant Jose Luis Mendez exchange texts in

13  English with Sean O'Connor?

14  **A.**  Yes, he did.

15  *Q.*  And admitted in evidence are only a sample of those texts.

16          Are there more than 300 English language texts between

17  Sean O'Connor and Jose Luis Mendez according to Sean O'Connor's

18  phone?

19  **A.**  I believe so, yes.

20  *Q.*  Now, back to the subject of English-speaking ability.

21          MR. FINLEY:  Can we get Government Exhibit 1C on the

22  screen, please?  It's admitted, Judge.

23  BY MR. FINLEY:

24  *Q.*  The jury has seen this before.  This is page 1 of

25  Government Exhibit 1C.  It's an envelope from Pacific

—— 2:19-cr-00295-GMN-NJK ——

1  Allocation Systems, Inc.

2          Do you see that?

3  *A.*  Yes, I do.

4  *Q.*  And it's from Miami Lakes, Florida.

5          Do you see that?

6  *A.*  Yes, sir.

7  *Q.*  Now, do you remember the text where Jose Mendez asks Patti

8  Kern to pick up the box from Miami?

9  *A.*  Yes, I do.

10  *Q.*  And this says Miami Lakes.  The text says Miami, right?

11  *A.*  Correct.

12  *Q.*  Just to be clear, Miami Lakes is located in a county that

13  is named Miami-Dade County, Florida, right?

14  *A.*  I believe so, yes.

15  *Q.*  And it's right close to the City of Miami?

16  *A.*  Yes.

17  *Q.*  And do people in -- you've been to Miami, haven't you?

18  *A.*  Yes.  For work.

19  *Q.*  And do people broadly refer to Miami-Dade County as Miami?

20  *A.*  I believe so, yes.

21  *Q.*  So this envelope says Pacific Allocation Systems on it.  I

22  want to ask you about English-speaking ability.

23          Would a person, who like Jose Mendez worked at the

24  Castro family letter shop and operated the OCE laser printing

25  machine, be able to see the notices that are being personalized

1   on that machine?

2   **A.**   Yes.

3           MR. BROWN:  Objection, your Honor.  Foundation.

4           THE COURT:  So the question was about the exterior of

5   the envelope?  Or the -- I think there's already been evidence

6   about the tri-fold part and the exterior.  I think this is just

7   foundational.

8           Overruled.

9           MR. BROWN:  Thank you.

10  BY MR. FINLEY:

11  *Q.*   And Jose Mendez working at the letter shop operating the

12  OCE laser printer, among other tasks that have been mentioned

13  to the jury, would he have the opportunity to see that the

14  words "Pacific Allocation Systems" are on this envelope and on

15  the notice inside?

16  **A.**   Yes, I would think so.

17  *Q.*   He would have ample opportunities to do that over eight

18  years in the letter shop?

19  **A.**   Eight -- eight years and thousands and thousands of pieces

20  of mail.

21  *Q.*   He did not have this particular company this whole time,

22  but earlier he had a company Advanced Allocation Systems.

23          Do you remember the testimony about that?

24  **A.**   Yes.

25  *Q.*   And he had some dbas under the corporation, as well?

─────────── 2:19-cr-00295-GMN-NJK ───────────

1    *A.*  I believe so.

2    *Q.*  He would have had the opportunity to see all those names of

3    companies that he had actually opened on the mailings that he

4    was producing and putting in the mail?

5    *A.*  You would have thought so, yes.

6    *Q.*  And even if you can't speak English at all but you speak

7    Spanish, you use the same alphabet, don't you?

8    *A.*  I believe that's true, yes.

9    *Q.*  And you could read the words and sound them out because the

10   letters are the same?  You might not know what they mean, but

11   can you read it, right?

12        MR. BROWN:  Objection, your Honor.  I think he's

13   asking him to talk about the differences between Spanish and

14   English, and there's no foundation for that.

15        MR. FINLEY:  Your Honor, everybody knows this.

16        THE COURT:  Well, I'd like to go back to the question

17   that you're asking now is -- is -- all right.  If you're

18   talking about specifically what someone who works the OCE

19   machine can see, we've already had testimony that it takes the

20   tri-fold paper and puts it in the envelopes.  You don't see the

21   inside.  You just see whatever it is viewable from the

22   tri-fold.

23        So I think you need to be more clear.  I'm not -- I

24   think you -- after I overruled the objection, I think you asked

25   a compound question and then it became more vague from there.

─── 2:19-cr-00295-GMN-NJK ───

1    So please clarify that, what it is that you're asking him

2    about.

3              MR. FINLEY:  Okay.

4    BY MR. FINLEY:

5    Q.  So the OCE printer, according to the testimony in this

6    case, is it -- it is a high speed printer that puts black ink

7    and provides all the personalization, like the name, the

8    address, in this case, the name "Betty" appearing over and over

9    again throughout the notice, all those personalized details

10   that make each notice look like it's coming to one person.

11             You've heard that testimony, right?

12   A.  Yeah, I think that is -- that is right.

13   Q.  And then after it comes off the machine, that's when it

14   gets -- it goes on a burster, then it gets folded, and then it

15   goes into an envelope.

16             Have you heard that testimony?

17   A.  Yes.

18   Q.  That's the order?

19   A.  I believe -- pardon me.  I believe that that is the

20   process.

21   Q.  Did you hear testimony that Jose Luis Mendez would do the

22   quality check and make sure that everything was lined up before

23   hitting Print, so he would have to look at a computer screen

24   before he hitting Print?

25   A.  Yes, sir.

1    Q.  And he'd do the quality checks, as well?

2          If the machine broke and there was a rejected notice

3    or something, he'd have to take that out and set it to the

4    sight?

5    A.  Yes, he would.

6    Q.  And that would give him an opportunity to read the notice,

7    wouldn't it?

8    A.  Yes.

9    Q.  Was he surrounded by these notices for eight years?

10   A.  According to the testimony of Sean O'Connor, he was.

11   Q.  He works in a warehouse that had pallets of them?

12   A.  Papers.

13          (Court reporter interruption.)

14   Q.  So let's go to the next page of this notice.

15          By the way, while we're waiting, we were talking about

16   Miami Lakes.

17          There was a P.O. box in Miami Lakes that was opened by

18   Jose Luis Mendez, correct?

19   A.  I believe so.

20   Q.  So he would be able to recognize the address of a mailbox

21   that he had opened on this notice?

22   A.  You would think so.

23   Q.  Regardless of whether he could speak English, he could read

24   the address and see that it was the same on his mailbox

25   application?

───── 2:19-cr-00295-GMN-NJK ─────

1    *A.*   Probably.

2    *Q.*   And he would also be able to see that there are large

3    amounts of money on this first page of the notice, right?

4          MR. FINLEY:  Let's blow up the first time the money

5    appears which is maybe about -- just about the middle.  So if

6    we could just pull up the middle section.

7    BY MR. FINLEY:

8    *Q.*   He would be able to see the numbers nine -- $987,456.98,

9    right?

10   *A.*   Yes, that is it.

11   *Q.*   The numerals in Spanish and English are the same?

12   *A.*   That is true.

13   *Q.*   He'd be able to see that this name "Betty Stirewalt" is

14   printed by his OCE printer all over this thing, right?

15   *A.*   Correct.

16   *Q.*   And he'd be able to notice that it's a different name for

17   each notice?  That's what he's doing on the printer?  He's

18   personalizing these?

19   *A.*   Yes, sir.

20   *Q.*   And he'd be able to know that he was doing that?

21   *A.*   You would think so, yes.

22   *Q.*   And then there's a -- there's a list of names down here of

23   people who have been recorded as having already received the

24   100 percent guaranteed cash prizes.

25          Do you see that?

1    **A.**  Yes, sir.

2    *Q.*  And he'd be able to see those names and see that they

3    stayed the same on every single notice?

4    **A.**  I believe that's how that worked, yes.

5    *Q.*  And he would be able to know that he was putting millions

6    of notices like that into the mail?

7    **A.**  You would think so.

8    *Q.*  And he would be able to see -- in fact, he did see,

9    according to IP log-on records, he'd be able to see the money

10   pouring into his bank account that's opened in the same name as

11   the mailbox and the notice and the check from the victim, same

12   name every time?

13   **A.**  Could you tell me that again, please?

