—2:19-cr-00295-GMN-NJK—

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,        )
                                     )   Case No. 2:19-cr-00295-GMN-NJK
5                Plaintiff,          )
                                     )   Las Vegas, Nevada
6        vs.                         )   Tuesday, April 11, 2023
                                     )   9:35 a.m.
7   MARIO CASTRO, SALVADOR           )
    CASTRO, MIGUEL CASTRO, and       )   JURY TRIAL, DAY 14
8   JOSE LUIS MENDEZ,                )   A.M. SESSION
                                     )
9                Defendants.         )   *C E R T I F I E D   C O P Y*

10  _____

11

12            REPORTER'S TRANSCRIPT OF PROCEEDINGS

13          THE HONORABLE GLORIA M. NAVARRO
14             UNITED STATES DISTRICT JUDGE

15

16

17  APPEARANCES:        See Pages 2 and 3

18

19

20

21

22  COURT REPORTER:     Patricia L. Ganci, RMR, CRR
                        United States District Court
23                      333 Las Vegas Boulevard South, Room 1334
                        Las Vegas, Nevada  89101
24
    Proceedings reported by machine shorthand, transcript produced
25  by computer-aided transcription.

———2:19-cr-00295-GMN-NJK———

1   APPEARANCES:

2   For the Government:

3           **MINA CHANG, AUSA**
            UNITED STATES ATTORNEY'S OFFICE
4           501 Las Vegas Boulevard South, Suite 1100
            Las Vegas, Nevada  89101
5           (702) 388-6336

6           **TIMOTHY T. FINLEY, ESQ.**
            **DANIEL E. ZYTNICK, ESQ.**
7           U.S. DEPARTMENT OF JUSTICE
            950 Pennsylvania Avenue, N.W.
8           Washington, D.C.  20530
            (202) 307-0050

9
    For Defendant Mario Castro:
10
            **JOSHUA L. TOMSHECK, ESQ.**
11          HOFLAND & TOMSHECK
            228 South 4th Street
12          Las Vegas, Nevada 89101
            (702) 895-6760
13
            **RICHARD E. TANASI, ESQ.**
14          TANASI LAW OFFICES
            8716 Spanish Ridge, Suite 105
15          Las Vegas, Nevada 89148
            (702) 906-2411
16
    For Defendant Salvador Castro:
17
            **DONALD J. GREEN, ESQ.**
18          LAW OFFICES OF DONALD J. GREEN
            4760 South Pecos Road, Suite 103
19          Las Vegas, Nevada 89121
            (702) 388-2047
20
    ////
21

22

23

24

25

2:19-cr-00295-GMN-NJK

1  For Defendant Miguel Castro:

2        **LUCAS GAFFNEY, ESQ.**
         GAFFNEY LAW
3        9900 Covington Cross Drive, Suite 290
         Las Vegas, Nevada 89144
4        (702) 742-2055

5        **THOMAS A. ERICSSON, ESQ.**
         THOMAS A. ERICSSON, CHTD.
6        9900 Covington Cross Drive, Suite 290
         Las Vegas, Nevada 89144
7        (702) 878-2889

8  For Defendant Jose Luis Mendez:

9        **CHRISTOPHER MISHLER, ESQ.**
         **WILLIAM H. BROWN, ESQ.**
10       BROWN MISHLER, PLLC
         911 N. Buffalo Drive, Suite 202
11       Las Vegas, Nevada 89128
         (702) 816-2200

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2:19-cr-00295-GMN-NJK

1                    INDEX OF EXAMINATIONS

2  CONTINUED TESTIMONY OF BARRY BOUCHIE

Continued Redirect Examination by Mr. Tomsheck......13
3     Redirect Examination by Mr. Gaffney.................62
      Redirect Examination by Mr. Green..................70

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2:19-cr-00295-GMN-NJK

1          LAS VEGAS, NEVADA; TUESDAY, APRIL 11, 2023; 9:35 A.M.

2                              --oOo--

3                      P R O C E E D I N G S

4          COURTROOM ADMINISTRATOR:  All rise.

5          THE COURT:  Thank you.  You may be seated.

6          All right.  So just an update.  We did hear from the

7    juror yesterday who wasn't here -- Juror Number 12?

8          COURTROOM ADMINISTRATOR:  12.

9          THE COURT:  12.  She was sick.  She did apologize.  She

10   thought that she had contacted us, but she was texting a

11   landline.  So she was actually concerned why we had not

12   responded to her.  But we never received the text because you

13   can't text a landline.  So -- so unfortunately she -- she was

14   sick, and she's aware now that she has been excused because she

15   missed court.

16         However, we're still waiting for a different juror who

17   is not here yet.  That juror did tell us right away that they

18   had to go back home to get something for their child and then

19   take it to the child's school.  So we know that that person was

20   running late and was supposed to be here by 9:30.  So it's 9:30

21   and they're not here yet, but hopefully will be here any minute

22   now.

23         That is a different person from the one who was late

24   yesterday, and a different person from the one who would like us

25   to go dark on Thursday and Monday because that juror is going to

─2:19-cr-00295-GMN-NJK─

 1  be -- or has plans and would like to be out of town, which we

 2  have haven't addressed yet, but I understand that we're -- a lot

 3  of moving parts here and we're not sure exactly what is going

 4  on.

 5      So today we're going to finish up -- when the juror

 6  gets here, obviously, not yet -- with Bouchie.  And then the

 7  Defense plans to call either one of the defendants out of order?

 8  Is that still the plan?

 9      MR. BROWN:  We could go today, Your Honor.

10      THE COURT:  Sorry?

11      MR. BROWN:  We could go today, Mr. Mendez, sure.

12      THE COURT:  Okay.  All right.  So that we can use the

13  California court interpreter that we have for the translation in

14  Spanish.

15      MR. FINLEY:  Salvador Castro's next.  We made that very

16  clear yesterday.  We're not prepared for Mendez to go first.

17      THE COURT:  Okay.  So Salvador Castro will be called

18  after Bouchie.  Is that right, Mr. Green?

19      MR. GREEN:  Court's pleasure, yes.  We have no problem

20  with that, yes.

21      THE COURT:  All right.  And then after that, Jose Luis

22  Mendez.  And then if we have time, we can get into Miguel Jr.,

23  but we're going to wait until lunch to see how much progress

24  we're able to make so that we're not bothering too many people

25  to come wait here for nothing.

1          MR. TANASI:  Not to correct Your Honor, it's Mario Jr.

2   who is coming ing.

3          THE COURT:  Mario Jr.

4          MR. TANASI:  And if I may be heard, Your Honor, just on

5   a kind of general scheduling request.  So I've spoken with

6   Defense counsel on this and we have sort of a unanimous request,

7   and that would be to have a dark day once the case has completed

8   so that we can have time to process all of the evidence and

9   prepare our closing statements.

10          It seems as though we might be on track to have that

11  dark day occur on Thursday.  But, again, there are still things

12  that are sort of up in the air.  So regardless of where we end,

13  that would be the request from the Defense.

14          THE COURT:  All right.  Well, I don't foresee that

15  happening, but maybe you're right because I don't know how many

16  questions you all plan.  And, of course, the jury has questions

17  as well.

18          So if we finish with Bouchie today and then we have the

19  two defendants and then we have the son of a different

20  defendant, we still have to settle jury instructions.  So if we

21  can get that all done by the end of tomorrow, then we can take

22  Thursday off, but I ...

23          MR. TANASI:  Your Honor, I would maybe propose doing

24  the jury instructions on the dark day as well, if that is the

25  track that we end up being on.

1          THE COURT:  Okay.  And then -- so if we took a -- if we

2     took a dark day on Thursday, would you also be taking a dark day

3     on Monday?  Because that's what the one juror is requesting.  Or

4     would we go ahead and start with closing arguments on Monday?

5          I imagine it would take two days for closing arguments.

6     Do you estimate that it will be less or more?

7          MR. FINLEY:  You know, I can say for us that we

8     probably need a total of two hours between opening, closing, and

9     rebuttal closing.

10          THE COURT:  Okay.

11          MR. TANASI:  I guess I would leave that to the Court's

12     discretion on -- on whether it be Thursday and Monday.

13          But I do understand the juror issue, that's sort of

14     wrapped into this as well.

15          THE COURT:  Yeah.

16          MR. FINLEY:  Your Honor, I just note that I think next

17     week there are already going to be a couple dark days,

18     Mr. Zytnick is informing me.

19          MR. ZYTNICK:  I think you had said, Your Honor, on

20     Thursday of next week you were planning to be dark already.

21          THE COURT:  Yeah, it's the quarterly meeting, but I've

22     already started making arrangements for other people to cover

23     for me.  So I -- hopefully it's a deliberation day and then it

24     would be fine because then I can just attend -- the meeting's in

25     Reno so I was going to attend by video anyway.

2:19-cr-00295-GMN-NJK

1            But if it's a deliberation day, I can attend by video,

2    and then as questions come up, we can handle them here.  But I

3    don't -- yeah, I don't foresee I'm going to be able to actually

4    -- if it's a deliberation day, it's a deliberation day.  And

5    they can deliberate and I can be here.  And so long as you are

6    all on call for any questions that come up, then that'll be

7    fine.

8            MR. TANASI:  And in speaking with Mr. Tomsheck, and he

9    has actually two -- two other issues.  One with respect to a

10   dental appointment that's tomorrow he needs to get to.  So no

11   matter what time we finish, he needs to finish for 3:50 in order

12   to get out.

13           THE COURT:  Okay.

14           MR. TANASI:  And depending on where we are, I may be

15   able to just fill in if we need to keep going.  And then I also

16   understand that on the 19th, he has another family-related

17   appointment as well that he needs to attend as well.  And so

18   depending on where we're at, I can either fill in or we may need

19   a break there as well.

20           (Pause.)

21           THE COURT:  So tomorrow, the 13th, is when we need to

22   stop at 3:50?

23           MR. TOMSHECK:  Yes.

24           THE COURT:  Okay.  So I can do that.

25           And then the 19th is Wednesday.  And then what time

 1  would we need to stop?

 2          MR. TOMSHECK:  I -- I will be unavailable to be here

 3  that day.

 4          THE COURT:  Oh, the whole day?  Okay.

 5          MR. TOMSHECK:  Yes.  And I can discuss that with the

 6  Court at sidebar, if you -- if you need to.

 7          MR. TANASI:  And, Your Honor, I guess depending sort of

 8  where we're at in the trial, that might be something that I can

 9  just fill in for Mr. Tomsheck so we don't slow things down.

10          (Pause.)

11          THE COURT:  Okay.  Well, if we don't have Mr. Tomsheck

12  at all the whole day of the 19th, then I don't think that we

13  should go dark on Monday.  But, again, we can -- we can see as

14  we get closer.

15          Because if we could have the parties close on Monday

16  and Tuesday, the 17th and 18th, then even if he's gone on the

17  19th, it's not a big deal because the jury will be deliberating.

18          MR. TANASI:  And ...

19          THE COURT:  Not yet?

20          (Directed to courtroom administrator.)

21          MR. TANASI:  Your Honor, I think that the Defense

22  consensus also would be that we can probably get through

23  closings in one day.

24          THE COURT:  I'm trying to remember, I don't think you

25  were.  You weren't on the last trial where Government's closing

1    was three days long?

2           MR. TANASI:  I fortunately was not.

3           MR. ZYTNICK:  That must have been a different

4    Government.

5           THE COURT:  It's a lot to cover.

6           MR. TANASI:  But I can understand how that might

7    undermine my estimations.

8           THE COURT:  And that's -- that's why I'm going, "When

9    have I heard that before?"  You know, many times I've heard

10   people underestimate how long their closing arguments will be,

11   so just trying to be careful.

12          You know, this is your last chance to talk to the jury.

13   I'm not trying to rush you.  I'm just trying to be reasonable in

14   how we determine what time is available.

15          COURTROOM ADMINISTRATOR:  Judge, I'm going to step out

16   and call the juror.

17          THE COURT:  Okay.  Yeah, just ...

18          (Pause.)

19          THE COURT:  Okay.  We've got the last juror.

20          COURTROOM ADMINISTRATOR:  She just walked in.

21          THE COURT:  Good.  Do we need to take a moment?

22          COURTROOM ADMINISTRATOR:  She needs, like, a minute.

23          THE COURT:  To use the bathroom or something.  Okay.

24          COURTROOM ADMINISTRATOR:  Yeah.  Do you want the

25   witness to be up here?

1    THE COURT:  Yeah, let's go ahead and bring in

2  Mr. Bouchie.

3    Good morning, sir.  Thank you for being on time.  Sorry

4  we're running late.

5    (Pause.)

6    COURTROOM ADMINISTRATOR:  All rise.

7    (Whereupon jury enters the courtroom at 9:47 a.m.)

8    THE COURT:  Thank you.  Everyone may be seated.

9    Back on the record in the presence of the jury in the

10  presence of the witness.  Let's go ahead and have the attorneys

11  place their appearance on the record.

12    MR. FINLEY:  Good morning, Your Honor.

13    Good morning, everyone.  I am Tim Finley.  This is Dan

14  Zytnick.  This is Mina Chang.  That's Erica Rush.  Tyaka Mallory

15  behind her.  And we represent the United States.

16    THE COURT:  Thank you.  Good morning.

17    MR. TOMSHECK:  Good morning.  Josh Tomsheck and Rich

18  Tanasi on behalf of Mario Castro.

19    MR. GAFFNEY:  Good morning, Your Honor.  Good morning,

20  ladies and gentlemen.  Lucas Gaffney and Thomas Ericsson on

21  behalf of Miguel Castro.  Thank you.

22    MR. BROWN:  Good morning, Your Honor.  Good morning,

23  everyone.  Will Brown and Chris Mishler for Jose Luis Mendez.

24  Also Rich Beasley and Lisa Smith.

25    Oh, and Bryan Glynn is here on the tech support IT

—2:19-cr-00295-GMN-NJK—

1  stuff.

2          MR. GREEN:  Good morning, Your Honor.  Good morning,

3  ladies and gentlemen of the jury.  Don Green on behalf of the

4  defendant, Salvador Castro.  And with me is my assistant,

5  Heather Tan-Sahl.  Thank you, Your Honor.

6          THE COURT:  Good morning.  Thank you, counsel.

7          So when we left off yesterday before the night break,

8  we did have cross and direct -- redirect examination by

9  Mr. Tomsheck.  I'm sorry I had to interrupt you so that we could

10  go home, but you may now continue, sir.

11          MR. TOMSHECK:  It's quite all right.  I wanted to go

12  home, too.

13          CONTINUED REDIRECT EXAMINATION OF BARRY BOUCHIE

14  BY MR. TOMSHECK:

15  Q.  Good morning.

16  A.  Good morning, sir.

17  Q.  During the trial people have called you different things:

18  retired inspector, inspector, mister.

19          You're currently an inspector, though, right?

20  A.  No.

21  Q.  Okay.

22  A.  I'm not.

23  Q.  But you told us yesterday you're still working as a postal

24  inspector?

25  A.  No, I'm working for the Postal Inspection Service.  I'm a

1    retired inspector.

2    Q.  Okay.  What do you prefer to be called?  I just want to get

3    the tag lines right.

4    A.  Barry.

5    Q.  Okay.

6         In fact, people you talked to in this case a lot call

7    you Barry, right?

8    A.  Yes, sir.

9    Q.  Okay.  Prior to yesterday, other than a good morning in the

10   hallway, you'd never spoken to me, right?

11   A.  No.

12   Q.  Okay.  I did speak to you yesterday about the recording of

13   interview issue.  I'm going to put that one to bed.  I want to

14   move on to one other part of the investigation that the jury's

15   heard a lot of testimony about, and that is the decision to

16   handcuff individuals when they're not being arrested.

17        You heard quite a bit of testimony about that during

18   this trial?

19   A.  Yes, sir.

20   Q.  Okay.  You talked about this Attorney General Holder memo in

21   2014 giving directives as it relates to recording of interviews.

22   Did you also have directives about when to handcuff individuals?

23   A.  No.

24   Q.  Okay.  That's just kind of a case-by-case decision?

25   A.  Case-by-case, yes, sir.

2:19-cr-00295-GMN-NJK

1    Q.  And, in fact, within a case, incident-by-incident, right?

2    A.  Correct.

3    Q.  Okay.  You don't dispute at all that when you were present

4    on February 21st of 2018 at Patti Kern's residence, she wasn't

5    handcuffed, right?

