—2:19-cr-00295-GMN-NJK—

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,        )
                                     )   Case No. 2:19-cr-00295-GMN-NJK
5              Plaintiff,            )
                                     )   Las Vegas, Nevada
6          vs.                       )   Wednesday, April 12, 2023
                                     )   9:25 a.m.
7   MARIO CASTRO, SALVADOR           )
    CASTRO, MIGUEL CASTRO, and       )   JURY TRIAL, DAY 15
8   JOSE LUIS MENDEZ,                )   A.M. SESSION
                                     )
9              Defendants.           )   *C E R T I F I E D   C O P Y*

10   _____

11

12                 REPORTER'S TRANSCRIPT OF PROCEEDINGS

13              THE HONORABLE GLORIA M. NAVARRO

14                 UNITED STATES DISTRICT JUDGE

15

16

17   APPEARANCES:        See Pages 2 and 3

18

19

20

21

22   COURT REPORTER:    Patricia L. Ganci, RMR, CRR
                        United States District Court
23                      333 Las Vegas Boulevard South, Room 1334
                        Las Vegas, Nevada  89101
24
     Proceedings reported by machine shorthand, transcript produced
25   by computer-aided transcription.

```
                    ─2:19-cr-00295-GMN-NJK─
```

1  APPEARANCES:

2  For the Government:

3          **MINA CHANG, AUSA**
           UNITED STATES ATTORNEY'S OFFICE
4          501 Las Vegas Boulevard South, Suite 1100
           Las Vegas, Nevada  89101
5          (702) 388-6336

6          **TIMOTHY T. FINLEY, ESQ.**
           **DANIEL E. ZYTNICK, ESQ.**
7          U.S. DEPARTMENT OF JUSTICE
           950 Pennsylvania Avenue, N.W.
8          Washington, D.C.  20530
           (202) 307-0050

9
   For Defendant Mario Castro:
10
           **JOSHUA L. TOMSHECK, ESQ.**
11         HOFLAND & TOMSHECK
           228 South 4th Street
12         Las Vegas, Nevada 89101
           (702) 895-6760
13
           **RICHARD E. TANASI, ESQ.**
14         TANASI LAW OFFICES
           8716 Spanish Ridge, Suite 105
15         Las Vegas, Nevada 89148
           (702) 906-2411
16
   For Defendant Salvador Castro:
17
           **DONALD J. GREEN, ESQ.**
18         LAW OFFICES OF DONALD J. GREEN
           4760 South Pecos Road, Suite 103
19         Las Vegas, Nevada 89121
           (702) 388-2047
20
   ////
21

