—— 2:19-cr-00295-GMN-NJK ——

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,        )
                                     )  Case No. 2:19-cr-00295-GMN-NJK
5              Plaintiff,            )
                                     )  Las Vegas, Nevada
6        vs.                         )  April 13, 2023
                                     )  9:08 a.m. to 12:07 p.m.
7   MARIO CASTRO, SALVADOR           )  Courtroom 7D
    CASTRO, MIGUEL CASTRO, and       )
8   JOSE LUIS MENDEZ,                )  JURY TRIAL, DAY 16, AM SESSION
                                     )
9              Defendants.           )  **C E R T I F I E D   C O P Y**
                                     )
10  _____     )

11

12

13

14      REPORTER'S TRANSCRIPT OF JURY TRIAL, DAY 16, AM SESSION
           BEFORE THE HONORABLE GLORIA M. NAVARRO,
                UNITED STATES DISTRICT JUDGE

15

16

17

18   APPEARANCES:       See next page

19

20

21

22   COURT REPORTER:    Samantha N. McNett, RPR, CRR, CCR, CSR
                        United States District Court
23                      333 Las Vegas Boulevard South, Room 1334
                        Las Vegas, Nevada  89101
24                      Samantha_McNett@nvd.uscourts.gov

25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.

2:19-cr-00295-GMN-NJK

1                          <u>**APPEARANCES**</u>

2    For the Government:

3         **TIMOTHY T. FINLEY  ESQ.**
          **DANIEL E. ZYTNICK, ESQ.**
4         U.S. DEPARTMENT OF JUSTICE
          950 Pennsylvania Avenue, N.W.
5         Washington, D.C. 20530
          202-307-0050
6
          -AND-
7
          **MINA CHANG, ESQ.**
8         UNITED STATES ATTORNEY'S OFFICE
          501 Las Vegas Boulevard South, Suite 1100
9         Las Vegas, Nevada 89101
          702-388-6336
10

11
     For Defendant Mario Castro:
12
          **JOSHUA L. TOMSHECK, ESQ.**
13        HOFLAND & TOMSHECK
          228 South Fourth Street, First Floor
14        Las Vegas, Nevada 89101
          702-895-6760
15
          -AND-
16
          **RICHARD E. TANASI, ESQ.**
17        TANASI LAW OFFICES
          8716 Spanish Ridge Avenue, Suite 105
18        Las Vegas, Nevada 89148
          702-906-2411
19

20
     For Defendant Salvador Castro:
21
          **DONALD GREEN, ESQ.**
22        LAW OFFICES OF DONALD J. GREEN
          4760 South Pecos Road, Suite 103
23        Las Vegas, Nevada 89121
          702-388-2047
24
     ///
25
     ///

2:19-cr-00295-GMN-NJK

1                          **APPEARANCES CONTINUED**

2

For Defendant Miguel Castro:

3
        **LUCAS J. GAFFNEY, ESQ.**
4       GAFFNEY LAW
        9900 Covington Cross Drive, Suite 290
5       Las Vegas, Nevada 89144
        702-742-2055
6
        -AND-
7
        **THOMAS A. ERICSSON, ESQ.**
8       THOMAS A. ERICSSON, CHTD.
        9900 Covington Cross Drive, Suite 290
9       Las Vegas, Nevada 89144
        702-878-2889
10

11

For Defendant Jose Luis Mendez:

12
        **WILLIAM H. BROWN, ESQ.**
13      **CHRISTOPHER MISHLER, ESQ.**
        BROWN MISHLER, PLLC
14      911 North Buffalo Drive, Suite 202
        Las Vegas, Nevada 89128
15

16                                    * * *

17

18

19

20

21

22

23

24

25

1

### INDEX OF EXAMINATIONS

2

**TESTIMONY OF JOSE LUIS MENDEZ**

   Cross-Examination by Mr. Finley.....................7

3

* * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **<u>INDEX OF EXHIBITS</u>**

2    <u>GOVERNMENT EXHIBITS</u>

3    EXHIBIT NO.:              OFFERED    ADMITTED    WITHDRAWN

4     (No exhibits offered or admitted.)

5

6    <u>DEFENDANT EXHIBITS</u>

7    EXHIBIT NO.:              OFFERED    ADMITTED    WITHDRAWN

8     (No exhibits offered or admitted.)

9                              *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      LAS VEGAS, NEVADA; THURSDAY, APRIL 13, 2023; 9:08 A.M.

2                              --oOo--

3                      P R O C E E D I N G S

4          THE COURT:  Good morning.  Thank you.  You may be

5  seated.

6          All of the jurors are here.  And I'm told that when

7  the last juror arrived, one of the staff members here heard the

8  other jurors clapping, so they're very proud of themselves

9  today.

10         So anything that we need to address or can we get

11  started with Jose Luis Mendez on the witness stand?  Is that

12  okay?

13         MR. TANASI:  I think we're ready, your Honor.

14         THE COURT:  All right.  Let's do that.

15         MR. TANASI:  Thank you.

16         THE COURT:  Good morning, sir.  Come on up and have a

17  seat.

18         THE WITNESS:  Good morning, your Honor.

19         (Whereupon, the jury enters at 9:10 a.m.)

20         THE COURT:  All right.  Everyone may be seated.

21         Good morning.  Welcome back.  We're on the record with

22  the jury and with the witness, Mr. Luis -- Jose Luis Mendez, on

23  the stand.  And we're going continue now with cross-examination

24  by the Government, Mr. Finley.

25         MR. FINLEY:  Thank you.  Good morning, your Honor.

1    THE COURT:  Good morning.

2    MR. FINLEY:  Good morning, everyone.

3                      JOSE LUIS MENDEZ,

4  recalled as a witness on behalf of the defendants, after having

5  been previously duly sworn, was examined and further testified

6  as follows:

7       (All testimony by the witness was given through the use

8  of the interpreter unless as otherwise indicated "In English.")

9                  CONTINUED CROSS-EXAMINATION

10 BY MR. FINLEY:

11 *Q.*  Good morning, sir.

12 **A.**  Good morning, sir.

13 *Q.*  Do you trust your family?

14 **A.**  Are you referring to my children and my wife?

15 *Q.*  Let's start with them.  You trust them, right?

16 **A.**  A lot.  Very.

17 *Q.*  How many of the members of your immediate family speak

18 English?

19 **A.**  Only my two children.

20 *Q.*  You have an adult son?

21 **A.**  Yes.

22 *Q.*  And he's fluent in English?

23 **A.**  Yes.

24 *Q.*  Do you trust your father-in-law, your wife's father, Jose

25 Salud Castro?

— 2:19-cr-00295-GMN-NJK —

1  *A.*  I can simply say that I have a lot of respect for him.

2  *Q.*  Not sure whether you trust him?

3  *A.*  Yes, I do trust him.

4  *Q.*  Is he an honest man?

5  *A.*  He has always been with me.

6  *Q.*  That's an interesting qualification.

7        The question is:  Is he an honest man?

8  *A.*  As far as what I know about his life, he has always been an

9  honest man.

10  *Q.*  Do you trust Luis Aguilar, who is the stepson of the

11  defendant Miguel Castro?

12  *A.*  It's been some time since we last talk.  It's been five or

13  six years.

14  *Q.*  I understand.

15        Do you trust him?

16  *A.*  At one point, I did.

17  *Q.*  What point was that?  When was that?

18  *A.*  That was -- well, we stopped talking about mid-2018.

19  *Q.*  Mid-2018.

20        In early 2018, February 21st, as everyone knows, that

21  is when search warrants were executed at your house and other

22  places in Las Vegas related to this scheme.

23  *A.*  Yes, sir.

24  *Q.*  And shortly after that, that was when you stopped trusting

25  Luis Aguilar?

1    *A.*   Yes.  We had some differences, sir.

2    *Q.*   Luis Aguilar was interviewed by law enforcement agents and

3    he gave testimony in the grand jury and he told the truth about

4    your involvement in the scheme that we're here today for.

5         That's why you don't trust him anymore?

6    *A.*   No, sir.  Our differences are because of a job that turned

7    out bad.

8    *Q.*   Up until 2018, you trusted Luis Aguilar?

9    *A.*   We had an argument after that job turned out bad.

10   *Q.*   Could you answer my question, please?

11   *A.*   It's not that I did or didn't trust him.  It's just simply

12   that our friendship ended, and if there's no friendship, then

13   there's nothing else.

14   *Q.*   So prior to 2018, you were unable to tell the jury whether

15   or not you trusted him or you didn't trust him?

16   *A.*   Yes, I did trust him, and we worked on many jobs together.

17   And especially working with shirts.

18   *Q.*   I'm glad we were able to clear that up.

19         So you trusted him before 2018?

20   *A.*   Yes, sir.

21   *Q.*   And I'm talking about Luis Aguilar.

22         How about your wife's sister, Claudia Castro?

23   *A.*   To be honest, sir, she and I really didn't have -- talk

24   much.

25   *Q.*   Did she ever live in the same house with you?

2:19-cr-00295-GMN-NJK

1   **A.**   No, sir.

2   *Q.*   Is she close to your wife?

3   **A.**   No, sir.

4   *Q.*   How about your wife's brother, Jose Silvestre Castro?

5   **A.**   He's my brother-in-law, and, yes, I trust him very much.

6   *Q.*   Okay.  What about the three defendants besides yourself?

7         I'll start with Mario Castro.  Do you trust him?

8   **A.**   Yes.

9   *Q.*   And you trust Miguel Castro?

10  **A.**   Yes.

11  *Q.*   And you trust Salvador Castro?

12  **A.**   Yes.

13  *Q.*   Did you trust Epi Castro?

14  **A.**   So much as trust.  You know, we didn't spend too much time

15  together, but I did trust the interpreting he was doing.

16  *Q.*   I'm not sure if we got an answer to the question of whether

17  you trust Epi Castro.  Yes or no?

18  **A.**   Yes.

19  *Q.*   You know, you might want to give the interpreter a chance

20  to translate what I'm saying because if you don't, the jurors

21  might notice that you speak English better than you say.

22  **A.**   Yes, sir.

23  *Q.*   Complete confidence in Mario Castro.

24         What about Miguel Castro?

25  **A.**   Complete trust in Miguel Castro, sir.

1    *Q.*  And Salvador Castro, you trust him, too?

2    **A.**  Complete trust in Salvador Castro, sir.

3    *Q.*  You actually rode in the car with Miguel Castro to court

4    yesterday, yes?

5    **A.**  Yes, sir.

6    *Q.*  And you rode to court this morning with Miguel Castro

7    again, yeah?

8    **A.**  Yes, sir.

9    *Q.*  And the lawyer for Miguel Castro and for yourself informed

10   me that you did that because your car broke down?

11   **A.**  Yes, sir.  The starter on my car broke down.

12   *Q.*  Now, yesterday evening, do you remember telling Judge

13   Navarro that you were going to take an Uber home so there would

14   be no question as to whether you spoke to anyone about the

15   case?

16   **A.**  Yes, sir.  I did leave in an Uber.

17   *Q.*  But you changed your mind this morning about how to come to

18   court?

19   **A.**  Yes, sir, when my car broke down.

20   *Q.*  Is there any other person in the family or in Las Vegas,

21   friend or family, who could give you a ride to court who is not

22   a defendant in this case?

23   **A.**  No, sir.

24   *Q.*  Only Miguel Castro?  He's the only one?

25   **A.**  I was thinking about the fastest way to get here, sir.

2:19-cr-00295-GMN-NJK

1    *Q.*  And you took an Uber last night but it didn't occur to you

2    to take an Uber today?

3    *A.*  When my car broke down, my son was on his way to work, and

4    yesterday my son is the one that called an Uber for me.

5    *Q.*  You trust Miguel Castro enough to have him be the first

6    person that you would call to help you out and give you a ride

7    this morning?

8    *A.*  Yes, sir.

9    *Q.*  The search warrants were in February 2018?

10   *A.*  Yes.

11   *Q.*  And you were indicted in November 2019?

12   *A.*  Sir, I don't remember the date, but I believe what you're

13   saying is correct.

14   *Q.*  So during the approximately one and a half years between

15   the time of the search warrants and the time that you were

16   criminally charged, did you have any conversations with any of

17   the ten or more members of your family who were involved in

18   this scheme in this case?

19   *A.*  Yes, I did have some conversations with Miguel Castro but

20   not related to the case.

21   *Q.*  The question was about conversations about the case.  I

22   don't know if I made that clear, but I only want to know about

23   conversations about this case.

24   *A.*  No, sir.

25   *Q.*  Search warrants are executed at your house February 2018

1    and you didn't think to speak to any of the ten family members

2    who are involved in this?  Is that your testimony?

