*2:19-cr-00295-GMN-NJK - April 13, 2023*

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEVADA

3   UNITED STATES OF AMERICA,      )
                                   ) Case No. 2:19-cr-00295-GMN-NJK
4              Plaintiff,          )
                                   ) Las Vegas, Nevada
5   vs.                            ) April 13, 2023
                                   ) 12:48 p.m. - 4:09 p.m.
6   MARIO CASTRO, SALVADOR         ) Courtroom 7D
    CASTRO, MIGUEL CASTRO, and     ) JURY TRIAL, DAY 16,
7   JOSE LUIS MENDEZ,              ) PM SESSION
                                   )
8              Defendants.         )
    _____    ) *C E R T I F I E D   C O P Y*

9

10           REPORTER'S TRANSCRIPT OF JURY TRIAL,
                    DAY 16, PM SESSION
11           BEFORE THE HONORABLE GLORIA M. NAVARRO
               UNITED STATES DISTRICT COURT JUDGE

12

13   APPEARANCES:

14   For the Government:   **TIMOTHY T. FINLEY, ESQ.**
                          **DANIEL E. ZYTNICK, ESQ.**
15                        *U.S. Department of Justice*
                          *950 Pennsylvania Avenue, N.W.*
16                        *Washington, D.C. 20530*
                          *(202) 307-0050*

17

18

19   (Appearances continued on pages 2 and 3.)

20

21   Court Reporter:      Amber M. McClane, RPR, CRR, CCR #914
                          United States District Court
22                        333 Las Vegas Boulevard South, Room 1334
                          Las Vegas, Nevada 89101
23                        (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25

2:19-cr-00295-GMN-NJK - April 13, 2023

```
 1    APPEARANCES CONTINUED:

 2    For the Government (Cont.):

 3        MINA CHANG, AUSA
          UNITED STATES ATTORNEY'S OFFICE
 4        501 Las Vegas Boulevard South, Suite 1100
          Las Vegas, Nevada 89101
 5        (702) 388-6336

 6

 7    For Defendant Mario Castro:

 8        JOSHUA L. TOMSHECK, ESQ.
          HOFLAND & TOMSHECK
 9        228 South Fourth Street, First Floor
          Las Vegas, Nevada 89101
10        (702) 895-6760

11    -AND-

12        RICHARD E. TANASI, ESQ.
          TANASI LAW OFFICES
13        8716 Spanish Ridge Avenue, Suite 105
          Las Vegas, Nevada 89148
14        (702) 906-2411

15

16    For Defendant Salvador Castro:

17        DONALD J. GREEN, ESQ.
          LAW OFFICES OF DONALD J. GREEN
18        4760 South Pecos Road, Suite 103
          Las Vegas, Nevada 89121
19        (702) 388-2047

20

21    / / / / /

22    / / / / /

23    / / / / /

24

25
```

```
 1   APPEARANCES CONTINUED:

 2   For Defendant Miguel Castro:

 3        LUCAS J. GAFFNEY, ESQ.
          GAFFNEY LAW
 4        9900 Covington Cross Drive, Suite 290
          Las Vegas, Nevada 89144
 5        (702) 742-2055

 6   -AND-

 7        THOMAS A. ERICSSON, ESQ.
          THOMAS A. ERICSSON, CHTD.
 8        9900 Covington Cross Drive, Suite 290
          Las Vegas, Nevada 89144
 9        (702) 878-2889

10   For Defendant Jose Luis Mendez:

11        WILLIAM H. BROWN, ESQ.
          CHRISTOPHER MISHLER, ESQ.
12        BROWN MISHLER, PLLC
          911 North Buffalo Drive, Suite 202
13        Las Vegas, Nevada 89128
          (702) 816-2200
14                              * * * * *

15                          I N D E X
```

```
16   Defense's Witnesses:                              Page

17   JOSE LUIS MENDEZ

18        Continued Cross-Examination by Mr. Finley    113

19        Redirect Examination by Mr. Brown           124

20        Questions by the Jury                       160

21        Recross-Examination by Mr. Tomsheck         175

22   MARIO CASTRO, JR.

23        Direct Examination by Mr. Tomsheck          182

24        Cross-Examination by Mr. Finley             212
```

```
25                              * * * * *
```

2:19-cr-00295-GMN-NJK - April 13, 2023

```
 1          LAS VEGAS, NEVADA; THURSDAY, APRIL 13, 2023; 12:48 P.M.
 2                              --o0o--
 3                        P R O C E E D I N G S
 4          (Outside the presence of the jury.)
 5          COURTROOM ADMINISTRATOR:  All rise.
 6          THE COURT:  Thank you.  Everyone may be seated.
 7          Thank you, Amber, for being here early.  It's --
 8   we're on the record but outside the presence of the jury
 9   because some parties wanted to place an objection on the
10   record.
11          MR. TOMSHECK:  Yeah, real quick record --
12          THE COURT:  Oh.  We don't have --
13          MR. TOMSHECK:  My client's not in here.  We've told
14   him what's going on.  He needs to eat.
15          THE COURT:  Okay.
16          MR. TOMSHECK:  He's got diabetic issues.
17          THE COURT:  That's fine.
18          MR. TOMSHECK:  We told him to wait outside.
19          THE COURT:  Okay.  So his presence is waived.
20          MR. TOMSHECK:  Thank you.
21          MR. TANASI:  Thank you.
22          THE COURT:  But I see another empty chair...
23          MR. GAFFNEY:  That goes for Miguel Castro as well.
24   He -- he needs to get something to eat.
25          THE COURT:  Okay.  And so you're asking to waive his
```

2:19-cr-00295-GMN-NJK - April 13, 2023

1    presence as well?

2         **MR. GAFFNEY:**  Yes, Your Honor.  Thank you.

3         **THE COURT:**  Okay.  So his presence will be waived.

4         **MR. BROWN:**  And Mr. Mendez is outside.

5         **THE COURT:**  Do you want him in or out for this?

6         **MR. TOMSHECK:**  Well, he's the witness, so...

7         **MR. BROWN:**  Yeah.

8         **THE COURT:**  Okay.  So his presence is waived also.

9    Who else are we missing?  Is that it?  Okay.

10        **MR. GREEN:**  We're also asking if Mr. Salvador

11   Castro -- that his presence be waived for a few moments.

12        **THE COURT:**  All right.  Yes.

13        **MR. GREEN:**  Thank you, ma'am.

14        **THE COURT:**  His presence will be waived as well then.

15        **MR. GREEN:**  Thank you.

16        **MR. TOMSHECK:**  Judge, the Government and I have a

17   fundamental difference in position on the line of questioning

18   that was happening before we broke.  Mr. Finley and I talked

19   about it at the break, and then we came back from the break.

20   My position is this.  The issue related to the car accidents

21   that purportedly other members of Mr. Mendez's family were in

22   over a period of time.  I understand where the Government's

23   going, and I think the clear inference is that there's some

24   kind of staging of accidents and/or insurance fraud happening.

25        The document that was given to us right before we

 1  broke, my cursory review of it -- and I've never seen it

 2  before today, just like the bank loan documents, has one

 3  mention of Mr. Mendez's name as the owner of a vehicle.  He's

 4  not there.  He's not involved in the accident, and I don't

 5  even think -- is his wife involved in that accident?

 6          **MR. MISHLER:**  No.

 7          **MR. TOMSHECK:**  His wife's not even involved in that

 8  accident.

 9          So my problem is, is to me it's very clear -- much

10  like the Government acquiesced to at sidebar on the first

11  issue -- that this is an allegation of some other type of

12  fraud that's being perpetrated by someone who's not a

13  defendant in this trial with the clear intent of placing that

14  in front of the jury.

15          My client has nothing to do with it.  Mr. Mario

16  Castro isn't alleged to be an owner, a participant, a

17  recipient, he's gotten no proceeds.  None of it has to do with

18  him except that the stair-stepped approach of the Government

19  is Mr. Mendez has to be aware that his wife and her family

20  members are committing some type of insurance fraud, and as a

21  result, he's fraudulent; and as a result, he's part of this

22  fraudulent scheme; and as a result, at the end of the day, we

23  should find all these people guilty.  Clearly they're not

24  going to make that direct argument, but that's the inference.

25          It's a 404(b) situation.  It's certainly more

1    prejudicial than any remoteness of a probative value that it

2    could have.  And my request to Mr. Finley was, look, is there

3    going to be anything more like this?  If so, please tell me.

4    We can disagree, bring it to the Court's attention, and you

5    can call the balls and strikes on the issue.

6          I think it's an inappropriate line of questioning.

7    Mr. Finley's represented to me that it's the last of what I

8    would term an inappropriate line of questioning.  They may

9    have a position to make, but I don't think the jury should be

10   hearing about it.

11         **THE COURT:**  All right.  And Mr. Brown, what's your

12   position?  Because it's your witness.

13         **MR. BROWN:**  Same -- same position, Your Honor.  And,

14   I mean, we -- we talked about this.  You know, to reiterate a

15   little bit, this has nothing to do with Mr. Mendez.  What the

16   Government is attempting to do is say he's married to a woman

17   whose family and extended family are involved in fraud.  And

18   by implication, she, I suppose, knew this was fraud; and by

19   implication, he, I suppose, knew this was fraud.  It's -- you

20   know, it's highly attenuated.  It's not -- it has nothing to

21   do with Mr. Mendez.

22         So we would join the objection that mister --

23   Mr. Tomsheck put on the record.

24         **THE COURT:**  All right.  Well, it doesn't have -- it

25   doesn't have nothing to do with Mr. Mendez.  So it is related

1    to Mr. Mendez inasmuch as it's his wife, but I don't see how

2    it could be inextricably intertwined because it's not money --

3    it's not fraud proceeds that we're following to see where it

4    goes and what's done with it.  This is different money that is

5    coming from insurance policies or something or -- or -- or

6    somebody who is the negligent party in the lawsuit?  So I'm at

7    a little bit of a loss, too, as to what is the relevance of

8    this information that does appear to be bad character

9    evidence.

10          And I know it's -- it would be relevant that people

11   who cheat and lie are going to cheat and lie.  People who

12   defraud are going to defraud.  But this is more akin to a

13   404(b) bad character evidence unless there is no prejudice.

14   So I'm trying -- I don't know what -- where we're going with

15   this.  So I guess that's why I'm trying to figure it out and

16   get ahead of it, but I honestly can't.

17          **MR. FINLEY:**  Yes, Your Honor.

18          So Your Honor will recall that on direct Mr. Mendez

19   presented an extremely prejudicial victim story about how him

20   and his family were terrorized at the hands of law

21   enforcement.

22          This goes directly to the credibility of that story.

23   Part of the mistreatment that he supposedly suffered was that

24   a huge amount of money was taken from the safe that should not

25   have been taken because it was clean money.  And he has a

1    story about that, about how it's all perfectly clean.  That's

2    his story.  He chose to put that in there.  This was very

3    prejudicial.  It's completely made up.  It's got -- it's got

4    the race card being played in a big way.  We had no notice of

5    it, and this rebuts that.  It also rebuts a lot of --

6            **THE COURT:**  How does this rebut that?

7            **MR. FINLEY:**  Because he's saying that money was

8    unjustly taken from him from the safe, and the whole story is

9    made up.  Because that money was not money from the settlement

10   to begin with and, also, his story about how it's clean and it

11   was legitimate money from a legitimate lawsuit which he

12   testified to, that's all false.

13           **THE COURT:**  He said the check came from the attorney

14   to his wife.

15           **MR. MISHLER:**  Your Honor?

16           **THE COURT:**  It was in the bank.  Is there bank

17   records showing that no money was ever deposited in the bank

18   or something like that?  Like, that would be a proper

19   impeachment of that story if he's saying the money came from

20   the lawyers.  And even though it was in a check, it got turned

21   into cash at the bank because he -- some of it was deposited

22   and some of it was withdrawn but there's no record of that in

23   the bank.  That would be fair.

24           So I guess I'm lost as to how does -- how does having

25   multiple -- five car accidents in six years, all in which they

2:19-cr-00295-GMN-NJK - April 13, 2023

1   are rear-ended, too many cars to keep track of to remember or

2   something like that he said, how does that rebut that he was

3   handcuffed and his wife was handcuffed and --

4           **MR. FINLEY:**  Part of the overall --

5           **THE COURT:**  Not the handcuffing --

6           **MR. FINLEY:**  -- story was that --

7           **THE COURT:**  -- part --

8           **MR. FINLEY:**  -- his money --

9           **THE COURT:**  The money in the safe.

10          **MR. FINLEY:**  It was rightfully his.  It was stolen

11  from him.  A big deal was made about, oh, you believed

12  everyone else about their money, you let some people keep it,

13  and here's this huge chunk of money that rightfully belonged

14  to him that was stolen by the police.  That's just the

15  beginning of how this is relevant.

16          **THE COURT:**  Not that belonged to him.  That belonged

17  to his wife that she had received in the car accident.

18          **MR. FINLEY:**  It's sitting in the safe with his money.

19  One of -- the car accident I'm about to ask about --

20          **THE COURT:**  Wasn't it in a different pouch or

21  something?  Like a zip pencil -- bigger than a pencil.  Kind

22  of like a makeup bag.  Like a zipper --

23          **MR. BROWN:**  That was -- that was -- that was from his

24  wife's wallet, I think.  The money in the safe, there were two

25  envelopes.  Mr. Mendez testified, yeah, that was mine.  That

2:19-cr-00295-GMN-NJK - April 13, 2023

```
 1    was from the businesses --
 2           THE COURT:  Oh.  The bank envelopes.
 3           MR. BROWN:  Then there were two separate stacks of
 4    money outside of envelopes.  He said that was from my wife.
 5           THE COURT:  Yeah.  And there was testimony --
 6           MR. FINLEY:  $40,000.
 7           THE COURT:  -- from someone else early on, one of the
 8    Government witnesses, that those are the kinds of envelopes
 9    that the bank provides when you withdraw cash from an account.
10    Those are the kind of envelopes that they put the cash in when
11    they give it to you.
12           MR. FINLEY:  Yes.  He also said that his
13    father-in-law is honest.  He hesitated about that.  He had to
14    be -- that had to be pulled out of him.  Looked like he was
15    thinking about a long history there.
16           His car, which I'm about to ask about, was an
17    instrumentality of this fraud.  It was damaged in the next
18    accident I'm going to talk about.  And his credibility
19    regarding not knowing about any of this, including that he
20    didn't know who was driving and, you know, what really
21    happened -- I mean, he's clearly lying about a bunch of
22    things.  And I'm trying to prove that that's what he's doing.
23           THE COURT:  But the means by which you prove that he
24    is lying is the question.  Some of it is appropriate; some of
25    it's not appropriate.  And...
```

1    **MR. FINLEY:**  I think it's appropriate if it's

2   probative of his lying.

3       **THE COURT:**  So questions probative of his lying are

4   relevant and proper impeachment so long as they're not also

5   attempting to show bad character that is not inextricably

6   intertwined with this case.  So if it's a separate act of bad

7   character that isn't part of this, his -- his -- like I said,

8   liar's going to lie, cheater's going to cheat.  All of that

9   obviously comes in.  The defrauding part when it comes to tax

10  fraud, bank fraud, and now possibly -- I don't know what

11  personal injury fraud is.  It's also fraud.

12       **MR. FINLEY:**  Insurance fraud.

13       **THE COURT:**  Another fraud.  The insurance fraud.

14  Thank you.

15       You know, if it had been a motion in limine, we could

16  have looked and there might be some cases that would be

17  helpful one way or the other.  Because it's -- I think maybe

18  the distinction here is that he's on the stand as opposed to

19  not on the stand, but I can't be sure of that --

20       **MR. FINLEY:**  Yes.

21       **THE COURT:**  -- without some research.

22       **MR. FINLEY:**  Yeah, this is cross-examination.  It's

23  his credibility.

24       **MR. TOMSHECK:**  But part of the -- part of the thing

25  he's alleging he's trying to rebut or impeach is a personal

1    character assessment of the witness of a family member.  Then

2    he's going to confront him with something else.

3           So, like -- I mean, that would be like me asking

4    Inspector Bouchie, hey, do you like Scooby-Doo, and then

5    confronting him with some anti-Scooby-Doo campaign.  Like, it

6    doesn't have anything to do with what we're talking about

7    here.  Like, he's making up assessments that the witness is --

8    like, whether or not he trusts someone or believes someone

9    that's not charged in this case, he's asking other people

10   things about that.  As to the defendants, like, I wouldn't

11   have a problem if he said do you trust Mario --

12           **THE COURT:**  Well, I don't take it like that because I

13   think he is -- I think that the Government is trying to test

14   the witness' understanding of what his fraud or his acceptance

15   of fraud or how big is the gray area between legitimate and

16   fraud in your world as opposed to maybe in other people's

17   worlds.  So I think there are quite a few questions that he's

18   asked so far that are relevant and are permissible.  I'm --

19   I'm just not comfortable going into tax fraud, insurance

20   fraud, bank fraud without some research because I feel very

21   blindsided.  And I apologize if my ruling is wrong, but I'm --

22   off the top of my head, I don't -- I don't feel comfortable

23   with it, and I think it would potentially be reversible error.

24           And if -- if you wanted to take a break, that's okay,

25   to give me a case or give me some time to look for something.

1   But I'm not seeing where that line of questioning -- if you

2   stay away from those claims and are just talking about his --

3   his -- well, I'm not going to tell you what to say.

4           **MR. FINLEY:**  Yeah.  I understand.  I understand the

5   Court's feeling about this.  I will stay away.

6           **THE COURT:**  Yeah.  The prohibited subjects are

7   portraying him as a -- tax fraud, bank fraud, insurance fraud

8   conduct that is unrelated to this case.  Obviously, if it's

9   more to the guts of this case, then it's -- like I said

10  before, when you're following the money and where the money

11  went and what you did with it, like you were saying, you know,

12  if you're hiding the money because you can't declare it, you

13  can't --

14          **MR. FINLEY:**  Well, you know, it's a key component of

15  the prejudicial victim story that was told, and this

16  completely falsifies that story and --

17          **THE COURT:**  Completely falsifies which story?

18          **MR. FINLEY:**  That he was -- part of victimization by

19  law enforcement was that money that rightfully belonged to him

20  was taken.  It wasn't -- you know, it wasn't his money.  It

21  wasn't -- you know, it wasn't even the insurance claim money

22  to begin with.  It was the Patti Kern/Castro scheme money that

23  was sitting in there, and they tried to lie and say it was

24  insurance money.  That's odd that you get a $100,000 check and

25  then you cash $40,000 and stick it in the safe.  Who does

2:19-cr-00295-GMN-NJK - April 13, 2023

1    that?  It's like -- that -- that's not true.  But if he's

2    going to go there, then I would like to falsify that.  He

3    put -- he put it directly in issue.  But I'm not going to

4    reargue it.  I respect your ruling, and I'll just move on.

5           THE COURT:  Well... when you say, "Who does that,"

6    that's a great question to ask in closing argument.  But for

7    impeachment purposes, if you don't have something more -- like

8    I said, like a bank record.  Oh, you claim that this -- you

9    got a check for $101,000 and it was deposited and then some of

10   it was withdrawn and here's your checking account with your

11   wife and -- you know, that would have to be on there and it's

12   not on there.  Something like that.  I'm just not following

13   how this line of questioning that you're asking now actually

14   is relevant to discredit his story about the car accident

15   money.

16          MR. FINLEY:  I appreciate all the --

17          THE COURT:  I'm sorry, but --

18          MR. FINLEY:  -- thought you've given it.  I will move

19   on.

20          THE COURT:  Yes.  That's all I can do.

21          MR. FINLEY:  Yeah.

22          THE COURT:  All right.  Anything else?

23          MR. FINLEY:  We -- we did -- yeah, we did straighten

24   out the issue with the text.  We know it's authentic.  We

25   looked at the data.  We compared the source data to the

1  exhibit.  It's all correct.  It's trustworthy because the

2  defendants stipulated to the same phone, and these texts are

3  from that same phone.  Other texts from that phone have been

4  stipulated as admissible.  I think that's proof in itself that

5  it's authentic.

6          **THE COURT:**  So the questions --

7          **MR. FINLEY:**  The question is if --

8          **THE COURT:**  -- before were --

9          **MR. FINLEY:**  -- it's relevant.

10         **THE COURT:**  -- whether or not it was from a different

11  person.  So if it's -- it's a text to Luis or from Luis, that

12  works.  But I think the -- wasn't the concern that this was a

13  text received by a different person that wasn't Luis and not

14  sent by Luis?  So that's been clarified --

15         **MR. FINLEY:**  Well, it's a group text, and it -- there

16  are within the group texts another person, but these are texts

17  between -- it is accurate to say these are texts between Jose

18  Mendez and Sean O'Connor.

19         **THE COURT:**  All right.

20         **MR. FINLEY:**  There might be some others in there.

21  That can certainly be clarified.  You know, be self-evident

22  from the exhibit itself.  But the title's not inaccurate.

23         **THE COURT:**  So, Mr. Brown then, do you agree that the

24  confusion has been clarified and that this is the exhibit -- I

25  think -- was it 302?  I lost my notes.  Was it 302 was what

1    you were...?

2              **MR. FINLEY:**  Yes, Your Honor.

3              **THE COURT:**  So it was -- so it's 302.

4              **MR. FINLEY:**  302, Dan?

