*2:19-cr-00295-GMN-NJK - April 17, 2023*

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF NEVADA

 3   UNITED STATES OF AMERICA,      )
                                    ) Case No. 2:19-cr-00295-GMN-NJK
 4              Plaintiff,          )
                                    ) Las Vegas, Nevada
 5   vs.                            ) April 17, 2023
                                    ) 8:11 a.m. - 12:02 p.m.
 6   MARIO CASTRO, SALVADOR         ) Courtroom 7D
     CASTRO, MIGUEL CASTRO, and     ) JURY TRIAL, DAY 17,
 7   JOSE LUIS MENDEZ,              ) AM SESSION
                                    )
 8              Defendants.         )
     _____) CERTIFIED COPY
 9

10              REPORTER'S TRANSCRIPT OF JURY TRIAL,
                       DAY 17, AM SESSION
11            BEFORE THE HONORABLE GLORIA M. NAVARRO
                UNITED STATES DISTRICT COURT JUDGE
12

13   APPEARANCES:

14   For the Government:  TIMOTHY T. FINLEY, ESQ.
                          DANIEL E. ZYTNICK, ESQ.
15                        U.S. Department of Justice
                          950 Pennsylvania Avenue, N.W.
16                        Washington, D.C. 20530
                          (202) 307-0050
17

18
```

(Appearances continued on pages 2 and 3.)

```
21   Court Reporter:     Amber M. McClane, RPR, CRR, CCR #914
                         United States District Court
22                       333 Las Vegas Boulevard South, Room 1334
                         Las Vegas, Nevada 89101
23                       (702) 384-0429 or AM@nvd.uscourts.gov

24   Proceedings reported by machine shorthand.  Transcript
     produced by computer-aided transcription.
25
```

```
 1    APPEARANCES CONTINUED:

 2    For the Government (Cont.):

 3         MINA CHANG, AUSA
           UNITED STATES ATTORNEY'S OFFICE
 4         501 Las Vegas Boulevard South, Suite 1100
           Las Vegas, Nevada 89101
 5         (702) 388-6336

 6

 7    For Defendant Mario Castro:

 8         JOSHUA L. TOMSHECK, ESQ.
           HOFLAND & TOMSHECK
 9         228 South Fourth Street, First Floor
           Las Vegas, Nevada 89101
10         (702) 895-6760

11    -AND-

12         RICHARD E. TANASI, ESQ.
           TANASI LAW OFFICES
13         8716 Spanish Ridge Avenue, Suite 105
           Las Vegas, Nevada 89148
14         (702) 906-2411

15

16    For Defendant Salvador Castro:

17         DONALD J. GREEN, ESQ.
           LAW OFFICES OF DONALD J. GREEN
18         4760 South Pecos Road, Suite 103
           Las Vegas, Nevada 89121
19         (702) 388-2047

20

21    / / / / /

22    / / / / /

23    / / / / /

24

25
```

```
 1    APPEARANCES CONTINUED:

 2    For Defendant Miguel Castro:

 3         LUCAS J. GAFFNEY, ESQ.
           GAFFNEY LAW
 4         9900 Covington Cross Drive, Suite 290
           Las Vegas, Nevada 89144
 5         (702) 742-2055

 6    -AND-

 7         THOMAS A. ERICSSON, ESQ.
           THOMAS A. ERICSSON, CHTD.
 8         9900 Covington Cross Drive, Suite 290
           Las Vegas, Nevada 89144
 9         (702) 878-2889

10    For Defendant Jose Luis Mendez:

11         WILLIAM H. BROWN, ESQ.
           CHRISTOPHER MISHLER, ESQ.
12         BROWN MISHLER, PLLC
           911 North Buffalo Drive, Suite 202
13         Las Vegas, Nevada 89128
           (702) 816-2200
14                                * * * * *

15                            I N D E X

16    Defense's Witnesses:                            Page

17    MARIO CASTRO, JR.

18        Continued Cross-Examination by Mr. Finley     74

19                                * * * * *

20                          E X H I B I T S

21    EXHIBIT NO.:          OFFERED          RECEIVED

22    Gov't 318              122               124

23    Gov't 319              126               128

24                                * * * * *

25
```

2:19-cr-00295-GMN-NJK - April 17, 2023

```
 1            LAS VEGAS, NEVADA; MONDAY, APRIL 17, 2023; 8:11 A.M.

 2                              --o0o--

 3                    P R O C E E D I N G S

 4            (Outside the presence of the jury.)

 5            COURTROOM ADMINISTRATOR:  Do you solemnly swear that

 6     you will well and truly interpret from the Spanish language

 7     into the English language and vice versa according to the best

 8     of your knowledge and ability, so help you God?

 9            MS. JENNER:  I do.

10            COURTROOM ADMINISTRATOR:  Thank you.

11            (Pause, 7:59 a.m., until 8:11 a.m.)

12            THE COURT:  Thank you.  You may be seated.

13            MR. GREEN:  Good morning, Your Honor.  Don Green.  I

14     apologize for being late.  There was a moving truck in front

15     of me, so I couldn't move him.  So we're a little late.

16            Thank you, Your Honor.

17            THE COURT:  Thank you.

18            All right.  Well, while I'm waiting for the computer

19     here to catch up, did everybody get a chance to review the

20     jury instructions we provided to you on Thursday?

21            MR. TANASI:  Yes, Your Honor.

22            MR. GREEN:  Yes, Your Honor.

23            MR. GAFFNEY:  Yes, Your Honor.

24            THE COURT:  So are we ready to go over them one by

25     one, or did you just have a few you wanted to discuss?  What's
```

1    your pleasure?  From the Government?

2            **MR. ZYTNICK:**  There are just a handful for us.  So

3    either way is fine, though.

4            **THE COURT:**  All right.  And --

5            **MR. MISHLER:**  I think one by one.  There's a lot of

6    language I think in most of them that needs to be adjusted to

7    account for multiple defendants rather than a single

8    defendant.

9            **THE COURT:**  Well, each defendant is -- so the jury's

10   told to review the evidence for each defendant separately.

11           **MR. MISHLER:**  No.  I just mean the way it's worded

12   says "the defendant," singular.

13           **THE COURT:**  Right, because they're to look at each

14   defendant individually, not all of them together.  But we can

15   go through them one by one and make sure it makes sense.

16           All right.  So Jury Instruction Number 1 is duties of

17   jury to find facts and follow law.  Any objection from the

18   Government?

19           **MR. ZYTNICK:**  No, Your Honor.

20           And if I may, though, the table of contents, I just

21   wanted to let the Court know that it's also incomplete.  So I

22   just wanted to flag that for your attention.

23           **THE COURT:**  What's incomplete?  I wasn't going to

24   give the table of the contents to the jury.  It's just for our

25   purposes but --

1    **MR. ZYTNICK:**  Okay.  If it's not going to the jury,

2    then it doesn't matter.  It just ends at Number 33 and -- but

3    there are actually more instructions.  But if that's not going

4    to the jury, it doesn't matter.

5        **THE COURT:**  I think that was just for our purposes so

6    we could quickly if we ended up -- if we started to move

7    things around so that we could look at where things might make

8    more sense.

9        All right.  So for Jury Instruction Number 1, no

10   objection from the Government.

11       Next any objection from the defense?

12       **MR. TANASI:**  No, Your Honor.

13       **THE COURT:**  Mr. Tanasi.

14       Mr. Gaffney?

15       **MR. GAFFNEY:**  No, Your Honor.

16       **THE COURT:**  Mr. Mishler?

17       **MR. MISHLER:**  No, Your Honor.

18       **THE COURT:**  Mr. Green?

19       **MR. GREEN:**  No objection, ma'am.

20       **THE COURT:**  All right.  Number 2 is charges against

21   defendant, not evidence, presumption of innocence, burden of

22   proof.

23       Any objection from the Government?

24       **MR. ZYTNICK:**  No, Your Honor.

25       **THE COURT:**  Any objection, Mr. Tanasi?

1      **MR. TANASI:**  No, Your Honor.

2      **THE COURT:**  Gaffney?

3      **MR. GAFFNEY:**  No, Your Honor.

4      **THE COURT:**  Mishler?

5      **MR. MISHLER:**  Yes, Your Honor.  So this refers to the

6   indictment.  I know you had concerns with that, that you had

7   raised.  A possible change would be:  The charges are not

8   evidence.  Each defendant has pleaded not guilty to the

9   charges.  Each defendant is presumed to be innocent.  Unless

10  the Government proves each defendant guilty -- basically

11  change "the defendant" to "each defendant" in this instruction

12  is what my suggestion would be.

13     **THE COURT:**  All right.  And what's the Government's

14  position?

15     **MR. ZYTNICK:**  Based on what Your Honor said before, I

16  don't know that it's necessary.  I'm not opposed to it, but

17  I'm not sure that it's necessary.

18     **THE COURT:**  Okay.  So we could change that to the

19  charges are not evidence, and then you want to change it to

20  each defendant.

21     So I'm changing "the" to "each" five times in there;

22  is that right?

23     **MR. MISHLER:**  Yes, Your Honor.  I counted five.

24     **THE COURT:**  So the charges are not evidence.  Each

25  defendant has pleaded not guilty to the charges.  Each

1  defendant is presumed to be innocent unless and until the

2  Government proves each defendant guilty beyond a reasonable

3  doubt.  In addition, each defendant does not have to testify

4  or present any evidence.  Each defendant does not have to

5  prove innocence.  The Government has the burden of proving

6  every element of the charges beyond a reasonable doubt?

7          **MR. MISHLER:**  Yes, Your Honor.

8          **THE COURT:**  Bless you.

9          Any objection to Instruction Number 2 now from the

10 Government?

11         **MR. ZYTNICK:**  No, Your Honor.

12         **THE COURT:**  And from the defense, Tanasi?

13         **MR. TANASI:**  No, Your Honor.

14         **THE COURT:**  Gaffney?

15         **MR. GAFFNEY:**  No, Your Honor.

16         **THE COURT:**  Mishler?

17         **MR. MISHLER:**  No, Your Honor.

18         **THE COURT:**  Green?

19         **MR. GREEN:**  No.

20         **THE COURT:**  All right.  Instruction Number 3, any

21 objection from the Government?  It's reasonable doubt.

22         **MR. ZYTNICK:**  Just there's a typo in the first line,

23 Your Honor.  It says "convicted" instead of "convinced."

24 Otherwise, no objection.

25         **THE COURT:**  Oh, you're right.  Okay.

1           All right.  And any objection from the defendant?

2           **MR. TANASI:**  No, Your Honor.

3           **MR. GAFFNEY:**  No, Your Honor.

4           **THE COURT:**  Now here we're not changing it to each

5    defendant, just the defendant?

6           **MR. MISHLER:**  Right, Your Honor.

7           **THE COURT:**  Okay.

8           **MR. MISHLER:**  I actually did have a suggestion,

9    though.  In that second paragraph, I think if it would read on

10   the second line, "beyond a reasonable doubt that a defendant

11   is guilty, it is your duty to find that defendant not guilty."

12   And then the same exact thing on the very bottom, "beyond a

13   reasonable doubt that a defendant is guilty, it is your duty

14   to find that defendant."

15          Those would be the only suggested changes.

16          **THE COURT:**  Okay.  All right.  So for the last

17   paragraph:  If after a careful and impartial consideration of

18   all the evidence you are not convinced beyond a reasonable

19   doubt that a defendant is guilty, it is your duty to find that

20   defendant not guilty.  On the other hand, if after careful and

21   impartial consideration of all the evidence you are convinced

22   beyond a reasonable doubt that a defendant is guilty, it is

23   your duty to find that defendant -- that defendant guilty.

24          All right.  Any objection from the Government?

25          **MR. ZYTNICK:**  No, Your Honor.

```
 1            THE COURT:  And from the defense, Tanasi?

 2            MR. TANASI:  No, Your Honor.

 3            THE COURT:  Gaffney?

 4            MR. GAFFNEY:  No, Your Honor.

 5            THE COURT:  Mishler?

 6            MR. MISHLER:  No, Your Honor.

 7            THE COURT:  And Green?

 8            MR. GREEN:  No.

 9            THE COURT:  All right.  Instruction Number 4 is what

10    is evidence.

11            Any objection from the Government?

12            MR. ZYTNICK:  No objection.

13            THE COURT:  And from the defense, Tanasi?

14            MR. TANASI:  No, Your Honor.

15            THE COURT:  Gaffney?

16            MR. GAFFNEY:  No, Your Honor.

17            THE COURT:  Mishler?

18            MR. MISHLER:  No, Your Honor.

19            THE COURT:  And Green?

20            MR. GREEN:  No.

21            THE COURT:  All right.  Instruction Number 5, direct

22    and circumstantial evidence.

23            Any evidence from the Government?

24            MR. ZYTNICK:  No, Your Honor.

25            THE COURT:  And from the defense, Mr. Tanasi?
```

```
 1              MR. TANASI:  No, Your Honor.

 2              THE COURT:  Gaffney?

 3              MR. GAFFNEY:  No, Your Honor.

 4              THE COURT:  Mishler?

 5              MR. MISHLER:  No, Your Honor.

 6              THE COURT:  And Green?

 7              MR. GREEN:  No.

 8              THE COURT:  Number 6, what is not evidence.

 9              Any objection from the Government?

10              MR. ZYTNICK:  No objection.

11              THE COURT:  Mr. Tanasi?

12              MR. TANASI:  No, Your Honor.

13              THE COURT:  Gaffney?

14              MR. GAFFNEY:  No, Your Honor.

15              THE COURT:  Mishler?

16              MR. MISHLER:  No, Your Honor.

17              THE COURT:  And Green?

18              MR. GREEN:  No.

19              THE COURT:  Okay.  Number 7, rulings on objections.

20     These are -- this is -- I gave this at the beginning of trial,

21     but y'all included this in -- in your instructions as well,

22     and because there was something that came up that I did tell

23     them to disregard, I thought it might be helpful to put it

24     back in.  So I'm open either way to your suggestions if you

25     want it or don't want it.
```

1              Does the Government have any objection to Instruction

2     Number 7?

3              **MR. ZYTNICK:**  No objection.

4              **THE COURT:**  And defense, Mr. Tanasi?

5              **MR. TANASI:**  No objection, Your Honor.

6              **THE COURT:**  Mr. Gaffney?

7              **MR. GAFFNEY:**  No, Your Honor.

8              **THE COURT:**  Mr. Mishler?

9              **MR. MISHLER:**  No, Your Honor.

10             **THE COURT:**  And Mr. Green?

11             **MR. GREEN:**  No.

12             **THE COURT:**  Number 8 is credibility of witnesses.

13             Any objection from the Government?

14             **MR. ZYTNICK:**  No, Your Honor.

15             **THE COURT:**  And from the defense, Mr. Tanasi?

16             **MR. TANASI:**  No, Your Honor.

17             **THE COURT:**  Gaffney?

18             **MR. GAFFNEY:**  No, Your Honor.

19             **THE COURT:**  Mishler?

20             **MR. MISHLER:**  No, Your Honor.

21             **THE COURT:**  And Green?

22             **MR. GREEN:**  No, ma'am.

23             **THE COURT:**  All right.  Instruction Number 9 is

24     testimony of witnesses involving special circumstances,

25     benefits, accomplice, plea.  So there's the defense version

1    and the Government version and the Ninth Circuit pattern.

2            So let's hear from the Government whether -- do you

3    insist it should be the Government's version?  Do you have a

4    particular problem with the defense version?  How does it

5    differ from the pattern instruction?  Just whatever you want

6    to put on the record so we can make a decision which one we're

7    using.

8            **MR. ZYTNICK:**  Sure.  Thank you, Your Honor.

9            So we were trying to do this in a way that most

10   closely matches the pattern.  The issue, frankly, that I had

11   with the defense version was that it said the testimony of

12   Kern and O'Connor was given in exchange for the terms outlined

13   in their guilty plea and cooperation agreement.  And that

14   language, to me, was unclear and potentially confusing to the

15   jury.  So what we proposed was something that we thought

16   better fit with the pattern instruction, and it also includes

17   the sentence about how the guilty pleas are not evidence

18   against the defendants, which was not in the defense version

19   but we thought that was in the pattern and that's an

20   appropriate, you know, sentence.

21           **THE COURT:**  All right.  Well, I agree with those --

22   with that.  Let's see.  And what's the -- who wants to speak

23   on the defense version, Mr. Tanasi?

24           **MR. TANASI:**  I'll take a stab at it first,

25   Your Honor.  I don't know if my colleagues might have

1    something to add.  I think the terms of their testimony and

2    the terms of their guilty plea agreements and the terms of

3    their agreements to testify were all covered extensively on

4    cross.  So I think the jury can leave it to their memory as to

5    what those terms were and how they'd be relevant.  And I do

6    think that what is left out of the Government's proposal

7    that's most important is the fact that those two defendants

8    have not -- or those two witnesses have not been sentenced

9    yet.  And so the outcome of this case has a -- an impact on

10   their potential sentence, which was, again, covered

11   extensively on cross.

12           So I think the defense proposed version more

13   accurately mirrors the Ninth Circuit instruction and also the

14   facts in this case.

15           **THE COURT:**  All right.  Mr. Gaffney?

16           **MR. GAFFNEY:**  Join.

17           **THE COURT:**  And Mr. Mishler?

18           **MR. MISHLER:**  Your Honor, I join with Mr. Tanasi.  I

19   do agree with the Government that there should be an

20   additional sentence added to the defense version.  I would

21   word it slightly differently than the Government's.  It would

22   follow the last sentence of the defense -- sorry.  It would be

23   before the last sentence of the defense version that starts

24   with "in addition."  I think what should go there is,

25   "Evidence that Patti Kern and Sean O'Connor pled guilty is not

1    evidence against the defendants, and you may consider that

2    evidence only in determining these witnesses' believability."

3    Other than that, I think the defense version is correct.

4        **MR. TANASI:**  And for the record, Your Honor, I would

5    join that as well on behalf of Mr. Mario Castro.

6        **MR. ZYTNICK:**  There's nothing in the pattern

7    instruction about a pending sentence issue, I would note.

8        **THE COURT:**  Yeah, there isn't anything in the pattern

9    instruction about the sentences.  Let's see.

10       **MR. ZYTNICK:**  And furthermore, unlike the cooperation

11   and plea agreements which are with the Government, you know,

12   obviously we can make a recommendation as to the pending

13   sentence or, rather, the future sentence, but that's

14   ultimately for the judge that sentences the defendants or the

15   cooperating witnesses.

16       **MR. TANASI:**  Your Honor, if I may address that?

17       **THE COURT:**  Yes.

18       **MR. TANASI:**  So I agree there is no word sentencing

19   in -- in the pattern instruction, but there are bracketed

20   words that leave open options, words like benefits and favored

21   treatment.  I think those all dovetail nicely and

22   appropriately into sentencing.

23       **THE COURT:**  All right.  So it looks like the

24   Government's version does mirror the pattern instruction

25   better.  I think the only change I need to make to the

1    Government's version -- I don't know if this is a typo on our

2    part, or if this was in the original -- is that in the second

3    line it says "the guilty plea are not evidence," it should be

4    "these guilty pleas are not evidence."  So I'm going to give

5    the Government's version with that little edit.

6            So it will say:  You have heard testimony from Patti

7    Kern and Sean O'Connor, witnesses who entered into plea and

8    cooperation agreements with the Government in connection with

9    this case and who pleaded guilty to a crime arising out of the

10   same events for which the defendants are on trial.  These

11   guilty pleas are not evidence against the defendants, and you

12   may consider them only in determining these witnesses'

13   believability.  For these reasons, the -- in evaluating the

14   testimony of Patti Kern and Sean O'Connor, you should consider

15   the extent to which or whether their testimony may have been

16   influenced by any of these factors.  In addition, you should

17   examine the testimony of Patti Kern and Sean O'Connor with

18   greater caution than that of other witnesses.

19           Maybe on the first -- I think in the first sentence I

20   should take out "in connection with this case."  Because they

21   weren't charged in this case.  I know it's in connection with

22   the greater scheme as a whole, but it's not in this case.

23   They weren't -- they don't have the same case numbers.  So I'm

24   going to take out in this case -- "in connection with this

25   case" just to make it more clear.

1          So instead the first sentence will say:  You have

2    heard testimony from Patti Kern and Sean O'Connor, witnesses

3    who entered into plea and cooperation agreements with the

4    Government, and who pleaded guilty to a crime arising out of

5    the same events for which the defendants are on trial.

6          All right.  Okay.  Instruction Number 10 is

7    eyewitness identification.

8          Any objection from the Government?

9          **MR. ZYTNICK:**  No, Your Honor.

10         **THE COURT:**  And from the defense, Mr. Tanasi?

11         **MR. TANASI:**  No, Your Honor.

12         **THE COURT:**  Mr. Gaffney?

13         **MR. GAFFNEY:**  No, Your Honor.

14         **THE COURT:**  Mr. Mishler?

15         **MR. MISHLER:**  No, Your Honor.

16         **THE COURT:**  And Mr. Green?

17         **MR. GREEN:**  No.

18         **THE COURT:**  All right.  Number 11 is opinion

19   evidence, expert witness.

20         Any objection from the Government?

21         **MR. ZYTNICK:**  No, Your Honor.

22         **THE COURT:**  And from the defense, Mr. Tanasi?

23         **MR. TANASI:**  No, Your Honor.

24         **THE COURT:**  Mr. Gaffney?

25         **MR. GAFFNEY:**  No, Your Honor.

```
1              THE COURT:  Mishler?

2              MR. MISHLER:  No, Your Honor.

3              THE COURT:  And Green?

4              MR. GREEN:  No.

5              THE COURT:  All right.  Number 12 is statements by

6    defendants.

7              Any objection from the Government?

8              MR. ZYTNICK:  Your Honor, you may want to clarify

9    that it's three defendants made statements or I'm not sure the

10   exact clarification.

