1  **RICHARD E. TANASI, ESQ.**
   Nevada Bar No. 9699
2  **TANASI LAW OFFICES**
   8716 Spanish Ridge Ave., Ste. 105
3  Las Vegas, Nevada 89148
   Telephone: (702) 906-2411
   Facsimile: (866) 299-5274
4  rtanasi@tanasilaw.com
   /////////////////////////////////////////////
   **JOSHUA TOMSHECK, ESQ.**
5  Nevada Bar No. 9210
   **HOFLAND & TOMSHECK**
6  228 S 4th Street, 1st Floor
   Las Vegas, NV 89101
7  Telephone: (702) 895-6760
   Facsimile: (702) 731-6910
   Email: JoshT@hoflandlaw.com
8
   ***Attorneys for Defendant Mario Castro***
9
                    **UNITED STATES DISTRICT COURT**
10
                        **DISTRICT OF NEVADA**
11
   UNITED STATES OF AMERICA,          CASE NO.: 2:19-cr-00295-GMN-NJK
12
                  Plaintiff,          **DEFENDANT MARIO CASTRO'S**
13                                     **SENTENCING MEMORANDUM**
   vs.
14
15 MARIO CASTRO, et al,
16                  Defendant.
17
   **Certificate of Timely Filing:** This memorandum is timely filed.
18
          Defendant, MARIO CASTRO ("Mario"), by and through his counsel of record,
19
   RICHARD E. TANASI, ESQ. and JOSHUA TOMSHECK, ESQ. hereby submits this document
20
   to aid the Court in its determination of sentence in the above-captioned case.
21
   ///
22
   ///
23
   ///
24

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

I.

STATEMENT OF FACTS

**A. Mario Castro's Background and Characteristics**



Mario Castro ("Mario"), pictured above with his granddaughter, Kehlani, is a 55-year-old father and grandfather.  Mario has been happily married for 35 years to his wife, Irma Graciela Reynoso.  They have and continue to be loving and supportive partners to one another, and loving and doting parents to their children.  His family's well-being, both emotionally and financially, will be greatly affected by any custodial sentence.

The true character of Mario is revealed through the words of his family and friends. One may say that a man's character can be determined by the type of father he has been, and this could not be any truer in Mario's case.  Throughout his entire adult life, Mario has strived to be a devoted family man and the best father he could be for his children.  In the words of his daughter, Ashely Castro ("Ashley"), Mario has always been a *"… strong, hardworking, and kind hearted man…" See* Exh. A, p. 1.  Ashley further elaborates the strength and integrity Mario has instilled in her throughout the years:

> I'm grateful to have found myself in the arms of such a strong, hardworking, and kind-hearted man the day I was born. I'll forever cherish and uphold all my dad has passed onto me. …I'm convinced that because of my father, I am a better person in many aspects. … My father has always been a symbol of great fortitude and perseverance to me. Despite a difficult and humble upbringing, he chose to work hard and reach for the things many thought was not possible for somebody like him: an immigrant child with no formal education. With no support or tools

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

at his disposal, sheer determination and a dream is what powered my father. His journey hasn't been easy, but he's never let that stop him. …My father has guided me down a path of virtue and galvanized my pursuit of truth. He has been the primary shaper of my being. The sole person in my life I've sought to emulate in character when my own has faltered. Anytime I'm told of my resemblance to him, whether it be physical or of the mind, all I can feel is immense pride. I am forever indebted to my father; everything I am, is of his doing. Wherever I go, whatever place I traverse, I'll be sure to carry on all he's instilled within me and I will do it with the greatest pride. (*Id*. at p. 1-2)

Mario was born in Zamora, Michoacan, Mexico. At the age of 13. On March 27, 1981, Mario immigrated to the United States and resided with his family in Long Beach, California where he spent most of his pubescent and adult life growing up. He was raised in a close-knit family and had a happy childhood. He met his wife Irma in 1988, and after four months of dating, they were married. They have raised four children together, who are all adults now, and are very close with Mario and they always seek his emotional support during times of hardship; especially, his daughters Ahsley and Chelsee.

Mario's youngest daughter, Chelsee Castro, ("Chelsee"), echoes the words of her sister Ashley. She reports that Mario has *"…never seems to fail to be there. As a child, and to this day*." (Id. at p. 4) Chelsee reports Mario's devotion to his children and family. Despite all the struggles and hardships, Mario has never failed to always be there for his children to give them strength and support even through their adult lives. As Chelsee puts is:

There's never been a time where I've needed him and he has not been there. It's crazy because my father would always tell me, you will never understand the amount of love I have for you and your siblings until you have a child one day. I thought of course I know how much he loves me. But then I had a child of my own, and realized, the love for your child is a love that can never be beaten. (*Id*. at p. 4.)

