# EXHIBIT L

# RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010



**UNITED STATES SENTENCING COMMISSION**
**September 2021**

United States Sentencing Commission
One Columbus Circle, N.E.
Washington, DC 20002
www.ussc.gov

Charles R. Breyer
Acting Chair

Patricia K. Cushwa
*Ex Officio*

Jonathan J. Wroblewski
*Ex Officio*



Kenneth P. Cohen
Staff Director

Glenn R. Schmitt
Director
Office of Research and Data

September 2021

**Ryan Cotter, Ph.D.**
*Deputy Director*
*Office of Research and Data*

**Courtney Semisch, Ph.D.**
*Senior Research Associate*
*Office of Research and Data*

**David Rutter, M.P.A.**
*Research Associate*
*Office of Research and Data*

United States Sentencing Commission



*Recidivism of Federal Offenders Released in 2010*

# TABLE OF CONTENTS

**1**   **INTRODUCTION**

    1       Introduction

    4       Key Findings

    6       Scope of Analysis

**9**   **OFFENDER AND OFFENSE CHARACTERISTICS**

    10      Offender Characteristics

    12      Original Federal Offense Types and Characteristics

    14      Criminal History

    15      Sentences Originally Imposed

**19**   **RECIDIVISM FINDINGS**

    20      Overall

    24      Age and Criminal History

    31      Additional Characteristics

**38**   **CONCLUSION**

**39**   **APPENDICES**

**53**   **ENDNOTES**

# INTRODUCTION

United States Sentencing Commission

# INTRODUCTION

This report is the first in a series continuing the United States Sentencing Commission's (the "Commission") research of the recidivism of federal offenders. It provides an overview of the recidivism of federal offenders released from incarceration or sentenced to a term of probation in 2010, combining data regularly collected by the Commission with data compiled from criminal history records from the Federal Bureau of Investigation (FBI). This report provides an overview of recidivism for these offenders and information on key offender and offense characteristics related to recidivism. This report also compares recidivism outcomes for offenders released in 2010 to federal offenders released in 2005.

Recidivism has been an ongoing research priority for the Commission, both in its development of the original sentencing guidelines and in its continuing duty to collect, analyze, and report sentencing data.[1] This study further advances the Commission's work in this area by examining recidivism in the wake of landmark changes in the federal criminal justice system: the Supreme Court's January 12, 2005 decision in *United States v. Booker* that rendered the federal sentencing guidelines advisory and expanded use of evidence-based practices in federal supervision.[2]

In 2013, the Commission undertook a comprehensive, multi-year study of the recidivism of federal offenders. The first of seven reports from that study, *Recidivism Among Federal Offenders: A Comprehensive Overview*,[3] examined the recidivism of 25,431 federal offenders released from prison or placed on probation in 2005. The Commission found that almost one-half (49.3%) of federal offenders released to the community in 2005 were rearrested over an eight-year period.[4] In addition, the report replicated the research of others in demonstrating the relationship between recidivism and an offender's age and criminal history.[5] The Commission's analysis of recidivism rates by age and criminal history demonstrated that the highest rearrest rates occurred among the youngest group of offenders and those with the most serious criminal histories.[6]

The Commission issued six additional publications in the series, all analyzing the offenders released to the community in 2005. Three of the reports provided detailed analyses of recidivism among specific offender groups: *Recidivism Among Federal Drug Trafficking Offenders*, *Recidivism Among Federal Firearms Offenders*, and *Recidivism Among Federal Violent Offenders*.[7] The remaining three reports provided detailed analyses of specific recidivism correlates: *The Past Predicts the Future: Criminal History and Recidivism of Federal*

*Offenders*, *The Effects of Aging on Recidivism Among Federal Offenders*, and *Length of Incarceration and Recidivism*.[8]

This report updates the Commission's earlier studies by analyzing federal offenders released into the community in 2010. The Commission combined offender and offense information that it regularly collects with recidivism data compiled in partnership with the FBI to examine the extent of recidivism, the types and timing of rearrests, and offense and offender characteristics of rearrested offenders. The 32,135 offenders in this study comprise the largest group of offenders with an eight-year recidivism study period examined by the Commission to date.

Notably, this analysis provides an opportunity to examine recidivism in the context of major changes in the federal criminal justice system. The offenders in this study were sentenced and released in conjunction with two significant transformations in federal sentencing and supervision. The Supreme Court's January 12, 2005 decision in *Booker* rendered the guidelines advisory.[9] The overwhelming majority (83.1%) of offenders in this study were sentenced following that landmark decision. Therefore, the majority of these offenders were sentenced under the advisory guideline system which provides increased judicial discretion to impose

sentences outside of the guidelines. In 2009, the Administrative Office of the United States Courts (AOUSC) began implementing new evidence-based practices in offender supervision.[10] The Federal Probation and Pretrial Services Office (PPSO) adopted the Federal Post Conviction Risk Assessment (PCRA), a risk assessment tool that incorporates criminogenic factors related to recidivism to improve supervision outcomes.[11] This study was not designed to directly measure the effects of these sentencing and supervision changes. Nevertheless, by comparing the recidivism patterns of offenders released before and after these changes, it provides insight into the possible impact of increased judicial discretion and evidence-based supervision programs on recidivism.



**This analysis provides an opportunity to examine recidivism in the context of major changes in the federal criminal justice system following the Supreme Court's decision in *Booker* and increased use of evidence-based practices in federal supervision.**

United States Sentencing Commission

# KEY FINDINGS



**49.3%
REARRESTED**

**50.7%
NOT REARRESTED**

**1** The **recidivism rate remained unchanged** for federal offenders released in **2010 compared to** offenders released in **2005** despite two intervening major developments in the federal criminal justice system: the Supreme Court's decision in *Booker* and increased use of evidence-based practices in federal supervision.

- Over an eight-year follow-up period, nearly one-half (49.3%) of federal offenders released in 2010 were rearrested, the same rate for offenders released in 2005 (49.3%).

- Other recidivism patterns also were consistent for the two offender cohorts.



**2** For offenders who were rearrested, the **median time** to arrest was **19 months**. The largest proportion (18.2%) of offenders were rearrested for the first time during the first year following release. In each subsequent year, fewer offenders were rearrested for the first time than in previous years. **Most** offenders in the study were rearrested **prior to the end of supervision terms**. Of those offenders who were sentenced to a term of supervision and rearrested, 76.3 percent were rearrested earlier than the expiration of their originally imposed supervision term.

**Median Time to Rearrest:
19 MONTHS**

**YEAR 8
49.3%**

**YEAR 1
18.2%**

**3** **Assault** was the **most common** (20.7%) offense at rearrest. The second most common offense was drug trafficking (11.3%), followed by: larceny (8.7%), probation, parole, and supervision violations (8.1%), and administration of justice offenses (7.5%).

**4**

*Recidivism of Federal Offenders Released in 2010*

**4** Combined, **violent offenses** comprised approximately **one-third of rearrests**; 31.4 percent of offenders were rearrested for assault (20.7%), robbery (4.5%), murder (2.3%), other violent offense (2.3%), or sexual assault (1.6%).



VIOLENT
REARREST
31.4%

NON-VIOLENT
REARREST
68.6%

**5** Similar to findings in its previous studies, the Commission found **age** and **Criminal History Category** (CHC) were **strongly associated with rearrests**.

- Offenders in CHC I (the least serious CHC) had the lowest rearrest rates (30.2%) and offenders in CHC VI (the most serious CHC) had the highest rearrest rates (76.2%).

- In addition, nearly three-quarters (72.5%) of offenders younger than age 21 upon release were rearrested during the study period compared to 15.9 percent of offenders aged 60 and older.

**6** **Combined, the impact of CHC and age** on recidivism was **even stronger**. During the eight-year follow-up period, 100 percent of offenders who were younger than 21 at the time of release and in CHC IV, V, and VI (the most serious CHCs) were rearrested. In contrast, only 9.4 percent of offenders in CHC I (the least serious CHC) who were aged 60 and older at release were rearrested.



Less ← Criminal History → More

Younger

100% rearrested

Age

Older    9.4%

**7** Offenders sentenced for **firearms** and **robbery** offenses had the **highest rearrest rates** during the eight-year follow-up period, with 70.6 percent and 63.2 percent, respectively. In contrast, offenders sentenced for **fraud, theft, or embezzlement** had the **lowest** rearrest rate (35.5%).

**5**

United States Sentencing Commission

# SCOPE OF ANALYSIS

## Defining and Measuring Recidivism

Recidivism "refers to a person's relapse into criminal behavior, often after the person receives sanctions or undergoes intervention for a previous crime."[12] Recidivism measures can provide policy makers with information regarding the relative threat to public safety posed by various types of offenders, and the effectiveness of public safety initiatives in deterring crime and rehabilitating offenders.[13] Recidivism measures are used by numerous public safety agencies to measure program performance and inform policy decisions on issues such as pretrial detention, prisoner classification and programming, and offender supervision in the community.[14]

Two measures are foundational to recidivism research, both of which can impact the outcomes of recidivism analyses. The first measure is the type of event used to indicate a relapse into criminal behavior. Recidivism typically is measured by criminal acts that resulted in the rearrest, reconviction, or reincarceration of an offender.[15] The Commission used rearrest for this study for several reasons. Rearrest is the most commonly used measure and is the primary measure of recidivism used by federal agencies in recent recidivism studies.[16] Federal agencies are using rearrest as the primary measure because it is a more reliable measure than reconviction and reincarceration due to the incomplete nature of disposition data.[17] Criminal records often fail to include reconvictions and reincarcerations because jurisdictions inconsistently report them. The records the Commission used to compile the data for this study reflect this inconsistency. For example, records for 44.1 percent of charges had no associated disposition information. For these reasons, the incomplete nature of disposition data used to identify reconviction and reincarceration events makes them unreliable measures of recidivism.

It should be noted that using rearrest does result in higher recidivism rates than reconviction or reincarceration. Not only are rearrests more consistently reported, but also the evidentiary standard for an arrest (probable cause) is less stringent than the evidentiary standard for a conviction and, therefore, incarceration (beyond a reasonable doubt). Because not all arrests result in conviction or incarceration, rearrests can overstate recidivism.[18] The Commission's rearrest measure also includes arrests for alleged violations (or revocations) of supervised release, probation, or state parole, which also can contribute to increased overall recidivism rates. The Commission, however, excluded rearrests for minor traffic offenses.

The second component of measuring recidivism is the "follow-up period," the period of time over which events are counted following release into the community. After a starting event, in this case, release from prison into the community or placement on probation, recidivism events are documented through the end of the follow-up period. The length of follow-up periods varies across recidivism studies. Often, due to limitations on available data, some studies follow offenders for as little as six months. Other studies follow offenders for several years. Tracking offenders for a longer duration provides a more accurate estimate of recidivism or desistance from crime.[19] The Commission used an eight-year follow-up period.

## Methodology

This report provides a comprehensive analysis of the recidivism of all federal offenders who were released from federal prison or sentenced to probation in 2010. The offenders in the study cohort were identified in cooperation with the Federal Bureau of Prisons (BOP) and the AOUSC. The BOP provided identifying information, release dates, and other pertinent information for the Commission to identify offenders released from prison. The AOUSC provided identifying information, revocation information, and other pertinent information for offenders sentenced to probation. The Commission compiled the identifying information for these offenders to obtain criminal records in partnership with the FBI.



