# EXHIBIT O

Cite as 11 LEWIS & CLARK L. REV. 521 (2007).    Available at http://law.lclark.edu/org/lclr/

# PURPOSES-BASED SENTENCING OF ECONOMIC CRIMES AFTER *BOOKER*

*by*
*Rodney D. Perkins**

*18 U.S.C. section 3553(a) defines a set of purposes to be considered when sentencing defendants under the United States Sentencing Guidelines (USSG). Until the decision in* United States v. Booker, *18 U.S.C. section 3553(a) was of little significance in federal criminal sentencing. Now, district courts are making frequent use of section 3553(a) to adjust Guidelines sentences. This is particularly true in the area of white-collar crimes sentenced under USSG section 2B1.1. This Comment argues in favor of using section 3553(a) purposes-based analysis to mitigate USSG section 2B1.1 sentences where Guidelines calculations exaggerate the harms caused by defendants and their role in the offense of conviction.*

I.   INTRODUCTION ..................................................................................... 522
II.  SENTENCING OF FEDERAL ECONOMIC CRIMES ........................... 523
     A. United States Sentencing Guidelines .................................................. 523
     B. Economic Crimes Under USSG Section 2B1.1 ................................... 523
        1. Section 2B1.1 Offense Characteristics ........................................ 524
           a. Loss .......................................................................................... 524
           b. Other Section 2B1.1 Offense Characteristics and
              Adjustments ............................................................................. 525
        2. Departures ................................................................................... 526
        3. Sentencing Table .......................................................................... 527
III. APPLYING 18 U.S.C. SECTION 3553(A) TO SECTION 2B1.1
     SENTENCES AFTER *BOOKER* ................................................................ 528
     A. Purposes-Based Analysis Under 18 U.S.C. Section 3553(A) ............ 528
     B. Purposes-Based Analysis as Applied to Section 2B1.1
        Sentencings ........................................................................................ 531
     C. Arguing in Support of Purposes-Based Analysis in Section 2B1.1
        Sentencings ........................................................................................ 533
IV.  CONCLUSION ........................................................................................ 536

* J.D. 2007, Lewis & Clark Law School. Thanks to Associate Professor Doug Beloof for critical comments and general support. Special thanks to the Lewis & Clark Law Review staff as well as all family and friends.

Cite as 11 LEWIS & CLARK L. REV. 521 (2007).                 Available at http://law.lclark.edu/org/lclr/

522                         LEWIS & CLARK LAW REVIEW                    [Vol. 11:2

I. INTRODUCTION

In *United States v. Booker*, the United States Supreme Court held that the mandatory application of the United States Sentencing Guidelines (USSG) violates the Sixth Amendment right to a jury trial.[1] The Court reasoned that USSG required, as opposed to recommended, that judges decide sentences based on differing sets of facts, and on that basis, their mandatory application violated the 6th Amendment.[2] In the remedial portion of *Booker*, the Court severed and excised 18 U.S.C. § 3553(b)(1), which made Guidelines sentences mandatory, and 18 U.S.C. § 3742(e), which established standards of appellate review of sentences, from the Federal Sentencing Act (FSA).[3] The Court then directed district courts to continue to calculate proper USSG sentence ranges, but said that FSA "requires judges to take account of the Guidelines with other sentencing goals," including 18 U.S.C. § 3553(a).[4] Thus, after *Booker*, the Guidelines are advisory, and courts can "tailor the [defendant's] sentence in light of other statutory concerns."[5]

Arguably, the most significant aspect of *Booker* is its directive to use 18 U.S.C. § 3553(a). This statute, which sets forth "purposes" to be considered when sentencing defendants under USSG, was rarely used before *Booker*. Now, district courts are using § 3553(a) to consider a much wider range of facts and conduct in sentencing decisions than was possible under a mandatory Guidelines regime. This new discretion, which some courts are reluctant to exercise, has been wielded with increasing frequency in cases involving a particularly controversial, and highly publicized, class of defendants: those convicted of economic crimes. As evidenced by the demise of such companies as Enron and WorldCom, white-collar economic crimes can involve complex financial schemes, numerous participants, and millions of dollars in economic losses. Defendants who are convicted of these offenses face tough sanctions. However, in some cases USSG calculations seriously exaggerate or overstate the harms caused by these defendants and their role in the offense. Cases like these best demonstrate the operation of purposes-based sentencing under 18 U.S.C. § 3553(a).

This Comment argues that district courts should use an 18 U.S.C. § 3553(a) purposes-based analysis to mitigate heavy § 2B1.1 prison sentences where Guidelines calculations overstate the harms the defendant caused as well as their role or participation in the offense. Part II discusses how sentences for economic crimes are derived under USSG § 2B1.1. Part III of this Comment

---

[1] 543 U.S. 220, 244 (2005) ("Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.").
[2] *Id.* at 233–335.
[3] *Id.* at 244.
[4] *Id.* at 224.
[5] *Booker*, 543 U.S. at 245–46.

2007]            PURPOSES-BASED SENTENCING AFTER *BOOKER*            523

argues in favor of the use of § 3553(a) purposes-based analysis to mitigate § 2B1.1 sentences in the manner described above.

## II. SENTENCING OF FEDERAL ECONOMIC CRIMES

### A. *United States Sentencing Guidelines*

Any discussion of white-collar criminal sentencing necessitates a brief background discussion of the mechanics of the United States Sentencing Guidelines (USSG). The Sentencing Reform Act (SRA) established the United States Sentencing Commission (USSC) and its authority to "promulgate and distribute" guidelines for federal criminal sentences.[6] The stated goals of the Guidelines are, among others, to provide:

> certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices.[7]

The Guidelines were designed with some specific objectives, including (1) honesty in sentencing; (2) uniformity between defendants convicted of similar crimes; and (3) proportionality between different sentences.[8] These goals are achieved through a system that assigns numerical weights to multiple sentencing factors to ultimately produce an offense level, which is used to determine a defendant's sentence range. Thus, the Guidelines do not reflect a specific sentencing philosophy but an attempt to codify empirical data about how crimes were sentenced in the past into a system that produces consistent and predictable results that can be adjusted as the need arises.[9]

### B. *Economic Crimes Under USSG Section 2B1.1*

USSG § 2B1.1 covers sentences for economic crimes, including theft, embezzlement, fraud, and forgery.[10] Section 2B1.1 is used to determine sentences for wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), and securities fraud (15 U.S.C. § 78j), which are among the most common white-collar crimes.[11] One of the adjustments USSC made was to raise economic

---

[6] *See* 28 U.S.C. § 994(1)(A)–(E) (1984). The Guidelines were not implemented until 1987 and were not fully operational until 1989.