14   *Q.*  He'd be able to see the money come rolling into that bank

15   account that was opened in the name of Pacific Allocation

16   Systems?  He could see that, right?

17   **A.**  Based on the -- the records of the IP, yes.

18   *Q.*  Now, those bank account statements for Pacific Allocation

19   Systems that were found at his house --

20   **A.**  Yes.

21   *Q.*  -- what language were those in?

22   **A.**  They were in English.

23   *Q.*  You're aware that you can ask the bank to give you your

24   statement in Spanish?

25   **A.**  I believe that is true, yes.

———— 2:19-cr-00295-GMN-NJK ————

1    *Q.*  You know that from your investigations and your -- always

2    involving -- or often involving banks in fraud cases?

3    **A.**  Yeah.

4    *Q.*  Now, there was, throughout the case, a lot of statements

5    and questions about Patti Kern tricking these defendants into

6    committing fraud for her.

7    **A.**  Yes.

8    *Q.*  And questions like that were asked of you today?

9    **A.**  Yes.

10    *Q.*  One question that was ask of you is, Patti Kern never went

11    up to the defendants and told them to their faces, "We are

12    committing fraud," right?

13    **A.**  No.

14    *Q.*  Do you remember that?

15    **A.**  Yes.

16    *Q.*  And your answer was, "No"?

17    **A.**  No.

18    *Q.*  "Not that I know of."

19          Now, would she have needed to do that if she had

20    already made them aware of a cease and desist order in 2009

21    from the Federal Government telling her to stop sending

22    fraudulent mail?

23    **A.**  No.

24    *Q.*  And if the defendants were aware of that, as the testimony

25    from multiple witnesses in this trial would suggest, they

─── 2:19-cr-00295-GMN-NJK ───

1  wouldn't need to hear that from Patti Kern?  They would have

2  known that the Federal Government thinks that these notices are

3  fraud?

4  *A.*  True.

5  *Q.*  And then there was the Glen Burke shutdown in 2013 where

6  federal agents went to National Print and Mail and a federal

7  receiver also went separately to National Print and Mail and

8  that case was about fraud that had been committed by one of the

9  defendant's biggest clients at the letter shop?

10  *A.*  Yes.

11  *Q.*  And so can you be tricked if you already know it's fraud

12  because the Federal Government came to your business and told

13  you it was?

14  *A.*  No, you can't be tricked because you should know.

15  *Q.*  Have you ever -- you've done a lot of fraud cases both with

16  the strike force and back in Minnesota, right?

17  *A.*  Yes, sir.

18  *Q.*  Have you ever had a fraud case where somebody got tricked

19  into receiving millions of dollars of victim money?

20  *A.*  No.

21        MR. FINLEY:  No further questions.  Thank you.

22        THE COURT:  Mr. Tomsheck, redirect?

23                    REDIRECT EXAMINATION

24  BY MR. TOMSHECK:

25  *Q.*  So you never had one before this case, right?

—— 2:19-cr-00295-GMN-NJK ——

1    *A.*   One before this case.

2    *Q.*   Okay.  Cool.

3          I think you told us on direct examination -- or I'm

4    sorry -- at the beginning of the Government's cross-examination

5    that the reason you got into this line of work is you saw a job

6    posting, right?

7    *A.*   Yes, sir.

8    *Q.*   And you said to yourself, "That looks pretty cool.  I'm

9    going to apply for that," right?

10   *A.*   Yes, sir.

11   *Q.*   And when the Government asked you why you did that because

12   you said because you wanted to catch the bad guys, right?

13   *A.*   Yes.

14   *Q.*   You'd agree with me that's a pretty noble thing to do in a

15   career, right?

16   *A.*   I would think so.

17   *Q.*   Okay.  You'd agree with me that on the flip side of that,

18   you certainly wouldn't want to catch any good guys, right?

19   *A.*   True.

20   *Q.*   You would not want to recommend that someone be arrested

21   and charges be filed if, for instance, they were just running a

22   lawful business, right?

23   *A.*   Pardon me, sir?

24   *Q.*   If someone was just running a lawful business --

25   *A.*   Yes.

───── 2:19-cr-00295-GMN-NJK ─────

1    *Q.*  -- you wouldn't recommend that he be arrested and charged,

2    right?

3    *A.*  Right.

4    *Q.*  And certainly, you'd agree with me, there's nothing

5    unlawful about doing a task at a business, right?

6    *A.*  Just depends on what the task is.

7    *Q.*  Right.

8         Just in and of itself, there's nothing illegal about

9    that, right?

10   *A.*  No.  It's just depends on what the task is.

11   *Q.*  Right.

12        In and of itself, just doing a task at work ain't

13   illegal, right?

14        MR. FINLEY:  Objection, your Honor.  This has been

15   asked and answered.  That was two responsive answers to that

16   question.

17        THE COURT:  Sustained.

18   BY MR. TOMSHECK:

19   *Q.*  Let me ask you this.

20   *A.*  Sure.

21   *Q.*  Can you envision a scenario where someone operates a print

22   shop where you don't recommend that they be charged with a

23   crime?

24   *A.*  Yeah.  Sure.

25   *Q.*  If someone is operating a letter shop and sending items out

1    into the U.S. mail, you don't recommend that they're charged

2    with a crime just based on that, right?

3    *A.*  Again, it depends on what they were putting in the mail.

4    *Q.*  I said just based on that.

5          The fact that they put something in the mail ain't

6    illegal, right?

7    *A.*  You can put something in the mail, sure.

8    *Q.*  You'd agree with that?

9    *A.*  To a -- to a point.  It depends on what they're putting in

10   the mail.

11   *Q.*  Okay.  You would agree with me that there are lots of print

12   and letter shops all throughout the United States that aren't

13   conducting fraud, right?

14   *A.*  Tons of them.

15   *Q.*  Right.

16          And the fact that those businesses exist doesn't mean

17   they should be prosecuted, right?

18   *A.*  Of course, not, no.

19   *Q.*  The differentiation is if the person who is sending out the

20   mail knows that they're participating in a fraud and they still

21   do it, that may be a problem, right?

22   *A.*  Could be.

23   *Q.*  You would agree with me that that's a problem, yes?

24   *A.*  Yes.

25   *Q.*  Okay.  I want to talk to you about a number of items that

1    Mr. Finley, the prosecutor, asked you about on

2    cross-examination.

3    *A.*  Okay.

4    *Q.*  First of all, you would agree with me that as it comes to

5    Governmental law enforcement agency, the United States Postal

6    Inspector Service is the agency that's responsible for this

7    investigation, right?

8    *A.*  Yes.

9    *Q.*  Out of all the federal law enforcement agency, you guys are

10   the one that investigated this alleged crime, right?

11   *A.*  Yes, sir.

12   *Q.*  Okay.  And you'd agree with me that out of all the people

13   from the Postal Inspector Service that are involved in this

14   investigation, you're the guy that would know the most about

15   this case, right?

16   *A.*  Probably, yes.

17   *Q.*  I mean, you heard all the other witnesses say exactly that,

18   right?

19   *A.*  Yes.

20   *Q.*  Yes?

21   *A.*  Yes.

22   *Q.*  You're the case agent, you told us, yes?

23   *A.*  I was the co-case agent, yes.

24   *Q.*  Okay.  You'd agree with me that you were here present

25   during this whole trial?

1          You told us that before, right?

2     *A.*   Yes, sir.

3     *Q.*   Okay.  No other witness said, "Hey, Inspector Bouchie was

4     co-case agent with this other guy," right?

5     *A.*   Okay.  Right.

6     *Q.*   They all said it was you, right?

7     *A.*   (Unintelligible).

8     *Q.*   Yes?

9     *A.*   Yes, sir.

10    *Q.*   Okay.  If there's anybody that can answer questions about

11    this investigation, what was done and why, it would be you,

12    right?

13    *A.*   Yes.

14    *Q.*   Okay.  Do you know why the Government didn't call you in

15    their case-in-chief?

16    *A.*   I think they wanted to cut the -- cut the time down for

17    this case.

18    *Q.*   Okay.  You understand that the jury's here to make a

19    determination about whether or not these four individuals are

20    guilty of federal offenses, right?

21    *A.*   Totally.

22    *Q.*   You understand that's a big deal, right?