6    A.  Patti Kern was not there when we went in.  And eventually

7    we -- her daughter called her and she came back.

8    Q.  Okay.  So once she came into the area where you were, up at

9    the residence, as opposed to off at the horse stables where she

10   was, she was cooperative with you.

11   A.  Pardon me?

12   Q.  She was cooperative with you?

13   A.  Yes.

14   Q.  Okay.  You would agree with me that you didn't pull her out

15   of her Ford F-250 at gunpoint, right?

16   A.  Uhm.  I do not recall, but since she had a gun and she told

17   us that she had a gun in the truck, we were very, very cautious

18   about that, sir.

19   Q.  Okay.  Yes, that's my next question.  You knew she had a

20   firearm with her?

21   A.  Yes, sir.

22   Q.  Okay.  And you agree there wasn't some kind of tactical SWAT

23   takedown of Patti Kern, right?

24   A.  No.

25   Q.  Okay.  No one had a gun out pointed at her, that you can

1  recall?

2  *A.*  That I can recall.  But we were -- there was -- there's four

3  or five of us there.  And if Patti Kern had been dumb, then

4  there would have been problems.  But she -- she did what we told

5  her to do, and that was it.

6  *Q.*  Yeah.  Patti Kern's not dumb, is she?

7  *A.*  I don't think she's dumb.

8  *Q.*  Pretty savvy, isn't she?

9  *A.*  Sure.

10  *Q.*  Okay.  And taking you back to my original question, as you

11  recall, nobody had her at gunpoint, right?

12  *A.*  I don't think so, sir.

13  *Q.*  Okay.  And certainly no dispute whatsoever that she was

14  never placed into handcuffs?

15  *A.*  Correct.

16  *Q.*  And that's because she was cooperative with you?

17  *A.*  Correct.

18  *Q.*  Okay.  You would agree with me that all of the other

19  testimony related to the execution of search warrants at the

20  residence -- residences and businesses of these four individuals

21  on trial, they were placed into handcuffs, right?

22  *A.*  I believe that was the case.  Her daughter was put into

23  handcuffs when we walked in the door.

24  *Q.*  Right.  Didn't ask you anything about that.  I asked you a

25  question, and with all due respect, if you could listen to the

1  question and answer the question I ask as opposed to offering

2  something nonresponsive to my question, the process will go a

3  lot quicker.  Okay?

4  **A.**  Thank you.

5  *Q.*  All right.

6        You would agree with me that the testimony was that at

7  the execution of search warrants for these four defendants, the

8  people that are actually on trial here, that all of them were

9  placed into handcuffs, correct?

10  **A.**  I believe that was true.

11  *Q.*  Okay.  You would also agree with me that all of those four

12  individuals, when confronted by law enforcement on February 21st

13  of 2018, were cooperative?

14  **A.**  Based on the testimony, yes.

15  *Q.*  Okay.  In fact, based on the testimony and the review of

16  reports generated through your investigation, you know that all

17  four of these defendants were entirely cooperative, right?

18  **A.**  Yes.

19  *Q.*  Specifically as it relates to my client, Mario Castro, when

20  he -- when he was at home and agents came in and inspectors came

21  in and interviewed him, he was cooperative in that process,

22  right?

23  **A.**  I think so, yes.

24  *Q.*  Okay.  Your search warrant authorized you to take

25  electronics from Mario Castro's business at Digital Express and

 1  his personal residence, correct?

 2  **A.**  Yes.

 3  Q.  And you took some, right?

 4  **A.**  I believe that they -- that they did, yes.

 5  Q.  Okay.  In fact, Mario Castro actually physically gave

 6  inspectors his personal telephone, right?

 7  **A.**  I think so, yes.

 8  Q.  Okay.  There was some testimony yesterday about some phones

 9  in this case were password protected.  Just so we're clear, the

10  four defendants here all provided cellular telephones and the

11  passwords, right?

12  **A.**  I -- I don't know for sure, but I think so, yes.

13  Q.  Okay.  And you know that specifically my client, Mario

14  Castro, provided the passwords and said, "Hey, inspectors.  Go

15  ahead and take my phone," right?

16  **A.**  I was not there so I don't know.

17  Q.  Well, you gave testimony yesterday about text messages from

18  my client's phone, right?

19  **A.**  I don't know whether it was his phone or Patti Kern's phone

20  or Sean O'Connor's phone.  I don't know which one.

21  Q.  Okay.  You know you testified in Government's Exhibit I

22  think it was 300 about text messages between my client and Sean

23  O'Connor, right?

24  **A.**  Sure, yeah.

25  Q.  Okay.  And I'm not trying to trick you at all here.  Nothing

1  in the record to suggest whatsoever that my client hid or

2  destroyed any electronic communications in this case?

3  *A.*  None.  I don't think so.

4  *Q.*  Nothing in the record to indicate that he hid or destroyed

5  any physical documents in this case?

6  *A.*  I don't think so.

7  *Q.*  Nothing in your investigation whatsoever that he hid from

8  your investigation in any way, shape, or form.  Would you agree

9  with that?

10  *A.*  Hid from my investigation?

11  *Q.*  Right.

12  *A.*  Well, I -- I don't think that he had any of the company

13  names in his name.

14  *Q.*  Well, we can agree about that.

15  *A.*  Okay.

16  *Q.*  You would agree with me that he had Digital Express in his

17  name, right?

18  *A.*  That one, yes.

19  *Q.*  You would agree with me that was an operating letter

20  shop/printing business, yes?

21  *A.*  Yes.

22  *Q.*  And you would agree with me he had all of that in his name,

23  right?

24  *A.*  He had that, yes, he did.

25  *Q.*  And you're aware that that business had QuickBooks, right?

—2:19-cr-00295-GMN-NJK—

1   *A.*  Yes, it did.

2   *Q.*  And you're aware that nothing in the QuickBooks was deleted

3   or destroyed, right?

4   *A.*  I do not know that.

5   *Q.*  Okay.  Can you point to one instance where there's a record

6   in QuickBooks that was deleted or destroyed?

7   *A.*  I do not know that because I haven't looked at QuickBooks.

8   *Q.*  Okay.  My question was, can you point to one?

9   *A.*  I can't.

10  *Q.*  Okay.  You would agree with me that if a physical record or

11  an electronic record related to the business of Digital Express

12  had been altered, deleted, or destroyed, that would be important

13  for your investigation, right?

14  *A.*  Yes.

15  *Q.*  And just so we're abundantly clear, as you sit here today,

16  there's nowhere you can point to within the entirety of this

17  investigation where that actually occurred, right?

18  *A.*  Regarding QuickBooks, yes.

19  *Q.*  Right.  Okay.  All right.

20      I'd like to move on then, if we could, to Government's

21  Exhibit 158.

22      MR. TOMSHECK:  Bryan, if you could bring that up.

23  BY MR. TOMSHECK:

24  *Q.*  The Government had asked you some questions yesterday about

25  Exhibit 158, about this letter from someone purporting to be a

1  receiver in a case involving Glenn Burke, right?

2  *A.*  Yes, sir.

3  *Q.*  Okay.  Now, it seems to me, in my observation yesterday,

4  when you were asked questions about Government's Exhibit 158,

5  that Mr. Finley was kind of reading from the letter and

6  suggesting to you what that meant and you just kind of agreed

7  with him.

8        Would you agree with that summary?

9  *A.*  I -- I do know what this is.  This was a gentleman who took

10  over the Burke Company, so ...

11  *Q.*  Okay.  Take you back to my question.

12  *A.*  Okay.

13  *Q.*  My observations yesterday were that Mr. Finley read from

14  this letter and suggested things to you and you essentially

15  agreed with him, right?

16  *A.*  Yes.

17  *Q.*  Okay.  You would agree with me that this letter wasn't found

18  as part of any investigation in this case, right?

19  *A.*  True.

20  *Q.*  Okay.  This letter, I think you said, was in a case file

21  from a case agent by the name -- was it Andrea Avery?

22  *A.*  Yes, sir.

23  *Q.*  Okay.  How is it that this letter came to be asked about

24  yesterday in this trial?  Who showed it to you?

25  *A.*  The Government did, but it was in the file.

———2:19-cr-00295-GMN-NJK———

1  Q.  Okay.  I'm not disputing it was in a file.  My question is,

2  who showed it to you?

3  A.  The Government did.

4  Q.  You would agree with me that you as the case agent, the

5  primary investigator in this case, didn't go out and find this

6  document and say, "Hey, I think this is relevant in this case,"

7  right?

8  A.  No, I did not.

9  Q.  Okay.  Mr. Finley and Mr. Zytnick went back through a file

10  and said, "Hey, we're going to ask you questions about this,"

11  right?

12  A.  Yes.

13  Q.  And you just told me a moment ago, "I do know what this

14  letter is."

15  A.  In general terms, yes.

16  Q.  Okay.  I mean, not trying to be sarcastic at all.  You can

17  read the English language, right?

18  A.  Think so, yes.

19  Q.  Okay.  Presumably all of the folks on this jury can read the

20  English language just as good as you can, right?

21  A.  Yes.

22  Q.  Okay.  You don't have any kind of specialized ability to

23  translate what this letter means?

24  A.  No, I don't.

25  Q.  Okay.  In fact, if we're being honest about it, you can't

————2:19-cr-00295-GMN-NJK————

1  really explain the process of what a receivership is and how it

2  happens and why, right?

3  *A.*  I can do it in a general term, is -- do you want me to?

4  *Q.*  Sure.

5  *A.*  They -- they will come into a business.  They will take over

6  all of the -- all the computers, everything else.  They go

7  through the books.  And they'd find out what the -- what the

8  company does.  And then they basically in time shut it down.

9  *Q.*  Okay.

10        It's your testimony that a receiver shuts down a

11  business?

12  *A.*  That's what -- that's what I think they do, yes.

13  *Q.*  Okay.  Would you be guessing about that?

14  *A.*  No, that's what I think they do.  Yes.

15  *Q.*  Okay.

16        You would agree with me that this letter purports to be

17  written to two separate individuals, right?

18  *A.*  Yes.

19  *Q.*  Miguel Castro and Luis Aguilar, right?

20  *A.*  Yes, sir.

21  *Q.*  Okay.  And it purports to be related to a Glenn Burke

22  business, right?

23  *A.*  Yes, sir.

24  *Q.*  Okay.

25        Do you see the first line of the letter after "Dear

————2:19-cr-00295-GMN-NJK————

 1  Mr. Castro and Mr. Aguilar"?

 2          MR. TOMSHECK:  Can you blow that up, that first

 3  paragraph.

 4  BY MR. TOMSHECK:

 5  *Q.*  What's the date of that letter?

 6  *A.*  Of the -- of the date of what they're talking about there or

 7  the date on the top of the letter?

 8  *Q.*  Both.

 9          MR. TOMSHECK:  Can you scroll up to the top real quick,

10  Bryan.

11          THE WITNESS:  The date is March 20th, 2013.

12          MR. TOMSHECK:  Okay.  And can you scroll down to the

13  first paragraph.

14          THE WITNESS:  January 28th, 2013.

15  BY MR. TOMSHECK:

16  *Q.*  Okay.  I'm going to read the first line, and you tell me if

17  I read it correctly.

18          "On January 28th, 2013, I was appoint as the receiver

19  for American Health Associates, LLC and all entities controlled

20  by Glenn Burke, including but not limited to Merchants Depot in

21  connection with an action brought by the Federal Trade

22  Commission versus Dayton Family Productions, Incorporated."

23          Did I read that correctly?

24  *A.*  Yes, that sounds right.

25  *Q.*  Not great at it, but I can read the English language, too.

—2:19-cr-00295-GMN-NJK—

1    Okay?

2    *A.*   Pretty good at it.

3    *Q.*   All right.  So I'm looking at that first line.  Do you know

4    what American Health Associates is?

5    *A.*   That was one of his companies, I think.

6    *Q.*   Okay.  You agree that that letter says that he was appointed

7    as a receiver for American Health Associates LLC, right?

8    *A.*   Okay.

9    *Q.*   Yes?

10   *A.*   Yes, sir.

11   *Q.*   And you believe that the receiver was appointed to collect

12   funds that belonged to one of his companies?

13   *A.*   Uhm.

14         It appears as a $25,000 check or payment.

15   *Q.*   Not what I asked you.

16   *A.*   Okay.

17   *Q.*   I asked you if you know what American Health Associates, LLC

18   is.

19   *A.*   I do not, no.

20   *Q.*   Okay.  Now, if this individual was appointed as a receiver

21   for American Health Associates, LLC, presumably he would be

22   trying to recoup moneys that belonged to American Health

23   Associates, LLC, right?

24   *A.*   Yes, sir.

25   *Q.*   So presumably that would not be one of Glenn Burke's

———2:19-cr-00295-GMN-NJK———

1  companies, right?

2       MR. FINLEY:  Your Honor, misstates the evidence,

3  objection.

4       MR. TOMSHECK:  Not quite sure what that objection

5  means.  I'm reading it and I'm asking him questions about it.

6       MR. FINLEY:  Your Honor, I would ask just to read the

7  sentence -- first sentence of this.  It's being misstated.

8       MR. TOMSHECK:  I'm asking him about his understanding

9  of it.

10      THE COURT:  All right.  So the sentence is, "as

11  receiver for American Health Associates, LLC and all entities

12  controlled by Glenn Burke, including but not limited to

13  Merchants Depot."  So there's a lot of -- he's the receiver for

14  different -- more than one company.

15  BY MR. TOMSHECK:

16  Q.  Okay.  My point is this.  As you sit here today, you're

17  aware that someone gave you this letter, right?

18  A.  Yes, sir.

19  Q.  And they said, "We're going to ask you questions about this

20  letter," right?

21  A.  Yes, sir.

22  Q.  You didn't have anything to do with this letter back in

23  2013, right?

24  A.  No, sir.

25  Q.  You don't know who the receiver was appointed on behalf of

1    or what his actual job was as it relates to these different

2    entities, if you're being honest, right?

3    *A.*   I do not know, yes.

4    *Q.*   Okay.

5          Presumably the importance of the letter was that it

6    contains the name of one of the defendants in the case.  You

7    understood that from Mr. Finley's questioning, right?

8    *A.*   Yes.

9    *Q.*   Okay.

10         MR. TOMSHECK:  Can you go to the last paragraph of the

11   letter, please.

12   BY MR. TOMSHECK:

13   *Q.*   Do you see in the last paragraph -- again, I'm going to read

14   the first line and you tell me if I read this correctly.  "As we

15   discussed when we met, I am open to releasing the funds in the

16   frozen National Print & Mail account if you can show me deposits

17   and offsetting withdrawals."

18         Did I read that right?

19   *A.*   Yes.

20   *Q.*   Okay.  You would agree with me that you cannot tell us when

21   that meeting between Thomas A. Seaman, receiver for American

22   Health Associates, and the people that he wrote this letter to

23   occurred, right?

24   *A.*   Yes, right.

25   *Q.*   You cannot tell us where that meeting occurred?

―2:19-cr-00295-GMN-NJK―

1   *A.*   No.

2   *Q.*   You cannot tell us who was present?

3   *A.*   I cannot.

4   *Q.*   You agree with me that because, like myself, you can read

5   the English language, you know the letter was addressed to

6   Miguel Castro and Luis Aguilar, right?

7   *A.*   Yes, sir.

8   *Q.*   Okay.  You cannot tell us whether or not Miguel Castro was

9   present at that interview, right?

10  *A.*   Yep.  Yeah.  No.

11  *Q.*   You don't know if this individual who drafted this letter

12  met with Mr. Aguilar, right?

13  *A.*   True.

14  *Q.*   Correct?

15  *A.*   Yes.

16  *Q.*   Okay.

17        You can't tell us that at the time this letter was

18  sent, Miguel Castro was given any notice whatsoever about Glenn

19  Burke's fraudulent mailings, right?

20  *A.*   True.

21  *Q.*   You know a little bit about Glenn Burke, right?

22  *A.*   Yes.

23  *Q.*   You know that he had his fingers in a lot of frauds, right?

24  *A.*   Yes, he did.

25  *Q.*   Of many different types, right?