22

23

24

25

```

2:19-cr-00295-GMN-NJK

1   For Defendant Miguel Castro:

2        **LUCAS GAFFNEY, ESQ.**
         GAFFNEY LAW
3        9900 Covington Cross Drive, Suite 290
         Las Vegas, Nevada 89144
4        (702) 742-2055

5        **THOMAS A. ERICSSON, ESQ.**
         THOMAS A. ERICSSON, CHTD.
6        9900 Covington Cross Drive, Suite 290
         Las Vegas, Nevada 89144
7        (702) 878-2889

8   For Defendant Jose Luis Mendez:

9        **CHRISTOPHER MISHLER, ESQ.**
         **WILLIAM H. BROWN, ESQ.**
10       BROWN MISHLER, PLLC
         911 N. Buffalo Drive, Suite 202
11       Las Vegas, Nevada 89128
         (702) 816-2200

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─────2:19-cr-00295-GMN-NJK─────

1                              INDEX OF EXAMINATIONS

2    CONTINUED TESTIMONY OF SALVADOR CASTRO
          Jury questions....................................12
3        Redirect Examination by Mr. Green.................18
         Recross-Examination by Mr. Finley.................19
4        Further Redirect Examination by Mr. Green.........29

5    TESTIMONY OF JOSE LUIS MENDEZ
          Direct Examination by Mr. Brown...................39

6

7                         GOVERNMENT'S EXHIBIT INDEX
     Exhibit No.                                    Admitted
8    135                                               65
     138                                               67

9

10                         DEFENDANT'S EXHIBIT INDEX
     Exhibit No.                                    Admitted
11   7028                                              14
     9044                                              68

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2:19-cr-00295-GMN-NJK

1          LAS VEGAS, NEVADA; WEDNESDAY, APRIL 12, 2023; 9:25 A.M.

2                              --oOo--

3                  P R O C E E D I N G S

4          THE COURT:  Thank you.  You may be seated.  We're on

5   the record.  We're still waiting for one juror who did call

6   yesterday, I think, or this morning.  But we knew ahead --

7          COURTROOM ADMINISTRATOR:  Twice.

8          THE COURT:  What was it?  Twice.  Yes, he's called

9   twice.  But the first time to say that he needed to take someone

10  to the airport and was going to be potentially late, and then

11  called afterwards to say, "Yeah, I'm still going to be late."

12  So he is in traffic on the way back, but will be here soon and

13  is being very courteous and thoughtful about it.

14         The other juror who wanted Thursday and Monday off

15  cancelled that trip.

16         COURTROOM ADMINISTRATOR:  Same juror.

17         THE COURT:  Oh, same juror.  Same juror who had -- who

18  wanted Thursday and Monday off cancelled that trip, so we don't

19  need to worry about taking the Thursday and Monday off.  I think

20  we'd already decided we weren't going to take it off anyway, but

21  that way we don't lose a juror, so that's good news.

22         If you think we're going to get done today, we can take

23  the day off tomorrow because I think that was the request.

24  Otherwise, we might have to keep going through tomorrow and then

25  just take -- we'll have the Friday, Saturday, Sunday off.  If

—2:19-cr-00295-GMN-NJK—

 1  you want Monday off, I don't know if you still do.  Wanted to

 2  think about that.  But see how it works today.

 3          So sorry about the late start, but at least we've --

 4  we're not losing a juror.  And as soon as the juror gets here --

 5  is he here, John?

 6          THE LAW CLERK:  Oh, no, not yet.

 7          THE COURT:  Not yet?  Okay.

 8          MR. FINLEY:  Your Honor?

 9          THE COURT:  Yes.

10          MR. FINLEY:  While we wait, can I just ask?  If we

11  finish today, but we don't do the jury instruction arguments,

12  when -- when would Your Honor like to do those?

13          THE COURT:  Well, we could do them tomorrow.  If we get

14  done today and all that's left is jury instructions, we could do

15  them first thing in the morning tomorrow and then you guys have

16  the rest of the day off.  Or, you know, we do them as soon as we

17  get done.  There's -- we still need to finish jury questions for

18  Mr. Salvador Castro.

19          Then if Jose Luis Mendez wants to still testify, we'll

20  have that testimony.  And then if Jose Miguel -- Mario Castro,

21  Jr. -- I don't know why I keep wanting to saying Miguel Jr.

22  It's Mario Castro, Jr.  If he wants to testify or if he's going

23  to be called, then we do that.

24          Then assuming there's no other defense witnesses, we go

25  to rebuttal witnesses.  And then after rebuttal witnesses,

1  everybody rests and we can look at jury instructions.  So that's

2  more or less the order.  I can't tell you the -- how much time

3  it's going to take because, like I said before, I don't know if

4  there's 10 questions or 110 questions that are going to be

5  asked.

6        But I'm here.  So I'm available.  I'll be here for you

7  all day today, all day tomorrow.  And I plan to be here Monday.

8        Thursday was my meeting in Reno that I already

9  rescheduled to do by video instead and can also -- and have also

10  talked to someone else to substitute for me for the parts where

11  I had to speak.  So I don't have to be there.  I'm not required

12  to be there any longer.

13        But it turns out one of the jurors has a meeting at

14  work on that day because the boss had looked at the schedule,

15  because we give them a copy of the jury schedule, and had set up

16  a meeting.  So Thursday of next week we will be dark because

17  that juror's not going to be here.  We haven't found out yet if

18  it's for the whole day or just for a part of the day.

19        So if the jury's is in the deliberation portion still,

20  they could just either come in later during the day if her

21  meeting is in the morning, or they could leave early if the

22  meeting is in the afternoon.  Or if they're all done, then it

23  won't be an issue.  But that's where we are with that.

24        So Thursday we'll lose a juror, who is currently on the

25  jury and is not an alternate.  We checked on that, too.

1          (Pause.)

2          THE COURT:  We can go off record until the jury gets

3  here.

4          (Recess taken at 9:30 a.m.)

5          (Resumed at 9:50 a.m.)

6          COURTROOM ADMINISTRATOR:  All rise.

7          THE COURT:  Thank you.  You may be seated.  I believe

8  we have all of the jurors here now.  Is that right, Nick?

9          COURTROOM ADMINISTRATOR:  Yes.

10          THE COURT:  Okay.

11          MR. TANASI:  Your Honor, before we call the jury in, we

12  do have one, I think, attempt to streamline things on a

13  stipulation addressing one of the juror's questions from

14  yesterday --

15          THE COURT:  Yes.

16          MR. TANASI:  -- regarding the list of names, sort of

17  family tree.  We did put that together and we have a stipulation

18  with respect to the -- with the Government with respect to

19  presenting that to the jury at the time that that juror question

20  comes up.

21          THE COURT:  Great.  Okay.  Thank you.

22          MR. TANASI:  And so we are sort of in the process of

23  e-mailing that to Nick now.  We don't have it printed, but we're

24  going to do that right now.

25          THE COURT:  Okay.

—2:19-cr-00295-GMN-NJK—

1          MR. TANASI:  And it will be coming in through Don

2   Green's list, Salvador Castro's list of exhibits.

3          THE COURT:  Okay.  So we have -- so it is in a format

4   that is viewable to be shown to the jury when I read the

5   question?

6          MR. TANASI:  Yes, Your Honor.

7          THE COURT:  Okay.  And then do we have a number,

8   proposed exhibit --

9          MR. TANASI:  7029.  And it's going to be e-mailed to

10   you.  7028.

11          MR. GREEN:  7028.

12          COURTROOM ADMINISTRATOR:  It's going to be Mr. Green's

13   exhibit.

14          MR. TANASI:  Yes, sir.

15          COURTROOM ADMINISTRATOR:  So I need an updated exhibit

16   list.

17          MR. GREEN:  Yes.

18          MR. TANASI:  That is in the works.

19          COURTROOM ADMINISTRATOR:  Okay.

20          THE COURT:  Okay.  Thank you very much.

21          MR. TANASI:  Thank you, Your Honor.

22          MR. GREEN:  Thank you, Your Honor.

23          THE COURT:  Want to call them in?  Yes, please.  Thank

24   you.

25          MR. GREEN:  Your Honor, would you like Mr. Castro up on

———2:19-cr-00295-GMN-NJK———

 1  the stand?

 2          THE COURT:  Oh, yes.

 3          MR. GREEN:  Yes.  Thank you, Your Honor.

 4          THE COURT:  Let's go ahead and bring him up to save

 5  some time.

 6          (Whereupon witness takes the stand.)

 7          THE COURT:  Please watch your step on the way up.  Then

 8  when you turn the corner.

 9          COURTROOM ADMINISTRATOR:  All rise.

10          (Whereupon jury enters the courtroom at 9:53 a.m.)

11          THE COURT:  All right.  Everyone may be seated.  Good

12  morning.

13          We're going to resume now with the witness,

14  Mr. Salvador Castro.  Would the parties please make their

15  appearances on the record.  From the Government, Mr. Finley?  Or

16  Mr. Zytnick, you want to do it.  Whoever is ready.

17          MR. ZYTNICK:  Sure.  Good morning, everybody.  On

18  behalf of the United States, Daniel Zytnick from the Department

19  of Justice, Consumer Protection Branch, along with Mr. Timothy

20  Finley, Ms. Mina Chang.  And we've got retired Postal Inspector

21  Barry Bouchie, who you all know well at this point, and Erica

22  Rush and Tyaka Mallory over there.

23          THE COURT:  Thank you.  Good morning.

24          MR. TANASI:  Good morning, Your Honor.  Thank you.

25  Good morning, ladies and gentlemen.  Rich Tanasi and Josh

—2:19-cr-00295-GMN-NJK—

1  Tomsheck for Mario Castro.  We also have Bryan Glynn handling

2  the IT and exhibits.  Thank you.

3          THE COURT:  Thank you.

4          MR. GAFFNEY:  Good morning, Your Honor.  Good morning,

5  ladies and gentlemen.  Lucas Gaffney and Thomas Ericsson on

6  behalf of Miguel Castro.  Thank you.

7          MR. BROWN:  Good morning, Judge.  Good morning,

8  everyone.  Will Brown and Chris Mishler for Jose Luis Mendez.

9  Also with us, Lisa Smith and Rich Beasley.

10          THE COURT:  Good morning.

11          MR. GREEN:  Good morning, Your Honor.  Good morning,

12  ladies and gentlemen of the jury.  Donald Green on behalf of

13  Salvador Castro.  And with me is my legal assistant, Heather

14  Tan-Sahl.

15          Thank you, Your Honor.

16          THE COURT:  Thank you.

17          All right.  So, Mr. Salvador Castro, I remind you that

18  you are still under oath to tell the truth.

19          THE WITNESS:  Yes.

20          THE COURT:  Yes.  And I have some jury questions here.

21  I am going to read the jury questions myself into the record,

22  but when you respond, please face the jury because these are

23  really jury questions, not my questions.

24          THE WITNESS:  All right, ma'am.

25

—2:19-cr-00295-GMN-NJK—

                          JURY QUESTIONS

1

2          THE COURT:  So Jury Note Number 144 asks three

3   questions.  The first question is:  Why did you feel like you

4   could trust your brother, Epi Castro?

5          THE WITNESS:  Because he was my brother.

6          THE COURT:  Okay.  Question Number 2:  Why didn't you

7   question your brother, Epi, on where the money was coming from

8   or how it was being made?

9          THE WITNESS:  I always thought it was from his company,

10  from the corporation.  I never had any mistrust in him.

11         THE COURT:  And Number 3:  Did you know that your

12  brother, Epi, was committing fraud with Patti Kern?

13         THE WITNESS:  No, never.

14         THE COURT:  Okay.  Jury Note Number 145 asks three

15  questions.  The first one is:  Can you explain in detail what

16  your work involved that paid you the $400 in the white

17  envelopes?

18         THE WITNESS:  Well, it was part of the corporation, but

19  sometimes he would give me more.

20         I would help him make magazines and to cut business

21  cards.  And I was always very good with the machines that fold

22  paper so I would help him with the setups with those machines.

23         THE COURT:  Okay.  Question Number 2:  When you

24  received more money, please tell us what that work involved.

25         THE WITNESS:  Well, sometimes he just had so much work

─────2:19-cr-00295-GMN-NJK─────

1  that he would call me to come in and help.  Sometimes I was

2  there for up to 10 hours helping.

3        But usually I didn't work all those hours.  Because I

4  am disabled so I would go and I would sit down, and then I would

5  get up and help again.

6        And that's the reason that he would sometimes give me

7  more money.

8        THE COURT:  Okay.  Question Number 3 asks:  How did you

9  learn about xerographing?

10        THE WITNESS:  I started doing it out of need and