3    *A.*  After the search warrant?

4    *Q.*  Yes, sir.

5    *A.*  Yes, sir.  We spoke the following day.

6    *Q.*  Who did you speak with?

7    *A.*  We all talked, sir.

8    *Q.*  And what did you talk about?

9    *A.*  That we did not know what had happened, that we were all

10   very confused.

11   *Q.*  So when you spoke, who did you speak with the next day?

12   *A.*  With Mario, with Miguel, with Salvador, sir.

13   *Q.*  Anybody else?

14   *A.*  No, sir.

15   *Q.*  You did not speak with Jose Salud Castro?

16   *A.*  No, sir.

17   *Q.*  Everybody agreed we don't understand what's happening?  We

18   have no idea what this is about?

19   *A.*  It was mostly about being confused and we also spoke quite

20   a bit about the trust we had placed in her.

21   *Q.*  In "her"?  Patti Kern, you mean?

22   *A.*  Yes, sir.

23   *Q.*  "How could this have happened to us?  We trusted Patti

24   Kern."  That was the conversation?

25   *A.*  Yes, sir.

1          And, actually, as far as me personally, I would even

2     pray for her at home.

3     Q.   That's nice.

4          Did you used to live on Terralinda Avenue?

5     A.   For a while, yes, sir.

6     Q.   During what time period?

7     A.   From, like, 2002 to around 2004, 2005, sir.

8     Q.   Did your wife's father live with you then?

9     A.   Yes, sir.

10    Q.   Just to be clear with the names, that's Jose Salud Castro,

11    your wife's father?

12    A.   Yes, sir.

13    Q.   Did your wife's mother, Carolina Tafoya de-Castro, also

14    live in that house with you?

15    A.   Yes, sir.

16    Q.   Your wife's sister, Azucena Castro, lived with you in that

17    house?

18         THE INTERPRETER:  For the interpreter, what is the

19    name of the sister?

20         MR. FINLEY:  Azucena Castro.

21         THE INTERPRETER:  Azucena?

22         MR. FINLEY:  Yeah.  A-Z-U-C-E-N-A.

23         THE WITNESS:  She mostly lived in Mexico, sir.

24    BY MR. FINLEY:

25    Q.   Did she live in the house with you for periods of time?

─── 2:19-cr-00295-GMN-NJK ───

1    **A.**    Yes, sir.

2    *Q.*    That might have been a more responsive answer then, yes?

3    **A.**    Yes, sir.

4    *Q.*    You understand that you're under oath and the jury is

5    evaluating your responsiveness to the questions?

6    **A.**    Yes, sir.

7    *Q.*    Did Claudia Castro, the wife of Jose Silvestre Castro, live

8    in that house with you?

9    **A.**    Sir, I don't remember.  I believe she first arrived in 2005

10    and we weren't living together by then.

11    *Q.*    Your best memory is she wasn't there?

12    **A.**    Yes, sir.

13    *Q.*    Okay.  Yesterday when we had -- when we broke, you were

14    having trouble deciding whether one of the lies that was

15    printed on your notice in Government Exhibit 1 was really a

16    lie, and as we broke, you couldn't answer the Court's question

17    about whether you believed that that was a lie and you said you

18    would need to see more in order to decide.

19         Do you remember that?

20    **A.**    Sir, the judge asked me?

21    *Q.*    Well, I asked you several times first, and then the judge

22    instructed you to answer that question.

23    **A.**    Yes, sir.

24    *Q.*    Okay.  I'd like to show you some more of the notices that

25    were in the box that I showed you.

1        MR. FINLEY:  If we could go to the electronic version

2   of Government Exhibit 1 at page 216.

3        If we could blow up the top half, please.

4   BY MR. FINLEY:

5   Q.  The title says Significant Prize Money Being Issued.

6        Do you see that?

7   **A.**  Yes, sir.

8   Q.  That's a lie?

9   **A.**  Sir, it seems like it was all a lie.  She never gave away

10  anything.

11  Q.  You also did not give away anything, correct?

12  **A.**  No, sir.

13  Q.  Nobody gave away anything, yes?

14  **A.**  No, sir.

15  Q.  You know that more of the money that you took from victims

16  went to you, the other three defendants, and your businesses

17  than the amount of money that was stolen that went to Patti

18  Kern?  You know that?

19  **A.**  No, sir.

20  Q.  Did you not see Inspector Kevin Towers and the defendant

21  Mario Castro -- Mario Castro's expert, who both testified, that

22  most of the millions of dollars in stolen money that went into

23  Digital Express was to you?

24  **A.**  That most of the money was directed to me?

25  Q.  Sorry.  That wasn't a very clear question.

1          The defendant Mario Castro's expert, you saw her

2     testify, yes?

3     *A.*   Yes, sir.

4     *Q.*   She looked at the money coming into the Digital Express

5     account?

6     *A.*   Yes, sir.

7     *Q.*   She said 65 percent was from prize notice companies

8     belonging to Patti Kern and her different partners which

9     included you and Dan Wagner and Gold Rush companies, 65 percent

10    of the business.

11    *A.*   Yes, sir.

12    *Q.*   Do you remember that?

13         And she didn't like that we included postage in our

14    calculation?

15    *A.*   Yes, sir.

16    *Q.*   But if you add postage, which we think you should because

17    the postage money was stolen money, it would be about the same

18    amount that Postal Inspector Kevin Towers found in his analysis

19    of bank records.

20         Do you remember that?

21    *A.*   Sir, I do remember that.

22    *Q.*   Do you have any reason to dispute the conclusions?

23    *A.*   No disputes, sir.

24    *Q.*   Let's look at this phony letter that you and the other

25    defendants printed and put in the mail.

2:19-cr-00295-GMN-NJK

1              It's to Betty Stirewalt?

2              THE INTERPRETER:  I'm sorry.  The interpreter did not

3    take it as a question.  I did not interpret it as a question.

4    *Q.*  Correct?

5    ***A.***  Yes, sir.

6    *Q.*  And this fraudulent letter is from your company, Pacific

7    Allocation Systems?

8    ***A.***  Sir, I do not see where it says Pacific Allocations

9    Systems.

10   *Q.*  Okay.

11             MR. FINLEY:  Will you un-zoom it?

12             If we go to the next page.

13   BY MR. FINLEY:

14   *Q.*  I was mistaken.  It's actually from Golden Products

15   Service, Inc.

16             So this is from Golden Products Service, Inc.  Whose

17   company is that?

18   ***A.***  I don't know, sir.

19   *Q.*  Let's look at one that your company sent.

20             MR. FINLEY:  We can go to Government Exhibit 1 at

21   page 595.

22   BY MR. FINLEY:

23   *Q.*  That's from Distribution Reporting Services, yes?

24             MR. FINLEY:  If we could blow up the top half.

25             THE INTERPRETER:  For the interpreter, the top half?

1          MR. FINLEY:  Yes, the top half.

2          THE WITNESS:  Yes, sir.

3    BY MR. FINLEY:

4    Q.  That's also to Betty Stirewalt?

5    A.  Yes, sir.

6    Q.  Do you see the amount on the top right corner?

7    A.  Yes, sir.

8          MR. FINLEY:  If we could blow up the top half, please.

9    BY MR. FINLEY:

10   Q.  Okay.  Can you read the amount?

11   A.  Yes, sir.

12   Q.  Go ahead.

13   A.  2,213,052.

14   Q.  Do you see beneath that large amount of money, can you read

15   the words there?

16   A.  Black or blue?

17   Q.  Blue.  The big -- the big words.

18   A.  Well, I'll try.  I do not know if I'll pronounce it

19   correctly.

20          (In English) Confirm cash award winner.

21   Q.  Confirmed cash award winner?

22   A.  Well, yes.  I don't know if I pronounced it correctly.  I

23   think I didn't.

24   Q.  Can you -- can you read the Spanish language?

25   A.  Yes, sir.

1  *Q.*  Okay.  So you could just sound it out using Spanish

2  consonants and vows, couldn't you?

3  **A.**  Yes, sir.

4  *Q.*  Okay.  You think you might be overdoing it a little bit?

5  **A.**  No, sir.

6  *Q.*  At the top, it says Official Notice of Payments, right?

7  **A.**  Yes, sir.

8  *Q.*  That's a lie?

9  **A.**  Yes, sir.

10  *Q.*  The promise of big money to the confirmed cash award winner

11  also a lie?

12  **A.**  If the letter states that that's what the person was going

13  to win, then, yes, that's a lie.

14  *Q.*  That's a -- that's a lie that went out under the name of

15  the company that you opened?

16  **A.**  Yes, sir.

17  *Q.*  You know what the word "cash" means?

18  **A.**  Yes, sir.

19  *Q.*  You know what the word "winner" means?

20  **A.**  Yes, sir.

21        MR. FINLEY:  If we can pull out -- I'm sorry.  Keep it

22  up.  My apologies.

23        Thank you.

24  BY MR. FINLEY:

25  *Q.*  At the bottom on the right-hand side, there's something

————— 2:19-cr-00295-GMN-NJK —————

1    called a notification officer, David Morrison.

2            Do you see that?

3    **A.**  Yes, sir.

4    *Q.*  How long have you known him?

5    **A.**  I do not know him, sir.

6    *Q.*  He worked at your company?

7    **A.**  No, sir.

8    *Q.*  Is there names of officials at Pacific Allocation Systems,

9    Distribution Reporting Services, Advanced Allocation Systems,

10   all of the companies that you opened?

11           Are there a bunch of different officials at those

12   companies who send these notices out?

13   **A.**  I assume so, sir.

14   *Q.*  You never bothered to look at the notices that were going

15   out under the name of your company?

16   **A.**  No, sir.

17   *Q.*  You didn't want to know what was on the notices that were

18   making so much money for you?

19   **A.**  No, sir, because I trusted a woman by the name of Patti

20   Kern very much.

21   *Q.*  You know, as you sit here today, that nearly every word

22   that was printed on the letters that are in the box that I

23   showed you, Government Exhibit 1, is a lie?

24   **A.**  Yes, sir.

25   *Q.*  And you know that those lies made money for you?

1    *A.*   Yes, sir.

2    *Q.*   You opened several bank accounts in the names that appear

3    on many of these notices?

4    *A.*   Yes, sir.

5    *Q.*   You took the victims' money?

6    *A.*   Yes, sir.

7    *Q.*   And if you wanted to know how you're making the money, all

8    you had to do was ask somebody?

9    *A.*   You're right, sir.  But there was a person by the name of

10   Patti Kern that I knew for 18 years who did not hide, which was

11   not a ghost.  I saw her during the day.  I didn't see her at

12   night hiding.  And she was a person that seemed honest.

13   *Q.*   So you think that you can just keep saying that you trusted

14   Patti Kern and not account for any of your own conduct?

15   *A.*   No, sir.  I'm definitely accountable for having put my

16   trust in this woman, in Patti Kern.

17   *Q.*   No matter how many questions I ask you about what -- you're

18   just going to keep saying that, right?

19          THE INTERPRETER:  For the interpreter, just going to

20   keep saying?

21   *Q.*   No matter what the question is, your answer is going to be,

22   "I trusted Patti Kern"?

23   *A.*   Yes, sir.

24   *Q.*   Good.  I'm glad we got that straight.  You can stop because

25   everyone has heard it already enough times.  Let's just stick

1   to the questions I'm asking.

2           You could have asked anybody you wanted if you wanted

3   to know how this worked?

4   *A.*   You're right, sir.   I could have done that.

5   *Q.*   You didn't want to?

6   *A.*   No, sir.

7   *Q.*   Many of the notices that you printed and mailed had what

8   appeared to be handwriting on them, yes?

9   *A.*   Sir, to be honest, I don't remember.

10  *Q.*   You rented mailboxes that the victim money went to?

11  *A.*   Yes, sir.

12  *Q.*   You rented a mailbox in Miami Lakes, Florida?

13  *A.*   Yes, sir.

14  *Q.*   Why did you rent a mailbox more than a thousand miles away

15  from here?

16  *A.*   Because that is the address that Mrs. -- that is the

17  address that Mrs. Patti Kern provided to me.

18          And I apologize for mentioning her name again, and,

19  yes, I know that everyone has heard it.

20  *Q.*   Do you have any other reason?

21  *A.*   No, sir.

22  *Q.*   Did you wonder why am I opening a mailbox more than a

23  thousand miles away from here?

24  *A.*   No, sir.

25          And, again, I will repeat myself.   Patti Kern is the

1    one that knew about the business.

2    Q.  You already said that.  I was asking if you had another

3    reason.

4    **A.**  No, sir.

5    Q.  You knew nothing about why you were doing this?

6    **A.**  No, sir.