5              **MR. ZYTNICK:**  Yes.

6              **THE COURT:**  This is the one that said "USA USA USA."

7              **MR. FINLEY:**  Yes.

8              **MR. ZYTNICK:**  And, Your Honor --

9              **THE COURT:**  That we thought was not in the Excel

10   Cellebrite extraction reference.  But now it's clarified that

11   it is?

12             **MR. ZYTNICK:**  Yeah, it was correct all along.  I was

13   a little unsure based on the concern, but we figured out what

14   the issue is.  I talked to mister -- Ms. Smith about it right

15   before you came on.  So I see the defense.  I think they're

16   still conversing about that, but -- I don't know.

17             **THE COURT:**  You say Mr. Smith?

18             **MR. ZYTNICK:**  No, Ms. Smith.  The paralegal.

19             **THE COURT:**  Oh, the paralegal.  Okay.

20             **MR. BROWN:**  Okay.  So what it looks like -- I think

21   what I'm gathering is that some of these text messages were

22   pulled from the chat subset of the extraction and some were

23   pulled from the instant message subset of the extraction?

24             **MR. ZYTNICK:**  Yes.

25             **MR. BROWN:**  Okay.  Okay.  I understand that now.

1          We still -- because these are not actually just text

2    messages between Mr. Mendez and Mr. O'Connor, this document

3    should not be titled "Text Messages between Jose Luis Mendez

4    and Sean O'Connor."

5          **THE COURT:**  So you want the group chat including --

6          **MR. BROWN:**  That would be more accurate.

7          **MR. FINLEY:**  I feel like --

8          **THE COURT:**  Are there other --

9          **MR. FINLEY:**  -- it's immaterial, and we also can

10   stipulate orally that -- you know, that it should say text and

11   chat message technically speaking.

12         **THE COURT:**  Well, the exhibit itself, does it show

13   texts from other people different than --

14         **MR. BROWN:**  Yes.

15         **THE COURT:**  Okay.

16         **MR. ZYTNICK:**  But I think --

17         **THE COURT:**  I see what you're saying, that it would

18   be self-evident and you can just explain that.

19         **MR. ZYTNICK:**  And I think, as a technical matter,

20   maybe it is a text versus a group chat.  But when people text

21   with more than two people, it may technically be a group chat.

22   But in normal usage, people just call that texting even --

23         **MR. TOMSHECK:**  Except -- I don't mean to interrupt.

24   But except that some of the texts that are proffered don't

25   come from Sean O'Connor or Jose Luis.  They come from a

1  different person, and there's other recipients in the chat.

2  It's not just those individuals.

3          MR. FINLEY:  You know, but why does that matter?  I

4  mean, these are just --

5          THE COURT:  Does it just --

6          MR. FINLEY:  -- immaterial technicalities, and we're

7  just going to have to call a rebuttal witness and extend the

8  trial.  It's coming in.

9          MR. TOMSHECK:  Well, out of respect, I think --

10          THE COURT:  So it --

11          MR. TOMSHECK:  -- you get to decide if it comes in.

12          THE COURT:  Are these extra texts and chats from the

13  other group members giving --

14          MR. TOMSHECK:  Yes.

15          THE COURT:  -- context to what's being said?

16          MR. TOMSHECK:  No.  Because they're not the complete

17  recitation of the texts.

18          For instance, they'll take two texts on one day and

19  put that there.  Then below it they'll put a different

20  conversation on a different day.  It's not -- it's not a fluid

21  conversation.  It's in different context from different

22  sources, and some of the texts --

23          THE COURT:  Are the dates represented on there so we

24  can see that these are different days and different

25  conversations and not an ongoing thing?

```
1            MR. TOMSHECK:  But there are texts on there that
2    neither --
3            THE COURT:  Is that a yes?
4            MR. ZYTNICK:  Yes.
5            THE COURT:  Okay.
6            MR. TOMSHECK:  -- neither of those individuals wrote.
7    So it's not texts between those two.
8            MR. FINLEY:  They received them.
9            THE COURT:  So you're saying they're not relevant?
10           MR. TOMSHECK:  Well, they're not relevant, and it's a
11   misrepresentation to the jury as to what they are.  They've
12   titled the document texts between these two.
13           THE COURT:  Does the chat not identify who is --
14   whose --
15           MR. TOMSHECK:  It doesn't all of them.
16           THE COURT:  There's blue and there's green from what
17   I saw.  I can't remember if there's other colors, too.  But
18   there's blue boxes and green boxes of texts.  Does it say
19   whose -- whose phone that came from or who is sending it
20   rather?
21           MR. TOMSHECK:  That's part of the problem, is the
22   original one had it coming from an unknown to Luis Aguilar.
23   And then the same text is titled in the second document from
24   Luis Aguilar to other individuals.  But there are -- there
25   are -- if I'm not mistaken -- I'm pulling it up right now --
```

2:19-cr-00295-GMN-NJK - April 13, 2023

```
1    there are names in there that are not identified and numbers
2    that aren't identified.
3           THE COURT:  Names and numbers that are not
4    identified?  What do you mean?  What does that mean?
5           MR. TOMSHECK:  I'll pull it up.
6           THE COURT:  There are names and numbers in there who
7    are not people that we've heard from before?
8           MR. FINLEY:  Right.  But the communication is
9    received by the two people we're talking about.  So it's
10   relevant that they're part of a conversation, and they're
11   listening and receiving the texts as well as sending the
12   texts.
13          So, you know, it is texts between Sean O'Connor and
14   Mendez.  Anybody can clarify that there are additional people.
15   What we really care about are those two.  And the texts are
16   accurate as to date.  We have been using all along text
17   extractions where you jump from one series of events on one
18   date to the next.  It's --
19          THE COURT:  And they're identified as such on that
20   exhibit?
21          MR. FINLEY:  Right, the dates are on there.
22          THE COURT:  So it's a different date and a different
23   time.  So I don't see the prejudice, and I don't see why they
24   wouldn't be relevant.  The objection's overruled.
25          MR. TOMSHECK:  So just to further the record -- I
```

```
 1    understand and respect the Court's ruling.  But the example I
 2    was giving is there are -- there's a text from a phone number
 3    identified as Luis Aguilar to a phone number that's identified
 4    as Edgar to a phone number that's not identified, there's no
 5    name attached to it, and to a phone number identified as Joe
 6    Luis.  So there are people on there that have not been
 7    identified, and there are phone numbers on there that have not
 8    been --
 9            THE COURT:  They are identified as being different
10    people that are not the witness or Sean O'Connor?
11            MR. ZYTNICK:  Well, in fact, I can clarify the --
12            THE COURT:  So it's clear to the jury we're not lying
13    to them that these are texts that are coming from Sean or the
14    witness.  They're from other people?
15            MR. TOMSHECK:  Well, some of them are from unknown.
16            MR. ZYTNICK:  The unknowns are all from Sean
17    O'Connor.  This is -- it's his phone.  The froms from him
18    are -- owner.  The two -- the texts that are to Sean O'Connor,
19    it just has the phone number.  All the other names are listed.
20            THE COURT:  So it's accurate.  I don't know why it's
21    prejudicial.  So that's why I'm overruling the objection.
22    It's not a misrepresentation.
23            Anything else before we bring in the jury?
24            MR. FINLEY:  No, Your Honor.
25            THE COURT:  All right.  Let's go ahead and bring them
```

```
 1   in, Nick.
 2           MR. TANASI:  Take a second.  We'll grab our clients,
 3   Your Honor.
 4           THE COURT:  Yes.
 5           MR. GREEN:  And for the record, Your Honor -- Don
 6   Green on behalf of Salvador Castro -- we join in the
 7   objections and arguments of counsel for Mr. Mario Castro and
 8   for Jose Luis Mendez.  Thank you.
 9           THE COURT:  Yes.  Thank you, Mr. Green.
10           Any of the objections that are made by the defendants
11   the Court assumes are joint objections and motions unless the
12   parties tell me otherwise that they want to be excluded and
13   not included in those.
14           MR. GREEN:  Thank you again, Your Honor.
15       (Pause in proceedings.)
16           COURTROOM ADMINISTRATOR:  All rise.
17       (Jury in at 1:13 p.m.)
18           THE COURT:  All right.  Let's go ahead and take a
19   seat.  We're back on the record in the presence of the jury.
20   We have the witness, Mr. Jose Luis Mendez, back on the witness
21   stand.
22           And I do remind you, sir, that you are still under
23   oath.
24           We're going to continue now with cross-examination by
25   the Government.
```

*Jose Luis Mendez - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1        Mr. Finley, you may proceed.

2              **CONTINUED CROSS-EXAMINATION**

3    BY MR. FINLEY:

4    Q.   Mr. Mendez, do you stand by your testimony from yesterday

5    that you never had any conversations with Sean O'Connor about

6    soccer?

7              **MR. BROWN:**  Objection.  Misstates testimony.  He said

8    he never had those conversations at work.

9              **MR. FINLEY:**  Your Honor, this is --

10             **THE COURT:**  All right.  So the jury -- the jury has

11   their own recollection which is what should guide them during

12   the deliberation process.

13             **MR. BROWN:**  Thank you.

14             **MR. FINLEY:**  May it please the Court?

15             **THE COURT:**  Yes.

16   BY MR. FINLEY:

17   Q.   Do you need the question again, sir?

18   A.   Please.

19   Q.   Do you stand by your testimony from yesterday that you

20   never had any conversations with Sean O'Connor about soccer?

21   A.   Not in person, no.

22   Q.   If --

23             **THE INTERPRETER:**  May the interpreter clarify?

24             **MR. FINLEY:**  Yes.

25             **THE WITNESS:**  Face to -- not face-to-face.

*Jose Luis Mendez - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    **BY MR. FINLEY:**

2    Q.   Not face-to-face.

3         If he said that the two of you joked around and

4    talked about soccer, he'd be lying?

5    **A.**   No, because we did joke around when it was the World Cup.

6    Q.   Okay.  So you don't stand by your testimony from

7    yesterday?

8    **A.**   I believe that we did kid around.  We did it by texting.

9    Q.   Only by texts.

10        So is there some reason you would only kid around by

11   text but not in person?

12   **A.**   You know, maybe because we did set up screens or a TV

13   screen to watch soccer there at the company.  So maybe if we

14   were watching soccer.

15   Q.   Did you speak to any person between yesterday and today

16   who may have informed you that you needed to change your prior

17   testimony about soccer?

18   **A.**   No, sir.

19        **MR. FINLEY:**  Can we go to Government Exhibit 302?

20   That's admitted.

21   **BY MR. FINLEY:**

22   Q.   Do you see that, sir?

23   **A.**   Yes.

24        **MR. MISHLER:**  Sorry, Judge.  Our monitors are dead

25   again somehow.

*Jose Luis Mendez - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1          **THE COURT:**  Oh, did we lose the monitor?

2          **COURTROOM ADMINISTRATOR:**  He may have stepped on the

3   cord.

4          **MR. MISHLER:**  No, no, no.  It's not that.  It's

5   something with the cords.

6      *(Pause in proceedings.)*

7          **THE COURT:**  Can the jury all see their screens?

8          **THE JURY:**  (Nods heads.)

9          **MR. GAFFNEY:**  Ours are working as well.

10         **THE COURT:**  Can we proceed with your sharing screens

11  for now, and we'll call IT to come fix it?

12         **MR. BROWN:**  (Nods head up and down).

13         **THE COURT:**  It's generally usually a loose wire.

14  It's just that they put all the wires under the fabric that

15  has the Velcro.  So if you start messing with it, it actually

16  makes it worse, not better.  But I apologize for that.  It's

17  the only way they know how to connect so many monitors

18  together with the few floor electrical sockets we have.

19         **MR. MISHLER:**  Sorry, Your Honor.

20         **THE COURT:**  No, not your fault.  Oh.  I see what you

21  did.  So the attorneys and the paralegal and the investigator

22  switched monitors.  Good.  Smart.  I'm sorry I didn't suggest

23  that earlier.

24         **MR. MISHLER:**  Didn't occur to me either.

25         **THE COURT:**  Okay.  Thank you.

*Jose Luis Mendez - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1          Sorry, Mr. Finley, for the interruption.  You can

2   proceed.

3          **MR. FINLEY:**  Thank you.

4   **BY MR. FINLEY:**

5   Q.   We're looking at Government Exhibit 302 which includes

6   some texts between you, Sean O'Connor, and others.

7          I will represent to you that "Unknown" on the texts

8   stands for Sean O'Connor's phone.

9          Look at the middle text, please.

10  **A.**   Yes, sir.

11  Q.   That's from Unknown, or Sean O'Connor, to somebody at the

12  phone number (702)238-9451.  Do you see that?

13  **A.**   Yes, sir.

14  Q.   And in the phone, the name associated with that number is

15  Joe Luis.  Do you see that?

16  **A.**   Yes, sir.

17  Q.   Is that a text that you received on March 26th, 2013?

18  **A.**   Yes, sir.

19  Q.   Does it say, "USA USA USA"?

20  **A.**   Yes, sir.

21  Q.   Do you respond to that text?

22  **A.**   Yes, sir.

23  Q.   Do you see where you say, I, k-o-n [sic], i-a-m -- I

24  think you meant to write I know I am?  Is that what you meant

25  to write there, sir?

*Jose Luis Mendez - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    **A.**    I think I wrote I'm an American citizen.

2    Q.    Yes, sir.  That's what you wrote.

3          And then you wrote F, asterisk, asterisk, asterisk,

4    Mexicans?

5    **A.**    Yes, sir.

6    Q.    And you are -- you're joking there; right?  You're making

7    a joke?

8    **A.**    Yes, that's the -- your Mexican humor there, sir.

9    Q.    Yes.  I understand.

10          Nothing wrong with making a joke.  I'm not suggesting

11   that.  But I am suggesting that you didn't tell the truth

12   yesterday when you suggested that you didn't talk with Sean

13   O'Connor about soccer and joke around.

14   **A.**    You're absolutely right, sir.  Maybe that doesn't justify

15   the misunderstanding.  But I thought you meant an argument

16   regarding soccer.

17   Q.    Don't think anybody asked you about that.  I think it was

18   your lawyer who asked you about soccer.

19          But anyway, there was a soccer game going on between

20   the United States and Mexico at the time of these texts;

21   correct?

22   **A.**    Sir, I don't remember that, but it must have been.

23   Q.    And if I were to represent to you that there is

24   information on YouTube that would show that there was such a

25   game and that the U.S.A. scored a goal before this "USA USA

*Jose Luis Mendez - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    USA" text was sent, would you have any reason to think that

2    that was not true?

3    **A.**    No, sir.  There would be no reason.  It just means

4    remembering.

5    Q.    Oh.  I stand corrected.  I got that wrong.  This game was

6    zero-zero.  The -- but the next page is from a different date;

7    correct?

8    **A.**    Wasn't the previous one also 9/10/2013, sir?

9    Q.    Let's go back.  No, sir.

10    **A.**    Oh.  You're right, sir.  It's a different date.

11    Q.    Okay.  Next page.  From owner -- sean O'Connor is the

12    owner of that phone -- there's a text to you and other people;

13    correct?

14    **A.**    Yes, sir.

15    Q.    And it says:  Goal, U.S.A., U.S.A.?

16    **A.**    Yes, sir.

17    Q.    And then you write in the next text, "I am American

18    cotizen."  Did you mean to write I am an American citizen?

19    **A.**    Yes, sir.

20    Q.    And the next text is not from you.  It's from Luis

21    Aguilar, isn't it?

22    **A.**    Yes, sir.

23    Q.    And again, there's some joking; yes?

24    **A.**    Yes, sir.

25    Q.    And then Luis Aguilar writes goal like they say on TV

*Jose Luis Mendez - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1  when you're watching soccer; right?

2  **A.**    Yes, sir.

3  Q.    There was a game going on at this time as well?

4  **A.**    I assume so, sir.

5  Q.    Another occasion where you and Sean O'Connor were

6  discussing soccer; yes?

7  **A.**    Yes, sir.

8  Q.    And you were able to remember somehow that there were

9  soccer games that everybody inside the lettershop would hang

10  out and watch, right, on TV?

11  **A.**    Yes, sir.

12       **MR. FINLEY:**   Can we go back to the first page?

13  **BY MR. FINLEY:**

14  Q.    You remember there was some testimony yesterday about

15  Google Translate?

16  **A.**    Yes, sir.

17  Q.    I believe you testified that you always used Google

18  Translate when you communicate with Patti Kern or Sean

19  O'Connor.

20  **A.**    Yes, sir.

21  Q.    Will you look at the text at the bottom where you write I

22  k-o-n [sic], and then the next word is i-a-m?

23  **A.**    Yes, sir.  But I'm not sure that I wrote that.

24  Q.    It says from Joe Luis, and it has the same phone number

25  that you identified with yourself?

1    **A.**   That's true, sir.  But sometimes we grab someone else's

2    phone.

3    Q.   I see.

4         So --

5         **MR. FINLEY:**  By the way, just for the record I

6    misspelled -- or I misstated the first word.  K-o-w-n.

7    **BY MR. FINLEY:**

8    Q.   Do you see that?

9    **A.**   Yes, sir.

10   Q.   Did Google Translate misspell those words for you?

11   **A.**   Sometimes when you in Spanish write -- well, I'm not

12   saying that it happened on this occasion, but I know it's

13   happened before on other texts where, if I misspell it in

14   Spanish, then the translation in English is misspelled.

15   Q.   How did you think to say that somebody else may have used

16   your phone?

17   **A.**   I'm not trying to say that that's what happened on this

18   occasion.  But, yes, we would -- we would kid around and we

19   would take each other's phones to send e-mails.  I apologize.

20   I mean messages.

21   Q.   Let's take a look at the next page.

22        Oh, by the way, the question was:  Did Google

23   Translate misspell those words for you?  And you didn't answer

24   the question, so I'd like to give you another opportunity to

25   answer that question.

*Jose Luis Mendez - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    **A.**    No, sir.  It's possible that I wrote that short phrase.

2    **Q.**    It looks like on page 2 in your message, "I am American

3    cotizen," there's another word misspelled; right?  You

4    misspelled the word citizen?

5    **A.**    Yes, sir.

6    **Q.**    And did Google Translate misspelled that word for you?

7    **A.**    No, sir.  I believe that was me.

8    **Q.**    There was a juror question a few days ago about Google

9    Translate.  You were here for that; right?

10   **A.**    I don't remember, sir.

11   **Q.**    Is the juror's question about Google Translate how you

12   got the idea to testify that you always used Google Translate?

13   **A.**    No, sir.  No.  This is something that I explained to my

14   attorney from the beginning.  And it's possible that you have

15   the images from my phone from when you guys took it and you

16   are able to find out that Google Translate app is on there.

17   **Q.**    Did you check Sean O'Connor's phone before you testified

18   yesterday?

19   **A.**    Sean O'Connor's phone?  I do not have his telephone --

20   oh, I don't understand.

21   **Q.**    It has been provided to you via your attorneys.  Having

22   that knowledge, did you check Sean O'Connor's phone before you

23   testified yesterday?

24        **THE INTERPRETER:**  For the interpreter, did you check

25   or did you text?  I'm not sure --

*Jose Luis Mendez - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1      **MR. FINLEY:**  Check.

2      **THE INTERPRETER:**  Check.

3      **THE WITNESS:**  Where?

4    **BY MR. FINLEY:**

5    Q.   I don't understand what you're asking me.  Do you need

6    the question to be restated?

7    A.   I don't understand your question either.

8    Q.   Did you check Sean O'Connor's phone before you testified

9    yesterday?

10   A.   But where I'm not understanding -- and I apologize.  But

11   I don't understand if you're saying if I checked a paper, if I

12   checked a telephone.

13   Q.   Did you look for Sean O'Connor's texts and check them at

14   any point in time before you testified yesterday?

15   A.   As a matter of fact, I do have them, sir, but I have very

16   few of them.  These specific texts here, I don't have those.

17   Q.   Do you wish you had seen them before you testified

18   yesterday?

19   A.   No, sir.  I don't know.  Unless I have a problem with

20   soccer?  I don't know.

21   Q.   Patti Kern spoke English to you?

22   A.   Always, sir.

23   Q.   Sean O'Connor spoke English to you?

24   A.   Always, sir.

25   Q.   You texted with Patti Kern in English?

*Jose Luis Mendez - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    **A.**   Yes, sir.

2           **MR. FINLEY:**  Can we look at Government Exhibit 150,

3    page 26?

4    **BY MR. FINLEY:**

5    Q.   Look at the third text down, August 21st, 2017,

6    12:04 p.m.  Your counsel asked you about that text yesterday.

7    You testified that you used Google Translate to send that

8    text.

9    **A.**   Yes, sir.

10   Q.   Did Google Translate misspell the word envelope for you

11   on this text?

12   **A.**   What?  I didn't understand.

13   Q.   I'll move on.

14          The money that was taken from you on the day of the

15   search warrants, did you file a claim demanding its return?

16   **A.**   Sir, on that same day I talked to some attorneys, and

17   they offered that option but I did not go through with it.

18   Q.   You did not go through with it because you knew you had

19   no right to that money?

20   **A.**   Yes, sir --

21          **MR. FINLEY:**  No further questions.

22          **THE WITNESS:**  -- I did not have a right to those

23   $40,000.  But I also didn't have a right to those other 25- or

24   $27,000 because they weren't mine.