11             MR. MISHLER:  I have a proposed --

12             MR. ZYTNICK:  Yeah, we can hear Mr. Mishler.

13             THE COURT:  Mr. Mishler?

14             MR. MISHLER:  I think changes that would address the

15   Government's concern would be:  You have heard testimony that

16   some defendants made statements.  It is for you to decide

17   whether -- one, whether a defendant made the statement, and if

18   so, how much weight to give to it.  In making those decisions,

19   you should consider all the evidence about the statement,

20   including the circumstances under which a defendant may have

21   made it.

22             THE COURT:  All right.  Any objection from the

23   Government to that change?

24             MR. ZYTNICK:  No, Your Honor.

25             THE COURT:  Rather than "some defendants made
```

1    statements," I think that implies that not all did, maybe I

2    should just say that one or more.  You have heard testimony

3    that one or more of the defendants made statements.

4              Any objection to that?

5         MR. ZYTNICK:  Not from the Government.

6         THE COURT:  Mr. Mishler?

7         MR. MISHLER:  No objection on behalf of Mr. Mendez.

8         THE COURT:  Okay.  So here's... you have heard

9    testimony that one or more of the defendants made statements.

10   It is for you to decide whether a defendant made the

11   statement, and if so, how much weight to give to it.  In

12   making those decisions, you should consider all the evidence

13   about the statement, including the circumstances under which a

14   defendant may have made it.

15             Any objection from the Government?

16        MR. ZYTNICK:  No, Your Honor.

17        THE COURT:  And from the defense, Mr. Tanasi?

18        MR. TANASI:  No, Your Honor.

19        THE COURT:  Gaffney?

20        MR. GAFFNEY:  No, Your Honor.

21        THE COURT:  Mishler?

22        MR. MISHLER:  No.

23        THE COURT:  And Green?

24        MR. GREEN:  No.

25        THE COURT:  All right.  Number 13 is defendants'

1   decision to testify.  Any objection from the Government?

2           **MR. ZYTNICK:**  No, Your Honor.

3           **THE COURT:**  Any objection from the defense, Tanasi?

4           **MR. TANASI:**  No, Your Honor.

5           **THE COURT:**  Gaffney?

6           **MR. GAFFNEY:**  No, Your Honor.

7           **THE COURT:**  Mishler?

8           **MR. MISHLER:**  No, Your Honor.

9           **THE COURT:**  And Green?

10          **MR. GREEN:**  No.

11          **THE COURT:**  All right.  Number 14 is defendants'

12  decision not to testify.  Any objection from the Government?

13          **MR. ZYTNICK:**  No, Your Honor.

14          **THE COURT:**  And defendants, Tanasi?

15          **MR. TANASI:**  No, Your Honor.

16          **THE COURT:**  Gaffney?

17          **MR. GAFFNEY:**  No, Your Honor.

18          **THE COURT:**  Mishler?

19          **MR. MISHLER:**  No, Your Honor.

20          **THE COURT:**  And Green?

21          **MR. GREEN:**  No.

22          **THE COURT:**  Number 15 is foreign language testimony.

23          Any objection from the Government?

24          **MR. ZYTNICK:**  No, Your Honor.

25          **THE COURT:**  And from the defense, Mr. Tanasi?

1          **MR. TANASI:**  No, Your Honor.

2          **THE COURT:**  Gaffney?

3          **MR. GAFFNEY:**  No, Your Honor.

4          **THE COURT:**  Mishler?

5          **MR. MISHLER:**  No, Your Honor.

6          **THE COURT:**  And Green?

7          **MR. GREEN:**  No.

8          **THE COURT:**  Number 16 is other crimes, wrongs, or

9     acts of defendant.

10          Any objection from the Government?

11          **MR. ZYTNICK:**  Your Honor, the third line of that

12     includes a reference to Jose Salud Castro and another crime

13     that he committed.  That did not end up coming into evidence,

14     so that line should be taken out.

15          **THE COURT:**  Any objection from the defense,

16     Mr. Tanasi?

17          **MR. TANASI:**  No, Your Honor.

18          **THE COURT:**  And Mr. Gaffney?

19          **MR. GAFFNEY:**  No, Your Honor.

20          **THE COURT:**  Mr. Mishler?

21          **MR. MISHLER:**  Yes, Your Honor.  I do have some

22     proposed changes.

23          **THE COURT:**  Do you agree with the Government's --

24          **MR. MISHLER:**  Striking the line, yes.

25          **THE COURT:**  -- striking that phrase?  Yes?

 1          MR. MISHLER:  Yes.

 2          THE COURT:  Okay.  And then what's your other

 3    suggestion?

 4          MR. MISHLER:  I think it's a better instruction if it

 5    reads:  You have heard evidence that some defendants may have

 6    been involved in other mail fraud schemes and may have had

 7    knowledge of government enforcement actions related to those

 8    schemes.

 9          And then the very last line:  You may not consider

10    this evidence of guilt of the crime for which each defendant

11    is now on trial.

12          Those would be my proposed changes.

13          THE COURT:  Okay.  Let's go back to the top one, that

14    you have heard evidence that some of the -- how about one or

15    more?

16          MR. MISHLER:  One or more is probably better, yes,

17    Your Honor.

18          THE COURT:  Okay.  You have heard evidence that one

19    or more of the defendants -- so take out the apostrophe --

20    were involved... okay.

21          MR. MISHLER:  Sorry, Your Honor.  My suggestion was

22    may have been involved.

23          THE COURT:  May have been involved.  Okay.

24          And what was the --

25          MR. MISHLER:  The second one was just before

1    knowledge, may have had knowledge.

2            **THE COURT:**  Okay.  So let me see if I got this right.

3    I'll read what I think is the -- the corrected version.

4            You have heard evidence that one or more of the

5    defendants may have been involved -- no, no.  So it's

6    involved, not involvement?

7            **MR. MISHLER:**  Involved.

8            **THE COURT:**  Yeah, involved.  Okay.

9            You have heard evidence that one or more of the

10    defendants may have been involved in other mail fraud schemes

11    and may have had knowledge of government enforcement actions

12    related to those schemes.  You may consider this evidence only

13    for its bearing, if any, on the question of the four

14    defendants' intent, motive, preparation, plan, knowledge,

15    identity, absence of mistake, absence of accident, or

16    consciousness of guilt, and for no other purpose.  You may not

17    consider this evidence as evidence of guilt of the crime for

18    which -- should be a defendant is now on trial.  The

19    defendants are now on trial?  Hmm.  Okay.

20            You may consider this evidence only for its bearing,

21    if any, on the question of each defendant's intent, motive --

22    instead of four?

23            **MR. MISHLER:**  I think that would be fine, Your Honor,

24    yes.

25            **THE COURT:**  I changed it to "a" on the last sentence.

2:19-cr-00295-GMN-NJK - April 17, 2023

```
 1    Let me try it again.
 2              You have heard evidence that one or more of the
 3    defendants may have been involved in other mail fraud schemes
 4    and may have had knowledge of Government enforcement actions
 5    related to those schemes.  You may consider this evidence only
 6    for its bearing, if any, on the question of each defendant's
 7    intent, motive, preparation, plan, knowledge, identity,
 8    absence of mistake, absence of accident, or consciousness of
 9    guilt, and for no other purpose.  You may not consider this
10    evidence as evidence of guilt of the crime for which a
11    defendant is now on trial.
12              Any objection from the Government?
13         MR. ZYTNICK:  No, Your Honor.
14         THE COURT:  Mr. Tanasi?
15         MR. TANASI:  No, Your Honor.
16         THE COURT:  Gaffney?
17         MR. GAFFNEY:  No, Your Honor.
18         THE COURT:  Mishler?
19         MR. MISHLER:  No, Your Honor.
20         THE COURT:  Green?
21         MR. GREEN:  No.
22         THE COURT:  All right.  Number 17 is activities not
23    charged.
24              Any objection from the Government?
25         MR. ZYTNICK:  No, Your Honor.
```

1          **THE COURT:**  Any objection from the defense,

2   Mr. Tanasi?

3          **MR. TANASI:**  Your Honor, again, this one references

4   indictment.  I think it's fine otherwise.

5          **MR. MISHLER:**  I do have some proposed changes.

6          **THE COURT:**  All right.  Mr. Mishler?

7          **MR. MISHLER:**  My suggestion would be:  You are here

8   only to determine whether a defendant is guilty or not guilty

9   of the crimes charged.  Each defendant is not on trial --

10  maybe -- sorry -- the defendants are not on trial for any

11  conduct or offense not charged.

12         That solves the indictment problem.

13         **THE COURT:**  Okay.  Let me give it a try.  You are

14  here only to determine whether a defendant is guilty or not

15  guilty of the charges -- that should be charges.

16         **MR. MISHLER:**  Charges is fine, I think.

17         **THE COURT:**  Yeah, I took it -- charges.  Okay.  You

18  are here only to determine whether a defendant is guilty or

19  not guilty of the charges.  The defendants are not on trial

20  for any conduct or offense not charged.

21         Any objection from the Government?

22         **MR. ZYTNICK:**  I think it would be better, Your Honor,

23  for the first sentence to say "to determine whether each

24  defendant" because it's -- obviously there are four

25  defendants.

1          **THE COURT:**  Yes.  Okay.  I agree.  You are here only

2    to determine whether each defendant is guilty or not guilty of

3    the charges.  The defendants are not on trial for any conduct

4    or offense not charged.

5          Any objection from the Government?

6          **MR. ZYTNICK:**  No, Your Honor.

7          **THE COURT:**  Mr. Tanasi?

8          **MR. TANASI:**  No, Your Honor.

9          **THE COURT:**  Gaffney?

10         **MR. GAFFNEY:**  No, Your Honor.

11         **THE COURT:**  Mishler?

12         **MR. MISHLER:**  No, Your Honor.

13         **THE COURT:**  And Green?

14         **MR. GREEN:**  No, Your Honor.

15         **THE COURT:**  Okay.  Number 18, specific investigation

16   techniques not required.

17         Any objection from the Government?

18         **MR. ZYTNICK:**  No, Your Honor.

19         **THE COURT:**  And from the defense, Mr. Tanasi?

20         **MR. TANASI:**  No, Your Honor.

21         **THE COURT:**  Mr. Gaffney?

22         **MR. GAFFNEY:**  No, Your Honor.

23         **THE COURT:**  Mr. Mishler?

24         **MR. MISHLER:**  Just one small change, Your Honor, on

25   the very last line.

1          **THE COURT:**  Yes.

2          **MR. MISHLER:**  This trial proves -- sorry, I'll just

3     start at the beginning.  Your concern, as I have said, is to

4     determine whether or not the evidence admitted in this trial

5     proves each defendant's guilt beyond a reasonable doubt.

6          **THE COURT:**  Okay.  I agree.  That's better.

7          Any objection to that change from the Government?

8          **MR. ZYTNICK:**  No, Your Honor.

9          **THE COURT:**  And from the defense, any objection,

10    Mr. Tanasi?

11         **MR. TANASI:**  No, Your Honor.

12         **THE COURT:**  Gaffney?

13         **MR. GAFFNEY:**  No, Your Honor.

14         **THE COURT:**  Mishler?

15         **MR. MISHLER:**  No, Your Honor.

16         **THE COURT:**  And Green?

17         **MR. GREEN:**  No.

18         **THE COURT:**  All right.  Number 19 is stipulations of

19    fact.

20         Any objection from the Government?

21         **MR. ZYTNICK:**  No, Your Honor.

22         **THE COURT:**  And from the defense, Mr. Tanasi?

23         **MR. TANASI:**  No, Your Honor.

24         **THE COURT:**  Mr. Gaffney?

25         **MR. GAFFNEY:**  No, Your Honor.

```
1              THE COURT:  Mr. Mishler?

2              MR. MISHLER:  No, Your Honor.

3              THE COURT:  Mr. Green?

4              MR. GREEN:  No.

5              THE COURT:  Number 20, charts and summaries admitted

6   into evidence.

7              Any objection from the Government?

8              MR. ZYTNICK:  No objection.

9              THE COURT:  And from the defense, Mr. Tanasi?

10             MR. TANASI:  No, Your Honor.

11             THE COURT:  Gaffney?

12             MR. GAFFNEY:  No, Your Honor.

13             THE COURT:  Mishler?

14             MR. MISHLER:  No, Your Honor.

15             THE COURT:  And Green?

16             MR. GREEN:  No.

17             THE COURT:  Okay.  Number 21 is on or about defined.

18             Any objection from the Government?

19             MR. ZYTNICK:  No, Your Honor.

20             THE COURT:  And from the defense, Tanasi?

21             MR. TANASI:  Your Honor, it does reference indictment

22  again.

23             THE COURT:  Oh.  Thank you.  We'll take out the word

24  indictment so it just says the charges.

25             MR. TANASI:  I think it's in the second paragraph as
```

1    well.

2            **THE COURT:**  So the charges allege -- alleged... but

3    take out "the offenses"?  The charges alleged in Count 1

4    through 14 -- no, that doesn't make sense.

5            **MR. TANASI:**  Maybe just the charges alleged were

6    committed on or about a certain date?

7            **THE COURT:**  So the charges alleged in Counts 1

8    through 14 were committed on or about a certain date.  Is that

9    what you're --

10           **MR. TANASI:**  I would say probably remove the counts

11   as well, but they could stay.  Either way.

12           **THE COURT:**  Well, the --

13           **MR. TANASI:**  I don't have a strong position on it.

14           **THE COURT:**  Well, the counts later are referenced in

15   the verdict, so --

16           **MR. TANASI:**  Okay.

17           **THE COURT:**  -- and also... separates the...

18           All right.  Any objection from the Government?

19           First sentence instead says:  The charges alleged in

20   Counts 1 through 14 were committed on or about a certain date,

21   and then the rest is the same.

22           **MR. ZYTNICK:**  No objection.

23           **THE COURT:**  Mr. Mishler, you're looking at me like --

24   do you have a recommendation?

25           **MR. MISHLER:**  I just -- I'm not sure.  Are you only

1   asking about the first sentence right now?

2            THE COURT:  No, no.  You can tell me all of it.

3            MR. MISHLER:  Okay.  So in the bottom paragraph, I

4   think after the word "14" should be stricken to the comma so

5   it just says:  Alleged in Counts 1 through 14, it is not

6   necessary.

7            THE COURT:  Okay.  I agree.

8            MR. MISHLER:  I think that's the easiest way to --

9            THE COURT:  Yeah, take out the word "of the

10  indictment."

11           All right.  So the charges alleged in Counts 1

12  through 14 were committed on or about a certain date.

13  Although it is necessary for the Government to prove beyond a

14  reasonable doubt that the offenses were committed on dates

15  reasonably near the date alleged in Counts 1 through 14, it is

16  not necessary for the Government to prove the offenses were

17  committed precisely on the date charged.

18           Any objection from the Government?

19           MR. ZYTNICK:  No, Your Honor.

20           THE COURT:  From the defense, Mr. Tanasi?

21           MR. TANASI:  No, Your Honor.

22           THE COURT:  Gaffney?

23           MR. GAFFNEY:  No, Your Honor.

24           THE COURT:  Mishler?

25           MR. MISHLER:  No, Your Honor.

1      **THE COURT:**  Green?

2      **MR. GREEN:**  No.

3      **THE COURT:**  Number 22 is knowingly defined.

4      Any objection from the Government?

5      **MR. ZYTNICK:**  No objection.

6      **THE COURT:**  And from the defense, Tanasi?

7      **MR. TANASI:**  No, Your Honor.

8      **THE COURT:**  Gaffney?

9      **MR. GAFFNEY:**  No, Your Honor.

10      **THE COURT:**  Mishler?

11      **MR. MISHLER:**  Your Honor, we did suggest language to

12      follow this that's included I think as defendant's proposed on

13      the conspiracy count.

14      **THE COURT:**  Yes.

15      **MR. MISHLER:**  So depending on how you rule on that,

16      we may want to preserve our option of having that language

17      here if you think that's better.

18      **THE COURT:**  I'm not convinced that the language is

19      required at all.  So do you have -- if you want to go ahead

20      and just provide your argument now for the record --

21      **MR. MISHLER:**  Of course.

22      **THE COURT:**  -- so that it's clear what the

23      justification is that you're relying upon.

24      **MR. MISHLER:**  I can, Your Honor.

25      Under Ninth Circuit law, specifically *U.S. versus*

1  *Thomas*, 612 F.3rd 1107, Ninth Circuit, 2010, the defense is

2  entitled to an instruction on their theory of defense as long

3  as that defense is supported by law, some foundation exists in

4  the evidence, and other instructions do not adequately cover

5  the defense.

6        Our position is that it's very clear that there is

7  evidence in the record to make a foundation that Mr. Mendez

8  doesn't speak or read English which would directly go to the

9  elements of knowingly both for the purposes of this

10  instruction and a later instruction on conspiracy.  And that

11  is supported by law as a basis for not finding he knowingly

12  entered or committed an act.  I know the Government will argue

13  that this instruction --

14      **THE COURT:**  What is the law that supports that, that

15  the language -- when you say that is supported by law, the --

16  the language that you're proposing about his knowledge of the

17  English language?

18      **MR. MISHLER:**  I don't have any case law specific as

19  to that affecting the element, but as Your Honor correctly

20  pointed out during the Rule 29 motions, if he doesn't

21  understand English, you're not sure how he could have

22  knowingly entered into a conspiracy because he couldn't know

23  what the conspiracy was.  So common sense --

24      **THE COURT:**  Well, that's not what I said, but what I

25  said was there's plenty of evidence that the Government has

1    proffered if the jury decides to believe it.  There's also

2    been a very good defense as well, and the jury can decide to

3    believe the defense version instead.

4         What I said was I think the closest case or the

5    most -- you know, likely the one that the jury would maybe get

6    hung up on would be the defense for Mr. Jose Luis Mendez

7    because there is much more evidence about his knowledge of the

8    English language being limited.  And I think that's maybe more

9    persuasive than some of the other defenses that have been put

10   forth.

11        But the jury -- you've seen the jury questions.

12   They're very sympathetic to the defenses that have been

13   raised.  So, you know, it could go either way, but there's

14   definitely been evidence that supports the Government's

15   conviction as well.

16        **MR. MISHLER:**  I do apologize, Your Honor.  I didn't

17   intend to misquote you.  I was sort of going off my memory

18   there.

19        **THE COURT:**  Oh, okay.  So I was just trying to figure

20   out what is -- so you're right, theory-of-defense instruction

21   is important so long as it's supported by law, but I didn't

22   see what law supports adding something about knowledge of

23   English language.  Because we're giving the knowingly defense

24   instruction that is not really a defense instruction; it's

25   part of the elements of the crime.  That is what the pattern

1   jury instruction requires.  So I didn't see why either to that

2   or the conspiracy I would add something regarding the language

3   factor.  That seems to be more a fact to consider in regards

4   to knowingly.

5           So I wasn't sure if you had some case law.  It sounds

6   like you don't have any case law specifically about language

7   barriers that -- in reference to knowledge.

8           **MR. MISHLER:**  Unfortunately I don't on that

9   particular issue, Your Honor.

10          **THE COURT:**  Okay.  All right.  Then any other

11  objection to Instruction Number 22, knowingly defined?  Going

12  once.  Going twice.  Okay.  So no objection to that.

13          Number 23 is deliberate ignorance.

14          Any objection from the Government?

15          **MR. ZYTNICK:**  No objection.

16          **THE COURT:**  Any objection from the defense, Tanasi?

17          **MR. TANASI:**  No objection.

18          **THE COURT:**  Gaffney?  Mishler?

19          **THE COURT REPORTER:**  Oh, I didn't hear Gaffney.

20          **THE COURT:**  Oh.  Gaffney?

21          **MR. GAFFNEY:**  No, Your Honor.

22          **THE COURT:**  And Mishler?

23          **MR. MISHLER:**  Some minor typos, Your Honor.

24          **THE COURT:**  Yes.

25          **MR. MISHLER:**  First line says:  You may find that a

1    defendants.  I think that should be a singular defendant.

2            **THE COURT:**  Yes, correct.

3            **MR. MISHLER:**  And then the next line that each

4    defendant, Number 1.  Number 2, you may not find such

5    knowledge.  However, if you can find that a defendant actually

6    believed.  And then on the bottom line, or if you find that a

7    defendant was simply negligent, careless, or foolish.

8            Those would be my suggested changes.

9            **THE COURT:**  Okay.  Let me see if I got them all.  So

10   you may find that a defendant acted knowingly if you find

11   beyond a reasonable doubt that each defendant -- or that

12   defendant?

13           **MR. MISHLER:**  Now that I've read it, I think that

14   defendant --

15           **THE COURT:**  Yeah, beyond --

16           **MR. MISHLER:**  -- is better.

17           **THE COURT:**  -- a reasonable doubt that a defendant?

18           **MR. MISHLER:**  I think that defendant, Your Honor.  I

19   think that is the best way.

20           **THE COURT:**  But then we've got "that that" twice.

21           **MR. MISHLER:**  Oh.  Why don't we just strike the word

22   "the" then?

23           **THE COURT:**  You may find a -- that a defendant acted

24   knowingly if you find beyond a reasonable doubt... that that

25   defendant... okay.  You may find a defendant acted knowingly