But it doesn't stop at Ahsley and Chelsee – Mr. Castro's other two children, Caren Castro ("Caren") and Mario Castro Jr. ("Junior") also the undoubtable dotting father Mario has been to them. Though Mario has made many mistakes along his path to adulthood as many of

**TANASI LAW OFFICES**
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

us naturally have, one thing which he has consistently gotten right is the way he loves and cares for his children.  His family has and continues to be the focal point of his life and he would do anything to ensure that they well cared for and are supported both emotionally and financially.  As Caren attests, Mario is "*... lovable, kind and always teaching us what's right from wrong. He is true to his word and his enthusiasm has led to many good works in society.*" (Id. at p. 9.)  And Junior adds that *"...Despite the challenges [Mario] has faced, he carries the burden gracefully, shielding us and everyone around him from the full extent of his own distress. This is his brightest quality and it is one that, through action, has taught me everything I have ever known about responsibility.*" (*Id*. at p. 9.)

Mario's loving and caring nature has not been only confined within his wife and children; it has extended to his other family members.  His niece, Amelia I. Marghella ("Amelia") reports that her Uncle Mario was the first person to reach out to when she was diagnosed with cancer.  In her own words: *"Last year he was the first one to call me when I was diagnosed with Cancer, I didn't know how he found out, but that showed me that even tho we don't talk everyday or live in the same state he always knows what is going on and what I am going thru. I don't know what i would do without his advice, help, calls, smiles. To see him happy with everyone and especially his own family, his wife, Children and grandchildren."* (*Id*. at p. 5.)  Mario has also been the pillar for his siblings.  When Mario's nephew passed away, his support and care for his sister was so profound that his presence by her side alone helped her heal through the pain of losing a young child.  As Amelia reports, *"I would never forget the time my brother past away, everyone was there my mom was destroyed no one could calm her down, as soon as my uncle Mario came into the room hugged her she started to calm down, he helped spiritually, emotionally."* (*Id*. at p. 5.)

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

Mario's caring and loving nature has also reached the members of his community and friends.  His generosity has helped many in his community through financially hard times.  He has also consoled many young men in his community to take the right path in life and to live a righteous life.  One of his close friends, Dr. Tony E. Huerta Serna, (Dr. Serna") sheds light on who Mario is in his community.  Many of his friends and members of his community would agree with Dr. Serna when he describes Mario's essence in the following words:

> Mario has consistently gone above and beyond all expectations, showing an exceptional level of care for his community. I have witnessed him generously providing financial support to his employees in times of need, paying for rent, medical bills, and groceries. His servant's heart and genuine concern for others are truly remarkable. Mario's dedication to caring for humanity and his commitment to obeying the law and trusting in our legal system make him a true American role model for future generations.
> ….
> I remember numerous instances where Mario has guided younger men to do the right thing: and to obey the laws of our great country. He exemplifies a strong sense of responsibility and accountability, taking ownership of his actions and their consequences. His honorable nature is reflected in his interactions with others, as he treats everyone with kindness, compassion, and fairness. Mario's strong moral compass and impeccable ethical standards serve as an example for others to follow. His unwavering integrity and commitment to doing what is right make him an exceptional individual. (*Id*. at p. 5.)

Mario's commitment and devotion to his family, friends, community, and specifically his children, is a common theme throughout the attached character letters and a strong factor in favor of the proposed sentence. Nearly all of the letters (*see* Exhibit A) discuss the type of incredible husband, father, and friend that Mario is and how his love and dedication to his loved ones are appreciable and heartfelt.

**TANASI LAW OFFICES**
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

## II.
## LEGAL ARGUMENT

### A. Objections to PSR

Based upon the objections noted below, Mr. Castro submits the following guideline calculations apply (without waiving any claims of innocence and factual objections to the PSR):

- Base Offense Level - USSG §2X1.1(a)/ USSG §2B1.1(a)(1):          7
- Loss between $3,500,000-$9,500,000 - USSG § 2B1.1(b)(1)(J):          18

**Base Offense Level**          **25**

### 1.  *Loss-Related Objections: 50, 52, 57, and 65.*

The PSR states: "The guideline for a violation of 18 U.S.C. § 1349 is USSG §2X1.1. Pursuant to §2X1.1(a), 2B1.1 is referenced when determining the offense level. The starting base offense level is 7. USSG §§2X1.1(a) and 2B1.1(a)(1). Pursuant to USSG §2B1.1(b)(1)(K), a 20-level increase is applied because the instant offense involved a loss of more than $9,500,000 but less than $25,000,000." *See* PSR at paragraph 65.

However, the adjustment should be an 18-level adjustment (USSG §2B1.1(b)(1)(J)) given the loss proven at trial ($6,159,238.00). *See* Exh. B, Govt. Trial Exhibit 260.  A more appropriate loss amount is under $9,500,000.00 as outlined in the alleged scheme's co-conspirator plea agreements (i.e. Kern, O'Connor, Del Rio, and Burrow).  *See* Exh. C, Co-Conspirators' Guilty Plea Agreements.

The PSR also fails to itemize/total/support (1) alleged Kern/Burke/Fennell losses related to sweepstakes fraud, (2) the alleged timeframe of those losses, and (3) how the defendants' conduct was the proximate cause of those actual losses.

Generally, for purposes of § 2B1.1, the determinative amount of financial loss in a fraud crime is the greater of the victims' actual loss or the amount of loss the defendants intended.