**Federal agencies most commonly use rearrest as the primary recidivism measure because it is a more reliable measure than reconviction and reincarceration due to the incomplete nature of disposition data.**

United States Sentencing Commission

The data used in this report combines data regularly collected by the Commission[20] with data compiled as part of a data sharing agreement with the FBI's Criminal Justice Information Services Division.[21]  Through an agreement with the FBI, the Commission collected and processed criminal history records from all state and federal agencies for the offenders in the study.[22]  The Commission then combined this criminal record data with the data it collected about the offenders when they were originally sentenced.

The final study group of **32,135 offenders** satisfied the following criteria:

- United States citizens;

- Re-entered the community during 2010 after discharging their sentence of incarceration or by commencing a term of probation in 2010;

- Not reported dead, escaped, or detained;[23]

- Have valid FBI numbers that could be located in criminal history repositories (in at least one state, the District of Columbia, or federal records).

## SUMMARY OF ANALYSIS

**2010**
YEAR OF RELEASE

**32,135**
OFFENDERS

**8**
YEAR FOLLOW-UP

This report provides an analysis of the overall recidivism rates during the **eight-year follow-up period** for the 32,135 federal offenders identified for this study, as well as key offense and offender characteristics of this group.[24]  For offenders who recidivated during the study period, the analysis examines the elapsed time from release to rearrest and the types of offenses at rearrest.  The analysis also compares recidivism patterns to those of federal offenders released in 2005.[25]

# OFFENDER AND OFFENSE CHARACTERISTICS

United States Sentencing Commission

# OFFENDER AND OFFENSE CHARACTERISTICS

Table 1.  Offender Characteristics
*Federal Offenders Released in 2010*

| Offender Characteristics | |
|---|---|
| **Race/Ethnicity** | |
| White | 41.2% |
| Black | 35.8% |
| Hispanic | 18.1% |
| Other | 4.9% |
| **Gender** | |
| Male | 82.7% |
| Female | 17.3% |
| **Education** | |
| Less than High School | 34.9% |
| High School Graduate | 38.4% |
| Some College | 20.3% |
| College Graduate | 6.4% |
| **Age at Sentencing** | |
| Average | 35 Years |
| Median | 33 Years |
| **Age at Release** | |
| Average | 38 Years |
| Median | 37 Years |

## Offender Characteristics

White offenders (41.2%) comprised the largest group of offenders in the study group, followed by Black (35.8%), Hispanic (18.1%), and Other Races (4.9%) (Table 1).[26]  The offenders predominantly were male (82.7%).  Nearly two-thirds (65.1%) of offenders were high school graduates, including 6.4 percent who graduated college.  Approximately one-third (34.9%) of offenders in the study did not complete high school.

*Recidivism of Federal Offenders Released in 2010*



**The offenders in this study group were similar to federal offenders released in 2005.**

Figure 1.  Age at Sentencing and Release
*Federal Offenders Released in 2010*



At sentencing, the average age of offenders in the study group was 35 years (median 33 years),[27] with offenders ranging from 18 to 84 years of age.  At the time of release, the average age of offenders was 38 years (median 37 years).  At release, the largest proportion (35.0%) of offenders were age 30 to 39 years old and only 5.3 percent were aged 60 or older (Figure 1).

The offenders in the study group were similar to federal offenders released in 2005.  Among offenders released in 2005, the overwhelming majority (81.7%) were male.  White offenders (43.7%) comprised the largest group of offenders, followed by Black (33.9%), Hispanic (17.8%), and Other Races (4.6%).  The educational attainment was as follows: 34.2 percent did not complete high school, 36.9 percent graduated high school, 21.4 percent completed some college, and 7.5 percent graduated college.  The median age at release was 36 years.[28]

United States Sentencing Commission

## Original Federal Offense Types and Characteristics

The largest proportion of offenders in the study group, 43.1 percent, were released following sentences for drug trafficking offenses (Figure 2).[29]  The remaining offenders were sentenced for fraud, theft, or embezzlement (17.4%), firearms (15.3%), immigration (4.4%),[30] robbery (4.1%), or other types of offenses (15.7%).[31]  A small proportion of offenders were sentenced for a violent offense, comprising 9.4 percent of the study group (Figure 3).[32]

Offenders in this study committed similar federal offenses as offenders released in 2005.  In the *2016 Recidivism Overview Report*, the Commission used a slightly different offense classification scheme for federal offenses.[33] Nevertheless, the distribution of offense types was similar for the two cohorts.



Figure 2.  Federal Offense Type
*Federal Offenders Released in 2010*

- DRUG TRAFFICKING — 43.1%
- FRAUD/THEFT/EMBEZZLEMENT — 17.4%
- FIREARMS — 15.3%
- IMMIGRATION — 4.4%
- ROBBERY — 4.1%
- OTHER OFFENSES — 15.7%

The largest proportion of offenders released in 2005 were sentenced for drug trafficking (41.6%).  Fraud (13.6%) and larceny (3.9%) were reported separately for offenders released in 2005, combined, they accounted for the third largest group of offenders. The second largest group was all other offenses (20.3%), followed by firearms (12.8%), robbery (4.3%), and immigration (3.5%).[34]

> **A small proportion of offenders in the study group were originally sentenced for a violent offense.**



Figure 3.  Violent Federal Offenses
*Federal Offenders Released in 2010*

- VIOLENT 9.4%
- NON-VIOLENT 90.6%

Figure 4. Selected Sentencing Factors
*Federal Offenders Released in 2010*



Figure 4 provides information on selected sentencing factors for offenders in the study group.  Weapon-involved offenses were determined by the application of a weapon-related specific offense characteristic at sentencing or a conviction under 18 U.S.C. § 924(c),[35] or both.[36]  Sentence enhancements for weapon-involved offenses applied to 11.7 percent of offenders in the study.

Chapter Three of the *Guidelines Manual* provides adjustments pertaining to an offender's role in the offense.  Relevant to this study, Chapter Three provides adjustments for offenders whose conduct constitutes an aggravating role (§3B1.1) or a mitigating role (§3B1.2) in the offense.  Section 3B1.1 provides a 2- to 4-level increase for offenders who acted in an aggravating role in the offense.[37]  Conversely, §3B1.2 provides a 2- to 4-level decrease for offenders who acted in a mitigating role in the offense.[38]  Courts applied these role adjustments for a small proportion of offenders at the time of sentencing; a slightly greater proportion of offenders had offense level decreases for mitigating role (8.4%) compared to offenders with offense level increases for aggravating role (5.0%).

Section 3E1.1 of the *Guidelines Manual* provides for a 2- or 3-level decrease for an offender who demonstrates acceptance of responsibility for the offense.[39]  The majority (92.2%) of offenders in the study had an offense level decrease for acceptance of responsibility at the time of sentencing.

United States Sentencing Commission

## Criminal History

Chapter Four of the *Guidelines Manual* provides for the calculation of a criminal history score based primarily on the type of sentence and length of any prior sentence of imprisonment, among other considerations.[40] The guidelines provide rules to determine the total number of criminal history points applicable to an offender's prior convictions, which, in turn, determine the offender's Criminal History Category (CHC) in the Sentencing Table.[41] For example, three points are assigned for each prior sentence of imprisonment exceeding one year and one month. In addition to points for prior sentences, two additional points are added if the defendant committed the federal offense while under any criminal justice sentence, such as probation. The total number of criminal history points determine the offender's CHC, ranging from I to VI.

Figure 5 shows the CHCs and underlying criminal history points for the offenders in the study. The largest proportion (45.3%) of offenders were in CHC I, the lowest Criminal History Category, with zero or one criminal history point assigned. The majority of CHC I offenders in the study had zero points assigned under the guidelines. Of the zero-point offenders, nearly half (47.9%) were first-time offenders who had no prior contact with the criminal justice system; that is, they did not have arrests or convictions prior to the original offense of conviction.[42] At the other end of the spectrum, 11.1 percent of offenders were in the most serious Criminal History Category of VI.[43] The number of criminal history points underlying calculations of CHC VI ranged from 13 to 56. The remaining offenders were in CHC II (11.9%), CHC III (15.8%), CHC IV (9.8%), and CHC V (6.1%).[44]

Figure 5. Criminal History Category and Underlying Criminal History Points
*Federal Offenders Released in 2010*



Figure 6.  Calendar Year of Federal Sentencing
*Federal Offenders Released in 2010*



In addition to CHC, the guidelines provide for enhanced penalties for some repeat offenders; two of those provisions are pertinent to this study.  First, §4B1.1 (Career Offender) provides enhanced penalties for offenders with an instant conviction for a felony "crime of violence" or a "controlled substance offense" (as those terms are defined in §4B1.2) and who have at least two prior felony convictions for such offenses.[45]  Second, §4B1.4 (Armed Career Criminal) provides enhanced penalties for armed career criminals pursuant to 18 U.S.C. § 924(e), the Armed Career Criminal Act (ACCA).  The ACCA and, in turn, §4B1.4, provide increased sentences for offenders who were convicted under 18 U.S.C. § 922(g) and who have at least three prior convictions for a "violent felony" or "serious drug offense."[46]  These enhancements applied to a very small proportion of offenders in the study; 3.8 percent were originally sentenced under the career offender or armed career criminal provisions.[47]

## Sentences Originally Imposed

The offenders in the study group were originally sentenced between 1990 and 2010 (Figure 6).  More than three-quarters (76.2%) were sentenced prior to the release year of 2010.  Notably, the overwhelming majority of offenders in the study (83.1%) were sentenced after January 12, 2005, the date of the Supreme Court's decision in *Booker*,[48] that rendered the sentencing guidelines advisory.  In addition, the offenders in the study were released (or sentenced to probation) during the PPSO's implementation of updated evidence-based supervision practices and use of the PCRA.

United States Sentencing Commission

Figure 7.  Type of Sentence Imposed
*Federal Offenders Released in 2010*



Most offenders in the study group originally were sentenced to a term of imprisonment.  As shown in Figure 7, a prison-only sentence was imposed for 80.8 percent of offenders.  Another 9.9 percent of offenders were sentenced to probation only (*i.e.*, where no type of confinement was imposed).  An additional 5.7 percent of offenders were sentenced to terms of probation with some type of alternative confinement, and 3.6 percent were sentenced to a combination of imprisonment and alternative confinement, such as a halfway house or home confinement.[49]  Following the same methodology used in the *2016 Recidivism Overview Report*, the Commission combined these four sentencing categories into two categories for analysis.[50]  The prison category comprises the 84.4 percent of offenders sentenced to prison only and those sentenced to a combination of imprisonment and alternative confinement; the probation category comprises the 15.6 percent of offenders sentenced to probation only and those sentenced to probation with some type of alternative confinement.

The average sentence imposed for all offenders in the study group was 51 months.[51]  For offenders sentenced to prison, the average imprisonment term was nearly five years (59 months).  The majority (60.2%) of offenders sentenced to prison were sentenced to terms ranging from two years to less than ten years (Figure 8). Offenders sentenced to prison terms of ten years or longer comprised 14.2 percent

*Recidivism of Federal Offenders Released in 2010*

of imprisoned offenders.[52]  For offenders sentenced to probation, the average probation term imposed was slightly more than three years (38 months).  The largest proportion (37.8%) of offenders sentenced to probation were sentenced to a three-year term.