[7] *See* 28 U.S.C. § 991(b)(1)(B) (1984).

[8] *See* U.S. SENTENCING GUIDELINES MANUAL § 1A1.1(A)(3) (2006).

[9] *See id.* ("For now, the Commission has sought to solve both the practical and philosophical problems of developing a coherent sentencing system by taking an empirical approach that uses data estimating the existing sentencing system as a starting point.").

[10] *See generally* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 (2006).

[11] In 2001, USSC implemented the 2001 Economic Crime Package, which, among other changes, consolidated the fraud (§ 2F1.1) and theft (§ 2B1.1) Guidelines into a single Guideline (§ 2B1.1). Each Guideline had separate loss tables, which were also consolidated in 2001.

Cite as 11 LEWIS & CLARK L. REV. 521 (2007).                Available at http://law.lclark.edu/org/lclr/

524                    LEWIS & CLARK LAW REVIEW                    [Vol. 11:2

crime sentences above pre-Guidelines levels so that an increased number of defendants would serve prison time; USSC believed that short, definite sentences for this class of offenders best served the Guidelines goals of proportionate punishment and deterrence.[12]

Structurally, § 2B1.1 is designed along the lines USSC established for regulatory offenses.[13] Section 2B1.1 starts with a low base offense level.[14] This offense level is either increased or decreased by specific offense characteristics, which are based on the defendant's conduct ("relevant conduct") during the commission of the offense.[15] If a defendant is convicted of multiple counts, all counts of conviction are grouped to form a single offense level.[16]

### 1. Section 2B1.1 Offense Characteristics
#### a. Loss

The most significant § 2B1.1 offense characteristic incrementally raises the defendant's offense level based on the amount of loss associated with an offense. According to the Guidelines commentary, "along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a *principal factor* in determining the offense level under this guideline" (emphasis added).[17] Loss is represented by two definitions: actual loss and intended loss. Actual loss is "the reasonably foreseeable pecuniary harm that *resulted from* the offense" (emphasis added).[18] Actual loss encapsulates the harm caused by the defendant's conduct.[19] Intended loss is the "pecuniary harm that was intended

---

[12] *See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 HOFSTRA L. REV. 1, 22 (1998).

> The [United States Sentencing] Commission deliberately chose, except in the least serious cases of these white-collar crimes (level '6' or less), to require some minimum form of confinement of one to six months—either intermittent confinement, community confinement, or imprisonment. The Commission took this course for two reasons. First, the Commission considered present sentencing practices, where white-collar criminals receive probation more often than other offenders who committed crimes of comparable severity, to be unfair. Second, the Commission believed that a short but definite period of confinement might deter future crime more effectively than sentences with no confinement condition.

[13] *See* U.S. SENTENCING GUIDELINES MANUAL § 1A1.1(A)(4)(f) (2006) (describing the design principles of regulatory offenses under the Guidelines).

[14] The 2B1.1 base offense level starts at either 6 or 7. *See* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(a)(1)–(2) (2006). This places a defendant with no criminal history in the zero to six month range. *See generally* U.S. SENTENCING GUIDELINES MANUAL § 5A (2006).

[15] *See generally* U.S. SENTENCING GUIDELINES MANUAL § 1B1.3 (2006).

[16] *See* U.S. SENTENCING GUIDELINES MANUAL § 3D1.1 (2006) (defining procedure for determining multiple count offense level); *see also* U.S. SENTENCING GUIDELINES MANUAL § 3D1.2 (2006) (defining procedure for grouping closely related counts); *see also* U.S. SENTENCING GUIDELINES MANUAL § 3D1.3 (2006) (defining the method for determining offense levels for groups of closely related counts); *see also* U.S. SENTENCING GUIDELINES MANUAL § 3D1.4 (2006) (defining the method for determining a combined offense level).

[17] *See* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt.n.(19)(B) (2006).

[18] *See id.* § 2B1.1 cmt. n.(3)(A)(i) (2006).

[19] *See* Roger W. Haines, Jr., Frank O. Bowman, III, & Jennifer C. Woll, FEDERAL SENTENCING GUIDELINES HANDBOOK: 2007 EDITION § 2B1.1, at 348–49 (2006) ("Actual loss

Cite as 11 LEWIS & CLARK L. REV. 521 (2007).                     Available at http://law.lclark.edu/org/lclr/

2007]        PURPOSES-BASED SENTENCING AFTER *BOOKER*         525

to result from the offense," which includes "intended pecuniary harm that would have been impossible or unlikely to occur."[20] Intended loss is both an assessment of mental state and the amount of blame that should be assigned to the defendant for the offense.[21]

The dollar amount used to calculate the sentence enhancement is the larger of actual or intended loss.[22] This amount is then matched against a loss table.[23] The loss table maps incremental increases in a defendant's offense level to a wide range of dollar amounts over $5,000. Both the number of offense levels and the dollar amounts have increased greatly over time. The loss table in the first set of Guidelines was based on increments of one additional offense level for each loss level. By 2006, each additional loss level added two extra offense levels to a sentence.[24] As for dollar amounts, the first Guidelines had a maximum of twenty additional offense levels for losses over $20 million, but intermediary events caused the dollar ranges to rise. For example, the Sarbanes-Oxley Act of 2002 arose out of a desire to deal with large-scale corporate fraud as embodied in the Enron and WorldCom scandals. Sarbanes-Oxley contained legislative directives to change the Guidelines to coincide with the Act's new criminal provisions.[25] In response, USSC amended the § 2B1.1 loss table by adding twenty-eight and thirty offense levels for losses of greater than $200 million and $400 million, respectively.[26] However, this was not the last offense level increase associated with the loss table. By 2006, the loss table peaked at thirty additional offense levels for losses of $400 million or more.[27]

### b. Other Section 2B1.1 Offense Characteristics and Adjustments

Section 2B1.1 features numerous specific offense characteristics that raise a defendant's offense level by small amounts. Offense level increases are

---

is primarily a measure of harm to the victim. It is also an imprecise proxy for culpable mental state and social dangerousness insofar as actual loss must be foreseeable to the defendant.").