23    *A.*   Yes, sir.

24    *Q.*   You would agree with me that hearing from the case agent

25    could be beneficial in the analysis of the citizens who are

—— 2:19-cr-00295-GMN-NJK ——

1   volunteering their time to make that decision?

2   **A.**  Yes, sir.

3   *Q.*  Okay.  All right.  So I noticed that when the Government

4   was asking you questions, there were a number of times when

5   Mr. Finley would give you a long question with a number of

6   different facts and you would kind of just agree with him?

7   **A.**  Okay.  Sure.

8   *Q.*  You did that a lot, right?

9   **A.**  Sure.

10  *Q.*  You understand that your answers are the actual evidence

11  the jury is to consider, not the questions and arguments he may

12  make from this table, right?

13  **A.**  Yes, sir.

14  *Q.*  Okay.  I'm going to ask you some questions and I'm going to

15  ask you to explain the answers that you agree with him on.

16  Okay?

17  **A.**  All right.  I will try.

18  *Q.*  Mr. Finley asked you the question that, it was intimated a

19  couple of times during this trial that through the questioning

20  of defense counsel, we were trying to infer that you were

21  trying to get someone to lie.

22          Do you remember him asking you that question?

23  **A.**  Yes.

24  *Q.*  And you agreed with that, right?

25  **A.**  Uh-huh.

1    *Q.*  Yes?

2    **A.**  Yes, sir.

3    *Q.*  Okay.  Cite me one example where one question was asked

4    where it was inferred that you tried to get someone to lie.

5    **A.**  I can't off the top of my head, but I do believe there was

6    something -- comments made, yes.

7    *Q.*  Okay.  You'd agree with me when he asked that you question,

8    you had no problem saying, "Yep, that happened"?

9    **A.**  Uh-huh.

10   *Q.*  Right?

11   **A.**  Yep.

12   *Q.*  Yes?

13   **A.**  Yes, sir.

14   *Q.*  And you're here under oath, right?

15   **A.**  Totally.

16   *Q.*  And you could look these folks in the eye and you can't

17   cite one example when that occurred, right?

18   **A.**  No.

19   *Q.*  Okay.  The Government asked you a number of questions about

20   your background in law enforcement.

21          Do you remember those questions?

22   **A.**  Yes, sir.

23   *Q.*  About investigations you'd been a part of, yes?

24   **A.**  Yes.

25   *Q.*  And awards you had won, right?

1    *A.*   Yes, sir.

2    *Q.*   You gave us an example of this high-end retail return

3    scheme where people were making money.

4          Remember that?

5    *A.*   Sure.  Yes.

6    *Q.*   Okay.  You'd agree with me that that investigation has not

7    a thing on God's green earth to do with this case, right?

8    *A.*   It does not.

9    *Q.*   Okay.  You'd agree with me there's not any relevance in

10   your answer to that question about whether or not these four

11   individuals are guilty, right?

12          MR. FINLEY:  Objection, your Honor.  Relevance is a

13   determination that your Honor makes initially and that the jury

14   makes finally.

15          THE COURT:  Sustained.

16   BY MR. TOMSHECK:

17   *Q.*   If I were to ask you what the relevance of that is to this

18   case, would you have an answer for me?

19   *A.*   Sure.  It involved bank accounts and it involved theft.

20   *Q.*   Okay.  And you believe that somehow the investigation that

21   you worked on previously has something to do with whether or

22   not these four guys are guilty?

23   *A.*   It gives me experience to move forward and investigate

24   different cases.

25   *Q.*   Okay.  I'm going to talk to you specifically about this

———— 2:19-cr-00295-GMN-NJK ————

1   case.

2   **A.**  Absolutely.

3   Q.  The Government asked you a question about this AG award you

4   had won and you said three other people got that award, too?

5   **A.**  Three other inspectors.

6       MR. FINLEY:  That misstates the testimony.

7       THE COURT:  Sustained.  He said three people were with

8   him when he received the award.

9   BY MR. TOMSHECK:

10  Q.  Okay.  How many people got the award?

11  **A.**  Oh, there was a lot of people.

12  Q.  How many?

13  **A.**  I don't know.  50.

14  Q.  So 50 people --

15  **A.**  60 people.

16  Q.  So 50 people got the same award, right?

17  **A.**  Sure.  Yeah.

18  Q.  Okay.  And you said three people were with you when you got

19  it, right?

20  **A.**  Three inspectors.  And then there was a large amount of

21  people there, too, prosecutors and other people.

22  Q.  Okay.  Do you know how many postal inspectors there are in

23  the United States?

24  **A.**  I think right now it's about a thousand.

25  Q.  Okay.  And about ten percent of the workforce of the postal

1    inspectors were here in 2018 to execute these search warrants,

2    right?

3    **A.**  Well, 2018, I think we had about 1,400 people.  We've

4    been -- we've been dropping fast.

5    *Q.*  Okay.  You had, like, a hundred people here, right?

6    **A.**  Yes.

7    *Q.*  And other people testified that at the briefing, you were

8    the case agent and the guy in charge, right?

9    **A.**  I was the co-case agent, yes, sir.

10   *Q.*  I know you want to defer on that now, but I'm telling

11   you --

12   **A.**  That's a fact.

13        MR. FINLEY:  Your Honor, I object to the -- counsel

14   making characterizations about the defendant's intent and

15   commentary on the witness's testimony.

16        MR. TOMSHECK:  I'm not sure what he's talking about,

17   "the defendant's intent."

18        MR. FINLEY:  I'm sorry.  The witness's intent and

19   commentary on the witness's testimony.  It's unnecessary.

20        MR. TOMSHECK:  It's a redirect examination quoting his

21   cross-examination questions.

22        MR. FINLEY:  No.  It's, "I know you want to do this

23   and that," and that's not appropriate.

24        He's also testifying about his knowledge as if that's

25   relevant.

1          THE COURT:  All right.  Just -- let's limit the

2   commentary and the -- just keep to the question.

3   BY MR. TOMSHECK:

4   Q.   Okay.  So I'll draw you back to the question I actually

5   asked you, which was:  When the other individuals testified

6   during this case, there was testimony that you were the guy in

7   charge, right?

8   A.   That's what they said, but that wasn't the truth.

9   Q.   Okay.

10  A.   There was two of us.

11  Q.   Okay.  So it's your testimony --

12          (Indiscernible simultaneous crosstalk.)

13          (Court reporter interruption.)

14          THE COURT:  Let the witness answer first.

15  BY MR. TOMSHECK:

16  Q.   Okay.  Is it your testimony now that when those other

17  inspectors testified, they weren't telling the truth?

18  A.   No, it's not they weren't telling the truth.

19  Q.   Okay.  You'd agree with me that all of them said you were

20  the case agent?

21  A.   Okay.

22  Q.   Do you agree with that?  Yes or no.

23  A.   I think they said that I was the case agent or one of the

24  case agents.

25  Q.   Okay.  I understand that you're saying that you were a

2:19-cr-00295-GMN-NJK

1  co-case agent, but you sat through the trial same as these fine

2  folks did, right?

3  *A.*  Yes, I did.

4  *Q.*  Okay.  And you understand that every other inspector said

5  you were the case agent?

6  *A.*  Okay.  Sure.

7  *Q.*  Do you understand that?

8  *A.*  Yes, I did.

9  *Q.*  Okay.  You would agree with me that there was a decision

10  made not to record interviews of people in this particular

11  case, right?

12  *A.*  In this case and two other ones that were going on at

13  the -- at the same time.

14  *Q.*  Okay.  I'm only here to talk about whether or not these

15  guys are guilty and whether the Government's met that burden.

16  *A.*  Okay.

17  *Q.*  Okay?

18  *A.*  Okay.

19  *Q.*  You would agree with me, in this case, there was a decision

20  made not to record interviews, right?

21  *A.*  Yes.

22  *Q.*  You knew when you drafted this search warrant that's a

23  90-plus page document that there were potentially interviews

24  that were going to be conducted at each of these eight

25  locations, right?

—2:19-cr-00295-GMN-NJK—

1    *A.*   Yes.

2    *Q.*   And you knew that in a number of those locations, those

3    interviews would be conducted of people who didn't speak

4    English as their first language, right?

5    *A.*   Correct.