1          And he was shut down by the Federal Government, right?

2  *A.*  Yes, sir.

3  *Q.*  And some of those related to frauds that he mailed out,

4  right?

5  *A.*  True.

6  *Q.*  Right?

7  *A.*  Yes.  True.

8  *Q.*  And some of them were related to frauds where he got people

9  on the phone, correct?

10  *A.*  Yes, sir.

11  *Q.*  Okay.

12          As you sit here today, being honest about your

13  understanding of this letter, you have no idea what this

14  actually relates to, right?

15  *A.*  I -- I don't know.

16  *Q.*  Okay.  Thank you.  Appreciate your honesty.

17          MR. TOMSHECK:  If you could bring up another letter,

18  please, Government's Exhibit 152.

19  BY MR. TOMSHECK:

20  *Q.*  You remember Mr. Finley asked you questions about

21  Government's Exhibit 152?

22  *A.*  Yes.

23  *Q.*  And that purports to be a letter drafted by Miguel Castro,

24  right?

25  *A.*  Yes.

—2:19-cr-00295-GMN-NJK—

1  *Q.*  Okay.  When you read that letter, you would agree with me

2  it's pretty evident that that letter is written by someone who

3  speaks English, yes?

4  *A.*  Yes.

5  *Q.*  As a second language, yes?

6  *A.*  Yes.

7  *Q.*  The grammar, the utilization of words within Government's

8  Exhibit 152, isn't textbook English language vocabulary, right?

9  *A.*  Right.

10  *Q.*  There are many misspellings, yes?

11  *A.*  Yes, sir.

12  *Q.*  Okay.

13      There are kind of weird grammar choices that you

14  wouldn't put in a letter if you were sending one out for

15  business purposes, right?

16  *A.*  Possibly, yes.

17  *Q.*  Okay.

18      Now, the Government asked you some questions yesterday

19  about this letter as it relates to Miguel Castro's ability to

20  speak English.  Do you remember that?

21  *A.*  Yes.

22  *Q.*  And Mr. Finley actually asked you the preface to a question

23  saying, "It has been represented during this trial that Miguel

24  Castro didn't speak English."  Do you remember that?

25  *A.*  I don't know if he said "didn't speak English."

---2:19-cr-00295-GMN-NJK---

1          No, I don't think he told me that.  I don't remember

2     that.

3     Q.  Well, the jury's recollection will certainly control.  But

4     you agree the purpose of Mr. Finley asking you questions about

5     this letter was not about the content of the letter, but for

6     purposes of illustrating that he spoke English?

7     *A.*  Yes.

8     Q.  Okay.  As you sit here today, you would agree with me that

9     there's not been a single person in this trial who said Miguel

10    Castro couldn't speak English, right?

11    *A.*  Not -- not that I know of, no.

12    Q.  Okay.  You know Miguel speaks English, right?

13    *A.*  I've never talked to him.

14    Q.  You've never talked to Miguel Castro?

15    *A.*  I don't think so, no.

16    Q.  Okay.  You're aware that English is his second language?

17    *A.*  Yes, sir.

18    Q.  My client, Mario Castro, you're aware he speaks English,

19    right?

20    *A.*  That's what they all tell me, yes, sir.

21    Q.  Okay.  And if you look at Mario, he's not even wearing the

22    headphones here in court?

23    *A.*  Uh-hmm.

24    Q.  Right?

25    *A.*  Yes.

2:19-cr-00295-GMN-NJK

1    *Q.*  You've encountered probably several people in your career

2    that speak a non-English language as their first language and

3    English as their second language, right?

4    **A.**  Yes.

5    *Q.*  The ability of those people to speak the English language as

6    a second language is unique to them as individuals, right?

7    **A.**  Yes.

8    *Q.*  Some people speak English as a second language very

9    fluently, right?

10   **A.**  Yes.

11   *Q.*  Others speak English as a second language not very well at

12   all, right?

13   **A.**  True.

14   *Q.*  Right?

15   **A.**  True.

16   *Q.*  Okay.  And do you understand that each of these four

17   defendants may speak English better or worse than the others,

18   right?

19   **A.**  True.

20   *Q.*  Okay.  You're aware that at least two of these defendants

21   hardly speak any English at all, right?

22   **A.**  Well, I spoke to Mr. Salvador Castro and he talked to me.

23   And he didn't talk to me in Spanish.

24   *Q.*  Right.  You would agree with me that you had a conversation

25   with Salvador Castro and you used the English language, right?

—2:19-cr-00295-GMN-NJK—

1  *A.*  He talked to me back.

2  *Q.*  I'm asking what language you used.

3  *A.*  I used English.  And his responses to me were in English.

4  *Q.*  Very broken English, right?

5  *A.*  I don't remember, but I didn't think it was that bad.

6  *Q.*  Okay.  You would agree with me you didn't have the ability

7  to speak with him in Spanish?

8  *A.*  Oh, no.

9  *Q.*  You would agree with me that you, like myself, don't speak

10  Spanish at all, right?

11  *A.*  I don't.

12  *Q.*  Okay.  You would agree with me that if you spoke Spanish, it

13  would be a far more productive conversation to talk to that man

14  in Spanish, right?

15  *A.*  Yes.

16  *Q.*  Because it is abundantly clear that he speaks Spanish well,

17  right?

18  *A.*  I would think so.

19  *Q.*  And it's equally as abundantly clear that he does not speak

20  English well, right?

21  *A.*  Well, when he talked to the inspector when they were at the

22  Digital Express, the inspector, who speaks Spanish, determined

23  in his own mind that Mr. Castro could speak English good enough.

24  *Q.*  Good enough.

25  *A.*  Yeah.

—2:19-cr-00295-GMN-NJK—

1  Q.  Have you listened back to the recording of that conversation

2  to see how it sounds in English?

3  A.  We do not have a copy of it, sir.

4  Q.  Understood.

5        So I want to talk to you then a little bit about the

6  content of this letter itself.  Okay?

7  A.  Yes, sir.

8  Q.  Have you read this letter?

9  A.  A couple times, just fast, though.

10  Q.  Okay.

11       You're aware that in this letter Miguel Castro is

12  giving his version of things that occurred over a time period,

13  right?

14  A.  Yes.

15  Q.  And that's a time period that includes the time period in

16  the conspiracy time range of 2010 to 2018 in which the

17  Government has charged these four defendants with crimes, right?

18  A.  Yes.

19  Q.  Okay.  You would agree with me that he talks in there about

20  different businesses that he had been a part of, right?

21  A.  Yes, sir.

22  Q.  You're aware that there was a business that Miguel Castro

23  was a part of that did exclusively printing for casino

24  companies, right?

25  A.  Uh.  Where would that -- would that be the Printing &

1   Mailing?

2   Q.  I'm just asking if you're aware of it.

3   A.  Yeah.  Okay.  Yes.

4   Q.  You know that Mario Castro was involved in that business as

5   well, right?

6   A.  Think so, yes.

7   Q.  Okay.  And, in fact, that business lost its business when

8   the casino industry went through a rough financial time along

9   with all of the rest of the Las Vegas Valley in 2008-2009?

10  A.  I don't know that.

11  Q.  Okay.  Are you aware that Mario Castro lived for long

12  periods of time out of the United States?

13  A.  No.

14  Q.  Were you aware that Mario Castro had a tequila business?

15  A.  I did hear about that, yes.

16  Q.  Okay.  What was the name of it?

17  A.  I don't recall.

18  Q.  Where did it occur?

19  A.  I thought it was here in this town.

20  Q.  Okay.  You believe here in this town, meaning Las Vegas?

21  A.  Yes, sir.

22  Q.  That's where the tequila business was?

23  A.  I don't know for sure, but that's what I thought.

24  Q.  And you also don't know for sure then that he spent large

25  periods of time out of the United States relative to that

—2:19-cr-00295-GMN-NJK—

 1  business, right?

 2  *A.*  I do not know that.

 3  *Q.*  Okay.

 4       Do you know that Miguel Castro had a plastics business?

 5  *A.*  No.

 6  *Q.*  Do you know that Miguel Castro spent large periods of time

 7  outside of the United States?

 8  *A.*  No.

 9  *Q.*  You don't know that?

10  *A.*  No.

11  *Q.*  How did this letter come to be in your possession?

12  *A.*  I think I -- I -- came part of a subpoena request, if I'm

13  not mistaken.

14  *Q.*  Miguel Castro sent a letter to the Government pursuant to a

15  subpoena request?

16  *A.*  I think so.  I think we -- he sent us some documentation

17  back, and -- and that was part of it.

18  *Q.*  Okay.

19  *A.*  I think so.

20  *Q.*  You would agree with me that you sent out some grand jury

21  subpoenas, right?

22  *A.*  Yes, sir.

23  *Q.*  And those grand jury subpoenas request information, right?

24  *A.*  Yes, sir.

25  *Q.*  And Miguel Castro cooperated with that request, right?

—2:19-cr-00295-GMN-NJK—

1   *A.*  Yes, he did.

2   *Q.*  And he gave you the information you asked for, right?

3   *A.*  Yes, sir.

4   *Q.*  And he even included this letter that explains in detail the

5   businesses that he had been involved in, right?

6   *A.*  Yes, sir.

7   *Q.*  Okay.  He even sent you his passport that showed that he'd

8   been out of the United States, right?

9   *A.*  I don't remember that.

10  *Q.*  Oh, you don't remember that?

11  *A.*  No.  Uh-huh.

12  *Q.*  Okay.  I'm sure his lawyer may have some questions about

13  that.

14  *A.*  Okay.

15  *Q.*  You would agree with me in Government's Exhibit 152, that's

16  in front of you on the screen, Miguel Castro actually talks to

17  you about being in Mexico related to the plastics businesses,

18  right?

19  *A.*  Yes, sir.

20  *Q.*  Okay.

21        MR. TOMSHECK:  Can you blow up the paragraph in the

22  middle of the page that starts out -- well, actually, start

23  where it says:  "Marketing Image Direct," and go to the three

24  paragraphs -- there you go.  Perfect.

25  BY MR. TOMSHECK:

1  *Q.*  In the middle of that letter that Miguel Castro sent to you

2  comporting with the subpoena request that you made of him, he

3  says:  "Marketing Image Direct; this company was open on 2012,

4  trying to reopen a new business but I -- D-I-N-D-N-T have any

5  money to keep working.  And I went to Mexico trying to come out

6  with a new business.

7          "I was few years back and forth to Mexico saling" --

8  and I don't know what the next word is, but it's spelled

9  P-O-L-Y-E-T-I-L-E-N-E -- "and PolyPro.  My bank statement can

10  show that I was in that country most of the time.  I have in

11  mails conversation with Asia Chemical in Texas, and the sales

12  representative, Libby Serrano, also with Quimirso in

13  Guadalajara, MX.  The company that I was using to import the

14  product in Mexico was INTERLOGIN in Guadalajara, Mexico."

15          Did I read that right?

16  *A.*  Yes, you did.

17  *Q.*  You agree with me that that's written in kind of broken

18  English, right?

19  *A.*  Yes.

20  *Q.*  And you would agree with me that that gives you details

21  about a business venture that takes place during the time Miguel

22  Castro's charged with this conspiracy, right?

23  *A.*  Based on what he's telling us, yes.

24  *Q.*  Okay.  And, in fact, there's documentary proof that he was

25  in Mexico, right?

—2:19-cr-00295-GMN-NJK—

1  *A.*  I don't know.

2  *Q.*  Okay.  If the man sent you his passport and it showed that

3  he was out of the United States for days or weeks or even maybe

4  months at a time during that time period, might that be relevant

5  to whether or not he's committing a conspiracy in the United

6  States?

7  *A.*  I do not remember him providing his passport, but it

8  didn't --

9  *Q.*  Not what I asked you.

10  *A.*  Okay.

11  *Q.*  What I asked you was, if he had provided you his passport,

12  would that not be relevant to you in determining whether he's

13  part of this conspiracy?

14  *A.*  Yes, it would.

15  *Q.*  Okay.  You'd agree with me that's an important piece of

16  information, right?

17  *A.*  Yes, sir.

18  *Q.*  And as you sit here today, as a witness in the trial in

19  which the Government's trying to convict the man, you don't

20  remember it?

21  *A.*  I don't, no.

22  *Q.*  Okay.  But you agree that's important?

23  *A.*  Yes, it would be important.

24  *Q.*  Okay.  That there, just so we're clear, is a reference from

25  Miguel Castro to you as the investigator in this case saying, "I

—2:19-cr-00295-GMN-NJK—

1    wasn't even in the United States.  I had a different business,"

2    right?

3    *A.*  Yes.

4    *Q.*  Okay.

5            The Government asked you some questions yesterday about

6    Exhibit 69.

7            MR. TOMSHECK:  If you could bring that up, please,

8    Bryan.

9    BY MR. TOMSHECK:

10   *Q.*  All right.  In Exhibit 69 there appears to be three separate

11   Bank of America credit and/or debit cards, right?

12   *A.*  Yes, sir.

13   *Q.*  And they have different business names on them, right?

14   *A.*  Yes, sir.

15   *Q.*  In part of the time period in which Mario Castro was being

16   cooperative with inspectors in his home, he actually gave them

17   his wallet, right?

18   *A.*  I think so, yes.

19   *Q.*  Okay.  And those cards purportedly came from his wallet,

20   right?

21   *A.*  Yes.

22   *Q.*  Okay.  You would agree with me that they're related to three

23   different entities, right?

24   *A.*  Correct.

25   *Q.*  Okay.  There's actually other cards in his wallet, too,

—2:19-cr-00295-GMN-NJK—

 1  right?

 2  *A.*  There's a partial part of a card up above there, yes, sir.

 3  *Q.*  Okay.  In addition to those three cards, there's other cards

 4  in his wallet, right?

 5  *A.*  I don't know.  I wasn't there.

 6  *Q.*  Were you aware that there were actually business cards found

 7  in his home related to his tequila business?

 8  *A.*  Uhm.  I -- I -- I don't know.

 9  *Q.*  Okay.  Do you know, as you sit here today, how those cards

10  were generated?

11  *A.*  No.

12  *Q.*  Do you know who they were sent to?

13  *A.*  No.

14  *Q.*  Do you know how they wound up in his wallet?

15  *A.*  No.

16  *Q.*  Do you know, were those cards ever used?

17  *A.*  I do not know.

18  *Q.*  You have no clue whatsoever, do you?

19  *A.*  No.

20  *Q.*  Okay.

21        Presumably somebody would know how Money Securities and

22  PI Printing Corporation became entities, right?

23  *A.*  Yes.

24  *Q.*  Okay.  And somebody would know how those entities were

25  named, right?

—2:19-cr-00295-GMN-NJK—

1  *A.*  Yes.

2  *Q.*  Okay.  You would agree with me that the naming of a doing

3  business as -- in other words, there's a company that exists and

4  there's a decision to do business under a different name.  You

5  understand how that works, right?

6  *A.*  Yes.

7  *Q.*  You would agree with me that the person who comes up with

8  the actual name, that's important, right?

9  *A.*  It could be.

10 *Q.*  That could be important to your investigation, right?

11 *A.*  Possibly.

12 *Q.*  Do you know who came up with the name Money Securities?

13 *A.*  I do not know that, no.

14 *Q.*  You were asked a question, actually a number of questions,

15 about the names of Hispanic women in this case by the

16 Government.  Do you remember those questions?

17 *A.*  Yes, sir.

18 *Q.*  Okay.

19       Mr. Finley actually asked you the question:  "In your

20 experience, do you know of women named Maria who use their

21 middle name?"

22       Do you remember that question?

23 *A.*  Yeah.

24 *Q.*  You agreed with that, right?

25 *A.*  I don't know for sure whether they do or not, but in some

—2:19-cr-00295-GMN-NJK—

 1  cases that they do, yes.

 2  Q.  The jury will remember those questions, I'm sure.

 3  A.  Sure, yep.

 4  Q.  Because they have an important decision to make.

 5  A.  Totally.

 6  Q.  And the Government asked you questions yesterday.

 7  A.  Yes, sir.

 8  Q.  And you agreed with that question?

 9  A.  Yup.

10  Q.  Okay.  Can you cite to me one example of a woman named Maria

11  Castro who uses her middle name, absent this case?  He said:

12  "In your experience before, have you dealt with women named

13  Maria who use their middle name?"

14  A.  I can't tell you off top of -- top of my head right now, no.

15  Q.  Okay.  You understand it's really important you don't just

16  agree with what they say.  You actually have to give substantive

17  testimony, right?