11  because I always liked that.  I -- I always liked anything

12  involving a print shop.

13        And that's why I learned serigraphy.

14        THE COURT:  Jury Note Number 146 asks:  Salvador, what

15  is the birth order of you and your brothers:  Epi, Salvador,

16  yourself, Mario, and Miguel?  Who is one, two, three, four,

17  order?

18        THE WITNESS:  Epi was the oldest.  Miguel went after

19  him.  Then me.  And Mario's the youngest.

20        THE COURT:  Okay.  Jury Note Number 147 asks about a

21  legal question, and the legal instructions about the charges in

22  this case will be provided to you by the judge, by me, in

23  writing later.  And you'll be able to keep them during the

24  deliberation process.  So I'm not going to ask this witness to

25  explain the law to you.  I'll be providing them to you in a

—————2:19-cr-00295-GMN-NJK—————

 1  written form.

 2          All right.  Jury Note Number 148 asks the judge:  May

 3  we have a breakdown of the Castro/Mendez relations, all of the

 4  different Marias, too?  Who is Mario married to?  Who is Epi

 5  married to?  Who is Miguel by blood or married to -- sisters --

 6  in this format to see the familial connections, please?  And

 7  where does Salud Castro fit in?

 8          So we did give that homework assignment, and it was

 9  accepted.  The challenge was accepted.  And I believe is it

10  Mr. Tanasi or Mr. Green?  I know it's a joint project, but ...

11          MR. TANASI:  There is a joint stipulation with respect

12  to Exhibit 7028, which whenever the Court is ready, we can

13  publish to the jury.

14          THE COURT:  All right.  And there's no objection from

15  the Government, right?  This is a stipulation.

16          MR. FINLEY:  No objection, Your Honor.

17          THE COURT:  All right.  Stipulation is a fancy word for

18  agreement.  Everyone's in agreement for once.  We don't have any

19  objections, so that's great.  So Defendant's Exhibit 7028 is

20  admitted and may be published to the jury.

21          (Defendant's Exhibit 7028 is admitted.)

22          MR. TANASI:  Your Honor, it appears as though the

23  jurors may have some questions, hand raising.

24          THE COURT:  Oh, is it not -- looks like it's not

25  working.

—————2:19-cr-00295-GMN-NJK—————

1          (Discussion held off the record.)

2          THE COURT:  And this is an exhibit that's been admitted

3    so it will also be available to you during the deliberation if

4    you want to write down the number of it so that you can find it

5    later.  I want to give you time to look at it now so you can see

6    it, but you don't have to memorize it or try to copy it.

7          All right.  So we can go ahead and take that down now.

8          The next Jury Note is Number 149.  It asks:  Did you

9    know Epi was committing fraud when he asked you to start a new

10   business?

11         THE WITNESS:  No, sir.

12         THE COURT:  Jury Note Number 150 asks:  You testified

13   that you did printing work for casinos and other companies.  Did

14   you ever proofread the contents of those printing jobs or did

15   you just print what was ordered?

16         THE WITNESS:  I would just fold and print what I was

17   told.

18         THE COURT:  Jury Note Number 151 asks:  Do you know

19   what it means to commit fraud?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  And Jury Note Number 152 asks:  I

22   understand you trusted your own brother, but why let years go by

23   and not ask questions or have doubts?

24         THE WITNESS:  Because of the same trust I had put in

25   him.  I couldn't distrust him.  He was my brother.

1          THE COURT:  And Number 2, the question is:  So

2    basically you just let your brother, Epi, use your name for

3    Epi's ideas?

4          THE WITNESS:  Basically that's how it is.

5          THE COURT:  And Jury Note Number 133 asks two

6    questions.  The first one is:  What did you think the mailboxes

7    were for that Epi had you open?

8          THE WITNESS:  Well, those boxes were to receive mail

9    from people that responded.

10          THE COURT:  And Question Number 2:  What did you do for

11    Digital Express?  How many hours a week did you work?

12          THE WITNESS:  I basically was not there full-time with

13    Digital Express.  I would just go spontaneously whenever they

14    needed help.  If one of the folding machines broke down, I would

15    fix it for them.  I would change the rollers.  I would help them

16    clean, throw out garbage.  Usually those are the things I would

17    do.

18          THE COURT:  And Jury Note Number 154 asks four

19    questions.  The first one is:  Why would your brother, Epi, do

20    such bad business for you?

21          THE WITNESS:  And I will say the same thing again.  I

22    don't know back then what he was thinking.  I was not in his

23    head.

24          THE COURT:  Number 2:  How much trust do you have for

25    Epi Castro?

1          THE WITNESS:  He was my brother.  I 100 percent trusted
2 him.
3          THE COURT:  Question Number 3:  You had no idea he was
4 using you to commit fraud for his financial gain and for Patti
5 as well?
6          THE WITNESS:  No, ma'am.
7          THE COURT:  And Number 4:  Don't you know when people
8 are using you?
9          THE WITNESS:  I can think that of other people, yes,
10 but not of my brother.  I could never think that of him.
11          THE COURT:  Jury Note Number 155 asks seven questions.
12 The first one is:  Do you do everything your brother, Epi, tells
13 you to do?  Would you steal a car for him?
14          THE WITNESS:  If I knew that was a stolen car, of
15 course I would not do that.
16          THE COURT:  Number 2:  Why wouldn't you ask Epi what
17 the bank account is for?
18          THE WITNESS:  No, I knew what the bank account was for.
19          THE COURT:  Number 3:  So did you or Mario fix the
20 machines?  I thought that Mario's -- I thought that was Mario's
21 job.
22          THE WITNESS:  Mario would repair one type of machines
23 and I would repair different type of machines.
24          THE COURT:  Number 4:  You testified that you saw these
25 sweepstakes from 2003 to 2008.  Is that true?

2:19-cr-00295-GMN-NJK

 1           THE WITNESS:  Yes, I did see them.

 2           THE COURT:  Number 5:  So you knew victim funds went

 3  into bank accounts that you opened?

 4           THE WITNESS:  Well, I usually -- well, that -- I opened

 5  the company in 2014 or 2015, not before then.

 6           THE COURT:  Number 6:  Throughout this trial we have

 7  been told you did sales.  Was that a lie?

 8           THE WITNESS:  No, it's true.

 9           I've done sales.  I've sold tequila.  I've sold shirts.

10  I've sold empty tequila bottles.  I've sold hats.

11           I like sales.  I sell vegetables.  And I like doing

12  that.

13           THE COURT:  Number 7:  Did you see Sean O'Connor early

14  in the mornings?

15           THE WITNESS:  No.

16           THE COURT:  All right.  And this is Mr. Green's

17  witness.  So do you have any follow-up, Mr. Green?

18           MR. GREEN:  Yes, Your Honor, please.  If I may.

19           THE COURT:  Yes you may.

20           MR. GREEN:  Thank you.

21                REDIRECT EXAMINATION OF SALVADOR CASTRO

22  BY MR. GREEN:

23  *Q.*  Good morning, Mr. Salvador Castro.

24  *A.*  Good morning, sir.

25  *Q.*  In response to a juror's question that -- whether you knew

—2:19-cr-00295-GMN-NJK—

1   that victims' funds were going into the bank account, did you

2   know that those victims' funds were fraudulent?

3   *A.* No, sir.

4   *Q.* Thank you.

5          In response to a juror's question, Mr. Salvador Castro,

6   about -- or a couple of questions from jurors about trusting

7   your brother, as you sit here today, do you think that your own

8   brother used you?

9   *A.* (Pause.) I believe so.

10         MR. GREEN: No further questions. Thank you, Your

11  Honor.

12         THE COURT: Any follow-up on behalf of Mario Castro for

13  Mr. Tanasi or Mr. Tomsheck?

14         MR. TANASI: No, Your Honor. Thank you.

15         THE COURT: Mr. Gaffney or Mr. Ericsson?

16         MR. GAFFNEY: No, Your Honor.

17         THE COURT: Brown or Mishler?

18         MR. BROWN: No, Your Honor.

19         THE COURT: And from the Government, Mr. Finley?

20         MR. FINLEY: Yes, Your Honor.

21            RECROSS-EXAMINATION OF SALVADOR CASTRO

22  BY MR. FINLEY:

23  *Q.* Good morning, sir.

24  *A.* Good morning, sir.

25  *Q.* The jury had some questions about the family relationships,

—2:19-cr-00295-GMN-NJK—

1  and there was an exhibit, but I don't think it answered all of

2  the questions.

3          MR. FINLEY:  If we could please have Defense

4  Exhibit 7028 on the screen.

5  BY MR. FINLEY:

6  *Q.*  So this only shows your mother's children and the spouses.

7  Is that right?

8  *A.*  Correct.

9  *Q.*  Does it show all the spouses?

10  *A.*  No, not all of them.

11  *Q.*  So you've been at this trial for -- since the beginning?

12  *A.*  Yes, sir.

13  *Q.*  Let me ask you this about the chart.  Are the only spouses

14  that are shown the spouses of the Castro brothers who have been

15  mentioned in this trial?

16  *A.*  Yes, sir.

17  *Q.*  The defendant, Jose Luis Mendez, is not on this chart.

18  What -- and I think the juror had a question about the Mendez

19  relationship.  How does the defendant, Jose Luis Mendez, fit in?

20  *A.*  Jose Luis Mendez is married to one of my nieces.  She is the

21  daughter of Jose Salud Castro.

22  *Q.*  Jose Luis Mendez is related to you by marriage?

23  *A.*  Yes, sir.

24  *Q.*  He's your nephew?

25  *A.*  Yes.

─────────2:19-cr-00295-GMN-NJK─────────

1           MR. BROWN:  Objection, Your Honor.  That's not the

2    relationship he explained.

3           THE COURT:  Say that again.

4           MR. BROWN:  That's not the relationship he explained.

5    It's not his nephew.

6           MR. FINLEY:  I'll rephrase.

7           THE COURT:  I guess nephew-in-law, is that what you

8    call it?

9           MR. FINLEY:  I didn't know that was a thing, but I'll

10   rephrase.

11          THE COURT:  Yes, that's fine.

12   BY MR. FINLEY:

13   Q.  Mr. Mendez is by law your nephew?

14   A.  Yes, and in Spanish we call it nephew-in-law.

15   Q.  Jose Salud Castro is Mr. Mendez's father-in-law?

16   A.  Yes, sir.

17   Q.  Maria P. Castro is Mr. Mendez's wife?

18   A.  Yes, sir.

19   Q.  Daughter of Jose Salud Castro?

20   A.  Yes, sir.

21   Q.  Let me ask you about some other family members.

22          MR. FINLEY:  Could we please see Exhibit 280 on the

23   screen.

24   BY MR. FINLEY:

25   Q.  If you look at the second line, Mario Castro, Jr. is

1   mentioned.  Who is he?

2   *A.*  My nephew.

3         MR. FINLEY:  Can we put Government's Exhibit 96 at

4   Page 11 on the screen.  And if we could blow up the driver's

5   license.

6   BY MR. FINLEY:

7   *Q.*  Is that Mario Castro, Jr.?

8   *A.*  Yes, sir.

9   *Q.*  Okay.

10        MR. FINLEY:  Back to 280, please.

11  BY MR. FINLEY:

12  *Q.*  We see Jose Luis Mendez.  We know who he is.  Who is Jose

13  Reyes?

14  *A.*  I do not know, sir.

15  *Q.*  Who is Maria De Los Angeles Ramirez?

16  *A.*  I don't remember her, sir.

17  *Q.*  You testified that Jose Garcia is your nephew?

18  *A.*  Yes, sir.

19  *Q.*  Did you know that you endorsed a check to Maria Ramirez?

20  *A.*  Can you repeat your question?

21  *Q.*  Did you know that you endorsed a check to Maria Ramirez?

22  *A.*  Sir, I don't remember that.

23  *Q.*  Are you sure that you don't know who Maria Ramirez is?

24  *A.*  Well, yes, I have met one -- one or more Maria Ramirez, yes,

25  I have.

2:19-cr-00295-GMN-NJK

1  Q.  Okay.  Who is Maria Ramirez that you endorsed the check to?

2  A.  Sir, I don't remember.  I would need to see the check.

3  Q.  Do you have any Maria Ramirez -- Maria Ramirezes that you

4  know who are related to any member of your family, by blood or

5  marriage?

6  A.  No.

7  Q.  Tell the jury who the Maria Ramirezes are that you know.

8  A.  Well, I had a friend.  Her name was Maria Ramirez.

9  Q.  Are there any other Maria Ramirezes that you know?

10  A.  No, sir.

11  Q.  That's the only Maria Ramirez that you know?

12  A.  Sí, señor.

13  Q.  The check that you --

14        THE INTERPRETER:  Sir.

15        MR. FINLEY:  I'm sorry.

16        THE WITNESS:  Yes, sir.

17  BY MR. FINLEY:

18  Q.  The check that you endorsed to Maria Ramirez came from one

19  of the mailing companies on this chart.  Does that refresh your

20  memory?

21  A.  That could be.

22  Q.  Did you ask your friend, Maria Ramirez, to open a mailing

23  company?

24  A.  No, sir.

25  Q.  I want to give you every opportunity to tell the truth in

—2:19-cr-00295-GMN-NJK—

1  response to that question.

2          Did Maria Ramirez open a mailing company for you or at

3  the request of any of your brothers?