7    Q.  Why didn't Patti Kern fill out your mailbox applications

8    like she did for the others?

9    **A.**  I don't know, sir.

10   Q.  Really?

11   **A.**  Yes, sir.  That would be a question to ask her.

12   Q.  You went to Bank of America branches to open accounts?

13   **A.**  Yes, sir.

14   Q.  Who went with you?

15   **A.**  The first time, it was Luis Aguilar.  He's the one that

16   interpreted for me with the person that was helping on that

17   occasion.

18   Q.  He came with you because he knew what to say if there were

19   any questions about what kind of business it was?

20   **A.**  Yes, sir.  He went with me because Sean explained it to

21   him.

22   Q.  And he knew what to say?

23   **A.**  I don't know if he knew what to say, but I don't know what

24   the information that he had to provide.

25   Q.  You know that when you walk into a bank to open an account

1  for a business, sometimes they ask you, "Oh, what kind of

2  business is this?"

3  *A.*  Sir, on that occasion, he practically did everything.  I

4  just signed.

5  *Q.*  Can we answer the question, please?

6  *A.*  No, sir, I had never heard that.

7  *Q.*  You would agree with me that that is a question that might

8  come up?

9  *A.*  Yes, sir.

10 *Q.*  If that question came up, let me guess what your answer

11 would be.  "I have no idea what I'm doing.  Patti Kern told me

12 to open this bank account."

13 *A.*  That is your opinion, sir.

14 *Q.*  Oh.  Then what's the answer?

15 *A.*  Sir, I'm giving you the answers that I think and then you

16 don't like the answers that I give you.

17 *Q.*  Let's not have an argument and a back and forth.  Let's

18 stick to the facts.  I'm asking you questions.  Can you give a

19 truthful answer?  I'm going to try again.

20        If somebody --

21 *A.*  I did not mean to be disrespectful, sir.  I apologize.

22 *Q.*  I don't care.  None of that matters.  You just have to

23 answer the questions.  I ask questions.  You tell the truth.

24 You're under oath.

25 *A.*  Yes, sir.

———— 2:19-cr-00295-GMN-NJK ————

1   *Q.* You know there's two ways not to tell the truth when you're

2   under oath.  One is by lying.  And one is by not answering --

3           THE COURT:  Please refrain from speaking to the

4   witness.  If you want me to admonish the witness, you can

5   address me.  Otherwise, just ask questions, please.

6           MR. FINLEY:  Understood, your Honor.

7   BY MR. FINLEY:

8   *Q.* I'll try again.

9           If somebody at a bank asked you, "What kind of

10  business is this," what would you have said?

11  *A.* I would have to answer that it was mailing.

12          THE INTERPRETER:  I'm sorry.  The interpreter can't

13  spit it out.

14          THE WITNESS:  Mailing.

15  *Q.* Mailing?

16  *A.* Yes, sir.

17  *Q.* Would you have any further information to provide an answer

18  to that question?

19  *A.* I believe that if it was a requirement, that, yes, sir.

20  *Q.* What more would you say?

21  *A.* I don't know.  I would say mailing.  I don't know.

22  Lottery.  Sweepstakes.

23  *Q.* Who filled out the mailbox application in your house that

24  says health beauty sales on it?

25  *A.* To be honest, sir, I don't remember, and it would be wrong

1    of me to try to guess who filled that out.

2    Q.  You said on your direct testimony that you felt great

3    remorse when you saw the victims testify in this trial?

4    **A.**  Yes, sir.

5    Q.  Do you accept responsibility for participating in this

6    fraud?

7    **A.**  Yes, sir.

8    Q.  Do you accept responsibility for taking money from

9    vulnerable people?

10   **A.**  Yes, sir.

11   Q.  Were you careless?

12   **A.**  You could even say that I was very dumb, sir.

13   Q.  Were you greedy?

14   **A.**  We all come to this country to make a better living, sir.

15   Q.  Were you greedy?

16   **A.**  No, sir.

17   Q.  Your testimony is you first realized more than five years

18   ago that this was a fraud?

19   **A.**  Exactly on the day of the search warrant, sir.

20   Q.  How much money have you given back to the victims?

21   **A.**  None, sir.

22   Q.  Are you planning to do that?

23   **A.**  Maybe not return it to the victims because I'm unaware of

24   who they are, but, yes, I believe that I would need to do

25   something to help out.

———— 2:19-cr-00295-GMN-NJK ————

1  *Q.*  Do you still think that the regular paychecks that you

2  received, which were funded with victim money, should not be

3  part of this case?

4  **A.**  Yes, I still believe that, sir.

5  *Q.*  And you would -- you would like to keep all that money,

6  yes?

7  **A.**  No, sir.

8  *Q.*  So I think your testimony on direct was that you were

9  presented with a business opportunity?

10  **A.**  Yes, sir.

11  *Q.*  It was exciting?

12  **A.**  Yes, sir.

13  *Q.*  Were you curious about what the business proposal was?

14  **A.**  It was just explained to me that it was regarding the same

15  thing that was already being done, sir.

16  *Q.*  Were you curious?

17  **A.**  About what?

18  *Q.*  The exciting business opportunity that you just testified

19  about.

20  **A.**  I was wanting to start something, sir.

21  *Q.*  Try again.

22          Were you curious?

23  **A.**  No, I wasn't curious.  I just wanted to do something

24  different with my life.

25          THE COURT:  I have -- "I want to do something more."

1  You said, "I want to do something different."  I don't know

2  if -- just maybe ask the question again or maybe repeat the

3  answer?

4  BY MR. FINLEY:

5  *Q.*  I'll try again.

6       Did you want to do something different?

7  *A.*  Yes.  I wanted to take advantage of the opportunity that

8  life was presenting me.

9  *Q.*  Patti Kern and Sean O'Connor presented you with this

10  opportunity?

11  *A.*  It was only Sean O'Connor, sir.

12  *Q.*  But eventually, Patti Kern was involved?

13  *A.*  Yes, sir.

14  *Q.*  What did you bring to the table?

15  *A.*  I was the only person that could repair the laser here in

16  Las Vegas.

17  *Q.*  But you were already doing that?

18  *A.*  Yes, sir.

19  *Q.*  You had been doing that for a long time with Patti Kern and

20  Sean O'Connor before they presented you with the business

21  opportunity, yes?

22  *A.*  Yes, sir.  And back then, I was looking for a job and Sean

23  O'Connor was aware of it.  Patti wasn't.  So they came to me

24  with that job offer.

25  *Q.*  Let me ask my question again.

1          What did you bring to the table when it came to this

2    new business opportunity?

3    *A.*   I would bring my name, sir, and the accounts.

4    *Q.*   So you understood that your contribution was to put your

5    name on the company, put your name on the mailbox, put your

6    name on the bank account?

7    *A.*   Yes, sir.

8    *Q.*   Did you contribute anything else?

9    *A.*   I just told you:  I could repair the machine that no one

10   else could.

11   *Q.*   You would agree that Patti Kern and Sean O'Connor made

12   partnerships with other people to form mailing companies who

13   did not repair that machine, yes?

14   *A.*   Yes, sir.

15   *Q.*   So that would mean that it's not really necessary for this

16   type of a mailing company partnership to have one of the

17   partners know how to repair the machine?

18   *A.*   Well, if I look it at that way now, sir, but she used me.

19   *Q.*   Yes.

20          The question is:  What else did you bring to the

21   table?

22   *A.*   That's all, sir.

23   *Q.*   And so by doing those three things, putting your name on a

24   company, putting your name on a mailbox, and putting your name

25   on a bank account, in turn, you made thousands of dollars?

2:19-cr-00295-GMN-NJK

1    *A.*  Yes, sir.

2    *Q.*  Thousands of dollars for virtually no labor?

3    *A.*  Well, to my -- in my perspective, yes, I did do.

4    *Q.*  Because of the machine?

5    *A.*  Because of the machine and other things that I did.

6    *Q.*  You already got a paycheck from the letter shop for that

7    work, right?

8    *A.*  Yes.  Not a very large check, sir.

9    *Q.*  And I thought you agreed with me a minute ago that being

10   able to repair the machine isn't really necessary for this kind

11   of partnership because it's already done by the letter shop,

12   which gets paid for that by invoices?

13   *A.*  I did not understand your question.

14   *Q.*  I think you just agreed with it.  I'll just move on.

15         Opening a bank account, opening a mailbox, and opening

16   a company, how many days later is that?

17   *A.*  To open the account, it was one day, sir.

18   *Q.*  What about the other things I listed?

19   *A.*  It didn't take me long to sign the letter for the P.O. box.

20   *Q.*  Okay.  One day for the bank account.

21         How much for the mailbox?

22   *A.*  I don't remember how long that lasted, sir.

23   *Q.*  Was it more than a week's worth of work?

24   *A.*  It's possible, sir.

25   *Q.*  And then in exchange for that week's worth of work or less,

2:19-cr-00295-GMN-NJK

1   you would make thousands of dollars for years without doing

2   anything else?

3   *A.*   Yes, sir.  And also working.

4   *Q.*   The payment for the mailing company is separate from your

5   paycheck, right?

6   *A.*   Yes, sir.

7   *Q.*   And you would have already been working for that paycheck

8   whether or not you became a partner with Patti Kern and Sean

9   O'Connor?

10  *A.*   Yes, sir.  But it wasn't much.  Again, that's why I was

11  looking for a different job, an extra job.

12  *Q.*   Did you ever think, "This is amazing.  I'm getting money

13  for doing very little"?

14  *A.*   I did think that I was doing well.

15  *Q.*   What product or service did the mailing company or mailing

16  companies that you opened provide?

17  *A.*   I did not understand the question.

18  *Q.*   What product or service did the mailing companies that you

19  opened provide?

20  *A.*   Patti is the one making the --

21         THE INTERPRETER:  The interpreter will correct

22  herself.

23  *A.*   Patti was the one offering that.

24  *Q.*   What product or services did the mailing companies that you

25  opened provide?

— 2:19-cr-00295-GMN-NJK —

1   **A.**  I don't know, sir.

2   *Q.*  Did you ask any of the three defendants that question?

3   **A.**  No, sir.

4   *Q.*  Did you ask your father-in-law, Jose Salud Castro, that

5   question?

6   **A.**  No, sir.

7   *Q.*  Epi Castro?

8   **A.**  No, sir.

9   *Q.*  Did you ask any of the ten or more family members of yours

10  who were involved in this that question?

11  **A.**  No, sir.

12  *Q.*  You could -- you agree with me that you could have at any

13  time during the six years from 2012 to 2018 asked that question

14  to those people, most of whom you trusted?

15  **A.**  Yes, sir.

16  *Q.*  If any of the people, the ten or more family members who

17  were involved in this knew that this was a fraud and didn't

18  tell you, that would be a betrayal?

19  **A.**  Yes, sir.

20  *Q.*  Mario Castro speaks English?

21  **A.**  Yes, sir.

22  *Q.*  Is he a good businessman?

23  **A.**  I wouldn't be able to say, sir.

24  *Q.*  You have no opinion about whether he's a good or bad

25  businessman?

1   *A.*   I wouldn't be able to say.  I don't see his accounts.

2   *Q.*   I'm sorry.  I didn't understand that.

3          See him?

4   *A.*   See his accounts.

5   *Q.*   You've worked with him for a long time?

6   *A.*   Yes, sir, but as I stated yesterday, I did not get involved

7   in financial matters.

8   *Q.*   I'm just asking if you have an opinion, any opinion at all

9   about how good a businessman is he.  If you answer the

10  question, I'll move on.

11  *A.*   I believe he's been both good and bad.

12  *Q.*   Is he a smart man?

13  *A.*   As far as I know, yes, sir.

14  *Q.*   You would have reason to know, wouldn't you?

15  *A.*   Yes, sir.

16  *Q.*   Let me ask my question again.

17          Is he smart?

18  *A.*   Yes, sir.

19  *Q.*   For example, if Miguel Castro read any one of the millions

20  of prize notices that the two of you were printing and mailing

21  together, would you expect him to know immediately that this

22  was a disgraceful fraud?

23  *A.*   Sir, the truth is, it is hard to answer your question

24  because we were not aware if prizes were being awarded or not.

25  *Q.*   You would expect him to be unable to determine whether this

1    was a fraud just from looking at the notice?

2            THE INTERPRETER:  For the interpreter, able or unable?

3    Q.  Let me rephrase.

4            We're talking about Mario Castro, yes?

5    **A.**  Yes, sir.