25          **MR. FINLEY:**  No further questions.

1              **THE COURT:**  Any redirect, Mr. Brown?

2                         **REDIRECT EXAMINATION**

3      **BY MR. BROWN:**

4      Q.   Mr. Mendez, what you know now about the prize notices in

5      this case is very different from what you knew before 2018; is

6      that fair?

7      **A.**   Yes, sir.

8      Q.   After 2018, you knew that those prize notices were fake?

9      **A.**   Yes, sir.

10     Q.   Did you know that before 2018?

11     **A.**   No, sir.

12     Q.   Thank you.

13             **THE COURT:**  Mr. Gaffney, any other questions for this

14     witness?

15             **MR. GAFFNEY:**  No, Your Honor.  Thank you.

16             **THE COURT:**  Mr. Green, any questions for this

17     witness?

18             **MR. GREEN:**  No questions.  Thank you, Your Honor.

19             **THE COURT:**  And Mr. Tomsheck, any questions for this

20     witness?

21             **MR. TOMSHECK:**  No thank you, Your Honor.

22             **THE COURT:**  All right.  So at this time if any member

23     of the jury has a question -- oh.  I'm sorry.  Mr. Finley, did

24     you have any recross after Mr. Brown's questions?  Technically

25     you have the right to if you do.

 1          **MR. FINLEY:**  No thank you, Your Honor.

 2          **THE COURT:**  Okay.  So if any members of the jury have

 3    a question for this witness, please go ahead and write it down

 4    on the form provided.  Take your time and write neatly.

 5    Number the questions or skip a line or add a dot.  Remember,

 6    we don't need your name or your jury number or initial; just

 7    your question.  And when you're all done, fold the piece of

 8    paper in half and look up and pass it to our courtroom deputy.

 9          **THE INTERPRETER:**  Your Honor, may the interpreter

10    take a minute to use the restroom while this is being done?

11          **THE COURT:**  I'm sorry.

12          **THE INTERPRETER:**  May I take a minute to run to the

13    restroom while this is being done?

14          **THE COURT:**  Yes, you may.

15          **COURTROOM ADMINISTRATOR:**  Judge, we have 15 notes,

16    and we're going to start at 158.

17          **THE COURT:**  Thank you.

18       *(At sidebar on the record.)*

19          **THE COURT:**  Jury Note Number 158 asks seven

20    questions.  The first one is:  Do you feel like Epi tricked

21    and used you, or how do you feel about Epi?

22          Any objection, Mr. Brown?

23          **MR. BROWN:**  No objection.

24          **THE COURT:**  Tomsheck?

25          **MR. TOMSHECK:**  No.

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

```
1              THE COURT:  Gaffney?

2              MR. GAFFNEY:  No, Your Honor.

3              THE COURT:  Green?

4              MR. GREEN:  No objection, Your Honor.

5              THE COURT:  And Finley?

6              MR. FINLEY:  No objection.

7              THE COURT:  Number 2:  I understand you probably took

8    an opportunity, but why didn't you accompany Sean and Patti to

9    see the attorney and confirm for yourself, confirm if the

10   business was legal?

11             Any objection, Mr. Brown?

12             MR. BROWN:  No objection.

13             THE COURT:  Tomsheck?

14             MR. TOMSHECK:  No, Your Honor.

15             THE COURT:  Gaffney?

16             MR. GAFFNEY:  No, Your Honor.

17             THE COURT:  Green?

18             MR. GREEN:  No.

19             THE COURT:  And Finley?

20             MR. FINLEY:  No, Your Honor.

21             THE COURT:  Number 3:  Do you feel like you were

22   racially profiled during the search warrant?

23             Mr. Brown?

24             MR. BROWN:  No objection.

25             THE COURT:  Tomsheck?
```

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    **MR. TOMSHECK:**  No objection.

2    **THE COURT:**  Gaffney?

3    **MR. GAFFNEY:**  No objection.

4    **THE COURT:**  Green?

5    **MR. GREEN:**  No objection.

6    **THE COURT:**  And Mr. Finley?

7    **MR. FINLEY:**  Objection.  It's irrelevant,

8    prejudicial, jury nullification.

9    **THE COURT:**  I agree.  That's Number 3.

10    Number 4:  Why did you feel like it could have been

11    your responsibility?

12    Mr. Brown?

13    **MR. BROWN:**  No objection.

14    **THE COURT:**  Mr. Tomsheck?

15    **MR. TOMSHECK:**  No objection.

16    **THE COURT:**  Mr. Gaffney?

17    **MR. GAFFNEY:**  No objection.

18    **THE COURT:**  Mr. Green?

19    **MR. GREEN:**  No objection.

20    **THE COURT:**  Mr. Finley?

21    **MR. FINLEY:**  No objection.

22    **THE COURT:**  Number 5:  Was there any update about

23    your wife's accident money?

24    Mr. Brown?

25    **MR. BROWN:**  Any update?

Jose Luis Mendez - Redirect
2:19-cr-00295-GMN-NJK - April 13, 2023

1          THE COURT:  After it was taken.

2          MR. GAFFNEY:  Can you read that again?  I'm sorry.

3          THE COURT:  Was there any update about your wife's

4    accident money?  I read it to mean after it was taken.  You

5    know, it was years ago.  They might mean something else.  If

6    you think they mean something else, I'm open to a different

7    interpretation.

8          MR. BROWN:  No objection.  And I think the Court's

9    interpretation makes sense.

10          THE COURT:  Mr. Tomsheck?

11          MR. TOMSHECK:  No objection.

12          THE COURT:  Mr. Gaffney?

13          MR. GAFFNEY:  No objection.

14          MR. GREEN:  No objection.

15          THE COURT:  Mr. Green?

16          Mr. Finley?

17          MR. FINLEY:  No objection.

18          THE COURT:  Number 6:  Do you feel like defendant --

19    defendants, plural, Mario Castro, Miguel Castro knew this was

20    fraud in a way like they lied to you, betrayed you?

21          Any objection, Mr. Brown?

22          MR. BROWN:  No objection.

23          THE COURT:  Tomsheck?

24          MR. TOMSHECK:  No objection.

25          THE COURT:  Gaffney?

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1      **MR. GAFFNEY:**  No objection.

2      **THE COURT:**  Green?

3      **MR. GREEN:**  No objection, ma'am.

4      **THE COURT:**  And Finley?

5      **MR. FINLEY:**  No objection.

6      **THE COURT:**  Number 7:  If Mario Castro knows how to

7  speak English, how did he know for eight years that this could

8  have been fraud?

9          I'm sorry.  Let's try that again.

10         If Mario Castro knows how to speak English, how did

11  he not know for eight years that this could have been fraud?

12         Any objection, Mr. Brown?

13     **MR. BROWN:**  No objection.

14     **THE COURT:**  Mr. Tomsheck?

15     **MR. TOMSHECK:**  Objection.  Vague and speculation.

16  And foundation, I guess.

17     **THE COURT:**  I suppose there could be a format change

18  to the question.

19         If Mario Castro knows how to speak Spanish, how did

20  he not know for eight years that this could have been fraud?

21     **MR. TOMSHECK:**  I think he meant English, Your Honor.

22     **MR. BROWN:**  He knows how to speak Spanish.

23     **THE COURT:**  What did I say?  I'm sorry.

24         This is Question Number 7 for the third time.  Let me

25  see.  If Mario Castro knows how to speak English, how did he

1    not know for eight years that this could have been fraud?

2         And so the objection is that it's vague and

3    speculative.

4         **MR. TOMSHECK:**  And foundation.  In other words, the

5    eight-year period is not the conspiracy theory.  That's vague.

6    The speculation is how Mario Castro would or would not know

7    something, and the foundational objection is there's been no

8    foundation as to how he would know what Mario knew.

9         **THE COURT:**  All right.  Mr. Gaffney, do you join?

10        **MR. GAFFNEY:**  I would join.  And was there another

11   question as to Miguel?

12        **THE COURT:**  No.

13        **MR. GAFFNEY:**  Okay.

14        **THE COURT:**  Well, the prior question was as to

15   Miguel, not this one.  Number 6 was as to Miguel.

16        **MR. GAFFNEY:**  Okay.

17        **THE COURT:**  But not this one.  You're right, it

18   doesn't include him.

19        Mr. Green, do you join the objection?

20        **MR. GREEN:**  We join with Mr. Tomsheck with the added

21   proviso that this is more of a jury question for which it will

22   be instructed to consider.

23        **THE COURT:**  Mr. Finley, what is your position as to

24   the question?

25        **MR. FINLEY:**  Agnostic?  I mean, I -- I don't object

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1   to it.  I also don't object to it not being asked.  I think we

2   would pretty much get an answer similar to what he's already

3   said.

4           **THE COURT:**  All right.  So I'm not going to ask that

5   question.

6           Jury Note 159 has four -- no, actually, five

7   questions.  The first one is:  How old was your son when he

8   was handcuffed during the search?

9           Any objection, Mr. Brown?

10          **MR. BROWN:**  No objection.

11          **THE COURT:**  Tomsheck?

12          **MR. TOMSHECK:**  No objection.

13          **THE COURT:**  Gaffney?

14          **MR. GAFFNEY:**  No, Your Honor.

15          **THE COURT:**  Green?

16          **MR. GREEN:**  No objection, ma'am.

17          **THE COURT:**  Finley?

18          **MR. FINLEY:**  No objection.

19          **THE COURT:**  Number 2:  Did the officers follow you to

20  the school where you dropped your child off at?  Saying if you

21  know.

22          Mr. Brown?

23          **MR. BROWN:**  No objection.

24          **THE COURT:**  Tomsheck?

25          **MR. TOMSHECK:**  No objection.

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    **THE COURT:**  Gaffney?

2    **MR. GAFFNEY:**  No, Your Honor.

3    **THE COURT:**  Green?

4    **MR. GREEN:**  No objection, ma'am.

5    **THE COURT:**  And Finley?

6    **MR. FINLEY:**  No objection.

7    **THE COURT:**  And Number 3:  Do you know how Andrea

8   Burrow was paid, cash or check?

9        Any objection, Mr. Brown?

10    **MR. BROWN:**  No objection.

11    **THE COURT:**  Tomsheck?

12    **MR. TOMSHECK:**  No objection.

13    **THE COURT:**  Gaffney?

14    **MR. GAFFNEY:**  No, Your Honor.

15    **THE COURT:**  Green?

16    **MR. GREEN:**  No objection, ma'am.

17    **THE COURT:**  And Finley?

18    **MR. FINLEY:**  No objection.

19    **THE COURT:**  Number 4:  Did you know how much Andrea

20   Burrow was paid from the companies you opened up?

21        Any objection, Mr. Brown?

22    **MR. BROWN:**  No objection.

23    **THE COURT:**  Mr. Tomsheck?

24    **MR. TOMSHECK:**  No objection.

25    **THE COURT:**  Gaffney?

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1      **MR. GAFFNEY:**  No, Your Honor.

2      **THE COURT:**  Green?

3      **MR. GREEN:**  No, ma'am.

4      **THE COURT:**  And Finley?

5      **MR. FINLEY:**  No objection.

6      **THE COURT:**  Number 5:  Did you receive a report with

7   exact amounts of money that were sent in when you would

8   receive a box?  This would include cash and checks.

9          Any objection, Mr. Brown?

10     **MR. BROWN:**  No objection.

11     **THE COURT:**  Mr. Tomsheck?

12     **MR. TOMSHECK:**  No.

13     **THE COURT:**  Mr. Gaffney?

14     **MR. GAFFNEY:**  No, Your Honor.

15     **THE COURT:**  Mr. Green?

16     **MR. GREEN:**  No objections.

17     **THE COURT:**  And Mr. Finley?

18     **MR. FINLEY:**  No.

19     **THE COURT:**  Jury Note 160:  Do you, Jose, know how to

20   print/place a watermark on a document/piece of paper?

21          And they're referring to Government's Exhibit 1,

22   page 595.  Is that a fake notary stamp?  If so, why?

23          Without looking at it, I'm not sure what it's

24   referring to.

25     **MR. MISHLER:**  There is a stamp.

1          **THE COURT:**  Okay.  Any objection, Mr. Brown?

2          **MR. BROWN:**  No objection.

3          **THE COURT:**  Mr. Tomsheck?

4          **MR. TOMSHECK:**  No objection.

5          **THE COURT:**  Mr. Gaffney?

6          **MR. GAFFNEY:**  No, Your Honor.

7          **THE COURT:**  Mr. Green?

8          **MR. GREEN:**  No objection, ma'am.

9          **THE COURT:**  And Mr. Finley?

10          **MR. FINLEY:**  No.

11          **THE COURT:**  Okay.  So if you'll ask your forensic

12    people to be ready to throw up when we get there.  It's Jury

13    Number 160.  Like, if you could please place on the screen

14    when we get to Jury Note 160 Government's Exhibit 1, page 595.

15          I do have all boys.  It feels like this.

16          Jury Note Number 161 asks:  Do you ever used to talk

17    to text?

18          Any objection, Mr. Brown?

19          **MR. BROWN:**  No objection.

20          **THE COURT:**  Mr. Tomsheck?

21          **MR. TOMSHECK:**  No objection.

22          **THE COURT:**  Mr. Gaffney?

23          **MR. GAFFNEY:**  No, Your Honor.

24          **THE COURT:**  Mr. Green?

25          **MR. GREEN:**  No objection, ma'am.

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1            **THE COURT:**  And Mr. Finley?

2            **MR. FINLEY:**  No objection.

3            **THE COURT:**  All right.  Jury Note 162, two questions.

4    First one:  Did you give a written statement to the postal

5    inspectors when they searched your home?  If so, in Spanish?

6            Any objection, Mr. Brown?

7            **MR. BROWN:**  My concern is that the answer might have

8    him refer to an invocation.

9            **THE COURT:**  He already said that he told them that he

10   wanted to speak to an attorney.

11           **MR. BROWN:**  Okay.  No objection.

12           **THE COURT:**  Okay.  Mr. Tomsheck?

13           **MR. TOMSHECK:**  I have no objection.

14           **THE COURT:**  Mr. Gaffney?

15           **MR. GAFFNEY:**  No, Your Honor.

16           **THE COURT:**  Mr. Green?

17           **MR. GREEN:**  No objection, ma'am.

18           **THE COURT:**  And Mr. Finley?

19           **MR. FINLEY:**  No objection.

20           **THE COURT:**  Number 2:  You testified that if you

21   spoke the words "confirmed cash award winners," you might

22   pronounce the words incorrectly.  The Government attorney then

23   asked you could just sound it out using Spanish vowels and

24   consonants, couldn't you?

25           As a person whose primary language is Spanish, would

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    enunciating words in a foreign language help you to understand

2    the words in your primary language?

3            Any objection, Mr. Brown?

4        **MR. BROWN:**  No objection.

5        **THE COURT:**  Mr. Tomsheck?

6        **MR. TOMSHECK:**  No, Your Honor.

7        **THE COURT:**  Mr. Gaffney?

8        **MR. GAFFNEY:**  No, Your Honor.

9        **THE COURT:**  Mr. Green?

10       **MR. GREEN:**  No objection, Your Honor.

11       **THE COURT:**  Mr. Finley?

12       **MR. FINLEY:**  No objection.

13       **THE COURT:**  Jury Note 163, two questions.  First:

14   How many checks did you have -- well, Mario write to your wife

15   during your trouble times, and were they always the same

16   amounts?

17           Any objection, Mr. Brown?

18       **MR. BROWN:**  No objection.

19       **THE COURT:**  Mr. Tomsheck?

20       **MR. TOMSHECK:**  No.

21       **THE COURT:**  Mr. Gaffney?

22       **MR. GAFFNEY:**  No, Your Honor.

23       **THE COURT:**  Mr. Green?

24       **MR. GREEN:**  No objection, ma'am.

25       **THE COURT:**  And Mr. Finley?

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1          MR. FINLEY:  No objection.

2          THE COURT:  Number 2:  Did you ever see any prize

3     winning paid out of the Advance Allocation Systems account?

4          Any objection, Mr. Brown?

5          MR. BROWN:  No objection.

6          THE COURT:  Mr. Tomsheck?

7          MR. TOMSHECK:  No, Your Honor.

8          THE COURT:  Mr. Gaffney?

9          MR. GAFFNEY:  No, Your Honor.

10         THE COURT:  Mr. Green?

11         MR. GREEN:  No, ma'am.

12         THE COURT:  And Mr. Finley?

13         MR. FINLEY:  No objection.

14         THE COURT:  Okay.  Jury Note 164 asks five questions.

15    The first one is:  When searching your home, did the postal

16    inspectors have reason to be fearful for their safety?

17         Any objection, Mr. Brown?

18         MR. BROWN:  No objection.

19         THE COURT:  Mr. Tomsheck?

20         MR. TOMSHECK:  No.

21         THE COURT:  Gaffney?

22         MR. GAFFNEY:  No, Your Honor.

23         THE COURT:  Green?

24         MR. GREEN:  No objection.

25         THE COURT:  And Finley?

1          **MR. FINLEY:**  No objection.

2          **THE COURT:**  Number 2:  Did the postal inspectors take

3     any weapons from you or your family members at your home?

4          Mr. Brown?

5          **MR. BROWN:**  No objection.

6          **THE COURT:**  Mr. Tomsheck?

7          **MR. TOMSHECK:**  No objection.

8          **THE COURT:**  Mr. Gaffney?

9          **MR. GAFFNEY:**  No, Your Honor.

10          **THE COURT:**  Mr. Green?

11          **MR. GREEN:**  No objection.

12          **THE COURT:**  And Mr. Finley?

13          **MR. FINLEY:**  No objection.

14          **THE COURT:**  Number 3:  Did you or your family members

15     in your home physically resist the search of your home by

16     postal inspectors?

17          Mr. Brown?

18          **MR. BROWN:**  No objection.

19          **THE COURT:**  Tomsheck?

20          **MR. TOMSHECK:**  No.

21          **THE COURT:**  Gaffney?

22          **MR. GAFFNEY:**  No, Your Honor.

23          **THE COURT:**  Green?

24          **MR. GREEN:**  No.

25          **THE COURT:**  And Finley?

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

 1              **MR. FINLEY:**  No objections.

 2              **THE COURT:**  Number 4:  Were you under arrest during

 3      the time you were handcuffed?

 4              Mr. Brown?

 5              **MR. BROWN:**  No objection.

 6              **THE COURT:**  Mr. Tomsheck?

 7              **MR. TOMSHECK:**  No objection.

 8              **THE COURT:**  Mr. Gaffney?

 9              **MR. GAFFNEY:**  No, Your Honor.

10              **THE COURT:**  Mr. Green?

11              **MR. GREEN:**  No objection.

12              **THE COURT:**  And Mr. Finley?

13              **MR. FINLEY:**  No objection.

14              Number 5:  Did any postal inspectors tell you you

15      were permitted to leave while you were handcuffed or

16      thereafter?

17              Mr. Brown?

18              **MR. BROWN:**  No objection.

19              **THE COURT:**  Mr. Tomsheck?

20              **MR. TOMSHECK:**  No.

21              **THE COURT:**  Mr. Gaffney?

22              **MR. GAFFNEY:**  No, Your Honor.

23              **THE COURT:**  Mr. Green?

24              **MR. GREEN:**  No objection, ma'am.

25              **THE COURT:**  And Mr. Finley?

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1          **MR. FINLEY:**  No objection.

2          **THE COURT:**  Doesn't that bleed over to the next page?

3     It's like a marker.

4          **MR. GREEN:**  Excuse, me ma'am?  It's a calligraphy

5     pen.

6          **THE COURT:**  But it doesn't bleed through to the next

7     page?

8          **MR. GREEN:**  No, ma'am.

9        *(Pause in proceedings.)*

10          **THE COURT:**  Jury Note 165:  In English, many who

11    speak English as their primary language might respond

12    differently to "Did you have a conversation with John?" versus

13    "Did you exchange text messages with John?"  Would the Spanish

14    language be similar in that regard?

15          I'm not sure how -- any objection, Mr. Brown?

16          **MR. BROWN:**  I'm -- I'm trying to think through the

17    mechanics.

18          **THE COURT:**  Because it's going to go through Spanish

19    either way.

20          **MR. BROWN:**  Right.

21          **THE COURT:**  He's going to be hearing all of it in

22    Spanish.

23          **MR. BROWN:**  No objection.

24          **THE COURT:**  Mr. Tomsheck?

25          **MR. TOMSHECK:**  No objection.

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1          **THE COURT:**  Mr. Gaffney?

2          **MR. GAFFNEY:**  I don't think I understand what the

3    English version of what's being asked, but no objection.

4          **THE COURT:**  Mr. Green?

5          **MR. GREEN:**  No objection, ma'am.

6          **THE COURT:**  You do or don't?  I'm sorry.

7          **MR. GREEN:**  Excuse me?

8          **THE COURT:**  No objection?

9          **MR. GREEN:**  No objection.  No.  Thank you.

10         **THE COURT:**  Okay.  And Mr. Finley?

11         **MR. FINLEY:**  No, Your Honor.

12         **THE COURT:**  Okay.  So we'll save -- Jury Note

13   Number 166 asks five questions.  First:  Did you know the

14   company you were opening, AAS, was going to be a fraudulent

15   company?

16         Mr. Brown?

17         **MR. BROWN:**  No objection.

18         **THE COURT:**  Mr. Tomsheck?