```
 1   if you find beyond a reasonable doubt that a defendant was
 2   aware... that that defendant...
 3           MR. TANASI:  Maybe too legalese but that said
 4   defendant?
 5           MR. BROWN:  Or "and that he."
 6           THE COURT:  Oh.  They are all male.  We could say
 7   "that he."
 8           MR. MISHLER:  That is a nice solution.
 9           THE COURT:  All right.  So you may find that a
10   defendant acted knowingly if you find beyond a reasonable
11   doubt that he, Number 1, was aware of... and Number 2, then
12   you may not find such knowledge, however, if you find that a
13   defendant actually believe that there was no direct mail
14   scheme that sent fraudulent prize notification mailings or if
15   you find that a defendant was simply negligent, careless, or
16   foolish.
17           Any objection from the defense?
18           And from the Government, any objection?
19           MR. ZYTNICK:  No, Your Honor.
20           THE COURT:  So moving on, Number 24, mere presence.
21           Any objection from the Government?
22           MR. ZYTNICK:  No, Your Honor.
23           THE COURT:  Any objection from the defense?
24           MR. TANASI:  No, Your Honor.
25           THE COURT:  Number 25, Count 1, conspiracy.
```

1        **MR. ZYTNICK:**  So, Your Honor, in the first element

2    where it says an agreement between two or more persons to

3    commit at least one crime as charged in the indictment, there

4    is only one crime charged as an object.  So it should probably

5    say in agreement between two or more persons to commit mail

6    fraud.

7        **THE COURT:**  Okay.  So, first, that beginning in or

8    around April -- I'm sorry, March 2010 and ending in or around

9    February 2018 -- why are we saying in or around when we just

10   gave an instruction on on or about?  Beginning -- I'm going to

11   change that to on or about.

12       All right.  So, first, that beginning on or about

13   March 2010 and ending on or about February 2018 there was an

14   agreement between two or more persons to commit mail fraud.

15   Keep the semicolon.  Second, the defendants became members of

16   the conspiracy knowing of at least one of its objects and

17   intending to help accomplish it.

18       Mr. Mishler, did you have any suggestion there, or

19   are you all right with that?  A defendant?  The defendant?

20       **MR. MISHLER:**  Yeah, I think a defendant became a

21   member.

22       **MR. ZYTNICK:**  I think it's fine though, Your Honor,

23   because the introduction to that is for the defendants to be

24   found guilty.  I mean, it's -- it's plural throughout that

25   instruction.

1          MR. MISHLER:  I would agree.  I don't think it's

2    critical on that one, but I did want to note that on the very

3    first line it says "of the indictment."

4          MR. ZYTNICK:  Oh.

5          MR. MISHLER:  So if we could just strike that?  The

6    defendants are charged in Count 1 with conspiracy, conspiring

7    to commit mail fraud.  But as far as the element second, I

8    would agree with the Government.  I think it makes sense the

9    way it is.  It's not confusing in context.

10          MR. ZYTNICK:  Judge, the second element also refers

11   to knowing of at least one of its object.  But, again, since

12   there's only one object, that should probably be changed to

13   just knowing of its object.

14          THE COURT:  Okay.  So you want it to say:  Second, a

15   defendant became a member of the conspiracy knowing its

16   objects and intending to help accomplish it?

17          MR. ZYTNICK:  Knowing its object, singular.

18          THE COURT:  Objective?  Are they going to know

19   what --

20          MR. MISHLER:  I think objective, yes.

21          MR. ZYTNICK:  Okay.  Objective, yeah.  That works.

22          THE COURT:  All right.  So, second, a defendant

23   became a member of the conspiracy knowing its objective and

24   intending to help accomplish it.

25          MR. ZYTNICK:  And then Your Honor has some

1    highlighted areas below.  Do you want us to address that,

2    or --

3              THE COURT:  Yes.

4         MR. ZYTNICK:  Okay.  So --

5              THE COURT:  First highlighted area says -- and this

6    is from the pattern:  You must find that there was a plan to

7    commit at least one of the crimes alleged in the indictment as

8    an object of the conspiracy with all of you agreeing as to the

9    particular crime which the conspirators agreed to commit.

10         MR. ZYTNICK:  So I don't think that's necessary

11   because this, again, only has one crime that was the object of

12   the conspiracy.  So there's no issue with jurors potentially

13   disagreeing on which crime was the object.

14             THE COURT:  Okay.  And what's the defense position?

15        MR. TANASI:  Your Honor, I -- I don't necessarily

16   have an objection to Mr. Zytnick's removal.

17             THE COURT:  And Mr. Gaffney?

18        MR. GAFFNEY:  Neither do I, Your Honor.

19             THE COURT:  Mr. Mishler?

20        MR. MISHLER:  I would agree that that whole sentence

21   should just be stricken out.

22             THE COURT:  And Mr. Green?

23        MR. GREEN:  Agree, Your Honor.

24             THE COURT:  All right.  The next thing is the

25   knowingly.  So it's either willfully or knowingly?

2:19-cr-00295-GMN-NJK - April 17, 2023

1          **MR. ZYTNICK:**  Yeah.  Your Honor, the issue here is

2     that the Ninth Circuit pattern instructions don't define

3     willfully, and they specifically don't define willfully

4     because there's a comment explaining that willfully has

5     different meanings in different contexts.  And the concern

6     here is that willfully is defined in the false statement

7     charge to mean that the defendant had to essentially know what

8     he was doing was unlawful, and that's not the mens rea for the

9     conspiracy charge.  It's not the mens rea for the underlying

10    mail fraud charge.  You know, the word willfully doesn't

11    appear in either of those statutes.  It doesn't appear in the

12    elements.  It's here in this explanatory paragraph, and what

13    it's really getting at is about how the defendant participated

14    and the fact that they did it willfully is -- is -- well, the

15    fact that they did it knowingly and that they did it with the

16    intent to defraud, those are the key issues that are expressed

17    in the elements.

18          Willfully would just be confusing in these

19    circumstances given the -- the -- the definition in the false

20    statement charge, which is inapplicable to the conspiracy

21    charge.

22          **THE COURT:**  So I'm looking at the pattern jury

23    instruction.  It doesn't have knowingly as an option instead

24    of willfully, but there are multiple cases that are cited at

25    the -- in the commentary.  So is that what you're referring

 1    to?  Is there a case there that instructs that we use

 2    knowingly instead of willfully?  I'm just not comfortable

 3    changing it willy-nilly, and I want to make sure that --

 4         **MR. ZYTNICK:**  Sure.  What I can provide, Your Honor,

 5    there is a case.  It's a Central District of California case

 6    where the judge addressed this exact same issue and decided to

 7    use the words "knowingly and intentionally" instead of

 8    "willfully."  That case is *U.S. versus Botvinsky*.  It's at

 9    2016 WL 9173466 at page 3.  And that Court addressed the exact

10    same issue here, found that willfully was not the right word

11    to use in a conspiracy jury instruction because that was not

12    the mens rea for the underlying offense.  And so in that case

13    the Court used the words knowingly and intentionally in place

14    of willfully in the jury instruction.

15         **THE COURT:**  Okay.  And what's the Government's [sic]

16    position, Mr. Tanasi?

17         **MR. TANASI:**  Your Honor, I -- I primarily would ask

18    the Court to follow the pattern instruction.  Alternatively,

19    the intentional and knowingly language proffered by the

20    Government I think would be acceptable as well.

21         **THE COURT:**  Mr. Gaffney?

22         **MR. GAFFNEY:**  I would join.

23         **THE COURT:**  Mr. Mishler?

24         **MR. MISHLER:**  Your Honor, we would agree that

25    knowingly and intentionally both in this paragraph and the

1  following paragraph are correct and appropriate.

2          **THE COURT:**  Okay.  Instead of willfully?

3      **MR. MISHLER:**  Yes.

4          **THE COURT:**  Okay.  And -- let's see.  Okay.  Let me

5  read it through one more time -- well, I haven't read it all

6  the way through on the record anyway.  Let me read it through

7  all the way, and tell me if you hear anything wrong.

8          The defendants are charged in Count 1 with conspiring

9  to commit mail fraud in violation of § 1349 of Title 18 of the

10 U.S. Code.  For a defendant to be found guilty of that charge,

11 the Government must prove each of the following elements

12 beyond a reasonable doubt:

13         First, that beginning on or about March 2010 and

14 ending on or about February 2018, there was an agreement

15 between two or more persons to commit mail fraud;

16         Second, a defendant became a member of the conspiracy

17 knowing its objective and intending to help accomplish it.  A

18 conspiracy is a kind of criminal partnership and agreement of

19 two or more persons to commit one or more crimes.  The crime

20 of conspiracy is the agreement to do something unlawful.  It

21 does not matter whether the crime agreed upon was committed.

22         For a conspiracy to have existed, it is not necessary

23 the conspirators made a formal agreement or that they agreed

24 on every detail of the conspiracy.  It is not, however, that

25 they simply met, discussed matters of common interest, acted

1    in similar ways, or perhaps helped one another.  One becomes a

2    member of a conspiracy by knowingly and intentionally

3    participating in the unlawful plan with the intent to advance

4    or further some object or purpose of the conspiracy even

5    though the person does not have full knowledge of all the

6    details of the conspiracy.

7            Furthermore, one who knowingly and intentionally

8    joins an existing conspiracy is as responsible for it as the

9    originators.  On the other hand, one who has no knowledge of

10   the conspiracy but happens to act in a way which furthers some

11   object or purpose of the conspiracy does not thereby become a

12   conspirator.  Similarly, a person does not become a

13   conspirator merely by associating with one or more persons who

14   are conspirators [indiscernible] by knowing that a conspiracy

15   exists.

16           Any objection from the Government?

17           **MR. ZYTNICK:**  No, Your Honor.

18           **THE COURT:**  And from defense, Mr. Tanasi?

19           **MR. TANASI:**  No, Your Honor.

20           **THE COURT:**  Gaffney?

21           **MR. GAFFNEY:**  No, Your Honor.

22           **THE COURT:**  Mishler?

23           **MR. MISHLER:**  I just had a question.  Are you -- are

24   you not going to use the proposed defense line there at the

25   end?

1    **THE COURT:**  Right.  So the defense proposes the, when

2   considering whether each defendant knowingly participated in a

3   conspiracy, you may consider each defendant's ability to

4   understand English.

5    It's not incorrect, but it's factual.  It's not a

6   legal statement.  Unless you have some legal citation for me.

7   Because every -- you know, they can consider everything.

8   There's nothing they can't consider for knowledge.

9    So it looks like you don't have a legal citation.  I

10   appreciate that.  But, yeah, so I'm not going to give that

11   additional line.

12    **MR. MISHLER:**  Then no objection, Your Honor.

13    **THE COURT:**  Okay.  And Mr. Green?

14    **MR. GREEN:**  No objection.

15    **THE COURT:**  Number 26 is knowledge of and association

16   with other conspirators.

17    Any objections or improvements, Government?

18    **MR. ZYTNICK:**  No, Your Honor.

19    **THE COURT:**  And defense, Tanasi?

20    **MR. TANASI:**  No, Your Honor.

21    **THE COURT:**  Gaffney?

22    **MR. GAFFNEY:**  No, Your Honor.

23    **THE COURT:**  Mishler?

24    **MR. MISHLER:**  No, Your Honor.

25    **THE COURT:**  Green?

2:19-cr-00295-GMN-NJK - April 17, 2023

1          **MR. GREEN:**  No.

2          **THE COURT:**  Okay.  Number 27, multiple conspiracies.

3     Objections or arguments from the Government?

4          **MR. ZYTNICK:**  No, Your Honor.

5          **THE COURT:**  From the defense, Tanasi?

6          **MR. TANASI:**  No, Your Honor.

7          **THE COURT:**  Gaffney?

8          **MR. GAFFNEY:**  No, Your Honor.

9          **THE COURT:**  Mishler?

10         **MR. MISHLER:**  Just on that first line I think we need

11    to strike the words "in the indictment."

12         **THE COURT:**  Correct.

13         **MR. MISHLER:**  But I think that's the only proposed

14    change that I have.

15         **THE COURT:**  Okay.  Any objection, Mr. Green?

16         **MR. GREEN:**  No objection.

17         **THE COURT:**  All right.  So, yes, I agree, I'm taking

18    out "in the indictment" on Number 27, multiple conspiracies.

19         All right.  Number 28 is separate consideration of

20    multiple counts, multiple defendants.

21         Any objection from the Government?

22         **MR. ZYTNICK:**  No, Your Honor.

23         **THE COURT:**  And from the defense, Tanasi?

24         **MR. TANASI:**  No, Your Honor.

25         **THE COURT:**  Gaffney?

1      **MR. GAFFNEY:**  No, Your Honor.

2      **THE COURT:**  Mishler?

3      **MR. MISHLER:**  No, Your Honor.

4      **THE COURT:**  And Green?

5      **MR. GREEN:**  No.

6      **THE COURT:**  Number 29 is separate consideration of

7  single count, multiple defendants.

8      Any objection from the Government?

9      **MR. ZYTNICK:**  Your Honor, I think is completely

10  redundant of the previous one.  I think this one only applies

11  if there was just a single count as to multiple defendants,

12  and that's not the case here.

13      **THE COURT:**  What's the defense position?

14      **MR. TANASI:**  Your Honor, I think -- I think it's

15  still important in this case to flush out the separate

16  defendants and the separate charges in this case, and so I

17  think the redundancy is actually appropriate.

18      **THE COURT:**  So there's the two -- so 28 and 29

19  address two different things.  So 28 is separate consideration

20  of multiple counts, multiple defendants, separate crime being

21  charged against one or more of the defendants.  So that's the

22  conspiracy charge.

23      Instruction Number 29 is separate consideration of

24  single count, multiple defendants; a separate crime is charged

25  against each defendant.  They're joined for trial.  All the

1  instructions apply to each defendant unless a specific

2  instruction states that it applies only to a specific

3  defendant, and we do have Count 14 here that only applies to

4  Defendant Salvador.

5          So I don't know if it's -- I don't -- at first I

6  thought it was redundant and we give one or the other, but

7  here I think we might need to give both.  I don't know if you

8  want me to clarify what we're talking about if you think that

9  it's confusing to the jury to give both or if you read them to

10  apply in a different way?  That was my thought as I went

11  through it.  I thought, oh, we only give one, not both.  But

12  then I realize, uh, here we do have conspiracy; they're all

13  charged.  The mail fraud counts; they're all charged.  They're

14  separate counts but they're all charged in all the counts.

15  And then Count 14, the false statement, only Salvador is

16  charged.  So that's a single -- single count, single

17  defendant, really, not single count -- so I don't know.  I --

18          **MR. ZYTNICK:**  I think if you look at the language

19  that the -- the -- Instruction 29 is entirely redundant.  I

20  mean, it's -- it's -- everything in there is actually in

21  Instruction 28, including that -- you know, the language about

22  unless a specific instruction states that it applies only to a

23  specific defendant or count.

24          **THE COURT:**  Yeah.  It does seem to say the same

25  thing, and we give one or the other.  I just don't know which.

2:19-cr-00295-GMN-NJK - April 17, 2023

1   Because a separate -- so the difference is the first line of

2   each instruction.  In 28 it says:  A separate crime is charged

3   against one or more of the defendants in each count.  In 29 it

4   says:  A separate crime is charged against each defendant.

5          Mr. Mishler, what is -- do you have any

6   recommendation?  Do we give one or the other or somehow just

7   combine the two first sentences so we don't have to give the

8   rest of it twice?

9          **MR. MISHLER:**  So it's actually interesting.  Because

10  when I was reviewing these, I had the exact same reaction that

11  you had, that these are the same instruction.  And then I

12  can't recall the specifics, but I did compare them and came to

13  the conclusion that they actually were different.  But for the

14  life of me I cannot tell you what it is now.  But that is what

15  my conclusion was when I was reviewing them.

16         **THE COURT:**  Yeah.  The only difference is the first

17  line.

18         **MR. ZYTNICK:**  Your Honor, if I can add?  I just

19  looked at the comments --

20         **THE COURT:**  Yes.

21         **MR. ZYTNICK:**  -- and I think the comments to the

22  instructions indicate that it's one or the other.  The comment

23  says for -- like, for multiple defendants, one, it says use

24  this instruction when there's more than one defendant charged

25  with the same crime.  If the case involves multiple defendants

1    and multiple counts, use the other one instead.  It says

2    "instead."  And then the comment for the multiple counts,

3    multiple defendants one is, you know, the same thing in the

4    sense that it says, if the case involves multiple defendants

5    charged with the same count, use the single count one instead.

6            So I think the instructions were intended to be one

7    or the other.

8            **THE COURT:**  I agree, but I think that -- my thought

9    was that we have both situations here because you have

10   multiple defendants charged in multiple mail fraud counts, but

11   you also have one defendant charged in the one false statement

12   count.  So how about I just...

13           **MR. ZYTNICK:**  I think there's actually different --

14           **THE COURT:**  Maybe just Number 28, just give the first

15   one and not the second one?

16           Mr. Green, because I guess this impacts your client

17   potentially more --

18           **MR. GREEN:**  Yes.

19           **THE COURT:**  -- so, so what's your position?

20           **MR. GREEN:**  Your Honor, because Salvador Castro is

21   charged in the false statement, I do not ordinarily believe

22   that there's undue emphasis on the charge as stated in

23   proposed Exhibit [sic] 29.  I think that it is included and

24   somewhat -- proposed Instruction 28.  The jury will be

25   instructed a little bit later on the specific charges, and

1   they know that he is only charged by virtue of reference to

2   the indictment.  He's the only one charged in the false

3   statement.

4        We would be satisfied if the Court strikes or

5   modifies proposed exhibit -- proposed Instruction Number 29

6   and either leave that out or merge it somehow in 28.  But I

7   think the jury can compart -- can compartmentalize these --

8   these counts.  I don't think it places undue weight.

9        **THE COURT:**  Mr. Mishler, what's your position?

10       **MR. MISHLER:**  I can't give you a basis for my

11  ultimate, like, coming to the conclusion that they were

12  different.  I mean, I think, as has been made abundantly clear

13  throughout the trial, that the more we can emphasize that each

14  defendant is differently situated and different evidence

15  applies to them, the better.  But I don't have a specific

16  feeling one way or the other on including or excluding 29.

17       **THE COURT:**  All right.  Well, 29 reads:  A separate

18  count is charged against each defendant, and here we've got a

19  separate crime is charged against one or more of the

20  defendants in each count.  So I think maybe we could just not

21  give Number 29.

22       Mr. Green, you don't have any objection to my taking

23  out 29 or do you want me --

24       **MR. GREEN:**  No -- no objection, Your Honor.  I think

25  the Court has made it clear to the jury and will throughout

```
1   all of the instructions.  No objection, ma'am.
2           THE COURT:  All right.  And no one else has an
3   objection either to my omitting Number 29, separate
4   consideration of single count, multiple defendants; is that
5   right, Government?
6           MR. ZYTNICK:  Correct, no objection.
7           THE COURT:  And Tanasi?
8           MR. TANASI:  No objection, Your Honor.  I think it's
9   ultimately --
10          MR. GAFFNEY:  No objection.
11          MR. TANASI:  -- Mr. Green's instruction.
12          THE COURT:  Mishler?
13          MR. MISHLER:  No objection, Your Honor.
14          THE COURT:  All right.  So I'll move on.  Number 30
15  is Count 2 through 13, mail fraud --
16      (Simultaneous crosstalk.)
17          MR. ZYTNICK:  Your Honor, several --
18      (Reporter instruction.)
19          THE COURT:  -- improvement there.  The first line
20  says "of the indictment," so that needs to go.
21          All right.  From the Government?
22          MR. ZYTNICK:  Just two other small typographical
23  things, Your Honor.  In that second line, it has the statutory
24  section, there's a typo there.  It should be --
25          THE COURT:  Oh, yeah.  It has too many numbers.
```

1      **MR. ZYTNICK:**  Too many, yeah.

2      **THE COURT:**  So it should just be 1341; right?

3      **MR. ZYTNICK:**  Correct.

4      **THE COURT:**  Okay.  So we'll take out that extra 4.

5      **MR. ZYTNICK:**  And then in the second paragraph, the

6  first element, in the third line it says "deceitful statements

7  of half truths."  I believe that should be "or half truths."

8      **THE COURT:**  Aah.  Thank you.

9      So deceitful statements or half truths may constitute

10  false or fraudulent representations.

11      Anywhere else anything?

12      **MR. ZYTNICK:**  Nothing else from the Government.

13      **THE COURT:**  And Mr. Tanasi, any objections or

14  improvements to Number 30?

15      **MR. TANASI:**  Not that I see, Your Honor, no.

16      **THE COURT:**  Mr. Gaffney?

17      **MR. GAFFNEY:**  No, Your Honor.

18      **THE COURT:**  Mr. Mishler?

19      **MR. MISHLER:**  Yes, Your Honor.  Just -- just my

20  usual.  Change the word "the" to "each."  Specifically the

21  very first line, "each defendant is charged."  The second

22  line, "for each defendant to be found guilty."  The next

23  paragraph, "First, each defendant knowingly participated in."

24  On the third element, "Third, each defendant acted."  "Fourth,

25  each defendant used."  And the paragraph at the start of the

 1    following page, "You may consider not only each defendant's

 2    words and statements."

 3              Those would be my proposed changes.

 4              **THE COURT:**  Okay.  Well taken.  Let me see if I got

 5    it right.

 6              Starting with:  Each defendant is charged in Counts 2

 7    through 13 with mail fraud in violation of... and then that's

 8    § 1341 of Title 18 of the United States Code.  For each

 9    defendant to be found guilty of that charge, the Government

10    must prove each of following elements beyond a reasonable

11    doubt.  For each defendant -- first, each defendant knowingly

12    participated and devised or intended to devise -- okay.  Then,

13    deceitful statements or half truths may constitute false --

14    second -- third, each defendant acted with intent to defraud.

15    Fourth, each defendant used.  And then at the end, in

16    determining whether a scheme to defraud exists, you may

17    consider not only each defendant's words and statement --

18              **MR. MISHLER:**  That's correct, Your Honor.

19              **THE COURT:**  Any objection from the Government?

20              **MR. ZYTNICK:**  No, Your Honor.

21              **THE COURT:**  And Mr. Tanasi?

22              **MR. TANASI:**  No, Your Honor.

23              **THE COURT:**  Gaffney?

24              **MR. GAFFNEY:**  No, Your Honor.

25              **THE COURT:**  And Green?

```
1              MR. GREEN:  No objection, Your Honor.

2              THE COURT:  All right.  So Number 31, mail fraud

3    victims.

4              Any objection from the Government?

5              MR. ZYTNICK:  No, Your Honor.

6              THE COURT:  From the defense, Tanasi?

7              MR. TANASI:  No, Your Honor.

8              THE COURT:  Gaffney?

9              MR. GAFFNEY:  No, Your Honor.

10             THE COURT:  Mishler?

11             MR. MISHLER:  No, Your Honor.

12             THE COURT:  And Green?

13             MR. GREEN:  No, ma'am.

14             THE COURT:  Instruction Number 32, scheme to defraud,

15   vicarious liability.