USSG § 2B1.1 cmt. 3(A) (2013). The Guidelines define actual loss as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* A reasonably foreseeable pecuniary harm is "pecuniary harm that the defendant knew or under the circumstances, reasonably should have known was a potential result of the offense." *Id*

In addition, the defendant's conduct must have been the proximate cause of actual loss. *U.S. v. Hicks,* 217 F.3d 1038, 1048-4 9 (9th Cir. 2000). "The Court need not make its loss calculation with absolute precision: rather it need only make a reasonable estimate of the loss based on available information." *Zolp,* 4 79 F.3d at 718. Courts should "take a realistic, economic approach to determine what losses a defendant truly caused or intended to cause." *United States v. Allison,* 86 F.3d 940, 943 (9th Cir. 1996).

In a conspiracy the court may not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but instead the court must identify the loss that falls within the scope of the defendant's agreement with his co-conspirators and that was reasonably foreseeable for that particular defendant. *Treadwell,* 593 F.3d at 1002. *United States v. Neuman,* 3:11-cr-00247-BR, at *7-8 (D. Or. Dec. 10, 2013)

The loss proven at trial was around $6 million but "the government intends to prove that losses from the charged scheme exceed $10 million…". *See* ECF No. 813 at p. 2 ll 10 – 11. Further, presumably, the government will attempt to prove a loss amount of "…Total: >$16 million." *Id.* at p. 6 ll 3 – 7. But this "simplified" loss calculation (between $10m and $16m) is still not a reasonable estimate supported by preponderant evidence. *United States v. Armstead,* 552 F.3d 769, 776, 778 2008 U.S. App. LEXIS 27703 (A district court generally uses a preponderance of the evidence standard of proof when finding facts at sentencing…. The court need only make a reasonable estimate of the loss, given the available information.)

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

The evidence on which the government relies is inherently insufficient to prove a reasonable estimate of the actual loss amount by a preponderance of the evidence.  *Armstead, supra*. The government plans to prove loss "primarily upon two sources of evidence: 1) the Fennell database for losses from the charged scheme and 2) the PacNet RAVEN database for losses from the Burke and Wagner schemes."  *See* ECF No. 813 at p. 5 ll 19-22. But significant issues and questions surround both Fennell and PacNet RAVEN databases.

### The Fennell and PacNet RAVEN Database

On May 4, 2023, gearing up for sentencing, the defense requested the government's exact loss amount along with corresponding bates ranges/exhibits.[1]   The request sought the government's position on all loss not proven by Government's Trial Exhibit 260 (attached hereto as Exhibit H) and how (1) those losses related to sweepstakes fraud, (2) the alleged timeframe of those losses, and (3) how the defendants' conduct was the proximate cause of those actual losses. Government Trial Exhibit 260 sources various bank accounts for the calculated losses—not the Fennell Database nor PacNet RAVEN database.[2]  On May 31, 2023, the government responded they had not yet finished the loss calculation.[3]

*Fennell*

On July 21, 2023, the government produced an excel spreadsheet of the extracted data from the *Fennell* database (created on 6.21.23).  *See* Ex. D, Narine Gevorgyan's (Defense Paralegal) Discovery Review letter. *Id.*  While the Fennell database was produced in 2020, the Fennell Database consists of 269,182 files and 307 individual folders, totaling the size of the combined files to 17.3 GB.  The "*Natives*" folder contains over two thousand (2,000) files with

---

[1] Email correspondence can be provided if disputed upon request.
[2] *Id.*
[3] *Id.*

.*dbs* file extensions, except several files are saved in excel. *Id.* The defense does not have a program that will open *.dbs* file extensions. *Id.* Again, as noted above, the government has not calculated the loss amount to date.

*PacNet RAVEN*

On August 15, 2023, the defense received two PacNet RAVEN database extracted excel spreadsheets from the government. *Id.* The databases have not yet been produced or located. Again, as noted above, the government has not calculated the loss amount to date.

Regardless, the Fennell and PacNet RAVEN database *spreadsheet extractions* are flawed. Forensic Accountant, Janet McHard, has reviewed some of the voluminous discovery regarding loss and the extracted Fennell and PacNet RAVEN databases spreadsheets, and has reached the following opinions:

- For both the PacNet RAVEN and Fennell database loss calculations, the information is extracted from larger datasets which have not been provided to me and which, I understand, cannot be located by counsel for the Defendants. *See* Exh E, Janet McHard's Opinions, at p. 1.