Section 5D1.1(a) of the *Guidelines Manual* provides that courts may impose a term of supervised release following a sentence of imprisonment for any felony or misdemeanor and must do so if required by statute.[53]  Nearly all (99.4%) of the offenders sentenced to prison also were sentenced to subsequent terms of supervised release.  The average term of supervised release imposed was nearly four years (46 months).  As shown in Figure 8, courts most often imposed supervised

release terms of three to less than four years, accounting for 52.3 percent of offenders.  A very small proportion of offenders, 2.0 percent, were sentenced to terms of supervised release of ten years or more, or life.  Nearly all (99.4%) offenders in the study were sentenced to some type of supervision (probation or supervised release).



**Nearly all offenders in the study group were sentenced to some type of supervision (probation or supervised release).**

Figure 8.  Length of Imprisonment, Probation, and Supervised Release
*Federal Offenders Released in 2010*



United States Sentencing Commission

# RECIDIVISM FINDINGS

United States Sentencing Commission

# OVERALL FINDINGS

Table 2.  Comparison of Overall Rearrest Findings
*Federal Offenders Released in 2010 and 2005*

|  | Offenders Released in 2010 | Offenders Released in 2005 |
|---|---|---|
| Percent Rearrested | 49.3% | 49.3% |
| Median Months to Rearrest | 19 | 21 |
| Median Number of Rearrests | 2 | 2 |
| Most Common Post Release Offense | Assault (20.7%) | Assault (23.3%) |
| Median Age at Release | 33 | 33 |

## Overall Recidivism Findings

The recidivism of federal offenders has remained constant.  Nearly half (49.3%) of offenders released in 2010 were rearrested within the eight-year follow-up period.[54] This rate is identical to the rearrest rate (49.3%) for federal offenders released in 2005.[55]  In addition, recidivism patterns were the same for offenders released in 2010 and offenders released in 2005 (Table 2).

Among offenders in this study who were rearrested, the median time to arrest was 19 months.  For one-half of offenders who were rearrested, the first rearrest occurred just over one and one-half years following their initial release to the community.  The number of rearrests during the follow-up period ranged from one to 43 and the median number of rearrests was two.  Slightly less than one-third (30.7%) of offenders had a single rearrest, but one-quarter (26.1%) were rearrested five times or more.  Assault was

the most serious and most common offense at rearrest (20.7%).[56]  For offenders who were rearrested, the median age at release was 33 years (average 35 years).

As shown in Table 2, recidivism patterns were unchanged from the Commission's findings in its *2016 Recidivism Overview Report* for federal offenders released in 2005.  In that study, the Commission also reported a median number of arrests of two and a median age at release of 33 years.  The most common offense at rearrest also was assault, and a slightly larger proportion of offenders in that study had assault as the most common type of offense (23.3%).  The median time to rearrest in that study was slightly longer at 21 months.

Notably, these similar recidivism patterns occurred in different federal criminal justice environments.  The overwhelming majority of offenders released in 2005 (77.8%) were sentenced prior to *Booker*, under the mandatory guideline system.[57]  In contrast, the

**20**

overwhelming majority of offenders released in 2010 were sentenced post-*Booker*, under the advisory guideline system.[58]  In addition, the two groups of offenders were released into different supervisory systems.  The offenders in this study were released in 2010, when the PPSO had increased its reliance on evidence-based practices by implementing the PCRA tool.  While this study was not specifically designed to assess the impact of these changes on recidivism, it is nevertheless notable that recidivism patterns remained entirely unchanged in their wake.

### Timing of Rearrest

The largest proportion of rearrests occurred soon after release and steadily decreased over time.  Of those offenders who were rearrested, the largest proportion were rearrested for the first time during the first year following release.  In each subsequent year, fewer offenders were rearrested for the first time than in previous years.  This pattern also mirrors that reported by the Commission for offenders released in 2005.  As shown in Figure 9, 18.2 percent of offenders in this study were rearrested during the first year following release into the community.  In the second year, an additional 10.4 percent of offenders were rearrested for the first time, and in the third year, an additional 6.8 percent were rearrested for the first time.  By the eighth year, only 1.8 percent of offenders who were not previously arrested recidivated for the first time.

Time to rearrest also is unchanged from offenders released in 2005.  In the *2016 Recidivism Overview Report*, the Commission reported that 16.6 percent of offenders in the 2005 cohort were rearrested during the first year of release, and fewer offenders were rearrested for the first time in each of the subsequent years.  Nearly identical to the current findings, that study also showed that 10.5 percent of offenders were rearrested for the first time in the second year, 6.6 percent were rearrested for the first time in the third year, and only 1.8 percent of offenders were rearrested for the first time in the eighth year.[59]

Figure 9.  Time to First Rearrest
*Federal Offenders Released in 2010*



United States Sentencing Commission

### *Rearrests and Federal Supervision Status*

To further explore the issue of timing of rearrest, the Commission also examined rearrests relative to federal supervision status.  As discussed above, nearly all (99.4%) offenders in the study originally were sentenced to a term of federal supervision (either probation or supervised release).  The average supervision term imposed was less than four years (44 months).  Because almost all[60] of the supervision terms imposed were shorter than the eight-year follow-up period, a large proportion of offenders had the opportunity to successfully complete their originally imposed supervision terms prior to the end of the study period.  While the data for this study included the length of supervision terms imposed, it did not include supervision status at the time of rearrest.  Therefore, for each rearrested offender, the Commission compared the length of supervision term imposed to the elapsed time prior to rearrest to provide a proxy of the offenders' supervision status at the time of rearrest.[61]

Overall, 49.2 percent of offenders originally sentenced to any term of supervision were rearrested during the study period.  Based on the length of terms imposed, most offenders in the study were rearrested prior to the end of those terms.  As shown in Figure 10, of those offenders who were sentenced to a term of supervision and rearrested, 76.3 percent were rearrested earlier than the expiration of their originally imposed supervision

Figure 10.  Rearrests by Supervision Status
*Federal Offenders Released in 2010 on Supervision*



term.  The remaining 23.7 percent were rearrested after the expiration of their originally imposed supervision term.

### *Types of Rearrests*

The Commission ranked offenses by severity to analyze new offenses committed by the offenders in the study.  This severity ranking was similar to the one in the Commission's *2016 Recidivism Overview Report*[62] and presents new offenses in order of seriousness.  If an offender was rearrested multiple times during the study period or had multiple charges in an arrest, the most serious offense according to this ranking was reported as the type of offense at rearrest.[63]

**22**

*Recidivism of Federal Offenders Released in 2010*

Figure 11.  Most Serious Offense at Rearrest
*Federal Offenders Released in 2010*



This analysis differs from the Commission's previous work in the reporting of one rearrest category.  To provide an increased level of detail for this analysis, the Commission expanded the previously reported "public order" category.  The Commission examined the offense types comprising the public order category and determined that reporting four separate categories provided a more meaningful analysis.  Therefore, the previously existing public order category is divided into administration of justice offenses; probation, parole, and supervision violations; other sex offenses; and public order offenses.

Using this method, the largest proportion (20.7%) of offenders in this study were rearrested for assault (Figure 11).  The second most common offense was drug trafficking (11.3%), followed by larceny (8.7%), probation, parole, and supervision violations (8.1%), and administration of justice offenses (7.5%). Other offense types each comprised less than seven percent of rearrests, including all remaining types of violent offenses. Combined, violent offenses comprised approximately one-third of rearrests; a total of 31.4 percent of offenders were rearrested for assault (20.7%), robbery (4.5%), murder (2.3%), an other violent offense (2.3%), or sexual assault (1.6%).[64]

United States Sentencing Commission

The predominant offenses at rearrest for offenders released in 2010 are consistent with the Commission's previous recidivism findings for offenders released in 2005. The *2016 Recidivism Overview Report* also reported that assault was the most common offense at rearrest; 23.3 percent of all federal offenders were rearrested for assault, followed by public order (15.5%),[65] drug trafficking (11.5%), and larceny (7.7%).[66]

Similarly, the Commission also reported that violent offenses comprised approximately one-third of rearrests, with 32.3 percent of offenders having been rearrested for assault (23.3%), robbery (4.7%), rape (1.9%), homicide (1.3%), or an other violent offense (1.1%).

## Age and Criminal History

Age and criminal history are consistently strong predictors of recidivism.[67] This strong association is demonstrated in the current study as well as in the Commission's prior study of offenders released in 2005. For both the 2010 and 2005 cohorts, *lower* rearrest rates were associated with older offenders and *higher* rearrest rates were associated with offenders with more extensive criminal histories. The combined impact of age and criminal history on recidivism is more pronounced. This section of the report focuses on these two primary correlates of recidivism: age and criminal history.

### Age

Figure 12 shows the age distribution of federal offenders released in 2010 and their corresponding recidivism rates. As shown in the figure, more than half of federal offenders were younger than 40 years of age at the time of release. Figure 12 also demonstrates the inverse relationship of age and recidivism. The youngest offenders had the highest recidivism rates, and those rates steadily declined with increasing age. For example, nearly three-quarters (72.5%) of offenders younger than age 21 were rearrested during the study period. Nearly two-thirds (64.4%) of offenders aged 21 to 29 were rearrested and less than one-third (30.8%) of offenders aged 50 to 59 were rearrested. The lowest rearrest rates were for offenders age 60 and older; 15.9 percent of offenders in that age group were rearrested during the study period.

In addition to having higher rearrest rates, younger offenders also recidivated sooner after release compared to their older counterparts. While the median time to rearrest was 19 months for all offenders in the study, as shown in Table 3, the median time to rearrest for the youngest group of offenders (younger than 21 years) was 12 months. One-half of offenders in that age group were rearrested before one year had elapsed following their release, and the other one-half of offenders were rearrested after one year had elapsed following their release. The median time to rearrest increased for offenders in each successive age group, nearly doubling to almost two years (22 months) for the two oldest groups of offenders.

*Recidivism of Federal Offenders Released in 2010*

Figure 12.  Age at Release and Rearrest Rates
*Federal Offenders Released in 2010*



The demonstrated relationship between age and recidivism is consistent with previous Commission findings.  In its *2017 Recidivism Age Report* the Commission demonstrated the overall relationship between age and recidivism.  In that study, the Commission found that younger offenders were more likely to be rearrested than older offenders and were rearrested faster than older offenders.[68]  For offenders released in 2005, the rearrest rate was highest (67.6%) among offenders younger than 21 and declined in each subsequent age group to 16.4 percent for offenders aged 60 and older.  In addition, offenders who were younger than age 30 when they were released had the shortest median time to rearrest (17 months).  Conversely, offenders aged 60 and older had the longest median time to rearrest (28 months).[69]  Furthermore, in that report the Commission demonstrated that the age-recidivism relationship persisted across all other factors in the analysis (*e.g.*, criminal history).[70]

Table 3.  Time to Rearrest by Age Group
*Federal Offenders Released in 2010*

| Age at Release | Time to Rearrest (median months) |
|---|---|
| Younger than 21 | 12 |
| 21 - 29 Years | 16 |
| 30 - 39 Years | 20 |
| 40 - 49 Years | 21 |
| 50 - 59 Years | 22 |
| 60 and Older | 22 |

### Criminal History Points and Criminal History Category

Criminal history also is strongly correlated with recidivism.  The Commission examined the relationship between rearrests and both the total number of criminal history points and the resulting CHC.  This examination confirmed that offenders with more extensive criminal histories had higher rearrest rates.

**25**

United States Sentencing Commission

As shown in Figure 13, rearrest rates increased with each CHC. The rearrest rates ranged from less than one-third (30.2%) of offenders in CHC I to nearly one-half (49.4%) of offenders in CHC II, and steadily increased to more than three-quarters (76.2%) of offenders in CHC VI.