[20] *See* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. n.(3)(A)(ii) (2006).

[21] Haines, Jr., Bowman, III & Woll, *supra* note 19, at 349 ("Intended loss has nothing to do with actual harm to the victim. It is instead a direct assessment of state of mind and therefore of blameworthiness and, to a lesser degree, social dangerousness.").

[22] *See* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. n.(3)(A) (2006).

[23] *See, e.g., id.* § 2B1.1(b)(1)(A)–(P).

[24] *See id.* § 2B1.1(b)(1).

[25] *See* Frank O. Bowman, III, Pour encourager les autres*? The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and the Sentencing Guidelines Amendments That Followed*, 1 OHIO ST. J. CRIM. LAW 373, 405-11 (2004).

[26] *See* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(b)(1)(O)–(P) (Supp. 2002). The temporary amendments were made on January 25, 2003. These amendments were made permanent on April 30, 2003. In addition to increased loss levels, the following enhancements were also added to § 2B1.1: two levels for 10–50 victims, four levels for more than 50 victims, and six levels for more than 250 victims under § 2B1.1(b)(2); four levels for conduct that substantially endangered the solvency or financial security of certain large organizations under § 2B1.1.1(b)(12)(b); and four levels for defendants who were officers or directors of publicly traded companies under § 2B1.1(b)(13).

[27] *See* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(b)(1)(O)–(P) (2006).

available for, among other things, the number of victims involved in the offense or the use of "sophisticated means" in the commission of the offense.[28] Like all Guidelines sections, § 2B1.1 sentences are subject to adjustments. White-collar defendants are often given offense level increases or decreases where the sentencing court finds that the defendant abused a position of public or private trust, used a special skill in committing the offense, or played an aggravating or mitigating role in the offense.[29]

### 2. *Departures*

Departures from Guidelines sentences might also be available. Guidelines sentencing ranges are designed to allow a judge to exercise great discretion within a range, but the Guidelines limit a court's ability to depart from that range through appeals by either the government or the defendant.[30] Application notes for § 2B1.1 express awareness that a Guidelines offense level may substantially "overstate" or "understate" the seriousness of the offense, thus necessitating an upward or downward departure.[31] In some instances, defendants who cooperate and "substantially assist" the prosecution of co-defendants or others may receive a government-sponsored departure from any

---

[28] *See id.* § 2B1.1(b)(2) (defining offense level increases based on number of victims involved in the offense); *see also* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(b)(9)(c) (2006) (defining offense level increases based on whether the defendant used "sophisticated means" in committing the crime).

[29] *See id.* (providing enhancements of up to four levels for "aggravating role" in a criminal activity); *see also id.* § 3B1.3 (providing enhancements of up to two levels for abusing a position of public trust or using a special skill in a manner that "significantly facilitated the commission or concealment of the offense"); *see also id.* § 3B1.2 (providing for a decrease of up to four levels for being a *minimal* participant and a two level decrease for being a *minor* participant in a criminal activity).

[30] *See* U.S. SENTENCING GUIDELINES MANUAL § 1A1.1(4)(b) (2006)

> The [United States Sentencing] Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

*See also* U.S. SENTENCING GUIDELINES MANUAL § 5K2.0 (2006) (providing general policy statement regarding availability of guideline departures); s*ee also* 18 U.S.C. § 3553(b)(1) (2006) (allowing departures from guideline ranges where there exists "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described"); *but also see* 18 U.S.C. § 3742(a)–(b) (2006) (providing for appeal of the judge's sentencing decision by either the defendant or the government); *see also Booker*, 543 U.S. at 234

> [D]epartures are not available in every case, and in fact are unavailable in most. In most cases, as a matter of law, the [United States Sentencing] Commission will have adequately taken all relevant factors into account, and no departure will be legally permissible. In those instances, the judge is bound to impose a sentence within the Guidelines range.

[31] *See* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt.(19)(A)–(C) (2006).

Cite as 11 LEWIS & CLARK L. REV. 521 (2007).                Available at http://law.lclark.edu/org/lclr/

2007]        PURPOSES-BASED SENTENCING AFTER *BOOKER*        527

Guidelines sentence.[32] Though the Guidelines provide for departures, they are relatively rare.[33]

   *3. Sentencing Table*

The final Guidelines calculation produces a single offense level which is then matched against a grid that determines sentence ranges. The X-axis (horizontal) of the grid designates criminal history, which is represented by thirteen points spread across six columns (I–VI).[34] The Y-axis (vertical) contains forty-three offense levels. The intersection of the X- and Y-axes indicates a minimum and maximum Guidelines range for a particular offense. Sentence ranges increase as the number of offense levels and criminal history points rise. Offense levels are further grouped into zones (A–D) that designate the availability of probation or imprisonment. All sentencing ranges with a Guidelines minimum of six months or less fall within zones A or B; defendants in these zones may qualify for probation.[35] Any defendant that lands in either zone C or D does not qualify for probationary sentences.[36]

USSC used a few overarching concepts in designing the sentencing table. The sentence ranges between offense levels overlap so a Guidelines maximum sentence is always near the middle of the sentence range above it.[37] The reasons for this are multi-fold. First, USSC wanted to discourage litigation over sentences by making the difference between sentence levels miniscule.[38] The second reason was to make level increases proportional to each other.[39] To this end, sentences double every six offense levels.[40] Another feature of the Guidelines is that they are built around a limitation imposed by Congress: the "25 percent rule." The SRA requires that a maximum Guidelines sentence be

---

[32] *See id.* § 5K1.1 (providing for downward departures where the defendant provides "substantial assistance" in the investigation or prosecution of an individual who has committed a crime).