6    *Q.*   And you would agree with me the decision could have been

7    made to record those interviews, yes?

8    *A.*   Yes.  Of course, it could have.

9    *Q.*   You would agree with me that if that decision had been

10   made, we wouldn't have to dispute and argue and have conjecture

11   about what was said during those interviews, right?

12   *A.*   Yeah.

13   *Q.*   Right?

14   *A.*   Yes.

15   *Q.*   As you sit here today, unmistakably, it would have been

16   better to record those interviews, right?

17   *A.*   Possibly.

18        But the people who talked to the defendants took very

19   good notes and they wrote very good reports.

20   *Q.*   And you're basing that on what?

21   *A.*   On their testimony and I've seen their -- seen their notes.

22   *Q.*   Okay.  You would agree with me that the way we determine if

23   a note is good and a report is accurate is to compare it to

24   something, right?

25   *A.*   True.

──────── 2:19-cr-00295-GMN-NJK ────────

1  *Q.*  For instance, if we had a recording and then we looked at

2  notes based on what was said in that recording or a report

3  drafted against that recording, we would have the ability to

4  say whether or not it was accurate, right?

5  *A.*  Sure.

6  *Q.*  And if all we have is notes and a report based on those

7  notes, it could be based on the wrong thing, right?

8  *A.*  Possibly.

9  *Q.*  You'd agree with me, then -- taking you back to my

10  question -- better to record it, right?

11  *A.*  Possibly.

12  *Q.*  And if there's any dispute about whether or not someone

13  understands the English language, it's certainly better to

14  record that interview, right?

15  *A.*  Potentially.

16  *Q.*  Okay.  Well, when we're talking about this case, we're not

17  talking about possibilities and potential.  We're talking about

18  what actually happened, right?

19  *A.*  Uh-huh.

20  *Q.*  Is that a yes?

21  *A.*  Yes.  Pardon me.

22  *Q.*  And the truth is, we have to rely on notes and we have to

23  rely on reports that may be wrong, right?

24  *A.*  I do not think that the reports here are wrong.

25  *Q.*  Okay.  You have an understanding as you sit here today that

—2:19-cr-00295-GMN-NJK—

1   you have a fundamental difference in what you believe versus

2   what these defendant believe, right?

3   A.   Yes, sir.

4   Q.   For instance, you want the jury to believe that they're

5   part of a criminal conspiracy and they've all denied that.  You

6   know that, right?

7   A.   Yes.

8   Q.   Right?

9        And you understand that it's their -- the jury's

10  determination about who's right and who's wrong?

11  A.   Yes.

12  Q.   Okay.  You'd agree with me that if you want them to make

13  that decision, it's an important one, right?

14  A.   Yes.

15  Q.   And because it's an important decision, we should probably

16  give them the best tools to do that, right?

17  A.   If practical, yes.

18  Q.   And you'd agree with me that we don't have the best tools

19  here to do that, do we?

20  A.   We've had the tools with our team's policy was to not

21  record noncustodial interviews.

22  Q.   This question's been asked of other inspectors, but it's

23  never been asked of you.  Can you give me a reason why it

24  wouldn't be best practice to record an interview?

25  A.   If you have a bunch of recording -- first off, all the

1    people have to know how to properly record and a lot of people

2    don't because they just didn't do it.  Two, it's -- we want to

3    maintain that everybody does the same thing.

4          And in our case, my -- my boss's case, he stated --

5    and that's what we do, is we don't record noncustodial

6    interviews.

7    Q.  I know what you don't do, and I know what you do.

8          My question is:  Can you give me a reason why you

9    wouldn't record all the interviews in this case?

10   A.  Just what I told you.  Back at that time, 2018, we were

11   instructed and we did not record noncustodial interviews.

12   Q.  I didn't ask you what you did.  We know what you did.

13   A.  Okay.

14   Q.  You would agree with me that it would have been better to

15   record, right?

16   A.  Probably, yes.

17   Q.  Okay.  Can you give me a reason why you didn't?

18   A.  Me?

19   Q.  Yes.

20   A.  Because the policy of our team is not to record

21   noncustodial interviews.

22   Q.  You understand that's a bad policy, right?

23   A.  No, it's not a bad policy.

24   Q.  Okay.  If we want to give the jury the most accurate

25   information to make a very important decision about someone

1    else's life, you would agree with me, it would be a better

2    policy to just push record, right?

3    **A.**   Possibly.

4    Q.   Okay.  I want to talk to you, then, about Government's

5    Exhibit 86 and 88.

6            MR. TOMSHECK:  Brian, if you could put those up on the

7    screen, please.

8    BY MR. TOMSHECK:

9    Q.   In front of you there is Government's Exhibit 86.

10           Do you see that?

11   **A.**   Yes, sir.

12   Q.   Okay.

13           MR. TOMSHECK:  Can you put up Government's Exhibit 88,

14   please.

15   BY MR. TOMSHECK:

16   Q.   See Government's Exhibit 88?

17   **A.**   Yes, sir.

18   Q.   Okay.  Now, one of the things you told the Government is

19   that the reason things changed in this case relative to the

20   Kern syndicate was because you didn't know about the envelopes

21   and you didn't know about the text messages.

22           Do you remember that testimony?

23   **A.**   And I also said that we did not know about where people

24   worked at and what they did.

25   Q.   Okay.  You'd agree with me that some of the information you

─── 2:19-cr-00295-GMN-NJK ───

1  put in that search warrant was just plain wrong, right?

2  *A.*  Such as?

3  *Q.*  For instance, saying that my client was the president of Pi

4  Printing?

5  *A.*  It was -- it was -- I thought it was Mario Castro, Jr. was,

6  or Mario Castro.

7  *Q.*  I'm just asking you about when you swore out this affidavit

8  and you put pen to paper, under oath, and gave it to a judge

9  and you said Mario Castro, Sr., was the president of Digital

10  Express and Pi Printing.  That was wrong, right?

11  *A.*  He was the president of Digital Express.

12  *Q.*  Don't disagree with that.

13  *A.*  Okay.

14  *Q.*  You agree with me, as you sit here today, you know darn

15  well he wasn't the president of Pi Printing, right?

16  *A.*  Based on that chart, yes.

17  *Q.*  Okay.  We're going to talk a lot about that chart in just a

18  second.

19  *A.*  Okay, sir.

20  *Q.*  But you understand, as you sit here today, that what you

21  put in that affidavit to a judge under oath was wrong, right?

22  *A.*  Could I look at it first?

23  *Q.*  Sure.

24  *A.*  Okay.

25  *Q.*  It's your warrant.

──────── 2:19-cr-00295-GMN-NJK ────────

1   *A.*  Could I look at it?

2   *Q.*  Do you have a copy with you?

3   *A.*  I do not.

4         MR. TOMSHECK:  Okay.  Brian, can you put up just for

5   the witness, please, the search warrant.

6   BY MR. TOMSHECK:

7   *Q.*  You wrote that document, right?

8   *A.*  Yeah.  Me and a lot of people, yes.

9   *Q.*  Okay.  You agree, on direct examination, you told me you

10  wrote it, right?

11  *A.*  Yes.

12  *Q.*  Okay.  And that you're the one that actually swore out the

13  truth of that document, right?

14  *A.*  Yes, I am, sir.

15  *Q.*  Okay.  So if you want to tell me what page you want to

16  refer to.

17  *A.*  Show me where it says that he was the president of Pi.

18  *Q.*  Is it your dispute that you actually said that?

19  *A.*  Pardon me?

20  *Q.*  Are you disputing that you said that in the warrant?

21  *A.*  I would like to look at it because it's been some time.

22  *Q.*  Okay.

23        MR. FINLEY:  Your Honor, I think it's at page 13 of

24  the PDF if that is helpful.

25        THE WITNESS:  Yes.

---
2:19-cr-00295-GMN-NJK
---

1   BY MR. TOMSHECK:

2   Q.   Okay.  Do you see where you talk about Mario Castro there?

3   A.   Yes, sir.

4   Q.   And do you see where you say he's the president of two

5   corporate entities?