18  A.  Yes, sir.

19  Q.  And so we're abundantly clear, two things:  As you sit here

20  today, you cannot cite one example of a woman named Maria who

21  goes by her middle name, absent this case, right?

22  A.  Not at the top of my head, no.

23  Q.  Okay.  As you sit here today, how many women named Maria

24  Castro exist in this case?

25  A.  I don't know.

1  *Q.*  You have no idea --

2  *A.*  Three or four.

3  *Q.*  -- whatsoever, right?

4  *A.*  No.

5  *Q.*  You would agree with me that just lumping all of the Maria

6  Castros into one pile together is a pretty irresponsible thing

7  to do as an investigator, right?

8  *A.*  I don't know about that, but ...

9  *Q.*  Okay.  Explain to me how it's responsible to take four

10  different individuals that have the same name and just utilize

11  them all as one in a trial.  Tell me how that's responsible.

12  *A.*  What we did is we took all of the checks that were paid to a

13  Maria Castro, and we put them all in a group.  What -- what we

14  didn't do is we didn't look on the back of the checks.  And we

15  could -- and then you could tell that it appeared they were

16  different people who signed the back of the checks.

17  *Q.*  When did you first discover that little nugget of

18  information?

19  *A.*  Uhm.  During this trial, yes.

20  *Q.*  Okay.  You know who Mr. Mishler is there back there?

21  *A.*  Yeah.  He did a great job, yes.

22  *Q.*  Yeah.  He actually pointed out to you and the Government

23  through the questioning of another witness --

24  *A.*  Yes.

25  *Q.*  -- that you guys hadn't identified that fact, right?

—2:19-cr-00295-GMN-NJK—

1    *A.*  Yes, sir.

2    *Q.*  Okay.  Just like we can both read the English language, we

3    both have the ability to look at signatures and see that they're

4    different, right?

5    *A.*  Yes, sir.

6    *Q.*  Okay.

7         Can you explain to the ladies and gentlemen of the jury

8    why you think it's appropriate to lump all of the Maria Castros

9    together?

10   *A.*  Well, that is not true.  We -- we should not have done that.

11   We should have checked the back of the checks and put them in

12   different groups.

13   *Q.*  Okay.  Just like you shouldn't lump all four of these

14   defendants together and say they're all part of the same deal

15   because they're brothers, right?

16   *A.*  Brothers and a nephew, I believe.

17   *Q.*  You agree with me that that's not appropriate either, right?

18   *A.*  Right.

19   *Q.*  Okay.

20        The Government also asked you a question yesterday

21   about bank records being provided in Spanish, and Mr. Finley

22   actually asked you the question.  You know from your experience

23   that bank records can be provided in Spanish, right?

24   *A.*  Yeah.  Because I have seen them before, yeah.

25   *Q.*  You've seen Spanish bank records?

1  *A.*  Yes, I have.

2  *Q.*  Okay.  Can you name a case where you have seen someone

3  request a bank record in Spanish, as you sit here today?

4  *A.*  No.

5  *Q.*  Okay.  You would agree with me that you agreed with his

6  question yesterday, right?

7  *A.*  Because you can get your bank statements in Spanish.

8  *Q.*  Okay.  If someone was a Spanish, as a first language,

9  primary reader, it would probably be easier for them to read in

10  Spanish, right?

11  *A.*  You would think so, yes, sir.

12  *Q.*  Okay.  If someone's controlling a bank account and their

13  main language is English, they probably would just get the

14  record in English, right?

15  *A.*  Could, yes.

16  *Q.*  Okay.  What's Patti Kern's main language?

17  *A.*  Her main language is English.

18  *Q.*  Okay.  You were here when Patti Kern told you she managed

19  all of the bank accounts in this case, right?

20  *A.*  She did, managed the -- the accounts, yes.

21  *Q.*  Yep.  My question was, you were here when she testified to

22  that, right?

23  *A.*  Yes, sir.

24  *Q.*  And, in fact, you know, because you were present at her

25  house in February of 2018, that she had all of the check

—2:19-cr-00295-GMN-NJK—

1  registers related to those accounts, right?

2  *A.*  Yes, sir.

3  *Q.*  Okay.  You're also aware that she directed people what to do

4  with those accounts, right?

5  *A.*  Explain that.

6  *Q.*  She told people when to open accounts under certain names,

7  right?

8  *A.*  I don't know about certain names, but she would tell them

9  that they -- that they should get bank accounts opened up, yes.

10 *Q.*  Right.  Patti Kern told people to get bank accounts, right?

11 *A.*  Told a few of the people, yes.

12 *Q.*  And once those bank accounts were opened, Patti Kern managed

13 them, right?

14 *A.*  She wrote the checks, yes.

15 *Q.*  Okay.  Not trying to split hairs.  She used the words that

16 she managed the bank accounts, right?

17 *A.*  Yes.

18 *Q.*  And, again, you want the jury to believe her, right?

19 *A.*  Yes.

20 *Q.*  Okay.

21        MR. TOMSHECK:  On that issue, I would like, Bryan, if

22 you could please bring up Government's Exhibit 300.

23 BY MR. TOMSHECK:

24 *Q.*  All right.  The Government asked you some questions about

25 text messages between Sean O'Connor and Mario, meaning Mario

—2:19-cr-00295-GMN-NJK—

1  Castro, the defendant in this case.  Do you remember those

2  questions?

3  *A.*  Yes, I do.

4  *Q.*  Okay.  You would agree with me there's a tag line on the top

5  of this exhibit, Government's Exhibit 300.  It's a three-page

6  document.  And at the top it says:  "Text between Sean and Mario

7  about Jr.'s company."

8        Do you see that?

9  *A.*  Yes, sir.

10  *Q.*  Did you pick those words on the top of that document?

11  *A.*  I did not choose those words.

12  *Q.*  Who did?

13  *A.*  People from the Government, but it was not me.

14  *Q.*  Okay.  The prosecutors picked that term, right?

15  *A.*  Possibly.

16  *Q.*  Okay.  You know, as you sit here today, that's not the

17  entirety of the text messages between Sean O'Connor and Mario

18  Castro, right?

19  *A.*  Right.

20  *Q.*  These are piecemeal text messages the Government chose to

21  show you and ask you about, right?

22  *A.*  Yes.

23  *Q.*  Okay.

24        In that conversation that they chose to show you and

25  ask you about, who is directing who what to do?

                          —2:19-cr-00295-GMN-NJK—

 1   *A.*   It appears that Sean O'Connor is talking to Mario Castro.

 2   *Q.*   Didn't ask you who was talking to who.

 3   *A.*   Directing -- pardon me.

 4   *Q.*   Who was directing who what to do?

 5   *A.*   It appears that Sean O'Connor is directing Mr. Castro.

 6   *Q.*   Okay.  And Mario Castro actually says in response to that

 7   direction where Mario Jr.'s at, right?

 8   *A.*   Yes.

 9   *Q.*   Okay.

10         MR. TOMSHECK:  Can you scroll to the next page, please,

11   Bryan.

12   BY MR. TOMSHECK:

13   *Q.*   The Government said something to you yesterday about this

14   being Dan, as in Dan Wagner, right?

15   *A.*   I think so, yes.

16   *Q.*   Okay.  You don't know which Dan they're talking about,

17   right?

18   *A.*   I think it's him.

19   *Q.*   Right.  You're presuming it's him, right?

20   *A.*   Yes, sir, yes.

21   *Q.*   Okay.  You would also agree with me that Sean O'Connor is

22   pressuring Mario Castro to get the bank account opened in the --

23   or to get the -- the business opened at City Hall, right?

24         MR. FINLEY:  Objection, misstates the evidence.

25         MR. TOMSHECK:  It doesn't.

1          (Pause.)

2          THE COURT:  I'll allow the witness to answer the

3   question.

4          THE WITNESS:  I don't think he is.  He's just talking.

5   BY MR. TOMSHECK:

6   *Q.*  I'm going to go back to that English language that we can

7   both read.

8   *A.*  Okay.

9   *Q.*  Mario Castro says to Sean O'Connor and says:  "Is up to you

10  and Dan.  I have no said so on this matter," right?

11  *A.*  Yes.

12  *Q.*  Sean O'Connor says:  "I got the money to start my company

13  from my dad.  It was a thousand bucks and Ricardo did it."

14         Did I read that right?

15  *A.*  Yes.

16  *Q.*  Okay.  And then Mario actually says:  "I'm calling Jr. to

17  cancel, don't worry," right?

18  *A.*  Yup.

19  *Q.*  Okay.

20         MR. TOMSHECK:  Go to the next page, please.

21  BY MR. TOMSHECK:

22  *Q.*  Sean O'Connor's response is:  "Come on, Mario," right?

23  *A.*  Yes.

24  *Q.*  Okay.  Mario Castro, the last text message the Government

25  showed you, was:  "Jr. don't have any money and I'm just trying

1  to help."

2  *A.*  Yes.

3  *Q.*  Do you know what that means?

4  *A.*  That his boy does not have any cash.  He's trying to help

5  him out.

6  *Q.*  Right.  Mario Castro's trying to help out his son, right?

7  *A.*  Yes.

8  *Q.*  And Sean O'Connor is essentially saying, "Hey, come on,

9  Mario, get this done," right?

10  *A.*  Possibly, yes.

11  *Q.*  And Mario Castro says:  "I have no said so" -- I'm assuming

12  meant say-so -- "in this matter," right?

13  *A.*  Okay.

14  *Q.*  I read all of that right, correct?

15  *A.*  Yes.

16  *Q.*  Okay.

17       All right.  The last thing I want to ask you about is

18  something where I asked you a few questions, I think it was the

19  topic we were on when we broke yesterday, specifically

20  Government's Exhibit 280.  You've seen that exhibit a lot.

21       MR. TOMSHECK:  Can you bring it up, Bryan.

22       THE WITNESS:  Yes, I have.

23  BY MR. TOMSHECK:

24  *Q.*  All right.  So I had asked you the question yesterday.  At

25  the top it says:  "Mailing Companies," right?

--2:19-cr-00295-GMN-NJK--

1  *A.*  Yes, sir.

2  *Q.*  Okay.  And, again, the Government chose that tag line at the

3  top, "Mailing Companies," right?

4  *A.*  Yes, sir.

5  *Q.*  Okay.  You would agree with me that if I was presenting this

6  exhibit to you, I could change that tag line to whatever I

7  wanted, right?

8  *A.*  If it's up -- if you did, yeah, you could put what -- what

9  you want to put down.

10  *Q.*  Right.  I could put on it "Companies That Patti Kern

11  Controlled," right?

12  *A.*  You could put what you wanted to, sir.

13  *Q.*  Okay.  You'd agree with me there's a lot of evidence that

14  Patti Kern controlled these companies, right?

15  *A.*  Patti Kern played a part in these companies.

16  *Q.*  Taking you on back to my question then.  You'd agree with me

17  there's a lot of evidence in this case that she controlled these

18  companies, right?

19  *A.*  She wrote the checks.

20  *Q.*  She managed the bank accounts, right?

21  *A.*  She managed the bank accounts.

22  *Q.*  She directed people to open businesses and accounts, right?

23  *A.*  At times.

24  *Q.*  You actually wrote in your search warrant affidavit that she

25  controlled all aspects of the mailing operation, right?

—2:19-cr-00295-GMN-NJK—

1    *A.*   That's what we thought at the time.

2    *Q.*   You wrote it in your search warrant affidavit, right?

3    *A.*   That's what I thought at the time, yes.

4    *Q.*   Okay.  You would agree with me, then, that there's a lot of

5    evidence in this case that Patti Kern controlled these mailing

6    companies, right?

7    *A.*   Patti Kern did her part as a partner.

8    *Q.*   Okay.

9         Let me ask you this.  For each one of these companies

10   there's a bank account, right?

11   *A.*   Yes, sir.

12   *Q.*   Okay.  And you don't dispute at all that Patti Kern managed

13   those bank accounts, right?

14   *A.*   No.

15   *Q.*   Okay.  For most of the companies that the Government's

16   referred to throughout their case, there is also a mailbox,

17   right?

18   *A.*   Explain that further.  A mailbox of what?

19   *Q.*   Jury's heard a lot of testimony about these mailboxes that

20   are opened that the victim payments go to, right?

21   *A.*   Yes.  Yes, sir.

22   *Q.*   Okay.  You would agree with me, then, that for most of these

23   companies there's a mailbox, right?

24   *A.*   There is a box or box somewhere around the country that the

25   payments go to, yes, sir.

-2:19-cr-00295-GMN-NJK-

1   Q.  Right.  And as I understand the Government's position and

2   your position in this case, that the people that have their

3   names on those mailboxes are in some way responsible because

4   their name is on the mailbox, right?

5   A.  They are part of --

6          MR. FINLEY:  Objection, Your Honor.  Mischaracterizes

7   the record.

8          THE COURT:  Well, he's asking him to explain if that is

9   the theory or not, so I'll allow it.

10          THE WITNESS:  Could you tell me that again?

11  BY MR. TOMSHECK:

12  Q.  You would agree with me that part of what you want the jury

13  to believe is that the people whose names are on these mailboxes

14  are responsible because their names are on the mailbox, right?

15  A.  They are part of the partnership, yes.

16  Q.  Okay.  Is it your testimony that Mario Castro, Jr. is part

17  of a partnership?

18  A.  No, his father is.

19  Q.  I'm asking is it your testimony that Mario Castro, Jr. is

20  part of a partnership?

21  A.  He is -- no, he is not a partner that way.

22  Q.  His name is on mailboxes, though?

23  A.  Yes, that his father had him get, open up.

24  Q.  Okay.  It's your position that his dad made him do that,

25  right?

—2:19-cr-00295-GMN-NJK—

1  *A.*  He didn't make him do it.  He had him do that.

2  *Q.*  Okay.  That's your position, right?

3  *A.*  That is mine, yes.

4  *Q.*  You agree with me that in the text message, Mario says:  "I

5  have no said so in this matter whatsoever," right?

6  *A.*  I would think he does.

7  *Q.*  Okay.  Mario Castro, Jr. would probably be a good person to

8  ask about who had him set up that mailbox and why, right?

9  *A.*  Yes.

10  *Q.*  Okay.

11       So here's what I'm trying to figure out.  If an

12  individual identifies the location for a mailbox and the reason

13  for having it there, are they responsible for the mailbox?

14  *A.*  Give me some content there.

15  *Q.*  Yeah.

16  *A.*  What do you mean?

17  *Q.*  I want to start a fraudulent mailing company and I pick a

18  mailbox in Saskatchewan, and that's the location that I've

19  chosen --

20  *A.*  Okay.

21  *Q.*  -- because I know fraudulent mail is going to go there.  Am

22  I responsible?

23  *A.*  You're responsible if -- if you're part of the partnership

24  and you have a -- a business or a company and you are having --

25  or getting prize notices mailed out and you're getting paid.

--2:19-cr-00295-GMN-NJK--

1   You're getting white envelopes.  You're getting distribution

2   checks.  Then yes.

3   Q.  Okay.  I'm asking you about a mailbox.

4   A.  Okay.

5   Q.  If I pick the location for the mailbox, am I responsible?

6   A.  Give me a name and I'll tell you.  Who?  Who?

7   Q.  It's a hypothetical.

8   A.  Okay.

9   Q.  What do you want the name to be?

10  A.  Hypothetical, possibly.

11  Q.  Okay.

12        If I picked the location for the mailbox and I tell

13  someone else what to write on a form and I fax that form in to

14  actually open the mailbox, am I responsible?

15  A.  Yes.  You are part of it, yes.

16  Q.  I'm actually the person who directed where the mailbox is,

17  when it was opened, and how it was opened under that scenario,

18  right?

19  A.  Based on what you got -- are talking about now, yes.

20  Q.  Okay.

21        Even if I use an alias when I do that, if I call myself

22  by some fictional name that I created to keep heat off me, I'm

23  still responsible, right?

24  A.  Yes.

25  Q.  Okay.  You know Patti Kern did that a lot, right?

1   *A.*   Did what a lot?