4  *A.* I never told that Maria or any Maria Ramirez to open that

5  company.

6  *Q.* Did one of your brothers?

7  *A.* That could be.

8  *Q.* Okay.  We are -- Salvador Castro, that's you.  Mario Castro,

9  Jr. again.

10          Jose Carrillo, who is that?

11  *A.* My brother.

12  *Q.* What's his real name?

13  *A.* Salvador -- oh, excuse me.  Jose Salud Castro Carrillo.

14  *Q.* Do you know if your brother, Jose Salud Castro, had state

15  identification cards in two different names?

16  *A.* No, I wasn't aware.

17  *Q.* Claudia Castro, who is that?

18  *A.* Claudia Castro is married to one of my nephews.

19          MR. FINLEY:  Can we see Government's Exhibit 34 at

20  Page 2, please.

21          And can we blow up the bottom right picture.

22  BY MR. FINLEY:

23  *Q.* Is that Claudia Castro?

24  *A.* Yes, sir.

25  *Q.* Is she married to Jose Silvestre Castro?

 1   *A.*  At one time she was married to him, yes.

 2   *Q.*  And was she married to Jose Silvestre Castro at the time she

 3   opened a mailing company?

 4        We can go back to Government Exhibit 280 and I'll show

 5   you the date.

 6        2013.

 7   *A.*  Yes, she was married to him.

 8   *Q.*  And just so we're clear, because of the family

 9   relationships, Jose Silvestre Castro is the son of your -- your

10   brother, Jose Salud Castro?

11   *A.*  Yes, sir.

12        MR. FINLEY:  Okay.  We can take 280 down.

13        Could we show Government's Exhibit 240, please.

14   BY MR. FINLEY:

15   *Q.*  Who is that?

16   *A.*  My daughter.

17   *Q.*  Does she speak fluent English?

18   *A.*  Yes.

19   *Q.*  Did Patti Kern tell the jury the truth when she said that

20   Angeles Castro was your daughter?

21   *A.*  I believe there was some confusion there.  However, yes, she

22   did tell the truth.

23   *Q.*  You worked at -- in addition to Digital Express, you also

24   worked at New Generation Graphics for your brother, Epi Castro?

25   *A.*  Yes, sir.

————2:19-cr-00295-GMN-NJK————

1   Q.  You were talking about fixing machines.  You fixed machines,

2   printing and mailing machines, at both businesses?

3   A.  Yes, I did help them.

4   Q.  And you received money from Digital Express and New

5   Generation Graphics in the form of checks written to your name?

6   A.  Yes, sir.

7   Q.  Who was in charge of the Castro letter shop from 2010 to

8   2018?

9   A.  On some occasions -- well, an example is that Digital --

10  Digital Express, Mario was in charge.

11          But I -- I don't remember if in 2011 or before, before

12  they moved to Digital Express, it was Luis Aguilar and --

13          THE INTERPRETER:  Interpreter needs clarification.

14          THE WITNESS:  And Miguel's son.

15  BY MR. FINLEY:

16  Q.  What about Miguel Castro, Sr., was he in charge?

17  A.  He would travel sporadically because he started up --

18          THE INTERPRETER:  And the interpreter's unclear if it's

19  polyurethane.

20          THE WITNESS:  He started a business.

21          And so sporadically they're the ones that would stay

22  there because he ended up traveling so much.

23  BY MR. FINLEY:

24  Q.  My question was, at times from 2010 to 2018 was Miguel

25  Castro ever in charge at the letter shop?

—2:19-cr-00295-GMN-NJK—

1  *A.*  Yes, sir.

2  *Q.*  You are not suggesting to the jury that somebody could

3  commit fraud by printing lies on paper, go to Mexico for a few

4  months, come back, continue to commit fraud, and somehow that

5  would be okay?

6  *A.*  I'm not able to answer that because I don't know if Miguel

7  knew.

8  *Q.*  I'm just -- I'm just asking, you're not -- I'm asking about

9  what you're suggesting to the jury.  You're not suggesting to

10  the jury that somebody can commit fraud, stop for a while,

11  commit fraud again, and that's not fraud?  You're not suggesting

12  that, right?

13  *A.*  No.

14  *Q.*  You know that that would still be fraud?

15  *A.*  Yes.

16  *Q.*  What did Jose Luis Mendez do from 2010 to 2018?

17  *A.*  He would run the laser.

18  *Q.*  Was that the big laser OCE printer?

19  *A.*  Yes.

20  *Q.*  And that big laser printer would put all of the different

21  names of the thousands of victims onto the prize notices,

22  correct?

23  *A.*  Yes.  He's the one that would run that.

24  *Q.*  Probably 90 percent of the time, correct?

25  *A.*  Yes, sir.

—2:19-cr-00295-GMN-NJK—

1   Q.  Was he a full-time employee from 2010 to 2018 at the letter

2   shop?

3   A.  Yes, sir.

4   Q.  Jose Salud Castro worked at the letter shop as well?

5   A.  Yes, sir.

6   Q.  Who else worked at the letter shop?

7   A.  Only Jose Luis Mendez, Mario, and my brother, Salud.

8   Q.  Covered everybody, I have?

9   A.  Well, that's it.

10  Q.  What about your wife, Maria De Los Angeles Ramirez, she

11  worked there, didn't she?

12  A.  No, my wife did not work there.

13  Q.  Did she get checks from Digital Express?

14  A.  Yes, because I would tell them to write them in her name.

15  Q.  You would tell them to write checks to you -- checks for you

16  in the name of your wife?

17  A.  On occasions I would go to California and she would ask me

18  to leave money for her.  And so I would say to Epi, you know,

19  "Write the check out to her."

20  Q.  So the answer to my question is, yes, she got paid with

21  checks from Digital Express?

22  A.  Yes, sir.

23  Q.  Did Maria P. Castro, Maria Patricia Castro, the defendant,

24  Jose Luis Mendez's wife, work at Digital Express?

25  A.  No.

—2:19-cr-00295-GMN-NJK—

1  Q.  Did you see her working there at any time between 2010 to

2  2018?

3  A.  No, sir.

4          MR. FINLEY:  A moment to confer.

5          THE COURT:  Yes.

6          (Prosecution conferring.)

7  BY MR. FINLEY:

8  Q.  Do you know anyone named Sixto?

9  A.  Not that I remember.

10         MR. FINLEY:  Thank you.  No further questions.

11         THE COURT:  Any other follow-up, Mr. Green?

12         MR. GREEN:  Yes, if I may, Your Honor.

13         THE COURT:  Go ahead.

14         MR. GREEN:  Thank you.

15         FURTHER REDIRECT EXAMINATION OF SALVADOR CASTRO

16  BY MR. GREEN:

17  Q.  Mr. Salvador Castro, in response to a Government's question

18  on recross-examination based on a juror's question as to a check

19  to your wife, did you frequently go to California to buy items

20  for the print shop?

21  A.  Yes, sir.

22  Q.  On those occasions, were there times when you were going to

23  get paid a check from the print shop?

24  A.  Yes, sir.

25         MR. GREEN:  Government's Exhibit 84, if we may, Your

 1  Honor.

 2  BY MR. GREEN:

 3  Q.  Mr. Salvador Castro, in front of you is Government's

 4  Exhibit 84.

 5          There's a picture of a Post-it note.  Do you recognize

 6  a name?

 7  A.  Yes, sir.

 8  Q.  What is that name?

 9  A.  Angeles Castro.

10  Q.  Do you know if that is the name of your wife or your

11  daughter?

12  A.  In the family, everyone knows my wife as Angeles Castro.

13  And the same goes for my daughter, Angeles Castro.

14  Q.  You have seen a check introduced by the Government payable

15  to Angeles Castro in January 2018, remember?

16  A.  Yes, sir.

17  Q.  And do you remember the testimony of many witnesses,

18  including Patti Kern, that the photograph in Government's

19  Exhibit 84 was taken on February 21st, 2018?

20  A.  Yes.

21  Q.  Would that be approximately one month after the date of the

22  check to Angeles Castro?

23  A.  Yes, sir.

24  Q.  In connection with the check and asking that a check be

25  written to Angeles Castro, who did you ask to have the check

-2:19-cr-00295-GMN-NJK-

1  written?

2  *A.*  My brother, Epi.

3  *Q.*  Did you write any checks?

4  *A.*  No, sir.

5  *Q.*  But you have seen in Government's Exhibit 285 --

6        MR. GREEN:  If we may, Your Honor.

7  BY MR. GREEN:

8  *Q.*  Government's Exhibit 285 is a series of 31 checks.  And do

9  you see the one in front of you, sir, on Page 1 of Government's

10 Exhibit 285?

11 *A.*  Yes, sir.

12 *Q.*  On -- did you write any of those checks?

13 *A.*  No, sir.

14 *Q.*  Is it possible that you may have signed over a check to a

15 family member?

16 *A.*  No.

17 *Q.*  So it's not possible or you don't remember?

18 *A.*  No, because I did not have the checks.

19 *Q.*  So if -- if someone showed you a check with your name

20 endorsing it, would that be unusual?

21 *A.*  Could you repeat the question?

22 *Q.*  If someone signed a check in your name and you signed the

23 check over to somebody, would that be possible?

24 *A.*  No.

25 *Q.*  You're saying it's not possible in this case?

—2:19-cr-00295-GMN-NJK—

1  *A.*  No.

2  *Q.*  Okay.

3       But if you were shown that document, would it refresh

4  your recollection?

5  *A.*  Yes.

6  *Q.*  How many checks have you seen in this case?

7  *A.*  I don't remember, but not many.

8  *Q.*  How many documents have you reviewed in this case?

9  *A.*  Many.

10  *Q.*  Okay.  Thank you.

11       Now ...  But you do admit that you had Epi or someone

12  write a check out to your daughter, Angeles Castro?

13  *A.*  Yes, sir.

14  *Q.*  And when you were asked a question by the Government in

15  response to a juror's question that -- about the lies on the

16  papers which were mailed out, did you know that information was

17  a lie?

18  *A.*  No, sir.

19  *Q.*  Were you there at Digital Express every day from the year

20  2010 to 2018?

21  *A.*  Not every day.

22  *Q.*  Approximately how many hours a day were you there?

23  *A.*  Two or three hours.

24  *Q.*  Were -- did you have any other jobs during that time from

25  2010 to 2018?

1  *A.*  Yes, sir.

2  *Q.*  Okay.

3        The exhibit shown this morning, 7028 --

4        MR. GREEN:  If we may put that on the screen, Your

5  Honor.  Thank you.

6  BY MR. GREEN:

7  *Q.*  The chart in front of you, let's call it the Castro family

8  chart, would it be safe to say that the first time you ever saw

9  this chart is the same time the jury saw this chart this

10 morning?

11 *A.*  Yes.

12 *Q.*  So did you have any advanced notice of the -- what's

13 contained in this chart?

14 *A.*  No, sir.

15 *Q.*  Do you believe that the information in this chart is correct

16 for the purpose of who these children are and who the family

17 members are for the -- the children of Maria Castro, husbands,

18 daughters, and wives?

19 *A.*  Yes.

20 *Q.*  This is not the complete Castro family.  Is that correct?

21 *A.*  It would not fit here.

22 *Q.*  Thank you.  Thank you.

23        MR. GREEN:  Indulgence for a moment, Your Honor, if I

24 may.

25        THE COURT:  Yes.

1  BY MR. GREEN:

2  *Q.*  Oh.  When you were asked this morning by Government counsel

3  in response to a jury question as to the names on these prize

4  notices, did you know the names of these people to which the

5  mailings were going?

6  *A.*  No, sir.

7          MR. GREEN:  Thank you.  I have no further questions.

8          THE COURT:  Thank you.

9          Any other questions on behalf of Mr. Mario Castro?

10         MR. TANASI:  No, Your Honor.  Thank you.

11         THE COURT:  Or Miguel Castro?

12         MR. GAFFNEY:  No, Your Honor.

13         THE COURT:  Jose Luis Mendez?

14         MR. BROWN:  No.  Thank you, Judge.

15         THE COURT:  And does the Government have any other

16 follow-up questions for this witness?

17         MR. FINLEY:  No, Your Honor.

18         THE COURT:  All right.  So, Mr. Salvador Castro, you

19 are all done with your testimony.  You are excused.  Please be

20 very careful on the way down with the steps.  You may return to

21 your seat.

22         THE WITNESS:  Thank you, Your Honor.

23         THE COURT:  Government may -- I'm sorry.

24         MR. BROWN:  Could we sidebar, Your Honor?

25         THE COURT:  Yes.

─────────2:19-cr-00295-GMN-NJK─────────

 1          (Whereupon, the following sidebar conference was held.)

 2          THE COURT:  Okay.  Go ahead, Mr. Brown.

 3          MR. BROWN:  Yeah.  Thank you, Judge.  I apologize.  I

 4  had a note to ask the Government about this, but I -- I forgot.

 5  There's been a lot of talk about how Mr. Mendez texted in

 6  English.  What we'd like to do is have him demonstrate for the

 7  jury exactly how he can do that on his phone.  Just put it under

 8  the ELMO and ...

 9          THE COURT:  Any objection to that, Mr. Finley?

10          THE COURT REPORTER:  I'm sorry?

11          MR. FINLEY:  No.

12          THE COURT:  Okay.  All right.

13          MR. FINLEY:  I don't even know where I am anymore, I'm

14  sorry.

15          THE COURT:  Okay.

16          MR. BROWN:  Okay.

17          THE COURT:  We need to make sure that Nick knows you're

18  going to be using the ELMO --

19          MR. MISHLER:  He does.  We talked to him.

20          THE COURT:  -- so it's turn on.

21          Because it's like one of those --

22          MR. BROWN:  Oh, is it?  Okay.

23          THE COURT:  -- Easy Bake Oven light bulbs and it takes

24  a while for it to warm up.

25          MR. BROWN:  And just -- can I --