6    Q.  We've been talking about him for a few minutes?

7            THE INTERPRETER:  Clarification as far as the

8    interpreter had heard Mario and Miguel.  So we are back to

9    Mario Castro?

10           MR. FINLEY:  Back to Mario Castro.  My apologies.

11   That's who I meant.

12           MR. ERICSSON:  Your Honor, I would move to strike the

13   question where he did indicate Miguel Castro.  I think it

14   confused all of us.

15           THE COURT:  Any objection, Mr. Finley?

16           MR. FINLEY:  Yes, I'll strike it.

17           THE COURT:  All right.  So that question and the

18   response is stricken as there was a misunderstanding regarding

19   who he was -- the witness was being asked about.  So please

20   disregard and don't consider that during your deliberation.

21   We're going to clarify now, make sure that we're all talking

22   about the same person.

23           MR. FINLEY:  Okay.

24   BY MR. FINLEY:

25   Q.  So I'm asking you now about Mario Castro.  Would you expect

1  him to know immediately just from looking at one of these

2  notices that this was a shameful fraud?

3  *A.* Yes, sir.

4  *Q.* What about Miguel Castro?  Same question:  Would you expect

5  him to know immediately from looking at these notices that this

6  is a shameful fraud?

7  *A.* Sir, the question is difficult because we've been doing

8  this work since the year 2000.

9  *Q.* The question is difficult, I understand.

10          What is the answer?

11  *A.* Yes, sir.

12  *Q.* They did more than just look at the notices, correct?

13  *A.* I'm not sure of that, sir.

14  *Q.* You worked with them for eight years in the same letter

15  shop and you can't answer that question?

16  *A.* No, sir, I'm not able to answer it because we did not work

17  side by side.

18  *Q.* Do you need to work side by side to be able to answer that

19  question?

20  *A.* I believe so, sir.

21  *Q.* I'll move on.

22          You never heard the name "Glen Burke" before.  That's

23  what you said, right?

24  *A.* No, sir.

25  *Q.* When was the first time you heard the name?

—— 2:19-cr-00295-GMN-NJK ——

1   *A.*   Here in court, sir.

2   *Q.*   This trial?

3   *A.*   Yes, sir.

4   *Q.*   Do you think it's strange that you don't know the name of

5   the letter shop's largest client from 2007 to 2013?

6   *A.*   No, sir, it is not strange.

7   *Q.*   You suggested yesterday that it was possible that you were

8   in Mexico on the day that federal agents came to National Print

9   and Mail as part of this shutdown of Glen Burke.

10          Do you remember that?

11  *A.*   Yes, I do, sir.

12  *Q.*   And then you agreed that you probably were not in Mexico if

13  that visit occurred in late January of 2013?

14  *A.*   Sir, it is possible that I was not in Mexico.

15  *Q.*   And you invited us to check your passport records?

16  *A.*   Yes, sir.

17  *Q.*   And if we looked at passport records and other

18  documentation and found that you traveled to Mexico the prior

19  December on December 14th and returned approximately

20  December 30th, would you have any reason to disagree with that?

21  *A.*   No, sir.

22  *Q.*   So we can agree that you were not in Mexico in late January

23  of 2013 when Glen Burke got shut down?

24  *A.*   Yes, sir.

25  *Q.*   Having just taken a vacation and returned, it is likely

—— 2:19-cr-00295-GMN-NJK ——

1  that you would have been at work in late January of 2013; would

2  you agree?

3  *A.*  Yes, sir.

4  *Q.*  You are aware that Sean O'Connor has testified that you

5  were there on that day?

6  *A.*  Yes, I did hear him say that.

7  *Q.*  Did he lie when he said that?

8  *A.*  Yes, sir.

9  *Q.*  Are you aware that there's another witness who said that

10  you were there that day?

11  *A.*  No, sir.

12  *Q.*  We've talked about Luis Aguilar?

13  *A.*  Yes, sir.

14  *Q.*  He probably would have been at National Print and Mail in

15  late January 2013, yes?

16  *A.*  I don't remember, but that could be, sir.

17  *Q.*  You know that he said you were there?

18  *A.*  No, sir.

19  *Q.*  That's why you don't trust him anymore?

20  *A.*  No, sir.  I will repeat myself.  Because of a shirt

21  business.

22  *Q.*  Did you know that we provided the evidence that we would

23  use to you via your counsel?

24  *A.*  Yes, sir.

25  *Q.*  You are aware that we started doing that a long time ago?

─────── 2:19-cr-00295-GMN-NJK ───────

1   **A.**  I assume so.

2   Q.  Were you interested in knowing who might present evidence

3   against you in this matter?

4   **A.**  Yes, sir.

5   Q.  You never heard from any member of your family that Luis

6   Aguilar had testified that you were at National Print and Mail

7   on the day Glen Burke got shut down?

8   **A.**  No, sir.

9   Q.  You're certain?

10          THE INTERPRETER:  For the interpreter, was that --

11          MR. FINLEY:  Yeah.

12          THE INTERPRETER:  I'm sorry.  The interpreter needs

13  repetition of the last question.

14          THE COURT:  "Are you certain?"

15  BY MR. FINLEY:

16  Q.  Certain?

17  **A.**  I'm certain, sir.

18  Q.  A hundred percent sure your memory is good on that?

19  **A.**  I clearly remember that no one mentioned that, sir.

20  Q.  Is it possible that someone mentioned it and you forgot?

21  **A.**  That could be, sir.

22  Q.  If Luis Aguilar said that you were there on the day Glen

23  Burke got shut down in early 2013, would that be a lie?

24  **A.**  Or it could be that he doesn't remember correctly, sir.

25  Q.  Are you aware of an article published on the CNN website

1  called "The Sin City Scammer"?

2  *A.*  No, sir.

3  *Q.*  Let me show it to you and see if it refreshes your memory.

4       MR. FINLEY:  Can we put Government Exhibit 159 on the

5  screen only, on the witness's screen only and mine.

6  BY MR. FINLEY:

7  *Q.*  Have you seen that CNN article before?

8  *A.*  I don't remember it, sir.

9  *Q.*  Do you see a date on this article?

10      MR. FINLEY:  I don't think that's the date.  If we

11  could go --

12      MR. BROWN:  Your Honor, this article is not in

13  evidence.

14      THE COURT:  It's not in evidence.  It's being shown to

15  try to refresh his recollection.

16  BY MR. FINLEY:

17  *Q.*  Okay.  Anyway, you see the article?

18  *A.*  Yes, sir.

19  *Q.*  Does that refresh your memory?

20  *A.*  No, sir.

21  *Q.*  None of the ten or more members of your family who were

22  involved in this told you about a CNN article about your

23  biggest client?

24  *A.*  I don't remember that, sir.

25  *Q.*  Okay.

---
2:19-cr-00295-GMN-NJK
---

1           MR. FINLEY:  We can take that down.

2    BY MR. FINLEY:

3    Q.  Luis Aguilar told you about the criminal charges against

4    Glen Burke?

5    A.  Sir, I don't remember that because I don't know Glen Burke.

6    Q.  The defendant Miguel Castro told you about the criminal

7    charges against Glen Burke?

8    A.  After the trial, sir?

9    Q.  No.  Approximately when it happened, which was several

10   years after early 2013.

11   A.  No, sir.

12   Q.  Miguel Castro and Luis Aguilar told you about Glen Burke

13   getting shut down in early 2013 because it affected all of you

14   financially?

15   A.  Sir, I was not told that.

16           MR. FINLEY:  Could we look at Government Exhibit 158?

17   That's in evidence.

18   BY MR. FINLEY:

19   Q.  You've seen this before, sir, in the trial?

20   A.  Yes, sir.

21           MR. FINLEY:  If we blow up the top half, please.

22   BY MR. FINLEY:

23   Q.  That's a letter from Thomas Seaman to Miguel Castro and

24   Luis B. Aguilar at National Print and Mail?

25   A.  Yes, sir.

—— 2:19-cr-00295-GMN-NJK ——

1  Q.  And it is a request for funds related to Glen Burke.

2      Do you see the section --

3  A.  I'm listening to you, sir.

4      MR. FINLEY:  And if we pull out and go to the bottom

5  half.

6  BY MR. FINLEY:

7  Q.  It says that this person's -- identifies himself as a

8  receiver who has been identified by the Court or -- I'm

9  sorry -- appointed by the Court to take control of companies

10 controlled by Glen Burke.

11     Do you remember that?

12 A.  No, sir.

13 Q.  You don't remember that from the trial?

14 A.  Well, in the trial, yes, sir.

15 Q.  You can see from looking at this letter that it has to do

16 with Glen Burke, yes?

17 A.  Sir, you're the one that mentioned him.

18 Q.  You can see from the letter that you're looking at that it

19 mentions Glen Burke, yes?

20 A.  Yes, sir, on the second line.

21 Q.  And you can see that it has a date of appointment for the

22 receiver of January 28, 2013?

23 A.  Yes, sir, I see the date.

24 Q.  If we go to the next page, there's a paragraph in the

25 middle that says -- this is Mr. Seaman to Miguel Castro and

—— 2:19-cr-00295-GMN-NJK ——

1   Luis Aguilar -- "As we discussed when we met"?

2   **A.**  I heard you, sir.

3   Q.  That's consistent with the testimony that we heard at this

4   trial that members of the Federal Government visited National

5   Print and Mail and informed National Print and Mail that it was

6   involved in a fraud?

7   **A.**  Okay.

8   Q.  Yes?  Consistent?

9   **A.**  Well, that's what -- what you're saying, yes.

10  Q.  No.

11        The question is:  The letter that you're looking at,

12  based on what I've just shown you, is consistent with the

13  testimony of witnesses who have said that the Federal

14  Government visited National Print and Mail and informed people

15  there that they were involved in fraud?

16        MR. TOMSHECK:  Judge, I have to object as to what he's

17  just shown him.  The witness has indicated he understands what

18  Mr. Finley is saying.

19        MR. FINLEY:  There are things on this letter that the

20  witness can read.

21        MR. TOMSHECK:  Yeah, a name and a date.

22        MR. FINLEY:  That's for the jury to decide.

23        THE COURT:  If you want to ask the translator to

24  translate the part, the whole thing or the portion that you are

25  asking him about?

—— 2:19-cr-00295-GMN-NJK ——

1   BY MR. FINLEY:

2   *Q.*  You can see on this letter that it says Miguel Castro, Luis

3   Aguilar?

4   ***A.***  Yes, sir.  I can see where those names are, sir, but I

5   don't find mine.

6   *Q.*  That's not the question.

7          Is the answer yes?

8   ***A.***  Yes.

9   *Q.*  And do you see there's somebody on there named Thomas

10  Seaman who says he's a receiver?  I just read that, right?

11  ***A.***  Yes, sir.

12  *Q.*  He's communicating with Miguel Castro and Luis Aguilar

13  about Glen Burke?

14          MR. BROWN:  Your Honor?

15          THE WITNESS:  That's what you're telling me the letter

16  says, sir.

17  BY MR. FINLEY:

18  *Q.*  No, it says it on there.

19          MR. BROWN:  Your Honor?

20          THE COURT:  Yes, Mr. Brown?

21          MR. BROWN:  If Mr. Finley would like to ask Mr. Mendez

22  questions about what this letter says, as the Court indicated,

23  the translator can translate the letter for Mr. Mendez.

24          THE COURT:  All right.  So it's 10:30, so we'll go

25  ahead and take our break.

1          During this morning break, remember, ladies and

2     gentlemen of the jury, that you are not to discuss this case

3     with anyone, not even your fellow jury members.  Please do not

4     read or listen to or view anything that touches upon this case

5     in any way.

6          If you have any questions, please write it down.

7          Do not perform any independent research or

8     investigation and do not form any opinion about the matters in

9     this case.  We will be providing you more testimony and

10    evidence.  I will give you written jury instructions of law

11    that you will use.  You will apply the facts as you finds them

12    to that law, and in that way, you will discuss with each other

13    your opinions, your beliefs, and then reach a unanimous

14    verdict, if you can.

15         Let's go ahead and stand for the jury so they can take

16    their morning break.  We'll welcome you back at 10:45.

17         (Whereupon, the jury exits at 10:31 a.m.)

18         THE COURT:  And to the witness and the interpreter,

19    after the jury exits, you may both also exit, stretch, use the

20    restroom.  We need you back here at 10:45.

21         Remember that you are not to discuss your testimony

22    with anyone until you are all done, until I excuse you, which

23    has not happened yet.  I'll tell you when I excuse you.

24         THE WITNESS:  Yes, your Honor.

25         THE COURT:  All right.  You may go, sir.

1          So we're outside the presence of the jury.  I want to

2   know what we're doing with that CNN article.  Is it being

3   admitted or not being admitted?  Is the jury going to go

4   looking for it?