19         **MR. TOMSHECK:**  No.

20         **THE COURT:**  Mr. Gaffney?

21         **MR. GAFFNEY:**  No, Your Honor.

22         **THE COURT:**  Mr. Green?

23         **MR. GREEN:**  No.

24         **THE COURT:**  Mr. Finley?

25         **MR. FINLEY:**  No.

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    **THE COURT:**  Number 2:  Did you ever take cash or

2    checks out of the sweepstakes envelopes?

3            Mr. Brown?

4    **MR. BROWN:**  No objection.

5    **THE COURT:**  Mr. Tomsheck?

6    **MR. TOMSHECK:**  No objection.

7    **THE COURT:**  Mr. Gaffney?

8    **MR. GAFFNEY:**  No, Your Honor.

9    **THE COURT:**  Mr. Green?

10   **MR. GREEN:**  No.

11   **THE COURT:**  And Mr. Finley?

12   **MR. FINLEY:**  No.

13   **THE COURT:**  Okay.  Number 3:  Did you consider Patti

14   Kern the boss of your company?

15           Mr. Brown?

16   **MR. BROWN:**  No objection.

17   **THE COURT:**  Mr. Tomsheck?

18   **MR. TOMSHECK:**  No objection.

19   **THE COURT:**  Mr. Gaffney?

20   **MR. GAFFNEY:**  No objection.

21   **THE COURT:**  Green?

22   **MR. GREEN:**  No.

23   **THE COURT:**  Finley?

24   **MR. FINLEY:**  No objection.

25   **THE COURT:**  Number 4:  Why did you let her have

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    control of your company, for example, checks, et cetera?

2          Mr. Brown?

3          **MR. BROWN:**  No objection.

4          **THE COURT:**  Mr. Tomsheck?

5          **MR. TOMSHECK:**  No objection.

6          **THE COURT:**  Gaffney?

7          **MR. GAFFNEY:**  No, Your Honor.

8          **THE COURT:**  Green?

9          **MR. GREEN:**  No.

10         **THE COURT:**  Finley?

11         **MR. FINLEY:**  No objection.

12         **THE COURT:**  How many mailing companies were you

13   directly involved with?

14         Mr. Brown?

15         **MR. BROWN:**  No objection.

16         **THE COURT:**  Tomsheck?

17         **MR. TOMSHECK:**  No objection.

18         **THE COURT:**  Gaffney?

19         **MR. GAFFNEY:**  No -- no objection.

20         **THE COURT:**  Green?

21         **MR. GREEN:**  No, ma'am.

22         **THE COURT:**  And Finley?

23         **MR. FINLEY:**  No objection.

24         **THE COURT:**  Jury Note 167 asks four questions.  The

25   first one is:  Are you saying that you were looking for

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

 1    another job/career other than printing and fixing the laser

 2    printer?

 3              Any objection, Mr. Brown?

 4         **MR. BROWN:**  No objection.

 5         **THE COURT:**  Tomsheck?

 6         **MR. TOMSHECK:**  No objection.

 7         **THE COURT:**  Gaffney?

 8         **MR. GAFFNEY:**  No, Your Honor.

 9         **THE COURT:**  Green?

10         **MR. GREEN:**  No.

11         **THE COURT:**  Finley?

12         **MR. FINLEY:**  No objection.

13         **THE COURT:**  Number 2:  In return, Sean and Patti

14    offered you to put companies in your name?

15              Mr. Brown?

16         **MR. MISHLER:**  Say that one more time.

17         **THE COURT:**  In return, Sean and Patti offered you to

18    put companies in your name?

19         **MR. MISHLER:**  Okay.  Thanks.  I just missed the first

20    word.

21         **MR. BROWN:**  I think it's -- I think it's paired with

22    the first question.  I don't have an objection to it, but I --

23    I think that's the context, in return for what.

24         **THE COURT:**  For him having a new job or career path?

25         **MR. BROWN:**  That's my understanding.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

1           **THE COURT:**  Any objection?

2           **MR. BROWN:**  No objection.

3           **THE COURT:**  Mr. Tomsheck?

4           **MR. TOMSHECK:**  No.

5           **THE COURT:**  Gaffney?

6           **MR. GAFFNEY:**  No, Your Honor.

7           **THE COURT:**  Green?

8           **MR. GREEN:**  No, ma'am.

9           **THE COURT:**  Finley?

10          **MR. FINLEY:**  No objection.

11          **THE COURT:**  Number 3:  Also, why exactly were you

12     looking to switch careers?

13          Mr. Brown?

14          **MR. BROWN:**  No objection.

15          **THE COURT:**  Mr. Tomsheck?

16          **MR. TOMSHECK:**  No, Your Honor.

17          **THE COURT:**  Gaffney?

18          **MR. GAFFNEY:**  No, Your Honor.

19          **THE COURT:**  Green?

20          **MR. GREEN:**  No, ma'am.

21          **THE COURT:**  And Mr. Finley?

22          **MR. FINLEY:**  No objection.

23          **THE COURT:**  Number 4:  Your Honor, can the jury see

24     proof of the settlement check that Jose Luis Mendez's wife

25     received?

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1              Mr. Brown?

2              **MR. BROWN:**  We actually -- we don't have a copy of

3    the check.

4              **THE COURT:**  So the answer's no.

5              **MR. MISHLER:**  We have a page from the settlement.

6              **MR. FINLEY:**  We can stipulate.  She did -- she did

7    deposit the money into a bank account, so --

8              **MR. BROWN:**  If we could just stipulate that the money

9    was deposited.

10             **THE COURT:**  Okay.  Well... so they're not asking if

11   it was deposited.  They're asking to see the settlement check.

12   So the parties stipulate that there was a settlement check

13   that the --

14             **MR. TOMSHECK:**  In the amount of --

15             **THE COURT:**  -- that the wife received?

16        *(Simultaneous crosstalk.)*

17             **MR. FINLEY:**  -- $101,000 --

18        *(Reporter instruction.)*

19             **MR. ERICSSON:**  I'm sorry.  Are we agreeing that it

20   was deposited as well?

21             **MR. FINLEY:**  Into a bank account.

22             **THE COURT:**  You want me to say deposited into a bank

23   account?  Because that's not part of the question.  And the

24   question:  Whose bank account?

25             **MR. FINLEY:**  Okay.

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    **MR. MISHLER:**  Yeah, that's fine.

2    **THE COURT:**  So I'm making the answer longer than the

3    question.

4    So the question is:  Your Honor, can the jury see

5    proof of the settlement check that Jose Luis Mendez's wife

6    received?  The parties stipulate that she did receive a check

7    for $101,000.

8    Parties stipulate she received a settlement check for

9    $101,000.

10    Jury Note 168 has four questions.  The first one is:

11    When you mentioned you were at a gas station and used the

12    wrong card, why did you have the AAS ATM debit card in your

13    possession?

14    Mr. Brown?

15    **MR. BROWN:**  No objection.

16    **THE COURT:**  Mr. Tomsheck?

17    **MR. TOMSHECK:**  No objection.

18    **THE COURT:**  Mr. Gaffney?

19    **MR. GAFFNEY:**  No objection.

20    **THE COURT:**  Mr. Green?

21    **MR. GREEN:**  No objection.

22    **THE COURT:**  And Mr. Finley?

23    **MR. FINLEY:**  No objection.

24    **THE COURT:**  Number 2:  Have you or your wife ever

25    received the car settlement money back that was seized?

1              Mr. Brown?

2         **MR. BROWN:**  No objection.

3         **THE COURT:**  Tomsheck?

4         **MR. TOMSHECK:**  No.

5         **THE COURT:**  Gaffney?

6         **MR. GAFFNEY:**  No objection.

7         **THE COURT:**  Green?

8         **MR. GREEN:**  No objection.

9         **THE COURT:**  Finley?

10        **MR. FINLEY:**  No objection.

11        **THE COURT:**  Number 3:  Can you explain the importance

12   of la familia to you as different culture holds family

13   differently?  And then there's a little arrow that says:

14   Judge, this pertains to why someone would trust family without

15   a question.

16             Mr. Brown?

17        **MR. BROWN:**  No objection.

18        **THE COURT:**  Mr. Tomsheck?

19        **MR. TOMSHECK:**  No objection.

20        **THE COURT:**  Mr. Gaffney?

21        **MR. GAFFNEY:**  No objection.

22        **MR. GREEN:**  No objection, Your Honor.

23        **THE COURT:**  I'm sorry.  Did you have an objection,

24   Mr. Gaffney?

25        **MR. GAFFNEY:**  No.  No objection.

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1      **THE COURT:**  Oh.  No objection.  I only heard the

2  objection.

3      **MR. GREEN:**  No objection for Don Green.

4      **THE COURT:**  Mr. Finley?

5      **MR. FINLEY:**  No objection.

6      **THE COURT:**  All right.  So no one has an objection.

7      Jury Note 169, six questions.  Number 1:  You get

8  work orders from Sean O'Connor how often?

9      Mr. Brown?

10     **MR. BROWN:**  No objection.

11     **THE COURT:**  Mr. Tomsheck?

12     **MR. TOMSHECK:**  It's vague as to time.  It's in the

13  present tense.

14     **THE COURT:**  This is -- the offense is 2010 to 2018;

15  is that right?

16     **MR. GAFFNEY:**  Right.

17     **THE COURT:**  An objection, Mr. Gaffney, with that

18  change from 2010 to 2018?

19     **MR. GAFFNEY:**  No, Your Honor.

20     **THE COURT:**  Mr. Green?

21     **MR. GREEN:**  No objection, Your Honor.

22     **THE COURT:**  Mr. Finley?

23     **MR. FINLEY:**  No objection.

24     **THE COURT:**  Number 2:  Was victims' data information

25  loaded into laser printer from a database?

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

```
1              Mr. Brown?

2         MR. BROWN:  No objection.

3         THE COURT:  Mr. Tomsheck?

4         MR. TOMSHECK:  No, Your Honor.

5         THE COURT:  Mr. Gaffney?

6         MR. GAFFNEY:  No objection.

7         THE COURT:  Mr. Green?

8         MR. GREEN:  No objection, ma'am.

9         THE COURT:  And Mr. Finley?

10        MR. FINLEY:  No objection.

11        THE COURT:  Who is the attorney that... pass -- oh

12   PAS 01 form and says it's legal?

13        Any objection, Mr. Brown?

14        MR. BROWN:  No objection.

15        THE COURT:  Mr. Tomsheck?

16        MR. TOMSHECK:  No.

17        THE COURT:  Gaffney?

18        MR. GAFFNEY:  No, Your Honor.

19        THE COURT:  Green?

20        MR. GREEN:  No objection, ma'am.

21        THE COURT:  Mr. Finley?

22        MR. FINLEY:  No objection.

23        THE COURT:  And I'm just going to rewrite this so I

24   remember what this actually says.  So it's P-A-S.

25        Number 4:  Did you know you are printing fraud
```

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    documents while working at the printshop?

2            **MR. BROWN:**  No objection.

3            **THE COURT:**  Mr. Tomsheck?

4            **MR. TOMSHECK:**  No.

5            **THE COURT:**  Mr. Gaffney?

6            **MR. GAFFNEY:**  No objection.

7            **THE COURT:**  Mr. Green?

8            **MR. GREEN:**  No objection, Your Honor.

9            **THE COURT:**  And Mr. Finley?

10           **MR. FINLEY:**  No objection.

11           **THE COURT:**  Number 5:  Why didn't you ask anyone how

12   you were making money from the prize award notification?

13           **MR. BROWN:**  No objection.

14           **THE COURT:**  Mr. Tomsheck?

15           **MR. TOMSHECK:**  No objection.

16           **THE COURT:**  Gaffney?

17           **MR. GAFFNEY:**  No objection.

18           **THE COURT:**  Mr. Green?

19           **MR. GREEN:**  No objection, ma'am.

20           **THE COURT:**  And Mr. Finley?

21           **MR. FINLEY:**  No objection.

22           **THE COURT:**  And last:  Are you able to read your

23   prize notification award letter?

24           **MR. BROWN:**  No objection.

25           **THE COURT:**  Mr. Tomsheck?

Jose Luis Mendez - Redirect
2:19-cr-00295-GMN-NJK - April 13, 2023

1          **MR. TOMSHECK:**  No objection.

2          **THE COURT:**  Mr. Gaffney?

3          **MR. GAFFNEY:**  No objection.

4          **THE COURT:**  Mr. Green?

5          **MR. GREEN:**  No objection, Your Honor.

6          **THE COURT:**  And Mr. Finley?

7          **MR. FINLEY:**  No objection.

8          **THE COURT:**  Jury Note 170 has two questions.

9   First -- Jury Note Number 170 refers to Exhibit 158, page 2.

10  So if you could tell your people for Jury Note Number 170

11  we're going to need Exhibit 158, page 2, please.

12          Do you understand this letter or able to read it?

13          Any objection, Mr. Brown?

14          **MR. BROWN:**  No objection.

15          **THE COURT:**  Mr. Tomsheck?

16          **MR. TOMSHECK:**  No.

17          **THE COURT:**  Mr. Gaffney?

18          **MR. GAFFNEY:**  No objection.

19          **THE COURT:**  Mr. Green?

20          **MR. GREEN:**  No objection, Your Honor.

21          **THE COURT:**  And Mr. Finley?

22          **MR. FINLEY:**  No objection.

23          **THE COURT:**  Do you feel you are a victim of fraud

24  from Patti and Sean and Epi?

25          Any objection, Mr. Brown?

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1          **MR. BROWN:**  No objection.

2          **THE COURT:**  Tomsheck?

3          **MR. TOMSHECK:**  No objection.

4          **THE COURT:**  Gaffney?

5          **MR. GAFFNEY:**  No objection.

6          **THE COURT:**  Green?

7          **MR. GREEN:**  No objection, Your Honor.

8          **THE COURT:**  And Mr. Finley?

9          **MR. FINLEY:**  No objection.

10         **THE COURT:**  Okay.  Jury Note Number 171 asks nine

11   questions.  First -- and there's even some scratched out --

12   how did you input information into the OCE if you do not

13   understand English?

14         Any objection, Mr. Brown?

15         **MR. BROWN:**  No objection.

16         **THE COURT:**  Tomsheck?

17         **MR. TOMSHECK:**  No.

18         **THE COURT:**  Gaffney?

19         **MR. GAFFNEY:**  No objection.

20         **THE COURT:**  Green?

21         **MR. GREEN:**  No objection, Your Honor.

22         **THE COURT:**  And Mr. Finley?

23         **MR. FINLEY:**  No objection.

24         **THE COURT:**  Number 2:  Why would you open companies

25   and not have any control of anything?

```
 1              Mr. Brown?
 2         MR. BROWN:  No objection.
 3         THE COURT:  Tomsheck?
 4         MR. TOMSHECK:  No objection.
 5         THE COURT:  Gaffney?
 6         MR. GAFFNEY:  No objection.
 7         THE COURT:  Green?
 8         MR. GREEN:  No objection.
 9         THE COURT:  And Finley?
10         MR. FINLEY:  No objection.
11         THE COURT:  Number 3:  Are you saying Patti would
12    open your bank accounts applications on your home IP address?
13              Mr. Brown?
14         MR. BROWN:  No objection.
15         THE COURT:  Tomsheck?
16         MR. TOMSHECK:  No objection.
17         THE COURT:  Gaffney?
18         MR. GAFFNEY:  No objection.
19         THE COURT:  Green?
20         MR. GREEN:  No objection, Your Honor.
21         THE COURT:  And Finley?
22         MR. FINLEY:  No objection.
23         THE COURT:  Number 4:  How did you get paid from Sean
24    when he was only part time after 2015?
25         MR. BROWN:  I think that's --
```

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    **THE COURT:**  Any objection, Mr. Brown?

2    **MR. BROWN:**  No objection.

3    **THE COURT:**  Mr. Tomsheck?

4    **MR. TOMSHECK:**  No objection.

5    **THE COURT:**  Gaffney?

6    **MR. GAFFNEY:**  No objection.

7    **THE COURT:**  Green?

8    **MR. GREEN:**  No objection.

9    **THE COURT:**  And Mr. Finley?

10   **MR. FINLEY:**  No objection.

11   **THE COURT:**  Number -- oh.  I see.  Okay.  Number 5 is

12   scratched out.  Number 6 says:  How did Sean handle the codes

13   when he was part time after 2015?

14        Any objection?

15   **MR. BROWN:**  No objection.

16   **THE COURT:**  Tomsheck?

17   **MR. TOMSHECK:**  No.

18   **THE COURT:**  Gaffney?

19   **MR. GAFFNEY:**  No objection.

20   **THE COURT:**  Green?

21   **MR. GREEN:**  No objection.

22   **THE COURT:**  Finley?

23   **MR. FINLEY:**  No objection.

24   **THE COURT:**  Number 7:  You never looked at anything

25   you printed for eight years?

1      Mr. Brown?

2           **MR. BROWN:**  No objection.

3           **MR. TOMSHECK:**  I object to you reading it with that

4      inflection.

5           **MR. BROWN:**  I join that objection.

6           **THE COURT:**  All right.  I won't read it with that

7      inflection.

8           **MR. TOMSHECK:**  Otherwise, no objection.

9           **THE COURT:**  Mr. Gaffney?

10          **MR. GAFFNEY:**  No objection.

11          **THE COURT:**  Mr. Green?

12          **MR. GREEN:**  No objection, ma'am.

13          **THE COURT:**  And Mr. Finley?

14          **MR. FINLEY:**  No objection.

15          **THE COURT:**  And next:  Out of curiosity, you never

16     once put the information into your Google to see what it was

17     that you were printing?  That's not a question, but really I

18     had to get that out, too.

19          Number 8:  How are you in charge or production and

20     not know how much you're printing?

21          Let's go back and see if that makes more sense.

22          Number 8:  How are you in charge of production and

23     not know how much you're printing?

24          Okay.

25          **MR. BROWN:**  No objection.

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

```
 1            THE COURT:  Mr. Tomsheck?
 2            MR. TOMSHECK:  No.
 3            THE COURT:  Mr. Gaffney?
 4            MR. GAFFNEY:  No objection.
 5            THE COURT:  Mr. Green?
 6            MR. GREEN:  No objection.
 7            THE COURT:  And Mr. Finley?
 8            MR. FINLEY:  No objection.
 9            THE COURT:  Number 9:  You didn't notice when
10   National Print and Mail changed company names?  Didn't you
11   work every day?
12            Any objection, Mr. Brown?
13            MR. BROWN:  No objection.
14            THE COURT:  Mr. Tomsheck?
15            MR. TOMSHECK:  No, Your Honor.
16            THE COURT:  Mr. Gaffney?
17            MR. GAFFNEY:  No objection.
18            THE COURT:  Mr. Green?
19            MR. GREEN:  No, ma'am.
20            THE COURT:  And Mr. Finley?
21            MR. FINLEY:  No objection.
22            THE COURT:  Okay.  And then 172, last one, four
23   questions.  Prior to starting these companies, have you ever
24   owned a business?
25            Mr. Brown?
```

1          **MR. BROWN:**  No objection.

2          **THE COURT:**  Tomsheck?

3          **MR. TOMSHECK:**  No.

4          **THE COURT:**  Gaffney?

5          **MR. GAFFNEY:**  No objection.

6          **THE COURT:**  Green?

7          **MR. GREEN:**  No.

8          **THE COURT:**  Finley?

9          **MR. FINLEY:**  No objection.

10          **THE COURT:**  Number 2:  Once you agreed with Sean to

11    start a company, what happened next?

12          Mr. Brown?

13          **MR. BROWN:**  No objection.

14          **THE COURT:**  Tomsheck?

15          **MR. TOMSHECK:**  No, Your Honor.

16          **THE COURT:**  Gaffney?

17          **MR. GAFFNEY:**  No objection.

18          **THE COURT:**  Green?

19          **MR. GREEN:**  No objection.

20          **THE COURT:**  Finley?

21          **MR. FINLEY:**  No objection.

22          **THE COURT:**  Number 3:  Once the bank accounts were

23    opened, what did you do with the bank-provided documents?  Who

24    instructed you on what to do after the accounts were opened?

25          **MR. BROWN:**  No objection.

*Jose Luis Mendez - Redirect*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    **THE COURT:**  Mr. Tomsheck?

2    **MR. TOMSHECK:**  No.

3    **THE COURT:**  Gaffney?

4    **MR. GAFFNEY:**  No objection.

5    **THE COURT:**  Green?

6    **MR. GREEN:**  No objection, Your Honor.

7    **THE COURT:**  And Finley?

8    **MR. FINLEY:**  No objection.

9    **THE COURT:**  And last question:  Were you present for

10   the notary stamping on company documents?

11   **MR. BROWN:**  No objection.

12   **THE COURT:**  Tomsheck?

13   **MR. TOMSHECK:**  No.

14   **THE COURT:**  Gaffney?

15   **MR. GAFFNEY:**  On company documents?

16   **MR. MISHLER:**  Is this referencing that one exhibit.

17   **MR. GAFFNEY:**  Is it the prize notice or a mailbox

18   application?

19   **THE COURT:**  Company documents.

20   **MR. BROWN:**  I think the only thing notarized is the

21   mailbox applications.

22   **MR. FINLEY:**  I think so.

23   **MR. GAFFNEY:**  No objection.

24   **THE COURT:**  Mr. Green?