16             Any objection from the Government?

17             MR. ZYTNICK:  No, Your Honor.

18             THE COURT:  Mr. Mishler, do we change this here, "if

19   you decide that a defendant"?

20             MR. MISHLER:  "A defendant," yes, that's what my

21   suggestion was going to be.

22             MR. ZYTNICK:  Actually, Your Honor, I noticed also

23   the second line, I think it's missing the word "defendant."

24   It says "the may."

25             THE COURT:  Where is it missing?  I'm not seeing --
```

2:19-cr-00295-GMN-NJK - April 17, 2023

1          **MR. ZYTNICK:**  I'm sorry.  It says -- it should say

2     "the defendant may be responsible," but the word "defendant"

3     is --

4          **THE COURT:**  Oh.

5          **MR. ZYTNICK:**  -- missing in the second line of the

6     instruction.

7          **THE COURT:**  Interesting.  Okay.  I don't know how

8     that got... okay.  So if you decide that a defendant was a

9     member of a scheme to defraud and that the defendant had the

10    intent to defraud, the defendant may be responsible for other

11    co-schemers' actions during the course of and in furtherance

12    of the scheme, even if the defendant did not know what the

13    other co-schemers said or did.

14         And I don't know why that seems to be off.  It's too

15    many tabs.

16         For the defendant to be guilty of an offense

17    committed by a co-schemer in furtherance of the scheme, the

18    defendant must be one that the defendant would reasonably

19    foresee as a necessary and natural consequence of the scheme

20    to defraud.

21         Any objection from the Government?

22         **MR. ZYTNICK:**  No, Your Honor.

23         **THE COURT:**  Any objection from the defense, Tanasi?

24         **MR. TANASI:**  No, Your Honor.

25         **THE COURT:**  Gaffney?

 1          **MR. GAFFNEY:**  No, Your Honor.

 2          **THE COURT:**  Mishler?

 3          **MR. MISHLER:**  Sorry, Your Honor.  So Mr. Brown and I

 4    were discussing, and on that first line we thought it might be

 5    cleaner to say:  If you decide that a defendant was a member

 6    of a scheme to defraud and he had the intent to defraud, he

 7    may be responsible for the other co-schemers' actions.

 8          And then on the second paragraph, "for a defendant to

 9    be guilty" I think is the only change we would have.  But the

10    "the defendant" on the other line -- oh.  Mr. Brown tells me

11    at the end of that first paragraph our preference is:  Even if

12    he did not know what the other co-schemer said or did.  Just

13    in the interest of making it as easy for jurors to understand

14    as possible.

15          **THE COURT:**  And how does that make it easier for them

16    to understand?

17          **MR. MISHLER:**  I mean, just the way that we're trying

18    to clarify each defendant, a defendant, that defendant, it can

19    sometimes make it more confusing instead of less because we

20    have the ability to easily parse that language.  Where when

21    you just take that out and say he, it's obviously much easier

22    for a jury to understand without getting into this defendant

23    maybe but not that one.

24          **THE COURT:**  Okay.  So to keep it consistent that

25    you're talking about the same defendant throughout?

1          MR. MISHLER:  Right.

2          THE COURT:  Okay.  Let me see if I got it right.  If

3    you decide that a defendant was a member of a scheme to

4    defraud and that he had the intent to defraud, he may be

5    responsible for other co-schemers' actions during the course

6    of and in furtherance of the scheme even if he did not know

7    what the other co-schemers said or did.  For the defendant to

8    be guilty of an offense committed by a co-schemer in

9    furtherance of the scheme, the offense must be one that he

10   could reasonably foresee as a necessary and natural

11   consequence of the scheme to defraud.

12          MR. MISHLER:  Yes, Your Honor.  Thank you.

13          THE COURT:  Any objection from the Government?

14          MR. ZYTNICK:  No, Your Honor.

15          THE COURT:  And the defense, Tanasi?

16          MR. TANASI:  No objection, Your Honor.

17          THE COURT:  Gaffney?

18          MR. GAFFNEY:  No, Your Honor.

19          THE COURT:  And Green?

20          MR. GREEN:  No, Your Honor.

21          THE COURT:  All right.  So Instruction 33 is aiding

22   and abetting.

23          Any objection from the Government?

24          MR. ZYTNICK:  No, Your Honor.

25          THE COURT:  Mr. Tanasi?

2:19-cr-00295-GMN-NJK - April 17, 2023

```
 1          MR. TANASI:  No, Your Honor.

 2          THE COURT:  Mr. Gaffney?

 3          MR. GAFFNEY:  No, Your Honor.

 4          THE COURT:  Mr. Mishler?

 5          MR. MISHLER:  No, Your Honor.

 6          THE COURT:  And Mr. Green?

 7          MR. GREEN:  Indulgence for one moment, Your Honor.

 8          THE COURT:  Sure.

 9          MR. GREEN:  No objection, Your Honor.

10          THE COURT:  Okay.  34 is Count 14, false statement to

11  government agency.

12          Any objection from the Government?

13          MR. ZYTNICK:  Your Honor, the first line refers to

14  the indictment.

15          THE COURT:  Aah, yes.

16          MR. ZYTNICK:  That needs to be removed.  Otherwise,

17  no objection.

18          THE COURT:  And Mr. Green, do you have any objection

19  to Instruction Number 34, Count 14, false statement to

20  government agency?

21          MR. GREEN:  No objection, Your Honor.  The

22  instruction is consistent with the Ninth Circuit pattern jury

23  instructions.

24          THE COURT:  All right.  And then instruction

25  Number 35 is duty to deliberate.
```

```
1              Any objection from the Government?
2         MR. ZYTNICK:  No objection.
3         THE COURT:  And any objection from the defense,
4    Tanasi?
5         MR. TANASI:  No, Your Honor.
6         THE COURT:  Gaffney?
7         MR. GAFFNEY:  No, Your Honor.
8         THE COURT:  Mishler?
9         MR. MISHLER:  No, Your Honor.
10        THE COURT:  And Green?
11        MR. GREEN:  No, Your Honor.
12        THE COURT:  Number 36 is use of notes.
13             Any objection from the Government?
14        MR. ZYTNICK:  No, Your Honor.
15        THE COURT:  Tanasi?
16        MR. TANASI:  No, Your Honor.
17        THE COURT:  Gaffney?
18        MR. GAFFNEY:  No, Your Honor.
19        THE COURT:  Mishler?
20        MR. MISHLER:  No, Your Honor.
21        THE COURT:  And Green?
22        MR. GREEN:  No objection.
23        THE COURT:  37 is consideration of evidence, conduct
24   of the jury.
25             Any objection from the Government?
```

1          **MR. ZYTNICK:**  No, Your Honor.

2          **THE COURT:**  And Mr. Tanasi?

3          **MR. TANASI:**  No, Your Honor.

4          **THE COURT:**  Gaffney?

5          **MR. GAFFNEY:**  No, Your Honor.

6          **THE COURT:**  Mishler?

7          **MR. MISHLER:**  No, Your Honor.

8          **THE COURT:**  And Green?

9          **MR. GREEN:**  No, Your Honor.

10         **THE COURT:**  Instruction 38 is jury consideration of

11    punishment.

12         Any objection from the Government?

13         **MR. ZYTNICK:**  No objection.

14         **THE COURT:**  Mr. Tanasi?

15         **MR. TANASI:**  No, Your Honor.

16         **THE COURT:**  Mr. Green?

17         **MR. GREEN:**  No objection.

18         **THE COURT:**  I'm sorry.  Mr. Gaffney?

19         **MR. GAFFNEY:**  No, Your Honor.

20         **THE COURT:**  And Mr. Mishler?

21         **MR. MISHLER:**  No, Your Honor.

22         **THE COURT:**  Okay.  Number 39 is verdict form.

23         Any objection from the Government?

24         **MR. ZYTNICK:**  No objection.

25         **THE COURT:**  And from the defense, Tanasi?

1       **MR. TANASI:**  No, Your Honor.

2       **THE COURT:**  Gaffney?

3       **MR. GAFFNEY:**  No, Your Honor.

4       **THE COURT:**  Mishler?

5       **MR. MISHLER:**  No, Your Honor.

6       **THE COURT:**  And Green?

7       **MR. GREEN:**  No.

8       **THE COURT:**  And Instruction Number 39 is

9  communication with Court.

10          Any objection from the Government?

11       **MR. ZYTNICK:**  Just a note that it's actually

12  Instruction 40.  39 was the previous one.

13       **THE COURT:**  You're right.  Thank you.

14       **MR. ZYTNICK:**  No -- no other objection.

15       **COURTROOM ADMINISTRATOR:**  Which will now be 39

16  because you took out one of the instructions.

17       **THE COURT:**  Yeah.  I still need to fix it on the

18  draft so it will renumber correctly.

19          Mr. Tanasi, any objection?

20       **MR. TANASI:**  No, Your Honor.

21       **THE COURT:**  Gaffney?

22       **MR. GAFFNEY:**  No, Your Honor.

23       **THE COURT:**  Mishler?

24       **MR. MISHLER:**  No, Your Honor.

25       **THE COURT:**  And Green?

1    **MR. GREEN:**  No.

2        **THE COURT:**  All right.  Then we have the potential

3    instructions.  Number 1 is the lesser included offense of

4    private express for letters and packets.

5        So who would like to justify that inclusion?

6        **MR. TANASI:**  Your Honor, I will, if I may?  Thank

7    you.

8        **THE COURT:**  Yes.

9        **MR. TANASI:**  So the evidence I think adduced thus far

10   shows that Digital Express worked closely with Pitney Bowes, a

11   vendor of post office stamps.  Digital Express ultimately

12   caused the conveyance of the sweepstakes letters in this case

13   to enter the U.S. mail stream.  And so the Government alleges

14   that those sweepstakes themselves were unlawful fraud.

15       So in looking at the statute, 18 USC § 1696, I think

16   that the facts that have come out thus far could lead the jury

17   to conclude that Digital Express transmitted letters by

18   unlawful means justifying this -- this instruction.

19       **THE COURT:**  And is that a -- and that's a criminal

20   offense?

21       **MR. TANASI:**  Yes, Your Honor.

22       **THE COURT:**  The private -- okay.

23       **MR. TANASI:**  It's a federal misdemeanor.

24       And I would also incorporate Mr. Mishler's defense

25   theory arguments as well and say the law that justifies it, I

1    would candidly admit I couldn't find a case that would fit

2    this box expressly, but I do think the statute itself and the

3    facts potentially supporting the elements justify it.

4         **THE COURT:**  And what's the Government's position as

5    to the lesser included offense of private express for letters

6    and packets?

7         **MR. ZYTNICK:**  Your Honor, there are two problems with

8    this.  First of all, it's not a lesser included offense.  It

9    has no elements overlapping with mail fraud, let alone, you

10   know, a lesser set of elements.  So just at the baseline, it

11   is not actually a lesser included offense.  It cannot be given

12   as a lesser included offense instruction.

13        Even in some alternative universe where this was a

14   lesser included offense, this is a statute about essentially,

15   like, operating a private post office.  You know, that's

16   not -- there are no facts or evidence in this case that

17   support this.  So on both the law and the facts, this

18   instruction is entirely inapplicable.

19        **THE COURT:**  So I agree it's not a lesser included

20   because it doesn't have the same elements in common.  I'm not

21   familiar with this particular offense.  And you're saying it

22   is a misdemeanor, so...

23        **MR. TANASI:**  Yes, Your Honor.

24        **THE COURT:**  So I haven't seen it here in District

25   Court.  If it was ever applied, it would be probably be taken

```
 1    care of in -- by the magistrate judge.

 2            So I don't think that this is a lesser included, and

 3    it hasn't been charged by the Government.  And I'm not sure

 4    that the facts -- the elements would even fit the facts in

 5    this case squarely.  Regardless, it's not a lesser included,

 6    so I'm not -- I'm not inclined to give that.  I'm not going to

 7    be giving that instruction.

 8            MR. TANASI:  Understood.

 9            THE COURT:  Potential Instruction Number 2 is advice

10    of counsel.

11            Who'd like to be heard on that one?  Mr. Mishler?

12    No?  Mr. Green?  Who was it?

13            MR. TANASI:  Your Honor, if I may?

14            THE COURT:  Go ahead.  Yes.  Okay.

15            MR. TANASI:  So, again -- again, incorporating

16    defense theory arguments from Mr. Mishler from early on.  And

17    it's no mystery that, you know, the defendants' theory in this

18    case is acting at the -- the direction and with the trust of

19    Patti Kern and Sean O'Connor.  Jose Luis Mendez testified

20    that -- that Patti Kern consulted with an attorney in this

21    case.  I think the attorney's last name was Oshins (phonetic).

22    He also testified that Mario and Miguel trusted Patti Kern

23    like he did because she was around.  And sort of baked into

24    that trust in this case is that reliance on counsel.

25            I would also point the Court to Defense Exhibit 5027,
```

1    which is an e-mail that Patti Kern forwarded to Mario Castro

2    in July of 2017, and the reference in that e-mail references

3    specifically consultations with attorneys.  And so I think the

4    infusion of counsel in this case would justify the advice of

5    counsel instruction.

6         **THE COURT:**  All right.  Well, I look at Mr. Brown and

7    Mr. Mishler because we just had this as a defense in a

8    different trial that they had with me in there.  So it was

9    pretty clear they had to have -- there has to be full

10   disclosure of all the material elements made to the attorney,

11   and then the attorney provides an opinion upon which the

12   client relies upon.

13        So here there's no defendant that was a client of an

14   attorney.  And even if they were, there hasn't been prima

15   facie evidence that all the material information had been

16   provided to that attorney for the attorney to be able to make

17   a good-faith legal advice or provide legal advice.  So I don't

18   think that it's -- I don't think it's justified to give the

19   instruction in this case.

20        I'll let the Government probably make a better record

21   than I can, but I'm just remembering how much trouble we went

22   through with -- with that other trial that we had trying to

23   make sure that we considered everything, and we did ultimately

24   give that instruction in the other case.  So I was satisfied

25   that -- that it -- there was merit to give that instruction.

1    In that case, the attorney took the stand.  The defendant took

2    the stand.  There was a full explanation to the jury about all

3    the facts that were provided and...

4         What's the Government's position on that instruction?

5         **MR. ZYTNICK:**  Your Honor is absolutely correct.

6    There's been no evidence that these defendants, any of them,

7    made -- made a disclosure of material facts or all material

8    facts to an attorney, that they received an attorney's advice,

9    that they followed the attorney's advice.  There's no evidence

10   about that at all.

11        The things that Mr. Tanasi is arguing, those are fine

12   for him to argue to the jury about the defendant's intent, but

13   they can't use an advice-of-counsel defense to support that.

14        **THE COURT:**  Yeah.  I think the problem is they're

15   relying allegedly on the advice of Patti Kern claiming that

16   she relied on advice of counsel, but there's not an

17   advice-of-counsel defense here, which is what is available

18   when someone in good faith goes to a lawyer, tells them

19   everything they know, and then the lawyer gives an opinion

20   that may or may not actually be correct.

21        So I'm not giving that instruction.

22        **MR. TANASI:**  Understood.

23        **THE COURT:**  All right.  So is there any other

24   instruction that I missed?  Because I know there was -- at the

25   last minute there was kind of a flurry of supplemental and

1    amended jury instructions.  So did we cover all of the

2    instructions that everybody proposed?  Does the Government

3    have anything that we might have missed that we need to cover?

4    We're going to the verdict form, but I just want to do jury

5    instructions first.

6           **MR. ZYTNICK:**  Yeah.  Nothing further, Your Honor.

7           **THE COURT:**  Okay.  And from the defense, Mr. Tanasi?

8           **MR. TANASI:**  No, Your Honor.

9           **THE COURT:**  Gaffney?

10          **MR. GAFFNEY:**  No, Your Honor.

11          **THE COURT:**  Mishler?

12          **MR. MISHLER:**  No, Your Honor.

13          **THE COURT:**  And Green?

14          **MR. GREEN:**  No, Your Honor.

15          **THE COURT:**  All right.  So looking at the jury

16   verdict, we've got them... so they're not in a -- let me make

17   sure.  Are they?  I think they're in the order that they're

18   charged in the indictment.  I was just going to put them in

19   alphabetical order, but I think that because the -- in the

20   indictment -- so, for example, if you look at the first one,

21   Mario Castro, it has the Case Number, GMN-NJK-1.  And then

22   when you go to the next one it's Salvador Castro, GMN-NJK-3,

23   and then Miguel Castro is dash 4 and Jose Luis is dash 5.

24   Number 2 would be a defendant that's not here.

25          So I don't know if you have any objection to the

1    order in which they're provided.  We did provide not guilty

2    first and then guilty.  And then each one refers to the victim

3    by name, not by initial because that was too confusing to keep

4    track of.  Salvador Castro is the only one charged in

5    Count 14.  And we were assuming that the verdict would be

6    given in April, so I put that in there, which is the date

7    being blank.

8            Any objection from the Government?  Anything you see

9    there that we missed or that's --

10           **MR. ZYTNICK:**  No, Your Honor.

11           **THE COURT:**  And how about from the defense,

12   Mr. Tanasi?

13           **MR. TANASI:**  No, Your Honor.

14           **THE COURT:**  Mr. Gaffney?

15           **MR. GAFFNEY:**  No, Judge.

16           **THE COURT:**  Mr. Mishler?

17           **MR. MISHLER:**  I just see one thing.  It's on all of

18   the verdict forms.  I don't know how big of a deal it is, but

19   on 2 through 13 and probably 14 for Mr. Salvador Castro it

20   says "in or about June" instead of "on or about."

21           **THE COURT:**  Oh yeah.

22           **MR. MISHLER:**  Probably a pretty easy fix.

23           **THE COURT:**  I hope so.  Okay.

24           **MR. MISHLER:**  Otherwise, nothing from us.

25           **THE COURT:**  Yeah, we want it to match the instruction

```
 1    that we gave.
 2            Okay.  So I think we're done.  Anything else from the
 3    Government?
 4            MR. ZYTNICK:  No, Your Honor.
 5            THE COURT:  Anything else from the defense?
 6            MR. TANASI:  No, Your Honor.
 7            THE COURT:  Mr. Brown?
 8            MR. BROWN:  Just if maybe we could have a break
 9    before the jury --
10            THE COURT:  Of course.  Yes.  I just wanted to make
11    sure we're -- we're done so I can hand this off to someone
12    else.  I did the track changes so that hopefully it's clear,
13    but sometimes, when you accept the track changes, then there's
14    formatting issues that happen.  So it's still going to need to
15    be cleaned up probably.
16            So are we -- are we done with jury instructions and
17    the verdict form so I can have someone who's better at this
18    clean them up, make sure that my changes didn't -- didn't
19    create more problems?
20            Mr. Tanasi?
21            MR. TANASI:  I think we're ready, Your Honor.  Yes.
22            THE COURT:  Okay.  Gaffney?
23            MR. GAFFNEY:  Your Honor, I think we're ready, and I
24    think the record should also reflect that the defendants have
25    been present throughout the settling of the jury instructions.
```

2:19-cr-00295-GMN-NJK - April 17, 2023