- The Government's calculation of loss from the PacNet RAVEN database is a subset of the losses alleged in a Federal Trade Commission filing for which *no* underlying supporting documentation or native data has been provided. *Id.* at p. 2

- Spreadsheets from the PacNet RAVEN database were prepared on July 3, 2023, by Agent Desa for the purposes of this loss calculation. Spreadsheets from the Fennell database were prepared on June 21, 2023, by Agent Desa for the purposes of this loss calculation. Information exists in the native database files which is excluded from the spreadsheets prepared by Agent Desa. While some of the excluded fields can be deduced from other evidence in this matter, it is unknown the range and importance of the information excluded by Agent Desa. *Id.*

- Within the PacNet RAVEN calculation there is a reduction of approximately 11% which represents payments returned or other refunds. This same reduction is *not* included in the loss calculated from the Fennell database/spreadsheet. At a bare minimum, this 11% should be used to reduce the loss calculated from the Fennell calculation for refunds and returned items. No supporting documentation, such as banking information or tax reporting, have been provided to confirm or refute the information in the PacNet RAVEN spreadsheets provided. *Id.*

- It is unclear from the Memo of Interview of Mr. Fennell that he was actually the creator of the so-called Fennell database from which the Fennell spreadsheet was extracted, as

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

his MOI only says he maintains, formats, and cleans the database. Actual data entry appears to have been performed by Andrea Burrow who admitted in her MOI that she deliberately increased amounts she entered into the database. *Id.*

- For both the Fennell database and the PacNet RAVEN database, the Government took a subset of data from what was already a subset of information from data accumulated by individuals who have either pled to charges or are awaiting adjudication for criminal charges and use that information despite having in their possession information which calls the accuracy of both databases into question. In other words, the two separate data sets are known to be incomplete and inaccurate at their very core. *Id.*

- My limited testwork found four examples of cancelled checks which are represented in the Fennell spreadsheet for a larger amount than on the face of the check, demonstrating the inaccuracy of the Fennell spreadsheet information. *Id.*

- The spreadsheets from the PacNet RAVEN database include amounts in US Dollars which are presented as amounts after foreign currency exchange rates and are shown in even dollar amounts without cents. Amounts after foreign currency exchange are rarely in even dollar amounts, which calls the accuracy of the spreadsheets into question. *Id.*

- The nature of both database tables and spreadsheets means that neither environment provides information showing whether there have been modifications, who made those modifications, and the result of those modifications. This lack of audit trail increases the importance of being able to confirm information in database tables and spreadsheets matches contemporaneous records, in this case contemporaneous financial records. *Id. at pp. 2-3.*

- For these reasons, as more fully described below, it is my expert opinion that is there are known overstatements in the Fennell database, and both the Fennell spreadsheet and the PacNet RAVEN spreadsheets lack sufficient supporting data and documents to be considered sufficiently reliable to produce a reasonable estimate of loss. *Id. at p. 3*

Based on these preliminary findings alone there's reason to believe the government's alleged loss amounts are speculative puffery. The Sixth Circuit has grappled with speculative losses by sending the case back to the District Court as follows:

Even a reasonable estimate, however, requires some explanation." *Howley*, 707 F.3d at 582. The district court's reasoning reveals that it failed to follow its own logic in two important [**24] ways. First, the district court used estimates that it had rejected earlier in its analysis. The district court declined to calculate anticipated profits based on You's projections in her [*41] Thousand Talents application of over $220 million in future profits, rejecting them as speculative and "likely inflated" due to "puffery." You's estimate of $7 billion for the annual world can-coating market, the court noted, was likely "intended to entice the Chinese government into issuing a grant." Yet, in estimating the annual Chinese market for can coatings to equal $2.9 billion, the district court appears to have relied on an estimate that was also in You's Thousand Talents application—the

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

same source whose projections the court had previously dismissed. We need not take a side on this inconsistency by determining whether You's projections were indeed speculative, but we ask the district court to resolve it.

*See United States v. Xiaorong You*, 74 F.4th 378 (6th Cir. 2023).

As a result, and considering the documented issues with Fennell database, this Honorable Court (respectfully) cannot be convinced by a preponderance of the evidence that the government's proffered loss estimate (presumably $10,167,961.76)[4] is reasonable and a corresponding two-level enhancement is therefore appropriate.[5]In sum, the loss amount proven at trial is $6,159,238.00, which corresponds to an 18-level enhancement.[6]

Likewise, the government has failed to foundationally prove relevant conduct losses. *See* USSG §1B1.3, *United States v. Treadwell*, 593 F.3d 990, 1003 (9th Cir. 2010) overruled on other grounds in *United States v. Miller*, 953 F.3d 1095, 1103 n. 10 (9th Cir. 2020) ("§ 1B1.3 requires… the district court make factual determinations establishing the scope of each defendant's joint undertaking and the amount of losses reasonably foreseeable to each defendant."); *see also, United States v. Garcia-Sanchez*, 189 F.3d 1143, 1147–48 (9th Cir.1999) (remanding for failure to make specific findings as to scope of defendant's agreement with coconspirator).

---

[4] As noted above, another loss possibility is that "…the government intends to prove that losses from the charged scheme exceed $10 million…". *See* ECF No. 813 at p. 2 ll 10 – 11. Further, presumably, the government will attempt to prove a loss amount of "…Total:>$16 million." *Id.* at p. 6 ll 3 – 7. A $10m-$16m range is not a reasonable estimate.

[5] Under USSG §2B1.1(b)(1)(K), a 20-level increase would apply if the instant offense involved a loss of more than $9,500,000 but less than $25,000,000.

[6] Under USSG §2B1.1(b)(1)(K), an 18-level increase would apply if the instant offense involved a loss of more than $3,500,000 but less than $9,500,000.