An offender's criminal history points largely determine the CHC.[71] Therefore, the relationship between recidivism and criminal history is more evident comparing rearrest rates and criminal history points. As shown in Figure 14, offenders with zero criminal history points had the lowest rearrest rates. Slightly more than one-quarter (26.8%) of offenders with no criminal history points assigned were rearrested during the study period. Rearrests increased more than 15 percentage points for offenders with one criminal history point (42.3%); and then increased steadily. With two exceptions (8 points and 12 points) each additional criminal history point was associated with a higher rate of rearrest. For example, more than half (57.9%) of offenders with four criminal history points were rearrested, more than two-thirds (69.2%) of offenders with seven criminal history points were rearrested, and 80.6 percent of offenders with 13 or more criminal history points were rearrested during the study period.

These findings are consistent with the Commission's previous findings for recidivism and criminal history for federal offenders released in 2005. In its *2016 Recidivism Overview Report* and its *2017 Recidivism Criminal History Report*, the

Figure 13. Rearrest Rates by Criminal History Category
*Federal Offenders Released in 2010*



CRIMINAL HISTORY CATEGORY

Commission reported the lowest recidivism rates among offenders with zero criminal history points (30.2%), a sharp increase for offenders with one criminal history point (46.9%), and a generally steady increase in recidivism with each additional criminal history point.[72] The *2016 Recidivism Overview Report* reported a recidivism rate of 81.5 percent for offenders with ten or more criminal history points and the *2017 Recidivism Criminal History Report* reported a recidivism rate of 85.7 percent for offenders with 15 or more criminal history points. In addition, both publications reported that rearrest rates steadily increased from a low of 33.8 percent for offenders in CHC I to a high of 80.1 percent for offenders in CHC VI.[73]

This study demonstrated notably lower rearrest rates among offenders in CHC I compared to offenders in the higher CHCs. To further analyze the relationship between criminal history and recidivism, the Commission undertook a closer examination of CHC I offenders. As described above, offenders in CHC I are assigned either zero or one criminal history point. As a group, offenders with zero criminal history points had a rearrest rate of 26.8 percent. Among offenders with zero criminal history points, approximately half (47.9%) had no prior contact with the criminal justice system. The remaining half (52.1%) of offenders with zero points had either prior arrests that did not result in convictions or convictions that did not qualify for criminal history points, or

Figure 14. Rearrest Rates by Criminal History Points
*Federal Offenders Released in 2010*



United States Sentencing Commission

Figure 15. Rearrest Rates for Offenders with Limited Criminal History
*Federal Offenders Released in 2010*



both. As shown in Figure 15, one-fifth (20.3%) of zero-point offenders with no prior contact with the criminal justice system were rearrested during the study period. In comparison, nearly one-third (32.7%) of zero-point offenders with prior contact were rearrested. However, both groups of zero-point offenders were rearrested at lower rates compared to their CHC I counterparts with one criminal history point, 42.3 percent of whom were rearrested during the study period.

These findings also are similar to the Commission's findings in the *2017 Recidivism Criminal History Report*. In that publication, the Commission reported that offenders with zero criminal history points had a rearrest rate of 30.2 percent. However, offenders who had no prior contact with the criminal justice system had a rearrest rate of 25.7 percent and offenders with prior contact had a rearrest rate of 37.4 percent.[74]

The Commission also analyzed career offenders and armed career criminals for both the 2010 and 2005 cohorts. Recidivism rates for those offenders were lower than for offenders who were in the highest CHC, absent application of those recidivist provisions. Only 3.8 percent of offenders in this study were sentenced as career offenders or armed career criminals. However, almost two-thirds (62.8%) of those offenders were rearrested during the study period (Figure 16). These rates were lower than the rearrest rates for offenders in the most serious CHC of VI (76.2%). This difference is attributable to the provisions in §§4B1.1 and 4B1.4. Those guideline provisions assign career offender and armed career criminal status based on a combination of the type of instant offense and types of prior convictions.[75] Because those guidelines assign CHC based on offender status in lieu of criminal history points, the resulting CHCs often supersede the otherwise applicable CHCs.[76] For

Figure 16.  Rearrest Rates for Offenders with Most Extensive Criminal History
*Federal Offenders Released in 2010*



example, more than half (51.0%) of career offenders and armed career criminals had higher CHCs than would have otherwise applied based on criminal history points alone.

Similarly, among offenders released in 2005, 69.5 percent of offenders who qualified as career offenders or armed career criminals were rearrested, compared to 80.1 percent of offenders in CHC VI.  The Commission also reported similar findings in other studies.  In its 2016 *Report to the Congress: Career Offender Sentencing Enhancements*, the Commission studied offenders who were released between 2004 and 2006 who had been sentenced as career offenders under §4B1.1.  Two-thirds (66.2%) of career offenders were rearrested in the eight-year study period.[77]  In its *Armed Career Criminal Report*, the Commission studied offenders who were released between 2009 and 2011 who had been sentenced as armed

career criminals pursuant to ACCA and §4B1.4.  More than half (59.0%) of armed career criminals were rearrested in the eight-year study period.[78]

### The Combined Impact of Age and Criminal History

Separately, age and criminal history are consistent predictors of recidivism.  Considered together, they are even better predictors of recidivism.  Older offenders were rearrested at lower rates compared to younger offenders within each CHC, and rearrests increased within each age category across CHC.  The Commission reported a similar pattern for offenders released in 2005 in its *2017 Recidivism Age Report*.[79]  In the current study, offenders aged 60 and older at release and in CHC I had the lowest rearrest rate, 9.4 percent (Table 4).  The rearrest rate was twice as high (18.2%) for CHC II offenders in that age group.  Furthermore, the rearrest

United States Sentencing Commission

rate was five times as high (46.9%) for CHC VI offenders in that age group; a rate comparable to CHC I offenders aged 21 to 29 at release (48.5%).  At the other end of the spectrum, all offenders younger than age 21 at release and in CHCs IV, V, and VI were rearrested.  Because CHC is determined, in part, by the number and length of prior sentences, only 19 offenders were under the age of 21 and in CHC IV, V, and VI.  There were 347 offenders under the age of 21 at release in CHC I, and two-thirds (66.6%) of those offenders were rearrested, a rate comparable to CHC V offenders aged 40 to 49 (67.4%).

Similarly, in the 2005 cohort, offenders aged 60 and older in CHC I had the lowest rearrest rate, 11.3 percent.  In comparison, 53.0 percent of CHC I offenders in the youngest age group in that study, younger than 30 years of age, were rearrested.  Considering CHC VI offenders in that study, 37.7 percent of offenders aged 60 and older were rearrested, compared to 89.7 percent of offenders younger than 30 years of age.



**Separately, age and criminal history are consistent predictors of recidivism. Considered together, they are even better predictors of recidivism.**

Table 4.  Rearrest Rates by Age at Release and Criminal History Category
*Federal Offenders Released in 2010*

| AGE | CRIMINAL HISTORY CATEGORY (CHC) | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|
| | CHC I | CHC II | CHC III | CHC IV | CHC V | CHC VI | |
| Younger than 21 | 66.6% | 84.1% | 90.7% | 100.0% | 100.0% | 100.0% | 72.5% |
| 21 – 29 | 48.5% | 66.9% | 79.1% | 85.4% | 86.4% | 89.9% | 64.4% |
| 30 – 39 | 31.2% | 49.6% | 61.3% | 71.4% | 77.3% | 81.1% | 54.1% |
| 40 – 49 | 22.3% | 41.6% | 50.9% | 62.9% | 67.4% | 73.1% | 42.7% |
| 50 - 59 | 15.0% | 30.8% | 46.4% | 48.6% | 61.7% | 65.3% | 30.8% |
| 60 and Older | 9.4% | 18.2% | 28.1% | 30.0% | 48.6% | 46.9% | 15.9% |
| TOTAL | 30.2% | 49.4% | 61.9% | 70.3% | 75.4% | 76.2% | |

*Recidivism of Federal Offenders Released in 2010*

# ADDITIONAL CHARACTERISTICS

## Offender Characteristics

As shown in Table 5, male offenders had substantially higher rearrest rates (52.3%) compared to female offenders (35.1%) during the study period. Black offenders had the highest rearrest rates (58.2%), followed by Other Races (50.2%), Hispanic (46.5%), and White (42.9%) offenders. These demographic differences in rearrest rates, however, must be considered in light of the association between criminal history and recidivism discussed above. Black offenders had the smallest proportion (30.0%) of offenders in CHC I compared to White (52.7%), Hispanic (55.3%), and Other Races (58.2%). Also, Black offenders had the largest proportion (16.5%) of offenders in CHC VI compared to White (9.1%), Hispanic (6.5%), and Other Races (4.6%). Rearrest rates were comparable for offenders in the highest CHC. For offenders in CHC VI, the rearrest rates were as follows: Black (75.0%), White (78.3%), Hispanic (74.1%), and Other Races (80.8%).

Rearrest rates decreased steadily for each successive increase in educational level. More than half of offenders who did not complete high school (60.8%) or graduated high school (50.2%) were rearrested. In comparison, 37.2 percent of offenders with some college and 19.6 percent of college graduates were rearrested during the study period.

Table 5. Rearrest Rates by Offender Characteristics
*Federal Offenders Released in 2010*

| Offender Characteristics | % Rearrested |
|---|---|
| **Gender** | |
| Male | 52.3% |
| Female | 35.1% |
| **Race/Ethnicity** | |
| White | 42.9% |
| Black | 58.2% |
| Hispanic | 46.5% |
| Other | 50.2% |
| **Education** | |
| Less than High School | 60.8% |
| High School Graduate | 50.2% |
| Some College | 37.2% |
| College Graduate | 19.6% |

Rearrest rates based on these offender characteristics were the same for offenders released in 2005. In the *2016 Recidivism Overview Report*, the Commission reported that 52.2 percent of male offenders and 36.4 percent of female offenders were rearrested during the study period. In addition, eight years after release into the community, Black offenders had been arrested at the highest rates (59.1%), followed by Other Races (49.4%), Hispanic (49.1%), and White (41.7%) offenders. Education levels were similarly associated with different rates of recidivism. Offenders who did not complete high school had the highest recidivism rates (60.4%), followed by high school graduates (50.7%) and those with some college (39.3%). College graduates had the lowest rates (19.1%).[80]

United States Sentencing Commission

Figure 17.  Rearrest Rates by Federal Offense Type
*Federal Offenders Released in 2010*



## Offense Characteristics

Rearrest rates varied substantially by the type of offense for which offenders were originally sentenced (Figure 17). Offenders sentenced for a federal firearms offense had the highest rearrest rate, 70.6 percent, followed by robbery (63.2%) and immigration[81] (56.7%).  Fewer than half of offenders sentenced for drug trafficking (48.0%), fraud, theft, or embezzlement (35.5%), and all other offenses (41.9%)

were rearrested.[82]  In addition, offenders who were released following sentencing for a violent offense were more likely to be rearrested than non-violent offenders, 59.9 percent compared to 48.2 percent (Figure 18).