[33] In fiscal year 2004, the United States Sentencing Commission identified 5,734 defendants who were sentenced under USSG § 2B1.1. Three hundred thirty-six of these individuals received Guidelines sentence departures. *See* U.S. SENTENCING COMM'N, *Sourcebook of Federal Sentencing Statistics*, tbl.28 (2004), http://www.ussc.gov/ANNRPT/2004/table28_post.pdf. The opinion in *Booker* was issued on January 12, 2005. In fiscal year 2005, 5,272 defendants who were sentenced under 2B1.1 were identified. Eight hundred ninety-six of these defendants received below-guideline sentences, and the courts in 339 of these cases cited *Booker* as the reason for the sentence reduction. *See Sourcebook of Sentencing Statistics 2005*, table 28, http://www.ussc.gov/ANNRPT/2005/table28_post.pdf. In fiscal year 2006, 7113 defendants sentenced under USSG § 2B1.1 were identified. One thousand twenty of these defendants were sentenced below the calculated guideline range; the courts in 700 of these cases cited *Booker* or 18 U.S.C. § 3553 as the reason for the reduction. *See* U.S. Sentencing Comm'n, Preliminary Quarterly Data Report, at 12 (Sept. 30, 2006), *available at* http://www.ussc.gov/Blakely/Quarter_Report_4Qrt_06.pdf.

[34] *See* U.S. SENTENCING GUIDELINES MANUAL § 5A1.1 cmt. n.(3) (2006).

[35] *See id.* § 5B1.1(a)(1)–(2).

[36] *See id*. § 5B1.1 cmt.(2).

[37] *See* U.S. SENTENCING GUIDELINES MANUAL § 1A1.1(A)(4)(h) (2006).

[38] *Id.*

[39] *Id.*

[40] *Id.*

528             LEWIS & CLARK LAW REVIEW            [Vol. 11:2

no more than the greater of six months or 25% higher than the minimum sentence of the Guidelines range.[41] The 25 percent rule created a significant, perhaps unintentional, side effect in the sentencing table: the difference between the Guidelines maximum and minimum increases logarithmically as the offense level increases.[42] The result is that after a threshold offense level, the gap between the Guidelines minimum and maximum increases as the offense level goes up; this gap is six months at the lowest offense level and seven years at the highest.[43]

### III.  APPLYING 18 U.S.C. SECTION 3553(A) TO SECTION 2B1.1 SENTENCES AFTER *BOOKER*

Part III of this Comment argues in favor of the use of a § 3553(a) purposes-based analysis to mitigate § 2B1.1 sentences. Part III.A discusses the mechanics of the analysis; Part III.B describes its application in two recent § 2B1.1 sentences: *United States v. Adelson* and *United States v. Olis*. These cases demonstrate both how § 2B1.1 sentences are calculated, and how courts have worked through purposes-based analyses using § 3553(a). Part III.C uses the cases in Part III.B to argue in support of purposes-based analysis in § 2B1.1 sentencing.

*A.  Purposes-Based Analysis Under 18 U.S.C. Section 3553(A)*

As noted earlier, *United States v. Booker* "requires judges to take account of the Guidelines with other sentencing goals," including 18 U.S.C. § 3553(a).[44] 18 U.S.C. § 3553(a), which was passed as part of the Sentencing Reform Act in 1984, defines numerous factors for district courts to consider in sentencing.[45] The statute's "parsimony provision" states that courts "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]."[46] These sentencing purposes are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [retribution]
>
> (B) to afford adequate deterrence to criminal conduct; [deterrence]
>
> (C) to protect the public from further crimes of the defendant; [incapacitation] and

---

[41] *See* 28 U.S.C. § 994(b)(2) (2000).

[42] *See* Frank O. Bowman, III, *Beyond Band-Aids: A Proposal for Reconfiguring Federal Sentencing After* Booker, 2005 U. CHI. LEGAL F. 149, 200 (2006).

[43] *Id.*

[44] *Booker*, 543 U.S. at 224.

[45] *See* Kate Stith and Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 WAKE FOREST L. REV. 223, 271–73 (1993) (describing the legislative history of 18 U.S.C. § 3553(a)).

[46] *See* 18 U.S.C. § 3553(a) (2000).

(D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner [rehabilitation].[47]

The parsimony provision links to these statutory provisions to create the foundation for a purposes-based analysis for individual USSG sentences.[48] This analysis is further developed through use of factors that, according to § 3553(a)(1)–(7), courts "shall consider" when imposing a sentence. These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant," "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," and "the need to provide restitution to any victims of the offense."[49]

Purposes-based analysis was essentially ignored until the decision in *Booker*.[50] Even after *Booker's* directive to use § 3553(a), courts are ambivalent about its application. Attitudes regarding purposes-based analysis fall into two camps. Many courts strictly adhere to the Guidelines approach, except in unusual circumstances, and others encourage consultation of § 3553(a) during each sentencing.[51] The use of purposes-based analysis is also bounded, at least in some ways, by the post-*Booker* flux regarding appellate review of Guidelines sentences. *Booker* held that any deviation from the Guidelines is subject to appellate review under an "unreasonableness" standard, which is determined by considering the final sentence in light of § 3553(a).[52] Post-*Booker* appellate review has largely fallen into three categories: (1) a sentence within a properly calculated Guidelines range; (2) a sentence that includes an upward or downward departure as allowed by the Guidelines; or 3) a non-Guidelines