6   A.   Yes, I do.

7   Q.   And do you see where one of those is Digital Express?

8   A.   Yes, sir.

9   Q.   And do you see where the other one is Pi or Pi Printing?

10  A.   Yes, sir.

11  Q.   Okay.  You don't dispute you said that under oath, right?

12  A.   No.

13  Q.   And as you sit here today, you know that's wrong, right?

14  A.   Based on -- based on documentation, yes, it was.

15  Q.   Okay.  All right.  So you also said on direct examination

16  that one of the reasons that your feelings about the case

17  changed was the envelopes that I just showed you in 86 and 88

18  as well as the fact that you didn't have text messages, right?

19  A.   Correct.

20  Q.   Okay.  You'd agree with me that at the time you swore out

21  that affidavit that you just looked at, you had a number of

22  pieces of physical information that you had subpoenaed through

23  a grand jury, right?

24  A.   Yes.

25  Q.   And those include phone records?

1    **A.**   Yes.

2    *Q.*   And in fact, you refer repeatedly throughout the body of

3    that affidavit to text messages, right?

4    **A.**   I believe so, yes.

5    *Q.*   And you indicate how many text messages there were?

6    **A.**   Correct.

7    *Q.*   I'm assuming you counted them?

8    **A.**   I -- no.  I don't know who -- there was another person who

9    did most of that and I spot-checked them, but, yes.

10   *Q.*   Okay.  You knew about the text messages, right?

11   **A.**   Yes, sir.

12   *Q.*   Okay.  And, in fact, you included that in the warrant,

13   right?

14   **A.**   Yes, sir.

15   *Q.*   Okay.  Now, when I showed you these exhibits, Government's

16   86 -- well, first of all, just so we're clear, to tell the jury

17   that you didn't know about text messages prior to the warrant

18   when you included information about text messages in a warrant,

19   that's not consistent, is it?

20   **A.**   No.  It's the content of the text messages.

21   *Q.*   Okay.  You were aware of the text messages, right?

22   **A.**   Yes.  But we did not have the contents of them.

23   *Q.*   Okay.

24   **A.**   So...

25   *Q.*   You told me on direct examination that when you work for

1  the Postal Inspection Service, you expect to get a paycheck,

2  right?

3  **A.**  Yes, sir.

4  Q.  Yeah.  You do work, you expect to be paid for it, right?

5  **A.**  Sure.

6  Q.  And I think you told us that's normal, right?

7  **A.**  I would hope it was, yes.

8  Q.  Okay.  Can you tell me how much Mario Castro got paid at

9  Digital Express for performing the tasks he was hired to do?

10  **A.**  I can't tell you at the top of my head, no.

11  Q.  Okay.  Do you know whether or not Patti Kern made the

12  decision to pay him for those tasks with checks or cash?

13  **A.**  I think it was combination of -- well, tasks?  He was a

14  partner.

15  Q.  Okay.  You're basing that on Patti Kern, right?

16  **A.**  And Sean O'Connor.

17  Q.  Okay.  Just so we're clear, Patti Kern says Mario Castro's

18  a partner with Patti Kern, right?

19  **A.**  That's what she said, yes.

20  Q.  Sean O'Connor tells you that Mario Castro's a partner with

21  Patti Kern, right?

22  **A.**  Okay.

23  Q.  Yes?

24  **A.**  I think so, yes.

25  Q.  I mean, that's what you just told us, right?

─────────── 2:19-cr-00295-GMN-NJK ───────────

1   *A.*   That's what I think, yeah.

2   *Q.*   You agree that Mario Castro disputes that, right?

3   *A.*   Of course.

4   *Q.*   And you'd agree with me that you have to -- in order to

5   accept that principle, that they're partners, you have to rely

6   on Sean O'Connor and Patti Kern, right?

7   *A.*   And cash envelopes and checks.  Yes.

8   *Q.*   You'd agree with me the part about them being a partner,

9   that comes from Patti, right?

10  *A.*   Yes.

11  *Q.*   You'd have to believe her, right?

12  *A.*   Yes.

13  *Q.*   Okay.  And you want the jury to believe her?

14  *A.*   Yes.

15  *Q.*   Okay.  Can you tell the ladies and gentlemen of the jury

16  how much Mario Castro got paid for doing printing work?

17  *A.*   I can't tell you that off the top of my head.

18  *Q.*   You'd agree with me that if he does a printing job at

19  Digital Express, he should be paid for it, right?

20  *A.*   Yes.

21  *Q.*   You're aware that he did printing work for other entities,

22  yes?

23  *A.*   Yes, he did.

24  *Q.*   And he got paid for it, right?

25  *A.*   Yes, he did.

—— 2:19-cr-00295-GMN-NJK ——

1    *Q.*  Okay.  You'd agree with me that he would be entitled to be

2    paid for a printing job he does for a customer or a client,

3    yes?

4    **A.**  He's printing for himself --

5    *Q.*  I'm --

6    **A.**  -- and his partners.

7    *Q.*  Okay.  I'm asking you if he would be entitled to be paid

8    for work he's done.

9    **A.**  Yes.

10   *Q.*  Okay.  And as you sit here today, you can't tell us how

11   much he was paid for doing printing jobs, right?

12   **A.**  Not at the top of my head, sir.

13   *Q.*  Okay.  In those envelopes in Government's 86 and 88, there

14   is cash?

15   **A.**  Yes, sir.

16   *Q.*  Can you tell me how much cash?

17   **A.**  I cannot.

18   *Q.*  Okay.

19        MR. TOMSHECK:  Can you go specifically to Government's

20   Exhibit 88?

21   BY MR. TOMSHECK:

22   *Q.*  Do you see the name "Mario" on that?

23   **A.**  Yes.

24   *Q.*  Okay.  Do you know how much money is in that envelope?

25   **A.**  I do not.

─────────────── 2:19-cr-00295-GMN-NJK ───────────────

1   *Q.*  Okay.  You were present when that money was seized, right?

2   *A.*  I was in the same house, yes.

3   *Q.*  So you were present when that money was seized, right?

4   *A.*  Correct.

5   *Q.*  Okay.  And you talked to Patti Kern that day, right?

6   *A.*  Correct.

7   *Q.*  That money was taken, correct?

8   *A.*  Yes, sir.

9   *Q.*  And you'd agree with me that you have no idea how much

10  money was in that inventory?

11  *A.*  I -- I don't think so, yes, right.

12  *Q.*  Okay.  You were here when other inspectors talked about

13  that impounding inventory that's in evidence and the jury will

14  have an opportunity to look at in deliberation.

15       Do you remember that?

16  *A.*  Yes, sir.

17  *Q.*  You'd agree with me there's references to U.S. currency

18  seized with no denomination on it?

19  *A.*  I -- I think so, yes.

20  *Q.*  Okay.  You'd agree with me that if, for instance, Mario was

21  entitled to be paid for a print job and the money in that

22  envelope matched up with how much that print job should cost,

23  that might be relevant to your investigation, right?

24  *A.*  Yeah.

25  *Q.*  Okay.  You'd agree with me you can't tell us at all how

—2:19-cr-00295-GMN-NJK—

1    much money is in there?

2    **A.**   I just told you that, sir.

3    *Q.*   Okay.  So you'd agree with me?

4    **A.**   Yes.

5    *Q.*   Okay.  All right.  Now, I want to talk to you about the

6    exhibit that you mentioned, Government's Exhibit 280.

7            MR. TOMSHECK:  If you could bring that up, please,

8    Brian.

9    BY MR. TOMSHECK:

10   *Q.*   Okay.  Do you see Government's Exhibit 280?

11   **A.**   Yes, sir.

12   *Q.*   What is it?

13   **A.**   It's -- it's a group of mailing companies that the -- that

14   the defendants and Patti Kern used.

15   *Q.*   That the defendants and Patti Kern used?

16   **A.**   That they were all part of, yes.

17   *Q.*   Okay.  This may seem like a silly question, but you

18   understand these defendants are four separate individuals,

19   right?

20   **A.**   Okay.

21   *Q.*   Yes?

22   **A.**   Yes, sir.

23   *Q.*   We can't just lump them all together, right?

24   **A.**   Correct.

25   *Q.*   Okay.  I'm asking you what Government's Exhibit 280 is, not

———— 2:19-cr-00295-GMN-NJK ————

1   asking you yet about the content that's on it.

2   **A.**   Okay.

3   *Q.*   What is it?

4   **A.**   It's a list of mailing companies.

5   *Q.*   Okay.  It is a list of mailing companies compiled by whom?