2   *Q.*   Decided where a mailbox should be opened, directed people to

3   fill out forms, told them what they needed to do, physically

4   faxed the form to the mailbox itself, and open the actual

5   mailboxes, you know she did that, right?

6   *A.*   Yes.

7   *Q.*   Okay.

8          All right.  I'm going to ask you just about three

9   things and then I'll be done, I promise.  Okay.

10  *A.*   All right.

11  *Q.*   You reviewed, I think you told us, thousands of documents in

12  this case, right?

13  *A.*   Tens of -- tens of thousands.

14  *Q.*   You've personally done a number of interviews, right?

15  *A.*   I have.

16  *Q.*   And you've read summarizations of other interviews, right?

17  *A.*   Yeah.  Yes.

18  *Q.*   Okay.  As you sit here today, do you have any information,

19  can you point to a document or an interview or a piece of

20  tangible evidence, whether it be in an electronic format or in

21  hard copy, where Patti Kern ever told Mario Castro that this was

22  fraud?

23  *A.*   I do not have that, no.

24  *Q.*   Same question.  Can you point to a single piece of evidence,

25  anything in those tens of thousands of documents that you've

1    reviewed in this case that Patti Kern ever told Miguel Castro

2    that this was fraud?

3    *A.*  Not that I know of, no.

4    *Q.*  I'm going to ask you this same question about Jose Luis

5    Mendez.  Can you tell the ladies and gentlemen of the jury one

6    singular piece of evidence where Patti Kern told that man that

7    this was a fraud?

8    *A.*  Not that I know of, no.

9    *Q.*  As you sit here today, after reviewing all of those tens of

10   thousands of documents, interviews, memoranda, exhibits, and sat

11   through this whole trial, you'd agree with me that there's not a

12   single piece of evidence whatsoever that Patti Kern told

13   Salvador Castro this was a fraud?

14   *A.*  I -- yes.  That she got up and told him this is a fraud, no.

15   *Q.*  You know, as you sit here today, that this was a fraud

16   because Patti Kern elicited payments from people in the public

17   under the guise that they were going to get a large cash award,

18   right?

19   *A.*  Patti did, yes.

20   *Q.*  You know Patti Kern didn't pay that large cash award, right?

21   *A.*  Right.  Yes.

22   *Q.*  As you sit here today, can you point to the ladies and

23   gentlemen of the jury any piece of evidence whatsoever where

24   Patti Kern ever told Mario Castro that she wasn't paying a large

25   cash award?

 1  *A.*  I do not recall that, no.

 2  *Q.*  Okay.  And you also don't recall a singular instance in the

 3  entirety of this case where Patti Kern ever told Miguel Castro

 4  that she wasn't paying the large cash prizes, right?

 5  *A.*  Right.

 6  *Q.*  I could go through it for each of the other two defendants,

 7  but you'd agree with me for simplicity sake that she never told

 8  Jose Luis Mendez or Salvador Castro that she didn't pay a large

 9  cash settlement, right?

10  *A.*  She did not tell them directly, yes.  No.

11  *Q.*  Okay.  No evidence, insinuation, or iota of anything in this

12  case that you can point to that says that any of those

13  individuals knew she wasn't paying a large cash prize?

14          MR. FINLEY:  Objection.  Asked and answered,

15  cumulative, badgering.

16          THE COURT:  Well, this is a little different because he

17  also asked about insinuations or inferences, so overruled.

18          THE WITNESS:  I would think that Jose Mendez looked at

19  his bank accounts so he could have found out if she did or she

20  didn't.  But Patti Korn -- Patti Kern didn't pay out anything.

21  BY MR. TOMSHECK:

22  *Q.*  And you're aware that there's no evidence in this case

23  whatsoever that she told any of those individuals?

24  *A.*  Right.

25  *Q.*  Okay.  You'd also agree with me that there's a lot of

—2:19-cr-00295-GMN-NJK—

1  information about cease and desist?  And this is the last thing
2  I'm going to ask you about.
3  *A.*  That's what you told me before.
4  *Q.*  No, I said three things.
5  *A.*  Okay.
6  *Q.*  One's the fraud.  Two is the cash payments.  Three is the
7  cease and desist.
8  *A.*  Okay.
9  *Q.*  You'd agree with me Mario Castro never got one, right?
10 *A.*  True.
11 *Q.*  You'd agree with me that Patti Kern never had a conversation
12 with Mario Castro about him receiving a cease and desist, right?
13 *A.*  I thought in her -- I thought that she had said that she had
14 talked to him about that.
15 *Q.*  Okay.  Can you point me to a single piece of evidence that
16 says that?
17 *A.*  I think she had a memorandum that she made that comment.
18 *Q.*  Yeah.  You agree with me that your memorandums aren't
19 evidence; otherwise, the jury would have the opportunity to
20 review those?
21 *A.*  Okay.
22 *Q.*  Right?
23 *A.*  Yes, yes.
24 *Q.*  You'd agree with me that if we recorded an interview, we
25 could probably play that for them, right?

1   *A.*   Yes, sir.

2   *Q.*   Okay.  You would agree with me that as you sit here right

3   now, at the conclusion of your testimony, you can't point to a

4   single time where Patti Kern had a conversation with Mario

5   Castro about a cease and desist?

6   *A.*   I can't recall at this time, no, sir.

7   *Q.*   Okay.  And I'm just going to ask you one more question as it

8   relates to the other three defendants.

9   *A.*   Okay.

10  *Q.*   No evidence whatsoever that any of them received a cease and

11  desist either, right?

12  *A.*   That they did?

13  *Q.*   Right.

14  *A.*   No.

15  *Q.*   Patti Kern did, though, right?

16  *A.*   Patti Kern did.

17          MR. TOMSHECK:  Nothing else.

18          THE COURT:  All right.  We're going to go ahead and

19  take our morning break at this time.  I remind the jury that you

20  are not to discuss the case with anyone, not even your fellow

21  jurors.  Remember that if you do inadvertently hear anyone

22  speaking about the case, even your fellow jurors, you're still

23  required to let me know.

24          Please do not read or listen to or view anything that

25  touches upon the case in any way or attempt to perform any

1  research or any independent investigation.  And do not form any

2  opinion.

3          It's 10:42.  We'll be back here at 11 a.m.

4          Let's stand for the jury as they are the judge of the

5  facts.

6          And, Mr. Bouchie, after the jury exits, you may also

7  take your stretch break.  And we'll see you back here at 11 a.m.

8          (Whereupon jury leaves the courtroom at 10:42 a.m.)

9          THE COURT:  All right.  We're off record.

10          (Recess taken at 10:43 a.m.)

11          (Resumed at 11:02 a.m.)

12          COURTROOM ADMINISTRATOR:  All rise.

13          THE COURT:  All right.  Let's have the witness back up

14  on the stand and we'll go grab the jury.

15          (Whereupon jury enters the courtroom at 11:03 a.m.)

16          THE COURT:  All right.  Everyone may be seated.  We're

17  back on the record with the jury and the witness is back in the

18  witness chair.

19          Mr. Gaffney, you may proceed with your questioning on

20  behalf of Miguel Castro.

21          MR. GAFFNEY:  Thank you, Judge.

22              REDIRECT EXAMINATION OF BARRY BOUCHIE

23  BY MR. GAFFNEY:

24  Q.  Good morning, sir.

25  A.  Good morning.

—2:19-cr-00295-GMN-NJK—

1   Q.  I want to talk a little bit about the subpoena that Miguel

2   Castro received in 2018.

3   A.  Okay.

4   Q.  You know that he had a right not to respond to the subpoena,

5   right?

6   A.  I think so, yes.  Yes.

7   Q.  He didn't have to provide any information that was

8   requested, right?

9   A.  I'm not for sure on it.

10  Q.  Okay.

11  A.  But, yeah, that's probably true.  Yes.

12  Q.  You testified that in response to the subpoena, Miguel

13  Castro's attorney provided a flash drive to the Government.  Do

14  you remember that?

15  A.  Yes, that's what it was.

16  Q.  And who was Miguel Castro's attorney back in 2018?

17  A.  I have no idea.

18  Q.  Okay.  It wasn't me, was it?

19  A.  I don't think so, sir.

20  Q.  Okay.  Obviously, you weren't present when Miguel Castro

21  discussed the subpoena with his attorney, right?

22  A.  No.

23  Q.  You don't know what legal advice his attorney may have

24  provided in relation to responding to the subpoena, correct?

25  A.  No.

—2:19-cr-00295-GMN-NJK—

1  Q.  And you don't know if maybe Miguel misunderstood his

2  attorney's advice, do you?

3  A.  I have no idea.

4  Q.  Fair to assume that because he had an attorney, and that

5  attorney provided a flash drive in response to the subpoena,

6  that Miguel Castro was acting on the advice of his attorney?

7          MR. FINLEY:  Objection.  No foundation, calls for

8  speculation.

9          MR. GAFFNEY:  That's fine.  I'll move on, Judge.

10          THE COURT:  Sustained.

11  BY MR. GAFFNEY:

12  Q.  The flash drive that was produced, do you recall what was on

13  it?

14  A.  No.

15  Q.  Do you recall that it contained a variety of documents?

16  A.  I don't know.

17  Q.  The -- the statement that we've been looking at, Exhibit

18  152.

19          MR. GAFFNEY:  Bryan, can you bring that up?

20  BY MR. GAFFNEY:

21  Q.  You testified yesterday that that statement was provided as

22  a part of the flash drive.  Do you remember that?

23  A.  Yes.

24  Q.  Okay.  And so taking a look at this statement, it doesn't

25  contain an actual signature, right?

—2:19-cr-00295-GMN-NJK—

1   *A.*  Yes -- no.  No, it doesn't.

2   *Q.*  Okay.  You don't know if Miguel Castro's attorney helped him

3   to draft this letter, right?

4   *A.*  Right.

5   *Q.*  It's not addressed to anyone in particular, is it?

6   *A.*  No.

7   *Q.*  It doesn't say anything about the letter being sent in

8   response to a subpoena, right?

9   *A.*  Right.

10  *Q.*  There's no mention of a subpoena anywhere in it, right?

11  *A.*  I don't think so.

12  *Q.*  The body of the letter starts with the word "companies,"

13  right?

14  *A.*  Yes, sir.

15  *Q.*  And you already testified that this looked like overall a

16  letter that was written by somebody whose English was a second

17  language, correct?

18  *A.*  Correct.

19  *Q.*  Okay.

20      And it gives some of Miguel's working history in the

21  printing and lasering industry, doesn't it?

22  *A.*  Yes.

23  *Q.*  And it also talks about that he went to Mexico for the

24  purpose of starting a company that looks like it was either

25  selling or importing plastics or chemicals, right?

2:19-cr-00295-GMN-NJK

1  *A.*  Yes, sir.

2  *Q.*  Okay.

3       MR. GAFFNEY:  Bryan, can you zoom in on the sixth

4  paragraph.

5  BY MR. GAFFNEY:

6  *Q.*  So in this letter, Miguel Castro gives you specific

7  information about what he was doing in Mexico, right?

8  *A.*  Yes, sir.

9  *Q.*  It talks about having I believe it's e-mail conversations

10  with Asia Chemical in Texas and a sales representative by the

11  name of Libby Serrano, right?

12  *A.*  Yes, sir.

13  *Q.*  Okay.  Did you investigate whether he was having

14  conversations with Asia Chemical in Texas?

15  *A.*  No.

16  *Q.*  Did you talk to Libby Serrano?

17  *A.*  No.

18  *Q.*  Did you investigate what Interlogin was?

19  *A.*  I don't think so.

20  *Q.*  You see it there in that paragraph that I've been talking

21  about?

22  *A.*  Yes.

23  *Q.*  There was some testimony about Miguel providing a passport

24  to the Government, and you indicated you didn't recall him doing

25  that.  Is that correct?

—2:19-cr-00295-GMN-NJK—

1   *A.*  I don't think so because it didn't come directly to me.

2   *Q.*  Okay.  Do you remember whether that passport was provided to

3   you in that same flash drive with the statement?

4   *A.*  I don't know, sir.

5   *Q.*  Would it your refresh recollection to take a look at the

6   passport pages that he submitted to you?

7   *A.*  Okay.  Yeah, sure.

8          MR. GAFFNEY:  Bryan, can you bring up Exhibit 8,000

9   just for the witness?

10  BY MR. GAFFNEY:

11  *Q.*  Do you see that on your screen?

12  *A.*  Yes, I do, sir.

13  *Q.*  Okay.

14         MR. GAFFNEY:  And, Bryan, can you scroll through those

15  page -- well, actually, I'm sorry, can you zoom in on that first

16  page?

17  BY MR. GAFFNEY:

18  *Q.*  Okay.  What does that appear to be?

19  *A.*  This appears to be part of the pages from a passport.

20  *Q.*  Okay.  And do you see stamps for admittance into Mexico?

21  *A.*  I see stamps.  I don't know whether I can tell whether

22  they're going to -- yeah, there's a couple of them that are,

23  yes.

24  *Q.*  Okay.  And then there's also stamps where he's being

25  re-admitted back into the United States.  Is that fair?

1    *A.*  That's fair.

2    *Q.*  Okay.

3        MR. GAFFNEY:  Could we go to Page 2, Bryan, and zoom in

4    on that.  This page is a little bit more clear.

5    BY MR. GAFFNEY:

6    *Q.*  You see stamps for admittance into Mexico, right?

7    *A.*  Yes, I think so.  Yes.

8    *Q.*  Okay.  And you also see stamps for admittance into the U.S.,

9    correct?

10        MR. FINLEY:  Objection.  I think it would be helpful to

11    clarify the time periods.

12    BY MR. GAFFNEY:

13    *Q.*  So -- well, obviously you can see that there are stamps

14    between -- showing travel between the U.S. and Mexico, right?

15    *A.*  Yes.

16    *Q.*  Okay.

17        MR. GAFFNEY:  Judge, this was stipulated to as being

18    admissible into evidence.  I would ask to publish this for the

19    jury.

20        THE COURT:  What number is it?

21        MR. GAFFNEY:  8,000.

22        THE COURT:  Is that right, Nick?  Do you have 8,000?

23        COURTROOM ADMINISTRATOR:  Yes, Your Honor.

24        THE COURT:  All right.  So Exhibit 8,000 can be

25    published to the jury.

```
                    ─────2:19-cr-00295-GMN-NJK─────
```

 1          MR. GAFFNEY:  And, Bryan, could you zoom out on this

 2  page?

 3          And can you zoom in on the Bates stamp on the left side

 4  of the page?

 5          THE INTERPRETER:  Your Honor?

 6          THE COURT:  Yes.

 7          THE INTERPRETER:  The interpreter's not able to hear.

 8          THE COURT:  Oh.  So you need to stay near the

 9  microphone.

10          MR. GAFFNEY:  Sorry.

11          THE COURT:  You can move the microphone towards you.

12          MR. GAFFNEY:  Bryan, can you please zoom in on the

13  Bates stamp that's in the left lower corner of the page.

14  BY MR. GAFFNEY:

15  Q.  Okay.  Do you see the Bates stamp I'm referring to there

16  that starts with GOV?

17  A.  Starts with what?

18  Q.  GOV.

19  A.  Oh, yes, yes.

20  Q.  Okay.  Is that a Government Bates stamp?

21  A.  I would think so, yes, sir.

22  Q.  Okay.

23          MR. GAFFNEY:  And could we go to the -- the last page

24  there.

25  BY MR. GAFFNEY:

1    Q.    This is another page from the passport, right?

2    A.    Yes.

3    Q.    Okay.  Did you do anything to investigate Miguel Castro's

4    travel between the U.S. and Mexico?

5    A.    No.

6    Q.    Did you subpoena his passport records from the U.S. State

7    Department?

8    A.    I did not.

9    Q.    Did you ask anybody else to do that?

10    A.    No.  Not that I know of anyway.

11          MR. GAFFNEY:  I'll pass the witness, Judge.

12          THE COURT:  Mr. Brown?

13          MR. BROWN:  No thank you, Judge.

14          THE COURT:  Mr. Green?

15          MR. GREEN:  Please, Your Honor.  Thank you.

16              REDIRECT EXAMINATION OF BARRY BOUCHIE

17    BY MR. GREEN:

18    Q.    Good morning, Inspector Bouchie.

19    A.    I am not an inspector.

20    Q.    Okay.  I'm old school and I -- I've seen your name a

21    thousand times.  So forgive me if I -- if I use that.  Is it

22    Mr. Bouchie?

23    A.    Yeah.  That's fine, sir.

24    Q.    Thank you so much.

25    A.    Thank you.

———2:19-cr-00295-GMN-NJK———

1   *Q.*  I don't want to call you Barry.