```
 1              THE COURT:  So maybe just turn it on now --
 2              MR. BROWN:  And just kind of in terms of --
 3              THE COURT:  -- and then eventually when you get to that
 4    point in the questioning, it will already be turned on.
 5              MR. BROWN:  Okay.  In terms of mechanics, what I'd like
 6    to do is have our investigator, Mr. Beasley, text Mr. Mendez a
 7    message in English and then have Mr. Mendez just walk through
 8    and explain how he's able to respond.
 9              THE COURT:  Any objection to that, Mr. Finley?
10              MR. FINLEY:  No, Your Honor.
11              THE COURT:  Okay.
12              MR. BROWN:  And the other thing is, I don't know
13    whether the jury instruction should go again because he'll be
14    in --
15              THE COURT:  I can say it again if you want.
16              MR. BROWN:  Probably safer.  Thank you.
17              THE COURT:  Anything else?
18              MR. GREEN:  Permission to announce that the Defense
19    rests for Salvador Castro.
20              THE COURT:  Okay.  Thank you.
21              MR. GREEN:  Thank you.
22              THE COURT:  Anyone else while we're here?  No?  Okay.
23    Thank you.
24              (Sidebar conference was concluded.)
25              THE COURT:  We're back on the record.
```

————2:19-cr-00295-GMN-NJK————

 1          And now, Mr. Green, do you have any other witnesses
 2   you'd like to call?
 3          MR. GREEN:  No, Your Honor.  We don't.  Your Honor, we
 4   would like to say to the Court, counsel, Government counsel, and
 5   ladies and gentlemen of the jury, the Defense of Salvador Castro
 6   rests.
 7          THE COURT:  Thank you, sir.
 8          MR. GREEN:  Thank you.
 9          THE COURT:  Mr. Brown, do you have any witnesses you'd
10   like to call on behalf of Jose Luis Mendez?
11          MR. BROWN:  Thank you, yes, Judge.  The Defense calls
12   Mr. Jose Luis Mendez.
13          THE COURT:  All right.  Come on up, sir.  Be careful
14   with the steps.  You'll be seated right here to my left.  And we
15   do have an interpreter as well.
16          So, ladies and gentlemen of the jury, just as
17   yesterday, when we have an individual who is testifying with an
18   interpreter -- and he has a right to do that -- you need to
19   raise your hand and let me know if you hear a translation that
20   you think is incorrect so that we can clarify that before we
21   move on.  Or at any time if you hear or start thinking about
22   "I'm not sure that's a correct translation," let us know so we
23   can correct it.
24          Once there is an English translation, that is the one
25   that everyone has to accept.  All jurors have to accept that

1  English translation.  And you can't debate it later during the

2  deliberation process.  So listen carefully and don't be shy to

3  tell me if you think that there's a mistranslation.

4          COURTROOM ADMINISTRATOR:  Would you raise your right

5  hand.

6          JOSE LUIS MENDEZ, having duly been sworn, was examined

7  and testified as follows:

8          COURTROOM ADMINISTRATOR:  Please take a seat.  And then

9  for the record, please state and spell your name.

10          THE WITNESS:  Jose Luis Mendez --

11          MR. GREEN:  Your Honor, before we forget what the --

12  the unit of translation is not working here for Mr. Castro.

13          THE COURT:  Oh, does it need a new batteries?

14          MR. GREEN:  This was placed here this morning.

15          THE COURT:  Yes.  Let's check.  We have a whole bunch

16  of them here.  Sometimes they're on the charger so we can get a

17  new one.

18          THE INTERPRETER:  The interpreter will test it.

19          THE COURT:  All right.  We'll test it for you and see

20  if it works now.

21          MR. GREEN:  Testing one, two, three.

22          COURTROOM ADMINISTRATOR:  Hey, Will, leave that one

23  down so we can clean it up.  Thank you.

24          MR. GREEN:  We have it.  Thank you very much, Your

25  Honor.

1          THE COURT:  Okay.

2          All right.  Mr. Brown, you may proceed.

3          MR. BROWN:  All right.  Thank you.

4          DIRECT EXAMINATION OF JOSE LUIS MENDEZ

5   BY MR. BROWN:

6   *Q.*  Good morning, Mr. Mendez.

7   **A.**  Good morning.

8   *Q.*  So please let me finish my question before you answer.

9   **A.**  Yes.

10  *Q.*  And if you don't understand a question, please ask me to

11  clarify.

12  **A.**  Yes.

13  *Q.*  So we've been here for three and a half weeks in trial, and

14  you've heard all of the Government's evidence.

15  **A.**  Yes.

16  *Q.*  Can you tell -- can you tell the jury whether you ever

17  intended to scam or cheat anyone?

18  **A.**  No.

19  *Q.*  You heard the victims testify in this case, Mr. Mendez?

20  **A.**  Yes.

21  *Q.*  And how did it feel hearing that people were scammed by

22  companies that had your name on them?

23  **A.**  Well, to be honest, I felt bad.  It was something really bad

24  that happened to them.  They lost their savings and probably

25  money that people was depending on them for that.

―2:19-cr-00295-GMN-NJK―

1  Q.  Okay.  Let's talk a little bit about your background,

2  Mr. Mendez.

3  A.  That's fine.

4  Q.  Where were you born?

5  A.  Zamora, Michoacán, Mexico.

6  Q.  When did you come to the United States?

7  A.  In the year 1997.

8  Q.  Are you a citizen of the U.S.?

9  A.  Yes.

10  Q.  Okay.  Let's talk about education.

11  A.  I finished high school.

12  Q.  Was that in Mexico or here?

13  A.  In Mexico.

14  Q.  Okay.  Do you have a family here, Mr. Mendez?

15  A.  Yes.

16  Q.  And who's in your family?

17  A.  My wife and my two children.

18  Q.  Okay.  What are your children's names?

19  A.  It's Julia Mendez and Luis Jose Mendez.

20  Q.  Okay.  What are you doing for work right now?

21  A.  I work for a company that brings -- brings, like, fish and

22  shrimp and -- in trailers and I do deliveries.

23  Q.  Okay.  What time do you work?  What are your hours?

24  A.  I work from Monday through Saturday.  I go in at 1 a.m. and

25  I leave work at 7 a.m. so that I can come to court.

1  Q.  Mr. Mendez, do you read English?

2  A.  No.

3  Q.  Do you speak English?

4  A.  Well, just the very basic to say "good morning," "good

5  afternoon," "thank you."

6  Q.  Mr. Mendez, since you and I met, what language have we

7  always spoken in?

8  A.  Always in Spanish.

9  Q.  All right.  Let's talk about text messages.

10        So the Government has talked a lot about text messages

11  between you and Sean O'Connor?

12  A.  Yes.

13  Q.  And between you and Patti Kern?

14  A.  Yes.

15  Q.  And can you explain to the jury how you're able to

16  understand a text in English and text back in English?

17  A.  Yes.

18  Q.  How do you do that?

19  A.  (In Spanish.)

20  Q.  Mr. Mendez, could you actually demonstrate for the jury how

21  you do that?

22  A.  Yes.

23  Q.  So if I have our investigator text you a message, could you

24  respond to that message?

25  A.  Yes.