5          I read it and it seems -- it's -- it's short.  So I

6   don't know if you all agree or disagree what to do with it or

7   want to meet and confer over the break or just --

8          MR. TOMSHECK:  We ask -- we don't agree to it.  It's

9   hearsay.

10          THE COURT:  I'm sorry.  I can't hear you.

11          MR. TOMSHECK:  We absolutely do not agree it to.  The

12   witness has never seen it.  It's hearsay.  It's not admissible.

13          I think the whole line of questioning is extremely

14   objectionable.  If it had been my client on the stand, I

15   certainly would have objected.  I don't want to step on

16   counsel's toes for their client, but asking them about a CNN

17   article when we've got a jury here being admonished not to read

18   articles, and he hasn't read it, doesn't recognize it, and he

19   continues to ask him questions about it -- I think there's a

20   clear inference about what he's trying to do.  He's testifying

21   from right here -- "he" being the Government -- and trying to

22   get in pieces of that article in front of the jury when the

23   witness has to idea what is it.

24          THE COURT:  Okay.  Well, I don't think the question

25   was asked in order to elicit the information that was contained

1    in the article but, rather, whether or not -- I think the

2    question was as to whether or not he had seen the article.  So

3    it's the existence of the article.  We don't have any issue

4    about whether the article actually existed and his credibility

5    as to whether he knew anything about this Mr. Glen Burke being

6    in PacNet, having a case against him.

7               MR. BROWN:  Your Honor?

8               THE COURT:  Are we done with that CNN article or are

9    you still going to talk some more about it?

10              MR. FINLEY:  Your Honor, I don't intend to move it

11   into evidence.  I intend to use it to refresh recollection.

12              And it is a refreshing recollection in the exact form

13   that has been used throughout the trial by the defense counsel.

14   The only difference being, I have a very solid good faith

15   factual basis for the question in that I -- there's ample

16   evidence that this witness has been told all about Glen Burke

17   and, specifically, there has -- there is evidence that Miguel

18   Castro, Jr. was shown that article by his father.  And there's

19   ample evidence that all these people are close.

20              Luis Aguilar testified in grand jury that he told

21   Mr. Mendez about Glen Burke and that -- he also testified that

22   this witness was present on the day that the feds came and shut

23   down Glen Burke and visited National Print and Mail.  And I'm

24   trying to test his credibility with solid information.

25              THE COURT:  All right.  So there does appear to be a

1    good faith basis to ask him and test his credibility.

2              As far as the objection about showing the witness an

3    exhibit -- which has been admitted, right?  That was an

4    admitted exhibit?

5              MR. FINLEY:  The letter, yeah.

6              THE COURT:  But the question was whether he agreed

7    with the contents of it.

8              I think we do need to let the translator interpret the

9    contents that you're asking about, not necessarily the whole

10   letter, but whatever portion of the letter it is that you're

11   asking him.

12             MR. FINLEY:  Your Honor, I would prefer just to move

13   on.

14             THE COURT:  Okay.  Then just move on.

15             MR. FINLEY:  If that's okay.

16             THE COURT:  All right.  We'll just move on.

17             All right.  10:45-ish depending on when the smokers on

18   the jury get back.

19             And I did get a notice this morning that one of the

20   elevators is down so that may or may not mean that there's a

21   delay, but try to be back here about 10:45, 10:50.

22             (Recess taken at 10:36 a.m.)

23             THE COURT:  Looks like everybody's here.

24             Yes, Mr. Brown?

25             MR. BROWN:  Can we talk -- can we discuss something

1    before the jury comes in, your Honor?

2            THE COURT:  Sure.  So let's go ahead and have a seat.

3            We're on the record outside the presence of the jury.

4            Mr. Brown?

5            MR. BROWN:  So this has to do with Government's,

6    what's their proposed Exhibit 302.  They're still planning on

7    trying to introduce that?  If not, it's a nonissue.

8            THE COURT:  Exhibit 302, Mr. Finley, are you planning

9    to admit that or proffer it for admission?

10            MR. FINLEY:  Yes, your Honor.  These are text messages

11    between Sean O'Connor and the defendant Mendez.  They relate

12    directly to testimony that he made yesterday about, you know,

13    various things on direct about his relationship with Sean

14    O'Connor.  It also has to do with his relationship with Luis

15    Aguilar.  So highly relevant to subjects that the defendant

16    himself brought up.

17            And it is from Sean O'Connor's phone.  All other texts

18    from Sean O'Connor's phone have come into evidence without

19    objection.  And there has been a stipulation as to authenticity

20    of those texts, so I would expect there to be no issue with

21    authenticity.  And it's relevant.

22            THE COURT:  All right.  Mr. Brown, what is your

23    objection?

24            MR. BROWN:  First of all -- and this may be difficult

25    because you don't have it in front of you, but this exhibit is

1    titled Texts Between Jose Luis Mendez and Sean O'Connor.  I

2    suppose there are one or two text messages between Sean

3    O'Connor and Mr. Mendez, but the rest of these text messages

4    are -- it's a group chat.  So there's three, four, five

5    different people on here.

6            On the second page, there is a text message that

7    involves some profanity, both in English and in Spanish.

8            And we actually got two versions of this exhibit.  So

9    yesterday, we get a version where this text message purportedly

10   comes from, parens, owner, unknown.  And it is to a number of

11   people including Luis Aguilar.

12           On the version of the exhibit we get today, it is now

13   from Luis Aguilar and he is no longer a recipient in this group

14   chat.

15           We also looked at the source documents from which

16   these texts come.  And there is a text message that just

17   reads -- it reads "USA."  This is on the latest version of

18   the -- version 2 of Exhibit 302 which we got today.

19           So on the first page, there is a text message from

20   3-26-2013 and the text reads, "USA, USA, USA."  So we looked in

21   the source documents in the native information, the Excel

22   spreadsheet that came from the Cellebrite extraction, that text

23   message doesn't appear on that date at that time to our client.

24           And in the exhibit, it indicates both that it was sent

25   on the purported date and time and that it was sent to our

—————— 2:19-cr-00295-GMN-NJK ——————

1   client.  So that's inconsistent as far as we can tell with the

2   Cellebrite extraction.

3         THE COURT:  And the Excel Cellebrite extraction is

4   what represents the information found by the forensics?

5         MR. BROWN:  That's -- that is what I was led to

6   believe.

7         THE COURT:  All right.  So Mr. Finley, are you aware

8   of why there might be a --

9         MR. BROWN:  There's a second --

10         THE COURT:  -- additional "USA, USA, USA" text message

11   on March 26, 2013 on your Exhibit 302 that is not in the Excel

12   extraction?

13         MR. FINLEY:  I think it's the matter of a dates,

14   right?  The dates of the games?

15         MR. ZYTNICK:  Your Honor, I think -- I think we have

16   to check that specifically, but my understanding from looking

17   at it this morning was that there was this message and it was

18   showing it was 1:06 a.m., but it was -- I was looking at a

19   different thing than what Mr. Brown was looking at, but it was

20   showing 1:06 a.m.

21         But based on the flow of the messages, we believe that

22   the time-stamp was just -- you know, has a time-stamp for a

23   different time zone, essentially, and that based on the back

24   and forth of the messages, that was actually at 10:06 p.m., you

25   know, Pacific time, basically.

1          MR. FINLEY:  Your Honor, I think we could show you

2     this because I think it would have to be extremely confusing

3     just to listen.

4          THE COURT:  No, I think I understand the problem is

5     you've got different individuals chatting in a different group

6     chat from different locations with different time zones?

7          MR. ZYTNICK:  Honestly, I'm not sure why it would be

8     Eastern time zone, but that was our best read of the situation

9     just given the flow of the messages and the precise three-hour

10    difference.

11         You know, obviously, I -- Mr. Brown just raised this

12    and we haven't had a chance to confer about it.

13         THE COURT:  Well, it sounds like the objection is to

14    the accuracy of the representation and there is a substantial

15    question, so unless you have someone who can explain, lay a

16    proper foundation, I don't think that it would be admissible to

17    include texts that we're not sure was actually part of the

18    conversation.

19         MR. FINLEY:  The texts are accurate.

20         THE COURT:  You know, what information is occurring on

21    March 26, 2013 seems to be --

22         MR. FINLEY:  If we could show it to you, I think it

23    would make a lot more sense.

24         Can we put it on the screen for -- okay.

25         THE COURT:  But what is the explanation for why it is

1  not included in the Excel spreadsheet but it is included in the

2  exhibit?

3          MR. FINLEY:  I don't know yet.  We put the exhibit

4  together the first time --

5          THE COURT:  My understanding was that it's an

6  assumption by Mr. Zytnick and the team that that's where it

7  belonged, but that's not a proper foundation for including

8  something that isn't in -- in the forensics extraction.

9          MR. BROWN:  Your Honor, we have a screenshot of the

10  forensic extraction for the relevant date and time.

11          MR. GREEN:  Your Honor, Donald Green on behalf of

12  Salvador Castro.

13          I don't mean to belabor the point, but we received

14  this e-mail at 8:55 a.m. Pacific Standard time on April 13th.

15  The title of the document, which we received, says, Corrected

16  Exhibit 302.  We're requesting when was this corrected and by

17  whom.  Thank you.

18          THE COURT:  Well, I haven't -- I'm not accepting the

19  representation that it has been corrected.  This is just

20  someone's extraction of what is on the Excel spreadsheet in a

21  representative format with colors to make it easier to follow.

22  It's -- it's just a demonstration of other information that

23  exists.  It's just a chart to make it easier to understand what

24  is relevant from the extraction.

25          But if y'all can't agree that it came from the

2:19-cr-00295-GMN-NJK

1  extraction and it's -- and it's presented in the proper format,

2  then it's not admissible.

3          MR. ZYTNICK:  If that message is the only one that's

4  the dispute about --

5          MR. BROWN:  It's not.

6          MR. ZYTNICK:  Okay.

7          MR. BROWN:  And your Honor, I'm looking at the

8  extraction, and it says this message was sent to someone named

9  Victo [phonetic].

10          MR. ZYTNICK:  That was part of the issue -- so this

11  developed yesterday while we were in court.  Someone else was

12  pulling this information for us and we sent what turned out to

13  be preliminary --

14          (Court reporter interruption.)

15          MR. ZYTNICK:  -- three USAs.

16          Basically, we identified that as a message that

17  appeared to not be the correct one and this other very similar

18  message that appeared to be the correct one based on the

19  records we were looking at.

20          MR. BROWN:  I don't understand what that means.

21          I'm looking at the Cellebrite extraction, the Excel

22  spreadsheet, and I'm looking at a text, "USA, USA, USA" from

23  the same date and time and it is to Victo or Vixto [phonetic].

24          And this exhibit --

25          THE COURT:  So it's not part of the group chat?  Is

1  that what you're saying?

2          MR. BROWN:  This exhibit indicates that it's just --

3          THE COURT:  No.  No.  In your extraction -- you say

4  you're looking at the extraction.  And what is the

5  representation in the extraction of the text that reads "USA,

6  USA, USA"?

7          MR. BROWN:  It's not a group chat.  Vixto appears to

8  be the only recipient.

9          MR. TOMSHECK:  And there are some messages -- not to

10  further complicate things -- in the proposed exhibit which are

11  between two individuals and they're coupled with other texts

12  that are group individuals, one of which yesterday indicated

13  the sender was unknown and the recipient included Luis Aguilar,

14  and today, it indicates that Luis Aguilar is the sender and no

15  longer a recipient.

16          So I have a problem with even the title, Texts Between

17  Jose Luis Mendez and Sean O'Connor, when some of the texts

18  don't -- aren't authored by either of those people.

19          THE COURT:  All right.  So this exhibit was not part

20  of the stipulation as to authenticity; is that right?

21          MR. FINLEY:  That's right.

22          THE COURT:  Okay.  So unless you can reach an

23  agreement with the parties about what is properly represented

24  on the exhibit that comes from the extraction and is logical

25  and everyone agrees that's -- that's a correct representation

1    on the exhibit of what is in the extraction -- I'll make the

2    call if I have to, but I'm not a forensic expert so I don't

3    think that it would be helpful.

4         I think you would need to lay the foundation with

5    someone who does know how to read the extraction if it is a

6    problem that we're misreading the extraction because of

7    timetables or something else.  Then you'd have to lay that

8    foundation.  You can do it outside the presence of the jury or

9    in front of the jury, but I can't admit something that is a

10   chart or a -- or a summary of evidence that is potentially not

11   accurate.