25   **MR. GREEN:**  No objection, Your Honor.

*Jose Luis Mendez - Questions by the Jury*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1          **THE COURT:**  And Mr. Finley?

2          **MR. FINLEY:**  No objection.

3          **THE COURT:**  I suppose you can tell your forensic

4    person that the Jury Note 172, they might need to throw up

5    something with the notary stamp.  If you think that's what's

6    being referenced if he says I don't know what you're referring

7    to.

8          Okay.  That's it.  Thank you.

9       *(End of discussion at sidebar.)*

10         **THE COURT:**  That one was for Mr. Mishler.

11         **MR. MISHLER:**  I'm sorry?

12         **THE COURT:**  That one was for Mr. Mishler, the song.

13   You didn't recognize the song?

14         **MR. MISHLER:**  You can put it back on.  I'm sorry.  I

15   wasn't paying attention, Your Honor.

16         **COURTROOM ADMINISTRATOR:**  "Poker Face."

17         **THE COURT:**  Okay.  Everyone else did.

18                     **QUESTIONS BY THE JURY**

19         **THE COURT:**  Okay.  Jury Note Number 158 -- Mr. Jose

20   Luis Mendez, these are jury questions.  I'm going to read them

21   into the record.  When you answer, please turn and face the

22   jury and respond to them, not to me.

23         **THE WITNESS:**  Yes, Your Honor.

24         **THE COURT:**  So Jury Note Number 158 asks:  Do you

25   feel like Epi tricked and used you, or how do you feel about

*Jose Luis Mendez - Questions by the Jury*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    Epi?

2            **THE WITNESS:**  To be honest, he was just interpreting.

3    I can't say that he deceived me.

4            **THE COURT:**  Number 2:  I understand you probably took

5    an opportunity, but why didn't you accompany Sean and Patti to

6    see the attorney and confirm for yourself, confirm if the

7    business was legal?

8            **THE WITNESS:**  She was basically a person that I had

9    been seeing since 2010 every day of the week except for

10   Saturday and Sunday or if it was a holiday.  I very much

11   trusted in her.

12           **THE COURT:**  Next question is:  Why did you feel like

13   it could have been your responsibility?

14           **THE WITNESS:**  Excuse me?

15           **THE COURT:**  Why did you feel like it could have been

16   your responsibility?

17           **THE WITNESS:**  Because I am responsible because I

18   didn't question, I didn't investigate.  And I cannot say that

19   I did not receive those checks.  They're there.  And, yes, I

20   am responsible.

21           **THE COURT:**  Okay.  Was there any update about your

22   wife's accident money?

23           **THE WITNESS:**  I do not understand.

24           **THE COURT:**  After it was taken.  After it was seized.

25           **THE WITNESS:**  That money was never returned to me,

1    and I never claimed it.

2         **THE COURT:**  Do you feel like Defendants Mario Castro

3    and Miguel Castro knew this was fraud in a way, like they lied

4    to you, betrayed you?

5         **THE WITNESS:**  No.  I believe that them, as I, we just

6    trusted this woman.  We had known her for so long.  They

7    trusted her so much or we -- we trusted her, she trusted us so

8    much that, as a matter of fact, they rented -- well, they

9    didn't rent.  They allowed her daughter to have an office

10   there.

11        **THE COURT:**  Jury Note Number 159 asks five questions.

12   The first one is:  How old was your son when he was handcuffed

13   during the search?

14        **THE WITNESS:**  '18, so let's see.  He's 26 right now.

15   He was an adult.

16        **THE COURT:**  Number 2:  Did the officers follow you to

17   the school where you dropped your child off at, if you know?

18        **THE WITNESS:**  I never saw them following me.  All I'm

19   aware of is when I was pulled over.

20        **THE COURT:**  Okay.  Number 3:  Do you know how Andrea

21   Burrows [sic] was paid, cash or check?

22        **THE WITNESS:**  No, I don't know, and I've never met

23   her.

24        **THE COURT:**  Do you know how much she, Andrea Burrow,

25   was paid from the companies you opened up?

Jose Luis Mendez - Questions by the Jury
2:19-cr-00295-GMN-NJK - April 13, 2023

1      **THE WITNESS:**  No, I also do not know that.  They were

2  the only ones that had contact with each other.

3      **THE COURT:**  Did you receive a report with exact

4  amounts of money that were sent in when you would receive a

5  box?  This would include cash and checks.

6      **THE WITNESS:**  No.  That box was closed when I

7  received it.  I -- it was closed when I turned it over to her.

8  And, no, I was not provided with any amounts of what was in

9  there.  Again, I will repeat myself, I trusted her.

10      **THE COURT:**  Jury Note Number 170 asks about

11  Government's Exhibit 1, page 595, if we can put that up?  Or

12  is it Exhibit 595, page 1.  I...

13      **MR. MISHLER:**  No.  You had it right.

14      **THE COURT:**  Okay.  So it's Exhibit 1, page 595, if we

15  could -- can you turn on the... can the jury see that?

16      Okay.  So the question is, for the witness:  Do you,

17  Jose, know how to print or place a watermark on a document,

18  piece of paper?

19      **THE INTERPRETER:**  The interpreter apologizes, but

20  it's not familiar with the word watermark in Spanish.  May she

21  look it up?

22      **THE COURT:**  Sure.  Yes.

23      **THE INTERPRETER:**  And can the question be repeated

24  for the interpreter, Your Honor?

25      **THE COURT:**  Yes.  Do you, Jose, know how to

*Jose Luis Mendez - Questions by the Jury*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

 1    print/place a watermark on a document, piece of paper?

 2         **THE WITNESS:**  I do not know what you're referring to

 3    of watermark.

 4         **THE COURT:**  So is that a fake notary stamp on that

 5    document?

 6         **THE WITNESS:**  That stamp was printed there at Epi's

 7    place.  The form already came with it.

 8         **THE COURT:**  So do you know if that is a fake notary

 9    stamp?

10         **THE INTERPRETER:**  If you know if the?

11         **THE COURT:**  Do you know if that is a fake notary

12    stamp?

13         **THE WITNESS:**  Now I know that it's fake.

14         **THE COURT:**  Did you know at the time between 2010 and

15    2018?

16         **THE WITNESS:**  No, I honestly didn't.  I swear before

17    God that this is the first time I see that stamp.

18         **THE COURT:**  Jury Note Number 161 asks one question:

19    Do you ever use talk-to-text?

20         **THE WITNESS:**  I did not before.  But now this

21    application has been getting modified, and so now I do use it.

22         **THE COURT:**  Okay.  Jury Note Number 162 asks two

23    questions.  The first one is:  Did you give a written

24    statement to the postal inspectors when they searched your

25    home?  If so, was it in Spanish?

Jose Luis Mendez - Questions by the Jury
2:19-cr-00295-GMN-NJK - April 13, 2023

1    **THE WITNESS:**  No, I did not give one.  Because at the

2    time that I asked am I arrested, I was told no, let's just go

3    have a talk at your house.  And then when he came to me --

4    well, when he said we were going to talk at home and he said,

5    okay, let's talk, and I said, only with my attorney, and I

6    don't know what is -- I don't know if that is what made them

7    upset with me.

8    **THE COURT:**  Number 2:  You testified that if you

9    spoke the words "confirmed cash award winner," you might

10   pronounce the words incorrectly.  The Government's attorney

11   then asked you could you just sound it out using Spanish

12   vowels and consonants, couldn't you.  As a person whose

13   primary language is Spanish, would enunciating words in a

14   foreign language help you to understand the words in your

15   primary language?

16   **THE WITNESS:**  I apologize, Your Honor, but I do not

17   understand.

18   **THE COURT:**  So as a person whose primary language is

19   Spanish, would pronouncing words -- English words with your

20   Spanish language help you to understand the English words in

21   your primary language?

22   **THE WITNESS:**  I believe that if it has the same

23   meaning, then yes.

24   **THE COURT:**  Jury Note Number 163 has two questions.

25   The first one is:  How many checks did you have Mario write to

Jose Luis Mendez - Questions by the Jury
2:19-cr-00295-GMN-NJK - April 13, 2023

 1    your wife during your troubled times, and were they always the

 2    same amounts?

 3         **THE WITNESS:**  No, they were not always the same

 4    amounts because part of that was from the sweepstakes.  And I

 5    do not know the number of checks.

 6         **THE COURT:**  Number 2:  Did you ever see any prize

 7    winning paid out of the Advanced Allocation Systems account?

 8         **THE WITNESS:**  No, I did not.

 9         **THE COURT:**  Okay.  Jury Note 164 asks five questions.

10    The first one is:  When searching your home, did the postal

11    inspectors have reason to be fearful for their safety?

12         **THE WITNESS:**  I don't think so because I cooperated

13    completely with everything that was asked of me.

14         **THE COURT:**  Number 2:  Did the postal inspectors take

15    any weapons from you or your family members at your home?

16         **THE WITNESS:**  No, I do not have any weapons at home.

17         **THE COURT:**  Number 3:  Did you or your family members

18    in your home physically resist the search of your home by

19    postal inspectors?

20         **THE WITNESS:**  No.  We were all very cooperative, and

21    we provided them with everything they requested.

22         **THE COURT:**  Number 4:  Were you under arrest during

23    the time you were handcuffed?

24         **THE WITNESS:**  Well, to be honest, I didn't know

25    because I did ask the officer that spoke Spanish if I was

Jose Luis Mendez - Questions by the Jury
2:19-cr-00295-GMN-NJK - April 13, 2023

1    under arrest, and he said no, yet I was cuffed the whole time.

2         THE COURT:  And Number 5:  Did any postal inspector

3    tell you you were permitted to leave while you were handcuffed

4    or thereafter?

5         THE WITNESS:  No, never.  As a matter of fact, I'm

6    the one that asked if they can let my wife and my son go.  I

7    said they have nothing to do with this.

8         THE COURT:  Jury Note 165 asks:  In English, many who

9    speak English as their primary language might respond

10   differently to these two statements.  The first one is:  Did

11   you have a conversation with John?  Versus:  Did you exchange

12   text messages with John?

13        Would the Spanish language be similar in that regard?

14        THE WITNESS:  Yes, it is similar in Spanish.  It's

15   more like exchange -- an exchange of conversation.

16        THE COURT:  Jury Note Number 166 asks six -- I'm

17   sorry, five questions.  The first one is:  Did you know the

18   company you were opening, AAS, was going to be a fraudulent

19   company?

20        THE WITNESS:  No.

21        THE COURT:  Number 2:  Did you ever take cash or

22   checks out of the sweepstakes envelopes?

23        THE WITNESS:  There were three occasions in which

24   Sean O'Connor handed me cash, but it was not in an envelope.

25   I received it directly from his hand.

1           THE COURT:  All right.  Number 3:  Did you consider
2   Patti Kern the boss of your company?

3           THE WITNESS:  I think that more than a boss.  We all
4   saw her as an example, as being on top and someone that was
5   helping us get ahead.

6           THE COURT:  Number 4:  Why did you let her have
7   control of your company, for example, checks, et cetera?

8           THE WITNESS:  Because when she asked me for them, I
9   trusted her.  I would have never just had distrust in her.

10          THE COURT:  Number 5:  How many mailing companies
11  were you directly involved with?

12          THE WITNESS:  I believe there were three.

13          THE COURT:  Jury Note Number 167 asks four questions.
14  The first one is:  Are you saying that you were looking for
15  another job/career other than printing and fixing the laser
16  printer?

17          THE WITNESS:  Yes.  I was looking for another job
18  because I was interested in learning how to print shirts.

19          THE COURT:  And in -- Number 2:  In return, Sean and
20  Patti offered you to put the companies in your company?

21          THE WITNESS:  No.  The first time it was just Sean,
22  not Patti.

23          THE COURT:  And Number 3:  Also why exactly were you
24  looking to switch careers?

25          THE WITNESS:  It was not necessarily switch careers.

*Jose Luis Mendez – Questions by the Jury*
*2:19-cr-00295-GMN-NJK – April 13, 2023*

1    It was more about learning different things.  And like

2    specifically with the octopus machine printing shirts, I know

3    that you can make good money there.

4         **THE COURT:**  And Number 4, it says:  Your Honor, can

5    the jury see proof of the settlement check that Jose Luis

6    Mendez's wife received?  And I can tell you that the parties

7    do stipulate -- and, again, stipulate is a fancy word for

8    agree.  So the parties agree that his wife did receive a

9    settlement check of $101,000.

10        **THE WITNESS:**  Yes.

11        **THE COURT:**  Jury Note Number 168 has three questions.

12   The first one is:  When you mentioned you were at a gas

13   station and used the wrong card, why did you have the AAS ATM

14   debit card in your possession?

15        **THE INTERPRETER:**  The interpreter is going to need

16   clarification.

17        **THE WITNESS:**  I have them on me specifically in case

18   a charge did not go through, and then I would provide...

19        The person that would call me spoke Spanish, and when

20   it did not go through automatically for whatever reason, then

21   we would just check the card numbers again.

22        **THE COURT:**  Okay.  Number 2:  Have you or your wife

23   ever received the car settlement money back that was seized?

24        **THE WITNESS:**  Could you repeat it?

25        **THE COURT:**  Have you or your wife ever received the

*Jose Luis Mendez - Questions by the Jury*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1   car settlement money back that was seized?

2        **THE WITNESS:**  No.

3        **THE COURT:**  Number 4 -- no.  Number 3:  Can you

4   explain the importance of la familia to you as different

5   cultures hold family differently?  And it says:  This pertains

6   to why someone would trust family without question.

7        **THE WITNESS:**  Could you repeat that?

8        **THE COURT:**  Yes.  Can you explain the importance of

9   la familia to you as different cultures hold family

10  differently?

11       **THE WITNESS:**  To me, my family is the most important

12  thing.  I'll do whatever for them.

13       **THE COURT:**  Jury Note Number 169 asks seven

14  questions.  No, I'm sorry.  Six, six questions.

15       Number 1:  During the time period of 2010 to 2018,

16  how often did you get work orders from Sean O'Connor?

17       **THE WITNESS:**  Every day, Monday through Friday.

18       **THE COURT:**  Number 2:  Was the victims' data

19  information loaded into the laser printer from a database?

20       **THE WITNESS:**  I do not know how he would input them.

21  All I did was I started the computer, and I looked for the

22  code that matched the form.  I would select the job order

23  number, and I would send it to print.

24       **THE COURT:**  Number 3:  Who is the attorney that

25  checked PAS 01 form and said it was legal?

Jose Luis Mendez - Questions by the Jury
2:19-cr-00295-GMN-NJK - April 13, 2023

1          THE WITNESS:  That came up.  That was either OSHA or
2   oshland, something to that effect.
3          THE COURT:  Number 4:  Did you know you are printing
4   fraud documents while working at the printshop?
5          THE WITNESS:  No.
6          THE COURT:  Number 5:  Why didn't you ask anyone how
7   you were making money from the prize award notification?
8          THE WITNESS:  The truth is we didn't speak much about
9   that amongst ourselves.
10         THE COURT:  No.  The question was why didn't you ask
11  anyone, not who -- who talked about it.  Maybe I read that
12  wrong.
13         Why didn't you ask anyone how you were making money
14  from the prize award notification?
15         THE WITNESS:  Well, because we're family, and because
16  maybe we didn't want to compare to see if Patti was giving
17  Mario more than she was giving me.
18         THE COURT:  Are you able to read your prize
19  notification award letter?
20         THE WITNESS:  No.
21         THE COURT:  Jury Note Number 170 references
22  Exhibit 158, page 2, if we could put that up on the screen.
23         All right.  So the question is:  Do you understand
24  this letter, or are you able to read it?
25         THE WITNESS:  No.

UNITED STATES DISTRICT COURT
Amber McClane, RPR, CRR, CCR #914

Jose Luis Mendez – Questions by the Jury
2:19-cr-00295-GMN-NJK – April 13, 2023

1      **THE COURT:**  And do you feel you are a victim of fraud

2   from Patti and Sean and Epi?

3      **THE WITNESS:**  I feel that way about Patti and Sean.

4   Epi, as I said, was interpreting.  So if he gave me the wrong

5   message or interpret it incorrectly, I'm just not sure of

6   that.

7      **THE COURT:**  Jury Note Number 171 asks eight

8   questions.  The first one is:  How did you input information

9   into the OCE if you do not understand English?

10      **THE WITNESS:**  You receive a job order.  It took me

11   two years to learn how to do it.  On top you have the number

12   of the form.  To the right of that is the job order.  I

13   learned how to open the program.  All I would do is open up a

14   folder where the job numbers were in.  I would select the job

15   number that was on there, and I would push print.

16      **THE COURT:**  Question Number 2:  Why would you open

17   companies and not have any control of anything?

18      **THE WITNESS:**  It sounds naive, but that's how it was.

19   Again, because I really trusted this woman.

20      **THE COURT:**  Number 3:  Are you saying Patti would

21   open your bank account applications on your home IP address?

22      **THE WITNESS:**  No.  No, no.  I would go into it from

23   my house, and she would go into the account from her house.

24   But those weren't shown to you here.  But I remember that the

25   three security questions were her responses.  One --

Jose Luis Mendez - Questions by the Jury
2:19-cr-00295-GMN-NJK - April 13, 2023

 1    specifically one where it was her boyfriend's name.

 2              **MR. BROWN:**  Ex-boyfriend I think, Your Honor.

 3              **THE WITNESS:**  Yes.

 4              **THE COURT:**  All right.  Number 4:  How did you get

 5    paid from Sean when he was only part time after 2015?

 6              **THE WITNESS:**  After 2015 he had nothing to do with

 7    me.

 8              **THE INTERPRETER:**  Clarification.

 9              **THE WITNESS:**  I would receive the envelopes directly

10    from Patti Kern.

11              **THE COURT:**  Number 6:  How did Sean handle the codes

12    when no -- when he was part time after 2015?

13              **THE WITNESS:**  He had a program since 2000.  So since

14    2000 to 2018 it was always the same program.

15              **THE COURT:**  Number 7:  You never looked at anything

16    you printed for eight years?

17              **THE WITNESS:**  I did not understand.

18              **THE COURT:**  Did you never look at anything that you

19    printed for eight years?

20              **THE WITNESS:**  No.  Usually, when you work in

21    printing, you're running it at a very fast speed.  So you're

22    concentrating more on production.

23              **THE COURT:**  Number 8:  How were you in charge of

24    production and not know how much you're printing?

25              **THE WITNESS:**  Because it's impossible to remember,

1    oh, today I printed 30,000 and tomorrow 60,000.  It was

2    impossible to keep track because of -- because of so many

3    years.

4         **THE COURT:**  Number 9:  Did you notice when National

5    Print and Mail changed company names?  Didn't you work every

6    day?

7         **THE WITNESS:**  Yes, I did notice it when it changed.

8    As a matter of fact, I don't know if it was with Digital

9    Express, but again, that was not my decision.

10        **THE COURT:**  Jury Note Number 172 asks four questions.

11   The first one is:  Prior to starting these companies, have you

12   ever owned a business?

13        **THE WITNESS:**  No, never.

14        **THE COURT:**  Number 2:  Once you agreed with Sean to

15   start a company, what happened next?

16        **THE WITNESS:**  Sean told -- well, he explained to Luis

17   Aguilar that we needed an account, a P.O. Box, and that's how

18   we followed those steps.

19        **THE COURT:**  Number 3:  Once the bank accounts were

20   opened, what did you do with the bank-provided documents?  Who

21   instructed you on what to do after the accounts were opened?

22        **THE WITNESS:**  It's the same.  Sean asked me, he says,

23   so that things will be managed better, hand me the checkbook.

24   And he sent me I believe it was to Office Depot so that I can

25   get a stamp of my signature, and I handed it to them.

Jose Luis Mendez - Recross
2:19-cr-00295-GMN-NJK - April 13, 2023

1      **THE COURT:**  And Number 4 is:  Were you present for

2  the notary stamping on company documents?

3      **THE WITNESS:**  No.  That was done at the printing

4  shop, and I never worked at the printshop with Epi.

5      **THE COURT:**  All right.  Any follow up, Mr. Brown?

6      **MR. BROWN:**  No.  Thank you, Your Honor.

7      **THE COURT:**  Any other questions, Mr. Tomsheck?

8      **RECROSS-EXAMINATION**

9  BY MR. TOMSHECK:

10  Q.   I just want to clear up one thing.  There was a number of

11  questions about what you knew and when you knew it.  I want to

12  ask you --

13  **A.**   Yes.

14  Q.   -- because in response to one of the juror's questions

15  you said you saw Patti Kern often -- I believe you said almost

16  every day -- for a number of years.

17  **A.**   Yes, sir.

18  Q.   Is that true?

19  **A.**   Yes, sir.

20  Q.   Did Patti Kern ever tell you that the items that she was

21  creating and sending out through the lettershop were

22  fraudulent?

23  **A.**   No, sir.

24  Q.   Did Patti Kern ever tell you that she did not, in fact,

25  pay the sweepstakes proceeds?

Jose Luis Mendez - Recross
2:19-cr-00295-GMN-NJK - April 13, 2023

1    **A.**    No, sir.

2    Q.    Prior to postal inspectors coming into your home in

3    February of 2018, did you know that this was fraud?

4    **A.**    No, sir.

5    Q.    Since that time, have you learned that it was?

6    **A.**    Yes, sir.

7    Q.    And do you now feel badly about what you know today?

8    **A.**    Yes, sir.