```
1          THE COURT:  Yes.  Everyone has been here throughout
2     the settlement.  The only one -- I think I saw one of the
3     investigators walk in like right when we started and maybe
4     missed like the first two instructions or something, and the
5     agent also walked in just -- just as we started as well.  But
6     everyone else is here.  So the record can reflect that all the
7     attorneys and all the defendants were here as well as the
8     interpreter.
9          Okay.  Then I'm going to go ahead and take a quick
10    recess, maybe come back at, what, 9:45?
11        (Recess at 9:35 a.m., until 9:49 a.m.)
12         THE COURT:  Thank you.  You may be seated.
13         All right.  So just to be clear, we're going to be
14    calling Mr. Miguel, Jr. -- why do I keep calling him Miguel?
15    Sorry.  Mario Castro, Jr. to the stand to finish
16    cross-examination.  Then we'll see if there's any other
17    defense witnesses, and then once the defense rests, we'll see
18    if there's any rebuttal witnesses.  And then, once that's
19    done, then we can take a break, come back.  I'll give jury --
20    read jury instructions.  Government does their opening, and
21    then the defense does -- I'm sorry, does their closing, and
22    then defense closing.  Just however it -- whatever timing it
23    takes, I'll give breaks in between as -- as needed, but we'll
24    just kind of play it by ear.
25         MR. TANASI:  Your Honor, is the Court --
```

1    **THE COURT:**  Oh.  Just a minute.  We've got -- do we
2    have a battery issue or no?  Can you hear?  Testing, one, two,
3    three, testing for --
4    **MR. GREEN:**  Same thing with Mr. Castro, Your Honor.
5    Salvador Castro.  Excuse me.
6    **THE COURT:**  Okay.  Let's change them out.
7    So, Counsel, when the one that you're using stops
8    working, don't put it back because we might accidentally give
9    someone one that's dead instead of one that's charged.  So
10   just make sure that when -- when you put the bad one back...
11   **COURTROOM ADMINISTRATOR:**  They can put in the end.
12   **THE COURT:**  Or not bad one.  But what do you call it?
13   The -- the dead battery one.
14   *(Pause in the proceedings.)*
15   **THE INTERPRETER:**  So it was the transmission.
16   **THE COURT:**  Oh, okay.  So it was just user error.
17   Good.  Okay.  Because we've got seven of them here that are
18   charged and ready to go.  Okay.
19   **MR. TANASI:**  Your Honor?
20   **THE COURT:**  Yes.
21   **MR. TANASI:**  Briefly just with respect to order, I
22   just want to make sure that the Court was still okay with
23   this, the defense actually starting their closing arguments
24   tomorrow regardless of where things end up.  Is that option
25   still on the table for the --

1          **THE COURT:**  I think that is, yeah.

2          **MR. TANASI:**  Okay.  Thank you.

3          **THE COURT:**  Okay.  And then you-all tell me what

4     order you want me to call you in for closing when we get

5     there, or if you want to just stand up so that I know who's

6     going next because I don't know what particular order you've

7     decided to go in, if any.

8          **MR. TANASI:**  That's still in the works, and we will

9     absolutely let the Court know.

10         **THE COURT:**  Okay.  If you can't decide, I'll --

11    I'll --

12         **MR. TANASI:**  No, no.

13         **THE COURT:**  We can do like a --

14         **MR. TANASI:**  We will have a decision.

15         **THE COURT:**  Pick a number between one and ten.

16         **MR. TANASI:**  We will have a decision, Your Honor.

17         **THE COURT:**  Okay.  All right.  Let's go ahead and get

18    the jury.

19         **COURTROOM ADMINISTRATOR:**  We need --

20         **THE COURT:**  Yes.  We can ask the witness to come back

21    on the stand.  Mr. Mario Castro, Jr., come on up, and when the

22    jury comes in, just make sure you stand up.

23         **COURTROOM ADMINISTRATOR:**  All rise.

24         *(Jury in at 9:54 a.m.)*

25         **THE COURT:**  All right.  Everyone may be seated.  Good

1    morning and welcome back.  We have our jury here, and the

2    witness is back on the stand as well, Mr. Mario Castro, Jr.

3            Before we continue with cross-examination, though,

4    let's have all the parties place their presence on the record,

5    starting with the Government.

6        **MR. FINLEY:**  Thank you, Your Honor.

7            Good morning, everyone.  Tim Finley, Dan Zytnick,

8    Mina Chang, Barry Bouchie, Erica Rush, Tyaka Mallory for the

9    United States.

10       **THE COURT:**  Thank you.  Good morning.

11       **MR. TANASI:**  Thank you, Your Honor.  Good morning.

12   Good morning, ladies and gentlemen.  Rich Tanasi and Josh

13   Tomsheck for Mario Castro.  Also with us at counsel table is

14   Brian Glynn.  Thank you.

15       **MR. GAFFNEY:**  Good morning, Your Honor.

16       **THE COURT:**  Good morning.

17       **MR. GAFFNEY:**  Good morning, ladies and gentlemen.

18   Lucas Gaffney and Thomas Ericsson on behalf of Miguel Castro.

19   Thank you.

20       **MR. BROWN:**  Thank you, Judge.  Good morning,

21   everyone.  Still Will Brown, Chris Mishler, and Jose Luis

22   Mendez.  Also Rich Beasley and Lisa Smith.

23       **THE COURT:**  Good morning.

24       **MR. GREEN:**  Good morning, Your Honor.  Good morning,

25   ladies and gentlemen of the jury.  Don Green on behalf of

1    Salvador Castro.  With me today is Michelle Gonzalez, the

2    investigator, and my legal assistant, Heather Tan-Sahl.  Thank

3    you.

4              **THE COURT:**  Thank you.

5              All right.  So, Mr. Mario Castro, Jr., I do remind

6    you, sir, that you are still under oath to tell the truth.

7    All right?

8              Please answer audibly.

9              **THE WITNESS:**  Yes.  Yes, I understand.

10             **THE COURT:**  Okay.  Thank you.  Go ahead with

11   cross-examination.

12                       **CROSS-EXAMINATION**

13   **BY MR. FINLEY:**

14   Q.   Good morning.

15   **A.**   Good morning.

16   Q.   You had mentioned on Thursday that you had some bank

17   accounts seized by the Government as part of this case?

18   **A.**   Correct.

19   Q.   Was that in February of 2018 that that happened?

20   **A.**   I -- I don't really remember the exact time that it

21   happened.  But it was -- my personal bank account was also

22   Bank of America as was the business bank account.  And they

23   were both seized, my personal one and that one, at -- around

24   the same time.

25   Q.   Okay.  And I understand you don't recall the exact date,

1  but was it around the same time that the search warrants in

2  this case were executed?

3  **A.**   It was at the same time, yes.

4  Q.   And you just referred to a personal bank account that was

5  seized.  I take it there was no fraud money from victims in

6  that account?

7  **A.**   No.  That was only my personal money that I made working

8  at the hospital as well as the $200 a week that were promised

9  to me.

10  Q.   Okay.

11       **MR. FINLEY:**  Could I please have Government Exhibit

12  445 placed on the screen just for the witness?

13  **BY MR. FINLEY:**

14  Q.   While we wait for that, you had a mailing company by the

15  name of Money Securities?

16  **A.**   I can only assume that that was one of the DBAs.  I don't

17  really remember the name of them.  The only name I remember is

18  the one I made, which was Pi Printing.

19  Q.   Okay.  Money Securities was one of the DBAs.  I just

20  referred to it as a mailing company because it sent mail.  The

21  other one was Assets Unlimited.  Those were both DBAs that

22  were registered by you to the company Pi Printing in January

23  of 2017.  Does that refresh your memory at all or -- I mean,

24  we'll look later, but does that sound about right?

25  **A.**   So the names don't really sound familiar because I never

1   made them.  But if you're saying that that's what it was, then

2   I assume --

3   Q.   Well, we'll just -- we'll look at it.  That's fine.

4   **A.**   Okay.

5   Q.   So we looked at the seizure records from this case, and I

6   count a -- I count that a Pi Printing d/b/a Money Securities

7   account was seized pursuant to a seizure warrant.  Do you

8   know -- you know that, like, to seize a bank account, the

9   Government can't just seize a bank account.  They need to get

10   a seizure warrant from a United States magistrate judge.  Were

11   you aware of that?

12   **A.**   I wasn't aware of that.

13   Q.   Okay.  And the -- were you aware that the seizure warrant

14   records are a part of the court records in this case?  Were

15   you aware of that?

16   **A.**   I wasn't aware of that either.

17   Q.   Okay.  So I count that one account that was seized was Pi

18   Printing d/b/a Money Securities.  Another one that was seized

19   was Pi Printing d/b/a Assets Unlimited.

20         Now, I will show the records.  But for now, if you

21   were to assume that those were the mailing companies that you

22   opened and that those accounts contained fraud money that was

23   received from victims, you wouldn't have any problem with

24   those accounts being seized; right?

25   **A.**   If it were just accounts in which I didn't have any

1    personal money, then I have no problem with them being seized.

2    It wasn't my money anyway.  The only reason I would have any

3    issue is if my own personal money was taken.

4    Q.    Now, this other one with -- let's call it clean money

5    just to be simple.

6    **A.**    Sure.

7    Q.    The one with -- the personal one with the clean money

8    that you say got seized, you said it was a Bank of America

9    account?

10   **A.**    That is correct, yeah.

11   Q.    Do you remember the name of the account?  Like, was it a

12   person like Mario Castro, yourself, or...?

13   **A.**    So I had tagged it in my banking app as personal.  As far

14   as, like, it having a specific -- like, I don't know if that

15   translates over to, like, that's on the official documentation

16   or if it's just something I see from, like, my UI.  But, yeah,

17   for me it just showed personal.

18          So whenever I would enter my app, I would see two

19   bank accounts that were for the business and then my own

20   personal one right below them.  And so the only time I would

21   really log on was just to transfer those $200 a week over.

22   Q.    Okay.  So your app says that -- your app identifies it as

23   a personal account.  Does that mean that the bank account that

24   you opened at Bank of America was in your personal name, Mario

25   Castro, or was it like a corporate account or something like

1    that?

2    **A.**   I don't believe that I know how that really works.  All I

3    know is I had those bank accounts, and I just figured I should

4    bank with the same bank that all that is in just to simplify

5    everything.

6    Q.   So you don't know the name of the account?  Like, if you

7    got a statement from the bank, you know, it usually says, you

8    know, the account name, account holder.  You don't know what

9    the name of the account was?

10    **A.**   I guess I -- I don't, no.

11    Q.   Do you know what kind of money was in that account when

12    it got seized?  I know you said it was, you know, from your

13    job, but can you be more specific about what kind of money was

14    in there, where it came from, how much was lost, that kind of

15    thing?

16    **A.**   I mean, for me it was a lot because I'm just working a

17    regular job.  So it was -- it couldn't have been more than a

18    couple thousand dollars in there.

19    Q.   Now, do you have any documentation of the account being

20    seized?  Usually somebody gets some documentation from the

21    Government or the bank or something when their account gets

22    seized pursuant to a court-ordered seizure warrant.

23    **A.**   Um-hum.

24    Q.   Did you have any of that -- those kind of paperwork for

25    that?

1    A.    So all the paperwork that I had for these bank accounts,

2    I -- once it was completely frozen and seized, Inspector

3    Bouchie asked me if I can provide that documentation.  So I

4    went through the app, and I found all the bank account

5    statements from, you know, as far back as I could find them.

6    I got them into a PDF form, and I provide them -- provided

7    them all to -- to the inspector.

8    Q.    Now, you said you provided bank account records to the

9    inspector?

10   A.    That is correct.

11   Q.    Which inspector?

12   A.    Bouchie.  Or if it wasn't directly to him, then it must

13   have been to someone that he was, you know, working with.

14   Q.    You gave your personal bank account records to Inspector

15   Bouchie?

16   A.    I gave him all the records of every bank account that was

17   seized.

18   Q.    So -- but you don't have -- right as you sit here, you

19   don't have any documents -- any documentation regarding the

20   seizure of your personal account?

21   A.    No, I don't -- I don't have any documentation like that.

22   Q.    Now, this personal account that you opened at Bank of

23   America, do you know what address you gave for the bank to

24   send statements?

25   A.    Yes.  It was all my parents' personal address.  It was

*Mario Castro, Jr. - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 17, 2023*

1    all tied to this bank account.

2    Q.   We don't need to say the number, but is that Garita

3    Street?

4    **A.**   That's correct.

5    Q.   Did you file a claim?

6    **A.**   I -- I never filed a claim, no.

7    Q.   You know if the Government seizes money that you believe

8    is legally earned, you know you have the right to make a

9    claim; right?

10   **A.**   I wasn't aware of that.  I don't believe that I was

11   really instructed or spoken to about any of my rights at that

12   moment, so I -- I wasn't aware of that.

13   Q.   Didn't you have an attorney around this time by the name

14   of Don Chairez?

15   **A.**   I knew him.  I knew Don Chairez.  I never paid him.  I

16   simply spoke to him at some point.  Because he wasn't my

17   lawyer.  He was more of a personal friend or a family friend.

18   Q.   So if Don Chairez worked on this case and told members of

19   the prosecution team that he represented you, he -- he would

20   have been wrong about that?

21   **A.**   I never gave Don Chairez any money.  I never signed any

22   documentation for him to legally represent me.  It was simply

23   just I spoke to him about counseling, but I never brought up

24   that I lost money to him personally.

25   Q.   Okay.  The question was a little different than that.

1    Are you saying that Don Chairez would have been wrong if he

2    said to the prosecution team that he represented you?

3    **A.**    Can you define what you mean by represent then?  Do

4    you --

5    Q.    Like he was your lawyer.  He told us he was your lawyer.

6    When you were getting ready to go have that interview with

7    Barry Bouchie and -- at the Starbucks, your lawyer contacted

8    Mr. Bouchie and said, go ahead, go ahead and have the

9    interview.

10            You don't recall that?

11   **A.**    I -- again, I -- I did speak to him.  I'm not denying

12   that there was any contact or that he didn't counsel me.  I

13   simply said that it was never official, and there was never

14   any transaction of money.

15   Q.    Okay.  So this Don Chairez person that you spoke to, did

16   you speak to him about the fact that your personal money had

17   been seized?

18   **A.**    No.  The only thing I really spoke to Don about was about

19   the fact that I had to come to Las Vegas for a grand jury and

20   that I was going to be questioned.  That's really all of

21   our -- the extent of our conversation.

22   Q.    Okay.  So is the answer no?

23   **A.**    The answer is no.

24   Q.    Okay.  Now, you have Government Exhibit 445 in front of

25   you.  The title is Affidavit in Support of Applications for

1    Civil Forfeiture Seizure Warrants.

2             Do you see that title?

3    **A.**   I see the title, yes.

4    Q.   Okay.  And this document is basically explaining to the

5    Court the justification for seizing bank accounts in order to

6    get the seizure warrant.  There is a listing at the bottom of

7    page 1 that has a listing of all the accounts that the

8    Government was asking for the Court's permission to seize.  Do

9    you see that?

10   **A.**   Yes, I see it's a total of six of them.  Correct.

11   Q.   Okay.  And it continues on the next page.  So -- yep.

12   There's the next page.  I'd like you to read all those

13   accounts, and tell the jury which one was the personal account

14   that got -- that got seized.

15           **THE COURT:**  You mean read them to yourself?

16           **MR. FINLEY:**  Correct.

17   **BY MR. FINLEY:**

18   Q.   Read them to yourself, sir, and tell the jury which one

19   of the accounts listed was your personal account that was

20   seized.  And if you need to move around between the pages,

21   just let us know and we'll change pages.

22           You need to go back?

23   **A.**   I don't.

24   Q.   Okay.

25   **A.**   Considering the fact that I don't really remember what

*Mario Castro, Jr. - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 17, 2023*

1  the name of my personal bank account is, I would only be able

2  to speculate which of these accounts was mine.

3  Q.   Are you able to identify which personal account here was

4  seized, which one of these was seized?

5  **A.**   Like I said, I don't remember the name, so the answer

6  would be no, I -- I can't figure out which one was mine.

7  Q.   Okay.

8        **THE COURT:**  Can you find the two business accounts

9  and see if there's a third one?

10       **THE WITNESS:**  There are three that are under the name

11  of Pi Printing.

12  **BY MR. FINLEY:**

13  Q.   Okay.  Okay.  Let's go back to the first page, and we'll

14  ask about that.  Okay?

15  **A.**   Sure.

16  Q.   You can see that the signers are listed; right?

17  **A.**   Yes.

18  Q.   You're not saying your personal account had -- had

19  signers who weren't you; right?

20  **A.**   Can you repeat that question one more time?

21  Q.   Yeah.  Just in terms of, you know, drilling down on which

22  ones might be the personal account with the clean money that

23  you said was seized, there's a column on the right-hand side

24  called signatory privileges.  That means the person who opens

25  the account and has the right to do business out of it.  So

1    that's called, like, the signer or the signatory by the bank.

2    Those people are listed.

3            There's, like, for example, Gage Muniz, Maria

4    Ramirez, Miguel Castro, et cetera.

5            Do you see that column?

6    **A.**    Yes, I do.

7    Q.    Now, your name on the first page appears once next to an

8    account called Pi Printing Corp d/b/a Assets Unlimited.

9            **MR. TOMSHECK:**  Judge, I have to object.  That's a

10    misrepresentation both in terms of what this document is and

11    what it says.  If we can have a sidebar, I can explain.

12            **THE COURT:**  Are you objecting to him --

13            **MR. TOMSHECK:**  I'm objecting to him reading from the

14    document and misrepresenting overtly as to what it says.

15            **THE COURT:**  Okay.  I don't see the misrepresentation

16    unless you're talking about the junior versus not junior?

17            **MR. TOMSHECK:**  I am.  And this --

18            **THE COURT:**  Okay.

19            **MR. TOMSHECK:**  -- is an application for a search

20    warrant.  This isn't a list of accounts seized.  The

21    Government knows that.  They're misrepresenting what this

22    document is, and I would ask that the Government be instructed

23    to ask questions based on facts rather than trying to trick

24    the witness through misrepresentation.

25            **THE COURT:**  All right.  I don't think there's any

*Mario Castro, Jr. - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 17, 2023*

1    trickery going on, but there -- some clarity as to when there

2    is a junior and there's not a junior probably would be

3    helpful.

4         **MR. TOMSHECK:**  As well as the issue of representing

5    this is a list of bank accounts that were seized.  This is an

6    application that predates seizing.

7         **MR. FINLEY:**  That's exactly what I said.  And if

8    we're going to have a sidebar to make allegations about

9    representations, then I would prefer that as opposed to having

10   them made in open court.

11        **MR. TOMSHECK:**  I agree.

12        **THE COURT:**  So Exhibit 445 has been properly

13   represented.  So the objection is overruled.

14   **BY MR. FINLEY:**

15   Q.   So for clarification, your name appears but it doesn't

16   say whether it's junior or senior; right?

17   **A.**   That's correct.

18   Q.   That is the bank account that you opened, though; right?

19   **A.**   I would assume that anything with Pi Printing on it was

20   something that I opened.

21   Q.   Yes?

22   **A.**   Yes.

23   Q.   Okay.  So that's not a personal account; right?  That's

24   the mailing company account, Assets Unlimited?

25   **A.**   That's correct.

1    Q.   Okay.

2         **MR. FINLEY:**  Next page.

3    **BY MR. FINLEY:**

4    Q.   And then we see the next time the name Mario Castro

5    appears, it's for Pi Printing d/b/a Money Securities; correct?

6    **A.**   That's correct.

7    Q.   Also a mailing company?

8    **A.**   Yes.

9    Q.   It's not your personal account?

10   **A.**   Both of these Pi Printing DBAs were opened up as

11   nonpersonal accounts.  They were opened up as business

12   accounts, that's correct.

13   Q.   Okay.  So the court records from the case don't list any

14   personal account of yours having been seized?

15        **MR. TOMSHECK:**  And that's the objection that I made

16   earlier, Judge.  This isn't a list of accounts that are

17   seized.  This is an application to seize accounts.  If they've

18   got a document that shows that his account wasn't seized, I'd

19   love to see it, but that's not what he's asking him.

20        **MR. FINLEY:**  It wasn't seized.

21        **THE COURT:**  There's no --

22        **MR. FINLEY:**  It's part of the court record.

23        **THE COURT:**  The documents wouldn't show what's not

24   seized.  Documents only show what is requested to be seized

25   and what is ultimately seized.  So the objection's overruled.

1    **BY MR. FINLEY:**

2    Q.   Here's what I think happened, sir.  I think you might be

3    a little confused.  I think that, when these accounts were

4    seized, because they're Bank of America accounts, Bank of

5    America closed the other one.  That's what they do.

6         Could that be what happened, and you just assumed

7    that the Government seized it because it was closed?

8    **A.**   The only thing I can say to that is you could potentially

9    be correct.  It's -- but all I remember is one day I logged on

10   to my account, and I saw that all three accounts that -- Pi

11   Printing and my personal one were completely at zero.  And at

12   that point I didn't really know what was going on.  I was

13   confused.  So I might be confused about what happened.

14   Q.   Understandable.

15        Pi Printing, I wanted to go back to that a little

16   bit.  We were talking about that when we broke on Thursday

17   evening.  On September 7th of 2016 you opened up Pi Printing;

18   right?

19   **A.**   Yes.

20   Q.   And we were looking at that text message between Sean

21   O'Connor, your dad, and it mentioned also a guy named Dan.  Do

22   you remember looking at that?

23   **A.**   I remember looking at that document here.

24   Q.   And that's the same day, and it referenced junior and it

25   referenced you going to city hall to open a, quote, new

1    corporation.  Do you remember that?

2    **A.**    Yes.

3    Q.    And then do you also remember we talked about how your

4    dad asked Sean O'Connor for the money to pay for the cost of

5    opening that company?  Do you remember seeing those texts?

6    **A.**    I do remember seeing those texts.

7    Q.    Do you know who ultimately did pay the cost of opening

8    that company?

9    **A.**    No, I don't.

10   Q.    But you do know it got opened?

11   **A.**    One more time.

12   Q.    You do know that you actually did open it?  Regardless of

13   who paid, you actually did open that corporation and get it

14   started?

15   **A.**    Yes, I did.  I came out here, some building around this

16   general area, and I opened them myself.

17   Q.    And who drove you to the building?

18   **A.**    I've mentioned a couple of times that I don't really

19   recall who it was because throughout this whole process I was