USSG §1B1.3 requires:

(a) Chapters Two (Offense Conduct) and Three (Adjustments). Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
   (i) within the scope of the jointly undertaken criminal activity,

   (ii) in furtherance of that criminal activity, and

   (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

Ultimately, both the government and the PSR fails to articulate how the PacNet Database (1) were fraudulent funds the product of acts or omissions of Mario Castro, or (2) were jointly undertaken criminal activity *that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.*

## 2.  Other Calculation Objections

### Paragraph 65. 2-Level Increase for Violation of Prior Order

The PSR states: "An additional 2-level increase is applied because the instant offense involved (C) a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines, pursuant to USSG §2B1.1(b)(9)(C)."

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

However, there is no evidence Mario was previously enjoined from sweepstakes mailing or mailing of any kind. USSG §2B1.1(b)(9)(C)(Application Note C) provides the following example: "For example, a defendant whose business previously was enjoined from selling a dangerous product, but who nonetheless engaged in fraudulent conduct to sell the product, is subject to this enhancement." *See* USSG §2B1.1(b)(9)(C)(Application Note C).

Here, Government Trial Exhibit 249 identifies all entities that were enjoined in this case. Neither Mario nor Digital Express were ever enjoined – the leader of the Kern Syndicate (Patti Kern) was enjoined. *See* Exh. F, Government Trial Exhibit 249.

**Paragraph 65. 2-Level Increase for Sophisticated Means**

The PSR states "Another 2-level increase is applied because (C) the instant offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means. USSG §2B1.1(b)(10)(C)."

However, there is no evidence Mario utilized sophisticated means.  USSG §2B1.1(b)(10)(C) (Application Note 9) states:

> For purposes of subsection (b)(10)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a tele-marketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

*See* USSG §2B1.1(b)(10)(C) (Application Note 9).

Here, there is no evidence Mario was anything more than a printer.  There's no evidence Mario located fictitious offices, created fictitious offices, or concealed the offense. Instead, Patti Kern directed the shell companies and their locations.

- 13-

**TANASI LAW OFFICES**
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

1      **<u>Paragraph 66 – 67: Vulnerable Victims</u>**

2      USSG §3A1.1(b)(1) Application Note 2 states:

3        The adjustment would apply, for example, in a fraud case in which the defendant
4        marketed an ineffective cancer cure or in a robbery in which the defendant
       selected a handicapped victim.  But it would not apply in a case in which the
       defendant sold fraudulent securities by mail to the general public and one of the
5        victims happened to be senile.

6   *See* USSG §3A1.1(b)(1) Application Note 2.

7      The PSR imposes a 4-level adjustment for alleged large volume of vulnerable victims.

8 First, Mario objects to any assertion he knowingly participated in a scheme. Second, even

9 assuming knowledge or a scheme was proven at trial, he was not convicted of knowingly

10 defrauding a vulnerable victim.  Additionally, no evidence was adduced at trial that Mario knew

11 or should have known the age of the mail recipients.  In fact, the government does not know the

12 demographics of all the alleged victims.   On July 6, 2020, the government argued that: "The

13 Crime Victims' Rights Act ("the Act") provides certain rights to victims in federal criminal

14 proceedings. 18 U.S.C.§ 3771. Among the rights provided by the Act are a victim's right to

15 "reasonable, accurate, and timely notice" of public court proceedings. *See* 18 U.S.C. § 3771(a).

16 *See* ECF No. 116.  The government went on to describe the alleged scheme (and the victims

17 involved) as follows:

18        In this case, the defendants are charged with mail fraud and conspiracy to commit
       mail fraud for engaging in a direct-mail scheme that sent fraudulent prize notices
19        to hundreds of thousands of consumers across the United States. The mailings
       misled victims to believe that they would receive a large cash prize, ranging from
20        hundreds of thousands to several million dollars, if they paid a relatively small
       fee.  The victims did not receive the promised large sums of money. The
21        government determined there are hundreds of thousands of potential victims who
       paid a fee, generally $20 or $25 as directed by the fraudulent mailings.

22 *See* ECF No. 116 at p. 3.

23

24

4444444



444444444444444444444444444444444444444444444444444444444444444

3B1.1]; *see also, United States v. Avila*, 95 F.3d 887 (9th Cir. 1996) (reversing for lack of evidence that defendant exercised control or organizational authority even though he was the sole contact between the buyer and the seller).)

The evidence from the trial demonstrates that Patti Kern and Sean O'Connor were leaders of the Kern Syndicate.  Inspector Bouchie testified Patti Kern was the head of the Kern Syndicate, specifically as follows:

> Patti Kern "made concerted effort to remove her name from Kern Syndicate… to hide her leadership role... became she was [] controlling all aspects of the mass mailing campaign, … she did not want the Government to know it was her."  *See* Exh. G, excerpts from Inspector Bouchie's testimony.

Likewise, Patti Kern testified concerning her leadership role as follows:

> "Right now ***I have a couple of Mexicans*** who have a printing and letter shop of their own with their mailings for casinos, et cetera. And they know that I do not exist if anybody asks what I'm doing there, even if it doesn't have to do with sweeps," *See* Exh. H, excerpts from Kern's testimony (emphasis added).