These findings reflect previous Commission findings for federal offenders released in 2005.  In its *2016 Recidivism Overview Report*, the Commission reported the highest rearrest rates for offenders who were released following sentences for firearms (68.3%) and robbery (67.3%) offenses.  In addition, the lowest rearrest rates were for offenders sentenced for fraud (34.2%), larceny (44.4%), and all other (42.0%) offenses.[83]  In addition, in its *2017 Recidivism Criminal History Report* the Commission determined that 64.1 percent of violent offenders were rearrested during the study period.[84]

> **Offenders sentenced for a federal firearms offense had the highest rearrest rate.**

Figure 18. Rearrest Rates by Violent Federal Offense Type
*Federal Offenders Released in 2010*



The Commission examined whether offenders in the study were consistent in their offending patterns. To make this determination, the Commission compared each offender's original federal offense type to the most serious offense at rearrest. These comparisons did not demonstrate consistent patterns. Similar to the overall findings reported above, assault was the most common type of rearrest for offenders originally sentenced for drug trafficking (19.9%), firearms (26.6%), immigration (22.8%), and all other types offenses (20.8%) (Table 6).

A pattern demonstrating consistency in the most common type of rearrest and federal offense appeared for only two groups of offenders. For offenders originally sentenced for fraud, theft, or embezzlement, the most common type of rearrest was larceny (18.8%) and the second most common type of rearrest was assault (13.8%), but the third was fraud (13.0%). In addition, the most common type of rearrest was robbery (24.7%) for offenders originally sentenced for robbery.

Table 6. Federal Offense Type by Most Common Rearrest Type
*Federal Offenders Released in 2010*

| Federal Offense Type | Most Common Rearrest |
|---|---|
| Drug Trafficking | Assault (19.9%) |
| Firearms | Assault (26.6%) |
| Immigration | Assault (22.8%) |
| All Other | Assault (20.8%) |
| Fraud/Theft/Embezzlement | Larceny (18.8%) |
| Robbery | Robbery (24.7%) |

United States Sentencing Commission

Figure 19.  Prevalence of Violence (Instant Federal Offense and Rearrest)
*Federal Offenders Released in 2010*



Violent offenders were more likely to be rearrested for a violent offense compared to non-violent offenders; 45.5 percent of offenders originally sentenced for a violent offense also had a violent offense as the most serious offense at rearrest. In comparison, 29.6 percent of offenders sentenced for non-violent offenses had a violent offense as the most serious offense at rearrest (Figure 19).

The Commission also assessed the relationship between various sentencing factors and recidivism.  As shown in Figure 20, most sentencing factors were not strongly associated with rearrest.  More than one-half (54.0%) of offenders whose original federal offense involved a weapon were rearrested, compared to less than half (48.7%) of offenders whose offense did not involve a weapon.  In addition, rearrest rates for offenders with and without sentencing adjustments for mitigating role and acceptance of responsibility were comparable.  In contrast, a notably smaller proportion of offenders who received an aggravating role adjustment (36.2%) were rearrested compared to offenders who did not receive the adjustment (49.9%).

**The Commission examined whether offenders in the study were consistent in their offending patterns and found that violent offenders were more likely to be rearrested for violent offenses compared to non-violent offenders.**

While the lower rearrest rate for arguably more culpable offenders may seem counterintuitive, two factors associated with lower rearrest rates, age at release and federal offense type, characterized offenders who received the adjustment. First, offenders who received a sentencing adjustment for an aggravating role were, on average, older at release (43 years) than offenders who did not receive the enhancement (38 years). Second, offenders originally sentenced for offenses with the lowest rearrest rates, fraud, theft, or embezzlement, comprised nearly one-third (30.2%) of offenders who received an aggravating role enhancement. That proportion is almost twice the proportion of fraud, theft, or embezzlement offenders in the overall study group of 17.4 percent.

## Sentences Imposed

### *Imprisonment*

More than half (53.0%) of offenders sentenced to imprisonment were rearrested (Figure 21), and there was some variation in rearrest rates comparing length of imprisonment terms. Offenders originally sentenced to imprisonment terms of less than six months had the lowest rearrest rates, 41.7 percent. In comparison, offenders who originally were sentenced to imprisonment terms of two to just under five years (55.0%) and five to just under ten years (56.2%) had the highest rearrest rates. The rearrest rate for offenders originally sentenced to terms of imprisonment of ten years or longer was comparatively low at 50.3 percent.

Figure 20. Rearrest Rates by Selected Sentencing Factors
*Federal Offenders Released in 2010*



United States Sentencing Commission

The Commission's findings in its *2020 Recidivism Incarceration Report* provide context for this outcome. That study included two research designs that matched offender comparison groups to analyze the relationship between length of incarceration and recidivism. The Commission used various statistical models and consistently found that incarceration lengths of more than ten years were associated with lower odds of rearrest. Two sets of analyses in that study demonstrated that offenders incarcerated for more than ten years were between 30 percent and 45 percent less likely to recidivate eight years after release compared to groups of offenders sentenced to shorter terms of imprisonment.[85] The Commission found no statistically significant relationship between recidivism and incarceration lengths of 60 months or

less.[86] In addition, when focusing on the shortest period of incarceration studied (12 to 24 months), the research designs yielded varying results, neither of which were statistically significant nor sufficiently reliable to make evidence-based conclusions.[87]

### *Probation*

Fewer than one-third (29.3%) of offenders sentenced to probation were rearrested (Figure 22). Offenders sentenced to a probation term of any length had lower rearrest rates compared to offenders sentenced to prison. The largest proportion of offenders sentenced to probation who were rearrested (31.5%) were sentenced to terms of three years and five years or more.

Figure 21. Rearrest Rates by Length of Imprisonment Terms
*Federal Offenders Released in 2010*



Imprisonment Rearrest Rate: 53.0%

| Less than 6 Months | 6 Months to less than 1 Year | 1 to less than 2 Years | 2 to less than 5 Years | 5 to less than 10 Years | 10 Years or More |
|---|---|---|---|---|---|
| 41.7% | 50.8% | 50.0% | 55.0% | 56.2% | 50.3% |

*Recidivism of Federal Offenders Released in 2010*

Figure 22.  Rearrest Rates by Length of Probation Terms
*Federal Offenders Released in 2010*



## Supervised Release

　　Nearly all (99.4%) offenders sentenced to a term of imprisonment also were sentenced to a term of supervised release, and there was some variation in rearrest rates comparing length of supervised release terms (Figure 23).  Offenders sentenced to less than two years of supervised release had the lowest rearrest rates, 46.4 percent, compared to 56.3 percent for offenders originally sentenced to three to just under four years of supervised release.

Figure 23.  Rearrest Rates by Length of Supervised Release Terms
*Federal Offenders Released in 2010*



**37**

United States Sentencing Commission

# CONCLUSION

This study examined the recidivism of federal offenders released in 2010 during an eight-year follow-up period. Almost one-half (49.3%) of federal offenders were rearrested during the study period. This recidivism rate is identical to the rate reported by the Commission for federal offenders released in 2005. Notably, this consistency ensued despite two substantial changes in the federal sentencing landscape: the change from a mandatory to an advisory guideline system following *Booker*, and the increasing reliance on evidence-based practices in federal supervision. Other recidivism patterns also were the same for the two offender cohorts.

Consistent with its prior reports,[88] the Commission found that the combined factors of age and criminal history were strongly associated with recidivism. All offenders in the study aged 21 and younger in CHC IV through VI were rearrested, compared to 9.4 percent of offenders aged 60 and older in CHC I. In addition, offenders who originally were sentenced for firearms offenses had the highest rearrest rates of any offense type and offenders originally sentenced for a violent offense had higher rearrest rates compared to non-violent offenders. The study also examined the relationships of other sentencing and offender characteristics that also were consistent with prior studies.



## For More Information

Visit the Commission's website for additional resources on recidivism.

*www.ussc.gov*

### Related Reports



**Recidivism Series**
*2005 Study Cohort*

Published 2016 - 2020

# APPENDICES

United States Sentencing Commission

# APPENDIX A

## Methodology

The Commission entered into a data sharing agreement with the FBI's Criminal Justice Information Services (CJIS) Division and the Administrative Office of the United States Courts (AOUSC) to provide the Commission with secure electronic access to criminal history records through CJIS's Interstate Identification Index (III) and International Justice and Public Safety Network (NLETS). Results received using this system provide an individual's Criminal History Record Information (CHRI) maintained by all U.S. states, the District of Columbia, U.S. territories, and federal agencies. Once the raw CHRI was obtained, the Commission organized and standardized the arrest and court disposition information into an analytical dataset. The resulting data contained CHRI for 32,135 offenders with valid identifying information and who were released in 2010.

### Identifying the Study Cohort

The study cohort includes all federal offenders who were U.S. citizens and released from federal prison after serving a sentence of imprisonment or placed on probation in 2010. For offenders released from prison, the Bureau of Prisons (BOP) provided release dates and identifying information for all offenders released in 2010. The Commission identified offenders placed on probation in 2010 and, with the assistance of the AOUSC, identified and removed offenders who died while on supervised release during the recidivism follow-up period.

### Processing the Criminal History Record Information

The Commission entered into a data sharing agreement with the FBI's CJIS Division and the AOUSC to acquire electronic records of offender CHRI. The AOUSC extracted offender CHRI through its Access to Law Enforcement System (ATLAS) which provides an interface to III and NLETS. The III allows authorized agencies to determine whether any federal or state repository has CHRI on an individual. Agencies can then securely access specific state CHRI through NLETS. As a result, ATLAS collects CHRI from all state and federal agencies.

The ATLAS system returns the literal text in the RAP sheets in the format in which the original records appear: dates of criminal justice system actions (*e.g.*, arrests); offense categories which indicate the charges in the terminology used by that agency (*e.g.*, text strings or numeric categories); subsequent action tied to arrest charges (*e.g.*, charges filed by prosecutors, court findings of guilt, etc.); and sentencing and corrections information. All of these records are subject to availability from the originating source.

The ATLAS system also "parses" records from RAP sheets received from all 50 states, the District of Columbia, and federal agencies. Parsing records involves organizing key data elements into logical components, for example: arrest, court, and correctional events. Key data elements include offender identifiers, dates of key actions (*e.g.*, arrests and convictions), the criminal charges, and outcomes, such as convictions and sentencing information, when provided by the courts. The parsing process collates the multi-state records into a uniform structure, regardless of the state, for all individuals with a valid FBI number who were found in one or more repositories across the country.

### Standardizing the Criminal Records

After acquiring offender CHRI, the Commission contracted with Integrity One Partners (IOP) to consolidate records for each offender and remove duplicative or extraneous material.[89] Following this preliminary process, IOP utilized a crosswalk created for the Commission's prior recidivism research[90] to standardize offense codes across states and federal agencies. The crosswalk was updated to standardize new offense codes not mapped in the original crosswalk. The crosswalk standardizes arrest and court codes, regardless of originating sources, into a common framework for analysis. This step was needed because criminal

record repositories are primarily designed to store records in ways that accurately reflect the requirements of each state or federal repository, such as the criminal code for that jurisdiction. As a result, any two repositories are likely to use many unique text strings to indicate the nature of the criminal charges and actions taken in response to those charges. Thus, standardizing the offense information was necessary for cross-jurisdictional analysis.

Within each arrest cycle, arrest charges were categorized using standardized codes. A charge severity index was created which incorporates both criminal law classification (*e.g.*, felony or misdemeanor) and offense severity. Offenses were first classified into standardized subcategories. These subcategories were then further grouped for analytical purposes into one of 20 major crime categories in ranking order by severity. For each offender, the most severe major crime category was identified in their arrest information. The rearrest categories and their underlying subcategories are provided in Table A.