---

[47] *See* 18 U.S.C. § 3553(a)(2)(A)–(D) (2000).
[48] *See* 18 U.S.C. § 3553(a)(1)–(7) (2000).
[49] *See* 18 U.S.C. § 3553(a)(2)(A)–(D) (2000).
[50] *See* Marc L. Miller & Ronald F. Wright, *Your Cheatin' Heart(Land): The Long Search for Administrative Sentencing Justice*, 2 BUFF. CRIM. L.R. 723, 745–747 (1999) (stating "[t]he parsimony concept was the centerpiece of the House version of departures [in the Sentencing Reform Act]. It has played almost no role in case law to this point—judges have essentially ignored not only the parsimony language, but the entire set of congressional directives to judges in 3553(a)"); *see generally* Daniel J. Freed & Marc Miller, *Taking "Purposes" Seriously: The Neglected Requirement of Guideline Sentencing*, 3 FED. SENT'G REP. 295 (1991); *see generally* Kenneth R. Feinberg, *The Federal Guidelines and the Underlying Purposes of Sentencing*, 3 FED. SENT'G REP. 326 (1991).
[51] *See, e.g.,* United States v. Wilson, 350 F. Supp. 2d 910, 912 (2005), *adhered to on denial of reconsideration*, 355 F. Supp. 2d 1269 (2005) ("[C]onsiderable weight should be given to the Guidelines in determining what sentence to impose" and that "[i]n all but the most unusual cases, the appropriate sentence will be the Guidelines sentence."); *cf.* United States v. Ranum, 353 F. Supp. 2d 984, 985–86 (E.D.Wis. 2005) (courts should follow § 3553(a)(1) and "must consider all of the applicable factors, listen carefully to defense and government counsel, and sentence the person before them as an individual"); United States v. Jaber, 362 F. Supp. 2d 365, 371–77 (D.Mass. 2005) (criticizing the *Wilson* approach to post-*Booker* Guidelines sentencing).
[52] *Booker*, 543.at 261.

Cite as 11 LEWIS & CLARK L. REV. 521 (2007).   Available at http://law.lclark.edu/org/lclr/

530                     LEWIS & CLARK LAW REVIEW                [Vol. 11:2

sentence which is either higher or lower than the calculated sentence range.[53] Category 1 and 2 sentences are essentially pre-*Booker* sentences. In many circuits, a category 1 sentence is presumptively reasonable, but there is disagreement on this point.[54] As before *Booker*, appellate review of Guidelines departures is still limited to abuse of discretion.[55] Category 3 designates an advisory, post-*Booker* sentence. There is no guidance about what makes a category 3 sentence "reasonable."[56] In its Spring 2007 term, the United States Supreme Court is set to provide guidance on: (1) whether a Guidelines sentence is presumptively reasonable; and (2) whether a below-Guidelines sentence is reasonable.[57]

Therefore, until the ability to use purposes-based analysis to depart from a Guidelines sentence is bound by Congress or the Court, district courts have a means by which to fine-tune a guideline sentence to the specific facts of a defendant's case. The next section will show how purposes-based analysis affects § 2B1.1 sentences.

---

[53] This categorical framework was derived from United States v. Tzep-Meija, No. 05-40386, 2006 WL 2361701 (5th Cir., August 15, 2006) (citing United States v. Smith, 440 F.3d 704, 707 (5th Cir. 2006)).

[54] *See, e.g.*, United States v. Green, 436 F.3d 449, 457 (4th Cir. 2006) ("[A] sentence imposed 'within the properly calculated Guidelines range . . . is presumptively reasonable.'"); United States v. Johnson, 445 F.3d 793, 797–98 (5th Cir. 2006); *see also* United States v. Williams, 436 F.3d 706, 707–08 (6th Cir. 2006); *see also* United States v. Myktiuk, 415 F.3d 606, 608 (7th Cir. 2005); United States v. Lincoln, 413 F.3d 716, 717 (8th Cir. 2005); United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006). *Cf.* United States v. Cooper, 437 F.3d 324, 332 (3rd Cir. 2006); *see also* United States v. Guerrero-Velasquez, 434 F.3d 1193, 1195 (9th Cir. 2006); *see also* United States v. Talley, 431 F.3d 784, 786–87 (11th Cir. 2005) (holding that a Guidelines sentence is not "per se reasonable" but "ordinarily we would expect a sentence within the Guidelines range to be reasonable").

[55] This standard was initially designated by the United States Supreme Court in Koon v. United States, 518 U.S. 81, 91 (1996). In 2003, Congress amended 18 U.S.C. § 3742(e) to establish a "de novo" standard of review, which replaced abuse of discretion. Pub. L. No. 108-21 § 51, 117 Stat. 650 (2003). *United States v. Booker* re-established the abuse of discretion standard.

[56] A statistical study of 1,515 post-Booker appellate sentencing decisions compiled by New York Council of Defense Lawyers (NYCDL) suggests that most above-Guidelines sentences are affirmed as reasonable. Within-Guidelines sentences are mostly upheld, but the majority of below-Guidelines sentences are vacated as unreasonable. *See* N.Y. Council of Def. Lawyers (NYCDL), Reasonableness Review Database (2006), http://www.nycdl.org/itemcontent/booker/NYCDL_reasonableness_review.PDF. For further commentary and criticism regarding this study, see Douglas A. Berman, The Stunning Data on Circuit Reasonableness Decisions (Dec. 20, 2006), http://sentencing.typepad.com/sentencing_law_and_policy/2006/12/the_stunning_da.html.

[57] *See* Claiborne v. United States, 439 F.3d 479 (8th Cir. 2006), *cert. granted*, 127 S. Ct. 551 (U.S. Nov 3, 2006) (No. 06-5618); *see also* Rita v. United States, 177 Fed. App'x 357 (2006), *cert. granted*, 127 S. Ct. 551 (U.S. Nov. 3, 2006) (No. 06-5754).