6   **A.**   By the Government.

7   *Q.*   Okay.  The prosecutors, right?

8   **A.**   Yes, sir.

9   *Q.*   They created this document, yes?

10  **A.**   Yes, sir.

11  *Q.*   And in that document, they put what they've titled Mailing

12  Companies, right?

13  **A.**   Yes, sir.

14  *Q.*   That they think are relevant to the case in front of the

15  jury, yes?

16  **A.**   Yes, sir.

17  *Q.*   Okay.  You'd agree with me at the bottom of that document,

18  they cite a number of source information, right?

19  **A.**   It appears so, yes.

20  *Q.*   Okay.  You'd agree with me that's not the extent of the

21  evidence in this case, right?

22  **A.**   No.

23  *Q.*   Correct?

24  **A.**   Correct, yes.

25  *Q.*   There are other bank accounts that aren't in this document,

—2:19-cr-00295-GMN-NJK—

1   yes?

2   *A.*   Yes, sir.

3   *Q.*   There are other companies that aren't in this document,

4   right?

5   *A.*   Yes, sir.

6   *Q.*   There are other individuals whose names are on title to

7   companies that aren't in the document, right?

8   *A.*   Yes, sir.

9   *Q.*   You'd agree with me that this document is a list that the

10  Government compiled because they want to point out certain

11  things about it to the jury, right?

12  *A.*   Sure.

13  *Q.*   Okay.  The Government asked you some questions about Assets

14  Unlimited.

15          Do you see that on there?

16  *A.*   Yes, sir.

17          MR. TOMSHECK:  Okay.  Can you blow that up, Brian?

18  BY MR. TOMSHECK:

19  *Q.*   Okay.  Second one down there, it says Assets Unlimited dba

20  of Pi Printing, Corp.

21          Do you see that?

22  *A.*   Yes, sir.

23  *Q.*   Who came up with the name "Assets Unlimited"?

24  *A.*   I do not know.

25  *Q.*   Okay.  Do you have any idea whatsoever?

—— 2:19-cr-00295-GMN-NJK ——

1   *A.*   No.

2   *Q.*   Okay.  You'd agree with me when the Government was asking

3   you questions, they were attributing the company to Mario

4   Castro, Jr., right?

5   *A.*   Yes.  Because his name was on it.

6   *Q.*   Okay.  Do you know who told Mario Castro, Jr. to put his

7   name on that document?

8   *A.*   I do not.

9   *Q.*   Okay.  Do you know who instructed Mario Castro, Jr. to open

10  a bank account relative to Pi Printing?

11  *A.*   Not for sure, no.

12  *Q.*   Do you know why he was instructed to open that bank

13  account?

14  *A.*   To open up a company to do prize notices.  So...

15  *Q.*   Did Mario Castro, Jr. talk to you in this investigation?

16  *A.*   He did talk to me.

17  *Q.*   Did he ever hide from you?

18  *A.*   No.  He was -- we met him at a coffee shop somewhere in

19  Pennsylvania.

20  *Q.*   Super cooperative, right?

21  *A.*   Very nice.

22  *Q.*   Answered your questions, correct?

23  *A.*   Yes, sir.

24  *Q.*   Okay.  And as you sit here today, you have no idea why that

25  company was opened, right?

2:19-cr-00295-GMN-NJK

1    **A.**  I would have to read the report that we did when we talked

2    to him.  That's been years ago.

3    Q.  Okay.  As you sit here today, you can't tell the ladies and

4    gentlemen of the jury why that account was opened, right?

5    **A.**  It was -- it was opened so that they could do prize

6    notices.

7    Q.  Okay.  And you're basing that on what?

8    **A.**  Because they did prize notices.

9    Q.  I don't dispute that there were prize notices.

10   **A.**  Okay.

11   Q.  You're basing that on what, that that's why it was opened?

12   **A.**  Because they were sent out.

13   Q.  You would agree with me that the person that made the

14   decision to open this company and this bank account, that would

15   be a relevant thing for the jury to know, right?

16   **A.**  Sure.

17   Q.  You'd agree with me that things like who named the company

18   the dba names, that would be important for the jury to know,

19   right?

20   **A.**  Possibly.

21   Q.  Okay.  And as you sit here today, you can't tell us that

22   right, right?

23   **A.**  Not off the top of my head, no, sir.

24   Q.  Okay.  When the Government asked you questions about that

25   particular entity -- and in fact, there's, I think, two of them

—— 2:19-cr-00295-GMN-NJK ——

1    that are dbas of Pi Printing.  You see Assets Unlimited, second

2    from the top, and then about halfway down, Money Securities.

3            You see those two different entities, right?

4    *A.*  Yes, I do.

5    *Q.*  Two different dbas, correct?

6    *A.*  Yes.

7    *Q.*  When the Government asked you the question -- I wrote this

8    down -- that Mario Castro, Jr. used these companies to commit

9    fraud.

10           Do you remember that?

11   *A.*  Yes.

12   *Q.*  What did Mario Castro, Jr. do to commit fraud?

13   *A.*  They printed prize notices with his company and his company

14   name.

15   *Q.*  Take you back to my question.

16           The Government asked you the question, "Did Mario

17   Castro Jr. use to commit fraud."

18           What did Mario Castro, Jr. do to commit fraud?

19   *A.*  He had his name on companies that sent out prize notices

20   that were fraudulent.

21   *Q.*  Okay.  So is your answer that he didn't do anything other

22   than have his name on the company?

23   *A.*  I don't -- I don't know what -- what else he did.

24   *Q.*  That's what I'm asking you.

25   *A.*  No, I don't know what else he did.

1    *Q.*  Okay.  On Government's 280, I noticed that all of those

2    companies are post-2009.

3           You'd agree with that, right?

4    *A.*  Yes, sir.

5    *Q.*  You'd agree with me that in 2009, Patti Kern received a

6    cease and desist from the Federal Government, right?

7    *A.*  I believe that's true, yes.

8    *Q.*  Okay.  And after that, she no longer put her name on

9    mailing companies, right?

10   *A.*  Correct.

11   *Q.*  She used her husband's, yes?

12   *A.*  Yes.

13   *Q.*  And then she used other people's, right?

14   *A.*  Sure.

15   *Q.*  Okay.  You'd agree with me that she couldn't have

16   perpetrated a fraud without using other people, right?

17   *A.*  Without being in a partnership with different people,

18   right.

19   *Q.*  Okay.  She didn't have printing presses?

20   *A.*  Not that I know of.

21   *Q.*  She needed them to get the mail out, right?

22   *A.*  Sure.  Yes.

23   *Q.*  Because she didn't have them, she needed to hire someone

24   else to do that, right?

25   *A.*  They were partners.

211

—2:19-cr-00295-GMN-NJK—

1    Q.  Okay.  Well, let me ask you this.  When the Government

2    asked you questions, they lumped it all together, printing and

3    mailing.

4         You understand, as you sit here today, that mailing

5    companies are entirely separate from the actual printing,

6    right?

7    A.  Yes.

8    Q.  Okay.  You understand that Patti Kern had a business

9    relationship with Epi Castro, right?

10   A.  Yes, she did.

11   Q.  And that he did the printing, right?

12   A.  He did the first part of the printing, yes.

13   Q.  Right.

14        The actual printing of graphics and things on a sheet

15   of paper, Epi's company did that, right?

16   A.  Yeah.  It was called a shell, yes.

17   Q.  Okay.  And you don't have any meaningful testimony to give

18   to the ladies and gentlemen of the jury about Patti's business

19   relationship with Epi, right?

20   A.  Explain that, please.

21   Q.  Do you know how they structured their payments?

22   A.  Not off the top of my head, no.

23   Q.  Okay.  So Epi Castro does work for Patti, right?

24   A.  Let me go back.

25        I believe that he got white -- white things full of

─── 2:19-cr-00295-GMN-NJK ───

1    cash.

2    Q.   Huh?

3    A.   I believe Epi Castro got white envelopes full of cash at

4    times, too.

5    Q.   Okay.  Not my question.

6    A.   Oh.

7    Q.   When Patti --

8    A.   I apologize.

9    Q.   Again, let me finish before you talk, if you could.

10    A.   Okay.

11    Q.   When Patti went to set up a business relationship with Epi

12    Castro --

13    A.   Yes.

14    Q.   -- do you have any meaningful testimony to give the ladies

15    and gentlemen of the jury about how that transaction occurred?