2   ***A.***  Okay.

3   *Q.*  You mentioned a few minutes ago and yesterday in your direct

4   examination that in connection with this case you have reviewed

5   tens of thousands of pages of documents, correct?

6   ***A.***  Yes.

7   *Q.*  Would it be safe to say that it's probably hundreds of

8   thousands of documents?

9   ***A.***  I don't know.  I have reviewed a lot of documents.

10  *Q.*  Okay.  In preparation of that search warrant of which you

11  were questioned yesterday, that would you agree that there's a

12  lot of detailed information in that?

13  ***A.***  Yes.

14  *Q.*  And I take it that the back-up documentation, you had to

15  look at probably hundreds of pages of documents, correct?

16  ***A.***  Well, this was -- this was not just done by me.  It is done

17  by a team of our -- our teams.  Certain people do -- do certain

18  parts of it and then it comes together.  And I review what they

19  all do just to make sure that it's as good as it can be.

20  *Q.*  Did you sign that warrant?

21  ***A.***  Yes, I did.

22  *Q.*  Okay.  So would it be safe to say that you reviewed the

23  material or some of the material in support of that warrant?

24  Correct?

25  ***A.***  Yes, sir.

—2:19-cr-00295-GMN-NJK—

1   Q.  And I take it that, in preparation of interviews, that you

2   also reviewed probably hundreds, if maybe not thousands, of

3   pages of documents in connection with preparing for your notes

4   and your interviews of many people in this case, correct?

5   A.  Explain that again.

6   Q.  Okay.  When you prepare a document -- when you prepare for

7   an interview, do you review documents?

8   A.  Yes.

9   Q.  Would you say that in this case that some witnesses required

10  looking at lots of documents?

11  A.  Yes, sir.

12  Q.  And that when you -- you're looking at these documents, were

13  you involved in the -- in the scanning of documents?

14  A.  No.

15  Q.  Were you involved in the preparation of exhibits?

16  A.  Not much, no.

17  Q.  Were you involved in the preparation of -- were you involved

18  in discussing exhibits?

19  A.  Yeah.

20  Q.  And the back-up to the -- and the back-up documents for

21  those exhibits?

22  A.  I didn't do much of that, sir.

23  Q.  But you've seen a number of Government exhibits presented

24  which have like a footnote at the bottom which talks about the

25  source of this particular chart or this particular mailing

1  company listing.

2          Do you remember that?

3  *A.*  Yes, I do.

4  *Q.*  And did you review those particular documents?

5  *A.*  At -- at times, but there's thousands of them.  So, no, I

6  did not review them all.

7  *Q.*  And would you say that in your training, when you left being

8  at the Post Office and saw that listing for a great job

9  opportunity to be a postal inspector, I take it that during your

10  training that you were -- you had classes on looking at

11  documents, observing, going into a room, tactically when you go

12  into a room, check the corners for possible suspects with --

13  with weapons, you did a lot of things on observation, correct?

14  *A.*  Yes.

15  *Q.*  And I guess in your training and experience, you've learned

16  that it's -- you have to observe things and recollect things

17  very quickly, correct?

18  *A.*  I don't know about that, but, yeah, you've got to check out

19  things.

20  *Q.*  And I take it that, Mr. Bouchie, probably more than any

21  other agent involved in this case, you probably have the

22  greatest wealth of knowledge, would you agree?

23  *A.*  I don't know about that, but I've got some knowledge.

24  *Q.*  But you were the coleader on probably one of the most

25  important searches, correct?

———2:19-cr-00295-GMN-NJK———

1   *A.*  Are you talking about Patti Kern's house?

2   *Q.*  Yes.

3   *A.*  Yes.

4   *Q.*  And before that there was this meeting.  Was it you and the

5   other agent who shared the responsibility as -- as being in

6   charge of that -- of being in charge of all of these searches as

7   codirector, coleader, something like that?

8   *A.*  Explain what are you talking about.

9   *Q.*  Well, let me ask you this.

10  *A.*  Okay.

11  *Q.*  Let me ask you this.  As coleader, was it your

12  responsibility not only to know about what's going on and all of

13  the searches, but where everybody was going to be, correct?

14  *A.*  No.

15  *Q.*  Oh, it wasn't?

16  *A.*  No.

17  *Q.*  So did you have people working under you as site leaders?

18  *A.*  Uhm.  What really happened was Inspector Gerber, because

19  this was so big, he's the one who was in charge of all of the

20  sites.  He helped pick who went where and what was done because

21  it was that big.

22  *Q.*  But, ultimately, in this case, would it be safe to say that

23  you're the number one case agent?

24  *A.*  Yeah -- yes.  Sure.

25  *Q.*  And you remember a lot of stuff about the case?

1   *A.*  I thought I did, yeah.

2   *Q.*  What was the first name of Victim Stirewalt?

3   *A.*  Cynthia, I believe.

4   *Q.*  What was the first name of Victim Midvich [sic] or

5   Miskovich?

6   *A.*  I think it was Bill or Jim.

7   *Q.*  Okay.  So we got -- Stirewalt was what?

8   *A.*  I thought it was Cynthia, but I don't know.  It could be

9   someone else.

10  *Q.*  Cynthia.  And Midvich was Bill?

11  *A.*  I think so, yes.

12  *Q.*  All right.  Let's get even more basic.  Just the other day,

13  what was the first exhibit in this case, Exhibit Number 1?

14  *A.*  I -- I don't recall.

15        MR. GREEN:  May we have, with the Court's permission,

16  Exhibit Number 1 placed on the screen?

17        THE WITNESS:  Okay.

18        MR. GREEN:  It's Government's Exhibit 1, previously

19  admitted.

20  BY MR. GREEN:

21  *Q.*  This was the very -- well, it's not the very first, but it's

22  Exhibit -- it's Government's Exhibit 1.  This appears to be a

23  letter?

24  *A.*  Yep.

25        MR. GREEN:  And could we go could go to -- could we go

─────2:19-cr-00295-GMN-NJK─────

1   to this page, Exhibit -- Exhibit 1, Page 2.

2   BY MR. GREEN:

3   *Q.*  This is one of those prize identification notifications,

4   correct?

5   *A.*  Yes.

6   *Q.*  Now, you mentioned the other -- you mentioned in response to

7   direct -- or to cross-examination by the Government yesterday

8   that -- that when these forms were going through these machines

9   and getting printed up, that, you know, it's not likely that

10  someone wouldn't know that it's a fraud, correct?

11  *A.*  Yeah.

12  *Q.*  And so do you remember what Government's Exhibit 280 is?

13  *A.*  I kind of do, but if you want to put it up, that would be --

14  *Q.*  I'm just asking if you remember what it is.

15  *A.*  Not for sure because there have been a lot --

16  *Q.*  Having seen it -- having seen the document at least a couple

17  of times in the past few days, including today.

18  *A.*  As I just told you, sir, if you want to show me that,

19  because there has been a lot of exhibits.

20  *Q.*  And on -- on the screen in front of you is -- is

21  Government's Exhibit Page -- Government's Exhibit 1, Page 2, of

22  1,222 pages.  On this document -- we'll just use this as an

23  example.

24          You mentioned on direct examination yesterday -- or

25  cross-examination yesterday that some of these forms, as you

2:19-cr-00295-GMN-NJK

1  know it, would be placed into a machine, correct?  For printing?

2  **A.**  Yes.

3  Q.  And then these forms would be taken possibly to a later

4  machine of some type for further graphics and adding on stuff,

5  correct?

6  **A.**  Yes, sir.

7  Q.  And that what we have in front of us on Exhibit 1, Page 2,

8  would you agree kind of like -- looks like maybe the final --

9  the final form?

10  **A.**  Yes, sir.

11  Q.  And on these other forms that went into the machines

12  originally, didn't they have, like, perforations on the sides?

13  **A.**  I don't know.  I wasn't there.

14  Q.  So -- that's right, you weren't at Digital Express, were

15  you?

16  **A.**  No, I wasn't.

17  Q.  But weren't -- weren't, like, cases and cases of these blank

18  forms seized at Digital Express?

19  **A.**  Yes.

20  Q.  And eventually did you ever see these cases of these -- of

21  these blank forms?

22  **A.**  Yes, I did.

23  Q.  So -- and you say that certain people involved in this case

24  had different roles, correct?

25  **A.**  According to the testimony, yes.

1    Q.  So if -- and, yeah, the testimony.  And you've sat here

2    through this entire trial.  You've listened to every single

3    witness, haven't you?

4    **A.**  Yes, I have.

5    Q.  Okay.  At -- and as to those blank forms, somebody put them

6    in the machine, correct?

7    **A.**  Yes.

8    Q.  And there's nothing on the form.  And when the form came

9    out, you said that they were taken, like, to a different machine

10   for further processing, correct?

11   **A.**  Yes.

12   Q.  So, ultimately, we have Page 2 -- just for example, we won't

13   go through all of the thousands.  But, ultimately, as to Page 2,

14   we have a -- kind of like a final format, correct?

15   **A.**  Yes.

16   Q.  And for million -- for thousands and thousands of documents,

17   do you -- do you think -- do you think it's reasonable that --

18   that every single one of them is read for quality assurance?

19   **A.**  No.

20   Q.  It wouldn't -- it wouldn't be practical, would it?

21   **A.**  Right.

22   Q.  Because you got to get them out, you got to get them mailed

23   and get those checks back, right?

24   **A.**  Yes.

25   Q.  Okay.

———2:19-cr-00295-GMN-NJK———

1          You were asked a question about the search -- or a

2   series of questions about the search at the home of Patti Kern.

3   Now, were you -- you were present at the Bogey Way address on

4   February 21st, 2018, for that search, correct?

5   *A.*  Yes.

6   *Q.*  And who was Inspector Anita Butler?

7   *A.*  I believe that she came there, uhm, at a different time

8   because it was -- it was that big that a different team came in

9   there, helped us out.

10  *Q.*  And did you speak with -- without saying what you -- what

11  she may have said to you, did you speak with Inspector Anita

12  Butler?

13  *A.*  I don't recall.

14  *Q.*  Do you know if she prepared any documentation in connection

15  with this case?

16  *A.*  I don't think so.

17  *Q.*  You don't think so.

18          MR. GREEN:  Government's Exhibit 241, please.

19          THE WITNESS:  Okay.

20          Oh, that.  Yes.

21  BY MR. GREEN:

22  *Q.*  Okay.  Now, let me ask you the question again.

23  *A.*  Okay.

24  *Q.*  Do you know if Inspector Anita Butler prepared any

25  documentation in connection with this case?

---2:19-cr-00295-GMN-NJK---

1  **A.**  Yes, she did the search warrant inventory.

2  **Q.**  Okay.  Say it -- what is that again?

3  **A.**  It's called a search warrant inventory.

4  **Q.**  Okay.  And yesterday you were asked a question of whether or

5  not you understood that if two ATM cards were found at the home

6  of Patti Kern, you -- you weren't sure, correct?

7  **A.**  No, I -- what I told you, if you want to, could you -- could

8  you show me a picture.

9  **Q.**  Well, we're -- we -- I told you we'd get to that.

10  **A.**  Oh, okay.  Thank you.

11  **Q.**  What is the very first item on the inventory on Government's

12  Exhibit 241?

13  **A.**  Do you want me to read it?

14  **Q.**  Please.

15  **A.**  Two debit cards in the name of Salvador Castro and Golden

16  Products Service, green USB drive, notes with passwords.

17  **Q.**  You've heard testimony in here by Patti Kern that Salvador

18  Castro never used those ATM cards, correct?

19  **A.**  I don't know.

20  **Q.**  Okay.

21        Weren't you sitting here during the examination of

22  Patti Kern?

23  **A.**  Yeah, there's a lot of testimony given.  No.

24  **Q.**  Hard to remember sometimes, isn't it?

25  **A.**  It is.

```
                      ──2:19-cr-00295-GMN-NJK──
```

 1          MR. GREEN:  Government's Exhibit 7027 -- I mean,

 2   Defense Exhibit 7027, please.

 3   BY MR. GREEN:

 4   Q.  In front of you is a photograph.  Who is this photograph?

 5   A.  Patti Kern.

 6   Q.  And who else?  By your own admission?

 7   A.  Oh, Betsy Spider or whatever you want to call her.

 8   Q.  Okay.  Isn't it true that in this case, in your review of

 9   thousands and thousands and thousands of documents, that the

10   only reference, the only reference in evidence in this case to

11   Betsy Spider is in connection with Salvador Castro, correct?

12   A.  I think so, yes.

13          I said I think so, yes.

14   Q.  Thank you.

15          MR. GREEN:  Exhibit 81, please.

16          If we could zoom in on the top half, please.

17   BY MR. GREEN:

18   Q.  You were asked a couple of questions concerning this

19   exhibit.  And at the top of the left page, as to Jose Luis

20   Mendez, do you see underneath the name on the left the word

21   "salary"?

22   A.  (Pause.)  Yes.  I don't know whether they showed that to --

23   to -- to me.

24   Q.  Okay.  I'm showing it to you.

25   A.  Oh, okay.  But you just told me that they showed it to -- to

---2:19-cr-00295-GMN-NJK---

1   me.

2   Q.  Is this part of the case file?

3   A.  This is part of the case file.

4   Q.  And have you seen this document before?

5   A.  Yes, I have.

6   Q.  Okay.  And down below the name Jose Luis Mendez, there's --

7   do you see the word "salary"?

8   A.  Yes, sir.

9   Q.  Over on the right is there a number, an amount?

10  A.  There's a number of 4400, which is the amount of time.

11  Q.  Does it look like $400?

12  A.  Yes, it does.

13  Q.  I mean, it doesn't say 4,000, does it?

14  A.  No.

15  Q.  Okay.  Thank you.

16        MR. GREEN:  Government's Exhibit 285, please.

17  BY MR. GREEN:

18  Q.  Government's Exhibit 285, sir, we represent to you is a

19  compilation of some 31 checks, all drawn out to Salvador Castro.

20  Were you present the other day when Patti Kern said that she

21  never -- that Salvador Castro never wrote a single check on any

22  of the accounts associated with his name?

23  A.  Yes, I think that is what she said.

24  Q.  And in -- and in 285, Page 1, in front of you --

25        MR. GREEN:  If we could zoom in on the top half of that

—2:19-cr-00295-GMN-NJK—

1  page, please.

2  BY MR. GREEN:

3  Q.  Do you see where it says Salvador Castro?

4  A.  Yes, sir.

5  Q.  And above that MMI?

6  A.  Yes, sir.

7  Q.  Is there a date on that check?

8  A.  9/2/2016.

9  Q.  What is the amount?

10  A.  $400.

11  Q.  That's the same amount like was -- we just showed in

12  Government's Exhibit 81 of Miguel Castro, correct -- I mean, on

13  Jose Luis Mendez, correct?

14  A.  Yes.

15  Q.  And in this check, down at the bottom right do you see where

16  it's got the bank routing numbers -- excuse me -- the bank

17  account number, 5010?

18  A.  The bank account number is 1254.

19  Q.  That's the routing number.  I'm talking about the account

20  number.  Do you see that 5010?

21  A.  Okay.  That's the first part.

22  Q.  Yes.  Can you read that 5010 number into the record, please?

23  A.  501019281254.

24  Q.  Okay.  We won't go through all of these checks.  Thank you.

25          MR. GREEN:  Can we go to Government's Exhibit 263, Page

—2:19-cr-00295-GMN-NJK—

1  3.

2  BY MR. GREEN:

3  Q.  This is the pie chart developed by Agent -- by Inspector

4  Towers.  And do you see where it says -- right in the middle

5  where it says "Salvador Castro --

6  A.  Yes.

7  Q.  -- $8,875?"  Do you see that?

8          (Court reporter clarification.)