```
                    ─2:19-cr-00295-GMN-NJK─
```

1            MR. BROWN:  Your Honor, could the witness come down

2    here and use the ELMO?

3            THE COURT:  Yes.

4            COURTROOM ADMINISTRATOR:  It's on.  Make sure the

5    microphone is on by you, though.

6            MR. MISHLER:  While we're waiting on the text, if

7    you ...

8            COURTROOM ADMINISTRATOR:  There's going to be a glare

9    on there.

10           MR. MISHLER:  Yeah, that's all right.  I thought maybe

11   I could ...

12           COURTROOM ADMINISTRATOR:  Yeah.

13           MR. BROWN:  Now everyone knows you're good.

14   BY MR. BROWN:

15   *Q.*  Okay.  So, Mr. Mendez, for the record, we're looking at your

16   cell phone?

17   **A.**  Yes.

18   *Q.*  And can you check your messages, please?

19   **A.**  Now I got this one.

20   *Q.*  Okay.  Can you just respond to this text message?

21   **A.**  Yes.

22           I forgot my glasses.  Can I go pick them up?

23   *Q.*  Sure.  I'll get your glasses.

24           And can you just explain to the jury, as you're doing

25   this, what you're doing.

—2:19-cr-00295-GMN-NJK—

1    A.  Yes.  When I get a text in English, I clicked and I copy the
2    whole text.
3              Then I go to the Google app.  I click.
4              I paste the message.  And it gives it to me in Spanish.
5    Q.  Okay.  And can you show -- can you explain what that message
6    says?
7    A.  It's a question.  "The weather today is warm and windy or
8    cold and rainy?"
9    Q.  Okay.  Now, can you show the jury how you would respond to
10   that message in English?
11   A.  When I write that it's hot, it gives me the translation in
12   English.
13             I copy it.  I go to the same message.  I paste it.  And
14   I send it.
15   Q.  Message received.
16             MR. BROWN:  Your Honor, could the record reflect that
17   the response text message reads:  "It's hot."
18             THE COURT:  Yes, the record will so reflect.
19             MR. BROWN:  Thank you, Mr. Mendez.
20   BY MR. BROWN:
21   Q.  Okay, Mr. Mendez.  I'd like to talk about a couple of
22   specific text messages.
23   A.  Yes.
24             MR. BROWN:  Bryan, can you pull up 150, please,
25   Page 26.

—2:19-cr-00295-GMN-NJK—

1          Judge, this is admitted.

2   BY MR. BROWN:

3   *Q.*  So, Mr. Mendez, on Page 26 of Exhibit 150, do you see the

4   third message from the top of the page?

5   *A.*  Which one?  I'm sorry.

6   *Q.*  The second green one down.

7   *A.*  This one, right?

8   *Q.*  From the top it's the third message down.

9   *A.*  Yes.

10  *Q.*  And did you use Google Translate to send this message?

11  *A.*  Yes.

12  *Q.*  Okay.

13          And you tell Patti:  "Envelope for me or no?"

14  *A.*  Yes.

15  *Q.*  And then Patti Kern responds:  "Gave Mario a big yellow one

16  for you last week.  He put it on top of the cabinet."

17  *A.*  Yes.

18  *Q.*  Do you recall translating these messages?

19  *A.*  Yes.

20  *Q.*  Okay.  And can you explain to the jury what envelope you're

21  talking about here, what big yellow envelope?

22  *A.*  Yes, it was a big envelope, yellow, like more or less 12

23  size, folded in half.  And there was a white envelope with a

24  check and some stickers, 10 of each.

25          She have just bought or was about to buy a newspaper,

—2:19-cr-00295-GMN-NJK—

1  and she wanted me to give her some samples of stickers and

2  magnets for promotion of her newspaper.  I didn't know if she

3  had already bought it or not.

4  Q.  Okay.

5          MR. BROWN:  Can we look at Page 59, please, Bryan, same

6  exhibit.

7  BY MR. BROWN:

8  Q.  So the second green text message from the top, so this says:

9  "Hello, Patti.  Checks that they can still write to me on behalf

10  of Price Awards."

11  A.  Yes.

12  Q.  And the next text says:  "Please."

13  A.  Yes.

14  Q.  And then Patti responds:  "Price Awards is Miguel.  You mean

15  Pacific Allocations?"

16          MR. BROWN:  Then if we go to the next page, please.

17  BY MR. BROWN:

18  Q.  You respond:  "Yes."

19          And then you say to Patti:  "What you do to me on

20  behalf of Digital Express if you can do them on behalf of Price

21  Awards."

22  A.  Yes.

23  Q.  Do you remember translating these text messages into

24  English?

25  A.  Yes.

2:19-cr-00295-GMN-NJK

1  *Q.*  And can you explain to the jury why you were asking Patti

2  Kern to send a check to Price Awards?

3  *A.*  Yes.  At that time Miguel Castro was doing really bad

4  economically, financially.  And I don't know if he had borrowed

5  some money or they had lent him some money from Price Awards.

6  And I knew that he was needing the money for rent.  So I would

7  always check with her and ask her if they can make those checks

8  to Miguel and then Miguel would pay them back.

9  *Q.*  Okay.  When you say "her"?

10  *A.*  Patti.

11  *Q.*  Patti Kern?

12  *A.*  Yes, sir.

13  *Q.*  Okay.

14         Let's take a step back and talk about your work with

15  the Castros and the mailing business.

16  *A.*  Yes.

17  *Q.*  So just so we're clear, what is your relationship to the

18  Castros?

19  *A.*  They are my wife's uncles.

20  *Q.*  Okay.  And would you talk with the Castros at work?

21  *A.*  Yes, we used to talk a lot.

22  *Q.*  How often would you talk about work and --

23         MR. FINLEY:  Your Honor.

24  BY MR. BROWN:

25  *Q.*  -- how often would you talk about other things?

—2:19-cr-00295-GMN-NJK—

1              MR. FINLEY:  Objection.  I think we've been trying to

2    differentiate "Castros" and "they" and so forth.  So I would ask

3    Mr. Brown to back up and specify who's being -- who's being

4    talked about.

5              THE COURT:  Yes.  Let's be more specific, please.

6              MR. BROWN:  Sure.

7    BY MR. BROWN:

8    Q.  Would you talk with Mario Castro at work?

9    A.  Yes.

10   Q.  If Miguel were there, would you talk with Miguel?

11   A.  Yes, if Miguel was here in Vegas, in the United States, yes.

12   Q.  Okay.  And what about Salvador?

13   A.  Yeah, with Salvador we would talk a little less.

14   Q.  Okay.

15             When you would talk with Mario, how often was talk

16   about work and how often was it about other stuff?

17   A.  When we were talking about work, we would specify if there

18   was some work that we have to do, how much of it, when we had to

19   have it done, and if it was for Patti or not.

20   Q.  Okay.  Did you mostly talk about work or did you mostly talk

21   about other stuff?

22   A.  Well, it was not much that we talked about work.  More than

23   anything we would talk -- we would talk about breakfast, what we

24   would cook, because we had an electric Comal there.  We had a

25   stove.  And we would talk about what we would cook and we were

 1  making jokes and we were teasing each other.

 2  *Q.*  Did you see any of the Castros outside of work?

 3  *A.*  No, normally we would never see each other outside of work.

 4  *Q.*  Okay.  And just so we're clear, when I say "the Castros," I

 5  mean Mario, Miguel, and Salvador Castro.

 6  *A.*  Yes.  When we would get out of our work, we wouldn't get

 7  together in the afternoons.

 8  *Q.*  Okay.  When did you first start working at a letter shop?

 9  *A.*  In 2000s, mid 2000s.

10  *Q.*  Okay.  And what -- what were your responsibilities when you

11  first started?

12  *A.*  When I started working there, I would do the sweeping.  I

13  would gather the paper, pick up the trays where you put the

14  letters.  I would move around pallets with the forklift.

15  *Q.*  Were you promoted to doing other things?

16  *A.*  Yes.

17  *Q.*  What kinds of things did you end up doing?

18  *A.*  Well, I wound up doing some mechanic work.  Mario Castro

19  taught me.  I learn it very well.

20  *Q.*  Okay.  And you ultimate -- ultimately end up running the

21  laser printer, right?

22  *A.*  Yes, I wound up running the laser, but more than that I was

23  fixing it.

24  *Q.*  Okay.  So I want to talk about the laser printer, and I'd

25  like for you to explain to the jury how the laser printer works,

1  but in short sentences so the translator has an opportunity to

2  translate.

3  *A.*  Well, the laser is not a machine that is as big as it has

4  been said here.  It's a machine where you put a box of paper,

5  about 2,000 sheets.  When you put that into the machine, you'd

6  have to do tuck.  I would get a work order number.  That work

7  order, I would receive it from Sean.

8          So I would just look for the number of that work and I

9  would put it in the form that it would go into.  And once I put

10 it there, practically I would push enter and the machine would

11 start working.  It is 466 sheets per hour.  It's not less than

12 that because the name of the machine is OCE 466, so it's 466 per

13 minute.

14 *Q.*  And what happens when a form goes through the OCE printer?

15 *A.*  Well, you have the form, preprinted form.  And the OCE just

16 puts the names and some codes, but when you open that form in

17 the computer, you only see Xs because that's the way it was

18 designed by Sean.  He was the only one running the program.

19         And it's so fast that you don't realize when -- when it

20 even begins.  You know when it finishes because it stops, and

21 then you have to put the other box so that it keeps doing it.

22 *Q.*  Okay.  And where do these forms go after they leave the

23 laser printer?

24 *A.*  (In Spanish.)

25         THE COURT:  Hold on.  I think it would be easier if you

———2:19-cr-00295-GMN-NJK———

1   speak in shorter sentences.  Or, rather, less sentences.  Give

2   the interpreter a chance to tell the jury what you're saying.

3   BY MR. FINLEY:

4   Q.  Okay.  So let me ask the question again and then give the

5   interpreter time to interpret.

6         So what happens when one of these forms leaves the

7   laser printer?

8   A.  When they leave the laser machine, the next process is

9   folding.

10  Q.  Okay.  What happens then?

11  A.  Then when it leaves the folder, it's -- it looks like a

12  letter that you have already fold ready to send.

13  Q.  Okay.  So let me ask you this.  When you used the laser

14  printer, are you looking at what's being printed?

15  A.  No, it's impossible to see that.

16  Q.  Why is that?

17  A.  Well, you can see it when you put in the material, but the

18  people that is working on the mailing, you don't focus on what

19  is being printed.

20  Q.  Okay.  Well, let me ask you this.  What kinds of things did

21  you print on the laser printer?

22  A.  In the laser, basically you put the names, a bar code, and I

23  think sometimes some text that Sean had written before.

24  Q.  Okay.  And prize notices were printed on this printer?

25  A.  Correct.

—2:19-cr-00295-GMN-NJK—

1  *Q.*  What else was printed on this printer?

2  **A.**  Also casino forms and for other clients.

3  *Q.*  Okay.  What percentage would you say you were printing prize

4  notices, these sorts of things, and what percentage of the time

5  was something completely different?

6  **A.**  I estimate that what it would be printed, that I knew of, it

7  was 30 percent of Patti's work, and the other 70 percent of

8  different companies.

9  *Q.*  Okay.  You mentioned "Patti."  Let's talk about her.

10       When was the first time that you saw Patti Kern?

11  **A.**  It was mid 2000s.  When I got there, I cannot say for

12  certain that it was the day after, two days after, but it was

13  mid 2000.

14  *Q.*  Okay.  So in the year 2000?

15  **A.**  Yes.

16  *Q.*  Okay.  Where did you see her?

17  **A.**  I remember I saw her at Sean O'Connor's office.

18  *Q.*  Okay.  And let's say from the year 2000 to the year 2010,

19  how often would you say you saw Patti Kern?

20  **A.**  From Monday through Friday except the days that we wouldn't

21  work.

22  *Q.*  Okay.  And would you see her at work?

23  **A.**  Yes.

24  *Q.*  And did you know why she was at your work?

25  **A.**  The first few years, no.  They were pretty reserved, Patti

2:19-cr-00295-GMN-NJK

 1  and Sean.  They -- they didn't like to talk to us.

 2  Q.  Okay.  But did you understand that Patti was a client?

 3  A.  Yes.

 4  Q.  So you knew she had some kind of a business?

 5  A.  Yes.

 6  Q.  And at some point did you learn what kind of business Patti

 7  was in?

 8  A.  Yes.

 9  Q.  And when was that?

10  A.  I believe it was 2008 when I learned that it was

11  sweepstakes, but I didn't understand the concept of sweepstakes.

12  Q.  Okay.  Did you ever talk with Patti Kern about her

13  sweepstakes business back in -- before 2010?

14  A.  No.

15  Q.  Did Patti appear to have a successful business?

16  A.  Yes, pretty successful.

17  Q.  Why was that?

18  A.  Well, because at that time -- well, the first time I met

19  her, she was really well-dressed.  And she would bring her hair

20  blue one day, the next day yellow and red, and that caught my

21  eye.  And she was driving luxury cars.

22  Q.  Okay.  Before 2010, did you have any reason to think that

23  what Patti was doing was illegal?

24  A.  No.

25  Q.  Did she appear to be hiding?

1  *A.*  No, never.

2  *Q.*  Did you ever hear Patti Kern speak Spanish?

3  *A.*  No, never.

4  *Q.*  Did you ever have an entire conversation with Patti Kern?

5  *A.*  No, never.

6  *Q.*  At some point you did communicate with Patti, though, right?

7  *A.*  Yes.

8  *Q.*  So if you don't speak English and she doesn't speak Spanish,

9  how are you able to communicate with her?

10  *A.*  Well, the first time I communicated with her, it was -- in

11  reality, Sean contacted me, but Sean doesn't speak English

12  either -- Spanish either.

13        Sean only know cursing words in Spanish.

14  *Q.*  Okay.

15  *A.*  He contacted Luis Aguilar.  They both came to me and told me

16  this, "Patti wants you to open a company with her."

17  *Q.*  Okay.  Now, I want to get to that, but I want to ask you

18  this first.

19        Did you or Patti ever use other people to interpret?

20  *A.*  Yes, several times.

21  *Q.*  Who would you use?

22  *A.*  Regularly, I would use a lot Epi.  Once or twice Mario.

23  *Q.*  How about Luis Aguilar?

24  *A.*  And Luis Aguilar.  Luis Aguilar was the one translating for

25  me most of the time because they -- they knew each other really