12        As far as the group chat, I don't think there's a

13   problem with, on its face, an exhibit that represents that

14   there is a group chat if, in fact, that's what the extraction

15   says.  If you need to black out people's names because you

16   don't think that it's relevant, I mean, there's ways to fix

17   that.  The profanity, likewise, we've already heard other

18   profanity here.  We're all adults.  If you want to just agree

19   to sanitize it with just a letter and a blank or something

20   that -- and say that's profanity, I don't think that matters.

21        But the fact that there's two different versions, the

22   version that's in the extraction and the version that's in the

23   sample that we can't agree is a correct representation, then I

24   can't -- can't let you admit it yet.

25        MR. FINLEY:  Got it.  We will be calling a rebuttal

2:19-cr-00295-GMN-NJK

1  witness to authenticate it if necessary.

2         But all I can say is that these are real texts.  There

3  might be some typos or something.  We're looking into it now,

4  but people have been working on it yesterday and checked -- you

5  know, are checking it.  That's why there's a corrected version.

6  There's probably a little confusion.  We'll figure it out,

7  but --

8         THE COURT:  Okay.

9         MR. FINLEY:  -- this was on his phone and the words

10  were on there and they -- this definitely establishes --

11         THE COURT:  Well, if you have a photograph of what's

12  on the phone, like a screenshot of what's on the phone, then I

13  think would be potentially admissible instead of --

14         MR. FINLEY:  Yeah.

15         THE COURT:  -- this exhibit which is kind of a cut and

16  paste of something else that we can't agree is properly

17  representing --

18         MR. FINLEY:  Okay.

19         THE COURT:  -- what, in fact, happened.

20         MR. FINLEY:  Yeah.  We will work on that and --

21         THE COURT:  As far as the other question that was

22  brought up about exhibits that are in English that are shown to

23  the witness, if it's something that is admitted, I think I

24  could take judicial notice of what it says and read it out loud

25  to the interpreter for the interpreter to translate into

—— 2:19-cr-00295-GMN-NJK ——

1  Spanish for the witness.  So it's not you representing what's

2  on the letter --

3          MR. FINLEY:  Yes.

4          THE COURT:  -- to remove that aura of, am I being

5  tricked.  I can certainly read a small section of letter.

6          But if you're going to -- if anybody is going to show

7  the witness an exhibit in English that has not been admitted

8  that the jury can't see, then, obviously, I can't read it into

9  the record.  So we can do it outside the presence of the jury

10  if you want to do it that way, but just keep that in mind.

11          I'm just offering that as a potential workaround so

12  that the witness can answer the question when we're looking at

13  an exhibit in English.

14          MR. FINLEY:  Okay.

15          THE COURT:  Okay.  All right.  So let's go ahead and

16  bring in the jury.

17          (Whereupon, the jury enters at 11:13 a.m.)

18          THE COURT:  All right.  Everyone may be seated.

19          We're back on the record in the presence of the jury

20  with the witness, Mr. Jose Luis Mendez, back on the witness

21  stand.

22          Sir, I do remind you that you are still under oath to

23  tell the truth.

24          THE WITNESS:  Yes, your Honor.

25          THE COURT:  All right.  And Mr. Finley, on behalf of

1    the Government, you may continue with your cross-examination.

2            MR. FINLEY:  Thank you.

3    BY MR. FINLEY:

4    Q.  Yesterday during your direct examination, you were asked to

5    explain some checks that are contained in Government

6    Exhibit 265.

7            MR. FINLEY:  If we could put that on the screen,

8    please.

9    BY MR. FINLEY:

10   Q.  Do you remember going over these checks with your counsel

11   in court yesterday?

12   A.  Yes.

13   Q.  And the first one is a check to Mario Castro for $500 dated

14   January 28, 2016?

15   A.  Yes.

16   Q.  It says, "For Jose Luis"?

17   A.  Yes.

18   Q.  Is this one of the checks with profit from a mailing

19   company that was intended for you and you instructed that it be

20   made out to your wife?

21   A.  Yes.

22           MR. FINLEY:  If we could look at page 2.

23   BY MR. FINLEY:

24   Q.  And this one is a similar check, sir?

25   A.  Yes.

1    *Q.*  June 15, 2015, the "For" line, this time, says, "AAS.  From
2    Patti.  Jose Luis."
3              Do you see that?
4    *A.*  Yes.
5              MR. FINLEY:  Let's go to page 3.
6    BY MR. FINLEY:
7    *Q.*  This one is a similar check from September 24, 2015 that
8    says, "Jose Luis Profit" in the "For" line?
9    *A.*  Yes.
10   *Q.*  This is -- again, this is mailing company profit?
11   *A.*  Yes.
12   *Q.*  Intended for you made out to your wife?
13   *A.*  The intention is that it's for my wife.
14   *Q.*  Right.
15             It's written to your wife, but it's -- it's your
16   profit?  She's not a profit in -- profit-making partner in AAS,
17   is she?
18   *A.*  No, she's not a profit-sharing partner, but the money was
19   for her.
20   *Q.*  I think we agree on that.
21             MR. FINLEY:  Let's look at page 4.
22   BY MR. FINLEY:
23   *Q.*  Similar check?
24   *A.*  Yes.
25   *Q.*  October 2016?

1    *A.*  Yes.

2    *Q.*  There's a reference to J. Luis on the "For" line; that's

3    you?

4    *A.*  Yes.

5            MR. FINLEY:  And if we could go through the rest of

6    the pages one by one, pause for about two seconds on each page.

7    BY MR. FINLEY:

8    *Q.*  And the date on the last check is August 20, 2016 --

9    *A.*  Yes.

10   *Q.*  -- correct?  Okay.

11           So I'd like to compare that date of August 20, 2016 to

12   something else shortly, but let me ask you this.

13           You explained during your direct testimony that you

14   wanted your wife to have this money?

15   *A.*  Yes.

16   *Q.*  And that was because something about you were separated

17   during this time?

18   *A.*  Yes.

19   *Q.*  And one of the reasons you wanted her to have this money

20   was to make car payments?

21   *A.*  So that she can make the house -- the house expenses.

22   *Q.*  You didn't say anything about car payments?

23   *A.*  Yes, also.

24   *Q.*  Now, one of the reasons why you might have this profit

25   check --

1          THE INTERPRETER:  The interpreter would like to

2     clarify one thing, if possible.

3          The interpreter's clarifying as to the household

4     expenses or house payment.

5          The response was:  Both.

6     Q.  So just so everything is clear now, there's house expenses,

7     house payment, and car payment.  Those are the things that you

8     wanted your wife to have this money for?

9     A.  Yes, that's what it was for.

10    Q.  And the money came from fraud victims?

11    A.  Yes, sir.

12    Q.  One of the reasons a person in a fraud scheme might have

13    dirty money made out to another person is to not pay taxes.

14          Was that your intent on this?

15    A.  No, sir.

16    Q.  Did you pay taxes on this money?

17    A.  I don't remember, sir.

18    Q.  It's possible you did not pay taxes on this money?

19    A.  I don't remember, sir.

20    Q.  The tax returns would have the answer?

21    A.  Yes, sir.

22    Q.  So you were making -- you were helping to make car payments

23    with the checks that we're looking at in Government

24    Exhibit 265.  And I'm looking at the last one, August 20, 2016.

25          What car were you paying for with this check?

— 2:19-cr-00295-GMN-NJK —

1  *A.*  I believe it was a Toyota.

2  *Q.*  Are you sure it wasn't a Ford Explorer?

3  *A.*  I've never had a Ford Explorer.

4       I apologize.  There was a Ford Explorer in my name,

5  but I wasn't paying for it.

6  *Q.*  So we're looking at this check in August 20th of 2016.

7       Did your wife apply for money from a bank to purchase

8  a 2016 Ford Explorer?

9  *A.*  I've never bought a Ford Explorer.  It's possible that she

10  signed for my brother-in-law to get a Ford Explorer.

11  *Q.*  The money that was making the car payments could have been

12  for a Ford Explorer that she purchased, yes?

13  *A.*  No, sir.

14  *Q.*  She didn't make any car payments on a Ford Explorer?

15  *A.*  I do not know if at one point she made a payment, but the

16  Ford Explorer belonged to my brother-in-law.

17  *Q.*  Then why did she fill out the application?

18  *A.*  What application, sir?

19  *Q.*  Let me show it to you and see if it refreshes your memory.

20       MR. FINLEY:  This is not in evidence, so it will go on

21  just the witness's screen.

22       Could I use the ELMO and still have it just on the

23  witness's screen?

24       THE COURTROOM ADMINISTRATOR:  Yes.

25       MR. MISHLER:  Counsel, can we see it?  Sorry.

1       MR. FINLEY:  I think counsel would all be able to see

2  it if we put it on the screen.  I think that might be the most

3  efficient way to look at it.

4       THE COURT:  It is on the screen for counsel but not

5  the jury.

6       (Counsel conferring.)

7  BY MR. FINLEY:

8  Q.  All right.  Sir, did you see the pages I showed you?

9  A.  Some, but very quickly.

10  Q.  Okay.  Did it appear to be a car loan application that was

11  made by your wife?

12       MR. BROWN:  Your Honor?

13       THE COURT:  Yes?

14       MR. BROWN:  I think he's trying to refresh the

15  witness's recollection.  The question should be, does this

16  refresh his recollection.  If not, the inquiry ends.

17  BY MR. FINLEY:

18  Q.  Does this refresh your recollection about whether your wife

19  applied for a car loan?

20  A.  No, sir.

21       But I believe on there, I saw my brother-in-law's

22  phone number.

23  Q.  Okay.  Did your wife work at Digital Express as a manager

24  for five years with the salary of approximately 70 --

25       MR. BROWN:  Your Honor, can we approach on something,

───── 2:19-cr-00295-GMN-NJK ─────

1  please?

2          MR. FINLEY:  Pardon?

3          THE COURT:  There was a request for a sidebar?

4          MR. BROWN:  Please.

5          (At sidebar on record.)

6          THE COURT:  Mr. Brown?

7          MR. BROWN:  Hi.  Yeah, Will Brown.

8          So I think the Government is going to try and ask

9  about information in this car loan application.  It has to do

10 with his wife.  It has nothing to do with this case.  I would

11 object on relevance grounds.

12         To the extent there's any relevance --

13         THE COURT:  So the objection is as to relevance.

14         So Mr. Finley, what is the relevance of this line of

15 questioning?

16         MR. FINLEY:  Okay.  Well, foundation has been laid

17 that dirty money has been paid to the defendant's wife and that

18 she was using it to pay for a car.  This car was purchased

19 within that period.  So it goes to the scheme, profiting from

20 the scheme, using the money to pay for the car and trying to

21 apply for the car in a dishonest manner because you can't tell

22 the bank honestly how the money was made which goes to the

23 defendant's guilty intent in this scheme.

24         Additionally --

25         THE COURT:  But wasn't the question about his

1   mother-in-law?  Am I confused?

2          What was the question that you objected to?  How much

3   money somebody made?  The yearly earnings of the mother-in-law?

4          MR. FINLEY:  No.  His wife.

5          THE COURT:  His wife.

6          MR. FINLEY:  His wife represented on the application

7   that she made $72,000 a year at Digital Express.  There's been

8   testimony in this trial that she never worked there.  That is a

9   lie in furtherance of this scheme so that they could enrich

10  themselves with the scheme and not have to tell the bank where

11  the money came from.  The guy who's paying for this car is Jose

12  Luis Mendez.

13         Now, if they think that that's not true, then they can

14  offer a different theory that explains the evidence, but that

15  is what evidence shows.

16         And it also shows a pattern of this witness

17  benefitting from fraud schemes, receiving stolen money, and not

18  being aware somehow.  It's part of a pattern that goes to his

19  credibility of his testimony that he's been giving.

20         THE COURT:  So is the application in the name of the

21  wife?

22         MR. BROWN:  Yes.

23         THE COURT:  So the wife is making the

24  misrepresentation.

25         MR. BROWN:  Yes.

1           And the testimony was not that fraud proceeds paid for

2     this Ford Explorer.  What he said was, "While I was living

3     outside of the house, I had my checks sent to my wife so she

4     could pay for household expenses."  That included the car

5     payment.  And he specifies --

6                THE COURT:  He said house, car, and kids expenses.

7                MR. BROWN:  Right.  And the car was his Toyota,

8     presumably his wife's Toyota.

9           And what he said is that his wife may have signed for

10    his brother-in-law to get a Ford Explorer.  His wife has

11    nothing to do with this.

12               THE COURT:  But this is his wife's application?

13               MR. BROWN:  It is.

14               THE COURT:  For what?

15               MR. TOMSHECK:  It's actually a lot of things.  It's

16    not just the application.  There's some insurance documentation

17    in someone else's name.

18               THE COURT:  Thank you.

19               MR. ZYTNICK:  Your Honor, it's the U.S. Bank loan

20    file.