9    Q.    If Patti Kern had told you that the items she was

10    creating and sending through the lettershop were fraud, would

11    you have ever done that?

12    **A.**    No, sir.

13        **MR. TOMSHECK:**  Nothing further.

14        **THE COURT:**  Mr. Gaffney, any follow up?

15        **MR. GAFFNEY:**  No, Your Honor.

16        **THE COURT:**  Mr. Green?

17        **MR. GREEN:**  No follow up.  Thank you, Your Honor.

18        **THE COURT:**  And Mr. Finley?

19        **MR. FINLEY:**  No, Your Honor.

20        **THE COURT:**  All right.  Mr. Jose Luis Mendez, now you

21    are excused.  That was the magic word I was telling you

22    before.  Now that I say the word "excused," you may talk to

23    your attorney and others about your testimony.  You're all

24    done.

25        **THE WITNESS:**  Thank you very much, Your Honor.

1    **THE COURT:**  Please be careful on the way down with

2    steps.  We'll go ahead and take our afternoon break at this

3    time.

4          Members of the jury, remember, you are not to discuss

5    the case with anyone nor permit anyone to discuss it with you.

6    You are required to let me know if you hear anything about the

7    case.  And please do not do any independent research or

8    investigation.  Don't read anything that touches upon this

9    case in any way or form any opinion.

10          It's 2:45.  So we'll -- well, it's 2:43.  We'll be

11   back here at 3:00 o'clock.

12       *(Jury out at 2:43 p.m.)*

13    **THE COURT:**  Mr. Brown, if you could just hold on for

14   just a second?  I just have one thing I need to put on the

15   record outside the presence of the jury about housekeeping.

16          Okay.  So I did go through all the jury instructions,

17   and I organized them in a format that I think makes sense but

18   I'm open to changing that.  So you should have received a PDF

19   copy of the jury instructions that, after my review of all the

20   proposed jury instructions and supplemental and amended copies

21   that I received, I put in order of what I think makes sense

22   and which version I picked.  And then at the end, after all

23   that, there's a section that has the proposed jury

24   instructions that I don't think that we'll be giving that I'm

25   still open to having you explain to me why you think that they

1    should be given so we can make that record, and then I can

2    give you my ruling.

3          I think there are one or two where there were dueling

4    versions of the same one that was given, and I think as to

5    those I did indicate which one is my preference and then --

6    but I still put both of those on the same page.

7          So just giving you an idea of what am I looking at so

8    that -- they were e-mailed to you so you should have them and

9    have a chance to look through them so that -- obviously we're

10   not doing that today, but Monday I guess?  I wanted to go over

11   them before you started preparing for your closing because I

12   always think that it's helpful when you're organizing your

13   closing to know what the instructions are going to be.  Maybe

14   what number they are so that you can reference them, but

15   that's not going to happen today I guess if we're still doing

16   other things that are planned.

17         So just wanted you to have them anyway.  You can, you

18   know, look at them over the weekend at your leisure.  When we

19   come back on Monday, I suppose, we'll go over them in the

20   morning, then take a break?  Maybe have the jury not come in

21   until 1:00 that day so that we have time to finalize the jury

22   instructions before closing?  I -- I'm just proposing that,

23   but think about that.  Go look at it, see if it makes sense to

24   you because you won't have time to ask me anything about it

25   until Monday if you don't look at it now.

 1          **MR. TANASI:**  Your Honor, the defense actually has

 2    kind of given this a little bit of thought seeing where we're

 3    at in the day, and we have --

 4          **THE COURT:**  Okay.

 5          **MR. TANASI:**  -- I guess a burdensome request and

 6    probably one that I don't know if the Court would agree with.

 7    But we would be open to staying tonight, try to get that all

 8    wrapped up.

 9          **THE COURT:**  The jury instructions?

10          **MR. TANASI:**  The jury instructions, yes, Your Honor.

11          **THE COURT:**  Oh.  Okay.  I think -- can we?  I think

12    so.  No?  Oh no.  I have a wiretap.  That's right.  I have a

13    wiretap at 4:00 o'clock that I've been pushing back, and it

14    expires today at 5:00 o'clock.  So I need to get that done.

15    I'm sorry.

16          **MR. TANASI:**  Understood.

17          **THE COURT:**  It's a wiretap extension, so I do need to

18    get that done.  So I can't do that tonight.

19          I am available tomorrow morning if you wanted to come

20    back tomorrow morning.  Oh no.  Nick doesn't want to come back

21    tomorrow morning.  We have a hearing that's scheduled, but the

22    parties are from out of town and blah, blah, blah.  And

23    they're trying to come up with a different date to change it

24    to because they wanted to do video but this, that, the other.

25    The point is they're not on the same page yet.  So my

```
 1   assumption is that they will work something out, which means
 2   it will be changed to a different day.  But yeah, we don't
 3   have that officially, so maybe we don't have time tomorrow
 4   morning.
 5           So we could do that Monday and have openings on
 6   Tuesday instead.
 7           MR. TANASI:  That would be the best option then,
 8   Your Honor.
 9           THE COURT:  So think about that over the break, and
10   then talk to each other and tell me.
11           MR. TANASI:  Understood.  Thank you.
12           MR. FINLEY:  Your Honor?
13           THE COURT:  I'll be here all week.
14           MR. FINLEY:  I don't think the jury instructions are
15   a heavy lift.  We'd hate to waste the whole day on Monday.  We
16   could get started with closings on Monday.
17           THE COURT:  Okay.  Well, at least started.  Because
18   if the defense is the only one that doesn't want to start on
19   Monday but the Government's willing to start on Monday,
20   obviously they get to go first anyway.  Maybe we start on
21   Monday, and then if we end early, that's a little extra time.
22   So just think about it over the break.
23           MR. TANASI:  We'll confer with the Government,
24   Your Honor.  Thank you.
25           THE COURT:  Mull it over and tell me.
```

1    **MR. FINLEY:**  Thank you.

2    *(Recess at 2:47 p.m., until 3:05 p.m.)*

3    **THE COURT:**  All right.  Our smokers have returned, so

4    the jury's back.  Everybody here ready to go?  Let's call the

5    jury in.

6    *(Pause in proceedings.)*

7    **COURTROOM ADMINISTRATOR:**  All rise.

8    *(Jury in at 3:07 p.m.)*

9    **THE COURT:**  All right.  Welcome back.  Everyone may

10   be seated.  We're back on the record in the presence of the

11   jury.  A couple days ago I had asked Mr. Green if he had any

12   other witnesses, and Mr. Green rested; no other witnesses.

13   Mr. Brown, do you have any other witnesses to call,

14   sir?

15   **MR. BROWN:**  We don't, Your Honor.  We rest.  Thank

16   you.

17   **THE COURT:**  All right.  And Mr. Gaffney, will you be

18   calling any witnesses, sir?

19   **MR. GAFFNEY:**  No, Your Honor.

20   **THE COURT:**  All right.  Mr. Tomsheck, you may call

21   your next witness.

22   **MR. TOMSHECK:**  One additional witness.  The defense

23   of Mario Castro would call Mario Castro, Jr.

24   **THE COURT:**  Good afternoon, Mr. Castro, Jr.  Come on

25   in.  Yes, you may come on in.  Watch your steps.  You're going

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

 1    to be seated over here to my left.  Right up here.

 2           **COURTROOM ADMINISTRATOR:**  Please remain standing.

 3        *(The witness is sworn.)*

 4           **THE WITNESS:**  Yes, sir.

 5           **COURTROOM ADMINISTRATOR:**  Thank you.  Please take a

 6    seat.  And for the record, please state and spell your name.

 7           **THE WITNESS:**  Sure.  My name is Mario Castro.  It's

 8    spelled M-a-r-i-o.  Last name, C-a-s-t-r-o.

 9           **COURTROOM ADMINISTRATOR:**  Thank you.

10           **THE COURT:**  You may proceed.

11           **MR. TOMSHECK:**  Thank you.

12                         **DIRECT EXAMINATION**

13    **BY MR. TOMSHECK:**

14    Q.    Silly question:  Who's your dad?

15    **A.**    Mario Castro, Sr., your -- your client.

16    Q.    Okay.  And you know I represent your dad; right?

17    **A.**    Yes.

18    Q.    Okay.  Just so the record's clear, you and I have talked

19    over the course of the last couple years two, three times?

20    **A.**    Yeah, I would say that sounds about right.

21    Q.    Okay.  And we told you you might be here to testify

22    during this trial?

23    **A.**    Correct.

24    Q.    Okay.  And then we talked to you sometime in the last I

25    guess week or so and said we were going to have you come in

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    and testify; is that right?

2    **A.**    That is correct.

3    Q.    And Mr. Tanasi's been promising you it would be today for

4    the last three or four days or so?

5    **A.**    Well, I was promised it would be Monday in the morning,

6    and it's not Monday in the morning.

7    Q.    So just so we're clear, Tanasi said that, not me.

8    **A.**    It was him, yes.

9    Q.    Yes.  Thank you.

10            All right.  So sillier question:  How long have you

11    known your dad?

12    **A.**    Let's see.  My whole life.  I'm 33 years old.

13    Q.    Okay.  So there's been a lot of testimony during this

14    trial about some stuff that happened back in 2018.  Where were

15    you living in February of 2018?

16    **A.**    In Lancaster, Pennsylvania.

17    Q.    Okay.  Where did you grow up?

18    **A.**    I was mostly raised here in Las Vegas from the age of

19    ten.  We actually moved into our home on my birthday.  And not

20    to bash on my dad, but he thought it was a good idea and it

21    wasn't.

22    Q.    Your birthday party was kind of ruined, I hear.

23    **A.**    Yeah, just moving.

24    Q.    Okay.  So when the events happened in early 2018, you

25    weren't in Las Vegas; is that right?

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    **A.**    No.  No, I wasn't.

2    **Q.**    Okay.  Last silly question, hopefully.  You also know the

3    other defendants in this case; right?

4    **A.**    Yes.  Salvador, Miguel are my uncles.  And Jose Luis is I

5    guess like a cousin-in-law?  I don't know what you would call

6    that, but he married my cousin.

7    **Q.**    Okay.  Do you speak Spanish?

8    **A.**    I do speak Spanish.

9    **Q.**    Clearly you speak English?

10   **A.**    Yeah.

11   **Q.**    You and I have always communicated in English?

12   **A.**    Correct.

13   **Q.**    You speak English fluently?

14   **A.**    Yes.

15   **Q.**    You also speak Spanish fluently?

16   **A.**    Yes, I do.

17   **Q.**    Okay.  The four defendants in this case, your father,

18   your two uncles, and your cousin-in-law, do you communicate

19   with them in different languages?

20   **A.**    So with all my uncles and with Jose Luis I communicate

21   strictly in Spanish.  And with my dad, we communicate in our

22   preferred language.  So he'll speak to me in Spanish, and I

23   will respond in English.

24   **Q.**    Okay.  Your dad understands and speaks English?

25   **A.**    Yes.  For the most part he speaks pretty decent English.

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    Q.   Okay.  What about the other three defendants?  What's

2    your experience with them as it relates to the English versus

3    the Spanish language?

4    **A.**   It's very basic English.  They understand some, but it's

5    very simple English that they'll understand.  As far as

6    speaking, they don't even try.

7    Q.   Okay.  When you say "they," have you ever seen or heard

8    Miguel engage in conversation in English?

9    **A.**   I have seen him engage in it, but it tends to get pretty

10   choppy and it tends to go, you know, relatively slow.

11   Q.   Okay.  In your personal evaluation, does Miguel speak

12   better English than Jose Luis and Salvador?

13   **A.**   I mean, yes.  I think my uncle can actually understand me

14   if I were to speak to him in English, but I -- I strictly

15   speak to Salvador and Jose Luis in Spanish because I know, if

16   I tried to speak to them in my, you know, everyday English,

17   they probably wouldn't understand.

18   Q.   So from your experience in dealing with the four

19   defendants in this case, is it your impression that Jose Luis

20   and Salvador don't speak English?

21   **A.**   Yes.

22   Q.   Okay.  I want to be clear about something.  Did I tell

23   you to say that?

24   **A.**   No.

25   Q.   Okay.

1    **A.**    No.

2    Q.    Is that your -- to the best you can -- assessment and

3    evaluation of their ability to speak English?

4    **A.**    Well, I've known them most of my life, and that's been

5    the case, so...

6    Q.    Okay.  I want to direct your attention to a specific

7    location.  We were talking about some incidents that happened

8    in 2018.  One of the areas that the jury's heard a lot about

9    is a business known as Digital Express on Pearl Street.  Are

10   you familiar with that location?

11   **A.**    Yeah.  I worked there for a little bit.  I used to do

12   graphic design there.

13   Q.    Okay.  And when you worked there, what time period was

14   that?

15   **A.**    That was around either 2015 or 2016.  I had originally

16   moved to Lancaster, Pennsylvania, and then I -- not to get too

17   personal, but I went through a breakup and I wanted to come

18   back to spend some time with my family, so I did.  And that's

19   around the point that I was working at Digital Express.

20   Q.    Okay.  Did you later move back to Pennsylvania after

21   that?

22   **A.**    Yes, I did.

23   Q.    Okay.  Did you have a real close friend in Pennsylvania?

24   **A.**    My best friend, yes.  He -- he lives in Pennsylvania.

25   Q.    Okay.  So you went there, and you stayed there for a

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    while, came back, and then eventually moved back to

2    Pennsylvania?

3    **A.**    I moved back with him, yes.

4    Q.    Okay.  Just so the jury knows a little bit more about

5    you, where do you live now?

6    **A.**    I don't live in any one place.  My fiancée and I have a

7    travel trailer, and we've been going around the country.

8    She's a travel nurse.  So wherever she may find a contract,

9    that's where we'll settle down for several weeks at a time.

10   Q.    Okay.  And your fiancée, she has nothing to do with this

11   case; right?

12   **A.**    None at all, no.

13   Q.    And that's Olivia back there smiling?

14   **A.**    That's her.

15   Q.    Okay.  And I just met her in the hallway?

16   **A.**    Yeah.

17   Q.    Okay.  So currently you don't have an address?  Like a --

18   **A.**    Not -- not that we actually reside in.  We have to have

19   for legal reasons an actual address, but not that we live in.

20   Q.    Okay.  So I want to talk to you real quickly about, like,

21   your dad's work history.

22   **A.**    Okay.

23   Q.    Did you know your dad was in the printing business?

24   **A.**    He's been in the printing business his whole life since

25   as far back as I could remember being a little kid.  He's

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    always been in printing.

2    Q.   Okay.  Did he do other things?

3    **A.**   My dad's a little bit of a -- like a mad scientist

4    whenever he's coming up with different business ideas.  At one

5    point he tried to go and mine for gold and silver out in the

6    desert.  And he's had a restaurant.  He's had a tequila

7    business.  And so, yeah, he's -- he's had several different

8    businesses.

9    Q.   Okay.  Do you remember a name of a printing business your

10   father worked at in Las Vegas prior to Digital Express?

11   **A.**   It's -- it was called Master Mailers.

12   Q.   Okay.  Any others?

13   **A.**   Like printing businesses?

14   Q.   Yes.

15   **A.**   I don't -- I don't believe so, or I'm not aware if there

16   was.

17   Q.   Okay.  Were you aware if any of your -- well, any of the

18   other three defendants in the case in addition to your father,

19   if they had printing businesses?

20   **A.**   I believe that my uncle, Miguel, started Digital Express,

21   and then at some point my dad came to join him.  That's my

22   understanding.  I hope I'm not butchering it because I don't

23   really remember the details of it too clearly.

24   Q.   Okay.  But you knew your dad worked in, like, the

25   printing and mailing business for a period of time?

1   **A.**   Yes.

2   Q.   Okay.  Do you recall your dad having a number of large

3   accounts with Las Vegas area casinos in the late 2000s, like

4   2007, '8, '6, that time period?

5   **A.**   Yeah.  During that time my dad's business was thriving,

6   and then he was doing work for the MGM Mirage Corporation.  He

7   was doing business for pretty much any casino like downtown

8   and in the Strip.  They would do a lot of work for them.  And

9   then I believe that, after the late 2000s recession, business

10  started going downhill.

11  Q.   Okay.  So it's sometime ago, but you're aware there was a

12  big housing and financial recession in the Las Vegas Valley?

13  You know that; right?

14  **A.**   Correct.  And that really affected his business.

15  Q.   Okay.  Did your dad actually declare bankruptcy at some

16  point?

17  **A.**   If he did, I wasn't aware of that.

18  Q.   Okay.  You were aware that your dad, in 2009ish or so,

19  started a tequila business?

20  **A.**   Yes.  I was very involved in that actually.  It's -- I

21  remember it very clearly because I had just graduated from

22  high school in 2008, and I took a sabbatical.  I was going to

23  go to college, but I decided to take a year off.  And I used

24  to go with him to Mexico all the time to, you know, events, to

25  market, everything.  So, yeah, I remember that very clearly.

1  Q.   Okay.  When you said you went with him all the time to

2  Mexico, in that time period did your dad spend large periods

3  of time out of the Las Vegas Valley?

4  **A.**   He did, and so did I with him.

5  Q.   And was that out of the country?

6  **A.**   It was in Mexico.

7  Q.   Okay.  Do you happen to know exactly how many days,

8  weeks, or months that you spent in Mexico?

9  **A.**   More often than not, our trips to Mexico would be

10  anywhere from, like, a week to several weeks.  But my dad has

11  always had spinal issues.  He has two discs -- located discs

12  in his back, and I know that oftentimes he'd go out there to

13  have treatments for that.  And whenever he would have to do

14  that, he'd have to spend several months there.

15  Q.   Okay.  So your memory is that around that time period,

16  when he's in Mexico for the tequila business, he's also

17  receiving some type of treatment for a spinal issue?

18  **A.**   Yeah.

19  Q.   Okay.  And just so it's clear, are we talking like a --

20  like an injection-type treatment --

21  **A.**   Injections is what it was, yeah.

22  Q.   Okay.  And he had to stay there for some period of time

23  when --

24  **A.**   Yeah, because it was, like, you know, a treatment where

25  he would take -- get an injection, and then several days later

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1   he'd, you know, get more injections and so on.  So he had to

2   stay there for -- for extended periods.

3   Q.   Okay.  I'm just going to remind you about something I've

4   reminded some other witnesses about.  This is Amber.  She's

5   typing down everything we say.

6   **A.**   Okay.

7   Q.   She gets super frustrated with me because I talk over

8   people or I talk too fast.  So make sure I finish before you

9   start talking so she can write it all down.

10  **A.**   I apologize.

11  Q.   Talking in court is different than talking in the real

12  world sometimes.

13  **A.**   Yeah.

14  Q.   All right.  So you mentioned that your dad was out of the

15  printing business, did some other things.  You -- do you

16  remember specifically when Digital Express started?  Do you

17  remember a year or a month?

18  **A.**   I don't really recall an exact time period for it.  I

19  know it was -- it couldn't have been earlier than, like, the

20  2010ish time.  I think after that it when he would

21  occasionally go to Digital Express.  He wasn't involved

22  initially.  But he's always been really mechanically inclined.

23  So whenever they would have any issues with their machinery,

24  their equipment, anything like that, they'd call to him to be

25  able to fix that up for them.

1    Q.   Okay.  You mentioned your dad's mechanically inclined.

2    Did he actually perform mechanic-type functions for printing

3    type machines at a number of different locations?

4    **A.**   Correct.  That's how he kind of made a name for himself.

5    He -- the company where he originally started working for

6    printing realized that he had a knack for diagnosing issues

7    that any machinery or equipment might have, and so that's how

8    he climbed up the ranks and was able to save enough money to

9    start his own small business in California.  And eventually

10   that led to, you know, a business out here in Las Vegas.

11   Q.   Okay.  His mechanical inclination, did that lend itself

12   to other things other than printing machines?

13   **A.**   Can you repeat the question?

14   Q.   Yeah.  Your dad, you mentioned, was very mechanically

15   inclined.  Did he perform mechanic-type duties on other things

16   other than printing machines?

17   **A.**   Yeah.  At one point we -- he rented out a garage and he

18   purchased, like, old vehicles to re -- redo them.  And I

19   remember I used to go with him as well, and I had a fun time

20   with the sandblaster and everything.  But they would redo the

21   whole body and the -- and the motor and everything.

22   Q.   Was that one of his other mad scientist business

23   ventures?

24   **A.**   It wasn't a business venture so much as, like, he just

25   really likes sports cars.

Mario Castro, Jr. - Direct
2:19-cr-00295-GMN-NJK - April 13, 2023

1    Q.    Okay.  And you remember going to a shop with him and

2    working --

3    A.    With him, yes.

4    Q.    Okay.  All right.  So I want to direct your attention

5    then to the -- the period of time when you mentioned that you

6    were working at Digital Express.  Was that at the Pearl Street

7    location?

8    A.    It was.

9    Q.    Okay.  And that was when you left for Pennsylvania,

10   come -- came back, and before you went back again?

11   A.    Correct.  It was in between my two visits to -- to

12   Pennsylvania.

13   Q.    What did you do at Digital Express?

14   A.    I did graphic design.  So logo design, menus, anything.

15   I worked ad stuff for, like, The Grandview Casino, casinos

16   downtown, as well as just, like, local restaurants.  And

17   actually it was pretty funny, because when we got back -- my

18   fiancée and myself got back here to Vegas, during some of the

19   first few days I remember seeing some work vans going around

20   with some logos that I had designed, and I just -- I found it

21   flattering and -- and funny.