20   asking around for guidance because I have really no idea how

21   business works.  So sometimes a guy by the name of Steve

22   Macris (phonetic) who worked for the company would go with me.

23   Other times it was a guy by the name of Ricardo.  I can't

24   recall his last name.  He was an accountant.  He went with me,

25   and -- and then at one point my uncle Miguel went with me to

1    the bank because I asked him if he could help me open up the

2    bank accounts.  At that point he went and he advised me and --

3    yeah.

4            So as far as coming to city hall, to answer the

5    question, it could have been Ricardo.  It could have been

6    Steve Macris.  I don't really remember which of the two it

7    was.

8    Q.   Okay.  So Steve Macris is an employee of Digital Express

9    at the time?

10   **A.**   Yes, he was a salesperson.

11   Q.   So he basically worked for your father?

12   **A.**   Yes.

13   Q.   Okay.  And then you mentioned I think somebody who was an

14   accountant.  Was that Ricardo Gonzalez?

15   **A.**   That -- that sounds accurate.

16   Q.   And did you know him to be an accountant who worked for

17   your father?

18   **A.**   Yes.  Yes, I did.

19   Q.   So it could have been either one of those two gentlemen

20   helping you with opening various companies and bank accounts?

21   **A.**   It wasn't various companies.  It was strictly only Pi

22   Printing.

23   Q.   Okay.  Just Pi Printing.  Got it.

24           And at the time that you went and did this, you were

25   actually working at Digital Express at the time; right?  When

1    you opened the company Pi Printing, you were working at

2    Digital Express?

3    **A.**    That's correct.

4    Q.    And, again, we're talking September of 2016?

5    **A.**    The dates are fuzzy to me but, like -- I mean, I -- I

6    don't assume you're lying.

7    Q.    Well, it's about right, about roughly right to you?

8    **A.**    Yeah.

9    Q.    Well, the records would be the best way to know?

10    **A.**    Yes.

11    Q.    Okay.  And when you went to Digital Express with Steve

12    Macris possibly or Ricardo Gonzalez possibly when you went to

13    open Pi Printing at the government building, how old were you

14    at the time?

15    **A.**    2017?

16    Q.    No.  This is September of 2016.

17    **A.**    Then I would have been 26.

18    Q.    Now, on September 19th -- so this is like 12 days

19    later -- you opened up the Pi Printing bank accounts.  Does

20    that sound right?

21    **A.**    Yeah.

22    Q.    And there's an exhibit I'd like to show you.  Government

23    Exhibit 51 -- oh.  It has been admitted.

24        **MR. FINLEY:**  Government Exhibit 51?

25        **MR. ZYTNICK:**  Yeah.

1          **MR. FINLEY:**  It's admitted, so we can put it on the

2     screen.

3          Okay.  So the parties have agreed that this document

4     was found at Digital Express on February 21st, 2018.

5          **THE COURT:**  I'm sorry, what was that date again?

6     February?

7          **MR. FINLEY:**  February 21st, 2018.

8          **THE COURT:**  Thank you.

9          **MR. FINLEY:**  And it looks like there's a -- some sort

10    of form from a company called United TranzActions.

11         **THE COURT:**  Okay.  But the only -- the part of the

12    stipulation is that the parties agreed that this document was

13    found on February 21st, 2018, at Digital Express; is that

14    right?

15         **MR. FINLEY:**  Correct.

16         **THE COURT:**  All right.  Any objection to that,

17    Mr. Tanasi?

18         **MR. TANASI:**  No, Your Honor.

19         **THE COURT:**  Gaffney?

20         **MR. GAFFNEY:**  No, Your Honor.

21         **THE COURT:**  Brown?

22         **MR. BROWN:**  No, Your Honor.

23         **THE COURT:**  Green?

24         **MR. GREEN:**  No -- no objection, Your Honor.

25         **THE COURT:**  All right.  Thank you for that

1    stipulation.

2    **BY MR. FINLEY:**

3    Q.    Okay.  And let's go to page 7 of this document.  Okay.

4    Do you recognize that at all?

5    **A.**    I don't believe that I recognize that document.

6    Q.    Whose signature is at the bottom?

7    **A.**    I mean, it looks like my signature, but I wasn't even in

8    the area during 2018.

9    Q.    I'm sorry.  This is 2016.

10    **A.**    Oh.  I see that now.

11    Q.    Okay.  So according to this document, maybe about 12, 13

12    days after you opened up the company Pi Printing, this

13    application is being filled out by somebody.  And then there's

14    handwriting on the document.  There's a signature on the

15    document.  You believe that signature looks like yours?

16    **A.**    If it was in 2016, that would have been my -- my

17    signature.  But the only reason that I was confused about

18    whether it was my signature or not in the beginning is

19    because, when I was in Pennsylvania, I sent back a stamp for

20    Patti that I had made for my signature at Office -- Office

21    Max, and I sent it back.  So after I was in Pennsylvania,

22    like, I -- you know, that -- my signature's probably just a

23    stamp.

24    Q.    Whose handwriting is on this?

25    **A.**    I don't know whose handwriting that is, but I know that

1    it's not mine.  Specifically by the way the numbers are

2    written, that's not my handwriting.

3    Q.   Do you know why you signed this?

4    **A.**   Because it was asked of me by Patti.

5    Q.   You're sure it was asked of you by Patti?

6    **A.**   It was under Patti's directive.

7    Q.   You're sure about that?

8    **A.**   100 percent sure.

9    Q.   You know that the mailing companies weren't opened until

10   three months later; right?

11   **A.**   I wasn't aware of that.

12   Q.   And you -- you realize the mailboxes that you opened were

13   also not opened until three months later?

14   **A.**   Correct.  But I remember signing for the mailboxes.  I

15   remember briefly reading that document and seeing what it was

16   about, and it showed that P.O. boxes were being opened in a

17   couple other states.  And my assumption at the time was, well,

18   it's going to be a mailing company.  I assume that we maybe

19   needed presence in several other states that we may have been

20   shipping to, and so I signed for those, yes.  And that was

21   before I left.

22        As far as timing goes, I can't remember if it was a

23   couple weeks, a couple months.  I just remember it happened.

24        **MR. FINLEY:**  Let's go to Government Exhibit 316, and

25   I'd like to just put that on the screen for now.  It's not

*Mario Castro, Jr. - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 17, 2023*

1    admitted.  On the witness screen.

2    **BY MR. FINLEY:**

3    Q.   Okay.  So you're -- this is -- you're looking at now a

4    timeline we put together based on the bank records and the

5    texts that we have.  We talked about how Pi Printing was

6    formed September 7 --

7              **COURTROOM ADMINISTRATOR:**  I know.  I hit the button,

8    and then it didn't shut off.  Now it's off.

9              **THE COURT:**  All right.  Is it corrected now?

10             **COURTROOM ADMINISTRATOR:**  Yes, Your Honor.

11             **THE COURT:**  Okay.  Thank you.

12             **MR. FINLEY:**  Okay.

13   **BY MR. FINLEY:**

14   Q.   So Pi Printing is formed September 7th, and there's a

15   reference to the text.  And then the bank account is opened

16   September 19th.  That's consistent with your memory; right?

17   **A.**   I'm agreeing with it because there's the documentation to

18   prove it, but I really don't have any recollection of any of

19   the dates or really, honestly, like, any of the time periods

20   in general.

21   Q.   Okay.  Let me just show you the documents then.  So let's

22   start with Government Exhibit 214 at 172.  It's already

23   admitted.

24             Do you see that, sir?

25   **A.**   Yeah.

*Mario Castro, Jr. - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 17, 2023*

1    Q.   And is that the corporate record for Pi Printing Corp?

2    Take a look at box Number 1.

3    **A.**   Yes.

4    Q.   Okay.  And are you listed as the -- the incorporator of

5    this company?

6    **A.**   Yes, I am.

7    Q.   Okay.  And is the date September 7, 2016?

8    **A.**   Yes, sir.

9    Q.   Okay.  So the entry on the timeline was accurate?

10   **A.**   Yes.

11   Q.   Okay.  Let's go to the bank record next, and that is

12   Government Exhibit 311A.

13        **MR. FINLEY:**  It has not been admitted, so if we can

14   just show that on the screen.

15   **BY MR. FINLEY:**

16   Q.   Okay.  Is that a Bank of America signature card for Pi

17   Printing Corp?

18   **A.**   Yeah.

19   Q.   Okay.  Did you sign it?

20   **A.**   I did.

21   Q.   And what's the date?

22   **A.**   September it either says 14 or 19 of '16.

23   Q.   Okay.

24        **MR. FINLEY:**  Can we blow up the signature portion of

25   this document for the witness?

*Mario Castro, Jr. - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 17, 2023*

1          **THE WITNESS:**  September 19th.

2     **BY MR. FINLEY:**

3     Q.    Okay.  So the timeline is accurate?

4     **A.**    Yes.

5     Q.    Okay.  You opened this bank account.

6          **MR. FINLEY:**  And then if we could go back to the

7     timeline at 316.  Again, this is just for the witness.

8     **BY MR. FINLEY:**

9     Q.    Okay.  Now, some money from United TranzActions, which

10    was the company whose application you had your signature on,

11    was deposited into the Pi Printing bank account.  Do you see

12    that?

13    **A.**    I do.

14    Q.    Now, obviously, do you know that that happened with your

15    bank account?

16    **A.**    No.

17    Q.    Okay.  Do you know anything at all about what happened to

18    your bank account after you opened it?

19    **A.**    No.

20    Q.    Do you know if that person named Sean O'Connor and that

21    guy named Dan had anything to do with your bank account for Pi

22    Printing that you opened?

23    **A.**    No.

24    Q.    Okay.  You do know Sean O'Connor; right?

25    **A.**    Yes.  He worked for my dad for many years.

1  Q.   Okay.  And then three months later, after -- three months

2  after September, that's when you actually opened the mailing

3  companies Assets Unlimited and Money Securities; right?

4  **A.**   Okay.  Yes.

5       **MR. FINLEY:**  Your Honor --

6       **MR. TANASI:**  Court's indulgence.

7       **THE COURT:**  Yes.

8       **MR. FINLEY:**  I have a document that I'd like to bring

9  up, but I would like to have a sidebar first.

10       **THE COURT:**  All right.

11       **MR. FINLEY:**  At the request of defense counsel.

12       **THE COURT:**  Yes.  Let's have a sidebar.

13     *(Pause in the proceedings.)*

14       **THE COURT:**  Okay.  We can go ahead and let the jury

15  take a break.  Remember not to discuss this case with anyone

16  nor permit anyone to discuss it with you.  Do not perform any

17  research or any independent investigation.

18       Let's stand for the jury as they are the judge of the

19  facts so they can go ahead and stretch, use the restroom.

20  We'll plan to be back here at 10:45, and then no more breaks

21  until noon.

22     *(Jury out at 10:31 a.m.)*

23       **THE COURT:**  All right.  We're outside the presence of

24  the jury.  And Mr. Finley, you had a concern about one of the

25  exhibits you plan to use next?

1      **MR. FINLEY:**  Yes.  Government Exhibit 310, if we can

2    maybe put that on the screen for the judge?  Okay.

3          **THE COURT:**  Did you want the witness here, or should

4    the witness step outside?

5          **MR. FINLEY:**  Probably be -- I -- I leave it to

6    Your Honor.  It might make sense for -- yeah, it might make

7    sense to have the witness wait outside while we discuss.

8          **THE COURT:**  All right.  Mr. Miguel Castro -- oh.

9    Mario.  Mario Castro, Jr., if you'll please step outside and

10   plan to be back here -- go ahead and stretch and use the

11   restroom.  Be back here in about 10.

12         **MR. FINLEY:**  Okay.  So, Your Honor, this is an e-mail

13   from Sean O'Connor to a -- someone with an e-mail address

14   danwaysouth@yahoo.com.  There's been testimony in the trial

15   that that is Dan Wagner living in Costa Rica.

16         Attached to the e-mail between these two gentlemen

17   is -- can we go to page 2? -- the same application that the

18   witness signed -- the same form and the numbers match.  It's

19   United TranzActions.  It is -- so this is what we would like

20   to show the witness and then move into evidence for the point

21   that this Pi Printing account didn't have anything to do with

22   Patti Kern for the first three months that it existed, and

23   it's the mailing companies when Patti -- you know, three

24   months later in January, that's when Patti Kern got involved

25   with this witness.  So this is evidence of that, and he just

1    testified to the contrary.  I'd like to see if this refreshes

2    his recollection.

3          **THE COURT:**  All right.  Any objection to that?

4          **MR. TOMSHECK:**  Yes.

5          **THE COURT:**  What's the objection?

6          **MR. TOMSHECK:**  Hearsay.  It's a hearsay document from

7    two individuals who aren't here to testify.  It's about a

8    third party by the name of Mo.  No one has any idea who that

9    is.  And there's no way he can lay a foundation for it with

10   this witness.

11         **MR. FINLEY:**  Your Honor, the -- first of all, the

12   e-mails from Sean O'Connor have been coming in at this trial

13   without objection.  It is a authentic e-mail.  I'm not going

14   to ask about this guy named Mo.  The point is these two guys

15   are having an e-mail, and this same document is attached.  And

16   then the witness ends up signing it.  I don't have to get into

17   anybody's statements.

18         **MR. TOMSHECK:**  He does if he's going to introduce the

19   e-mail.  That is a statement.  It's an out-of-court statement.

20   It's certainly being offered for the truth of the matter

21   asserted, and it is without exception.  The Sean O'Connor

22   e-mails that were stipulated to come in were when Sean

23   O'Connor was on the witness stand and we could ask him

24   questions about it.

25         I have no problem with him removing the Government's

1  Exhibit 310, page 2 of 2 reference at the bottom; showing him

2  this document and saying, Does this appear to be a blank copy

3  of the same type of document that you just indicated you

4  signed?  What the relevance of that is, I don't know.  But if

5  they want to do that, that's fine.  But it doesn't get him

6  around the hearsay issue.

7        **MR. FINLEY:**  Your Honor --

8        **THE COURT:**  All right.  Well, it sounds like you can

9  use it to refresh his recollection --

10        **MR. FINLEY:**  Okay.

11        **THE COURT:**  -- and if it refreshes his recollection,

12  then it might become admissible.  If it doesn't refresh his

13  recollection, then there's going to be a hearsay objection,

14  which I would sustain.

15        **MR. FINLEY:**  Got it.

16        **THE COURT:**  Okay.

17        **MR. GREEN:**  Your Honor, may we look at page 1 again,

18  please, with the Court's permission?  310, page 1.

19        Your Honor, the defense of Salvador Castro joins in

20  the objection of Defendant Mario Castro and adds that this is

21  a e-mail from Jerry Stampman to Chango Consulting.  It is not

22  an e-mail from Mr. O'Connor.  Thank you.

23        **THE COURT:**  Well, I agree it's to -- it's made out to

24  Sean O'Connor at his Chango Consulting e-mail address that he

25  testified about previously.  It's not from Sean O'Connor.

*Mario Castro, Jr. - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 17, 2023*

1    It's to Sean O'Connor, but... my ruling remains the same.

2          He can -- you can attempt to refresh his recollection

3    with the document, and then depending on whether or not to

4    what extent it refreshes his recollection, it may or may not

5    be admissible.  But if it doesn't refresh his recollection,

6    there's going to be a hearsay objection that I will sustain.

7    Okay.

8          **MR. TOMSHECK:**  And I would just point out to the

9    Court -- maybe you're aware of it -- but this e-mail appears

10   to be from April 11th of 2016.  The signed document that the

11   witness was previously asked about occurred in September.  I

12   mean, it's quite a ways off in terms of time.

13         **THE COURT:**  I think my ruling remains the same.

14         All right.  Jury's not going to be back until

15   10:45 if y'all want to stretch.  We won't take any more breaks

16   until noon, so use your time efficiently.

17      *(Recess at 10:38 a.m., until 10:49 a.m.)*

18         **COURTROOM ADMINISTRATOR:**  All rise.

19         **THE COURT:**  All right.  Let's call the jury back in.

20         **COURTROOM ADMINISTRATOR:**  Can we get the witness back

21   up on the stand?

22         **THE COURT:**  Oh, yes.  Let's have the witness come

23   back up on the stand.

24      *(Pause in proceedings.)*

25         **COURTROOM ADMINISTRATOR:**  All rise.

1           *(Jury in at 10:50 a.m.)*

2                **THE COURT:**  All right.  Everyone may be seated.

3      We've got the jury back from break.  The witness, Mr. Mario

4      Castro, Jr., is back on the stand.

5                And, Mr. Finley, you may proceed with the

6      Government's cross-examination.

7      **BY MR. FINLEY:**

8      Q.   We were talking about Pi Printing, the time period of

9      September 2016.

10               Based on what we've looked at, your father was

11     involved in that in the sense that a couple of the people who

12     worked for him may have taken you to the state building to

13     open it up?

14     **A.**   Yes, at my request.

15     Q.   And you mentioned your uncle, Miguel Castro, may have

16     driven you to the bank.  Was it to open the -- this account,

17     or was it to open another account such as the Money Securities

18     or the Assets Unlimited accounts that were opened three months

19     later in January of 2017?

20     **A.**   I'm trying to remember.  I -- I believe it was for Pi

21     Printing, the actual Pi Printing company, because it was the

22     first bank account that I was going to open as a business

23     account.  And I didn't know, like, if there was a specific

24     type of account I had to pick, and I didn't know any of the

25     details.  And I know that he had opened up the bank accounts

1  for Digital Express, so I figured he has experience with this,

2  so I should probably bring him along so I don't mess something

3  up.

4  Q.   Why did you call it Pi Printing?  I know why you called

5  it Pi.  But why Printing?

6  **A.**   Because I -- that's what I believed the company was, it

7  was a printing company.

8  Q.   Did you know anything about what Pi Printing really did?

9  **A.**   No, that was never really elaborated to me.

10  Q.   It would be an odd name for a mailing company, would you

11  agree, Pi Printing?

12  **A.**   I -- I mean, I did it because I thought -- this is really

13  silly -- and I don't understand how it's relevant -- but I can

14  answer the question.  I just -- my favorite cologne is named

15  Pi by Givenchy, and I just always liked how their logo looks.

16  So I figured I wanted to do something similar to that.

17  Q.   Okay.  The question was a little different from that.  It

18  would be odd to send, like, prize promotions, solicitations,

19  sweepstakes mailings, whatever you want to call them, under

20  the name of Pi Printing; right?  That wouldn't be a good name

21  for that kind of mailing, would it?

22  **A.**   I don't know what would be a good name or a bad name.

23  I -- but, I mean, if you don't think so, then, I mean, I -- I

24  guess so.

25  Q.   Well, the question is for you.

1    **A.**    Um-hum.

2    Q.    Is your answer I don't know?

3         **THE COURT:**  I think the disconnect here -- I think

4    the witness is focusing on the word Pi, but perhaps the

5    Government's question is focusing on the word Printing?

6         **MR. FINLEY:**  Yes, it was.  Thank you.

7         **THE COURT:**  Okay.  Let's see if that --

8    **BY MR. FINLEY:**

9    Q.    Yeah.  So I'm focused on that word Printing.

10   **A.**    Okay.

11   Q.    Like Pi Printing, that would be kind of a confusing name

12   to put on, like, a direct-mail solicitation informing somebody

13   that they are going to win a big prize and asking for $20.

14   That would be a weird name to print on that; right?

15   **A.**    I don't know what was being printed.  As far as the

16   choice of name was partially what I just described, and I felt

17   like Pi Printing is something that is memorable because of the

18   alliteration.

19   Q.    If you can, can you give the jury a yes or no as to

20   whether that's a weird name to put on one of these mailings?

21   **A.**    I don't believe so.

22   Q.    So I wanted to ask you about the three defendants in

23   addition to your father.  You -- you had testified about them

24   on Thursday.  How close are you with the three defendants who

25   are not your father?  In other words, your two uncles and your

1   cousin-in-law.

2   **A.**   I would say that -- I mean, we're friendly with each

3   other.  They've never treated me poorly.  As far as an uncle

4   and nephew relationship, all is well.  But I've always kind of

5   liked to keep to myself, which is why I moved all the way

6   across the country to a -- like a pretty rural area because I

7   like the peace and the quiet and I don't like too many people

8   around.  So it's distant, but it's -- it's -- it's a good

9   relationship.

10  Q.   And the way you just characterized that, is that the same

11  for all three of the people we were talking about, or would

12  you need to kind of, you know, make differences between them?

13  **A.**   I would say it's pretty similar, my relationship with my

14  two uncles, who are also co-defendants, as well as Jose Luis

15  who married my cousin, so...

16  Q.   Can you describe how often you would talk with the

17  defendant Miguel Castro, for example, during the period 2010

18  to 2018?

19  **A.**   While I was working there, I would see him in passing and

20  we would occasionally talk about soccer or, you know, very

21  casual conversations.  I wouldn't really call that very

22  in-depth interactions.  I just -- I've always felt a little

23  bit of a disconnect in terms of, like, finding something that

24  I can relate to them with.  I believe that culturally we're a

25  little different.  So in passing hi any day that I was there

1    at the company, but as far as, like, longer conversations,

2    rarely.

3    Q.    And so we were talking about Miguel Castro.  What

4    about -- would you say it was a similar situation with your

5    uncle, Salvador Castro, from 2010 to 2018?

6    **A.**    Very similar, yeah, with him.

7         As far as Jose Luis, because he's not my uncle, he

8    never really treated me as like -- you know, I think my

9    uncles, even to this day, me being 33, still treat me like I'm

10   a little bit of like a kid, which is frustrating sometimes.

11   Jose Luis came into my family, and he's always treated me, you

12   know, as like someone my age.  So I would say the I -- I would

13   have actually more conversations with Jose Luis than -- than

14   either of my uncles.

15   Q.    Okay.  Your uncle, Epi Castro, how -- how close were

16   you -- how often did you talk from 2010 to 2018?

17   **A.**    My uncle, Epi, I believe he always had a really soft spot

18   for me.  He always wanted a son, and he didn't really get one

19   until pretty late on.  And so whenever I went over to his

20   business, he would always hug me and greet me very, very

21   nicely.

22   Q.    What about Jose Salud Castro?  How close were you with

23   him?  How often did you talk from 2010 to 2018?

24   **A.**    About the same as the other two uncles, my uncle Miguel

25   and my uncle Salvador.

*Mario Castro, Jr. - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 17, 2023*

1    Q.   You know Miguel Castro, Jr.; right?

2    **A.**   That's my cousin, yeah.

3    Q.   How often would the two of you talk from 2010 to 2018?

4    **A.**   All the time.  My cousins were my best friend, and so we

5    were always together.

6    Q.   Which other cousins -- well, actually, let me ask it this

7    way.  Do you know Luis Aguilar, Miguel Castro's stepson?

8    **A.**   I do.

9    Q.   And do you consider him to be your cousin, too?

10   **A.**   I was always a little bit more removed from him.  He was

11   a little bit older than the cousins that I'm referring to.

12   I'm obviously not referring to all my cousins because I have a