Sean O'Connor was also a leader.  Specifically, Sean O'Connor testified as follows:

> O'Connor "suggested – [Patti Kern] should use some of the Castros because they're financially -- would gain from being partner with Patti…" because at the time, "[Patti Kern] couldn't have her name on anything anymore…"  *See* Exh. I, excerpts from O'Connor's testimony.

> O'Connor and Patti Kern talked about "continuing to do the work… opening up mailing companies, [Patti Kern] opening up bank accounts… and Patti's idea [to] opening up mailboxes." *See* Exh. J, excerpts from O'Connor's testimony.

> O'Connor controlled the language on the sweepstakes. "…Let me know if you need more copy on the edits, and I will type something up to copy and paste. It's the same old stuff. Report to people register for millions in sponsored sweepstakes that have to be paid by law, blah, blah, blah… Let me know if you need more of this, and I will type something up." *Id*.

> "Account manager was on of [O'Connor's] job titles… it might have been [himself] at one point" who gave him that title. *See* Exh. K, excerpts from O'Connor's testimony.

> O'Conner "was aware that Mario's a mechanic by trade… [and] that in 2010 to 2014, [Mario] doesn't own a print shop." (*Id*.)

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

**TANASI LAW OFFICES**
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

**B.    A Sentence to Credit for Time Served Followed by 3 Years Supervised Release is a Sentence Sufficient, but not Greater Than Necessary Under 18 USC § 3553.**

18 USC 3553(a) guides this Honorable Court as the appropriate sentence.  In *United States v. Booker*, (2005) 543 US 220, 160 L Ed 2d 621, 125 S Ct 738, the Supreme Court held that 18 USCS § 3553(b)(1), which makes the Federal Sentencing Guidelines mandatory, is incompatible with the requirements of the Sixth Amendment and therefore must be severed and excised from the Sentencing Reform Act of 1984.  As a result, this Honorable Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of 18 USC § 3553.

**C.    A Sentence to Credit for Time Served Followed by 3 Years Supervised Release Adequately Addresses the Characteristics of Mr. Castro**

Mario's character is defined by his loved ones in the attached letters of support and character pictures attached hereto. *See* Exh. A; *see also supra* I (A).  Thus, the defense requested sentence would constitute a sufficient but not greater than necessary sentence, when applying all Section 3553(a) factors.

**D.    A Sentence to Credit for Time Served Followed by 3 Years Supervised Release Adequately Factors Mr. Castro's Low Recidivism Rate, and Duty to Impose Sentences that Afford Adequate Deterrence and Protect the Public from Further Crimes of Mr. Castro.**

Mr. Castro's actions in this case *were not violent*.  At age 55, Mario has no criminal history.  Overall, older offenders with no criminal history, like Mr. Castro, have the lowest rearrest rates (15% - 9.4%):

Table 4. Rearrest Rates by Age at Release and Criminal History Category
*Federal Offenders Released in 2010*

| AGE | CRIMINAL HISTORY CATEGORY (CHC) | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|
| | CHC I | CHC II | CHC III | CHC IV | CHC V | CHC VI | |
| Younger than 21 | 66.6% | 84.1% | 90.7% | 100.0% | 100.0% | 100.0% | 72.5% |
| 21 - 29 | 48.5% | 66.9% | 79.1% | 85.4% | 86.4% | 89.9% | 64.4% |
| 30 - 39 | 31.2% | 49.6% | 61.3% | 71.4% | 77.3% | 81.1% | 54.1% |
| 40 - 49 | 22.3% | 41.6% | 50.9% | 62.9% | 67.4% | 73.1% | 42.7% |
| 50 - 59 | 15.0% | 30.8% | 46.4% | 48.6% | 61.7% | 65.3% | 30.8% |
| 60 and Older | 9.4% | 18.2% | 28.1% | 30.0% | 48.6% | 46.9% | 15.9% |
| TOTAL | 30.2% | 49.4% | 61.9% | 70.3% | 75.4% | 76.2% | |

*See* Exh. L, U.S. *Sent'g Comm'n, Recidivism of Federal Offenders Released in 2010*, p. 30 (Sept. 2021.)

Additionally, fraud offenses have the lowest recidivism rates (35.5%):



Figure 17. Rearrest Rates by Federal Offense Type
*Federal Offenders Released in 2010*

*Id.* at p. 32.

Similarly, Courts have recognized that defendants over the age of 50 "militates in favor of finding that [the defendant]" is unlikely to "pose a current danger to the public" and that those individuals "over [the age of] 50 have a lower likelihood of recidivism." *Varner v. Brown*, 393 F. App'x 479, 487 (9th Cir. 2010) (discussing parole consideration with respect to age and likelihood of recidivism). Therefore, based upon the foregoing, a credit-for-time-served sentence adequately imposes a sentence that afford adequate deterrence, and protects the public from further crimes of the Mr. Castro.