United States Sentencing Commission

Table A.  Rearrest Offense Categories and Charges

| | |
|---|---|
| **MURDER** | *Murder of public officer* |
| | *Murder* |
| | *Attempted murder* |
| | *Unspecified manslaughter/homicide* |
| | *Nonnegligent manslaughter/homicide* |
| **SEXUAL ASSAULT** | *Rape* |
| | *Forcible sodomy* |
| | *Fondling* |
| | *Statutory rape* |
| | *Luring minor by computer* |
| | *Other sexual assault* |
| | *Sexual assault unspecified* |
| **ROBBERY** | *Armed robbery* |
| | *Robbery unspecified* |
| | *Unarmed robbery* |
| **ASSAULT** | *Aggravated/felony assault* |
| | *Simple/misdemeanor assault* |
| | *Assault unspecified* |
| | *Assault of public officer* |
| | *Intimidation* |
| | *Hit and run driving with bodily injury* |
| | *Intimidating a witness* |
| **OTHER VIOLENT** | *Kidnapping* |
| | *Blackmail/Extortion* |
| | *Rioting* |
| | *Child abuse* |
| | *Other violent offense* |
| | *Arson* |
| **DRUG TRAFFICKING** | *Trafficking cocaine/crack* |
| | *Trafficking heroin* |
| | *Trafficking marijuana* |
| | *Trafficking methamphetamine* |
| | *Trafficking other/unspecified controlled substance* |
| **BURGLARY** | *Burglary* |

| | |
|---|---|
| LARCENY | *Motor vehicle theft* |
| | *Grand/felony larceny* |
| | *Petty/misdemeanor larceny* |
| | *Larceny unspecified* |
| | *Receiving stolen property* |
| | *Trafficking stolen property* |
| | *Unauthorized use of vehicle* |
| FRAUD | *Fraud/forgery* |
| | *Identity theft* |
| | *Embezzlement* |
| | *Bribery* |
| OTHER PROPERTY | *Destruction of property* |
| | *Hit and run with property damage* |
| | *Trespassing* |
| | *Possession of burglary tools* |
| | *Other property offense* |
| DRUG POSSESSION | *Possession of cocaine/crack* |
| | *Possession of heroin* |
| | *Possession of marijuana* |
| | *Possession of methamphetamine* |
| | *Possession of other/unspecified controlled substance* |
| OTHER DRUG | *Unspecified cocaine/crack offense* |
| | *Unspecified heroin offense* |
| | *Unspecified marijuana offense* |
| | *Unspecified methamphetamine offense* |
| | *Unspecified other/unspecified drug offense* |
| WEAPON | *Weapon offense* |
| OTHER SEX OFFENSE | *Morals offense* |
| | *Indecent exposure* |
| | *Commercialized vice* |
| | *Contributing to the delinquency of a minor* |
| **DUI/DWI** | *Driving while intoxicated/under the influence,* |
| | *Substance unspecified* |
| | *Driving while intoxicated/under the influence, alcohol* |
| | *Driving while intoxicated/under the influence, drugs* |
| IMMIGRATION | *Immigration offense* |

United States Sentencing Commission

| | |
|---|---|
| **ADMINISTRATION OF JUSTICE OFFENSES** | *Escape from custody* |
| | *Flight to avoid prosecution* |
| | *Warrant* |
| | *Contempt of court* |
| | *Failure to appear* |
| | *Violation of restraining order* |
| | *Other court offense* |
| | *Prison contraband offense* |
| | *Sex offender registry offense* |
| | *Obstruction of justice* |
| **PROBATION/PAROLE/ SUPERVISED RELEASE VIOLATION** | *Parole violation* |
| | *Unspecified probation/parole violation* |
| | *Probation violation* |
| **PUBLIC ORDER OFFENSES** | *Family-related offense* |
| | *Drunkenness/vagrancy/disorderly conduct* |
| | *Invasion of privacy* |
| | *Liquor law violation* |
| | *Other public order offense* |
| | *Curfew violation* |
| **OTHER/UNSPECIFIED OFFENSES** | *Vehicular manslaughter/homicide* |
| | *Negligent (involuntary) manslaughter/homicide* |
| | *Habitual offender* |
| | *Runaway* |
| | *Truancy* |
| | *Ungovernability* |
| | *Status liquor law violation* |
| | *Miscellaneous status offense* |
| | *Other offense* |
| | *Unspecified inchoate offense* |
| | *Military offense* |
| | *Not applicable* |
| | *Unspecified offense* |

*Recidivism of Federal Offenders Released in 2010*

# APPENDIX B

Table B-1.  Selected Offender Characteristics
*Federal Offenders Released in 2010 and 2005*

| | Release Year | |
|---|---|---|
| **Offender Characteristics** | **2010** | 2005 |
| **Race/Ethnicity** | | |
| White | 41.2% | 43.7% |
| Black | 35.8% | 33.9% |
| Hispanic | 18.1% | 17.8% |
| Other | 4.9% | 4.6% |
| **Gender** | | |
| Male | 82.7% | 81.7% |
| Female | 17.3% | 18.3% |
| **Education** | | |
| Less than High School | 34.9% | 34.2% |
| High School Graduate | 38.4% | 36.9% |
| Some College | 20.3% | 21.4% |
| College Graduate | 6.4% | 7.5% |
| **Age at Sentencing** | | |
| Average | 35 Years | 35 Years |
| Median | 33 Years | 33 Years |
| **Age at Release** | | |
| Average | 38 Years | 38 Years |
| Median | 37 Years | 36 Years |

United States Sentencing Commission

Table B-2. Selected Offense Characteristics and Sentencing Information
*Federal Offenders Released in 2010 and 2005*

| Offense Characteristics and Sentencing Information | Release Year | |
|---|---|---|
| | 2010 | 2005 |
| **Federal Offense Type*** | | |
| Drug Trafficking | 43.1% | 41.6% |
| Firearms | 15.3% | 12.8% |
| Fraud/Theft/Embezzlement | 17.4% | 13.6% |
| Immigration | 4.4% | 3.5% |
| Robbery | 4.1% | 4.3% |
| All Other Offenses | 15.7% | 24.2% |
| **Weapon Involvement** | | |
| Enhancement Applied | 11.7% | 9.8% |
| **Aggravating Role** | | |
| Enhancement Applied | 5.0% | 6.4% |
| **Mitigating Role** | | |
| Reduction Applied | 8.4% | 10.6% |
| **Acceptance of Responsibility** | | |
| Reduction Applied | 92.2% | 90.7% |
| **Criminal History Category** | | |
| CHC I | 45.3% | 53.6% |
| CHC II | 11.9% | 12.2% |
| CHC III | 15.8% | 14.3% |
| CHC IV | 9.8% | 7.9% |
| CHC V | 6.1% | 4.4% |
| CHC VI | 11.1% | 7.6% |
| **Sentence Type** | | |
| Prison | 84.4% | 81.2% |
| Probation | 15.6% | 18.8% |
| **Sentence Length** | | |
| Average | 51 Months | 45 Months |
| Median | 36 Months | 30 Months |
| **Imprisonment Length** | | |
| Average | 59 Months | 55 Months |
| Median | 45 Months | 37 Months |

* The Commission used slightly different offense classification schemes for federal offenses in the two analyses. The offense type categories for this report were derived from the 30 Type of Crime categories the Commission reports in its *Sourcebook of Federal Sentencing Statistics*. *See* U.S. Sent'g Comm'n, 2020 Sourcebook of Federal Sentencing Statistics 210–14 (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf. The offense type categories reported in the 2016 Recidivism Overview Report were derived from the 33 Primary Offense categories the Commission previously reported in its *Sourcebook of Federal Sentencing Statistics*. *See* U.S. Sent'g Comm'n, 2020 Sourcebook of Federal Sentencing Statistics 167–70 (2018), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/2017SB_Full.pdf. To facilitate comparison, the offense types for offenders in the 2005 cohort were updated in this table to conform to the classification scheme used for the 2010 cohort.

*Recidivism of Federal Offenders Released in 2010*

# APPENDIX C

Figure C.  Distribution of Other Offense Types at Original Sentencing
*Federal Offenders Released in 2010*



| Distribution of Other Offenses | |
|---|---|
| Money Laundering | 1.7% |
| Administration of Justice | 1.6% |
| Child Pornography | 1.5% |
| Tax | 1.5% |
| Forgery/Counterfeit/Copyright | 1.5% |
| Assault | 1.0% |
| Sexual Abuse | 0.9% |
| All Other | 6.0% |

United States Sentencing Commission

# APPENDIX D

Table D-1.  Selected Offender Characteristics
*Federal Offenders Released in 2010 With No Rearrests*

| <u>**Offender Characteristics**</u> | |
|---|---|
| **Race/Ethnicity** | |
| White | 46.4% |
| Black | 29.6% |
| Hispanic | 19.1% |
| Other | 4.9% |
| **Gender** | |
| Male | 77.9% |
| Female | 22.1% |
| **Education** | |
| Less than High School | 27.0% |
| High School Graduate | 37.7% |
| Some College | 25.2% |
| College Graduate | 10.1% |
| **Age at Sentencing** | |
| Average | 39 Years |
| Median | 37 Years |
| **Age at Release** | |
| Average | 41 Years |
| Median | 40 Years |

Table D-2.  Selected Offense Characteristics and Sentencing Information
*Federal Offenders Released in 2010 With No Rearrests*

| Offense Characteristics and Sentencing Information | |
|---|---|
| **Federal Offense Type** | |
| Drug Trafficking | 44.2% |
| Firearms | 8.9% |
| Fraud/Theft/Embezzlement | 22.1% |
| Immigration | 3.8% |
| Robbery | 3.0% |
| All Other Offenses | 18.0% |
| **Criminal History Category** | |
| CHC I | 62.4% |
| CHC II | 11.8% |
| CHC III | 11.9% |
| CHC IV | 5.7% |
| CHC V | 3.0% |
| CHC VI | 5.2% |
| **Sentence Type** | |
| Prison | 78.3% |
| Probation | 21.7% |

United States Sentencing Commission

# APPENDIX E

Table E.  Rearrest Rates by Federal Offense Type
*Federal Offenders Released in 2010*

| Federal Offense Type | Total Offenders | Offenders Rearrested | |
|---|---|---|---|
| | N | N | % |
| Drug Trafficking | 13,835 | 6,641 | 48.0 |
| Firearms | 4,917 | 3,469 | 70.6 |
| Fraud/Theft/Embezzlement | 5,580 | 1,980 | 35.5 |
| Robbery | 1,322 | 835 | 63.2 |
| Immigration | 1,431 | 812 | 56.7 |
| Forgery/Counterfeit/Copyright | 480 | 280 | 58.3 |
| Assault | 321 | 223 | 69.5 |
| Child Pornography | 494 | 204 | 41.3 |
| Administration of Justice | 510 | 189 | 37.1 |
| Other | 368 | 184 | 50.0 |
| Sexual Abuse | 283 | 159 | 56.2 |
| Prison Offenses | 160 | 133 | 83.1 |
| Obscenity/Other Sex Offenses | 184 | 131 | 71.2 |
| Money Laundering | 539 | 127 | 23.6 |
| Drug Possession | 165 | 84 | 50.9 |
| Stalking/Harassing | 103 | 63 | 61.2 |
| Tax | 483 | 61 | 12.6 |
| Extortion/Racketeering | 151 | 43 | 28.5 |
| Arson | 71 | 34 | 47.9 |
| Burglary/Trespass | 46 | 32 | 69.6 |
| Manslaughter | 47 | 31 | 66.0 |
| Murder | 68 | 31 | 45.6 |
| Bribery/Corruption | 236 | 31 | 13.1 |
| Commercialized Vice | 111 | 20 | 18.0 |
| Individual Rights | 67 | 17 | 25.4 |
| Environmental | 93 | 17 | 18.3 |
| Kidnapping | 20 | 11 | 55.0 |
| National Defense | 21 | 5 | 23.8 |
| Food and Drug | 24 | 4 | 16.7 |
| Antitrust | 5 | 0 | 0.0 |

**50**

# ENDNOTES

United States Sentencing Commission

# ENDNOTES

1	28 U.S.C. § 995(a)(12)–(14).