2007]        PURPOSES-BASED SENTENCING AFTER *BOOKER*        531

*B. Purposes-Based Analysis as Applied to Section 2B1.1 Sentencings*

*1.* United States v. Adelson

On February 16, 2006, Richard Adelson (Chief Operating Officer, Impath, Inc.) was convicted of: (1) one count of conspiracy; (2) one count of securities fraud; and (3) three counts of false filings with the Securities and Exchange Commission (SEC).[58] Under pressure from Anuradha Saad (Chief Executive Officer), five Impath employees began overstating the company's financial results.[59] Adelson became aware of the scheme to inflate company earnings sometime later, but instead of stopping the fraud, he helped perpetuate it.[60] Impath's earnings were restated in July and August of 2003, which caused the company's stock to lose over $50 million in value.[61] The five Impath employees who devised and executed the scheme cooperated with the government. One of the participants received one month in prison; all of the defendants were ordered to pay $50 million in restitution.[62] Anuradha Saad received three months in prison for charges unrelated to the fraud.[63]

Adelson's initial sentence was calculated using the 2003 Guidelines.[64] His criminal history rating was zero and his offense level, including all enhancements, was forty-six. The 2003 Guidelines minimum for an offense level of forty-two with a Category I criminal history was 360 months and the maximum was life in prison.[65] Twenty-four of the forty-two offense levels were derived from the estimated actual loss over $50 million.[66] Thus, the addition of the loss-based levels increased the applicable guideline minimum by 333 months (27.5 years). This was a substantial reduction from the government's recommended offense level of fifty-five, which carries a single sentencing option: life in prison.[67]

After calculating the Guidelines sentence of 360 months to life in prison, which the court referred to as "an absurd guideline result that not even the Government seriously defended," the court conducted a purposes-based

---

[58] *See* United States v. Adelson, 441 F. Supp. 2d 506, 507 (S.D.N.Y. 2006).
[59] *Id.*
[60] *Id.* at 507.
[61] *Id.* at 509.
[62] *See* Securities and Exchange Commission, Litigation Release No. 19783 (Aug. 21, 2006), http://www.sec.gov/litigation/litreleases/2006/lr19783.htm.
[63] *Adelson*, 441 F. Supp. 2d at 507.
[64] *Id.* at 508.
[65] *See* U.S. SENTENCING GUIDELINES MANUAL § 5A (2003).
[66] *Adelson*, 441 F. Supp. 2d at 511. The other twenty-two offense levels were derived as follows: base offense level of six under § 2B1.1(a)(2); six levels because the offense involved more than 250 victims under § 2B1.1(b)(2); four offense levels for a violation of securities law involving an officer of a publicly-traded company under § 2B1.1(b)(15)(A)(i); four offense levels for a leadership role in a criminal activity involving five or more people or that was "otherwise extensive" under § 3B1.1(a). All section numbers correspond to the 2003 Guidelines. *See generally* U.S. SENTENCING GUIDELINES MANUAL (2003).
[67] *Adelson*, 441 F.Supp.2d at 509.

Cite as 11 LEWIS & CLARK L. REV. 521 (2007).    Available at http://law.lclark.edu/org/lclr/

532                LEWIS & CLARK LAW REVIEW              [Vol. 11:2

analysis.[68] The court began by looking at § 3553(a)(1). It noted that Adelson was not the originator of the fraud, that he participated in the fraud toward the end, and that the company's stock price was not inflated during the time period in which he participated.[69] The court then looked at the need for retribution under § 3553(a)(2)(A); the court found that this sentencing purpose was served by Adelson's responsibility for $50 million in restitution.[70] The court held that the need for deterrence under § 3553(a)(2)(B) was best served by a 3.5 year prison sentence.[71] In referencing the parsimony provision, the court noted that it was convinced that 3.5 years "was all that was necessary to achieve the purposes set forth in § 3553(a)(2)."[72]

    *2. United States v. Olis*

Jamie Olis (Vice President of Finance, Dynegy, Inc.) was indicted on: (1) one count of conspiracy to commit mail, wire and security fraud; (2) one count of securities fraud; (3) one count of mail fraud; and (4) three counts of wire fraud in 2006.[73] Olis, along with Gene Foster (Vice President of Taxation and Olis's immediate superior) and Helen Sharkey (Manager, Accounting, Deal Structure), participated in "Project Alpha," a complicated financial transaction designed to make a $300 million loan look like positive cash flow generated through Dynegy's company operations.[74] After the SEC reviewed the transactions, Dynegy was forced to restate the nature of $300 million in cash flow, which caused the company's stock price to drop significantly.[75]

Unlike Foster and Sharkey, who pled guilty and ultimately received fifteen month and one month sentences respectively, Olis went to trial and was convicted. Olis's criminal history rating was zero and his initial offense level was forty under the 2001 Guidelines.[76] Twenty-six of these levels were derived from an actual loss of over $105 million, which was the amount of value that the University of California Retirement System lost when Dynegy's stock price collapsed.[77] Olis was given 292 months in prison.[78]

---

[68] *Id*. at 511.
[69] *Id.* at 512–13.
[70] *Id.* at 514.
[71] *Id*. at 514–15.
[72] *Id.*
[73] *See* United States v. Olis, 429 F.3d 540, 541–42 (5th Cir. 2005).
[74] *Id.* This scheme was achieved by the creation of a special purpose entity (SPE), which bought natural gas at market prices, and sold it to Dynegy at a discount. In turn, Dynegy sold the gas at the market price. This allowed the company to classify the $300 million as operating cash flow and $79 million in net income, which was then reported as a tax benefit. Under SEC regulations, classification of this transaction as operating income, as opposed to a financial transaction, required the SPE to be independent from Dynegy and the financer to bear the risk of their investment.
[75] *Id.*
[76] *See* U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 (2001).
[77] *See Olis*, 429 F.3d at 542. The other fourteen offense levels were derived as follows: base offense level six based on § 2B1.1(a)(2); two levels for use of a special skill in a manner that "significantly facilitated the commission or concealment of the offense" under § 3B1.3; two levels for use of sophisticated means under § 1(b)(8)(c); and four levels for the

2007]         PURPOSES-BASED SENTENCING AFTER *BOOKER*         533

Olis appealed his sentence, and between the time of the trial court sentence and the Fifth Circuit Court of Appeals decision, the opinion in *Booker* was issued. Olis made a successful *Booker* challenge to the loss calculations, and on remand, the trial court recalculated the loss figures.[79] The court held that Olis's actions caused an intended loss of $79 million, which was the amount of taxes that Olis and Gene Foster intended to avoid through the creation of Project Alpha.[80] This dropped the number of loss levels to twenty-four, and after further enhancement removals, the offense level was dropped to thirty-four.[81] The minimum for this offense level is 151 months and the maximum is 188 months.[82] Thus, the addition of the loss-based levels increased the Guidelines minimum by 145 months (twelve years) and the Guidelines maximum by 176 months (fifteen years).