16    A.   No.

17    Q.   Okay.  You don't know, for instance, if Epi Castro did

18    printing for Patti on credit and got paid on the back end for

19    his printing, do you?

20    A.   I don't recall how that worked.  So, no.

21    Q.   In fact, you don't recall how any of that worked as it

22    relates to this case, the printing and mailing jobs that were

23    done, how much and when those payments would be made for that

24    work?

25    A.   For which -- which business are you talking about?

1    *Q.*  Any of them.

2    **A.**  I don't have it on top of my head, but that -- we -- we

3    went through the accounts.

4    *Q.*  Okay.  And you can't tell the ladies and gentlemen of the

5    jury how that was contractually arranged?  For instance, I'll

6    do a thousand jobs for a thousand bucks.  I'll do a million

7    sheets of paper for $500.

8            You have no meaningful testimony to give us about

9    that, right?

10   **A.**  Yeah, I don't know how that process went.

11   *Q.*  Okay.  I had asked you a moment ago that these are all past

12   2009, all these mailing companies in Government's 280, right?

13   **A.**  Yes, sir.

14   *Q.*  Okay.

15   **A.**  Yes.

16   *Q.*  You would agree with me that you were aware of all of these

17   companies when you drafted your search warrant affidavit,

18   right?

19   **A.**  I think I was, yes.

20   *Q.*  Yeah.

21           And you put in your search warrant affidavit that

22   Patti Kern hid her leadership role, right?

23   **A.**  Yes, sir.

24   *Q.*  And that Patti Kern controlled all aspects of the mass

25   mailing operation, right?

1    *A.*  I don't know if that was the words used.

2    *Q.*  I took them verbatim.

3            You don't dispute that, do you?

4    *A.*  Okay.

5    *Q.*  That she took a concentrated effort to remove her name.

6            You agree with that, right?

7    *A.*  Can you -- can you show it to me?  Thank you.

8    *Q.*  Do you see at paragraph 4 there, the Investigation

9    Background?

10   *A.*  Yes, sir.  And I do see the part where --

11   *Q.*  If you want to read paragraph 4 into page 5, the

12   Investigation Background portion of that document, I think you

13   should be able to answer these questions.

14   *A.*  You want me to read it now first?

15           MR. FINLEY:  I think he can just --

16           THE COURT:  Read it to yourself and then look up when

17   you're done.

18           THE WITNESS:  Yes.

19   BY MR. TOMSHECK:

20   *Q.*  Have you had a chance to read that?

21   *A.*  Yes, I have, sir.

22   *Q.*  Okay.

23           THE COURT:  You want him to read paragraph 5, as well?

24           MR. TOMSHECK:  I want him to read page 4 into page 5,

25   the section entitled Investigation Background.

—— 2:19-cr-00295-GMN-NJK ——

1          THE WITNESS:  Could you go down, please?

2          Okay.

3    BY MR. TOMSHECK:

4    Q.   Okay.  And then if you could read at the bottom of page 5,

5    paragraph 8, Basic Business Components of a Mass Mailing Fraud

6    Scheme.

7    A.   Okay.

8          Okay.

9    Q.   Okay.  You told us before that Patti Kern, in this

10   scenario, is the person you've identified as the mailer,

11   correct?

12   A.   Yes.

13   Q.   You'd agree with me that you wrote there, verbatim, "The

14   mailer controls all aspects of the fraudulent mass mailing

15   campaign and is the ultimate beneficiary of all victim

16   payments."

17          Did you write that?

18   A.   Yes.

19   Q.   Okay.  Did you write, "The mailer hires all business

20   components necessary to fully execute the fraud scheme"?

21   A.   Yes.

22   Q.   Okay.  I'm going to take you back up to the Investigation

23   Background at paragraph 4 on page 4.

24          See that?

25   A.   Yes, sir.

— 2:19-cr-00295-GMN-NJK —

1  *Q.* Okay. You'd agree with me that's where you first refer to

2  it as the Kern syndicate, right?

3  *A.* I believe so, yes.

4  *Q.* And in that paragraph, you refer to it as the Kern

5  syndicate more than once, correct?

6  *A.* Yes.

7  *Q.* "Patti Kern is a principal coconspirator in a mail fraud

8  scheme that involves the mass mailing of millions of fraudulent

9  solicitations," right?

10        MR. FINLEY: Objection. I -- if counsel could just

11  ask the question again, I didn't hear the word that came before

12  "principal coconspirator." I did not hear it.

13        THE COURT: Go ahead and ask the question again that

14  he didn't hear.

15        MR. TOMSHECK: Yep.

16  BY MR. TOMSHECK:

17  *Q.* I'm going to read it back to you again.

18  *A.* Sure.

19  *Q.* "Patricia Kern is a principal coconspirator in a mail fraud

20  scheme that involves the mass mailing of millions of fraudulent

21  solicitations," yes?

22  *A.* Yes, sir.

23  *Q.* Okay. You'd agree with me in this document, as you told us

24  on direct examination, you identify conspirators, right?

25  *A.* Yes.

1    *Q.*  And then you also identify -- I think you told us they were

2    participants?

3    **A.**  I believe that's what we put in here, yes.

4    *Q.*  Okay.  You identified Mario Castro as a participant, right?

5    **A.**  I believe so.

6    *Q.*  Okay.  And Patti Kern is a coconspirator, right?

7    **A.**  Principal.

8    *Q.*  Okay.  All right.

9    **A.**  Coconspirator, true.

10   *Q.*  To take you back to my original questions, you would agree

11   that Kern make a concerted effort to remove her name from the

12   Kern syndicate, right?

13   **A.**  Yes.

14   *Q.*  To hide her leadership role in the mass mailing scheme,

15   right?

16   **A.**  Yes.

17   *Q.*  By relying on other individuals and front companies as will

18   be discussed below, right?

19   **A.**  Yes.

20   *Q.*  Okay.  You'd agree with me that in Government's

21   Exhibit 280, Patti Kern has removed her name from all that

22   stuff, right?

23   **A.**  Yes.

24   *Q.*  And you would agree with me that in Government's 280, if I

25   was drafting --

1          MR. TOMSHECK:  Can you put 280 back up there, please?

2          THE COURT:  It's past 4:00.  Is there -- I was trying

3  to wait for a place where it looked like you were done were

4  getting ready to move onto a different area, but --

5          MR. TOMSHECK:  Now is fine.

6          THE COURT:  Is that all right?

7          So we're going to go ahead and let the jury go home

8  tonight.  We'll welcome you back tomorrow at 9:00.

9          Remember, you're not to discuss this case with anyone,

10  not even each other.  You can tell your boss, your coworkers,

11  your daycare helpers, all those kind of people, your spouse,

12  "No, we're not done yet," but please don't tell them anything

13  about the case.

14          Do not speak or listen to anything that touches upon

15  this case in any way or attempt to perform any research or any

16  independent investigation.  And write down your questions.  Do

17  not form any opinions.

18          And we will see you back here at 9:00 a.m. tomorrow

19  morning.

20          (Whereupon, the jury exits at 4:03 p.m.)

21          THE COURT:  Mr. Bouchie, you're also excused for the

22  night.  We just need you back here at 9:00 a.m. tomorrow

23  morning.  Please be careful with the steps and remember not to

24  speak to anyone about the testimony.

25          THE WITNESS:  Yes, ma'am.

————— 2:19-cr-00295-GMN-NJK —————

1          THE COURT:  So we're still on the record outside the
2     presence of the jury.
3          After Mr. Bouchie's jury questions and follow-ups,
4     then is the plan still to call Mario Castro, Jr. so that
5     Mr. Goodman knows whether he needs to waste another day here?
6          MR. TOMSHECK:  So Mr. Goodman notified us he has
7     hearings tomorrow.
8          THE COURT:  Okay.
9          MR. TOMSHECK:  And I know we've got the issue with the
10    interpreter.  It may be best if we just defer Mario, Jr. until
11    after the Spanish speakers have testified.
12         THE COURT:  Okay.  Any objection to that by anybody?
13         Is that all right if we use our time efficiently with
14    the interpreter?  So tomorrow, we'll have Salvador Castro, Jose
15    Luis Mendez.
16         MR. TOMSHECK:  And because the interpreter is only
17    available, as I understand it, tomorrow, I wouldn't object if
18    we put -- push pause on Inspector Bouchie and did the Spanish
19    speakers and then came back to him.  Just a suggestion.
20    Doesn't matter to me.
21         THE COURT:  I don't know how much more the jury can
22    parcel out separating him midway.  I think we'd be better off
23    just finishing with Mr. Bouchie and then --
24         MR. TOMSHECK:  Okay.
25         THE COURT:  -- and then going into the interpreter, if

2:19-cr-00295-GMN-NJK

1  we can start at 9:00 a.m. tomorrow.