9  BY MR. GREEN:

10  Q.  Do you see where it says "Salvador Castro"?

11  A.  Yes, sir.

12  Q.  And you see where it says $8,875?

13  A.  Yes, sir.

14  Q.  Yes.

15          Now, on this chart, from what you can tell, are they

16  payments to Salvador Castro or are they payments to, like,

17  Golden Products, MMI, Montgomery Marketing, or Imperial Award

18  Services?

19  A.  I think these would be payments to -- to Salvador Castro.

20  Q.  You're certain?

21  A.  I didn't do the chart, but I'm pretty sure.

22  Q.  Did you look at this chart in anticipation of either trial

23  preparation or potential testimony?

24  A.  No.

25  Q.  Okay.  Thank you.

—2:19-cr-00295-GMN-NJK—

1           MR. GREEN:  Government's Exhibit 90- -- 90, Page 3.

2  BY MR. GREEN:

3  Q.  Sir, I'm representing to you that this is a mailbox

4  application.  I take it in your career you've seen thousands?

5  A.  Thousands.

6  Q.  And in this case --

7           MR. GREEN:  If we could zoom in on the middle.

8  BY MR. GREEN:

9  Q.  You were shown a driver's license yesterday of Salvador

10 Castro.  And did you see that Sentry Palm Court address right

11 there in the middle?

12 A.  Yes, sir.

13 Q.  And this is -- would you say that this is like an official

14 Government form?

15 A.  Yes, it is.

16 Q.  It is.

17           And on this form, does it appear as if Salvador Castro

18 used his own address?

19 A.  Yes.

20 Q.  And where it says, "Imperial Award Services," like a -- the

21 business name.  See that?

22 A.  Yes.

23 Q.  And down there on Item Number 11 of this official Government

24 form, what does it say is the nature of the business?

25 A.  Marketing/direct mail.

 1   Q.  Thank you.

 2           MR. GREEN:  And if we could zoom down a little bit on

 3   the bottom of this page.

 4   BY MR. GREEN:

 5   Q.  And it appears as if Mr. Castro signed this in front of a

 6   notary, correct?

 7   A.  Yes, sir.

 8   Q.  Despite what a lot of people think, it's still a solemn

 9   thing to sign something in front of a notary.  Would you agree?

10   A.  Yeah.

11   Q.  Okay.

12           MR. GREEN:  Government's Exhibit 93- -- 93, Page 5,

13   please.

14           All right.  That was the same one.  Excuse me.  I'll

15   withdraw that.

16           Thank you, Your Honor.  Double note here.

17           Okay.  If we could go to Government's Exhibit 101A,

18   Page 1.

19   BY MR. GREEN:

20   Q.  Sir, we're not going to go through hundreds of bank

21   documents, but just to highlight a few.  This document here,

22   Government's Exhibit 101A.

23           MR. GREEN:  If we could zoom in at the top of the page

24   please.  There we go.

25   BY MR. GREEN:

1    Q.   Do you see the name of the corporation?

2    A.   Yes, sir, Golden Products -- Golden Products Services, Inc.

3    Q.   And -- okay.  And does it show that -- like, the person

4    who's going to be signed on it or a resolution, that the bank

5    can be a depository for this -- for this business?

6    A.   Yes.

7    Q.   Whose name is there?

8    A.   Salvador Castro.

9    Q.   Not hiding his name?

10   A.   No.

11   Q.   Not Betsy Spider?

12   A.   Not Betsy Spider.

13          MR. GREEN:  Okay.  Government's Exhibit 101A, Page 12.

14   BY MR. GREEN:

15   Q.   Okay.  Sir, we -- we have a -- just sake of argument, we

16   have a signature addendum file card here.  And at the top there,

17   where it says account number, what are the last four digits of

18   that account number?

19   A.   4866.

20   Q.   And on here does it show, like, an ATM debit card request?

21   Do you see that?

22   A.   Yes.

23   Q.   And that's by Salvador Castro?

24   A.   Yes, sir.

25   Q.   Okay.

1          MR. GREEN:  Government's Exhibit 101A, Page 3.

2    BY MR. GREEN:

3    Q.  On this form, right at the top center, does it have the

4    words "business signature card"?  Do you see that?

5    A.  Yes, sir.

6    Q.  And then underneath that, what does that say?  Underneath

7    where it says, "business signature card," what does it say

8    underneath that?

9    A.  "With substitute Form W-9."

10   Q.  Do you know what a W-9 is with the IRS?

11   A.  I don't think I know for sure, but no.

12   Q.  It's like where you send in, like, your tax I.D. number or

13   your Social Security number?

14   A.  Yes.

15   Q.  Okay.  Thank you.

16          MR. GREEN:  Can we go to the bottom of this page,

17   please.  Right there.

18   BY MR. GREEN:

19   Q.  Does it have the name of someone who you may have

20   recognized?

21   A.  Salvador Castro.

22   Q.  Okay.  Again, not hiding his name, correct?

23   A.  Correct.

24   Q.  Okay.

25          MR. GREEN:  If we could go to Government's

—2:19-cr-00295-GMN-NJK—

1  Exhibit 92-3 -- 92, Page 3.

2  BY MR. GREEN:

3  Q.  Now, you see this document here?

4  A.  Yes, I do.

5  Q.  Where it says -- do you see a name there, down there at the

6  bottom?

7  A.  Yes, I do.

8  Q.  And what is that name?

9  A.  Tom Weedman.

10  Q.  Yes.  And then up at the top there's an address?

11  A.  Yes.

12  Q.  And what's that address there in Arkansas?

13  A.  6629 JFK Boulevard, Suite 20, North Little Rock.

14  Q.  Now, does this appear to be some kind of a letter or some

15  kind of an e-mail?

16  A.  Looks like a letter.

17  Q.  And to whom is the letter addressed on the box renewal?

18  A.  It says "Betsy."

19  Q.  How many Betsys are named in this case?

20  A.  One.

21  Q.  And who was that also known as?

22  A.  Patti Kern.

23  Q.  Thank you.

24       MR. GREEN:  Government's Exhibit 158, please.

25  BY MR. GREEN:

—2:19-cr-00295-GMN-NJK—

1  Q.  Do you remember being examined about this letter?  This is

2  the letter from the -- the -- I can't -- it's not a trustee --

3  the receiver.  Excuse me -- receiver by the name of Thomas

4  Seaman.

5          Do you remember this line of questioning today?

6  A.  Yes, sir.

7  Q.  And on this, would you -- would you agree that this is not a

8  cease and desist letter?

9  A.  Yes, it is not.

10  Q.  In fact, isn't this letter, like, you better pay back

11  $25,000 or we might take legal action, something like that?

12  A.  Possibly.

13  Q.  Okay.  Thank you.

14          And Mario Castro's not listed on this letter, correct?

15  A.  No.

16  Q.  Jose Luis Mendez is not listed on this -- on this letter,

17  correct?

18  A.  No.

19  Q.  And Salvador Castro's not listed on this letter?

20  A.  No.

21  Q.  But you see where it says:  "Miguel Castro, Luis B.

22  Aguilar," and it says:  "National Print & Mail"?

23  A.  Yes, sir.

24  Q.  Did you hear Mr. O'Connor testify the other day about his

25  e-mail at National Print & Mail Company?

-2:19-cr-00295-GMN-NJK-

1   *A.*   Who did this?

2   *Q.*   Did you hear Mr. O'Connor testify about his name being on an

3   e-mail with, like, the end of it being National Print & Mail or

4   something like that?

5   *A.*   Possibly, but I don't know.

6   *Q.*   I know it was a long time ago.  It was just a few days ago.

7   *A.*   Uhm.  Yeah.

8        MR. GREEN:  Okay.  Exhibit 297, please.

9   BY MR. GREEN:

10  *Q.*   These are the -- these are the pictures of the BMW, correct?

11  *A.*   Yes, sir.

12  *Q.*   Okay.

13       MR. GREEN:  May we -- may we zoom in on the top right

14  photograph of Government's Exhibit 297.

15  BY MR. GREEN:

16  *Q.*   To the best of your knowledge, in looking at this document,

17  what is the year of make of this BMW?

18  *A.*   2007.

19  *Q.*   What is it?

20  *A.*   2007.

21  *Q.*   So that's like, what, 11 years old by the time you guys took

22  the picture on February 21st, 2007 -- 2013 -- 2018?  Excuse me.

23  *A.*   Yes.

24  *Q.*   Thank you.

25       Now, you were asked a question about whether Patti Kern

—2:19-cr-00295-GMN-NJK—

1  knew Ricardo Gonzalez.  Do you remember that?

2  *A.*  I think so, yes.

3  *Q.*  Do you know if, in your review of thousands and thousands of

4  documents, whether there was a single document which indicates

5  some knowledge by Patti Kern of the existence of Ricardo

6  Gonzalez?

7  *A.*  I think she knew about him, yes.

8  *Q.*  Okay.

9        MR. GREEN:  Government's Exhibit 190, please.

10  BY MR. GREEN:

11  *Q.*  I'll represent to you, sir, that this is an e-mail.  Does it

12  say from whom the e-mail -- or who's the author of the e-mail?

13  *A.*  Which one are you talking about, the bottom one or the top

14  one?

15  *Q.*  The top -- the top e-mail, sir.  Thank you for

16  clarification.

17  *A.*  PK1726@Americanonline.com.

18  *Q.*  Who was -- who had that e-mail in this case, PK1726@aol.com?

19  *A.*  Patti Kern.

20  *Q.*  And what's the date of this e-mail?

21  *A.*  June 5th, 2013.

22  *Q.*  And to whom was this e-mail sent?

23  *A.*  To ChangoConsulting@gmail.com.

24  *Q.*  Who was Chango Consulting?

25  *A.*  Sean O'Connor.

1    Q.  Okay.  And that Chango was the nickname Monkey?

2    A.  Yeah.

3    Q.  Okay.  Now, as to this in here, do you see where -- where

4    this message -- this message is forwarded to someone?

5    A.  Yes.

6    Q.  To whom is it forwarded?

7    A.  I can't read this -- it's RRGonzalezS@hotmail.com.

8    Q.  And what does it say underneath that e-mail -- that

9    addressee e-mail, what does it say?

10   A.  It says:  "Hey, Ricardo.  Jose needs a new dba for Advanced

11   Allocation Systems.  The new dba is Pacific Disbursement

12   Reporting.  He needs this ASAP to keep things moving.  Thanks,

13   Sean."

14   Q.  Okay.  So what is your understanding of the role of Ricardo

15   Gonzalez in this case?

16   A.  He helped set up that company.

17   Q.  And the -- that company is Pacific Disbursement Reporting?

18   A.  Yes, sir.

19   Q.  And didn't Ricardo Gonzalez set up all of the corporations

20   in this case?

21   A.  I don't know about all of them, but he did a lot of them.

22   Yes, sir.

23   Q.  And Ricardo Gonzalez got paid for his work?

24   A.  I think so, yes.

25   Q.  And there are -- there are checks in evidence payable to

―2:19-cr-00295-GMN-NJK―

1   Ricardo Gonzalez from one or more of the accounts?

2   **A.**  There -- there are checks for -- for him, yes.

3   *Q.*  And Ricardo Gonzalez was -- you heard testimony the other

4   day that Ricardo Gonzalez had stopped in at Digital Express at

5   one time or another?

6   **A.**  I think he had, yes.

7   *Q.*  He wasn't charged, was he?

8         He hasn't been charged in this case, has he?

9   **A.**  No.

10        MR. GREEN:  Okay.  Can we look at Government's Exhibit

11  214, Page 89.

12        89, please.

13  BY MR. GREEN:

14  *Q.*  Okay.

15        MR. GREEN:  Can we zoom to the bottom of that -- okay.

16  No, let's stop it there.

17  BY MR. GREEN:

18  *Q.*  At the top up there, what does it say?

19        MR. GREEN:  If we could do the half -- the top half,

20  please.

21        THE WITNESS:  "Profit annual list of officers,

22  directors, and registered" --

23  BY MR. GREEN:

24  *Q.*  Yes.  What is the name of this entity?

25  **A.**  Pardon me?

—2:19-cr-00295-GMN-NJK—

1   Q.  What is the name of the entity which is submitting this

2   annual list of officers?

3   A.  Marketing Image Direct, Incorporated.

4   Q.  Is -- is there a name in the block in bold letters?

5   A.  Yes, sir.

6   Q.  What is that name?

7   A.  Ricardo Gonzalez.

8   Q.  Look down at the bottom of that page, please --

9           MR. GREEN:  And please enlarge it.  Right there.  Stop.

10  BY MR. GREEN:

11  Q.  It says:  "Miguel Castro."  What is his role?

12  A.  President.

13  Q.  Miguel Castro, another role?

14  A.  Secretary.

15  Q.  Miguel Castro, another role?

16  A.  Treasurer.

17  Q.  And Miguel Castro, what's the other role?

18  A.  Director.

19  Q.  Down at the bottom of the page where there's an X, what are

20  the words in bold underneath the line?  What are those words?

21  A.  "Signature of officer."

22  Q.  Above those words, what is the name?

23  A.  Ricardo Gonzalez.

24  Q.  And over on the right, is there a title for Ricardo

25  Gonzalez?

———2:19-cr-00295-GMN-NJK———

1  *A.*  President.

2  *Q.*  Thank you.

3        Let's go to the year 2019, June or July, some 14, 15

4  months after the search.  Do you remember speaking to Salvador

5  Castro?

6  *A.*  Yes, I do.

7  *Q.*  You did not go there to speak to Salvador Castro if he knew

8  Patti Kern, correct?

9  *A.*  Right.

10  *Q.*  And isn't it true that on or after February 21st, 2018, that

11  one or more pieces of paper were left at Digital Express or the

12  homes of the four -- of the businesses of the four defendants

13  that had something to do with this case, some kind of papers,

14  correct?

15  *A.*  So you talking about a copy of the search warrant and then

16  the search warrant --

17  *Q.*  Something like that, yes?

18  *A.*  -- signatory.

19  *Q.*  Yes.

20  *A.*  Yes.  Yes.

21  *Q.*  And prominently featuring the name of Patti Kern and Patti

22  Kern Syndicate?

23  *A.*  I don't know.

24  *Q.*  But would you agree that in the intervening 14 months, from

25  February of 2018 until June or July of 2019, when you went to

 1    talk to Salvador Castro again, that there had been a number of

 2    papers maybe exchanged or something giving the name of Patricia

 3    Kern or Patti Kern?

 4    *A.*  Possibly.

 5    *Q.*  Okay.

 6          Now, on that day in June or July of 2019, the vegetable

 7    cutter, and I guess for 50,000 it's not that slice-and-dicer

 8    that you see for 19.95 that I've seen on TV, correct?

 9    *A.*  Yes.

10    *Q.*  This was a heavy piece of machinery, correct?

11    *A.*  Yeah.

12    *Q.*  Capable of slicing just a number of vegetables in a -- in a

13    short period of time, correct?

14    *A.*  I think so, yes.

15    *Q.*  And the reason why you went over there was to do what in

16    connection with the machine?

17    *A.*  To find out where it was at.

18    *Q.*  Okay.  For the purposes of?

19    *A.*  Potentially taking it or to forfeit it.

20    *Q.*  Okay.  What is your understanding of forfeiture?

21    *A.*  My understanding of forfeiture, it's if there is a crime and

22    we can get either houses, cars, cash, or other properties, we

23    forfeit that.  And when the case is done, then we will dis --

24    dispose of that and then hopefully give that back to the

25    victims.

—2:19-cr-00295-GMN-NJK—

1  Q.  Does the item of forfeiture have to be used in the crime?

2          MR. FINLEY:  Your Honor, object.  Calls for a legal

3  conclusion.

4  BY MR. GREEN:

5  Q.  Well, let me ask you this.  Were you trying to get --

6          MR. GREEN:  I'll rephrase that, Your Honor, if I may.

7  BY MR. GREEN:

8  Q.  Were you trying to get the machine because it may have

9  resulted from traceable proceeds of this conspiracy?

10  A.  What I wanted to do was find out where it was at and then go

11  and -- and talk to our forfeiture people and find out.

12  Q.  Okay.  So you got Patti Kern's truck, the Ford F-250?

13  A.  Got her truck, her horse --

14  Q.  Got the horse trailer?

15  A.  Yes, sir.

16  Q.  Correct?

17          You got -- wow.  What did you think when you saw that

18  money in the safe?