—2:19-cr-00295-GMN-NJK—

1  well.

2  *Q.*  Okay.

3         Back in 2010, did you trust Patti Kern?

4  ***A.***  Well, in 2010 I always trusted Patti Kern.  I knew her in

5  2000.  I know right away she wouldn't trust me or I wouldn't

6  trust her.

7         Seeing her every day, I think that I gained her trust.

8  *Q.*  Okay.  Did you have any reason before 2010 not to trust

9  Patti?

10  ***A.***  No, never.

11  *Q.*  Okay.  Let's talk about someone else you mentioned, Sean

12  O'Connor.

13         When did you first meet Sean?

14  ***A.***  The same day I met Patti.

15  *Q.*  Okay.  Where did you meet him?

16  ***A.***  There in his office.  His office was at the entry.

17  *Q.*  And at that time did you know whether Sean and Patti had any

18  kind of a relationship?

19  ***A.***  No, I didn't know what was their relationship between them.

20  When I was there, they -- they would leave the door open.

21         But when a person that probably would know English,

22  they would close the door.

23  *Q.*  Okay.  Did you ever have an entire conversation with Sean

24  O'Connor in English?

25  ***A.***  No, never.

2:19-cr-00295-GMN-NJK

1  *Q.*  You heard him say to the jury that he talked with you every

2  day about schedules, paper, soccer, and clients.  Do you

3  remember that?

4  **A.**  Yes, I remember.

5  *Q.*  Did you ever have any conversations like that with him?

6  **A.**  No, never.

7  *Q.*  And you recall Sean O'Connor saying that in 2013 he told you

8  about losing business because of Glenn Burke?

9  **A.**  No, he never mentioned that to me.

10  *Q.*  You heard Sean O'Connor testify that he told you he was hot

11  in 2016?

12  **A.**  No, he never mentioned that to me.  And if that was his

13  intentions, he would have had to find somebody to tell me that.

14  *Q.*  Okay.  Well, he also said that sometimes he used Mario,

15  Miguel, and Luis Aguilar to translate for him so he could

16  communicate with you.  Was that right?

17  **A.**  Yes, he contradicted himself that day.

18  *Q.*  Okay.

19       Back in 2010, did you trust Sean O'Connor?

20  **A.**  Yes.

21  *Q.*  Let's talk about Glenn Burke.  Before 2018, had you ever

22  heard the name Glenn Burke?

23  **A.**  No, I hadn't heard it or met him.

24  *Q.*  Dan Wagner?

25  **A.**  I do remember seeing him one time.  He went there one time

─2:19-cr-00295-GMN-NJK─

1  and I printed some shirts for him from Costa Rica.

2  Q.  Okay.  Is that the only thing you knew about Dan Wagner

3  before 2018?

4  **A.**  Yes, Sean O'Connor brought him to the company.  He explained

5  how he wanted his shirts.  And the next day at night he picked

6  them up.

7  Q.  Okay.  How was he able to explain how he wanted his shirts

8  to you?

9  **A.**  Because recently I was there at the pool-pull (phonetic).  I

10  don't know what's the -- what's the translation in English, but

11  where you do the serigraphy for the shirts, Luis Aguilar was

12  there.

13  Q.  Okay.  Let's talk about something else.  Let's talk about

14  what kind of business experience you've had.

15       Now, you recall that AAS was formed in 2012.  Is that

16  right?

17  **A.**  Yes.

18  Q.  Now, before 2012, had you ever formed a company?

19  **A.**  No, never.

20  Q.  Did you know how to form a company?

21  **A.**  No.

22  Q.  Did you know what documents you might need to form a

23  company?

24  **A.**  No, neither.

25  Q.  Did you know how much it would cost?

—2:19-cr-00295-GMN-NJK—

1   *A.*  No.

2   *Q.*  Did you know what a dba was?

3   *A.*  No.

4   *Q.*  Did you know why someone might use a dba?

5   *A.*  No.

6   *Q.*  Had you ever owned any kind of a business?

7   *A.*  No.

8   *Q.*  Had you ever opened a bank account for a business?

9   *A.*  I'm sorry, what?

10  *Q.*  Before 2012, had you ever opened a bank account for a

11  business?

12  *A.*  No.

13  *Q.*  Had you ever applied for a Post Office box for a business?

14  *A.*  No, never.

15  *Q.*  Okay.  Now let's go to 2012, and let's talk about Advanced

16  Allocation Systems.

17         Whose idea was it to form AAS?

18  *A.*  Sean O'Connor.

19  *Q.*  Okay.  And can you just explain to the jury how this

20  happened?

21  *A.*  He came with Luis Aguilar.  They approached me.  We were

22  between his office and the laser printer.

23         And then he asked me if I was interested in opening a

24  company --

25  *Q.*  When you say -- when you say "he"?

2:19-cr-00295-GMN-NJK

1  *A.*  Sean told Luis so that Luis would tell me.

2       And when Luis asked me or told me what Sean was saying,

3  without thinking I said yes.

4  *Q.*  Why did you not even think about it?

5  *A.*  Because I saw it as a big opportunity.  I had seen somebody

6  being successful for many years, and I thought it was a great

7  opportunity for me.

8  *Q.*  And the opportunity is Sean is offering to let you start a

9  company.  Is that right?

10  *A.*  Yes.

11  *Q.*  And who was involved in AAS?

12  *A.*  Patti, Sean, and me.

13  *Q.*  Did you choose that name, AAS?

14  *A.*  No.

15  *Q.*  Okay.  And what was AAS's business going to be?

16  *A.*  I knew it was sweepstakes.

17  *Q.*  Okay.  Let's talk about -- a little bit about that.

18       What was your understanding of what a sweepstakes

19  business was?

20  *A.*  What I understood it was that it was like a lottery, like a

21  raffle.

22  *Q.*  Okay.  Did you think there was a prize?

23  *A.*  Yes.

24  *Q.*  Who did you think was going to pick the prize winner?

25  *A.*  I thought it would be Patti Kern.

1  *Q.* Okay. Who did you think would send the prize money?

2  **A.** Patti Kern.

3  *Q.* Okay. Where did you think the prize money was going to come

4  from?

5  **A.** The same responses that would come.

6  *Q.* Okay. And, obviously, throughout this trial we've seen text

7  messages between you and Patti.

8  **A.** Yes.

9  *Q.* And did you and her text about AAS?

10  **A.** Yes, I believe so, in some occasions.

11  *Q.* And that would have been using the Google Translate app?

12  **A.** Yes.

13  *Q.* Okay. Did you ever talk with Patti Kern about AAS through

14  other people?

15  **A.** In some occasions I used Epi.

16  *Q.* Is that Epi Castro?

17  **A.** Yes, Epi Castro.

18  *Q.* So would Epi sometimes tell you, Patti says this?

19  **A.** I beg your pardon?

20  *Q.* Would Epi sometimes give you messages from Patti?

21  **A.** Yes.

22  *Q.* Okay. Let's talk about actually forming the company.

23      You know you formed a company called AAS?

24  **A.** Yes.

25  *Q.* Who told you to do that?

—2:19-cr-00295-GMN-NJK—

1  *A.*  Well, Sean O'Connor told Luis.  Luis told me.  I just want

2  to be clear, Luis was going -- was only translating for me.

3  *Q.*  Okay.  So Sean told you through Luis that you need to open a

4  company?

5  *A.*  Yes.

6  *Q.*  And since you've never opened a company before, how did you

7  know how to do it?

8  *A.*  Well, Sean explained that to Luis and I remember Luis went

9  with me to open the bank account.

10  *Q.*  Do you remember filing any dbas for AAS?

11  *A.*  What is a dba?

12  *Q.*  So it's a document where a company can use another name.

13  *A.*  I believe so.

14  *Q.*  Okay.

15       Did anyone ever explain to you why your company needed

16  a dba?

17  *A.*  Yes, yes, yes.  That was explained because supposedly each

18  company could only have certain amount of promotions.

19  *Q.*  Who explained that to you?

20  *A.*  Well, Patti explained that to Epi and Epi explain that to

21  me.

22  *Q.*  Okay.  Let's talk about the bank accounts for AAS.

23       You did open a bank account for AAS?

24  *A.*  Yes.

25  *Q.*  And you'd never opened a company bank account before so how

—2:19-cr-00295-GMN-NJK—

1  did you know how to do that?

2  **A.**  Because the instructions would come from Sean to Luis, Luis

3  would tell me.  He gave Luis all of the instructions for me to

4  do.

5  *Q.*  Okay.  Did Luis actually go to the bank with you?

6  **A.**  Yes.

7  *Q.*  Because the teller didn't speak Spanish, I guess?

8  **A.**  No, the one who attend -- who received us, she didn't speak

9  Spanish.

10  *Q.*  Okay.  This bank account that you opened for AAS, did you

11  ever withdraw any money from it?

12  **A.**  Yes, two times.

13  *Q.*  What was the first time?

14  **A.**  The first time I remember I was on a trip and I lost my

15  wallet.  And I called her through my son.  My son was with me.

16  She didn't answer.  So I texted her.

17          And I ask authorization to withdraw some money.  And I

18  withdraw -- I don't remember if it was four or $500.

19  *Q.*  When you say you asked permission, from who?

20  **A.**  Patti Kern.

21  *Q.*  Okay.  What about the second time?

22  **A.**  If I don't -- if I'm not mistaken, I remember the second

23  time was at a gas station.

24          I -- I misplaced -- I used the wrong card and I used

25  her card.

1  *Q.* Apart from those two times, did you ever take any money out

2  of the AAS bank account?

3  *A.* No.

4  *Q.* Did you ever transfer money into a different bank account?

5  *A.* No.

6  *Q.* Did you ever write any checks from this bank account?

7  *A.* No, never.

8  *Q.* Did anyone write checks from this bank account?

9  *A.* Patti Kern.

10 *Q.* And how was Patti able to write checks out of an account in

11 your name?

12 *A.* Because that was one of the things I was told, that for her

13 to have the control of the things coming in and the prizes, she

14 needed to have the checkbook and a stamp.

15 *Q.* Who told you that?

16 *A.* That was told from Patti Kern -- I don't remember if it was

17 Luis Aguilar or to Epi.  I think it was Epi.

18 *Q.* Okay.  Now, the Government showed you some evidence showing

19 that you accessed these bank accounts online.  Is that right?

20 *A.* Yes.

21 *Q.* Why were you accessing these bank account online?

22 *A.* Sometimes she would come to the company and said, "I forgot

23 my phone.  Could you check if Epi got his payment?"

24      Some other times I would login just with my accounts

25 currently.

1  *Q.*  Why would you do that?

2  **A.**  Sometimes I -- I'm kind of hyperactive.  I don't know if

3  this happens to anybody else, but I think that the greatest bad

4  thing in this world is our phones.  Sometimes I just open apps

5  and close apps, and I don't know what to do with it.

6  *Q.*  Okay.  So let's talk about something else.  Let's talk about

7  the P.O. boxes for AAS.  Did you apply for P.O. boxes for this

8  company?

9  **A.**  Yes.

10  *Q.*  Did anyone tell you to do that?

11  **A.**  Yes, that was also said to me, like, when they told me about

12  the bank accounts and with the boxes.

13  *Q.*  Okay.  You said you'd never applied for a P.O. box before

14  this.  So how did you know how to do it?

15  **A.**  I remember that time Luis Aguilar got a form that it was

16  prefilled.  And that time, that first time I went to a UPS store

17  on Sunset.  He was the one that filled it out.  I just sign it.

18  *Q.*  Okay.  Let's -- I want to look at some of these specific

19  mailbox applications.

20         MR. BROWN:  Bryan, if we could pull up Exhibit 79.

21         This is admitted, Your Honor.

22         Okay.  And if we could go to Page 3, please.

23         Could we make that a little bigger, Bryan?

24  BY MR. BROWN:

25  *Q.*  Can you see this, Mr. Mendez?

2:19-cr-00295-GMN-NJK

1   **A.**  Yes.

2   *Q.*  Who filled this out?

3   **A.**  I know that what it says, Jose Luis Mendez, is my

4   handwriting because my handwriting is ugly.

5   *Q.*  What about the rest of the handwriting on this?  Is this

6   yours?

7   **A.**  No.

8   *Q.*  Now, you -- there's been some testimony.  Do you see the

9   Number 11, the box with Number 11, in it?

10  **A.**  Yes.

11  *Q.*  Now, you've heard testimony that that says "health/beauty

12  sales"?

13  **A.**  Yes.

14  *Q.*  Did you write that?

15  **A.**  No.

16  *Q.*  Do you even know what that is?

17  **A.**  What -- something related to beauty.

18  *Q.*  Okay.

19         MR. BROWN:  And if we could go up a little bit.

20  BY MR. BROWN:

21  *Q.*  You see, Mr. Mendez, it says "Beverly Hills Mailbox"?

22  **A.**  Yes.

23  *Q.*  Did you ever receive any mail from Beverly Hills?

24  **A.**  No.

25  *Q.*  Did you ever receive any mail from California at all?

—2:19-cr-00295-GMN-NJK—

1  *A.*  No.

2  *Q.*  Do you know if this mailbox application was even sent to

3  anyone?

4  *A.*  No.

5  *Q.*  Why was this in your house?

6  *A.*  Ah, I don't remember at that time when I sign it.  I don't

7  remember, honestly, who told me that it was not going to be

8  used.  And I took it home and I left it in the garage.

9  *Q.*  Okay.  Let's look at another one.

10        MR. BROWN:  Exhibit 135, admitted in evidence, please,

11 Bryan.

12        Could you make that a little bigger?

13        COURTROOM ADMINISTRATOR:  It's not admitted.

14        MR. BROWN:  It's not admitted?

15        COURTROOM ADMINISTRATOR:  No.

16        MR. FINLEY:  No objection to its admission, Your Honor.

17        THE COURT:  All right.  Exhibit 135 will be admitted

18 and can be published to the -- to the jury.

19        (Government's Exhibit 135 is admitted.)

20 BY MR. BROWN:

21 *Q.*  Do you recognize this, Mr. Mendez?

22 *A.*  Yes.

23 *Q.*  And is this your handwriting?

24 *A.*  No.

25        MR. BROWN:  Okay.  Can we go down a little bit, Bryan.

1  BY MR. BROWN:

2  *Q.*  You see at the bottom on the right, is that your signature?

3  *A.*  It doesn't look like mine.

4  *Q.*  Do you have any idea who filled this out?

5  *A.*  Honestly, I don't.

6  *Q.*  Okay.

7       MR. BROWN:  Can we go to 137, please, Bryan?  This is

8  admitted.

9  BY MR. BROWN:

10 *Q.*  Okay.  Do you recognize this, Mr. Mendez?

11 *A.*  Yes.

12 *Q.*  Okay.  And this is your signature at the bottom, right?

13 *A.*  Yes.

14 *Q.*  And there's a notary stamp there?

15 *A.*  Yes.

16 *Q.*  Did you fill this out?

17 *A.*  Yes.

18 *Q.*  And how did you know how to fill this out?

19 *A.*  This one specifically, Patti gave me a copy telling me how

20 to fill it up.

21 *Q.*  Okay.

22       MR. BROWN:  And Exhibit 138.

23       COURTROOM ADMINISTRATOR:  It's not admitted.

24       MR. BROWN:  Sorry, it's another mailbox application.

25       MR. FINLEY:  No objection.