21               THE COURT:  Just a minute.  Let me check this out and

22    see.  This is Maria Castro's name only on the U.S. Bank

23    account.  Maria Castro's name on the Ford Explorer Prestige

24    Chrysler bill of sale.  The authorization for payoff has only

25    Maria Castro's name on it.

1        MR. FINLEY:  It's entire loan file.  We were only
2   going to --
3        THE COURT:  This is Maria P., as in Patricia, Castro,
4   and sometimes it does actually spell out the whole word
5   "Patricia."  Odometer disclosure statement, the U.S. Bank
6   check, the certificate of title, the credit application is also
7   only in the name of Maria P. Castro.  The agreement to
8   (unintelligible).
9        (Court reporter interruption.)
10        THE COURT:  The agreement to furnish insurance policy
11   is also only in her name as the buyer.
12        MR. FINLEY:  That's the point.
13        THE COURT:  I understand.
14        MR. FINLEY:  They're married.
15        MR. TOMSHECK:  I think the Government would stipulate
16   that our client's not mentioned anywhere in there, none of our
17   clients are, none of the defendants are.
18        THE COURT:  But they're married.  The explanation that
19   this is a car for someone else, there's no evidence of that
20   anywhere on this paperwork.
21        MR. TOMSHECK:  Sure.
22        And I'm quite certain my wife wouldn't want to be
23   judged by things that I've done.
24        The testimony is that he never owned the car, never
25   possessed the car.  She never owned the car or possessed the

1   car and there's --

2          THE COURT:  And this is proper cross-examination that

3   she did, in fact, purchase a car and own a car and agree to

4   take out insurance for that.

5          MR. TOMSHECK:  Yeah, I one hundred percent agree --

6          THE COURT:  So it does impeach his credibility about

7   his wife's --

8          MR. TOMSHECK:  I a hundred percent agree that it would

9   be --

10         THE COURT:  -- financial --

11         MR. TOMSHECK:  I don't want to talk over your Honor.

12         I one hundred percent agree that it would be proper

13  impeachment for her if she was called to the stand.

14         THE COURT:  It's proper impeachment for him because he

15  made the representation that she did not purchase a car.

16         MR. BROWN:  I think what he said was she may have

17  signed for it.

18         MR. TOMSHECK:  Yes.

19         THE COURT:  Yeah, but she didn't co-sign anything.

20  Everything is in her name.  She's not a co-signer on the

21  application.  She's the only signer.  That's why I wanted to

22  see who else's name was on there.  If she was on here with

23  someone else, that would make perfect sense so then it wouldn't

24  be impeachment because it would be consistent, not

25  inconsistent.

```
 1              MR. TOMSHECK:  It's also --
 2              THE COURT:  Who is -- who is the mother-in-law?
 3              MR. FINLEY:  This is the wife.
 4              THE COURT:  Is that the one that's also Maria Castro
 5    or no?
 6              MR. TOMSHECK:  No.  No.
 7              THE COURT:  I'm confused.
 8              MR. TOMSHECK:  He said brother-in-law, I think --
 9              THE COURT:  Oh, I'm sorry.  Brother-in-law.
10              MR. TOMSHECK:  -- is the driver of the vehicle.
11              MR. BROWN:  Yeah.  His brother-in-law, so it would be
12    his wife's brother.
13              MR. TOMSHECK:  She put a car in her name for him,
14    apparently.
15              THE COURT:  Not apparently.  This is the problem.
16    There's no male name on here.
17              MR. FINLEY:  Right.
18              And we don't have to accept the witness's version of
19    events here.  There's evidence that two beneficiaries and
20    participants in this scheme used victim money to buy a car and
21    then gave it away to another participant in the scheme.
22              MR. TOMSHECK:  The clear inference is that they're
23    trying to implicate Mr. Mendez in a criminal act that is not
24    charged in this case by introducing a document that he just
25    testified he's never seen.
```

1           MR. FINLEY:  I'm not introducing it.

2           MR. TOMSHECK:  You're asking about it.

3           MR. FINLEY:  That's different.

4           THE COURT:  Yeah, I think the objection was to the

5    line of questioning.  I think the line of questioning is

6    appropriate to impeach his credibility about what he has done

7    with that money, what the family has done with that money

8    because he has stated something different than what the

9    evidence that the Government has shown.

10          So I think it's fair for the Government to attempt to

11   impeach him with a misstatement.  There's a good faith belief

12   that this was not a car that was co-signed for someone else.

13   So I think that's appropriate.

14          MR. BROWN:  I understand that.

15          A slightly separate issue.  I think the Government was

16   going to ask him about representations that his wife made on

17   the loan application.

18          I would object to that because that has nothing to do

19   with whether or not his wife applied for the car.  I think what

20   he wants to ask --

21          THE COURT:  Well, is that that he said that she never

22   worked there but she represents on the application --

23          MR. BROWN:  That's right.

24          THE COURT:  -- that she made money from there and

25   that's the reason why he actually wanted the checks to be sent

1    in her name?  That's --

2              MR. BROWN:  I think.

3              THE COURT:  That's the impeachment value?

4              MR. FINLEY:  He's a party to bank fraud in furtherance

5    of this scheme.

6              MR. TOMSHECK:  That's --

7              THE COURT:  That would be 404(b) that we haven't

8    discussed yet.

9              MR. TOMSHECK:  Yes.

10             THE COURT:  My understanding was that the purpose was

11   to demonstrate that he had the checks written out to her so

12   that she would have something to -- some credit or some --

13   something that she could show is the reason why she was buying

14   this car not, because of something else.

15             MR. FINLEY:  It was part of this scheme.

16             THE COURT:  If this is about bank fraud, then, no,

17   then it's not -- it's, in a sense, relevant but it would be

18   overly prejudicial.

19             MR. BROWN:  And I think he wants to elicit testimony

20   from this witness to show that his wife lied on the bank loan

21   application.  That's what prompted me to make the objection.

22   That's where I saw the Government heading.

23             THE COURT:  Well, we could have a limiting instruction

24   as to that because that's definitely not appropriate.

25             MR. GREEN:  Yes.  Thank you.

1          THE COURT:  The issue is whether or not this witness

2   is telling the truth about why he had checks written out to his

3   wife, where is the money going, the cash payments, did they go

4   to pay for this car that clearly is in her name that she

5   purchased -- so, you know, follow the money, essentially,

6   follow the trail of the money -- and whether or not he's

7   telling the truth about what was -- where that money went and

8   what it was used for.  So that's relevant and inadmissible

9   impeachment.  But if you're going the talk about bank fraud,

10  then it's not.

11         MR. TOMSHECK:  Well, I think that's the clear

12  inference.

13         And I think the Government's putting on the record --

14  and that was my objection if it wasn't clear, that they're

15  introducing evidence of a criminal act that does not involve

16  any of our clients in an effort to say they're more likely to

17  have committed this crime.  That's 404(b).  Any relevance it

18  has is outweighed by the extreme prejudicial impact.  And my

19  client has nothing to do with this.

20         So I'm in a situation now where at least two of the

21  defendants have said, hey, this might be a severance issue, and

22  now we've got another one.

23         THE COURT:  What's the Government's position?  Are you

24  diving deep into bank fraud?  Because that wouldn't be

25  admissible.  If you're just trying to examine him -- his

——— 2:19-cr-00295-GMN-NJK ———

1  credibility for what --

2          MR. FINLEY:  Your Honor --

3          THE COURT:  -- he has said the money trail -- where

4  the money really went.

5          MR. FINLEY:  I accept the Court's ruling about the

6  prejudice.

7          I do believe the misstatement is intrinsic to this

8  scheme because it shows that you have to hide the guy who's

9  going to pay for the car because he can't tell the bank how

10  he's going to pay for it.  It shows that this scheme is a

11  total, you know, fraud scheme.  And so it's relevant for that

12  reason.

13          I can stay away from saying "bank fraud," but there's

14  a misstatement.

15          THE COURT:  Why can't he lie if she did it?  I'm not

16  following that logic.

17          MR. FINLEY:  They're husband and wife.  He's paying

18  for the car.

19          MR. BROWN:  He's nowhere on these documents.

20          THE COURT:  If the relevance is that he can't put his

21  name on it because it's fraudulent money and he can't show

22  where it came from -- but that's exactly what she's doing.

23  She's putting on the application that she's employed at a

24  company we know she's not and that she's earning money that

25  she's not.

1          MR. TOMSHECK:  It's the opposite of hiding the

2    company.

3          THE COURT:  Are you saying say he can't commit the

4    fraud so he's having her commit the fraud for him?  I'm not

5    sure.  I'm just not following the logic.  That's why I'm asking

6    the questions.

7          MR. TOMSHECK:  So the logic is there's secreting

8    money.  She's actually saying that she --

9          THE COURT:  She's exposing herself --

10         MR. TOMSHECK:  Right.

11         THE COURT:  -- and putting herself in danger so that

12   -- I don't think that that is a logical reason for asking her

13   about -- about her.

14         MR. FINLEY:  All right.  So what do I get to ask?  I'm

15   just confused now.

16         THE COURT:  Yeah.  Is he aware that she's representing

17   she worked there even though he knows she didn't?  Did he have

18   anything to do with that?  I mean, if he's lying about where

19   she works, that's credibility.  Where the money came from to

20   pay for that car.  I think all those lines of questioning

21   regarding the funds, the source of the funds, and his knowledge

22   of her representations, whether or not he is, you know,

23   adopting those and told her to do that and things like that,

24   that's appropriate but not --

25         MR. FINLEY:  Okay.

1          THE COURT:  -- not anything that starts going into

2    bank fraud or tax fraud.

3          MR. FINLEY:  The representation that she was working

4    there, I can ask?

5          THE COURT:  Yes.

6          MR. FINLEY:  Okay.  I got it.

7          MR. GREEN:  Your Honor, Donald Green on behalf of

8    Salvador Castro.

9          May we request a limiting instruction for our clients,

10   that is, Salvador Castro in particular?

11         THE COURT:  Yes.

12         MR. FINLEY:  (Unintelligible).

13         (Court reporter interruption.)

14         MR. FINLEY:  What requires a limiting instruction if

15   this colloquy resulted in the objection being overruled since

16   the question pending was, was he aware that she made a

17   misstatement on this application.  I didn't say anything about

18   bank fraud.  That's the question.  I thought you just said I

19   could ask it, your Honor.

20         THE COURT:  Yes.  Yes.

21         MR. GREEN:  403.  With all due respect, 403.

22         THE COURT:  So we discussed a lot of different things.

23   So some were granted, some were not.  So it's sustained in part

24   and overruled in part consistent with my explanation.

25         MR. FINLEY:  Okay.

—— 2:19-cr-00295-GMN-NJK ——

1           MR. TOMSHECK:  So just so we're clear, not to belabor

2     the point, but what is the question the Government intends on

3     asking?

4           MR. FINLEY:  Are you aware that your wife said on the

5     loan application for this truck that she worked at Digital

6     Express making $72,000 a year?

7           MR. TOMSHECK:  Okay.

8           MR. FINLEY:  That's the question.

9           THE COURT:  Okay.

10           MR. BROWN:  And then we move on?

11           MR. FINLEY:  Well, we need -- the jury will need to

12     know whether that's true.

13           MR. BROWN:  Right.  I meant after he answers the

14     question --

15           MR. FINLEY:  Okay.

16           MR. BROWN:  -- then we'll move on?

17           MR. FINLEY:  Yeah.  Yeah.

18           THE COURT:  Okay.  So is there a limiting instruction

19     that you need me to give or not?

20           MR. GREEN:  Excuse me, your Honor?

21           (Indiscernible simultaneous crosstalk.)

22           (Court reporter interruption.)

23           THE COURT:  That's why I'm asking again.  Do you still

24     want me to give the limiting instruction or not?

25           MR. TOMSHECK:  On behalf of Mario Castro, if that's

———— 2:19-cr-00295-GMN-NJK ————

1   the extent of the questions, we do not want a limiting

2   instruction.

3           THE COURT:  Mr. Gaffney?

4           MR. GAFFNEY:  I would join.

5           THE COURT:  And Mr. Green?

6           MR. GREEN:  We'll withdraw that, your Honor, and join

7   in with Mr. Tomsheck.  Thank you.

8           THE COURT:  Thank you.

9           (End of discussion at sidebar.)

10          THE COURT:  Okay.  Go ahead.  You may proceed,

11  Mr. Finley.

12  BY MR. FINLEY:

13  Q.  Mr. Mendez, are you aware that your wife told the bank in

14  her loan application for the Ford Explorer that she worked at

15  Digital Express making $72,000 a year?

16  A.  No, sir.

17  Q.  Did your wife work at Digital Express making $72,000 a

18  year?