22   Q.    Okay.  So at the time you were at Digital Express, is it

23   safe to say that there were other things being created and

24   printed and distributed other than sweepstakes mailings?

25   A.    Absolutely.  We had a lot of work to do with, like, wide

1    format printing and that.  So yeah, of course.  That's where I

2    came in.

3    Q.   For those of us who don't work in the printing world,

4    what is wide format printing?

5    **A.**   So wide format printing is literally what it sounds like.

6    You have, like, huge equipment that you can print up to the

7    size of, like, billboards and stuff like that.  So if you

8    wanted, like, a big poster board or anything like that, that's

9    what -- that's what you would be doing.

10   Q.   Okay.  The jury's heard some testimony about a type of

11   printing called, like, variable data printing --

12   **A.**   Okay.

13   Q.   -- where your information is put into a computer and it's

14   printed out onto, like, a prefabricated form.

15   **A.**   Okay.

16   Q.   Are you familiar with that?

17   **A.**   Not that well.  I can't say that I do.

18   Q.   Okay.  So, for instance, if you were working on a

19   restaurant menu, there would be graphics and things designed

20   for the menus; right?

21   **A.**   Yes.

22   Q.   And then there's the ability to print variable data like

23   the menu items over the top of those menus.  Are you familiar

24   with that?

25   **A.**   Yes.

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    Q.   Okay.  And is that the type of thing you worked on?

2    **A.**   I think maybe that would be like for something more large

3    scale.  I literally would put in everything myself right on,

4    like, Photoshop or anything for like menus or anything such

5    thing.

6    Q.   Okay.  So the work you did is separate and distinct --

7    that's the point I'm trying to make -- then from the -- the

8    sweepstakes mailings that the jury's heard about?

9    **A.**   Yes.  So my work was basically just that, graphic design.

10   Occasionally I -- I would go and I'd help them with, you know,

11   like the larger amounts of mail.  But it was just like on a

12   machine that would either, like, insert documentation into

13   like an envelope or folding documentation and then just

14   gathering it all, putting it into a tray, and then shipping it

15   off.

16   Q.   Okay.  In the time that you were at Digital Express, did

17   clients of the business ever come in?

18   **A.**   Clients, people that would bring in business?

19   Q.   Yes.

20   **A.**   Yes.  Oftentimes there would be clients -- I met quite a

21   few of them.  And not just in that way, but I shared an office

22   with a guy by the name of Steve Macris (phonetic) who was

23   my -- my family's employee there.  And I would oftentimes go

24   with him because he was doing sales and customer service, and

25   I -- he'd just teach me the ropes of, like, you know, the

1    people that he would approach and tips on how to sell services

2    and so on.  So I met them in that way as well.

3    Q.   Okay.  Do you have any idea how many clients you met?

4    **A.**   I can't put a number on it.  I wouldn't really remember.

5    Q.   Okay.  More than a couple?

6    **A.**   Way more than a couple.

7    Q.   Okay.  I want to give you a name, and you can tell me if

8    that's a name that you recognize.

9    **A.**   Sure.  Yes.

10   Q.   Have you ever heard the name Patti Kern?

11   **A.**   Yes, I've heard of Patti Kern.

12   Q.   Okay.  And how did you first come to know or know of

13   Patti Kern?

14   **A.**   So Patti Kern I know was one of their clients who would

15   bring in business, and she also rented out one of the offices

16   in my dad's building for her daughter to paint in.  So she had

17   all her easels and her portraits and everything in there that

18   she'd be painting.  And she'd come in once awhile there to,

19   you know, talk to either her daughter or to talk to my dad

20   or -- or my uncles or something.

21   Q.   Okay.  Did it seem like she was friendly with your dad

22   and your uncles?

23   **A.**   They were very friendly, yeah.  Everybody was friendly.

24   Q.   Did it seem like she was a good customer?

25   **A.**   Yes.  I mean, it seemed like she was a great customer and

1    a great business owner.  I remember she used to come in with

2    these awesome cars all the time.  So, I mean, that was pretty

3    cool.

4    Q.   Okay.  Did you have any in-depth conversations when you

5    first met Patti about what type of business she was in?

6    **A.**   No, I never really had -- I had one verbal conversation

7    with Patti ever.

8    Q.   Okay.  I'm going to talk to you about that in just a

9    second.

10          You mentioned that, when you saw her come in, she

11    would be driving nice vehicles.  What do you mean?

12    **A.**   Like, just brand-new vehicles.  I remember she had a BMW.

13    She had a really nice, like, fully loaded truck that we all

14    got to see from the inside and out.  And that's the types of

15    vehicles I'm referring to.  And I like cars just like my dad,

16    so it was always interesting to me to go out there and check

17    them out.

18    Q.   Okay.  From your perspective when you were there, did it

19    seem to you like she was a successful business person?

20    **A.**   Oh yeah.  Yeah, I obviously thought that.

21    Q.   Okay.  All right.  Now, you mentioned you had a

22    conversation with Patti.  I think the way you put it is you

23    had one conversation.  Were you talking about one conversation

24    related to business or one conversation ever?

25    **A.**   One conversation in general.  Patti and I used to, like,

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    say hi in passing, but it never really went past that except

2    for when I started the process of opening Pi Printing.

3    Q.    Okay.  I'm going to talk to you about that.

4          At some point are you -- after you come back to

5    Vegas, do you make the decision that you want to go back to

6    Pennsylvania?

7    **A.**    Yes, I did.  I --

8    Q.    Did you talk about that with your mom and your dad?

9    **A.**    I -- so the first time that I went to Pennsylvania, it

10   wasn't a concern to me because I had a job as a certified

11   nurse assistant at the local hospital there lined up.  So I

12   wasn't too concerned about finances.  But the second time that

13   I was coming around, I didn't really have anything set up.  I

14   didn't know how long I was going to wait.  So I originally

15   asked my dad -- and my mom was there -- if I could be involved

16   in his business somehow remotely doing anything.  And at first

17   it was shut down immediately because my parents didn't want me

18   to go back to Lancaster to begin with.

19         But I'm a little bit bullheaded, and I was going to

20   go to Lancaster regardless.  So the time was approaching, and

21   I told my dad, like, dad, I leave in, like, two weeks.  Like,

22   I'm going to ask you one more time:  Is there anything I can

23   do?  Is there any way I can get involved in the business?  And

24   he finally caves, like, all right, I'll put you in contact

25   with Patti.  She might be able to help you out.  And then

1    that's the first and only time that I've ever had an extended

2    conversation with Patti.

3    Q.   Okay.  When you're talking to your dad about a financial

4    thing, are you asking him, like, hey, give me a gift of money?

5    **A.**   I don't want to put it that way because it sounds

6    unflattering, but I was basically asking him for help.

7    Q.   Okay.  And did your dad have anything to offer you at

8    that time?

9    **A.**   No, he didn't.

10   Q.   Okay.  Did your dad say something along the lines of,

11   hey, talk to Patti, she might be able to help you out?

12   **A.**   That's -- that's pretty much what happened.  I don't

13   remember the exact phrasing, but he did tell me that he'd put

14   me in touch with her.

15   Q.   Okay.  And then did you have a conversation with Patti?

16   **A.**   And that's -- that's the conversation I had with her.  I

17   met up with her, and there was really no talk about, like, the

18   actual business side of -- you know, like the business.  It

19   was simply just I was given a list of steps to take, which is

20   open the company, open the bank accounts, set up these DBAs,

21   and so on, and so that's exactly what I did.  I went to the --

22   I guess it must -- the business bureau, something.  It was a

23   building actually not too far away from here where I opened up

24   Pi Printing, and I remember during all this I had no idea

25   what -- what I was doing.  So I was asking several people

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1  around to help me or go with me and just guide me along the

2  process.

3  Q.   Okay.  The name Pi Printing, where did that name come

4  from?

5  **A.**   My nickname.  My family calls me, in Spanish, Pilo.  It's

6  just -- and then eventually some cousin started calling me

7  Pilo, and so I just shortened it to Pi.  And that's how the

8  name came to be.

9  Q.   What's it mean?

10  **A.**   Huh?

11  Q.   What's it mean?

12  **A.**   It's just -- Pi stands for, like, the first part of my

13  nickname.  There's no meaning to it.  It's just a name.

14  Q.   Okay.  What does your nickname mean?

15  **A.**   There's no meaning to it either.  I -- we used to watch a

16  comedian when I was pretty young, and his whole thing was that

17  he would dress up in, like, a little sailor suit and pretend

18  to be a child and act childish.  And apparently as a young

19  child I really enjoyed that.  So my uncles started calling me

20  the nickname, which was [Spanish spoken], but my sister

21  couldn't say that name so she just called me Pilo and that's

22  what stuck.

23  Q.   Okay.  So no significance to the name Pi Printing other

24  than --

25  **A.**   Absolutely none.  There's -- it's a silly name.

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    Q.   Okay.  You mentioned some DBAs.

2    **A.**   Yes.

3    Q.   The jury's heard some testimony and seen some DBAs, doing

4    business as, names.

5    **A.**   Correct.

6    Q.   Did you come up with those names?

7    **A.**   I did not.

8    Q.   Do you know who did?

9    **A.**   Patti did, yes.

10   Q.   Okay.  Do you know why?

11   **A.**   I have no idea why.  The only thing I really remember

12   about the DBAs is that there was some paperwork filled out

13   already, and all I had to do was just sign it.

14   Q.   Okay.  When -- to be clear about that, when the paperwork

15   was already filled out, do you know who filled it out?

16   **A.**   I can only speculate who it was, but it --

17   Q.   I don't want you to speculate.  I only want you to tell

18   the jury stuff --

19   **A.**   Yeah.

20   Q.   -- that you know and is true.

21   **A.**   It was given to me and told me, Patti needs you to sign

22   this.

23   Q.   Okay.  Do you remember who handed it to you?

24   **A.**   I think it was Jose Luis who -- who gave it to me because

25   we were working in the same place.  And he's like, hey, Patti

1    brought this, and she just needs you to sign it.

2    Q.    Okay.  Was there anything, like, weird about that, him

3    just saying, hey, somebody dropped this off, you need to sign

4    it?

5    **A.**    Well, I didn't think there was anything weird to it

6    because I had spoken to Patti, and she told me what the steps

7    were going to be.  And so it arrived, so I figured, okay, I'll

8    sign it.  It's part of the business.

9    Q.    Okay.  Did you know what the business was?

10   **A.**    I really don't know.

11   Q.    Okay.  Did you care?

12   **A.**    I really did not care.

13   Q.    Okay.  What do you mean?

14   **A.**    As in, like, I had other things on my mind like moving

15   across the country to worry about that I didn't really care.

16   And to me, I -- since I had originally been the one to ask

17   them, like, can I do something, can I be involved some way, I

18   figured, well, they know that they're doing.  She's clearly

19   very successful, and I have no reason to question it.  I felt

20   like I was being helped out.

21   Q.    Okay.  Did you ever have conversation at all with Patti

22   about the legality of her business?

23   **A.**    The only conversation that I had with Patti was the time

24   that we sat down and she gave me the list of steps to follow.

25   I've had no further conversations with her.

1    Q.   Okay.  In that conversation, did Patti Kern tell you this

2    is a fraudulent mailing business I'm conducting?

3    **A.**   No, absolutely not.

4    Q.   Okay.  Did she tell you this involves sweepstakes?

5    **A.**   I never heard anything about any sweepstakes.

6    Q.   Okay.  Had you seen sweepstakes printed in Digital

7    Express?

8    **A.**   I don't know what a sweepstakes being printed would look

9    like.

10   Q.   Okay.  Did -- did Patti ever tell you, like, look, here's

11   the business.  You're going to put your name on it, I'm going

12   to mail things out, I'm going to promise people money, but I'm

13   not going to give it to them?

14   **A.**   No, she never said anything like that to me.

15   Q.   Okay.  You -- did you see this as a successful business

16   person giving you an opportunity?

17   **A.**   Yes, that's exactly how I -- I perceived it.

18   Q.   Okay.  In hindsight, do you perceive it differently?

19   **A.**   Well, it's been a massive headache for me.  It's been,

20   you know, excuse the language, but a pain in the ass having to

21   deal with all this.  So in retrospect I wish I hadn't done it.

22   Q.   Okay.  Let me ask you this.  If your goal is I gotta get

23   out of town, I'm moving away and I need some cash, why didn't

24   you go sell drugs?

25   **A.**   Because it's illegal.

1  Q.   Okay.  Would you have done this if you had known that it

2  was a fraud that Patti Kern was utilizing?

3  **A.**   No, because all I got is $200 a week.  I don't think

4  that's worth selling my soul over.

5  Q.   Okay.  Did Patti arrange with you a specific amount of

6  money she was going to give you?

7  **A.**   $200 a week.

8  Q.   Okay.  And did she tell you it was $200 a week in

9  response to --

10  **A.**   Me -- me starting the company.

11  Q.   Okay.  So you believed that you were starting a company

12  and she was paying you for that process?

13  **A.**   Basically, yeah.  I -- I thought, like, I started the

14  company, and she's taking over some of the responsibilities.

15  I -- I was given -- again, I was given that list of steps, and

16  as far as what the company was, I -- I -- I was under the

17  impression that it was going to be some sort of, like,

18  brokering company where, like, she just brings more business

19  to, you know, like my uncle Epi's business or to, like, my

20  dad's business is what I -- I was under the impression of what

21  it was -- what it was going to be.

22  Q.   Okay.  You knew at that time your uncle Epi had a

23  printing business as well?

24  **A.**   Correct.

25  Q.   And you knew he had a relationship with Patti?

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1  **A.**  Correct.  She would go to his business as well.

2  Q.  Okay.  And was that part of the reason you thought you

3  could trust her?

4  **A.**  Well, yeah, she did business with my -- all my family

5  pretty much, and she was there often.  She drove nice cars.

6  She was always well put together.  So I perceived her pretty

7  highly.

8  Q.  Okay.  Did you have any idea at all she was involved in

9  any kind of illegal activity?

10  **A.**  I did not know that.

11  Q.  Did you overhear any conversation between your uncles

12  about her being involved in illegal activity?

13  **A.**  I never heard any of that.  I think, if I had heard

14  anyone talking about that, then I -- I would have probably

15  distanced myself from -- from that whole process.

16  Q.  Okay.  You know your dad pretty well; right?

17  **A.**  I -- I would hope so.

18  Q.  Okay.  Do you love your dad?

19  **A.**  I love my dad.

20  Q.  Okay.  Are you here testifying and telling lies because

21  you want to help him out?

22  **A.**  No.  I'm here to tell the truth.

23  Q.  Okay.  Do you believe, knowing your father as you do,

24  that he would have you introduced to Patti Kern if he knew she

25  was engaging in fraud?

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    **A.**   I genuinely don't believe that my dad would put me in a

2    position that he knows I could get in trouble for.

3    **Q.**   Do you believe your dad would allow you to put your name

4    on something if he thought that it was a fraudulent activity?

5    **A.**   I don't believe so.

6    **Q.**   Okay.  In the time you've spent with your dad, has he

7    tried to protect you?

8    **A.**   I think my dad has spent too much of his time trying to

9    protect me.

10   **Q.**   All right.  I'm going to ask you about just a couple

11   other things.

12        At some point -- oh.  The jury heard some testimony

13   during this trial about some debit cards in the name Mario

14   Castro that had a d/b/a Money Securities and the name Pi

15   Printing and that they were in your father's wallet when the

16   inspectors came into his home on February 21st, 2018.

17        Do you have any idea how those cards got there?

18   **A.**   Well, it would make sense as to why he was in the

19   possession because my business address was my parent's home

20   address.

21   **Q.**   Okay.  And at the time the cards got sent for the bank,

22   were you in Pennsylvania?

23   **A.**   Yes.

24   **Q.**   Okay.  Did you do anything with the bank accounts related

25   to those entities?

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    **A.**    I had access to them through my phone, but the only thing

2    I would do is I would go on the mobile app and I would take

3    out every Friday $200 and transfer it right over to my

4    account.  I also -- so it was Bank of America.  And so both of

5    the -- the accounts, my personal one and the business one,

6    were linked.  So I would just transfer $200 over every Friday.

7    Q.    Who directed you to do that?

8    **A.**    Patti told me that I could do that.  That would be my

9    payment weekly.

10    Q.    All the other financial activities, deposits,

11    withdrawals, checks, et cetera, related to the accounts that

12    you now know were in your name, who did those activities?

13    **A.**    That was Patti doing all those activities.  She reached

14    out, and my dad told me, he's like, hey, do you mind passing

15    me your -- your password for the bank accounts?  Patti wants

16    access to them.  And he even suggested to me to make sure to

17    change my password to them because I used my same password for

18    just about everything.  So at his recommendation I even

19    changed it, and the password was just password1 and --

20    Q.    Would you have given Patti Kern access to a bank account

21    with your name on it if you knew she was perpetrating fraud?

22    **A.**    If she was committing fraud, absolutely not.

23    Q.    Okay.  I want to direct your attention then to 2018.  Do

24    you find out that something's wrong when a bunch of search

25    warrants are executed?

1    A.    Well, the first thing I noticed was that all the money in

2    those bank accounts -- so the business one as well as my

3    personal one -- had been seized.  So I lost my personal money

4    as well.  And I was panicking.  My first thought was, like,

5    holy crap, I was just screwed by Patti.  I thought she had

6    taken the money and just ran or something.  But as it turns

7    out and from what I heard later, it was the Government who had

8    seized that.

9    Q.    Okay.  So you found out about a search warrant about your

10   dad's house and his business and --

11   A.    Well, my mom called me at some point to let me know that

12   my dad had been arrested and that they had gone and searched

13   their entire home and had them handcuffed outside the house.

14   Q.    Okay.  The money that was in your personal account, did

15   you have money that was in no way affiliated with the Patti

16   Kern business?

17   A.    Well, yeah, I worked at -- I got a job again this time as

18   a phlebotomist at the same hospital.  And so a lot of that

19   money was my personal money that I had made working there.

20   Q.    Okay.  And that got seized?

21   A.    Yeah, it was all seized.  Never saw it again.

22   Q.    Okay.  You got that pursuant to, like, a paycheck working

23   as a phlebotomist?

24   A.    One more time?

25   Q.    You got a paycheck working as a phlebotomist?

1    **A.**    Correct.

2    Q.    Okay.  And that money got taken, never got it back?

3    **A.**    That's correct.

4    Q.    Okay.  At some point do you meet postal inspectors and/or

5    prosecutors in this case?

6    **A.**    Yes.  I met Inspector Bouchie -- Bouchie.

7    Q.    Okay.  And where did you meet him?

8    **A.**    So he first reached out to me, and he let me know what

9    was going on.  He told me the magnitude of the situation.  And

10   obviously, like, you know, when you have a government official

11   reaching out to you and telling you all this, I was -- I mean,

12   my initial -- I was nervous.  I was intimidated by the

13   situation.  And so he asked me if we could meet, and I felt

14   safer if we met somewhere public.  I don't know why, but I

15   just did.  And so I recommended that we meet at -- at

16   Starbucks, and that's when I met Inspector Bouchie.

17   Q.    Where was the Starbucks?

18   **A.**    In Lancaster, Pennsylvania.  He flew out to see me.

19   Q.    Was it just him that talked to you the first time?

20   **A.**    You know, it's kind of fuzzy, but it may have been him

21   and one other person.  But I remember he was there for sure.

22   Q.    Okay.  Do you know was that interview recorded?

23   **A.**    The name doesn't sound familiar, but it doesn't mean it

24   wasn't him.  I just don't remember.

25   Q.    No.  I said:  Was the interview recorded?

Mario Castro, Jr. - Direct
2:19-cr-00295-GMN-NJK - April 13, 2023

1  **A.**   Oh.  If it was, I wasn't aware of it.  But, yeah, I don't

2  know.

3  Q.   Okay.  After that conversation, were you contacted by

4  federal authorities again?

5  **A.**   Well, Mr. Bouchie was pretty courteous during our

6  interview.  I remember it was a pretty, you know, mellow

7  thing.  So he and I kept talking, texting mostly, and that was

8  really the only interaction I had with any authorities.  And

9  then he was also the one that notified me that I had to come

10  back to Las Vegas, be flown out here for the grand jury.

11  Q.   Okay.  Did you actually testify at the grand jury?

12  **A.**   I did.

13  Q.   And you understand, when you testified there, that they

14  were actually keeping a record of what you said?

15  **A.**   Yes, I knew that.

16  Q.   Okay.  Kind of like Amber's keeping of the record we're

17  talking about today.

18  **A.**   Yes, I knew that that was going on.

19  Q.   Okay.  Do you remember who it was that asked you

20  questions at the grand jury?

21  **A.**   It was Mr. Finley.

22  Q.   Okay.  Did you talk to Mr. Finley prior to your testimony

23  at the grand jury?

24  **A.**   Yes.  I spoke to both of the prosecutors the -- the day

25  before.

*Mario Castro, Jr. - Direct*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    Q.   Okay.  These two prosecutors here?

2    **A.**   That's correct.

3    Q.   Okay.  They got nametags in front of them there.  Zytnick

4    and Finley?

5    **A.**   Correct.  I spoke to them both.