13   huge family, but Luis Aguilar is -- is older.  And so, I mean,

14   the -- it's just a different crowd.  So not as much.

15   Q.   And is Claudia Castro your cousin as well?

16   **A.**   Claudia?

17   Q.   Yeah, the daughter of Jose Salud Castro.  Actually,

18   daughter-in-law of Jose Salud Castro married to -- or formally

19   married to Jose Silvestre Castro.  Do you know her?

20   **A.**   I never met her.

21   Q.   Okay.  What about Jose Silvestre Castro, do you know him?

22   **A.**   I know him, but there was zero interaction between

23   himself and me during that time period.

24   Q.   So from 2010 to 2018, your dad and his brother, Miguel

25   Castro, Jose Salud Castro, Epi Castro, and Salvador Castro

1    were in the printing business; yes?

2    **A.**    My uncles were, but my dad wasn't until around, like, mid

3    2010s is when he became involved.

4    Q.    Okay.  Mid 2010?

5    **A.**    I'm sorry?

6    Q.    So you just have to say yes.  Was it -- so from mid 2010

7    to 2018, all those people that I just mentioned, they were

8    involved in the printing business?

9    **A.**    I'm sorry.  Yes.

10   Q.    And you -- you testified you were there approximately

11   late 2016?

12   **A.**    Yes.

13   Q.    And during that time period, you mentioned you knew Patti

14   Kern?

15   **A.**    Yes.

16   Q.    Okay.  She -- you saw her come in about maybe four to

17   five times?

18   **A.**    I don't remember an exact number but, yeah, that -- I

19   mean, it was a handful of times, yeah.

20   Q.    And she would come in and she would actually joke around

21   with Salvador Castro, wouldn't she?

22   **A.**    Yeah.  It seemed pretty amicable.  They both joked and

23   laughed.  Just it was a little awkward because there's a clear

24   language barrier.  So it was oftentimes more funny because of,

25   like, you know, like, the word choice, that was -- you know,

1    chosen by -- by my uncles.

2    Q.    And so Patti Kern didn't just come in and joke around

3    with Salvador Castro.  She also would joke around with your

4    dad, with Salud Castro, and with Jose Luis Mendez; correct?

5    **A.**    Yes.  The same thing that I mentioned in terms of them

6    being amicable with each other.  It extended to pretty much

7    everybody in -- in that company.

8    Q.    They joked around so much that you would have to close

9    the door sometimes?

10   **A.**    Yes.  Or put my headphones on.

11   Q.    Let's take a look at one of the letters that your company

12   sent to a person named Betty Stirewalt.

13        **MR. FINLEY:**  Can we have Government Exhibit 1C on the

14   screen, please?  Okay.  That's not the one.  1D.  1D is also

15   admitted.  Okay.  There it is.

16   **BY MR. FINLEY:**

17   Q.    Do you see that?

18   **A.**    Yeah.

19   Q.    And you're looking at a copy of an envelope from Money

20   Securities; correct?

21   **A.**    Yes.

22   Q.    That's a d/b/a that you opened and registered to Pi

23   Printing in January of 2017; correct?

24   **A.**    Yes.

25   Q.    And based on the handwriting, it's -- this envelope is

1    being written on by someone in around June of 2017.  Do you

2    see that?

3    **A.**    Yeah, at the top.

4    Q.    Okay.  There's been testimony in the trial that the

5    handwriting on this envelope was from somebody named Betty

6    Stirewalt who was a victim of many prize notices that had been

7    sent as part of the scheme in this case.

8          It looks like there's an address for Money Securities

9    in Congers, New York.  Do you see that?

10   **A.**    Yes.

11   Q.    Did you open a mailbox there?

12   **A.**    It may have been one of the mailboxes that I signed for.

13   Q.    And it says "Important Document Enclosed" in the box

14   there.  Do you see that?

15   **A.**    Yes.

16   Q.    And Betty Stirewalt writes in handwriting "Significant

17   prize money being issued on that envelope."  Do you see that?

18   **A.**    Yes.

19   Q.    Okay.  Let's look at the next page.

20          So this is the first page of a prize notice that the

21   company, Money Securities, sent and says at the top

22   "Significant prize-money being issued."  Do you see that?

23   **A.**    Yes.

24   Q.    That's the same thing that Ms. Stirewalt wrote on the

25   outside of the envelope?

1  **A.**   Correct.

2  Q.   Okay.  And it also says in the box on the left towards

3  the top "This notice intended for you," underlined.  Do you

4  see that?

5  **A.**   Um-hum, yes.

6  Q.   Take a look at the right-hand side under the kind of fake

7  blue handwriting where it says, "This document bears a special

8  watermark."  Can you see that?

9  **A.**   Yes, I do.

10  Q.   Okay.  Does this appear to you to be some kind of fake

11  notice?

12  **A.**   I wouldn't be able to tell you if it's fake or real.

13  Q.   Okay.  But it looks like a notice?

14  **A.**   Yes.

15  Q.   Okay.  And it looks kind of fancy, it looks kind of

16  official?

17  **A.**   Yes, it does.

18  Q.   Okay.  Take a look at the bottom of the page where there

19  appears to be some kind of signature.  Do you see that?

20  **A.**   Yes, I do.

21  Q.   And it says, "Happy to be assisting you," J. or L. Witmer

22  (phonetic) Payment Adviser.  Do you see that?

23  **A.**   I do see it.

24  Q.   And is this some kind of a fake person, this J. Witmer,

25  Payment Adviser?  That's not a real person, is it?

1    **A.**    I wouldn't -- I wouldn't know.

2    **Q.**    Okay.  Well, Money Securities is your company.  Did you

3    employ somebody named J. Witmer?

4    **A.**    I never did.

5    **Q.**    Do you believe that this Mr. Witmer is -- or Ms. Witmer

6    is a real person or a nonexistent person?

7    **A.**    That would require speculation.

8    **Q.**    No, I'm just asking your belief.  Your belief is

9    important.  But what is your belief, is that a real person or

10   a fake person?

11   **A.**    I wouldn't know.

12   **Q.**    Look at just under where it says, "Dear Betty Stirewalt,

13   this letter to you is from our main office."  Do you see that?

14   **A.**    Yes.

15   **Q.**    "Who is now handling your prize dollar amount data file."

16   Do you see that?

17   **A.**    Yes.

18   **Q.**    To your knowledge, did Money Securities have any kind of

19   main office that handled the kind of file that is being

20   described here?

21   **A.**    I -- I don't know.

22   **Q.**    What do you believe?  Do you think there was, like, a

23   real main office where people were handling people's files?

24   **A.**    There is nothing in this document that would suggest that

25   there isn't.

1    Q.   Nothing in the document to suggest that there isn't?

2    **A.**   That there isn't a main office and that J. Witmer is not

3    a real person.

4    Q.   Okay.  So your belief is that the main office is real,

5    and this guy here or woman is real?  Is that your belief?

6    **A.**   There is -- again, I want to repeat that there is nothing

7    on this documentation that it would suggest that that -- none

8    of that is real.

9    Q.   All right.  If we go down to the middle it says, "Direct

10   office attention is being rendered for you."  Do you see that?

11   **A.**   Yes.

12   Q.   Did that really happen?  Was there somebody at the main

13   office giving attention to Betty Stirewalt?

14   **A.**   I don't know.

15   Q.   What do you believe?

16   **A.**   Right now, after I know exactly what was happening?

17   Q.   Yes, sir.  What do you believe?

18   **A.**   I mean, I know what's happening.  So it's not my belief.

19   It's just realization of what happened.  So I think I can't

20   give you an unbiased or -- answer or something, you know,

21   because I already have the knowledge of what happened.

22   Q.   Okay.  So I'm just asking about what you believe.  Can

23   you answer yes or no:  Do you believe that direct office

24   attention was being given to Betty Stirewalt as represented in

25   the notice that your company sent her?  What do you believe?

1   **A.**   There is nothing in this document that would suggest that

2   there wasn't someone giving her direct attention.

3   Q.   Okay.  So is that a yes?

4        **THE COURT:**  That wasn't the question.  Listen to the

5   question again.

6   **BY MR. FINLEY:**

7   Q.   Okay.  Is that a yes to you believe that direct office

8   attention is being given to Betty Stirewalt as represented in

9   the notice that your company sent her?  That's your belief?

10  **A.**   I've been trying to tell you the whole time that I really

11  don't know.  And that was the truth back then, and it can --

12  and like, now, I know that obviously it wasn't, right, because

13  I found out what happened.

14  Q.   I appreciate the clarification.  So let's stick to the

15  present tense.  Okay?

16       Do you believe now that that really happened, that

17  Betty Stirewalt was receiving direct attention from some kind

18  of office?

19  **A.**   I now understand that that wasn't happening.

20       **MR. FINLEY:**  And then if we could look, please, at

21  the -- that little section that's indented that says, "Our

22  records confirm"?  Can we blow that up?

23  **BY MR. FINLEY:**

24  Q.   "Our records confirm Betty Stirewalt is, in fact, holding

25  prize data ID 501266-4070." Do you see that?

1    **A.**   Yes.

2    Q.   Okay.  Did Money Securities really have records

3    confirming that Betty Stirewalt had some kind of unique prize

4    data ID?

5    **A.**   I don't know.

6    Q.   Okay.  What do you believe today?

7    **A.**   I now understand that that wasn't the case.

8    Q.   Okay.  And this -- if this prize data ID number was

9    actually not unique but actually the exact same number

10   appeared on thousands of different notices to all kind of

11   different people, that would be a lie; right?

12   **A.**   I don't know how these -- if this were real, I don't know

13   how it would work.  So I can't say that it would be a lie.

14   Q.   And then please take a look at the bottom where the

15   paragraph says, "To conclude this matter."

16        **MR. FINLEY:**  If we could blow that up?

17   **BY MR. FINLEY:**

18   Q.   Do you see the second line where it says, "100 percent

19   guarantees your access to the monies/prizes in-full"?  Do you

20   see that?

21   **A.**   Yes.

22   Q.   Does this notice appear to be promising Betty Stirewalt

23   some kind of big cash prize?

24   **A.**   Yes, it's saying 100 percent guarantee.  Sounds like a

25   promise to me.

1    Q.   And did your company, Money Securities, have that

2    $2 million prize waiting for her?

3    **A.**   I don't -- like, I didn't personally have it, but I don't

4    know if anyone else did.

5    Q.   I mean, what we're looking at is a fake notice from a

6    fake person at a fake company promising a fake prize; right?

7    That's what this looks like to you?

8    **A.**   There's nothing on it that would suggest it's fake.

9    Q.   Okay.  Yeah, but if you look at it, it's just ridiculous

10   how fake it looks; right?

11   **A.**   Based on what?

12   Q.   Just based on you being a human being with life

13   experience, when you look at that, it looks ridiculously fake;

14   right?

15   **A.**   That would require speculation on my end.  I can't say

16   there's anything on this document that would suggest that it's

17   fake, so no.

18   Q.   Okay.  It's not speculation.  You have to answer the

19   question unless somebody makes a speculation objection and it

20   gets sustained.

21        So does it look to you that that notice that you're

22   looking at is pretty obviously fake?

23   **A.**   No.

24   Q.   If you got this in the mail, would you send $20?

25   **A.**   I probably would not even open it honestly because I --

Mario Castro, Jr. - Continued Cross
2:19-cr-00295-GMN-NJK - April 17, 2023

1    I'm really bad at keeping up to it.  So I don't think it's --

2    I don't think it's, you know, a question I can answer.

3    Q.   What if you did open it and you looked at the things that

4    we just went over, would you send $20?

5    A.   I would probably check to see if there's a number I can

6    call would be my first thing I would do.

7    Q.   Okay.  Look it over and tell us what that number is, what

8    the phone number is where you can call your company, Money

9    Securities.

10   A.   Are you basically telling me that there's no number on

11   there?  Because I'm not finding one.

12   Q.   Okay.  Let's look at the next page.  That's page 4,

13   actually.  Do you see that form that says "Confirmation for

14   Delivery" at the top?

15   A.   Yeah.

16   Q.   Okay.  And so this is some kind of a -- looks like some

17   kind of a return slip; right?

18   A.   Yes.

19   Q.   Do you see a phone number?

20   A.   No.  I only see an address.

21   Q.   Okay.  So you're looking -- you know, you got this

22   notice.  You took it out of the envelope.  You're looking at

23   it.  It's asking you to send $20.

24        The question was:  Would you send $20?  And you said

25   you'd look for a number to try to find out more.

1   **A.**   Um-hum.

2   Q.   Okay?  So now you see there's no phone number, would you

3   send $20?

4   **A.**   I probably wouldn't.

5   Q.   Okay.  You can see that Betty Stirewalt did send $20,

6   right, because she checked the box that says check, and then

7   you can see a photocopy of the actual check that she sent to

8   your company; yes?

9   **A.**   Yes.

10  Q.   Okay.  Now, if you studied this closely at the time, is

11  it fair to say that you would have had some serious concerns

12  about whether you were lying to people?

13  **A.**   If I had studied this in depth, I -- I can say that there

14  would be concerns.

15  Q.   You didn't study it because you didn't care; right?

16  **A.**   Because I never saw it.  I wasn't around.  I was in

17  Pennsylvania.

18  Q.   Okay.  So let's talk about that.  You testified on

19  Thursday that you never saw any sweepstakes mailings while you

20  were working at Digital Express in late 2016.  Do you remember

21  testifying to that on Thursday?

22  **A.**   That I never saw any?

23  Q.   Yeah.  You said you never -- do I need -- I'll show it to

24  you so you can remember.

25  **A.**   Okay.

1    **MR. FINLEY:**  If we could just have this on the screen

2   for the witness?

3         **THE COURT:**  So this is for the witness only?

4         **MR. FINLEY:**  Yeah, witness only.  Thank you.

5         **THE COURT:**  Okay.

6         **COURTROOM ADMINISTRATOR:**  You can't use that.  I have

7   to do it from here.  Let's see.  Pull that down and push it

8   back up.  You may want to -- yeah.  You can't see it.

9         **THE COURT:**  Yes.  Perfect.  All right.

10        **MR. FINLEY:**  All right.  So it's just on the witness'

11   screen?

12        **COURTROOM ADMINISTRATOR:**  Yes.

13   **BY MR. FINLEY:**

14   Q.   So I'm showing you your testimony from April 13th, 2023.

15   Did you -- were you asked this question, and did you give this

16   answer?

17   **A.**   Yes.

18   Q.   Okay.  I'll just read it for the record, and then -- and

19   then you can answer.

20        "Q   Okay.  Had you seen sweepstakes printed in Digital

21        Express?

22        "A   I don't know what a sweepstakes being printed would

23        look like."

24   **A.**   Yes, I did say that.

25   Q.   Okay.  Now, you actually did see these prize promotion or

1    solicitations or whatever you want to call them like the one

2    we were looking at, you saw pieces of mail like that while you

3    were at Digital Express, didn't you?

4    **A.**    Yes.

5    Q.    You saw these while you worked there in late 2016?

6    **A.**    Yes.

7    Q.    And you -- had you forgotten about that on Thursday when

8    you testified?

9    **A.**    No.

10   Q.    Okay.  Then why did you say it?

11   **A.**    Because when I saw them, I didn't know that it was

12   sweepstakes.  I didn't know anything because I never studied

13   them in depth.  I just saw them from a distance, and they just

14   looked like important documents to me.

15   Q.    Okay.  Do you remember when you testified in the grand

16   jury?

17   **A.**    Yeah.

18   Q.    You said that you saw prize promotions and solicitations

19   similar to what we were looking at.  It was a slightly

20   different one I think that you saw the prior day that was for

21   Assets Unlimited, but a similar kind of a notice.  You said

22   that you saw ones that looked like that when you were at

23   Digital Express.  Do you remember giving that testimony in the

24   grand jury?

25   **A.**    Yeah, an image of one or an actual one -- I don't

*Mario Castro, Jr. - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 17, 2023*

1    remember exactly -- was shown to me, and I was asked if I had

2    seen similar documentation there before.  And the answer was

3    yes.

4    Q.   Okay.  Let's take a look at exactly what you said.

5             **MR. FINLEY:**  This is for the witness.

6             Okay.  All right.  There it is.  Okay.

7    **BY MR. FINLEY:**

8    Q.   All right.  Question about halfway down:

9        "Q   Yes- " --

10           And this is Mr. Zytnick; right?

11   **A.**   Yes.

12   Q.   Okay.

13       "Q   Yesterday when we talked we showed you some

14       solicitations and prize promotion mailings?

15       "A   Um-hum.

16       "Q   Had you ever seen any of those before?

17       "A   Yes.  I told you guys that I had seen some similar

18       papers to that.

19       "Q   Where had you seen those before?

20       "A   In my dad's business."

21           Do you see that?

22   **A.**   Yes.

23   Q.   Does that refresh your recollection about whether it was

24   actually physical paper versus something on a screen?

25   **A.**   So I guess it was physical paper, and I must have been

1    misremembering.  They showed it to me the previous day when --

2    when the two prosecutors were questioning me in their own

3    office.  And then it was brought up the following day at the

4    grand jury, and this was the outcome.

5    Q.    So that was the testimony that you gave to the grand

6    jury?

7    **A.**    Yes.

8    Q.    And when you testified in front of the grand jury, did

9    you tell them the truth?

10   **A.**    Yes, I did.

11         **MR. FINLEY:**  Your Honor, I move to admit what's on

12   this screen pursuant to 801(d) as a substantive statement.

13        *(Government Exhibit No. 318, offered.)*

14         **THE COURT:**  Any objection?  It's just the bottom half

15   of the page, not the whole page, is that what -- I mean,

16   you're saying what's on the screen.

17         **MR. FINLEY:**  Yes, Your Honor.

18         **THE COURT:**  All I see on the screen is --

19         **MR. FINLEY:**  When -- when I publish it, I'm going

20   to --

21         **THE COURT:**  -- the bottom half.

22         **MR. FINLEY:**  -- straighten that out and just show

23   that.

24         **THE COURT:**  All right.  Any objection, Mr. Tomsheck?

25         **MR. TOMSHECK:**  I mean, in terms of context, well,

1    one, I'm not sure the foundation's been laid for what he's

2    trying to do because he just essentially testified to what he

3    just testified to a moment before.  But if he's going to

4    introduce the document, I would just ask that the whole thing

5    be introduced.

6              **THE COURT:**  The entire page?

7              **MR. TOMSHECK:**  No, the entire transcript.

8              **THE COURT:**  Oh.  We're not going to take a whole

9    transcript.

10             Any other objections?

11             **MR. GAFFNEY:**  No, Your Honor.

12             **THE COURT:**  All right.  So what exhibit number would

13   this be?

14             **COURTROOM ADMINISTRATOR:**  I have no idea.  Is that

15   going to be Exhibit 318?

16             **MR. FINLEY:**  Yeah.  Let's see.

17             **THE COURT:**  What's the next in line?

18             **MR. TOMSHECK:**  So is the idea that he's introducing

19   the question and answer that he just read into the record

20   verbatim?

21             **THE COURT:**  It's the admission of the bottom half of

22   the transcript of that page that illustrates the --

23             **MR. FINLEY:**  Can we make it 320?

24             **COURTROOM ADMINISTRATOR:**  I have nothing after 317 to

25   445.  So you wanted 318?

*Mario Castro, Jr. - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 17, 2023*

1    **MR. FINLEY:**  Sure.

2    **THE COURT:**  All right.  So Exhibit 318 is admitted.

3    *(Government Exhibit No. 318, received.)*

4    **MR. FINLEY:**  I'll tell you when I'm ready to publish.

5    **COURTROOM ADMINISTRATOR:**  Okay.

6    **MR. FINLEY:**  Okay.  Move to publish that, Your Honor.

7    **THE COURT:**  Yes.  It's Exhibit 318 is admitted and

8    may be published to the jury.  And for the record, that's

9    lines 18 through 25 of that page.

10    **MR. FINLEY:**  Thank you.

11    **BY MR. FINLEY:**

12    Q.  So we're looking at Government Exhibit 318.  Are those

13    the questions and answers that we just went over?

14    **A.**  Yes.

15    Q.  Okay.  So you saw the prize notices when you're working

16    at Digital Express in 2016; yes?

17    **A.**  Yes.

18    Q.  And around that same time you were looking for some

19    guaranteed income; yes?

20    **A.**  Yes, I was.

21    Q.  And that's what you said in grand jury, right, you were

22    looking for guaranteed income?

23    **A.**  Yes.

24    Q.  Same time you were in a warehouse where these things were

25    being printed all around you; right?

1    **A.**    Not all around me.  I was in my office, and I was focused

2    on my own part.  But, yes, it was being printed in the same

3    company.

4    Q.    And at that time when you were thinking about getting

5    some guaranteed income -- those are your words, right, they're

6    not my words?

7    **A.**    They're my words.

8    Q.    Okay.  When you were thinking about get some guaranteed

9    income, you really didn't care at all about what your company

10   was doing; right?

11   **A.**    I cared initially, but eventually it became clear to me

12   that my involvement was just creating the company after which

13   point in Pennsylvania I was just asked for things like, hey,

14   change your password or -- not change your password but share

15   the password, print out a stamp, and just little menial tasks

16   like that.  And as far as I was concerned, that was my role,

17   and I believed that I was being helped because I asked for

18   help.  And so yes.

19   Q.    Okay.  So you say today that you cared initially.  I'm

20   going to show you your grand jury testimony that we were

21   just -- a different page that we were just going over.  I'm

22   going to show you grand jury exhibit -- or I'm sorry,

23   transcript at page 10 just for the witness.

24          All right.  So this is actually close to the

25   testimony I -- in -- in -- on the page that we were just going

1    over.  Did Mr. Zytnick ask you this question, and did you give

2    this answer?

3    **A.**    Everything in yellow is accurate.

4    Q.    Okay.  I'm just going to read it for the record, and then

5    you can answer.

6         "Q   Did you care at all about this company under your

7         name was doing?

8         "A   I really didn't care.  Frankly, I didn't."

9              Did you give that answer?

10   **A.**    Yes.

11   Q.    Were you telling the truth?

12   **A.**    I was telling the truth.

13        **MR. FINLEY:**  Your Honor, I'd move to admit and

14   publish this as Government Exhibit 13 [sic].

15        *(Government Exhibit No. 319, offered.)*

16        **THE COURT:**  Exhibit 13 or 319?

17        **MR. FINLEY:**  319.  Thank you, Your Honor.

18        **THE COURT:**  Any objection to Exhibit 319?

19        **MR. TOMSHECK:**  Well, yeah, it's improper impeachment.

20   It's not a prior inconsistent statement.  He's said that's

21   exactly what he just testified to.  And, again, I don't have

22   an objection if he wants to admit the whole question and

23   answer, and then we can just skip all this.

24        **MR. FINLEY:**  He said he didn't care initially.

25        **THE COURT:**  Right.  It's not consistent because at

1    the grand jury he said he didn't care and --

2          **MR. TOMSHECK:**  It is consistent.

3          **THE COURT:**  -- here he says he didn't --

4          **MR. TOMSHECK:**  I asked him --

5          **THE COURT:**  -- he did care.

6          **MR. TOMSHECK:**  -- the same question on direct

7    examination.  Then the Government asked him the same question

8    again, and they read the same question from the grand jury.

9    They're all the same.

10         **MR. FINLEY:**  He said he really did care initially.

11   This is contrary to that.

12         **THE COURT:**  Yeah, it is contrary and inconsistent.