- 18 -

**E.  A Sentence to Credit for Time Served Followed by 3 Years Supervised Release is Sufficient but not Greater Than Necessary, because it Avoids Unwarranted Sentencing Disparities**

18 USC 3553 requires this Honorable Court to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See also Gall v. United States,* 128 S. Ct. 586, 600 (2007).  Inversely, this requires the Court to ensure defendants with dissimilar records who have been found guilty of dissimilar conduct, be sentenced dissimilarly.  Here, the following alleged co-conspirators have received the following sentences:

| Name | Case No. | Sentence |
|------|----------|----------|
| Berk, Glen | 2:16-CR-262-01-JAD-(PAL) | 87 months (ECF 61) |
| Burrow, Andrea | 2:19-cr-00295-GMN-NJK-6 | 36 months (ECF 184) |
| Del Rio, Edgar | 2:19-cr-00022-JCM-VCF | Pending |
| Kern, Patricia | 2:19-cr-00032-RFB-VCF | Pending[7] |
| O'Connor, Sean | 2:19-CR-179-JAD-NJK | Pending |

As noted above, the trial demonstrated that Patti Kern and Sean O'Connor were leaders of the Kern Syndicate.  Additionally, unlike Mario Castro, Glen Berk was the *leader* of an expansive scheme warranting 87-months.  Also, unlike Mario, Andrea Burrow worked closely with Patti Kern maintaining the Fennell Database.   Lastly, considering recent sentencing data, the average sentence for fraud was 21 months (with a median of 12 months).  *See* Exh. M Table 6 (page 9) of U.S. Sent'g Comm'n, *Quarterly Data Report USSCFY 22, October 1, 2021, through March 31, 2022* (sentence length by type of crime).  Therefore, based upon the foregoing, a sentence substantially lower than that recommended by the PSR is appropriate.

---

[7] On September 15, 2022, the government advised the undersigned that the PSR recommended that Kern receive 97 months in prison, 3 years supervised release, and no fine. Restitution was deemed impracticable given the number of victims.

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

**F.  A Sentence to Credit for Time Served Followed by 3 Years Supervised Release Further Court Policy Statements Regarding Fraud Guidelines**

This Honorable Court should vary from the PSR-guideline range, because the Sentencing Commission promulgated the base offense level contrary to "empirical data and national experience," *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007), and as a result, it recommends a sentence that is "greater than necessary, to comply with the purposes set forth" in 18 U.S.C. § 3553(a)(2).

Further, empirical research shows that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects. …Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." *See Exh*. N, Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research, p. 28-29 (2006). This is because potential criminals are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentence consequences in the manner one might expect of rational decision makers. *Id*.

Here thus, the increase in punishment based upon the application of rigid guidelines will not yield an increased deterrent effect to Mr. Castro or others. Simply standing before this Court facing the potential of a sentence of incarceration is deterrent effect enough for Mr. Castro who has no criminal history.

Additionally, there are significant defects in the calculation of Guidelines sentences under § 2B1.1; and the use of 18 U.S.C § 3553(a) factors can assist a court in mitigating these defects.  Exh. O, Rodney Perkins, *Purposes-Based Sentencing of Economic Crimes After Booker*, 11 LEWIS & CLARK L. REV. 521 (2007).  Two defects are discussed next. *Id.* at p. 14/533-536.

- 20-

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

*First*, purposes-based analysis using 18 U.S.C. § 3553(a) can mitigate the manner in which Guidelines sentences attempt, and often fail, to link the defendant's conduct to the harms caused by their conduct or their blameworthiness for those harms. *Id.* This failure occurs because USSG § 2B1.1 maps monetary loss to offense levels, which is a gross and inaccurate indicator of harm caused by defendants or their blameworthiness for those harms. *Id.* The reason for incremental increases in offense levels under the Guidelines has an identifiable basis. *Id.* It is consistent with proportionality goals; each dollar amount now equals two offense levels. *Id.* These incremental increases are also consistent with the concept of actual loss as a proxy for causation, harm, and mental state, and intended loss as a representation of blameworthiness. *Id.* For example, loss is the principal harm in economic crimes. *Id.* If the defendant's acts caused the loss or the defendant could have reasonably foreseen the loss, it is logical to link increasing amounts of loss to increasing amounts of punishment. *See also, United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2005) ("All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment.")

However, under the loss table, dollar amounts alternately increase by a quarter, third, half, or three-quarters while the offense levels steadily double. *Id.* This method of mapping randomly increasing dollar amounts to incremental increases in offense levels may capture broad notions of harm or blameworthiness, but it cannot address the harm in specific cases. *Id.* Worlds of causation, harm and mental culpability exist between the gaps in the loss table's dollar amounts, and at best, the table serves only as a gross approximation of the harm caused in individual cases. *Id.* As one court has noted: the guidelines provisions for theft and fraud place excessive weight on this single factor [loss], attempting—no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of sentencing boxes—to assign precise

**TANASI LAW OFFICES**
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

1    weights to the theft of different dollar amounts. *Id.* In many cases . . . the amount stolen is a

2    relatively weak indicator of the moral seriousness of the offense or the need for deterrence.