2	543 U.S. 220 (2005) (striking the mandatory provision of 18 U.S.C. § 3553(b)(1) and rendering the guidelines advisory).

3	Kim Steven Hunt & Robert Dumville, U.S. Sent'g Comm'n, Recidivism Among Federal Offenders: A Comprehensive Overview (2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf [hereinafter 2016 Recidivism Overview Report].

4	*Id.* at 15.

5	U.S. Sent'g Comm'n, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 41–44 (1987), https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/1987_Supplementary_Report_Initial_Sentencing_Guidelines.pdf. *See also* William Rhodes, Christina Dyous, Ryan Kling, Dana Hunt & Jeremy Luallen, ABT Assoc., Recidivism of Offenders on Federal Community Supervision (2012), https://www.ojp.gov/pdffiles1/bjs/grants/241018.pdf [hereinafter Rhodes]; Alfred Blumstein, David P. Farrington & Soumyo Moitra, *Delinquency Careers: Innocents, Desisters, and Persisters*, 6 Crime & Just. 187 (1985) (describing two major cohort studies and the recidivism probability of youthful offenders increasing with successive involvements with law enforcement); Paul Gendreau, Tracy Little & Claire Goggin, *A Meta-Analysis of the Predictors of Adult Offender Recidivism: What Works!*, 34 Criminology 575 (1996) (explaining meta-analysis of 131 studies which found the strongest predictors of recidivism included criminogenic needs, criminal history, social achievement, age/gender/race, and family factors) [hereinafter Gendreau].

6	*See* 2016 Recidivism Overview Report, *supra* note 3, at 5.

7	Louis Reedt, Kim Steven Hunt, James L. Parker, Melissa K. Reimer & Kevin T. Maass, U.S. Sent'g Comm'n, Recidivism Among Federal Drug Trafficking Offenders (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/2017/20170221_Recidivism-Drugs.pdf; Matthew J. Iaconetti, Tracey Kyckelhahn & Mari McGilton, U.S. Sent'g Comm'n, Recidivism Among Federal Firearms Offenders (2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190627_Recidivism_Firearms.pdf [hereinafter 2019 Recidivism Firearms Report]; Kim Steven Hunt, Matthew J. Iaconetti & Kevin T. Maass, U.S. Sent'g Comm'n, Recidivism Among Federal Violent Offenders (2019), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190124_Recidivism_Violence.pdf [hereinafter 2019 Recidivism Violence Report].

8	Tracey Kyckelhahn & Trishia Cooper, U.S. Sent'g Comm'n, The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf [hereinafter 2017 Recidivism Criminal History Report]; Kim Steven Hunt & Billy Easley, U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/2017/20171207_Recidivism-Age.pdf [hereinafter 2017 Recidivism Age Report]; Ryan Cotter, U.S. Sent'g Comm'n, Length of Incarceration and Recidivism (2020), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200429_Recidivism-SentLength.pdf [hereinafter 2020 Recidivism Incarceration Report].

9	*See* case cited *supra* note 2 and accompanying text.

10	Jonathan E. Hurtig & Lisa Marie Lenart, *The Development of the Evidence-Based Practice Blue Print and Where We are Now*, 75 Fed. Prob. J. (2011), https://www.uscourts.gov/sites/default/files/75_2_6_0.pdf; Melissa

Alexander, Bradley Whitley & Christopher Bersch, *Driving Evidence-Based Supervision to the Next Level: Utilizing PCRA, "Drivers," and Effective Supervision Techniques*, 78 Fed. Prob. J. 2 (2014), https://www.uscourts.gov/sites/default/files/probation_dec_2014_1219b.pdf.

11       Prob. & Pretrial Servs. Off., Admin. Off. of the U.S. Cts., An Overview of the Federal Post Conviction Risk Assessment (2018), https://www.uscourts.gov/sites/default/files/overview_of_the_post_conviction_risk_assessment_0.pdf.

12       Nat'l Inst. of Just., U.S. Dep't of Just., *Recidivism*, (June 17, 2014), https://web.archive.org/web/20160120175242/http://www.nij.gov/topics/corrections/recidivism/pages/welcome.aspx; *see also* Michael D. Maltz, Recidivism 1, 54 (2001) [hereinafter Maltz].

13       *See* Maltz, *supra* note 12, at 7–20; *see also* Ryan King & Brian Elderbroom, Urb. Inst., Improving Recidivism as a Performance Measure (2014), https://www.bja.gov/Publications/UI-ImprovingRecidivism.pdf.

14       *See, e.g.*, Christopher T. Lowenkamp, Marie VanNostrand & Alexander Holsinger, Investigating The Impact Of Pretrial Detention On Sentencing Outcomes (2013), https://craftmediabucket.s3.amazonaws.com/uploads/PDFs/LJAF_Report_state-sentencing_FNL.pdf.

15       *See* Maltz, *supra* note 12, at 61–64.  *See also* Nat'l Inst. of Just., U.S. Dep't of Just., *Measuring Recidivism* (Feb. 20, 2008), https://web.archive.org/web/20160129195540/http://www.nij.gov/topics/corrections/recidivism/pages/measuring.aspx.

16       *See, e.g.*, Mariel Alper, Matthew R. Durose & Joshua Markman, Bureau of Just. Stat., U.S. Dep't of Just., Update of Prisoner Recidivism: A 9-Year Follow-up Period (2005–2014) (2018), https://www.bjs.gov/content/pub/pdf/18upr9yfup0514.pdf [hereinafter Alper]; Admin. Off. of the U.S. Cts., *Just the Facts:  Post-Conviction Supervision and Recidivism*, (Oct. 22, 2018), https://www.uscourts.gov/news/2018/10/22/just-facts-post-conviction-supervision-and-recidivism#chart1; Rhodes, *supra* note 5.

17       *See* Maltz, *supra* note 12, at 55–60.

18       *See* Maltz, *supra* note 12, at 56–58.

19       *See* Alper, *supra* note 16.

20       The Commission collects and analyzes data on federal sentences to carry out its statutory responsibilities.  As authorized by Congress, the Commission's research responsibilities include: (1) the establishment of a research and development program to serve as a clearinghouse and information center for the collection, preparation, and dissemination of information on federal sentencing practices, (2) the publication of data concerning the sentencing process, (3) the systematic collection and dissemination of information concerning sentences actually imposed and the relationship of such sentences to the sentencing factors in 18 U.S.C. § 3553(a), and (4) the systematic collection and dissemination of information regarding the effectiveness of sentences imposed.  *See* 28 U.S.C. § 995(a)(12), (14)–(16).  The Commission collects information for every federal felony and Class A misdemeanor offense sentenced each year.  Sentencing courts are statutorily required to submit five sentencing documents to the Commission within 30 days of entry of judgment in a criminal case, including: (1) the charging document, (2) the plea agreement, (3) the Presentence Report, (4) the Judgment and Commitment order, and (5) the Statement of Reasons form.  *See* 28 U.S.C. § 994(w)(1).  For each case in its Individual Offender Datafile, the Commission routinely collects case identifiers, sentencing data, demographic variables, statutory information, the complete range of court guideline application decisions, and departure and variance information from these documents.

21       The data utilized in the course of conducting analyses in this report includes information obtained pursuant to an interagency agreement with the FBI, which prohibits the Commission from releasing the dataset.

22       Appendix A provides a detailed description of the data collection methodology.

United States Sentencing Commission

23      This includes any offenders released from BOP on detainer, which ordinarily indicates transfer of custody to state court or to a state correctional facility following completion of their federal sentence.

24      Offenders were excluded from various analyses in this report due to missing information for the variables required for those analyses.

25      Appendix B provides comparisons of offender and offense characteristics for the two study groups.

26      The 1,586 offenders comprising the Other Race category were American Indian/Alaskan Native (52.0%), Asian or Pacific Islander (41.8%), or Multi-racial/Other (6.2%).

27      The median is the midpoint; half of the offenders were below the median and the remaining half of offenders were above the median.

28      *See* 2016 Recidivism Overview Report, *supra* note 3, at 9.

29      The offense type categories were derived from the 30 Type of Crime categories the Commission reports in its *Sourcebook of Federal Sentencing Statistics. See* U.S. Sent'g Comm'n, 2020 Sourcebook of Federal Sentencing Statistics 210–14 (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf.

30      U.S. citizens sentenced for immigration offenses primarily are sentenced under §2L1.1 (Smuggling, Transporting, or Harboring an Unlawful Alien). *See id.* at 132.

31      Offense type categories were selected for analysis that comprised more than four percent of the total. Information for the offense types comprising the "other" category is provided in Appendix C.

32      The Commission defined violent offenses based on guideline application.  In cases where multiple Chapter Two guidelines applied because the offender had multiple counts of conviction for different offenses, this report identifies the offender as violent if any of the guidelines that applied was for a violent offense, regardless of whether that guideline ultimately produced the highest offense level (*i.e.*, the primary guideline). *See* U.S. Sent'g Comm'n, *Guidelines Manual*, §1B1.5(a), comment. (n.1) (Nov. 2018) [hereinafter USSG].

33      The offense type categories reported in the *2016 Recidivism Overview Report* were derived from the 33 Primary Offense categories the Commission previously reported in its *Sourcebook of Federal Sentencing Statistics. See* U.S. Sent'g Comm'n, 2017 Sourcebook of Federal Sentencing Statistics 167–70 (2018), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/2017SB_Full.pdf.

34      *See* 2016 Recidivism Overview Report, *supra* note 3, at 10.

35      Section 924(c) provides incremental, consecutive mandatory minimum penalties for the use, carrying, or possession of a firearm during or in furtherance of a crime of violence or a drug trafficking crime.  *See* 18 U.S.C. § 924(c).

36      Weapon involvement does not include: (1) cases in which a weapon is present in the offense, but the offender was not convicted of 18 U.S.C. § 924(c) or did not receive a weapon-related sentencing enhancement, (2) cases in which the specific enhancement can be applied for multiple reasons (*e.g.*, the specific enhancement can be applied if the offense involved either physical contact or if a dangerous weapon was possessed), or (3) cases sentenced as weapon offenses under Chapter Two, Part K of the *Guidelines Manual* (unless they were convicted of 18 U.S.C. § 924(c)).