After calculating the Guidelines sentence, the court used a purposes-based analysis to determine the "reasonableness" of the Guidelines sentence.[83] Using facts presented to the jury, the court stepped through each relevant § 3553(a) factor.[84] In analyzing the "nature and circumstances" of Olis's offense under § 3553(a)(1), the court noted that Olis acted with both indicted and un-indicted co-conspirators, and that while he was involved in the execution and planning of the conspiracy, he did not have the authority to approve the scheme and he did not draft the documents carrying out or concealing the conspiracy.[85] The court ultimately concluded that Olis should be sentenced to six, instead of twenty-five, years in prison.[86]

### C.  Arguing in Support of Purposes-Based Analysis in Section 2B1.1 Sentencings

This Section uses *United States v. Olis* and *United States v. Adelson* to argue: (1) that there are significant defects in the calculation of Guidelines sentences under § 2B1.1; and (2) that use of 18 U.S.C § 3553(a) factors can assist a court in mitigating these defects. First, purposes-based analysis using 18 U.S.C. § 3553(a) can mitigate the manner in which Guidelines sentences attempt, and often fail, to link the defendant's conduct to the *harms* caused by their conduct or their *blameworthiness* for those harms. This failure occurs because USSG § 2B1.1 maps monetary losses to offense levels, which is a gross and inaccurate indicator of harms caused by defendants or their blameworthiness for those harms. The reason for incremental increases in

---

involvement of fifty or more victims under § 1(b)(2)(B). All section numbers correspond to the 2001 Guidelines. *See generally* U.S. SENTENCING GUIDELINES MANUAL (2001).

[78] *Olis*, 429 F3d at 542.
[79] *Id.* at 545–50.
[80] *See* United States v. Olis, No. H-03-217-01, 2006 WL 2716048, at *10 (S.D. Tex. Sept. 22, 2006).
[81] *Id.* at *11.
[82] *See* U.S. SENTENCING GUIDELINES MANUAL § 5A (2001).
[83] *Olis*, 2006 WL 2716048, at *11.
[84] *Id.* at *12.
[85] *Id.*
[86] *Id.* at *14.

Cite as 11 LEWIS & CLARK L. REV. 521 (2007).  Available at http://law.lclark.edu/org/lclr/

534 LEWIS & CLARK LAW REVIEW [Vol. 11:2

offense levels under the Guidelines has an identifiable basis. It is consistent with proportionality goals; each dollar amount now equals two offense levels. These incremental increases are also consistent with the concept of actual loss as a proxy for causation, harm, and mental state, and intended loss as a representation of blameworthiness. For example, loss is the principal harm in economic crimes. If the defendant's acts caused the loss or the defendant could have reasonably foreseen the loss, it is logical to link increasing amounts of loss to increasing amounts of punishment.[87] However, under the loss table, dollar amounts alternately increase by a quarter, third, half, or three-quarters while the offense levels steadily double. This method of mapping randomly increasing dollar amounts to incremental increases in offense levels may capture broad notions of harms or blameworthiness but it cannot address the harm in specific cases. Worlds of causation, harm and mental culpability exist between the gaps in the loss table's dollar amounts, and at best, the table serves only as a gross approximation of the harms caused in individual cases. As one court has noted:

> the guidelines provisions for theft and fraud place excessive weight on this single factor [loss], attempting—no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of sentencing boxes—to assign precise weights to the theft of different dollar amounts. In many cases . . . the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.[88]

For instance, consider the earlier discussion of the *Olis* case. The defendant participated in the same criminal acts as his cohorts. These criminal acts led to a single amount of intended loss: $79 million in avoided taxes. Yet, the co-defendants' single-count pleas and government cooperation allowed them to receive substantially reduced prison sentences. The *Olis* defendant, on the other hand, went to trial, was convicted, and initially received a Guidelines sentence based largely on the $79 million loss figure. The *Adelson* case falls along similar lines. Five other people concocted and executed the Impath accounting fraud, which caused over $50 million in actual losses. The individuals who originated the fraud received virtually no prison time; the *Adelson* defendant went to trial, was convicted, and faced a Guidelines sentence of 360 months to life based largely on a loss figure for which all

---

[87] *See* United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2005) ("All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment.").

[88] *See id.*; United States v. Pimental, 367 F.Supp.2d 143, 156 (D. Mass. 2005) (*citing Emmenegger*, 329 F. Supp. 2d at 427); *see also* United States v. Mueffelman, 400 F. Supp. 2d 368, 373 (D. Mass. 2005) ("The amount of loss that a given crime has engendered is surely one measure of the seriousness of the offense. Sometimes loss is an entirely appropriate proxy for culpability. At other times, it is not."); *see also* United States v. Ranum, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) ("One of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level. For example, the guidelines treat a person who steals $100,000 to finance a lavish lifestyle the same as someone who steals the same amount to pay for an operation for a sick child.").

2007]         PURPOSES-BASED SENTENCING AFTER *BOOKER*         535

parties involved bore responsibility.[89] It cannot be said that these loss figures were representative of the harms caused by these specific defendants. To the extent that others participated in the fraudulent acts, and those individuals' actions also contributed to the loss figures, shifting this burden to defendants who are convicted at trial through an additional twelve or twenty-eight years in prison makes no sense. The Guidelines do not account for varying links between causation, harm, and blameworthiness, which are essential in designing a fair and just punishment. In fact, the Guidelines are not even intended to make such distinctions.[90] This is one reason why the use of purposes-based analysis should be used to link Guidelines sentences to purposes defined in 18 U.S.C. § 3553(a).