2          All right.  So today is Monday.  Tuesday.  Wednesday.

3  When -- so settle jury instructions on Thursday or Wednesday

4  afternoon?

5          I've already gone through them.  We've got what we

6  think is a rough draft.  We'll, of course, look at them one

7  more time.  So I'm assuming there's no other extra

8  instructions?

9          Obviously, now we've got to make sure we keep both in

10 about defendant testifies, defendant doesn't testify because

11 some will and some won't, but we'll talk about -- we'll go

12 through all of them so that you can object to the ones that I

13 think should be included that you think should not and also so

14 you can object to the ones that I did not include and explain

15 to me more why you think they should be included.

16          Mr. Mishler, you got your fingers up?

17          MR. MISHLER:  Your Honor, I do apologize.  I spoke

18 with Nick.  I must have misunderstood last week.  I'll get our

19 proposed jury instructions filed tonight and send a Word copy

20 to your clerk as well so that he can integrate them.  I

21 apologize on that, your Honor.

22          THE COURT:  Are these proposed instructions different

23 than what's already been submitted?

24          MR. MISHLER:  I think, for the most part, they're the

25 same instruction.

1          THE COURT:  Okay.  Then I don't need the same

2     instructions again.  I just need if you got something

3     additional that wasn't already submitted.

4          MR. MISHLER:  They're revisions to those.

5          THE COURT:  Revisions to ones that were already

6     submitted?

7          MR. MISHLER:  Yes, your Honor.  By the Government, I

8     believe.

9          THE COURT:  Which ones?

10          MR. MISHLER:  Off the top of my head, I think

11     knowingly, conspiracy, elements.

12          THE COURT:  We use the model.  Is there --

13          MR. MISHLER:  I think we have one on foreign language

14     testimony since some of the witnesses are going to testify in

15     foreign language.

16          THE COURT:  And actually, that was one of the ones

17     that I added in that nobody else had already put yet, so I do

18     have that one, too.

19          MR. BROWN:  Just, I made a note to remind myself, but

20     the foreign language is supposed to be given, I see from the

21     comment, before the witness testifies.  So I just wanted to

22     flag that.  I have a note to myself, but I just want to make

23     sure we don't forget to do that.

24          THE COURT:  Thank you.  I appreciate that.

25          MR. ZYTNICK:  Your Honor, could we also have one or

1    two additional ones that we will submit tonight?  One of them

2    is new and one of them is a slightly different version of what

3    the defense submitted but that we think more accurately tracks

4    the model instruction.

5        THE COURT:  Okay.  There are a couple of instructions

6    that have parenthesis -- or brackets, actually, they are,

7    brackets with optional language.  So take -- take a look at

8    those because on some of those, we started to try to get an

9    idea of what might go in there, but I'd rather you fill it in

10   rather than have three or four different ones.  So take a look

11   at those as well to see how you would put that in.

12       One problem I did notice with the verdict form is that

13   it references the indictment.  I don't give a copy of the

14   indictment.  So the verdict form has to say more specifically

15   what is charged instead of saying "as charged in the indictment

16   in Count 2," because they're not going to have the indictment

17   to look at.  So you need to be more specific about what it is

18   that's charged in the indictment.

19       And it -- I don't -- I think, at this point, we can

20   use the full name.  We don't have to be using the initials even

21   though the initials are in the indictment.  But the jury has

22   all heard what the names are of the victims and they have

23   paperwork that has the names of the victims, and I think it

24   makes more sense, because there are some that have similar

25   initials, if you just use the names in the verdict form

──────── 2:19-cr-00295-GMN-NJK ────────

1    instead.

2           Also, I always put "not guilty" first and then

3    "guilty," not the other way around, because the presumption is

4    not guilty unless the burden is met.

5           All right.  Well, submit to me any of your new jury

6    instructions that you haven't already provided.

7           As I said before, and I'll say it again, any of the

8    defense instructions that anybody submitted I assume is joined

9    unless you object to it and tell me you don't want it to be

10   joined.  So you don't have to give me four versions of the same

11   jury instruction.

12          MR. TANASI:  So your Honor, on that, over the weekend,

13   I did submit -- and actually, it was late on Sunday night -- a

14   proposed packet of jury instructions that would, basically,

15   supercede all of Mario Castro's past instructions.  It would

16   just be the one document for the Court to go off for Mario

17   Castro.  I believe it's 707.

18          THE COURT:  Okay.  Well, I'll see if I can figure out

19   what you changed because I've already put together, based on

20   what you provided, I went through all of them, yes, no, yes,

21   no, yes, no, made my packet of yes, and then I have the packet

22   of "I don't know why they want me to give these," or "No, this

23   is not what the law says," you know, and so forth.  So I

24   planned to go through each one.  So I've already taken it all

25   apart and figured out.

1          So I'll try to see if I can figure out what's

2   different about the packet if you don't -- if you want to tell

3   me tomorrow or just give me one that's highlighted that tells

4   me, "We just changed this one line here because we saw this

5   case and we think it sounds better if we use this phrase

6   instead of the other phrase" --

7          MR. TANASI:  It was more to fill in the brackets as

8   your Honor had --

9          THE COURT:  Oh, good.  Okay.  I do want that.  I do

10  want the bracket information to find out what it is you think

11  should be in those brackets.  I do appreciate that.

12         MR. TANASI:  But I will identify those.

13         THE COURT:  Okay.  Good.  All right.  Then we are --

14         MR. FINLEY:  Your Honor?

15         THE COURT:  Yes?

16         MR. FINLEY:  Sorry to belabor it, but I just want to

17  make sure that I'm clear that the order is Salvador Castro and

18  Jose Luis Mendez tomorrow?  In that order?

19         MR. GREEN:  After Bouchie, yes.

20         MR. TANASI:  So on that, your Honor, just given

21  Mr. Goodman's schedule, I'm trying to identify what time to

22  have him here.  So it sounds like I shouldn't even necessarily

23  have him here tomorrow or even have him here tomorrow maybe at

24  the very end of the day.

25         THE COURT:  I think we will know better by lunchtime

———— 2:19-cr-00295-GMN-NJK ————

1    tomorrow if we think that we're actually going to get to

2    Miguel, Jr. [sic], right?

3            MR. TANASI:  I mean, that makes sense.

4            THE COURT:  I'm not calling the defendants; you are.

5    So you know if you're going to ask him three questions or 103

6    questions.  I don't know.

7            But I think maybe you could tell him, "Hey, I'll -- at

8    lunchtime, I'll let you know how it's progressing."  And you

9    might have a better idea by lunchtime.

10           MR. TANASI:  Understood.

11           THE COURT:  How close we are?  I don't know.  But I

12   appreciate that if he's got court in the morning and he's not

13   here all day, that I think it's the courteous thing to do is to

14   let him do what he needs to tomorrow morning and not ask him to

15   reschedule everything.  Okay.

16           MR. TANASI:  Understood.

17           THE COURT:  Anything else?

18           MR. FINLEY:  No, your Honor.

19           THE COURT:  All right.  Then we'll see you here at

20   9:00 a.m. tomorrow morning.

21           (The proceedings adjourned at 4:11 p.m.)

22                              * * *

23

24

25

2:19-cr-00295-GMN-NJK

--o0o--

COURT REPORTER'S CERTIFICATE


    I, SAMANTHA N. MCNETT, Official Court Reporter, United

States District Court, District of Nevada, Las Vegas, Nevada

certify that the foregoing is a correct transcript from the

record of proceedings in the above-entitled matter.


Date:  April 10, 2023


                                    /s/ Samantha N. McNett
                                    Samantha McNett, RPR, CRR, CCR