19  A.  Cash.

20  Q.  Yeah.

21          That was like a personal ATM.  How much was in there?

22  A.  Must have been 170,000.

23  Q.  Yeah.  In small bills?

24  A.  I didn't count it so I don't know, sir.

25  Q.  Okay.  Now, as to this machine -- or -- or let me ask you --

—2:19-cr-00295-GMN-NJK—

1  yeah, let's go back to that.

2      Would items used to create these fraudulent mailings

3  also be possibly forfeited items?

4  *A.*  Possibly.

5  *Q.*  What printers did you take or the Government take from any

6  location for forfeiture purposes in connection with this case?

7  *A.*  We didn't take any.

8  *Q.*  What about the forklift?

9  *A.*  No.

10 *Q.*  Didn't you have testimony that the forklift may have been

11 used to -- to -- to remove these cartons and cartons of these --

12 of these documents?

13 *A.*  Yes.

14 *Q.*  Inspector Ellis used it?

15 *A.*  Yes.

16 *Q.*  Smile on his face with that big, big -- big crate of

17 these -- of these documents?

18      MR. FINLEY:  Objection, relevance.

19      MR. GREEN:  I'll withdraw the question, Your Honor.

20      THE COURT:  Thank you.

21      MR. GREEN:  Thank you.

22 BY MR. GREEN:

23 *Q.*  So when you spoke to Mr. Castro, Salvador Castro, in June or

24 July of 2019, some 14 months after he had his conversation with

25 Inspector Ellis, in speaking with Patti -- about Patti Kern, is

————2:19-cr-00295-GMN-NJK————

1  it true that he had already received or his businesses had

2  received documents with the name of Patti Kern on it?

3  **A.**  Possibly.

4  *Q.*  You did not go there to discuss whether he knew her,

5  correct?

6  **A.**  No.

7  *Q.*  On or after February 21st, 2018, were the bank accounts

8  associated with Golden Products, Montgomery Marketing, Marketing

9  Image, or Imperial Award Services seized by the Government?

10  **A.**  I think they were, yes.

11  *Q.*  And do you know that -- as to those amounts -- as to those

12  accounts, whether they all had positive balances in the bank?

13  **A.**  We wouldn't have taken the money if there wasn't a positive

14  balance.

15  *Q.*  Okay.  Would you -- would you disagree that the amount was

16  somewhere between 14 and $15,000?

17  **A.**  I don't know with that.

18  *Q.*  And to this day, you don't recollect those bank numbers,

19  correct?

20  **A.**  No.

21  *Q.*  I mean, there's a lot of things when you're getting ready

22  for court and there's -- agreed?  Would that be understandable

23  that you don't know the -- the four bank account numbers,

24  correct?

25  **A.**  Yes.  I don't.

─────2:19-cr-00295-GMN-NJK─────

1   Q. And about the same time that you had interviewed Mr. Castro,

2   you had also spoke to Sean O'Connor, correct?

3   A. Possibly.

4   Q. Was that on July 31st of 2019, with Mr. Finley being

5   present?

6   A. Possibly.

7   Q. Was that in the United States Attorney's Office in the

8   District of Nevada?

9   A. Possibly.

10  Q. You heard Sean O'Connor testify the other day?

11  A. Yes, I did.

12  Q. And you heard Sean O'Connor say that he was never around

13  when Kern dropped off white envelopes for the Castro group.

14  A. Correct, yes.

15      MR. GREEN:  Government's Exhibit 92-2, please.

16  Government's Exhibit 92, Page 2.

17      I'll be done in a few moments, Your Honor.

18      THE COURT:  That's fine.  We have nine more minutes

19  before lunch.

20      MR. GREEN:  Thank you so much.

21  BY MR. GREEN:

22  Q. Okay.  Let's get right to it.  Here's an e-mail extraction

23  or letter extraction of some type.  And we've had testimony --

24  we had testimony about this the other day, correct?

25  A. Yes, sir.

—2:19-cr-00295-GMN-NJK—

1    Q.  And as to this -- as to this exhibit, Government's

2    Exhibit 92, Page 2, does it have -- is it, like, from somebody

3    to somebody?

4    A.  Yes.

5    Q.  And who was that?

6    A.  It appears to be from Betsy Spider.

7    Q.  And is this to Tom Weedman?

8    A.  Yes, sir.

9    Q.  Is this that same Tom Weedman that we talked about a few

10   minutes ago that has that mailbox place in Arkansas?

11   A.  I think so, yes.

12   Q.  And in this document, it mentions the name of Salvador

13   Castro, correct?

14   A.  Yes, sir.

15   Q.  Does it mention an address?

16   A.  It does.

17   Q.  What is the address?

18   A.  5685 Sentry Palm Court, Las Vegas, Nevada 89122.

19   Q.  Is there also a phone number, sir?

20   A.  Yes, it does.

21   Q.  What is that phone number?

22   A.  Phone number (702) 517-0688.

23   Q.  And what does -- what does Betsy Spider say as instructions

24   to Tom Weedman?

25   A.  "Here is the new ship too address.  Remember to mark it as

 1  not needing a signature."

 2  *Q.* As being associated with the Post Office for many years and

 3  then becoming an inspector, are there forms that you fill out or

 4  is there some kind of authorization a mailbox place needs to

 5  waive a signature if they get a package or something?

 6  *A.* For the Post Office, yes.

 7  *Q.* Okay. And so this is -- these are -- are very specific

 8  instructions, correct?

 9  *A.* Yes, sir.

10  *Q.* And would you say that those instructions were needed by

11  Mr. Weedman to note his file to let his employees know that if

12  we get something for this particular mailbox, that we don't need

13  a signature, correct?

14  *A.* It's correct if they are going to forward all of that mail

15  to that -- to that address.

16  *Q.* So would you agree that this might be in the file folio for

17  this account for this mailbox?

18  *A.* Yes.

19  *Q.* And there's no "to Salvador Castro" in this e-mail?

20  *A.* Correct.

21  *Q.* And in this case --

22       MR. GREEN:  If we could go to Government's Exhibit 120,

23  please.

24       Just a few moments.  Government's Exhibit 120.

25  BY MR. GREEN:

```
                    —2:19-cr-00295-GMN-NJK—
```

1  Q.  In this document, sir, we'll get right to it, see at the

2  bottom right there is the year 2013 down at the bottom left?

3  A.  Yes, sir.

4  Q.  In this case, as to those entries marked Exhibit Number 122

5  to 130, dates of November 3rd of 2010 to January 2nd of 2013, in

6  your analysis of this case, is there one single cease and desist

7  order issued to those entities?

8  A.  Yes.

9  Q.  Which one?

10  A.  Okay.  Give me the question again.

11  Q.  Let's go over it again.  Let's go by the numbers.

12  A.  Okay.

13  Q.  We know that there is a cease and desist order of some type

14  dated in 2009 as to Patricia Kern's organizations, correct?

15  A.  Yes, sir.

16  Q.  And that is the one that she -- that she kept in her house,

17  correct?

18  A.  I think so, yes.

19  Q.  Wasn't there a cease and desist order found in Patti Kern's

20  home office dated in 2009?

21  A.  Yes.

22  Q.  And does the -- it was discovered during the search on

23  February 21st, 2018, some nine years later?

24  A.  Yes.

25  Q.  And by her own admission, Ms. Kern said that she kept that

—2:19-cr-00295-GMN-NJK—

1  as a constant reminder of what she's not supposed to do?

2  **A.**  I -- yes, I think that's what she said.

3  *Q.*  Okay.  As to the other entities here on the right, for

4  Richard Knowles, Andrea Flores, Edgar Del Rio, Michael Keith

5  Kern, Sixto, Omar, Ubaldo, were any -- in this case was there a

6  single cease and desist order sent to those entities, as far as

7  you know?

8  **A.**  It was sent to the person that was part of the signer.  So

9  there would have been one to Patti Kern, Richard Knowles, on

10 down.

11 *Q.*  Where are the CDs -- where are the cease and desist orders

12 for Money Trust Alliance, Financial Reserve Network, NSD

13 Products, Promotional Marketing Systems, G.A.M., MKI, Platinum

14 Awards?  Where are they?

15 **A.**  They are there.  There should be copies of them.

16 *Q.*  Okay.  So we have those.  Are any of those people Mario

17 Castro?

18 **A.**  No.

19 *Q.*  Miguel Castro?

20 **A.**  No.

21 *Q.*  Jose Luis Mendez?

22 **A.**  No.

23 *Q.*  Salvador Castro?

24 **A.**  No.

25 *Q.*  Okay.  And on those cease and desist --

—2:19-cr-00295-GMN-NJK—

1          MR. GREEN:  Let's look at Government's Exhibit 280,

2   please.

3          And I'm almost done, Your Honor.

4   BY MR. GREEN:

5   *Q.*  This is Government's Exhibit 280.  And I'd like you to focus

6   in.  It appears as if -- you see in the -- kind of like the top

7   corner where it says:  "Golden Products Service, Inc."?

8   *A.*  Yes, sir.

9   *Q.*  And the year opened, 2013?

10  *A.*  Yes, sir.

11  *Q.*  Then if you go down for Imperial Award Services, bank

12  account opened in 2014, correct?

13  *A.*  Yes.

14  *Q.*  And then for MMI, it says 2015, over on the right, for

15  Salvador Castro, correct?

16  *A.*  Yes.

17  *Q.*  And then Money -- Montgomery Marketing is where it says

18  2015, correct?  See that?

19  *A.*  Yes.

20  *Q.*  Okay.  As to these -- as to the -- Salvador Castro and as to

21  any person on this mailing companies compendium, was there a

22  single cease and desist order sent to these people or entities,

23  yes or no?

24  *A.*  There might have been one sent to Omar Del Rio.

25  *Q.*  No, I'm -- okay.  As to these people -- okay.  Was there one

—2:19-cr-00295-GMN-NJK—

1  sent to Salvador Castro?

2  **A.**  Oh.  Is that what you're getting at?

3      (Court reporter clarification.)

4  BY MR. GREEN:

5  *Q.*  I'm sorry.

6          Was there one sent to Salvador Castro?

7          MR. FINLEY:  Your Honor, this has been covered by the

8  last couple minutes of testimony.  It's asked and answered.

9          THE COURT:  I agree.  Sustained.

10  BY MR. GREEN:

11  *Q.*  Are there any texts in this case, in the hundreds of

12  thousands of pages, from Salvador Castro to anyone?

13  **A.**  No.

14  *Q.*  Are there any envelopes, whether opened or unopened, laying

15  on the floor, on a desk, anywhere in this case in the name of

16  Salvador Castro?

17  **A.**  Not that I know of, no.

18  *Q.*  Okay.

19          There were checks in the name of Salvador Castro,

20  correct?

21  **A.**  Correct.

22  *Q.*  And by the testimony of Patti Kern, Betsy Spider, whoever

23  she was those several days, Patti Kern, Betsy Spider, wrote all

24  of the checks, correct?

25  **A.**  To my knowledge, yes.

—————2:19-cr-00295-GMN-NJK—————

1   *Q.*  And as to Government's Exhibit 241, we talked about that

2   today, the very first item of those two ATM cards, the two ATM

3   cards found in the home of Patti Kern, is there any evidence

4   whatsoever in this case that those two ATM cards were ever used

5   by Salvador Castro?

6           MR. FINLEY:  Asked and answered.

7           THE COURT:  I'll allow it one last time.

8           MR. GREEN:  Nothing further.  Thank you, Your Honor.

9           COURT REPORTER:  I didn't hear the answer.

10          THE COURT:  I didn't hear the answer.

11          THE WITNESS:  Oh.  Pardon me again?

12  BY MR. GREEN:

13  *Q.*  Were the ATMs ever used by Salvador Castro?

14  **A.**  Not that I know of.

15          THE COURT:  No further questions.  Thank you, Your

16  Honor.

17          THE COURT:  All right.  Thank you, Counsel.

18          At this time we're going to take our lunch break.  It's

19  12 o'clock so we'll welcome you back at 1 o'clock.  Remember

20  you're not to discuss this case with anyone.  Don't permit

21  anyone to discuss it with you.  Let me know right away if you

22  overhear anyone, even each other, speaking about the case.

23          Do not read or listen to or view anything that touches

24  upon the case in any way or perform any independent research or

25  investigation nor form any opinion.

─2:19-cr-00295-GMN-NJK─

1          Write down your questions.  You can do that at lunch if

2   you have some extra time.  Eventually we will getting to that

3   point where we will be asking jury questions to Mr. Bouchie.  So

4   if you want to go ahead and write down the questions, don't go

5   online.  Okay.

6          Thank you very much for your patience so far.  We'll

7   welcome you back at 1 o'clock.

8          Let's stand for the jury.

9          Mr. Bouchie, when the jury has exited, then you may

10  also step down.  We just need you back at 1 o'clock.

11          (Whereupon jury leaves the courtroom at 12:01 p.m.)

12          THE COURT:  All right.  We're outside the presence the

13  jury.  Is there anything that we need to touch base on before

14  1 o'clock?

15          THE INTERPRETER:  Yes, Your Honor.

16          THE COURT:  Yes.  All right.  We've got the

17  interpreter.  Yes.

18          THE INTERPRETER:  Yes.

19          (Court reporter interruption.)

20          THE INTERPRETER:  Once there is a Spanish-speaking

21  witness on the stand, there are a few options so I just wanted

22  to mention it to everyone.  Whether it's all done consecutive or

23  whether the question is simultaneous after consecutive or

24  whether the interpreters here do the simultaneous and -- so

25  there's some options.

———2:19-cr-00295-GMN-NJK———

1          THE COURT:  Right.  I'm aware of that.  And we've

2    discussed it with the court reporter.  And she prefers not to

3    hear the Spanish interpretation, just to hear the English

4    interpretation.  So that's how we're going to be going forward

5    while this court reporter is here.

6          A different court reporter might not object to having

7    the Spanish translation done on the record, in which case we

8    would not need to have so many court interpreters.

9          So for this -- so, Patty, you're -- I'm sorry.

10          COURT REPORTER:  I'm sorry.  Is this on the record?

11          THE COURT:  Yes, yes.  So the court interpreter [sic]

12    we have now, she's going to be leaving at noon and we have

13    someone else coming in at 1 o'clock.

14          Is it Sam or Judy?

15          COURTROOM ADMINISTRATOR:  Judy.

16          THE COURT:  You sure?  No, I have written down Sam.

17    Did that change again?

18          COURTROOM ADMINISTRATOR:  Maybe it is Sam.

19          THE COURT:  Yeah, it's Sam.  And she's okay with

20    having the interpreter --

21          (Court conferring with court reporter.)

22          THE COURT:  I'm aware of the issue.  I just don't know

23    what the answer is yet because it depends on who the court

24    reporter is.  And since it's not going to be Patty, because

25    she's done at noon, we'll take this up with Sam when she gets

─────2:19-cr-00295-GMN-NJK─────

 1  here and figure out what's the best way to do this.  So thank

 2  you.  I appreciate that.  We'll talk to Sam and see, if she's

 3  coming up next, what --

 4         THE INTERPRETER:  Okay.  There's one more component,

 5  and I apologize everyone for taking their lunchtime.  But if

 6  it's being done consecutive, so two interpreters would be

 7  standing over there and switching also, where if it's being done

 8  simultaneous and consecutive, there's one interpreter there,

 9  there are two switching here, and there might be a need to

10  rotate if it's going to be long.

11         And at this point we don't know, again, if it's two

12  questions or if it's going to be two hours.  So that's another

13  component.  Just food for thought.  And let us know and we'll

14  work whichever way we're asked to.

15         THE COURT:  Okay.  So we will rely on that court

16  interpreter to let us know by raising her hand when they need to

17  break and rotate.

18         THE INTERPRETER:  Yes, Your Honor.

19         THE COURT:  I won't be able to keep track of how much

20  time goes past if it's every 15, 20 minutes.  Okay.

21         MR. TANASI:  Thank you, Your Honor.

22         THE COURT:  Thank you.

23         (Recess taken at 12:05 p.m.)

24

25

─2:19-cr-00295-GMN-NJK─

--oOo--

COURT REPORTER'S CERTIFICATE

I, PATRICIA L. GANCI, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  April 11, 2023.

/s/ **Patricia L. Ganci**

Patricia L. Ganci, RMR, CRR