```
                          ─2:19-cr-00295-GMN-NJK─
```

1           MR. BROWN:  Move to admit 138, Your Honor.  No

2    objection.

3           THE COURT:  138 is admitted and may be published to the

4    jury.

5           (Government's Exhibit 138 is admitted.)

6           MR. BROWN:  Let me go back to 137, please.

7    BY MR. BROWN:

8    *Q.*  So, Mr. Mendez, you see this is from Miami Lakes, Florida?

9    *A.*  Yes.

10   *Q.*  You did get mail from Miami Lakes, Florida, correct?

11   *A.*  Yes.

12          MR. BROWN:  Okay.  If we can go to 138, please.

13   BY MR. BROWN:

14   *Q.*  Okay.  This is also from Miami Lakes, Florida, Mr. Mendez?

15   *A.*  Yes.

16   *Q.*  And is that your signature at the bottom?

17   *A.*  Yes.

18   *Q.*  And there's a notary stamp there?

19   *A.*  Yes.

20   *Q.*  And did you fill this out?

21   *A.*  There is a part that it is written by me.

22   *Q.*  What part did you write?

23   *A.*  Where it says Advanced Allocation Systems.  And I'm not sure

24   about what it says, 831 Sleepy, because that looks really nice

25   to be my handwriting.

—2:19-cr-00295-GMN-NJK—

1  Q.  Okay.  There's a box where it says Number 11.  Do you see

2  that?

3  A.  Yes.

4  Q.  Did you write those words there?

5  A.  No, I don't know the meaning of that.

6  Q.  Okay.

7          (Counsel conferring.)

8          MR. BROWN:  Your Honor, we have a stipulation as to

9  what's marked for identification -- identification purposes as

10  9044.  Government stipulates to its admissibility.

11          THE COURT:  All right.  Exhibit 9044 is admitted and

12  may be published to the jury.

13          MR. BROWN:  Thank you, Your Honor.

14          (Defendant's Exhibit 9044 is admitted.)

15  BY MR. BROWN:

16  Q.  Do you recognize this, Mr. Mendez?

17  A.  Yes.

18  Q.  Did you fill this out?

19  A.  No.

20  Q.  Okay.  So about half of the way down --

21          MR. BROWN:  Bryan, where it says Lakesshow@me.com.

22  BY MR. BROWN:

23  Q.  So, Mr. Mendez, does this look like an e-mail address?

24  A.  Yes.

25  Q.  Was that ever your e-mail address?

─2:19-cr-00295-GMN-NJK─

1  *A.* No, never.

2  *Q.* Okay.

3      MR. BROWN:  And if we could go down to the bottom of

4  the page, please, Bryan.

5  BY MR. BROWN:

6  *Q.* You see in the bottom left there?

7  *A.* Yes.

8  *Q.* Can you read that name?

9  *A.* Luis Aguilar.

10 *Q.* And there's a phone number there.

11 *A.* Do I have to read it?

12 *Q.* Is that your phone number?

13 *A.* No.

14 *Q.* Okay.  And then below that looks like another e-mail

15 address.

16 *A.* Yes.

17 *Q.* Was that ever your e-mail address?

18 *A.* No.

19 *Q.* Okay.

20     MR. BROWN:  We can take that down, please, Bryan.

21 BY MR. BROWN:

22 *Q.* So let's talk about the mail that went to your house,

23 Mr. Mendez.

24     Did the mail for this company go directly to your

25 house?

—2:19-cr-00295-GMN-NJK—

1   *A.*  Yes.

2   *Q.*  And how did that arrive?

3   *A.*  Regularly we were getting boxes from UPS.

4   *Q.*  Okay.  The boxes, did you ever open them?

5   *A.*  No, never.

6   *Q.*  Why not?

7   *A.*  Because I wanted her -- I mean, she had trusted me, and I

8   want to make her feel that she could trust in me and that she

9   wouldn't think that I was going to steal from her.

10  *Q.*  Who is "she"?

11  *A.*  Patti Kern.

12  *Q.*  Okay.  Now, let's talk about the money you made from AAS.

13       How were you paid from this company?

14  *A.*  AAS?

15  *Q.*  AAS.

16  *A.*  With a check.

17  *Q.*  And how would you get that check?

18  *A.*  She would normally give Sean an envelope.  Several times I

19  saw her doing that.  Some others I didn't.  And then Sean would

20  give me that check.

21  *Q.*  Would Sean open the envelope in front of you?

22  *A.*  The few times that I saw him, no.  He would grab the

23  envelope, go to the bathroom, go out from the bathroom to his

24  office, and then hand me the check.

25  *Q.*  Okay.  Did you tell Patti Kern how much to pay you from AAS?

—2:19-cr-00295-GMN-NJK—

1    *A.*  No, never.

2    *Q.*  Who made that decision?

3    *A.*  She did.

4    *Q.*  Did you tell her how often to pay you?

5    *A.*  No.

6    *Q.*  Did you tell her how much to pay Sean O'Connor?

7    *A.*  No.

8    *Q.*  Who made that decision?

9    *A.*  Patti Kern.

10   *Q.*  Okay.  And with these checks that you get from AAS, what do

11   you do with them?

12   *A.*  Several of those I would deposit in a bank account.  Some

13   others I would cash.

14   *Q.*  Okay.  Anything in particular you would do with the cash?

15   *A.*  Part of that money, of course, I would use it for my family.

16   When I would have cash, I would put it in a box.  I had a small

17   safe box in my house.

18   *Q.*  Okay.  Now let's talk about the other company that had your

19   name on it, Pacific Allocation Systems.  Do you remember that

20   company?

21   *A.*  Yes.

22   *Q.*  Whose idea was it to form Pacific Allocation Systems?

23   *A.*  Patti Kern.

24   *Q.*  Who picked the name?

25   *A.*  Patti Kern.

─────────────2:19-cr-00295-GMN-NJK─────────────

1   Q.  And how did you know how to form this company?

2   **A.**  Patti Kern told Epi and Epi told me.

3   Q.  Okay.  What exactly did they tell you?

4   **A.**  Well, he told me -- Epi told me that Patti had said that we

5   couldn't have more promotions so we needed to create another

6   company.

7          And I accepted and opened another company.

8   Q.  And why did you think you needed another company to do more

9   promotions?

10  **A.**  Because of her explanation that there was certain amount of

11  promotions that could be done.  I really didn't know how she

12  would run her business.

13  Q.  Okay.  And the PAS bank account and P.O. boxes, did you do

14  all of that pretty much the same way you did it for AAS?

15  **A.**  Yes.

16  Q.  Okay.  Now, let's talk about the money you made from PAS.

17  How were you paid from PAS?

18  **A.**  With a check.

19  Q.  Okay.  And who would deliver that check to you?

20          THE INTERPRETER:  Could you repeat that question for

21  the interpreter?

22  BY MR. BROWN:

23  Q.  Who would deliver that check to you?

24  **A.**  The pay at PAS, those, Patti would hand to me.

25  Q.  Okay.  And were you ever paid for PAS through Digital

1   Express?

2   *A.*   Yes.

3   *Q.*   And why was that?

4   *A.*   That was her decision that all the checks have to be for

5   Digital Express.  I -- I didn't have any issues with that.

6   *Q.*   Okay.  Who decided how much you would be paid for PAS?

7   *A.*   Patti Kern.

8   *Q.*   And what did you do with the checks that you got from PAS?

9   *A.*   The same thing.  Some I would deposit.  Others cash out.

10  *Q.*   Did anyone ever tell you specifically that Patti Kern's

11  sweepstakes were legal or approved by a lawyer?

12  *A.*   Yes.

13  *Q.*   Can you explain to the jury?

14  *A.*   Epi.  Epi told me.  As a matter of fact, at that time Epi

15  told me they were going to take the forms to an attorney to

16  check them out to see that everything was in order.

17          THE COURT:  Mr. Brown, I'm sorry.  I need to interrupt

18  you because we have a juror who's taking a call at 12 o'clock.

19          MR. BROWN:  Sure.

20          THE COURT:  And so we need to just take a lunch break

21  now.

22          Remember, everybody, you are not to speak about this

23  case with your fellow jurors.  You can talk to them about other

24  things, but not about this case.

25          And remember that you are not to read or listen to or

—2:19-cr-00295-GMN-NJK—

1  view anything that touches upon this case in any way or attempt

2  to perform any research or any independent investigation.  And

3  please do not form any opinions.

4        Let's stand for the jury, as they are the judge of the

5  facts.  And we'll see you back here at 1 o'clock.

6        (Whereupon jury leaves the courtroom at 11:56 a.m.)

7        THE COURT:  Mr. Jose Luis Mendez, after the jury exits

8  the courtroom, you may also exit for your lunch break.  Please

9  remember that you are not to discuss your testimony with anyone,

10  not even your attorney, until you are completely done testifying

11  in this case.

12        THE WITNESS:  I would normally get together to have

13  lunch with the Castros.  Can I do that?

14        THE COURT:  You can have lunch with everybody, but you

15  can't talk about your testimony.  So you can talk about other

16  things, but not about this case.

17        THE WITNESS:  Yes, Your Honor.

18        THE COURT:  So if they're going to talk about the case,

19  maybe you have lunch somewhere else today.

20        THE WITNESS:  Yes, Your Honor.

21        THE COURT:  All right.  Mr. Brown -- where's Mr. Brown?

22  Oh, there he is.  I was looking over there.

23        Just so you know, your client was asking when I gave

24  him the admonition not to talk about his testimony or this case,

25  he says he usually has lunch with everybody and is he allowed to

———2:19-cr-00295-GMN-NJK———

 1  have lunch.  So I told him, yes, he can have lunch with

 2  everybody, but not if they're going to be talking about the

 3  case, so then maybe he needs to eat somewhere else.

 4        So I'll leave that up to you and him to figure out

 5  where he's having his lunch today to make sure there's not a

 6  problem.

 7        Obviously, the Government will have an opportunity to

 8  ask about whether he's talked to his codefendants or his

 9  attorneys about the case during lunch, and then that will just

10  prolong things, so ...

11        MR. BROWN:  So --

12        THE COURT:  Please make sure he understands he's not to

13  talk about this case with you or with anyone else during the

14  break and not until he's completely done with his testimony.

15        MR. BROWN:  I'll reiterate exactly that to him, Judge.

16        THE COURT:  Yeah, I'm just not sure if he understood it

17  the way that I said it.  So thank you.

18        All right.  We'll see you back here at 1 o'clock.

19        MR. TANASI:  Thank you, Your Honor.

20        THE COURT:  Thank you.

21        (Recess taken at 11:58 a.m.)

22

23

24

25

─────────2:19-cr-00295-GMN-NJK─────────

1

2                              --oOo--

3              COURT REPORTER'S CERTIFICATE

4

5       I, PATRICIA L. GANCI, Official Court Reporter, United

6   States District Court, District of Nevada, Las Vegas, Nevada,

7   certify that the foregoing is a correct transcript from the

8   record of proceedings in the above-entitled matter.

9

10  Date:  April 12, 2023.

11                          /s/ **Patricia L. Ganci**

12                          Patricia L. Ganci, RMR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25