19  A.  No, sir.

20  Q.  You testified yesterday that when you went online to look

21  at your bank accounts for the mailing companies, you did that

22  because Patti Kern asked you to?

23  A.  Not always, sir.

24  Q.  Correct.

25          That was one of the reasons?

1    *A.*  Yes, sir.

2           MR. FINLEY:  If we could get Government Exhibit 266 on

3    the screen.  It's already admitted.

4    BY MR. FINLEY:

5    *Q.*  Have you seen this exhibit before?

6    *A.*  Yes, sir.

7    *Q.*  Do you remember the testimony that IP addresses assigned to

8    your home accessed mailing company bank accounts more than 300,

9    maybe 400 times?

10   *A.*  Yes, sir.

11   *Q.*  Did you access mailing company bank accounts that you

12   opened approximately 300 to 400 times?

13   *A.*  I did not count them, but, yes, sir.

14   *Q.*  It sounds about right?  I think that's what you're trying

15   to say?

16   *A.*  Yes, sir.

17   *Q.*  How many times were you doing this at Patti Kern's request?

18   *A.*  I don't remember, sir.  Several.

19   *Q.*  So it wouldn't be more than 10 if you said several?

20   *A.*  I would say over 10, sir.

21   *Q.*  Would it be over 20?

22   *A.*  I would say over 50, sir.

23   *Q.*  Over 50?

24   *A.*  Yes, sir.

25   *Q.*  Were those requests made in person or on the phone?

1    *A.*   Usually she would request it from Epi and then Epi would

2    request it of me.

3    *Q.*   Then the rest of the times, I guess more than 300 times --

4    well, let me start a new question.

5            You testified that the other reason why you accessed

6    your bank accounts online was because you were hyperactive?

7    *A.*   Yes, sir.

8    *Q.*   The true reason that you accessed your bank accounts so

9    much was because you liked to see the money in there?

10   *A.*   You can -- you can check in this period of time right now.

11   I still go in there often, sir.

12   *Q.*   The question is:  You liked to see the money in the

13   accounts; that's why you looked at them so much?

14   *A.*   Many of the times that I went in there was to verify if a

15   check for printing had been paid for and if the stamps had been

16   paid for.

17   *Q.*   Is it your testimony that you did not like to see the money

18   in the accounts?

19   *A.*   Everyone likes to see what's in their account, sir.

20   *Q.*   So you liked to see the money in your accounts because you

21   like money?

22   *A.*   All of us work for money, sir.

23   *Q.*   You liked to look at the money in your accounts because you

24   like money?  Yes or no.

25   *A.*   No, sir.

—— 2:19-cr-00295-GMN-NJK ——

1          MR. FINLEY:  Let's take a look at Government

2    Exhibit 150.

3          And if we could go to page 34.

4    BY MR. FINLEY:

5    Q.  Do you see that text?

6    A.  Yes, sir.

7    Q.  You write to Patti Kern in 2017, "I have a package that

8    came for you."

9          Patti Kern writes back, "Okay.  Thanks.  Do you know

10   what it is?"

11         You say, "It's the envelopes from Miami."

12         That's where you opened a mailbox, yes?

13   A.  Yes, sir.

14   Q.  And you continue -- the last text in this exchange on the

15   page is, dollar sign, dollar sign, dollar sign?

16   A.  Yes, sir.

17   Q.  You like money?

18   A.  I was saying that we were receiving money, sir.

19   Q.  Do you like money?

20   A.  Sir, we all like money.

21   Q.  I'm not asking about if everybody likes money.

22         Do you like money?

23   A.  Yes, sir.

24         MR. FINLEY:  If we could go to page 41.

25   ///

1  BY MR. FINLEY:

2  Q.  You're talking about a box that you wanted Patti Kern to

3  come to your house and pick up, yes?

4  **A.**  Yes, sir.

5  Q.  You describe it as a very nice box, heavy, thumbs up emoji.

6      Do you see that?

7  **A.**  Yes, sir.

8  Q.  Again, you like money?

9  **A.**  Yes, sir.

10  Q.  You looked at the bank accounts, you would have been able

11  to see that those bank accounts never paid a dime of prize

12  money to anybody?

13  **A.**  No, sir.

14  Q.  Have you ever heard conversations among any of the people

15  who participated in this scheme about a prize winner?

16  **A.**  No, sir.

17  Q.  Is that something you would expect your coconspirators to

18  talk about if that happened?

19  **A.**  It's something I would have expected Patti Kern to mention.

20  Q.  Did she ever mention it?

21  **A.**  No, sir.

22  Q.  What does that tell you about whether this scheme paid

23  anybody any prize money?

24  **A.**  Sir, I'm going to repeat myself.  She did this for 18 years

25  so I thought she was doing things right.

1    *Q.*  You just said that you would have expected Patti Kern to

2  mention it if she was giving away a big prize to somebody and

3  you just confirmed that she never mentioned that.

4        What does that tell you about whether big prizes were

5  being paid?

6    *A.*  Well, sir, being here in court, I am aware now that they

7  were not paid.

8    *Q.*  Why did you have Patti Kern's bank card in your billfold?

9        MR. FINLEY:  Looking at Government Exhibit 77.

10       THE INTERPRETER:  For the interpreter, the term

11  "billfold," is that the same as a wallet?

12       MR. FINLEY:  Yes, ma'am.

13       And we could blow up Government Exhibit 77 where the

14  bank cards are.

15  BY MR. FINLEY:

16    *Q.*  Do you see that, sir?

17    *A.*  Yes.

18    *Q.*  Those are bank cards for mailing company accounts that you

19  opened?

20    *A.*  Yes, sir.  It's just that in the beginning, I understood

21  your question to be as to why I had Patti's cards.

22    *Q.*  Right.

23        Because your testimony was that Patti controlled

24  everything about the bank accounts, right?

25    *A.*  Yes, sir.

——— 2:19-cr-00295-GMN-NJK ———

1    *Q.*  Is the billfold that we saw, was that your billfold?

2    *A.*  I do not see a wallet there, sir.

3          MR. FINLEY:  If we could blow out.

4    BY MR. FINLEY:

5    *Q.*  That wallet, is that yours?

6    *A.*  Yes, sir, it's mine.

7    *Q.*  You and your father both -- sorry.

8          I mean, you and your wife's father both participated

9    in the fraud scheme and you both took fraud money from victims?

10   *A.*  Yes, sir, through Patti Kern.

11   *Q.*  Patti Kern made you do it, yes?

12   *A.*  Sir, she didn't force us to do this.

13   *Q.*  You said your father-in-law was an honest person.

14         You are aware that he has lied for money before,

15   right?

16   *A.*  No, sir, I don't know that.

17   *Q.*  You're not aware of him lying about anything else for

18   money?

19   *A.*  I don't know that, sir.

20   *Q.*  I'm talking about Jose Salud Castro.

21   *A.*  Sir, I know who you're talking about.

22   *Q.*  On the day you were caught, some of the money that Patti

23   Kern gave you was in your house?

24   *A.*  Yes, sir.

25   *Q.*  You say that $30,000 of the money that was seized was

1  actually from your wife's personal injury settlement from a car

2  crash?

3  **A.**  Sir, I did not say 30,000.  I said between 25 and 27.

4  *Q.*  25- and 27,000?

5  **A.**  Yes, sir.

6  *Q.*  You said your lawyer -- your lawyer has the check?  You

7  could show it?

8  **A.**  Sir, he has a copy.

9  *Q.*  Right, a copy.

10        That money from that car crash, that came from a

11  lawsuit that your dad -- I'm sorry, correct -- her dad, your

12  wife and her sister filed?

13  **A.**  Yes, sir.

14  *Q.*  They filed seeking payment for alleged personal injuries?

15  **A.**  Sir, as far as my wife goes, it wasn't supposed to be.  She

16  was injured.

17  *Q.*  Totally legitimate money?

18  **A.**  Yes, sir.

19  *Q.*  The car crash that the settlement came from was in

20  March 2014?

21  **A.**  So I don't know the date.

22  *Q.*  Does that sound about right?

23  **A.**  It's possible, sir.

24  *Q.*  Your wife was not the driver?

25  **A.**  I don't know, sir.

1    *Q.*  You didn't talk to her about whether she was the driver or

2    not in a car crash that she was in where she was supposedly

3    injured?

4    *A.*  No, sir.  I talked to her about her health.

5    *Q.*  Your wife, Maria Patricia Castro's mother, Carolina, was

6    driving, correct?

7    *A.*  Again, sir, I will repeat myself, I don't know.

8    *Q.*  Your wife was in a car --

9        MR. BROWN:  Objection, your Honor.  Relevance and

10   maybe lunch.

11       THE COURT:  I think the question is appropriate.  His

12   wife was in a car accident.  He doesn't know who was driving?

13   I think he doesn't understand the question.  It seems -- I'll

14   allow the Government to ask it again and see if...

15   BY MR. FINLEY:

16   *Q.*  Your wife and her mother were in the car?

17   *A.*  I assume so, sir.

18   *Q.*  Your wife's father, Jose Salud Castro, was in the car, too?

19   *A.*  Sir, I cannot say for sure who was in the car.  I was not

20   there.

21   *Q.*  Is that because there's been too many car accidents for you

22   to remember the details of all of them?

23   *A.*  Sir, no.  I'm not able to remember the details for all of

24   them except for mine.

25   *Q.*  The car stopped suddenly?

1    **A.**   What car, sir?

2    Q.   The car in the accident that I'm talking about.

3    **A.**   Again, sir, I was not in the car.

4    Q.   The car that resulted -- the car accident that we're

5    talking about which resulted in you and your wife receiving

6    over $100,000, that occurred on U.S. 95, correct?

7    **A.**   I don't know, sir.

8           And my wife and I did not receive it.  My wife

9    received it.

10   Q.   You and your wife are married?

11   **A.**   Yes, sir.

12   Q.   The money was sitting a safe, according to you, along with

13   fraud money that was received from the scheme in this case?

14   **A.**   Yes, sir.

15   Q.   This car accident was the sixth time in less than five

16   years that your wife's parents and sisters had been in car

17   crashes where they were rear-ended?

18   **A.**   I don't know, sir.  If you think that's strange, I don't

19   think it is.

20   Q.   So you know that there have been six car accidents in five

21   years involving your wife's parents and sisters in a car that

22   you owned?

23   **A.**   I'm learning it as you say it right now, but I want to know

24   what car you're talking about.

25   Q.   Let me see if I can help you.

─── 2:19-cr-00295-GMN-NJK ───

1    **A.**   Thank you.

2            MR. MISHLER:  Your Honor?

3            THE COURT:  Yes?

4            MR. MISHLER:  If it's a new document, it might be a

5    good time for lunch.

6            THE COURT:  All right.  We can do that.

7            All right.  So during this time, our lunch break,

8    please remember, ladies and gentlemen of the jury, you are not

9    to discuss this case with anyone, not even your fellow jurors.

10   Remember that the attorneys, their staff, the witnesses are not

11   allowed to speak to you at all about anything.

12           And you are not to read or listen to or view anything

13   that touches upon in case that any way or attempt to perform

14   any research or investigation.

15           Write down your questions.

16           Don't form any opinions yet.

17           Let's go ahead and stand for the jury.

18           It's 12:05 so be back here -- we'll plan to be back

19   here at 1:05.  Have a good lunch, everybody.

20           The interpreter and the witness may also have their

21   lunch break after the jury exits.  And we need you all back

22   here 1:05.

23           (Whereupon, the jury exits at 12:07 p.m.)

24           THE COURT:  All right.  Do we need to come back before

25   1:05?  Or is 1:05 okay?  Because I have a different court

--- 2:19-cr-00295-GMN-NJK ---

1  reporter coming in this the afternoon so I just need to know if

2  you need to talk about anything.

3         MR. TOMSHECK:  We need to make a record about this

4  line of questioning.  We can do it now or we can do it then.

5  It's up to the Court.

6         THE COURT:  Okay.  Let's do it then.  Let's come back

7  at 12:45.

8         (Recess taken at 12:07 p.m.)

9                            * * *

10

11

12                        --o0o--

13              COURT REPORTER'S CERTIFICATE

14

15     I, SAMANTHA N. MCNETT, Official Court Reporter, United

16  States District Court, District of Nevada, Las Vegas, Nevada

17  certify that the foregoing is a correct transcript from the

18  record of proceedings in the above-entitled matter.

19

20  Date:  April 13, 2023

21

22                              /s/ Samantha N. McNett
                                _____
23                              Samantha McNett, RPR, CRR, CCR

24

25