6    Q.   Okay.  Can you tell us about that conversation?

7    **A.**   Basically everything that had happened with Mr. Bouchie

8    and him being courteous was kind of thrown out the window

9    there.  Because it was -- it was really crappy.  I remember

10   feeling like I was being more so interrogated that actually

11   asking questions.  And he became extremely aggressive, so much

12   to the point that he was asked by his own colleagues to step

13   outside the office.

14   Q.   Who is "he"?

15   **A.**   Mr. Finley.

16   Q.   Okay.  Do you remember your reaction after that

17   conversation?  Do you remember what you did?

18   **A.**   Yeah, I do.  I remember I -- I drove home crying, and I

19   don't do that very often.  And the last thing I want to do is

20   talk to him again, but here I am.

21   Q.   Okay.  If we're being honest about it, you probably don't

22   want to be here and testify; right?

23   **A.**   No.  It's scary.

24   Q.   Okay.  I get it.

25           Knowing now today that there were real victims that

1  Patti Kern stole money from, do you feel bad about that?

2  **A.**   I feel terrible that anybody would be defrauded.

3  Q.   Okay.  Would you have ever allowed your name to be used

4  in a fraud if you'd known it was fraud?

5  **A.**   Not knowingly.

6          **MR. TOMSHECK:**  We pass the witness, Judge.

7          **THE COURT:**  Mr. Gaffney, any questions?

8          **MR. GAFFNEY:**  No, Your Honor.  Thank you.

9          **THE COURT:**  Mr. Green?

10         **MR. GREEN:**  No questions, Your Honor.

11         **THE COURT:**  Mr. Brown?

12         **MR. BROWN:**  No thank you, Your Honor.

13         **THE COURT:**  Mr. Finley?

14                     **CROSS-EXAMINATION**

15  **BY MR. FINLEY:**

16  Q.   Good afternoon.

17          So you just testified that you went into the grand

18  jury and you were examined by me?

19  **A.**   I remember I had a conversation with you, too.  As far as

20  the grand jury, it could have been you.  It could have been

21  Mr. Zytnick.  I don't really remember.

22          What I do remember is that due to the previous

23  experience the previous day with you guys, I was going into it

24  very nervous.  And it seemed kind of just, like, it very nice

25  because I wasn't attacked the way I was the previous day.  And

*Mario Castro, Jr. - Cross*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1    so I walked out pleasantly surprised during the grand jury.

2    Q.    So it was actually Mr. Zytnick over here who questioned

3    you in the grand jury.

4    **A.**    Okay.

5    Q.    I didn't ask you a single question in the grand jury.

6    **A.**    Okay.  Not during the grand jury.  I mentioned that you

7    were asked to step outside of your guys' meeting room in your

8    guys' office the previous day because you were being very

9    aggressive with me.

10   Q.    You love your father?

11   **A.**    I do.  I love him very much.

12   Q.    You don't want to see him go to prison?

13   **A.**    Of course not.

14   Q.    You were shown some bank cards from the bank accounts

15   that you opened.  Do you remember that?

16   **A.**    I -- I -- do you have them on you?  Maybe --

17   Q.    Oh.  We're talking about just now on the screen.  Do you

18   remember that?

19         **MR. TOMSHECK:**  Judge -- Judge, I didn't show him

20   anything.

21         **THE COURT:**  Oh.  They weren't shown to him.  They

22   were just discussed.

23         **MR. FINLEY:**  Oh.  They were just discussed.  I see.

24   Could we -- do you have that exhibit number?

25         **THE COURT:**  You're asking about the same cards that

1    he discussed with Mr. Tomsheck?

2            **MR. FINLEY:**  Yes.

3            **THE COURT:**  He didn't have to see them before, so

4    that's fine.

5            **MR. TOMSHECK:**  Tim, I think it's 69.

6            **MR. FINLEY:**  Think it's 60.

7            **MR. TOMSHECK:**  Sixty-nine.

8            **MR. FINLEY:**  Sixty-nine.  Thank you.

9            **MR. TOMSHECK:**  Sure.

10   **BY MR. FINLEY:**

11   Q.   And I think you mentioned that it wouldn't surprise you

12   that these cards were found in your father's house?

13   **A.**   That's correct.

14   Q.   And that would be because the business address was --

15   **A.**   My --

16   Q.   -- his house?

17   **A.**   Sorry.  My -- my business address was my parent's home

18   address.  So any time that I would request anything from a

19   bank from the business, that's where it would show up.

20   Q.   Did you know that these cards were found in his wallet?

21   **A.**   I didn't know they were found in his wallet.  I do

22   remember asking for them to be delivered there because Patti

23   had asked my dad to ask me for that favor so that she could

24   have them.

25   Q.   If the business address is the same as your father's

1    house, wouldn't really explain why it was in his wallet;

2    right?

3    **A.**   I -- I mean, I wouldn't -- I don't know why it would be

4    an issue that they'd be in his wallet if they arrived there.

5    He saw them.  He found them.  He intended on giving them to

6    Patti.  Then I could see why he would carry them there.

7    Q.   When did you open the bank accounts?

8    **A.**   I opened the bank accounts before I left to Pennsylvania.

9    I don't remember an exact date.  I think it was -- should have

10   been either 2015 or 2016.

11   Q.   And do you know that the cards were found in his wallet

12   more than a year after that?

13   **A.**   That's not when I asked for the cards to be shipped to

14   me.  I opened up the bank account, and then it was several

15   months later once I was -- when I was in Pennsylvania that I

16   was asked to have some cards shipped out to Las Vegas.

17   Q.   Did you know that the expiration dates on these cards are

18   four months apart?

19   **A.**   That sounds about right.  Like I said, several months

20   later is when I -- when I was asked for that.

21   Q.   And so those cards would still be sitting in his wallet

22   for a pretty long time.  He must have delayed for quite awhile

23   before delivering them to Patti Kern; yes?

24   **A.**   I can only speculate.

25   Q.   Just based on the time that you just testified that you

*Mario Castro, Jr. - Cross*
*2:19-cr-00295-GMN-NJK - April 13, 2023*

1  opened the account and it's not disputed that these were in

2  his wallet and these were in his house -- and that was

3  February 21, 2018 -- so that even accounting for the fact that

4  it was a while before you asked the cards to be shipped, they

5  would be in his -- would have taken him a very long time to

6  deliver that to Patti Kern; right?

7  **A.**   Again, I can only speculate what the answer to that would

8  be.  But, I mean, the original cards were not asked -- like,

9  no one asked for the original cards.  The original cards

10 simply just arrived to my dad's home because I had left before

11 they had a chance to arrive.  And so I assume he probably just

12 picked it up and just kept it in his wallet.

13        And then the other ones, yes, it was like several

14 months later.  You mentioned it was like four months apart,

15 the expiration date.  That sounds about right of, like, the

16 time that I was asked to ship some out for Patti.

17 Q.   And you said you didn't -- that you were speculating.

18 Were you speculating when you testified that these cards were

19 going to be delivered to Patti?

20 **A.**   Was I speculating?  I'm sorry, can you clarify that for

21 me?

22 Q.   Yeah.  Were you speculating a few minutes ago when you

23 said that these cards were probably going to be delivered to

24 Patti and that's why they were in your father's wallet, were

25 you speculating about that?

1  **A.**   There was no need for me to speculate.  If my dad needed

2  me to send him a card, he could have just told me, hey, I need

3  you to send me a card, and I would have done it.

4  Q.   Right.  But what are you basing the testimony that this

5  was going -- this was in your father's wallet on February 21,

6  2018, for purposes of being delivered to Patti Kern, on what

7  information are you basing that on?

8  **A.**   Basing the fact that these were supposed to be given to

9  Patti?

10  Q.   Who said that?

11  **A.**   I'm -- I'm -- can you clarify for me?

12      **THE COURT:**  Why did you think that these cards found

13  in your dad's wallet were supposed to be provided to Patti?

14      **THE WITNESS:**  Because my dad told me that Patti

15  needed them.

16  **BY MR. FINLEY:**

17  Q.   Do you remember when that was?

18  **A.**   I don't have an exact date.  I don't remember.

19  Q.   When did you move to Pennsylvania?  I guess the cards are

20  found February 21, 2018.  How much earlier than that was it

21  that you moved to Pennsylvania?

22  **A.**   They -- must have been, like, 2017.

23  Q.   You moved in -- do you know when in 2017?

24  **A.**   2016 or 2017.  I don't have an exact time frame that I

25  remember.  I've always been bad at keeping track of dates.

1   Q.   And were you aware that corporate documents from Pi

2   Printing and the DBAs that you opened, Money Securities and

3   Assets Unlimited, were found in your father's house and in a

4   car that was parked outside the house?  I think it was a

5   Nissan.  Were you aware of that?

6   **A.**   I wasn't aware of any of that.

7   Q.   Okay.  Now, you said that Patti -- your -- you asked your

8   father to -- to set you up in business.  I think that was your

9   term?

10  **A.**   I didn't ask him to set up a business for me.  I asked

11  him if I could get involved in some sort of way was the -- the

12  more accurate wording.  If I could be involved in his business

13  in some way.

14  Q.   Yes.  Okay.  Set you up in business, involved in

15  business, yeah.  Fine.

16          But you went to him first?

17  **A.**   Correct.

18  Q.   And it was his idea to set you up with Patti?

19  **A.**   It was his idea to not let me get involved to begin with

20  because he was trying to keep me here in Vegas, along with my

21  mom.  And when I insisted and he saw I was leaving, that's

22  when he directed me to Patti.

23  Q.   And it was Patti who told you to open up Pi Printing?

24  **A.**   She didn't specify a name, but yes.

25  Q.   Right.  So she's the one who told you to open the

1    corporation -- or open a corporation, and you decided it was

2    Pi Printing?

3    **A.**    Correct.

4    Q.    Okay.  Are you sure that it happened that way?

5    **A.**    Yes, I'm very sure.  100 percent sure that it happened

6    that way.

7    Q.    Are you sure that your father didn't ask Dan Wagner and

8    Sean O'Connor to pay for the cost of you to open that company?

9    **A.**    I don't think so?  I don't know if...

10    Q.    Could I show you Government Exhibit 300, which has been

11    admitted?  So these are texts -- the parties have agreed these

12    are real texts between a person named Sean O'Connor and Mario

13    Castro, your father.  And it says in the title about Junior's

14    company because that's how it -- that's how you're being

15    referred to in these texts.

16           If you look at the text from September 7th, 2016, do

17    you see where Mario Castro writes to Sean O'Connor:  He is at

18    city hall now.  Dan told me to ask you for money for the new

19    corporation.  I will give the total after he finish

20    everything.

21           Do you see that?

22    **A.**    Yes.

23    Q.    Okay.  Does that refresh your memory about whether it was

24    actually Dan Wagner and Sean O'Connor that your father went to

25    first to be partners with you on the mailing company?

1    **A.**    This is the first time that I see these text messages.  I

2    wasn't aware that this conversation had occurred.

3    Q.    And then according to the text message that you're

4    looking at, the next one, Sean O'Connor refuses to pay.  Do

5    you see that?

6    **A.**    I do.

7    Q.    And then in the next text your father writes, "It's up to

8    you and Dan.  I have no said so on this matter."

9              Do you see that?

10   **A.**    I see that.

11   Q.    And were you aware that you opened Pi Printing on the day

12   that this text was sent according to state corporate records?

13   **A.**    I wasn't aware of that.

14   Q.    Are you aware that Pi Printing, the corporation, never

15   mailed any mailings under that particular name?  Did you know

16   that?

17   **A.**    I was not aware of that either.

18   Q.    Now, you opened two DBAs registered to Pi Printing

19   several months later.  Maybe approximately four months later.

20   Do you remember doing that four months later?

21   **A.**    I never did that.

22   Q.    You didn't open up DBAs in the name of Pi Printing

23   called --

24   **A.**    The --

25   Q.    I'm sorry.  Let me just get the question out.

1          You didn't open up DBAs under the name Pi Printing

2     d/b/a name Number 1, Money Securities, d/b/a name Number 2,

3     Assets Unlimited?

4     **A.**   So the only DBAs I remember signing for were the -- the

5     ones right before I left to Pennsylvania.  And then after I

6     left to Pennsylvania, I never opened up any other DBAs.  So if

7     there was one opened, it wasn't me.

8     Q.   So did you know that it was only months after Dan Wagner

9     and Sean O'Connor refused to pay for the cost of opening Pi

10    Printing that you and Patti Kern actually started sending out

11    mailings under the name Assets Unlimited and Money Securities?

12    It was months later?

13    **A.**   I don't know what happened.  I never mailed anything out.

14    I was in Lancaster, Pennsylvania, having a completely separate

15    job.  So I don't know what was happening.

16    Q.   So you -- you don't deny that because you just don't know

17    what you were doing; is that right?

18    **A.**   I'm not denying or saying yes to anything.  I just don't

19    know what was happening during that time.

20    Q.   I understand.

21          **THE COURT:**  Mr. Finley, it's 4:00 o'clock.  So we

22    need to take our overnight break.  So I do remind the members

23    of the jury --

24          **MR. FINLEY:**  Thank you.

25          **THE COURT:**  -- that during this extended break we do

2:19-cr-00295-GMN-NJK - April 13, 2023

```
 1   need you to not discuss this case with your co-workers or your
 2   spouses or your employers or babysitters or dogsitters or
 3   anybody else.  You can tell them, no, we're not done yet; yes,
 4   we have to go back next week.  But don't get into any of the
 5   details.  It's very difficult to stop talking about it once
 6   you start.
 7          Please remember that, if you do accidentally overhear
 8   anything that touches upon this case in any way, you are
 9   required to let the Court know right away.  And remember that
10   all the parties, the attorneys, the witnesses, the defendants,
11   none of their staff members are permitted to talk to you about
12   anything at all.  Not the weather, anything.  Please do not
13   read or listen to or view anything that touches upon this case
14   in any way or attempt to perform any research or any
15   investigation.  Write down your questions.  And do not form
16   any opinions yet.  We still have testimony, exhibits for you.
17   I will provide to you the written instructions of law that
18   will guide you.  You can then apply the facts to that law and
19   talk to each other and share your opinions at that time.  That
20   will be after the closing arguments.
21          So let's go ahead and stand for the jury as they are
22   the judge of the facts.  And Mr. Mario Castro, Jr., after the
23   jury exits, then you can exit as well.  I do need to tell you
24   that you are not permitted to talk about your testimony with
25   anyone, not even your fiancée.  You can't talk to your dad or
```

 1    any of the attorneys until after you're all done, which means

 2    until I say the magic words "you are excused."  So not until

 3    then.  Please don't talk about the case or testimony you've

 4    given or might be giving.  Just don't talk about the case at

 5    all.

 6              **THE WITNESS:**  Yes, ma'am.

 7              **THE COURT:**  Okay.  I know it's a long weekend, so

 8    it's hard to do.  So we'll see you back Monday at 9:00 a.m.

 9         *(Jury out at 4:04 p.m.)*

10              **THE COURT:**  All right.  You are excused.  Please be

11    careful with the steps down.

12              So 9:00 a.m.  Hopefully, if possible -- I don't see

13    Mr. Goodman here.  Did he leave?  Hopefully we can continue

14    with Mr. Mario Castro, Jr. at 9:00 a.m.  After that, whatever

15    other witnesses come after that.  If we're done with

16    witnesses, then we'll go over the jury instructions.  And the

17    Government can decide whether they want to give their closing

18    argument at 1:00 o'clock or if they want to wait until

19    9:00 a.m. Tuesday morning if we're going to settle the

20    instructions later.  I --

21              **MR. FINLEY:**  Your Honor, Mr. Zytnick suggested maybe

22    8:00 o'clock?  I think that would make sense.  And I was

23    talking to Mr. Tomsheck --

24              **THE COURT:**  8:00 o'clock for the --

25              **MR. FINLEY:**  8:00 o'clock in the morning for the jury

1    instructions.

2              **THE COURT:**  Jury instructions you want to do that?

3              **MR. FINLEY:**  Yeah.  I think it would be -- makes good

4    sense.

5              **THE COURT:**  Okay.  I don't mind doing that so long as

6    there's not anything new that you think -- you know, you guys

7    know better if there's any other witnesses or jury

8    instructions that need to come in after.

9              **MR. FINLEY:**  We're not currently planning anything

10   like that.

11             **THE COURT:**  Okay.  So let's settle them --

12             **MR. FINLEY:**  We'll try not to.

13             **THE COURT:**  -- at 8:00 a.m.  Oh, well, no, we don't

14   know if we have a court reporter.

15             **COURTROOM ADMINISTRATOR:**  Yeah, we don't have a court

16   reporter.

17             **MR. TOMSHECK:**  Judge, in talking to the Government

18   and co-counsel, I do not think the jury instruction

19   conversation will be very long at all.

20             **THE COURT:**  Okay.  We might have to e-mail you to let

21   you know if we can get a court reporter here at 8:00 a.m.

22   because that's not on their calendar.  Oh, it's Paige.

23             The person who's -- who's going to be doing it on

24   Monday is probably not going to even be here by 9:00 a.m. to

25   be honest.  So we'll see what we can do and e-mail you if it

1    turns out that -- so let me just take a poll.

2           Is there anyone who cannot be here at 8:00 a.m. on

3    Monday?

4        *(Court reporter conferring with Judge Navarro.)*

5        **THE COURT:**  Okay.  Let me see.  Mr. Ericsson, are you

6    not available?

7        **MR. ERICSSON:**  Your Honor, I just looked at my

8    schedule.  I have a 7:30 hearing.  It should be fairly quick.

9    So I think I'd be here by 8:00, but I -- I do have a 7:30

10   hearing Monday.

11       **THE COURT:**  All right.  Could -- could Mr. Gaffney

12   take care of jury instructions if you're not here, or do we

13   need to wait for you to return?

14       **MR. GAFFNEY:**  Your Honor, we're not submitting any

15   jury instructions on behalf of Miguel Castro.  We're joining

16   in the instructions of our co-counsel.  So, yeah, I can -- I

17   can be here.  We don't need Mr. Ericsson for that portion.

18           Judge, can you ask the Government if they plan at

19   this point to present any rebuttal witnesses?

20       **THE COURT:**  He said they're not planning to yet.

21       **MR. FINLEY:**  That's still the plan currently.

22       **MR. GAFFNEY:**  Okay.  Thank you.

23       **THE COURT:**  All right.  So -- so we'll let you -- so

24   it looks like -- Amber, thank you so much.  You are an angel.

25   So we'll be here at 8:00 a.m. Monday morning.  We'll settle

1    jury instructions.  That will give us some time behind the

2    scenes to get them in -- tell my other law clerks you're going

3    to be on spellcheck duty.  So we'll make sure that those get

4    done so that, as soon as we need them, we can give them.

5    Takes me a good 30 minutes to read them out loud.  I don't

6    rush through them.  I do read them carefully.  And then we

7    don't give them a copy.  We keep it during your closings so

8    they're not distracted and looking at it.  They will have a

9    copy of it in the deliberation room but not while you're

10   presenting your closing argument.

11           So then we can begin with Government's closing on

12   Monday, see how far we get, and then defense can tell me if

13   you want to start or not or if you want to do Tuesday and

14   who's going to go first.  I'll call you in whatever order you

15   tell me to call you if there is a preference for who goes

16   first and who goes last, if you haven't already figured that

17   out.

18           **MR. TOMSHECK:**  I think we have a general idea.

19           **THE COURT:**  Okay.

20           **MR. TOMSHECK:**  I don't foresee it being a problem,

21   but I just wanted to remind the Court before we break for the

22   weekend, I don't think there's any way we get to Wednesday the

23   19th with actual arguments but I cannot be here that day.

24           **THE COURT:**  Right.  So long as your client is willing

25   to waive your presence on -- which I think we already talked

1    about.  Maybe we didn't.

2            **MR. TOMSHECK:**  We did.

3            **THE COURT:**  On the 19th, if there are jury questions

4    and I need to poll you on what the answer should be, sometimes

5    we actually need to come back into court.  We try to do it by

6    e-mail when possible.  With so many people, it might not work.

7    But jury questions -- I don't think I've ever done a trial

8    where there wasn't at least one jury question.

9            So, Mr. Mario Castro, do you understand that

10   Mr. Tomsheck is not available on Wednesday, the 19th, and

11   while we don't expect to be doing closing arguments, we might

12   be.  But if we're doing -- if the parties -- if the jury is

13   deliberating and there is a jury question, are you comfortable

14   with just having Mr. Tanasi available to address the jury

15   question and not Mr. Tomsheck physically here?

16           **MR. MARIO CASTRO:**  I am.

17           **THE COURT:**  All right.  I think that's it.

18           **MR. FINLEY:**  Thank you.

19           **THE COURT:**  We'll see you Monday morning.

20       *(Proceedings adjourned at 4:09 p.m.)*

21                       --o0o--

22             COURT REPORTER'S CERTIFICATE

23

24       I, AMBER M. McCLANE, Official Court Reporter, United

25   States District Court, District of Nevada, Las Vegas, Nevada,

1    do hereby certify that pursuant to 28 U.S.C. § 753 the

2    foregoing is a true, complete, and correct transcript of the

3    proceedings had in connection with the above-entitled matter.

4

5    DATED:  4/13/2023

6

7                          /s/ *Amber M. McClane*
                           AMBER McCLANE, RPR, CRR, CCR #914
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25