13         **MR. TOMSHECK:**  It's -- it's -- it's not, though --

14         **THE COURT:**  I'm not going to admit the whole grand

15   jury transcript.  So Exhibit 319 is which lines?  Is it

16   line 11?  No, it starts at line 10.

17         **MR. FINLEY:**  Lines 15 through 17.

18         **MR. TOMSHECK:**  The objection is, Judge, the question

19   he's asked at 15, is about a specific point in time as to what

20   the company was doing.  If he asked him a preface question

21   about whether or not he cared initially and then he goes to a

22   point in the transcript which is entirely consistent with what

23   he's already said, it misleads the jury about what's contained

24   in the grand jury transcript, which is why the entirety should

25   be admitted for context if he's going to continue to do this.

*Mario Castro, Jr. - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 17, 2023*

1      **MR. FINLEY:**  This is too much arguing.

2      **THE COURT:**  Yeah.  If there's some -- you'll have

3  redirect.  So if there's some other portion that you want to

4  admit as well that provides some other context that is not

5  clear, you can consider it at that time.

6      So Exhibit 319 is admitted and may be published to

7  the jury, and that's lines 15 through 17.

8      *(Government Exhibit No. 319, received.)*

9      **MR. FINLEY:**  I'll go ahead and let you know when I

10  have the question and answer isolated.

11      Okay.  Can we please publish that to the jury?

12  **BY MR. FINLEY:**

13  Q.  That's the question and answer that we just went over?

14  **A.**  Yes.

15  Q.  You did not care at all what this company was going to

16  do; right?

17  **A.**  There's a lot more context to this than that, including

18  the lines right above it.

19  Q.  Lines above it.  Let me see if I'm -- if I have what

20  you're referring to correctly.  At page 10, line 10:

21      "Q   Did you ask any -- any questions about what the

22      company did?

23      "A   Not really.  I just had a general idea that they

24      printed out stuff and sent it out.  As far as more details

25      about it, I really didn't know."

1              Right?

2    **A.**   Correct.

3    Q.   Is that the context you're referring to?

4    **A.**   Well, I said including, but there's -- I mean, there's a

5    lot more context to my answer, including questions that we had

6    gone over the previous day, and I understood during the grand

7    jury what questions they were referring to very specifically.

8              And one thing that is very frustrating when you're

9    sitting up here and you're being asked questions is that

10   you're expected to give yes-or-no answers, and I don't think

11   that that's how people commonly communicate.  I think that

12   people usually communicate with a, like, desire to understand

13   the other party.  And it feels like this is being

14   misrepresented by constantly being asked yes or no, yes or no,

15   yes or no.

16            **MR. FINLEY:**  Your Honor, I'd move to strike that as

17   nonresponsive.

18            **THE COURT:**  Sustained.

19   **BY MR. FINLEY:**

20   Q.   So I guess what you would like to say then is that you

21   really did care?

22   **A.**   Initially.

23   Q.   Okay.  So you're in the warehouse.  It's 2016.  You've

24   seen these types of notices.  You want guaranteed income, and

25   you cared initially about how it was going to be made; is that

1    right?

2    **A.**    Yes.

3    Q.    So when you were -- and then later on you didn't care at

4    all?

5    **A.**    No, because I had other things on my mind, including

6    moving across the country, I was going through some

7    depression, I needed a new scenery, and -- and, I mean, like

8    that's -- that was my main focus really, just trying to feel

9    better.

10    Q.    So how long was the period where you initially cared

11    before you then stopped caring at all?  How long was that?

12    **A.**    So initially I asked my dad if I could be involved.

13    Initially the answer was no.  Then he took me over to Patti.

14    I had a brief conversation with Patti in which she gave me a

15    list of steps.  At that point I'm obviously involved.  I

16    obviously want to do this because I want to make sure that I'm

17    not starving or that I have a place to live when I'm in

18    Pennsylvania.  At that point I'm pretty concerned, I'm pretty

19    interested, and I care.

20        But then, once I moved away and I realized that

21    nobody was really asking anything of me, then, I mean, my mind

22    just became distracted with everything else going on in my

23    life.  Like, this wasn't -- to me, personally, I didn't see

24    this as, like, a big deal.  I didn't see this as, like,

25    anything other than, like, hey, I'm getting 200 bucks a week.

1    I can at least afford my rent.  I can afford my food, and

2    that's when I can say that I didn't care.  Not because I sat

3    there and thought and I'm, like, well, I really don't care

4    about this.  It was more so I just didn't think about it.

5    Q.    So during the period that you cared -- I think I'm still

6    looking for an answer to that question -- how long did that

7    period last when you cared until you stopped caring?

8    **A.**    I would say after I opened up the accounts and I moved to

9    Pennsylvania and then my life in Pennsylvania took over,

10   that's the period where I stopped thinking about it.

11   Q.    So you -- you actually did care all the way up until the

12   time that you went to Pennsylvania?

13   **A.**    Correct.

14   Q.    You know that's completely inconsistent with your entire

15   grand jury testimony; right?

16   **A.**    It's not inconsistent at all.

17   Q.    Okay.  All right.  So you say you initially cared.  Who

18   did you talk to about what the business was going to be?

19   **A.**    The only person who I ever really spoke -- and I'm going

20   to say this in quotes -- "in depth" with was Patti, and the

21   depth of the conversation was just the list of steps that I

22   had to take to create this company, to start the bank

23   accounts, and so on.

24   Q.    What questions did you ask about what's -- what's the

25   business?  What are we making?  What's the product?  Did you

1   ask questions like that?

2   **A.**   I did not.

3   Q.   Okay.  So you cared but you didn't care enough to ask a

4   single person what the product in this business was going to

5   be; is that right?  Do I have your testimony today correctly?

6   **A.**   Correct.  I believed that that would come later.

7   Q.   Oh, later on you started asking what the product was?

8   **A.**   No, I never asked.

9   Q.   Tell the jury who you asked about what the product was

10   going to be.

11   **A.**   I never asked anybody what the product was going to be.

12   Q.   You didn't want to know?

13   **A.**   It's not that I didn't want to know.  I just didn't ask.

14   Q.   So you did want to know?

15   **A.**   Now you're putting words in my mouth.  I just never

16   asked.  Again, I want to reiterate that I had a lot of other

17   things that I was focusing on that, as far as any of this

18   went, I just knew what I had to do.  I didn't know what the

19   business consisted of.  I assumed that it was going to be

20   printing, just like everything else, and I -- at that moment I

21   just didn't believe that there was a reason to question Patti.

22   I -- she was nice enough to me that I never really had a

23   reason to doubt her.

24   Q.   Okay.  So the question is:  Did you want to know or did

25   you not want to know what kind of business, what kind of

1  product you were actually selling?

2  **A.**   I believe that I answered that question.  But, again, I'm

3  asking -- I'm being asked for a yes-or-no question, and I feel

4  like that is used as a misrepresentation of what I'm saying.

5         **MR. FINLEY:**  Okay.  So the witness is just arguing.

6  **BY MR. FINLEY:**

7  Q.   Let me just put it to you this way.  No -- Nobody's --

8         **MR. TOMSHECK:**  Judge?

9  **BY MR. FINLEY:**

10 Q.   -- forcing --

11        (Reporter instruction.)

12        **MR. FINLEY:**  I'm just asking another question.

13        **MR. TOMSHECK:**  I need to interject, however.  This is

14 about the third time in the last ten questions were Mr. Finley

15 has indicated his own personal feelings about things, like

16 what the grand jury transcript says and what the witness is

17 doing.  He knows that's improper.

18        **THE COURT:**  The witness is doing the same.

19        If the witness will please just answer the question

20 and the Government will please just ask the question, I think

21 we'd all appreciate it so we can move along.

22        **MR. FINLEY:**  Understood.

23 **BY MR. FINLEY:**

24 Q.   I will ask you a question.  If you want to answer it yes

25 or no, go ahead.  If you think it's unfair and don't want to,

1    then let that be your answer.  But I think it's a simple yes

2    or no.

3             Did you want to know what kind of business you were

4    getting into?

5    **A.**   I already gave my answer.

6    Q.   Now, what you do know about the business is you signed

7    documents and then you received money.  That's how it worked?

8    **A.**   Yes.

9    Q.   Did you do any work?

10   **A.**   I mean, I went to open these accounts, and I was just

11   doing, like I said, menial tasks.  That's what the extent of

12   my involvement was.

13   Q.   Okay.  Fair enough.

14            So you did some work in the beginning?

15   **A.**   Yes.

16   Q.   Okay.  You go -- but then you go to Pennsylvania, right,

17   and you keep getting money, right, about $800 a month?

18   **A.**   Correct.

19   Q.   You're not doing any work at that business?

20   **A.**   Not really, no.

21   Q.   Okay.  Did you know that your uncle, Salvador Castro,

22   testified?

23   **A.**   I'm aware that he testified.

24   Q.   And were you aware that he said that he opened companies,

25   mailboxes, and bank accounts just like you did?

1    **A.**    I was -- I'm not aware of anything that he said on his

2    testification [sic].

3    Q.    Okay.  What about just from being there.  Are -- are you

4    aware that he opened companies, mailboxes, and bank accounts?

5    **A.**    I wasn't aware that he did that.

6    Q.    Are you aware that he received money that victims sent

7    just like you did?

8    **A.**    I wasn't aware of that.

9    Q.    And he testified that he didn't know what the business

10   was either just like you.

11        **MR. TOMSHECK:**    Judge, I object to this whole line of

12   questioning, him asking about what another witness testified

13   to when he says he doesn't know what was testified to is

14   improper.

15        **THE COURT:**    I think it's proper to ask what another

16   person testified to.  He is aware of that.  So the objection's

17   overruled.

18        **THE WITNESS:**    I'm aware that he testified.  I'm not

19   aware of anything that he said during his testimony.  I'm

20   not aware that he was doing anything like this.  I just wasn't

21   aware of any of it.

22   **BY MR. FINLEY:**

23   Q.    Okay.  How about from the period from -- forget about the

24   trial -- just about the period from 2010 to 2018, did you ever

25   come across any evidence, whether it's a person talking to

1    you, whether it's him talking to you, whether it's just you

2    seeing things or hearing things, did you -- were you aware

3    that your uncle, Salvador Castro, had signed documents,

4    received money, didn't know what the business was, and didn't

5    ask anybody?

6    **A.**    No.

7    Q.    Okay.  You're aware that your cousin-in-law, Jose Luis

8    Mendez, testified?

9    **A.**    I'm aware that he testified, but the exact same thing as

10    with my uncle, I'm not aware of anything that was discussed

11    during that testifying process.

12    Q.    Now, do you know from your life that Jose Luis Mendez

13    signed documents, he opened a company, he opened a mailbox, he

14    opened bank accounts, and he received money just like you did?

15    **A.**    I was not aware of that either.

16    Q.    You never talked to him about that?

17    **A.**    No.

18    Q.    It seems pretty amazing that a person could just sign

19    some documents and get money; right?

20    **A.**    Normally I would say yes, but considering the fact that I

21    was asking for help, I was under the impression that I was

22    being helped.

23    Q.    Okay.  I'm not just talking about you.  I'm just talking

24    about this concept of signing your name on documents and then

25    just receiving money.  Like, most people are not aware that

1    you can do that.  Would you agree?

2    **A.**   I would agree that under most circumstances that would

3    probably be true.

4    Q.   And if something like that happened to you, wouldn't it

5    be kind of like this amazing thing that you'd want to share?

6    **A.**   No.

7    Q.   Did you talk to the Defendant Jose Luis Mendez at any

8    time about the fact that either you or he had signed some

9    documents, you had mailing companies, and you were receiving

10   money?

11   **A.**   No, I never did.

12   Q.   You didn't compare notes?

13   **A.**   I'm sorry?

14   Q.   You didn't compare notes about that at all with anybody?

15   **A.**   No, I didn't.

16   Q.   Okay.  You know who Glen Burke is; right?

17   **A.**   Yes.

18   Q.   He was one of your father's biggest clients for a while?

19   **A.**   I wasn't aware of -- that he was, like, one of my dad's

20   biggest clients.  Most of what I know about Glen Burke

21   actually came from Inspector Bouchie who showed me an entire

22   article of something that was done about him, and that was

23   when I became aware of -- of Glen Burke's involvement in this

24   type of stuff.

25   Q.   And so you were never aware that Glen Burke was actually

1  your father's client from 2017 to 2013?

2  **A.**  So I didn't know what his last name was, Burke.  I knew

3  that there was a client named Glen.

4  Q.  And that article you were talking about, was that a CNN

5  article called "The Sin City Scammer" about Glen Burke?

6  **A.**  I don't really recall what the article name was.

7  Q.  Did Miguel, Jr., show you that article?

8  **A.**  No.

9  Q.  Now, your uncle, Miguel Castro, Sr., took you to the bank

10  to open some kind of bank account related to these mailings;

11  right?

12  **A.**  The initial bank account for Pi Printing, that's when he

13  went with me.

14  Q.  And did you ask him why you were going to the bank?

15  **A.**  Did I ask him?

16  Q.  Yes.  Did you say, why are we going to the bank, to him

17  or words to that effect?

18  **A.**  I -- I wouldn't need to ask him because I knew that I was

19  going to open up a business bank account.  I asked him to go

20  with me.

21  Q.  So you're 26 years old?

22  **A.**  Yes.

23  Q.  Why do you need your uncle to come to the bank with you

24  to open an account?

25  **A.**  Because it was a business account and not a personal one.

1    I didn't know if there was a difference or -- I didn't know

2    what I had to choose.  I didn't know if there was certain

3    things like interest rates.  I don't really know how finances

4    work.  So I just wanted some guidance, again, to make sure

5    that I didn't mess anything up.

6    Q.    And so you asked him, Come to the bank with me, I need to

7    open a business account?  Is that the conversation?

8    A.    Initially I asked my dad if he'd go with me, but he was a

9    bit busy that day.  So he's like, hey, you know what?  Your

10   uncle's probably a better bet for this because he opened up

11   the business accounts for -- for the businesses.

12   Q.    Okay.  Did you have a conversation, the two of you, about

13   what this business account was for?  Like, what kind of

14   business?

15   A.    No, not really.  I simply -- as I was filling out the

16   paperwork, I asked him like, hey, do I choose this or do I

17   choose that?  Do I choose this or that?  And he was just

18   guiding me along the process.

19   Q.    The Defendant Salvador Castro testified that his brother,

20   Epi, betrayed him by getting him involved in this scam.  Are

21   you aware of that?

22   A.    I wasn't aware of anything that my uncle Salvador said.

23   Q.    The Defendant Jose Luis Mendez testified that if any of

24   the members of the Castro family who he trusted knew this was

25   fraud and didn't tell him, that would be a betrayal.  Did you

1    know that he said that?

2    **A.**    No.

3    Q.    Do you agree?

4    **A.**    That if he knew that this was a scam or a fraud and he

5    didn't tell them, if I would consider that a betrayal?  I'm

6    asking for clarification.

7    Q.    No problem.

8         So the question is:  If members of the Castro family

9    that Mr. Mendez trusted knew that this was a fraud and did not

10   tell him of that fact, he thought that that would betrayal.

11   Do you agree with that?

12   **A.**    I do agree with that.  I think that that would absolutely

13   fall under the scope of betrayal.

14   Q.    And let me ask you the same question.  If members of your

15   family that you trust knew that this was a fraud and they

16   didn't tell you that when you got into this mailing company

17   business, would that be a betrayal?

18   **A.**    I would feel like that was a betrayal towards me, yes.

19   Q.    Okay.  Now, let me ask you something.  Money Securities

20   and Assets Unlimited, it's fair to say you don't really know

21   very much about what happened with those companies; right?

22   **A.**    Correct.

23   Q.    Okay.  I want to talk to you about your mailing

24   companies, Money Securities and Assets Unlimited.  Do you know

25   where the victim money that was paid to your companies went?

1    **A.**   No, not really.  I don't know where it went.

2    Q.   Okay.  Let me show you Government Exhibit 253 -- already

3    been admitted -- at pages 22 to 25.

4         **MR. FINLEY:**  All right.  We're on page 22.  If we

5    could blow up the entries on the spreadsheet that refer to Pi

6    Printing d/b/a Assets Unlimited.

7    **BY MR. FINLEY:**

8    Q.   Do you see that?

9    **A.**   Yes.

10   Q.   Okay.  Now, that's your company, right, Assets Unlimited?

11   **A.**   Correct.

12   Q.   Okay.  This is a spreadsheet -- there's been testimony at

13   this trial that this is a spreadsheet that lists profit checks

14   that were paid to the real owners of the mailing companies.

15   This is just a part of the listing of profit checks for Pi

16   Printing/Assets Unlimited.

17        If you look at the line for Check 1008 and 1009, it

18   would look like they are matching checks on the same date in

19   number sequence in the round amount of $750 made out to

20   Digital Express and Kern and Associates; right?

21   **A.**   Correct.  I'm sorry, correct.

22   Q.   Now, there's been testimony at the trial that Kern and

23   Associates is Patti Kern's company.  Have you heard that

24   company name before, Kern and Associates?

25   **A.**   No, I hadn't never heard of that company.

1    Q.    You've never received a check from Kern and Associates?

2    **A.**    I never did.

3    Q.    You would just get your money out using what?

4    **A.**    Whatever money was under one of the two business

5    accounts, one of the two DBAs, I would pull from one of them.

6    I forget which one of the two it was.  I would just pull

7    directly through my bank app into my bank account since they

8    were all linked.

9    Q.    And then do you see Digital Express, Inc.?

10    **A.**    Yes.

11    Q.    That's your father's company; yes?

12    **A.**    Yes.

13    Q.    And this payment of $750, was it -- did he then cut you a

14    check for $750?

15    **A.**    I wish but no.

16    Q.    No?

17         Now, look at the rest of these lines.  It seems like

18    there's similar entries.  Kern and Associates, Digital

19    Express, round amounts, Kern is getting the same, Digital

20    Express is getting the same, the number sequences are

21    together, and these checks are being cut on the same dates.

22    Do you see that?

23    **A.**    I do.

24    Q.    Okay.  Let's look at the next page, page 23.  Okay.

25    Disregard the one with the strike-through.  The rest of them,

1    do you see a similar pattern of checks going to your father's

2    company and Patti Kern's company coming out of the mailing

3    company that you opened?

4    **A.**    Yes.

5    Q.    Okay.  Let's go to page 24.  Again, we're at Pi

6    Printing/Assets Unlimited, but then it switches a little way

7    down to a different bank account that you opened, and this is

8    Pi Printing d/b/a Money Securities.  You recognize those both

9    as accounts -- bank accounts that you opened?

10   **A.**    Yes.

11   Q.    And take a look at the money coming out of the bank

12   accounts on this profit distribution spreadsheet.  Do you see

13   a similar pattern of round amounts going to Digital Express

14   and Kern and Associates throughout this page?

15   **A.**    I mean, there are exceptions in this page and the

16   previous ones in terms of the pattern, but they're -- the

17   pattern does exist in certain parts.

18   Q.    Okay.  All the checks you see, round amounts, and it's

19   either to Digital Express or Kern and Associates?

20   **A.**    Yes.

21   Q.    Okay.

22           **MR. FINLEY:**  Next page.  And it stops at about a

23   third of the way down.  Can we blow up that top third?  Okay.

24   **BY MR. FINLEY:**

25   Q.    Disregard the strike-through.  Everything else for your

*Mario Castro, Jr. - Continued Cross*
*2:19-cr-00295-GMN-NJK - April 17, 2023*

1    company, Money Securities, those are round amounts to Digital

2    Express and Kern and Associates?

3    **A.**    Yes.

4    Q.    Did you get any of this money?

5    **A.**    No.

6    Q.    Did your father tell you that he was profiting from Money

7    Securities and Assets Unlimited?

8    **A.**    No.

9    Q.    If he was, do you think he should have told you that?

10   **A.**    Well, I don't really know what his involvement was in the

11   company.  So I was promised a certain amount, and that's what

12   I was getting.  And so long as I'm getting what I was promised

13   for doing my part, then I don't see why anybody needs to tell

14   me what's happening with the rest of the money.

15           **THE COURT:**  All right.  We're going to go ahead and

16   take our lunch recess now.  I do remind the members of the

17   jury that you are not to discuss this case with anyone nor

18   permit anyone to discuss it with you.  You can speak to your

19   fellow jurors about other things but not about the case.

20   Remember that the parties, the attorneys, the witnesses, the

21   staff is not permitted to speak to you at all about anything.

22   So don't be offended if you see them and they see you, you

23   meet eyes, and then they run the other way.  They just don't

24   want to get in any trouble.  Please do not read or listen to

25   or view anything that touches upon this case in any way or

1    perform any independent research or investigation.  If you

2    have questions, write them down.  And please do not form any

3    opinions until after you have heard all of the testimony,

4    received the evidence, then I will provide you the written

5    jury instructions, the law that will guide you; you will apply

6    the facts as you find them to that law, and then discuss your

7    opinions with each other in an effort to reach a unanimous

8    verdict.

9            Let's go ahead and stand for the jury so they can

10   enjoy their lunch.  We'll welcome you back at 1:00 o'clock.

11           After the jury exits, then Mr. Mario Castro, Jr., you

12   may also exit, take your lunch, stretch, use the restroom, get

13   some water.  We just need you back here at 1:00 o'clock, sir.

14           **THE WITNESS:**  Sure.

15       *(Jury out at 12:01 p.m.)*

16           **THE COURT:**  Go ahead, sir.  Watch your step on the

17   way down.  And more steps.

18           All right.  So we'll see you back here at

19   1:00 o'clock.

20       *(Lunch recess at 12:02 p.m.)*

21                       --o0o--

22               COURT REPORTER'S CERTIFICATE

23

24       I, AMBER M. McCLANE, Official Court Reporter, United

25   States District Court, District of Nevada, Las Vegas, Nevada,

1    do hereby certify that pursuant to 28 U.S.C. § 753 the

2    foregoing is a true, complete, and correct transcript of the

3    proceedings had in connection with the above-entitled matter.

4

5    DATED:  4/17/2023

6

7                        /s/ *Amber M. McClane*

8                        AMBER McCLANE, RPR, CRR, CCR #914

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25