3    *United States v. Pimental*, 367 F.Supp.2d 143, 156 (D. Mass. 2005) (*citing Emmenegger*, 329 F.

4    Supp. 2d at 427); *see also United States v. Mueffelman*, 400 F. Supp. 2d 368, 373 (D. Mass.

5    2005) ("The amount of loss that a given crime has engendered is surely one measure of the

6    seriousness of the offense. Sometimes loss is an entirely appropriate proxy for culpability. At

7    other times, it is not."); *see also United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis.

8    2005) ("One of the primary limitations of the guidelines, particularly in white-collar cases, is

9    their mechanical correlation between loss and offense level. For example, the guidelines treat a

10   person who steals $100,000 to finance a lavish lifestyle the same as someone who steals the

11   same amount to pay for an operation for a sick child.").  Further, the Guidelines do not account

12   for varying links between causation, harm, and blameworthiness, which are essential in

13   designing a fair and just punishment.[8]

14        ***Second,*** purposes-based analysis using 18 U.S.C. § 3553(a) can mitigate Guidelines

15   features that attempt, and fail, to quantify the defendant's role and participation in the offense.

16   USSG § 2B1.1 and § 3B feature offense characteristics and adjustments that map facets of the

17   defendant's role and participation in a crime to offense levels. Many of these characteristics are

18   substantially similar but given independent weight. Exh. O, Rodney Perkins, *Purposes-Based*

19

20   [8] Punishment is a blunderbuss. We do not know its precise effects, nor can the criminal justice
     system tell us much (beyond fairly obvious differences) about the true comparative 'just deserts'
21   of any two offenders – even in respect to the crimes they have committed. There is little, if
     anything, to be gained in terms of punishment's classical objectives by trying to use highly
22   detailed offense characteristics to distinguish finely among similar offenders. And there is much
     to be lost, both in terms of guideline workability and even in terms of fairness (recall the
23   guidelines' logarithmic numerical scales). Ranking offenders through the use of fine distinctions
     is like ranking colleges or the 'liveableness' of cities with numerical scores that reach 10 places
24   past a decimal level. The precision is false." *Id.* at 535.

*Sentencing of Economic Crimes After Booker*, 11 LEWIS & CLARK L. REV. 521 (2007) at p. 14/533-536.

Here, Mr. Castro's PSR base offense level is 33. However, 20 levels are rigidly added for the loss amount as the offense involved more than $9,500,000 but less than $25,000,000. *Id.* Rigid mathematical punishment associated with the guidelines in this case does not address all 3553 factors. In fact, Digital Express recouped a little over $3 million from postage. *See* Exh. P, at p. 63, Janet McHard Report (also Defense Trial Exhibit 5043). Likewise, Mario earned over $88,000 over three years (an average of $28,000/year). *See* Ex. Q at p. 6, Government's Trial Exhibit 264 summarizing Mario's alleged proceeds. As a result, the guidelines do not properly track offense seriousness. Thus, the guidelines here are a gross and inaccurate indicator of the appropriate sentence for Mr. Castro under § 3553.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274

**III.**

**CONCLUSION**

Mr. Castro requests this Honorable Court sentence him to credit for time served followed by 3 years supervised release as a sentence sufficient, but not greater than necessary under 18 USC § 3553.[9]

Dated: September 8, 2023.

Respectfully submitted,

By:   /s/ Richard Tanasi & Joshua Tomsheck
      RICHARD TANASI, ESQ. (9699)
      JOSHUA TOMSHECK, ESQ. (9210)
      *Attorneys for Mario Castro*

**CERTIFICATE OF ELECTRONIC SERVICE**

That on September 8, 2023, he served an electronic copy of the above and foregoing **DEFENDANT MARIO CASTRO'S SENTENCING MEMORANDUM** by electronic service (ECF) to the person named below:

JASON FRIERSON
DANIEL E. ZYTNICK
TIMOTHY FINLEY

Dated: September 8, 2023.

/s/ Richard Tanasi
RICHARD TANASI, ESQ. (9699)
*Attorney for Mario Castro*

---

[9] Mr. Castro requests this Honorable Court Order the release of the $100,000.00 bond posted by surety/property-owner *Irma Castro,* when Mr. Castro self-reports to serve his sentence. *See* ECF No. 141. Further, Mr. Castro requests this Honorable Court not Order restitution consistently with other alleged co-conspirators. *See* U.S. v. Burke, Case No. 2:16-CR-262-01-JAD-(PAL) ECF No. 47; U.S. v Del Rio, Case No. 2:19-cr-00022-JCM-VCF, ECF No. 5; U.S. v. Kern, Case No. 2:19-cr-00032-RFB-VCF ECF No. ;10 U.S. v. O'Connor, Case No. 2:19-cr-00179-JAD-NJK, ECF No. 6; U.S. v. Burrow, Case No. 2:19-CR-295-GMN-NJK, ECF No. 184 (Judgment of Conviction) and ECF No. 128 (Guilty Plea Agreement).

TANASI LAW OFFICES
8716 Spanish Ridge Ave, Suite 105
Las Vegas, Nevada 89148
702-906-2411 • Fax 866-299-5274