37      USSG §3B1.1. Section 3B1.1 provides for a 4-level increase for an offender who was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, a 3-level increase for a manager or supervisor of criminal activity that involved five or more participants or was

**54**

otherwise extensive, and a 2-level increase for an organizer, leader, manager, or supervisor in any criminal activity than otherwise described. *Id.*

38      USSG §3B1.2. Section 3B1.2 provides for a 4-level decrease for an offender who was a minimal participant in any criminal activity, a 2-level decrease for any offender who was a minor participant in any criminal activity, and a 3-level decrease for offenders falling between the two. *Id.*

39      USSG §3E1.1. Section 3E1.1 provides for a 2-level decrease if the offender clearly demonstrates acceptance of responsibility for the offense. An additional 1-level decrease can apply if the offense level determined prior to the 2-level decrease is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty. *Id.*

40      USSG Ch.4. Other considerations include the type of offense (certain minor offenses are excluded from the criminal history score) and the length of time between the prior sentence and the instant federal offense. The guidelines exclude certain prior convictions based on factors such as the type of offense (*e.g.*, fish and game violations), disposition (*e.g.*, diversionary dispositions without a finding of guilt), or remoteness of the conviction. *See* USSG §4A1.2.

41      USSG Ch.5, Pt.A (Sentencing Table).

42      Of the 11,338 offenders with zero criminal history points, the remaining 52.1% had prior contact with the criminal justice system; that is, they had prior arrests that did not lead to convictions or they had convictions that did not receive points due to the age of the conviction or the minor nature of the offense.

43      In some instances, the percentage of offenders comprising the criminal history points categories do not sum to the total percentage of offenders comprising the associated CHC. This is because some guidelines provide for a CHC that supersedes the CHC determined by criminal history points. *See, e.g.*, USSG §4B1.1(b). Additionally, in a small number of cases, the CHC is determined by court findings and differs from the calculated criminal history points.

44      By comparison, the corresponding rates for offenders released in 2005 were as follows:  CHC I (53.6%), CHC II (12.2%), CHC III (14.3%), CHC IV (7.9%), CHC V (4.4%), and CHC VI (7.6%). 2016 Recidivism Overview Report, *supra* note 3, at 10.

45      USSG §4B1.1(a).

46      *See* 18 U.S.C. § 924(e); USSG §4B1.4.

47      Of the 1,211 offenders sentenced under these provisions, 81.7% were sentenced as career offenders, 18.1% were sentenced as armed career criminals, and 0.2% were sentenced under both provisions.

48      *See* case cited *supra* note 2 and accompanying text.

49      The four types of sentences correspond to the four "Zones" (A–D) in the Sentencing Table of the *Guidelines Manual*. *See* USSG Ch.5, Pt.A (Sentencing Table); *see also* USSG §§5B1.1, 5C1.1 (setting forth the sentencing options for Zones A–D). Zone A authorizes probation only; Zone B authorizes probation with a condition of confinement; Zone C authorizes a "split" sentence of imprisonment and community confinement (*e.g.*, home detention or a halfway house); and Zone D authorizes sentences of imprisonment only. *See* USSG §§5B1.1, 5C1.1.

50      *See* 2016 Recidivism Overview Report, *supra* note 3, at 11.  As in the *2016 Recidivism Overview Report*, the Commission analyzed the sentences imposed for offenders sentenced to alternatives for the current study. Similar to the prior analysis, offenders in the current study who were sentenced to prison with some type of alternative confinement had a median term of imprisonment of five months.  In addition, nearly all (99.0%) offenders sentenced to a Zone B sentence of probation with some type of alternative confinement were

United States Sentencing Commission

sentenced to home confinement or community confinement (*e.g.*, a halfway house) rather than confinement in a jail or prison.

51      The median sentence imposed was 36 months.  Sentence imposed includes any time served amounts and imprisonment under §5G1.3.  Probation sentences are included as zero months.  Any portion of a sentence that is an alternative confinement as described in §5C1.1 is included.  Life sentences and sentences exceeding 470 months are included in the calculation as 470 months.

52      Twelve offenders among those sentenced to ten years or longer were originally sentenced to imprisonment terms of life.  They are included in the release cohort because they were subsequently resentenced to reduced terms.  Sentences reported in this study are the sentences originally imposed.  The Commission did not collect resentencing information prior to fiscal year 2006; therefore, complete resentencing information is not available for all offenders in the study.

53      USSG §5D1.1(a)–(c); 18 U.S.C. § 3583(a).  Convictions for drug trafficking offenses and certain kidnapping and sex offenses require a term of supervised release.  *See*, *e.g.*, 21 U.S.C. §§ 841, 846; 18 U.S.C. § 3583(k).

54      Selected data for offenders in the study who were not rearrested is provided in Appendix D.

55      2016 Recidivism Overview Report, *supra* note 3, at 15.

56      *See infra* note 63 and accompanying text.

57      2016 Recidivism Overview Report, *supra* note 3, at 11.

58      The rearrest rates for offenders released in 2010 were marginally different for offenders sentenced before (53.5%) and after (48.5%) the *Booker* decision.  Having been sentenced prior to January 12, 2005, offenders sentenced pre-*Booker* naturally had longer sentences compared to offenders sentenced post-*Booker*.  Attributes related to their longer sentences also are associated with recidivism.  For example, a smaller proportion of pre-*Booker* offenders (19.0%) were in CHC I than post-*Booker* offenders (50.7%).  In addition, a larger proportion of pre-*Booker* offenders (17.9%) than post-*Booker* offenders (7.7%) were sentenced for a violent offense.  Conversely, a smaller proportion of pre-*Booker* offenders (1.7%) than post-*Booker* offenders (20.6%) were sentenced for fraud, theft, or embezzlement.

59      2016 Recidivism Overview Report, *supra* note 3, at 16.

60      Courts originally imposed supervision terms of eight years or longer (including life) for only 2.7% of offenders in the study.

61      This measurement is based on the supervision term imposed at the time of original sentencing and does not account for any changes in supervision status following release.  Such information was not available in the data used for this study.  Therefore, if a court terminated an offender's supervision prior to the expiration of the term initially imposed, that offender would still be considered under supervision for this analysis.  Alternatively, if a court extended an offender's supervision beyond the term originally imposed, that offender would be considered to have completed the supervision term for purposes of this analysis.

62      2016 Recidivism Overview Report, *supra* note 3, at 9, 31 n.24.

63      Accordingly, the data should not be interpreted to represent the overall frequency of the listed offense among rearrests.

64      The "other violent" category includes violent offenses that do not fit into any of the specific violent categories.  It includes arson, blackmail/extortion, child abuse, kidnapping, rioting, and any other unspecified violent offense.

**56**

65    The Commission separated rearrests for administration of justice offenses (*e.g.*, failure to appear, resisting arrest without violence, and tampering with evidence), probation, parole, and supervision violations, and other sex offenses from public order offenses (*e.g.*, disorderly conduct, vice crimes, and public drunkenness) for this analysis, whereas the Commission previously combined those offense types into a single "public order" category.  *See* 2017 Recidivism Age Report, *supra* note 8, at 34 n.6.  *See also* Courtney Semisch, Kristen Sharpe & Alyssa Purdy, U.S. Sent'g Comm'n, Federal Armed Career Criminals: Prevalence, Patterns, and Pathways 80 n.68 (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210303_ACCA-Report.pdf [hereinafter Armed Career Criminal Report].  Combined, the current findings for administration of justice, probation, parole, and supervision violations, other sex offenses, and public order offenses generally are analogous to the 2016 finding for public order offenses.  Reported separately, or in combination, the Commission ranks these offense types low in its severity ranking.  In addition, the four separate offense categories reported in this study comprised the previously existing public order category, making them largely comparable.

66    2016 Recidivism Overview Report, *supra* note 3, at 17.

67    *See* 2016 Recidivism Overview Report, *supra* note 3, at 18–19, 23.  *See also* 2017 Recidivism Criminal History Report, *supra* note 8; 2017 Recidivism Age Report, *supra* note 8.

68    2017 Recidivism Age Report, *supra* note 8, at 22–23.

69    *Id.* at 22.

70    *Id.* at 25.

71    *See supra* notes 39–40 and accompanying text.

72    2016 Recidivism Overview Report, *supra* note 3, at 18; 2017 Recidivism Criminal History Report, *supra* note 8, at 7.

73    2016 Recidivism Overview Report, *supra* note 3, at 18–19; 2017 Recidivism Criminal History Report, *supra* note 8, at 7–8.

74    2017 Recidivism Criminal History Report, *supra* note 8, at 9.

75    *See supra* notes 45–46 and accompanying text.

76    *See* USSG §§4B1.1(b), 4B1.4(c).

77    U.S. Sent'g Comm'n, Report to the Congress: Career Offender Sentencing Enhancements 39 (2016), www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf.

78    Armed Career Criminal Report, *supra* note 65, at 43.

79    2017 Recidivism Age Report, *supra* note 8, at 25.

80    *See* 2016 Recidivism Overview Report, *supra* note 3, at 24.

81    *See supra* note 30.

82    Rearrest rates for the offense types comprising the "All Other" category are provided in Appendix E.

83    2016 Recidivism Overview Report, *supra* note 3, at 20.  The Commission also reported on the recidivism of firearms offenders in its 2019 *Recidivism Firearms Report*.  Offenders in that study were designated as

United States Sentencing Commission

firearms offenders who: 1) were sentenced under §2K2.1, the primary sentencing guideline for unlawful receipt, possession or transportation of firearms or ammunition, and prohibited transactions involving firearms or ammunition, 2) sentenced pursuant to 18 U.S.C. § 924(e), the Armed Career Criminal Act ("ACCA"), 3) sentenced as career offenders pursuant to §4B1.1 who were also convicted of a federal firearms crime as part of the instant offense, or 4) convicted under 18 U.S.C. § 924(c) who did not otherwise receive the ACCA or career offender enhancement. All other offenders in the study were designated as non-firearms offenders. Because of this specific definition, the firearms offenders in this study are not directly comparable to those in the previous study. Nevertheless, 68.1% of firearms offenders in the previous study were rearrested. 2019 RECIDIVISM FIREARMS REPORT, *supra* note 7, at 2, 17.

84    2017 RECIDIVISM CRIMINAL HISTORY REPORT, *supra* note 8, at 11–12. The Commission also reported on the recidivism of violent offenders in its 2019 *Recidivism Violence Report*. Offenders in that study were designated as violent who engaged in violent criminal conduct as part of their instant offense *or* had been arrested for a violent offense in their past. In addition, offenders were designated as non-violent who *neither* engaged in a violent instant offense nor been arrested for a violent crime in their past. Because of this specific definition, the violent offenders in this study are not directly comparable to those in the previous study. Nevertheless, in the previous study, 63.8% of violent offenders were rearrested, compared to 39.8% of non-violent offenders. 2019 RECIDIVISM VIOLENCE REPORT, *supra* note 7, at 3–4.

85    2020 RECIDIVISM INCARCERATION REPORT, *supra* note 8, at 4.

86    *Id*. at 4, 53 n.10.

87    *Id*. at 4.

88    *See* 2016 RECIDIVISM OVERVIEW REPORT, *supra* note 3, at 18–19, 23. *See also* 2017 RECIDIVISM CRIMINAL HISTORY REPORT, *supra* note 8; 2017 RECIDIVISM AGE REPORT, *supra* note 8.

89    Instances of arrest or sentencing that appeared to be duplicates of existing events were removed by IOP. Minor traffic offenses (*e.g.*, speeding) and arrest entries occurring outside of the eight-year follow-up period were removed and, therefore, not used to ascertain recidivism.

90    *See* 2016 RECIDIVISM OVERVIEW REPORT, *supra* note 3, Appendix B.



**United States Sentencing Commission**

www.ussc.gov

THURGOOD MARSHALL FEDERAL JUDICIARY BUILDING

ONE COLUMBUS CIRCLE N.E.

SUITE 2-500, SOUTH LOBBY

WASHINGTON, DC 20002-8002