Second, purposes-based analysis using 18 U.S.C. § 3553(a) can mitigate Guidelines features that attempt, and fail, to quantify the defendant's *role* and *participation* in the offense. USSG § 2B1.1 and § 3B feature offense characteristics and adjustments that map facets of the defendant's role and participation in a crime to offense levels. Many of these characteristics are substantially similar but given independent weight.[91] For example, the defendant in *Adelson* received four offense levels because he was an officer of a publicly traded company and was convicted for a violation of securities law.[92] Another four offense levels were added to his sentence because he was the leader of a criminal activity involving at least five people or that was "otherwise extensive."[93] These characteristics follow from each other. Consider the *Olis* case, in which two offense levels were added to the defendant's sentence for use of a special skill in a manner that "significantly facilitated the commission or concealment of the offense."[94] Then, consider that another two levels were added for "use of sophisticated means," which is defined as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."[95] These offense characteristics are indistinguishable but the Guidelines give them independent value to increase a

---

[89] *See* United States v. Adelson, 441 F. Supp. 2d 506, 507 (S.D.N.Y. 2006).

[90] *See* Stephen Breyer, *Federal Sentencing Guidelines Revisited*, CRIM. JUST., Spring 1999, at 28, 35 (1998)
> Punishment is a blunderbuss. We do not know its precise effects, nor can the criminal justice system tell us much (beyond fairly obvious differences) about the true comparative 'just deserts' of any two offenders—even in respect to the crimes they have committed. There is little, if anything, to be gained in terms of punishment's classical objectives by trying to use highly detailed offense characteristics to distinguish finely among similar offenders. And there is much to be lost, both in terms of guideline workability and even in terms of fairness (recall the guidelines' logarithmic numerical scales). Ranking offenders through the use of fine distinctions is like ranking colleges or the 'liveableness' of cities with numerical scores that reach 10 places past a decimal level. The precision is false."

[91] *See generally* Frank O. Bowman, III, *Economic Crimes: Model Sentencing Guidelines §2B1*, 18 FED. SEN'G REP. 330 (2006).

[92] *See id.* § 2B1.1(b)(15)(A)(i).

[93] *See id.* § 3B1.1(a).

[94] *See id.* § 3B1.3.

[95] *See id.* § 2B1.1 cmt.(8)(b).

defendant's prison sentence. Given that these offense characteristics are in completely different Guidelines sections, it is unlikely that this point-stacking is even intentional. It is more likely the effect of "factor creep": the increasingly frequent addition of aggravating factors to Guidelines offenses, which increases punishments overall and makes the rules more complex.[96]

Third, use of 18 U.S.C. § 3553(a) helps alleviate the disparity between the sentences of equally culpable defendants. As noted by the sentencing courts in the *Adelson* and *Olis* cases, the involvement of the defendants in these crimes was equal to or less than that of the co-defendants who pled guilty. Yet, the convicted defendants received higher punishments. This occurred because the defendants who pled and cooperated with an investigation gained the benefit of a government-sponsored sentencing departure under USSG § 5K1.1. This disparity between the punishments of similarly situated defendants convicted of the same crimes is built-in to the Guidelines. In cases like those discussed here, this feature helps equally culpable parties evade punishment and leaves those who exercise their right to trial to suffer the consequences. The natural and probable consequence of use of 18 U.S.C § 3553(a) factors is the shortening of sentences between similar defendants convicted of the same crimes.[97]

## IV. CONCLUSION

The goal of this Comment has been to: (1) outline the use of purposes-based sentencing analysis after *United States v. Booker*, and (2) demonstrate how its application in one specific class of cases (economic crimes sentencing under USSG § 2B1.1) is an improvement over the mandatory guideline system. Instead of assuming that the Guidelines calculations inherently encapsulate the harms caused by the defendant and his or her role or participation in the offense, purposes-based analysis can, and should, be used to determine whether

---

[96] *See* R. Barry Ruback & Jonathan Wroblewski, *The Federal Sentencing Guidelines: Psychological And Policy Reasons for Simplification*, 7 PSYCHOL. PUB. POL'Y & L. 739, 752–53 (2001) (defining the phenomenon of "factor creep" in the Guidelines, identifying its sources and describing the problems it causes); *see also* U.S. SENTENCING COMM'N, FIFTEEN YEARS OF GUIDELINE SENTENCING 137–38 (2004), *available at* http://www.ussc.gov/15_year/15_year_study_full.pdf

> While many guideline amendments have clarified ambiguous terms or simplified guidelines operation, other amendments have added to their complexity. It is possible to imagine countless circumstances that would make an offense more serious. . . . [A]s more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness.

[97] 18 U.S.C. § 3553(a)(6) states that courts can consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Courts have largely held that sentencing disparities created because co-defendants provide "substantial assistance" are not prohibited by § 3553(a)(6). *See, e.g.,* United States v. Duhon, 440 F.3d 711, 720–21 (5th. Cir 2006) (holding that "a sentencing disparity intended by Congress is not unwarranted" and that "sentencing disparity produced by substantial assistance departures was intended by Congress and is thus not a proper sentencing consideration under section 3553(a)(6)"). So, in effect, the closing of the sentence gap through other § 3553(a) considerations tends to render such a limitation moot.

the purposes as defined in 18 U.S.C. § 3553(a) are served by that sentence. In fact, after *Booker*, use of both the Guidelines calculations and purposes-based analysis is the law governing sentencing of federal crimes.

The purpose of this Comment has not been to excuse the behavior of individuals who execute schemes that cause large-scale financial fraud. All of the individuals identified in this Comment, whether they were convicted by a jury or negotiated a plea, bear responsibility for their actions and deserve punishment. The point has been to show that § 2B1.1 cannot adequately capture the constellation of actions surrounding an offense, and in many cases, substantially overstates a defendant's culpability and role in an offense.

Finally, § 2B1.1, which has been the main focus of this Comment, represents only a single category of USSG offenses. 18 U.S.C § 3553(a) obviously applies to all federal criminal sentencing. Many of the issues described here are applicable across all Guidelines sections. Any hesitations sentencing courts might have in using a purposes-based analysis with a class of largely non-violent class offenders such as those described here are certainly amplified when the defendants are involved in violent crimes. Examining purposes-based analysis in the context of § 2B1.1 sentences may represent the "easier" side of post-*Booker* sentencing, thus providing a test-bed that yields greater insights that are valuable to all sentencing categories.